# EXHIBIT 1

## Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913)



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

September 22, 2022

Rick Marquis
FHWA NY Division Administrator
Federal Highway Administration
Leo O'Brien Building
11A Clinton Ave, Suite 719
Albany, NY 12207

Ronald Epstein
Executive Deputy Commissioner/CFO
New York State Department of Transportation
50 Wolf Road
Albany, NY 12232

Allison L. C. de Cerreño, Ph.D.
Deputy Chief Operating Officer
Metropolitan Transportation Authority
2 Broadway, 23rd Floor
New York, NY 10004

William Carry
Assistant Commissioner for Policy
NYC Department of Transportation
55 Water Street, 9th Floor
New York, NY 10041

RE: Draft Environmental Assessment– Central Business District Tolling Program, New York, NY

Dear Mr. Marquis, Mr. Epstein, Dr. de Cerreño, and Mr. Carry,

In accordance with our responsibilities under Section 309 of the Clean Air Act and the National Environmental Policy Act (NEPA), the United States Environmental Protection Agency (EPA) has reviewed the Draft Environmental Assessment (EA) prepared by the Federal Highway Administration (FHWA or Lead Agency) in coordination with New York State Department of Transportation, and Metropolitan Transportation Authority (together referred to as Project Sponsors), for the Central Business District Tolling Program (CBDTP or the Project) in New York. The CAA Section 309 role is unique to EPA, providing EPA the authority to review and comment in writing on the environmental impact of any major Federal agency action and to make EPA's written comments available to the public.

14913-25180

EPA understands the purpose of the Project is to reduce traffic congestion in the Manhattan Central Business District (CBD), which encompasses the geographic area of Manhattan south of 60th Street, in a manner that will generate revenue for future transportation improvements. The Draft EA has been developed to address potential impacts associated with the CBDTP and the wider regional study area, which consists of twenty-eight counties where most of the trips to and from the CBD originate or terminate. EPA recognizes that congestion pricing has been used as a traffic reduction strategy and is anticipated to bring varied benefits to the CBD.

14913-25181

EPA focused its review on the preferred alternative, Zone-Based Pricing. EPA appreciates the opportunity to engage early with the Project Sponsors and continues to support a thorough NEPA public process as a cooperating agency on the Project. This Draft EA has incorporated EPA's feedback, most notably with respect to public accessibility and transparency, regarding expanded mesoscale and local air quality analyses. Furthermore, we commend FHWA for improving the clarity of some of the major findings by including an Executive Summary available in nine different languages and presenting information in tabular or visual formats for public engagement and understanding of the Project.

14913-25182

Due to the insufficiency of data in the Draft EA around localized and disproportionate air quality impacts in the surrounding area, EPA is unable to confirm that impacts are less than significant without appropriate mitigation. EPA remains concerned about the potential for adverse air quality impacts on communities in areas outside the CBD—e.g., Bronx County, Bergen County, and Richmond County—where the analysis in the Draft EA projects that traffic congestion will likely worsen due to Project implementation. EPA recommends that the analysis of these sensitive areas in the Draft EA be improved, and appropriate mitigation be identified to ensure adverse impacts are less than significant, especially given the historical environmental justice (EJ) concerns and cumulative impacts to the affected communities.

14913-25183
14913-25184
14913-25185

EPA recommends the Project Sponsors include more robust air quality modeling to assess localized Project impacts in areas of EJ concern which will inform development of mitigation measures. The Project Sponsors should also engage in more robust community outreach to consider mitigation. EPA recommends the Project Sponsors use data evaluated in the EA to include mitigation measures, rather than rely on post-implementation monitoring to inform mitigation decisions.

Addressing these issues is incumbent on the Lead Agency and Project Sponsors. In accordance with Executive Order 12898's mandate, federal agencies must "to the greatest extent practicable and permitted by law," make EJ part of their mission, "by identifying and addressing, as appropriate, disproportionately high, and adverse human health or environmental effects of [their] programs, policies, and activities." EO 14008 requires federal agencies to "make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related, and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[1]  In addition, the Council on Environmental Quality's NEPA EJ guidance states that agencies, among other things: i) "should consider the composition of the affected area, to determine whether [communities with EJ concerns] are present …, and if so whether there may be disproportionately high and adverse human health or environmental effects…"; and ii) "should consider relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards…"[2]  Finally, New York State's (the State) Climate Leadership and Community Protection Act (CLCPA), requires the State to address disproportionate impacts and reduce the burden to Disadvantaged Communities (DAC). Given the potential impacts identified in the Draft EA, and any future impacts not clearly identified, especially to communities with EJ concerns, EPA believes further investigation and analysis could lead to more thorough, comprehensive, and targeted mitigation measures from the Project.

EPA recommends that FHWA clarify and expand upon the following subjects in the Final EA and provide mitigation measures in accordance with EPA's enclosed detailed comments to better address: the alternatives analysis; direct, indirect, and cumulative impacts; impacts on communities with EJ concerns; and mitigation commitments to address significant adverse impacts during and after implementation of the proposed action. Based on the impacts disclosed and mitigation considered in the Draft EA, significant impacts to communities with EJ concerns must be appropriately mitigated to meet the requirement of the mitigated Finding of No Significant Impact (FONSI) pursuant to 40 CFR §1501.6(c). As discussed in our detailed comments, EPA has

---

[1] Executive Order 14008 on Tackling the Climate Crisis at Home and Abroad (Jan. 27, 2021).
[2] Council on Environmental Quality (CEQ) EJ Guidance Under NEPA (1997) pg. 9.

Central Business District Tolling Program – Draft EA – EPA Comments - 9/22/2022
Page 2 of 12

## Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

14913-25185

determined that additional analysis should be conducted to identify mitigation measures to reduce disproportionate, significant impacts to communities with EJ concerns. Lead Agency and Project Sponsors should include concrete mitigation requirements as commitments in its decision

14913-25186

document. EPA also recommends that FHWA make the draft FONSI available for public review.

14913-25187

EPA has included in the detailed comments proposed methods to address mitigation. The Lead Agency and Project Sponsors should implement suggestions and proposed mitigation strategies introduced by representatives from communities with EJ concerns, the EJ Technical Advisory Group and the EJ Stakeholder Working Group throughout the scoping and public comment period. These suggestions address quality of life considerations that impact "human health, economic, and social effects of federal actions" as is required by NEPA by: reducing emissions and vehicle miles traveled; increasing alternative transportation options; and enhancing public and mass transit for all users while advancing green infrastructure in the New York Metropolitan Area.

EPA looks forward to a response from your team and an opportunity to review the final documents. We are committed to working with the Lead Agency and Project Sponsors through completion of the NEPA process. Should you have any questions or would like clarification, please contact David Kluesner, Director of EPA Region 2 Strategic Programs Office at Kluesner.Dave@epa.gov or (212) 637-3653.

Sincerely,

Lisa F. Garcia
Regional Administrator
US Environmental Protection Agency, Region 2

Enclosure

Central Business District Tolling Program – Draft EA – EPA Comments – 9/22/2022
Page 3 of 12

[Page Left Intentionally Blank]

Central Business District Tolling Program – Draft EA – EPA Comments – 9/22/2022
Page 4 of 12

## Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

**United States Environmental Protection Agency Detailed Comments**
*Draft Environmental Assessment*
*Central Business District Tolling Program – New York, NY*

**Air Quality**

14913-25188

Based on our review of the Draft EA, EPA recommends that Project Sponsors fully disclose Air Quality impacts to the regional and local communities in the study area. Additionally, EPA recommends that air quality analyses should include the entire study area, especially those where traffic increases and pollutant increases are anticipated. EPA offers the following comments to consider:

14913-25189

- EPA recommends that the Project Sponsors to reduce potential increases in air pollution and other impacts from increased vehicle traffic through a comprehensive mitigation package for all scenarios under consideration. In considering impacts, the Project Sponsors must recognize and acknowledge that compliance with the National Ambient Air Quality Standards (NAAQS) does not equate to no potential impacts and localized harm to human health and the environment. Executive Order 14008 requires agencies to make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related, and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts.[1] Air pollution contributes to a wide variety of adverse health effects. Numerous scientific studies have linked particle pollution exposure to a variety of problems [including premature death in people with heart or lung disease] … [and increased asthma attacks].[2] For these reasons, the impacts of the Project's air emissions, specifically regarding increased truck traffic, need to be evaluated beyond EPA's public health air quality standards or benchmarks.
  - While EPA has issued formal designations as "attainment" or nonattainment" regarding certain criteria air pollutants, these designations may not always be representative of all localized air quality impacts and resulting health disparities. For instance, previously unidentified "hot spots" that exceed the level of the $PM_{2.5}$ NAAQS may exist even in areas designated as attainment. The regional area impacted by the study is currently following a maintenance plan after previously having not attained the $PM_{2.5}$ NAAQS. Therefore, increased traffic or new traffic and pollution hotspots could threaten the regional area's current attainment status.
  - EPA encourages the Project Sponsors to complete an analysis of localized impacts in areas that may not meet the New York State Environmental Quality Review Act (SEQRA) criteria for adverse effects located in communities with EJ concerns to determine the potential impacts on existing air quality and subsequent public health.

14913-25190

- EPA appreciates the Project Sponsors' additional completion of three hot spot analyses (pg. 10-47) completed for the Draft EA based on previous discussions with the NEPA review team throughout the scoping process of the Project.

14913-25191

- The Draft EA analyzed 102 intersections (pg. 10-43) as part of the microscale hot spot screening analysis. These intersections are the same as those analyzed in the local intersection transportation analysis and were selected based on expected increases in traffic. EPA suggests the rationale for using these intersections for the microscale air quality screening analysis should be further clarified in the Final EA.

[1] Executive Order 14008 on Tackling the Climate Crisis at Home and Abroad (Jan. 27, 2021).
[2] https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm.

Central Business District Tolling Program – Draft EA – EPA Comments – 9/22/2022
Page 5 of 12

14913-25191

  - EPA recommends the Project Sponsors include a more expansive microscale screening analysis of intersections with an increase in traffic and additional intersections to encompass all local counties. This should include Richmond County and Bergen County, which show projected increases in air pollutants in both 2023 and 2045.
  - EPA acknowledges that the microscale screening analysis (pg. 10-42) rules out the need for hot spot analysis. EPA notes that benefits in some areas do not mean that disproportionate adverse impacts do not occur elsewhere. All potential adverse impacts should be identified, explained, and analyzed, irrespective of benefits to other areas.
  - Although Table 10-13 provides the results of the microscale screening, this table may be more beneficial if specific data or illustrative quantitative information is provided.

**Environmental Justice**

Based on our review of the Draft EA, EPA's comments regarding Environmental Justice (EJ) focuses on three key components:

14913-25192

1. *Tolling Impacts* – While the Draft EA acknowledges the disproportionate impact of tolling on communities with EJ concerns, EPA recommends that the Final EA and Draft FONSI include more sufficient mitigation methods to be implemented to ensure these impacts are less than significant.

14913-25193

2. *Localized Traffic Impacts* – The Draft EA does not identify the disproportionate impact of the circumferential traffic diversions to roadways in communities with EJ concerns and its subsequent impact on the air quality in particularly near road communities. EPA recommends the Final EA and Draft FONSI clearly identifies these impacts and sufficient mitigation to be implemented that ensures these impacts are less than significant.

14913-25194

3. *Cumulative Impacts* – In order to meet NEPA regulations,[3] cumulative impacts must be considered throughout the entirety of the Final EA, most notably in the chapter on Environmental Justice.

*Tolling Impacts*

14913-25195

- EPA recommends that the Project Sponsors pursue a toll policy that would waive all tolls upfront for low-income drivers residing both within and outside the CBD in addition to relying on tax credits. Waiting for an annual tax credit may present a hardship for many low-income drivers due to their inability to cover the costs of this new expense prior to recouping the expenses annually via tax credits. If waiving all tolls for low-income drivers is determined not practicable, EPA recommends developing a tiered approach for tolls that is dependent on income level.

14913-25196

- The Draft EA does not adequately address the identified disproportionate impact to low-income drivers residing outside the CBD. While a tax credit is proposed for low-income drivers residing within the CBD, this proposal excludes drivers residing outside the CBD. The United States Department of Transportation (DOT) Order 5610.2C states that "DOT officials will ensure that any of their respective programs, policies or activities that will have

[3] Effective May 20, 2022, CEQ updated the CEQ NEPA Implementing Regulations 40 CFR §1508.1 "Definition" to reinstate the definition of "cumulative effects" as a requirement for NEPA analysis. CEQ noted in the preamble that "*the deletion of the definition of "cumulative impacts" in the 2020 rule did not absolve agencies from evaluating reasonably foreseeable cumulative effects, and therefore, it is unclear that the deletion would narrow the scope of effects analyzed by agencies.*" (Federal Register Vol. 87, No. 78, page 23463).

Central Business District Tolling Program – Draft EA – EPA Comments – 9/22/2022
Page 6 of 12

# Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

14913-25196

a disproportionately high and adverse effect on minority populations or low-income populations will only be carried out if further mitigation measures or alternatives that would avoid or reduce the disproportionately high and adverse effect are not practicable." EPA recommends the Final EA be updated to discuss and identify appropriate mitigation to ensure impacts to drivers residing outside of the CBD is less than significant.

- Although mitigation is proposed to waive the $10 E-Z Pass deposit fee and establish a bi-annual EJ Community Group, EPA believes these measures do not sufficiently address the potential costs associated from new tolls. EPA recommends developing proposed mitigation to adequately address this disproportionate impact. If there is no practicable mitigation that could address increased tolls to low-income residents outside the CBD, please state this clearly in the Final EA.

14913-25197

- EPA urges that the selected method for reduced tolling for residents and low-income drivers into the CBD should be widely advertised to ensure qualified populations are able to take advantage of these benefits.

14913-25198

- EPA recommends identifying which alternatives have the most and the least adverse impacts on communities with EJ concerns. EPA encourages the Project Sponsors to select a tolling scenario that minimizes adverse impacts to low-income and minority communities. Additionally, the Final EA should provide a thorough description of any adverse impacts to low-income and minority communities resulting from each of tolling scenarios being considered.

14913-25199

- EPA encourages the FHWA or Lead Agency to consult with internal or external partners with expertise in socioeconomic impacts of tolling to conduct an independent review. Many claims are made throughout the Draft EA of the impact of tolling scenarios on economic conditions, particularly on communities with EJ concerns and low-income drivers.

*Localized Traffic Impacts*

14913-25200

- EPA recommends the Lead Agency provide a comparative analysis of potential air quality impacts between the general population and minority communities and low-income populations throughout the study area. While local traffic volume comparisons were provided in Chapters 4a and 17, the air quality evaluation was only conducted at a county level. Communities with EJ concerns are already disproportionately impacted across cumulative environmental, health, socioeconomic and climate stressors. The Project may exacerbate the disproportionate impacts, and as such, EPA recommends the Final EA include further comparison as noted below.
  - As Figures 17-7, 17-8, and 17-9 display, there are considerable increases in Roadway Vehicle-Miles Traveled (VMT) in and adjacent to tracts identified as communities with significant EJ concerns.
  - Traffic diversion may result in continued or increased air pollution in many residential neighborhoods along the East River, including in communities with EJ concerns, like the South Bronx and Washington Heights. All tolling scenarios suggest a potential increase in vehicle and truck traffic in some areas outside the CBD tolling areas. In some scenarios, the South Bronx could see as much as an additional 700 truck trips per day (p. 4A-42). Increases were also found to impact neighborhoods in Richmond County, NY and Bergen County, NJ. Projected benefits for the CBD are not expected to offset these impacts in outside areas (p. 4A-30).

14913-25201

- EPA recommends the Project Sponsors adequately identify adverse impacts to populations with EJ concerns. We appreciate the detailed modeling conducted for ten highway segments most likely to experience an increase in traffic (see Section 17.6.1.1 and Table 17.3).



14913-25201

However, the EA states that all ten segments analyzed are within or adjacent to EJ census tracts. Furthermore, eight of the ten segments would result in increased delays and queues in peak hours and three of the segments would constitute adverse effects on traffic conditions according to SEQRA impact criteria. These identified adverse traffic congestion impacts appear to be predominantly borne by communities of color or low-income populations (given all identified increases occur within or adjacent to communities with EJ concerns). Additionally, at a minimum, the three segments meeting SEQRA impact criteria appear to be appreciably greater in magnitude than the congestion impacts experienced by the general public .

- The Draft EA states that "Traffic modeling for the Project indicates that the CBD Tolling Alternative would result in some traffic diversions around Manhattan, into the Bronx and northern New Jersey and Staten Island in all tolling scenarios. These circumferential diversions are due to implementation of the tolling in the Manhattan CBD, as drivers and trucks traveling to and from Long Island and Pennsylvania would divert around Manhattan to avoid the tolling in the Manhattan CBD" (p. 17-29). The Draft EA also states that "…environmental justice communities experiencing the largest increases in traffic volumes, including trucks, from circumferential diversions would be along I-95 in northern New Jersey and in Queens at the approach to the Robert F. Kennedy Bridge" (p. 17-31).
  - EPA recommends the Project Sponsors clearly identify the increased traffic congestion in these highway segments as disproportionately high and adverse to communities of color and low-income populations as well as commit to implementation of measurable mitigation measures to address these impacts that will be shouldered primarily by communities with EJ concerns.

14913-25202

- Project Sponsors should incorporate community and workgroup feedback such as prioritizing the servicing of zero-emission buses in areas of significant EJ concerns that would be adversely impacted by the Project . While EPA recognizes this ongoing effort as part of MTA's 2020-2024 capital program, EPA encourages MTA to partner with other public and private mass transit bus entities to expand benefits throughout the entire study area, beyond the CBD.

14913-25203

*Cumulative Impacts*

- Consideration of cumulative impacts is foundational to an EJ analysis. CEQ's EJ Guidance lists cumulative impacts as one of a handful of factors agencies should consider when determining whether an impact is disproportionately high and adverse. EPA recommends that the Project Sponsors provide more detailed analysis of cumulative effects in accordance with definition from CEQ updated NEPA Implementing Procedures (40 CFR § 1508.1(g)(3)). Executive Order 14008 clarified the importance of considering cumulative impacts: "Agencies shall make achieving EJ part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts." Executive Order 12898 Section 3-301(b) provides that whenever practicable and appropriate, the environmental human health analyses shall identify multiple and cumulative exposures.
  - It is unclear whether or to what extent cumulative impacts were considered during the EJ analysis for air and other potential impacts to communities with EJ concerns. Several communities within the study area are already experiencing adverse and disproportionately high human health effects. A more robust analysis of impacts would clarify whether the Project would add to these disproportionately high health effects.

## Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

**14913-25203**
- o EPA recommends that the Final EA further analyze cumulative impacts in communities with EJ concerns to determine the potential for significant adverse impacts and identify appropriate mitigation to ensure impacts are less than significant.

**14913-25204**
- EPA appreciates the ongoing inclusion of the EJ Technical Advisory Group (EJ TAG) to continue months after implementation of the proposed action. We recommend that the Project Sponsors commit to a schedule for consulting the working group, sharing results from monitoring conducted after implementation, and using feedback from these meetings to influence changes to the program as needed in the EA. The sponsors should also allow for public comment on any future or new projects that address impacts beyond the Final EA.
  - o EPA recommends the EJ TAG meet to address substantive EJ concerns during tolling scenario selection, implementation, and after implementation of an action. EPA further recommends the EJ TAG meet on a quarterly basis to track and communicate progress.
  - o EPA encourages the Project Sponsors to provide opportunities for the EJ TAG to participate in discussions of actual impacts during the monitoring period and provide opportunities for the public to provide first-hand accounts of observed impacts. These commitments and accountability measures should also be clearly outlined in the EA.
  - o EPA recommends the Projects Sponsors create an interagency working group in tandem with the ongoing EJ Technical Advisory Group (TAG) to implement potential projects that arise from mitigation be created to provide a holistic planning approach to address community-identified needs.

**14913-25205**
- EPA recommends the Project Sponsors consult with existing groups at the federal and local levels that currently work to address impacts of traffic on communities with EJ concerns. Collaboration with federal and local agencies will permit for a visible and accurate portrayal of the air quality impacts seen by the Project as well as arriving at solutions that address the full range of impacts and have the full support of the whole of government to meet EO directives and CEQ guidance.
  - o For example, Project Sponsors should consider incorporating monitoring results captured by the New York State Department of Environmental Conservation's 2022-23 Statewide Community Air Monitoring Initiative where through a contract with Aclima will be measuring air pollution from sources such as cars, diesel trucks, construction equipment, commercial sources and industrial facilities. The EJ TAG can assist in identifying and defining specific areas for monitoring.

**14913-25206**
- As discussed above, EPA recommends the Project Sponsors consider Air Quality impacts and its effects on existing health disparities, including asthma at additional intersections in communities with EJ concerns. Based on existing toxics levels and information from EJScreen, these impacts may be disproportionate. Modeling by the Lead Agency and Project Sponsors should be used to identify and propose direct mitigation to address potential impacts.
- EPA recommends that the Final EA clearly discuss how relevant existing conditions in communities with EJ concerns across cumulative environmental, health, socioeconomic and climate stressors were considered when determining whether impacts are disproportionately high and adverse. Table 17-11 states the Bronx, Richmond, and Bergen Counties are all projected to experience increases from the CBD tolling alternatives for criteria pollutants and MSATs in the Year 2023 and the Year 2045. EPA's EJScreen tool and NYC's Environmental and Health Data Portal indicates numerous Block Groups (BGs) in these areas that may already be heavily overburdened from the types of impacts relevant to the

**14913-25206**
project, including the following based on EJ percentiles compared to other BGs across the nation:
  - o Bronx County BG 360050051002:
    - 97th% PM 2.5
    - 99th% diesel PM
    - 98th% air toxics cancer risk
    - 99th% air toxics respiratory hazard index
    - 95th% traffic proximity
  - o Richmond County BG 360850040002:
    - 98% PM2.5
    - 99% diesel PM
    - 98% air toxics cancer risk
    - 98% air toxics respiratory hazard index
    - 97% traffic proximity
  - o Bergen County BG 340170145013:
    - 96% PM2.5
    - 96% diesel PM
    - 98% air toxics cancer risk
    - 98% air toxics respiratory hazard index
    - 96% traffic proximity

**14913-25207**
- EPA recommends the Project Sponsors consider using applicable tools common to the health impact assessment process as part of the monitoring and mitigation plan including in the FONSI, to better identify the intensity of impacts on specific communities already experiencing significant stressors to human health, identify and implement appropriate mitigation to ensure impacts are less than significant, and monitor the effectiveness of the mitigation measures.

**14913-25208**
- Certain communities within the regional study area have existing stressors that need to be considered in identifying mitigation to ensure impacts are less than significant. Each of the three block groups discussed above have been denied services through the discriminatory practice of redlining as they were classified as "D-Hazardous" in the Homeowners' Loan Corporation neighborhood ranking system. The Bronx and East Harlem bear the greatest disproportionate impacts in New York City with respect to asthma rates in both children and adults, including other health outcomes.
  - o The pediatric rates (estimated annual rate per 10,000 residents) of asthma emergency department visits and hospitalizations in the Bronx are 416.5 and 52.7 respectively.
  - o In East Harlem, the pediatric rates of asthma emergency department visits and hospitalizations are 485.3 and 52.2.
  - o Richmond County also bears asthma disparities for both adults and children. The pediatric rates of asthma emergency department visits and hospitalizations are 157.5 and 29.9 respectively. Additionally, in Richmond County the asthma rate is 90 among public school children ages 5 to 14 years of age.

**14913-25209**
- NYS's Climate Leadership and Community Protection Act (CLCPA), requires the State to address disproportionate impacts and reduce the burden to Disadvantaged Communities (DAC). The Project Sponsors (of a New York State project) should comply with the CLCPA in an effort to reduce the impacts from climate change while increasing benefits to DAC and communities with EJ concerns and identify conditions for compliance in the FONSI.

**14913-25210**
- EPA understands the Project Sponsors describe the overall benefits of the CBDTP as outweighing the impacts. However, the benefits and costs are unevenly distributed, with some costs falling disproportionately on overburdened communities. EPA recommends that

med

med

## Response to Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913)

**14913-25180**

Comment noted.

**14913-25181**

Comment noted.

**14913-25182**

To supplement the air quality analyses presented in the EA, and in coordination with FHWA and EPA, additional research was undertaken to broaden the analysis, and additional commitments are now included. See the Technical Memorandum, Appendix 17D, "Environmental Justice," as well as the response to Frequently Received Comment 39 for more details .

**14913-25183**

See response to previous comment.

**14913-25184**

In addition to the analyses noted in the response to Comment 3, the Project Sponsors also undertook additional meetings with the Environmental Justice Technical Advisory Group (EJTAG) to refine several mitigation and enhancement measures already included in the EA and to develop new commitments. See response to Frequently Received Comment 39 for information on new commitments.

**14913-25185**

For certain topics of potential effect, mitigation will be implemented if monitoring demonstrates the need to mitigate. For these topics, the Project Sponsors have provided more clarity for when monitoring will begin and the specific thresholds that would trigger mitigation in Chapter 16 "Summary of Effects." For other areas, as identified in Chapter 16 and response to Frequently Received Comment 39 , the Project Sponsors make commitments (without advance monitoring) should approval for the project be granted. Also, see Technical Memorandum, Appendix 17D, "Environmental Justice" for additional analysis and clarification.

**14913-25186**

FHWA and the Project Sponsors will follow the applicable regulations in determining the process for the decision document.

**14913-25187**

The Project Sponsors conducted public outreach prior to the release of the EA, including nine webinars to engage with environmental justice populations. In addition, FHWA and the Project Sponsors also provided smaller meetings in the form of a technical advisory group (EJTAG) and a stakeholder working group (EJSWG) to further engage with environmental justice populations. As detailed in Chapter 17 of the EA, the Project Sponsors invited 37 community leaders, advocacy groups, industry groups, and community members from the regional study area with expertise in environmental justice considerations to participate in the EJTAG, of which 16 groups accepted the invitation. In addition, the Project Sponsors established the EJSWG, which comprised interested members of the public with a focus on environmental justice concerns. Representatives from these groups attended multiple meetings beginning in October 2021. In both groups, the agendas for these meetings were largely driven by the participants while the Project Sponsors listened and provided answers to questions. Based on feedback and concerns raised during public outreach related to environmental justice, including feedback from the EJTAG and EJSWG, the Project Sponsors undertook additional analyses and developed additional commitments which were incorporated into the Final EA. See also, response to Frequently Received Comment 12 and Comment 39 as well as the Technical Memorandum, Appendix 17D, "Environmental Justice."

**14913-25188**

Please see Frequently Received Comment 35 for information about the Project's effects on air quality. In subsequent discussion with US EPA, the FHWA and Project Sponsors understood that additional information on the methodology and on health effects associated with traffic-related pollutants was desired. Please refer to the Technical Memorandum, Appendix 17D, "Environmental Justice," for more information.

**14913-25189**

See the Supplemental Information in the Technical Memorandum, Appendix 17D, "Environmental Justice," as well as response to Frequently Received Comment 39.

## Response to Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

**14913-25190**

Comment noted.

**14913-25191**

The 102 intersections selected for analysis were deemed to have the greatest potential for increased traffic for certain tolling scenarios based upon an evaluation of diversions using the BPM. These intersections are generally located at or near the approaches to tunnels and bridges crossing into the Manhattan CBD, as well as along certain circumferential diversion routes. While the regional analysis identified the potential for VMT increases in certain counties, most of the increase would occur on highways. Increases at highway entry and exit points would be widely dispersed and the effect on specific intersections would be very small and does not warrant more detailed analysis. The most conservative tolling scenario had a maximum of 50 out of 365 instances of potential intersection impacts. Each instance represents a traffic volume increase of 50 or more vehicles (based on CEQR screening guidance) during one of the peak hour periods (i.e. am, midday, pm or overnight). Because many of the 102 intersections selected also receive traffic from facilities t hat would have reduced traffic under the CBD Tolling Program, most intersections would have a net reduction in traffic. However, in order to be conservative, all 102 intersections analyzed for potential traffic effects were included in the microscale air quality screening analysis regardless of the change, if any, in traffic volumes. With respect to request for a more expansive microscale intersection screening analysis, there were four intersections in Jersey City approaching the Holland Tunnel that were originally included in the intersection analysis, but were later excluded since traffic volumes at the Holland Tunnel would be lower under all tolling scenarios during all time periods. With respect to circumferential diversions to New Jersey via the Verrazzano Narrows Bridge and George Washington Bridge, traffic would be expected to stay on the highways and would be utilizing multiple on/off ramps. Similarly, Staten Island traffic diverting to the Bayonne Bridge would also use multiple entry/exit points along the major highways. Therefore, because traffic would be dispersed along multiple entry/exit points along highways, the potential traffic effects at any single intersection would be expected to be small. For these reasons, a more expansive microscale screening analysis at intersections was deemed not necessary. As discussed in Section 10.3.2.2, all intersections passed the screening criteria. As such, no adverse air quality effects are expected. Details of the screening analysis, including the screening tables for CO and PM organized by the locations identified in Table 10-13, are contained in Appendix 10B. For further analysis of potential disproportionate adverse air quality effects on environmental justice populations already overburdened by pollution and chronic disease, see the Technical Memorandum,

## Response to Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

**14913-25191**

Appendix 17D, "Environmental Justice." The EA, Page 10-13 contains county-level VMT data, whereas Section 10.3.2.2 contains the microscale screening analysis. Section 10.3.2.2 (beginning on page 10-42) discusses the screening criteria and results (all intersections passed the screening criteria). Details of the screening analysis, including the screening tables for CO and PM organized by the locations identified in Table 10-13, are contained in Appendix 10B.

**14913-25192**

See response to Frequently Received Comment 39.

**14913-25193**

See the supplemental information in the Technical Memorandum, Appendix 17D, "Environmental Justice."

**14913-25194**

See the Technical Memorandum, Appendix 17D, "Environmental Justice," as well as Chapter 17, "Environmental Justice" of the Final EA.

**14913-25195**

See response to Frequently Received Comment 18 as well as response to Frequently Received Comment 39.

**14913-25196**

See response to Frequently Received Comment 39.

**14913-25197**

See response to Frequently Received Comment 37.

**14913-25198**

The different scenarios presented in the EA would have different outcomes and, therefore, different effects on different communities . As detailed in Chapter 2, "Project Alternatives" of the EA, when considering the effects of various parameters other than the toll rate—such as crossing credits, peak periods, and exemptions and caps for taxis and FHVs or other vehicles—it is important to understand that these would not be applied in isolation from setting the toll rate. One of the four objectives of the Project is to create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program. As a result, the more vehicles that are given crossing credits, exemptions, etc., the higher the toll must be to ensure sufficient revenues are generated, which in turn would lead to additional diversions and other resultant effects. For example, exempting taxi and FHVs would benefit taxi and FHV drivers and passengers who are part of environmental justice communities, but these exemptions would result in higher tolls for other vehicles. These higher tolls would in turn increase diversions through environmental justice communities and non-taxi/FHV drivers would pay more. For further details see Chapter 2, "Summary of Effects" and Chapter 17, "Environmental Justice" of the Final EA. See also, Frequently Received Comment 15.

**14913-25199**

TBTA relied on the expertise of their independent environmental consulting team, which includes team members with expertise in socioeconomic impacts, for the analyses in the EA. In recognition of the concerns of the effects of the Project, if the Project is approved, the Project Sponsors have committed to establishing a Small Business Working Group and an Environmental Justice Community Group. The purpose of these groups will be to share information about the implementation of the Project, findings from evaluating the effects of the Project, and to solicit ongoing input on how businesses and communities are being affected. Both groups would have their first meeting six months prior to Project implementation. For further information see response to Comment 39.

**14913-25200**

See the supplemental information provided in the Technical Memorandum, Appendix 17D, "Environmental Justice," as well as response to Frequently Received Comment 35 and Frequently Received Comment 39.

## Response to Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

**14913-25201**

See the supplemental information provided in the Technical Memorandum, Appendix 17D, "Environmental Justice," as well as response to Frequently Received Comment 35 and Frequently Received Comment 39.

**14913-25202**

See Comment Response 25187, as well as response to Frequently Received Comment 39.

**14913-25203**

See the supplemental information provided in the Technical Memorandum, Appendix 17D, "Environmental Justice," as well as response to Frequently Received Comment 39.

**14913-25204**

The Project Sponsors commit to ongoing discussions with an Environmental Justice Community Group. The EA noted that the Project Sponsors will meet with the Environmental Justice Community Group on a bi-annual basis, with the first meeting six months after Project implementation. As can be seen in the Final EA, Chapter 16 "Summary of Effects," the Project Sponsors have modified this as follows: the Group will meet quarterly with the first meeting taking prior to Project implementation. Further, the Project Sponsors commit to having the EJTAG involved in determining where additional air monitors are located.

**14913-25205**

The Project Sponsors did reach out to New York State Department of Environmental Conservation (NYSDEC) regarding their air monitoring initiative to ensure that there is no duplication and that the information that is generated by both efforts will be shared . The NYSDEC and other agencies conducting monitoring will continue to be consulted with by the Project Sponsors prior to finalizing the monitoring approach.

**14913-25206**

See the Technical Memorandum, Appendix 17D, "Environmental Justice."

**14913-25207**

See the Technical Memorandum, Appendix 17D, "Environmental Justice."

**14913-25208**

See the Technical Memorandum, Appendix 17D, "Environmental Justice."

## Response to Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

**14913-25209**

The Climate Leadership and Community Protection Act (CLCPA), which became law in July 2019, establishes a comprehensive climate policy for New York State. The act requires that the State of New York reduce greenhouse gas emissions to 85 percent below 1990 levels by 2050 and offset the remaining 15 percent, establishing a "net-zero" economy.

As set forth in Chapter 10, "Air Quality" of the EA, by reducing congestion in the Manhattan CBD and reducing VMT within the region, the Project would reduce pollution from particulate matter and other mobile source pollutants. This would consequently reduce greenhouse gas emissions and improve air quality throughout the region. Although traffic diversions to certain highways would result in slight increases in pollutant levels adjacent to those highways, these increases will not cause exceedances of NAAQs or result in adverse effects. Therefore, this Project, including the commitments established in the Final EA, is consistent with the CLCPA.

The CLCPA requires that state agencies and authorities, when issuing administrative approvals and decisions, not disproportionately burden "Disadvantaged Communities" identified by the Climate Justice Working Group and prioritize reductions of greenhouse gas emissions and co-pollutants in those communities. CLCPA §7(3). The Climate Justice Working Group released a draft list of Disadvantaged Communities to which this provision applies in 2021, and the final list of "Disadvantaged Communities" (by census tract) for all of New York State in March 2023. The criteria used to identify Disadvantaged Communities include climate change risks, and are different from the criteria used to identify environmental justice communities. Further, the Disadvantaged Communities are only relevant to New York State counties. Thus, the list of Disadvantaged Communities for the Project's environmental justice study area differs somewhat from the environmental justice communities identified in the EA.

Of the New York census tracts in the final list of Disadvantaged Communities located within the environmental justice study area for the EA, 955 of 1,002 are also identified as environmental justice communities in the EA, Chapter 17, "Environmental Justice."

In other words, 47 Disadvantaged Communities census tracts were not identified as environmental justice census tracts, though many of them are within the same

**14913-25209**

communities as environmental justice census tracts. (Of note, the environmental justice analysis in the EA includes 776 New York census tracts that are not designated as Disadvantaged Communities.)

With respect to the 47 Disadvantaged Communities census tracts that are not environmental justice census tracts in the environmental justice study area:
-    44 are within the broader communities for which current environmental and health burdens were discussed in the Final EA, and for which traffic and/or truck traffic effects were assessed where relevant.
-    3 are within communities not addressed initially; however, further review indicates that one of those would experience a benefit (reduced traffic), and the other two would experience no change in traffic effects, under all tolling scenarios.

After toll rates are set, a process that includes additional analyses, inclusive of the communities in the final list of Disadvantaged Communities, as well as community input, will take place to determine the sites of the "placed-based" mitigation identified in Appendix 17D, "Technical Memorandum." For further information on commitments made by the Project Sponsors, see response to Frequently Received Comment 39.

**14913-25210**

See the Technical Memorandum, Appendix 17D, "Environmental Justice."

**14913-25211**

See response to Frequently Received Comment 7 and Frequently Received Comment 8.

**14913-25212**

See response to Frequently Received Comment 39, as well as Chapter 16, "Summary of Effects."

## Response to Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

### 14913-25213

The Project Sponsors will work with New York City Department of Health and Mental Hygiene (DOHMH) to expand the New York City Community Air Survey (NYCCAS), a network of air monitors located throughout the City. The pollutants currently measured by the NYCCAS include nitric oxide (NO), nitrogen dioxide (NO2), ozone, fine particulates (PM2.5), and black carbon (BC). These are products of vehicle exhaust, among other sources. The Project Sponsors will fund an expansion of this program, including the addition of several real-time PM monitors, along corridors of potential project impact from increased truck traffic. This includes portions of the Cross-Bronx Expressway, the Trans-Manhattan Expressway, the Long Island Expressway, the Brooklyn-Queens Expressway, approaches to the Robert F Kennedy Bridge, and the Staten Island Expressway. After baseline data collection begins, the Project Sponsors will develop appropriate thresholds for mitigation in consultation with DOHMH, Environmental Justice Community Group, NYSDEC, and USEPA. For the year after Project Implementation, data will be shared as it becomes available and analysis is completed, and reviewed on a quarterly basis with the same group. Please refer to Chapter 16, "Summary of Effects," for more clarity related to mitigation measures previously proposed. See also, response to Frequently Received Comment 39 .

### 14913-25214

Please see the response to Comment 25213.

### 14913-25215

See response to Frequently Received Comment 39.

### 14913-25216

Please refer to Chapter 16, "Summary of Effects," for more clarity related to mitigation measures previously proposed. See also, response to Frequently Received Comment 39 .

### 14913-25217

The enhancements in the EA included: 1. Expanding the network of sensors to monitor air quality; 2. to prioritize the Kingsbridge and Gun Hill Depots for bus electrification; and 3. ongoing monitoring and reporting of potential effects. These have been updated as noted in Chapter 16, "Summary of Effects" and additional information on the Project Sponsors' approach to implementing these commitments has also been newly included. The Project Sponsors commit to ongoing monitoring and reporting of potential effects on the Project on the project website in open data format to the greatest extent practicable.

### 14913-25218

As stated in the EA, the MTA is committed to prioritizing the deployment of zero emissions vehicles received from the next major procurement of over 400 battery electric buses to environmental justice communities, beginning with the Kingsbridge Depot and Gun Hill Depot in the Bronx. Both depots operate bus routes that serve environmental justice communities in the South Bronx which may experience increased traffic due to the Project. Zero emissions buses will be assigned to routes serving these communities as soon as the buses are received and approved for service, beginning in 2025. The MTA is committed to a zero-emission bus fleet by 2040. By converting the MTA bus fleet to 100 percent zero emissions vehicles, the MTA will prevent over 335,000 metric tons of greenhouse gasses that would be emitted from an all-diesel bus fleet. Deployment of zero emissions buses is being prioritized to environmental justice communities first. The 2020-2024 MTA Capital Program includes $1.1 billion in funding to buy 500 zero-emission buses and build charging infrastructure at 11 of the 28 depots where the MTA stores and maintains its bus fleet. Of these 11, nine are located within, or entirely surrounded by, environmental justice communities, and transit bus routes primarily benefit these neighborhoods. It is important to note that modifications that would allow for the deployment of electric buses to West Farms Depot, which is located closer to the South Bronx, are on hold through 2030. A significant portion of the West Farms Depot serves as a staging area for the Bruckner Expressway Reconstruction and Ramps project, a $1.7 billion project being carried out by the New York State Department of Transportation. NYSDOT's Bruckner reconstruction and ramps installation project, as well as MTA's commitment to the deployment of zero emissions vehicles to other depots in the Bronx, will provide air quality benefits to environmental justice communities across the borough .

## Response to Lisa F. Garcia, Environmental Protection Agency Region 2, September 23, 2022 (Submission 14913) - Continued

**14913-25219**

The purpose of the CBD Tolling Program is to reduce traffic congestion in the Manhattan CBD in a manner that would generate revenue for future MTA Capital Program transportation improvements. However, although the preliminary alternatives outlined in Chapter 2, "Project Alternatives" of the EA do not meet all of the Program's objectives, they are not mutually exclusive and, therefore, are not precluded from being implemented. Also , see response to Frequently Received Comment 2 for alternatives to reducing congestion, and response to Frequently Received Comment 39 for more on Project commitments.

**14913-25220**

See response to Frequently Received Comment 39 for information on commitments made by the Project Sponsors based on input from the public and EJTAG. Additional information on the Project Sponsors' approach to implementing commitments has also been newly included in the Final EA, Chapter 16, "Summary of Effects."

**14913-25221**

As detailed in the EA, the Project Sponsors will implement monitoring plans prior to Project implementation, as well as post-implementation data collection. The Project Sponsors will evaluate the monitoring results to determine Project effects and whether adjustments to the commitments in the EA are merited. If adjustments are instituted, the same process for monitoring and adjusting would continue through the post-implementation monitoring period. In this way, the method we will be employing for monitoring and adjusting commitments is a form of adaptive management. See response to Comment 34 regarding details of the proposed air quality monitoring plan, as well as response to Frequently Received Comment 39.