# EXHIBIT 4

State of New Jersey
OFFICE OF THE GOVERNOR
P.O. BOX 001
TRENTON, NJ 08625-0001

PHILIP D. MURPHY
*Governor*

June 12, 2023

Shailen Bhatt, Administrator
Federal Highway Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

Richard J. Marquis, Division Administrator
Federal Highway Administration – New York Division
Leo W. O'Brien Federal Building
11A Clinton Ave, Suite 719
Albany, New York 12207

Robert Clark, Division Administrator
Federal Highway Administration – New Jersey Division
840 Bear Tavern Road, Suite 202
West Trenton, New Jersey 08628

RE: State of New Jersey Comments to Final Environmental Assessment and Draft Finding of No Significant Impact for the Central Business District Tolling Program

Dear Administrator Bhatt, Division Administrator Marquis, and Division Administrator Clark:

The State of New Jersey[1] opposes adoption of the Final Environmental Assessment (Final EA) and the Draft Finding of No Significant Impact (FONSI) for the Central Business District (CBD) Tolling Program (Project or CBDTP).[2] Half of the counties in the regional study area are located in New Jersey, and they are home to more than seven million residents. Unfortunately, the New York-based project sponsors have structured their evaluation of the Project in a manner that disregards New Jersey's interests and discounts significant environmental and other harms to New Jersey residents. Instead of rushing to endorse this fundamentally flawed product, the U.S. Department of Transportation Federal Highway Administration (FHWA) should require the completion of an Environmental Impact Statement (EIS).

To be clear, New Jersey is conceptually open to traditional congestion pricing when *traffic reduction* is the primary goal. The Project, however, as proposed by the Metropolitan Transportation Authority (MTA), has *revenue generation*, not traffic reduction, as its primary goal. As such, throughout this process, the numerous and substantial environmental impacts of the Project have taken

---

[1] The New Jersey Department of Transportation (NJDOT), the New Jersey Department of Environmental Protection (NJDEP), the New Jersey Department of Health (NJDOH), the New Jersey Transit Corporation (NJTRANSIT), and the New Jersey Turnpike Authority (NJTA) contributed to these comments.

[2] Incorporated herein by reference is New Jersey's September 23, 2022, letter identifying the technical comments from the affected New Jersey transportation agencies.

a backseat to this misplaced motivation, to the detriment of New Jersey's communities, businesses, commuters, agencies, and millions of residents. Moreover, the Final EA does not even specify which of the proposed tolling scenarios will be implemented – apparently any one of the seven alternatives could be implemented, or an entirely different, heretofore undisclosed option could be implemented without appropriate environmental review. This is unprecedented, unsafe, and unreasonable.

MTA's focus on revenue generation and the Final EA's procedural irregularities have resulted in a flawed vision for New York's congestion pricing program – a vision that would serve as a poor model for congestion pricing across the United States. The CBDTP proposed in the Final EA would discriminate against New Jersey residents; impose counterproductive tolls on commuter buses; and fail to award full credit for all tolls paid to enter New York City, creating new incentives for increased vehicle miles traveled (VMT) and pollution in parts of New Jersey. This approach to congestion pricing fundamentally distorts an otherwise promising concept.

### A. *The Final EA Is the Result of a Failed Process*

The National Environmental Policy Act (NEPA) requires that federal agencies take a "hard look" at the full range of potential environmental consequences of projects proposed.[3] An agency must document its analysis, afford interested agencies a *meaningful opportunity* to participate, and make information available to the public for comment before implementation of the proposed project. When a proposed action is "not likely to have significant effects or when the significance of the effects is unknown," an agency first prepares an EA.[4] If the agency finds that "significant" environmental effects are a likely result of the proposed action, the agency must then prepare the more thorough EIS.[5] The EIS requires the agency to consider all direct, indirect, and cumulative environmental effects of the proposed action, and conduct an alternatives analysis.[6]

New Jersey has a strong interest in preventing and mitigating the adverse transportation, environmental and public health impacts of the Project, including air quality degradation and noise pollution which will stem from the proposed project alternatives. If the FONSI is issued based on the Final EA, without the completion of an EIS, New Jersey roads will be adversely affected, our vulnerable communities will be exposed to more congestion and air quality issues, and our State services will be further strained. New Jersey will be left with the difficult decision of considering transportation fare increases to accommodate higher costs directly resulting from the Project, which would be passed on to customers, many of whom are socioeconomically disadvantaged. Perversely, this may disincentivize use of public transportation and would, in fact, increase VMT on the New Jersey side of the river, the exact opposite of one of the Project's stated goals.

### 1. *The Scoping of the Project Overlooked the Unique Characteristics of Manhattan's Central Business District*

The CBDTP's Project Sponsors, the Triborough Bridge and Tunnel Authority, an affiliate of the MTA, in partnership with the New York State Department of Transportation and the New York City Department of Transportation (collectively, hereinafter referred to as MTA), have touted the success of congestion pricing programs around the world, in particular the London and Singapore programs. However, there are material differences between those programs and what is being proposed for the New York metropolitan region.

---

[3] 42 U.S.C. § 4332.

[4] 40 C.F.R. §§ 1501.4(b), 1508.9 (1978).

[5] 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3 (1978).

[6] 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.8(b), 1508.7 (1978).

The FHWA's own analysis of international pricing programs in Singapore, London and Stockholm indicates a 10 to 30 percent or greater reduction in traffic in the priced zones.[7] In contrast, MTA's CBDTP is only projected to reduce VMT by 5% at most, under Tolling Scenario D, and vehicles by 10% at most under Tolling Scenario E.[8] No doubt this is because, unlike MTA's Project, the London program is true congestion pricing with a "primary rationale...to improve mobility and efficiency"[9] rather than raising revenue generation as the primary objective.

Furthermore, MTA has not addressed or even acknowledged New Jersey's unique geographic position in the context of the United States and the national precedent the CBDTP would set for congestion pricing. Of the top 10 U.S. cities by population, two are located within 10 miles of New Jersey's borders. Specifically, New Jersey is bookended by two major metropolitan areas not within its jurisdiction – New York City and Philadelphia. Indeed, New York City and Philadelphia are the only two of the top ten U.S. cities within 10 miles of a neighboring state border. The stakes of getting this plan right could not be higher for New Jersey and the region.

   2.   ***FHWA and MTA Did Not Conduct Adequate Outreach to Impacted New Jersey Agencies and Local Entities***

The Final EA was fundamentally flawed from the start due to the absence of meaningful dialogue between and among FHWA, MTA, New Jersey agencies and local entities concerning the regional impacts of the CBDTP. One of NEPA's long-standing goals is to "provide a springboard for public comment" in the agency decision-making process.[10] This is particularly true for State and local governmental entities who have specialized expertise directly related to the proposed project and who may also need to make their own project-related decisions. Thus, federal agencies "shall involve . . . State and local governments" and "relevant agencies" while "preparing environmental assessments."[11] FHWA's NEPA regulations similarly require this.[12]

MTA failed to meet these basic requirements as related to New Jersey. While the Final EA suggests that planning for the CBDTP involved "meaningful opportunities for public participation and engagement in the Project"[13] amongst federal, state and local agencies, none of the New Jersey transportation agencies had any substantive meetings or dialogue with either FHWA or MTA about their vision for the CBDTP and its potential regional impacts. Staff members of NJDOT, NJTRANSIT, and NJTA were invited to regional agency meetings that were informational only. There was no opportunity for a *dialogue* between MTA and the New Jersey transportation agencies during those meetings, as would ordinarily occur in a true meeting with stakeholders, nor was there any attempt to follow up with any of New Jersey's transportation agencies to seek any input or opinions after the meetings.

---

[7] FHWA KTA: Lessons Learned from International Experience in Congestion Pricing Final Report (August 2008) p. 4-1, available at: https://ops.fhwa.dot.gov/publications/fhwahop08047/intl_cplessons.pdf.

[8] Final EA Table 6-23, at 6-51; *id.* Table 6-30, at 6-63.

[9] FHWA KTA p. 4-2.

[10] *DOT v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (quoting *Baltimore Gas & Electric Co. v. Nat. Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983)).

[11] 40 C.F.R. § 1501.5(e).

[12] 23 C.F.R. § 771.119(b) (applicants seeking EA actions "must, at the earliest appropriate time, begin consultation with interested agencies" in order "to advise them of the scope of the project" and "identify alternatives" and mitigation measures to reduce adverse environmental impacts).

[13] Final EA 0-1.

The Final EA lists only one New Jersey-based entity as a participating agency: the North Jersey Transportation Planning Authority (NJTPA).[14] NJTPA has indicated that there were no presentations made to its board outlining the impacts of the CBDTP, nor were there any board actions pertaining to same. While NJDOT and NJTRANSIT participate on the NJTPA Board, NJTA does not. Additionally, none of the New Jersey transportation agencies have staff embedded in NJTPA, and thus no agency staff, who would have had the expertise necessary to meaningfully contribute to the CBDTP development process, or express their respective agency's concerns, participated in any MTA meeting for the CBDTP. Moreover, none of the New Jersey transportation agencies ceded their respective authority to NJTPA for purposes of commenting on the proposed CBDTP. Consequently, any coordination with NJTPA regarding the CBDTP in lieu of engagement with the New Jersey transportation agencies denied those agencies any meaningful opportunity to contribute to the CBDTP development process and express their concerns, which is a violation of 40 C.F.R. § 1501.5(e). Collaborative communication amongst affected transportation agencies is a hallmark of any significant regional or cross-border transportation project and policy, yet MTA developed the Final EA without directly engaging any of the New Jersey transportation agencies. Likewise, it did not consult with FHWA's New Jersey Division Office.[15]

Further, with respect to the environmental and health impacts to New Jersey communities, while the MTA invited community groups to participate in an Environmental Justice Technical Advisory Group, neither NJDEP nor the NJDOH were among the groups invited to participate.[16]

Although MTA touts its unprecedented outreach, it fails to list any meaningful outreach to any New Jersey agency. In short, the Final EA's list of consulting agencies shows that the MTA locked itself into an echo chamber with other New York agencies.

### 3. *The Project's Purpose and Need Are Too Narrowly Defined*

The incomplete public outreach and consultation process resulted in the CBDTP's scope being too narrowly defined – limiting the Final EA's utility and ultimately undermining the Draft FONSI. An agency may not define the purpose of its action in terms so unreasonably narrow that only one alternative would accomplish the goals of the agency action.[17] Nor may an agency artificially narrow its purpose to avoid considering relevant alternatives.[18] In such instances, the agency's purpose for action must be rejected and redefined.[19] As the FHWA's own guidance documents explain, a project's purpose and need "serve[] as the cornerstone for the alternatives analysis" and thus the agency should take care "that the purpose and need statement is not so narrowly drafted that it unreasonably points to a single solution."[20]

---

[14] Final EA 5C-7.

[15] *See* 18-1 to -2.

[16] While the New Jersey Environmental Justice Alliance was invited to participate, engagement with additional and more localized groups in Orange, East Orange, Newark, Fort Lee and/or regional Bergen and Essex County groups would be more appropriate when conducting outreach on place-based mitigation. A more balanced set of perspectives may help to ensure that funds for place-based mitigation projects are being spent throughout the region and not solely in New York's communities.

[17] *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

[18] *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983).

[19] *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73.

[20] July 23, 2003 Memorandum regarding Guidance on "Purpose and Need" from Mary E. Peters, Administrator, Federal Highway Administration and Jennifer L. Dorn, Administrator, Federal Transit Administration, to FHWA

Despite these requirements, the Project's need and purpose were defined far too narrowly. FHWA and MTA determined the solution to New York City's congestion problem needed to: 1) reduce daily VMT in the Manhattan CBD; 2) reduce the number of vehicles entering the CBD; 3) create a funding source capable of raising $15 billion for the MTA Capital Project; and, 4) establish a tolling program consistent with New York's "MTA Reform and Traffic Mobility Act."[21] Even with MTA's decision to remove statutory compliance from its review when considering potential alternatives, the remaining prongs still defined the Project far too narrowly by including specific fundraising goals alongside the expected vehicle reduction goals. Had New Jersey been involved more directly throughout the Project's scoping, further ideas could have been generated to better define the Project's purpose in a way that considered potential impacts to the region, not just New York and MTA.

### 4. Tolling Alternatives

Even though MTA is proposing a novel solution to the Manhattan CBD's traffic congestion problem, the only alternatives the Final EA seriously considered were the CBDTP and the No Action Alternative.[22] All other potential primary alternatives were rejected at the outset as MTA argued they would not meet all three of the Project's goals. This was a mistake and must be corrected.

The Final EA reflects the inadequate public outreach undertaken, and when combined with an artificially narrow purpose and need, resulted in an insufficient alternatives analysis. As those who work in the transportation field know, the Concept Development Phase of the Project Delivery process always results in the identification of a preferred alternative. That preferred alternative is the basis of the environmental review (or the NEPA process) and the alternative against which all other alternatives, including a "no build" alternative, are compared. Since the Project was defined so narrowly, the Final EA predictably considered only the regulatorily-required No Action Alternative alongside the CBD Tolling Alternative. This was an error. "[A]lternatives to the proposed action are 'the heart of'" a NEPA analysis.[23] This is necessary to ensure "the agency has taken a 'hard look' at [the] environmental consequences" of its proposed action.[24] Thus, a "properly drafted [EA] must include a discussion of appropriate alternatives to the proposed project."[25] EAs that do not include sufficient alternatives or reject reasonable or feasible alternatives do not meet NEPA's requirements.[26]

To begin, there was no serious consideration in the Final EA of alternatives that did not meet all three narrow Project objectives. For instance, several alternatives – including rationing license plates, incorporating mandatory carpooling, and creating tolls on the East and Harlem River bridges – would have reduced the VMT daily as well as the number of vehicles in the CBD.[27] Yet they were rejected from any true consideration because they would not have, standing alone, met the $15 billion

---

Division Administrators and FTA Regional Administrators, *available at* Environment.fhwa.dot.gov/legislation/nepa/memo_purpose_need.aspx/.

[21] Final EA 1-18.

[22] Final EA 2-8.

[23] *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 575 (D.C. Cir. 2016); *see also* 42 U.S.C. § 4332(C)(iii) (requiring "alternatives to the proposed action" to be included in every NEPA assessment).

[24] *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

[25] *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002).

[26] *See, e.g., id.* at 1122 (environmental assessment's alternatives discussion insufficient in part because alternatives "were improperly rejected" as "they did not meet the" project's purpose and need "standing alone," and the agency did not "give[] adequate study" to "[c]umulative options[.]").

[27] Final EA 2-6 to 2-7.

MTA fundraising goal. While New York's legislation required the $15 billion goal, that statute is neither binding on FHWA nor does it outweigh NEPA's alternatives analysis requirement.

Furthermore, the Final EA never considered whether the proposed congestion tolling could be combined with one or more additional alternatives to create cumulative alternatives that still met the three narrowly defined Project goals. For example, both parking pricing strategies and reducing government-issued parking permits would have reduced vehicle miles traveled, albeit not at the percentages the Project sought here.[28] Likewise, as noted above, carpooling, license plate rationing, and tolling on other bridges also would have reduced VMT and reduced the number of vehicles in the CBD.[29] While all of these alternatives were rejected from further consideration because none, standing alone, would have met all three of the Project's objectives, the Final EA never considered whether one or more of these alternatives could have been combined with the proposed congestion tolling to achieve greater congestion reductions. In short, there was no attempt to consider cumulative alternatives.

This stunted approach to the alternatives analysis is particularly problematic given the history of prior congestion pricing proposals that included cumulative approaches. For instance, the 2007 PlaNYC report suggested a congestion pricing plan, but proposed it as a three-year temporary pilot plan. And congestion pricing was just one aspect of the plan in addition to new ferry service to underserved areas, better traffic law enforcement, expanded meter usage and integrating mass transit modes.[30] Further, the 2007 PlaNYC report recognized that infrastructure improvements were necessary, but funding would need to come from multiple sources rather than a single, dedicated source.[31] Similarly, the 2018 Fix NYC Plan proposed a three phase roll-out for congestion tolling, wherein the first phase included elements designed to prepare the region for the tolls, including mass transit upgrades, moving and parking violation enforcement, government parking placard review and addressing private buses.[32] Notably the 2018 Fix NYC Plan drafters recognized that NEPA would require an EIS, not an EA, for a project of that magnitude.[33] While the Final EA mentions these reports, it wholly ignores their underlying concepts and focuses instead on only one piece of the puzzle each presented, thereby missing additional possible alternatives.

Finally, the Final EA never considered pilot programs that other governmental entities have undertaken, such as charging a toll based on the number of miles people drove within the CBD, rather than a toll for entry or exit from the CBD.[34] FHWA was certainly aware of this alternative and the concept is supported by prior studies noting that taxi and for-hire vehicle cruising caused significant

---

[28] The parking pricing strategies were also rejected because MTA does not have an agreement with New York City as to how the parking funds would be allocated. EA 2-7 at n.2. This is odd for at least two reasons. First, the Final EA is silent as to the efforts MTA undertook to pursue such an agreement. Second, the Final EA elsewhere notes that while MTA does not have an agreement with the New York/New Jersey Port Authority to install congestion tolling infrastructure on Port Authority property, MTA nonetheless hopes an agreement "regarding potential use of" the property can be reached. EA 2-25. Nowhere does the Final EA explain why an agreement with the Port Authority may be imminent while a similar agreement with the City is not a possibility. It is unreasonable to allow such disparate treatment of these issues, which effectively gives New York City alone an absolute veto to exclude potential alternatives from consideration.

[29] Final EA 2-6 to 2-7.

[30] The City of New York, PlaNYC: A Greener, Greater New York at 77-78.

[31] *Id.* at 77.

[32] Fix NYC Advisory Panel Report, January 2018 at 4-5.

[33] *Id.* at 5.

[34] U.S. Department of Transportation, Federal Highway Administration; Congestion Pricing, Pay as You Drive, *available at*

https://ops.fhwa.dot.gov/congestionpricing/strategies/not_involving_tolls/pay_drive.htm.

CBD congestion.[35] Yet the Final EA never mentions, let alone seriously considered, the possibility. That is particularly unfortunate because an alternative that charged tolls based on actual contributions to congestion in the CBD presumably would better serve the typical policy objectives of congestion pricing and better comport with New York laws requiring tolling of vehicles for remaining in the CBD – not merely upon entry and exit.

The Final EA's failure to consider any alternatives other than the Project and the regulatorily-required no action alternative renders the rest of the analysis fundamentally flawed. For instance, the Final EA recognizes that the Project will cause traffic patterns to shift, thereby increasing air pollution in some parts of New Jersey and causing further negative impacts to already overburdened environmental justice communities.[36] Rather than consider alternatives that would truly reduce traffic throughout the entire regional study area, such as a combination of parking pricing, requiring carpooling and addressing governmental placards, the Final EA instead solely focused on an alternative that effectively shuffled the traffic out of the CBD and into surrounding areas. Thus, the Final EA ignores the very real possibility that the hypothetical tolling scenarios it considers could have had reduced congestion tolling rates, which would reduce traffic shifts and associated environmental impacts throughout the study area as drivers alter their travel to avoid tolls. And since the Final EA's alternatives analysis is so flawed, the draft FONSI must be rejected and an EIS undertaken that incorporates a true alternatives analysis.

### B. The Final EA Fails to Account for Impacts on New Jersey's Transportation Network and Commuters

MTA's process failures resulted in a Final EA that fails to account meaningfully for significant impacts on New Jersey transportation agencies and commuters.

#### 1. Potential Revenue Impacts to the New Jersey Turnpike Authority

NJTA is an independent authority of the State of New Jersey. It is fully dependent on the revenues it collects from two tolled roadways (the New Jersey Turnpike and the Garden State Parkway). It receives no State or federal funds. The impact of traffic diversion from NJTA's roadways will vary, perhaps greatly, based on the final selected tolling scenario. This fact, coupled with the short timeframe allotted for review of the Final EA, meant that NJTA could not commission a formal origin and destination study, toll sensitivity study or diversion analysis. What is known, however, is that capacity at the shared Hudson River crossings (the Holland and Lincoln Tunnels) is limited. Without meaningful engagement by the FHWA or MTA, as described in detail above, NJTA was deprived of the opportunity to conduct the necessary studies that would allow NJTA to fully understand the financial impacts to its Capital Program and day-to-day operations. Further, NJTA holds a vast repository of traffic data collected over decades. FHWA's and MTA's failure to meaningfully engage with NJTA and avail themselves of such data specific to NJTA calls into question the validity of assumptions made in the Final EA with respect to the CBDTP's impacts on NJTA. NJTA supports a full federal EIS so that all affected can better understand the full impacts that will be generated by a preferred tolling scenario.

#### 2. Potential Fare Impacts for New Jersey's Most Economically Distressed Communities

As is consistent with transit agencies across the nation, NJTRANSIT's fare box revenue is not sufficient to support the operational costs of the transit system for which it is responsible. It is

---

[35] See Fix NYC Report at 13 ("[A]pp-based transportation companies ... are now the most significant source of congestion[.]").

[36] See, e.g. EA 10-23 to -34; 10-37 to -41; 17-30 to -43.

becoming increasingly clear that transit agencies across the country are approaching a "fiscal cliff" as the impacts resulting from the slow recovery of public transit ridership from the COVID-19 pandemic are compounded by the winding down of the federal COVID-19 relief fund program. Based upon the CDBTP tolling scenarios discussed in the Final EA, it is clear that NJTRANSIT buses entering the Port Authority Bus Terminal (PABT) will be assessed the CBDTP toll unless an alternative tolling scenario not considered by the Final EA is implemented.

Pre-pandemic, approximately 1,850 buses used the Lincoln Tunnel to access the PABT on any given morning during the peak commuter hour. That same volume of trips occurs during the evening peak commuter hour. Without an identified preferred tolling scenario, the cost of the CBDTP on NJTRANSIT operations and ridership fares is impossible to determine. For purposes of this exercise, consider the well-publicized peak hour CBDTP toll of $23. If 1,850 buses travel 261 days a year, the increased cost to NJTRANSIT would be more than $22 million annually, not an insignificant amount of money for an already financially-strapped agency.

NJTRANSIT buses only marginally touch the CBD before entering the PABT. Failure to affirmatively state that an exemption will be provided for these buses contradicts the policy rationale of Congestion Pricing – encouraging use of mass transit – because CBDTP tolls will make it more costly for commuters to use mass transit. That increased cost will inevitably trickle down to riders who, in many cases, are already economically disadvantaged. These disadvantaged riders are the least able, of all riders, to alter their travel patterns due to the nature of their employment, which often provides little, if any, flexibility as to when they report to work or whether they work remotely. These increased fares may cause public transit riders to return to their cars – clearly contradicting the CBDTP's purpose and need under at least two of the potential tolling scenarios.

NJTRANSIT will not only suffer direct impacts from the implementation of the CBDTP, but will also experience indirect expenses related to increased equipment needs and labor costs. NJTRANSIT has concerns regarding the ability to absorb any increase in ridership that may result from the CBDTP and the scope of capital investments that may be required to scale its ability to serve additional customers. The New York State Legislature and MTA recognized the strain that the CBDTP would place on two rail systems that serve the CBD – Long Island Railroad (LIRR) and Metro-North Railroad (MNR) – and accounted for the strains by allocating each 10% of the revenue stream associated with the CBDTP. Given the stresses to NJTRANSIT's capital plan and the fact that it will experience similar impacts as LIRR and MNR, it is only fair and equitable that MTA provide the same relief to the third railroad that serves the Manhattan CBD. It should be noted that, in addition to New Jersey-based commuters, NJTRANSIT serves New York customers on its "West-of-Hudson" service, including Rockland and Orange Counties, through the Pascack Valley and Port Jervis lines.[37]

Turning to non-public-transit commuters, the socioeconomic and demographic data on who currently drives into the CBD is not available, nor has it been fully considered. Many of these individuals cannot afford to live in Manhattan and must travel great lengths to reach their workplaces. It would be a mistake to assume, without sufficient data, that only the most privileged drive into New York, and the burden of the CBD's eventual tolling scheme should not, ultimately, be borne by those who can least afford it and have no other alternatives. To date, MTA has not done enough to protect these commuters; additional steps, including discounts and credits, must be taken. While MTA may provide a 25% discount on the full CBDTP toll to low-income drivers (after the first ten trips in a calendar month), it is unclear whether the proposed discount would be available to all New Jersey low-income drivers or only those in MTA's identified EJ communities. Additionally, the CBDTP may allow for double tolling when commuters use bridges/tunnels and then enter the CBD—a particular burden for low-income commuters. To avoid this unjust result, MTA must ensure that George Washington Bridge commuters who enter the CBD within a reasonable timeframe are credited and that

---

[37] EA Table ES-4; 17-16

9

any credit for Port Authority of New York and New Jersey commuters is not capped now or in the future.[38]

The MTA also should consider providing a tolling exemption for individuals being treated for an illness in a NYC health care facility. A patient who needs to be transported to NYC for medical treatment, either emergent or chronic, should not be required to ride public transportation. Patients could be immunocompromised, contagious, or unable to navigate public transportation due to their illness.

Finally, it should be noted that the CBDTP process for setting credits, discounts, and exemptions is inherently flawed. The make-up of the Traffic Mobility Review Board (TMRB) demonstrates that the deck is stacked against New Jersey. The TMRB is the six-member body created by the New York State Legislature to recommend toll rates, including credits, discounts, and exemptions. New Jersey does not have any representation on the TMRB. Yet, MTA – the beneficiary of CBD tolling – will have two current and three former board members on the TMRB, representing five out of six seats. The incentives of MTA's board members on the TMRB are obvious. That MTA announced the appointment of TMRB board members on behalf of the New York State and New York City Departments of Transportation evidences the degree of coordination and control that MTA has in setting such credits, discounts, and exemptions. It is also in stark contrast to New Jersey's lack of representation.

### 3. *Potential Impacts on the New Jersey Department of Transportation*

The CBDTP also will have negative consequences for NJDOT. For example, NJDOT's ability to manage traffic demand will be significantly impacted. Traffic demand management is the application of policies and strategies to reduce travel demand or to redistribute this demand in space or in time. Without a firm preferred tolling alternative, there is no mechanism for NJDOT to anticipate shifts in traffic amongst its various roadways and/or facilities. Similarly, NJDOT cannot determine how it will be required to shift its maintenance and operation forces and it will not be in a position to understand how mobility concerns during special events, inclement weather, or other unforeseen circumstances will need to be managed.

### C. *The Final EA Fails to Appropriately Consider the Effects of the Project on New Jersey's Environmental Justice Communities*

This Project raises equity and affordability concerns for New Jersey's low-income residents. Unfortunately, the State cannot fully evaluate potential environmental justice concerns based on the information presented in the Final EA. Additional analysis and engagement is needed.

In preparing the Final EA, the MTA EA utilized federal data and mapping tools, which resulted in the conclusions drawn about the potential for adverse environmental and public health impacts on New Jersey's EJ communities being inaccurate and ill-defined. The MTA should conduct a supplemental analysis utilizing New Jersey and New York-specific data and mapping tools to more accurately assess adverse environmental and public health impacts on New Jersey's EJ communities. Only with this more robust and refined analysis, coupled with increased NJ-based community engagement, can appropriate place-based mitigation measures be identified and implemented.

---

[38] Rather than the proposed discount for individuals being treated for an illness in a NYC health care facility, the MTA should consider providing a tolling exemption. A patient who needs to be transported to NYC for medical treatment, either emergent or chronic, should not be required to ride public transportation. Patients could be immunocompromised, contagious, or unable to navigate public transportation due to their illness. Final EA 16-28.

### 1. *The Final EA Improperly Confuses Economic Disparity with Environmental Disparity*

First, in Chapter 17 – Environmental Justice, the MTA inappropriately conflates a host of economic and environmental issues of disparity. While the economic effects of the tolling program on low-income populations present an issue of equity broadly, they are not, in and of themselves, issues of environmental equity and justice. Rather, environmental justice includes the determination of whether an industrial, commercial and/or governmental decision has caused, or will cause disparate environmental and public health impacts for certain groups of people based on their race, color, national origin or income and the implementation of solutions to undo or prevent said impacts. Environmental justice is not the analysis of whether an industrial, commercial, or governmental decision will cause disparate economic impacts to said groups of people.

As such, an EIS should be completed, with more specificity, and utilizing New Jersey specific data and mapping tools, to determine whether the Project will cause disparate environmental and public health impacts for certain groups of people based on their race, color, national origin, or income and the implementation of solutions to undue or prevent said impacts.

### 2. *The Final EA Fails to Fully Consider Air Quality Impacts in New Jersey as a Result of Traffic Diversions*

While the Final EA concludes that regional air emissions will decrease as a result of the Project, the Final EA does not fully address the localized impacts to New Jersey communities. Indeed, it is anticipated that air emissions in Bergen County alone will increase due to increased truck traffic under most tolling scenarios.[39] This will result in an increase in air pollutants in Bergen County, including National Ambient Air Quality criteria pollutants such as carbon monoxide (CO); nitrogen dioxide ($NO_2$); ozone ($O_3$); PM regulated in two sizes, 2.5 microns and 10 microns ($PM2.5$ and $PM10$); sulfur dioxide ($SO_2$); and lead (Pb) and mobile source air toxics. The potential for adverse impacts to New Jersey communities necessitates further study and identification.

Increased air pollution from increased, diverted truck traffic in Bergen County could cause adverse health effects within some communities that have the highest pre-existing pollution burdens. One of the communities that has census tracts warranting place-based mitigation measures is Fort Lee which has pre-existing pollution and chronic disease burden at the 90th percentile; however, Fort Lee is one of the communities with the highest propensity for truck diversion if the Project is implemented. To address these potential adverse effects, the MTA has committed funds to invest in regional and place-based mitigation measures to reduce diversions and emissions regardless of the selected tolling scenario. Such mitigation efforts must include a George Washington Bridge credit to reduce toll shopping at the Lincoln and Holland Tunnels, which will also reduce the traffic impact on buses using those tunnels. However, nowhere in the Final EA does the MTA address how mitigation funds will be utilized in New Jersey's effected communities.

The overall effect of the Program will be to shift traffic impacts outside of New York City, further exacerbating environmental and public health stressors in already overburdened communities in New Jersey. In order to fully understand the impacts and to develop effective place-based mitigation measures, an EIS must be completed.

---

[39] *See* Tables 17-11, 17-13. The EA identifies census tracts in Fort Lee as Environmental Justice Communities. This finding is supported by NJ's Environmental Justice Mapping Assessment and Protection (EJMAP) tool. According to EJMAP, almost all of Fort Lee's block groups are overburdened block groups subject to adverse cumulative environmental and public health stressors, making them communities that are in need additional analysis and protections to accomplish environmental justice. Further, the majority of these block groups are adversely stressed by heavy-duty truck traffic.

3. ***The Final EA Fails to Explain Its Environmental Justice Methodology and May Improperly Exclude Certain New Jersey EJ Communities***

In addition to Fort Lee, the Final EA lists three other New Jersey communities as having census tracts that would warrant place-based mitigation measures because they have some of the highest pre-existing pollution and chronic disease burdens: Orange, East Orange, and Newark. I-280 which runs through Orange, East Orange, and Newark connects to I-95 which serves as feeder route to the George Washington Bridge via Fort Lee.

While Orange, East Orange and Newark are flagged as communities with environmental justice concerns, there are several other communities with census tracts within the regional study area that have pre-existing pollution and chronic disease burdens which the Final EA does not address; the Final EA further reflects that mitigation measures likely will not be provided to these communities. It is unclear how the MTA selected Orange, East Orange, Newark and Fort Lee, while excluding other similarly situated communities. For example, I-280 also runs through East Newark and Harrison; however, the Final EA does not list those municipalities as having census tracts with pre-existing pollution and chronic disease burdens. Clarity surrounding the methodology of how the communities were selected is necessary in order for the State to understand how and when place-based mitigation measures are warranted.

The inclusion of some affected communities but not others could be due to the fact that the MTA relied upon the White House Council on Environmental Quality's CEJST tool to review environmental justice census tracts with pre-existing pollutant or chronic disease burdens above the 90th national percentile, rather than utilizing state or county percentiles for comparison like EJMAP does.[40] The New Jersey EJMAP shows all the overburdened census block groups within these municipalities as being subject to adverse cumulative environmental and public health stressors. The utilization of NJ-specific metrics and a smaller unit of scale (block group rather than tract) would provide a more refined analysis for the potentially impacted New Jersey communities with environmental justice concerns than that which is used within the EA.[41]

4. ***The Final EA Fails to Allocate Certain Place-Based Mitigation Measures to NJ***

The Project Sponsors have committed to a $155 million investment in mitigation measures over 5 years, including regional measures to reduce diversions and emissions from trucks throughout the 10-county environmental justice study area, as well as place-based measures that would be implemented in specific areas that have the highest pre-existing burdens or could experience the largest magnitude of diversions as the result of the Project. The Project Sponsors commit to these measures, regardless of the tolling structure eventually adopted. To mitigate the increases in air pollution, the Final EA concludes that several communities, including four in New Jersey—again, Orange, East Orange, Newark and Fort Lee—have census tracts that would merit place-based mitigation measures.

---

[40] EJMAP calculates disproportionate impacts by counting the total number of environmental and public health stressors higher than that of the 50th percentile of non-overburdened block groups in the county or the state, whichever is lowest and compares that total count of "higher than" stressors to the total count of stressors of the non-overburdened block groups in the county or the state, whichever is lower, at the 50th percentile.

[41] MTA's analysis under-defines overburdened communities in comparison to New Jersey's mapping in the counties closest to New York City. MTA's EJ Areas are: 1) Minority when at least 50% of census tract is minority, or minority percentage of tract exceeds minority percentage of the county where the tract is located; and 2) Low income when the percentage of individuals with household incomes up to twice the federal poverty threshold was higher than that percentage for the 28-county region. New Jersey, however, also includes important criterion like English proficiency and utilizes census block rather than census tract.

While measures to mitigate the negative effects of increased truck traffic are important, the State urges the MTA to consider all feasible avenues to avoid and minimize potential impacts before determining that mitigation alone is sufficient. Importantly, it is unclear whether the MTA will commit to a comprehensive investment of funds for mitigation measures across the region and especially in New Jersey as the Final EA is explicit about limitations on spending funds outside of New York, for example:

- The installation of electric truck charging infrastructure to reduce air pollutants will be implemented through the Federal Carbon Reduction Program using funds received by NYSDOT and will therefore be limited to locations in New York.

- The NYC Department of Health and Mental Hygiene (DOHMH) will conduct a needs assessment to identify schools in affected census tracts with existing high rates of asthma. NYC DOHMH will select a location in the Bronx to implement an asthma center with programming to benefit neighbors with asthma.

If NYSDOT and NYC DOHMH either cannot or have no intention to spend funds for electric truck charging infrastructure and asthma programming beyond NYS and NYC, respectively, the MTA must explore opportunities to deliver meaningful avoidance and mitigation measures comprehensively throughout the region.

A commitment to environmental justice requires that regional improvements in air pollution not discount localized harm potentially born by environmental justice or overburdened communities. Additional analysis and community input to determine specific implementation locations for place-based mitigation measures is necessary.

### D. *The Final EA Fails to Account for Other Negative Impacts on Regional Air Quality and Public Health*

Of concern, the Final EA does not include any assessments of the impact of air quality on health outcomes. Assessing health outcomes from potential impacts on air quality requires modeling and estimated theoretical risk assessments.

The Final EA seemingly analyzed a study area that included a site near I-95 in New Jersey, west of the George Washington Bridge in an EJ community. The study predicted that the annual $PM_{2.5}$ level within this EJ community would increase from 11.1 to 11.2.[42] Although this level is below the current primary annual standard for $PM_{2.5}$ of 12.0 μg/m³, on January 6, 2023, the EPA announced its proposal to revise the primary annual $PM_{2.5}$ standard to within the range of 9.0 to 10.0 μg/m³.[43] Currently, the NJDEP operates an air monitoring station in Fort Lee, near the approach to the George Washington Bridge, that consistently records some of the highest levels of $PM_{2.5}$ levels of all New Jersey. The 2019-2021 annual $PM_{2.5}$ design value was 9.6 ug/m³.[44] The Project would only exacerbate $PM_{2.5}$ levels near Fort Lee, and would likely result in the levels exceeding the revised EPA standards.

---

[42] *See* Table 10-14, page 10-48.

[43] 88 FR 5558.

[44] https://www.nj.gov/dep/airmon/pdf/2021-nj-aq-report.pdf

The harmful effects of particulate matter are well-established.[45] $PM_{2.5}$ has significant health impacts due to its ability to penetrate deeply into the lungs.[46] Considering the health impacts of $PM_{2.5}$, especially from mobile sources and within overburdened communities, any predicted increase of $PM_{2.5}$ due to increased VMT as a result of the Project is of concern and should be mitigated. Therefore, in addition to the concerns expressed by the environmental justice stakeholders that in "communities that already are overburdened by pollution, even a single additional truck is of concern," the continuing elevated levels of $PM_{2.5}$ in the Fort Lee monitor could contribute to a classification of nonattainment when EPA implements the new lower $PM_{2.5}$ NAAQS.[47]

New York should proactively implement measures to reduce $PM_{2.5}$ emissions, including in New Jersey communities. Although the MTA has committed to target certain New York locations to receive higher priority for zero emission buses, there are no similar mitigation measures that address the projected increases in VMT and $PM_{2.5}$ levels in New Jersey. In addition, the MTA notes that there will be installation or upgrades to air filtration units in NYC schools, as well as expanded asthma case management. However, since there was not a thorough evaluation on the Project's impact on New Jersey communities, there is no proposal to mitigate similar impacts to New Jersey's residents. This is despite the fact that one in four children in Newark has asthma, three times the national rate. Indeed, the Final EA and Draft FONSI state that no mitigation is needed, and instead, ongoing monitoring and reporting of potential effects will be reported.[48] In addition, the Final EA contains does not address Mobile Source Air Toxics Health impacts, instead saying the MTA does not have sufficient information to do so.[49]

The Final EA attempts to obscure the impacts to areas outside of New York by shifting the perspectives from a regional to a local level. For example, the EA shows that Bergen County will suffer increased air pollutants as a result of the proposed program, both in the near and the far term, yet the EA concludes there will not be significant air impacts because region-wide, the air quality will

---

[45] *See* Comments of the Attorneys General for the States of California, Connecticut, Delaware, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, the District of Columbia, and the City of New York on the EPA Administrator's Reconsideration of the National Ambient Air Quality Standards for Particulate matter, 88 Fed. Reg. 5558 (Jan. 27, 2023) (March 28, 2023), at https://downloads.regulations.gov/EPA-HQ-OAR-2015-0072-2307/attachment_1.pdf.

[46] *See* EPA, Health and Environmental Effects of Particulate Matter (PM), https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm. Exposure to $PM_{2.5}$ has been linked to premature mortality, lung cancer, cardiovascular effects and disease, and nervous system effects. Exposure to $PM_{2.5}$ has also been linked to respiratory effects including changes in lung function, decrements in lung function growth, increased respiratory symptoms, such as coughing, difficulty breathing, irritation of the airways, respiratory infection and aggravated asthma. *See* 85 FR 82,684, 82,695 through 82,703. Studies also indicate that "asthma, lung function decrement, respiratory symptoms, and other respiratory problems appear to occur more frequently in people living near busy roads." 69 FR 38,958, 38,966. One study "indicated that long-term residence near major roads, an index of exposure to primary mobile source emissions (including diesel exhaust), was significantly associated with increased cardiopulmonary mortality." *Id.* "Other studies have shown children living near roads with high truck traffic density have decreased lung function and greater prevalence of lower respiratory symptoms compared to children living on other roads." *Id.* Diesel PM emissions also contain "numerous organic compounds, including over 40 known cancer-causing organic substances. Examples of these chemicals include polycyclic aromatic hydrocarbons, benzene, formaldehyde, acetaldehyde, acrolein, and 1,3-butadiene" referred to as air toxics. *See* CARB, Overview: Diesel Exhaust & Health, https://ww2.arb.ca.gov/resources/overview-diesel-exhaust-and-health.

[47] The National Ambient Air Quality Standards (NAAQS) is a health-based standard, which the Clean Air Act requires be established at a level required to protect public health, with an adequate margin of safety. 42 U.S.C. 7409(b)(1).

[48] *See* FONSI page 10; *see also* draft EA at page 10-48 and Table 10-16 on page 10-53.

[49] Final EA 0-5 to -8.

improve. This approach buries the reality that while Manhattan's air quality will improve, New Jersey air quality will deteriorate as traffic and accompanying pollutants shift.

There are several tolling options presented in the EA, and it is unknown which one will be chosen, or whether some other alternative not analyzed in the Final EA will be implemented. Regardless, there will be increased traffic and air quality impacts on overburdened communities in New Jersey. These impacts are significant, and they require both the completion of an EIS and meaningful mitigation.

### E.  *Conclusion*

Underlying the NEPA process is an understanding that an agency can only issue a FONSI if, "after reviewing the direct and indirect effects of a proposed action, it concludes that the action will not have a significant effect on the human environment."[50] To determine whether a project's effects on the environment are significant enough to require an EIS, an agency must consider the context and the intensity of the project.[51]

> Factors affecting the "intensity" of an action include effects "that may be both beneficial and adverse," effects that are "individually insignificant but cumulatively significant," effects on "unique characteristics" of the project area such as "cultural resources" and "ecologically critical areas," the "degree to which the effects . . . are likely to be highly controversial," the "degree to which the possible effects . . . are highly uncertain or involve unique and unknown risks" . . . . The obligation to conduct an EIS can be triggered by an effect on one of those significance factors, but the simple existence of an effect does not trigger that obligation—the "relevant analysis is the *degree* to which the proposed action affects" a listed factor.[52]

The EA process is not instituted because the agency believes that there are no or only minimal impacts at the start; rather, an EA is instituted because the impacts are unknown. If an agency finds that "significant" environmental effects are a likely result of the proposed action, the agency must then prepare the more thorough EIS. The EIS requires the agency to consider all direct, indirect, and cumulative environmental effects of the proposed action, and conduct an alternatives analysis.

Here, the Draft EA disclosed significant impacts to numerous areas outside the CBD, including increased air pollution and environmental justice impacts on New Jersey neighborhoods. Concerns were raised in response to the Draft EA, but there was no meaningful additional outreach to affected agencies or communities, and the Final EA does not address how these impacts would be mitigated or cured.

In short, the Final EA for the CBDTP is flawed. The flaws began with the utter lack of adequate outreach to New Jersey during the scoping process for this novel project, which has not been tried before in a multi-state context. Further, while the Final EA provided seven different tolling scenarios, it failed to identify a preferred tolling scenario that would be the basis for an agency to conduct a thorough review and due diligence. Making matters worse, the Final EA implies that it is unlikely any

---

[50] *WildEarth Guardians v. Conner,* 920 F.3d 1245, 1261 (10th Cir. 2019).

[51] *Ibid.*

[52] *Ibid.,* citing *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs,* 702 F.3d 1156, 1180 (10th Cir. 2012).

of the scenarios presented will be implemented in their entirety.[53] In fact, the amounts of the CBDTP's actual tolls will not be decided until after the FONSI is issued. Without identification of a preferred tolling scenario, it is impossible to understand and evaluate the potential environmental impacts that may flow from implementation of the CBDTP. Further, the Final EA fails to fully consider the unique and serious impacts the CBDTP will have on New Jersey, including impacts to New Jersey's roads, air quality and its environmental justice communities. This failure no doubt contributed to the Final EA's "all or nothing" approach to the required alternatives analysis whereby the only stated alternative to the CBDTP is no project at all.

Further, FHWA has allowed MTA to structure this proceeding in a way that inhibits meaningful comment with appropriate technical data as to the impacts of the CBDTP on New Jersey roads, transit facilities and ridership, the health of vulnerable communities, or affected agency finances. Frankly, without a preferred tolling scenario, the Final EA fails to achieve the purposes for which EAs are required pursuant to NEPA.[54]

The Final EA and its omissions make clear that FHWA should have required the EIS process rather than the more truncated EA process, and the failure to do so harms New Jersey and its residents, communities (including our most disadvantaged), businesses, commuters and agencies.[55]

Given the significant public interest, the Project's novelty, and the errors in the process used here, FHWA must rescind the Draft FONSI and instead require the MTA to undertake an EIS based on MTA's preferred tolling scenario.

Thank you for your review and consideration.

Sincerely,

Philip D. Murphy
Governor

---

[53] *See* Appendix 2E-2, n.1. "The parameters in this table were assumed for modeling purposes . . . . Actual toll rates, potential credits/exemptions, and/or other discounts, and the time of day when the toll rates would apply, would be determined by the TBTA Board after recommendation by the Traffic Mobility Review Board."

[54] *See* 40 C.F.R. § 1501.5(c)(1) (noting that an EA must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact").

[55] Looking ahead, if the CBDTP is implemented despite the lack of proper environmental analysis, the Federal Transit Administration must enter into a discussion concerning current federal funding shares amongst MTA and other transportation agencies in the region. It is imperative that any revenue benefit that flows to MTA be offset by an appropriate sharing of federal funding to ensure that the New Jersey agencies that may suffer revenue loss can be fairly compensated through federal dollars.