# EXHIBIT 2-A

(Final Environmental Assessment available at:
https://new.mta.info/document/110751)

(Volume 6 of 6)

Table 17-4.    Vehicle Access in the Regional Study Area

| GEOGRAPHIC AREAS | TOTAL HOUSEHOLDS | HOUSEHOLDS WITH NO ACCESS TO A VEHICLE | PERCENTAGE OF HOUSEHOLDS WITH NO ACCESS TO A VEHICLE |
|---|---|---|---|
| New York City | 3,167,034 | 1,730,704 | 54.6 |
| Bronx County | 503,829 | 297,663 | 59.1% |
| Kings County (Brooklyn) | 958,567 | 534,368 | 55.8% |
| New York County (Manhattan) | 759,460 | 584,710 | 77.0% |
| Queens County | 778,932 | 286,141 | 36.7% |
| Richmond County (Staten Island) | 166,246 | 27,822 | 16.7% |
| Long Island Counties | 936,278 | 56,401 | 6.0 |
| New York Counties North of New York City | 721,013 | 84,061 | 11.7 |
| New Jersey Counties | 2,558,509 | 314,320 | 12.3 |
| Connecticut Counties | 670,761 | 64,645 | 9.6 |
| TOTAL | 8,053,595 | 2,250,131 | 27.9 |

Source:   U.S. Census Bureau, ACS 2015–2019 5-Year Estimates.
Note:
    Long Island counties include Nassau and Suffolk.
    New York counties north of New York City include Dutchess, Orange, Putnam, Rockland, and Westchester.
    New Jersey counties include Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union, and Warren.
    Connecticut counties include Fairfield and New Haven.

Residents of New York City in particular are most likely to use transit[12] to travel to work in the Manhattan CBD. With a dense network of public transportation options throughout New York City and 24-hour service throughout that network, CTPP data indicate that 88 percent of the New York City residents who travel to the Manhattan CBD for work from outside the Manhattan CBD use public transportation for their commute. All of New York City is within one-half mile of a commuter rail station, subway station, or bus stop except one small area in southern Queens, a gated community called Breezy Point (see **Figure 5A-3 in Subchapter 5A**). Most of New York City is also within one-half mile of the faster public transportation modes available—commuter rail, subway, or Select Bus Service (SBS), New York City's growing bus rapid transit system.[13]

Approximately 440,000 people (or about 5.2 percent of the city's 8.4 million residents) live in areas of New York City that are more than one-half mile from these faster public transportation modes (commuter rail, subway, or express bus or SBS service), and approximately 33,900 of them commute to the Manhattan CBD. Approximately 5,200 (15 percent) of these commuters to the Manhattan CBD travel by car.

[12]    Unless otherwise noted, the terms "public transportation" and "transit" are used interchangeably throughout this chapter.
[13]    One-half mile represents an approximately 10- to 15-minute walk for an average pedestrian, and therefore indicates the availability of these transportation services.

Chapter 17, Environmental Justice

### 17.5.3.3   Minority Commuters to Manhattan CBD from the Regional Study Area

More than half of the population of the regional study area (52 percent) identifies as minority, as shown in **Table 17-2** earlier in this chapter. The percentage of population who identify as minority populations is highest in New York City (68 percent), where all but Richmond County (Staten Island) are more than 50 percent minority and the Bronx (91 percent) and Queens (75 percent) have the highest proportions. In New Jersey, the counties closest to New York City also have populations with more than half identifying as minority (in particular, Essex County, with 70 percent; Hudson County, with 71 percent, Middlesex, with 57 percent; Passaic, with 59 percent; and Union, with 61 percent).

Consequently, many of the people who commute to work in the Manhattan CBD identify as minority. **Table 17-5** provides information on the number of minority commuters to the Manhattan CBD from the different origins in the regional study area. A total of 715,195 of the region's commuters to the Manhattan CBD (47.2 percent) identify as minority populations. Of these commuters, over three-quarters (76.9 percent) are from New York City, 14.5 percent are from New Jersey, 0.8 percent are from Connecticut, and 7.8 percent are from the other New York counties in the study area.

**Table 17-5.**   Origins for All Commuters and Minority Commuters to the Manhattan CBD (All Modes)

| ORIGIN (PLACE OF RESIDENCE) | ALL COMMUTERS | MINORITY COMMUTERS | OF COMMUTERS WHO ARE MINORITY |
|---|---|---|---|
| New York City | 1,074,244 | 549,993 | 51.2 |
| Bronx County | 99,929 | 89,406 | 89.5% |
| Kings County (Brooklyn) | 277,884 | 142,988 | 51.5% |
| New York County (Manhattan) | 454,981 | 163,832 | 36.0% |
| Queens County | 210,661 | 143,214 | 68.0% |
| Richmond County (Staten Island) | 30,789 | 10,553 | 34.3% |
| Long Island Counties | 96,458 | 28,897 | 30.0 |
| New York Counties North of New York City | 89,410 | 26,962 | 30.2 |
| New Jersey Counties | 226,300 | 103,685 | 45.8 |
| Connecticut Counties | 27,697 | 5,658 | 20.4 |
| TOTAL | 1,514,109 | 715,195 | 47.2 |

Source:   U.S. Census Bureau. CTPP, 2012–2016 Estimate. Percentages may not sum to 100 percent due to rounding.
Notes:
1.  Numbers from different tables in the CTPP (e.g., total commuters to the Manhattan CBD) may not be identical due to rounding and different methods of estimating inherent in the CTPP.
2.  Long Island counties include Nassau and Suffolk.
    New York counties north of New York City include Dutchess, Orange, Putnam, Rockland, and Westchester.
    New Jersey counties include Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union, and Warren.
    Connecticut counties include Fairfield and New Haven.

**Table 17-6** provides information on the mode of transportation to work for all workers and for minority workers in the Manhattan CBD. As shown in **Table 17-6**, approximately 10 percent of the minority commuters to the Manhattan CBD, or close to 73,000 people, use cars to make their trip. This is similar to the overall population of all commuters, of whom approximately 10.2 percent use cars.

Table 17-6.    Travel Mode to Manhattan CBD for All Workers and Minority Workers

| COMMUTERS TO MANHATTAN CBD | COMMUTE BY AUTO | COMMUTE BY TRANSIT | COMMUTE BY BICYCLE OR WALK | COMMUTE BY OTHER MODE |
|---|---|---|---|---|
| All workers | 157,852 (10.2%) | 1,213,793 (78.1%) | 128,638 (8.3%) | 53,530 (3.4%) |
| Minority workers | 72,936 (10.0%) | 602,493 (82.4%) | 42,080 (5.8%) | 13,425 (1.8%) |

Source:    U.S. Census Bureau. CTPP, 2012–2016 Estimate. Percentages may not sum to 100 percent due to rounding.
Notes:
1.  Numbers from different tables in the CTPP (e.g., total commuters to the Manhattan CBD) may not be identical due to rounding and different methods of estimating inherent in the CTPP. Total workers shown in this table are those for whom means of transportation is available.
2.  Commute by other mode includes taxicab, motorcycle, other modes, and people who work at home.

Table 17-7 and Figure 17-5 provide more specific information on the origins of minority auto commuters to the Manhattan CBD, based on the CTPP. As shown, more than half of the minority auto commuters come from locations in New York City, including more than 20 percent from Queens. About one-quarter of the minority auto commuters come from locations in New Jersey.

Table 17-7.    Estimated Origins of Minority Auto Commuters to the Manhattan CBD

| ORIGIN (PLACE OF RESIDENCE) | MINORITY AUTO COMMUTERS TO MANHATTAN CBD | PERCENTAGE OF STUDY AREA TOTAL |
|---|---|---|
| New York City | 41,505 | 56.9 |
| Bronx County | 8,125 | 11.1% |
| Kings County (Brooklyn) | 9,528 | 13.1% |
| New York County (Manhattan) | 5,143 | 7.1% |
| Queens County | 16,410 | 22.5% |
| Richmond County (Staten Island) | 2,299 | 3.2% |
| Long Island Counties | 6,740 | 9.2 |
| New York Counties North of New York City | 6,756 | 9.3 |
| New Jersey Counties | 17,070 | 23.4 |
| Connecticut Counties | 864 | 1.2 |
| TOTAL | 72,936 | 100.0 |

Source:    U.S. Census Bureau, CTPP, 2012–2016 Estimate.
Estimates of origins for minority commuters based on analysis by AKRF, Inc. for this EA.
For more information on the methodology for this estimate, see Appendix 17, "Environmental Justice."

Central Business District (CBD) Tolling Program Environmental Assessment
Chapter 17, Environmental Justice

Figure 17-5.    Origins of Minority Auto Commuters to the Manhattan CBD



Source: U.S. Census Bureau, CTPP, 2012–2016 Estimate.
*[Note:    For an audio description, please go to the following link: https://youtu.be/VV6-gf9PuFw.]*

### 17.5.3.4   Low-Income Commuters to Manhattan CBD from the Regional Study Area

About 14 percent of the commuters to the Manhattan CBD (about 219,000 people) are low-income. Most of these low-income commuters (88 percent, or just under 193,000 people) live in New York City, and about 14 percent (close to 32,000 people) live and work within the Manhattan CBD. About 8 percent of the low-income commuters to the Manhattan CBD are from New Jersey, about 2 percent are from Long Island and the New York counties north of New York City, and fewer than 1 percent are from Connecticut (See **Table 17-8**.)

**Table 17-8.    Origins for All Commuters and Low-Income Commuters to the Manhattan CBD (All Modes)**

| ORIGIN (PLACE OF RESIDENCE) | ALL COMMUTERS | LOW-INCOME COMMUTERS | OF COMMUTERS WHO ARE LOW-INCOME |
|---|---|---|---|
| New York City | 1,074,244 | 192,497 | 17.9 |
| Bronx County | 99,929 | 36,718 | 36.7% |
| Kings County (Brooklyn) | 277,884 | 49,910 | 18.0% |
| New York County (Manhattan) | 454,981 | 64,439 | 14.2% |
| Queens County | 210,661 | 38,959 | 18.5% |
| Richmond County (Staten Island) | 30,789 | 2,471 | 8.0% |
| Long Island Counties | 96,458 | 3,773 | 3.9 |
| New York Counties North of New York City | 89,410 | 4,443 | 5.0 |
| New Jersey Counties | 226,300 | 16,830 | 7.4 |
| Connecticut Counties | 27,697 | 980 | 3.5 |
| TOTAL | 1,514,109 | 218,523 | 14.4 |

Source:   U.S. Census Bureau, CTPP, 2012–2016 Estimate. Percentages may not sum to 100 percent due to rounding.
Notes:
1.  Numbers from different tables in the CTPP (e.g., total commuters to the Manhattan CBD) may not be identical due to rounding and different methods of estimating inherent in the CTPP.
2.  Low-income commuters are those with household incomes of less than $50,000.
3.  Long Island counties include Nassau and Suffolk.
    New York counties north of New York City include Dutchess, Orange, Putnam, Rockland, and Westchester.
    New Jersey counties include Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union, and Warren.
    Connecticut counties include Fairfield and New Haven.

A total of 16,100 low-income workers drive to the Manhattan CBD for work, based on the CTPP. The CTPP provides information on income level and mode by commuters' origin, but only at the county level. However, information on commuting patterns to Manhattan overall help to understand where low-income drivers to the Manhattan CBD live. As shown in **Table 17-9**, about 72 percent of the low-income commuters who drive to Manhattan for work come from locations within New York City, and the largest share comes from Queens, followed by Brooklyn and the Bronx. About 14 percent of the low-income drivers come from New Jersey.

Chapter 17: Environmental Justice

Table 17-9.    Travel Modes for Low-Income Commuters to Manhattan Overall by Origin

| ORIGIN (PLACE OF RESIDENCE) | ALL LOW-INCOME COMMUTERS | LOW-INCOME COMMUTERS BY TRANSIT | LOW-INCOME COMMUTERS BY AUTO | OF ALL LOW-INCOME COMMUTERS BY AUTO |
|---|---|---|---|---|
| New York City | 401,220 | 319,400 | 28,485 | 72 |
| Bronx County | 81,005 | 73,210 | 6,200 | 16% |
| Kings County (Brooklyn) | 93,785 | 85,685 | 6,280 | 16% |
| New York County (Manhattan) | 137,510 | 83,965 | 5,300 | 13% |
| Queens County | 83,335 | 72,215 | 9,580 | 24% |
| Richmond County (Staten Island) | 5,585 | 4,325 | 1,125 | 3% |
| Long Island Counties | 7,375 | 4,690 | 2,520 | 6 |
| New York Counties North of New York City | 8,247 | 5,245 | 2,880 | 7 |
| New Jersey Counties | 27,328 | 21,465 | 5,406 | 14 |
| Connecticut Counties | 1,705 | 1,215 | 480 | 1 |
| TOTAL | 445,875 | 352,015 | 39,771 | 100 |

Source:   U.S. Census Bureau, CTPP, 2012–2016 Estimate.
Notes:
1.  Auto commuters include those who drive alone and those who carpool.
2.  Low-income commuters are those with household incomes of less than $50,000.
3.  Long Island counties include Nassau and Suffolk.
     New York counties north of New York City include Dutchess, Orange, Putnam, Rockland, and Westchester.
     New Jersey counties include Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic,
     Somerset, Sussex, Union, and Warren.
     Connecticut counties include Fairfield and New Haven.

### 17.5.3.5   Businesses Dependent on Vehicles: Taxi and For-Hire Vehicles

The analysis presented in **Chapter 6, "Economic Conditions,"** examines the effects of the Project on various vehicle-dependent industries and concludes that the implementation of a new toll with the CBD Tolling Alternative would not result in adverse effects on businesses in the Manhattan CBD because of the introduction of a new toll.

Tolling scenarios included in the CBD Tolling Alternative include a range of treatments of taxis and FHV trips. Some scenarios exempt taxi and FHV trips from the charge entirely, some include discounts in the form of caps on the number of trips that would be subject to the charge, some charge taxi and FHV trips once per day, and others charge them for every trip entering or remaining in the Manhattan CBD. Scenarios that charge every taxi and FHV trip would lead to higher overall prices paid by customers for these trips. While the CBD Tolling Alternative would not result in an adverse economic impact on the taxi and FHV industry overall, it could reduce employment of taxi and FHV drivers in some tolling scenarios. **Section 17.6.2.2** later in this chapter describes the potential adverse effect on these drivers in more detail. This section presents information about the population characteristics of those drivers, based on available information from the New York City Taxi and Limousine Commission (TLC), which grants licenses for taxi cabs and FHVs in the city.

Taxis include yellow cabs (which are authorized to operate throughout New York City) and green cabs (which are authorized to pick up passengers by street-hail outside of the core service area of Manhattan).

Street-hail livery cabs can accept trips in Manhattan north of East 96th Street and West 110th Street, and in any location in the boroughs outside of Manhattan. FHVs include "traditional" FHVs, which are pre-arranged trips via black cars, liveries, and luxury limousine dispatched from a base that handles fewer than 10,000 trips each day, and "high-volume" for-hire services, which are pre-arranged trips dispatched from a base that handles more than 10,000 trips each day. The high-volume FHV category includes Lyft and Uber.

The TLC provides data for both licensed vehicles and drivers (those who are currently in good standing with TLC's licensing division) and active vehicles and drivers (those who provided at least one trip in a given time period). According to the TLC's 2020 Fact Book, in 2019 there were 13,587 yellow cabs, 2,895 green cabs, and 101,663 FHVs licensed by the TLC.[14] In 2019 the TLC licensed more than 118,000 vehicles and nearly 185,000 drivers in total. The number of active vehicles differs from the number of licensed vehicles, because not every licensed vehicle is actively in use during a given time period. In April 2022, there were 7,053 yellow cabs, 1,027 green cabs, and 70,281 FHVs that made at least one trip.

Data from the TLC indicates that approximately 96 percent of yellow and green cab drivers and 91 percent of FHV drivers were born in countries other than the United States. Based on this data, more than half the taxi or FHV drivers are from countries in Asia, Africa, and the Caribbean that have high percentages of populations that would be considered minority populations for this analysis.[15] **Table 17-10** lists the countries of birth for taxi and FHV drivers according to the 2020 TLC Fact Book. Because no more specific data on the racial and ethnic characteristics of these drivers is available, for this analysis, all taxi and FHV drivers are identified as a minority population.

---

[14]   The New York City TLC's 2020 Fact Book defines paratransit vehicles as vehicles that provide pre-arranged service for medical-related purposes. Trips are usually to or from healthcare facilities and vehicles must be dispatched by a paratransit base. These do not include ADA-accessible yellow cabs.

[15]   New York City TLC. 2020 Fact Book. https://www1.nyc.gov/assets/tlc/downloads/pdf/2020-tlc-factbook.pdf.

Chapter 17, Environmental Justice

Table 17-10.   Country of Birth for Taxi and FHV Drivers, 2018–2019

| COUNTRY OF ORIGIN | YELLOW CAB | GREEN CAB | TRADITIONAL FHV | HIGH VOLUME FHV |
|---|---|---|---|---|
| Bangladesh | 23% | 23% | 4% | 9% |
| China | – | – | 5% | 3% |
| C te d'Ivoire | – | 2% | – | – |
| Dominican Republic | 2% | 12% | 31% | 14% |
| Ecuador | – | 3% | 6% | – |
| Egypt | 4% | 3% | 2% | 3% |
| Ghana | 4% | – | – | – |
| Guinea | – | 3% | | |
| Haiti | 6% | 3% | 3% | 3% |
| India | 8% | 8% | 4% | 5% |
| Morocco | 3% | – | – | – |
| Nepal | – | – | – | 3% |
| Pakistan | 9% | 12% | 6% | 9% |
| Senegal | 2% | – | – | – |
| United States | 4% | 3% | 8% | 9% |
| Uzbekistan | – | – | 3% | 3% |
| TOTAL REPORTED | 65 | 72 | 69 | 58 |
| OTHER ORIGINS NOT REPORTED | 35 | 28 | 31 | 42 |

Source:   New York City TLC. 2020 Fact Book. https://www1.nyc.gov/assets/tlc/downloads/pdf/2020-tlc-factbook.pdf.
Note:   Data are as presented in the 2020 Fact Book. Information on country of birth for other drivers of each type is not available.

## 17.6    POTENTIAL ADVERSE EFFECTS ON ENVIRONMENTAL JUSTICE POPULATIONS

This section provides an analysis of the issues identified as warranting further investigation, based on the information in previous chapters of this EA and the concerns related to environmental justice raised during public outreach (see Table 17-*[17]* for a summary of the effects for each tolling scenario *[and Table 17-18 for a summary of how mitigation and enhancement measures will be implemented by the Project Sponsors]*). This analysis considers whether potential adverse effects would occur to minority and/or low-income populations, given the context specific to those populations, even when no adverse effects would occur to the general population.

Consideration of whether effects would be adverse includes consideration of any measures to avoid, minimize, or mitigate potentially adverse effects.

### 17.6.1    Potential Adverse Effects in the Local Study Area

As noted earlier in this chapter, most of the effects of the CBD Tolling Alternative on environmental justice populations would be local effects. This section of the chapter evaluates each of those local effects to identify whether potential adverse effects on environmental justice populations would occur. The discussion includes the following topics, based on the issues identified in other chapters of this EA and as a result of environmental justice outreach for the Project:

- Increased traffic congestion on highway segments (**Section 17.6.1.1**)
- Changes in traffic conditions at local intersections (**Section 17.6.1.2**)
- Traffic-related effects on air quality (**Section 17.6.1.3**)
- Traffic-related effects on noise (**Section 17.6.1.4**)
- Increases to transit ridership (**Section 17.6.1.5**)
- Changes in passenger flows at transit stations (**Section 17.6.1.6**)
- Changes in pedestrian circulation on sidewalks near transit hubs (**Section 17.6.1.7**)
- Potential for indirect displacement (**Section 17.6.1.8**)
- *[Potential effects on the costs of goods (Section 17.6.1.9)]*

### 17.6.1.1    Increased Traffic Congestion on Highway Segments

During the targeted environmental justice public outreach for the Project in fall 2021, some commenters voiced concerns about the potential for increases in traffic on regional highways and how that might affect nearby environmental justice neighborhoods. This section describes the Project's potential effects on traffic operations on highways in and around the Manhattan CBD. **Section 17.6.1.3** presents the potential air quality effects of these traffic changes and **Section 17.6.1.4** describes the conclusions of the noise analysis.

In response to comments during the fall 2021 outreach, the traffic analyses for the EA were expanded to include additional locations in environmental justice neighborhoods where concerns were raised and more detailed evaluation of changes in truck volumes on highways and local roadways. In addition, the Project Sponsors added a tolling scenario for analysis throughout the EA, Tolling Scenario G, to evaluate opportunities for reducing truck diversions that would result from the CBD Tolling Alternative.

As described in **Subchapter 4B, "Transportation: Highways and Local Intersections,"** detailed modeling was conducted for 10 highway segments near the Manhattan CBD that provide access to the Manhattan CBD or are circumferential routes around the Manhattan CBD that drivers could use to avoid the toll. These are the locations most likely to experience an increase in traffic due to a shift in traffic from currently toll-free facilities to currently tolled facilities and diversion of through Manhattan CBD traffic to circumferential routes. Several of these highway corridors were raised as a concern during early public outreach for the Project, given their proximity to neighborhoods with environmental justice populations.

The analysis presented in **Subchapter 4B, "Transportation: Highways and Local Intersections,"** concludes that with implementation of the CBD Tolling Alternative, traffic patterns would shift throughout the study area because of drivers who divert to avoid the new toll. The level of diversions would depend on the toll value and potential crossing credits or exemptions.

Tolling Scenario D—with the highest crossing credits, exemptions, and discounts—was determined to be representative of the tolling scenarios with the highest potential for diversions and increases in traffic at certain Manhattan CBD crossings, Manhattan CBD highway approaches, intersections within and outside of the Manhattan CBD, and circumferential routes bypassing the Manhattan CBD. Based on the results of the modeling, Tolling Scenario D would result in increased traffic congestion on 8 of those 10 highway segments, resulting in increased delays and queues in peak hours. The effects of Tolling Scenarios E and F would be similar. The projected increases in delays are discussed further in **Subchapter 4B, "Transportation:**

---

**Highways and Local Intersections."** On 3 of the 10 segments analyzed in detail, the increases in delay and queue length due to the Project would constitute adverse effects on traffic conditions according to New York State's State Environmental Quality Review Act (SEQRA) impact criteria, as follows:

- Approaches to westbound George Washington Bridge on the Trans-Manhattan Expressway (I-95) between the Harlem River and the bridge during the midday peak hour
- The westbound Long Island Expressway (I-495) near the Queens-Midtown Tunnel during the midday peak hours
- The southbound and northbound Franklin D. Roosevelt (FDR) Drive between East 10th Street and the Brooklyn Bridge during the PM peak hour

With implementation of the CBD Tolling Alternative, a robust post-implementation traffic monitoring program will be implemented to identify and quantify actual traffic effects associated with the adopted tolling scenario and to inform the development of appropriate mitigation measures, if needed, including Intelligent Transportation Systems (ITS) measures, signing, motorist information, and targeted toll policy modifications. Depending on the tolling program implemented, it is possible that some residual traffic effects along certain highway segments may remain. However, given the relatively few locations where there is a potential for adverse traffic effects along highways leading to and from the Manhattan CBD and circumferential highways, the offsetting reductions in traffic volumes and improvements in travel times along routes from which traffic would divert, and the overall Project benefits in the Manhattan CBD and regionally due to a reduction in vehicular travel, the Project when viewed holistically would not have an adverse effect on traffic. **Subchapter 4B, "Transportation: Highways and Local Intersections,"** provides more specific information on the adverse effects and proposed mitigation.

All 10 highway segments analyzed in detail for this EA are within or adjacent to environmental justice census tracts. As shown in **Figure 17-3**, much of the area around the Manhattan CBD consists of neighborhoods with environmental justice census tracts. However, as major regional highways, these highway segments predominantly serve regional and interstate traffic rather than local traffic.

### 17.6.1.2   Changes in Traffic Conditions at Local Intersections

**Subchapter 4B, "Transportation: Highways and Local Intersections,"** presents the results of a detailed analysis of traffic conditions in and near the Manhattan CBD. To evaluate the potential localized traffic effects of the Project, multiple study areas were defined based on the key entry points to the Manhattan CBD, including along the 60th Street Manhattan CBD boundary and on either side of the bridges and tunnels that provide access to and from the Manhattan CBD. These local study areas are the intersections most likely to have increases in traffic, based on the regional transportation modeling for the Project. A total of 102 intersections were evaluated (see **Figure 17-6**).

Many of these intersections were identified through the public outreach process to reflect locations where communities expressed concerns regarding the Project's potential to affect traffic conditions there. Of these 102 intersections, almost half are in environmental justice neighborhoods, reflecting the concerns that were expressed during public outreach.

Central Business District Tolling Program Environmental Assessment
Chapter 17, Environmental Justice

Figure 17-6.   Local Traffic Analysis Intersections Relative to Environmental Justice Neighborhoods



Source: U.S. Census Bureau, ACS 2015–2019 5-Year Estimates.
*[Note:   For an audio description, please go to the following link: https://youtu.be/bS9QUwdbo-Y.]*

The traffic analysis concluded that shifts in traffic patterns would change conditions at some local intersections within and near the Manhattan CBD. Of the 102 intersections analyzed (with more than 363 analyses in multiple peak hours), most intersections would have reductions in delay under all tolling scenarios. The detailed evaluation conducted for the tolling scenarios with the greatest change in traffic volumes showed that those tolling scenarios (Tolling Scenarios D, E, and F) would result in increases in average delays at four intersections that would exceed the impact threshold established for SEQRA evaluations. These delays will be mitigated through the use of signal-timing adjustments and, therefore, there would not be an adverse traffic effect at any intersection. **Subchapter 4B, "Transportation: Highways and Local Intersections,"** provides more information on the proposed mitigation at each potentially affected location.

Consequently, the changes in traffic conditions at local intersections would not result in adverse effects on environmental justice populations.

### 17.6.1.3    Traffic-Related Effects on Air Quality

During early public outreach for the Project, participants in the environmental justice outreach sessions raised concerns that the CBD Tolling Alternative would divert traffic to circumferential highways around the Manhattan CBD and that these additional vehicles would adversely affect the nearby neighborhoods by degrading air quality. Other participants were concerned that changes in traffic at local intersections, including on the Lower East Side in the Manhattan CBD and in the South Bronx outside the Manhattan CBD, would adversely affect air quality nearby.

Air pollution is a concern because of its associated adverse effects on human health. This is a particular concern for environmental justice populations, who often live in areas already considered overburdened by pollution. Exhaust from trucks, which has a higher level of particulate matter (PM) than automobile exhaust, and has been associated with adverse health effects like cardiovascular and respiratory diseases, is a particular concern for many environmental justice populations (for more information on health effects of air pollutants, see **Appendix 10, "Air Quality"**). Members of the Environmental Justice Technical Advisory Group for the Project requested additional information on the Project's potential to increase the number of trucks on highways outside the Manhattan CBD, especially on the Cross Bronx Expressway in the South Bronx.

**Chapter 10, "Air Quality,"** of this EA presents the results of the evaluation conducted of the Project's potential effects on air quality. The analysis included consideration of highway segments throughout the region and local intersections where traffic would be most likely to change as a result of the Project. In response to specific environmental justice concerns identified above, the Project Sponsors included locations on the Lower East Side, in the South Bronx, and at other locations in environmental justice neighborhoods in and near the Manhattan CBD.

The air quality analysis included evaluation of the following types of air pollutants (for more information, see **Chapter 10, "Air Quality"**):

- Pollutants regulated by the National Ambient Air Quality Standards (NAAQS): Referred to as "criteria" pollutants, these include carbon monoxide (CO); nitrogen dioxide ($NO_2$); ozone ($O_3$); PM regulated in two sizes, 2.5 microns and 10 microns ($PM_{2.5}$ and $PM_{10}$); sulfur dioxide ($SO_2$); and lead (Pb).
- Mobile source air toxics (MSAT): These are air pollutants associated with vehicular traffic that are hazardous to human health and are also regulated by the U.S. Environmental Protection Agency (EPA).

## Effects of the Project on Regional Air Quality

The regional analysis focused on 12 counties in New York and New Jersey. Emissions estimates were based on predicted changes in VMT, speed, and vehicle mix since the interaction of these factors affects the relative decreases and increases in each county. Some counties are predicted to show increases in pollutant emissions, while others would have decreases, as shown in **Table 17-11** (for more information, see **Chapter 10, "Air Quality"**).

## Effects of the Project on Local, Neighborhood Air Quality

The analysis of the Project's potential effect on local air quality near roadways where traffic would increase considered all 102 intersections for which traffic analyses were conducted as presented in **Subchapter 4B, "Transportation: Highways and Local Intersections"** (Figure 17-6). Those intersections are the locations most likely to experience increases in traffic, based on the regional transportation modeling for the Project. Of these 102 intersections, approximately half are in environmental justice neighborhoods, reflecting the concerns that were expressed during public outreach.

Based on the air quality analyses conducted, the level of potential change in CO and $PM_{2.5}/PM_{10}$ at all 102 intersections would not result in adverse effects on local air quality, based on evaluation criteria developed by NYSDOT. All locations passed the screening criteria used to identify the potential for adverse effects requiring further evaluation.

## Effects of the Project on Highway Traffic Related to Diversions

To address specific concerns related to truck diversions raised during environmental justice public outreach, the air quality analysis also included specific consideration of the potential truck diversions that could occur as a result of the CBD Tolling Alternative. In addition, the Project Sponsors also evaluated a segment of the FDR Drive near the Lower East Side in Manhattan because of the potential for notable traffic diversions there. Truck traffic is not permitted on the FDR Drive, so this analysis considered the effects of automobile traffic only.

Chapter 17, Environmental Justice

Table 17-11.   Summary of Effects of CBD Tolling Alternative on Air Pollutants at the County Level

| GEOGRAPHY | CRITERIA POLLUTANTS (2023) | CRITERIA POLLUTANTS (2045) | MSATs (2023) | MSATs (2045) |
|---|---|---|---|---|
| Manhattan CBD | Decreases of all pollutants | Decreases of all pollutants | Decreases in all MSATs | Decreases in all MSATs |
| New York County (Manhattan) | Decreases of all pollutants | Decreases of all pollutants | Decreases in all MSATs | Decreases in all MSATs |
| Bronx County | Increases of all pollutants | Decreases of some pollutants; increases of other pollutants | Increases in all MSATs | Decreases of some MSATs; increases of others |
| Kings County (Brooklyn) | Decreases of all pollutants | Decreases of all pollutants | Decreases in all MSATs | Decreases in all MSATs |
| Queens County | Decreases of all pollutants | Decreases of all pollutants | Decreases in all MSATs | Decreases in all MSATs |
| Richmond County (Staten Island) | Increases of all pollutants | Increases of all pollutants | Increases in all MSATs | Increases in all MSATs |
| Bergen County | Increases of all pollutants | Increases of all pollutants | Increases in all MSATs | Increases in all MSATs |
| Hudson County | Decreases of all pollutants | Decreases of all pollutants | Decreases in all MSATs | Decreases in all MSATs |
| Nassau County | Increases of all pollutants | Decreases of some pollutants; increases of other pollutants | Increases in all MSATs | Decreases of some MSATs; increases of others |
| Putnam County | Decreases of some pollutants; increases of other pollutants | Decreases of some pollutants; increases of other pollutants | Increases in all MSATs | Decreases in all MSATs |
| Rockland County | Decreases of all pollutants | Decreases of some pollutants; increases of other pollutants | Decreases in all MSATs | Decreases of some MSATs; increases of others |
| Suffolk County | Decreases of some pollutants; increases of other pollutants | Decreases of all pollutants | Increases in all MSATs | Decreases in all MSATs |
| Westchester County | Decreases of some pollutants; increases of other pollutants | Decreases of some pollutants; increases of other pollutants | Decreases in all MSATs | Decreases of some MSATs; increases of others |

The Project Sponsors also developed and evaluated a modified tolling scenario, Tolling Scenario G, following completion of a preliminary analysis of Tolling Scenarios A through F, specifically in response to concerns about truck diversions. Scenario G was developed as a potential modification to the Base Plan (Tolling Scenario A) that would reduce the number of trucks that would divert around the Manhattan CBD. This modification, Tolling Scenario G, has lower toll rates for trucks than the other tolling scenarios (see Chapter 2, "Project Alternatives," Section 2.4.2.4 for more information).

Traffic modeling for the Project indicates that the CBD Tolling Alternative would result in some traffic diversions around Manhattan, into the Bronx and northern New Jersey and Staten Island in all tolling scenarios. These circumferential diversions are due to implementation of the tolling in the Manhattan CBD, as drivers and trucks traveling to and from Long Island and Pennsylvania would divert around Manhattan

to avoid the tolling in the Manhattan CBD. These diversions would be most pronounced at the approach to the Robert F. Kennedy Bridge in Queens, across the South Bronx and the George Washington Bridge, and into northern New Jersey. Diversions to the south would occur across the Verrazzano-Narrows Bridge and through Staten Island. Diversions would be greatest in Tolling Scenarios D, E, and F, and smallest in Tolling Scenario G.

To address concerns related to the potential effects on local air quality from those traffic diversions, the Project Sponsors conducted additional, more detailed analyses for four highway segments near environmental justice neighborhoods. These segments were selected based on the potential increases in diesel-truck traffic that might occur due to the Project, community concern, and/or existing high volumes of Annual Average Daily Traffic. The following locations were evaluated:

- FDR Drive at 10th Street, Manhattan, New York
- I-95 west of the George Washington Bridge, Fort Lee, New Jersey
- Cross Bronx Expressway (I-95) at Macombs Road, Bronx, New York
- Robert F. Kennedy Bridge approach, Queens, New York

For the FDR Drive, where Project-related changes would be related to automobiles and no trucks are permitted, the Project Sponsors conducted additional evaluation of the potential Project-related effects on CO. For the three other highway segments, because of the concern about increases in truck traffic, the Project team conducted detailed microscale PM analyses at these locations. The analyses for all four highway segments concluded that the CBD Tolling Alternative would not result in adverse effects on air quality at any of those locations. **Chapter 10, "Air Quality,"** provides more information on these analyses.

## Changes in Traffic Volumes and VMT in Environmental Justice Neighborhoods

The air quality analyses presented in **Chapter 10** conclude that no adverse effects to air quality would occur at local intersections or along highway segments due to the CBD Tolling Alternative in any of the tolling scenarios. This section compares the changes in traffic volumes, and particularly VMT, that would occur in environmental justice neighborhoods to those that would occur in non-environmental justice neighborhoods. **Subchapter 4A, "Transportation: Regional Transportation Effects and Modeling,"** provides more detailed information on where increases and decreases in traffic volumes would occur due to diversions, as well as a comparison of Project-related changes in VMT in environmental justice communities vs. non-environmental justice communities.

Tolling Scenarios A, B, C, and G, with the lowest level of discounts, exemptions, and/or crossing credits, would reduce the overall traffic volumes entering and leaving the Manhattan CBD with the least potential effect on travel patterns and diversions. However, VMT would increase slightly in Staten Island and the Bronx due to drivers to and from New Jersey diverting around the Manhattan CBD to avoid paying the CBD toll. Tolling Scenarios D, E, and F, with higher discounts, exemptions and/or crossing credits would create the highest overall reduction in traffic entering and leaving the Manhattan CBD, but with higher potential changes in travel patterns and diversions to several highways.

*[Decreases and]* increases in traffic volumes due to diversions would occur near some environmental justice communities, depending on the tolling scenario. The environmental justice communities experiencing the largest increases in traffic volumes, including trucks, from circumferential diversions would be along I-95 in northern New Jersey and in Queens at the approach to the Robert F. Kennedy Bridge. Environmental justice communities experiencing the largest decreases in traffic volumes, including trucks, would be along the Long Island Expressway (I-495) in Queens, Hell's Kitchen in Manhattan (near the Lincoln Tunnel), and in areas of New Jersey south of the Lincoln Tunnel. Decreases would result primarily from traffic no longer traveling from Long Island through the Queens-Midtown Tunnel, across the Manhattan CBD, and through the Lincoln Tunnel into New Jersey. As shown in **Subchapter 4A**:

- Within New York City, non-environmental justice areas would have slightly higher reductions in VMT in most tolling scenarios compared to environmental justice areas.

- Within the Manhattan CBD, environmental justice areas would have substantially higher reductions in VMT for all tolling scenarios compared to non-environmental justice areas.

- Within New York City areas outside the Manhattan CBD closest to the Manhattan CBD crossings (i.e., near 60th Street; the Brooklyn, Manhattan, Williamsburg, and Ed Koch Queensboro Bridge, and the Queens-Midtown Tunnel), environmental justice areas would have slightly lower reductions in VMT compared to non-environmental justice areas for Tolling Scenarios A, B, and G (tolling scenarios without crossing credits) and slightly higher reductions in VMT compared to non-environmental justice areas for Tolling Scenarios C, D, E, and F (tolling scenarios with crossing credits).

- Within areas of New York City outside but relatively close to the Manhattan CBD (i.e., the Upper East Side, Upper West Side, East Harlem, and western portions of Queens and Brooklyn), environmental justice areas would experience similar but slightly lower reductions in VMT compared to non-environmental justice areas.

- Within other areas of New York City outside the Manhattan CBD, environmental justice areas would experience slight reductions in VMT, while non-environmental justice areas would experience increases in VMT.

- Outside New York City in other New York counties north of New York City, environmental justice areas would experience slightly higher reductions in VMT compared to non-environmental justice areas for Tolling Scenarios C, D, E, and F.

- In New Jersey and Long Island counties, environmental justice areas would experience similar or deeper reductions in VMT compared to non-environmental justice areas for all tolling scenarios.

**Figure 17-7, Figure 17-8, and Figure 17-9** illustrate the predicted changes in VMT for Tolling Scenarios A, D, and G relative to the location of environmental justice census tracts. Those three tolling scenarios represent the range of changes that would occur in all tolling scenarios evaluated.

Chapter 17, Environmental Justice

Figure 17-7.    Predicted Changes in Vehicle-Miles Traveled in Tolling Scenario A Relative to Environmental Justice Neighborhoods



Source: WSP, Best Practice Model, 2021.
*[Note:    For an audio description, please go to the following link: https://youtu.be/B9CoB4C_rJQ.]*

Chapter 17, Environmental Justice

Figure 17-8.   Predicted Changes in Vehicle-Miles Traveled in Tolling Scenario D Relative to Environmental Justice Neighborhoods



Source: WSP, Best Practice Model, 2021.
*[Note:   For an audio description, please go to the following link: https://youtu.be/vZHcX33DB6c.]*

Chapter 17, Environmental Justice

Figure 17-9.   Predicted Changes in Vehicle-Miles Traveled in Tolling Scenario G Relative to Environmental Justice Neighborhoods



Source: WSP, Best Practice Model, 2021.
[Note:    For an audio description, please go to the following link: https://youtu.be/sxDWQaXx8Xw.]

Chapter 17, Environmental Justice

During the public outreach phase of the Project, several commenters raised questions about the type and location of diversions in the Bronx, and particularly on the Cross Bronx Expressway, the Bruckner Expressway, and the Major Deegan Expressway. Additional analysis was conducted to address these questions and is described in **Subchapter 4A, "Transportation: Regional Transportation Effects and Modeling."** As described there, increases in VMT in the Bronx would be driven largely by increases in VMT on the Cross Bronx Expressway between the Alexander Hamilton Bridge and the two Long Island Sound crossings (Whitestone and Throgs Neck Bridges). Personal vehicle VMT would comprise most of the VMT increases on the Cross Bronx Expressway, with commercial truck VMT contributing roughly 25 percent of the overall VMT increase in all tolling scenarios. This increase in truck VMT would equate to up to 7 additional trucks during the 4-hour AM period, 40 additional trucks during the 6-hour midday period, and 10 additional trucks during the 4-hour PM period.

In addition, as noted earlier, following completion of preliminary analysis of Tolling Scenarios A through F, and in response to concerns raised during environmental justice outreach for the Project, the Project Sponsors identified a potential modification to the Base Plan (Tolling Scenario A) that would reduce the number of trucks that would divert around the Manhattan CBD, particularly those diverting to the South Bronx and Staten Island. This modification, Tolling Scenario G, would apply the same toll rates to all vehicle classes instead of charging higher rates small and large trucks and buses. As with Tolling Scenario A, there would be no crossing credits in Tolling Scenario G, and taxis, FHVs, buses, and small or large trucks would pay the Manhattan CBD toll each time they access the Manhattan CBD. Tolling Scenario G would substantially reduce the diversion of trucks from the Manhattan CBD, resulting in a total daily increase in truck traffic on the Cross Bronx Expressway at Macombs Dam Road of 50 trucks (as compared to 704 for Tolling Scenario B and 536 for Tolling Scenario F, the two tolling scenarios with the highest truck diversions).

---

### MTA Actions to Improve Air Quality

As an independent action, MTA is currently transitioning its fleet to zero-emission buses, which will reduce air pollutants and improve air quality near bus depots and along bus routes. TBTA coordinated with MTA NYCT, which is committed to prioritizing service to traditionally underserved communities and particularly for areas with concerns related to air quality and climate change, and has developed a new an approach that actively incorporates these priorities in the deployment phasing process of the bus-fleet transition. Based on feedback and concerns raised during public outreach for the Project related to environmental justice, MTA NYCT will prioritize transitioning the fleet at two bus depots in Upper Manhattan and the Bronx: the Kingsbridge Depot and Gun Hill Depot[ with] MTA NYCT[ s] next major procurement of battery electric buses[ which began in late] 2022. Both of these depots are in and provide service to environmental justice neighborhoods.

---

*[Additional Analysis of Project Effects of Traffic and Truck Traffic on Communities with Associated Pre-Existing Air Pollutant and Health Burdens*

*Based on the comments received during the public comment period after the August 2022 release of the EA, and on input from the Environmental Justice Technical Advisory Group, the Project Sponsors conducted*

an additional assessment of the Project effects on traffic proximate to environmental justice communities and resulting emissions and potential associated health effects. The analysis, presented in Appendix 17D, "Technical Memorandum," describes how and why traffic, and particularly truck traffic, contributes to pollutant burdens and the association between these burdens and health outcomes.

New York City's air quality has been improving in many ways since 1990; indeed, the city has experienced substantial declines in the annual average of USEPA's criteria pollutants since 1990.[16] Nevertheless, the impacts of the region's history of land-use and transportation development is still felt by residents living near roadway traffic. Further, the people of the 10-county local study region—whether they live in communities designated as environmental justice communities or in other communities—are burdened with high levels of air toxics cancer risk, air toxics respiratory hazards risk, and diesel particulate matter levels, when compared to the rest of the United States.

Appendix 17D, "Technical Memorandum," includes an overview of how the 10-county local study area developed and how past land use and development patterns, together with pre-existing traffic proximity, have contributed to pre-existing pollutant and chronic disease burdens that affect environmental justice populations in the study area. The analysis considers changes in traffic that would occur as a result of the CBD Tolling Alternative, and where these changes would occur relative to environmental justice populations that already have high levels, compared to national norms, of pre-existing pollutant or chronic disease burdens. It identifies locations where the CBD Tolling Alternative would reduce traffic, thereby having a positive effect on existing conditions, as well as where it could increase traffic, thus potentially adding to pre-existing burdens on potentially vulnerable communities. Based on this new analysis, the Project Sponsors have committed to a package of mitigation measures to address potential traffic diversions and associated pollutant emissions or health effects resulting from the Project, to avoid a disproportionately high and adverse effect on environmental justice populations (Section 17.7).

To identify and describe the burdens experienced by environmental justice communities with pre-existing pollutants or chronic diseases, the analysis relies on data from a number of sources, including USEPA, the Council on Environmental Quality, the Centers for Disease Control (CDC), New York State Department of Health, New York City Department of Health and Mental Hygiene, New Jersey Department of Health, and New Jersey Department of Environmental Protection. The analysis identifies those census tracts in the 10-county local study area where pre-existing/cumulative pollutant burdens are at or above the 80th percentile for the United States or existing health burdens are above the 66.66th percentile for the United States. Figure 17-10 illustrates these locations; more detail can be found in Appendix 17D, "Technical Memorandum."

---

[16] USEPA, OAR. 2022. "Air Quality - Cities and Counties | US EPA." USEPA. June 1, 2022. https://www.epa.gov/air-trends/air-quality-cities-and-counties.]

Chapter 17, Environmental Justice

*[Figure 17-10. Environmental Justice Designated Census Tracts with Pre-Existing Pollutant or Chronic Disease Burdens above the 80th or 66.66th National Percentile, Respectively]*



Combined Number of Pre-Existing Chronic Disease Burdens At or Above the 66.66th Percentile or Number of Pre-Existing Pollutant Burdens At or Above the 80th Percentile

- 1 - 2
- 3 - 4
- 5 - 6
- 7 - 8

Source:   USEPA EJScreen 2021 data. EJI 2022.

*Based on prior analysis regarding truck traffic diversions in the EA and additional analysis regarding the magnitude of effects experienced by populations living near highways (both of which are detailed in Appendix 17D, "Technical Memorandum"), Figure 17-11 denotes the locations experiencing pre-existing pollutants or chronic disease at the 80th and 66.66th percentiles, respectively, where truck traffic would either decrease or increase as a result of the Project.*

*[Figure 17-11. Environmental Justice Census Tracts with Either Pre-Existing Pollutant Indicators At or Above the 80th Percentile or Pre-Existing Chronic-Disease Indicators At or Above the 66.66th Percentile That Could Experience Truck Traffic Increases or Decreases (Tolling Scenario E)]*



Source:   CDC PLACES Estimates 2020 via EJI 2022 data; BPM.

There are 434 census tracts in the 10-county local study area within 300 meters of a highway. All of the 434 census tracts within 300 meters of a highway—both those that are environmental justice communities and those that are not—have at least one pollutant burden at or above the 80th national percentile or at least one chronic-disease burden above the 66.66th percentile, including the 284 census tracts that could experience decreases or increases in truck traffic proximity under Tolling Scenario E. As summarized in Table 17-12, the proportion of environmental justice census tracts within 300 meters of a highway (71.7 percent) relative to the total of all census tracts within that distance mirrors the overall proportion of environmental justice census tracts in the 10-county local study area as a whole relative to the total number of census tracts (70.6 percent).

*[Table 17-12.  Summary of Project Effects on Truck Traffic Proximity (Tolling Scenario E)]*

| DIRECTION OF HIGHWAY TRUC   TRAFFIC PROXIMITY CHANGES | NUMBER OF TRACTS WITH PRE-EXISTING AIR POLLUTANT OR CHRONIC DISEASE BURDENS WITHIN 300 METERS OF A HIGHWAY | | | OF COMMUNITY TYPE AFFECTED | |
|---|---|---|---|---|---|
| | Non-Environmental Justice | Environmental Justice | Total | Non-Environmental Justice | Environmental Justice |
| Decrease | 23 | 56 | 79 | 19% | 18% |
| No Change | 49 | 101 | 150 | 40% | 32% |
| Increase | 51 | 154 | 205 | 41% | 50% |
| TOTAL | 123 | 311 | 434 | | |

*Increases in truck traffic in currently overburdened environmental justice communities, relative to national percentiles, would constitute an adverse effect. The effects would vary in magnitude depending on the additional volume of truck traffic and the extent of pre-existing pollutant and chronic disease burdens.*

*To identify locations for mitigation to address Project effects, the Project Sponsors determined that it would be appropriate to follow the Council on Environmental Quality's Climate and Economic Justice Screening Tool's (CEJST) methodology for identifying communities in the 10-county local study area that are at or above the 90th percentile for either pre-existing pollutant or chronic disease burdens, and which may also experience increases in truck traffic proximity as a result of the Project. Due to the nature of this region and the distribution of both environmental justice census tracts and the level of pre-existing burdens, the environmental justice census tracts with either pre-existing pollutant or chronic disease indicators that could experience truck traffic increases are the same whether applying the 80th and 66.66th percentiles, or the 90th percentile (Figure 17-11).[17] These areas would benefit from regional mitigation measures described in Section 17.7 of this chapter.*

*Figure 17-12 depicts the environmental justice census tracts where individuals experience at least one pre-existing pollutant burden and at least one pre-existing chronic disease burden at or above the 90th percentile, nationally, and where truck proximity could increase as a result of the Project. The map further categorizes each tract by the number of indicators for which the tract is in the 90th national percentile or higher. The tracts shown here have a combined number of indicators at or above the 90th percentile between two and seven; none are at or above the 90th percentile for eight or all nine indicators.*

---

[17]   *Section 17D-5 of Appendix 17D, "Technical Memorandum," analyzes pre-existing air pollutant and health burdens at the 80th and 66.66th percentiles to understand the Project effects. Section 17D-7 analyzes these burdens at the 90th percentiles to determine where mitigation is needed. In essence, the census tracts identified for both of these analyses are co-extensive because all census tracts in which highway truck traffic proximity would increase have at least one pre-existing burden exceeding the 90th percentile. The regional-focused mitigation would benefit these census tracts regardless of the percentile used for analysis.]*

*[Figure 17-12. Environmental Justice Census Tracts with High Pre-Existing Pollutant and Chronic Disease Burdens Where Truck Traffic Proximity Could Potentially Increase (Tolling Scenario E)]*



Source:  USEPA National Air Toxics Assessment (NATA) and Agency Air Quality System via EJScreen 2021 data; CDC PLACES Estimates 2020 via EJI 2022 data; BPM, WSP 2021.

Note:  Percentiles are national. Census Tract 3009, Nassau County not shown. Potential truck volume increases and decreases on roadways within the tract would ultimately cancel each other out and result in no change of truck traffic proximity for the residential populations within the tract.

*The census tracts where increases or decreases would occur are often in the same neighborhoods and towns. In 63 census tracts with high pre-existing pollutants and health burdens, truck traffic proximity would remain the same (47) or decrease (16) in Tolling Scenario E. Under the same tolling scenario, truck traffic proximity could increase in 56 environmental justice census tracts where at least one pre-existing pollutant burden and at least one pre-existing chronic disease are at or above the 90th percentiles (the locations of increases are listed in Table 17-13).*

*The specific census tracts that would experience increased or decreased truck traffic change slightly depending on the tolling scenario. The following communities (as illustrated in Figure 17-12 and listed in Table 17-13) could have census tracts that would merit place-based mitigation: High Bridge, Morrisania and Crotona, Tremont, Hunts Point, Mott Haven, Pelham, Throgs Neck, Northeast Bronx, East Harlem, Randall's Island, Downtown Brooklyn, Fort Greene, South Williamsburg, Orange, East Orange, Newark, and Fort Lee.*

Chapter 17, Environmental Justice

*[Table 17-13. Daily Truck Volume in Tolling Scenario E Compared to No Action in Overburdened Communities]*

| COUNTY | MAP MAR | COMMUNITY | NO. OF TRACTS BY NO. OF PRE-EXISTING POLLUTANT OR CHRONIC DISEASE BURDENS | | | HIGHWAYS | DAILY TRUC  VOLUME | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | 2-3 | 4-5 | 6-7 | | NO ACTION (AADT) | CHANGE (AADT) | CHANGE (  ) |
| Bronx, NY | 1 | High Bridge–Morrisania and Crotona–Tremont | 0 | 16 | 2 | Cross Bronx Expwy | 21,819 | 168 | 0.8% |
| | 2 | Hunts Point–Mott Haven/Pelham–Throgs Neck | 0 | 11 | 3 | Bruckner Expwy | 5,624 | 277 | 4.9% |
| | 3 | Hunts Point–Mott Haven | 0 | 1 | 2 | Major Deegan Bruckner Expwys | 7,618 | 874 | 11.5% |
| | | | 0 | 0 | 1 | Approach to RFK Bridge | 9,868 | 1,339 | 13.6% |
| | 4 | Pelham–Throgs Neck | 0 | 1 | 0 | Throgs Neck Expwy | 4,194 | 50 | 1.2% |
| | | | 0 | 1 | 0 | Cross Bronx Expwy Ext. | 9,580 | 398 | 4.2% |
| | 5 | Northeast Bronx | 0 | 1 | 0 | New England Thruway | 13,640 | 191 | 1.4% |
| New York, NY | 6 | East Harlem | 0 | 0 | 2 | RFK Bridge Approach at E 125th St | 1,513 | 1,556 | 102.8% |
| | 7 | Randall's Island | 0 | 0 | 1 | RFK Bridge on Randall's Island | 12,432 | 3,170 | 25.5% |
| Kings, NY | 8 | Downtown Brooklyn–Fort Greene | 0 | 0 | 3 | Brooklyn Queens Expwy | 14,107 | 891 | 6.3% |
| | 9 | South Williamsburg | 0 | 3 | 1 | Brooklyn Queens Expwy | 15,870 | 853 | 5.4% |
| Essex, NJ | 10 | Orange–East Orange–Newark | 2 | 3 | 1 | I-280 | 6,106 | 116 | 1.9% |
| Bergen, NJ | 11 | Fort Lee | 0 | 1 | 0 | I-95 / George Washington Bridge | 14,768 | 195 | 1.3% |

Notes:
AADT – Average Annual Daily Traffic.
* Census Tract 27.01, Bronx County, immediately north of junction between bridge approach and Bruckner Expwy; tract also included in row for Major Deegan & Bruckner Expwys above.
** Tracts with pre-existing air pollutant and chronic disease burdens that would benefit from reduced traffic, and those affected by increased traffic would vary somewhat, but the identified communities remain largely the same across tolling scenarios. Under Tolling Scenario G, Fort Lee would not experience increases.
** Census Tract 3009, Nassau County; closer examination indicates that this tract is shown with a potential increase in truck traffic proximity under Tolling Scenario E; though roadways passing through the tract have the potential to see decreases in truck traffic, the center of its population is near a roadway where modeling indicates that truck traffic could increase.

*As shown in Table 17-13, certain areas in the Bronx, notably Hunts Point and High Bridge, have many census tracts with high pre-existing burdens. Though the increase in traffic due to the Project at some of these locations would be more modest (e.g., along the Cross Bronx Expressway), when combined with the pre-existing burdens, these areas suggest a high priority for place-based mitigation measures. Other locations, particularly East Harlem, do not have a large number of tracts with pre-existing pollutant or chronic disease burdens, but do have a larger Project-related increase in truck traffic and therefore also merit place-based mitigation measures. Locations with neither high pre-existing burdens, nor large increases in truck traffic, that may experience adverse effects from Project-related truck diversions will be addressed more broadly through regional mitigation.*

*Similar modeling was performed for non-truck traffic proximity changes resulting from the Project. In this case, 35 environmental justice communities with at least one census tract demonstrating a pre-existing air pollutant burden or chronic disease burden would potentially experience a decrease in highway non-truck traffic proximity. However, 33 communities with these same pre-existing air pollutant or chronic disease burdens could experience an increase in non-truck traffic proximity. All but 11 of these communities were also identified during the analysis of truck traffic. The results from this analysis and concerns raised by environmental justice communities drew particular attention to a projected increase in traffic ion the FDR Drive adjacent to communities in Lower Manhattan and the Lower East Side.*

*The Project Sponsors have committed to a package of regional and place-based measures to mitigate these potential adverse effects on environmental justice populations, regardless of the tolling structure eventually adopted, which is discussed in Section 17.7 of this chapter.]*

#### *17.6.1.4 Traffic-Related Effects on Noise*

Participants in the environmental justice outreach sessions in fall 2021 commented that changes in traffic conditions due to the CBD Tolling Alternative would adversely affect noise levels in nearby environmental justice neighborhoods. The EA includes an analysis of the potential for increased noise levels resulting from changes in traffic conditions with the CBD Tolling Alternative in **Chapter 12, "Noise."**

The noise assessment was conducted for locations where traffic analysis was performed, where the results of the traffic studies indicated the potential for changes in noise levels to occur as a result of the Project. The assessment was completed for AM, midday, PM, and late-night peak periods at the same 102 local intersections for which detailed traffic analyses were conducted (**Figure 17-6**). Those intersections are the locations most likely to have increases in traffic, based on the regional transportation modeling for the Project. Of these 102 intersections, approximately half are in environmental justice neighborhoods, reflecting the concerns that were expressed during public outreach.

As described in **Chapter 12, "Noise,"** the analysis found that projected noise-level changes versus the No Action Alternative on all roadways evaluated would be below 3 dB(A),[18] a level that is barely perceptible to

[18] The noise analysis considers noise levels in dB(A), or A-weighted decibels, a unit of sound that accounts for those frequencies most audible to the human hearing range. Generally, the average human is unable to perceive noise-level changes until the changes measure more than 3 dB(A) and can readily perceive changes of 5 dB(A) or more (for more information on noise levels and human perception, see **Chapter 12, "Noise"**).

most listeners. At locations near bridge and tunnel crossings, the maximum predicted noise level increase of 2.9 dB(A), which was predicted in Manhattan adjacent to the Queens-Midtown Tunnel in Tolling Scenario D, would not be perceptible. Similarly, the maximum predicted noise level on local streets where traffic would increase, an increase of 2.5 dB(A) at Trinity Place and Edgar Street in Lower Manhattan, would not be perceptible. Consequently, with the CBD Tolling Alternative, ambient noise levels would not be perceptibly different from those without the Project. Noise-level changes at approximately 90 percent of the evaluated roadways would range from -1 dB(A) to +1 dB(A), and less than 1 percent of the roadways evaluated would show an increase between 1 dB(A) and 2 dB(A).

As a result, the CBD Tolling Alternative would result in no adverse effects on ambient noise levels related to traffic changes with the CBD Tolling Alternative.

### 17.6.1.5   Increases to Transit Ridership

Some participants in the fall 2021 public outreach related to environmental justice raised concerns that the Project has the potential to overburden local bus service as people shift from automobile to transit to avoid the toll. The EA includes a detailed evaluation of the Project's effects on transit ridership in **Subchapter 4C, "Transportation: Transit."**

With all tolling scenarios for the CBD Tolling Alternative, some people who currently drive to and from the Manhattan CBD would shift to using transit instead. Overall, ridership on the extensive public transit system linking the Manhattan CBD with the surrounding region would increase by 1 to 2 percent relative to the No Action Alternative.

The region's transit users, including environmental justice populations, would experience increases in ridership on transit vehicles and at transit stations. Analysis presented in **Subchapter 4C, "Transportation: Transit,"** shows that there is sufficient capacity throughout the system, including commuter rail, Port Authority Trans-Hudson (PATH) rail, subway, and bus, to accommodate this increase in passengers.

In early public outreach, some participants expressed concerns regarding increases in bus ridership that could result from Project implementation. Commenters asked if additional buses would be needed to account for ridership increases. Based on the line-haul capacity analysis results presented in **Subchapter 4C,** which examined bus ridership at the point where the route would be the most crowded, no buses would cross the threshold for requiring detailed line-haul analysis; therefore, no adverse effects on bus lines are projected. This means that no new buses would be required to support ridership increases as a result of implementation of the CBD Tolling Alternative.

### 17.6.1.6   Changes in Passenger Flows at Transit Stations

The analysis in **Subchapter 4C, "Transportation: Transit,"** concludes that most transit stations throughout the regional public transportation system have adequate capacity to accommodate the projected increase in passengers that would occur as a result of the CBD Tolling Alternative, as people switch from automobile to transit to avoid the new CBD toll. However, analysis of the tolling scenarios with the greatest predicted increase in passengers at transit stations reveals that vertical circulation elements within four MTA NYCT subway stations in New York City and the PATH/NJ TRANSIT rail terminal in Hoboken, NJ, could become

overcrowded by the additional riders during peak periods. These stations are in or adjacent to neighborhoods with environmental justice census tracts. In addition, since the majority of people who travel in the region use public transit, including minority populations, some of the passengers using the affected stairways and escalators are environmental justice populations.

**Subchapter 4C, "Transportation: Transit,"** identifies measures to mitigate the effects on these vertical circulation elements, and these measures would eliminate the adverse effects at these locations. These affected stations, the specific location within the station where the adverse effect would occur, and the proposed mitigation measures are as follows:

- 42nd Street-Times Square subway station (Manhattan), Stair ML6/ML8 connecting mezzanine to uptown Nos. 1/2/3 subway lines platform: Remove the center handrail and standardize the riser, so that the stair meets code without the hand rail. Mitigation likely needed for Tolling Scenario E, and possibly for Tolling Scenarios D and F. Requires future monitoring, which will be conducted for the selected tolling scenario.

- Flushing-Main Street subway station (Queens), Escalator E456 connecting street to mezzanine level: Increase speed from 100 feet per minute to 120 feet per minute. Mitigation likely needed for Tolling Scenarios A, C, D, E, F; and possibly for Scenario B. Requires future monitoring, which will be conducted for the selected tolling scenario.

- Union Square subway station (Manhattan), Escalator E219 connecting the L subway line platform to the Nos. 4/5/6 subway line mezzanine: Increase speed from 100 feet per minute to 120 feet per minute. Mitigation likely needed for Tolling Scenarios A, C, D, E, F; and possibly for Scenario B. Requires future monitoring, will be conducted for the selected tolling scenario.

- PATH Hoboken Station (New Jersey), Stair 01/02: Monitor pedestrian volumes on Stair 01/02, then implement improved signage and wayfinding to divert some people from Stair 01/02 if agreed thresholds are met.

All passengers, including environmental justice populations, would benefit from the proposed mitigation measures and, consequently, the changes in transit ridership would not result in adverse effects on environmental justice populations.

### 17.6.1.7   Changes in Pedestrian Circulation on Sidewalks Near Transit Hubs

The CBD Tolling Alternative in all tolling scenarios would result in new pedestrian trips near transit hubs as a result of people who shift from driving to using transit as a result of the new toll. New pedestrian trips would occur at transit stations throughout the local study area, including areas that are in or adjacent to environmental justice census tracts. In addition, the sidewalks near transit stations throughout the local study area are already used by thousands of pedestrians each day, and some of these are minority and low-income populations.

Within the Manhattan CBD, walking and cycling are heavily used modes of travel because people often bike or walk between transit stations or parking lots and garages to reach their destination, and many others make their trips entirely by bicycle or on foot. Walking and cycling are also heavily used modes of travel in

the local study area. Within the Manhattan CBD, and particularly the densely developed commercial and office corridors, and in the densely developed neighborhoods and communities in the local study area, pedestrian infrastructure elements (sidewalks, marked crosswalks, and pedestrian signals) are common.

Subchapter 4E, "Transportation: Pedestrians and Bicyclists," examines the potential for new pedestrian trips to result in crowding at crosswalks, corners, and sidewalks near transit stations. In most cases, there is adequate capacity at corners and crosswalks and on sidewalks to absorb the additional pedestrian trips without adversely affecting pedestrian conditions there.

The analysis identified the potential for adverse effects to pedestrian flows in the Herald Square/Penn Station area (in the Manhattan CBD) on one sidewalk and two crosswalks. By repainting the crosswalks to widen the area available to legally cross the street and removing a planter on the sidewalk, the Project Sponsors will mitigate the adverse effects on pedestrian circulation at these three locations.

One of the affected locations (Seventh Avenue and West 32nd Street) is within an environmental justice census tract and the other two (Eighth Avenue between West 34th and West 35th Streets, and Sixth Avenue at West 34th Street) are adjacent to both environmental justice census tracts and non-environmental justice tracts. The Herald Square/Penn Station New York area is a major hub for transit and accommodates high volumes of pedestrians in peak and off-peak hours, and the proposed mitigation would alleviate the effects of increased pedestrian activity at the analysis locations, including effects on environmental justice populations.

Therefore, the change in pedestrian trips associated with the CBD Tolling Alternative would not result in adverse effects on environmental justice populations.

### 17.6.1.8    Potential for Indirect Displacement

During public outreach for the Project related to environmental justice, the Environmental Justice Technical Advisory Group raised concerns about the potential involuntary displacement of environmental justice populations.

Subchapter 5A, "Social Conditions: Population Characteristics and Community Cohesion," presents an analysis of this issue that concludes that involuntary displacement would be unlikely to occur as a result of the CBD Tolling Alternative. The analysis concludes that the CBD Tolling Alternative would not result in changes in market conditions that would increase real estate values, so as to result in increased rents; the CBD Tolling Alternative would not result in an increase in the cost of goods within the Manhattan CBD; and certain residents of the Manhattan CBD would be entitled to a New York State tax credit to offset their tolls.

In terms of increased real estate values, any changes in residential patterns related to residents moving closer to transit would be broadly distributed throughout the regional study area because of the wide variety of factors that influence a household's decision about where to live. In addition, in areas to which people might move to avoid the toll or be close to transit, the value of residential property and rents is already influenced by the existing proximity to transit. While there could be some additional value to living

close to transit (i.e., the value of living near a commuter station) in the future with the CBD Tolling Alternative, there is value to such proximity under existing conditions. Within the Manhattan CBD in particular, residential property values are already well established and influenced by factors such as the area's central location in New York City and its proximity to transit. While a reduction in traffic congestion could increase residential sales prices and thus could exert upward pressure on rents, this factor would not be substantial enough to markedly influence rents or residential property market conditions given the other factors already influencing New York City's residential real estate market (i.e., its central location and proximity to transit, jobs, cultural amenities, etc.).

Moreover, the substantial number of apartments in the Manhattan CBD that have protected rents (e.g., apartments under the jurisdiction of the New York City Housing Authority and apartments that are protected by New York State's rent control and rent stabilization laws) would not be subject to market-driven price increases. Furthermore, the Manhattan CBD already has the highest cost of living and highest home prices and rents in the region, and it is unlikely that many individuals would seek to move to the Manhattan CBD specifically to avoid the toll or because of a reduction in congestion. Therefore, the CBD Tolling Alternative would not substantively affect population characteristics of the Manhattan CBD or other transit hubs by attracting new residents seeking to avoid the toll.

Furthermore, the cost of new tolls with the CBD Tolling Alternative would not be likely to result in an increase in the cost of goods within the Manhattan CBD, as discussed below in **Section 17.6.1.9**.

In addition, residents whose primary residence is inside the Manhattan CBD and whose New York adjusted gross income for the taxable year is less than $60,000 would be entitled to a New York State tax credit equal to the aggregate amount of Manhattan CBD tolls paid during the taxable year.

For these reasons, the CBD Tolling Alternative would not result in adverse effects on environmental justice populations related to indirect displacement.

### 17.6.1.9    *Potential Effects on Cost of Goods*

During public outreach for the Project related to environmental justice, the Environmental Justice Technical Advisory Group raised concerns about the potential for the introduction of a new CBD toll to affect the price of price of consumer goods in the Manhattan CBD.

**Chapter 6, "Economic Conditions,"** presents an analysis of the CBD Tolling Alternative's potential to affect the price of goods in the Manhattan CBD, including the cost at smaller businesses such as local *[market convenience stores]* and delis. That analysis describes that the new CBD toll would increase the cost of shipping to the Manhattan CBD for some shippers*[,]* because of the price of the new toll*[,]* but reduce it for others*[,]* (because of travel time savings*[,]* the potential for reduced parking fees *[(since, with fewer automobiles entering the Manhattan CBD each day, the demand for parking would be reduced and additional legal curbside parking would be available for delivery vehicles), and other potential cost savings]*). The specific change to costs *[for any particular shipper]* would vary greatly depending on the toll rate, whether there is a cap on the number of tolls per day, and the number of times a truck is detected entering or remaining in the Manhattan CBD. Businesses in the Manhattan CBD that would be more likely to be

affected by increased delivery costs associated by tolling increases are small businesses that have a high rate of deliveries, and most specifically small retail businesses such as grocery stores, restaurants, and small market convenience stores, since they are dependent on frequent deliveries of smaller loads and delivery of goods represent a higher portion of their operating costs. There are approximately 600 such businesses within the Manhattan CBD, representing slightly less than 1 percent (0.7 percent) of all businesses within the Manhattan CBD.

The analysis in **Chapter 6** concludes that the incremental toll costs that are passed along to receiving businesses would be passed on in a diluted fashion, because shippers would allocate the toll costs among the multiple receivers on a journey *[(within New York City, averaging 5.5 stops per journey). While small retail businesses may receive more frequent deliveries,]* shippers to small retail stores like bodegas typically make many stops and consequently would share toll cost*[s]* among those multiple receivers. An incremental cost to any one retail store would be passed along as an incremental cost to consumers but would represent a very small component of the retail price charged to the consumer. *[In addition, the incremental cost of the new toll passed to receivers could be further diluted by cost savings realized by shippers due to reduced congestion, which would reduce the cost of delivering goods and services because of decreased travel times and lower operating costs incurred on the transportation system and could ultimately lower the cost of some products consumed in New York City.]* Consequently, the CBD Tolling Alternative would be unlikely to result in an appreciable increase in the cost of goods in the Manhattan CBD.

## 17.6.2   Potential Adverse Effects in the Regional Study Area

The analysis considers the potential regional effects of the CBD Tolling Alternative on environmental justice populations for the topics identified in **Table 17-1** earlier in this chapter. It considers how implementation of the CBD Tolling Alternative would affect the regional population in terms of increased costs (tolls), changes in trip time, and changes in transit conditions. The discussion includes the following topics, based on the issues included in **Table 17-1**:

- Potential effects associated with the increased cost for drivers (**Section 17.6.2.1**)
- Potential effects on employment for taxi and FHV drivers (**Section 17.6.2.2**)

### *17.6.2.1   Increased Cost for Drivers*

During early public outreach for the Project in fall 2021, members of the public raised concerns related to the increased cost of travel to the Manhattan CBD for low-income drivers, low- and middle-income families in the Manhattan CBD, and residents of the Manhattan CBD traveling regionally to visit family and friends outside the Manhattan CBD.

As discussed earlier, most people (76 percent) in the regional study area travel to and from the Manhattan CBD by public transportation using the region's robust transit network and the transit share is higher for minority and low-income populations (82 and 79 percent, respectively). With the CBD Tolling Alternative, most people, including minority and low-income populations, would continue to use public transportation to travel to and from the Manhattan CBD and would not be adversely affected by the new toll. With the

new toll, some people would switch from driving to transit to travel to and from the Manhattan CBD. This is consistent with the purpose of the Project, which is to reduce traffic congestion in the Manhattan CBD.

**Subchapter 5A, "Social Conditions: Population Characteristics and Community Cohesion,"** describes that all areas of New York City outside the Manhattan CBD have transit access to the Manhattan CBD and would not be isolated from community services or ties within the Manhattan CBD. It also discusses that while most community facilities and services within the Manhattan CBD serve a local clientele, some do serve people in a wider area. Most community facilities and services in the Manhattan CBD are close to transit services, making this a viable mode choice for access to those community facilities. The analysis in **Subchapter 5A** concludes that since the majority of trips to and from the Manhattan CBD are made by transit, community cohesion and access to employment would not be adversely affected.

Given the region's robust transit network, most people, including minority and low-income populations, would have alternative travel options to avoid the CBD toll. However, for some people, switching to transit is not a viable option because they have poor access to transit, commuting by transit is inefficient with long travel times, they have work hours during times of limited transit service, or they need access to a private automobile for their work. For these individual drivers who do not have *[reasonable]* alternatives *[to private vehicles]*, the new toll would represent an adverse effect. Other people would choose to drive because it is more convenient for them and they would benefit from the reduced congestion within the Manhattan CBD.

The costs incurred by individuals driving to or through the Manhattan CBD would vary widely, depending on individual circumstances and the specific tolling scenario. The greatest cost would be incurred by those who make frequent driving journeys to the Manhattan CBD during peak hours. Driving to and from the Manhattan CBD is already expensive given the very limited availability of free or low-cost parking and the cost of off-street parking or taxi/FHV fares. Individuals who drive less frequently would incur lower costs because of the toll. **Appendix 4A.3, "Transportation: Representative Commuting Costs by Auto and Transit,"** presents information about the wide range of costs and travel times for people who travel to and through the Manhattan CBD today.

This section considers the specific effects of that increased cost on minority and low-income drivers.

## Minority Drivers

As presented earlier in this chapter, more than half (about 52 percent) of the population of the regional study area identifies as minority and close to half of the people who work in the Manhattan CBD identify as minority. Most minority workers who commute to the Manhattan CBD use transit (82 percent). Approximately 10 percent of the minority workers (close to 73,000 people) commute by vehicle to the Manhattan CBD, a similar proportion to that of the overall population. These minority workers come from locations throughout the regional study area, with higher numbers coming from New York City and the immediately surrounding areas with higher populations and higher proportions of minority population. These areas are well-served by the regional public transportation network. *[I]*ndividual minority drivers who do not have *[reasonable]* alternatives other than driving to reach the Manhattan CBD *[would be subject to* the new toll*, as* would *non-minority drivers who must drive]*.

One group of minority drivers who would be adversely affected by the new CBD toll is taxi and FHV drivers, who would need to pay the CBD toll for entering or remaining in the Manhattan CBD, including at the start of their work day, in tolling scenarios that do not have caps or exemptions for taxis and FHV drivers (Tolling Scenarios A, D, and G).[19] According to the TLC's 2020 Fact Book, while about half of all FHV and taxi passenger pickups were in Manhattan, the majority of taxi and FHV drivers (80 percent) do not live in Manhattan. **Section 17.6.2.2** below provides more information on the potential effects of the CBD Tolling Alternative on taxi and FHV drivers.

### Low-Income Drivers

An estimated 79 percent of low-income populations who work in the Manhattan CBD use transit to make their commute and approximately 9 percent) rely on automobiles for their commute to work in Manhattan. An estimated 16,100 low-income people (including people who live within the Manhattan CBD) use an automobile for their commute to work in the Manhattan CBD. *[For more information on how the number of low-income commuters and their home locations were estimated, see Appendix 17E, "Approach to Mitigating the Effect of CBD Tolls on Low-Income Frequent Drivers."]*

These low-income workers come from locations throughout the regional study area, with higher numbers coming from New York City and the immediately surrounding areas with larger populations and higher proportions of low-income population. These areas are well-served by the regional public transportation network. Considering the availability of alternative modes of transit, many low-income drivers would have other alternatives available for their trip to work.

However, as noted earlier, switching to transit is not a viable option for some people, because they have poor access to transit, commuting by transit is inefficient with long travel times, they have work hours during times of limited transit service, or they need access to a private automobile for their work. For individual low-income drivers who do not have viable alternative modes other than driving to reach the Manhattan CBD, the new toll would represent an adverse effect. The size of cost increase would depend on the tolling scenario and each driver's specific route and travel patterns. *[For low-income drivers who do not have reasonable alternatives to driving to reach the Manhattan CBD and must pay the toll, the new CBD toll would represent a potential adverse effect in the context of their existing income.]*

### 17.6.2.2    Effects on Taxi and For-Hire Vehicle Drivers in New York City

The analysis in **Chapter 6, "Economic Conditions,"** concludes that some tolling scenarios could reduce VMT by taxis and FHVs, and particularly for yellow cabs operating in Manhattan. The predicted change in overall taxi/FHV travel characteristics indicates that there could be some shift in business practices within the industry, particularly for yellow cabs operating in Manhattan, where under some tolling scenarios the predicted reductions in VMT could exceed 10 percent. Under scenarios with predicted reductions in VMT, there could also be reductions in taxi and FHV employment, as described in this section.

---

[19]   As detailed in Section **17.6.2.2**, the Project Sponsors also considered modifications to these three tolling scenarios that would include caps and/or exemptions for taxi and FHV drivers.

According to TLC's 2020 Fact Book, there were 185,000 TLC-licensed drivers in New York City in 2019. In April 2022, 72,244 TLC-licensed drivers made at least one FHV trip in New York City, while 9,560 made at least one yellow taxi trip. A TLC-licensed driver can work for any sector of the industry (yellow cab, green cab, or FHV) at any time, if the license is active. In 2019 there were 13,587 yellow cabs, 2,895 green cabs, and 101,663 FHVs. In April 2022, there were 7,053 yellow cabs, 1,027 green cabs, and 70,281 FHVs that made at least one trip. The number of drivers was larger than the number of cabs and FHVs, because drivers typically share vehicles. Before the COVID-19 pandemic, the number of licensed yellow cabs was steady between 2015 and 2019, limited by the number of total medallions (permits for yellow cabs) available from the TLC. In contrast, the number of licensed green cabs decreased by 48 percent between 2016 and 2019 as the emerging FHV technology gained popularity and the number of licensed FHVs increased by 50 percent over that period.[20]

TLC-licensed vehicles completed more than 1,000,000 trips a day on average in 2019. Most trips in yellow cabs (97 percent) originated in Manhattan and most drop-offs occurred within the other four boroughs. According to the 2020 TLC Fact Book, 56 percent of the passenger pickups in Manhattan were by FHV and 45 percent were by taxi. Similarly, 54 percent of all passenger drop-offs in Manhattan were by FHV and 46 percent were by taxi. The 2020 TLC Fact Book notes that high-volume FHVs "are universally used both in and outside of Manhattan," but does not provide more specific statistics.

The number of active vehicles differs from the number of licensed vehicles, because not every licensed vehicle is actively in use during a given time period. In 2018, during peak activity periods, as many as 12,610 active yellow cabs, 4,026 green cabs, and 90,284 active FHVs were providing trips in New York City.[21]

With the CBD Tolling Alternative, reductions in vehicle volumes and VMT in the Manhattan CBD and other locations within the regional study area would benefit taxi and FHV drivers. With less congestion and improved speeds, drivers can reach their customers more quickly and transport them to their destinations more quickly. By

> **New York City's Commitment to Supporting Taxi and FHV Drivers**
>
> In 2019, New York City became the first city in the world to implement a trip-based, guaranteed minimum pay standard for high-volume FHV drivers, whether they drive their own vehicle or lease an FHV. The TLC also modified rules for yellow and green taxis to increase driver income protections, including reducing the daily maximum credit card surcharge and increasing accessible dispatch fees.
>
> In 2021, the City implemented a medallion relief program and loan guaranty program to provide relief for owners with five or fewer medallions. Both programs provide financial assistance and free legal representation to help negotiate with lenders to reduce loan balances and lower monthly payments.

[20] New York City TLC. 2018 Fact Book and 2020 Fact Book. https://www1.nyc.gov/assets/tlc/downloads/pdf/2018_tlc_factbook.pdf; https://www1.nyc.gov/assets/tlc/downloads/pdf/2020-tlc-factbook.pdf.

[21] The New York City TLC's 2018 Fact Book presents an annual number for licensed yellow cab, green cab, and FHVs, while data on the number of active vehicles is reported on a monthly basis. In the case of green cabs, the highest monthly statistic for active vehicles (4,026 in January 2018) was greater than the number of reported average annual licensed vehicles (3,579 vehicles in 2018); this is likely due to a downward trend in licensed green cab vehicles over 2018. For this reason, the numbers of licensed and active vehicles should not be used to estimate the percentage of licensed vehicles that are active. This level of data is not provided in the 2020 Fact Book.

Chapter 17 / Environmental Justice

improving the trip times, the CBD Tolling Alternative could facilitate more fares during drivers' shifts and increase their receipts.

Under some tolling scenarios, there could be an increase in taxi and FHV fares that could reduce demand and industry revenues for taxis and/or FHVs. As detailed in **Chapter 2, "Project Alternatives,"** the tolling scenarios assess a variety of tolling policies for taxis and FHVs ranging from charging a toll each time a taxi or FHV enters the Manhattan CBD to a complete exemption from paying the Manhattan CBD toll. Tolling Scenarios A, D, and G would have no limit to the number of times taxis and FHVs would pay the CBD toll each day, Tolling Scenarios B and F would limit (cap) the number of times taxis and FHVs would pay the CBD toll to once each day, and Tolling Scenarios C and E would exempt taxis from the CBD toll and limit the

> **Modified Tolling Scenarios Addressing Taxi/FHV Policies**
>
> ❖ Tolling Scenario A with Tolls for Taxis/FHVs capped once per day
> ❖ Tolling Scenario D with Tolls for Taxis/FHVs capped once per day
> ❖ Tolling Scenario D with Taxi/FHV Tolling Exemption
> ❖ Tolling Scenario G with Tolls for Taxis/FHVs capped once per day

number of times that FHVs would pay the toll to three times a day. In addition, in response to concerns expressed during the public outreach process with respect to the anticipated effects of the Project on taxi and FHV drivers, additional analyses were conducted of modified tolling scenarios with caps and exemptions for taxis and FHVs, as discussed later in this section.

**Table 17-*[14]*** shows the projected reductions in daily taxi/FHV VMT in New York City relative to the No Action Alternative for each of the tolling scenarios without modifications.[22] The VMT estimates shown in the table do not include cruising miles without a customer, and only reflect daily VMT for travel when the taxi/FHV has a customer. As shown in the table, the effects of the tolling scenarios would include the following:

- **Under Tolling Scenarios A, D, and G**, which would have uncapped tolls for both taxis and FHVs, there would be reductions in overall daily VMT in New York City for taxis and FHVs (by 5.1 percent, 8.8 percent, and 5.9 percent, respectively), and larger reductions in the Manhattan CBD, the core service area for yellow taxis, of 6.6 percent for Tolling Scenario A, 16.6 percent for Tolling Scenario D, and 8.6 percent for Tolling Scenario G. Reductions in Manhattan overall would be 10.9 percent for Tolling Scenario A, 16.7 percent for Tolling Scenario D, and 12.3 percent for Tolling Scenario G.

- **Under Tolling Scenarios B and F**, taxis and FHVs would be tolled a maximum once per day, There would be a nominal overall decrease in taxi/FHV VMT in New York City; under both these tolling scenarios there would be slight increases in taxi/FHV VMT within the Manhattan CBD (due to the relatively inelastic price sensitivity of auto commuters combined with the scenarios' easing congestion, which in turn would increase the utility of commuting by taxi/FHV within the Manhattan CBD). Reductions in Manhattan overall would be less than 3 percent.

- **Tolling Scenarios C and E, which would exempt taxis but would toll FHVs up to three times a day**, would result in 3.4 percent and 5.2 percent reductions in overall daily taxi/FHV VMT in New York City, respectively. In the Manhattan CBD, Tolling Scenario C would reduce VMT by 3.5 percent and Tolling Scenario E would reduce VMT by 7.9 percent; in Manhattan overall, VMT reductions would be larger.

---

[22]   Taxis and FHVs are a single mode in the Best Practice Model and therefore cannot be presented separately.

Chapter 17: Environmental Justice

Given that taxis would not be tolled under Tolling Scenarios C and E, it is likely that taxis would experience increases in VMT while FHVs would experience greater VMT reductions. With Tolling Scenarios C and E, taxi drivers would not pay a toll, so there would be no additional toll cost for the driver or customer.

In addition, in response to concerns expressed during the public outreach process with respect to the anticipated effects of the Project on taxi and FHV drivers, the Project Sponsors considered modified Tolling Scenarios A and D with a cap on tolls of once per day for taxis and FHVs (like Tolling Scenarios B and F), a modified Tolling Scenario D with both taxis and FHVs exempt from the toll, and a variation of Tolling Scenario G (referred to as Tolling Scenario G1) with a cap on tolls of once per day for taxis and FHVs. The effects of the modifications would be as follows:

- **Tolling Scenario A with Tolls for Taxis/FHVs Capped at Once Per Day** – The cap would result in about 22 percent more taxis and FHVs entering the Manhattan CBD as compared to original Tolling Scenario A. To still meet the congestion and revenue objectives of the Project, tolls would need to be raised 10 percent to 15 percent on all vehicle classes in Tolling Scenario A to offset forgone taxi and FHV revenues. This would further reduce personal vehicles and trucks at the Manhattan CBD boundary by 2 percent to 3 percent compared to Tolling Scenario A. However, the decline in personal vehicles and trucks would be mostly offset by the increase in taxis and FHVs entering the Manhattan CBD. As a result, the volumes of all vehicles entering the Manhattan CBD would not change overall.

Table 17-*[14]*. Change in Taxi/For-Hire Vehicle Daily Vehicle-Miles Traveled in New York City vs. No Action Alternative, 2023

| GEOGRAPHIC AREA | SCENARIO A | SCENARIO B | SCENARIO C | SCENARIO D | SCENARIO E | SCENARIO F | SCENARIO G |
|---|---|---|---|---|---|---|---|
| **Taxi Toll Policy** | | | Exempt | | Exempt | | |
| **FHV Toll Policy** | All Entries | Once per Day | Up to 3 Times Daily | All Entries | Up to 3 Times Daily | Once per Day | All Entries |
| Bronx County | -8,392 (-3.1%) | -5,717 (-2.1%) | -6,426 (-2.4%) | -9,346 (-3.4%) | -3,991 (-1.5%) | -1,959 (-0.7%) | -7,831 (-2.9%) |
| Kings County (Brooklyn) | -33,855 (-9.1%) | -20,648 (-5.5%) | -10,247 (-2.7%) | -37,923 (-10.2%) | -27,854 (-7.5%) | -7,095 (-1.9%) | -39,183 (-10.5%) |
| New York County (Manhattan) | -77,843 (-10.9%) | -19,553 (-2.7%) | -51,989 (-7.3%) | -119,349 (-16.7%) | -73,223 (-10.2%) | -17,076 (-2.4%) | -87,944 (-12.3%) |
| Inside Manhattan CBD | -21,498 (-6.6%) | +15,020 (+4.6%) | -11,371 (-3.5%) | -54,416 (-16.8%) | -25,621 (-7.9%) | +4,962 (+1.5%) | -27,757 (-8.6%) |
| Outside Manhattan CBD | -56,345 (-14.4%) | -34,573 (-8.8%) | -40,618 (-10.4%) | -64,873 (-16.6%) | -47,602 (-12.2%) | -22,038 (-5.6%) | -60,187 (-15.4%) |
| Queens County | -3,873 (-0.4%) | +21,258 (+2.0%) | -10,804 (-1.0%) | -47,911 (-4.4%) | -19,342 (-1.8%) | +4,979 (+0.5%) | -7,812 (-0.7%) |
| Richmond County (Staten Island) | -4,884 (-8.6%) | -5,071 (-8.9%) | -4,940 (-8.7%) | -4,539 (-8.0%) | -6,002 (-10.5%) | -4,370 (-7.7%) | -4,917 (-8.6%) |
| NEW YORK CITY TOTAL | -128,847 (-5.1 ) | -29,731 (-1.2 ) | -84,406 (-3.4 ) | -219,068 (-8.8 ) | -130,412 (-5.2 ) | -25,521 (-1.0 ) | -147,687 (-5.9 ) |

Source:   Best Practice Model, WSP 2021.
Note:     Projections include VMT only during fares and do not include cruising without passenger(s).

- **Tolling Scenario D with Tolls for Taxis/FHVs Capped at Once Per Day –** The cap would result in about 25 percent more taxis and FHVs entering the Manhattan CBD compared to the original Tolling Scenario D. Since original Tolling Scenario D (with uncapped tolling of taxis and FHVs) would have annual net revenue higher than the Project objectives by about $300 million, this modified Tolling Scenario D would continue to meet the revenue objective without needing to raise toll rates from those in original Tolling Scenario D.

- **Tolling Scenario D with Taxi/FHV Tolling Exemption –** Exempting taxis and FHVs from the Manhattan CBD toll would increase the number of additional taxis and FHVs entering the Manhattan CBD by up to 50 percent compared to original Tolling Scenario D. No change in the toll rate would be required for this modified tolling scenario.

- **Tolling Scenario G with Tolls for Taxis/FHVs Capped at Once Per Day –** Capping the tolls paid by taxis and FHVs would reduce the VMT for taxis and FHVs in New York City by 1.7 percent relative to the No Action Alternative. In the Manhattan CBD, VMT for taxis and FHVs would increase relative to the No Action Alternative by 3.1 percent. Given this cap, toll rates for other vehicles would be approximately 10 percent higher than in original Tolling Scenario G. This toll increase was low enough so as not to notably affect the results from Tolling Scenario G. More importantly, with this modification Tolling Scenario G would still address the concerns regarding commercial truck traffic in the South Bronx, although the daily number of trucks on the Cross Bronx Expressway at Macombs Road would increase from 50 with original Tolling Scenario G to 251 in this modified scenario, which is still lower than every other tolling scenario except Tolling Scenario C.

**Figure 17-*[13]*** illustrates how the different tolling policies would affect taxi and FHV VMT. Exemptions and caps decrease the toll burden on taxi/FHV drivers, while increasing the toll rate for other drivers to meet the Project's congestion and revenue objectives. If taxis and FHVs are charged for each trip, the demand for their service would decline, particularly in New York City, reducing trips and better meeting the Project objectives, but creating new direct costs and/or potential job insecurity.

Figure 17[-*13.*]  Changes in Daily Taxi/FHV VMT in the Manhattan CBD, CBD Tolling Alternative Tolling Scenarios Compared to the No Action Alternative



Source: Best Practice Model, WSP 2021.

Under tolling scenarios that would toll taxis and/or FHVs more than once a day, customers could choose to avoid the toll by switching to transit, walking, or biking to their destination in the Manhattan CBD, thereby reducing the frequency of taxi/FHV utilization. The potential decrease in overall demand for taxis and/or FHVs in Manhattan, ranging from 7 percent to 17 percent in tolling scenarios without a once-a-day cap on taxi/FHV tolls, could reduce employment in the taxi and/or FHV industries. This would occur in unmodified Tolling Scenarios A, D, and G; for FHV drivers, it would also occur in Tolling Scenarios C and E. The projected reductions in VMT indicate potential economic costs within an industry in flux where journeys have already been shifting from taxis to FHVs and could correlate to lost revenues for both taxis and FHVs operating in New York City. Since driver income is directly related to the miles they travel with paying customers, these reductions could result in reductions in taxi and FHV employment. Thus, tolling scenarios that toll taxis and/or FHVs more than once a day would result in an adverse effect on the drivers of those vehicles in New York City, who largely identify as minority populations.

### 17.6.3   *[Summary of]* Potential Adverse Effects on Environmental Justice Populations

Based on the information presented in the previous subsections of **Section 17.6**, the CBD Tolling Alternative would not result in adverse effects on environmental justice populations in most of the topic areas reviewed. **Table 17-*[15]*** summarizes the results of the analysis.

The Project would result in the following potential adverse effects on environmental justice populations:

- *[While some environmental justice census tracts that have high pre-existing pollutant burdens or chronic disease burdens would benefit from decreases in traffic, and notably truck traffic, others may experience increases in traffic and related emissions that contribute to associated health effects as a result of the CBD Tolling Alternative and therefore would constitute a potential adverse effect on these environmental justice populations.]*

- The increased cost to drivers with the new CBD toll in all tolling scenarios would adversely affect low-income drivers who currently drive to the Manhattan CBD and do not have *[reasonable]* alternative transportation modes available.

- Tolling scenarios that would toll taxis and/or FHVs once or more a day (unmodified Tolling Scenarios A, D, and G; and Tolling Scenarios C and E for FHV drivers) would adversely affect taxi and/or FHV drivers in New York City, who largely identify as minority populations, as follows:

    – The cost of the new toll would adversely affect taxi and FHV drivers, who would need to pay the Manhattan CBD toll, including at the start of their workday, in tolling scenarios that toll their vehicles more than once a day.

    – The new CBD toll would reduce VMT associated with taxis and/or FHVs in Manhattan. Since the income of taxi and FHV drivers is directly related to the miles they travel with paying customers, this would reduce the income of taxi and FHV drivers and this reduction would be large enough that job losses could occur in tolling scenarios that toll their vehicles more than once a day.

In Tolling Scenarios B and F, and the modified Tolling Scenarios A, D, and G, these adverse effects would not occur.

*[The Project Sponsors have committed to a package of mitigation measures to address these potential adverse effects on environmental justice populations, as described in Section 17.7 later in this chapter.]*

Table 17-*[15]*. Summary of Potential Adverse Effects on Environmental Justice Populations

| EA CHAPTER/ ENVIRONMENTAL CATEGORY TOPIC | SUMMARY OF EFFECTS | LOCATION | ADVERSE EFFECT: GENERAL POPULATION | ANALYSIS OF ADVERSE EFFECT ON ENVIRONMENTAL JUSTICE POPULATIONS | ANALYSIS CONCLUSION |
|---|---|---|---|---|---|
| 4A - Regional Transportation | Traffic Results: Some diversions to different crossings to Manhattan CBD or around the Manhattan CBD altogether, depending on tolling scenario. As traffic, including truck trips, increase on some circumferential highways, simultaneously there is a reduction in traffic on other highway segments to the CBD. | Roadways throughout the 28-county study area; greatest effect closest to Manhattan CBD | No | Based on public comments, required further evaluation; see Sections 17.6.1.1 and 17.6.1.2 | No adverse effect on environmental justice populations |
| 4B – Transportation: Highways and Local Intersections | The introduction of the CBD Tolling Program may produce increased congestion on highway segments approaching on circumferential roadways used to avoid Manhattan CBD tolls, resulting in increased delays and queues in midday and PM peak hours on certain segments in some tolling scenarios: Westbound Long Island Expressway (I-495) near the Queens-Midtown Tunnel (midday) Approaches to westbound George Washington Bridge on I-95 (midday) Southbound and northbound FDR Drive between East 10th Street and Brooklyn Bridge (PM) Other locations will see an associated decrease in congestion particularly on routes approaching the Manhattan CBD. | Three highway segments | Yes | Yes; see Section 17.6.1.1 | No adverse effect on environmental justice populations |
| | Shifts in traffic patterns, with increases in traffic at some locations and decreases at other locations, would change conditions at some local intersections within and near the Manhattan CBD. Of the 102 intersections analyzed, most intersections would see reductions in delay. | 363 locations (All Day) 102 locations (AM, Midday, and PM) 57 locations (Overnight) | Yes | Yes; see Section 17.6.1.2 | No adverse effect on environmental justice populations |
| | Potential adverse effects on four local intersections in Manhattan: Trinity Place and Edgar Street (midday); East 36th Street and Second Avenue (midday); East 37th Street and Third Avenue (midday); East 125th Street and Second Avenue (AM, PM) | Four locations with potential adverse effects that would be addressed with signal timing adjustments | Yes | Yes; see Section 17.6.1.2 | No adverse effect on environmental justice populations |

Chapter 17, Environmental Justice

Table 17-[15]. Summary of Potential Adverse Effects on Environmental Justice Populations

| EA CHAPTER/ ENVIRONMENTAL CATEGORY TOPIC | SUMMARY OF EFFECTS | LOCATION | ADVERSE EFFECT: GENERAL POPULATION | ANALYSIS OF ADVERSE EFFECT ON ENVIRONMENTAL JUSTICE POPULATIONS | ANALYSIS CONCLUSION |
|---|---|---|---|---|---|
| 4C – Transportation: Transit | The Project would generate a dedicated revenue source for investment in the transit system. Transit ridership would increase by 1 to 2 percent systemwide for travel to and from the Manhattan CBD, because some people would shift to transit rather than driving. Increases in transit ridership would not result in adverse effects on line-haul capacity on any transit routes. | Regional public transportation system | No | Based on public comments, required further evaluation; see Section 17.6.1.5 | No adverse effect on environmental justice populations |
| | Transit Stations: Increased ridership would affect passenger flows at transit stations, with the potential for adverse effects at certain vertical circulation elements (i.e., stairs and escalators) in five transit stations | Hoboken Terminal – PATH station | Yes | Yes; see Section 17.6.1.6 | No adverse effect on environmental justice populations |
| | | 42 St-Times Square – subway station (Manhattan) | Yes | | |
| | | Flushing-Main St subway station (Queens) | Yes | | |
| | | Union Sq subway station (Manhattan) | Yes | | |
| | | Court Sq subway station (Queens) | Yes | | |
| 4E – Transportation: Pedestrians and Bicycles | Pedestrian Circulation: Increased pedestrian activity on sidewalks outside transit hubs because of increased transit use. At most locations, increases not large enough to result in adverse effects. At one location in the Manhattan CBD, the increase could adversely affect pedestrian circulation. | Herald Square/Penn Station NY | Yes | Yes; see Section 17.6.1.7 | No adverse effect on environmental justice populations |

Chapter 17, Environmental Justice

Table 17-[15]. Summary of Potential Adverse Effects on Environmental Justice Populations

| EA CHAPTER/ ENVIRONMENTAL CATEGORY TOPIC | SUMMARY OF EFFECTS | LOCATION | ADVERSE EFFECT: GENERAL POPULATION | ANALYSIS OF ADVERSE EFFECT ON ENVIRONMENTAL JUSTICE POPULATIONS | ANALYSIS CONCLUSION |
|---|---|---|---|---|---|
| 5A – Social Conditions: Population | Community Cohesion: Changes to travel patterns, including increased use of transit, and increased cost for people who drive to the CBD | 28-county study area | No | Based on public comments, required further evaluation; see Sections 17.6.1.5, 17.6.1.6, and 17.6.2.1 | Potential adverse effect on low-income drivers who do not have alternative transportation modes to reach the Manhattan CBD [ all tolling scenarios ] |
| | Indirect Displacement: No notable changes in socioeconomic conditions or cost of living so as to induce potential involuntary displacement of residents | Manhattan CBD | No | Based on public comments, required further evaluation; see Section 17.6.1.8 | No adverse effect on environmental justice populations |
| | Access to Employment: Increased cost for people who drive to work in the Manhattan CBD | 28-county study area | No | Based on public comments, required further evaluation; see Section 17.6.2.1 | Potential adverse effect on low-income drivers who do not have [reasonable] alternative[s] to reach the Manhattan CBD (all tolling scenarios) |

April 2023

17-59

Chapter 17, Environmental Justice

Table 17-*[15]*. Summary of Potential Adverse Effects on Environmental Justice Populations

| EA CHAPTER/ ENVIRONMENTAL CATEGORY TOPIC | SUMMARY OF EFFECTS | LOCATION | ADVERSE EFFECT: GENERAL POPULATION | ANALYSIS OF ADVERSE EFFECT ON ENVIRONMENTAL JUSTICE POPULATIONS | ANALYSIS CONCLUSION |
|---|---|---|---|---|---|
| | Price of Goods: Cost of new toll would not result in changes in the cost of most consumer goods in the Manhattan CBD | Manhattan CBD | No | Based on public comments, required further evaluation; see Section 17.6.1.9 | No adverse effect on environmental justice populations |
| 6 - Economic Conditions | Taxi and FHV Drivers: Depending on the tolling scenario, the toll could reduce taxi and FHV revenues for New York City drivers due to a reduction in taxi/FHV VMT with passengers within the CBD. The industry would remain viable overall, but adverse effects, including job losses, could occur to taxi and FHV drivers. | New York City | No | Yes; see Section 17.6.2.2 | Potential adverse effect on New York City taxi and/or FHV drivers, who largely identify as minority populations, due to the cost of the new toll and potential job losses related to reductions in VMT in tolling scenarios that toll their vehicles more than once a day (unmodified Tolling Scenarios A, D, and G; and Tolling Scenarios C and E for FHV drivers) |

Table 17-*[15]*. Summary of Potential Adverse Effects on Environmental Justice Populations

| EA CHAPTER/ ENVIRONMENTAL CATEGORY TOPIC | SUMMARY OF EFFECTS | LOCATION | ADVERSE EFFECT: GENERAL POPULATION | ANALYSIS OF ADVERSE EFFECT ON ENVIRONMENTAL JUSTICE POPULATIONS | ANALYSIS CONCLUSION |
|---|---|---|---|---|---|
| 10 - Air Quality | Regional Air Quality Benefits: On a regional (mesoscale) level, reductions in VMT would reduce air pollutants and greenhouse gases | 28-county study area | No | Based on public comments, required further evaluation; see Section 17.6.1.3 | No adverse effect on environmental justice populations |
| | Local Intersections: Changes in air emissions at local intersections due to traffic volume changes | Local intersections | | | |
| | Highway Segments: Changes in air emissions on highway due to traffic volume changes | Selected highway segments | | | |
| | Truck Volume Changes: Changes in emissions related to truck traffic diversions | Circumferential roadways near the CBD | No | Based on public comments, required further evaluation; see Section 17.6.1.3 | [ otential adverse effect to environmental ustice populations as a result of traffic diversions in communities already potentially vulnerable due to pre e isting air pollution and chronic diseases] |
| 12 – Noise | Traffic-Related Noise: Imperceptible increases or decreases in noise levels resulting from changes in traffic volumes | Bridge and tunnel crossings and local streets | No | Based on public comments, required further evaluation; see Section 17.6.1.4 | No adverse effect on environmental justice populations |

## 17.6.4    Offsetting Benefits

While the introduction of a new CBD toll would result in adverse effects to individuals who currently drive to the Manhattan CBD and do not have alternative transportation modes available, the CBD Tolling Alternative would also have substantial benefits associated with reduced vehicle congestion in the Manhattan CBD, a primary goal of the Project. The Project would address the demonstrated need to reduce vehicle congestion in the Manhattan CBD, which would benefit all drivers traveling to and near the Manhattan CBD, especially those who value their travel-time savings more than the toll cost. The reduced congestion would produce other related benefits in the Manhattan CBD, including travel-time savings, improved travel-time reliability, reduced vehicle operating costs, improved safety for vehicles, pedestrians, and bicyclists, and improved air quality in the Manhattan CBD and regionwide.

These congestion-reduction benefits would result in economic benefits as well. Travel-time savings associated with both work and non-work journeys are an economic benefit because they increase a person's productivity and overall utility by reducing time spent on less productive activities (i.e., traveling to a destination). In addition, reductions in vehicle volumes and VMT in the Manhattan CBD and other locations within the regional study area would benefit those who continue to drive in the Manhattan CBD, including delivery vehicles and taxi and FHV drivers. With less congestion and improved speeds, drivers can reach their customers more quickly and transport them to their destinations more quickly. By improving the trip times, the CBD Tolling Alternative could facilitate more fares during taxi and FHV drivers' shifts and increase their receipts. Reduced congestion would also facilitate the more efficient and cost-effective distribution of goods and services by truck in the Manhattan CBD. Transit riders who use buses, including minority and low-income passengers, would benefit from the CBD Tolling Alternative through congestion reduction that would result in travel-time savings, improved travel-time reliability, and improved safety.

Reduced regional air pollution would provide an important benefit to all residents of the region, particularly for environmental justice populations who experience adverse health effects related to air pollution, such as asthma. Most environmental justice populations who live in the Manhattan CBD would experience lower localized pollutant emissions due to reduced traffic. Additional information on where traffic would decrease is provided in **Subchapter 4A, "Transportation: Regional Transportation Effects and Modeling,"** and described and illustrated earlier in this chapter in **Section 17.6.1.3**.

In addition, the CBD Tolling Alternative would establish a reliable, recurring local source of funding for MTA capital projects, which would allow MTA to reinvest in and improve its transportation network. As discussed earlier, approximately 76 percent of the people who travel to the Manhattan CBD for work use public transportation to make their trip and this percentage is higher for minority commuters (82 percent) and low-income commuters (79 percent). MTA's transportation network is critical for mobility in the region, and improvements to the network would allow it to absorb increasing transit ridership and further reduce vehicle congestion.

## 17.7    POTENTIAL DISPROPORTIONATELY HIGH AND ADVERSE EFFECTS

USDOT Order 5610.2C and FHWA Order 6640.23A require FHWA to identify whether its actions could have a disproportionately high and adverse effect on low-income and minority populations, after accounting for mitigation and offsetting benefits.

USDOT Order 5610.2C and FHWA Order 6640.23A both define a disproportionately high and adverse effect on an environmental justice population occurs when the following occurs:

- An adverse effect is predominantly borne by a minority population and/or a low-income population; or
- An adverse effect would occur to a minority population and/or low-income population that would be appreciably more severe or greater in magnitude than the adverse effect that would occur to the non-minority population and/or non-low-income population.

USDOT Order 5610.2C and FHWA Order 6640.23A both describe that in making determinations regarding disproportionately high and adverse effects on minority and low-income populations, mitigation and enhancement measures that will be implemented and all offsetting benefits to the affected minority and low-income populations may be taken into account, as well as the design, comparative impacts, and the relevant number of similar existing system elements in non-minority and non-low-income areas.

Based on the previous steps in this analysis, the CBD Tolling Alternative would result in *[three]* potential adverse effects on environmental justice populations: *[1) a potential adverse effect from increased air pollution due to traffic increases near environmental justice communities that are already overburdened by pre-existing air pollution and chronic diseases, relative to national percentiles; 2)]* a potential adverse effect on minority and low-income drivers due to the increased cost associated with the new toll; and *[3)]* a potential adverse effect on minority taxi and FHV drivers resulting from a decrease in employment. *[This section of the chapter describes those effects and additional mitigation the Project Sponsors will implement to avoid disproportionately high and adverse effects on environmental justice populations.]*

### 17.7.1    *[Potential Effects of Traffic on Communities with Associated Pre-Existing Air Pollutant and Health Burdens]*

*[Following release of the EA in August 2022, the Project Sponsors undertook an additional assessment of the Project effects on traffic increases, and resulting emissions and potential associated health effects. That analysis concluded that in some environmental justice census tracts that have high pre-existing pollutant burdens or chronic disease burdens where the CBD Tolling Alternative would increase traffic, these traffic increases have the potential to increase pollutant burdens and could contribute to chronic disease burdens and therefore would constitute a potential adverse effect on environmental justice populations. The specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario. The effects would vary in magnitude depending on the additional volume of traffic and the extent of pre-existing pollutant and chronic disease burdens.*

*If the Project receives Federal approval, the Project Sponsors will implement mitigation measures to potential Project-related traffic diversions, related air pollutants, and associated health effects in*

*communities that are already overburdened by pre-existing air pollution and chronic diseases, relative to national percentiles. Mitigation measures will include both regional measures, which will reduce truck diversions and reduce emissions, and place-based measures, to reduce emissions and improve air quality and/or health outcomes in areas with the greatest potential effect due to the Project. To fund these mitigation measures the Project Sponsors have committed $155 million over 5 years. The regional and place-based mitigation measures are summarized in Table 17-16. The Project Sponsors commit to these measures, regardless of the tolling structure eventually adopted. An adaptive management approach will be used which will include monitoring the efficacy of mitigation, stakeholder consultation, and adjustments as warranted. An additional $5 million has been allocated for mitigation and enhancement measures related to monitoring across other topics, along with $47.5 million for the low-income toll discount discussed in Section 17.7.2.*

*The specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario, but the communities largely remain the same across tolling scenarios.*

*As noted in Table 17-16, the Project Sponsors have committed to a toll policy that would further reduce tolls in the overnight period. Based on preliminary analysis, it is expected that this policy will avoid a substantial portion of projected truck diversions, as many of these diverted trucks are projected to occur during the overnight hours. Following the adoption of a final toll structure by the TBTA Board, which will include this reduced overnight toll rate along with the toll rates and any other potential discounts, crossing credits and/or exemptions, modeling of the adopted tolling structure will be undertaken to compare potential effects to the EA analyses.[23]*

*Of the seven place-based mitigation measures identified, five are flexible in where they can be implemented, while the tolling of movements into the Manhattan CBD at East Houston Street and the replacement of transport refrigeration units (TRUs) at Hunts Point Produce Market are specific to those particular locations.*

*After the actual toll rates are adopted, a process that includes both additional analyses and community input will take place to determine the sites of the other five place-based mitigation measures (e.g., in which schools to install air filtration units, or on what roadways to plant vegetation). This will require coordination between the Project Sponsors, the Environmental Justice Community Group (representing the 10-county environmental justice study area, and as described further in Table 17-18), the relevant communities receiving the place-based mitigation, and local implementing agencies, and will include needs assessments and feasibility screening to determine the range of possibilities.*

---

[23]   *As described in the EA, the adopted tolling scenario will be evaluated to determine if it could have effects that are materially different from those identified in the EA; and if so, further analysis may be required before Project implementation.]*

*[Table 17-16. Regional and Place-Based Mitigation Measures]*

| MITIGATION MEASURES | BENEFIT AND RESULT OF MITIGATION | 5-YEAR FUNDING[1] | RELEVANT LOCATION(S) | FUNDING SOURCE | IMPLEMEN-TATION LEAD |
|---|---|---|---|---|---|
| **Regional Mitigation** | | | | | |
| Further reduced overnight toll | Minimize/avoid truck diversions | $30 million | 10-county environmental justice study area | CBD Tolling Program | TBTA |
| Expand NYC Clean Trucks Program | NOx and PM2.5 reductions from 500 new clean trucks | $20 million | | CBD Tolling Program | NYCDOT |
| Expand NYCDOT Off-Hours Delivery Program | Safety and emissions reduction benefits resulting from reduced truck traffic during the day | $5 million | | CBD Tolling Program | NYCDOT |
| **Place-Based Mitigation** | | | | | |
| Toll vehicles traveling northbound on the FDR Drive that exit at East Houston Street and then travel southbound on FDR Drive | 25 to 35 percent of the non-truck traffic increases on the FDR Drive could be mitigated | N/A | FDR Drive between the Brooklyn Bridge and East Houston Street | N/A | TBTA |
| Replacement of Transport Refrigeration Units (TRUs) at Hunts Point Produce Market | Major NOx and PM2.5 reductions from the replacement of up to 1,000 TRUs | $15 million[2] | Hunts Point | MTA CMAQ Program | NYCDOT |
| Implement Electric Truck Charging Infrastructure | NOx and PM2.5 reductions from electric vehicles using 35 new chargers (at seven stations) | $20 million | After toll rates are set, a process that includes both additional analyses and community input will take place to determine specific locations | $10 million Federal CRP + $10 million CBD Tolling Program | NYSDOT |
| Install Roadside Vegetation to Improve Near-Road Air Quality | Improves near-road air quality by pollutant capture from 4,000 trees and 40,000 shrubs | $10 million | | CBD Tolling Program | TBTA with Relevant State and Local Agencies |
| Renovate Parks and Greenspace in Environmental Justice Communities | Increases overall community well-being. 2-5 park/greenspace renovations depending on size and complexity. | $25 million | | CBD Tolling Program | TBTA with Relevant State and Local Agencies |
| Install Air Filtration Units in Schools Near Highways | Removes air pollutants from classrooms. 25-40 schools depending on school size and complexity of existing HVAC system. | $10 million | | CBD Tolling Program | TBTA with Relevant State and Local Agencies |
| Establish Asthma Case Management Program and Bronx Center | Reduces hospitalizations and doctor visits, decreases days and nights with symptoms and missed school days – program expansion up to 25 schools | $20 million | | CBD Tolling Program | NYC DOHMH |

Notes:

[1]   An additional $5 million has been allocated for mitigation and enhancement measures related to monitoring across other topics, along with $47.5 million for the low-income toll discount discussed below. Enhancement measures include air quality monitoring that will expand NYC's existing monitoring network. Locations will be selected in consideration of the traffic and air quality analyses in the EA and in coordination with environmental justice stakeholders and relevant state and local agencies. This will complement the regional and place-based mitigation measures related to traffic diversions outlined here (see Chapter 10, "Air Quality," for details).

[2]   After three years, any remaining funds designated for TRU replacements may also be used for clean truck replacement vouchers through the NYC Clean Trucks Program.

*The specific feasibility factors and forms of engagement vary by mitigation and include:*

- *Electric Truck Charging Infrastructure: This mitigation will be implemented through the Federal Carbon Reduction Program (CRP) using funds received by NYSDOT and will therefore be limited to locations in New York. Siting considerations will include potential visual impacts, proximity to highways (to minimize travel on local roads), and the study of potential traffic and noise impacts. The NYMTC Clean Freight Corridors Study—a study developed by the metropolitan planning organization in consultation with motor carriers, utility companies, fuel infrastructure manufacturers/suppliers, truck stop operators, industrial real estate companies, and community and advocacy organizations—will be used to help identify priority locations. Such groups will be re-engaged, as warranted, along with state and local officials, to provide feedback in the course of identifying appropriate locations.*

- *Roadside Vegetation to Improve Near-Road Air Quality: The Project Sponsors will work with relevant local and state agencies to assess the availability of roadside space and the presence of existing plantings, as well as access and maintenance considerations, to identify appropriate sites near sensitive receptors (e.g., schools, day care, senior or community centers, or outdoor recreational facilities) as locations for new plantings. To align with community priorities, the Project Sponsors will engage with community stakeholders, elected officials, and the Environmental Justice Community Group.*

- *Parks and Greenspace in Environmental Justice Communities: The Project Sponsors will work with relevant state and local agencies to assess potential locations for park and greenspace investments in the affected communities, including in existing parkland where the expansion of green space, tree planting, or other upgrades is feasible. The agencies will solicit input on prioritization of locations and treatments from the Environmental Justice Community Group, local officials, and other community stakeholders.*

- *Air Filtration Units in Schools Near Highways: The Project Sponsors will work with relevant school authorities to assess needs and analyze feasibility of upgrading existing filtration systems in schools in census tracts within 300 meters of highways where truck traffic is projected to increase. Factors will include the design and performance of existing HVAC systems, the facility's proximity to highways, and the area asthma rates, as well as scheduled capital projects. The Project Sponsors will work with relevant state and local agencies and solicit input from community stakeholders to determine locations where air filtration upgrades will be most impactful.*

- *Asthma Case Management Program and Center: This mitigation will expand on the success of existing city programs operating within the five New York City counties.*

  - *Asthma Case Management Program—NYC Department of Health and Mental Hygiene (DOHMH) will conduct a needs assessment to identify schools in affected census tracts with existing high rates of asthma. Additionally, NYC DOHMH will engage with school leadership on expansion of the Asthma Care Management Program and will solicit input from the Environmental Justice Community Group, parents, and other community stakeholders on priority locations that should be prioritized and how to best reach families of children with asthma.*

  - *Asthma Center—Selection of a location in the Bronx will include consideration of asthma rates, population concentration, proximity to sensitive receptors, the location of existing facilities and*

*services, accessibility via public transportation, and availability of suitable space. NYC DOHMH will work with community stakeholders to solicit input on programming and outreach strategies to ensure that the center maximizes its benefit to people with asthma.*

*With implementation of these mitigation measures, the CBD Tolling Program would not result in adverse effects on environmental justice populations as a result of increased truck traffic. Therefore, no disproportionately high and adverse effect would occur. Further details on these investments and how they will be implemented by the Project Sponsors are provided in Table 17-17 and Table 17-18 at the end of this chapter.]*

## 17.7.2   Evaluation of Adverse Effect on Minority and Low-Income Drivers

The previous sections of this chapter describe that most people in the regional study area travel to and from the Manhattan CBD by public transportation using the region's robust transit network. With the CBD Tolling Alternative, most people, including minority and low-income populations, would continue to use public transportation to travel to and from the Manhattan CBD and would not be adversely affected by the new toll.

Most people who currently drive to the Manhattan CBD have alternative travel options to avoid the CBD toll. However, for some people, switching to transit is not a *[reasonable]* option because they have poor access to transit, commuting by transit is inefficient with long travel times, they have work hours during times of limited transit service, or they need access to a private automobile for their work. Individual drivers who do not have viable alternatives *[would be subject to the new CBD toll, unless otherwise exempt. For low-income drivers]*, the increased cost of travel to the Manhattan CBD due to the new toll would represent an adverse effect *[in the context of their existing income]*. The size of cost increase would depend on the tolling scenario and each driver's specific route and travel patterns.

### 17.7.2.1   Minority Drivers

The effect of the cost associated with the new CBD toll on minority drivers who have no *[reasonable]* alternative mode for reaching the Manhattan CBD other than private vehicle would be the same effect as experienced by the general population. This effect would not be predominantly borne by a minority population. As discussed earlier, approximately 52 percent of the region's population identifies as minority, and slightly less than half of the people who travel to the Manhattan CBD for work identify as minority. About 10 percent of the minority commuters to the Manhattan CBD, or approximately 73,000 commuters, commute by private vehicles. This is approximately 5 percent of all commuters to the Manhattan CBD. In addition, the effect on minority drivers would not be more severe or greater in magnitude for the minority population than for the general population. Consequently, the effect on minority drivers associated with the cost of the new toll would not be a disproportionately high and adverse effect.

### 17.7.2.2   Low-Income Drivers

The cost of the new CBD toll would not be predominantly borne by low-income drivers. As described earlier, approximately 14 percent of the commuters to the Manhattan CBD are low-income and 9 percent of the people who drive to the Manhattan CBD are low-income.

However, for low-income drivers who have no *[reasonable]* alternative to reach the Manhattan CBD other than private vehicle, the effect of that cost would be appreciably more severe than the effect on the non-low-income population, because the cost of the toll would represent a larger proportion of each driver's available income. The specific cost associated with the new toll would vary for each driver, depending on the route, time of day, frequency of the trip, and the tolling scenario. In addition, while the lowest tolls would be available to drivers who use E-ZPass, some low-income drivers may have difficulty maintaining an E-ZPass account. There is no fee for setting up an E-ZPass account and TBTA already offers a Pay-Per-Trip option and a Reload Card for cash customers to replenish their E-ZPass. However, there is a $10 refundable deposit required for customers who do not have a credit card account linked to their account.

For low-income travelers, a wide variety of discounted and lower cost transportation options are currently available in the New York City metropolitan region, including:

- **Transit Fare Discount for Individuals in Low-Income Households.** Beyond the Manhattan CBD, New York City residents between the ages of 18 and 64 who reside in a household with an income below the Federal poverty threshold, and are not receiving full carfare from the Department of Social Services/Human Resources Administration or any other New York City agency, are eligible for the Fair Fares program, which allows travel at half the full fare cost on MTA subway; local, limited, and SBS buses; and Access-A-Ride paratransit. *[As of January 2023, there were more than 275,500 people enrolled in the Fair Fares program.]*

- **Transit Fare Discount for Persons with Disabilities and Those 65 Years of Age and Older.** Even broader geographically, MTA subway, bus, and rail riders who are 65 and older or are persons with disabilities are eligible for a Reduced Fare program, which allows travel on transit at half the full fare cost. This program is not restricted to New York City residents. *[Nearly 1.4 million MTA customers are enrolled in the Reduced Fare program and, as of January 2023, more than 925,000 of those enrolled have been active in the past 18 months.]*

- **Student Transit Fare Discount.** MTA works with the New York City Department of Education so that students have access to education. Student MetroCards[24] are distributed by schools to students whose home is one-half mile or farther from their school. These MetroCards allow three free rides each school day between 5:30 a.m. and 8:30 p.m., including free transfers between buses or between the subway and local, limited, and SBS buses. *[For the 2021–2022 school year, NYCT distributed more than 3,425,000 Student MetroCards to the NYC Board of Education. These cards are provided for students for transportation to and from school (one MetroCard per semester) and for school-approved extracurricular activities.[25]]*

- **Free Ferry Service.** The Staten Island Ferry, which operates 24 hours a day, seven days a week, every day of the year, runs free ferry service from Staten Island to the Manhattan CBD. *[The ferry carries approximately 25 million passengers annually.[26]]*

---

[24] MetroCard is the primary payment method for the New York City subway and New York City and MTA buses.
[25] *MTA NYCT analysis, 2022.]*
[26] *NYCDOT, "Staten Island Ferry Facts." https://www.nyc.gov/html/dot/html/ferrybus/ferry-facts.shtml#:~:text=The%20Ferry%20carries%20approximately%2025,day%2C%20365%20days%20a%20year.]*

- **Reduced-Fare Bike Share.** Citi Bike, in partnership with Healthfirst and NYCDOT, provides reduced cost membership of $5/month (roughly one-third the typical membership) for low-income individuals 16 years and older who are residents of New York City Housing Authority facilities or receive Supplemental Nutrition Assistance Program (SNAP) benefits. *[For those who cannot bike for their entire commute, Citi Bike can serve as a "first-mile/last-mile" mode to access transit. In 2022, there were more than 15,000 people enrolled in Citi Bike's low-fare membership program, and those enrolled took 50 percent more rides than full-priced members, a testament to its utility for low-income people.[27]]*

- **24-Hour Public Transportation Widely Available.** As described in other chapters of this EA, New York City and the surrounding regional transportation network that operates seven days a week all year long. The services within New York City operate 24 hours a day.

- **E-ZPass Payment Options.** To make the convenience of E-ZPass available for as many customers as possible, TBTA offers a Pay-Per-Trip option and a Reload Card for customers without credit cards to replenish their E-ZPass. *[About 250,000 accounts, or 6 percent of all MTA E-ZPass accounts, are Pay-Per-Trip accounts. Establishing an E-ZPass account ensures customers pay the lowest applicable tolls and can qualify for resident rebates on existing facilities. For example, there are more than 200,000 transponders associated with more than 135,000 accounts enrolled in the Staten Island Resident Rebate program, which provides drivers with an effective toll rate of $2.75 (the cost of a one-way MTA transit fare) in each direction on the Verrazzano-Narrows Bridge.[28]]*

- *[MTA City Ticket Program. MTA established the reduced-cost, flat-fare City Ticket to encourage travel on Long Island Rail Road and Metro-North Railroad between stations within New York City. Currently, City Tickets cost $5.00 and are good for one-way travel during off-peak hours. MTA will soon expand the City Ticket program to include peak hours with a modestly higher peak rate, to be adopted by the MTA Board. By comparison, peak hour travel tickets currently can cost as much as $10.75 on Long Island Rail Road and $9.75 on Metro-North Railroad. This change will make faster travel between the Manhattan CBD and neighborhoods in the Bronx, Brooklyn, and Queens more affordable, and will benefit more than 10,000 trips on an average weekday.[29]]*

*[In addition to]* these *[existing]* programs offered or supported by the Project Sponsors, the Project Sponsors will implement the following mitigation measures *[to address the potential adverse effect of the CBD Tolling Program on low-income drivers]*:

- *[New in the Final EA – TBTA will ensure that for the first five years of the Project, the final tolling structure includes a discounted toll rate for low-income frequent drivers, who could include, for example, commuters to the Manhattan CBD or people who travel regularly to the CBD for medical appointments. The discounted toll rate will be in place for drivers who have either a Federal adjusted*

---

[27] *The Better Bike Share Partnership, "This Summer, NYC Youth Rode Citi Bike to Work." https://betterbikeshare.org/2022/09/27/this-summer-nyc-youth-rode-citi-bike-to-work/.]*

[28] *TBTA analysis, 2022.]*

[29] *Office of New York Governor Kathy Hochul. 2023. "Governor Hochul Announces Public Transit Expansions to Increase Access, Affordability and Safety." Jan. 10, 2023. https://www.governor.ny.gov/news/governor-hochul-announces-public-transit-expansions-increase-access-affordability-and-safety]*

*gross income reported on their income tax return for the prior calendar year in the amount of no more than $50,000 or proof of enrollment in a qualifying government-provided income-based program (such as the Supplemental Nutrition Assistance Program (SNAP) or the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC)).[30] Through the use of their E-ZPass tag and an associated Low-Income Discount Plan on their E-ZPass account, qualifying drivers will benefit from a 25 percent discount on the full CBD E-ZPass toll rate for the applicable time of day after the first 10 trips in each calendar month. (This discount will not include the overnight period, which will already be deeply discounted.) For more information on development of this mitigation, see Appendix 17E, "Approach to Mitigating the Effect of CBD Tolls on Low-Income Frequent Drivers."*

- *New in the Final EA – Further Reduced Overnight CBD Toll. All tolling scenarios in the EA included an overnight toll rate of either 50 or 60 percent of the peak rate. TBTA will ensure the overnight toll rate for all vehicles is reduced to at or below 50 percent of the peak toll from at least 12:00 a.m. to 4:00 a.m. in the final toll structure; this will benefit low-income drivers who travel during that time and who may have limited opportunities to take transit because of reduced frequency or service during the overnight hours.]*

- **Tax Credit for Tolls Paid:** The Project will include a tax credit for CBD tolls paid by residents of the Manhattan CBD whose New York adjusted gross income for the taxable year is less than $60,000. (As shown in **Figure 17-*[14]***, 33 percent of the households in the Manhattan CBD have household incomes below $60,000.) TBTA will coordinate with the New York State Department of Taxation and Finance (NYS DTF) so that documentation that may be needed for those eligible for the New York State tax credit is available.[31]

- **Education/Outreach/Coordination on the Tax Credit:** TBTA will post information on the Project website related to the tax credit and a link to the appropriate location on the NYS DTF website that guides eligible drivers to information on filing their taxes.

- **Elimination of the E-ZPass Tag Deposit Fee:** For all drivers, the best way to reduce toll costs associated with the CBD Tolling Program would be to use E-ZPass, since toll rates would be lower for those who use E-ZPass than for those who do not. As noted, TBTA already offers a Pay-Per-Trip option and a Reload Card for cash customers to replenish their E-ZPass. However, there is a $10 refundable deposit required for customers who do not have a credit card account linked to their account. Recognizing that these tend to be low-income customers, TBTA, as one of the Project Sponsors, will eliminate the required refundable deposit for customers who want E-ZPass but do not have a credit card connected to their account. This will benefit all TBTA E-ZPass tag holders who do not have a credit card connected to their account, whether or not they drive to the Manhattan CBD. *[Importantly, in many cases, once customers have an E-ZPass, they will also benefit from lower toll rates (compared to Tolls by Mail) on other facilities, including but not limited to the Port Authority of NY & NJ tunnels and bridges, TBTA's bridges and tunnels, the New York State Bridge Authority bridges, and the New York State Thruway, thus*

---

[30] *The Project Sponsors commit to a five-year period for the discounted toll rate to allow time for frequent low-income drivers to try alternatives and/or adjust their travel habits as capital projects increase reliability and access.]*

[31] *Although some people might not earn annually to have to file a tax return, they may still opt to submit a tax return to claim the credit. Free tax filing programs are available for qualifying individuals through the NYS Department of Taxation and Finance and the NYC Department of Consumer and Worker Protection (DCWP).]*

*reducing their overall toll expenditure. There are over 815,000 MTA E-ZPass accounts that are not linked to a credit card and require the tag deposit.[32]*

- **Enhanced Promotion of Existing E-ZPass Payment and Plan Options:** TBTA will provide enhanced promotion of existing E-ZPass payment and plan options, including the ability for drivers to pay per trip (rather than a pre-load *[ed]* balance) and refill their accounts with cash at participating retail partners.

- **Education/Outreach on Transit Discounts:** TBTA will coordinate with MTA to provide outreach and education on eligibility for existing discounted transit fare products and programs, including those for individuals 65 years of age and older, those with disabilities, and those with low incomes, about which many may not be aware.

Figure 17-*[14]*.  Income Distribution for Households in the Manhattan CBD



Source: U.S. Census Bureau, ACS 2015-2019 5-Year Estimates.

- Establishment of an Environmental Justice Community Group: The Project Sponsors commit to establishing an Environmental Justice Community Group that *[will]* meet on a *[quarterly]* basis, with the first meeting *[taking place prior to]* Project implementation. *The Project Sponsors will continue to provide meaningful opportunities for participation and engagement related to environmental justice concerns by sharing updated data and analysis, listening to concerns and seeking feedback on the toll setting process].*

In addition, the Project Sponsors are committed to implementing the following enhancement:

---

[32   *TBTA analysis, 2023.]*

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 17, Environmental Justice

- *Enhancement: Prioritizing Equity in Improving Bus Service in New York City.* New York City's buses serve a greater share of low-income and minority households compared to other modes of transportation, including subways. *[MTA NYCT, when redesigning its bus networks, took into consideration areas with higher rates of low-income and minority households.]* The recently implemented Bus Network Redesigns in Staten Island and the Bronx have been well-received. *[Since implementation of the redesigns, bus speeds in Staten Island have increased by 5 percent on weekdays overall, with the AM peak weekdays speeds 9 percent faster. And on Bronx bus routes speeds are now the highest in the system, outperforming the systemwide average by 7 percent. Not only are customers reporting satisfaction with these changes, but the routes are also attracting new riders, with increased ridership on many of the changed routes.[33]]* Network redesigns in Queens and Brooklyn are progressing. TBTA commits to working with NYCT to address areas identified in the EA where bus service could be improved as the Brooklyn and Manhattan Bus Network Redesigns move forward.

*[The additional mitigation measures will help to address the adverse effect of the new toll on low-income drivers who have no reasonable alternative to driving to the Manhattan CBD. With the additional mitigation measures, the CBD Tolling Program would not have a disproportionately high and adverse effect on low-income drivers.]*

### 17.7.3   Evaluation of Adverse Effect on Taxi and FHV Drivers

A potential adverse effect would occur to taxi and/or FHV drivers in New York City, who largely identify as minority populations, in tolling scenarios that toll their vehicles more than once a day. This would occur in unmodified Tolling Scenarios A, D, and G; for FHV drivers it would also occur in Tolling Scenarios C and E. The adverse effect would be related to the cost of the new CBD toll and the reduction of VMT for taxis and/or FHVs, which would result in a decrease in revenues that could lead to losses in employment. This adverse effect would occur predominantly to a minority population and therefore would be a disproportionately high and adverse effect.

*[To address this adverse effect, the Project Sponsors have committed to a toll structure of no more than once per day toll for taxis or FHVs in the final CBD toll structure. With this mitigation, no disproportionately high and adverse effect would occur to taxi and FHV drivers.[34]]*

### 17.8   CONCLUSION

Consistent with USDOT Order 5610.2C and FHWA Order 6640.23A, the environmental justice analysis included a review of Project effects to identify appropriate study areas, identification of existing minority and low-income populations in the study areas, identification of potential adverse effects of the Project on

---

[33 *MTA NYCT analysis, 2022.]*
[34 *This commitment would not preclude New York City taxi and FHV drivers from benefiting from the low-income driver mitigation measures, including the Low-Income Discount Plan for their vehicles that are not licensed as taxis or FHVs, provided that they can demonstrate eligibility.]*

environmental justice populations, and consideration of whether the CBD Tolling Alternative would result in disproportionately high and adverse effects on environmental justice populations.

Public engagement is a critical component of USDOT's and FHWA's policies and practices related to environmental justice. FHWA and the Project Sponsors conducted an extensive early public outreach program for the Project during preparation of *[the]* EA with a specific focus on coordinating with and obtaining feedback environmental justice populations and representatives of environmental justice communities that could be affected by the Project.

*[USDOT Order 5610.2C and FHWA Order 6640.23A state that FHWA will ensure that any actions that have the potential for a disproportionately high and adverse effect on minority or low-income populations will only be carried out if:*

1. *"Further mitigation measures or alternatives that would avoid or reduce the disproportionately high and adverse effect are not practicable."*

2. *"A substantial need for the program, policy or activity exists, based on the overall public interest."*

3. *"Alternatives that would have less adverse effects on protected populations have either: (a) adverse social, economic, environmental, or human health impacts that are severe; or (b) would involve increased costs of extraordinary magnitude."*

*USDOT Order 5610.2C and FHWA Order 6640.23A further explain, "In determining whether a mitigation measure or an alternative is 'practicable,' the social, economic (including costs) and environmental effects of avoiding or mitigating the adverse effects will be taken into account."]*

The environmental justice analysis *[presented in this chapter]* conclude*[s]* that the CBD Tolling Alternative would not result in adverse effects on environmental justice populations in most of the topic areas reviewed*[, and that with the implementation of mitigation the Project would not result in any potentially disproportionately high and adverse effects on environmental justice populations.]*

The Project would address the demonstrated need to reduce vehicle congestion in the Manhattan CBD, which would benefit all drivers traveling to and near the Manhattan CBD, especially those who value their travel-time savings more than the toll cost. The reduced congestion would produce other related benefits, including travel-time savings, improved travel-time reliability, reduced vehicle operating costs, improved safety for vehicles, pedestrians, and bicyclists, and improved air quality in the Manhattan CBD and regionwide.

Reductions in vehicle volumes and VMT in the Manhattan CBD and other locations within the regional study area would benefit those who continue to drive in the Manhattan CBD, including delivery vehicles and taxi and FHV drivers. Transit riders who use buses, including minority and low-income passengers, would benefit from the CBD Tolling Alternative through congestion reduction that would result in travel-time savings, improved travel-time reliability, and improved safety.

Central Business District (CBD) Tolling Program Environmental Assessment
Chapter 17, Environmental Justice

Reduced regional air pollution would provide an important benefit to all residents of the region, particularly for environmental justice populations who experience adverse health effects related to air pollution, such as asthma. Most environmental justice populations who live in the Manhattan CBD would experience lower localized pollutant emissions due to reduced traffic.

In addition, the CBD Tolling Alternative would establish a reliable, recurring local source of funding for MTA capital projects, which would allow MTA to reinvest in and improve its transportation network. Most people throughout the region use public transportation to travel to and from the Manhattan CBD. As discussed earlier, approximately 76 percent of the people who travel to the Manhattan CBD for work use public transportation and this percentage is higher for minority commuters (82 percent) and low-income commuters (79 percent). MTA's transportation network is critical for mobility in the region, and improvements to the network would allow it to absorb increasing transit ridership and further reduce vehicle congestion.

**Table 17-*[17]*** summarizes the effects of the environmental justice analysis presented in this chapter*[, and Table 17-18 provides a summary of how mitigation and enhancement measures will be implemented by the Project Sponsors]*.

Table 17-/17/. Summary of Effects of the CBD Tolling Alternative Related to Environmental Justice.

| TOPIC | SUMMARY OF EFFECTS | [ DEAT O ] | DATA SHOWN IN TABLE | TOLLING SCENARIO | | | | | | | POTENTIAL ADVERSE EFFECT | MITIGATION AND ENHANCEMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | A | B | C | D | E | F | G | | |
| Low-income drivers | [The EA as published in August 2022 found t]he increased cost to drivers with the new CBD toll would disproportionately affect low-income drivers to the Manhattan CBD who do not have [a reasonable] alternative for reaching the Manhattan CBD. [ ith further analysis of the population affected and the addition of new mitigation the inal EA concludes there would not be a disproportionately high and adverse effect on low [income drivers ] | [2 county study area] | Narrative | The increased cost to drivers would [occur under] all tolling scenarios. | | | | | | | Yes | Mitigation needed. The Project will include a tax credit for CBD tolls paid by residents of the Manhattan CBD whose New York adjusted gross income for the taxable year is less than $60,000. TBTA will coordinate with the New York State Department of Taxation and Finance (NYS DTF) to ensure availability of documentation needed for drivers eligible for the New York State tax credit.

TBTA will post information related to the tax credit on the Project website, with a link to the appropriate location on the NYS DTF website to guide eligible drivers to information on claiming the credit.

TBTA will eliminate the $10 refundable deposit currently required for E-ZPass customers who do not have a credit card linked to their account, and which is sometimes a barrier to access.

TBTA will provide enhanced promotion of existing E-ZPass payment and plan options, including the ability for drivers to pay per trip (rather than a pre-load[ed] balance) and refill their accounts with cash at participating retail locations, and discount plans already in place, about which they may not be aware.

TBTA will coordinate with MTA to provide outreach and education on eligibility for existing discounted transit fare products and programs, including those for individuals 65 years of age and older, those with disabilities, and those with low incomes, about which many may not be aware.

The Project Sponsors commit to establishing an Environmental Justice Community Group that [will] meet on a [ uarterly] basis, with the first meeting [ta ing place prior to] Project implementation, to share updated data and analysis and hear about potential concerns. [As it relates to environmental ustice the ro ect  ponsors will continue providing meaningful opportunities for participation and engagement by sharing updated data and analysis  listening to concerns and see ing feedbac on the toll setting process

ew in  inal EA - TBTA will ensure the overnight toll for truc s and other vehicles is reduced to at or below  0 percent of the pea  toll from at least  2 00 a m to    00 a m  in the final CB  toll structure  this will benefit low income drivers who travel during that time

me in the  inal EA -  or five years  TBTA commits to a  ow  ncome iscount  lan for low income fre uent drivers who will benefit from a 2 percent discount on the full CB  E   ass toll rate for the applicable time of day after the first  0 trips in each calendar month  not including the overnight period  which will already be deeply discounted

Enhancement
TBTA will coordinate with MTA   CT to improve bus service in areas identified in the EA as the Broo lyn and Manhattan Bus   etwor  edesigns move forward ] |

| TOPIC | SUMMARY OF EFFECTS | [LOCATIO ] | DATA SHOWN IN TABLE | TOLLING SCENARIO | | | | | | | POTENTIAL ADVERSE EFFECT | MITIGATION AND ENHANCEMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | A | B | C | D | E | F | G | | |
| | | | Narrative | Potential adverse effect would occur in Tolling Scenarios A, D, and G, which would not have caps or exemptions for taxis and FHV drivers. | | | | | | | | |
| | [The EA as published in August 2022 found a] potential disproportionately high and adverse effect would occur to taxi and FHV drivers in New York City, who largely identify as minority populations, in tolling scenarios that toll their vehicles more than once a day. This would occur in unmodified Tolling Scenarios A, D, and G; for FHV drivers, it would also occur in Tolling Scenarios C and E. The adverse effect would be related to the cost of the new Manhattan CBD toll and the reduction of VMT for taxis and FHVs, which would result in a decrease in revenues that could lead to losses in employment. [ ith the addition of new mitigation the  inal EA concludes there would not be a disproportionately high and adverse effect on ta i and  drivers ] | [ ew or City] | Change in daily taxi/FHV VMT with passengers in the CBD relative to No Action Alternative: Scenarios included in EA | -21,498 (-6.6%) | +15,020 (+4.6%) | -11,371 (-3.5%) | -54,476 (-16.8%) | -25,621 (-7.9%) | +4,962 (+1.5%) | -27,757 (-8.6%) | Yes | [ ew in  inal EA  Mitigation needed  TBTA will ensure that a toll structure with tolls of no more than once per day for ta is or  s is included in the final CB  toll structure ] |
| Taxi and FHV drivers | | | Net change in daily taxi/FHV trips to CBD relative to scenarios included in EA: Additional analysis to assess effects of caps or exemptions | Tolls capped at 1x / Day; +2% | — | — | Tolls capped at 1x / Day; +3% / Exempt +50% | — | — | Tolls capped at 1x / Day; +2% | | |

| TOPIC | SUMMARY OF EFFECTS | [ OCAT O ] | DATA SHOWN IN TABLE | TOLLING SCENARIO | | | | | | | POTENTIAL ADVERSE EFFECT | MITIGATION AND ENHANCEMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | A | B | C | D | E | F | G | | |
| [ ncreases or decreases in traffic as a result of traffic diversions in communities already overburdened by pre e isting air pollution and chronic diseases | Certain environmental ustice communities would benefit from decreased traffic some communities that are already overburdened by pre e isting air pollution and chronic diseases could see an adverse effect as a result of increased traffic | The specific census tracts that would e perience increased or decreased traffic change slightly depending on the tolling scenario The following communities could have census tracts that ment place based mitigation igh Bridge Morrisania and Crotona Tremont unts oint Mott aven elham Throgs ec ortheast Bron East arlem andall s sland ower East ide ower Manhattan owntown Broo lyn ort Greene outh illiamsburg Orange East Orange ewar and ort ee ee ote | arrative | | | | Census tracts with pre e isting air pollutant and chronic disease burdens that would benefit from reduced traffic and those affected by increased traffic would vary somewhat but the identified communities remain largely the same across Tolling cenarios nder Tolling cenario G ort ee would not e perience increases | | | | | es | ew in inal EA Mitigation needed **egional Mitigation** TBTA will ensure the overnight toll for truc s and other vehicles is reduced to at or below 0 percent of the pea toll from at least 2 00 a m to 00 a m in the final toll structure this will reduce truc diversions C OT will e pand C Clean Truc s rogram to accelerate the replacement of eligible old diesel truc s which travel on highways in certain environmental ustice communities while tra o ect is pro ected to increase truc traffic to lower emission electric hybrid compressed natural gas and clean diesel vehicles C OT will e pand its off hours delivery program to locations where this e ect is pro ected to increase truc diversions to reduce daytime truc traffic and increase roadway safety in certain environmental ustice communities **lace based Mitigation** TBTA will toll vehicles traveling northbound on the ... ... e it at I uu narrow ... and then limit to immediately travel south on ... this will mitigate modeled non truc traffic increases on the ... between the Bron lyn Bridge and Lin urston Tred C OT will coordinate to replace diesel burning f s se ... with cleaner vehicles IT will coordinate to e pand electric truc charging infrastructure The o ect ponsors will coordinate to install roadside vegetation to improve near road air uality The o ect ponsors will renovate par s and greenspaces The o ect ponsors will install or upgrade air filtration units in schools The o ect ponsors will coordinate to e pand e isting asthma case management programs and create new community based asthma programming through a neighborhood asthma center in the Bron [ ] |

*[Note:*
*7 The o ect ponsors have committed to a toll policy that will reduce the overnight toll rate from at least 2 00 a m to 00 a m Based on the modeling underta en for the tolling scenarios analy ed in the EA it is e pected that this policy will avoid a substantial portion of pro ected truc diversions as many of these diverted truc s were pro ected to occur during the overnight hours ollowing the adoption of the CB tolling structure by the TBTA Board which will include this overnight e emption discount modeling of the adopted tolling structure will be underta en to determine where truc diversions are e pected to occur After the communities and census tracts are confirmed through the analysis of the adopted toll schedule specific siting of place based mitigation measures will re uire further coordination between the o ect ponsors the Environmental Justice Community Group representing the 0 county environmental ustice study area the relevant communities receiving the place based mitigation and relevant local and state implementing agencies ]*

[Table 17-18. Summary of the CBD Tolling Alternative Implementation Approach for Mitigation and Enhancement Measures Related to Environmental Justice]

| TOPIC | RELEVANT LOCATION(S) | DESCRIPTION OF MITIGATION OR ENHANCEMENT | TIMELINE FOR PRE- AND POST-PROJECT IMPLEMENTATION DATA COLLECTION FOR SPECIFIC MEASURES | THRESHOLD FOR DETERMINING WHEN NEXT STEP(S) WILL BE IMPLEMENTED | TIMING FOR SPECIFIC MEASURES | LEAD AGENCY |
|---|---|---|---|---|---|---|
| Low-income drivers | 28-county study area | The Project will include a tax credit for CBD tolls paid by residents of the Manhattan CBD whose New York adjusted gross income for the taxable year is less than $60,000. TBTA will coordinate with the New York State Department of Taxation and Finance (NYS DTF) to ensure availability of documentation needed for drivers eligible for the NYS tax credit. | N/A – No early monitoring required; implemented under any adopted tolling structure. Data on the utilization of tax credits for CBD tolls paid will be collected by NYS DTF. | | Coordination with NYS DTF will begin immediately after project approval, if approved. | TBTA will lead and coordinate with the NYS DTF. |
| | | TBTA will post information related to the tax credit on the Project website, with a link to the appropriate location on the NYS DTF website to guide eligible drivers to information on claiming the credit. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Information will be made available to the public about the tax credit during the public information campaigns at least 60 days prior to Project implementation. Information will be provided through a combination of methods which may include print publications, radio, billboards, websites, social media, and existing MTA assets such as digital subway station signs and bus advertising. Information will be provided in multiple languages and targeted geographically. | TBTA will lead and coordinate with the NYS DTF. |
| | | TBTA will eliminate the $10 refundable deposit currently required for E-ZPass customers who do not have a credit card linked to their account, and which is sometimes a barrier to access. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | 60 days prior to Project implementation. | TBTA will lead. |
| | | TBTA will provide enhanced promotion of existing E-ZPass payment and plan options, including the ability for drivers to pay per trip (rather than a pre-loaded balance), refill their accounts with cash at participating retail locations, and discount plans already in place, about which they may not be aware. | N/A – No early monitoring required; implemented under any adopted tolling structure. Information on the scope and reach of promotion efforts will be documented, and data on E-ZPass account type and volume is collected in an ongoing manner. | N/A – No threshold required; implemented under any adopted tolling structure. | Promotion will be part of the public information campaigns at least 60 days prior to Project implementation. | TBTA will lead. |
| | | TBTA will coordinate with MTA to provide outreach and education on eligibility for existing discounted transit fare products and programs, including those for individuals 65 years of age and older, those with disabilities, and those with low incomes, about which many may not be aware. | N/A – No early monitoring required; implemented under any adopted tolling structure. Information on the scope and reach of outreach efforts will be documented. | N/A – No threshold required; implemented under any adopted tolling structure. | Outreach will be part of the public information campaigns at least 60 days prior to Project implementation. | TBTA will lead in partnership with MTA. |
| | | The Project Sponsors commit to establishing an Environmental Justice Community Group that will meet on a quarterly basis, with the first meeting taking place prior to Project implementation. As it relates to environmental justice, the Project Sponsors will continue providing meaningful opportunities for participation and engagement by sharing updated data and analysis, listening to concerns and seeking feedback on the toll setting process. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Membership will be confirmed six months prior to Project implementation, with the first meeting taking place prior to implementation, the second meeting within the six months after implementation, and meetings quarterly thereafter. | TBTA will lead, in partnership with NYSDOT and NYCDOT. |
| | | New in Final EA: TBTA will ensure the overnight toll for trucks and other vehicles is reduced to at or below 50 percent of the peak toll from at least 12:00 a.m. to 4:00 a.m. in the final CBD toll structure; this will benefit low-income drivers who travel during that time. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Concurrent with Project implementation. | TBTA will lead. |
| | | New in Final EA: For five years, TBTA commits to a Low-Income Discount Plan for frequent low-income drivers who will benefit from a 25 percent discount on the toll CBD E-ZPass toll rate for the applicable lane of day after the first 10 trips in each calendar month (not including the overnight period, which toll already be deeply discounted). | N/A – No early monitoring required; implemented under any adopted tolling structure; application process will begin several months in advance of the commencement of tolling operations. | N/A – No threshold required; implemented under any adopted tolling structure. | Concurrent with Project Implementation. | TBTA will lead. |

| TOPIC | RELEVANT LOCATION(S) | DESCRIPTION OF MITIGATION OR ENHANCEMENT | TIMELINE FOR PRE- AND POST PROJECT IMPLEMENTATION DATA COLLECTION FOR SPECIFIC MEASURES | THRESHOLD FOR DETERMINING WHEN NEXT STEP(S) WILL BE IMPLEMENTED | TIMING FOR SPECIFIC MEASURES | LEAD AGENCY |
|---|---|---|---|---|---|---|
| Low-income drivers (Cont'd) | New York City | TBTA will coordinate with MTA NYCT to improve bus service in areas identified in the EA as the Brooklyn and Manhattan Bus Network Redesigns move forward. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Coordination between TBTA and NYCT is ongoing and will increase after toll rates are set. The Brooklyn Bus Network Redesign Draft Plan was published in December 2022 and will be refined in 2023. The next step in the Manhattan Bus Network Redesign is an Existing Conditions Report. | TBTA will coordinate with NYCT. |
| Taxi and FHV drivers | New York City | New in Final EA: TBTA will ensure that a toll structure with tolls of no more than once per day for taxis or FHVs is included in the final CBD toll structure to avoid a disproportionately high and adverse effect on taxi and FHV drivers from the Project. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Concurrent with Project implementation. | TBTA will lead. |
| Traffic diversion to certain communities already overburdened by pre-existing air pollution and chronic diseases (See Note 1) | Multiple throughout the environmental justice study area | New in Final EA: TBTA will ensure the overnight toll for trucks and other vehicles is reduced to at or below 50 percent of the peak toll from at least 12:00 a.m. to 4:00 a.m. in the final structure; this will reduce truck diversions. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Concurrent with Project implementation. | TBTA will lead. |
| | | New in Final EA: NYCDOT will expand NYC Clean Trucks Program to accelerate the replacement of eligible old diesel trucks, which travel on highways in certain environmental justice communities where the Project is projected to increase truck traffic, to lower-emission electric, hybrid, compressed natural gas, and clean diesel vehicles. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Engagement with truck-owning companies will start after toll rates are set; implementation will begin within six months of start of tolling operations. | NYCDOT will lead. |
| | | New in Final EA: NYCDOT will expand its off-hours deliveries program to locations where the Project is projected to increase truck traffic to reduce daytime truck traffic and minimize roadway safety in certain environmental justice communities. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Engagement with shippers and receivers will start after the toll rates are set; implementation will begin within six months of start of tolling operations. | NYCDOT will lead. |
| | FDR Drive between the Brooklyn Bridge and East Houston Street | New in Final EA: TBTA will toll vehicles traveling northbound on the FDR Drive that exit at East Houston Street and then turn to immediately travel south on FDR Drive; this will mitigate avoided non-truck traffic increases on the FDR Drive between the Brooklyn Bridge and East Houston Street. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Concurrent with Project implementation. | TBTA will lead. |
| | Hunts Point Produce Market | New in Final EA: The Project Sponsors will coordinate to replace diesel-burning TRUs with cleaner vehicles at the Hunts Point Produce Market. | N/A – No early monitoring required; implemented under any adopted tolling structure. | N/A – No threshold required; implemented under any adopted tolling structure. | Engagement with TRU owners and lessees for TRU replacement will start immediately after receiving Project approval. | NYCDOT will lead. |

| TOPIC | RELEVANT LOCATION(S) | DESCRIPTION OF MITIGATION OR ENHANCEMENT | TIMELINE FOR PRE- AND POST-PROJECT IMPLEMENTATION DATA COLLECTION FOR SPECIFIC MEASURES | THRESHOLD FOR DETERMINING WHEN NEXT STEP(S) WILL BE IMPLEMENTED | TIMING FOR SPECIFIC MEASURES | LEAD AGENCY |
|---|---|---|---|---|---|---|
| Traffic diversion to certain communities already overburdened by pre-existing air pollution and chronic diseases (See Note 1) (Cont'd) | The specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario. The following communities could have census tracts that merit place-based mitigation: High Bridge, Morrisania and Crotona, Tremont, Hunts Point, Mott Haven, Pelham, Throgs Neck, Northeast Bronx, East Harlem, Randall's Island, Downtown Brooklyn, Fort Greene, South Williamsburg, Orange, East Orange, Newark, and Fort Lee (See Note 1). | New in Final EA: NYSDOT will coordinate to expand electric truck charging infrastructure through the Federal Carbon Reduction Program. | After toll rates are set, analyses of the adopted toll structure will be undertaken as outlined in Appendix 17D to determine where truck diversions are expected to occur. With this analysis and through continued engagement with the Environmental Justice Community Group and other stakeholders, specific locations for place-based mitigation will be determined. Data on the scope and impact of mitigation measures implemented will be collected in an ongoing manner. | N/A – No threshold required, implemented under any adopted tolling structure. | Specific locations will be determined after toll rates are set; implementation will begin within six months of start of tolling operations. | NYSDOT will lead. |
| | | New in Final EA: The Project Sponsors will coordinate to install roadside vegetation to improve near-road air quality. | | | Specific locations will be determined with the affected communities after toll rates are set; implementation will begin within six months of start of tolling operations. | The Project Sponsors will coordinate with relevant state and local agencies. |
| | | New in Final EA: The Project Sponsors will renovate parks and greenspaces. | | | Specific locations will be determined with the affected communities after toll rates are set; implementation timing will be determined after locations are confirmed. | The Project Sponsors will coordinate with relevant local agencies. |
| | | New in Final EA: The Project Sponsors will install or upgrade air filtration units in schools. | | | After the toll rates are set, a siteneeds assessment will take place prior to start of tolling operations; implementation timing will be determined after locations are confirmed. | The Project Sponsors will coordinate with relevant local agencies. |
| | | New in Final EA: The Project Sponsors will work with NYC DOHMH to expand their asthma case management program and create new community-based asthma programming through a neighborhood asthma center in the Bronx. | | | After the toll rates are set, a siteneeds assessment will take place prior to start of tolling operations; implementation timing will be determined after locations are confirmed. | The Project Sponsors will coordinate with NYC DOHMH. |

Notes:
1. To fund the mitigation measures for this topic the Project Sponsors have committed $155 million over five years. The Project Sponsors commit to these measures, regardless of the tolling structure eventually adopted. The allocation of funding is described in greater detail in Chapter 17, "Environmental Justice." An additional $5 million has been allocated for mitigation and enhancement measures related to monitoring across other topics, along with $43.5 million for the low-income toll discount.
2. The Project Sponsors have committed to a toll policy that will reduce the overnight toll rate at least from 12:00 a.m. to 4:00 a.m. Based on the modeling undertaken for the tolling scenarios analyzed in the EA, it is expected that this policy will avoid a substantial portion of projected truck diversions, as many of these diverted trucks were projected to occur during the overnight hours. Following the adoption of the CBD tolling structure by the TBTA Board, which will include this overnight exemption/discount, modeling of the adopted tolling structure will be undertaken to determine where truck diversions are expected to occur. Following this analysis, specific siting of place-based mitigation measures will require further coordination between the Project Sponsors, the Environmental Justice Community Group (representing the 10-county environmental justice study area), the relevant communities receiving the place-based mitigation, and relevant local and state implementing agencies.

## 17.9   ENVIRONMENTAL JUSTICE PUBLIC ENGAGEMENT

Public engagement is a critical component of USDOT's and FHWA's policies and practices related to environmental justice. FHWA and the Project Sponsors conducted an extensive early public outreach program for the Project during preparation of this EA with a specific focus on coordinating with and obtaining feedback from environmental justice populations and representatives of environmental justice communities that could be affected by the Project. This section describes the extensive environmental justice public outreach program that FHWA and the Project Sponsors developed for the Project. See **Chapter 18, "Agency Coordination and Public Participation"** for additional details on outreach methods and general public involvement efforts for the Project.

FHWA and the Project Sponsors used comments and feedback provided during this early public outreach to inform the environmental justice analysis and overall preparation of this EA as described throughout this chapter. A summary of issues raised and how they were addressed in the environmental justice analysis is provided in **Section 17.4** of this chapter.

FHWA and the Project Sponsors began outreach for the Project to environmental justice populations in August 2021. Using preliminary data and analyses collected during development of this EA, the Project Sponsors identified social media and traditional media outlets that would reach a wide audience of minority and low-income populations in the 28-county regional study area. The Project Sponsors relied on contact information from MTA's Office of Diversity, NYCDOT, and Metropolitan Planning Organizations and Councils of Government that represent counties within the study area to begin a contact list and have updated that list as members of the public have expressed interest in the Project. The Project Sponsors used the contact list to circulate information about the Project and public meeting opportunities. In addition, FHWA and the Project Sponsors corresponded with Federally recognized and state recognized Native American tribes with current or historical presence within the regional study area to inform them about the Project and to offer an opportunity to meet with them to provide further information and discuss any concerns.

### 17.9.1   Environmental Justice Webinars

The Project Sponsors held webinars to engage with environmental justice populations throughout the regional study area. Promotional materials and the Project website (https://new.mta.info/project/CBDTP) described that the purpose of these meetings was to provide information to and get input from environmental justice populations. The Project Sponsors targeted sessions to the three states in the study area, Connecticut, New Jersey, and New York, but people were welcome to attend any session. Although advertised as environmental justice webinars, any member of the public could attend and speak at the sessions.

The Project Sponsors advertised the environmental justice webinars through social media, traditional media, signs and posters on public transportation and at stations, and announcements on the Project Sponsors' websites. As described in **Chapter 18, "Agency Coordination and Public Participation,"** the Project Sponsors advertised meetings on 33 media outlets including English and foreign language publications throughout the 28-county region. The meetings were also advertised on radio stations, and the Project

Chapter 17, Environmental Justice

Sponsors conducted digital advertising through Geo Fencing, Twitter, and World Journal. Advertisements for the webinars were translated to Spanish, Chinese, Haitian Creole, Bengali, Korean, Italian, Portuguese, and Russian, which are the most prominent non-English languages used by residents of the regional study area.

The Project Sponsors hosted six environmental justice webinars in October 2021 (October 7, 12, 13, 26, 27, and 28) and three environmental justice webinars in December 2021 (December 7, 8, and 9, 2021). The meetings began at 6:00 p.m. **Table 17-*[19]*** lists the dates and times of each webinar and provides an overview of the participation at each webinar.

Table 17-*[19]*Environmental Justice Webinars

| MEETING | LOCATION | DATE | MEETING START TIME | MEETING END TIME | TOTAL UNIQUE OOM WEBINAR VIEWERS | TOTAL YOUTUBE LIVE VIEWERS | TOTAL ORAL COMMENTS | TOTAL Q A |
|---------|----------|------|--------------------|--------------------|----------------------------------|-----------------------------|----------------------|-----------|
| Webinar 1 | New York | 10/7/2021 | 6:00 p.m. | 6:54 p.m. | 31 | 14 | 11 | 20 |
| Webinar 2 | New Jersey | 10/12/2021 | 6:00 p.m. | 6:37 p.m. | 10 | 13 | 4 | 27 |
| Webinar 3 | Connecticut | 10/13/2021 | 6:00 p.m. | 8:07 p.m. | 12 | 12 | 3 | 17 |
| Webinar 4 | New York | 10/26/2021 | 6:00 p.m. | 8:09 p.m. | 23 | 25 | 4 | 18 |
| Webinar 5 | New Jersey | 10/27/2021 | 6:00 p.m. | 8:08 p.m. | 9 | 10 | 4 | 18 |
| Webinar 6 | Connecticut | 10/28/2021 | 6:00 p.m. | 8:11 p.m. | 18 | 9 | 10 | 55 |
| Webinar 7 | New York | 12/7/2021 | 6:00 p.m. | 8:02 p.m. | 32 | 15 | 6 | 20 |
| Webinar 8 | New Jersey | 12/8/2021 | 6:00 p.m. | 8:01 p.m. | 7 | 10 | 1 | 13 |
| Webinar 9 | Connecticut | 12/9/2021 | 6:00 p.m. | 8:00 p.m. | 3 | 8 | 0 | 9 |
| | | | | TOTALS | 145 | 116 | 43 | 197 |

The webinars were targeted to different geographic areas; however, the webinars were open to anyone who wished to participate regardless of where they lived or worked. Meeting attendees were able to participate via computer or telephone. Meeting attendees could sign up to speak for two minutes either in advance of or during the meeting. Attendees also had the opportunity to communicate via the Question-and-Answer function of the web platform. The webinars continued beyond the two-hour duration as necessary to accommodate all speakers.

American Sign Language interpretation and closed captioning were available at each webinar. Additional language interpretation in any language were made available upon advance request. Individuals who are hearing impaired could dial 711 to be connected free of charge with a communications assistant. To provide additional accessibility, the Project Sponsors live-streamed public webinars and posted recordings of all public presentations for on-demand viewing in multiple languages via YouTube.

The participation in the environmental justice webinars is shown in **Table 17-*[19]*** and described below. It should be noted that environmental justice populations also participated in the 10 public webinars held in September and October 2021. There were approximately 1,150 participants in these public webinars. As

part of these webinars, attendees could take an optional survey, which included questions about their demographic characteristics. Based on the results received, approximately one-third of meeting attendees identified as environmental justice populations. (Refer to **Chapter 18, "Agency Coordination and Public Participation,"** for more information about the public webinars.)

### 17.9.1.1    *Environmental Justice Webinars 1 through 6*

The Project Sponsors held Environmental Justice Webinars 1 through 6 in October 2021. The webinars introduced the participants to the Project, using the same presentation at each webinar. The webinars began with a live introduction and overview of attendees from the Project Sponsors. This was followed by a recorded presentation. The first half of the presentation was the same as for the early outreach public webinars (see **Chapter 18, "Agency Coordination and Public Participation"**). It provided an overview of the Project's purpose, needs, and objectives; identified the two alternatives studied in detail in this EA (No Action Alternative and CBD Tolling Alternative); described the tolling scenarios and range of potential tolls; and identified the topics to be studied in the EA. The second half of the presentation focused specifically on the environmental justice analysis for this EA. It described the regulatory framework for this environmental justice analysis, the methodology for preparing the analysis, an overview of identified environmental justice populations in the regional study area; and a preliminary list of the Project's potential benefits to and effects on environmental justice populations. The presentation also described the Environmental Justice Technical Advisory Group and the Environmental Justice Stakeholder Working Group, and the Project Sponsors explained how participants could sign up to participate in the Environmental Justice Stakeholder Working Group. The presentation concluded with the Project schedule, a description of future public engagement opportunities, and information on the Project website.

Following the presentation, the Project Sponsors moderated the oral testimony. Although the Project Sponsors gave speakers an opportunity to sign up in advance, anyone in attendance could speak. Comments and questions could be submitted via the Question-and-Answer function of the webinar as well. The Project Sponsors responded to questions sent via the Question-and-Answer function, providing factual and technical responses, along with logistical information. There were 36 speakers and 155 Question- and-Answer submissions during the October webinars. Each webinar was recorded, and the public could view the YouTube recording on the Project's website at any time following the meeting. The oral and written comments were logged in the Project's record.

### 17.9.1.2    *Environmental Justice Webinars 7 through 9*

The Project Sponsors hosted Environmental Justice Webinars 7 through 9 in December 2021. These webinars followed the same format as Environmental Justice Webinars 1 through 6 and included a live introduction followed by a recorded presentation. The presentation reviewed the purpose, need, and objectives for the Project and the approach to the environmental justice analysis. Then, the presentation identified the demographic characteristics of the regional study area and identified environmental justice populations. The presentation continued with a description of travel characteristics of environmental justice populations with a focus on travel to and from the Manhattan CBD. It followed with an overview of the tolling scenarios and travel demand forecasting, including preliminary results for changes in automobile

trips, transit ridership, and taxi/FHV trips. The presentation concluded with an overview of the MTA 2020–2024 Capital Program.

Following the presentation, the Project Sponsors moderated the oral testimony. Although the Project Sponsors gave speakers an opportunity to sign up in advance, anyone in attendance could speak. Comments and questions could also be submitted via the Question-and-Answer function of the webinar. The Project Sponsors responded to questions sent via the Question-and-Answer function, providing factual and technical responses, along with logistical information. There were 7 speakers and 42 Question-and-Answer function submissions during the December webinars. Each meeting was recorded, and the public could view the YouTube recording through the Project's website at any time following the meeting. The oral and written comments were logged in the Project's record.

### 17.9.2    Environmental Justice Technical Advisory Group

The Project Sponsors invited community leaders, advocacy groups, industry groups, and community members from the regional study area with expertise in environmental justice considerations to participate in an Environmental Justice Technical Advisory Group. The Project Sponsors invited 37 groups to participate in the Environmental Justice Technical Advisory Group. The following 16 groups accepted the invitation to participate:

- ALIGN
- Chhaya
- Community Voices Heard
- Connecticut Coalition for Environmental Justice
- El Puente
- Good Old Lower East Side (GOLES)
- Hispanic Federation
- NAACP Metropolitan Council Region
- National Action Network
- New Jersey Environmental Justice Alliance
- New York City Environmental Justice Alliance
- South Bronx Unite
- UPROSE
- Urban League of Greater Hartford
- WE ACT for Environmental Justice
- Youth Ministries for Peace and Justice (YMPJ)

Representatives of 14 groups participated in the first meeting of the Environmental Justice Technical Advisory Group, which was held on October 13, 2021, from 1:00 p.m. to 3:00 p.m. Following introductions by the Project Sponsors and the participants, the Project Sponsors presented Project information. Meeting participants were invited to interject with questions or comments during the presentation. The presentation included a Project overview (purpose and need, alternatives studied in this EA, the environmental topics covered in this EA, and schedule), identification of the potential benefits and effects of the Project on environmental justice populations, the process to assess potential effects on environmental justice populations, an overview of the race and income characteristics of the regional study area, the initial identification of environmental justice populations in the regional study area, and an overview of public engagement activities, including targeted outreach to environmental justice populations. *[The Project Sponsors prepared a summary]* to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.

Following the meeting, the Project Sponsors prepared a summary of the topics raised by the meeting participants and topics for which additional information was requested. The Project Sponsors circulated the list of topics with the members of the Environmental Justice Technical Advisory Group and requested their input on the list as well as any additional topics or concerns that would like to discuss further. The Project Sponsors developed the materials for the second meeting of the Environmental Justice Technical Advisory Group based on these requests.

A second meeting of the Environmental Justice Technical Advisory Group was held on November 3, 2021, from 10:00 a.m. to 12:00 p.m., and representatives of 11 groups participated. The presentation provided more information on topics raised at the first meeting using the list of topics and input from members described above. The topics included modes of travel to the Manhattan CBD by environmental justice populations, demographic characteristics of Manhattan CBD residents, access to transit within the regional study area, an overview of the tolling scenarios, the process for travel demand forecasting, preliminary traffic analysis results, preliminary findings on indirect displacement and changes in air quality emissions, and an overview of the MTA 2020–2024 Capital Program. *[The Project Sponsors prepared a summary]* to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.

The Project Sponsors held a third meeting of the Environmental Justice Technical Advisory Group on February 9, 2022, from 6:00 p.m. to 8:00 p.m. Representatives of seven groups attended. The presentation included additional information to respond to previous questions and concerns raised in the second meeting, including how the Project would change traffic volumes in environmental justice areas, changes in traffic at local intersections, potential effects on air quality, effects of the Project on bus ridership levels, and concerns related to the potential for indirect displacement because of the Project. *[The Project Sponsors prepared a summary]* summary to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.

*[The Project Sponsors held a fourth meeting of the Environmental Justice Technical Advisory Group on August 22, 2022, from 1:00 p.m. to 2:40 p.m. Representatives of 10 groups attended. At the meeting, the Project Sponsors provided a draft of the presentation planned for the upcoming public hearings. The Project Sponsors invited participants to provide feedback on the draft presentation and stressed the importance of submitting comments formally in addition to the discussion at this meeting. The Project Sponsors prepared a summary to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.*

*The Project Sponsors held a fifth meeting of the Environmental Justice Technical Advisory Group on October 10, 2022, from 3:30 p.m. to 6:00 p.m. Representatives of six groups attended. The presentation included reviewing the comments and suggestions made by the Environmental Justice Technical Advisory Group during the public comment period. These comments included concerns regarding potential Project effects on areas already overburdened in terms of air quality pollution and associated health effects, traffic, noise, and new costs and associated economic effects. The suggestions included measures related to emissions initiatives; health and community programs; street and traffic improvements; toll and fare policy; and*

*transit improvements. Other measures also being considered by the Project Sponsors were also discussed. The Project Sponsors prepared a summary to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.*

*The Project Sponsors held a sixth meeting of the Environmental Justice Technical Advisory Group on January 5, 2023, from 2:00 p.m. to 3:30 p.m. Representatives of eight groups attended. Slides presented during the meeting were shared with members afterwards. The Project Sponsors prepared a summary to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.*

*The Project Sponsors held a seventh meeting of the Environmental Justice Technical Advisory Group on January 12, 2023, from 2:00 p.m. to 3:30 p.m. Representatives of five groups attended. Slides presented during the meeting were shared with members afterwards. The Project Sponsors prepared a summary to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.]*

### 17.9.3   Environmental Justice Stakeholder Working Group

The Project Sponsors established an Environmental Justice Stakeholder Working Group. This group comprises interested members of the public with a focus on environmental justice concerns. The Project Sponsors provided information about the Environmental Justice Stakeholder Working Group during the initial, broad public outreach any person or group could request to join. People could suggest themselves or others as participants in this group. Members requested participation in the Environmental Justice Stakeholder Working Group using a form on the Project website or by contacting the Project Sponsors using the telephone hotline.

When expressing interest in the Environmental Justice Stakeholder Working Group, interested members of the public provided information about the purpose of their participation and their expertise or interest in environmental justice considerations. Some people expressed an interest in the study itself or on topics that are more general than or not germane to environmental justice considerations. Twenty-seven people expressed interest in participating in the Environmental Justice Stakeholder Working Group, and the Project Sponsors invited these 27 people to each meeting. Some of these people represented particular interest groups or industries, including people representing bus advocacy groups or bus companies and people representing motorcycle riders.

The first meeting of the Environmental Justice Stakeholder Working Group was held on November 9, 2021, from 6:00 p.m. to 8:05 p.m. Nineteen of the 27 members participated in the meeting. Following introductions by the Project Sponsors and the participants, the Project Sponsors presented Project information. Participants were invited to interject with questions or comments during the presentation. The presentation included the Project overview (purpose and need, alternatives studied in detail in this EA, the environmental topics covered in this EA, and schedule), the regulatory framework on environmental justice and the process to assess potential effects on environmental justice populations, the definitions of minority and low-income populations and charts and maps showing the identification of environmental justice populations in the regional study area, preliminary results on the Project's potential effects on traffic

and the taxi/FHV industry, an overview of comments received during the early public outreach for this EA, and potential topics of discussion for the group. *[The Project Sponsors prepared a summary]* to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.

Following the meeting, the Project Sponsors prepared a summary of the topics raised by the meeting participants and topics for which additional information was requested. The Project Sponsors circulated the list of topics with the members of the Environmental Justice Stakeholder Working Group and requested their input on the list as well as any additional topics or concerns that they would like to discuss further. The Project Sponsors developed the materials for the second meeting of the Environmental Justice Stakeholder Working Group based on these requests.

A second meeting was held on November 30, 2021, from 6:00 p.m. to 8:15 p.m., and 19 of the 27 members participated. The presentation provided more information on topics raised at the first meeting based on the list of topics and member input described above. The topics included information on the race of residents of the regional study area, a more detailed description of the travel demand modeling process, predicted changes in vehicular and transit trips with the CBD Tolling Alternative (including patterns of travel by low-income individuals), preliminary results of the traffic analysis (including potential effects in the South Bronx and the Lower East Side), and changes in transit ridership by mode and at regional transit hubs. *[The Project Sponsors prepared a summary]* to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.

*[A third meeting was held on August 19, 2022, from 1:00 p.m. to 3:00 p.m., and 14 of the 27 members participated. At the meeting, the Project Sponsors provided a draft of the presentation planned for the upcoming public hearings. The Project Sponsors invited participants to provide feedback and stressed the importance of submitting comments formally in addition to the discussion at this meeting. The Project Sponsors prepared a summary to document the meeting, including questions and comments raised by the participants and the responses provided by the Project Sponsors.]*

### 17.9.4   *[EA Public Review and]* Future Outreach to Environmental Justice Populations

During the public review of this EA, FHWA and the Project Sponsors *[held]* additional meetings with the Environmental Justice Technical Advisory Group and Environmental Justice Stakeholder Working Group.

In addition, the Project Sponsors conduct*[ed]* outreach targeted to taxi and FHV drivers. Working with the TLC, the Project Sponsors distribute*[d]* information *[in 13 languages]* to TLC's industry-wide email distribution list of nearly 200,000 industry contacts. This list includes nearly 175,000 drivers and thousands of other industry contacts working for yellow taxi, green cab, livery, and black car owners; FHV companies; luxury limousine companies; commuter van companies; paratransit drivers; medallion brokers; leasing agents; and base owners.

FHWA and the Project Sponsors *[have]* consider*[ed]* comments raised about environmental justice considerations and address*[ed]* the comments as part of FHWA's NEPA decision document.

Following completion of the NEPA process, so that ongoing concerns related to environmental justice can be addressed, the Project Sponsors will establish an Environmental Justice Community Group that will meet on a *[quarterly]* basis, with the first meeting *[prior to]* implementation of the Project, to share updated data and analysis and hear about potential concerns.

# 18.   Agency Coordination and Public Participation

## 18.1   INTRODUCTION

The FHWA and the Project Sponsors have and continue to provide meaningful opportunities for public participation throughout the environmental review process for the CBD Tolling Program (the Project). This chapter describes agency coordination and public participation activities for the Project. In recognition of the social distancing requirements resulting from the unprecedented COVID-19 pandemic, the Project Sponsors are carrying out a program that incorporates virtual public meetings and other tools that do not require in-person or on-site participation, in addition to traditional public involvement methods.

## 18.2   COORDINATION WITH COOPERATING AND PARTICIPATING AGENCIES

### 18.2.1   Agencies Invited to Participate in the Process

Agencies have been invited to participate in the NEPA process and advise on the scope of this EA, the potential effects of the Project and any measures to avoid, minimize or otherwise mitigate potential adverse effects, and issues and concerns identified by the interested public. FHWA and the Project Sponsors have also engaged with tribal nations in the study area.

In consideration of the resources that the Project could affect, the analyses conducted for this EA, and other important issues for this Project, FHWA and the Project Sponsors developed a list of agencies to invite to participate in the NEPA process. FHWA consulted with agencies on particular topics (i.e., Section 106 of the National Historic Preservation Act (NHPA), coastal zone consistency), sought agency expertise in the analysis of resources (i.e., transportation, environmental justice), and sought input from the agencies on the conclusions of this EA. **Table 18-1** lists the agencies that FHWA invited to participate along with their role in or expertise about the Project.

Table 18-1.   Agencies Invited to Participate in the National Environmental Policy Act Process and Their Role or Expertise

| ROLE | AGENCY | INVOLVEMENT/EXPERTISE |
|---|---|---|
| Federal Agencies | Federal Transit Administration | Funds transit capital projects that may also be funded with revenue generated through the Project |
| | U.S. National Park Service | Consultation on National Historic Landmarks |
| | U.S. Environmental Protection Agency | Section 309 Clean Air Act (CAA), NEPA, environmental justice |

Chapter 18, Agency Coordination and Public Participation

| ROLE | AGENCY | INVOLVEMENT/EXPERTISE |
|---|---|---|
| State Transportation Agencies | Connecticut Department of Transportation | Agency with transportation expertise in a portion of the regional study area |
| | New Jersey Department of Transportation | Agency with transportation expertise in a portion of the regional study area |
| | New Jersey Transit | Agency with transportation expertise in a portion of the regional study area |
| | New Jersey Turnpike Authority | Agency with transportation expertise in a portion of the regional study area |
| New York State Resource Agencies | New York State Department of Environmental Conservation | Air quality conformity (Section 309 of the CAA), threatened and endangered species coordination |
| | New York State Department of State | Coastal zone consistency |
| | New York State Office of Parks, Recreation and Historic Preservation | <ul><li>Section 106, NHPA</li><li>Cultural resource review/coordination</li></ul> |
| Other New York State Agencies | New York State Division of Homeland Security and Emergency Services | For informational purposes given their role in emergency management |
| Regional Transportation Agencies | Connecticut Metropolitan Council of Governments | Agency with transportation expertise in a portion of the regional study area |
| | Delaware Valley Regional Planning Commission | Agency with transportation expertise in a portion of the regional study area |
| | Dutchess County Transportation Council | Agency with transportation expertise in a portion of the regional study area |
| | New York Metropolitan Transportation Council | <ul><li>Air quality conformity</li><li>Inclusion in fiscally constrained Transportation Improvement Plan</li><li>Agency with transportation expertise in a portion of the regional study area</li></ul> |
| | North Jersey Transportation Planning Authority | Agency with transportation expertise in a portion of the regional study area |
| | Orange County Transportation Council | Agency with transportation expertise in a portion of the regional study area |
| | Port Authority of New York and New Jersey | Has jurisdiction over several sites upon which it is preferable to locate tolling system infrastructure and tolling equipment |
| | South Central Regional Council of Governments | Agency with transportation expertise in a portion of the regional study area |
| | Western Connecticut Council of Governments | Agency with transportation expertise in a portion of the regional study area |
| New York City Resource Agencies | Mayor's Office of Environmental Coordination | Agency with expertise in environmental considerations in New York City |
| | New York City Department of City Planning | <ul><li>Local Waterfront Revitalization Plan consistency</li><li>Agency with expertise in social, economic, and environmental considerations in New York City</li></ul> |
| | New York City Department of Environmental Protection | <ul><li>Agency with expertise in environmental considerations in New York City</li><li>Coordination during construction</li></ul> |
| | New York City Department of Parks and Recreation | Agency with jurisdiction over parkland where tolling system infrastructure and tolling equipment might be located |

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 76 of 139 PageID: 1996

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 18, Agency Coordination and Public Participation

### 18.2.2    Agency Coordination

FHWA and the Project Sponsors held the following agency meetings during the course of the preparation of this EA:

- August 29, 2019, with MTA, New York Metropolitan Transportation Council (NYMTC) staff, and Interagency Consultation Group regarding Transportation Conformity

- April 15, 2021, Project presentation to NYMTC's Program, Finance and Administration Committee (PFAC) as a prelude to the Project's inclusion in the Federal Fiscal Years 2022–2050 Regional Transportation Plan, adopted by NYMTC's principal members on September 9, 2021, and accompanying Transportation Conformity Determination adopted by PFAC on August 19, 2021

- September 9, 2021, for Federal agencies and New York State resource agencies listed in **Table 18-1** to introduce the EA process

- September 10, 2021, for regional transportation agencies and New York City resource agencies listed in **Table 18-1** to introduce the EA process

- April 19, 2022, follow-up meeting with the Interagency Coordination Group to discuss Project-level conformity with regard to conducting particulate matter hot-spot analyses on highway segments

- August *[1]*, 2022, a second meeting with the Federal agencies and New York State resource agencies prior to the EA Notice of Availability

- August *[4]*, 2022, a second meeting with the regional transportation agencies and New York City resource agencies prior to the EA Notice of Availability

### 18.3    PUBLIC INVOLVEMENT ACTIVITIES

FHWA and the Project Sponsors are committed to providing meaningful opportunities for public involvement during the environmental review process for the Project to inform the public, encourage open discussion of Project details and issues, and provide opportunities for commenting. Meaningful opportunities for public input, as described in this section, are occurring during the environmental review process and will continue through construction of the Project.

The public involvement strategy for the Project focuses on outreach to the 28-county regional study area where travel patterns could change because of the Project (described in **Chapter 3, "Environmental Analysis Framework"**).

### 18.3.1    Public Outreach Tools and Efforts

The Project Sponsors have used and continue to use the following outreach tools to communicate with the public throughout the NEPA environmental review process:

- **Project Website:** The Project Sponsors maintain a Project website hosted by MTA (mta.info/CBDTP), which is the primary platform to share Project information, download published documents, and advertise virtual public information webinars. The website provides links to recordings of public meetings. The website provides an opportunity to sign up for the Project's email list and to provide comments. The website address appears on Project information material, including meeting notices and media releases.

- **Project Fact Sheet:** The Project Sponsors have developed a Fact Sheet that includes: an overview of the Project, its location, its purpose, expected benefits, information about how tolls would be set, how people would pay the tolls, how the money would be used, public meeting opportunities, environmental justice opportunities for participation, and contact information. The Fact Sheet is available in nine languages: English, Spanish, Chinese, Haitian Creole, Bengali, Korean, Russian, Italian, and Portuguese. These Fact Sheets have been made available through the following means: via the Project website; emailed to the mailing list; and shared with Federal, State, and local agencies, officials, and community organizations to post and disseminate.

- **Social Media:** The Project Sponsors use social media to provide information about both public engagement activities and general Project information. Appropriate existing MTA channels on Facebook, Twitter, and Instagram are used to direct members of the public to the various engagement opportunities. The social-media posts also provide a link to the comment form on the Project website. The MTA social-media effort encompasses the entire 28-county regional study area. In addition, TBTA was able to target zip codes with higher percentages of low-income and minority populations in the study area to provide information related to environmental justice webinars described in **Section 18.3.2**, and the Stakeholder Working Group described in **Section 18.3.3**. Information about virtual public meetings and opportunities to comment on social-media channels can be translated by users into multiple languages using in-app language settings.

- **Database and Email List:** The Project Sponsors maintain a master contact list of approximately 2,300 entries. Interested stakeholders may sign up for the list on the Project website, or directly by email. The Project Sponsors use the contact list to send email updates and official notifications of Project milestones and public meetings.

- **Media:** The Project Sponsors use online and print advertising in English and non-English outlets throughout the 28-county regional study area, as well as radio announcements to publicize the Project and public participation opportunities. In recognition of Executive Order 12898 described in **Chapter 17, "Environmental Justice,"** the Project Sponsors developed this list to emphasize communication to environmental justice populations in the 28-county study area. Below is a list of media outlets used by MTA for the Project:

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 78 of 139 PageID: 1998

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 18, Agency Coordination and Public Participation

- Print
  - o  New Haven Register
  - o  Connecticut Post
  - o  Stamford Advocate
  - o  Middletown Times Herald Record
  - o  Poughkeepsie Journal
  - o  Bergen Record
  - o  Courier News
  - o  Daily Record
  - o  New Jersey Herald
  - o  Jersey Journal/NJ.com
  - o  Newark Star-Ledger/NJ.com
  - o  Times of Trenton
  - o  Warren Reporter
  - o  AM New York Metro
  - o  Daily News
  - o  Journal News/Lohud
  - o  Newsday
  - o  Staten Island Advance
  - o  El Sol
  - o  Haiti Liberte
  - o  Haitian Times
  - o  Haitian Voice
  - o  Korea Daily
  - o  La Voz Hispana CT
  - o  Luso Americano
  - o  Russkaya Reklama
  - o  Weekley Bengalee
  - o  24Horas Newspaper
  - o  El Diario (New York)
  - o  El Especialito (Essex, Hudson, Union)
  - o  El Hispano (bilingual)
  - o  Korean Bergen News
  - o  World Journal/Chinese Daily News
  - o  Americano Newspaper
- Digital
  - o  Twitter (sponsored ads)
  - o  World Journal (sponsored ads)

### 18.3.2   Early Outreach Webinars

The Project Sponsors conducted a series of early outreach webinars to obtain public input for consideration in the development of this EA. (See **Section 18.5.2** for information regarding public webinars during the EA comment period.) **Table 18-2** provides details about the 19 meetings (10 were advertised as general webinars and 9 for environmental justice community members throughout the regional study area). The Project Sponsors used all the public outreach tools described in **Section 18.3.1** to publicize the early outreach webinars. In addition, MTA posted digital ads and posters in nine languages in all subway stations and commuter rail stations, and posters in nine languages on all its bus routes. This effort along with the far reaching print and digital media ads, addressed both the environmental justice populations identified in **Chapter 17, "Environmental Justice,"** as well as the Title VI of the Civil Rights Act of 1964 (Title VI) census tracts identified in **Subchapter 5A, "Social Conditions: Population Characteristics and Community Cohesion."**

The webinars were assigned to different geographic areas; however, the webinars were open to anyone who wished to participate regardless of where they lived or worked. 1,066 people signed up to participate in these webinars. The agenda for each webinar included introductions by the Project Sponsors, a recorded presentation, and a public comment session.

Meeting attendees were asked to fill out an optional survey, which included demographic questions. The survey received 309 responses, approximately one-third of which were from individuals who identified themselves as minority.

Chapter 18, Agency Coordination and Public Participation

Table 18-2.    Early Outreach Virtual Webinars

| MEETING | LOCATION | DATE | MEETING START TIME | MEETING END TIME | TOTAL UNIQUE OOM WEBINAR VIEWERS | [ EA ] YOUTUBE LIVE VIEWERS | TOTAL ORAL COMMENTS | TOTAL Q A |
|---|---|---|---|---|---|---|---|---|
| Public Webinar – 1 | Outer Boroughs | 9/23/2021 | 10:00 a.m. | 12:40 p.m. | 194 | 119 | 55 | 89 |
| Public Webinar – 2 | Manhattan CBD | 9/23/2021 | 6:00 p.m. | 9:40 p.m. | 257 | 73 | 83 | 179 |
| Public Webinar – 3 | New Jersey | 9/24/2021 | 10:00 a.m. | 11:04 a.m. | 54 | 45 | 16 | 19 |
| Public Webinar – 4 | Northern NY Suburbs | 9/29/2021 | 10:00 a.m. | 10:51 a.m. | 26 | 34 | 9 | 21 |
| Public Webinar – 5 | Long Island | 9/29/2021 | 6:00 p.m. | 6:53 p.m. | 31 | 26 | 11 | 16 |
| Public Webinar – 6 | Outer Boroughs | 9/30/2021 | 6:00 p.m. | 8:55 p.m. | 98 | 28 | 65 | 96 |
| Public Webinar – 7 | Connecticut | 10/1/2021 | 1:00 p.m. | 1:41 p.m. | 17 | 23 | 7 | 17 |
| Public Webinar – 8 | New Jersey | 10/4/2021 | 6:00 p.m. | 7:29 p.m. | 42 | 31 | 26 | 46 |
| Public Webinar – 9 | Northern NY Suburbs | 10/5/2021 | 6:00 p.m. | 7:08 p.m. | 31 | 18 | 17 | 25 |
| Public Webinar – 10 | Manhattan Outside CBD | 10/6/2021 | 6:00 p.m. | 8:52 p.m. | 127 | 36 | 66 | 94 |
| EJ Webinar – 1 | New York | 10/7/2021 | 6:00 p.m. | 6:54 p.m. | 31 | 14 | 11 | 20 |
| EJ Webinar – 2 | New Jersey | 10/12/2021 | 6:00 p.m. | 6:37 p.m. | 10 | 13 | 4 | 27 |
| EJ Webinar – 3 | Connecticut | 10/13/2021 | 6:00 p.m. | 8:07 p.m. | 12 | 12 | 3 | 17 |
| EJ Webinar – 4 | New York | 10/26/2021 | 6:00 p.m. | 8:09 p.m. | 23 | 25 | 4 | 18 |
| EJ Webinar – 5 | New Jersey | 10/27/2021 | 6:00 p.m. | 8:08 p.m. | 9 | 10 | 4 | 18 |
| EJ Webinar – 6 | Connecticut | 10/28/2021 | 6:00 p.m. | 8:11 p.m. | 18 | 9 | 10 | 55 |
| EJ Webinar – 7 | New York | 12/7/2021 | 6:00 p.m. | 8:02 p.m. | 32 | 15 | 6 | 20 |
| EJ Webinar – 8 | New Jersey | 12/8/2021 | 6:00 p.m. | 8:01 p.m. | 7 | 10 | 1 | 13 |
| EJ Webinar – 9 | Connecticut | 12/9/2021 | 6:00 p.m. | 8:00 p.m. | 3 | 8 | 0 | 9 |
| TOTALS | | | | | 1,022 | 549 | 398 | 799 |

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 80 of 139 PageID: 2000

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 18, Agency Coordination and Public Participation

Meeting attendees could sign up to speak for two minutes either in advance of or during the meeting. 398 people spoke at these webinars. Attendees also had the opportunity to communicate via the Question & Answer function in real time with Project Sponsors. The Project Sponsors did not respond to Project comments via the Question & Answer function but used this to address factual, technical, and logistical questions.

Meeting attendees were able to participate via computer or telephone. Meeting information and the opportunity to sign up was accessed through the Project website and via the Project telephone hotline. Most webinars were two hours long and took place at different times of day over multiple days. Some webinars continued beyond the two-hour duration as necessary to accommodate all speakers.

American Sign Language and closed captioning were available at each webinar. Additional language interpretation services were made available upon advance request. Individuals who are hearing impaired could dial 711 to be connected free of charge with a communications assistant. The webinars were streamed live on YouTube, and recordings were subsequently posted on YouTube for on-demand viewing. As of February 2022, there were over 14,000 views of these recordings, combined.

### 18.3.3    Environmental Justice Advisory and Working Groups

FHWA and the Project Sponsors have and continue to follow Executive Order 12898 regarding environmental justice, as described in **Chapter 17, "Environmental Justice."** In addition to the nine webinars specific to environmental justice populations, two environmental justice groups have been established to allow for more in-depth discussion and engagement by FHWA and Project Sponsors with environmental justice populations: an Environmental Justice Technical Advisory Group and Environmental Justice Stakeholder Working Group. See **Section 17.10** for more details on environmental justice public engagement activities.

### 18.3.4    Coordination with Stakeholder Groups

The Project Sponsors have and will continue to respond to requests for meetings with stakeholder groups during the preparation and public review of this EA for the Project. The following list includes the meetings held to date:

- October 13, 2021, Environmental Justice Technical Advisory Group

- November 3, 2021, Environmental Justice Technical Advisory Group

- November 9, 2021, Environmental Justice Stakeholder Working Group

- November 29, 2021, South Bronx Unite

- November 30, 2021, Environmental Justice Stakeholder Working Group

- December 14, 2021, Federal Law Enforcement Agencies (Drug Enforcement Administration, Department of Homeland Security/Immigration and Customs Enforcement, Department of Justice/ Bureau of Alcohol, Tobacco, Firearms and Explosives, and Federal Bureau of Investigation)

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 18, Agency Coordination and Public Participation

- January 12, 2022, Connecticut, New Jersey, and New York Trucking Associations

- January 25, 2022, Environmental Defense Fund

- February 9, 2022, Environmental Justice Technical Advisory Group

- March 9, 2022, Taxi and Limousine Commission

- August 19, 2022, Environmental Justice Stakeholder Working Group

- August 22, 2022, Environmental Justice Technical Advisory Group Meeting

- *[October 7, 2022, Environmental Justice Technical Advisory Group Meeting*

- *January 5, 2023, Environmental Justice Technical Advisory Group Meeting*

- *January 12, 2023, Environmental Justice Technical Advisory Group Meeting]*

### 18.3.5    Outreach During Construction

The Project Sponsors will develop a specific construction communications plan and implement it to inform affected road users, area residences and businesses, appropriate agencies, and the public about anticipated construction activities, including their schedule and duration, and any potential roadway or lane closures, sidewalk closures or other impacts to pedestrians, commuter alternatives, and any potential temporary impacts on traffic during construction.

### 18.4    OVERVIEW OF COMMENTS RECEIVED DURING EARLY OUTREACH ACTIVITIES

During the early outreach activities from August 26, 2021, through publication of this EA described in **Section 18.3**, the Project Sponsors received 7,338 comments through the following means:

- 5,936 via online form submitted through the Project website
- 179 emails
- 534 during the public webinars, both oral and submitted via the Question & Answer function
- 610 via U.S. Postal Service
- 79 via voicemail messages on the Project's telephone hotline

Each of these comments has been collected, archived, and categorized by method of submission, identification of submitter, and content of submission. These comments have been considered during the development of this EA.

The following is a summary of comments received via all means listed above, organized by the major themes where these topics are discussed and analyzed in the EA. Comments received during early outreach are based on limited publicly available information as analyses had not yet been completed and published. The sections below follow the order of this EA's Table of Contents.

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 82 of 139 PageID: 2002

Central Business District (CBD) Tolling Program Environmental Assessment
Chapter 18, Agency Coordination and Public Participation

### 18.4.1    Purpose and Need

Commenters stated that the Project is a method to improve the regional transportation network, citing that it is an integral step to making urban transportation more efficient, sustainable, and equitable. Others stated that roads and highways in the region are clogged with cars and increasing the financial cost of driving into the Manhattan CBD is a method to reduce traffic congestion both in the Manhattan CBD and across the region. Others stated that excess traffic in the Manhattan CBD and the region contributes to negative economic, public health, and environmental impacts that would be reduced as part of the Project.

Commenters stated that residents of New York City, most of whom depend on public transportation, would benefit directly from the revenue the Project would generate and infuse into the subway, bus, and rail systems. Others stated that there is need for transit investment to enhance accessibility for those with disabilities, and to address resiliency, considering extreme weather and climate change. Others stated that transit investments would benefit the entire region.

Other commenters questioned the purpose of the Project and suggested that congestion in the Manhattan CBD is caused by a lack of enforcement, resulting in illegally parked cars, as well as inappropriate use of government-issued parking placards.

Commenters stated that the Project would result in increased costs passed on to consumers and would discriminate against areas with poor transit access and against persons with disabilities and the elderly.

Other commenters stated that this is not the right time to impose a toll while the region is still recovering from the COVID-19 pandemic.

Refer to **Chapter 1, "Introduction,"** for more information on the Project's Purpose and Need.

### 18.4.2    Transportation – Highways and Local Intersections

Commenters stated that the Project would reduce traffic within the Manhattan CBD as well as on streets and highways that connect to the CBD.

Other commenters stated that the Project would not alleviate traffic congestion within the Manhattan CBD or along highways that intersect and provide access to Lower Manhattan. Commenters stated that tolling would cause an increase in traffic to areas outside of the Manhattan CBD, and that tunnels and highways in other areas of the city (including low-income and minority populations) would bear the brunt of increased congestion due to shifting driving patterns.

Commenters stated that roadways that have been narrowed to accommodate bicycle infrastructure or the increase in FHV licenses have caused traffic congestion.

Commenters stated support for increased use of motorcycles as a means to reduce traffic congestion in the Manhattan CBD.

Refer to **Subchapter 4B, "Transportation: Highways and Local Intersections"** for more information on the traffic analysis and potential notable changes in traffic as a result of the CBD Tolling Alternative. **Chapter 17, "Environmental Justice,"** presents additional assessment.

### 18.4.3   Transportation – Parking

Commenters stated that implementation of tolling would result in an increase in traffic in neighborhoods just outside the Manhattan CBD as drivers search for parking there.

**Subchapter 4D, "Transportation: Parking,"** and **Subchapter 5B, "Social Conditions: Neighborhood Character,"** examine the potential effects on parking supply and demand in neighborhoods near the Manhattan CBD boundary.

### 18.4.4   Transportation – Pedestrians and Bicycles

Commenters stated that the Project would be a method to increase bicycle and pedestrian safety in the Manhattan CBD, potentially encouraging drivers to reconsider nonessential trips or switch to transit. Others stated that congestion often leads to angry and frustrated drivers who block intersections and bike lanes. Commenters stated that by discouraging driving through tolling, congestion would decrease. It was noted that reducing private-vehicle traffic would free up space to create additional bike lanes and pedestrian friendly spaces.

Other commenters stated that bike lanes take up roadway space and cause congestion. Citi Bike stands located in the street were also noted to cause congestion. Cyclists not following traffic rules and delivery people on fast-moving motorized bicycles and riding on the sidewalks were also concerns.

**Subchapter 4E, "Transportation: Pedestrians and Bicycles,"** examines the potential safety effects of the CBD Tolling Alternative. It also describes bicycle infrastructure in the Manhattan CBD.

### 18.4.5   Social Conditions – Population Characteristics and Community Cohesion

Commenters focused on the following specific populations or organizations who live or operate in the Manhattan CBD boundary or must cross the boundary and would therefore be affected:

- Persons with disabilities
- Nonprofit social service providers
- FHV drivers
- Older adults who live in the zone
- Low- and middle-income families who live in the zone

Commenters stated that that low- and middle-income residents would leave New York City.

Commenters stated that those with disabilities would be affected and should be exempted from the tolling. Others stated that funds generated by the Project should be spent on making transit more accessible for

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 84 of 139 PageID: 2004

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 18, Agency Coordination and Public Participation

persons with disabilities. Commenters asked that persons with disabilities who have parking permits be exempt from the toll (this would include private vehicles).

**Subchapter 5A, "Social Conditions: Population Characteristics and Community Cohesion,"** describes the potential effects of the CBD Tolling Alternative on disabled populations. The subchapter also examines the potential for the CBD Tolling Alternative to inhibit travel for certain social groups or between certain neighborhoods.

## 18.4.6   Social Conditions – Neighborhood Character

Commenters stated that tolls would improve public streetscapes for residents and visitors of the Manhattan CBD by freeing up space for playgrounds, plazas, and outdoor restaurants. Others stated that safer streets and sidewalks would improve throughout the Manhattan CBD for everyone. Commenters stated that decreasing the number of vehicles would benefit everyone who lives, works, and visits the Manhattan CBD.

Commenters discussed the Manhattan CBD boundary proximity to Lincoln Square flagging the many cultural institutions found there as traffic is already a significant problem for drivers, delivery vehicles, and pedestrians around Lincoln Square.

Commenters questioned the term "Central Business District," stating that the area is residential, not just commercial in nature. Others stated the Project would punish residents and small businesses in the Manhattan CBD.

Commenters stated concerns about traveling regionally to visit family and friends outside of the Manhattan CBD, noting that tolling may make it cost prohibitive. Commenters who are patients from regional locations and outer boroughs expressed concerns about having to pay tolls for attending medical appointments at hospitals within the Manhattan CBD.

Refer to **Subchapter 5B, "Social Conditions: Neighborhood Character,"** for more information on the EA analysis of neighborhood character.

## 18.4.7   Social Conditions – Public Policy

Commenters noted that the Project is consistent with various plans, policies, or laws:

- Climate Leadership and Community Protection Act
- Americans with Disabilities Act
- New York City's Open Streets program

Other commenters stated that the Project would be inconsistent with the Americans with Disabilities Act as it could result in an economic burden for persons with disabilities who rely on FHVs.

Refer to **Subchapter 5C, "Social Conditions: Public Policy,"** for more information regarding the EA analysis of public policy.

### 18.4.8    Economic Conditions

Commenters stated that the Project would "price out" residents and visitors of the Manhattan CBD. Others stated that tolling would economically penalize residents with small children, elderly with limited mobility, persons with disabilities, and those workers who work during off hours who are less well served by the transit system. Others stated that the Project would decrease property values in the Manhattan CBD and potentially cause long-term consequences such as abandonment of residential areas below 60th Street.

Commenters stated that New Yorkers are overtaxed already and that low-income residents, many on fixed incomes, would be unable to afford costs associated with the tolls. Commenters also stated that the Project is discriminatory based on geographic location, and the Project would increase the cost of living for residents living below 60th Street. Others stated that tolling would cause an increase in fees for other services in the Manhattan CBD such as deliveries. They stated that businesses would not absorb the added cost but would immediately hand it off to the consumer.

Other commenters stated that businesses may choose to move to other locations outside of the Manhattan CBD if tolls are enacted, or that businesses may be forced to close, causing empty storefronts. Commenters stated that the Project would hurt tourist areas like Chinatown and Broadway. They stated that people drive in from outside the city to visit those areas and may be fearful to take public transportation home late at night. Commenters stated that tolls may make it so that fewer people would be able to attend concerts, sporting events, and other cultural events in Manhattan. Taxi/FHV drivers who commented stated that there could be economic hardship specific to their industry if the Project were implemented and they were not exempted.

Commenters stated that tolls would make it easier for goods and products to be delivered throughout the Manhattan CBD because fewer vehicles would be on the roadways. Others stated that with less traffic, more streets can be converted to bus-only lanes, therefore speeding up travel times for bus riders. Other commenters stated that the tolls could stimulate the economy and create jobs. They stated that the Project is expected to raise more than $1 billion annually, which will be used to make needed improvements to the transit system.

**Chapter 6, "Economic Conditions,"** provides an economic profile and regional context of the Manhattan CBD boundary and assesses the potential effects of the Project on a regional and more localized neighborhood or specific industry basis.

### 18.4.9    Parks and Recreational Resources

Commenters stated that the Project would have positive benefits for parks or recreational space, green space, or open space. Others noted that reducing the volume of public space dedicated to cars would free up space for additional green space or opportunities for green infrastructure. Examples cited included converting street space to playgrounds, pocket parks, and pedestrian plazas. Commenters also noted that existing parks would benefit from reduced traffic noise.

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 86 of 139 PageID: 2006

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 18, Agency Coordination and Public Participation

Commenters stated that the Project would likely have negligible impacts in or immediately around Central Park.

**Chapter 7, "Parks and Recreational Resources,"** examines the potential effects of the CBD Tolling Alternative on Central Park. The CBD Tolling Alternative does not include closing any streets to create green spaces.

## 18.4.10   Visual Resources

Commenters stated concern about the physical design of tolling infrastructure as well as any associated signage or visual clutter. Others stated concern that the system would feature strobe lights. They stated that those lights would affect adjacent neighbors.

Commenters stated that truck and car traffic cause visual blight and that reducing their numbers would improve the visual environment.

**Chapter 9, "Visual Resources,"** describes the visual environment within the Manhattan CBD, including key features of the area, and it describes the potential visual effects of tolling system infrastructure and tolling equipment within the Manhattan CBD.

## 18.4.11   Air Quality

Commenters stated support for the Project for air quality improvements. Commenters mentioned vehicular exhaust and soot as being detrimental to air quality. Others stated concerns about asthma levels and overall health impacts from poor air quality. Others commented on the contribution of vehicles to overall greenhouse gas emissions, and the negative impacts of climate change on the study area. Others stated their concern about potential impacts of emissions on environmental justice populations due to diminished air quality conditions that could result from increases in traffic levels and congestion on local streets and highways.

During early public outreach for the Project, participants in the environmental justice outreach sessions raised concerns that the CBD Tolling Alternative would divert traffic to circumferential highways around the Manhattan CBD and that these additional vehicles would adversely affect the nearby neighborhoods by degrading air quality. Other participants were concerned that changes in traffic at local intersections, including on the Lower East Side in the Manhattan CBD and in the South Bronx outside the Manhattan CBD, would adversely affect air quality nearby.

**Chapter 10, "Air Quality,"** includes an assessment of regional and local (intersection-level) changes in air quality as a result of the Project. The chapter concludes that the Project would not result in any adverse localized effects on air quality and would reduce regional emissions. The Project Sponsors screened all Scenarios (including G) and analyzed the areas with the highest truck traffic, highest increases in trucks, and a site in the south Bronx due to community concerns.

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 87 of 139 PageID: 2007

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 18, Agency Coordination and Public Participation

### 18.4.12   Energy

Commenters stated that the Project would be an important way to reduce fuel consumption and the use of combustion engines.

For more information regarding the EA analysis of energy, refer to **Chapter 11, "Energy."**

### 18.4.13   Noise

Commenters noted noise benefits associated with the Project stating that traffic in the Manhattan CBD generates noise. Commenters cited car horns and general traffic noise as a nuisance. They also noted that emergency vehicles stuck in traffic are a source of noise and that the Project would help reduce those sounds. Other commenters illustrated the impacts of current noise by explaining that they have trouble putting children to sleep or getting work done. Others noted that environmental justice populations bear the brunt of noise pollution. Commenters noted health benefits from a less noisy environment. Others commented whether the Project could reduce the use of loud dirt bikes and motorcycles.

Commenters noted a potential for increased noise in areas just outside the Manhattan CBD boundary from people looking for parking. Others stated that there would be a decrease in noise pollution and that areas like Jersey City and Hoboken—where congestion is also bad—would also benefit from the Project. Commenters stated that the Project may redistribute traffic throughout the day, resulting in an increase in the amount of traffic noise at night.

**Chapter 12, "Noise,"** examines potential increases in traffic noise at locations that may realize an increase in traffic because of the CBD Tolling Alternative. The chapter concludes that the CBD Tolling Alternative would not result in perceptible increases in noise.

### 18.4.14   Environmental Justice

Commenters stated that the Project would benefit low-income and minority populations who depend on the transit system. Commenters stated that low-income populations represent the largest share of public transit riders in New York City and would benefit from public transit improvements. Commenters stated that the Project would not only decrease the number of traffic-causing vehicles on the road but would generate a ripple effect of positive health and environmental benefits due to the reduced emissions associated with fewer road-miles being driven.

Commenters noted the potential for displacement of environmental justice community members should improvements to the public transit system contribute to neighborhood gentrification. Others stated that the Project would increase traffic in some environmental justice populations outside the Manhattan CBD, which would diminish air quality. Commenters stated that CBD tolling could reinforce segregation or other racial disparities for environmental justice populations outside the zone.

As described in **Section 18.4** and **Chapter 17, "Environmental Justice,"** FHWA and the Project Sponsors have provided meaningful opportunities to engage with environmental justice populations to address their concerns. **Chapter 17** examines the potential effects of the Project on identified environmental justice populations in the 28-county regional study area and describes how concerns raised during public outreach related to environmental justice have been addressed.

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 88 of 139 PageID: 2008

Central Business District (CBD) Tolling Program Environmental Assessment
Chapter 18, Agency Coordination and Public Participation

As an independent action, MTA is currently transitioning its fleet to zero-emission buses, which will reduce air pollutants and improve air quality near bus depots and along bus routes. MTA is committed to prioritizing service to traditionally underserved communities and particularly for areas with concerns related to air quality and climate change, and has developed a new Environmental Justice Scoring framework to actively incorporate these priorities in the deployment phasing process of the bus fleet transition. Based on feedback and concerns raised during public outreach for the Project related to environmental justice, MTA will prioritize transitioning the fleet at two bus depots in Upper Manhattan and the Bronx—the Kingsbridge Depot and Gun Hill Depot—when MTA receives its next major procurement of battery electric buses later in 2022. Both of these depots are in and provide service to environmental justice neighborhoods.

## 18.4.15   Comments Outside the Scope of this Environmental Assessment

Certain comments received were outside the scope of this Project, which is specific to the Value Pricing Pilot Program (VPPP) application and the CBD Tolling Alternative as established by the MTA Reform and Traffic Mobility Act.

Commenters offered specific suggestions about aspects of the toll rate that will not be determined in this EA. Project toll rates will ultimately be set by a vote of the TBTA Board after the environmental review process and after the Traffic Mobility Review Board makes its recommendations.

## 18.5      AVAILABILITY OF TH*[E]* EA, EA PUBLIC HEARINGS, AND WAYS TO PROVIDE COMMENTS

*[The EA when complete and made available in 2022 was]* available for public viewing at the Project's website.

For further information about viewing th*[e]* EA, virtual public hearings, or providing comments on the Project during the public comment period, *[individuals could]* contact:

> CBD Tolling Program
> c/o Triborough Bridge and Tunnel Authority
> 2 Broadway, 23rd Floor
> New York, NY 10004
> Telephone: 646-252-7440
> Fax: 212-504-3148
> Email: CBDTP@mtabt.org

Individuals *[offered]* comments on this EA in the following ways:

- Via the Project website: mta.info/CBDTP
- Via U.S. Postal Service to the address listed above
- Via email to the email address listed above
- Via fax
- Via telephone

Chapter 18, Agency Coordination and Public Participation

The comment period *[began]* on Wednesday, August 10, 2022, and *[ended]* on Friday, September *[23]*, 2022.

### 18.5.1    Repositories for Reviewing the Environmental Assessment

Table 18-3 lists the locations where this EA *[was]* available for public viewing.

Table 18-3.    Repositories for Reviewing the Environmental Assessment

| REPOSITORY | CITY OR COUNTY/STATE | FACILITY | ADDRESS |
|---|---|---|---|
| FHWA | New York (Albany) | FHWA New York Division Office | O Brien Federal Building, Room 719 Albany, NY 12207 (518) 431-4127 |
| | New Jersey (Trenton) | FHWA New Jersey Division Office | 840 Bear Tavern Road, Suite 202 West Trenton, NJ 08628 (609) 637-4200 |
| | Connecticut (Hartford) | FHWA Connecticut Division Office | 450 Main Street, Suite 612 Hartford, CT 06103 (860) 659-6703 |
| TBTA | New York (New York City) | | 2 Broadway New York, NY 10004 (212) 878-7000 |
| NYSDOT | New York (New York City) | Region 11 | Hunter's Point Plaza 47-40 21st St. Long Island City, NY 11101 (718) 482-4526 |
| NYCDOT | New York (New York City) | | 55 Water Street New York, NY 10041 (212) 639-9675 |
| LIBRARIES (New York City Counties) | Bronx County | The Bronx Library Center | 310 East Kingsbridge Road Bronx, NY 10458 (718) 579-4244 |
| | Kings County (Brooklyn) | Brooklyn Central Library | 10 Grand Army Plaza Brooklyn, NY 11238 (718) 230-2100 |
| | New York County (Manhattan) | New York Public Library - Schwarzman Building | 476 5th Avenue New York, NY 10018 (917) 275-6975 |
| | Queens County | Queens Public Library - Central Library | 89-11 Merrick Boulevard Jamaica, NY 11432 (718) 990-0700 |
| | Richmond County (Staten Island) | New Dorp Library | 309 New Dorp Lane Staten Island, NY 10306 (718) 351-2977 |

| REPOSITORY | CITY OR COUNTY/STATE | FACILITY | ADDRESS |
|---|---|---|---|
| LIBRARIES (Long Island Counties) | Nassau County, NY | Hempstead Public Library | 115 James A. Garner Way Hempstead, NY 11550 (516) 481-6990 |
| | Suffolk County, NY | Middle Country Public Library | 575 Middle Country Road Selden, NY 11784 (631) 585-9393 |
| LIBRARIES (New York Counties North of New York City) | Dutchess County, NY | Poughkeepsie Public Library | 93 Market Street Poughkeepsie NY 12601 (845) 485-3445 |
| | Orange County, NY | Middletown Thrall Library | 11-19 Depot Street Middletown, New York 10940 (845) 341-5454 |
| | Putnam County, NY | Mahopac Public Library | 668 Route Six Mahopac, NY 10541 (845) 628-2009 |
| | Rockland County, NY | Finkelstein Memorial Library | 24 Chestnut Street Spring Valley, NY 10977 (845) 352-5700 |
| | Westchester County, NY | White Plains Public Library | 100 Martine Avenue White Plains, NY 10601 (914) 422-1400 |
| LIBRARIES (New Jersey Counties) | Bergen County, NJ | North Bergen Free Public Library | 8411 Bergenline Avenue North Bergen, NJ 07047 (201) 869-4715 |
| | Essex County, NJ | Montclair Public Library | 50 S. Fullerton Avenue Montclair, NJ 07042 (973) 744-0500 |
| | Hudson County, NJ | Jersey City Free Library | 472 Jersey Avenue Jersey City, NJ 07302 (201) 547-4526 |
| | Hunterdon County, NJ | Hunterdon County Library | 314 State Route 12  3 Flemington, NJ 08822 (908) 788-1444 |

Chapter 18. Agency Coordination and Public Participation

| REPOSITORY | CITY OR COUNTY/STATE | FACILITY | ADDRESS |
|---|---|---|---|
| LIBRARIES (New Jersey Counties) (continued) | Mercer County, NJ | Hickory Corner Branch | 2751 Brunswick Pike Lawrence Township, NJ 08648 (609) 448-1330 |
| | Middlesex County, NJ | Middlesex County Library | 1300 Mountain Avenue Middlesex, NJ 08846 (732) 356-6602 |
| | Monmouth County, NJ | Monmouth County Library | 125 Symmes Road Manalapan, NJ 07726 (732) 431-7220 |
| | Morris County, NJ | Morris County Library Main | 30 Hanover Avenue Whippany, NJ 07981 (973) 285-6930 |
| | Ocean County, NJ | Ocean County Library | 101 Washington Street Toms River, NJ 08753 (732) 349-6200 |
| | Passaic County, NJ | Passaic Public Library | 195 Gregory Avenue Passaic, NJ 07055 (973) 779-0474 |
| | Somerset County, NJ | Somerset County Library System | 1 Vogt Drive Bridgewater, NJ 08807 (908) 458-8415 |
| | Sussex County, NJ | Sussex County Main Library | 125 Morris Turnpike Newton, NJ 07860 (973) 948-3660 |
| | Union County, NJ | Union Public Library | 1980 Morris Avenue Union, NJ 07083 (908) 851-5450 |
| | Warren County, NJ | Richard D. Gardner Branch | 2 Shotwell Drive Belvidere, NJ 07823 (908) 818-1280 |
| LIBRARIES (Connecticut Counties) | Fairfield County, CT | Fairfield Public Library | 1080 Old Post Road Fairfield, CT 06824 (203) 256-3155 |
| | New Haven County, CT | New Haven Free Public Library | 133 Elm Street New Haven, CT 06510 (203) 946-8130 |

| REPOSITORY | CITY OR COUNTY/STATE | FACILITY | ADDRESS |
|---|---|---|---|
| GOVERNMENT OFFICES (New York City Counties) | Bronx County | Bronx County Clerk's Office | 851 Grand Concourse, Room 118 Bronx, NY 10451 (718) 618-3300 |
| | Kings County (Brooklyn) | Brooklyn Borough Hall | 209 Joralemon St. Brooklyn, NY 11201 (718) 802-3808 |
| | New York County (Manhattan) | New York County Clerk's Office | 60 Centre Street, Room 161 New York, NY 10007 (646) 386-3600 |
| | Queens County | Queens County Clerk's Office | 88-11 Sutphin Boulevard,  106 Jamaica, NY 11435 (718) 298-0600 |
| | Richmond County (Staten Island) | Staten Island Community Board 1 Office | 1 Edgewater Plaza, Room 217 Staten Island, NY 10305 (718) 981-6900 |
| GOVERNMENT OFFICES (Long Island Counties) | Nassau County, NY | Nassau County Clerk's Office | 240 Old Country Road Mineola, NY 11501 (516) 571-2660 |
| | Suffolk County, NY | Suffolk County Department of Public Works, Transportation Office | 335 Yaphank Avenue Riverhead, NY 11901 (631) 852-4010 |
| GOVERNMENT OFFICES (New York Counties North of New York City) | Dutchess County, NY | Dutchess County Executive Record Room | 22 Market Street Poughkeepsie, NY 12601 (845) 486-2000 |
| | Orange County, NY | Orange County Clerk's Office | 255 Main Street Goshen, NY 10924 (845) 291-2690 |
| | Putnam County, NY | Putnam County Clerk's Office | 40 Gleneida Avenue, Room 100 Carmel, NY 10512 (845) 808-1142 |
| | Rockland County, NY | Rockland County Clerk's Office | 1 South Main Street, Suite 100 New City, NY 10956 (845) 638-5070 |
| | Westchester County, NY | Westchester County Clerk's Office | 110 Dr. Martin Luther King Jr. Blvd, Room 330 White Plains, NY 10601 (914) 995-4218 |

Chapter 18. Agency Coordination and Public Participation

| REPOSITORY | CITY OR COUNTY/STATE | FACILITY | ADDRESS |
|---|---|---|---|
| GOVERNMENT OFFICES (New Jersey Counties) | Bergen County, NJ | Bergen County Clerk's Office | 1 Bergen County Plaza Hackensack, NJ 07601 (201) 336-7000 |
| | Essex County, NJ | Essex County Clerk's Office | 495 Martin Luther King Jr. Blvd Newark, NJ 07102 (973) 621-4920 |
| | Hudson County, NJ | Hudson County Register Office | 257 Cornelison Avenue, 4th Floor Jersey City, NJ 07302 (201) 395-4760 |
| | Hunterdon County, NJ | Hunterdon County Clerk's Office | 71 Main Street Flemington, NJ 08822 (908) 788-1214 |
| | Mercer County, NJ | Mercer County Planning Department | 640 S. Broad Street Trenton, NJ 08650 (609) 989-6545 |
| | Middlesex County, NJ | Middlesex County Clerk's Office | 75 Bayard Street, 4th Floor New Brunswick, NJ 08901 (732) 745-3365 |
| | Monmouth County, NJ | Monmouth County Clerk of the Board's Office | 1 East Main Street Freehold, NJ 07728 (732) 431-7387 |
| | Morris County, NJ | Morris County Clerk's Office | 10 Court Street Morristown, NJ 07963 (973) 285-6120 |
| | Ocean County, NJ | Ocean County Planning Board's Office | 129 Hooper Avenue Toms River, NJ 08754 (732) 929-2054 |
| | Passaic County, NJ | Passaic County Clerk s Office | 401 Grant Street, Room 130 Paterson, NJ 07505 (973) 881-4127 |
| | Somerset County, NJ | Somerset County Office of Planning, Policy and Econ. Dev. Office | 20 Grove Street Somerville, NJ 08876 (908) 231-7021 |
| | Sussex County, NJ | Sussex County Clerk s Office | 1 Spring Street Newton, NJ 07860 (973) 579-0250 |
| | Union County, NJ | Union County Bureau of Transportation Planning Office | 10 Elizabethtown Plaza Elizabeth, NJ 07207 (908) 558-2273 |
| | Warren County, NJ | Warren County Clerk's Office | 413 2nd Street Belvidere, NJ 07823 (908) 475-6211 |
| GOVERNMENT OFFICES (Connecticut Counties) | Fairfield County, CT | Western Connecticut Council of Governments | 1 Riverside Road Sandy Hook, CT 06482 (475) 323-2060 |
| | New Haven County, CT | Connecticut Metro Council of Governments | 1000 Lafayette Blvd Bridgeport, CT 06604 (203) 366-5405 |

* Digital access only

### 18.5.2   Virtual Public Hearings During Environmental Assessment Comment Period

FHWA and the Project Sponsors *[hosted]* virtual public hearings to solicit public comments on this EA. Similar to the webinars described in **Section 18.3.2**, these virtual hearings *[were]* conducted using the Zoom Webinar platform and *[were]* posted to YouTube. They *[included]* a presentation and the opportunity to comment orally. The presentation *[included]* information on how to submit comments via other means, such as via the Project website, email, fax, telephone, and U.S. Postal Service during the public comment period.

The Project Sponsors *[used]* all the public outreach tools described in **Section 18.3.1** to publicize the public hearings during the EA comment period. In addition, MTA *[posted]* digital ads and posters in nine languages in all subway stations and commuter rail stations, and posters in nine languages on all its bus routes. This effort along with the far-reaching print and digital media ads, *[addressed]* both the environmental justice populations identified in **Chapter 17, "Environmental Justice,"** as well as the Title VI census tracts identified in **Subchapter 5A, "Social Conditions: Population Characteristics and Community Cohesion."**

Hearing attendees *[participated]* via computer or telephone. Hearing information *[was]* available through the Project website and via the Project telephone hotline. Publicly accessible computers *[could be]* reserved at the library repositories listed in **Table 18-3** to participate in these hearing.

**Table 18-4** provides information on *[the]* hearings scheduled in August 2022.

Table 18-4.   Public Hearing Dates and Times

| PUBLIC HEARING SESSION NO. | DATE | [MEET G TA T] TIME | [MEET G E T ME] | [TOTA E OOM EB A E E ] | [ EA O T BE E E E ] | [TOTA O A COMME T ] |
|---|---|---|---|---|---|---|
| 1 | Thursday, August 25, 2022 | 5:00 p.m. (EDT) | [ 2 p m E T] | [ 3 ] | [ 2 ] | [ ] |
| 2 | Saturday, August 27, 2022 | 10:00 a.m. (EDT) | [2 p m E T] | [ 2] | [ 3] | [ 2] |
| 3 | Sunday, August 28, 2022 | 1:00 p.m. (EDT) | [ p m E T] | [ 3] | [ ] | [ ] |
| 4 | Monday, August 29, 2022 | 1:00 p.m. (EDT) | [ 33 p m E T] | [2 ] | [ ] | [ ] |
| 5 | Tuesday, August 30, 2022 | 5:00 p.m. (EDT) | [ 2 3 a m E T] | [300] | [ ] | [ ] |
| 6 | Wednesday, August 31, 2022 | 10:00 a.m. (EDT) | [ p m E T] | [3 ] | [ ] | [ ] |
| [TOTA ] | | | | [ ] | [3 ] | [ 2] |

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 18, Agency Coordination and Public Participation

## 18.6 [COMMENTS RECEIVED DURING THE FORMAL OUTREACH PERIOD

*The Chapter 18 appendices provide all comments submitted on the CBD Tolling Program during the public comment period. FHWA and the Project Sponsors made the EA available for public review on August 10, 2022. A 44-day public comment period was provided, during which members of the public, agencies, elected officials, and organizations could submit comments on the EA. The public comment period was initially advertised as extending from August 10, 2022, through September 9, 2022, and was subsequently extended to September 23, 2022, based on requests from members of the public. In addition, FHWA and the Project Sponsors considered comments received after the formal close of the comment period, while this EA was being finalized.*

*FHWA and the Project Sponsors received nearly 70,000 public input submissions on the EA. These included more than 14,000 individual submissions (containing more than 22,000 individual comments, as many submissions have multiple comments), including oral testimony at the public hearings, letters, e-mails, voicemails, and submissions via an electronic comment form. In addition to the individual submissions, the Project Sponsors also received more than 55,000 submissions made as part of four form letter campaigns. These campaigns are of significant magnitude and therefore have been included separately as Appendix 18D.*

*The Chapter 18 appendices provide the full set of comment submissions with responses to each comment and consist of four sub-appendices:*

- *18A: Responses to Frequently Received Comments*
- *18B: Index of All Submissions (with separate sections for elected officials and agencies)*
- *18C: Comments and Responses*
- *18D: Form Letter Submissions*

*Note that submissions received where the comments were wholly outside the scope of the Project (such as inquiries about existing toll bill payment), or where the entire submission contained only derogatory and inappropriate language, were not included.*

### 18.6.1 Appendix 18A: Responses to Frequently Received Comments

*As many individuals submitted similar comments in different submissions, the Responses to Frequently Received Comments document contains responses to 39 of the most frequent comments made during the public comment period.*

### 18.6.2 Appendix 18B: Index of All Submissions

*This appendix provides an index of all submissions, organized into categories by submission type, including the following:*

- *Elected officials*
- *Agencies*
- *General public*

Case 2:23-cv-03885-BRM-LDW   Document 7-6   Filed 07/21/23   Page 96 of 139 PageID: 2016

Central Business District (CBD) Tolling Program Environmental Assessment
Chapter 18, Agency Coordination and Public Participation

*Within each category, commenters are listed in alphabetical order by the last name of the submitter.*

### 18.6.3    Appendix 18C: Comments and Responses

*The Comments and Responses Document consists of all comments and responses to those comments. This appendix is organized in the same subsections as above (e.g., elected officials, agencies, and the general public), and within each subsection, comments are organized in alphabetical order by the last name of the submitter. Each submission is numbered, based on the order that it was processed by the Project Sponsors. Each submission is also divided into the individual comments made by the submitter, which allowed responses to be provided to each separate comment within a submission. All comments are individually numbered, also based on the order in which they were processed by the Project Sponsors. Where multiple submissions were made by the same submitter, any duplicates (i.e., submissions with identical substance that were provided multiple times) are not included. Such duplicate submissions are listed in the index in Appendix 18B, however, to allow readers to see the full set of submissions received.*

*Many responses to individual comments in this appendix reference the detailed responses provided in Appendix 18A, Responses to Frequently Received Comments.*

### 18.6.4    Appendix 18D: Form Letter Submissions

*Appendix 18D consists of four form letter campaigns where the same submission was made by multiple people. For the first three, the appendix provides the text of the comment followed by a list of names of people who submitted them. For the fourth, the appendix provides the text of the campaign followed by a copy of all signatures received with this submission.*

*Note that where the form letter was altered by the commenter, if the modified comment merited a different response than the original form letter, the submission was treated as an individual submission and included in Appendix 18C rather than 18D.*

### 18.7    AVAILABILITY OF THE DRAFT DECISION DOCUMENT AND FINAL EA

*The Draft Decision Document and the Final EA are available for public viewing at the Project's website: mta.info/CBDTP. Print copies of the Draft Decision Document and this Final EA are available at Project Sponsors' offices and FHWA Division Offices in New York, New Jersey, and Connecticut. Table 18-5 lists the Project Sponsors' offices where the Draft Decision Document and this Final EA are available for public viewing. The Draft Decision document and this Final EA will also be available for public viewing electronically at dedicated computers or sites at the same libraries where the EA was available for review in August and September 2022, which are listed in Table 18-3.]*

Chapter 18, Agency Coordination and Public Participation

[*Table 18-5.   Repositories for Reviewing the Final Environmental Assessment and the Draft Decision Document*]

| REPOSITORY | CITY OR COUNTY/STATE | FACILITY | ADDRESS |
|---|---|---|---|
| FHWA | New York (Albany) | FHWA New York Division Office | Leo W. O Brien Federal Building, 11A Clinton Avenue, Room 719 Albany, NY 12207 (518) 431-4127 |
| | New Jersey (Trenton) | FHWA New Jersey Division Office | 840 Bear Tavern Road, Suite 202 West Trenton, NJ 08628 (609) 637-4200 |
| | Connecticut (Hartford) | FHWA Connecticut Division Office | 450 Main Street, Suite 612 Hartford, CT 06103 (860) 659-6703 |
| TBTA | New York (New York City) | | 2 Broadway New York, NY 10004 (212) 878-7000 |
| NYSDOT | New York (New York City) | Region 11 | Hunter's Point Plaza 47-40 21st St. Long Island City, NY 11101 (718) 482-4526 |
| NYCDOT | New York (New York City) | | 55 Water Street New York, NY 10041 (212) 639-9675 |

[*Print copies of specific comments and their responses will be provided upon request submitted to TBTA. To request a record of specific comments and their responses, or for further information about viewing the Draft Decision Document or the Final EA, including its appendices, individuals should contact:*

*CBD Tolling Program*
*c/o Triborough Bridge and Tunnel Authority*
*2 Broadway, 23rd Floor*
*New York, NY 10004*
*Telephone: 646-252-7440*
*Fax: 212-504-3148* ]

# 19.   Section 4(f) Evaluation

## 19.1   INTRODUCTION

Section 4(f) of the Department of Transportation Act of 1966 (now 49 United States Code [USC] Section 303 and 23 USC Section 138; U.S. Department of Transportation [USDOT] Act) applies to the use of publicly or privately owned historic sites determined eligible for or listed on the National Register of Historic Places (NRHP); and publicly owned parks[1], recreation areas, and wildlife and waterfowl refuges (collectively, Section 4(f) properties). The requirements of Section 4(f) apply to FHWA and other agencies of USDOT.

## 19.2   REGULATORY FRAMEWORK

Section 4(f) of the USDOT Act stipulates that FHWA and other USDOT operating administrations may not approve the use of Section 4(f) properties unless they have determined that the following conditions apply:

- There is no feasible and prudent alternative that would avoid the use of the Section 4(f) property; and

- The Project includes all possible planning to minimize harm to that property resulting from such use (23 Code of Federal Regulations [CFR] Section 774.3(a)); or

- The use of the Section 4(f) property, including any measures(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures) will have a *de minimis* impact, as defined in 23 CFR Section 774.17, on the property.

Pursuant to 23 CFR Section 774.17, a project uses a Section 4(f) property when:

- Land from the Section 4(f) property is permanently incorporated into a transportation facility;

- There is a temporary occupancy of land that is adverse in terms of the statute's preservation purpose, as determined by the criteria in 23 CFR Section 774.13(d) (e.g., when all or part of the Section 4(f) property is required for a project's construction-related activities); or

- There is a "constructive" use of a Section 4(f) property, as determined by the criteria defined in 23 CFR Section 774.15(a).

The permanent incorporation of land in a transportation facility occurs when land from a Section 4(f) property is purchased outright as transportation right-of-way, or when a project acquires a property interest that allows permanent access onto a property, such as a permanent easement for maintenance.

Temporary occupancy results when a Section 4(f) property is required for a project's construction activities and the land is not permanently incorporated into a transportation facility upon the completion of

---

[1]   There are plazas adjacent to commercial and residential buildings in the local study area that are privately owned but are designated as publicly accessible open space. These plazas are considered Section 4(f) properties for this analysis.

construction, but the activities are considered adverse in terms of the protected features of the property. As outlined in 23 CFR Section 774.13(d), when the following five conditions are met, a temporary occupancy is not considered a "use" for the purposes of Section 4(f):

1. Duration must be temporary, i.e., less than the time needed for construction of the project, and there should be no change in ownership of the land;

2. Scope of the work must be minor, i.e., both the nature and the magnitude of the changes to the Section 4(f) property are minimal; When there is a constructive use of a Section 4(f) property as determined by the criteria in 23 CFR § 774.15;

3. There are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis;

4. The land being used must be fully restored, i.e., the property must be returned to a condition which is at least as good as that which existed prior to the project; and

5. There must be documented agreement of the official(s) with jurisdiction over the Section 4(f) resource regarding the above conditions.

Constructive use occurs when there is no permanent incorporation or temporary occupancy of land, but the proximity impacts (e.g., visual and noise) of a project are so severe that the protected activities, features, or attributes that qualify a resource for protection under Section 4(f) are substantially impaired.

A *de minimis* impact involves the use of Section 4(f) property that is generally minor in nature. A *de minimis* impact is one that—after considering avoidance, minimization, mitigation, and enhancement measures that are committed to by the applicant—results in no adverse effect to a historic site and no adverse effect to the activities, features, or attributes qualifying a park, recreation area, or refuge for protection under Section 4(f). As set forth in the Section 4(f) regulations (23 CFR Part 774), once FHWA determines that a transportation use of Section 4(f) property results in a *de minimis* impact, an analysis of avoidance alternatives is not required, and the Section 4(f) evaluation process is complete.

As defined in the Section 4(f) regulations, FHWA may make a finding of *de minimis* impact on a historic site when the following have occurred:

1. FHWA has considered the views of any consulting parties participating in the Section 106 consultation process, as established by the National Historic Preservation Act and its implementing regulation (36 CFR Part 800).

2. The Section 106 process results in a determination of no adverse effect with the written concurrence of the State Historic Preservation Office (SHPO) and the Advisory Council on Historic Preservation (ACHP) if that agency is participating in the Section 106 consultation.[2]

---

[2] NPS has oversight of National Historic Landmarks, and therefore, it is an official with jurisdiction over Central Park. The Advisory Council on Historic Preservation did not participate in the Section 106 consultation process for the CBD Tolling Program.

3. The SHPO, and the ACHP if participating in the Section 106 consultation, are informed of FHWA's intent to make a *de minimis* impact finding based on their written concurrence in the Section 106 determination of no adverse effect.

FHWA may determine that the impacts of a transportation project on a publicly owned park, recreation area, and wildlife or waterfowl refuge that qualifies for Section 4(f) protection may be *de minimis* if:

1. The transportation use of the Section 4(f) property, together with any impact avoidance, minimization, and mitigation or enhancement measures incorporated into the project, does not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f);

2. The public has been afforded an opportunity to review and comment on the effects of the project on the protected activities, features, or attributes of the Section 4(f) property; and

3. The official(s) with jurisdiction over the property are informed of FHWA's intent to make the *de minimis* impact finding and concur in writing that the project will not adversely affect the activities, features, or attributes that qualify the property for protection under Section 4(f).

Section 4(f) regulations identify exceptions to the requirement of Section 4(f) approval. The exception to the requirement of Section 4(f) approval for the use of historic transportation facilities identified in 23 CFR Section 774.13(a)(3) is relevant to the potential effects of the CBD Tolling Alternative, and states:

> Maintenance, preservation, rehabilitation, operation, modernization, reconstruction, or replacement of historic transportation facilities, if the Administration concludes, as a result of the consultation under 36 CFR 800.5, that:
>
> (i) Such work will not adversely affect the historic qualities of the facility that caused it to be on or eligible for the National Register, or this work achieves compliance with Section 106 through a program alternative under 36 CFR 800.14; and
>
> (ii) The official(s) with jurisdiction over the Section 4(f) resource have not objected to the Administration conclusion that the proposed work does not adversely affect the historic qualities of the facility that caused it to be on or eligible for the National Register, or the Administration concludes this work achieves compliance with 54 U.S.C. 306108 (Section 106) through a program alternative under 36 CFR 800.14.

The following sections identify the CBD Tolling Alternative's potential to use Section 4(f) properties in accordance with Section 4(f) regulations.

## 19.3    DESCRIPTION OF THE PROPOSED ACTION

The purpose of the Project is to reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into the FHWA's Value Pricing Pilot Program.

The Project would address the following needs:

- Reduce vehicle congestion in the Manhattan CBD.
- Create a new local, recurring funding source for MTA capital projects.

FHWA in cooperation with TBTA—an affiliate of MTA—NYSDOT, and NYCDOT (collectively the Project Sponsors) have established the following objectives to further refine the Project purpose:

- Reduce daily vehicle-miles traveled within the Manhattan CBD.

- Reduce the number of vehicles entering the Manhattan CBD daily.

- Create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program.

- Establish a tolling program consistent with the purposes underlying the New York State legislation entitled the MTA Reform and Traffic Mobility Act.


## 19.4   PROJECT ALTERNATIVES

FHWA and the Project Sponsors are evaluating two alternatives for the Project:

- The No Action Alternative, in which a vehicular tolling program to reduce traffic congestion in the Manhattan CBD would not be implemented. With the No Action Alternative, existing tolls at bridges and tunnels connecting to Manhattan—which are managed and collected by TBTA and the Port Authority of New York and New Jersey (PANYNJ)—would remain in effect, and the other East River and Harlem River bridges connecting to Manhattan would remain untolled. With the No Action Alternative, MTA will implement its 2020–2024 Capital Program and subsequent capital programs, to the extent practical, using available sources to fund projects. However, without a new stream of revenue, MTA would have to delay or forgo important transit and commuter railroad projects and improvements in its capital plan.

- The CBD Tolling Alternative would implement a vehicular tolling program to reduce traffic congestion in the Manhattan CBD consistent with the Traffic Mobility Act. The CBD Tolling Alternative would place tolling system equipment (including signage) on existing infrastructure or new infrastructure with a similar appearance to existing streetlight poles, signal poles, sign poles, mast arms, or overhead structures on city streets and sidewalks. **Chapter 2, "Project Alternatives,"** provides more information on the proposed tolling infrastructure and tolling system equipment.


## 19.5   HISTORIC SITES

As set forth in the Section 4(f) regulations (23 CFR Section 774.11(e)), Section 4(f) applies to the use of historic sites (i.e., any prehistoric or historic district, site, building, structure, or object) that are listed on or eligible for listing on the NRHP, unless one of the exceptions defined in the regulations (23 CFR Section 774.13) applies. Section 4(f) historic sites are identified through the consultation process

established under Section 106 of the National Historic Preservation Act and its implementing regulation (36 CFR Part 800). **Chapter 8, "Historic and Cultural Resources,"** documents the Section 106 consultation process for the Project. **Table 19-1** lists the Section 4(f) historic sites that have been identified in the Section 106 Area of Potential Effects (APE). These sites are mapped in **Figure 19-1 through Figure 19-7**. The historic sites qualify as Section 4(f) resources because they are either listed on the NRHP or have been determined eligible for listing on the NRHP.

There are 41 historic sites that are listed on or eligible for listing on the NRHP in the Area of Potential Effects (APE) for historic resources. The CBD Tolling Alternative would not result in the use of 40 of these Section 4(f) properties for the following reasons:

- At 30 sites, the Project would have no effect on the historic site pursuant to Section 106 of the National Historic Preservation Act. Therefore, in accordance with Section 4(f) regulations, there would be no use of these Section 4(f) properties, and no further review of these properties under Section 4(f) is required.

- Four sites are historic transportation facilities, and the exception to the requirement of Section 4(f) approval for use of these properties to install tolling infrastructure and tolling system equipment applies in accordance with 23 CFR Section 774.13(a)(3).

- At six sites, the Project Sponsors would install new tolling infrastructure and tolling system equipment within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors. Therefore, there would be no Section 4(f) use of these properties.

The Project Sponsors would replace four poles at three locations in Central Park, which is listed on the NRHP and is also a National Historic Landmark. FHWA intends on finding that the CBD Tolling Alternative would have a *de minimis* impact on Central Park in accordance with the criteria described in **Section 19.2**.

- Through the Section 106 process, FHWA and the Project Sponsors consulted with National Park Service (NPS), SHPO, New York City Department of Parks and Recreation (NYC Parks), and other consulting parties regarding the potential effects of the CBD Tolling Alternative, including the replacement of four poles in Central Park, on the historic attributes and features of Central Park. The new tolling infrastructure and tolling system equipment would be of a design similar to existing streetlights, signs, and other equipment within Central Park, and to the extent feasible, equipment would match the color of other infrastructure within the park.

- With the above measures incorporated into the Project, FHWA found that the CBD Tolling Alternative would not have an adverse effect on Central Park. SHPO concurred with FHWA's finding. (Refer to **Appendix 8, "Historic and Cultural Resources: Section 106 Finding Documentation."**)

- NPS, SHPO, and NYC Parks are the agencies with jurisdiction over Central Park with respect to its historic designation. FHWA informed NPS, SHPO, and NYC Parks of its intent to make a *de minimis* effect finding for the CBD Tolling Alternative. These agencies concurred with the Section 106 determination and the proposed *de minimis* impact finding. (Refer to **Appendix 8, "Historic and Cultural Resources: Section 106 Finding Documentation"** and **Appendix 19, "Section 4(f) Correspondence."**)

Chapter 19, Section 4(f) Evaluation

Table 19-1.    Section 4(f) Historic Sites

| FIGURES 19-2 TO 19-7 MAP NO. | ADDRESS/NAME | PROJECT CHANGE | SECTION 106 EFFECT FINDING | SECTION 4(f) USE |
|---|---|---|---|---|
| 1 | Ed Koch Queensboro Bridge | Minor changes – installation of tolling equipment on bridge structure | No adverse effect | Exception from Section 4(f) approval in accordance with 23 CFR Section 774.13 |
| 2 | Manhattan Bridge | Minor changes – installation of steel girder with tolling equipment | No adverse effect | Exception from Section 4(f) approval in accordance with 23 CFR Section 774.13 |
| 3 | South Street Seaport Historic District and Extension | • Minor changes – installation of a pole with equipment cabinet in a parking lot within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors<br>• Minor change to setting | No adverse effect | No use |
| 4 | Holland Tunnel | • No physical changes to tunnel structure<br>• Minor change to setting | No effect | No use |
| 5 | Tribeca North Historic District | • Minor changes – installation of one new pole with mast arm with tolling equipment in location of existing sidewalk light pole within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors<br>• Minor change to setting | No adverse effect | No use |
| 6 | Tribeca West Historic District | No physical changes or changes to immediate setting | No effect | No use |
| 7 | American Thread Building | No physical changes or changes to immediate setting | No effect | No use |
| 8 | Gansevoort Market Historic District | • Minor changes – installation of one new pole with equipment cabinet on sidewalk within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors<br>• Minor change to setting | No adverse effect | No Use |
| 9 | Whitehall Building | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on adjacent sidewalk | No effect | No use |
| 10 | Public Baths | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on adjacent sidewalk | No effect | No use |
| 11 | 21 West Street | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on sidewalk on same block | No effect | No use |

Chapter 19: Section 4(f) Evaluation

| FIGURES 19-2 TO 19-7 MAP NO. | ADDRESS/NAME | PROJECT CHANGE | SECTION 106 EFFECT FINDING | SECTION 4(f) USE |
|---|---|---|---|---|
| 12 | U.S. Post Office – Morgan General Mail Facility | • No physical changes <br> • Minor change in setting – new pole with mast arm with tolling equipment on adjacent sidewalks | No effect | No use |
| 13 | 406-426 West 31st Street[3] | • No physical changes <br> • Minor change to setting – new pole with mast arm with tolling equipment on sidewalk on adjacent sidewalk | No effect | No use |
| 14 | U.S. General Post Office | No physical changes or changes to immediate setting | No effect | No use |
| 15 | Pennsylvania Railroad North River Tunnel (used by Amtrak and NJ TRANSIT) | No physical changes or changes to immediate setting | No effect | No use |
| 16 | St. Michael's Roman Catholic Church Complex[3] | • No physical changes <br> • Minor change to setting – new pole with mast arm with tolling equipment on adjacent sidewalk | No effect | No use |
| 17 | Master Printers Building[3] | • No physical changes <br> • Minor change to setting – new pole with mast arm with tolling equipment on sidewalk on same block | No effect | No use |
| 18 | Webster Apartments[3] | • No physical changes <br> • Minor change to setting – new pole with mast arm with tolling equipment on adjacent sidewalk | No effect | No use |
| 19 | Harding Building/Garment Center Historic District[1] | No physical changes or changes to immediate setting | No effect | No use |
| 20 | Paddy's Market Historic District | • Minor changes – installation of two new poles with mast arms with tolling equipment on sidewalk within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors <br> • Minor change to setting | No adverse effect | No Use |
| 21 | Former Pinehill Crystal Water Company[3] | No physical changes or changes to immediate setting | No effect | No use |
| 22 | Hill Building[3] | No physical changes or changes to immediate setting | No effect | No use |
| 23 | 500 West 37th Street[3] | No physical changes or changes to immediate setting | No effect | No use |
| 24 | Underhill Building[3] | No physical changes or changes to immediate setting | No effect | No use |

Chapter 19, Section 4(f) Evaluation

| FIGURES 19-2 TO 19-7 MAP NO. | ADDRESS/NAME | PROJECT CHANGE | SECTION 106 EFFECT FINDING | SECTION 4(f) USE |
|---|---|---|---|---|
| 25 | 408 West 39th Street | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on adjacent sidewalk within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |
| 26 | 523-539 Ninth Avenue | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on same block within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |
| 27 | Lincoln Tunnel | Minor changes – installation of tolling equipment at the three portals of the tunnel within right-of-way controlled by the PANYNJ | No adverse effect | Exception from Section 4(f) approval in accordance with 23 CFR Section 774.13 |
| 28 | St. Raphael Roman Catholic Church and Rectory | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on sidewalk on same block within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |
| 29 | 500-506 West 42nd Street[3] | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on adjacent sidewalk within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |
| 30 | McGraw-Hill Publishing Company Building | No physical changes or changes to immediate setting | No effect | No use |
| 31 | The High Line | Minor changes – installation of tolling equipment on underside of viaduct structure within the public right-of-way without the need for an easement or transfer of property, but requires an access agreement for future maintenance | No adverse effect | Exception from Section 4(f) approval in accordance with 23 CFR Section 774.13 |
| 32 | Former French Hospital | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on sidewalk on same block within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |

Chapter 19: Section 4(f) Evaluation

| FIGURES 19-2 TO 19-7 MAP NO. | ADDRESS/NAME | PROJECT CHANGE | SECTION 106 EFFECT FINDING | SECTION 4(f) USE |
|---|---|---|---|---|
| 33 | Lithuanian Alliance of America | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on sidewalk on same block within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |
| 34 | Hotel Irwin | • No physical changes.<br>• Minor change to setting – new pole with mast arm with tolling equipment on sidewalk on same block within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |
| 35 | Engine Co. 34 Firehouse | No physical changes or changes to immediate setting | No effect | No use |
| 36 | P.S. 191 Hudson Honors School | • No physical changes<br>• Minor change to setting – new pole with mast arm with tolling equipment on adjacent sidewalk within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |
| 37 | Cova Building | • No physical changes<br>• Minor change to setting – 2 new poles with mast arm with tolling equipment on sidewalks on same block within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors | No effect | No use |
| 38 | 59th Street-Columbus Circle Subway Station | No physical changes or changes to setting | No effect | No use |
| 39 | Central Park[2] | • Minor changes<br>  o Replacement of four existing poles at three detection locations with new poles with tolling equipment along the interior park roads<br>  o Replacement of existing light pole with new pole with tolling equipment on Fifth Avenue sidewalk<br>  o Installation of a new pole with mast arm on Central Park West sidewalk within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors<br>• No easement or transfer of property, but requires access agreement for future maintenance<br>• Minor changes to setting | No adverse effect | e minimis impact |

Chapter 19, Section 4(f) Evaluation

| FIGURES 19-2 TO 19-7 MAP NO. | ADDRESS/NAME | PROJECT CHANGE | SECTION 106 EFFECT FINDING | SECTION 4(f) USE |
|---|---|---|---|---|
| 40 | Upper East Side Historic District | • Minor changes – installation of one new pole with mast arm with tolling equipment on sidewalk within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors<br>• Minor changes to setting | No adverse effect | No use |
| 41 | Upper East Side Historic District Boundary Increase and Additional Documentation | • Minor changes – installation of one new pole with mast arm with tolling equipment on sidewalk within the public right-of-way without the need for an easement, access agreement, or other transfer of property to the Project Sponsors<br>• Minor changes to setting | No adverse effect | No use |

Source:   Cultural Resource Information System at https://cris.parks.ny.gov
          NYC Landmarks Preservation Commission "Discover NYC Landmarks" at https://www1.nyc.gov/site/lpc/index.page
Notes:    Refer to the Section 106 Finding Documentation in **Appendix 8, "Historic and Cultural Resources: Section 106 Finding Documentation,"** for more information about the potential
          changes associated with the CBD Tolling Alternative.
[a]       The Harding Building is the only building in the Garment Center Historic District (NRHP-Listed) that is in the Area of Potential Effect.
[b]       The NRHP and New York City Landmark boundaries differ for Central Park at the location of the corner of the park at Central Park South (59th Street) and Fifth Avenue; this corner is
          included as part of the Grand Army Plaza Scenic Landmark (Resource No. 43) but excluded from the New York City Scenic Landmark boundaries (Resource No. 39a on **Figure 19-6**).
          Grand Army Plaza is included within the Central Park NRHP and National Historic Landmark boundaries (Resource No. 39b on **Figure 19-6**).

Figure 19-1.   Key Map of Section 4(f) Historic Sites



Sources:   NYC Open Data, NYC Planimetrics, https://data.cityofnewyork.us/Transportation/NYC-Planimetrics/wt4d-p43d; New York City Department of City Planning (NYCDCP), BYTES of the BIG APPLE, https://www1.nyc.gov/site/planning/data-maps/open-data.page; ArcGIS Online, https://www.arcgis.com/index.html.

Chapter 19, Section 4(f) Evaluation

Figure 19-2.   Section 4(f) Historic Sites – Ed Koch Queensboro Bridge and Manhattan Bridge



**Ed Koch Queensboro Bridge**    0   100   200   300 FEET      **Manhattan Bridge**    0   500 FEET

 Proposed Location of Tolling Infrastructure and Tolling System Equipment
(each circle represents a detection location, which may include one or more new poles
or new tolling system equipment mounted on existing infrastructure in that general location)

❶ Historic Resource (corresponds to Table 19-1)

NR-listed/NR-eligible Tunnel and Bridge Boundaries (approximate)

Note: NYCL Boundary for the Ed Koch Queensboro Bridge
includes Queensboro Bridge Plaza as shown

Sources:   TBTA. October 2021. New York State, NYS Interactive Mapping Gateway: New York Statewide Digital Orthoimagery Program (NYSDOP) High Resolution Imagery 2000 –
2018. http://gis.ny.gov/gateway/mg/index.html.

19-12          April 2023

Chapter 19: Section 4(f) Evaluation

Figure 19-3.   Section 4(f) Historic Sites – Brooklyn Bridge and Holland Tunnel



**Brooklyn Bridge**

**Holland Tunnel**

○ Proposed Location of Tolling Infrastructure and Tolling System Equipment (each circle represents a detection location, which may include one or more new poles or new tolling system equipment mounted on existing infrastructure in that general location

○ Potential Location of Tolling Infrastructure and Tolling System Equipment on PANYNJ Property in Place of All Other Detection Points at and Near the Holland Tunnel

③ Historic Resource (corresponds to Table 19-1)

☐ Historic Resource Tax Lot (as applicable)

▨ NR-listed/NR-eligible Tunnel and Bridge Boundaries (approximate)

**Historic Districts**

☐ South Street Seaport Historic District (NR-listed)
☐ South Street Seaport Historic District Extention (NR-listed)
☐ Tribeca North Historic District (NR-eligible)
☐ Tribeca West Historic District (NYCHD, NR-eligible)

Sources:   TBTA. October 2021. New York State, NYS Interactive Mapping Gateway: NYSDOP High Resolution Imagery 2000 – 2018. http://gis.ny.gov/gateway/mg/index.html.
*[Note: For an audio description, please go to the following link: https://www.youtube.com/watch?v=2bxytJKYe64&list=PLZHkn788ZQJPEY5zv-dr2gzkzMQFMgb_2&index=29.]*

Figure 19-4.   Section 4(f) Historic Sites – Battery Park Underpass and Hugh L. Carey Tunnel



**Battery Park Underpass**          **Hugh L. Carey Tunnel**

0                           300 FEET

🔵  *Proposed Location of Tolling Infrastructure and Tolling System Equipment
(each circle represents a detection location, which may include one or more new poles
or new tolling system equipment mounted on existing infrastructure in that general location
– existing open road tolling infrastructure would be used for the Hugh L. Carey Tunnel)*

**9**  *Historic Resource (corresponds to Table 19-1)*

Sources:   TBTA. October 2021. New York State, NYS Interactive Mapping Gateway: NYSDOP High Resolution Imagery 2000 –
2018. http://gis.ny.gov/gateway/mg/index.html.

Figure 19-5.   Section 4(f) Historic Sites – Lincoln Tunnel



Sources:   TBTA. October 2021. New York State, NYS I
2018. http://gis.ny.gov/gateway/mg/index.html.
*[Note:   For an audio description, please go to the following link:
https://www.youtube.com/watch?v=9mjiYdKv6z8&list=PLZHkn788ZQJPEY5zv-dr2gzkzMQFMgb_2&index=30*

Chapter 19, Section 4(f) Evaluation

Figure 19-6.   Section 4(f) Historic Sites – 60th Street and Central Park



Sources:   TBTA. October 2021. New York State, NYS Interactive Mapping Gateway: NYSDOP High Resolution Imagery 2000 – 2018. http://gis.ny.gov/gateway/mg/index.html.

Chapter 19, Section 4(f) Evaluation

Figure 19-7.   Section 4(f) Historic Sites – FDR Drive at East 25th Street and West Side Highway/Route 9A at Gansevoort Street



**FDR Drive/East 25th Street**



**West Side Highway/Gansevoort Street**

Proposed Location of Tolling Infrastructure and Tolling System Equipment
(each circle represents a detection location, which may include one or more new poles
or new tolling system equipment mounted on existing infrastructure in that general location
– existing open road tolling infrastructure would be used for the Hugh L. Carey Tunnel)

Historic Resource (corresponds to Table 19-1)

Gansevoort Market Historic District (NR-listed)

Sources:    TBTA. October 2021. New York State, NYS Interactive Mapping Gateway: NYSDOP High Resolution Imagery 2000 – 2018. http://gis.ny.gov/gateway/mg/index.html.

## 19.6 USE OF PUBLICLY OWNED PARKS, RECREATION AREAS, AND WILDLIFE AND WATERFOWL REFUGES

### 19.6.1 Recreation Areas and Wildlife and Waterfowl Refuges

No designated recreation areas or wildlife and waterfowl refuges are within or adjacent to the Manhattan CBD, which is the area where tolling infrastructure and tolling system equipment, including new signage, would be located. Therefore, the CBD Tolling Alternative would not result in the use of any such resources.

### 19.6.2 Publicly Owned Parks

There are 82 parks (defined here as including publicly accessible plazas) adjacent to or near locations where tolling infrastructure and tolling system equipment would be located. **Figure 19-8** provides a map of these parks and plazas, and **Table 19-2** provides information on each park or plaza, the potential change resulting from implementation of the CBD Tolling Alternative, and the proposed conclusion regarding the Section 4(f) use of the property. **Table 19-2** includes parks and plazas owned by NYC Parks, the New York City Economic Development Corporation, New York City Department of Education, Hudson River Park Trust, and private property owners. All these parks and plazas are publicly accessible, and therefore, they are considered Section 4(f) properties.

Except for the installation of tolling infrastructure and tolling system equipment on the underside of the High Line and within and adjacent to Central Park, the CBD Tolling Alternative would not place tolling infrastructure or tolling system equipment within parks and plazas in the local study area. Tolling infrastructure and tolling system equipment would be within the street, sidewalk, or immediately adjacent areas of these other parks, and would not require a change in ownership or restrict the access to or use of the property. The presence of the tolling infrastructure and tolling system equipment—which would be similar in nature and character to existing infrastructure already present along streets and sidewalks throughout New York City—would not substantially impair the protected activities, features, or attributes that qualify these resources for protection under Section 4(f) (i.e., constructive use).[3]

---

[3]   Chapter 7, "Parks and Recreational Resources," provides information on why the CBD Tolling Alternative would not adversely affect activities in parks near proposed tolling infrastructure and tolling system equipment.

Figure 19-8.    Section 4(f) Parks



Sources:    NYC Open Data, NYC Planimetrics, https://data.cityofnewyork.us/Transportation/NYC-Planimetrics/wt4d-p43d;
NYCDCP, BYTES of the BIG APPLE, https://www1.nyc.gov/site/planning/data-maps/open-data.page; ArcGIS Online,
https://www.arcgis.com/index.html.

Chapter 19, Section 4(f) Evaluation

Table 19-2.    Section 4(f) Parks

| FIGURE 19-8, MAP NO. | OPEN SPACE | LOCATION | PROJECT CHANGE | SECTION 4(f) USE |
|---|---|---|---|---|
| 1 | Riverside Park South | Riverside Boulevard between West 59th Street and West 72nd Street | New tolling infrastructure and tolling system equipment on the adjacent block at the southern portion of the park and outside the park boundary | No use |
| 2 | Waterline Square | West 60th Street between Freedom Place South and Riverside Boulevard | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 3 | P.S. 452 playground | 210 West 61st Street | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 4 | The Regent Plaza | 45 West 60th Street | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 5 | Broadway Malls | Broadway from West 59th Street to West 168th Street | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 6 | Trump International Hotel Plaza | 1 Central Park West | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 7 | Columbus Circle | Broadway and Central Park South | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 8 | Central Park | Fifth Avenue to Eighth Avenue, 59th Street to 110th Street | • Four existing poles replaced with new poles with tolling equipment at three detection locations on the interior park roads<br>• Existing light pole replaced with new pole with tolling equipment on Fifth Avenue sidewalk<br>• New pole installed with mast arm on Central Park West sidewalk<br>• No easement or transfer of property, but requires access agreement for future maintenance | e minimis impact |
| 9 | Grand Army Plaza | Fifth Avenue and Central Park South | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 10 | Savoy Plaza | 200 East 61st Street | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 11 | Tramway Plaza | Second Avenue between East 59th Street and East 60th Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 12 | Evansview Plaza | 303 East 60th Street | New tolling infrastructure and tolling system equipment on the same and adjacent blocks outside of the park boundary | No use |

Chapter 19: Section 4(f) Evaluation

| FIGURE 19-8, MAP NO. | OPEN SPACE | LOCATION | PROJECT CHANGE | SECTION 4(f) USE |
|---|---|---|---|---|
| 13 | Landmark Plaza | 300 East 59th Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 14 | Honey Locust Park | 1130 Second Avenue | New tolling infrastructure and tolling system equipment on the same and adjacent blocks outside of the park boundary | No use |
| 15 | Bridge Tower Place Plaza | First Avenue and East 60th Street | New tolling infrastructure and tolling system equipment on the same and adjacent blocks outside of the park boundary | No use |
| 16 | Bridgemarket Public Plaza | East 59th Street between First and York Avenues | New tolling infrastructure and tolling system equipment on the same and adjacent blocks outside of the park boundary | No use |
| 17 | Queensboro Oval | York Avenue between East 59th and East 60th Streets | New tolling infrastructure and tolling system equipment on the same and adjacent blocks outside of the park boundary | No use |
| 18 | Twenty-Four Sycamores Park | 501 East 60th Street | New tolling infrastructure and tolling system equipment on the same and adjacent blocks outside of the park boundary | No use |
| 19 | Andrew Haswell Green Park | FDR Drive and East 60th Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 20 | Sutton Place Park | East 57th Street and Sutton Place | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 21 | Sutton Parks | 25 Sutton Place South | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 22 | Peter Detmold Park | 454 East 51st Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 23 | MacArthur Playground | 436 East 49th Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 24 | Robert Moses Playground | East 42nd Street and First Avenue | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 25 | East River Esplanade-Midtown Section | East River and East 37th Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 26 | The Corinthian Plaza | 330 East 38th Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 27 | St. Vartan Park | 613 First Avenue | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 28 | Manhattan Place plaza | 630 First Avenue | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 29 | American Copper Buildings plaza | 626 First Avenue | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |

Chapter 19, Section 4(f) Evaluation

| FIGURE 19-8, MAP NO. | OPEN SPACE | LOCATION | PROJECT CHANGE | SECTION 4(f) USE |
|---|---|---|---|---|
| 30 | Alexandria Science Center plaza | 450 East 29th Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 31 | Bellevue Sobriety Garden | East 26th Street and FDR Drive | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 32 | Asser Levy Playground | 501 East 23rd Street | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 33 | Stuyvesant Cove Park | East River waterfront, from East 18th Street to East 23rd Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 34 | Murphy Brothers Playground | 292 Avenue C | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 35 | Captain Patrick J. Brown Walk | East River waterfront, from East 13th Street to East 18th Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 36 | John V. Lindsay East River Park | East River waterfront, from Jackson Street to East 13th Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 37 | P.S. 142 playground | 100 Attorney Street | New tolling system equipment and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 38 | Luther Gulick Park | 21 Columbia Street | None | No use |
| 39 | Corlears Hook Park | 397 FDR Drive | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 40 | Pier 42 | East River waterfront at Jackson Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 41 | P.S. 184m playground | 327 Cherry Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 42 | East River Esplanade-Lower Manhattan Section | East River waterfront between Broad and Jefferson Streets | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 43 | Forsyth Plaza | Forsyth Street and Canal Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 44 | Sophie Irene Loeb Playground | 10 Market Street | None | No use |
| 45 | Coleman Playground | Intersection of Cherry Street, Pike Street, and Monroe Street | None | No use |
| 46 | Murray Bergtraum softball field | Market Slip between Cherry and South Streets | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |

Chapter 19: Section 4(f) Evaluation

| FIGURE 19-8, MAP NO. | OPEN SPACE | LOCATION | PROJECT CHANGE | SECTION 4(f) USE |
|---|---|---|---|---|
| 47 | Catherine Slip Malls | Catherine Slip between Cherry and South Streets | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 48 | City Hall Park | Broadway, Chambers Street, Centre Street, and Park Row | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 49 | Drumgoole Plaza | Frankfort Street and Gold Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 50 | Verizon Building plaza | 375 Pearl Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 51 | Fishbridge Park Garden and Dog Run | Pearl Street and Dover Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 52 | Peck Slip Plaza | Peck Slip and FDR Drive | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 53 | Imagination Playground | 89 South Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 54 | Mannahatta Park | Wall Street between Front and South Streets | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 55 | Financial Square plaza | South Street between Old Slip and Gouverneur Lane | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 56 | 55 Water Street plaza | 55 Water Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 57 | Vietnam Veterans Plaza | 24 South Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 58 | 125 Broad Street plaza | 125 Broad Street | New tolling system equipment on the adjacent FDR Drive outside of the park boundary | No use |
| 59 | Battery Park (also known as "Battery" or "The Battery") | State Street and Battery Place | New tolling infrastructure and tolling system equipment on the same and adjacent blocks outside of the park boundary | No use |
| 60 | 17 Battery Place Plaza | 17 Battery Place | New tolling infrastructure and tolling system equipment on the same and adjacent blocks outside of the park boundary | No use |
| 61 | Elizabeth H. Berger Plaza | Edgar Street, Greenwich Street and Trinity Place | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 62 | Battery Park City parks | Throughout Battery Park City neighborhood | New tolling system equipment on the adjacent block and the adjacent West Side Highway/Route 9A outside of the park boundary | No use |

Chapter 19, Section 4(f) Evaluation

| FIGURE 19.8, MAP NO. | OPEN SPACE | LOCATION | PROJECT CHANGE | SECTION 4(f) USE |
|---|---|---|---|---|
| 63 | 50 West Street plaza | 50 West Street | New tolling system equipment on the adjacent block and the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 64 | Liberty Park | Liberty, West, Cedar, and Greenwich Streets | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 65 | 9/11 Memorial | West, Liberty, Greenwich, and Fulton Streets | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 66 | 101 Barclay Street plaza | 101 Barclay Street | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 67 | One Eleven Murray plaza | 111 Murray Street | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 68 | Washington Market Park | 199 Chambers Street | New tolling infrastructure and tolling system equipment on the same block outside of the park boundary | No use |
| 69 | Salomon Smith Barney plaza | 388 Greenwich Street | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 70 | Tribeca Park | 8 Beach Street | None | No use |
| 71 | Albert Capsouto Park | 68 Varick Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary, depending on whether tolling system equipment would be located on PANYNJ property | No use |
| 72 | Freeman Plaza | Hudson Street, Broome Street, Varick Street, Watts Street, Holland Tunnel Entrance Ramps | New tolling infrastructure and tolling system equipment on the same or adjacent block outside of the park boundary, depending on whether tolling system equipment would be located on PANYNJ property | No use |
| 73 | Canal Park | Canal Street between West Street and Washington Street | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 74 | Hudson River Park | Areas of waterfront and Hudson River west of West Side Highway/Route 9A from Battery Place to West 59th Street | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 75 | 14th Street Park | Eleventh and Twelfth Avenues, West 22nd to West 24th Streets | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |
| 76 | Chelsea Waterside Park | Tenth and Eleventh Avenues, West 14th and West 15th Streets | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No use |

Chapter 19: Section 4(f) Evaluation

| FIGURE 19-8, MAP NO. | OPEN SPACE | LOCATION | PROJECT CHANGE | SECTION 4(f) USE |
|---|---|---|---|---|
| 77 | The High Line | Elevated linear alignment from Gansevoort Street to West 34th Street, paralleling Washington Street, Tenth Avenue, West 30th Street, Twelfth Avenue/Route 9A, and West 34th Street | • Installation of tolling system equipment on the underside of the viaduct structure<br>• No tolling infrastructure or tolling system equipment within the publicly accessible park<br>• No easement or transfer of property, but requires access agreement for future maintenance | e minimis impact |
| 78 | 500 West 30th Street plaza | 500 West 30th Street | New tolling infrastructure and tolling system equipment on the same and adjacent block outside of the park boundary | No use |
| 79 | Hudson Yards Eastern Railyard plaza | Hudson Boulevard between Eleventh Avenue and 33rd Street | New tolling infrastructure and tolling system equipment on the adjacent block outside of the park boundary | No use |
| 80 | 450 West 33rd Street plaza | 450 West 33rd Street | New tolling infrastructure and tolling system equipment on the same and adjacent block outside of the park boundary | No use |
| 81 | Manhattan West plaza | Ninth and Dyer Avenues, West 31st and West 33rd Streets | New tolling infrastructure and tolling system equipment on the same and adjacent block outside of the park boundary | No use |
| 82 | DeWitt Clinton Park | Between West Side Highway/Route 9A and Eleventh Avenue from West 52nd Street to West 54th Street | New tolling system equipment on the adjacent West Side Highway/Route 9A outside of the park boundary | No Use |

*Central Business District (CBD) Tolling Program Environmental Assessment*
Chapter 19, Section 4(f) Evaluation

The following sections describe the proposed installation of tolling infrastructure and tolling system equipment on the underside of the High Line and within and adjacent to Central Park.

### 19.6.2.1  High Line

The CBD Tolling Alternative would attach tolling system equipment to the High Line, a publicly owned park under the jurisdiction of NYC Parks. The High Line is a former railroad viaduct, and the top of the structure was converted to a park. The Project Sponsors would attach tolling system equipment on the underside of the High Line structure. It would be mounted to a metal pipe that would be bolted to the existing girders of the viaduct. The construction of this equipment would take place outside the publicly accessible parkland. Therefore, there would be no temporary occupancy of the Section 4(f) property.

Because the Project Sponsors require permanent access to the tolling equipment attached to the underside of the High Line, there would be use of this Section 4(f) property for the CBD Tolling Alternative. However, FHWA intends to make a finding that the CBD Tolling Alternative would result in a *de minimis* impact on the High Line in accordance with criteria described in **Section 19.2**:

- Access to the tolling infrastructure or tolling system equipment would not require access to the parkland that is atop the High Line. The tolling system equipment attached to the High Line structure would not be visible from the park nor would it alter any characteristics of the park or activities of park users; therefore, the CBD Tolling Alternative would not impair the protected activities, features, or attributes of the publicly accessible parkland that qualify it for protection under Section 4(f).

- FHWA will consider the views of the public regarding its intention to find a *de minimis* impact on the High Line. The public will be afforded the opportunity to comment on the proposed finding concurrent with the public review period for this EA. Refer to **Chapter 18, "Public Participation,"** for more information about how the public may provide comments during the public review period.

- NYC Parks is the official with jurisdiction over the High Line. FHWA and NYSDOT notified NYC Parks that FHWA intends on making a finding that the CBD Tolling Program would have a *de minimis* impact on the High Line. NYC Parks concurred in writing with this proposed finding, stating that the CBD Tolling Alternative would not affect the activities, features, or attributes that qualify the property for protection under Section 4(f). (Refer to **Appendix 19, "Section 4(f) Correspondence"** for copies of these letters.)

### 19.6.2.2  Central Park

Central Park is at the northern boundary of the Manhattan CBD where the CBD Tolling Alternative would be implemented. Central Park is protected under Section 4(f) as a publicly owned park and a historic site. Central Park is listed on the NRHP and is a National Historic Landmark, and as described in **Section 19.5**, FHWA intends to find that the CBD Tolling Alternative would have a *de minimis* impact on the historic attributes of Central Park. This section describes the potential use of Central Park as a publicly owned park and considers the permanent use, constructive use, and temporary occupancy of Central Park.

## Potential for Permanent Use

Tolling system equipment is proposed on four replacement poles at three detection locations just inside Central Park near 59th Street. The equipment would prevent authorized vehicles from using the park to enter the Manhattan CBD without paying the CBD toll. Pole-mounted tolling system equipment is also proposed at two locations on sidewalks outside the park's wall to detect vehicles entering the Manhattan CBD on Central Park West and Fifth Avenue. **Figure 19-9** shows the proposed location of tolling infrastructure and tolling system equipment within and adjacent to Central Park.

Equipment that is similar in appearance is already mounted on other poles in Central Park, and the proposed equipment would be visually consistent with the existing streetlight poles found throughout Central Park, including matching the existing color scheme (refer to **Figures 7-3a through Figure 7-3d** and **Figure 7-4 through Figure 7-6** in **Chapter 7, "Parks and Recreational Resources"**). Because the equipment would be mounted on replacement poles in the same locations as existing poles, the amount of park space would not be reduced. However, the Project Sponsors must have continued access to the poles for maintenance.

In addition, the CBD Tolling Alternative would place signs on the replacement streetlight poles in Central Park to warn authorized drivers using the park roadway system that exiting to Central Park South/59th Street via West Drive (at Seventh Avenue) or East Drive (at Grand Army Plaza) would incur a toll. Signs would be attached to the replacement pole on West Drive and to one of the poles on East Drive. The new signs would be similar to other signs in the park and would not affect any recreational areas of the park. Signs would also be attached to existing poles at locations along Central Park West and Fifth Avenue.

The Project Sponsors have coordinated with NYC Parks and the Central Park Conservancy regarding the installation of tolling infrastructure and tolling system equipment within and adjacent to Central Park. The Project Sponsors would continue to coordinate with NYC Parks and the Central Park Conservancy in the final design of the tolling infrastructure and tolling system equipment in Central Park.

Because the Project Sponsors would require permanent access to the tolling infrastructure and tolling system equipment proposed on four replacement poles at three locations within Central Park, there would be use of this Section 4(f) property for the CBD Tolling Alternative. However, FHWA intends to make a finding that the CBD Tolling Alternative would result in a *de minimis* impact on Central Park in accordance with criteria described in **Section 19.2**.

- The installation of tolling infrastructure and tolling system equipment on four replacement poles within Central Park would not alter the recreational features of the park, reduce the amount of usable parkland, or change access to the park. The tolling infrastructure and tolling system equipment would not alter any characteristics of the park's amenities and features. Therefore, the CBD Tolling Alternative would not impair the protected activities, features, or attributes of the publicly accessible parkland that qualify It for protection under Section 4(f).

Central Business District (CBD) Tolling Program Environmental Assessment
Chapter 19, Section 4(f) Evaluation

Figure 19-9.    General Locations of Proposed Tolling Equipment and New Signs in Central Park



| | | |
|---|---|---|
| ⊙ General Location Proposed for Tolling System Equipment and New Sign | 🟩 Park or Recreational Resource | *Two replacement poles at one location |
| 🟧 General Location Proposed for Tolling System Equipment without New Sign | | |

Sources:    NYC Open Data, NYC Planimetrics, https://data.cityofnewyork.us/Transportation/NYC-Planimetrics/wt4d-p43d;
NYCDCP, BYTES of the BIG APPLE, https://www1.nyc.gov/site/planning/data-maps/open-data.page; ArcGIS
Online, https://www.arcgis.com/index.html.

- FHWA will consider the views of the public regarding its intention to find a *de minimis* impact on Central Park. The public will be afforded the opportunity to comment on the proposed finding concurrent with the public review period for this EA. Refer to **Chapter 18, "Public Participation,"** for more information about how the public may provide comments during the public review period.

- NYC Parks is the official with jurisdiction over the Central Park. FHWA and NYSDOT notified NYC Parks that FHWA intends on a making a finding that the CBD Tolling Program would have a *de minimis* impact on the Central Park. NYC Parks concurred in writing with this proposed finding, stating that the CBD Tolling Alternative would not affect the activities, features, or attributes that qualify the property for protection under Section 4(f). (Refer to **Appendix 19, "Section 4(f) Correspondence"** for copies of these letters.)

## Potential for Constructive Use

The installation of tolling infrastructure and tolling system equipment within and adjacent to Central Park would not alter the recreational features of the park, reduce the amount of usable parkland, or change access to the park. As described in **Chapter 4B, "Transportation: Highways and Local Intersections,"** based on the results of the traffic modeling conducted for the Project, the CBD Tolling Alternative under all tolling scenarios analyzed in this EA would reduce the traffic volumes adjacent to Central Park on Fifth Avenue and Central Park West as well as the traffic volumes crossing the park using the park's sunken transverse roads.[4] Therefore, changes in traffic resulting from the CBD Tolling Alternative would not adversely affect the character of Central Park. The CBD Tolling Alternative would also not result in adverse air quality or noise effects (see **Chapter 10, "Air Quality"** and **Chapter 12, "Noise"**). Overall, the CBD Tolling Alternative would not impair the protected activities, features, or attributes that qualify Central Park for protection under Section 4(f); therefore, it would not result in constructive use of Central Park.

## Potential for Temporary Occupancy

The construction of tolling system infrastructure and tolling system equipment within Central Park would result in temporary occupancy of the park. However, consistent with criteria set forth in 23 CFR Section 774.13(d), the temporary occupancy of Central Park would not be a use of this Section 4(f) property for the following reasons:

- In each location, the total amount of time required for construction for the CBD Tolling Program would be less than a month, which is less than the one-year duration for construction of the entire Project, and there would be no change in the ownership of the land.

- The Project involves only minor construction activities, including limited excavation to replace the poles and connect with existing utilities, installation of new poles, and restoration of the ground surface within very limited areas of the 840-acre park (see **Figure 19-9**).

- Once complete, the permanent infrastructure would be similar in appearance to existing streetlight poles and signs within the park, and there would be no permanent effect on park uses.

---

[4]   See Chapter 2, "Project Alternatives," for more information on the tolling scenarios evaluated in this EA.

- The utility trenches would be covered and restored to their current condition (i.e., fill or pavement). If landscaping is removed, it would be restored or replaced.

- TBTA will coordinate work with NYC Parks and will require the contractor to implement measures to avoid, minimize, or mitigate construction effects on the park and park users to the extent feasible (refer to **Chapter 15, "Construction Effects"** for a listing of these measures). The Project Sponsors have and will continue to coordinate with NYC Parks and the Central Park Conservancy regarding the construction of tolling infrastructure and tolling system equipment within Central Park.

NYC Parks, the official with jurisdiction over Central Park, has concurred that the temporary occupancy of Central Park for the construction of the CBD Tolling Alternative would not impair the protected activities, features, or attributes that qualify Central Park for protection under Section 4(f); therefore, the temporary occupancy of Central Park is not a use of this Section 4(f) property. (Refer to **Appendix 19, "Section 4(f) Correspondence"** for a copy of the NYC Parks letter.)

## 19.7    PUBLIC INVOLVEMENT AND SECTION 4(f) COORDINATION

Before FHWA can make a *de minimis* impact finding for a park protected by Section 4(f), in addition to the coordination with officials with jurisdiction for the park, public notice and an opportunity for public review and comment concerning the effects on the protected activities, features, or attributes of the property must be provided. This requirement can be satisfied in conjunction with other public involvement procedures, such as a comment period provided on a National Environmental Policy Act document. For this Project, an opportunity for public review and comment on FHWA's proposed *de minimis* impact finding for the potential use of the High Line and Central Park will occur concurrent with public review and comment period for this EA (see **Chapter 18, "Public Participation"**).

## 19.8    CONCLUSION

There are 41 historic sites and 82 parks and plazas in the local study area. The CBD Tolling Alternative *[will]* not use these Section 4(f) properties except for the High Line and Central Park. *[The EA as published in August 2022 described FHWA's proposed]* finding that the CBD Tolling Alternative would result in a *de minimis* impact on Central Park and the High Line, and the officials with jurisdiction over these resources concurred with this finding.

*[The EA as published in August 2022 EA described FHWA's proposed]* finding that the temporary occupancy of Central Park for construction of the CBD Tolling Alternative would not impair the protected activities, features, or attributes that qualify Central Park for protection under Section 4(f)*[, and]* therefore, the temporary occupancy of Central Park is not a use of this Section 4(f) property.

*[Following consideration of public input received during the public comment period, FHWA has concluded the CBD Tolling Alternative would not affect the activities, features, and attributes that qualify the High Line for protection under Section 4(f), and the CBD Tolling Alternative would have a de minimis impact on Central Park.]*

# 20. Short-Term Uses of the Environment and Maintenance and Enhancement of Long-Term Productivity

Short-term uses of the environment associated with implementation of the CBD Tolling Alternative would include temporary effects during construction, such as short-term traffic lane closures, visual effects, construction noise, and potential dust-related effects. As described in **Chapter 15, "Construction Effects,"** the overall duration of construction for the CBD Tolling Alternative is expected to be less than one year. At each location, the total construction duration would generally be approximately one to two weeks, although inclement weather or other unforeseen conditions could extend the duration of construction at individual locations. Concurrent construction at multiple sites would likely occur to allow efficient construction management. During that time, the TBTA will ensure that the Project contractors minimize construction-related disruptions, using, for example, maintenance and protection of traffic plans and dust suppression measures.

The long-term productivity, or benefits, associated with the Project would include reduced vehicular congestion in the Manhattan CBD through the implementation of a vehicular tolling program. Because the Project would reduce congestion in the Manhattan CBD, it would improve regional air quality. The vehicular tolling program would create a new local, recurring funding source for the MTA capital projects. Funding for transit would allow for more fleet, would improve the efficiency of the system, and would generally enhance transit use, thereby allowing MTA's transportation network to absorb increasing transit ridership and further reduce vehicle congestion.

# 21.   Irreversible and Irretrievable Commitment of Resources

The implementation of the CBD Tolling Alternative would result in the permanent commitment of natural, physical, and human resources that cannot be recovered after completing the Project.

The overall duration of construction for the CBD Tolling Alternative is expected to be less than one year. At each location, the total construction duration would generally be approximately one to two weeks, although inclement weather or other unforeseen conditions could extend the duration of construction at individual locations. Concurrent construction at multiple sites would likely occur to allow efficient construction management. During construction and equipment installation, activities would require the irretrievable use of fuel for construction vehicles, equipment, and construction workers' personal vehicles. Electrical energy would be irretrievably used during construction and operation to power equipment and to transmit and process data. The physical infrastructure installed for the CBD Tolling Alternative would be made of raw materials such as iron ore, aggregate, and silicon. These resources are not retrievable, but they are not in short supply, and their use would not have an adverse effect on their continued availability.

Overall, the commitment of fuel and electricity for construction equipment, raw materials to construct Project infrastructure, and the public funds spent during construction would ensure long-term gains in regional mobility through establishing a vehicular tolling program that would reduce vehicle congestion in the Manhattan CBD, thereby improving overall traffic flow and regional air quality. The vehicular tolling program would create a new local, recurring funding source for the MTA capital projects. Funding for transit would allow increased fleet size, would improve the efficiency of the system, and would generally enhance transit use, thereby allowing MTA's transportation network to absorb increasing transit ridership and further reduce vehicle congestion.

# List of Preparers

This Central Business District (CBD) Tolling Program Environmental Assessment was prepared under the direction and with the involvement of the Federal Highway Administration in cooperation with the New York State Department of Transportation, the Triborough Bridge and Tunnel Authority—an affiliate of the MTA—and the New York City Department of Transportation. The following agencies and contracted firms prepared this report:

- **Agencies**
  - Federal Highway Administration
  - Triborough Bridge and Tunnel Authority
  - New York City Department of Transportation
  - New York State Department of Transportation
- **Firms**
  - AKRF, Inc.
  - EA Harper Consulting
  - FHI Studio
  - HDR
  - Resource Systems Group, Inc.
  - Sive, Paget & Riesel P.C.
  - TransCore
  - WSP USA

List of Preparers

## AGENCIES

Federal Highway Administration
1200 New Jersey Avenue, SE
Washington, DC, 20590

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|------|------------------|-----------|---------------------|
| Lee Ellen Carter | FHWA Environmental Project Development Specialist | M.E.M., Environmental Management B.A., Anthropology | 13 |
| Megan Cogburn, AICP | FHWA Project Development Technical Assistance (Environmental Justice) | M.C.R.P., City  Regional Planning B.A., Geography  Political Science | 12 |
| Robert Davies | FHWA Project Development Technical Assistance | M.S., Civil Engineering B.S., Civil Engineering | 28 |
| Kara Hogan, Ph.D. | Title VI of the Civil Rights Act | Ph.D., Educational Psychology Methodology M.S. Ed., Educational Psychology B.S., English B.S., Education in English | 10 |
| Kaylie Kramer | Environmental Protection Specialist | A.S., Environmental Studies B.S., Plant Science | 12 |
| Gautam Mani | FHWA Planning and Air Quality Conformity (Plan/TIP) | M.S., Urban and Regional Planning B.A., Geography | 10 |
| Monica Pavlik, P.E. | FHWA Project Manager | M.S., Environmental Science and Engineering B.S., Geological Engineering | 29 |
| Anna Price | FHWA Assistant Project Manager | M.B.A., Business Administration B.S., Environmental Policy | 25 |
| Matt Seymour, P.E. | FHWA Project Development Technical Assistance (Noise Analysis, Traffic Analysis) | B.S., Civil Engineering | 9 |
| Melissa Toni | FHWA Biologist and NEPA Project Coordinator | B.S., Natural Resources Management and Engineering | 20 |

Triborough Bridge and Tunnel Authority
2 Broadway
New York, NY 10004

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|------|------------------|-----------|---------------------|
| Richard Amana | Content Review | M.U.P., Urban Planning B.A., Urban Studies | 13 |
| Nichola Angel | Program Oversight, EA Project Management, and Content Review | M.S., Business Analytics M.S., Transportation Planning and Engineering B.S., Applied Math and Statistics; Economics | 24 |
| [Christopher Blucher | Content  eview and Analytical  upport | B    Business Administration M    Business Analytics | ] |

List of Preparers

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| Eric Bohn | Transit Content Review and Analytical Support | M.U.P., Transportation<br>B.A., International Studies and Business<br>B.S., Psychology | 12 |
| Allison L. C. de Cerre o, Ph.D. | Overall Program and Project Lead | Ph.D., Political Science<br>M.Phil., Political Science<br>M.A., Political Science<br>B.A., Political Science | 31 |
| Linda Corcoran | Content Review | M.C.R.P., City and Regional Planning<br>M.B.A., Finance<br>B.A., Psychology and Sociology | 36 |
| Stephen Crim, AICP | Project Management, [Environmental Justice] and Content Review | M.C.P., City Planning<br>B.A., Individualized Study | 14 |
| Romolo De Santis, P.E. | Preliminary Engineering for Infrastructure and Visual Resources | M.S., Construction Management<br>B.S., Civil Engineering | 31 |
| Leah Flax | Project Management and Content Review | M.U.P., Infrastructure, Transportation, and the Environment<br>B.A., Metropolitan Studies | 16 |
| Paul Friman | Evaluation of Laws, Regulations and Other Requirements; and Content Review | J.D.<br>M.B.A., Finance<br>B.A., Telecommunications and Psychology | 33 |
| Rosalyn Green, Ph.D | Department of Diversity and Civil Rights, Content Review | Ph. D., Urban Affairs and Public Administration<br>M.S., Human Resources and Business Administration<br>B.S., Interdisciplinary Studies (Math and Criminal Justice) | 27 |
| [Adam  art e | Content  eview and Analytical  upport | M A    rban  lanning | 3] |
| [ an  art | Content  eview and Analytical  upport | M      rban  lanning<br>B A    sychology | ] |
| Robyn Hollander, AICP | Content Review | M.C.P., Transportation and Land Use Planning<br>B.A., History | 29 |
| [  eil  orowit | Content  eview | M    Transportation  lanning and Engineering<br>B A   Business Administration | ] |
| Jay Krantz | Transit Content Review and Analytical Support | M.C.R.P., City and Regional Planning<br>B.A., History | 28 |
| [Minha  ee | Content  eview and Analytical  upport | h    Civil Engineering<br>M    Transportation Engineering<br>B    Transportation Engineering | ] |
| Lawrence Lennon, P.E., AICP | Traffic and Transit Impact Assessment, Content Review | M.B.A., Strategic Planning<br>M.S., Transportation Planning and Engineering<br>B.E., Civil Engineering | 40 |
| Nolan Levenson | Content Review | M.U.P., Urban Planning<br>B.A., Geography and Urban Studies | 11 |

List of Preparers

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| Lou Oliva | Evaluation of Laws, Regulations and Other Requirements; and Content Review | LL.M., Environmental Law<br>J.D.<br>B.A., History | 31 |
| Jeremy Parnes | Transit Content Review and Analytical Support | M.U.R.P., Urban and Regional Planning<br>B.A., Geography | 24 |
| [Tanisa  hillips | Content  eview | M     Criminal Justice<br>B     Criminal Justice | ] |
| Sergio Reis | Preliminary Systems  Infrastructure Design and Content Review | B.S., Finance   Marketing | 26 |
| Zulema Robinson | Preliminary Back Office System Design and Content Review | M.A., Urban Planning<br>B.A., Sociology    African Studies | 25 |
| [ athanael  ots o | Content  eview and Analytical  upport | M     rban  lanning<br>A B    rban  tudies | ] |
| Pamela Sbano | Long Island Rail Road Content Review | M.R.P., Regional Planning<br>M.A., Geography<br>B.A., Geography | 25 |
| Josh Schneider, AICP | Project Management, Document Manager, and Content Review | M.C.R.P., City and Regional Planning<br>B.A., Government and Legal Studies | 20 |
| Lisa Schreibman | Transit Content Review | M.U.P., Urban Planning<br>B.A., Economics and Philosophy | 25 |
| [ idayat Jon  uparyo | Content  eview | M B A   nternational Management<br>B      Business Administration | ] |
| Elisa Van Der Linde | Metro-North Railroad Related Content Review | M.S., Urban Planning<br>B.A., Architecture | 23 |
| Michael Wojnar | Outreach Coordinator | B.A., International Affairs | 22 |

New York City Department of Transportation
55 Water Street
New York, NY 10041

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| William Carry | Project Lead | M.C.P., City Planning<br>A.B., Public Policy | 17 |
| Patrick Smith | Policy Reviewer | B.S., Environmental Policy | 8 |
| William Ullom | Technical Reviewer | M.S., Civil Engineering<br>B.S., Civil Engineering | 9 |
| Andrew Weeks | Technical Reviewer | B.S., Civil Engineering | 19 |
| Benjamin Yeung | Technical Reviewer | B.S., Civil Engineering | 7 |

**New York State Department of Transportation**
**50 Wolf Road**
**Colonie, NY 12205**

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| Lori Blair | Section 106/Section 4(f) Review/Coordination | M.A., Anthropology<br>B.A., Anthropology | 34 |
| Nicolas Choubah, P.E. | NYSDOT Chief Engineer | M.S., Civil Engineering<br>B.S., Civil Engineering | 36 |
| Catherine Leslie | Environmental Review /Coordination | M.A., Geography<br>B.A., Geography, English | 22 |
| Daniel Nierenberg | Environmental Review/ Coordination | B.S., Geology | 15 |

## FIRMS

**AKRF, Inc.**
**440 Park Avenue South, 7th Floor**
**New York, NY 10016**

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| Noah Bernstein, AICP | Parks and Recreational Resources; Environmental Justice | M.U.P., Urban and Regional Planning<br>B.A., Psychology | 21 |
| Christopher Calvert, AICP | NEPA Co-Lead<br>Visual Resources; Environmental Justice;<br>Section 4(f) Evaluation | M.C.P., Land Use and Land Development<br>B.A., Urban Studies | 25 |
| Matthew Carmody, P.E. | Parking; Pedestrians and Bicycles | B.S., Civil Engineering | 24 |
| Chi K. Chan | Transit | M.S., Transportation Studies<br>B.E., Civil Engineering | 31 |
| Claudia Cooney | Historic and Cultural Resources | M.S., Historic Preservation<br>B.A., Modern European Studies | 26 |
| Julia Cowing, AICP | NEPA Co-Lead<br>Visual Resources; Environmental Justice | B.A., History | 34 |
| James Finegan, AICP | Social Conditions; Parks and Recreational Resources; Construction Impacts | M.U.P., Urban and Regional Planning<br>B.A., Linguistics | 14 |
| Connor Lacefield, AICP | Social Conditions | M.C.P., Urban and Regional Planning<br>B.A., Urban Design and Architecture Studies | 19 |
| Aubrey McMahon, CA | Natural Resources | M.S., Environmental Policy<br>B.A., Environmental Studies | 20 |
| Elizabeth Meade, Ph.D., RPA | Historic and Cultural Resources | Ph.D., Anthropology<br>M.Phil., Anthropology<br>M.A., Anthropology<br>B.A., Anthropology | 18 |

List of Preparers

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| [Ma  Melt er  A C | E  A Assistant Co  ead | M      rban  lanning<br>B A    ociology | 0] |
| John Neill | Economic Conditions | M.B.A., Management<br>M.E.S., Environmental Studies<br>B.A., Economics and Public Policy Studies | 29 |
| Axel Schwendt | Asbestos-Containing Materials, Lead-Based Paint, Hazardous Wastes, and Contaminated Materials | M.S., Geology<br>B.A., Geology | 27 |

EA Harper Consulting
40 West 135th Street, #4C
New York, NY 10037-2505

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| Elizabeth Harper | Regional Transportation and Modeling Results<br>Transit | M.U.S., Urban Studies<br>B.S., Conservation of Human and Natural Resources | 37 |

FHI Studio
11 Hanover Square, 3rd Floor
New York, NY 10005

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| Hannah Brockhaus | Transit | B.S., Urban and Regional Studies | 6 |
| Maura Fitzpatrick | Public Participation | M.P.A., Public Policy<br>B.A., English | 37 |
| Chris Henry | Transit | M.S., City and Regional Planning<br>B.A., Geography | 22 |

HDR
500 Seventh Avenue
New York, New York 10018

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| Robert Figliolia | Technical Review | B.S., Civil Engineering | 7 |
| Michael Lewis | Program Manager, Document Review | B.S., Civil Engineering | 38 |
| Helena Tam, P.E. | Technical Review | M.S., Structural Engineering | 21 |
| Caitlin Timoney | Program Coordination, Document Review | B.S., Engineering | 10 |

Interstate Transportation of I-287 Corridor Environmental Assessment
List of Preparers

Resource Systems Group, Inc.
55 Railroad Row
White River Junction, VT 05001

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|------|------------------|-----------|---------------------|
| William Woodford | Transit | M.S., Transportation<br>B.S., Civil Engineering | 37 |

Sive, Paget & Riesel P.C.
560 Lexington Avenue, 15th Floor
New York, N.Y. 10022

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|------|------------------|-----------|---------------------|
| Mark A. Chertok | Outside Environmental Counsel | J.D.<br>B.A., Psychology | 48 |
| Elizabeth Knauer | Outside Environmental Counsel | J.D.<br>B.A., Comparative Literature | 22 |

TransCore
33 Whitehall St, Suite 1401
New York, NY 10004

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|------|------------------|-----------|---------------------|
| Larry Henson, P.E. | Deputy Project Manager, Preliminary Infrastructure Design | M.S.C.E., Civil Engineering<br>B.S.C.E., Civil Engineering<br>B.A., Liberal Arts | 34 |
| Clint Holley, P.E. | Project Manager, Preliminary Infrastructure Design | B.S., Civil Engineering | 20 |
| Gia Maineiro, AIA, LEED AP BD+C, Assoc. DBIA | Visual Quality Manager – Preliminary Infrastructure Design | B.Arch., Architecture | 17 |

WSP USA
One Penn Plaza, 4th Floor
New York, NY 10119

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|------|------------------|-----------|---------------------|
| Michael Babin | Editor/Document Specialist | Certificate in Editing<br>B.A., Theater | 30 |
| John Chow, AICP | Transit | M.S., Civil Engineering<br>A.B., Applied Mathematics | 41 |
| Clint Daniels | Regional Transportation and Modeling Results; Transit | M.B.A., M.S. Community and Regional Planning<br>B.A., Urban and Regional Planning | 21 |
| Robert Donnelly | Regional Transportation and Modeling Results; Transit | M.S., Transportation Studies<br>B.A., Political Science | 44 |

List of Preparers

| NAME | RESPONSIBILITIES | EDUCATION | YEARS OF EXPERIENCE |
|---|---|---|---|
| Victoria Hallas, AICP | Deputy Project Manager | M.S., City and Regional Planning<br>B.A., Environmental Studies and Fine Arts | 9 |
| Adrian Jarrett, ENV SP | Highways and Local Intersections | M.S., Transportation Planning and Engineering<br>B.S., Business Technology Management | 15 |
| Aryeh Lemberger, AICP | Transit; Highways and Local Intersections | M.S., Engineering | 21 |
| Peter Liebowitz, AICP | Project Manager | M.S., Urban Planning<br>B.A., Urban Studies | 37 |
| Alice Lovegrove | Air Quality; Energy | M.S., Environmental and Waste Management<br>B.E., Engineering Science | 32 |
| Michael Lucia | Assistant Deputy Project Manager | M.C.R.P., City and Regional Planning<br>B.A., Geography | 5 |
| Ian McNamara | Project Manager | M.EngSc<br>B.Eng Hons, Civil Engineering | 25 |
| Arthur Morrone | Noise | B.S., Meteorology | 42 |
| Seth Myers | Project Manager | M.S., Urban Planning<br>B.A., Political Science | 17 |
| David Ory, Ph.D. | Regional Transportation and Modeling Results; Transit | Ph.D., Civil Engineering<br>M.S., Civil Engineering<br>B.S., Civil Engineering | 21 |
| Lawrence Pesesky, AICP | Indirect and Cumulative Effects<br>Environmental Justice | M.S., Geography<br>B.S., Agricultural Economics | 43 |
| Katie Shepard, AICP | Deputy Project Manager | M.C.R.P., City and Regional Planning<br>B.A., Geography<br>B.A., Psychology | 6 |
| Yue Shuai | Regional Transportation and Modeling Results | M.S., Urban Planning | 5 |
| Ethan Smolinsky, EIT, ENV SP | Highways and Local Intersections | M.S., Transportation Systems<br>B.S., Civil Engineering | 6 |
| Matt Stratton | Regional Transportation and Modeling Results; Transit | M.S. Urban Planning and Policy<br>B.S., Geography | 14 |
| Edward Tadross | Energy | B.A., Earth Sciences<br>B.A., Environmental Studies | 23 |
| [Christine Tiernan  A C | ro ect Manager | M A  Oceanography and imnology<br>B A  Environmental  lanning and olicy | 3 ] |
| Victor Teglasi | Highways and Local Intersections | M.S., Urban Planning<br>B.S., Civil Engineering | 42 |
| Mark Walker, AICP | Transit | M.Phil., Urban Planning<br>M.S., Urban Planning<br>B.S., Geography | 38 |