**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

STATE OF NEW JERSEY,

                Plaintiff,

     v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, FEDERAL HIGHWAY
ADMINISTRATION, SHAILEN BHATT, in
his official capacity as Administrator of the
Federal Highway Administration, and
RICHARD J. MARQUIS, in his official
capacity as Division Administrator of the New
York Division of the Federal Highway
Administration,

                Defendants.

Hon. Brian R. Martinotti

Civ. No. 2:23-cv-03885-BRM-LDW

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE METROPOLITAN TRANSPORTATION AUTHORITY AND**
**THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY'S**
**MOTION TO INTERVENE**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT .................................................................................................... 10

   I.   The MTA and TBTA Are Entitled to Intervention as of Right .......................... 10

      A.   The MTA and TBTA's Motion to Intervene Is Timely ................................. 11

      B.   The MTA and TBTA Have a Compelling Interest in This Case ................................. 12

      C.   The MTA and TBTA's Interests May Be Adversely Affected ..................................... 13

      D.   FHWA May Not Fully Represent the MTA and TBTA's Interests .............................. 15

   II.   Alternatively, the MTA and TBTA Should Be Granted Permissive Intervention............. 16

      A.   The MTA and TBTA Should Be Permitted to Intervene Pursuant to Rule 24(b)(1)(B) 17

      B.   The MTA and TBTA Should Be Permitted to Intervene Pursuant to Rule 24(b)(2)(A) 18

CONCLUSION .................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                    **Pages(s)**

*Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*,
278 F.R.D. 98 (M.D. Pa. 2011) ................................................................ 17

*Appleton v. C.I.R.*,
430 Fed. App'x 135 (3d Cir. 2011) ..................................................... 18, 19

*Barry v. Koskinen*,
Case No. 3:18-cv-14276-BRM, 2019 WL 4297796 (D.N.J. Sept. 11, 2019) ............................... 11

*Benjamin ex rel. Yock v. Dep't of Pub. Welfare*,
701 F.3d 938 (3d Cir. 2012) ............................................................. 11–14

*Brody ex rel. Sugzdinis v. Spang*,
957 F.2d 1108 (3d Cir. 1992) ............................................................ 14–16

*City of Newark v. City of New York*,
Civ. A. No. 19-20931 (MCA) (LDW), 2020 WL 10505722 (D.N.J. May 1, 2020) .......... 11, 12, 18

*Coffey v. C.I.R.*,
663 F.3d 947 (8th Cir. 2011) .................................................................. 19

*Cont'l Cas. Co. v. SSM Grp., Inc.*,
No. Civ. A. 94-7789, 1995 WL 422780 (E.D. Pa. July 13, 1995) ................................ 17

*First Am. Bank Co. v. SJP Grp., Inc. Employee Stock Ownership Trust*,
Civ. A. No. 17-3778 (MAS) (DEA), 2018 WL 11246702 (D.N.J. Feb. 9, 2018) ......................... 19

*Halderman v. Pennhurst State Sch. & Hosp.*,
612 F.2d 84 (3d Cir. 1979) .................................................................... 18

*Harris v. Pernsley*,
820 F.2d 592 (3d Cir. 1987) .................................................................. 11

*In re Fine Paper Antitrust Litig.*,
695 F.2d 494 (3d Cir. 1982) .................................................................. 11

*Karr v. Castle*,
768 F. Supp. 1087 (D. Del. 1991) ............................................................. 19

*Kleissler v. U.S. Forest Serv.*,
157 F.3d 964 (3d Cir. 1998) ................................................. 10, 12–14, 16

*League of Women Voters v. Bd. of Comm'rs*,
Civ. A. No. 86-0546, 1986 WL 3868 (E.D. Pa. Mar. 27, 1986)................................................... 18

*Liberty Mut. Ins. Co. v. Treesdale, Inc.*,
419 F.3d 216 (3d Cir. 2005) ........................................................................................ 10

*Metro Transp. Co. v. Balboa Ins. Co.*,
118 F.R.D. 423 (E.D. Pa. 1987) ................................................................................... 19

*Mountain Top Condo Ass'n v. Dave Stabbert Master Builder, Inc.*,
72 F.3d 361 (3d Cir. 1995) ..........................................................................11, 12, 15, 16

*Nuesse v. Camp*,
385 F.2d 694 (D.C. Cir. 1967) .......................................................................... 17, 19, 20

*Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*,
223 F.R.D. 326 (D.N.J. 2004) ......................................................................................11

*Sec. Nat'l Ins. Co. v. Amchin*,
309 F.R.D. 217 (E.D. Pa. 2015) ................................................................................... 19

*Trbovich v. United Mine Workers*,
404 U.S. 528 (1972)..................................................................................................... 15

*United States v. Hooker Chems. & Plastics Corp.*,
749 F.2d 968 (2d Cir. 1984) .........................................................................................11

*Worthington v. Bayer Healthcare LLC*,
Civ. A. No. 11-2793 (ES) (CLW), 2011 WL 6303999 (D.N.J. Dec. 15, 2011)............................ 17

**Statutes**

N.Y. Veh. & Traf. Law ................................................................................. 4, 12, 20

**Rules and Regulations**

23 C.F.R. Part 771 ........................................................................................... 5

Fed. R. Civ. P. 24................................................................................................. *passim*

## **PRELIMINARY STATEMENT**

In this action, New Jersey threatens a long-overdue congestion pricing program in the Manhattan Central Business District ("CBD") that will reduce traffic congestion affecting millions of residents, visitors and commuters, reduce emissions and improve regional air quality, and secure a stable source of funding for critical investments in the region's public transit infrastructure that is maintained by the Metropolitan Transportation Authority (the "MTA") and its affiliate, the Triborough Bridge and Tunnel Authority ("TBTA").[1]  While this lawsuit facially challenges the comprehensive environmental review process conducted by the Federal Highway Administration ("FHWA") pursuant to the National Environmental Policy Act ("NEPA"), memorialized in a Final Environmental Assessment ("Final EA")[2] and Finding of No Significant Impact ("FONSI"), New Jersey's ultimate aim is clear: to prevent implementation of a landmark program mandated by New York state law, in order to maintain the status quo, or as leverage to claim a substantial portion of the tolling revenue for itself.  While New Jersey professes to be "conceptually open to traditional congestion pricing,"[3] its real complaint is the supposed lack of revenues flowing to it.[4]

---

[1] The MTA is a public benefit corporation under New York state law, with a separate and distinct legal status from the State of New York, responsible for providing public transit in the New York City metropolitan area.  The MTA oversees North America's largest transportation network, serving 15.3 million people across 5,000 square miles in New York City, Long Island, southeastern New York State, northeastern New Jersey, and southern Connecticut.  The MTA carries out these services directly and through its subsidiary and affiliate agencies, including TBTA, one of the Project Sponsors.  As explained below and in the accompanying Declaration of Allison L. C. de Cerreño, Ph.D., Chief Operating Officer of TBTA and Project lead ("C. de Cerreño Decl."), TBTA would implement the CBD Tolling Program, but by law the revenues would be used both by that agency and the MTA to fund capital improvements in the transit system.

[2] The Final EA is Exhibit 2 to the Complaint and available online at https://new.mta.info/project/CBDTP/environmental-assessment.

[3] *See* Compl. Ex. 4 at 1.

[4] *Id.* at 15 n.55.

1

The MTA's affiliate, TBTA, is charged by law with designing, developing, installing and operating the congestion pricing tolling program (the "CBD Tolling Program" or the "Project"). Project revenues will fund critical capital improvements to North America's largest public transit system, as well as $155 million of investments in air quality and public health improvements to offset pre-existing burdens placed on environmental justice communities as a result of historic transportation and land use planning. To protect these interests, the MTA and TBTA respectfully move this Court for leave to intervene as of right in this action, pursuant to Federal Rule of Civil Procedure 24(a)(2). In the alternative, the MTA and TBTA move for permissive intervention pursuant to Rule 24(b)(1) or (2). Pursuant to Rule 24(c), the MTA and TBTA have attached a copy of their proposed Answer as Appendix I.[5]

## STATEMENT OF FACTS

Traffic congestion has long been one of New York City's most challenging policy problems. For generations, congestion has stymied economic growth and caused significant damage to the environment, public health, and quality of life throughout the region. A 2018 study by the nonprofit Partnership for New York City estimated that "traffic congestion will be a $100 billion drag on the New York metro area economy over the next five years," and identified the Manhattan CBD specifically as the primary source of traffic congestion in the region.[6] Yet despite

---

[5] Counsel for Plaintiff and counsel for Defendants have informed counsel for the MTA and TBTA that they do not oppose the MTA and TBTA's intervention.
[6] *See* Final EA at 1-12 (citing Partnership for New York City, $100 Billion Cost of Traffic Congestion in Metro New York (Jan. 2018), https://pfnyc.org/wp-content/uploads/2020/01/2018-01-Congestion-Pricing.pdf).

multiple traffic-reduction initiatives and the existence of the nation's most extensive public transit network, New York City continues to rank as the most congested urban area in the country.[7]

There is also a growing recognition that the issues of traffic congestion and public transit are inextricably linked: to reduce traffic, New York City needs to improve the reliability of its public transit system, which is chronically underfunded, outdated, and in need of significant and reliable capital investment. Accordingly, for more than 50 years, state and local officials, policy experts and stakeholder advocacy groups have studied various solutions to determine the most effective way to reduce congestion, with the clear conclusion that congestion pricing is the most effective tool.[8]

In 2018, the New York State Legislature created the Metropolitan Transportation Sustainability Advisory Workgroup, focused on addressing traffic congestion and identifying sources of sustainable funding for the region's public transit system.[9] Like numerous commissions and panels before it, the Workgroup recommended the implementation of a congestion pricing tolling program for the Manhattan CBD in order to reduce congestion and generate critical revenue to repair, improve, and modernize the MTA system.[10]

On April 1, 2019, based on the Workgroup's recommendations, the legislature enacted the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act" or the "Act") with the goal of reducing traffic congestion in the CBD and creating a dedicated funding source for the MTA's

---

[7] C. de Cerreño Decl. Ex. A (Final EA Exec. Summary), at ES-5, Fig. ES-3 (citing INRIX, Global Traffic Scorecard (2021), https://inrix.com/scorecard-city/?city=New%20York%20City%20NY&index=5).

[8] *See* Final EA, App. 2A, "Previous Studies and Concepts Considered," https://new.mta.info/document/111096.

[9] *Id.* at 2A-4 (citing Metropolitan Transportation Sustainability Advisory Workgroup, Report (Dec. 2018), https://pfnyc.org/wp-content/uploads/2018/12/2018-12-Metropolitan-Transportation-Sustainability-Advisory-Workgroup-Report.pdf).

[10] *Id.*

capital needs.  In the Act's findings, the legislature recognized that "[t]he ongoing failures of the tracks, signals, switches, electrical power, and other transportation infrastructure throughout the subway system in the city of New York continue to have a significant deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers, as well as business and commerce in the metropolitan commuter transportation district, which is the recognized economic engine of the state of New York, and thereby have adversely affected the economy of the state of New York."  N.Y. Veh. & Traf. Law § 1701, as added by L 2019, ch. 59, part ZZZ [Traffic Mobility Act], subpart A, § 1.

The legislature also declared that "traffic congestion in the city of New York … results in significant cost to the New York metropolitan area economy and in turn the state's economy at estimates exceeding one hundred billion dollars over the next five years," and that "[c]ongestion in these areas is crippling and impacts the everyday lives of residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services, and is a significant contributor to decreased air quality."  *Id.*

Finally, the legislature found that "[i]n order to ensure a safe and efficient mass transit system within the city of New York and to protect the public health and safety of New York's residents, a program to establish tolls for vehicles entering or remaining in the most congested area of the state is found to be necessary and to be a matter of substantial state concern."  *Id.*  To that end, the Act directed TBTA, an affiliate agency of the MTA, to establish a plan to toll vehicles entering or remaining in "the most congested area of the state": the Manhattan CBD.  *Id.*  This Project, and the *four-year* long environmental review process that New Jersey disingenuously challenges as a "rubber stamp" for the CBD Tolling Program, is the result of that democratically

enacted legislative directive, followed by significant input from federal, regional, state and local agencies throughout the tri-state region, as well as the public.

In June 2019, shortly after passage of the Traffic Mobility Act, the Project Sponsors[11] submitted an Expression of Interest for tolling authority under FHWA's Value Pricing Pilot Program ("VPPP"), a mechanism created by Congress that allows FHWA to authorize tolling of federal aid highways in order to reduce roadway congestion through congestion pricing strategies.[12] This submission required FHWA, as the lead federal agency, to evaluate the potential effects of the proposal in accordance with NEPA. *See* C. de Cerreño Decl. ¶ 27.

In March 2021, FHWA determined that the Project should be treated as a NEPA Class III (EA) action under 23 C.F.R. Part 771. Class III actions are those for which the significance of the environmental impact is not clearly established. For Class III actions, Project Sponsors must prepare an Environmental Assessment ("EA") to determine whether the action is likely to have a significant impact on the built and natural environment; if an unmitigated significant impact is found, an Environmental Impact Statement ("EIS") must be prepared. *Id.* ¶ 28. If no significant impact is found, or if any predicted impacts would be mitigated to less than significant levels, then an action may move forward based on the review conducted in the EA process. *Id.*

*Extensive Outreach and the Draft Environmental Assessment*

To ensure agency input into the NEPA process, FHWA and the Project Sponsors reached out to multiple agencies at the federal and state level—including those in New Jersey—to invite their participation. *Id.* ¶ 29. Notwithstanding New Jersey's suggestions in its Complaint to the

---

[11] The Project Sponsors are TBTA, the New York State Department of Transportation and the New York City Department of Transportation. *See* C. de Cerreño Decl. ¶ 1.

[12] FHWA, Value Pricing Pilot Program, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last visited Oct. 5, 2023).

contrary, FHWA and the Project Sponsors specifically invited the New Jersey Department of Transportation ("NJDOT"), New Jersey Transit Corporation ("NJT"), the New Jersey Turnpike Authority ("NJTA") and the North Jersey Transportation Planning Authority ("NJTPA") to participate. *Id.* ¶ 30. Indeed, representatives of these New Jersey agencies attended regional agency meetings held in the early outreach and public review periods for the EA. However, New Jersey agencies never provided any data, information or guidance that they believed could inform the EA analyses. *Id.* ¶ 54.

FHWA and the Project Sponsors made significant efforts to inform the public about the Project, encourage open discussion of Project details and potential issues, and provide ample opportunity for public comment, focusing on a 28-county regional area where it was anticipated that travel patterns could potentially change as a result of the Project. *Id.* ¶ 30. The Project Sponsors also conducted a series of early outreach webinars to solicit public input for consideration in the development of the Draft EA. A total of 19 early outreach meetings occurred, ten of which were advertised as general webinars and nine of which were advertised for environmental justice community members throughout the 28-county regional study area. *Id.* Of these, two public sessions and three environmental justice sessions focused on participants from New Jersey. *Id.* In addition to these public webinars, FHWA and the Project Sponsors established and met with two environmental justice groups to allow for more in-depth discussion and engagement: an Environmental Justice Technical Advisory Group ("EJTAG")—which included representation from New Jersey—and an Environmental Justice Stakeholder Working Group ("EJSWG"). *Id.* ¶ 36.

On August 10, 2022, FHWA and the Project Sponsors issued a Draft EA for public review and comment. *Id.* ¶ 42. The Draft EA examined numerous categories of potential environmental

impacts. Because the exact tolling structure was not yet defined,[13] the Draft EA analyzed seven different tolling scenarios, with different variables, ranging from the physical effects of construction and the visual effects of the tolling infrastructure to the effects on roadway traffic and air quality by diversions of vehicular traffic that could occur due to the toll; it looked at the greatest impact on each resource area from the different scenarios to maximize the identification of potential impacts. *Id.* ¶ 41.  Thus, the Draft EA evaluated these seven tolling scenarios to identify the range of potential effects from the Project.[14]  The Draft EA also identified mitigation measures to which the Project Sponsors committed to mitigate potentially adverse impacts on the environment, including on environmental justice populations. *Id.* ¶ 42.

As the lead federal agency, FHWA was assisted in its review of the Draft EA by the U.S. Environmental Protection Agency ("EPA") with respect to several subject matter areas, including environmental justice and compliance with the Clean Air Act (the "CAA").  *Id.* ¶ 33.

*The Final EA and FONSI*

FHWA provided a 44-day public comment period, during which members of the public, agencies, elected officials and organizations could submit comments on the Draft EA.  The initially announced public comment period was extended by two weeks, from September 9 to September

---

[13] The Traffic Mobility Act requires the TBTA Board to establish a Traffic Mobility Review Board ("TMRB") with members representing the region who have experience in public finance, transportation, mass transit, or management.  C. de Cerreño Decl. ¶ 25.  The TMRB must recommend to the TBTA Board the toll amounts and toll structure, such as crossing credits, discounts, and/or exemptions for existing tolls paid on bridges and tunnels.  The variable pricing structure could vary by time of day, day of week, and day of year and could vary for different types of vehicles.  Informed by the TMRB's recommendation, the TBTA Board must approve and adopt a final toll structure following a public hearing in accordance with the State Administrative Procedure Act.  *Id.*  At this time, the TMRB has held three meetings; it is expected to issue its recommendations in October 2023.

[14] As a result of engagement with the EJTAG and EJSWG, the Final EA conducted additional sensitivity analyses of further modified versions of the scenarios.  *See id.* ¶ 41.

23, 2022, based on requests from members of the public.  In addition, FHWA and the Project Sponsors considered comments received after the formal close of the comment period.  During the comment period, FHWA and the Project Sponsors hosted six virtual public hearings, at which 552 comments were received.  *Id.* ¶ 44.  All told, FHWA and the Project Sponsors received nearly 70,000 public input submissions on the EA, including oral testimony at the public hearings, letters, e-mails, voicemails, and submissions via an electronic comment form.  *Id.* ¶ 45.

Over many months, FHWA and the Project Sponsors reviewed and prepared responses to each of the many thousands of comments received and worked to address those comments that raised substantive issues.  *Id.* ¶ 47.  This included, where necessary, the preparation of additional material and revisions to the Draft EA in response to public feedback as well information provided during discussions with the EJTAG, which resulted in the publication of a revised, Final EA.[15]  *Id.* ¶ 48.  Specifically, the Final EA added further analysis of environmental justice considerations and included a $155 million mitigation package over five years to improve air quality and public health in communities with pre-existing burdens due to historic transportation and land use planning that could experience increased highway traffic as the result of the Project, including communities in New Jersey.  *See id.* ¶¶ 49–50.  The Final EA also included additional analysis and mitigation commitments to address potential adverse effects of the Project on low-income frequent drivers, including those from New Jersey.  *Id.* ¶ 51.  Based on the Final EA (as well as EPA's review), including the substantial commitments to mitigation measures made by the Project Sponsors, FHWA issued a Draft FONSI, determining that, with the incorporation of the mitigation

---

[15] The Final EA contains 21 chapters and 19 appendices.  The full document, inclusive of appendices (with the exception of responses to public comments), totals 958 pages and is publicly available on the MTA's website: https://new.mta.info/project/CBDTP/environmental-assessment.

commitments, the Project would not have a significant adverse impact on the human or natural environment. *Id.* ¶ 53.

The Final EA and Draft FONSI were made available for public review for a period of 30 days, from May 12, 2023, to June 12, 2023. *Id.* FHWA and the Project Sponsors reviewed additional submissions received during this period, but it was determined that they did not provide new information and therefore did not require changes to the EA. *Id.* ¶ 55. Accordingly, on June 23, 2023, FHWA's New York Division Administrator signed the FONSI, thus concluding FHWA's four-year long NEPA review of the Project. *Id.* ¶ 56.

Although the NEPA review has concluded, the Project cannot commence operation until the TMRB issues its recommendation, the TBTA Board adopts a tolling structure, and the Project Sponsors and FHWA execute an agreement authorizing tolling under the VPPP. *Id.* ¶ 57. Before reaching a VPPP agreement, FHWA and the Project Sponsors will also evaluate whether the TBTA-adopted tolling structure differs from the numerous tolling scenarios analyzed in the Final EA in such a way that could result in different environmental effects, including any significant impacts that the mitigation to which the Project Sponsors have committed would not address. Depending on the nature of the adopted toll structure, this could require additional technical analysis. *Id.*

Far from the expedited, rushed process that New Jersey's Complaint erroneously portrays, the environmental review for this Project has in fact taken far longer, and at significantly greater cost, than anticipated. The MTA and TBTA have already made substantial investments in the Project, and each month of delay in implementing the Project would cost the MTA and TBTA (and the regional public they serve) roughly $83 million in lost revenues.[16] New Jersey's short-sighted

---

[16] The MTA will require an estimated $1 billion in annual net toll revenue in order to generate the $15 billion in funding for Capital Program projects mandated by the Traffic Mobility Act. C. de Cerreño Decl. ¶ 3.

and self-serving attempt to delay or prevent the Project's implementation threatens not only the economic and environmental interests of the MTA and TBTA, but those of the entire region—including those of New Jersey's own citizens.

## **ARGUMENT**

### I.  **The MTA and TBTA Are Entitled to Intervention as of Right**

Given the MTA and TBTA's significant interest in reducing congestion in the Manhattan CBD, securing reliable revenues for much-needed capital improvement to the transportation system, and improving regional air quality and public health, the threat New Jersey's challenge poses to those interests, and the possibility that FHWA will not fully represent the interests of the MTA or TBTA throughout this litigation, the MTA and TBTA have a right to intervene in this action.

Rule 24(a)(2) of the Federal Rules of Civil Procedure governs intervention as of right and provides that "the court must permit anyone to intervene who…claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Accordingly, the Third Circuit has explained that "a litigant seeking intervention as of right under Rule 24(a)(2) must establish 1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005) (citing *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998)).  Although a party seeking intervention must meet all four requirements, "a very strong showing that one of the requirements is met may result in a

lesser showing of another requirement." *Harris v. Pernsley*, 820 F.2d 592, 596 n.6 (3d Cir. 1987)

(citing *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 983 (2d Cir. 1984)).  The

MTA and TBTA satisfy each of the four requirements for intervention as of right.

### A.  The MTA and TBTA's Motion to Intervene Is Timely

The timeliness of a motion to intervene is "determined from all the circumstances and, in

the first instance, by the [trial] court in exercise of its sound discretion." *Princeton Biochemicals,

Inc. v. Beckman Coulter, Inc.*, 223 F.R.D. 326, 328 (D.N.J. 2004) (citing *In re Fine Paper Antitrust

Litig.*, 695 F.2d 494, 500 (3d Cir. 1982)) (quotations omitted).  Courts in the Third Circuit weigh

three factors in determining timeliness: "(1) the stage of the proceeding; (2) the prejudice that

delay may cause the parties; and (3) the reason for the delay." *Mountain Top Condo Ass'n v. Dave

Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995) (citation omitted).  Courts are

generally reluctant to dispose of a motion to intervene as of right on timeliness grounds given the

risk of irreparable harm that the would-be intervenor would face if not permitted to intervene.

*Benjamin ex rel. Yock v. Dep't of Pub. Welfare*, 701 F.3d 938, 949 (3d Cir. 2012).

There can be no dispute that the MTA and TBTA's motion is timely, as it was filed prior to

the submission of the administrative record (which substitutes for discovery in Administrative

Procedure Act ("APA") challenges) and, therefore, "prior to any discovery or litigation on the

merits." *City of Newark v. City of New York*, Civ. A. No. 19-20931 (MCA) (LDW), 2020 WL

10505722, at *2 (D.N.J. May 1, 2020).  Thus, because the case is "still in the early stages….[,]

there will be no undue prejudice to the parties if the [MTA and TBTA's] Motion to intervene is

granted." *Barry v. Koskinen*, Case No. 3:18-cv-14276-BRM, 2019 WL 4297796, at *4 (D.N.J.

Sept. 11, 2019) (granting intervention and finding the motion was timely nearly a year after the

case was filed).  *See also Mountain Top*, 72 F.3d at 370 (finding no prejudice from a four-year

delay in filing motion to intervene where there had been no depositions taken, dispositive motions filed, or decrees entered).  Accordingly, the MTA and TBTA's motion is timely.

### B.  The MTA and TBTA Have a Compelling Interest in This Case

The MTA and TBTA have a clear interest in ensuring that FHWA's EA and FONSI are upheld, and that the Project may proceed as directed by New York law.  In determining whether a movant's interest is sufficient under Rule 24(a), the Third Circuit has eschewed "bright line" tests, *Kleissler*, 157 F.3d at 969, and instead has counseled courts to "adhere[] to the elasticity that Rule 24 contemplates" and account for "pragmatic considerations," *id* at 970.  "[T]he precise nature of the interest required to intervene as of right has eluded precise and authoritative definition," *Mountain Top*, 72 F.3d at 366, and "the Third Circuit has endorsed a 'pragmatic' and 'elastic[]' approach," *City of Newark*, 2020 WL 10505722, at *2 (quoting *Kleissler*, 157 F.3d at 970).  "A proposed intervenor's interest need not be a legal interest, provided that he or she will be practically disadvantaged by the disposition of the action."  *Benjamin*, 701 F.3d at 951 (quotations omitted).  Notwithstanding the flexibility afforded by the standard, there is no question that the MTA and TBTA satisfy this requirement.

The MTA and TBTA's interests in the implementation of the Project are not remote or hypothetical—they are direct and protected by state law.  New York's Traffic Mobility Act declares as one of its purposes the provision of "sufficient revenues…to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA Capital Program, and any additional revenues above that amount to be available for any successor programs."  N.Y. Veh. & Traf. Law § 1704-a, as added by L 2019, ch. 59, part ZZZ [Traffic Mobility Act], subpart A, § 1.  These revenues are needed to fund critical capital improvements to improve system reliability, expand access, improve safety and customer service, and increase system sustainability, all of which will benefit the transit-

using public—including residents of New Jersey, New York, and Connecticut.  C. de Cerreño Decl. ¶ 2.  $155 million of these revenues are committed to measures to improve air quality and public health in the most currently overburdened communities that could experience traffic increases from Project-related traffic diversions.  *Id.* ¶¶ 5, 50, 59.

The Third Circuit has found that local government entities with a statutorily protected interest in revenues generated from a project subject to a NEPA challenge are entitled to intervene in defense of the project to protect those interests.  In *Kleissler*, school districts and municipalities moved to intervene as defendants in a NEPA action brought by environmental groups seeking to halt logging in a state forest, which would have deprived the intervenors of their share of timber harvest revenues to which they were entitled under state law.  157 F.3d at 973.  The court found that the school districts and municipalities had "direct" and "substantial" interests in the litigation, "because state law commands the Commonwealth, through its political subdivisions, to forward to them federal grant money generated through timber harvesting each year, money that they will lose, at least temporarily and perhaps permanently, if plaintiffs are successful in this lawsuit."  *Id.*

Should New Jersey succeed in its lawsuit, there can be no doubt that the MTA and TBTA— as well as the public that relies on mass transit—would be "practically disadvantaged" as a result. *Benjamin*, 70 F.3d at 951.  As a result, the MTA and TBTA's interests in this case, "which are protected by state law, are direct, substantial and of adequate public interest as to justify intervention" as of right.  *Kleissler*, 157 F.3d at 973.

### C.  The MTA and TBTA's Interests May Be Adversely Affected

It is clear from New Jersey's Complaint—which attacks the statutorily protected revenue-generating goals of the Project and refers to the MTA and TBTA by name more than 50 times— that this action intends to deprive the MTA and TBTA of the revenues desperately needed to keep

the New York City metropolitan area's primary mode of transportation running. "Under this element of the test, the [proposed intervenors] must demonstrate that their legal interests may be affected or impaired, as a practical matter by the disposition of this action." *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1122 (3d Cir. 1992) (quotation omitted). "[T]his factor may be satisfied if, for example, a determination of the action in the applicants' absence will have a significant stare decisis effect on their claims, or if the applicant's rights may be affected by a proposed remedy." *Id.* at 1123.

Despite styling its Complaint as an action against FHWA, New Jersey aims much of its vitriolic attack across the Hudson, claiming hyperbolically and erroneously that FHWA's environmental review was a mere "rubber-stamp" dictated by the MTA, Compl. ¶ 1, and that the MTA "stack[ed] the deck" in favor of a proposal that would meet the revenue requirements of state law, *id.* ¶ 69. New Jersey takes particular umbrage with the fact that revenues generated from this New York-based project, being implemented with State funds and by New York State and City entities, will go primarily to the MTA as mandated by New York State law, rather than to New Jersey. *Id.* ¶¶ 3, 4, 53, 88, 109. Therefore, while the relief requested in the Complaint is nominally procedural, a successful outcome for New Jersey necessarily suggests either no CBD Tolling Program or some alternative version of the Project whereby the MTA and TBTA's share of the revenues would be reduced. *See id.* ¶¶ 10, 69, 113, 114, 116 (alleging that alternatives were improperly rejected because they would not have met the revenue requirements of the Traffic Mobility Act).

Even if New Jersey's challenge succeeds only in delaying the Project's implementation, there can be no doubt that the MTA and TBTA would be "practically disadvantaged" by such a result. *Benjamin*, 70 F.3d at 951. In *Kleissler*, the Third Circuit observed that even temporary

14

injunctive relief, "until such time as the NEPA process is completed[,] would have an immediate, adverse financial effect on the [proposed intervenors]," and that such an effect "is not speculative, intangible or unmeasurable, especially when, as other courts have observed, NEPA compliance actions can take years." 157 F.3d at 972–73. That is true here as well. Delays occasioned by the length of the NEPA process—far from the "rubber stamp" that New Jersey asserts—have already resulted in significant lost revenues for the MTA and TBTA. Indeed, additional delay would, as noted, cost the MTA and TBTA approximately $83 million each month (based on the projected net annual $1 billion in Project revenues). C. de Cerreño Decl. ¶ 4.

Further delay—as sought by New Jersey in its plea to enjoin FHWA's approval of the Project—would not only cost the MTA and TBTA (and the public they serve) financially; it would also frustrate the realization of significant economic and environmental benefits to the entire region that will otherwise result from the Project, including critical investments in the region's mass transit infrastructure. Accordingly, the MTA and TBTA have clearly demonstrated that their interests "may be affected or impaired, as a practical matter by the disposition of the action," *Brody*, 957 F.2d at 1122, and that they should be granted intervention in order to adequately defend these interests.

### D. FHWA May Not Fully Represent the MTA and TBTA's Interests

The MTA and TBTA need only show that FHWA's representation "'*may* be' inadequate," a "minimal" burden. *Mountain Top*, 72 F.3d at 368 (emphasis added) (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). Here, although the MTA and TBTA seek to defend FHWA's environmental review process and resulting FONSI, the MTA and TBTA's interests are governed by their obligations under New York state law; in contrast, FHWA's interests are focused on defending NEPA and are national in focus. The interests of the MTA, TBTA, and FHWA may

15

align to defend the FONSI, but the MTA and TBTA cannot necessarily rely on FHWA to fully represent their independent and statutorily mandated interests throughout this litigation's unpredictable course, particularly where Plaintiff is another state with which FHWA also partners regularly on highway projects.  Further, as the Third Circuit observed in *Kleissler*, a federal agency defending a NEPA challenge might choose not to appeal an adverse ruling, or might decide to settle, leaving it at odds with project proponents:

> [T]he government represents numerous complex and conflicting interests in matters of this nature.  The straightforward business interests asserted by intervenors here may become lost in the thicket of sometimes inconsistent governmental policies.  Although it is unlikely that the intervenors' economic interest will change, it is not realistic to assume that the [federal] agency's programs will remain static or unaffected by unanticipated policy shifts.

157 F.3d at 973–74 (citations omitted).  Such concerns are well founded here, given the significant political attention generated by the Project already, and they are enough to demonstrate "that although the applicant's interests are similar to those of a party, they diverge sufficiently that the existing party cannot devote proper attention to the applicant's interests."  *Brody*, 957 F.2d at 1123.  Accordingly, because FHWA's representation of the MTA and TBTA's interests "may be inadequate," the Court should grant the MTA and TBTA's motion to intervene as of right pursuant to Rule 24(a).  *Mountain Top*, 72 F.3d at 368 (quotation and alteration omitted).

## II.       <u>Alternatively, the MTA and TBTA Should Be Granted Permissive Intervention</u>

As set forth above, the MTA and TBTA meet the requirements for intervention as of right under Rule 24(a).  However, should the Court nonetheless deny the MTA and TBTA's Rule 24(a) motion, the MTA and TBTA request permission to intervene under Rule 24(b).  Pursuant to Rule 24(b)(1)(B), the MTA and TBTA's interests are entirely coincident with the defense that FHWA's environmental review process for the Project complied with NEPA, its implementing regulations,

the CAA, and the APA.  Further, pursuant to Rule 24(b)(2)(A), the dispute concerns a program that the MTA and TBTA are charged with designing, developing and implementing by New York's Traffic Mobility Act.  Finally, as discussed above, the motion is timely and will not unduly delay or prejudice the adjudication of this matter, and it is therefore proper pursuant to Rule 24(b)(3).

### A.  The MTA and TBTA Should Be Permitted to Intervene Pursuant to Rule 24(b)(1)(B)

Rule 24(b) provides for permissive intervention where a party "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  "Whether to allow a party to permissively intervene is left to the sound discretion of the Court."  *Worthington v. Bayer Healthcare LLC*, Civ. A. No. 11-2793 (ES) (CLW), 2011 WL 6303999, at *8 (D.N.J. Dec. 15, 2011) (citation omitted).  However, "Rule 24(b) . . . provides basically that anyone may be permitted to intervene if his claim and the main action have a common question of law or fact."  *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967).  Further, "[a]lthough the rule speaks in terms of a 'claim or defense' this is not interpreted strictly so as to preclude permissive intervention."  *Id.*  *See also Cont'l Cas. Co. v. SSM Grp., Inc.*, No. Civ. A. 94-7789, 1995 WL 422780, at *5 (E.D. Pa. July 13, 1995) ("In interpreting the requirements of Rule 24(b), the words 'claim or defense' have not been read in a technical sense.") (quotations omitted).

The MTA and TBTA's defense is entirely coincident with FHWA's defense—namely, that FHWA complied with NEPA, the CAA and the APA in its environmental review of the Project and the resulting FONSI.  *See Am. Farm Bureau Fed'n v. U.S. Env't Prot. Agency*, 278 F.R.D. 98, 111 (M.D. Pa. 2011) (permissive intervention warranted for environmental groups, municipal water organizations and municipal authorities association in APA action to defend EPA pollution standards).  Moreover, given the MTA and TBTA's central involvement in the lengthy and complex environmental review process that New Jersey challenges here, their "presence…may serve to

17

clarify issues and, perhaps, contribute to resolution of this matter." *Id.* at 111; *see also City of Newark*, 2020 WL 10505722, at *3 n.1 (permissive intervention warranted where plaintiff and intervenor cities in New Jersey brought similar challenges to New York City's homeless assistance program) (citing *League of Women Voters v. Bd. of Comm'rs*, Civ. A. No. 86-0546, 1986 WL 3868, at *2 (E.D. Pa. Mar. 27, 1986) (granting permissive intervention to parties seeking to assert similar challenges to redistricting plan as those asserted by plaintiff)).[17]   Therefore, the MTA and TBTA respectfully request permission to intervene pursuant to Rule 24(b)(1)(B) in the event the Court does not find a basis for intervention as of right.

### B.  The MTA and TBTA Should Be Permitted to Intervene Pursuant to Rule 24(b)(2)(A)

While the MTA and TBTA satisfy the requirements for general permissive intervention, Rule 24(b) also provides separately for permissive intervention by a government officer or agency when "a party's claim or defense is based on…a statute or executive order administered by the officer or agency."  Fed. R. Civ. P. 24(b)(2)(A).  The Third Circuit described an earlier, substantially similar version of the rule as "mak[ing] specific provision for intervention by governmental agencies interested in statutes, regulations, or agreements relied upon by the parties in the action." *Halderman v. Pennhurst State Sch. & Hosp.*, 612 F.2d 84, 92 (3d Cir. 1979), *rev'd on other grounds*, 451 U.S. 1 (1981).

The Third Circuit has explained that permissive intervention by a government officer or agency under Rule 24(b)(2)(A) requires that "(1) the motion to be timely, (2) the potential

---

[17] The fact that FHWA may raise similar arguments does not weigh against permissive intervention, because—as explained above—intervention by the MTA and TBTA will not lead to undue delay or prejudice.   *See Appleton v. C.I.R.*, 430 Fed. App'x 135, 138 (3d Cir. 2011) (potential "redundancy…due to identity of interest should only be a bar to intervention when it has the adverse effect of 'undue delay' or 'prejudice'").

intervener be a 'federal or state governmental officer or agency', (3) the issue must be based on a statute, executive order, or regulation which is administered by the entity, and (4) the intervention may not cause undue delay or prejudice to the original parties' rights." *Appleton*, 430 Fed. App'x at 137–38. "When considering these factors, the Court must be mindful that Rule 24(b)(2) requires that intervention be granted liberally to governmental agencies because they purport to speak for the public interest." *First Am. Bank Co. v. SJP Grp., Inc. Employee Stock Ownership Trust*, Civ. A. No. 17-3778 (MAS) (DEA), 2018 WL 11246702, at *2 (D.N.J. Feb. 9, 2018) (quotation and citations omitted). *See also Karr v. Castle*, 768 F. Supp. 1087, 1092 (D. Del. 1991) ("The thrust of this portion of Rule 24(b) is in the direction of liberally allowing government agencies to intervene."). The MTA and TBTA satisfy these factors as well, as they administer the Traffic Mobility Act, which is central to this litigation.

While New Jersey's Complaint does not explicitly raise a claim under the Traffic Mobility Act, "Rule 24(b) expands the traditional concept of claim or defense insofar as intervention by a governmental officer or agency is concerned." *Metro Transp. Co. v. Balboa Ins. Co.*, 118 F.R.D. 423, 424 (E.D. Pa. 1987) (citing *Nuesse*, 385 F.2d at 705). Indeed, the Third Circuit has taken a broad approach to Rule 24(b)(2)(A), allowing intervention by government entities where a statute they administer is sufficiently central to the issues in the litigation, even if no party explicitly asserts a claim or defense arising under the statute. *See Appleton*, 430 Fed. App'x at 137–38 (permitting intervention by government of U.S. Virgin Islands to defend interpretation of U.S. federal law that would affect the Islands' Economic Development Plan, which the government administered, even though plaintiff's claim did not arise under the Plan). *See also Coffey v. C.I.R.*, 663 F.3d 947, 951 (8th Cir. 2011) (agreeing with Third Circuit's analysis in *Appleton*); *Sec. Nat'l Ins. Co. v. Amchin*, 309 F.R.D. 217, 222 (E.D. Pa. 2015) (permitting intervention by FDIC based

19

on agency's powers under federal FIRREA statute, which was "sufficiently central to the…dispute…that the parties' claims and defenses [were] reasonably 'based on' that statute").

The Traffic Mobility Act, which charges TBTA with most aspects of its implementation and administration, is clearly central to this dispute.  New Jersey mistakenly claims that the MTA improperly relied on the requirements of the Act to "stack[] the deck" in the environmental review process in favor of the MTA's preferred outcome.  Compl. ¶ 69; *see also id.* ¶¶ 10, 113, 114, 116.  Similarly, New Jersey repeatedly attacks the Project for dedicating the Project's revenues primarily to the MTA, in keeping with the revenue requirements of the Act.  *See id.* ¶¶ 3, 4, 53, 69.  And there can be no dispute that the MTA and TBTA administer the Act, because, as explained above, the Act directs the MTA (through its affiliate, TBTA) to establish the CBD Tolling Program, as well as to coordinate the planning, design, installation, construction and maintenance of the Program's infrastructure, including a toll collection system and customer service center.  N.Y. Veh. & Traf. Law § 1704, as added by L 2019, ch. 59, part ZZZ [Traffic Mobility Act], subpart A, § 1.  *See Nuesse*, 385 F.2d at 705 ("In any realistic appraisal of the issues, the statutes and regulations administered by the state commissioner are 'relied on' by the plaintiff, even though the reliance may be indirect and one step removed from the federal standard that ultimately governs the case.").  Therefore, because the Traffic Mobility Act, which the MTA and TBTA are charged with administering, is central to the issues in this case, the Court should permit the MTA and TBTA to intervene pursuant to Rule 24(b)(2)(A).

## **CONCLUSION**

For the reasons set forth above, the MTA and TBTA respectfully request that the Court grant them leave to intervene as Defendants in this case.

Dated: October 6, 2023     Respectfully submitted,


          */s/ Daniel Chorost*
          Daniel Chorost
          Mark A. Chertok*
          Elizabeth Knauer*
          John F. Nelson*
          SIVE, PAGET & RIESEL, P.C.
          560 Lexington Avenue, 15th Floor
          New York, NY 10022
          (212) 421-2150
          dchorost@sprlaw.com
          mchertok@sprlaw.com
          eknauer@sprlaw.com
          jnelson@sprlaw.com

          *Counsel for Proposed Intervenor-*
          *Defendants the Metropolitan Transportation*
          *Authority and the Triborough Bridge and*
          *Tunnel Authority*

          *\*Application for admission pro hac vice*
          *pending*