## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STATE OF NEW JERSEY,

                Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, FEDERAL HIGHWAY
ADMINISTRATION, SHAILEN BHATT, in
his official capacity as Administrator of the
Federal Highway Administration, and
RICHARD J. MARQUIS, in his official
capacity as Division Administrator of the New
York Division of the Federal Highway
Administration,

                Defendants.

Hon. Brian R. Martinotti

Civ. No. 2:23-cv-03885-BRM-LDW

**DECLARATION OF DR. ALLISON L.
C. DE CERREÑO**

I, Allison L. C. de Cerreño, Ph.D., hereby declare as follows:

1. I am the Chief Operating Officer of the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the Metropolitan Transportation Authority (the "MTA"). In that capacity and in my prior positions with the MTA, I have acted as the project lead for the Central Business District Tolling Program (the "CBD Tolling Program" or the "Project"), a New York State legislatively mandated program pursuant to which TBTA, the New York State Department of Transportation ("NYSDOT") and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") plan to introduce congestion pricing to Manhattan's Central Business District (the "CBD"). The Project will reduce congestion and provide a stable source of revenue to improve subway, bus and commuter rail systems in the MTA's 2020-2024 Capital Plan and successor plans.

2.     New Jersey's challenge to the environmental review of the proposed CBD Tolling Program by the Federal Highway Administration ("FHWA") seeks to negate years of planning and work by the MTA and TBTA (as well as the other Project Sponsors) to advance the Project in order to reduce congestion in the CBD in a manner that would generate revenues for future transportation improvements.  Achieving this purpose would strengthen the region's transit system and improve regional mobility and air quality.  These Project attributes would benefit many New Jersey residents, especially those who work in and/or travel to the CBD, as well as residents of New York and Connecticut.

3.     The litigation not only seeks to nullify the MTA/TBTA's substantial investment in the Project, but also, critically, to cut off a statutorily mandated means for reducing congestion and source of critical funding to the MTA—net toll revenues of roughly $1 billion per year that would generate $15 billion to be dedicated to sorely needed capital improvements of mass transit in the New York metropolitan area.[1]

4.     This declaration is submitted in support of the MTA's and TBTA's motion to intervene as of right or, alternatively, for permissive intervention.  Intervention is warranted because the MTA and TBTA each have a substantial interest in the outcome of this litigation, which the existing defendants may not adequately represent.  If New Jersey is successful, the litigation would delay for years, if not indefinitely, TBTA's implementation of the first congestion pricing program in the country, a project that is critical to reducing congestion and enhancing the region's transportation system, environment, and economy, with implications for the nation's economy

---

[1] The $1 billion is the annual net revenue estimated to be required to generate the $15 billion in funding for Capital Program projects mandated by the New York State legislation.  *See* N.Y. Veh. & Traf. Law § 1704-a(1).

as well.[2]   Each month of delay would cost the MTA (and the regional public it serves) roughly $83 million in lost revenues, assuming the roughly $1 billion in net annual revenues necessitated by state law; this means that critical capital improvements to the transit system are delayed.  The MTA and TBTA therefore have a very significant interest in ensuring that the litigation does not derail the successful implementation of a program that would reduce congestion and improve the metropolitan region's transportation network, benefiting the millions of transit (MTA subway, rail, and bus) riders who enter and exit the CBD on an average weekday.[3]

5.   The environmental review process for the Project (described below) resulted in a commitment that over $155 million in toll revenues will be directed to mitigation measures that would expand the city's off-peak delivery program, incentivize trucks to travel during the overnights, and directly improve air quality and public health regionally through replacing older diesel trucks with lower-emitting or fully electric vehicles.  Additionally, air quality would be improved in specific communities with existing health burdens that could experience increased traffic as the result of Project-related traffic diversions through measures such as improved air filtration in schools, planting of roadside vegetation, and park enhancement; these communities include some in New Jersey.  The MTA and TBTA, as public authorities committed to equity, also have an interest in seeing this unprecedented investment make meaningful inroads into ameliorating the detrimental public health effects of historic transportation and land use planning.  If New Jersey succeeds in this lawsuit, the opportunity to achieve these extensive benefits will be lost in favor of the status quo.

---

[2] *See* Ex. A (Final EA Exec. Summary), at ES-2.
[3] *See* Final EA at 1-13.

6.   This declaration, unless otherwise noted, uses language and information contained within the Final Environmental Assessment (the "Final EA") for the CBD Tolling Program or personal knowledge.[4]  The Final EA was prepared to inform the review of the Project by FHWA and the public under the National Environmental Policy Act ("NEPA").  Environmental review under NEPA is triggered because FHWA approval under its Value Pricing Pilot Program ("VPPP") is required to implement the Project.

7.   As explained below, the environmental review process included extensive public outreach, the preparation and publication of an Environmental Assessment ("EA") in August 2022, a public comment period and further public outreach, the preparation and publication of the Final EA and a draft Finding of No Significant Impact ("FONSI") in May 2023 for public review, and FHWA's issuance of a FONSI in June 2023.[5]  This FONSI was the culmination of a process that began approximately four years earlier, when the Project Sponsors submitted their expression of interest for participation in FHWA's VPPP, and took over two years after FHWA formally commenced the NEPA process.[6]

<u>The Purpose and Need for the CBD Tolling Program</u>

*Persistent and Worsening Congestion in the CBD*

8.   The CBD is the commercial center of a 28-county region that surrounds and includes New York City.[7]  Within nine square miles, the CBD houses 1.5 million jobs, 450 million square

---

[4]   The Final EA is Exhibit 2 to the Complaint and available online at https://new.mta.info/project/CBDTP/environmental-assessment.  The Executive Summary of the Final EA is attached here as Exhibit A.

[5]   The August 2022 EA is referred to herein as the Draft EA, to avoid confusion and clearly distinguish it from the Final EA.

[6]   A copy of the FONSI, which is Exhibit 3 to the Complaint, is attached here as Exhibit B.

[7]   Ex. A (Final EA Exec. Summary), at ES-2.

feet of office space, and more than 617,000 residents.[8]  It is also a regional and national destination for commerce, entertainment, and tourism, and the economic hub of the New York City region.  The region's population has grown by 5 percent since 2000 and is expected to continue to grow, exceeding 25 million by 2045.[9]  New York City is the most populous city in the country, with a population projected to surpass 9 million by 2045.[10]

9.  The growth in New York City's population and employment has increased traffic congestion and delays, thereby slowing travel and jeopardizing economic vitality and public health.  A 2018 study by the Partnership for New York City (a nonprofit organization comprised of business leaders and major companies) stated that "traffic congestion will be a $100 billion drag on the New York metro area economy over the next five years."  It cited the CBD as the primary source of traffic congestion in the region and reported that excess congestion had increased by 53 percent since it began studying the issue in 2006.[11]  The New York metropolitan region helps to power the national economy; as explained in the Final EA, this region is the "largest and most economically significant metropolitan area in the United States."[12]  Thus, maintaining the economic vitality of the CBD is of national importance.

10. This congestion makes travel a challenge as well.  NYCDOT's 2019 New York City Mobility Report found that the CBD had the highest concentration of slow-moving buses in the

---

[8] *Id.*; U.S. Census Bureau, 2012–2016 Census Transportation Planning Package; N.Y. State Comptroller, New York City's Office Market Report (2017); U.S. Census Bureau, American Community Survey, 2015–2019 Estimates.

[9] *See* Final EA at 1-10 (citing N.Y. Metro. Transp. Council ("NYMTC"), 2050 Socioeconomic and Demographic Forecasts (2015), https://www.nymtc.org/DATA-AND-MODELING/SED-Forecasts/2050-Forecasts).

[10] *Id.*; *id.* at 5A-10–5A-11.

[11] *See id.* at 1-12 (citing Partnership for New York City, $100 Billion Cost of Traffic Congestion in Metro New York (Jan. 2018), https://pfnyc.org/wp-content/uploads/2020/01/2018-01-Congestion-Pricing.pdf).

[12] Ex. A (Final EA Exec. Summary), at ES-2.

entire city during the average weekday afternoon/evening peak period (4 p.m. to 6 p.m.), with speeds between 5 and 6 miles per hour.[13]

11. Traffic congestion has been one of New York City's most challenging policy problems for decades. Despite multiple traffic-reduction initiatives and programs to encourage the use of transit, and despite the country's most extensive and robust public transit network, traffic congestion persists, and indeed has worsened. In 2020 and 2021, New York City's traffic congestion ranked worst among the cities in the United States, with last-mile speeds in the CBD of only 12 miles per hour.[14]

12. The Texas A&M Transportation Institute's Travel Time Index is a well-established method to measure congestion, representing the average additional time required to reach a destination during peak times compared to times of light traffic. If the time required during free-flow travel and peak times is the same, the Travel Time Index value is 1.0.[15]

13. Despite the widespread availability of public transit, Manhattan still has Travel Time Index values of 1.84 in the morning peak period and 2.07 in the evening peak period.[16] This means that for drivers, a trip that should take 20 minutes in free flow conditions could take more than twice that time on average during the evening peak hours. This is time wasted on a regular basis because of congestion.

14. Another way to look at congestion is through the New York Metropolitan Transportation Council's ("NYMTC") Level of Travel-Time Reliability indicator.[17] Again, a ratio that is close

---

[13] *See* Final EA at 1-12 (citing NYCDOT, New York City Mobility Report (Aug. 2019), https://www1.nyc.gov/html/dot/downloads/pdf/mobility-report-print-2019.pdf).

[14] *See id.* at 1-1.

[15] *Id.* at 1-14–1-15.

[16] *Id.* at 1-15.

[17] *Id.* NYMTC is the Metropolitan Planning Organization for New York City, Long Island, and the lower Hudson Valley (Putnam, Rockland and Westchester counties). It is a federally

to 1.0 demonstrates little variability throughout the day and from day to day.  A higher number means travel time is more unpredictable, while a lower number means it is more predictable.  In Manhattan, the daily level of travel-time reliability for all vehicle modes is 1.65 and for trucks it is 2.67, reflecting widely variable and therefore unpredictable travel times.[18]

15. Finally, NYMTC also uses a Planning Time Index that represents the additional amount of time that drivers need to allow to reach their destination under most conditions.  In Manhattan, to arrive at a destination on time, drivers regularly need to assume that their trip could take more than four times as long as it would during free-flow periods.[19]

16. The low travel speeds and unreliable travel times to, from, and within the CBD increase auto commute times, erode worker productivity, reduce bus and paratransit service quality, raise the cost of deliveries and the overall cost of doing business, and delay emergency vehicles.[20]

17. New York State and City officials, as well as independent stakeholder and advocacy groups, have conducted multiple studies over the past 45 years to determine the most effective way to address congestion in the CBD.  These studies repeatedly pointed to congestion pricing as the most effective tool.[21]

*The Need for Assured and Reliable Funding for Transit*

18. Studies have also identified sustained investment in public transportation as a key strategy for addressing traffic congestion in the CBD.  The importance of transit to New York

---

mandated planning forum comprised of elected officials and heads of transportation and environmental agencies responsible for establishing and implementing transportation plans, projects, and programs.  *See* NYMTC Home Page, https://www.nymtc.org (last visited Oct. 5, 2023).

[18] Final EA at 1-15.

[19] *Id.*

[20] *Id.* at 1-16.

[21] *See* Final EA, App. 2A, "Previous Studies and Concepts Considered," https://new.mta.info/document/111096.

City's overall economy cannot be overstated. As the primary mode of travel to the CBD, continued investment in transit is critical to mobility and accessibility of the CBD and the region. More than 75 percent of all trips, and 85 percent of commuter trips, into the CBD are made by bus, subway, commuter rail, or ferry.[22] In 2019, MTA subways served 1.7 billion passengers, and MTA buses carried 677.6 million passengers, providing access to employment, healthcare, education, and the full range of services and entertainment options available throughout New York.[23] The Long Island Rail Road ("LIRR") and Metro-North Railroad were the busiest commuter rail systems in the United States in terms of average weekday ridership in 2021.[24]

19. Elements of the MTA's commuter rail and subway system are more than 100 years old, and essential capital needs remain to ensure a state of good repair and to bring the MTA's transit and rail assets into the 21st century. The MTA's 2020–2024 Capital Program is intended to ensure that improvements put in place will be sustainable for years to come.[25] The Program identifies $52.0 billion of critical investments in the region's subways, buses, and commuter railroads. Key tenets of the 2020–2024 Capital Program include:

- Investing to improve reliability;

- Committing to environmental sustainability;

- Building an accessible transit system for all users;

---

[22] *See* Final EA at 1-16 (citing NYMTC, Hub Bound Travel Data Report 2019 (Jan. 2021), https://www.nymtc.org/Portals/0/Pdf/Hub%20Bound/2019%20Hub%20Bound/DM_TDS_Hub_Bound_Travel_2019.pdf?ver=GS5smEoyHSsHsyX_t_Zriw%3d%3d; U.S. Census Bureau, 2012–2016 Census Transportation Planning Package).

[23] *See id.* (citing MTA, MTA Performance Metrics, https://new.mta.info/coronavirus/ridership). Bus ridership reflects the total annual reported numbers for New York City Transit and MTA Bus Company. *Id.*

[24] *See id.* (citing APTA, Public Transportation Ridership Report: Fourth Quarter 2021, https://www.apta.com/wp-content/uploads/2021-Q4-Ridership-APTA.pdf).

[25] *Id.* at 1-17.

• Easing congestion and creating growth; and

• Improving safety and customer service through technology.[26]

20. Although the MTA draws funding from several sources (e.g., transit fares, tolls at TBTA bridge and tunnel crossings, and federal, state and local support), there is a history of gaps in funding when economic conditions reduce the tax base, when governments reduce financial support, and when the cost of needed transit improvements exceeds the available funding.

<u>The Traffic Mobility Act</u>

21. To address the need to both reduce congestion and establish a stable source of revenue to fund the MTA's Capital Program, in April 2019 the New York State Legislature enacted the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act" or the "Act").[27]  The Act directs TBTA to plan, design, install, construct, and maintain the CBD Tolling toll collection system. The Act also directs that TBTA coordinate with NYCDOT and that NYCDOT cooperate with TBTA for the planning, design, installation, construction and maintenance of the CBD Tolling infrastructure.

22. As defined in the Act, the CBD consists of the geographic area of Manhattan south and inclusive of 60th Street, but not including the Franklin D. Roosevelt Drive, the West Side Highway/Route 9A, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street.[28]  The Act directs TBTA to toll vehicles entering or remaining in the CBD via an electronic tolling system.[29]

---

[26] *See id.* (citing MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019), https://new.mta.info/sites/default/files/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf).
[27] N.Y. Veh. & Traf. Law § 1701, as added by L 2019, ch. 59, part ZZZ.
[28] *Id.* § 1704(2).
[29] *Id.* § 1703.

23. The toll will apply to all registered vehicles (i.e., those with license plates), with the exception of qualifying vehicles transporting persons with disabilities and qualifying authorized emergency vehicles.  There may also be crossing credits for certain types of vehicles that pay existing tolls on bridges and tunnels before entering the CBD, possible additional exemptions, and certain discounts (such as discounts for frequent low-income drivers, which the Project Sponsors committed to in the Final EA).  Passenger vehicles will be tolled no more than once a day.[30]

24. The Act requires that the annual net revenues from the CBD Tolling Program be sufficient to support a $15 billion investment in the MTA Capital Program, which revenues must be used by the MTA to fund transit and commuter rail projects in the 2020–2024 Capital Program and successor programs.  Eighty percent of the funds must be allocated to New York City subways and buses, and ten percent to each of Metro-North Railroad and the LIRR.[31]

25. The Traffic Mobility Act requires the TBTA Board to establish the Traffic Mobility Review Board (the "TMRB") with members representing the region who have experience in public finance, transportation, mass transit, or management.  The TMRB must recommend to the TBTA Board the toll amounts and toll structure, such as crossing credits, discounts, and/or exemptions for existing tolls paid on bridges and tunnels.  The variable pricing structure could vary by time of day, day of week, and day of year, and could be different for different types of vehicles.  Informed by the TMRB's recommendations, the TBTA Board must approve and adopt a final toll structure following a public hearing in accordance with the State Administrative

---

[30] *Id.* § 1704-a.

[31] *Id.*; N.Y. Pub. Auth. Law § 553-j(3-a).  As reflected in the Final EA, it is estimated that the Project needs to generate net annual revenue (after expenses for Project operating costs) of $1 billion.  Final EA at 2-39, Tbl. 2-4 n.2.

Procedure Act.[32]  At this time, the TMRB has held three public meetings; it is expected to issue its recommendations in October 2023.

The VPPP and NEPA

26. Certain streets within the CBD are part of the National Highway System and, in some instances, have been improved with federal funding provided through FHWA.  Although 23 U.S.C. § 301 generally prohibits tolling of federal aid highways, Congress established the VPPP "to demonstrate whether and to what extent roadway congestion may be reduced through application of congestion pricing strategies, and the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs."[33]  Through this program, FHWA can provide tolling authority to state, regional or local governments to implement congestion pricing tolling programs on federal aid highways.

27. In June 2019, TBTA, NYSDOT and NYCDOT submitted an Expression of Interest for tolling authority under the VPPP for the purpose of implementing the CBD Tolling Program. This submission required FHWA to evaluate the potential environmental effects of the proposal in accordance with NEPA.[34]  As the sole federal agency from whom approval is required for the CBD Tolling Program, FHWA served as the lead federal agency for the NEPA review.

28. In March 2021, FHWA determined that the Project should be treated as a NEPA Class III (EA) action under 23 CFR Part 771.  Class III actions are those for which the significance of the environmental impact is not clearly established.  Therefore, an Environmental Assessment is

---

[32] N.Y. Veh. & Traf. Law § 1704-a; N.Y. Pub. Auth. Law §§ 553(12-a), 553-k.
[33] FHWA, Value Pricing Pilot Program, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last visited Oct. 5, 2023).
[34] A copy of this letter, without exhibits, is attached here as Exhibit C.

prepared to determine whether the Project is likely to have a significant impact on the built and natural environment, and thereby require the preparation of an Environmental Impact Statement ("EIS").[35]

*Early Outreach to Agencies and the Public*

29. To ensure public and agency input into the NEPA process, FHWA and the Project Sponsors developed a list of agencies to invite to participate in the NEPA process.  Since the beginning and throughout the NEPA process, FHWA and the Project Sponsors sought agency expertise in the analysis of different resource areas (e.g., transportation, historic resources, and environmental justice).[36]  Thus, before and during the preparation of the EA that was presented for public review (as discussed below), FHWA and the Project Sponsors held multiple meetings with agencies.

30. FHWA and the Project Sponsors specifically invited the New Jersey Department of Transportation ("NJDOT"), the New Jersey Turnpike Authority ("NJTA"), New Jersey Transit ("NJT"), and the North Jersey Transportation Planning Authority ("NJTPA"), to engage in the process, in addition to twenty other agencies and five tribal nations throughout the 28-county regional study area where it was anticipated that travel patterns could potentially change as a result of the Project.[37]  The first regional transportation agency meeting was held on September 10, 2021, and executives were invited from NJDOT, NJT, NJTA, NJTPA, and other agencies.[38] Executives from NJDOT, NJT and NJTPA participated or sent staff.  During that session, the Project Sponsors gave a presentation, requested feedback, and offered to answer any questions.

---

[35] A copy of this letter is attached here as Exhibit D.

[36] A complete list of the agencies that FHWA invited to participate is included in Table 18-1 of the Final EA and is attached here as Exhibit E.

[37] *See* Final EA at 18-1–18-2.

[38] *See id.* at 18-3.

31. The second regional transportation agency meeting was held on August 4, 2022, and the same agencies were invited; attendees included representatives from NJDOT, NJT, NJTPA, and NJTA.[39]

32. In addition, the Project Sponsors reached out to the Port Authority of New York and New Jersey, a bi-state agency, as well as to NJT, to review the potential for adverse effects at the Hoboken PATH station and to coordinate potential mitigation efforts to avoid any such potential adverse effects.

33. FHWA staff dedicated to environmental review and environmental justice, as well as EPA, provided expertise in the public participation efforts and analysis undertaken with respect to the Project's potential effects on environmental justice populations, pursuant to Executive Order 12898 and corresponding U.S. Department of Transportation and FHWA guidance documents, as well as compliance with the Clean Air Act (the "CAA").[40]

34. FHWA and the Project Sponsors made a significant effort to inform the public, encourage open discussion of Project details and issues, and provide opportunities for comment, focusing on the 28-county regional study area. The Project Sponsors also conducted a series of early outreach webinars to solicit public input for consideration in the development of the EA. A total of 19 early outreach meetings occurred, ten of which were advertised as general webinars and nine of which were advertised for environmental justice community members throughout the 28-county regional study area.[41] Of these, two public sessions and three environmental justice sessions focused on participants from New Jersey.[42]

---

[39] *See id.*
[40] *See id.* at 18-1.
[41] *Id.* at 18-5–18-8.
[42] *Id.* at 18-6, Tbl. 18-2.

35. Although assigned to different geographic areas, the webinars were open to anyone who wished to participate, regardless of where they lived or worked.  Over 1,000 people signed up to participate in these webinars.   The webinars included introductions by Project Sponsor representatives and a public informational session during which participants could provide oral comments and submit written questions through the question/answer function.   Project staff responded to these questions in real time during the events.[43]

36. In addition to the webinars directed to the general public, including the nine webinars targeted to environmental justice populations, the Project Sponsors established two environmental justice advisory groups to allow for more in-depth discussion and engagement: an Environmental Justice Technical Advisory Group (the "EJTAG"), which included representation from New Jersey, and an  Environmental Justice Stakeholder Working Group (the "EJSWG"), which was open to individuals identifying as members of communities with environmental justice concerns from throughout the region.  Early outreach meetings with the EJTAG occurred in October and November 2021, and February 2022, and with the EJSWG in November 2021.[44]

37. The Project Sponsors also met with stakeholders upon request during the early outreach period, including a group of federal law enforcement agencies, the Connecticut, New Jersey and New York Trucking Associations, and the New York City Taxi and Limousine Commission.

38. More than 7,000 comments were received during the early outreach and were considered in the preparation of the EA.[45]

---

[43] *Id.* at 18-5–18-7.
[44] *Id*. at 18-7.
[45] *See id.* at 18.4 *et seq.*

*The August 2022 Environmental Assessment and Public Participation*

39.   An important initial step in the preparation of the EA was the definition of the purpose and need driving the proposed action, as this informs what alternatives can be considered reasonable.  The Project purpose was defined as: "to reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's VPPP."[46]  The Project needs were defined as (1) the need to reduce vehicle congestion in the CBD and (2) the need to create a new local, recurring funding source for the MTA's capital projects.[47]

40.   Based on the purpose and need, the Draft EA (as well as the Final EA) stated the following objectives to define how the purpose and need would be met:

  a.   Reduce daily vehicle-miles traveled ("VMT") within the CBD by at least 5 percent as compared to forecast traffic without the CBD Tolling Program (the "No Action Alternative").

  b.   Reduce the number of vehicles entering the CBD daily by at least 10 percent as compared to the No Action Alternative.

  c.   Create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program, as required by the Traffic Mobility Act.[48]

41.   The Draft EA assessed a number of potential alternatives but found that only one, the CBD Tolling Program, could meet the purpose and need.  The Draft EA then compared that alternative to a No Action Alternative, under which the CBD Tolling Program was not authorized and the Act was not implemented.  Because a tolling structure has not yet been adopted, the analysis in the Draft EA was designed to identify the potential effects that may result from implementing the CBD Tolling Alternative, including any potential crossing credits, discounts,

---

[46] *Id.* at 1-10.
[47] *Id.*; *id.* at 1-16.
[48] *Id.* at 2-5; N.Y. Veh. & Traf. Law § 1704-a(1).

and/or exemptions, as such elements could affect the behavior of drivers and people accessing the CBD differently.  Therefore, the Draft EA considered a range of tolling scenarios with different attributes to identify the range of effects that may occur.  The Draft EA assessed seven different scenarios with different elements, and analyzed the effects on different resource areas of the scenario that was representative of the maximum anticipated impacts on relevant resource areas (e.g., one scenario was analyzed for potential impacts on traffic, and a different scenario was analyzed for potential impacts on neighborhood character).[49]

42.   A draft EA was issued for public review and comment on August 10, 2022.  The Draft EA examined numerous categories of potential environmental impacts, ranging from the physical effects of construction and the visual effects of the tolling infrastructure to the effects on roadway traffic and air quality from diversions of vehicular traffic.  The Draft EA identified mitigation measures to which the Project Sponsors committed to avoid potential significant environmental impacts and potential disproportionately high and adverse impacts on environmental justice populations.[50]

43.   A 44-day public comment period was provided, during which members of the public, agencies, elected officials and organizations could submit comments on the Draft EA.  The initial 30-day public comment period was extended by two weeks—from September 9, 2022 to September 23, 2022—based on requests from members of the public.  In addition, FHWA and the Project Sponsors considered comments received after the formal close of the comment period.[51]

---

[49] Draft EA (Compl. Ex. 6), at 2-29–2-40.  As a result of engagement with the EJTAG and EJSWG, the Final EA conducted additional sensitivity analyses of further modified versions of the scenarios.
[50] *Id.* at 17-57–17-63.
[51] Final EA at 18-22.

44.   During the comment period, FHWA and the Project Sponsors hosted six virtual public hearings.  These hearings were conducted using the Zoom webinar platform and were posted to the MTA's YouTube channel, with simultaneous translation into American Sign Language and the provision of Communication Access Realtime Translation (known as "CART"), as well as translation to other languages upon request.  They included a presentation—led by TBTA—describing the CBD Tolling Program and the findings of the Draft EA, and provided the opportunity for public comment.  There was no limit on the number of people who could comment at each hearing, and a total of 552 attendees at these hearings provided comments.[52]

45. FHWA and the Project Sponsors received and responded to nearly 70,000 public input submissions on the Draft EA.  These included more than 14,000 individual submissions (containing more than 22,000 individual comments, as many submissions have multiple comments), including oral testimony at the public hearings, letters, e-mails, voicemails, and submissions via an electronic comment form.[53]

46.   Following the release of the Draft EA, the Project Sponsors held one additional meeting with the EJSWG and four additional meetings with the EJTAG, to further engage with environmental justice communities.[54]  The EJTAG meetings were the source of recommendations for additional mitigation.

47. Over many months, FHWA and the Project Sponsors reviewed and considered the many thousands of comments received and worked to address those comments that raised substantive

---

[52] Ex. A (Final EA Exec. Summary), at ES-26.
[53] *Id.*  In addition to the individual submissions, the Project Sponsors received more than 55,000 submissions made as part of four form-letter campaigns.  *Id.*
[54] *Id.*

issues concerning the Draft EA analyses.  Responses to every comment received were prepared.

*Environmental Assessment and Draft Finding of No Significant Impact*

48. Based on feedback received during the public comment period and additional EJTAG discussions, as well as direction from FHWA, the Draft EA was revised with additional material, resulting in a Final EA for the CBD Tolling Program.

49. The principal changes to the Draft EA included the addition of an appendix to the environmental justice analysis, which examined how environmental justice communities with pre-existing air pollution and health burdens related to historic transportation and land use planning could potentially be affected by Project-generated increases or decreases in highway traffic adjacent to these areas—a concern that was raised during the public comment period, in discussions with the EJTAG and EJSWG, and in discussions with FHWA and EPA.[55]  The Technical Memorandum is a supplemental discussion to the air quality analysis in the Draft  EA and informs an expanded Chapter 17, "Environmental Justice."

50. The CBD Tolling Program will, as reflected in the Final EA, improve regional air quality—a region that includes New Jersey.[56]  To offset localized effects of potential traffic diversions in environmental justice communities in New York and New Jersey, the Final EA added a Project commitment to use CBD tolling revenues for a $155-million mitigation package over five years.  This package would directly improve air quality and public health regionally through the replacement of diesel trucks with modern lower-emitting or full electric vehicles, which would materially reduce vehicular emissions.  These trucks travel throughout the

---

[55] *See* Final EA, App. 17D, "Technical Memorandum: Considerations for Environmental Justice Communities with Existing Pollution or Health Burdens," https://new.mta.info/document/111056.
[56] *See* Final EA at 10-21.

metropolitan region, and thus would benefit communities in New Jersey as well as in New York. The measures would also expand the City's off-peak delivery program and incentivize trucks to travel during the overnights.  In addition, localized, "place-based" mitigation measures include the installation or improvement of air filtration units in schools, roadside plantings, and renovation of parks and greenspace.  Once again, these place-based mitigation measures would be deployed in communities in both New York and New Jersey.[57]  EPA concurred with these mitigation commitments to address the potential impact on environmental justice communities.

51. Another added appendix to the environmental justice analysis provides background information about the development of mitigation to address a potential adverse effect on low-income frequent drivers who commute to the CBD.[58]  The Final EA added a commitment to provide a low-income driver discount plan offering a discounted toll rate after the first 10 tolls are incurred each month, for a period of five years.  This mitigation program applies to low-income drivers who commute to the CBD from New Jersey as well as other states.[59]

52. The Final EA also added a commitment that drivers of NYC taxis and for-hire vehicles, who are identified as an environmental justice population because many of them meet the definition of "minority," would not be tolled more than once per day, the same as private passenger vehicles.[60]

---

[57] *See id.* at 17-66.  The Project Sponsors have committed to additional mitigation measures to address asthma in New York City, including the establishment of an asthma center in the Bronx, which has the highest rate of asthma in the country.  NYSDOT would also expand its electric truck charging infrastructure to accommodate electric vehicles traveling to and within New York, which vehicles include those entering from New Jersey.  *See id.* at 17-66–17-67.

[58] Final EA, App. 17E, "Approach to Mitigating the Effect of CBD Tolls on Low-Income Frequent Drivers," https://new.mta.info/document/111056.

[59] Final EA at 17-75, Tbl. 17-17.

[60] *See id.* at 17-76.  Other analyses were enhanced in response to public comments, including Chapter 10, "Air Quality," and Chapter 6, "Economic Conditions."

53. Based on the Final EA (as well as EPA's review), including the substantial commitments to mitigation measures made by the Project Sponsors, FHWA issued a Draft FONSI, determining that, with the incorporation of the mitigation commitments, the Project would not have a significant adverse impact on the human or natural environment.  The Final EA and a Draft FONSI were made available to the public to review for a period of 30 days—from May 12, 2023 to June 12, 2023.  This period of public availability preceded FHWA's signing of the FONSI being challenged in this action.

54. Although the Governor of New Jersey and certain New Jersey agencies submitted letters commenting on the August 2022 EA and the May 2023 Final EA, none ever provided data or information they believed to be important to informing the EA analyses, including with respect to the identification of environmental justice communities within the state.

*FHWA Issuance of the FONSI*

55. During the period of public availability, some agencies and members of the public made written submissions offering their perspectives on the CBD Tolling Program and/or the Final EA.  These submissions were reviewed by the Project Sponsors and FHWA to determine if they contained any new information that required consideration in the Final EA.  This review revealed that the submissions repeated viewpoints voiced during the public comment period on the August 2022 EA and did not provide new information.  Therefore, FHWA determined that no additional changes to the Final EA were required.[61]

56. On June 23, 2023, FHWA New York Division Administrator Richard Marquis signed the FONSI, concluding FHWA's NEPA review of the Project.  The FONSI (attached here as Exhibit B) determines that in consideration of the mitigation commitments made by the Project Sponsors,

---

[61] *See* Ex. B (FONSI), at 25.

the CBD Tolling Program will not have a significant adverse impact on the human or natural environment.  The FONSI was issued four years after the Project Sponsors submitted their Expression of Interest in the VPPP, and more than two years after FHWA had directed the Project Sponsors to prepare an EA.

<u>Next Steps Toward Adoption of a Tolling Structure</u>

57. Although NEPA review has concluded, the Project cannot commence operation until the TMRB issues its recommendations, the TBTA Board adopts a tolling structure following the New York State Administrative Procedure Act, and the Project Sponsors and FHWA execute an agreement authorizing tolling under the VPPP.  As contemplated by the Final EA, before such an agreement is entered, FHWA and the Project Sponsors will evaluate whether the adopted tolling structure has differences from the tolling scenarios analyzed in the Final EA that could result in any new significant impacts that the mitigation to which the Project Sponsors have committed would not address.  Depending on the nature of the adopted toll structure, this could require additional technical analysis.[62]

58. TBTA and its contractor are working to put infrastructure in place that will enable implementation of the Project once a toll structure is adopted and a tolling agreement with FHWA is executed.  This work includes both installation of equipment and development of the technical capability to detect vehicles and charge CBD tolls.  The current schedule anticipates that tolling would not commence before May 2024.

59. The MTA and TBTA, along with the other Project Sponsors, have a substantial interest in ensuring that the CBD Tolling Program is implemented in order to reduce traffic congestion in the CBD in a manner that will generate revenue for future transportation improvements; these

---

[62] *See id.* at 25–26.

revenues would be used by the MTA to improve mass transit throughout the region.  The MTA and TBTA also have a substantial interest in advancing the $155 million commitment in air quality and public health improvements to offset inequitable burdens created by historic transportation and land use planning, including in New Jersey environmental justice communities.  All of these interests benefiting travelers and residents in the region would be delayed or possibly negated by a ruling here in favor of New Jersey.  These substantial interests in the outcome of this action warrant granting the MTA and TBTA's motion to intervene.

60. The MTA and TBTA also need to participate in this litigation to ensure that their significant interests are adequately represented.  Although the MTA and TBTA seek to defend FHWA's environmental review process and resulting FONSI, MTA's and TBTA's interests are in an expeditious approval of the Project which they are obligated by state law to implement, while FHWA's interests are national in focus.  Thus, MTA/TBTA have an obligation to implement the Traffic Mobility Act; in contrast, FHWA has no such obligation under NEPA.

61. The MTA/TBTA's and FHWA's interests may align to defend the FONSI, but the MTA/TBTA cannot rely solely on FHWA to fully represent their interests throughout this litigation's unpredictable course, particularly where the plaintiff is another state with which FHWA also partners regularly on highway projects.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:          October 6, 2023
                New York, NY



_____
Allison L. C. de Cerreño, Ph.D.


22