# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration,<br><br>    Defendants,<br><br>    and<br><br>METROPOLITAN TRANSIT AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,<br><br>    Defendant-Intervenors. | Civil Case No. 2:23-cv-03885 |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ............................................................................................1

II.  FACTUAL BACKGROUND ..............................................................................................7

    A.   New York's Plans for Congestion Pricing in Manhattan Previously Centered on the Environment: They Now Improperly Focus on Revenue Generation ..........................7

    B.   The Origins of NEPA and FHWA-Approved Projects Requiring an EIS .......................10

    C.   MTA's Federal Funding and FHWA's Agreement to "Fast Track" its Approval of Congestion Pricing....................................................................................................13

    D.   The Project Sponsors Completed the Draft EA but Did Not Address Environmental Impacts on New Jersey and Proposed No Mitigation ..............................14

    E.   FHWA Issued the Final EA and FONSI Without Requiring the Project Sponsors to Prepare an EIS ..........................................................................................16

III. LEGAL STANDARD.........................................................................................................18

IV. ARGUMENT .....................................................................................................................21

    A.   FHWA's Issuance of a FONSI Was Unlawful Because It Failed to Take a Hard Look at the Environmental Impacts on New Jersey ........................................................21

        1.   The Final EA Acknowledged that Congestion Pricing Will Cause Significant Increased Air Pollution in New Jersey, and Did Not Explain Why Those Impacts Should Be Deemed Insignificant..................................................22

        2.   The Final EA Proposed No Mitigation of Unavoidable and Adverse Impacts of Air Pollution in New Jersey....................................................................24

    B.   FHWA's Final EA and FONSI Were Arbitrary and Capricious Because They Selectively Relied on Inadequate Data and Analysis and Failed to Take a Hard Look at the Impacts on New Jersey .....................................................................................26

    C.   FHWA's Final EA and FONSI Were Arbitrary and Capricious Because They Failed to Fully Consider and Take a Hard Look at Adverse Impacts on New Jersey's Communities with Environmental Justice Concerns ..........................................33

        1.   FHWA Did Not Adequately Collect Data on New Jersey's Communities with Environmental Justice Concerns..................................................................35

2.  FHWA Did Not Sufficiently Consider and Mitigate Adverse Impacts on Communities with Environmental Justice Concerns in Bergen County.....................36

3.  FHWA Did Not Adequately Assess Impacts on Other Communities with Environmental Justice Concerns in the Regional Study Area ....................................38

D.  FHWA's Failure to Provide Adequate New Jersey Participation Renders the Final EA and FONSI Arbitrary and Capricious..........................................................................39

E.  The Final EA Failed to Take a Hard Look at Alternatives .................................................43

F.  FHWA Failed to Conduct a Transportation Conformity Analysis in Violation of the Clean Air Act ....................................................................................................................47

1.  The Failure to Conduct a Conformity Analysis for New Jersey Violates the CAA and Was Arbitrary and Capricious ......................................................................48

2.  FHWA's Failure to Consult Relevant New Jersey Agencies Violates the CAA and is Arbitrary and Capricious .................................................................................49

V.  CONCLUSION....................................................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*350 Montana v. Haaland,*
    50 F.4th 1254 (9th Cir. 2022) ...................................................................23

*Am. Canoe Ass'n v. White,*
    277 F. Supp. 2d 1244 (N.D. Ala. 2003)....................................................26

*Am. Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017)..............................................................4, 20

*Baptiste v. Bethlehem Landfill Co.,*
    965 F.3d 214 (3d Cir. 2020)......................................................................33

*Bark v. U.S. Forest Serv.,*
    958 F.3d 865 (9th Cir. 2020) ....................................................................20

*Blanton v. Off. of the Comptroller of the Currency,*
    909 F.3d 1162 (D.C. Cir. 2018)................................................................19

*Cal. v. U.S. Dept of Transp.,*
    260 F. Supp. 2d 969 (N.D. Cal. 2003) .....................................................32

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979)..................................................................................48

*Citizens for Clean Energy v. U.S. Dep't of Interior,*
    621 F.Supp.3d 1165 (D. Mont. 2022).......................................................31

*Colo. Env't Coal. v. Salazar,*
    875 F. Supp. 2d 1233 (D. Colo. 2012)................................................20, 21

*Comm. to Stop Rte. 7 v. Volpe,*
    346 F. Supp. 731 (D. Conn. 1972), *order vacated on other grounds*, 515 F.
    Supp. 151 (D. Conn. 1980) ..................................................................29, 32

*Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.,*
    538 F.3d 1172 (9th Cir. 2008) .......................................................... *passim*

*Ethyl Corp. v. EPA,*
    306 F.3d 1144 (D.C. Cir. 2002)................................................................48

*Food & Water Watch v. Fed. Energy Reg. Comm'n,*
    28 F.4th 277 (D.C. Cir. 2022)...................................................................32

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
    681 F.2d 1172 (9th Cir. 1982) ................................................................21

*Guindon v. Pritzker*,
    31 F. Supp. 3d 169 (D.D.C. 2014) ......................................................19

*Habitat Educ. Ctr., Inc. v. Bosworth*,
    381 F. Supp. 2d 842 (E.D. Wis. 2005)................................................26

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) ........................................................26, 30

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Srv.*,
    373 F.Supp.2d 1069 (E.D. Cal. 2004)..................................................44

*Kootenai Tribe of Idaho v. Veneman*,
    142 F. Supp. 2d 1231 (D. Idaho 2001) ..................................... *passim*

*Lower Alloways Creek Twp. v. Pub. Serv. Elec. & Gas Co.*,
    687 F.2d 732 (3d Cir. 1982)...........................................................22, 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).................................................................... *passim*

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) (per curiam)......................................44, 47

*N. Cascades Cons. Council v. U.S. Forest Serv.*,
    98 F. Supp. 2d 1193 (W.D. Wash. 1999)............................................26

*N.Y. v. Nuclear Regul. Comm'n*,
    681 F.3d 471 (D.C. Cir. 2012)..............................................19, 20, 29

*Nat. Res. Def. Council v. EPA*,
    638 F.3d 1183 (9th Cir. 2011) ..............................................................48

*Nat. Res. Defense Council, Inc. v. Morton*,
    458 F.2d 827 (D.C. Cir. 1972)..............................................................44

*Nat'l Audubon Society v. Dep't of Navy*,
    422 F.3d 174 (4th Cir. 2005) ...............................................................29

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v.*
    *Geertson Seed Farms*, 561 U.S. 139 (2010) ................................. *passim*

*O'Reilly v. All State Financial Co.*,
  2023 WL 6635070 (5th Cir. Oct. 12, 2023)........................................................36

*O'Reilly v. U.S. Army Corps of Eng'rs*,
  477 F.3d 225 (5th Cir. 2007) ...........................................................................26

*Protect Key West, Inc. v. Cheney*,
  795 F.Supp.1552 (S.D. Fla. 1992) .....................................................................28

*Pub. Emps. For Env't Resp. v. U.S. Fish & Wildlife Serv.*,
  177 F. Supp. 3d 146 (D.D.C. 2016)....................................................................47

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989).........................................................................................11

*Sierra Club v. Mainella*,
  459 F. Supp. 2d 76 (D.D.C. 2006).....................................................................22

*Sierra Forest Legacy v. Rey*,
  577 F.3d 1015 (9th Cir. 2009) ..........................................................................43

*Simmons v. U.S. Army Corps of Eng'rs.*,
  120 F.3d 664 (7th Cir. 1997) ......................................................................44, 46

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017)..............................................................34, 39

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021).........................................................................20

*Town of Cave Creek v. FAA*,
  325 F.3d 320 (D.C. Cir. 2003)...........................................................................24

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
  6 F.4th 1321 (D.C. Cir. 2021)......................................................................34, 37

*W. Watersheds Project v. Abbey*,
  719 F.3d 1035 (9th Cir. 2013) ..........................................................................29

*W. Watersheds Project v. Bernhardt*,
  543 F.Supp.3d 958 (D. Idaho 2021) ...................................................................47

*Wildearth Guardians v. U.S. Bureau of Land Mgmt.*,
  457 F. Supp. 3d 880 (D. Mont. 2020).................................................................45

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).............................................................................................21

v

**Statutes**

5 U.S.C. §§ 701–706 .................................................................................................18, 19

42 U.S.C. § 4321 *et seq.* ........................................................................................ *passim*

42 U.S.C. §§ 7401 *et seq.* ....................................................................................... *passim*

N.J. Stat. § 13:1D-158 ....................................................................................................35

N.J. Stat. § 26:2C-8.11 ..................................................................................................49

N.Y. Veh. & Traf. Law §§ 1701–1706 ................................................................... *passim*

**Other Authorities**

23 C.F.R. §§ 771 *et seq.* .......................................................................................... *passim*

40 C.F.R. §§ 93 *et seq.* ............................................................................................47, 49

40 C.F.R. §§ 1500–1508 .......................................................................................... *passim*

74 C.F.R. § 650.4(k)(2)(i) ..............................................................................................33

88 Fed. Reg. 5560 (Jan. 27, 2023) ................................................................................37

Deborah N. Archer, *White Men's Roads Through Black Men's Homes*, 73 Vand. L. Rev. 1259 (2020) ......................................................................................................10

Exec. Order No. 14,008, 3 C.F.R. § 477 (2022) ...........................................................33

Exec. Order No. 12,898, 3 C.F.R. § 859 (1995), *reprinted as amended in* 42 U.S.C. § 4321 (1994 & Supp. VI 1998) ....................................33

Fed. R. Civ. P. 56(a) ......................................................................................................18

Grace Brennan, *Park on the Highway*, 49 Fordham Urb. L.J. 825, (2022) ....................10

N.Y. Comp. Codes R. & Regs. tit. 6 § 240-2.8(e) ........................................................31

S. Rep. No. 91-296 (1969) .............................................................................................10

I.      **PRELIMINARY STATEMENT**

This is a case about the environmental impacts of a groundbreaking congestion pricing scheme—the first ever in our nation's history—imposed by the Metropolitan Transit Authority ("MTA" or "Intervenors") on all drivers entering Manhattan's Central Business District ("CBD").[1]  This radical change will unquestionably have profound environmental impacts on the tri-state area, increasing pollution and harming public health in communities throughout the region, including New Jersey.  But while the burdens are shared, the benefits are not.  Every single one of the billions of dollars in annual proceeds from New York's scheme of charging drivers up to $23 when they cross into midtown Manhattan will go to the MTA to fund its mass transportation system and mitigate adverse environmental impacts in New York and *only* in New York.  Not one penny has been committed to New Jersey.

Faced with significant environmental impacts and the fundamental unfairness to New York's neighbors, one would have expected the Federal Highway Administration ("FHWA")— the agency responsible for conducting this environmental review—to require that the Project Sponsors prepare a comprehensive environmental impact statement ("EIS") that thoroughly considers the project's significant effects on the region.  That is, after all, what the law typically requires—and what FHWA has done with other tolling schemes.  That is not what FHWA did here.  Instead, it issued a "Finding of No Significant Impact" ("FONSI"), green-lighting New York's project to advance towards launch in the Spring of 2024.  And FHWA did so without requiring *any* mitigation to address the serious environmental impacts that the scheme will cause in New Jersey.

---

[1]    Exhibit A to the Declaration of Randy M. Mastro includes a glossary of acronyms used herein. Exhibits attached to the Mastro Declaration are referred to as "Ex."

This is the antithesis of what the National Environmental Protection Act ("NEPA") and the Clean Air Act ("CAA") require. The mountain of paperwork FHWA has produced as an administrative record cannot bury the fact that, by issuing a FONSI, it failed to take the "hard look" federal law requires of a project with such profound impacts. Indeed, even though FHWA has routinely required an EIS for toll projects all across the country, it did not here, instead allowing a congestion pricing scheme never before attempted in the nation to go through a fast-tracked environmental review process that favored New York State. FHWA did so without requiring any mitigation for adversely affected New Jersey communities, or adequately taking into account New Jersey's concerns from inception as a direct stakeholder, or sufficiently considering alternatives to this unprecedented scheme, or even requiring the MTA to present for review its actual final proposal, which, to this day, remains a work in progress. That is not how the environmental review process is supposed to work, and that is not what federal law requires. Because "[j]ustice hurried on a proposal of this magnitude is justice denied," *Kootenai Tribe of Idaho v. Veneman*, 142 F. Supp. 2d 1231, 1247 (D. Idaho 2001), this Court should require FHWA to meet its legal obligations to prepare an EIS before the congestion pricing scheme goes forward.

FHWA's misguided FONSI violates NEPA's requirements. NEPA does not allow an agency to issue a FONSI and bypass an EIS when the record shows, as here, there will be significant unmitigated environmental impacts. *Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008) (EA "markedly deficient" when "the agency's FONSI is based primarily on its conclusory assertion—contradicted by evidence in the record—that the [project] will have no significant environmental impact"). FHWA inexplicably concluded that there would be "no significant impact" on New Jersey, even though its Final Environmental Assessment ("Final EA") acknowledged clear and concrete environmental impacts in New

Jersey.  Rather, FHWA's analysis of the impacts on New Jersey was cursory as compared to its analysis for New York.  It failed to analyze several potentially affected New Jersey areas and communities with environmental justice concerns, summarily labeled all identified impacts on New Jersey as "insignificant," and committed to *no* mitigation measures for New Jersey while more than $100 million was committed to mitigate similar adverse environmental impacts in New York.

FHWA's own findings make it clear that an EIS or mitigation is required.  Among other impacts in New Jersey, FHWA found that once this congestion pricing scheme is implemented, Bergen County will experience increased air pollutants through at least 2045 in *every* measured category.  This finding is compounded by FHWA's acknowledgment that several communities with environmental justice concerns in Bergen County already rank above the 95th percentile in air toxics cancer risk, among other public health indicators.  *See* ECF 7-7 at 17D-17–17D-20.  The project's uncontroverted exacerbation of these concrete public health concerns is undoubtedly a significant impact under NEPA that warrants completion of an EIS or mitigation.  Yet FHWA somehow determined the probable impacts on Bergen County and its residents (and those in other areas in New Jersey) do not require further assessment or mitigation measures.  *See* ECF 1-3 at 10.  Instead, FHWA concluded that the Bronx, but not Bergen County, was entitled to mitigation notwithstanding the Final EA's finding that traffic increases in New Jersey—which are linked to adverse air quality impacts—will be *two to four times greater* in Bergen County than in the Bronx.  *See id.*  This finding illustrates a fundamental problem with FHWA's approach to the Final EA and FONSI—its unwillingness to face facts.  Rather, FHWA's "head-in-the-sand approach" is the "antithesis of NEPA's requirement that an agency's environmental analysis candidly confront

the relevant environmental concerns." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017).

FHWA also failed to consider any alternative to the congestion pricing scheme, including those less harmful to New Jersey and the region as a whole. FHWA and the MTA had three objectives—reduce vehicles miles traveled within the CBD, reduce the number of cars entering in the CBD, and raise enough money to "generate sufficient annual net revenues" to fund "*[fifteen] billion [dollars]* for . . . the MTA [c]apital [p]rogram." ECF 7-1 at 2-5 (emphasis added); *see also* N.Y. Veh. & Traf. Law § 1704-a(1). But it was the last requirement alone—fifteen billion dollars in revenue—that rendered three alternative plans insufficient in the FHWA's eyes, even though they would have decreased congestion in the CBD. ECF 7-1 at 2-6. That, however, is no excuse for FHWA's fundamentally flawed and improperly truncated decision-making.

Moreover, in connection with this unprecedented scheme, the MTA will allocate 10% of these funds to Long Island Rail Road and 10% to Metro-North Railroad—but nothing to New Jersey's transit agencies, even though more than 400,000 New Jersey residents commute into Manhattan every day, those residents will pay millions of dollars under the congestion pricing scheme, and New Jersey will have to incur additional transit-related capital costs to accommodate increased ridership caused by the scheme. In short, FHWA has authorized a scheme intended to encourage public transit, and at the same time committed no funds to support New Jersey's transit systems. The end result is that New Jersey will bear much of the environmental, financial, and public health burden of the congestion pricing scheme, but will see few benefits and no mitigation.

At every step of the process, FHWA, acting in concert with the MTA, failed to take the required "hard look" at the environmental impacts of congestion pricing. *Am. Wild Horse*, 873 F.3d at 931. And FHWA openly expressed its willingness to bypass a full environmental review,

which would have taken more time and required significant agency resources. This was wholly improper.

NEPA also requires federal agencies to meaningfully consult with the public (including, of course, the New Jersey public) and affected stakeholders throughout the environmental review process. That did not happen. Instead, New Jersey was effectively cut out of the process. Defendants will no doubt claim that the Final EA was the result of many meetings, drafts, and comments, and that the document itself is thousands of pages long, but quantity does not make up for lack of quality. "Neither the number of meetings nor the volumes of comments are instructive . . . if the evidence suggests that the decision-making process was used to rationalize or justify decisions already made." *Kootenai Tribe*, 142 F. Supp. 2d at 1246. Here, even though the federal Environmental Protection Agency ("EPA") expressly pointed to the "insufficiency of data" in FHWA's environmental assessment "around localized and disproportionate air quality impacts in the surrounding area" in New Jersey, ECF 1-1 at 2, FHWA ignored those concerns. Instead, it only consulted New York's environmental, health, and human services departments and never even contacted their counterparts across the Hudson.

In a stunning act of agency cognitive dissonance, FHWA concluded that the additional traffic steered to New Jersey would cause increased mobile source air toxins and other pollutants in parts of New Jersey, but nonetheless issued a finding of "no significant impact." That cannot stand. FHWA's determination that the congestion pricing scheme does not require an EIS is arbitrary, capricious, unlawful, and violates NEPA for five separate and independent reasons.

*First*, FHWA failed to meaningfully consider, propose, and commit to mitigation measures to offset the increased air and noise pollution resulting from shifting traffic patterns, even though it concluded that the congestion pricing scheme will cause adverse impacts throughout New

Jersey.  In doing so, FHWA ignored its express finding that, for example, in Bergen County, there will be increases in every category of pollutant, volatile organic compounds, nitrogen oxides, carbon monoxide and carbon dioxide equivalents.  ECF 7-5 at 10-23 to 10-24.  In such circumstances, NEPA does not allow an agency to issue a FONSI when the record shows there are significant impacts on the environment.  FHWA did it anyway.  Further, although FHWA concluded that there will be an increase in daily vehicle-miles traveled in both the Bronx and Bergen County—although at a lesser level for the Bronx—it only proposed mitigation for the Bronx.  This is the epitome of arbitrary and capricious decision-making.

*Second*, FHWA avoided considering the full range of environmental impacts on New Jersey by cherry-picking which of the seven tolling scenarios to analyze, selectively relying on air quality results in parts of the state, and ignoring the EPA's expertise and its opinion that FHWA needed a more robust air quality analysis.  This undercuts FHWA's finding of no significant impact and requires an EIS to properly account for these identified impacts.

*Third*, FHWA ignored the adverse impacts on New Jersey's communities with environmental justice concerns, which have some of the highest preexisting pollution and chronic disease burdens.  The place-based mitigation measures adopted in the Final EA would only mitigate impacts in New York.  There is no indication that there will be any commitment of funds for mitigation in New Jersey.

*Fourth*, FHWA failed to afford New Jersey agencies a meaningful and early opportunity to engage in substantive meetings or dialogue regarding the potential regional impacts of congestion pricing in the CBD.  FHWA consulted *over four times* as many New York agencies than New Jersey agencies, engaged in meetings with New York agencies *more than twice as often* as they did with New Jersey agencies; and, most importantly, invited *no* state environmental

agencies from New Jersey to participate in the EA process, even though their New York counterparts were consulted throughout the entire process.

*Fifth*, FHWA failed to assess any option other than the MTA's congestion pricing scheme and a "no action" alternative and ignored a dozen other alternatives, including three that would decrease congestion in the CBD.

Further, FHWA's failure to perform a conformity analysis under the CAA for New Jersey's State Implementation Plan—although it completed one for New York—is arbitrary and capricious because parts of *both* states are within the same area designated as nonattainment of federal air quality standards.  Thus, FHWA was required to confirm that the congestion pricing scheme is consistent with and does not inhibit progress toward attainment in New Jersey, as it did with New York.

At the end of the day, NEPA does not allow an agency to issue a "finding of no significant impact" if adverse impacts remain unmitigated, but FHWA did so here, even though the undisputed record reflects express findings of significant impacts throughout New Jersey.  For these reasons, Plaintiff respectfully requests that the Court grant its Motion for Summary Judgment.

## II.        **FACTUAL BACKGROUND**

### A.        **New York's Plans for Congestion Pricing in Manhattan Previously Centered on the Environment: They Now Improperly Focus on Revenue Generation**

In 2007, then-Mayor Bloomberg announced "PlaNYC: A Greener, Greater New York," a proposal to help New York City achieve certain sustainability goals by 2030.[2]  The plan involved open space, energy improvements, improving water and air quality, addressing climate change,

---

2    Jen Chung, *Mayor Bloomberg Says Congestion Pricing and Likes It*, Gothamist (Apr. 23. 2007), https://gothamist.com/news/mayor-bloomberg-says-congestion-pricing-and-likes-it.

and, lastly, congestion pricing.  Specifically, Bloomberg's congestion pricing proposal aimed to decrease air pollution and asthma rates in the streets of Manhattan, among other goals.[3]  While lobbying for PlaNYC, Bloomberg touted the environmental benefits of congestion pricing and urged New Yorkers and the State legislature to "seize this golden opportunity to use Federal funds to reduce congestion [and] improve air quality."[4]  However, due to a lack of public support, state assembly leaders blocked the project in 2008.[5]

    In October 2017, then-Governor Cuomo brought together a mix of community representatives, government officials, and business leaders from across New York to serve on the "Fix NYC Advisory Panel," and tasked that group with developing recommendations to address congestion in Manhattan and identifying sources of revenue to fix the ailing subway system.[6]  In January 2018, this panel issued a report recommending that "the MTA must first invest in public transportation alternatives and make improvements in the subway system before implementing a zone pricing plan to reduce congestion."[7]  The report explicitly mentioned that this would require "completion of an Environmental Impact Statement (EIS)."[8]

    Fix NYC's sensible approach was subverted when, in 2019, the New York State Legislature pursued a congestion pricing program that would stand to benefit New York City at the expense of neighboring communities and states.  In April 2019, the Legislature passed the

---

[3]   *Id.*

[4]   Matthew Schuerman, *Mayor Bloomberg Outlines Case for Congestion Pricing*, WNYC (Mar. 19, 2008), https://www.wnyc.org/story/78009-mayor-bloomberg-outlines-case-for-congestion-pricing/; Sewell Chan, *U.S. Offers New York $354 Million for Congestion Pricing*, N.Y. Times (Aug. 14, 2007), https://archive.nytimes.com/cityroom.blogs.nytimes.com/2007/08/14/us-will-give-new-york-354-million-for-congestion-pricing/?searchResultPosition=1.

[5]   Nicholas Confessore, *$8 Traffic Fee for Manhattan Gets Nowhere*, New York Times (Apr. 8, 2008), https://www.nytimes.com/2008/04/08/nyregion/08congest.html.

[6]   Fix NYC Report, HNTB (Jan. 19, 2023), https://www.hntb.com/fix-nyc-report/.

[7]   *Id.* at 3 (emphasis added).

[8]   *Id.* at 5.

MTA Reform and Traffic Mobility Act (the "TMA").  The goal of the TMA is clear: to create a dedicated revenue stream that "at minimum, ensure[s] annual revenues and fees collected under such program . . . to fund fifteen billion dollars for . . . the 2020 to 2024 MTA capital program," as well as any successor programs, while reducing traffic congestion within the CBD.  N.Y. Veh. & Traf. Law § 1704-a(1).  The TMA authorized the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the MTA, to "establish and charge variable tolls and fees." *Id*.  It also directed the TBTA to establish a plan to toll vehicles entering or remaining in the CBD.  *Id*. §§ 1704-a(1), 1705.  The CBD will generally include the entirety of Manhattan south of 60th Street, with a few key exceptions, such as the FDR Drive and the West Side Highway.  ECF 7-1 at ES-2.

The TMA imposed only two requirements for the ultimate congestion pricing scheme: (1) qualifying vehicles transporting persons with disabilities and authorized emergency vehicles are exempt; and (2) passenger vehicles will be tolled no more than once a day.  N.Y. Veh. & Traf. Law §§ 1704-a(1)–(2).  The TMA also left room for the scheme to charge passenger vehicles that "remain" in the CBD, which are detected when leaving but not entering the same day.  *Id.*  The remaining contours are left up to the TBTA and its appointed Traffic Mobility Review Board ("TMRB").  Based on the TMRB's recommendations, the TBTA will set the toll price, the time period when the toll will be operative, credits to cars that access the CBD through bridges and tunnels and already pay a toll, exemptions for taxis, and pricing for buses, among other considerations.  *See e.g.*, ECF 7-1 at 2-30 to 2-34 (describing the seven different tolling scenarios).

Following the TMA's enactment, the MTA/TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") began developing proposals for the congestion pricing scheme and submitted an Expression of Interest to FHWA, seeking tolling

9

authority under the Value Pricing Pilot Program ("VPPP") to implement their congestion pricing scheme.  ECF 7-1 at 0-1.  In order to approve the scheme under the VPPP, FHWA had to perform a NEPA review.[9]  23 C.F.R. § 771.109; ECF 7-1 at 0-1.

B.        **The Origins of NEPA and FHWA-Approved Projects Requiring an EIS**

In the decades preceding NEPA's enactment, the federal government pursued extensive development projects at the expense of local communities.  Rapid highway construction, in particular, brought about devastating impacts on the environment, historic sites, and the health and well-being of vulnerable populations.  Indeed, in the late 1940s and early 1950s, New Yorkers watched in horror as the Cross Bronx Expressway bulldozed through the Bronx neighborhood of East Tremont, displacing local communities, and instigating large-scale environmental impacts that continue to affect local residents.[10]  As the federal government accelerated its efforts, a national anti-freeway movement emerged.  By the 1960s, the so-called "freeway revolts" gained widespread attention from the public and government alike.[11]

In 1970, Congress passed NEPA in response to "[t]he public's growing concern" about the environmental impact of "federally sponsored or aided construction activities such as highways." S. Rep. No. 91-296, at 8 (1969).  By its plain terms, NEPA was enacted "to promote efforts which will prevent or eliminate damage to the environment" and to "stimulate the health and welfare of man."  42 U.S.C. § 4321.  In recognition of the "profound influences of population growth, high-density urbanization," and other activity affecting the "environmental quality" of human health and welfare, NEPA requires the federal government to "use all practicable means . . . to improve

---

[9]    To date, FHWA has not approved the congestion pricing scheme pursuant to the VPPP.

[10]   *See* Grace Brennan, *Park on the Highway: Building a Cap Park as a Solution to Decades of Devastation Caused by the Construction of the Cross Bronx Expressway*, 49 Fordham Urb. L.J. 825, 832–37 (2022).

[11]   *See* Deborah N. Archer, *White Men's Roads Through Black Men's Homes: Advancing Racial Equity Through Highway Reconstruction*, 73 Vand. L. Rev. 1259, 1310–11 (2020).

and coordinate Federal plans, functions, programs, and resources" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C. § 4331.

To that end, NEPA is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). NEPA does so by: (1) requiring agencies to take a hard look at the environmental impacts of an action before making decisions; and (2) providing the public with a "role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

Under NEPA, the agency funding, authorizing, or implementing a proposed action must conduct and prepare an EA analyzing the proposed action's direct, indirect, and cumulative impacts to determine whether or not the action would "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). There are two potential outcomes of an EA. *First*, if the lead agency finds that the action will significantly affect the quality of the human environment, it must prepare an EIS. 40 C.F.R. § 1501.5(c)(1); 23 C.F.R. § 771.119(i). An EIS requires a detailed and rigorous assessment of the proposed action and imposes more stringent requirements on the public consultation process. Pursuant to FHWA regulations, an EIS must (1) provide a full and fair discussion of significant environmental impacts, (2) inform decisionmakers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment, (3) assess all reasonable alternatives that are consistent with the identified purpose and need, and (4) evaluate a no-action alternative and all reasonably available measures to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14(a), 1502.14(c). *Second*, if the lead agency finds, in the alternative, that the proposed

action will have no significant impact on the environment, it may issue a Finding of No Significant Impact, or a "FONSI." *Id.* § 1501.6.

Since January 1, 2020, at least 20 FHWA-approved projects have required an EIS.[12] Preparing an EIS takes time; on average, it takes FHWA almost four years.[13] Nevertheless, FHWA routinely prepares EISs—including, for example, four related to tolling in the last three years—and nine in 2022 alone.[14] To name a few tolling projects where EISs were required: the Chesapeake Bay Crossing Study[15] sought to decrease congestion at the Bay Bridge in Maryland; the Hood River-White Salmon Interstate Bridge Replacement Project[16] in Oregon involved changing tolling facilities to all-electronic tolling; the Lafayette Regional Xpressway[17] project in Louisiana proposed the building of a new connector and tolling alternatives were considered in the EIS; and the I-495 and I-270 Managed Lanes Study[18] in Maryland proposed replacing an existing bridge and implementing two high-occupancy toll lanes in an effort to decrease congestion. Notably, in each of these cases, FHWA determined that merely changing the tolling procedure— not instituting a whole new tolling scheme—warranted an EIS.

---

[12]   EPA, *NEPA: Environmental Impact Statement (EIS) Database*, https://cdxapps.epa.gov/cdx-enepa-II/public/action.eis/search (last visited Nov. 10, 2023). Data were filtered by Agency ("FHWA") and Federal Registration Publication Date (Jan. 1, 2020, to July 12, 2023). Repeating EISs and supplements were not included in the count, as well as any projects that consulted FHWA but did not list FHWA as the lead agency.

[13]   Fed. Highway Admin., Environmental Review Toolkit, https://www.environment.fhwa.dot.gov/nepa/timeliness_of_nepa.aspx (last visited Nov. 10, 2023).

[14]   EPA, *NEPA: Environmental Impact Statement (EIS) Database*, *supra* note 12. Data was filtered by Agency ("FHWA"), Federal Registration Publication Date (Jan. 1, 2021 to July 12, 2023). Repeating EISs and supplements were not included in the count, as well as any projects that consulted FHWA but did not list FHWA as the lead agency.

[15]   Fed. Highway Admin., Final EIS, Chesapeake Bay Crossing Study: Tier 1 NEPA (Mar. 2022), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=323312 (last visited Nov. 10, 2023).

[16]   Fed. Highway Admin., Suppl. Draft EIS, Hood River – White Salmon Interstate Bridge Replacement Project (Nov. 2020), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=314171 (last visited Nov. 10, 2023).

[17]   Fed. Highway Admin., Final EIS, Lafayette Regional Xpressway: Combined Tier 1 FEIS/ROD (Dec. 2022), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=397583 (last visited Nov. 10, 2023).

[18]   Fed. Highway Admin., Final EIS, I-495 & I-270 Managed Lanes Study (June 2022) at ES-7 to ES-8, available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=368681 (last visited Nov. 10, 2023).

FHWA has also determined a full EIS was required for at least eight projects in New York over the past ten years.[19]  For example, in 2014, FHWA required an EIS to assess a project that would modify the I-87 Exit 4 area in the Town of Colonie by constructing new exit ramps, an intersection, and widening pavement.[20]  It also required EISs for a proposal to re-route I-81 to connect with I-481 and for a proposal to construct two new ramps and replace a bridge near Buffalo.[21]  In 2019, FHWA required an EIS for a far less significant proposal than the one at issue here—the addition of a 4.3-mile vehicular travel lane near JFK Airport.[22]

### C.   MTA's Federal Funding and FHWA's Agreement to "Fast Track" its Approval of Congestion Pricing

As the COVID-19 pandemic hit New York in early 2020, ridership on the New York City subway and buses plummeted and the MTA lost billions of dollars in revenue.  The federal government stepped in with a lifeline: in May 2020, the MTA received $500 million in transit funding under the Coronavirus Aid, Relief, and Economic Security Act.[23]  Then, between May 2020 and March 2022, the MTA received over $15 billion in pandemic relief funding.[24]  Despite

---

[19] EPA, *NEPA: Environmental Impact Statement (EIS) Database*, *supra* note 12.  Data were filtered by Agency ("FHWA"), Federal Registration Publication Date (Jan. 1, 2013 to July 12, 2023), and State or Territory ("New York").  Repeating EISs and supplements were not included in the count, as well as any projects that consulted FHWA but did not list FHWA as the lead agency.

[20] Fed. Highway Admin., Final EIS, Interstate 87 (I-87) Exit 4 Access Improvements (Aug. 2014), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=88433 (last visited Nov. 10, 2023).

[21] Fed. Highway Admin., Final EIS, Interstate 81 Viaduct Project (Apr. 2022), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=362431 (last visited Nov. 10, 2023); Fed. Highway Admin., Final EIS, NYS Route 198 (Scajaquada Expressway) Corridor Project (Nov. 2017), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=241793 (last visited Nov. 10, 2023).

[22] Fed. Highway Admin., Final Environmental Impact Statement, Van Wyck Expressway Capacity and Access Improvements to JFK Airport Project (Aug. 2019), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=279281 (last visited Nov. 10, 2023).

[23] Stephanie Pagones, *MTA to Get $3.9B in Coronavirus Aid, Cuomo Says Trump 'cut red tape' to Send NY Expedited Funding*, Fox Business (May 14, 2020, 2:58 PM EDT), https://www.foxbusiness.com/lifestyle/trump-cuomo-new-york-city-subway-funding.

[24] N.Y. State, Statement from Governor Kathy Hochul on the MTA Receiving 769 Million in Additional COVID Relief Funding from the Federal Transit Administration (Mar. 7, 2022), https://www.governor.ny.gov/news/statement-governor-kathy-hochul-mta-receiving-769-million-additional-covid-relief-funding.

these influxes of federal funds, the MTA required more money.  This time, the MTA determined it could receive another $15 billion from the congestion pricing scheme.  However, that money was delayed when FHWA failed to act on its VPPP application for two years.

Finally, in February 2021, then-chief development officer (now Chair and CEO), Janno Lieber, stated, "[i]n recent weeks," the MTA "heard from [FHWA] that they are going to fast-track our environmental process."[25]  The next month, Lieber confirmed that "good news," "which will certainly get the MTA moving forward towards being able to realize this source of funds and instituting [congestion pricing]."[26]  A few days later, FHWA authorized the Project Sponsors to proceed with a NEPA Class III EA action under 23 C.F.R. § 771.  ECF 7-1 at 0-1.  In its letter, FHWA emphasized that it would "*expedite* its efforts wherever possible."  ECF 1-5 at 2 (emphasis added).

### D.    The Project Sponsors Completed the Draft EA but Did Not Address Environmental Impacts on New Jersey and Proposed No Mitigation

Once FHWA authorized the Project Sponsors to proceed, they began drafting the EA. During this process, FHWA and the Project Sponsors never invited New Jersey's environmental and health agencies to participate, and New Jersey's transportation agencies were only invited to three virtual briefings before the Draft EA's publication.  *See infra* IV.D.  And although the Project Sponsors convened an Environmental Justice Technical Advisory Group, only *one* organization (out of 16) represented the interests of any New Jersey communities with environmental justice concerns.  ECF 7-6 at 17-84.  There was *no* meaningful engagement with localized groups in

---

[25]  Eric Bascome, *NYC Congestion Pricing May Be Pushed Forward Under Biden*, silive.com (Feb. 26, 2021, 1:09 PM EST), https://www.silive.com/news/2021/02/nyc-congestion-pricing-may-be-pushed-forward-under-biden.html.; Alissa Walker, *Secretary Pete Is Already Coming Through for New York City on Congestion Pricing*, Curbed (Feb. 23, 2021), https://www.curbed.com/2021/02/congestion-pricing-nyc-approval-pete-buttigieg.html.

[26]  MTA Board Meeting on March 17, 2021 Minutes, in MTA Board Action Items, at 15 (Mar. 17, 2021), https://new.mta.info/document/33901.

Orange, East Orange, Newark, Fort Lee and/or Bergen and Essex Counties—all of which contain minority and low-income communities and are burdened by pre-existent pollutants and chronic diseases.  To no one's surprise, then, the Draft EA did not adequately account for New Jerseyans.

On August 10, 2022, the Project Sponsors published the completed Draft EA.  The Draft EA made clear that the Project Sponsors' primary goal was to generate $15 billion for the MTA. As set forth in the Draft EA, the MTA's congestion pricing scheme was intended to: (1) reduce daily vehicle miles traveled ("VMT") in the CBD; (2) reduce the number of vehicles entering the CBD; (3) create a funding source capable of raising $15 billion for the MTA Capital Project; and (4) establish a tolling program consistent with the TMA.  ECF 7-1 at 1-18; ECF 1-6 at ES-6.[27]

The Draft EA reflected FHWA's determination that an EIS was not required for the congestion pricing scheme—in other words, that if there were any significant environmental impacts caused by congestion pricing, they could be effectively mitigated.  The publication of the Draft EA initiated a 30-day formal comment period, which was subsequently extended by only 14 days despite requests for substantially longer extensions.  During those 44 days, FHWA and the Project Sponsors received more than 14,000 individual submissions and 55,000 form letters.  ECF 7-1 at 0-2.  In total, over 22,000 individual comments were submitted.  *Id.*

New Jersey Governor Murphy and several New Jersey agencies were among those who submitted comments and outlined the Draft EA's failure to adequately identify, address, and mitigate the scheme's impacts on New Jersey and its residents.  ECF 1-7.  On September 23, 2022, Governor Murphy sent a letter to FHWA, urging the agency to complete an EIS under NEPA.  The letter incorporated comments from the New Jersey Department of Transportation ("NJDOT"), New Jersey Transit Corporation ("NJTRANSIT"), and New Jersey Turnpike Authority ("NJTA").

---

[27] Although the Draft EA and Final EA reflect four project objectives, only the first three were used to assess and eliminate potential alternatives.  *See infra* IV.E.

Governor Murphy made clear that New Jersey opposed the proposed congestion pricing scheme because "the Program [] has revenue production as a primary goal" and therefore left open "a high degree of uncertainty and potential for significant impact associated with the [congestion pricing scheme] as outlined." *Id.* at 1.

As Governor Murphy explained, the Draft EA shortchanged New Jersey.  First, FHWA provided inadequate time for public review and comment.  *Id.*  Second, FHWA did not provide public hearings *during* the Draft EA's development, instead holding them *after*, in direct contradiction of NEPA's purpose.  *Id.*  Third, and as a direct result of FHWA's skirting of NEPA's requirements, few New Jersey residents had the opportunity to comment on the Draft EA, despite congestion pricing's *direct impacts* on them.  *Id.*  Fourth, New Jersey had no representation on the entities that *did* play a leading role in the process.  *Id.*  Overall, Governor Murphy explained that the scheme will impact New Jersey highways, expose vulnerable communities to more congestion and air quality issues, pass costs onto New Jersey commuters and, may actually *disincentivize* transit use and *increase* vehicles in New Jersey.  *Id.* at 2–7.  In other words, the putative benefits are reserved for New Yorkers, while the very real disadvantages are borne by New Jerseyans.

E.     **FHWA Issued the Final EA and FONSI Without Requiring the Project Sponsors to Prepare an EIS**

In early May 2023, FHWA published its Final EA.  Despite New Jersey's concerns, the Final EA remained largely unchanged from the Draft EA.  Adding insult to injury, although it added several mitigation measures for New York, it committed to *no* mitigation for New Jersey. *See infra* IV.A.2.  In conjunction with the Final EA, FHWA published a Draft FONSI which stated that it had "independently evaluated [the Final EA] and determined [it] to adequately and accurately discuss the purpose and need, environmental issues, and impact of the Proposed Action

and appropriate mitigation measures." ECF 1-8. FHWA concluded that the Final EA "provide[d] sufficient evidence and analysis" to determine that an EIS was "not required." *Id*.

The Draft FONSI summarized the potential effects of congestion pricing and mitigation to prevent any significant impacts. *Id*. at 3–15. However, it wholly failed to commit mitigation measures to ameliorate identified New Jersey impacts. Notably, even though FHWA recognized that congestion pricing could increase traffic diversions, and thus emissions, in Bergen County under all seven tolling scenarios, it determined there was "no mitigation needed" and "no adverse effects." *Id.* at 10. Although FHWA recommended that the Project Sponsors work with the NYC Department of Health and Mental Hygiene and the NY State Department of Environmental Conservation ("NYSDEC") to determine whether changes in air pollution would result from traffic pattern changes in New York, it failed to propose *any* corresponding monitoring for New Jersey. *Id*.

Similarly, while the Draft FONSI recognized that "certain environmental justice communities [] already over-burdened by pre-existing air pollution and chronic disease could see an adverse effect as a result of increased traffic," and listed Orange, East Orange, Newark, and Fort Lee as potentially impacted communities, FHWA's mitigation measures omitted any reference to New Jersey or cooperation with its agencies. *Id.* at 14. Instead, the Project Sponsors— all New York entities—would install or upgrade air filtration units in New York schools and work with New York agencies. *Id*.

The Draft FONSI was made available for public review for 30 days. New Jersey's transportation agencies were invited to just one meeting after the publication of the Final EA and Draft FONSI—a virtual briefing with no opportunity for meaningful engagement. *See infra* IV.D.

Neither the New Jersey Department of Environmental Protection ("NJDEP") nor the New Jersey Department of Health ("NJDOH") was contacted.

On June 12, 2023, Governor Murphy, NJDOT, NJDEP, NJDOH, NJTRANSIT and NJTA, sent a letter to FHWA opposing the adoption of the Final EA and the Draft FONSI.  New Jersey wrote: (i) the Final EA was the result of a failed process without adequate outreach to New Jersey agencies; (ii) the purpose and needs were too narrowly defined as a result of inadequate public outreach; and (iii) FHWA failed to consider alternative tolling schemes.  ECF 1-4 at 2–15.  As a result, the Final EA failed to account for: (i) potential revenue impacts to New Jersey's transit authority; (ii) potential fare impacts on New Jersey's economically distressed communities; (iii) shifts in traffic patterns; (iv) effects on New Jersey's communities with environmental justice concerns; (v) disparate environmental and public health impacts; and (vii) air quality impacts.  *Id.* New Jersey requested that FHWA rescind the Draft FONSI, require an EIS based on the MTA's preferred tolling scenario—instead of approving seven or more proposed schemes—and ensure that any EIS considers the harms to New Jersey.

However, just a few weeks later, without directly responding to New Jersey's letter, FHWA published its Final FONSI without notable changes.  The Final EA and FONSI reflected a fatally flawed assessment of the seven or more potential tolling scenarios and their possible effects on New Jersey, failed to require necessary mitigation measures, and failed to consider alternatives—all culminating in an unjustified finding of no significant impact.

## III.   **LEGAL STANDARD**

Courts must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Here, Plaintiff's claims are governed by the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), which allows courts to "hold unlawful and set aside" an agency decision if it

is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or undertaken "without observance of procedure required by law." *Id.* at § 706(2)(A) & (D).

"An agency's decision not to prepare an EIS must be set aside" if it falls into either of these two categories. *N.Y. v. Nuclear Regul. Comm'n*, 681 F.3d 471, 477 (D.C. Cir. 2012); *see also Blanton v. Off. of the Comptroller of the Currency*, 909 F.3d 1162, 1170 (D.C. Cir. 2018). "Normally, an agency [decision] would be arbitrary and capricious if the agency failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To make this finding, courts must review the administrative record and decide whether the agency, "examin[ed] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 185 (D.D.C. 2014) (citing *State Farm*, 463 U.S. at 43).

In particular, a FONSI may be issued only when an action would "not have significant effects" on the human environment. 40 C.F.R. § 1501.6(a) (2022). In determining "significance," an agency must consider the severity of a proposed action's impacts on the affected locale, region, and societal interests. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *see also* 40 C.F.R. § 1501.3(b)(2) (2022). Among many factors, an agency evaluates: (i) to what extent the proposed action affects public health; (ii) what the short-term and long-term effect may be; and (iii) whether the proposed action would violate any laws protecting the environment. 40 C.F.R. § 1501.3(b)(2) (2022). Courts are "require[d]" to "determine whether

the agency . . . provided a convincing statement of reasons to explain why a project's impacts are insignificant" and review "the agency's determination in light of the degree of uncertainty manifested, and the degree of controversy generated" regarding the "effects on the quality of the environment." *Babbit*, 241 F.3d at 731.  As such, depending on context, any *potential* impact, large or small, may be significant within NEPA's meaning. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 870 (9th Cir. 2020) (EIS required when substantial questions are raised as to whether a proposed project "may cause" an adverse environmental impact); *Ctr. for Bio. Diversity*, 538 F.3d at 1219 (same).

Although courts are deferential to an agency's decision whether to prepare an EIS or issue a FONSI, courts "routinely vacate agency action taken in violation of NEPA." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (citing cases).  The reviewing court's "task" "is to ensure that the [agency], in finding no significant impact, (1) accurately identified the relevant environmental concern; (2) took a hard look at the problem in making its decision; (3) has made a convincing case for its finding of no significant impact; and (4) has shown that even if there is an impact of true significance, an [EIS] is unnecessary because changes and safeguards in the project sufficiently reduce the impact to a minimum." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 930 (D.C. Cir. 2017) (cleaned up).  If the agency does "not examine the environmental effects" of the proposed action or its FONSI is "not supported by substantial evidence on the record," the FONSI must be vacated and an EIS required. *N.Y.*, 681 F.3d at 478–79.

NEPA requires agencies to take a "'hard look' at the environmental consequences that may flow from a particular action." *Colo. Env't Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1250 (D. Colo. 2012).  "The purpose of the 'hard look' requirement is to ensure that the 'agency has adequately

considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary or capricious.'" *Id.* at 1250 (quoting *Baltimore Gas*, 462 U.S. at 97). Indeed, "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).

## IV.   **ARGUMENT**

### A.   **FHWA's Issuance of a FONSI Was Unlawful Because It Failed to Take a Hard Look at the Environmental Impacts on New Jersey**

The Final EA repeatedly acknowledges that congestion pricing will cause increased air pollution in New Jersey. This public health finding—especially within the context of New Jersey's communities already overburdened by air pollution—is proof positive that the impacts are significant. *Babbitt*, 241 F.3d at 731. Yet rather than call these impacts what they are—significant—FHWA "shunted aside" "significant questions" about those impacts "with mere conclusory statements," erroneously determined that all adverse impacts to New Jersey will be insignificant, and, having defined them out of the statutory calculus, proposed no mitigation measures to offset them even though its own findings support the significance of these impacts. *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982). Because FHWA's FONSI is "based primarily on its conclusory assertion—contradicted by evidence in the record—that [congestion pricing] will have no significant environmental impact," the Court must grant summary judgment to the State and vacate the Final EA and FONSI. *Ctr. for Bio. Diversity*, 538 F.3d at 1220.

1.      **The Final EA Acknowledged that Congestion Pricing Will Cause Significant Increased Air Pollution in New Jersey, and Did Not Explain Why Those Impacts Should Be Deemed Insignificant**

Although the Final EA identifies several significant adverse impacts on air quality in New Jersey, it summarily labeled these impacts "insignificant." But FHWA had no basis for that "bare conclusion." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 108 (D.D.C. 2006). As an initial matter, FHWA's finding cannot stand because it did not provide a "convincing statement of reasons to explain *why* [these] impacts are insignificant," which is "crucial to determining whether the [FHWA] took a 'hard look' at the potential environmental impact of a project." *Ctr. for Bio. Diversity*, 538 F.3d at 1220 (cleaned up); *see also Lower Alloways Creek Twp. v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732, 741–42 (3d Cir. 1982) (agency must "'suppl[y] convincing reasons why potential impacts are truly insignificant,' if such is the agency's recommendation." (citation omitted)).

The Final EA explicitly states that "increases in *all pollutants*" will occur in Bergen County in 2023 and 2045 due to shifts in truck traffic. ECF 7-5 at 10-21 (emphasis added).[28] Specifically, National Ambient Air Quality Standards ("NAAQS") criteria pollutants—such as carbon monoxide; nitrogen oxides; ozone; particulate matter ("PM"); sulfur dioxide; and lead and mobile source air toxins, as well as carcinogens like formaldehyde—will rise in Bergen County. *Id*. at 10-21, 10-23, 10-24, 10-37, 10-38; *see* Exs. 1–2. While Bergen County serves as a useful illustration of the congestion pricing scheme's impacts on air quality, it is by no means the only area in New Jersey that will necessarily experience impacts. Rather, because FHWA's air quality analysis evaluated only two New Jersey counties (Bergen and Hudson), it is simply impossible to

---

[28]   The Final EA included a regional air quality assessment only under Tolling Scenario A because that scenario was "predicted" to result in the "smallest change in VMT." ECF 7-5 at 10-21. However, virtually every other tolling scenario will cause greater changes in VMT across New Jersey in the short- and long-term. *See* Ex. 2.

rule out whether other New Jersey counties will experience similar or worse adverse impacts than Bergen County.  *See infra* IV.B.

These identified significant harms to Bergen County's air quality will seriously impact human health by increasing the likelihood of premature mortality, increased hospital admissions for heart or lung causes, acute and chronic bronchitis, asthma attacks, emergency room visits, respiratory problems.  ECF 1-4 at 13 n.46.  That is all the more likely because Bergen County *already* experiences poor air quality and resulting health impacts.  Indeed, as FHWA itself acknowledged, individuals in southeast Bergen are already exposed to "air toxics cancer risk worse than 94 percent of the nation."  ECF 7-7 at 17D-18; *see also id.* at 17D-19.  And diesel particulate matter levels in "large portions" of Bergen County are "at or above the 95th percentile" of all U.S. communities.  *Id.*

Despite this, the Final FONSI never explains why air quality impacts in Bergen County will be insignificant.  The only statement about these impacts' significance in the Final FONSI is one-word: "No."[29]

| LOCATION | DATA SHOWN IN TABLE | TOLLING SCENARIO | | | | | | | POTENTIAL ADVERSE EFFECT |
|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G | |
| I-95, Bergen County, NJ | Increase or decrease in AADT | 9,843 | 11,459 | 7,980 | 5,003 | 7,078 | 5,842 | 12,506 | No |
| | Increase or decrease in daily number of trucks | 801 | 955 | 729 | 631 | 696 | 637 | -236 | |
| | Potential adverse air quality effects from truck diversions | No | No | No | No | No | No | No | |

The Final EA fares no better.  Nowhere does it provide any reasons—let alone a "convincing statement"—for FHWA's determination that air quality impacts in Bergen County will be insignificant.  *350 Montana v. Haaland*, 50 F.4th 1254, 1269 (9th Cir. 2022); *see also Ctr.*

---

[29] "AADT" stands for "Annual Average Daily Traffic," which is a measurement for vehicle traffic.  *See* Ex. A (Glossary of Terms).

*for Bio. Diversity*, 538 F.3d at 1224 (EA inadequate where "NHTSA has not explained *why* its rule will not have a significant effect"). An agency cannot "avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect upon the environment." *Lower Alloways*, 687 F.2d at 741. Yet that is precisely what FHWA did here: it identified severe air quality impacts in Bergen County, but labeled them insignificant, without explaining how it reached that conclusion. That does not satisfy FHWA's statutorily mandated obligation to take a "hard look" at the environmental impacts in New Jersey.

2.    **The Final EA Proposed No Mitigation of Unavoidable and Adverse Impacts of Air Pollution in New Jersey**

As explained above, while the Final EA acknowledges that the scheme will cause increased air pollution in New Jersey, FHWA refused to provide for and commit to any mitigation of those impacts despite the well-established rule that where a project will result in "impact[s] of true significance, preparation of an EIS can be avoided *only* if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum." *Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003). FHWA cannot deny the significance of the impacts in New Jersey or the fact that they merit mitigation because it *did* commit to mitigation of similar impacts in New York.

Under every tolling scenario, Bergen County will experience an increase in Annual Average Daily Traffic ("AADT") roughly ***two to four times greater*** than the corresponding increase in the Bronx:

| LOCATION | DATA SHOWN IN TABLE | TOLLING SCENARIO | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G |
| Cross Bronx Expressway at Macombs Road, Bronx, NY | Increase or decrease in Annual Average Daily Traffic (AADT) | 3,901 | 3,996 | 2,056 | 1,766 | 3,757 | 2,188 | 3,255 |
| | Increase or decrease in daily number of trucks | 509 | 704 | 170 | 510 | 378 | 536 | 50 |
| | Potential adverse air quality effects from truck diversions | No | No | No | No | No | No | No |
| I-95, Bergen County, NJ | Increase or decrease in AADT | 9,843 | 11,459 | 7,980 | 5,003 | 7,078 | 5,842 | 12,506 |
| | Increase or decrease in daily number of trucks | 801 | 955 | 729 | 631 | 696 | 637 | -236 |
| | Potential adverse air quality effects from truck diversions | No | No | No | No | No | No | No |

ECF 1-3 at 10 (alterations added); Ex. 1.  As set forth in the above chart, while the increase in

AADT ranges from 1,766 to 3,996 vehicles per day in the Bronx under every tolling scenario, it

ranges *from 5,003 to 12,506* vehicles per day in Bergen County.  *Id.*  The numbers speak for

themselves—AADT in Bergen County may be as much as *four times greater* than the Bronx but

no mitigation was committed to Bergen County.  Instead, FHWA identifies and commits to 10

mitigation measures expressly limited to New York.  They include: (1) expanding the *NYC* Clean

Trucks Program; (2) expanding the *NYCDOT* off-hours delivery program; (3) tolling certain

vehicles on the *FDR Drive*; (4) replacing transport refrigeration units in the *Bronx*; and (5)

establishing an asthma center in the *Bronx*.  ECF 7-6 at 17-65, ECF 1-3 at 14.[30]  None applies to

New Jersey.  FHWA's decision to mitigate air quality impacts in New York but not Bergen County

and the FONSI's failure to provide *any explanation* for why communities in the Bronx deserve

---

[30]  The remaining five mitigation measures are functionally limited to New York because they are funded by New York entities and/or will be implemented only by New York agencies and entities.  ECF 7-6 at 17-65–17-67.  For instance, the implementation of electric truck charging infrastructure "will be implemented . . . using funds received by NYSDOT and will therefore be limited to locations in New York."  *Id*. at 17-66.  Similarly, the TBTA—a purely New York entity—is charged with leading the installation of air filtration units in schools near highways.  *Id*. at 17-65.

mitigation, but those in Bergen County do not demonstrate why the FONSI is arbitrary and capricious.

While "proposed mitigation measures need not be laid out to the finest detail," *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 231 (5th Cir. 2007), an agency may only avoid an EIS if mitigation measures compensate for otherwise significant environmental impacts. *Babbitt*, 241 F.3d at 733–35; *Am. Canoe Ass'n v. White*, 277 F. Supp. 2d 1244, 1262 (N.D. Ala. 2003). Here, they do not. Despite identifying significant impacts on air quality in New Jersey, FHWA did not propose or commit to a single mitigation measure in New Jersey. *Contra* 40 C.F.R. § 1501.6 (requiring federal agency to conduct an EIS when significant impacts are identified but not mitigated). Because FHWA failed to fulfill this obligation under NEPA, the Court should vacate the Final EA and FONSI.

B.   **FHWA's Final EA and FONSI Were Arbitrary and Capricious Because They Selectively Relied on Inadequate Data and Analysis and Failed to Take a Hard Look at the Impacts on New Jersey**

Agency actions are arbitrary and subject to reversal if, as here, they "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. In determining the geographic scope of its environmental impact analysis, an agency's choice "must represent a reasoned decision and cannot be arbitrary." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) (agency violated NEPA by arbitrarily limiting analysis to a small geographical range); *see also Habitat Educ. Ctr., Inc. v. Bosworth*, 381 F. Supp. 2d 842, 849 (E.D. Wis. 2005). An agency's failure to analyze "the entire [] system" and whether a project will increase traffic "throughout the system to greater or lesser degrees" violates NEPA. *N. Cascades Cons. Council v. U.S. Forest Serv.*, 98 F. Supp. 2d 1193, 1198 (W.D. Wash. 1999).

That is what happened here. The geographic scope of the Final EA and FONSI was unduly narrow—after all, traffic and pollution do not stop at artificial geographic lines. As a result,

FHWA failed to consider the full range of environmental impacts on New Jersey by: (1) cherry-picking which tolling scenarios to analyze; (2) selectively relying on air quality results in only particular portions of the state; and (3) ignoring the EPA's expertise in assessing the need for a more robust air quality analysis.

*First*, because the Final EA only analyzed Tolling Scenario A when conducting a regional analysis of air quality changes, it ignored the adverse environmental effects on New Jersey. Unsurprisingly, the tolling scenarios vary greatly based on, for example, the amount, the times tolls would be imposed, exemptions, crossing credits, truck tolls, and discounts applied to different types of vehicles. ECF 7-1 at 2-30. Nevertheless, the Final EA only analyzed Tolling Scenario A for the mesoscale, Mobile Source Air Toxics ("MSAT"), and greenhouse gas ("GHG") analyses because it purportedly "would result in the smallest reduction of VMT compared to the No Action Alternative" and thus "would have the lowest beneficial effect on regional air quality because changes in regional air quality emissions burden are directly related to changes in VMT." ECF 7-5 at 10-11. However, the Final EA shows that Tolling Scenario A will *not* result in the smallest reduction of VMT (or, in some instances, *any* reduction in VMT) on a regional, State-wide, or local scale in New Jersey. ECF 7-2 at 4A-14, 4A-20. In fact, the other six tolling scenarios all show significantly greater **increases** in VMT throughout New Jersey. *See* Ex. 3. For example, by 2023, Tolling Scenarios C through G would cause VMT to increase by 1012%, 920%, 517%, 1130% and 381%, respectively, compared to Tolling Scenario A. Those effects will generally worsen over time. By 2045, Tolling Scenarios B through F would cause VMT to increase by 600%, 1940%, 922%, 617%, and 1700%, respectively, compared to Tolling Scenario A: [31]

---

[31]   This chart collects data from Table 4A-6 and 4A-13 of the Final EA. The Final EA provides no data or explanation as to why Scenario G potentially has a beneficial impact on VMT in New Jersey counties.

| VMT - LOCATIONS, YEARS AND DIFFERENCES | NO ACTION | SCENARIO A | SCENARIO B | SCENARIO C | SCENARIO D | SCENARIO E | SCENARIO F | SCENARIO G |
|---|---|---|---|---|---|---|---|---|
| 14 NEW JERSEY COUNTIES (2023) | 97,578,100 | 97,594,939 | 97,590,826 | 97,748,567 | 97,733,034 | 97,665,181 | 97,768,338 | 97,642,310 |
| VMT INCREASES FROM NO ACTION (2023) | | 16,839 | 12,726 | 170,467 | 154,934 | 87,081 | 190,238 | 64,210 |
| PERCENT VMT DIFFERENCES RELATIVE TO SCENARIO A | | 0% | 76% | 1012% | 920% | 517% | 1130% | 381% |
| 14 NEW JERSEY COUNTIES (2045) | 107,907,842 | 107,914,688 | 107,948,940 | 108,040,676 | 107,970,946 | 107,950,075 | 108,024,196 | 107,882,082 |
| VMT INCREASES FROM NO ACTION (2045) | | 6,846 | 41,098 | 132,834 | 63,104 | 42,233 | 116,354 | -25,760 |
| PERCENT VMT DIFFERENCES RELATIVE TO SCENARIO A | | 0% | 600% | 1940% | 922% | 617% | 1700% | -376% |

Despite these staggering increases in VMT (and corresponding air emissions), the Final EA only looked at Tolling Scenario A in finding that the congestion pricing scheme would benefit regional air quality.  *Id.* at 4A-24; ECF 7-5 at 10-21.  Worse yet, although New Jersey's VMT will increase under *every* tolling scenario by 2023, FHWA's "Conclusion" on VMT does not even refer to New Jersey; instead, it focuses solely on the impacts in the CBD.  ECF 7-2 at 4A-49 (presenting VMT study results and stating that "each tolling scenario would result in reductions in VMT in the Manhattan CBD, as well as across the region.").

As a result, the Final EA ignores the fact that New Jersey will experience traffic increases (and attendant negative air quality) *up to twenty times worse* if the MTA picks one of the other six scenarios, or an unknown eighth scenario not analyzed in the Final EA.[32]  That is the exact opposite

---

[32]  The Final EA even contemplated that TBTA could "adopt[] a toll schedule structure that has substantially different attributes from those examined in this EA" and, if that happens, "the Project Sponsors would review those changes with FHWA" to "identify a course of action to assess and document the changes in accordance with NEPA prior to implementation of the Project."  ECF 7-1 at 2-29 (emphasis added).  That FHWA left open the possibility that there could be a congestion pricing scheme that is "substantially different" than the ones proposed in the Final EA underscores that it did not take a hard look at the environmental impacts of the proposed project.  *See, e.g., Protect Key West, Inc. v. Cheney*, 795 F.Supp.1552, 1569-60 (S.D. Fla. 1992) (enjoining defendant from beginning construction of military housing at proposed site because the agency "barely took any look at the environmental consequences of the project in the EA").

of a hard look and clearly arbitrary and capricious. *N.Y.*, 681 F.3d at 481 (agency violates NEPA by "brush[ing] away" adverse environmental impacts identified by its own analysis); *Nat'l Audubon Society v. Dep't of Navy*, 422 F.3d 174, 194 (4th Cir. 2005) ("An agency's hard look should include neither researching in a cursory manner nor sweeping negative evidence under the rug."); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013) (ordering agency to revise EA where it failed to consider meaningfully different options for regulating livestock grazing near the project area).

*Second*, the Final EA excluded 12 New Jersey counties from its regional air quality analysis for no good reason. The Project Sponsors established a 28-county "Regional Study Area." ECF 7-2 at 3-3. Of the 28 counties, 12 were in New York, 14 in New Jersey, and 2 in Connecticut. *Id*. However, in analyzing the congestion pricing scheme's air quality impacts, the Final EA evaluated only 12 counties from those 28 counties in the Regional Study Area, and only *two* in New Jersey— despite the fact that New Jersey had represented *half* of the 28-county Regional Study Area. ECF 7-5 at 10-10 to 10-11.[33] This allowed FHWA and the Project Sponsors to ignore the congestion pricing scheme's effects in 12 New Jersey counties, in favor of New York. *See e.g.*, *Comm. to Stop Rte. 7 v. Volpe*, 346 F. Supp. 731, 739–41 (D. Conn. 1972) ("Consideration of the environmental impact of [only] a small segment of a proposed route makes impossible adequate consideration"), *order vacated on other grounds*, 515 F. Supp. 151 (D. Conn. 1980). Since FHWA and the Project Sponsors only evaluated air quality impacts in Hudson and Bergen Counties, they did not assess impacts in other counties, like Union and Essex Counties, that contain numerous communities with environmental justice concerns and will experience increases in vehicular traffic due to the congestion pricing scheme. ECF 7-6 at 17-12, 17-33 to 17-35. This willfully limited

---

[33]    The remaining 10 counties are in New York.

analysis—despite data showing adverse impacts on a greater geographic scale—is exactly what NEPA is meant to prevent. *Idaho Sporting*, 305 F.3d at 973 (finding "choice of analysis scale must represent a reasoned decision and cannot be arbitrary," and holding the agency "ignored the detailed and well–supported conclusions of its own scientists").

The following map shows that if FHWA and the Project Sponsors had included those 12 New Jersey counties, they would have had to grapple with the fact that the congestion pricing scheme is likely to cause an increase in VMT of 500 miles or greater in portions of at least 6 additional New Jersey counties:



*See* Ex. 5.  Further, this map reveals that at least 74 New Jersey census tracts—spanning six counties excluded from the Final EA's regional air quality analysis—will see an adverse impact in VMT (and attendant air pollution):

| New Jersey Counties Not Analyzed in the Final EA | Estimated Number of Census Tracts with a VMT Increase over 500 |
|---|---|
| Essex | 19 |
| Middlesex | 24 |
| Monmouth | 1 |
| Morris | 11 |
| Passaic | 10 |
| Union | 9 |

Despite this, the Final EA focused its air quality analysis mostly—and its mitigation measures only—on New York.

Likewise, in its microscale "hot spot" analysis of air quality, the Final EA arbitrarily analyzed only *four* intersections in New Jersey (out of 102) to evaluate potential carbon monoxide and particulate matter.  ECF 7-5 at 10-11, 10-42; ECF 7-3 at 4B83 (Figure 4B-13).  The Final EA chose the 102 intersections because "they are the locations expected to demonstrate the largest changes in traffic due to the Project."  ECF 7-5 at 10-42 to 10-43.  But instead of picking locations with the "largest changes"—both increases *and* decreases—the Final EA only picked four intersections in New Jersey where traffic is expected to *decrease* and air quality to *improve* if the congestion pricing scheme is implemented.[34]  ECF 7-5 at 10-44; Ex. 6.  Notably, the Final EA did not analyze any intersections in Bergen County—the New Jersey county that will see the biggest increase in VMT as a result of the scheme—which would not have yielded a favorable outcome.  ECF 7-5 at 10-11.  NEPA's "hard look" requirement cannot be satisfied when an agency "attempt[ed] to curtail the potential environmental impacts" of a project by failing to consider relevant facts.  *Citizens for Clean Energy v. U.S. Dep't of Interior*, 621 F.Supp.3d 1165, 1173–74

---

[34]  FHWA's "hot-spot" analysis also appears to have violated New York law.  DOT_0039947 (indicating that the EPA provided notice that the "hot spot" screening analysis did not comply with Codes, Rules and Regulations of the State of New York (N.Y. COMP. CODES R. & REGS. tit. 6 § 240-2.8(e)), which requires interagency consultation prior to the implementation of a hot-spot analysis).

(D. Mont. 2022); *Volpe*, 346 F. Supp. at 739–41 ("[c]onsideration of the environmental impact of a small segment of a proposed route" does not fulfill NEPA's "hard look" requirement). There is no good reason (or really any reason at all) for excluding the portions of New Jersey most likely to be adversely impacted by the congestion pricing scheme.[35]

*Third*, FHWA ignored the EPA's recommendation that a more robust air quality analysis be undertaken before issuing the Final EA and FONSI. Specifically, the EPA recommended that FHWA expand its microscale screening analysis to include intersections with an *increase* in traffic (not just a decrease) and to encompass intersections in Bergen County, where VMT is expected to do just that. ECF 1-1 at 2, 6. The EPA explicitly explained to FHWA that "benefits in some areas do not mean that disproportionate adverse impacts do not occur elsewhere. *All* potential adverse impacts should be identified, explained, and analyzed, irrespective of benefits to other areas." *Id.* at 6 (emphasis added).[36] Yet FHWA ignored the EPA's expert advice, turned a blind eye to increases in VMT and attendant air pollution in New Jersey, and issued its FONSI without addressing the EPA's concerns. This renders FHWA's air quality analysis and FONSI arbitrary and capricious and warrants vacatur. *Cal. v. U.S. Dept of Transp.*, 260 F. Supp. 2d 969, 972–74 (N.D. Cal. 2003) (EIS required where agency "ignored or did not adequately treat the[] concerns" of other agencies with expertise on the environmental impact of project); *see also Food & Water Watch v. Fed. Energy Reg. Comm'n*, 28 F.4th 277, 289 (D.C. Cir. 2022) ("[T]he mere possibility that a project's overall emissions calculation will be favorable because of an 'offset ... elsewhere'

---

[35] FHWA applied the same 102-intersection selection to evaluate noise pollution impacts—even though FHWA acknowledged that "potential increases in noise levels are partly tied to instances where there would be increases in vehicular traffic" and thus "the largest potential noise exposure across the tolling scenarios should be consistent with the highest incremental increase in traffic volumes." ECF 7-5 at 12-3. For the same reasons the air quality conclusion based on the 102 "hot-spot" intersection analysis is inadequate to assess the impact of air pollution, the noise pollution analysis based on the same intersections is improper, arbitrary, and capricious.

[36] *See also* DOT_0041088 (July 12, 2022 EPA letter to FHWA and MTA explaining that "[b]enefits in the form of reductions in pollutants in one area do not negate the potential increases (in some cases of similar magnitude) in other regions," including Bergen County).

does not 'excuse' the [agency] 'from making emissions estimates' in the first place."); 74 C.F.R. § 650.4(k)(2)(i) ("A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.").

C.     **FHWA's Final EA and FONSI Were Arbitrary and Capricious Because They Failed to Fully Consider and Take a Hard Look at Adverse Impacts on New Jersey's Communities with Environmental Justice Concerns**

FHWA not only failed to take a hard look at significant impacts on New Jerseyans in general; it also gave short shrift to the impacts on some of New Jersey's most vulnerable communities. Indeed, "recent studies have shown that environmental pollution . . . has a disparate impact on racial-ethnic minorities and low-income communities." *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 226 (3d Cir. 2020). To address and mitigate such inequities, Executive Order 14008 directs that "[a]gencies shall make achieving environmental justice part of their missions" and provides that it is the "policy of [this] Administration to secure environmental justice and spur economic opportunity for disadvantaged communities that have been historically marginalized and overburdened by pollution." Exec. Order No. 14,008, 3 C.F.R. §477 (2022). That commitment to environmental justice builds on Executive Order 12898's longstanding requirements, which provide: "[t]o the greatest extent practicable and permitted by law . . . each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations[.]" Exec. Order No. 12,898, 3 C.F.R. § 859 (1995).

FHWA itself has issued environmental justice guidance emphasizing the importance of complying with Executive Order 12898 and addressing environmental justice concerns in NEPA

review.[37]  The guidance cautions that "[s]mall clusters or dispersed populations" of low-income or minority persons "should not be overlooked" and that "[u]nder NEPA, consideration must be given to mitigation . . . for all adverse effects regardless of the type of population affected."  *Id.* To  ensure "that environmental justice concerns are effectively identified and addressed,"[38] the Council on Environmental Quality's guidance provides that agencies "should seek input from [communities with environmental justice concerns] as early in the process as information becomes available,"  and consider at least "the composition of the affected area [and] relevant public health data and industry data concerning the potential for multiple or cumulative exposure[.]"  *Id.* at 9, 11.  It emphasizes that "[m]itigation measures . . . should, whenever feasible, address significant and adverse environmental effects of proposed federal actions on minority populations, low-income populations, and Indian tribes."  *Id.* at 4.

Under NEPA, "[t]he purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low-income populations." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017) (citing *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003)). That analysis cannot be "cursory" or "bare-bones,"  *Standing Rock*, 255 F. Supp. 3d at 139, the agency must establish "a rational connection between the facts found and the decision made," *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) (quoting *State Farm*, 463 U.S. at 43), and it cannot "fail[ ] to consider an important aspect of the problem."  *State Farm*, 563 U.S. at 43.

---

[37]  FHWA, Guidance on Environmental Justice and NEPA (2011)
https://www.environment.fhwa.dot.gov/env_topics/ej/guidance_ejustice-nepa.aspx.

[38]  Council on Env't Quality, Environmental Justice: Guidance Under the National Environmental Policy Act 1 (1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf

FHWA failed to take the requisite "hard look" by failing to (1) adequately consult New Jersey's data on communities with environmental justice concerns, (2) adequately consider and mitigate identified impacts on communities with environmental justice concerns in Bergen County, and (3) adequately assess impacts on other communities with environmental justice concerns across New Jersey.

1. **FHWA Did Not Adequately Collect Data on New Jersey's Communities with Environmental Justice Concerns**

Throughout the NEPA review process, FHWA did not seek adequate input from New Jersey and its local communities about potential environmental justice impacts. The Final EA did not take into account a mapping tool from NJDEP—the Environmental Justice Mapping, Assessment and Protection Tool—which would have more precisely reflected existing, localized environmental and public health stressors in New Jersey. Instead, the EA relied on less precise federal data and mapping tools, which analyzed environmental and public health stressors across overburdened census tracts, rather than census block groups. ECF 7-6 at 17-8. Census tracts, however, encompass much larger areas than census block groups, which permit a more refined analysis.[39] FHWA also did not explain why it declined to use New Jersey's definition for communities with environmental justice concerns, which generally includes any census block group in which: (1) at least 35 percent of all households qualify as low-income households; (2) at least 40 percent of residents identify as a racial minority or as members of a State-recognized tribal community; or (3) at least 40 percent of households have limited English proficiency. N.J. Stat. § 13:1D-158. Instead, FHWA improperly limited its assessment to census tracts in which: (1) at least 50 percent of the census tract's population identifies as a racial minority, or the percentage of residents identifying as a racial minority exceeds the minority share in the county; and (2) the

---

[39] *Glossary*, U.S. Census Bureau, https://www.census.gov/programs-surveys/geography/about/glossary.html.

percentage of individuals with household incomes up to twice the Federal poverty threshold was higher than that for the 28-county region.  ECF 7-6 at 17-8.  That definition unjustifiably excluded numerous census block groups, for example, in Fort Lee—an area that will experience significant increases in traffic volumes.  ECF 7-7 at 17D-78.  Thus, the Final EA erroneously concluded that only one census tract in Fort Lee might merit place-based mitigation, and in the end, committed to *no* mitigation measures anywhere in New Jersey.  ECF 7-7 at 17D-110; Ex. 7.

That comes as no surprise given that New Jersey's most vulnerable communities were also denied a meaningful opportunity to participate in the EA process.  For instance, the Environmental Justice Technical Advisory Group included only *one* organization (out of 16) that represented the interests of any New Jersey communities with environmental justice concerns.  *See* ECF 7-6 at 17-84.  There was no meaningful engagement with localized groups in Orange, East Orange, Newark, Fort Lee and/or Bergen and Essex County, which all have communities with environmental justice concerns and all of which will be adversely impacted by congestion pricing. *See, e.g.*, *id.* at 17-81 to 17-88.

2.      **FHWA Did Not Sufficiently Consider and Mitigate Adverse Impacts on Communities with Environmental Justice Concerns in Bergen County**

It also comes as no surprise that, given this lack of meaningful engagement, the Final EA failed to adequately consider impacts on New Jersey's communities with environmental justice concerns.  As part of a proper "hard look" review, an agency must "consider how the incremental effects of the project might compound [] preexisting environmental concerns."  *O'Reilly v. All State Financial Co.*, 2023 WL 6635070, at *7 (5th Cir. Oct. 12, 2023).  Here, the Final EA failed to account for how traffic diversions would exacerbate preexisting public health and environmental conditions in these communities.  For example, FHWA (1) knew that several communities with environmental justice concerns in Bergen County already rank above the 95th percentile in air

toxics cancer risk, among other public health indicators, ECF 7-7 at 17D-17 to 17D-20; (2) found that Bergen County will experience increases in every category of pollutant, including volatile organic compounds, nitrogen oxides, carbon monoxide, and carbon dioxide equivalents, Exs. 1–2; but (3) failed to commit to any mitigation measures to address those impacts, ECF 7-6 at 17-65.

Fort Lee illustrates the problem. Fort Lee has pre-existing pollution and chronic disease burdens at the 90th percentile, including some of the highest levels of $PM_{2.5}$ in all of New Jersey. *Id.* at 18; ECF 1-4 at 12. Under the congestion pricing scheme, Fort Lee is one of the communities most likely to experience truck diversion. Indeed, FHWA acknowledged that "[t]he environmental justice communities experiencing the largest traffic volumes and truck increases from . . . diversions are along I-95 in northern New Jersey," where Fort Lee and other communities with environmental justice concerns are located. ECF No. 7-5 at 10-42; *see also* DOT_0000405 at DOT_0001170 (I-95 west of the George Washington Bridge will experience "[h]ighest AADT in all scenarios"). Yet FHWA did not expand the hot-spot air pollution study area to include this area, ECF 7-5 at 10-42 to 10-44, despite the requirement that "[w]hen conducting an environmental justice analysis, an agency's delineation of the area potentially affected by the project must be 'reasonable and adequately explained.'" *Vecinos*, 6 F.4th at 1331 (citation omitted). Indeed, the only supplemental analysis conducted for Fort Lee confirmed that Fort Lee's annual $PM_{2.5}$ levels already *exceed* the EPA's proposed air quality standards and will only increase once the congestion pricing scheme is implemented, but FHWA did not make any changes to the Final EA to mitigate these impacts. ECF 7-4 at 10-48 ($PM_{2.5}$ levels in Fort Lee will exceed 11 $\mu g/m^3$ under Tolling Scenario C); Reconsideration of the NAAQS for Particulate Matter, 88 Fed. Reg. 5560 (Jan. 27, 2023) (proposing lowering the $PM_{2.5}$ standard from 12.0 $\mu g/m^3$ to 9.0–10.0 $\mu g/m^3$).

The Final EA compounded these problems by neglecting to propose *any* place-based mitigation measures in affected New Jersey communities with environmental justice concerns—even though it did so for similarly situated communities in New York. *See* Ex. 7. As a result of FHWA's flawed analysis, the EA listed only four New Jersey communities (Fort Lee, Orange, East Orange, and Newark) as having census tracts that would warrant place-based mitigation measures. The EA acknowledged that these areas have some of the highest existing pollution and chronic disease burdens. ECF 7-1 at ES-38. For example, nine communities in East Orange rank above the 90th percentile for at least three of five major chronic disease burdens, including asthma, cancer, diabetes, high blood pressure, and poor mental health. ECF 7-7 at 17D-23 to 17D-24. Notwithstanding those preexisting vulnerabilities, each of the place-based mitigation measures adopted in the EA will mitigate impacts only in New York, and there is no commitment to invest in similar mitigation measures across the region, including in New Jersey, despite similar (or worse) impacts. ECF 1-3 at 14; ECF 7-6 at 17-65 to 17-66.

3. **FHWA Did Not Adequately Assess Impacts on Other Communities with Environmental Justice Concerns in the Regional Study Area**

The Final EA also inexplicably failed to address other communities in New Jersey with census tracts in the regional study area with preexisting pollution and chronic disease burdens. These communities include, but are not necessarily limited to, Union City, East Newark, Harrison, Bayonne, Elizabeth, and Perth Amboy. ECF 7-7 at 17D-29 to 17D-34. Take, for example, Union City, where every census tract ranks at or above the 90th percentile for at least three of four major pollutant burdens, including air toxics cancer risk, air toxics exposure, diesel particulate matter, and $PM_{2.5}$. ECF 7-7 at 17D-31. As a major transit hub, Union City is likely to experience increased traffic as a result of the congestion pricing scheme, ECF 7-3 4C-13, 4C-23 to 4C-25, but FHWA failed to assess any potential impacts on Union City's communities with environmental justice

concerns.  Likewise, the EA did not consider impacts in Bayonne, Elizabeth, and Perth Amboy, all of which have bridges to Staten Island—another way to avoid the CBD—and all of which are communities with environmental justice concerns.  *See, e.g.*, ECF 7-7 at 34 (Bayonne is one of the two "most burdened municipalities" for "pollution-linked illness and disease").  Instead, the EA merely acknowledged that in places like Bayonne, there "would be a net increase in . . . traffic volumes" during "peak hours," but provided no further analysis and did not propose any mitigation measures.  ECF 7-2 at 4B-63.

For all of these reasons, FHWA's analysis of environmental impacts on New Jersey communities with environmental justice concerns was unacceptably "cursory."  *Standing Rock*, 255 F. Supp. 3d at 139.  Despite the high stakes, FHWA turned a blind eye to some of New Jersey's most vulnerable neighborhoods.  That failure to take a hard look at these impacts runs afoul of the federal environmental justice commitments and fails to comply with the requirements of NEPA.

### D.   FHWA's Failure to Provide Adequate New Jersey Participation Renders the Final EA and FONSI Arbitrary and Capricious

FHWA's failures to engage were not limited to communities with environmental justice concerns in New Jersey.  It abrogated its responsibility under NEPA by failing to meaningfully engage New Jersey and its agencies more generally throughout the EA's preparation.  The consequences of this failure—which was both a function and a cause of FHWA's ignorance of impacts on New Jersey—cannot be overstated.  Had FHWA engaged New Jersey to the same extent it did New York, it might have properly considered the significant impacts of congestion pricing on New Jersey.  But FHWA chose to remain blissfully uninformed.

The CEQ regulations require federal agencies to "involve . . . State . . . and local governments" and "relevant agencies . . . to the extent practicable" while preparing an EA. 40 C.F.R. § 1501.5(e); *see also id.* § 1506.6(a) (agency must "[m]ake diligent efforts to involve

the public in preparing and implementing their NEPA procedures."). In addition, FHWA regulations provide that "[p]ublic involvement and a systematic interdisciplinary approach [are] essential parts of the development process for proposed actions." 23 C.F.R. § 771.105(d). To that end, "States . . . that may be significantly affected by the action . . . must be notified early and their views solicited by the applicant in cooperation with the [FHWA]." *Id.* § 771.111(e). Likewise, when preparing an EA, the "applicant, in consultation with the [FHWA], must, at the earliest appropriate time, begin consultation with interested agencies . . . to advise them of the scope of the project [and] identify alternatives and measures that might mitigate adverse environmental impacts." *Id.* § 771.119(b).

It is undisputed that New Jersey's transportation agencies (NJTRANSIT, NJTA, NJTPA, and NJDOT) have an interest in any congestion pricing scheme that will cause significant impacts on New Jersey's regional transportation networks. Indeed, the Final EA specifically notes that "[i]n fall [sic] 2019, an average of 212,191 people entered and exited the [] CBD via NJ Transit commuter rail on average weekdays," ECF 7-2 at 4-10, and public transit ridership is expected to increase in New Jersey as a result of the congestion pricing scheme. ECF 7-2 at 4C-23, 4C-25. Likewise, FHWA knew that NJDEP and NJDOH were interested agencies based on the scheme's significant impacts on air quality and communities with environmental justice concerns. *See supra* IV.A–C. As a result, it was required to notify these entities early, solicit their views, and begin consultation. It did not.

As discussed below, FHWA and the Project Sponsors invited New Jersey's transportation agencies to attend just *four virtual* meetings during the year it took to draft the EA. Contrary to what the MTA now claims,[40] these meetings were essentially briefings, not opportunities for

---

[40] ECF 33-1 ¶ 30 ("FHWA and the Project Sponsors specifically invited [New Jersey transportation agencies] to *engage* in the process.") (emphasis added).

"meaningful consultation."  *Kootenai*, 142 F. Supp. 2d at 1245 (NEPA violation where agency did not meaningfully engage with Tribe or communicate specific information regarding impacts of proposed project on tribal members despite holding meeting with tribal representatives).

To be clear, FHWA and the Project Sponsors *never* contacted—let alone consulted—NJDEP and NJDOH.  They did, however, routinely consult their New York counterparts.  Ex. 8 (noting consultation with the NYSDEC, NYCDEP, NYC Mayor's Office of Environmental Coordination, and NYC Dep't of Health and Mental Hygiene).  The sheer number of New York versus New Jersey agencies consulted, and the number of meetings held with each, demonstrates the disparity in the consultation process:

|  | New York | New Jersey |
|---|---|---|
| Number of agencies or government offices consulted | 17 | 4 |
| Number of environmental agencies or government offices consulted | 3 | None. |
| Number of meetings held with agencies or government offices | 9 | 4 (3 before Final EA was issued) |
| Number of meetings held with environmental agencies or local environmental offices | 5 | None. |

*See* Ex. 8.  It is not just the disparity in quantity, but also in quality that is problematic.  The details of each meeting demonstrate that they were superficial attempts to satisfy FHWA's obligations rather than true opportunities for meaningful consultation.

For example, on September 10, 2021—two years after the TMA was signed into law and the NEPA review started—NJDOT, NJTRANSIT, and NJTPA attended a virtual meeting where the Project Sponsors shared information about congestion pricing.  DOT_0041617.  The Project Sponsors did not invite New Jersey environmental agencies to participate, even though their New York counterparts—including the NYCDEP and NYC Mayor's Office of Environmental Coordination—were consulted.  *Id.*

On March 11, 2022, the MTA held a briefing with NJTRANSIT, but only to discuss the limited issue of potential increases in "pedestrian volume" at a *single* stairway at the Hoboken Terminal and PATH station.  *See* DOT_0039957.

On August 4, 2022—just 6 days before the Draft EA was published—NJDOT, NJTRANSIT, NJTA, and NJTPA attended a virtual briefing in which the Project Sponsors provided an "overview of the Draft EA."  DOT_0041634.  While time was given for questions, this virtual informational meeting in no way rose to the level of meaningful engagement NEPA requires.  *Kootenai*, 142 F. Supp. 2d at 1245.  Indeed, the timing of the meeting shows that the Project Sponsors never seriously intended to consider any input from New Jersey's agencies before publishing the Draft EA.  At that point, the train had effectively left the proverbial station.

On May 11, 2023—six days *after* the Final EA and Draft FONSI were published—NJDOT, NJTRANSIT, and NJTPA attended a virtual briefing that provided an overview of the Final EA.  DOT_0043818.  This post-mortem clearly did not include an opportunity for meaningful consultation coming, as it did, *after* the documents' publication.  And no changes were made to either document before the Final FONSI was published in June.

In addition, the general process for public comment demonstrates FHWA's failure to engage.  FHWA and the Project Sponsors provided only 30 days for public comments on the 4,000-plus page Draft EA and extended the time a mere two weeks due to public outcry.  ECF 7-1 at 0-2.  During that 44-day public comment period, FHWA and the Project Sponsors received more than 14,000 individual submissions and 55,000 form letters.  *Id.*[41]  While the MTA now suggests that the sheer number of comments submitted evinces sufficient consultation, ECF 33-2 ¶¶ 45, 47,

---

[41]   The FHWA and Project Sponsors did not formally invite public comments in response to the publication of the Final EA and Draft FONSI.  Nevertheless, the public, New Jersey, and its agencies submitted comments.  As the MTA and TBTA now admit, the FHWA and Project Sponsors made *no* changes to the Final EA or FONSI in light of these comments.  ECF 33-1 ¶ 55.

"[n]either the number of meetings nor the volumes of comments are instructive by themselves if the evidence suggests that the decision-making process was used to rationalize or justify decisions already made," *Kootenai*, 142 F. Supp. 2d. at 1246.  The evidence here, including an unnecessarily short comment period, suggests just that.[42]

FHWA and the Project Sponsors also provided insufficient responses to public comments. The MTA claims that they responded to each of the "nearly 70,000 public input submissions on the Draft EA,"  ECF 33-1 at 8, but the responses in the Final EA suggest that FHWA and the Project Sponsors responded to *far less*.[43]  "[T]his is strong evidence that[,] because of the hurried nature of this process[,] [FHWA] was not well informed enough to present a coherent proposal or meaningful dialogue and that the end result was pre-determined."  *Kootenai*, 142 F. Supp. 2d. at 1247.  FHWA therefore deprived New Jersey (and the public) of any meaningful consultation into the EA process, despite NEPA's requirements.

E.     **The Final EA Failed to Take a Hard Look at Alternatives**

The Final EA's analysis is also arbitrary and capricious and fails to meet the hard look standard because it fails to consider alternatives that would have also decreased congestion in the CBD but with less collateral damage.  ECF 1-4 at 5–7.  NEPA requires federal agencies to study in detail all reasonable alternatives to actions significantly affecting the quality of the human environment, *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021–22 (9th Cir. 2009) (citing 40 C.F.R. § 1502.14(a)), and the existence of a "viable but unexamined alternative" renders the EA

---

[42]   Moreover, all of the public "hearings" that followed the publication of the Draft EA occurred "within 12 business days of the end of the . . . comment period" (*before* the comment period was extended an additional two weeks).  *Kootenai*, 142 F.Supp.2d at 1246–47 (finding "comment period was grossly inadequate and thus deprived the public of any meaningful dialogue or input into the process").  Leaving those hearings to the last minute underscored how not seriously FHWA and the Project Sponsors took them.

[43]   Appendix 18C to the Final EA reproduces "all comments and responses."  ECF 7-6 at 18-23.  Despite receiving "nearly 70,000 comments," Appendix 18C is only 28,688 pages long, with many comments and responses spanning several pages.

process deficient. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (per curiam) (agency violated NEPA by considering but preliminarily dismissing several viable alternatives).   Thus, an agency may not "contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. U.S. Army Corps of Eng'rs.*, 120 F.3d 664, 666 (7th Cir. 1997).   Nor may an agency consider only a no action alternative on the one hand and a series of "virtually identical" alternatives on the other. *Muckleshoot*, 177 F.3d at 813.   Instead, the reviewing court must ensure that the agency gathered information sufficient to permit a reasoned choice of distinct and viable alternatives. *Nat. Res. Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

NEPA prohibits an agency from "narrowly defin[ing] [a project's] purpose and need so as to winnow down the alternatives until only the desired one survives." *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Srv.*, 373 F.Supp.2d 1069, 1088 (E.D. Cal. 2004). But that's what happened here.   As a result, FHWA's alternatives analysis was doomed by design.   As an initial step in the NEPA review process, FHWA and the Project Sponsors defined the project's purpose and need as "reduc[ing] traffic congestion in the CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's VPPP." ECF 7-1 at 1-10.   To further refine that, FHWA and the Project Sponsors defined three objectives: (1) reduce daily VMT within the CBD by at least 5%; (2) reduce the number of vehicles entering the CBD daily by at least 10%; and (3) generate sufficient annual net revenues to fund $15 billion for MTA capital projects.   *Id.* at 2-5.   These objectives were, in turn, used to decide which alternatives would actually be evaluated.[44]   They also mirrored the requirements of the TMA.   N.Y. Veh. & Traf. Law § 1704-a(1)).

---

[44]   The Final EA did not include the fourth Project goal as one of these objectives—"Establish a tolling program consistent with the purposes underlying the New York State legislation."   ECF 7-1 at 2-5.

The details of FHWA's alternatives "assessment" demonstrate that the agency only ever intended to evaluate—and approve—the congestion pricing scheme at issue.  During the initial "screening evaluation"—*i.e.*, before a fulsome NEPA evaluation—if one of the potential alternatives did "not meet one or more of the three Project objectives used for screening, [it was] dismissed [] from further consideration as an alternative that is not reasonable."  ECF 7-1 at 2-5.  Of the eleven alternatives considered, Alternatives T-2, O-4, and O-5 each "meets" the criteria for Objectives 1 and 2—they would sufficiently reduce congestion in the Manhattan CBD—but failed to meet Objective 3's funding source obligation.  *Id.* at 2-6.  FHWA and the Project Sponsors thus rejected *all three* outright without any further analysis.  *Id.* at 2-5; Ex. 9.

| ALTERNATIVE | PURPOSE AND NEED: Reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements | OBJECTIVE 1: Reduce daily VMT within the Manhattan CBD  Criterion: Reduce by 5% (relative to No Action) | OBJECTIVE 2: Reduce the number of vehicles entering the Manhattan CBD daily  Criterion: Reduce by 10% (relative to No Action) | OBJECTIVE 3: Create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program |
|---|---|---|---|---|
| NA-1: No Action | Does not meet | Does not meet | Does not meet | Does not meet |
| NTP-1: Parking pricing strategies | Does not meet | Does not meet (see note 2) | Does not meet | Does not meet (see note 2) |
| T-1: Pricing on full roadways: Raise tolls or implement variable tolls on existing toll facilities | Does not meet | Does not meet (see note 3) | Does not meet (see note 3) | Does not meet |
| T-2: Pricing on full roadways: Toll East and Harlem River bridges | Does not meet (see note 4) | Meets | Meets | Does not meet (see note 4) |
| T-3: High-occupancy toll (HOT) lanes | Does not meet (see note 5) | Does not meet | Does not meet | Does not meet (see note 5) |
| T-4: Zone-based pricing: CBD Tolling Program | Meets | Meets | Meets | Meets |
| O-1: Parking pricing: Reduce government-issued parking permits | Does not meet | *[Does not meet (see note 6]]* | *[Does not meet (see note 6]]* | Does not meet |
| O-2: Provide additional taxi stands to reduce cruising | Does not meet | Does not meet (see note *[7]*) | Does not meet | Does not meet |
| O-3: Create incentives for teleworking | Does not meet | Does not meet | Does not meet (see note *[8]*) | Does not meet |
| O-4: Ration license plates | Does not meet | Meets | Meets | Does not meet |
| O-5: Mandatory carpooling | Does not meet | Meets | Meets | Does not meet |
| O-6: Truck time-of-day delivery restrictions | Does not meet | Does not meet (see note *[9]*) | Does not meet (see note *[9]*) | Does not meet |

The failure to fully analyze alternatives that would also reduce VMT and the number of vehicles entering the CBD—thereby satisfying the congestion pricing scheme's key environmental objectives—violated NEPA's hard look standard, which requires an agency take a "hard look" at viable alternatives *before* making a decision.  NEPA does not allow an agency to first make a decision—in this case, approving the congestion pricing scheme—and justify it later.  *Wildearth*

45

*Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 890–91 (D. Mont. 2020) (NEPA violated where agency "stat[ed] summarily . . . there was no need to analyze . . . alternative[s]"). FHWA's singular focus on raising money for Intervenors even in the face of viable alternatives that would sufficiently decrease congestion falls far short of its NEPA obligations. *Simmons*, 120 F.3d at 669 (agency failed to comply with its "duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project" (citation omitted)). This left FHWA considering only the No Action Alternative and meant that the scheme, which it deemed "the *only reasonable* build alternative," was "the *only* build alternative *evaluated in detail* in th[e] EA." ECF 7-1 at 2-5 (emphases added).

The problem with FHWA's outright dismissals of other alternatives is compounded by its lack of explanation for doing so. For instance, Alternative O-5 would institute carpooling by preventing single occupant vehicles from entering the CBD on weekdays from 6 am to 10 am. ECF 7-1 at 2-4. FHWA provided ***no*** explanation for rejecting this alternative, even though carpool lanes are listed as one of FHWA's "congestion pricing strategies." *Id.* at 2-3. Likewise, Alternative T-2 proposed a toll on the currently untolled East River and Harlem River crossings into Manhattan. *Id.* at 2-4. In rejecting this alternative in the Draft EA, FHWA acknowledged earlier studies concluding that "this alternative would reduce congestion and could raise toll revenues equivalent to Project objectives" but nonetheless rejected it outright because "there is no law or agreement in place between the City of New York and MTA that would direct the revenue to MTA to support the Capital Program." *Id.* at 2-7. When the Final EA was issued, FHWA relied on a fifteen-year-old study suggesting that this alternative might adversely affect two environmental justice communities—far fewer than the instant congestion pricing scheme—but did not update the study or conduct any further diligence. *Id.* FHWA's failure to analyze an

alternative that *would reduce congestion* while potentially affecting far fewer environmental justice communities underscores the Final EA's and FONSI's flaws, contradicts the purported goals of the project, and fails to satisfy FHWA's obligation to examine all viable alternatives. *Muckleshoot*, 177 F.3d at 814; *W. Watersheds Project v. Bernhardt*, 543 F.Supp.3d 958, 981 (D. Idaho 2021); *Pub. Emps. For Env't Resp. v. U.S. Fish & Wildlife Serv.*, 177 F. Supp. 3d 146, 156 (D.D.C. 2016) (permitting agency to evade review of alternatives "has the potential to eviscerate NEPA").

F.      **FHWA Failed to Conduct a Transportation Conformity Analysis in Violation of the Clean Air Act**

The CAA sets forth the framework and goals for improving air quality to protect public health and the environment by mandating the establishment of NAAQS. 42 U.S.C. §§ 7401 et seq. If a State fails to meet one or more of those standards, it must develop and obtain EPA approval of a State Implementation Plan ("SIP") to achieve them. *Id.* § 7410. The CAA conditions FHWA authorization of any project, program, or plan on conformance to the applicable SIP(s). *Id.* § 7506(c)(1). To that end, the CAA requires FHWA to conduct a conformity analysis and determination for all new transportation projects, *id.* § 7506(c); 40 C.F.R. § 93.150(b), and provide "reasonable opportunity for consultation" on transportation conformity to the EPA, state air agencies, and local air quality and transportation agencies before making conformity determinations, 40 C.F.R. § 93.105.

There is no dispute that the CAA's conformity requirements apply to the congestion pricing scheme and that FHWA completed a conformity analysis for New York's SIP. 40 C.F.R. § 93.102(a)(1)(iii) ("[C]onformity determinations are required for . . . [t]he approval, funding, or implementation of FHWA/FTA projects."); ECF 7-5 at 10-49. There is also no dispute FHWA did *not* perform a conformity analysis for New Jersey's SIP, and did *not* consult the required

agencies.  42 U.S.C. § 7506(c).  These failures violated the CAA and were arbitrary and capricious because FHWA identified pollutant increases that go beyond state borders.  5 U.S.C. § 706(2)(A).

       1.      **The Failure to Conduct a Conformity Analysis for New Jersey Violates the CAA and Was Arbitrary and Capricious**

An agency action that "violates [a statute] is 'not in accordance with law' within the meaning of 5 U.S.C. § 706(2)(A)."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979); *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1150 (D.C. Cir. 2002).  Courts "must set aside an agency's action where it failed to consider mandatory factors set forth by statute or in a regulation." *Nat. Res. Def. Council v. EPA*, 638 F.3d 1183, 1190 (9th Cir. 2011).  Here, FHWA had to analyze congestion pricing's effects beyond New York's borders where the EA identified (1) air quality impacts in New Jersey, or (2) regional air quality impacts that would encompass areas in New Jersey.  42 U.S.C. § 7506(c).  Instead, FHWA disregarded mandatory factors under the CAA and its implementing regulations. Because the CAA imposes on FHWA an affirmative responsibility to assure conformity, 42 U.S.C. § 7506(c)(1), FHWA must confirm that all transportation plans or projects conform to any relevant SIP, including addressing potential localized emissions impacts on health-based pollutant standards, *before* approving, accepting, or funding any transportation plans or projects.  FHWA did this for New York, but not New Jersey.

Moreover, FHWA failed to consider congestion pricing's impact on New Jersey emissions levels.  *State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious where it "entirely failed to consider an important aspect of the problem").  Parts of New Jersey that will, according to the EA, be impacted by congestion pricing are nonattainment areas for ozone, and maintenance for $PM_{2.5}$ and carbon monoxide.  ECF 7-5 at 10-4.  NYSDOT and FHWA knew this.  In September 2021, NYSDOT sent a letter to FHWA requesting approval of new transportation conformity determinations for the New York portions of four areas—including *three* that include parts of New

Jersey: (1) New York-Northern New Jersey-Long Island, NY-NJ-CT PM$_{2.5}$ Maintenance Area; (2) New York-Northern New Jersey-Long Island, NY-NJ-CT Ozone Nonattainment Area; and (3) New York-Northern New Jersey-Long Island, NY-NJ-CT Carbon Monoxide maintenance area. DOT_0039319 at DOT_0039319.  In doing so, NYSDOT put FHWA on notice that the covered projects affected more than just New York.  *Id.*  Yet, FHWA failed to require more than NYSDOT's analysis despite FHWA's express finding that the congestion pricing scheme will cause increased air pollution in New Jersey.  *See supra* IV.A.; ECF 7-5 at 10-50.  That conclusion required FHWA to consider the project's effects on New Jersey's compliance with NAAQS, and its failure to do so both violates the CAA and is arbitrary and capricious.

2.  **FHWA's Failure to Consult Relevant New Jersey Agencies Violates the CAA and is Arbitrary and Capricious**

FHWA was also required to provide a reasonable opportunity for consultation with state and local transportation environmental agencies before making conformity decisions.  40 C.F.R. § 93.105(a)(2) (agencies "*must* provide reasonable opportunity for consultation with State air agencies, local air quality and transportation agencies, DOT, and EPA") (emphasis added).  In fact, FHWA itself has required conformity analyses for both New York *and* New Jersey's SIPs for similar projects in the tri-state area.[45]  But here, despite regulations requiring it, FHWA failed to provide a "reasonable opportunity for consultation" on the congestion pricing scheme's transportation conformity in New Jersey to the EPA and other consultation partners, including NJDEP.  *See* 40 C.F.R. § 93.105(a)(2).  Indeed, FHWA never contacted NJDEP.  *See supra* IV.D. As the agency tasked with implementation of the CAA in New Jersey and responsible for its SIP, NJDEP should have been consulted on conformity.  N.J. Stat. § 26:2C-8.11.  FHWA's inexplicable

---

45  Cross Harbor Freight Program, Environmental Impact Statement ("EIS Methodology"), at C-17 (Sept. 2010), https://web.archive.org/web/20101227103306/http://www.panynj.gov/about/pdf/EIS-Methodology-Draft-Appendices.pdf.

failure to do so is further evidence that FHWA failed to provide consultation required under the CAA and, in turn, § 706(2)(A).

## V.   **CONCLUSION**

For all these reasons, Plaintiff respectfully requests that the Court grant its Motion for Summary Judgment.

Dated:  New York, New York            By:  */s/ Randy M. Mastro*
       November 10, 2023                      Randy M. Mastro (NJ Bar No. 011681982)
                                                    Craig Carpenito (NJ Bar No. 027102000)
                                                    Jessica Benvenisty (*pro hac vice*)
                                                    Lauren Myers (*pro hac vice*)
                                                    KING & SPALDING LLP
                                                    1185 Avenue of the Americas
                                                    New York, New York 10036
                                                    Tel. (212) 556-2100

                                                    Peter Hsiao (*pro hac vice*)
                                                    KING & SPALDING LLP
                                                    633 West Fifth Street, Suite 1600
                                                    Los Angeles, CA 90071
                                                    Tel. (213) 433-4355

                                                    Cynthia AM Stroman (*pro hac vice*)
                                                         KING & SPALDING LLP
                                                       1700 Pennsylvania Avenue, NW, Suite 900
                                                    Washington, DC 20006-4704
                                                    Tel. (202) 737-0500

                                                    *Attorneys for Plaintiff*