# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY, | |
| *Plaintiff,* | |
| v. | |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration, | Hon. Brian R. Martinotti<br><br>Civ. No. 2:23-cv-03885-BRM-LDW |
| *Defendants,* | |
| and | |
| THE METROPOLITAN TRANSPORTATION AUTHORITY and THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, | |
| *Intervenor-Defendants.* | |

## MEMORANDUM OF LAW IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT BY INTERVENOR-DEFENDANTS THE METROPOLITAN TRANSPORTATION AUTHORITY AND THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY AND IN OPPOSITION TO NEW JERSEY'S MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

    A.    The Need for Congestion Pricing ........................................................... 3

    B.    Overview of the Four-Year Long NEPA Process .................................. 5

LEGAL STANDARD ......................................................................................................... 14

ARGUMENT ...................................................................................................................... 16

    I.    New Jersey Had Ample Opportunity to Participate in the NEPA Process ...................... 16

        A.    FHWA and the Project Sponsors Involved the Public and Relevant Agencies in the Environmental Review at the Earliest Appropriate Time and Solicited Their Views .......... 17

        B.    New Jersey Failed to Exercise its Right to Request Additional Involvement .............. 21

    II.    FHWA and the Project Sponsors Considered Reasonable Alternatives .......................... 22

        A.    The EA Appropriately Defined the Purpose and Need for the Project ........................ 22

        B.    The Project Sponsors Considered all Reasonable Alternatives .................................... 24

    III.    FHWA Took a Hard Look at Potential Environmental Impacts in New Jersey .............. 27

        A.    The EA Thoroughly Analyzed Potential Air Quality Impacts in New Jersey ............. 27

        B.    The EA Explained Why the Project Would Not Cause Significant Impacts on Air Quality in Bergen County ................................................................................................ 30

        C.    FHWA Based Its Analysis on Robust Data and Well-Founded Methodologies .......... 31

    IV.    The EA Took a Hard Look at Environmental Justice Concerns ..................................... 36

        A.    FHWA and the Project Sponsors Thoroughly Evaluated Environmental Justice ........ 37

        B.    The EA's Environmental Justice Screening Methodology Was Reasonable ............... 43

        C.    The EA and FONSI Include a Binding Commitment to Implement $155 Million in Mitigation That Will Benefit New York and New Jersey .................................................... 44

        D.    The EA Fully Considered Effects on New Jersey Environmental Justice Communities . ........................................................................................................................................... 46

    V.    FHWA Complied with the Clean Air Act ....................................................................... 48

CONCLUSION .................................................................................................................... 50

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
524 F. Supp. 2d 642 (D. Md. 2007) ..................................................................50

*Barnes v. F.A.A.*,
865 F.3d 1266 (9th Cir. 2017) ........................................................................31

*Bitters v. FHWA*,
No. 14-cv-1646-KJM-SMS, 2016 WL 159216 (E.D. Cal. Jan. 13, 2016) ...................34

*Brodsky v. U.S. Nuclear Regul. Comm'n*,
704 F.3d 113 (2d Cir. 2013).......................................................................14, 19

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty v. Zinke*,
889 F.3d 584 (9th Cir. 2018) ........................................................................23

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) .......................................................................31

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ...................................................................23, 24

*City of Alexandria v. Slater*,
198 F.3d 862 (D.C. Cir. 1999) .......................................................................22

*City of New York v. U.S. Dep't of Transp.*,
715 F.2d 732 (2d Cir. 1983)...........................................................................25

*City of Olmsted Falls v. F.A.A.*,
292 F.3d 261 (D.C. Cir. 2002) ...................................................................48, 49

*City of S. Pasadena v. Slater*,
56 F. Supp. 2d 1106 (C.D. Cal. 1999) ............................................................50

*Coal. for Healthy Ports v. U.S. Coast Guard*,
No. 13-CV-5347 (RA), 2015 WL 7460018 (S.D.N.Y. Nov. 4, 2015)................... *passim*

*Coliseum Square Ass'n, Inc. v. Jackson*,
465 F.3d 215 (5th Cir. 2006) ...............................................................32, 36, 43

*Communities Against Runway Expansion, Inc. v. F.A.A.*,
355 F.3d 678 (D.C. Cir. 2004) .............................................................35, 36, 43

*Conservation L. Found., Inc. v. Dep't of Airforce*,
864 F. Supp. 265 (D.N.H. 1994)................................................................................49

*Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*,
685 F.3d 259 (3d Cir. 2012)......................................................................................14

*Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*,
869 F.3d 148 (3d Cir. 2018)................................................................................15, 49

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) .......................................................................................... *passim*

*Erlbaum v. New Jersey Dep't of Env't Prot.*,
No. CV 16-8198 (RMB/JS), 2017 WL 465466 (D.N.J. Feb. 3, 2017) .........................15

*FreshWater Accountability Project v. U.S. Army Corps. of Eng'rs*,
629 F. Supp. 3d 761 (S.D. Ohio 2022) .....................................................................18

*Friends of Ompompanoosuc v. FERC*,
968 F.2d 1549 (2d Cir. 1992)....................................................................................25

*Iseke v. City & Cnty. of Honolulu*,
No. CV 15- 00193 LEK-RLP, 2017 WL 6803423 (D. Haw. Sept. 20, 2017).............36

*Jones v. Peters*,
No. 2:06-CV-00084BSJ, 2007 WL 2783387 (D. Utah Sept. 21, 2007) ......................23

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976)..................................................................................................15

*Kootenai Tribe v. Veneman*,
142 F. Supp. 2d 1231 (D. Idaho 2001) ......................................................................21

*Latin Ams. for Soc. & Econ. Dev. v. FHWA*,
756 F.3d 447 (6th Cir. 2014) ....................................................................................36

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989)..................................................................................................31

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
345 F.3d 520 (8th Cir. 2003) ....................................................................................44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................................................................................................31

*Mt. Lookout—Mt. Nebo Prop. Prot. Ass'n v. FERC*,
143 F.3d 165 (4th Cir. 1998) .........................................................................................25

*Nat'l Indian Youth Council v. Andrus*,
501 F. Supp. 649 (D.N.M. 1980) ...................................................................................25

*Nat'l Post Office Collaborate v. Donahoe*,
No. 3:13-CV-1406 (JBA), 2014 WL 6686691 (D. Conn. 2014) ...................................25

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) .......................................................................................25

*Norwalk Harbor Keeper v. U.S. Dep't of Transp.*,
No. 3:18-cv-0091 (SRU), 2019 WL 2931641 (D. Conn. July 8, 2019)...................22, 25

*Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......................................................................................................15

*Protect Lake Pleasant, LLC v. Connor*,
No. CIV 07-0454-PHX-RCB, 2010 WL 5638735 (D. Ariz. July 30, 2010) ...................23, 27, 48

*Sierra Club v. Atlanta Reg'l Comm'n*,
255 F. Supp. 2d 1319 (N.D. Ga.) ...................................................................................50

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) ............................................................................ *passim*

*Sierra Club v. FHWA*,
No. 17-cv-1661-WJM-MEH, 2018 WL 1610304 (D. Colo. Apr. 3, 2018) ...................31

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) .................................................................................31

*Sierra Club, Inc. v. Bostick*,
787 F.3d 1043 (10th Cir. 2015) .....................................................................................15

*Slockish v. FHWA*,
No. 3:08-cv-01169-YY, 2020 WL 8617636 (D. Or. Apr. 1, 2020).........................15, 43

*Soc'y Hill Towers Owners Ass'n v. Rendell*,
210 F.3d 168 (3d Cir. 2000)...........................................................................................14

*Spiller v. White*,
352 F.3d 235 (5th Cir. 2003) .........................................................................................25

*Stand Up for California! v. U.S. Dep't of Interior*,
919 F. Supp. 2d 51 (D.D.C. 2013) ................................................................23

*Stand Up for California! v. U.S. Dep't of Interior*,
204 F. Supp. 3d 212 (D.D.C. 2016) ..............................................................49

*Tinicum Twp. v. U.S. Dep't of Transp.*,
685 F.3d 288 (3d Cir. 2012)..........................................................................15

*Twp. of Belleville v. Fed. Transit Admin.*,
30 F. Supp. 2d 782 (D.N.J. 1998) .................................................................24

*Twp. of Bordentown v. FERC*,
903 F.3d 234 (3d Cir. 2018)....................................................................14, 15

*Utah Env't Congress v. Bosworth*,
439 F.3d 1184 (10th Cir. 2006) ....................................................................23

*Vill. of Logan v. U.S. Dep't of Interior*,
No. 12-CV-401 WJ/LFG, 2013 WL 12084730 (D.N.M. Jan. 14, 2013)......15

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
784 F.3d 677 (10th Cir. 2015) ......................................................................46

**STATUTES**

5 U.S.C. § 706(2)(A)................................................................................5, 14

42 U.S.C. §§ 4321 *et seq.*..............................................................................6

42 U.S.C. § 4332(2)(C)(iii)............................................................................24

42 U.S.C. § 7407(a) .......................................................................................48

42 U.S.C. § 7409(b)(1) ..................................................................................31

42 U.S.C. § 7506(c)(1)..............................................................................6, 48

**OTHER AUTHORITIES**

6 NYCRR § 240.2.8(e) ..................................................................................34

23 C.F.R. §§ 771 *et seq.*...................................................................... *passim*

40 C.F.R. pt. 51..............................................................................................27

40 C.F.R. pt. 91 ............................................................................................................27

40 C.F.R. §§ 93 *et seq.* .......................................................................................29, 49, 50

40 C.F.R. pt. 1500 ...........................................................................................................6

40 C.F.R. §§ 1501 *et seq.* .................................................................................... *passim*

40 C.F.R. § 1503.4(a) ....................................................................................................21

40 C.F.R. § 1506.6(a) ....................................................................................................18

40 C.F.R. § 1508.1(z) ....................................................................................................24

Fed. R. Civ. P. 56(a) ......................................................................................................16

## PRELIMINARY STATEMENT

In this action, New Jersey threatens a long-overdue congestion pricing program enacted by the New York State Legislature in 2019 that will reduce crippling traffic congestion in the Manhattan Central Business District (the "CBD") for the benefit of millions of residents, visitors, and commuters, make streets safer for pedestrians and cyclists, cut vehicular emissions, and secure a stable source of funding for critical investments in the region's public transit infrastructure.

As lead federal agency under the National Environmental Policy Act ("NEPA"), the Federal Highway Administration ("FHWA") conducted a comprehensive environmental assessment ("EA") studying the potential environmental impacts of the CBD Tolling Program (the "Project"), with assistance from the three Project Sponsors: the Triborough Bridge and Tunnel Authority ("TBTA"),[1] the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT"). Over four years, FHWA and the Project Sponsors consulted with federal, regional, state, and local agencies; held multiple public outreach meetings; and considered and responded to tens of thousands of public comments before issuing the 958-page EA with 32,543 pages of appendices. FHWA carefully reviewed the EA—including the Project Sponsors' commitment to fund $155 million in mitigation to improve air quality, and public health in environmental justice communities with preexisting pollution and health burdens throughout the region. Applying NEPA's well-established legal standards, FHWA issued a Finding of No Significant Impact ("FONSI") determining that the Project, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on environmental justice communities or populations.

---

[1] TBTA is an affiliate agency of the Metropolitan Transportation Authority (the "MTA"). The MTA is a public benefit corporation responsible for North America's largest transportation network, serving 15.3 million people across 5,000 square miles in New York City, Long Island, Southeastern New York, Northeastern New Jersey, and Southern Connecticut.

New Jersey's claim that it was deprived of adequate opportunities to consult on the Project is revisionist history.  From early on, New Jersey agencies were encouraged to participate in the NEPA process.  Yet not once did New Jersey (or any of its agencies) request more active involvement.  The State offered scant comments, excluding most of the specific challenges it now asserts—waiving many of its claims.  Instead, New Jersey chose to oppose the Project in the public arena, through misleading attacks in the press and threats of litigation.  As a result, many of New Jersey's objections to the Project appear to rest on fundamental misunderstandings of the EA, which could have been resolved earlier had the State opted to participate more fully in the NEPA process.  These misunderstandings include the mantra repeated 25 times in New Jersey's brief that no mitigation will be provided to New Jersey environmental justice communities.  Repetition does not render truthful that which is directly refuted by the EA's identification of several New Jersey communities for place-based mitigation.  New Jersey makes similar erroneous assertions about the scope of analyses excluding New Jersey communities when they demonstrably include them.

New Jersey employs a similarly convenient but false interpretation of FHWA's NEPA obligations.  FHWA and the Project Sponsors were not obligated to consider alternatives that did not meet the statutorily required objective to raise funds for the MTA's Capital Program, critical to the region's economy and to providing reliable transit as an alternative to driving.  As precedent makes clear, revenue generation is an appropriate purpose for projects analyzed under NEPA.

New Jersey's misreading of the EA infects all of the State's claims that the EA failed to take a hard look at traffic, air quality, and environmental justice effects in New Jersey.  The EA thoroughly analyzed these effects according to methodologies approved by FHWA and the U.S. Environmental Protection Agency ("EPA"), incorporating the input and comments of various stakeholders.  Indeed, the EA reflects EPA's comments and includes an amplified analysis of the

Project's potential impacts on environmental justice communities—including in New Jersey.  New Jersey's Clean Air Act ("CAA") challenge is similarly groundless and misstates the law.  The Record clearly shows that FHWA and the Project Sponsors analyzed the Project's potential impact on New Jersey's air quality and offered New Jersey agencies multiple opportunities to consult on the analysis.  New Jersey agencies largely ignored those opportunities.  More fundamentally, New Jersey has not identified any flaws in the EA's technical analyses, let alone articulated how greater participation by New Jersey agencies would have changed the result.

In short, the Record demonstrates that FHWA and the Project Sponsors went beyond NEPA's mandate to take a "hard look" at the environmental effects of the Project and provide opportunities for public, agency, and stakeholder input.  What New Jersey mischaracterizes as a rushed-through rubber stamp actually comprised an exhaustive, four-year long review with extensive and repeated stakeholder outreach and public engagement, and painstaking responses to comments.  New Jersey faults FHWA for not studying things that were clearly studied and mischaracterizes the EA's findings. New Jersey's belated and misdirected criticisms of the EA are insufficient to establish that FHWA's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Because New Jersey has failed to satisfy that deferential standard, the Court should grant summary judgment to Defendants.

## STATEMENT OF FACTS

### A.  The Need for Congestion Pricing

Traffic congestion has long plagued the New York metropolitan area, which includes New York City, Long Island, Southeastern New York, Northern New Jersey, and Western Connecticut. For generations, congestion has stymied economic growth and harmed the environment, public health, and quality of life in the region.  Congestion increases travel times, eroding worker productivity, devastating bus and Access-a-Ride paratransit service, raising the cost of deliveries

and the overall cost of doing business, and impeding the movement of emergency vehicles. Congestion takes a significant economic toll, causing 102 hours of lost time at an annual cost of nearly $1,595 per driver in the region. (AR 36197 [EA ES-6].)[2] A 2018 study estimated that "traffic congestion [would] be a $100 billion drag" on the area economy over five years, and identified the CBD—home to a quarter of the region's economic activity—as the primary source of traffic congestion in the region. (*See* AR 36253 [EA 1-12].) Yet despite multiple traffic-reduction initiatives and the nation's most extensive public transit network, the New York metro area remains the most congested urban area in the country. (AR 36196 [EA ES-5, fig. ES 3].)

For over 50 years, state and local officials, policy experts, and advocacy groups have studied various solutions to determine the most effective way to reduce congestion; there is a clear consensus that congestion pricing—charging vehicles to drive in highly congested areas—is the most effective tool to achieve that goal. (AR 4513–22 [EA App. 2A].)[3] Traffic congestion and public transit are inextricably linked: to reduce traffic, the region needs to improve the reliability of its transit system, which is chronically underfunded and in need of capital investment.

In 2018, the New York State Legislature created the Metropolitan Transportation Sustainability Advisory Workgroup, focused on addressing congestion and identifying sources of sustainable funding for the region's transit system. (AR 4518 [EA App. 2A-4].) The Workgroup

---

[2] Citations to the Administrative Record are identified as "AR" followed by the Bates numbers for the pages on which the referenced material appears. For convenience, citations to the Final EA also include page numbers within the document itself, which is included in the Record and available at https://new.mta.info/project/CBDTP/environmental-assessment.

[3] In 2007, New York City proposed congestion pricing for lower Manhattan as part of "PlaNYC," the City's long-term plan. The State of New York created a commission to evaluate a wide range of approaches to reducing congestion and to recommend a comprehensive congestion mitigation plan. The commission identified five options to evaluate in detail—congestion pricing, bridge tolling, pricing of parking and taxis, and license plate rationing—and ultimately recommended a modified version of the City's congestion pricing proposal. (AR 4515 [EA App. 2A-1].) However, at the time, the legislature did not enact a law authorizing the concept.

4

recommended the implementation of a congestion pricing tolling program for the CBD to reduce congestion and generate critical revenue to repair, improve, and modernize the MTA system.  (*Id.*)

On April 1, 2019, based on the Workgroup's recommendations, the legislature enacted the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act" or the "Act") with the goal of reducing traffic congestion in the CBD and creating a dedicated funding source for the MTA's capital needs.  The Act's findings recognized that "[t]he ongoing failures of the tracks, signals, switches, electrical power, and other transportation infrastructure throughout the subway system in the city of New York continue to have a significant deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers, as well as business and commerce in the metropolitan commuter transportation district[.]"  (AR 4527 [EA App. 2B-3].)  The legislature also recognized that traffic congestion "results in significant cost to the New York metropolitan area economy" and "impacts the everyday lives of residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services, and is a significant contributor to decreased air quality."  (*Id.*)  Accordingly, the Act directed TBTA, an affiliate agency of the MTA, to establish a plan to toll vehicles entering or remaining in the CBD.  (AR 4529 [EA App. 2B-5].)[4]

This Project, and the *four-year* long environmental review process that New Jersey calls a "rubber stamp," is the result of that legislative directive and significant input from federal, regional, state, and local agencies throughout the tri-state region, as well as the public.

## B.  Overview of the Four-Year Long NEPA Process

### 1.  Early Outreach to Agencies and the Public

In June 2019, shortly after passage of the Traffic Mobility Act, the Project Sponsors

---

[4] As defined in the Traffic Mobility Act, the CBD consists of the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway/Route 9A, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street.  (AR 4529 [EA App. 2B-5].)

submitted an Expression of Interest for tolling authority under FHWA's Value Pricing Pilot Program ("VPPP"), a mechanism created by Congress under which FHWA may authorize tolling of federal aid highways to reduce roadway congestion through congestion pricing strategies.[5]  (AR 38307–14.)  FHWA needed to evaluate the potential environmental effects of the proposal before it could authorize the Project, in accordance with NEPA, 42 U.S.C. §§ 4321 *et seq.*, and implementing regulations promulgated by the Council on Environmental Quality ("CEQ") (which apply to all federal agencies), 40 C.F.R. § 1500, and by FHWA, 23 C.F.R. § 771.  As part of the NEPA process, and in accordance with Presidential Executive Order ("EO") 12,898, FHWA also would analyze the potential impact of the proposal on minority and low-income populations, *i.e.*, environmental justice communities.  Finally, to comply with the CAA, FHWA would perform a transportation conformity analysis to evaluate whether the proposal would cause or contribute to violations of National Ambient Air Quality Standards ("NAAQS").  42 U.S.C. § 7506(c)(1).

FHWA sought, and TBTA provided, considerable information about the Project and its potential effects over the course of the following years.  (AR 38969, 40964–71.)  In March 2021, FHWA determined that the Project should be treated as a NEPA Class III (EA) action.  (AR 40972–73.)  Class III actions are those for which the significance of the environmental impact is not clearly established.  For Class III actions, Project Sponsors must prepare an EA to determine whether the action is likely to have a significant impact on the built and natural environment; if an unmitigated significant impact is found, an Environmental Impact Statement ("EIS") must be prepared.  40 C.F.R. §§ 1501.3, 1501.5, 1501.6.  If no significant impact is found, or if any predicted impacts would be mitigated to less than significant levels, the federal agency may issue a FONSI, and the action may proceed.  *Id*. § 1501.6.  FHWA stated that an EA would best serve

---

[5] FHWA, Value Pricing Pilot Program, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/.

the "mutual goals of producing needed traffic and air quality analysis and soliciting robust public input from all stakeholders." (AR 40972–73.) FHWA also required "enhanced coordination and public involvement that engages stakeholders from throughout all three states (New York, New Jersey, and Connecticut) in the commuting area of the CBD." (*Id.*)

Accordingly, FHWA and the Project Sponsors implemented a robust outreach plan to solicit input from residents, businesses, and federal, state, and local agencies, focusing on a 28-county regional area where it was anticipated that the Project could change travel patterns. (AR 36216 [EA ES-25], 39267–70.) From September 2021 through the conclusion of the NEPA process, members of the public could ask questions and comment on the Project through a designated email address, phone number, and mailing address. (AR 39267–70.) Additional outreach tools included: (1) a website; (2) Project Sponsor social media accounts; (3) a telephone hotline; (4) a contact list; and (5) media advertising. (AR 37045–49 [EA 18-4–8].) The MTA also posted digital ads and posters in nine languages in its facilities. (AR 37046 [EA 18-5].)

FHWA and the Project Sponsors established two environmental justice working groups to allow for more in-depth discussion about environmental justice issues: the Environmental Justice Technical Advisory Group (the "EJTAG") and the Environmental Justice Stakeholder Working Group (the "EJSWG"). (AR 37048 [EA 18-7].) Thirty-seven groups were invited to participate in the EJTAG, including the New Jersey Environmental Justice Alliance. (AR 36217 [EA ES-26], 37037 [EA 17-84].) EJSWG membership was open to nominations and to individuals who expressed interest. (AR 36217 [EA ES-26].) All 27 people who were nominated or expressed interest were invited to join the EJSWG. (*Id.*)

In 2021, FHWA and the Project Sponsors held 19 virtual early outreach meetings, of which five were specifically targeted towards New Jersey residents, and nine were targeted to

environmental justice community members. (AR 37046–47 [EA 18-5–6].) All meetings included a public comment session and a digital Question & Answer function, which members of the public could use to ask questions and receive responses in real time. (*Id.*) The meetings were held at different times of day and over multiple days to maximize participation. (AR 37048 [EA 18-7].) FHWA and the Project Sponsors also met with the EJTAG seven times and the EJSWG three times between 2021 and early 2023. (AR 37048–49 [EA 18-7–8].) In total, over 1,000 people attended early outreach meetings, and nearly 400 people spoke. (AR 37047 [EA 18-6].)

FHWA and the Project Sponsors invited 24 agencies from across the tri-state region to participate in the NEPA process; five of these agencies had representatives from New Jersey. (AR 37042–43 [EA 18-1–2].) These agencies included three state transportation agencies—the New Jersey Department of Transportation ("NJ DOT"), New Jersey Transit ("NJ Transit"), and the New Jersey Turnpike Authority ("NJ TA")—and two regional transportation agencies—New Jersey Transportation Planning Authority ("NJ TPA") and the Port Authority of New York and New Jersey ("PANYNJ"). (AR 37043 [EA 18-2].)[6] As part of their participation in the NEPA process, these New Jersey agencies were invited to advise on multiple topics, including (1) the scope of the EA, (2) potential effects of the Project, (3) measures to mitigate potential adverse effects, and (4) issues identified by the public. (AR 37042 [EA 18-1].)[7] Although regulations expressly allow state and local agencies to formally request active involvement, 40 C.F.R. § 1501.8(a), no other

---

[6] To the extent New Jersey claims that only NJ TPA was named a participating agency, Compl. ¶ 73, this assertion is simply wrong. NJ DOT, NJ Transit, and NJ TA were also invited to participate. (AR 37043 [EA 18-2].)

[7] The Project Sponsors also engaged in affirmative outreach to agencies for additional consultation on specific issues, such as NJ Transit and PANYNJ with respect to the potential for overcrowding of a stairway at the Hoboken Terminal and PATH station. (AR 39946, 39957–58, 39960–73, 7780 [EA App. 18C-327], 45368–71.) FHWA and the Project Sponsors also sought input from these agencies on the conclusions of the EA. (*Id.*)

New Jersey entities or officials requested to participate in the NEPA process.

New Jersey's transportation agencies also attended regional agency meetings. On September 10, 2021, NJ DOT, NJ Transit, NJ TPA, and NJ TA attended a meeting during which FHWA and the Project Sponsors presented information on the Project and the NEPA process. (AR 41617–20, 37044 [EA 18-3].) Both NJ Transit and NJ TPA asked questions, which were answered. (*Id.*) On August 4, 2022, the same agencies attended a regional agency meeting, wherein the Project Sponsors provided an overview of the Draft EA before it was published. (AR 41634–38.) The Project Sponsors requested feedback, but no New Jersey agency provided any. (*Id.*)

### 2. The Draft EA and Public Participation

On August 10, 2022, FHWA and the Project Sponsors issued for public review and comment an 868-page Draft EA, which was informed by the early outreach conducted over the past year and complex technical analyses. (AR 37149, 37057 [EA 18-16].) The Draft EA examined numerous categories of potential environmental effects, from the visual effects of tolling infrastructure to the indirect air quality and noise effects of changes in traffic patterns, to the effects on transit systems of shifts in travel mode choice. (AR 37296–37885.) The Draft EA also studied potential effects on environmental justice communities and populations, including the potential effect of traffic diversions on local air quality in the locations throughout the region most likely to experience diversions, including in New Jersey. (AR 37886–37955.)

Because the tolling structure was not yet defined,[8] the Draft EA analyzed seven tolling

---

[8] The Traffic Mobility Act required the TBTA Board to establish a Traffic Mobility Review Board ("TMRB") composed of regional representatives to recommend the toll amounts and toll structure, such as exemptions, discounts, and/or crossing credits for existing tolls paid on bridges and tunnels. Informed by the TMRB's recommendation, the TBTA Board must approve and adopt a final toll structure following a public hearing in accordance with the New York State

scenarios, with different variables, using the New York Metropolitan Transportation Council Best Practice Model ("BPM") to predict changes in regional travel demand and patterns for all scenarios, as compared to predicted conditions in 2023 and 2045.  (AR 37361.)  It then studied the scenarios that yielded the representative worst-case effects for different resource categories (*e.g.*, traffic, noise, etc.) to maximize the identification and consider the full range of potential effects from the Project.  (*Id.*)  The Draft EA also identified measures to which the Project Sponsors committed to mitigate potential adverse environmental effects and potential effects on environmental justice populations that were identified in the analyses.  (AR 37942–46.)

The Draft EA was made available for public viewing on the Project's website and at 62 repositories, 29 of them in New Jersey.  (AR 37057–62 [EA 18-16–21].)  In late August 2022, FHWA and the Project Sponsors held six virtual public hearings, totaling over 38 hours, to discuss the Draft EA.  (AR 37062 [EA 18-21].)  In total, over 1,700 people attended the public hearings and over 500 people spoke.  (*Id.*)

FHWA and the Project Sponsors held a 44-day public comment period, during which anyone could submit comments on the Draft EA.[9]  Over 100 government representatives and agencies submitted comments.  (AR 7455–7946 [EA 18C-2–493].)  New Jersey submitted a two-page letter from Governor Murphy and joint comments from New Jersey transportation agencies in a document totaling eight pages in length, which mainly pointed out certain findings of the Draft

---

Administrative Procedure Act ("SAPA").  (AR 36205 [EA ES-14].)  The TMRB issued its recommendation report on November 30, 2023, and on December 6, 2023, the TBTA Board voted to authorize TBTA to commence the rate-making process under SAPA for the toll structure recommended by the TMRB.  *See* Congestion Pricing in New York (Nov. 2023), https://new.mta.info/document/127761; MTA, Press Release (Dec. 6, 2023), https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.
[9] The initially announced public comment period was extended by two weeks, from September 9 to September 23, 2022, after requests from members of the public.  (AR 36217 [EA ES-26].)

EA (without taking issue with the methodologies used or the scope of analysis) and raised concerns about fiscal impacts on the New Jersey agencies. (AR 7768, 7772–75 [EA App. 18C-315, 18C-319–22].) No comments were submitted by the New Jersey Department of Environmental Protection ("NJDEP") or the New Jersey Department of Health ("NJDOH").

EPA also reviewed the Draft EA with respect to several subject matter areas, including environmental justice and CAA transportation conformity requirements. (AR 37956.) In addition to commending improvements made to the environmental analysis based on early agency outreach, EPA's comments principally concerned the Draft EA's air quality and environmental justice analyses. (AR 7920–25 [EA 18C-467–72].) EPA also recommended consideration of additional mitigation to address potential effects on environmental justice communities. (*Id.*)

After the formal close of the Draft EA comment period, FHWA and the Project Sponsors continued to receive and consider new comments on the Draft EA up to the point the Final EA was submitted.[10] They held an additional regional agency meeting on May 11, 2023, to discuss the changes between the Draft EA and the Final EA. (AR 43818–21.) NJ Transit and NJ DOT asked questions about next steps but did not comment on substance or express any concerns. (*Id.*)

In total, FHWA and the Project Sponsors received nearly 70,000 public input submissions on the EA. They reviewed and prepared responses to each one, and these comments informed the Final EA and Draft FONSI. (AR 7452–36141 [EA App. 18C].)

### 3.   *The Final EA and FONSI*

Between August 2022 and April 2023, FHWA and the Project Sponsors reviewed and prepared responses to each of the many thousands of comments and prepared a Final EA incorporating these responses and changes informed by the public input. (AR 36150–37107.)

---

[10] *See, e.g.*, AR 3688–4155 [EA App. 18B] (reflecting comments received after the close of the comment period that were included and responded to in the Final EA).

FHWA (with EPA's concurrence) approved the issuance of a Final EA in May 2023.  (AR 40579–80, 45366.)  In response to comments submitted by EPA and based on feedback from the EJTAG and EJSWG, FHWA and the Project Sponsors included in the Final EA an extensive supplemental analysis focused on environmental justice.  Found in Appendix 17D and summarized in Chapter 17, this analysis principally focused on the potential impact of the Project on traffic proximate to environmental justice communities and resulting emissions and potential associated health effects.  (AR 36989–96 [EA 17-36–43], 6963–82 [EA App. 17A], 7243–7440 [EA App. 17D].)  The Final EA identified 2,193 of the 3,106 census tracts in the local 10-county study area—over 70%—as environmental justice communities.  (AR 7251 [EA App. 17D-3].)

The Project Sponsors also committed to a robust, $155 million mitigation package over five years to improve air quality and public health in environmental justice communities that face preexisting burdens due to historic transportation and land use planning.  This mitigation package is multifaceted.  For starters, the mitigation package contains regional measures, including: (1) reducing the overnight period toll, which will avoid and minimize overnight truck diversions; (2) spending $20 million to accelerate the replacement of approximately 500 older diesel trucks used in the region with newer electric, hybrid, or clean diesel vehicles; and (3) spending $5 million to expand NYCDOT's off-hours delivery program, which facilitates deliveries at less congested times.  The mitigation package also includes localized, place-based mitigation, such as installing roadside vegetation to improve near-road air quality, focusing on sensitive sites (*e.g.*, schools, day cares, senior or community centers, etc.), renovating parks and greenspace, and installing air filtration units in schools near highways.  (AR 7322–25 [EA App. 17D-74–77].)  The supplemental analysis identified environmental justice communities beset with high preexisting pollution and health burdens, including several communities in New Jersey, that could see *any* additional traffic

as a result of the Project based on modeling for the tolling scenarios with the highest overall

diversions; these particularly burdened areas were identified as warranting place-based mitigation.

(AR 7324–26 [EA App. 17D-76–78].)  The EA recognized that regional mitigation measures such

as the clean trucks program, described above, would benefit areas throughout the region situated

near highways.  (AR 7322–23 [EA App. 17D-74–75].)  The Final EA also included additional

mitigation commitments to address potential adverse effects of the Project on low-income frequent

drivers to the CBD.  (AR 37025 [EA 17-72].)  Confirming that the substantial revisions addressed

their prior comments on the Draft EA, EPA "acknowledge[d] the improvements [made] throughout

the NEPA process," praised the supplemental environmental justice analysis and mitigation

package, and, critically, did not request any further changes or analysis.  (AR 45366.)

In light of these and other mitigation commitments, the Final EA concluded that the Project

would not have a disproportionately high and adverse effect on environmental justice communities

or populations.  (AR 37026 [EA 17-73].)  Based on the Final EA, FHWA approved the issuance

of a Draft FONSI, which determined that the Project would not have a significant adverse impact

on the human or natural environment.  (AR 393.)

The Final EA and Draft FONSI were made available for public review for a period of 30

days, from May 12, 2023, to June 12, 2023.  (AR 40580, 40683–84.)  FHWA and the Project

Sponsors reviewed additional submissions received during this period but determined that these

comments did not provide new information and therefore did not require changes to the EA.[11]  (AR

393.)  Accordingly, on June 23, 2023, FHWA's New York Division Administrator signed the

---

[11] These included a 16-page submission from Governor Murphy, which included some of the erroneous assertions made in this lawsuit as well as other erroneous assertions New Jersey has now properly abandoned. The letter belatedly challenged the methodology used to identify environmental justice communities, but did not identify any communities that New Jersey believed should have been identified but were not.  (AR 40844–58; ECF 1-04.)

FONSI, thus concluding FHWA's four-year long NEPA review of the Project.  (AR 363.)

The Project will not commence operation until the TBTA Board adopts a tolling structure through a formal rate-setting and the Project Sponsors and FHWA execute a tolling agreement under the VPPP.  (AR 393–94.)  Before reaching a VPPP agreement, FHWA and the Project Sponsors will also evaluate the TBTA-adopted tolling structure to determine whether the FONSI is still valid.  Depending on the nature of the adopted toll structure, this could require additional technical analysis.  (AR 394.)

## LEGAL STANDARD

New Jersey concedes that it must overcome a "deferential" standard of review to justify the relief it seeks.  Pl.'s Mem. of L. in Supp. of Mot. for Summ. J. ("Pl. Br.") 20.  "When an agency publishes an EA and concludes an EIS is not needed, courts set those determinations aside only if there is evidence they were arbitrary or capricious."  *Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 271 (3d Cir. 2012) (citing 5 U.S.C. § 706(2)(A), *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004), and *Soc'y Hill Towers Owners Ass'n v. Rendell*, 210 F.3d 168, 180 (3d Cir. 2000)).

As the Third Circuit has explained, "NEPA is 'primarily [an] information-forcing' statute; it 'directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another.'"  *Twp. of Bordentown v. FERC*, 903 F.3d 234, 248 (3d Cir. 2018) (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017)).  Therefore, "judicial 'review of administrative choices under NEPA…focuses primarily on the procedural regularity of the decision,' rather than on its substance."  *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 118–19 (2d Cir. 2013) (internal citations omitted).  "So long as the agency takes a 'hard look at the environmental consequences' the agency has satisfied its responsibilities and a reviewing court may not 'substitute its judgment for that of the agency as to the environmental consequences of its

actions.'"  *Twp. of Bordentown*, 903 F.3d at 248 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)); *see also Tinicum Twp. v. U.S. Dep't of Transp.*, 685 F.3d 288, 294 (3d Cir. 2012).

"Before bringing their NEPA challenges in court, parties must 'structure their participation' in the administrative process 'so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration.'"  *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 155 (3d Cir. 2017) (alterations omitted) (quoting *Pub. Citizen*, 541 U.S. at 764).  "Accordingly, parties challenging an agency's compliance with NEPA must ordinarily raise relevant objections during the public comment period."  *Erlbaum v. New Jersey Dep't of Env't Prot.*, No. CV 16-8198 (RMB/JS), 2017 WL 465466, at *14 (D.N.J. Feb. 3, 2017) (citation and internal quotation marks omitted); *see also Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978) ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by…, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider [the matter].").

Consistent with this rule, objections not raised during a public comment period ordinarily may not be raised in litigation.  *See Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015); *see also Pub. Citizen*, 541 U.S. at 764.[12]  Thus, issues raised for the first time during a public availability period for a draft FONSI, which by regulation is not a public comment period, *see* 40 C.F.R. § 1501.6(a)(2), are not preserved for judicial review (AR 40836).

---

[12] An exception is objections to or based on information made available after the public comment period.  *See, e.g.*, *Slockish v. FHWA*, No. 3:08-cv-01169-YY, 2020 WL 8617636, at *33 (D. Or. Apr. 1, 2020), *R. & R. adopted in relevant part*, 2021 WL 683485 (D. Or. Feb. 21, 2021); *Vill. of Logan v. U.S. Dep't of Interior*, No. 12-CV-401 WJ/LFG, 2013 WL 12084730, at *3 (D.N.M. Jan. 14, 2013).

Summary judgment is proper where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because the Court's review is limited to the Administrative Record, which supports the rationality of FHWA's decision, Defendants are entitled to summary judgment.

## ARGUMENT

### I.   New Jersey Had Ample Opportunity to Participate in the NEPA Process

Most of New Jersey's substantive challenges to the Final EA follow a central theme: if only New Jersey agencies had been afforded the opportunity to participate in the NEPA review of the Project, the analyses would have better addressed the concerns raised in the lawsuit. But this theme rests on a mistaken premise—that FHWA and the Project Sponsors failed to adequately include New Jersey. In truth, New Jersey could have raised its concerns at any time in formal meetings or by reaching out to its neighbor state, with which it has many channels of communication. New Jersey instead *chose* to limit its participation to formal comments that did not even raise most of the issues presented for the first time in this litigation.

New Jersey claims that FHWA "abrogated its responsibility under NEPA by failing to engage New Jersey and its agencies," and by failing to provide adequate time for public comment on the Draft EA. Pl. Br. 39–43. To the contrary, the public and New Jersey agencies in particular had multiple opportunities to engage with FHWA and the Project Sponsors and to share their concerns well before and after the publication of the Draft EA.

Four New Jersey agencies were proactively invited to participate in the NEPA process: NJ DOT, NJ Transit, NJ TA, and NJ TPA, which conducts CAA conformity analyses for New Jersey's Transportation Improvement Program. (AR 37043 [EA 18-2].) These agencies were subsequently invited to more than 25 meetings and public hearings, during which they had the opportunity to share any information they believed germane to the environmental review, including any concerns

regarding the Project's effects on New Jersey.  (AR 37046–47, 37062 [EA 18-5–6, 18-21], 41617–20, 41634–38, 39946, 39957–58, 39960–73.)  New Jersey agencies also attended multiple regional agency meetings, during which New Jersey agencies asked just two questions and declined the Project Sponsors' repeated invitations to engage further or provide additional substantive comments.  (AR 41617–20, 41634–38, 37044 [EA 18-3].)

New Jersey agencies, like all members of the public, were also given the opportunity to provide comments through various means through the entire NEPA process.  (AR 37056–57 [EA 18-15–16].)  Early outreach commenced in September 2021, and the formal public comment period did not close until late 2022.  (AR 37046–47, 37063 [EA 18-5–6, 18-22].)  During that time, and even afterward, New Jersey agencies had dozens of opportunities to engage with FHWA and the Project Sponsors about the Project or request more active involvement.  Nothing prohibited them from proactively reaching out to FHWA or the Project Sponsors.  Most surprisingly given their current stance and the close relationship between the two states, New Jersey agencies never engaged with their counterparts in New York to (1) voice concerns about the environmental effects of the Project in New Jersey; (2) propose different methodologies or provide useful data in support of the analyses; or (3) identify a new alternative to the Project that should be considered.  Rather, they participated minimally when afforded the opportunity and submitted written comments during the comment period and the availability period for the Draft FONSI.  Those comments did not address many of the issues New Jersey now takes with the EA and FONSI.  New Jersey's failure to participate in no way demonstrates that FHWA neglected its responsibilities under NEPA.

## A. FHWA and the Project Sponsors Involved the Public and Relevant Agencies in the Environmental Review at the Earliest Appropriate Time and Solicited Their Views

New Jersey claims that FHWA failed to comply with NEPA regulations concerning the involvement of the public, state and local governments, and interested agencies in the NEPA

process.  Pl. Br. 39–43 (citing 40 C.F.R §§ 1501.5(e) and 1506.6(a), and 23 C.F.R. §§ 771.111(e) and 771.119(b)).  New Jersey forfeited this objection by failing to raise it during the administrative process.  *See Pub. Citizen*, 541 U.S. at 564–65.  These claims are also meritless.

Under 40 C.F.R. §§ 1501.5(e) and 1506.6(a), agencies are to involve "the public, State, Tribal, and local governments, [and] relevant agencies…*to the extent practicable*, in preparing environmental assessments" and must "make diligent efforts" to involve the public in the NEPA process.  (emphasis added).  23 C.F.R. § 771.119(b) similarly provides for lead agencies to, "*at the earliest appropriate time*, begin consultation with interested agencies and others to advise them of the scope of the project" and to achieve certain objectives, including: (1) determining "which aspects of the proposed action have potential for social, economic, or environmental impact" and (2) identifying "alternatives and measures that might mitigate adverse environmental impacts." (emphasis added).  Such consultation must be completed through "early coordination activities or through a scoping process."  23 C.F.R. § 771.119(b).

The CEQ regulations grant the lead federal agency the discretion to decide how much involvement by the public, government entities, and relevant agencies is "practicable."  40 C.F.R. § 1501.5(e); *see also FreshWater Accountability Project v. U.S. Army Corps. of Eng'rs*, 629 F. Supp. 3d 761, 775 (S.D. Ohio 2022) ("[T]he Corps had no specific obligation [under 40 C.F.R. § 1501.5(e)] to obtain comment from [other] agencies."); *Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13-CV-5347 (RA), 2015 WL 7460018, at *15 (S.D.N.Y. Nov. 24, 2015) ("An agency preparing an EA is required to 'involve environmental agencies, applicants, and the public' only 'to the extent practicable' …and agencies are afforded 'considerable discretion to decide the extent

to which such public involvement is practicable…'") (citing *Brodsky*, 704 F.3d at 121).[13]
Moreover, the lead agency has the flexibility to determine the "earliest appropriate time" to involve
interested parties.  23 C.F.R. § 771.119(a), (b).  Neither NEPA nor its implementing regulations
*require* consultation at any particular stage of the process.

In any event, FHWA and the Project Sponsors brought other agencies, including those from
New Jersey, into the conversation early in the process, beginning the year before the Draft EA was
published.  Despite New Jersey's protestation that a failure to consult resulted in insufficient
attention to New Jersey communities and methodologies in the EA, New Jersey never provided
input on what it wanted included in the document.  Even in providing formal public comments on
the Final EA, Governor Murphy stated that New Jersey could have provided relevant data if
adequately consulted, yet it never did so during the years of environmental review.  (AR 40847.)

As detailed above, there is no question that FHWA and the Project Sponsors sufficiently
consulted New Jersey entities at the earliest appropriate time in preparing the EA and provided
adequate opportunity for public involvement.  The Project Sponsors held 19 early outreach
meetings, all of which were advertised multiple ways.  They then held six public hearings on the
Draft EA and responded to all written comments.  The public and New Jersey agencies were also
invited to provide comments via multiple other avenues.

New Jersey agencies were also afforded additional opportunities to participate.  More than
one fifth of the agencies invited to participate in the NEPA process had representatives from New
Jersey.  These agencies were invited to three regional transportation meetings, during which they

---

[13] A plaintiff's participation claims are actionable only to the extent the lack of participation
prevented the lead agency from taking a "hard look" at the relevant areas of environmental
concern.  *Coal. for Healthy Ports*, 2015 WL 7460018, at *15.  Because New Jersey's claims of
deficiencies in the EA must fail, New Jersey must lose on this claim as well.

were given the opportunity to ask questions and provide feedback.  (AR 41617–20, 43820–21.)

New Jersey's new, belated complaints about these participation opportunities are meritless. New Jersey speculates that given the timing of the August 4, 2022, regional transportation meeting, the "Project Sponsors never seriously intended to consider any input from New Jersey's agencies before publishing the Draft EA."  Pl. Br. 42.  But FHWA and the Project Sponsors would have had to receive substantive input from New Jersey agencies in order to consider it.  None of the four New Jersey agencies attending that meeting commented on the presentation.  (AR 41634–38.) New Jersey's claim regarding the alleged futility of the May 11, 2023, meeting addressing the Final EA is similarly flawed, since neither of the New Jersey agencies in attendance commented on the substantive material during that meeting either.  Pl. Br. 42.  (AR 43820–21.)  And New Jersey's comments on the Draft EA contained perfunctory objections and did not provide substantive information that the State now claims it was denied the opportunity to provide.  (AR 7768, 7772–75 [EA App. 18C-315, 18C-319–22].)

Moreover, the Project Sponsors met separately with NJ Transit and PANYNJ on March 11, 2022, to discuss mitigation for potential passenger crowding at Hoboken station.  (AR 39957.) While New Jersey attempts to minimize the importance of this meeting by claiming it was limited to discussing a "single stairway," Pl. Br. 42, this meeting resulted in continued dialogue and a follow-up meeting at the Project Sponsors' request.[14]  (AR 39946, 39957–58, 39960–73).  Thus, contrary to New Jersey's claim, Pl. Br. 40, FHWA and the Project Sponsors complied with 23 C.F.R. § 771.111(e), which requires "[o]ther States…that may be significantly affected by the action or by any of the alternatives to be notified early and their views solicited."

New Jersey asserts that FHWA and the Project Sponsors provided only 44 days to

---

[14] New Jersey's challenges to the EA do not concern effects on transit facilities.

participate in the NEPA process.  Pl. Br. 15.  That assertion is belied by the Record.  FHWA and

the Project Sponsors began engaging with the public and New Jersey agencies in 2021, held 25

public meetings between September 2021 and September 2022, provided New Jersey agencies

with the opportunity to comment on the Project and ask questions during the entire NEPA process,

and responded to all 70,000 public comments received, including many that were received

following the formal comment period.[15]  (AR 3688–4506 [EA App. 18B], 7452–36141 [EA App.

18C], 37063 [EA 18-22], 39267–70.)  Given this extensive public engagement, New Jersey's

reliance on *Kootenai Tribe of Idaho v. Veneman*, 142 F. Supp. 2d 1231 (D. Idaho 2001), is sorely

misplaced.  In *Kootenai*, the court found the agency's engagement with the public and other

interested groups for the preparation of an EIS was insufficient because *all* of the public meetings

regarding the project occurred within a twelve-day period, and none of the over one million public

comments were responded to.  *Id.* at 1246.  Not so here.

### B.  New Jersey Failed to Exercise its Right to Request Additional Involvement

To the extent New Jersey claims NJDEP and NJDOH should have been invited to

participate in the NEPA process, such claims ignore the responsibility agencies have to voice their

desire for additional involvement.  Pl. Br. 41.  Under the CEQ regulations, any State or local

agency may request that the lead agency designate it as a participating or cooperating agency.  40

C.F.R. § 1501.8(a).[16]  NJDEP or NJDOH could have requested to be participating agencies, but

---

[15] New Jersey notes that while over 70,000 submissions were received, the responses to comments are fewer than 70,000 pages.  Over 50,000 submissions consisted of duplicative form comments. Each unique comment, including each different form submission, received a response.  (AR 37063 [EA 18-22], AR 3598–37107 [EA Apps. 18A, 18B, 18C, 18D].)  FHWA reasonably approved of this method rather than unnecessarily generating a vast number of repetitive responses, an approach that is permitted by the CEQ regulations.  40 C.F.R. § 1503.4(a).  In any event, New Jersey offers no support for its apparent belief that FHWA's responses must have the same page count as the total number of comments received.

[16] *See also* Environmental Review Toolkit, FHWA, Question 4, https://www.environment.fhwa. dot.gov/legislation/authorizations/safetealu/reviewProcess_faq.aspx#faq_1.

never did.  In fact, neither agency submitted comments on the EA until June 12, 2023—almost a year after the formal comment period ended and a year and half after early outreach began.  (AR 40844–58.)  Therefore, this objection was also forfeited.  *See Pub. Citizen*, 541 U.S. at 764–65.

Second, it is entirely within the lead agency's discretion to identify participating agencies. *Coal. for Healthy Ports*, 2015 WL 7460018, at *15.  The Project Sponsors invited five agencies with representatives from New Jersey to participate in the NEPA process, including the three agencies New Jersey incorrectly claimed in its Complaint were not invited to participate—NJ DOT, NJ Transit, and NJ TA.  Compl. ¶ 73.  (AR 37043 [EA 18-2].)  Additionally, while New Jersey takes issue with the relative number of New York agencies that were invited to meetings, Pl. Br.  41, the Project will be physically located in New York and is mandated by New York legislation.  The involvement of New York entities in no way hindered New Jersey from meaningfully participating or requesting the opportunity for more of its agencies to participate.

## II.   FHWA and the Project Sponsors Considered Reasonable Alternatives

### A.  The EA Appropriately Defined the Purpose and Need for the Project

New Jersey claims, without any basis in legal authority, that the EA's focus on the MTA's revenue goals, in addition to congestion reduction, resulted in a purpose and need that was too narrowly defined, thereby foreclosing consideration of non-revenue-generating alternatives.  Pl. Br. 44–46.  However, the EA properly rejected alternatives that did not meet the critical, statutorily mandated goal of funding public transit.

NEPA affords agencies "considerable deference" in defining a project's purpose and need based on their "expertise and policy-making role."  *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999); *Norwalk Harbor Keeper v. U.S. Dep't of Transp.*, No. 3:18-CV-0091 (SRU), 2019 WL 2931641, at *7 (D. Conn. July 8, 2019).  When addressing a challenge to a project's stated purpose and need, courts review an agency's definition of a project's objectives under the

"rule of reason." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C. Cir. 1991). As long as the agency "look[s] hard at the factors relevant to the definition of purpose," courts will generally defer to the agency's definition of objectives. *Id.* at 196.

It is reasonable for an EA to assess in detail only the no-action alternative and one practical alternative where no other potential alternative would meet a project's stated objectives. *Utah Env't Congress v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006); *see also Citizens Against Burlington, Inc.*, 938 F.2d at 197 (upholding decision in EIS "to evaluate only the preferred and do-nothing alternatives" after other alternatives were rejected as unreasonable); *Jones v. Peters*, No. 2:06-CV-00084BSJ, 2007 WL 2783387, at *18–19 (D. Utah Sept. 21, 2007) (holding that EA reasonably winnowed alternatives to the preferred alternative and the no-build alternative).

Additionally, where a goal of a project is financial, courts have recognized that it is appropriate to include the revenue goal in the project's defined objectives and to reject alternatives that would not meet that goal. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty v. Zinke*, 889 F.3d 584, 603 (9th Cir. 2018) ("FEIS's 'purpose and need' statement was [not] 'artificially limited'" where "[t]he FEIS explained that the objectives ... were to…[i]mprove the socioeconomic status of the Tribe by providing a new revenue source…"); *Stand Up for California! v. U.S. Dep't of Interior*, 919 F. Supp. 2d 51, 79 (D.D.C. 2013) ("[I]t was rational for the Secretary to reject potential alternatives if they would not, in the Secretary's informed judgment, allow for a large enough development to provide the North Fork Tribe with revenues that would meet the purpose and need of the proposed action…."); *Protect Lake Pleasant, LLC v. Connor*, No. CIV 07-0454-PHX-RCB, 2010 WL 5638735, at *16, *31 (D. Ariz. July 30, 2010) (holding where a project purpose was to provide county parks department with a percentage of the project's annual revenue, it was reasonable to eliminate an alternative that would not involve the

county); *cf. Citizens Against Burlington, Inc.*, 938 F.2d at 198–99 ("FAA defined the goal for its action as helping to launch a new cargo hub [and] helping to fuel the Toledo economy.  The agency then eliminated from detailed discussion the alternatives that would not accomplish this goal.").

Here, the Project's defined purpose "is to reduce traffic congestion in the [CBD] in a manner that will generate revenue for future transportation improvements."  (AR 36197 [EA ES-6].)  FHWA and the Project Sponsors established specific objectives, which include: (1) reducing daily vehicle-miles traveled  ("VMT") within the CBD by at least five percent; (2) reducing the number of vehicles entering the CBD daily by at least ten percent; (3) creating a funding source for capital improvements and generating sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program; and (4) establishing a tolling program consistent with the purposes underlying the Traffic Mobility Act.  (AR 36198 [EA ES-7], 36259 [EA 1-18], 4525–46 [EA App. 2B].)  FHWA and the Project Sponsors reasonably included generation of revenue critically needed for transit improvements in the Project's purpose, need, and objectives, particularly as reliable transit service will reduce congestion further than tolling alone.  To avoid narrowing the possibilities only to the Project, the preliminary alternatives were specifically *not* screened against the fourth Project objective: consistency with the Act.  (AR 36200 [EA ES-9].)

## B.  The Project Sponsors Considered all Reasonable Alternatives

New Jersey does not endorse any particular alternative as environmentally preferable to the Project, but nevertheless questions why certain other ideas for congestion reduction were rejected.  Pl. Br. 46.  NEPA requires agencies to assess in detail only potential alternatives that are reasonable.  42 U.S.C. § 4332(C)(iii); *see also* 40 C.F.R. §§ 1501.5(c)(2), 1502.14.  An alternative is considered reasonable if it is "technically and economically practical or feasible and meet[s] the purpose and need of the proposed action."  40 C.F.R. § 1508.1(z); *see Twp. of Belleville v. Fed. Transit Admin.*, 30 F. Supp. 2d 782, 798-99 (D.N.J. 1998) ("Reasonableness is measured by

whether it achieves the goals the [a]genc[y] set out to achieve.").  NEPA does not require that agencies provide detailed information about alternatives they have "in good faith rejected as too remote, speculative, or impractical or ineffective," or to study "in detail" projects that only partially meet a project's goals.  *Nat'l Post Office Collaborate v. Donahoe*, 3:13-CV-1406 (JBA), 2014 WL 6686691, at *8 (D. Conn. Nov. 26, 2014); *Norwalk Harbor Keeper*, 2019 WL 2931641, at *10.

Furthermore, where a project aims to meet statutory objectives, a court will give substantial weight to the legislative grant of power when deciding whether an agency should have considered additional alternatives.  *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983) ("Statutory objectives provide a sensible compromise between unduly narrow objectives an agency might choose to identify to limit consideration of alternatives and hopelessly broad societal objectives that would unduly expand the range of relevant alternatives.").

Under NEPA, "an agency's obligation to consider alternatives under an EA is… a lesser one than under an EIS."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *see also Mt. Lookout—Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998) ("The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required…."); *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1558 (2d Cir. 1992).[17]  But here, FHWA and the Project Sponsors met even the heightened EIS standard by identifying and evaluating all potential reasonable alternatives and, where necessary, screening them based on their ability to meet the purpose, need, and objectives.

The Project Sponsors began by assessing several preliminary alternatives.  These included:

---

[17] Courts have recognized that where an EA fulfills the function of an EIS, it can be considered the functional equivalent of an EIS.  *Spiller v. White*, 352 F.3d 235, 245 n.6 (5th Cir. 2003) (holding that "[f]orcing the Lead Agencies to prepare an EIS would likely be unnecessarily duplicative and a waste of resources" where the EA "has all the hallmarks of an EIS"); *Nat'l Indian Youth Council v. Andrus*, 501 F. Supp. 649, 656–57 (D.N.M. 1980).

(1) implementing parking pricing strategies ("NTP-1"); (2) raising tolls or implementing variable tolls on existing toll facilities ("T-1"); (3) tolling the East and Harlem River bridges ("T-2"); (4) creating high-occupancy toll lanes ("T-3"); (5) implementing zone-based pricing ("T-4"); (6) reducing government-issued parking permits ("O-1"); (7) providing additional taxi stands to reduce cruising ("O-2"); (8) creating incentives for teleworking ("O-3"); (9) rationing license plates ("O-4"); (10) implementing mandatory carpooling ("O-5"); and (11) establishing truck time-of-day delivery restrictions ("O-6").  (AR 36267 [EA 2-6], 36200 [EA ES-9].)

The Project Sponsors dismissed from further consideration the preliminary alternatives that failed to meet one or more of the three Project objectives.  (AR 36267 [EA 2-6], 36266 [EA 2-5].) Alternative T-4 (CBD Tolling Program) was the only alternative that met the Project's purpose and need and all three objectives.  (AR 36299–300 [EA 2-38–39], 36266–67 [EA 2-5–6].) Therefore, two alternatives[18] were studied in further detail: (1) the No Action Alternative, which would not implement a vehicular tolling program in the CBD, and (2) the CBD Tolling Alternative (the Action Alternative).  (AR 36199 [EA ES-8].)

Although many congestion reduction ideas were considered and rejected, largely based on the prior studies undertaken by policymakers in 2008 and prior to the enactment of the Traffic Mobility Act, New Jersey takes issue with the rejection of alternatives O-4, O-5, and T-2.  Pl. Br. 45–46.   These alternatives would not have created a funding source for MTA capital improvements.[19]  (AR 36267–68 [EA 2-6–7].)  Given that revenue generation is a permissible

---

[18] The No Action Alternative does not meet the Project purpose and objectives (AR 36269 [EA 2-8], 36300 [EA 2-39]), but it must still be evaluated as the baseline condition against which the potential effects are evaluated, 40 C.F.R § 1502.14(c).

[19] New Jersey complains that Alternative T-2—tolling on the East River and Harlem River bridges—could generate revenue.  The EA explained that this alternative was not viable because tolling City bridges is beyond the jurisdiction of TBTA or the MTA, and "there is no law or

objective, the Project Sponsors were not required to abandon that objective or evaluate alternatives

that would not meet that objective or could do so only if other major actions were taken. *See, e.g.*,

*Protect Lake Pleasant, LLC*, 2010 WL 5638735, at *16, *31.

### III.   FHWA Took a Hard Look at Potential Environmental Impacts in New Jersey

### A.   The EA Thoroughly Analyzed Potential Air Quality Impacts in New Jersey

Chapter 10 of the EA presented a detailed analysis of the Project's potential effects on air

quality throughout a 12-county study area that included two counties in New Jersey—Bergen and

Hudson.  (AR 36838–57 [EA 10-21–40].)  The analysis methodology was based on EPA's CAA

regulations, 40 C.F.R. Parts 51 and 93, relevant guidance, and EPA-approved air quality models.

(AR 36818–19, 36823, 36832 [EA 10-1–2, 10-6, 10-15].)  Using these tools, the EA presented a

regional "mesoscale" analysis to study effects on pollution loads throughout the study area, a local

"microscale" hot-spot analysis centered on specific local intersections, and a "highway-link" hot-

spot analysis to evaluate potential effects near highway segments projected to see the most

pronounced traffic diversions or with the greatest overall truck volumes.[20]  Based on this

multifaceted analysis, FHWA determined that the Project would not cause exceedances of the

---

agreement in place between the City of New York and MTA that would direct the revenue to MTA
to support the Capital Program."  (AR 36268 [EA 2-7].)  This alone is sufficient to eliminate this
alternative, as any revenue generated would not flow to the MTA.  *See Protect Lake Pleasant,
LLC*, 2010 WL 5638735, at *31.  New Jersey also ignores other reasons offered in the EA for
rejecting T-2.  As the EA explained, the 2008 New York City Traffic Congestion Mitigation
Commission Study noted that T-2 would not toll trips that start and end within Manhattan, such as
trips beginning or ending on the Upper East and West Sides.  (AR 36268 [EA 2-7], 7943 [EA App.
18C-490], 3613 [EA App. 18A-8].)  Similarly, the EA explained that, based on that study, O-4
(restricting license plates entering the CBD by number, which would not generate revenue) would,
*inter alia*, disproportionately affect lower-income, one-car households.  (AR 3611 [EA App. 18A-
6].)
[20] The hot-spot analysis focused on locations predicted to have truck diversions because
"[a]lthough all motor vehicles produce air pollutants, emissions from trucks are of particular
concern to near-road air quality because they are predominantly powered by diesel fuel," the
exhaust from which contains "gases and solid particles" that "can be harmful to peoples' health."
(AR 7255 [EA App. 17D-7]; *see also* AR 36860 [EA 10-43].)

NAAQS set by EPA, the leading federal agency responsible for air quality that also reviewed the air quality analyses in the EA.  (AR 36818–19, 36868 [EA 10-1–2, 10-51].)

Starting with the regional (mesoscale) analysis, the EA used projections of VMT, speed, and vehicle mix, to estimate the percent change in emissions for volatile organic compounds, nitrogen oxides, carbon monoxide (CO), particulate matter ($PM_{2.5}$ and $PM_{10}$), carbon dioxide equivalent, and Mobile Source Air Toxics.  (AR 36838–59 [EA 10-21–42].)  Using Tolling Scenario A, which was projected to have the smallest reduction in VMT region-wide and therefore the smallest air pollution improvement, total regional differences were projected comparing projected emissions with and without the Project.  The analysis concluded that the Project would result in an overall reduction in all types of emissions in the 12-county study area as a whole.  (AR 36839, 36852–53 [EA 10-22, 10-35–36].)  The results were also broken down by county.  (AR 36840–41 [EA 10-23–24].)  This sub-regional analysis showed that certain counties could experience small increases in county-wide emissions, but the Project would lower "overall regional VMT and emission burdens," and "benefit regional air quality by reducing criteria pollutants in the 12-county study area." (AR 36838 [EA 10-21].)[21]  For example, Bergen County was predicted to have increases in total emissions of various pollutants that were all under 1%, while Hudson County was predicted to have decreases in all pollutants in the 1–4% range.  (AR 36840–41, 36854–55 [EA 10-23–24, 10-37–38].)  Neither in early outreach, nor in formal comments, nor in any informal communication, did any New Jersey agency propose that any other New Jersey counties should be studied in the mesoscale analyses.

The EA also included a local, microscale screening analysis to evaluate potential effects

---

[21] Criteria pollutants are the those for which EPA has established NAAQS: particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead.  (AR 36819 [EA 10-2].)

from CO and $PM_{2.5}/PM_{10}$ at particular intersections throughout the study area in accordance with EPA's air quality regulations. 40 C.F.R. §§ 93.116, 123. Developed through interagency consultation with the Interagency Consultation Group ("ICG"), composed of representatives of NYSDOT, EPA, FHWA, the Federal Transit Administration, and NYMTC, the screening analysis evaluated 102 intersections throughout the study area, including four in New Jersey, which were selected based on traffic modeling and community feedback[22] as the intersections "expected to demonstrate the largest changes in traffic due to the Project." (AR 36859–60 [EA 10-42–43].) All locations—including those in New Jersey—passed the applicable screening thresholds, demonstrating that the Project "would not create any new or worsen any existing violation" "or delay timely attainment" of NAAQS. (AR 36859–63, 36868 [EA 10-42–46, 10-51].)

The EA also included a "highway link" analysis to evaluate potential effects of traffic diversions on local air quality near certain highway segments. (AR 36863–64 [EA 10-46–47].) "Since the tolling scenarios affect individual highway links differently, this screening analysis evaluated every highway link under every scenario and selected those sites that demonstrated the highest [annual average daily traffic] and the highest increase in heavy-duty diesel trucks" in any scenario. (AR 36864 [EA 10-47].) Having identified the highways most likely to be impacted by the Project, the EA included a localized hot-spot analysis at three highways, including I-95 west of the George Washington Bridge in New Jersey; in each case, the EA evaluated the tolling scenario projected to have the greatest impact on traffic diversions. (AR 36865 [EA 10-48].) Once

---

[22] "A total of 102 intersections were identified and were aggregated into 15 study areas" "defined based on the key entry points to the CBD." (AR 36475 [EA 4B-82].) "[M]any of these study areas were identified through the public outreach process at locations where communities expressed concerns regarding the potential impacts of more local traffic changes." (*Id.*) No New Jersey agency ever identified additional locations that should be included in the intersection analyses either for traffic or air quality.

again, the analysis demonstrated that the Project would not result in exceedances of applicable

NAAQS, including west of the George Washington Bridge.  (*Id.*)

To ensure that actual impacts are consistent with projections, the Project Sponsors also

committed to monitoring air quality for the life of the Project.  (*Id.*)  Monitoring locations will be

selected in consultation with environmental justice stakeholders and relevant agencies, including

in New Jersey.  (*Id.*)  Finally, the Project Sponsors also performed an extensive environmental

justice analysis, described below, which further assessed potential effects relevant to air quality.

**B.  The EA Explained Why the Project Would Not Cause Significant Impacts on Air Quality in Bergen County**

The Record refutes New Jersey's claims that the EA failed to take a "hard look" at potential

impacts on air quality in that state, including in Bergen County.  Pl. Br. 22–24.  As explained, the

EA used sophisticated EPA modeling techniques to analyze potential effects on air quality in New

Jersey at the regional, intersection, and highway levels.  (AR 36838–65 [EA 10-21–48].)  Although

the mesoscale analysis predicted overall concentrations of certain criteria pollutants could increase

in Bergen County by less than 1%, the microscale air quality modeling demonstrated that the

Project would not result in exceedances of NAAQS at the worst-case locations in the worst-case

scenario.  (AR 36865 [EA 10-48].)  In addition, Appendix 17D of the EA further analyzed the

potential effect of traffic diversions related to local air quality in environmental justice

communities in Bergen County, and Fort Lee (located west of the George Washington Bridge in

Bergen County) was identified as a community that may warrant place-based mitigation.  (AR

7325–26 [EA App. 17D-77–78].)  Bergen County was diligently considered.

New Jersey's position appears to assume that *any* predicted increase in emissions within a

county constitutes a *significant* impact requiring preparation of an EIS.  New Jersey cites no

authority for this nonsensical proposition, which would require an EIS for virtually any highway

project.  To the contrary, determining significance "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise," and courts "must defer to the informed discretion of the responsible federal agencies." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376-77 (1989) (internal quotation marks omitted).  To satisfy NEPA, an agency simply must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

Here, FHWA examined the results of EPA-approved traffic and air modeling and concluded that the Project would comply with the EPA-approved NAAQS.  (AR 36868 [EA 10-51].)  Because EPA sets such standards with "an adequate margin of safety…to protect the public health," 42 U.S.C. § 7409(b)(1), "the case law is nearly unanimous that federal agencies may rely on NAAQS compliance to conclude that human health will not be seriously affected by a transportation project," *Sierra Club v. FHWA*, No. 17-cv-1661-WJM-MEH, 2018 WL 1610304, at *7 (D. Colo. Apr. 3, 2018) (collecting cases); *Barnes v. F.A.A.*, 865 F.3d 1266, 1273 (9th Cir. 2017); *Coal. for Healthy Ports*, 2015 WL 7460018, at *26.[23]

## C.  FHWA Based Its Analysis on Robust Data and Well-Founded Methodologies

New Jersey further attempts to undermine the EA by claiming that FHWA "cherry-pick[ed] which tolling scenarios to analyze" in the regional air quality analysis by studying only Tolling Scenario A.  Pl. Br. 27–29.  As a threshold matter, New Jersey forfeited this claim by failing to

---

[23] The cases New Jersey cites to rebut this conclusion are poles apart from this case.  In *Sierra Club v. Mainella*, the agency provided no "substantive analysis" whatsoever, relying instead on a bare description of the potential impact "followed by a conclusion that the impact was not… 'significant.'"  459 F. Supp. 2d 76, 106–08 (D.D.C. 2006).  Similarly, in *Center for Biological Diversity v. National Highway Traffic Safety Administration*, the agency provided no basis for its determination that a small percentage change in greenhouse gas emissions would not significantly impact the environment, arguing instead that its conclusion was "self-evident" despite having no "analysis or supporting data."  538 F.3d 1172, 1223 (9th Cir. 2008).

raise it during the administrative process.  *See Pub. Citizen*, 541 U.S. at 764–65.

Even if New Jersey had properly preserved the issue, the EA's analysis was sound.  As New Jersey acknowledges, Tolling Scenario A was used for this analysis "because it is the tolling scenario that would result in the smallest reduction of VMT compared to the No Action Alternative." (AR 36828 [EA 10-11].)  In other words, "Tolling Scenario A would have the lowest beneficial effect on regional air quality because changes in regional air quality emissions burden are directly related to changes in VMT." (*Id*.)  Although localized impacts vary depending on the tolling scenario, it was reasonable for FHWA to use the regional worst-case scenario for the regional air quality analysis, and that methodological choice is entitled to deference.  *Sierra Club*, 867 F.3d at 1369–70 (holding "methodology was reasonable, even where it deviated from what Sierra Club would have preferred"); *see also Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006) (rejecting methodological challenge where the agency "gave attention to the issues plaintiffs raise, for all they disagree with the conclusions").[24]

New Jersey's brief contains a table purporting to show "staggering increases" in VMT in New Jersey between Tolling Scenario A and other tolling scenarios.  Pl. Br. 28.  But New Jersey mischaracterizes as "twenty times worse" a scenario that is really only a de minimis *0.12%* increase in VMT compared to the No-Action Alternative—0.12% just happens to be 20 times 0.006%, which is the increase in VMT in New Jersey predicted for Tolling Scenario A.  (AR 36353–54,

---

[24] New Jersey claims in a passing footnote that the fact that the final tolling structure could differ from the seven scenarios analyzed in the EA proves that FHWA failed to take a hard look at the Project.  Pl. Br. 28 n.32.  This specter is false and misleading.  Consistent with FHWA's NEPA regulations, the FONSI clearly states that "[t]he adopted TBTA toll rates and structure will have to be re-evaluated to determine if the decision made in the FONSI is still valid.  This requires that the TBTA demonstrate to FHWA that the effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA and that the mitigation is still valid." (AR 394.)  *See also* 23 C.F.R. § 771.129.  Any prospective challenge to FHWA's failure to take a hard look in a re-evaluation of a not-yet-adopted tolling structure is unripe and not part of this case.

36360–61 [EA 4A-14–15, 4A-21–22].)  New Jersey reaches this misleading result by comparing relatively small differences among the various tolling scenarios to the increases predicted for *Tolling Scenario A*, rather than comparing them to the No-Action Alternative, to suggest that other scenarios will cause explosive traffic growth instead of the tiny percent increases actually predicted.[25]  This is clear from reviewing the New Jersey Counties data reflected in Tables 4A-7 and 4-A-14 in the EA (AR 36354, 36361 [EA 4A-15, 4A-22]), showing the actual percent increase predicted for each scenario:

| | Tolling Scenario A | Tolling Scenario B | Tolling Scenario C | Tolling Scenario D | Tolling Scenario E | Tolling Scenario F | Tolling Scenario G |
|---|---|---|---|---|---|---|---|
| Percent Change in NJ VMT in 2023 Compared to No-Action | 0.0% | 0.0% | 0.2% | 0.2% | 0.1% | 0.2% | 0.1% |
| Percent Change in NJ VMT in 2045 Compared to No-Action | 0.0% | 0.0% | 0.1% | 0.1% | 0.0% | 0.1% | 0.0% |

New Jersey next argues that additional counties should have been included in the regional air quality study, arguing that "it is simply impossible to rule out whether other New Jersey counties will experience similar or worse adverse impacts than Bergen County."  Pl. Br. 22–23, 29.  Here again, New Jersey did not object to the scope of the regional air quality analysis during the administrative process and so has forfeited this objection.  *See Pub. Citizen*, 541 U.S. at 564–65.  Even if New Jersey had preserved this issue, its concerns are misplaced.  As the EA explained, the 12-county regional study area included the two counties in New Jersey that were projected to see the largest changes in VMT—Bergen County and Hudson County.  (AR 36828 [EA 10-11].) The BPM predicted that the remaining New Jersey counties would see smaller increases than

---

[25] For example, New Jersey presents Tolling Scenario B as a "76% difference[] relative to Scenario A" and thus suggests that Scenario B represents an *increase* in VMT as compared to Scenario A, but in reality, traffic modeling predicted that Scenario B would result in *lower* VMT compared to Scenario A (76% *of* Scenario A's VMT).  Pl. Br. 28.

Bergen County, less than half a percent, in VMT. (AR 36830 [EA 10-13].) And while New Jersey complains that Essex and Union Counties were ignored, Pl. Br. 29, the EA's environmental justice chapter specifically analyzed potential effects related to local traffic diversions in those counties, (AR 36959 [EA 17-6]). FHWA "provided a rational basis for its definition of the project study area," and "[t]here is no evidence of arbitrary line-drawing with the goal of excluding an area that would have undermined the analysis." *Bitters v. FHWA*, No. 14-cv-1646-KJM-SMS, 2016 WL 159216, at *14 (E.D. Cal. Jan. 13, 2016). FHWA's "choice among reasonable analytical methodologies is entitled to deference." *Sierra Club*, 867 F.3d at 1368 (citations omitted).

New Jersey claims that the EA "arbitrarily analyzed only four intersections in New Jersey" in the 102-intersection microscale analysis. Pl. Br. 31–32. As the Final EA explained in response to an EPA comment concerning the choice of intersections for analysis, "[t]he 102 intersections selected for analysis were deemed to have the greatest potential for increased traffic for certain tolling scenarios based upon an evaluation of diversions using the BPM." (AR 7927 [EA App. 18C-474]; *see also* 36475 [EA 4B-82], 4647–74 [EA App. 4B.1].) This approach was not arbitrary and capricious. Indeed, New Jersey repeatedly relies on EPA's comments on the Draft EA, but after reviewing the Final EA and its responses to comments, EPA did not request any further analysis. (AR 45366.) New Jersey also complains that traffic modeling for the four New Jersey intersections predicted decreases in traffic, but many analyzed intersections in New York also were projected to experience traffic decreases. (AR 6815–24 [EA App. 10-11–20].)[26]

---

[26] New Jersey implies in a footnote that the screening analysis "appears to have violated New York law," but the email it cites for this proposition actually shows that the screening process for the microscale analysis was provided to the ICG in compliance with 6 NYCRR § 240.2.8(e). Indeed, the methodology for the hot-spot analysis was provided to the ICG for review and approved subject to certain conditions that were incorporated into the EA. (AR 40053, 44959, 44966.) There was no violation of state law.

New Jersey particularly complains that intersections in Bergen County were not analyzed, again ignoring the response to EPA's comment, which explained that "[t]he local intersections at the New Jersey and Manhattan approaches to the George Washington Bridge" (in Bergen County) were not included in the 102-intersection microscale analysis "because traffic at those intersections connects primarily to regional highways and not local streets."  (AR 36475 [EA 4B-82]; *see also* AR 7927 [EA App. 18C-474].)  Because "diversions would be most pronounced" on the highway west of the George Washington Bridge (AR 36859 [EA 10-42]), the EA instead performed a highway-link analysis, which showed that even under the tolling scenario predicted to have the greatest impact on traffic diversions in Fort Lee, at one of the overall worst-case locations in the study area, the Project could result in an increase of $PM_{2.5}$ emissions of *less than a tenth of one percent* (from 11.1 $\mu g/m^3$ to 11.2 $\mu g/m^3$) and would not cause exceedances of the NAAQS for particulate matter (12.0 $\mu g/m^3$) (AR 36865 [EA 10-48], 7927 [EA App. 18C-474]).  Here again, FHWA's methodological choice was "reasonable and adequately explained."  *Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004).[27]

Finally, New Jersey repeatedly cites EPA's comments on the Draft EA, which suggested additional analysis of localized effects on air quality.  Pl. Br. 32–33.  New Jersey's reliance on EPA's comments is misplaced; the Project Sponsors thoroughly addressed them by "conduct[ing] an additional assessment of the Project effects on traffic proximate to environmental justice communities and resulting emissions and potential associated health effects," and committing to

---

[27] New Jersey halfheartedly objects to the EA's noise analysis.  Its only substantive grievance is that the EA focused on highways and intersections where the greatest noise effects are predicted. Pl. Br. 32 n.35.  New Jersey forfeited this objection by failing to raise it during the administrative process.  In any event, it was rational to focus the analysis on locations expected to experience the greatest impacts.  Even these locations were predicted to have imperceptible increases in noise as a result of the Project.  (AR 36878, 36882–83, 36886 [EA 12-3, 12-7–8, 12-11].)

spend $155 million in mitigation for communities with preexisting pollution and health burdens. (AR 36989–96 [EA 17-36–43], 6963–82 [EA App. 17A], 7243–7440 [EA App. 17D].)   EPA subsequently "acknowledge[d] the improvements [made] throughout the NEPA process," praised the supplemental analysis and mitigation package, and did not request any further analysis.  (AR 45366.)  New Jersey's claim that FHWA and the Project Sponsors "ignored the EPA's expert advice, turned a blind eye to" impacts in New Jersey, "and issued its FONSI without addressing the EPA's concerns" is therefore demonstrably false.  Pl. Br. 32.  Collaboration of this kind between expert agencies and project sponsors is the hallmark of a successful NEPA process.

## IV.  The EA Took a Hard Look at Environmental Justice Concerns

"The principle of environmental justice encourages agencies to consider whether the projects they sanction will have a 'disproportionately high and adverse' impact on low-income and predominantly minority communities." *Sierra Club*, 867 F.3d at 1368 (quoting EO 12,898).  When included in a NEPA document,[28] "an environmental justice analysis is measured against the arbitrary-and-capricious standard." *Id*.  The EA's methodology must be "reasonable and adequately explained," but the agency's "choice among reasonable analytical methodologies is entitled to deference." *Communities Against Runway Expansion, Inc.*, 355 F.3d at 689; *Coliseum Square Ass'n, Inc.*, 465 F.3d at 233.  "As always with NEPA, an agency is not required to select the course of action that best serves environmental justice, only to take a 'hard look' at

---

[28] Because EO 12,898 does not create a private right of action, some courts have held that environmental justice claims of this kind are unreviewable.  *See, e.g.*, *Iseke v. City & Cnty. of Honolulu*, No. CV 15-00193, 2017 WL 6803423, at *11 (D. Haw. Sept. 20, 2017).  Other courts have held that if an agency evaluates environmental justice as part of NEPA, the claim "arises under NEPA and the APA" and so "is properly subject to 'arbitrary and capricious' review under the APA." *Communities Against Runway Expansion, Inc.*, 355 F.3d at 689 (affirming environmental justice analysis); *Coliseum Square Ass'n, Inc.*, 465 F.3d at 232-33 (same); *Latin Ams. for Soc. & Econ. Dev. v. FHWA*, 756 F.3d 447, 476 (6th Cir. 2014) (same).  The Third Circuit does not appear to have addressed the issue.

environmental justice issues." *Sierra Club*, 867 F.3d at 1368.  New Jersey's challenge to the environmental justice analysis in the EA centers on the misrepresentation that the State was left out of mitigation commitments and that New Jersey's state-specific methodology for defining "overburdened communities" should have been used to identify environmental communities in New Jersey, although it fails to explain how that would have made a difference in the EA.

### A. FHWA and the Project Sponsors Thoroughly Evaluated Environmental Justice

The EA rigorously followed guidance from USDOT and FHWA outlining the methodology for evaluating potential environmental justice impacts in a NEPA document.  (AR 36954–55 [EA 17-1–2].)[29]  First, utilizing analysis from other chapters of the EA and community feedback, the EA identified potential effects from the Project that could affect minority or low-income (environmental justice) communities or populations, including traffic, air quality, noise, and travel costs for low-income drivers, and then defined a local and regional study area to evaluate those potential impacts.  (AR 36956–58 [EA 17-3–5].)  The EA identified a "10-county local study area…where the greatest change in traffic volumes and vehicle-miles traveled are predicted to occur."  (AR 36958 [EA 17-5].)  The local study area included four New Jersey counties—Bergen, Essex, Hudson, and Union—along with the five boroughs of New York City and Nassau County.  (AR 36959 [EA 17-6].)  Regionally, the EA used a 28-county study area, of which 14 counties were in New Jersey, to analyze "how implementation of the CBD Tolling Alternative would affect the regional population in terms of increased costs (tolls), changes in trip time, and changes in transit conditions."  (AR 36957, 36960 [EA 17-4, 17-7], 6970 [EA App. 17A-4].)

---

[29] *See also* FHWA, Guidance on Environmental Justice and NEPA (Dec. 16, 2011), https://www.environment.fhwa.dot.gov/env_topics/ej/guidance_ejustice-nepa.aspx;   USDOT Order 5610.2C (May 16, 2021), https://www.transportation.gov/sites/dot.gov/files/2021-08/Final-for-OST-C-210312-003-signed.pdf;   FHWA   Order   66420.23A   (June   14,   2012), https://www.fhwa.dot.gov/legsregs/directives/orders/664023a.cfm.

The EA next identified minority and low-income communities.  To do so, FHWA and the Project Sponsors considered USDOT and FHWA guidance, input from the community during early outreach, as well as the availability and granularity of data sources "to ensure that the approach reflects the local context for the Project and employs an appropriate methodological approach." (AR 6974–79 [EA App. 17A-8–13].)  FHWA and the Project Sponsors also considered seven potential environmental justice screening tools to identify environmental justice communities, including EPA's EJSCREEN tool, various New York State and City guidance and poverty metrics, and the *New Jersey Environmental Justice Screen*.  (*Id*.)  Informed by these tools, a census tract was considered minority if at least 50% of the population identifies as minority *or* if the percentage identifying as minority exceeds the share of minority population in the county where the census tract is located.  A census tract was considered low-income if the percentage of households with incomes up to *twice* the federal poverty level was higher than the percentage for the 28-county region.  (AR 36961 [EA 17-8], 6969–81 [EA App. 17A-3–15].)

These metrics are conservative.  Building on the definition of minority populations in USDOT and FHWA guidance, the EA incorporates both absolute and relative tests for identifying minority communities, resulting in a more inclusive identification of environmental justice communities than using one metric alone.  (AR 6970–72 [EA App. 17A-4–6].)  Similarly, although USDOT and FHWA guidance generally "define low-income populations as people living below the [U.S. Department of Health and Human Services] poverty guideline," FHWA and the Project Sponsors determined that using twice the federal poverty level would better account for the higher cost of living in the region.  (AR 6974 [EA App. 17A-8].)

The EA then applied the above definitions to every census tract in the local and regional study areas.  In the local study area, the EA identified 2,193 of the 3,106 census tracts—over

70%—as environmental justice communities.  (AR 7251 [EA App. 17D-3].)  In the regional study area, the EA estimated the number of low-income and minority commuters to the CBD, including the proportion of such commuters who hail from New Jersey, to assess region-wide impacts of the Project under each scenario.  (AR 36971–75, 37001–08 [EA 17-18–22, 17-48–55].)

Having identified environmental justice communities at the census tract level, the EA evaluated nine categories of potential effects in the 10-county local study area, including traffic congestion, traffic-related air quality, and noise in environmental justice areas.  (AR 36977–37001 [EA 17-24–48].)[30]  Regionally, the EA analyzed the potential increased cost of the Project on low-income and minority drivers, as well as potential impact on taxi and for-hire vehicles, who were identified as an environmental justice population based on data from the New York City Taxi and Limousine Commission.  (AR 36975–77, 37001–14 [EA 17-22–24, 17-48–61].)

Applying this analysis, the EA found that the Project would not adversely affect environmental justice communities with respect to traffic, noise, transit ridership, displacement, and the costs of goods.  Based on the Project Sponsors' commitment to limit tolling of taxis and for-hire-vehicles, the EA also found that their drivers would not suffer a disproportionately high and adverse effect on their job security as a result of the Project.  (AR 37025 [EA 17-72].)

In response to comments from EPA and others on the Draft EA, and based on feedback from the EJTAG, the Final EA included a technical memorandum evaluating the potential impact of traffic diversions on local air quality and health in environmental justice communities.  (AR 36981–96 [EA 17-28–43], 6963–82 [EA App. 17A], 7243–7440 [EA App. 17D].)  This analysis

---

[30] The categories of potential effects were: (1) increased traffic congestion on highway segments; (2) changes in traffic conditions at local intersections; (3) effects on air quality; (4) effects on noise; (5) increases to transit ridership; (6) changes in passenger flows at transit stations; (7) changes in pedestrian circulation on sidewalks near transit hubs; (8) potential for indirect displacement; and (9) potential effects on the costs of goods.  (AR 36977–78 [EA 17-24–25].)

"identif[ied] and describe[d] the burdens experienced by environmental justice communities with pre-existing pollutants or chronic diseases" using "data from a number of sources," including EPA, CEQ, the Centers for Disease Control ("CDC"), the New York State Department of Health, the New York City Department of Health and Mental Hygiene, NJDOH, and NJDEP.  (AR 36990 [EA 17-37].)  Reflecting their commitment to analyzing potential impacts in New Jersey, the Project Sponsors incorporated data published by New Jersey State and local agencies, and also used CDC health measures data in place of EPA and CEQ tools incorporating health data, which tools were missing data for New Jersey.  (AR 7270–71 [EA App. 17D-22–23].)

The technical memorandum used this data to identify environmental justice census tracts within the local study area with high preexisting pollution and chronic disease burdens, compared to census tracts nationwide.  The analysis then identified which of those census tracts were predicted to have any increase in highway truck traffic, and, separately, non-truck traffic, as the result of the Project.  The technical memorandum did so by comparing the No Action condition with the Project using a "traffic proximity" metric: a distance-weighted measure that provides a way to describe a census tract's exposure to highway traffic from all directions.  (AR 7266–71, 7292 [EA App. 17D-18–23, 17D-44].)  To be conservative, the EA used the scenarios modeled to have the largest potential impact on truck diversions (Scenario E) and, separately, non-truck diversions (Scenario G).  (AR 7292–7312 [EA App. 17D-44–64].)  Based on the metric used in the latest CEQ guidance for identifying disadvantaged communities to which benefits of federal programs should be directed, the EA identified environmental justice tracts with preexisting traffic-associated air pollution or health burdens at the 90th percentile or higher compared to national values, which tracts could also experience increases of any magnitude in traffic proximity as the result of the Project.  (AR 7283–7312 [EA App. 17D-35–64].)

40

The EA concluded that overall air quality in the local and regional study areas is projected to improve due to the Project, and that "a larger number of census tracts identified as environmental justice tracts (56) would experience reduced truck traffic proximity when compared to non-environmental justice tracts (23)." (AR 7303 [EA App. 17D-55].)  However, the EA found that absent mitigation, traffic diversions in certain particularly overburdened environmental justice communities could constitute an adverse effect.

To address these potential impacts, the Project Sponsors committed to a $155 million package of regional and place-based mitigation to avoid and mitigate adverse effects on overburdened environmental justice populations.  Specifically, the EA identified census tracts with either high air pollution or health burdens with predicted traffic proximity increases as benefitting from regional mitigation measures, whereas those with high burdens in both categories were identified as meriting place-based mitigation within their communities.  (AR 7324–26 [EA App. 17D-76–78].)   This was a highly conservative analysis—communities were identified for mitigation based on preexisting burdens possibly caused by proximity to existing highways constructed in the pre-environmental justice era, without consideration of the magnitude of effects predicted from the Project as long as some increase was possible.  The EA identified communities in New Jersey as warranting both types of mitigation, including four communities that were identified as areas that could merit place-based mitigation: Orange, East Orange, and Newark in Essex County, as well as Fort Lee in Bergen County.  (*Id.*)  The regional mitigation includes: (1) reducing the overnight period toll rates, which will minimize or avoid overnight truck diversions (when modeling showed many diversions would occur); (2) $20 million to accelerate the replacement of approximately 500 older diesel trucks used in the region with newer electric, hybrid, or clean diesel vehicles; and (3) $5 million to expand NYCDOT's off-hours delivery

program.  These measures will benefit *all* New Jersey environmental justice communities within the study area, regardless of their preexisting pollutant or chronic disease burden.  (AR 7322–23 [EA App. 17D-74–75].)

The Project Sponsors have also committed to implementing $100 million worth of place-based mitigation throughout the local study area that "will provide direct emissions reductions and air quality improvements, and will address some of the pre-existing health burdens."  (AR 7325 [EA App. 17D-77].)  Because the "specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario," (AR 36994 [EA 17-41]), once the final tolling structure is adopted, the Project Sponsors will determine the appropriate sites for place-based mitigation in consultation with an Environmental Justice Community Group to be established, relevant communities, elected officials, and local implementing agencies, to select optimal sites for place-based mitigation.  Place-based mitigation measures in New Jersey could include: (1) installing roadside vegetation to improve near-road air quality, focusing on sensitive sites (*e.g.*, schools, day cares, senior or community centers, etc.); (2) renovating parks and greenspace; and (3) installing air filtration units in schools near highways.[31]  (AR 37018–20 [EA 17-65–67], 7324–26 [EA App. 17D-76–78].)  Finally, the Project Sponsors will implement an "adaptive management" program that "will include monitoring the efficacy of mitigation, stakeholder consultation, and adjustments as warranted" to ensure successful implementation of

---

[31] Other place-based mitigation measures that were identified for specific communities based on input from the EJTAG include modifying tolling locations on the FDR to eliminate a potential toll avoidance route that could otherwise divert traffic into the Lower East Side, replacing refrigeration units at Hunts Point Produce Market, and establishing an asthma case management program and center in the Bronx.  (AR 37018–19 [EA 17-65–66].)

regional and place-based mitigation.  (AR 37017 [EA 17-64].)[32]

Accordingly, FHWA found that the Project "would not result in adverse effects on environmental justice populations in most of the topic areas reviewed, and that with the implementation of mitigation the Project would not result in any potentially disproportionately high and adverse effects on environmental justice populations."  (AR 37026 [EA 17-73].)

## B.   The EA's Environmental Justice Screening Methodology Was Reasonable

New Jersey argues that rather than using a uniform environmental justice screening methodology in the entire study area, FHWA should have adopted a fragmented approach that applied New Jersey's statutory definition for "overburdened communities" in New Jersey counties. Pl. Br. 35 (citing N.J. Stat. 13:1D-158).  New Jersey did not raise this objection until after the Final EA was circulated, almost a year after the close of the public comment period on the Draft EA. New Jersey has therefore forfeited this claim.  *See, e.g.*, *Slockish*, 2020 WL 8617636, at *33.

Moreover, the EA's methodology was reasonable because it allowed a comparison of effects across the study area.  (*See, e.g.*, AR 7263 [EA 17D-15 n.40].)  Courts defer to an agency's reasonable methodological choices for defining environmental justice communities.  *See Sierra Club*, 867 F.3d at 1370; *Coliseum Square Ass'n, Inc.*, 465 F.3d at 233; *Communities Against Runway Expansion, Inc*, 355 F.3d at 689 (affirming environmental justice methodology used to compare demographics of impacted populations).  New Jersey has not cited any case or legal rule requiring an agency to adopt a balkanized definition of environmental justice communities. Indeed, at least one court has specifically refused to require that an agency use data available for

---

[32] New Jersey claims that FHWA "failed to propose any…monitoring for New Jersey," Pl. Br. 17, but here again, New Jersey is mistaken.  Nothing in the EA limits ongoing air quality monitoring to New York.  (AR 7321 [EA App. 17D-73 n.109].)  To the contrary, the EA states that the Project Sponsors will select monitoring locations with "environmental justice stakeholders" and "other agencies conducting monitoring."  (*Id.*)  This includes New Jersey.

some (but not all) census tracts in defining environmental justice communities. *See Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003) (agreeing that "an environmental justice analysis must use consistent data sets in order for the comparison to be meaningful" and holding that the plaintiff's "suggested approach (using a medley of assorted data), and not [the government's], could more fairly be characterized as arbitrary").[33]

Critically, New Jersey has not alleged that its preferred definition would have identified *any* different or additional census tracts as environmental justice communities among the 30% of local study area census tracts that were not considered environmental justice communities in the EA. New Jersey asserts that Fort Lee was "unjustifiably excluded" from the environmental justice analysis, Pl. Br. 36, but the EA identified *every census tract in Fort Lee* as an environmental justice community, (AR 6995 [EA App. 17B-11], 7131 [EA App. 17C-127]). The EA also named Fort Lee as a community that may warrant place-based mitigation. (AR 7325–26 [EA App. 17D-77– 78]; *see also* AR 7253 [EA App. 17D-5].) Fort Lee was in no way "unjustifiably excluded."

### C. The EA and FONSI Include a Binding Commitment to Implement $155 Million in Mitigation That Will Benefit New York and New Jersey

New Jersey asserts *25 times* in its brief that the binding mitigation commitments in the EA and FONSI "would only mitigate impacts in New York" and that "[t]here is no indication that there will be any commitment of funds for mitigation in New Jersey." *See, e.g.*, Pl. Br. 6. This is at best a severe misreading which could have been rectified with a single phone call. Instead, New

---

[33] Moreover, New Jersey fails to demonstrate that its methodology is more inclusive. The regional percentage of low-income households used as the EA threshold is 28.6% (AR 36968 [EA 17-15]), and New Jersey's statutory threshold is 35%; both methodologies use twice the federal poverty threshold to define low income, N.J.S.A. 13:1D-158 (AR 6974 [EA 17A-8]). New Jersey complains that the uniform federal definition was "less precise" because it evaluated census tracts rather than smaller census blocks, Pl. Br. 35, but as the EA explained, FHWA used census tracts to facilitate comparisons to other data sets, such as CDC and BPM data, "which is not available at the block or block group level," (AR 7263 [EA App. 17D-15 n.40]). This reasonable methodological choice is entitled to deference, which New Jersey has failed to overcome.

Jersey filed this lawsuit.

As detailed above, the EA identified and evaluated potential impacts to New Jersey environmental justice communities and committed to a robust, $155 million package of measures to mitigate impacts throughout the region, including in New Jersey.  With respect to the $55 million in regional mitigation, New Jersey dismisses these measures as "expressly limited to New York," Pl. Br. 25, but such a distinction appears nowhere in the EA or the FONSI.  New Jersey brushes aside the $20 million committed to replace older, more polluting trucks because it is a "NYC" program, but trucks are only eligible for upgrade if 70% of their mileage occurs within the New York–New Jersey–Connecticut tri-state area.  (AR 7322 [EA App. 17D-74].)  This program will directly benefit communities in New Jersey proximate to truck routes.  New Jersey also dismisses the expansion of the NYCDOT Off-Hours Delivery Program, but this program will provide regional benefits by reducing diversions of all trucks entering or traveling through New York City.  (AR 7322–23 [EA App. 17D-74–75].)  The EA recognized that these programs will benefit the region, including New Jersey.  (AR 37018 [EA 17-65], 7322–23 [EA App. 17D-74–75].)

In addition to regional measures, the Project Sponsors have committed to spending $100 million on place-based mitigation to address potential effects on local air quality.  Although the final sites for place-based mitigation will be selected once the final tolling structure is adopted, the EA identified several communities in New Jersey that, depending on the tolling scenario, could merit place-based mitigation, including Orange, East Orange and Newark in Essex County, and Fort Lee in Bergen County.  (AR 7325–26 [EA App. 17D-77–78].)  Place-based mitigation measures eligible to be implemented in New Jersey include planting roadside vegetation to improve near-road air quality, renovating parks and greenspace, and installing air filtration units

in schools near highways ($10 million).  (AR 37018–20 [EA 17-65–67].)[34]

**D.  The EA Fully Considered Effects on New Jersey Environmental Justice Communities**

New Jersey's remaining objections to the EA's environmental justice analysis fare no better.  New Jersey claims that the EA ignored potential effects on environmental justice communities in Bergen County, including Fort Lee, but the Record belies this claim.  Because Bergen County was located in the local environmental justice study area, the EA used EPA-approved models to assess the potential impact of traffic diversions in all 178 census tracts in Bergen County, and then evaluated those potential diversions in light of the preexisting pollution and chronic disease burdens in the areas due to historic development practices.  (AR 7139 [EA App. 17C-135], 7283–7326 [EA App. 17D-35–78].)  New Jersey complains that the EA did not include an intersection in Fort Lee in its hot-spot air quality study.  But as explained above, air quality in Fort Lee was properly considered using a highway link hot-spot analysis, because Project-related diversions would travel on highways; this analysis concluded that the Project would not cause exceedances of the NAAQS.  (AR 36859, 36865 [EA 10-42, 10-48].)

New Jersey also mistakenly faults the EA for not comparing predicted $PM_{2.5}$ levels in Fort Lee to proposed changes to EPA's air quality standard, which changes have not been adopted.  It is well-settled that agencies are not required to consider proposed regulatory standards.  *See, e.g.*, *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 694 (10th Cir. 2015) (holding

---

[34] Perhaps recognizing that its argument attempts to prove too much, New Jersey concedes that the EA identified four New Jersey communities as potentially warranting place-based mitigation, but nonetheless asserts that "there is no commitment to invest in similar mitigation measures…in New Jersey."  Pl. Br. 38.  The only explanation New Jersey offers for this baseless assertion is a footnote saying that these measures "are functionally limited to New York because they are funded by New York entities and/or will be implemented by New York agencies or entities."  *Id.* at 25 n.30.  But as the EA explains, the mitigation measures listed above will be principally implemented by TBTA along with "Relevant State and Local Agencies," which for New Jersey communities will include New Jersey agencies.  (AR 37019 [EA 17-66].)  And New Jersey can hardly complain that the mitigation will be funded by New York entities.

agency did not "act[] arbitrarily and capriciously in relying on studies predicated on then-prevailing [air quality standards] promulgated by the nation's leading environmental agency, simply because new standards were forthcoming" and noting that "[n]ot surprisingly, [plaintiffs] have no caselaw to support that proposition"). Finally, Fort Lee was identified as a community that may warrant place-based mitigation depending on the final tolling structure, notwithstanding that the NAAQS would not be exceeded even in the worst-case location under the worst-case scenario. (AR 7325 [EA App. 17D-77].) If anything, Fort Lee was afforded special consideration because of its adjacency to a potential diversion route via the George Washington Bridge.

Continuing this pattern, New Jersey says that FHWA "inexplicably failed" to evaluate potential impacts on other environmental justice communities in Union City, East Newark, and Bayonne in Hudson County, Elizabeth in Union County, and Perth Amboy in Middlesex County. Pl. Br. 38. Apart from Perth Amboy, which New Jersey did not raise until its opening brief in this litigation,[35] all the communities New Jersey identifies were included in the local environmental justice study area and studied at the census-tract level, as outlined above. New Jersey singles out Union City as an area with preexisting pollutant burdens for criteria pollutants, but the EA determined that those census tracts are predicted to see a *decrease* in truck traffic as a result of the Project. (AR 7299, 7317 [EA App. 17D-51, 17D-69].) New Jersey also cites potential increased traffic in Bayonne, but here again, Bayonne was extensively analyzed as part of the local study area. (AR 7302, 7320 [EA App. 17D-54, 17D-72].) Union City and Bayonne will also benefit from regional mitigation that will improve air quality throughout the study area. (AR 7322 [EA App. 17D-74].) Notably, New Jersey never offered any expert analysis during the administrative

---

[35] Regardless, Middlesex County, which contains Perth Amboy, was not included in the local study area because modeling predicted that Middlesex would see small changes in traffic volume and VMT. (AR 36958 [EA 17-5].)

process challenging the robust modeling or suggested other methods.

NEPA does not command particular results; rather, it requires agencies to "take a 'hard look' at environmental justice issues." *Sierra Club*, 867 F.3d at 1368. FHWA's and the Project Sponsors' meticulous consideration of environmental justice more than satisfied the standard.

## V.   FHWA Complied with the Clean Air Act

Under the CAA, EPA sets NAAQS for certain pollutants; each state then has "the primary responsibility for assuring air quality" in its borders through a State Implementation Plan ("SIP") that "specif[ies] the manner in which" NAAQS "will be achieved and maintained." 42 U.S.C. § 7407(a). The "conformity rule" requires that federal agencies may not "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to" an EPA-approved SIP. 42 U.S.C. § 7506(c)(1). Federal activities cannot: (1) "cause or contribute to any new violation of any standard;" (2) "increase the frequency or severity of any existing violation of any standard;" or (3) "delay timely attainment of any standard or any required interim emission reductions or other milestones." 42 U.S.C. § 7506(c)(1)(B).

Challenges to CAA conformity determinations are reviewed under the APA's "arbitrary and capricious" standard. *See City of Olmsted Falls v. F.A.A.*, 292 F.3d 261, 269 (D.C. Cir. 2002). Without objecting during the administrative process to the conformity determination, New Jersey now alleges that FHWA failed to comply with the CAA's conformity rule. New Jersey asserts first that FHWA failed to perform a conformity analysis for the Project in relation to New Jersey's SIP, and second, that FHWA failed to adequately consult New Jersey agencies on the impact of the Project on New Jersey air quality. Pl. Br. 48–50. Neither claim warrants relief.

First, New Jersey has forfeited this claim by failing to raise it during the administrative process. *See Pub. Citizen*, 541 U.S. at 764–65; *see also Protect Lake Pleasant, LLC*, 2010 WL 5638735, at *38 (holding party waived conformity challenge by failing to raise issue during NEPA

proceedings); *City of Olmsted Falls*, 292 F.3d at 265 (same).

Second, New Jersey cites no authority requiring a conformity determination for a state neighboring the locus of a transportation project.  The only case addressing the issue held that an agency need *not* make a conformity determination for a state neighboring the one where the project's physical construction is located.  *Conservation L. Found., Inc. v. Dep't of Airforce*, 864 F. Supp. 265, 277–78 (D.N.H. 1994), *aff'd in part, rev'd in part on other grounds*, *Conservation L. Found. v. Busey*, 79 F.3d 1250 (1996).[36]  EPA, the federal agency responsible for implementing the CAA, never raised this issue during the NEPA process.

Moreover, the EA complied with the CAA.  As outlined above, Chapter 10 of the EA analyzed the Project's potential impact on New Jersey's air quality using sophisticated regional, local, and highway-link modeling, all in accordance with EPA's CAA conformity regulations and applicable agency guidance.  *See* 40 C.F.R. §§ 93.116, 123.[37]  Based on this analysis, FHWA concluded that the Project "meets the project-level conformity requirements and would not create any new or worsen any existing violation of the NAAQS or delay timely attainment of any NAAQS or any required interim emission reductions or other milestones," including in New Jersey.  (AR 36868 [EA 10-51].)  New Jersey has not identified any flaws in the EA's technical analysis.  There is no reason to compel a second formal conformity determination based on the same analysis.[38]

---

[36] The only contrary example New Jersey cites is the Cross Harbor Freight Program EIS, but that EIS analyzed a multi-state project undertaken by PANYNJ that involved potential construction in both states. Pl. Br. 49 n.45.

[37] Notably, New Jersey's conformity guidance echoes the regulatory standards in 40 C.F.R. § 93.123 that were applied in the EA.  *See* NJ DOT, Socioeconomic Guidance Manual, A Practitioner's Guide, App. G (Sept. 2010), https://www.nj.gov/transportation/eng/Environmental/pdf/GuidanceManual.pdf (citing 40 C.F.R. § 93.123(b)(1)).

[38] Put another way, because the EA contained the relevant substantive analysis, any failure to reference the New Jersey SIP was harmless.  *See Del. Riverkeeper Network*, 869 F.3d at 162; *see also Stand Up for California! v. U.S. Dep't of Interior*, 204 F. Supp. 3d 212, 319 (D.D.C. 2016),

New Jersey mistakenly claims that FHWA violated EPA's conformity regulations by failing to provide a "reasonable opportunity for consultation" with New Jersey agencies.[39]  Pl. Br. 47, 49.  However, the regulation from which New Jersey selectively quotes does not even apply to FHWA.  Rather, that section requires that "[metropolitan planning organizations] and State departments of transportation . . . provide reasonable opportunity for consultations."  40 C.F.R. § 93.105(a)(2).  Regardless, FHWA and the Project Sponsors undertook a far-reaching, multi-year outreach campaign offering New Jersey agencies ample opportunities for consultation.[40]  *See City of S. Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1142 (C.D. Cal. 1999) (holding that providing air quality reports and an "opportunity to question the models chosen by the defendants" satisfied the consultation obligation); *see also Sierra Club v. Atlanta Reg'l Comm'n*, 255 F. Supp. 2d 1319, 1346 (N.D. Ga. 2002), *aff'd*, 54 F. App'x 491 (11th Cir. 2002).  In short, New Jersey has shown no deficiency with the substance or the process of the conformity determination.

## CONCLUSION

For the reasons set forth above, the Court should deny New Jersey's Motion for Summary Judgement and grant Intervenor-Defendants' Cross-Motion for Summary Judgment.

---

*aff'd*, 879 F.3d 1177 (D.C. Cir. 2018) (applying harmless error to CAA conformity); *Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 703 (D. Md. 2007) (holding alleged failure to make statutory conformity findings was harmless where the court "affirm[ed] the [finding] that project emissions will not contribute to violations in the hot-spot locations").

[39] New Jersey also asserts, erroneously, that EPA was not consulted.  Pl. Br. 49.  However, EPA played a significant role in reviewing the EA as a whole and was also part of the ICG that consulted on the conformity analysis in particular.  (*See, e.g.*, AR 44933, 44959, 44977, 45366.)

[40] Proving the point, in April 2023, NJ TPA, the entity responsible for transportation conformity in northern New Jersey, emailed MTA staff requesting information about the Project so that it could be included in "NJ TPA's conformity analysis," and MTA staff promptly answered NJ TPA's questions.  (AR 40570–71.)

Dated: December 15, 2023                    Respectfully submitted,

                                            */s/ Daniel Chorost*
                                            Daniel Chorost
                                            Mark A. Chertok*
                                            Elizabeth Knauer*
                                            SIVE, PAGET & RIESEL, P.C.
                                            560 Lexington Avenue, 15th Floor
                                            New York, NY 10022
                                            (212) 421-2150
                                            dchorost@sprlaw.com
                                            mchertok@sprlaw.com
                                            eknauer@sprlaw.com

                                            */s/ Roberta A. Kaplan*
                                            Roberta A. Kaplan*
                                            Gabrielle E. Tenzer*
                                            Kaplan Hecker & Fink LLP
                                            350 Fifth Avenue
                                            New York, NY 10118
                                            rkaplan@kaplanhecker.com
                                            gtenzer@kaplanhecker.com

                                            Raymond P. Tolentino*
                                            Kate Harris*
                                            Kaplan Hecker & Fink LLP
                                            1050 K Street NW, Suite 1040
                                            Washington, DC 20001
                                            rtolentino@kaplanhecker.com
                                            kharris@kaplanhecker.com

                                            *Counsel for Intervenor-Defendants the
                                            Metropolitan Transportation Authority and
                                            the Triborough Bridge and Tunnel Authority*

                                            *Admitted pro hac vice*