# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY,<br><br>                        Plaintiff,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration,<br><br>                    Defendants,<br><br>   and<br><br>METROPOLITAN TRANSIT AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,<br><br>                    Defendant-Intervenors. | Civil Case No. 2:23-cv-03885 |

## PLAINTIFF NEW JERSEY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' AND DEFENDANT-INTERVENORS' CROSS-MOTIONS AND IN FURTHER SUPPORT OF NEW JERSEY'S SUMMARY JUDGMENT MOTION

# TABLE OF CONTENTS

Page(s)

I.   PRELIMINARY STATEMENT ............................................................................. 1

II.  ADDITIONAL FACTS ........................................................................................ 9

    A. After This Suit Was Filed, The TMRB Recommended a New Tolling Scheme
    That Is Not One of the Seven Analyzed in the Final EA or FONSI ................................... 9

III. FHWA AND MTA ARE NOT ENTILTED TO DEFERENCE AND MISAPPLY THE
    STANDARD OF REVIEW ............................................................................ 10

IV.  ARGUMENT ................................................................................................... 12

    A. The Final EA and FONSI Must Be Vacated Because FHWA Did Not Evaluate the
    Tolling Scheme MTA Intends to Implement ................................................... 12

    B. FHWA's "Methodological" Choices Obscure Adverse Impacts in New Jersey and
    Should Not Be Given Deference ................................................................. 15

        1. New Jersey Did Not Waive Its Claims Regarding Air Quality Impacts .................... 16

        2. FHWA's Regional Air Quality Analysis of Two New Jersey Counties Is
        Entitled to No Deference and Is Arbitrary and Capricious ............................. 17

        3. FHWA's Regional Air Quality Analysis Based on Tolling Scenario A Only Is
        Entitled to No Deference and Is Arbitrary and Capricious ............................. 18

        4. FHWA's "Hot-Spot" Analysis Is Entitled to No Deference and Is Arbitrary
        and Capricious ........................................................................ 20

    C. FHWA Failed to Adequately Explain Why Identified Impacts on Air Quality in
    New Jersey Should Be Deemed Insignificant ................................................. 22

    D. The Final EA and FONSI Failed to Take a Hard Look at Adverse Impacts on New
    Jersey's Communities with Environmental Justice Concerns ............................... 25

    E. FHWA Admits that It Committed to No Concrete Measures to Mitigate
    Significant Environmental Impacts in New Jersey ........................................... 31

    F. New Jersey Communities and Agencies Were Not Adequately Consulted to the
    Extent Required by NEPA ........................................................................ 34

        1. New Jersey Communities Were Not Provided with a Sufficient Opportunity
        for Public Comment and Input ......................................................... 35

        2. New Jersey Did Not Waive Its Consultation Argument ................................. 37

3.  FHWA Failed to Adequately Consult the Relevant New Jersey Agencies as Required by Statute ........................................................................................... 37

G.  FHWA and MTA Admit They Did Not Seriously Consider Any Alternatives ................ 40

1.  The Project's Purpose and Need Were Too Narrowly Defined ................................ 40

2.  FHWA Admits that It Did Not Take a Hard Look at Alternatives ............................ 42

H.  FHWA's Failure to Conduct a Transportation Conformity Analysis in Violation of the Clean Air Act Was Arbitrary and Capricious ............................................................. 46

1.  New Jersey Did Not Waive Its Conformity Argument ................................................. 47

2.  FHWA's Air Quality Analysis in the Final EA Is Not an Adequate Substitute for the Transportation Conformity Analysis Required By the CAA .......................... 48

V.  CONCLUSION ............................................................................................................................ 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Airport Impact Relief, Inc. v. Wykle*,
    192 F.3d 197 (1st Cir. 1999) ........................................................................11

*Am. Rivers. & Ala. Rivers All. v. FERC*,
    895 F.3d 32 (D.C. Cir. 2018) ......................................................................43

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
    273 F.3d 1229 (9th Cir. 2001) ....................................................................11

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
    524 F. Supp. 2d 642 (D. Md. 2007) .....................................................15, 49

*Balt. Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983) ......................................................................................15

*Barnes v. FAA*,
    865 F.3d 1266 (9th Cir. 2017) ....................................................................24

*Brower v. Evans*,
    257 F.3d 1058 (9th Cir. 2001) ....................................................................11

*Cachil Dehe Band of Wintun Indians of Coluso Indian Comm. v. Zinke*,
    889 F.3d 584 (9th Cir. 2018) ......................................................................41

*Cal. v. Bernhardt*,
    472 F. Supp. 3d 573 (N.D. Cal. 2020) ........................................................11

*Cal. v. Block*,
    690 F.2d 753 (9th Cir. 1982) ........................................................14, 15, 34

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n.*,
    449 F.2d 1109 (D.C. Cir. 1971) ..................................................................42

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) ....................................................................41

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,
    669 F.3d 1203 (11th Cir. 2012) ..................................................................40

*City of Bridgeton v. FAA*,
    212 F.3d 448 (8th Cir. 2000) ......................................................................40

*City of Davis v. Coleman,*
521 F.2d 661 (9th Cir. 1975) ..............................................................20

*City of New York v. U.S. Dep't of Transp.,*
715 F.2d 732 (2d Cir. 1983)................................................................41

*Cmtys. Against Runway Expansion, Inc. v. FAA,*
355 F.3d 678 (D.C. Cir. 2004).............................................................27

*Coal. for Healthy Ports v. U.S. Coast Guard,*
2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015)....................................24

*Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. U.S. Fish & Wildlife Serv.,*
2005 WL 8164390 (D.N.M. Jan. 31, 2005) .........................................39

*Concerned Citizens All., Inc. v. Slater,*
176 F.3d 686 (3d Cir. 1999)................................................................41

*Conservation Law Found., Inc. v. Dep't of Airforce,*
864 F. Supp. 265 (D.N.H. 1994)..........................................................46

*Ctr. for Bio. Div. v. U.S. Forest Serv.,*
349 F.3d 1157 (9th Cir. 2003) ............................................................35

*Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Engineers,*
685 F.3d 259 (3d Cir. 2012)................................................................37

*Del. Riverkeeper Network v. U.S. Army Corps of Engineers,*
869 F.3d 148, 162 (3d Cir. 2017)........................................................49

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004)............................................................................47

*Druid Hills Civic Ass'n, Inc. v. FHWA,*
772 F.2d 700 (11th Cir. 1985) ............................................................15

*Dubois v. U.S. Dep't of Agric.,*
102 F.3d 1273 (1st Cir. 1996).......................................................13, 14

*el Bienestar de la Comunidad Costera v. FERC,*
6 F.4th 1321 (D.C. Cir. 2021)........................................................18, 28

*Env'tl Def. Fund, Inc. v. Froehlke,*
473 F.2d 346 (8th Cir. 1972) ..............................................................44

*Food & Water Watch v. Fed. Energy Reg. Comm'n,*
28 F.4th 277 (D.C. Cir. 2022).............................................................19

*Food & Water Watch v. U.S. Dep't of Agric.*,
  2019 WL 2423833 (D.D.C. June 10, 2019) ........................................................47, 48

*Great Basin Mine Watch v. Hankins*,
  456 F.3d 955 (9th Cir. 2006) ...........................................................................16, 37

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
  55 F. Supp. 2d 1248 (W.D. Wash. 1999)..................................................................11

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
  951 F.3d 1217 (10th Cir. 2020) ...............................................................................42

*Idaho Conservation League v. Lannom*,
  200 F. Supp. 3d 1077 (D. Idaho 2016), *amended,* 2017 WL 242474 (D. Idaho
  Jan. 18, 2017)........................................................................................................42

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002) .....................................................................16, 23, 26

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
  464 F.3d 1083 (9th Cir. 2006) .................................................................................48

*Indian River Cnty. v. Dep't of Transp.*,
  348 F.Supp.3d 17 (D.D.C. 2018) .............................................................................41

*Jones v. Peters*,
  2007 WL 2783387 (D. Utah Sept. 21, 2007) ..........................................................41

*Klamath-Siskiyou Windlands Ctr. v. U.S. Forest Serv.*,
  373 F.Supp.2d 1069 (E.D. Cal. 2004).....................................................................41

*Latin Ams. for Soc. and Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
  756 F.3d 447 (6th Cir. 2014) ...................................................................................41

*League Wild. Defs./Blue Mtns. Biod. Proj. v. Forsgren*,
  309 F.3d 1181 (9th Cir. 2002) .................................................................................31

*Lemon v. McHugh*,
  668 F. Supp. 2d 133 (D.D.C. 2009) .........................................................................12

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)...........................................................................................12, 26

*Md.-Nat'l Capital Park & Plan. Comm. v. U.S. Postal Serv.*,
  487 F.2d 1029 (D.C. Cir. 1973) ..............................................................................31

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
  345 F.3d 520 (8th Cir. 2003) ...................................................................................28

*N.Y. v. Nuclear Regul. Comm'n,*
  681 F.3d 471 (D.C. Cir. 2012) ..................................................................15, 20

*NAACP Erie Unit 2262 v. FHWA,*
  648 F. Supp. 3d 576 (W.D. Pa. 2022) ..............................................................24

*Nat'l Audubon Soc'y v. Dep't of Navy,*
  422 F.3d 174 (4th Cir. 2005) ....................................................................18, 22

*Nat'l Audubon Soc'y v. Hoffman,*
  132 F.3d 7 (2d Cir. 1997) ................................................................................9

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,*
  606 F.3d 1058 (9th Cir. 2010) .......................................................................40

*Nat'l Res. Def. Council, Inc. v. FAA,*
  564 F.3d 549 (2d Cir. 2009)...........................................................................41

*Native Ecosys. Council v. Dombeck,*
  304 F.3d 886 (9th Cir. 2002) .........................................................................16

*Native Ecosystems Council v. U.S. Forest Serv.,*
  428 F.3d 1233 (9th Cir. 2005) .......................................................................43

*Neighbors of Cuddy Mtn. v. U.S. Forest Serv.,*
  137 F.3d 1372 (9th Cir. 1998) .......................................................................31

*Nio v. U.S. Dep't of Homeland Sec.,*
  385 F. Supp. 3d 44 (D.D.C. 2019) ...................................................................9

*NRDC v. Morton,*
  458 F.2d 827 (D.C. Cir. 1972) .......................................................................44

*O'Reilly v. All State Fin. Co.,*
  2023 WL 6635070 (5th Cir. Oct. 12, 2023)................................................ *passim*

*O'Reilly v. U.S. Army Corps. of Engineers,*
  477 F.3d 225 (5th Cir. 2007) ........................................................... *passim*

*Ohio Valley Env'tl Coal. v. U.S. Army Corps of Eng'rs,*
  674 F. Supp. 2d 783 (S.D. W. Va. 2009).........................................................36

*Openlands v. U.S. Dep't of Transp.,*
  124 F. Supp. 3d 796 (N.D. Ill. 2015) ..............................................................43

*Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne,*
  497 F.3d 337 (3d Cir. 2007)...........................................................................10

*Protect Lake Pleasant, LLC v. Connor*,
  2010 WL 5638735 (D. Ariz. July 30, 2010) ..................................................41

*Protect Our Parks, Inc. v. Buttigieg*,
  2021 WL 3566600 (N.D. Ill. Aug. 12, 2021), *aff'd*, 39 F.4th 389 (7th Cir.
  2022) .........................................................................................................42

*Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*,
  177 F. Supp. 3d 146 (D.D.C. 2016) ...........................................................43

*Rankin v. Coleman*,
  394 F.Supp.647 (E.D.N.C. 1975).................................................................43

*N.M. ex rel. Richardson v. Bureau of Land Mgm't*,
  565 F.3d 683 (10th Cir. 2009) ...................................................14, 15, 33

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)...................................................................31, 32, 35

*San Luis Valley Ecosys. Council v. U.S. Fish & Wildlife Serv.*,
  657 F. Supp. 2d 1233 (D. Colo. 2009).........................................................33

*Sierra Club v. EPA*,
  972 F.3d 290 (3d Cir. 2020)......................................................................12

*Sierra Club. v. Fed. Energy Reg. Comm'n*,
  867 F.3d 1357 (D.C. Cir. 2017) ..................................................................17

*Sierra Club v. Fed. Highway Admin.*,
  435 F. App'x 368 (5th Cir. 2011) ...............................................................40

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.C. Cir. 2013)...........................................................11

*Simmons v. U.S. Army Corps of Eng'rs*,
  120 F.3d 664 (7th Cir. 1997) ...............................................................40, 41

*Estate of Smith v. Bowen*,
  656 F. Supp. 1093 (D. Colo. 1987)...........................................................35, 36

*Soc'y Hill Towers Owners' Ass'n v. Rendell*,
  210 F.3d 168 (3d Cir. 2000).......................................................................44

*Stand Up for California! v. U.S. Dep't of Interior*,
  919 F. Supp.2d 51 (D.D.C. 2013) .........................................................41, 49

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) ..................................................................11

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) ........................................................................36

*Twp. Of Springfield v. Lewis*,
    702 F.2d 426 (3d. Cir. 1983) .........................................................................15

*Union Neighbors United, Inc. v. Jewell*,
    831 F.3d 564 (D.C. Cir. 2016) ......................................................................43

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
    21 F.4th 1229 (10th Cir. 2021) ......................................................................47

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
    305 F.3d 1152 (10th Cir. 2002), *as modified on reh'g,* 319 F.3d 1207 (10th
    Cir. 2003) .......................................................................................................41

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ................................................................................39, 41

*W. Watersheds Project v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013) ..................................................................22, 45

*W.R. Grace & Co. v. EPA*,
    261 F.3d 330 (3d Cir. 2001) ..........................................................................11

*Webster v. U.S. Dep't of Agric.*,
    685 F.3d 411 (4th Cir. 2012) .........................................................................40

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ................................................................11

*WildEarth Guards. v. Off. of Surface Mining, Reclam., & Enf't*,
    104 F. Supp. 3d 1208 (D. Colo. 2015) ..........................................................24

*Wilderness Soc., Ctr. For Native Ecosystems v. Wisely*,
    524 F. Supp. 2d 1285 (D. Colo. 2007) ..........................................................42

**Statutes**

42 U.S.C. §§ 4321 *et seq.* ..................................................................... *passim*

42 U.S.C. §§ 7401 *et seq.* ..................................................................... *passim*

N.Y. Veh. & Traf. Law § 1704 .......................................................................44

**Other Authorities**

23 C.F.R. §§ 771 *et seq.* ........................................................................ *passim*

40 C.F.R. §§ 93 *et seq.* ...................................................................................46, 47, 49

40 C.F.R. §§ 1501–1508 ...................................................................... *passim*

43 C.F.R. § 46.420(b) ....................................................................................44

74 C.F.R. § 650.4(k)(2)(i) ..............................................................................19

CEQ, Environmental Justice: Guidance Under the National Environmental Policy
    Act 1 (1997) ..............................................................................................25, 27

Center for Environmental Excellence, *Practitioner's Handbook, Addressing Air
    Quality Issues in the NEPA Process for Highway Projects* (2017) ........................................48

Exec. Order No. 12,898, 3 C.F.R. § 859 (1995) .........................................25

Exec. Order No. 14,008, 3 C.F.R. §477 (2022) ..........................................25

FHWA, NEPA Re-Evaluation Joint Guidance for Federal Highway
    Administration (FHWA), Federal Railroad Administration (FRA), & Federal
    Transit Administration (FTA) (2019) ......................................................................13

I.      **PRELIMINARY STATEMENT**

The cross-motions and oppositions of the Federal Highway Administration ("FHWA") and Metropolitan Transportation Authority ("MTA"), stripped of their rhetoric, effectively concede this case.  In trying to defend a facially defective NEPA process, the FHWA now admits that it "*will* need to determine whether" the MTA's final tolling scheme "warrant[s] *additional environmental review*" because that scheme still has not been finalized.  ECF No. 79 ("FHWA Opp.") at 8 n.6 (emphasis added).[1]  Instead of evaluating the actual proposal to be implemented, and then properly assessing that proposal through traffic studies, environmental analyses, stakeholder input, and committed mitigation, the FHWA now admits it never actually had a final proposal to evaluate.  Nevertheless, according to the FHWA, it can just kick the administrative can down the road and determine then what, if any, "additional environmental review" is required once the actual proposal is finalized.  *Id.* at 8, n.6.  That is too little, too late.  The FHWA never should have issued its "Finding of No Significant Impact" in the first place and has to do the job right— and do it right now—rather than promising to consider doing so at some later date.

A prime example of this approve-now, figure it out later approach is mitigation.  Although the FHWA has acknowledged that New Jersey communities will experience adverse environmental impacts from this congestion pricing scheme, there is *no* dedicated mitigation funding for *any* New Jersey community.  Faced with that indisputable fact, the FHWA and MTA nevertheless argue that there are funds committed to mitigation for the region, for places to be determined later, and that New Jersey *might* get some of these mitigation funds.  FHWA Opp. at 34; ECF No. 74 ("MTA Opp.") at 41.  That stands in sharp contrast with the $155 million in mitigation funding committed to New York-based agencies to distribute, including more than $20

---

1   New Jersey respectfully refers the Court to its Glossary of Acronyms filed at ECF No. 67-3.

million already committed to mitigate impacts in the Bronx.  DOT_0037018.  The MTA mocks these points as New Jersey's "mantra," MTA Opp. at 2, but that "mantra" is both true and fatal to Defendants' arguments.  For that reason alone, this Court should stop this unprecedented scheme from going forward until *after* completion of a full environmental impact statement ("EIS") that reviews the actual tolling scheme and identifies specific mitigation measures for New Jersey's hardest-hit communities.

Both the FHWA and MTA now claim that New Jersey is somehow "misreading" the FHWA's decision documents as "only mitigat[ing] impacts in New York" and failing to commit "any [] funds for mitigation in New Jersey."  MTA Opp. at 44 (quoting ECF No. 67-2 ("Opening Br.") at 6).  But the EA and FONSI do not actually commit *any* mitigation funding to *any* New Jersey community, even though they specifically do so for the Bronx.  It is no excuse for the FHWA now to say that it "expects" mitigation will ultimately include New Jersey and for the MTA now to argue that New Jersey communities "may" or "could" "warrant place-based mitigation." FHWA Opp. at 20; MTA Opp. at 41, 47.  And it is no comfort to be told by the MTA that "mitigation measures"—including any "for New Jersey communities"—"will be principally implemented by the TBTA," a New York-based affiliate of the MTA.  MTA Opp. at 46 n.34. Right now, no mitigation funding has been committed to New Jersey.  This equivocation—and fundamental inequity—simply confirms the EA's insufficiency.

A promise to consider doing things later that the FHWA and MTA were legally obligated to do before cannot be squared with the law.  NEPA requires that a federal agency determine the mitigation necessary to actually mitigate adverse environmental effects—as well as how that mitigation will be implemented, monitored, and enforced—*before* issuing its finding, not after. The FHWA now admits that "the ultimate tolling proposal will determine the effects of the Project,

and, in turn, the mitigation necessary to ameliorate those effects," out of which "place-based mitigation **may** be applied to New Jersey communities."  FHWA Opp. at 31.  But that has it backwards.  The FHWA did not take the "hard look" and then make the hard decisions required under NEPA.  Instead, in its rush to green-light the project, the FHWA ducked those decisions at the request of New York authorities holding their cards close to the vest (including on mitigation).

The FHWA and MTA, unable to justify the fatal flaws in their environmental review, now try to blame New Jersey for not "reaching out to its neighbor state" and banging down the door to participate in this NEPA process, and instead, claim there were "ample opportunities to offer feedback."  MTA Opp. at 16; FHWA Opp. at 42.  But New Jersey did try to participate.  Indeed, as the FHWA and MTA now admit, when Governor Murphy and New Jersey agencies were finally given a comprehensive written proposal in the Draft EA, they submitted lengthy, substantive comments.  MTA Opp. at 10-11; DOT_0007772–75.  Regardless, it was not New Jersey's burden to force itself into a federal review process, especially when the project being reviewed was a half-baked proposal—or more accurately, set of proposals—that had yet to be finalized.  NEPA requires meaningful "early" consultation of a neighboring state.  23 C.F.R. § 771.111(e).  Accordingly, it was the FHWA's affirmative legal obligation to "make diligent efforts" to notify and include New Jersey "early" as a State that is an "interested" stakeholder that "may be significantly affected by the action."  40 C.F.R. § 1506.6(a); 23 C.F.R. §§ 771.105(d), 771.111(e), 771.119(b).  The FHWA and MTA deprived New Jersey of that opportunity.  That is not how an environmental review process is supposed to work, and that is not what federal law requires.

At bottom, the FHWA approved an unprecedented and open-ended project with wide-ranging impacts without taking the requisite "hard look" at the actual congestion pricing scheme to be implemented.  In fact, that scheme still awaits TBTA approval.  Instead, the FHWA

approved a range of proposals, even though critical elements affecting the scheme's scope and impacts were left to be decided.  Indeed, on November 30—four months after this lawsuit was filed and five months after the Final EA and FONSI were issued—an MTA-established recommending body, the TMRB, made its final recommendation for a completely new tolling scheme different from any of those proposed during the environmental review process or addressed in the Final EA, as the FHWA and MTA have now admitted.  FHWA Opp. 8 n.6; MTA Opp. 9– 10 n.8.  The TMRB's recommendation, which is likely to be adopted by the TBTA, introduces entirely new elements to congestion pricing (including expanded peak hours and a per-ride toll for taxis and Ubers), and substantially changes others.  Those components have never been subject to *any* environmental review, either individually or as a comprehensive package.  For this very reason, the Final EA and FONSI must be vacated, and the FHWA compelled to reevaluate this congestion pricing scheme in light of these material changes.

The FHWA and MTA's opposition to New Jersey's other arguments for summary judgment in its favor similarly fail.

*First*, the FHWA is not entitled to deference here.  Deference is due only to decisions based on an agency's subject matter expertise, not general decisions about the scope of environmental analysis required by NEPA.  The truth is, the FHWA's analysis deliberately overlooked New Jersey.  The FHWA admits that its "methodology" considered only ***two*** New Jersey counties, as compared to ***ten*** New York counties.  FHWA Opp. at 23–24.  That arbitrary line-drawing to reach a pre-determined outcome by excluding a broader cross-section of New Jersey communities from the FHWA's analysis warrants no deference.  The FHWA and MTA also considered only regional highway intersections, not local streets—no matter how large and well-traveled—in their "hot-spot" analysis.  As a result, *no* intersections in Bergen County were included even though it

will experience increases in every category of pollutant under Tolling Scenario A (the only tolling scenario analyzed in this respect). That makes no sense. Whether traffic connects to a regional highway or a busy local street, it undoubtedly has significant air quality impacts on the surrounding population. Further, the FHWA admits that local sites around the George Washington Bridge will have the ***highest increase*** in vehicles under ***all*** tolling scenarios, FHWA Opp. at 17, but nevertheless analyzed only one particular scenario for the George Washington Bridge (Tolling Scenario A), *id.* at 25. Even under this truncated analysis, the adverse and disproportionate impacts on New Jersey are obvious. Had the FHWA complied with its NEPA obligations to take a "hard look" at the environmental consequences for the entire metropolitan area, those adverse impacts would have been even more obvious and would have affected the FHWA's NEPA approval.

*Second*, the FHWA and MTA now have the audacity to claim that any impact on air quality in New Jersey will be "minimal" on a "region[al] level." FHWA Opp. at 30. But that conclusion is undercut by the limited analysis done for New Jersey. *See* Opening Br. at 22. More importantly, "minimal" regional impacts do not equate to no significant impacts at all. At a local level, certain areas of New Jersey will admittedly see ***thousands more vehicles and hundreds more trucks every day***. *Id.* at 30; *see also id.* at 23–25; DOT_0000378 at 10. The FHWA and MTA cannot credibly characterize undeniable impacts on New Jersey as "minimal" when they did not assess them adequately or, in many cases, at all.

*Third*, the FHWA and MTA claim they sufficiently analyzed and addressed impacts on communities with environmental justice concerns, but they did not. At every phase of the process, the FHWA's environmental justice analysis failed to meet NEPA's exacting standards. Rather, it arbitrarily used an overly-broad definition to identify these communities, but an unduly narrow study area focused on highways to assess changes in traffic volumes. As a result, the FHWA

5

entirely ignored potential impacts on non-highway intersections and undertook no localized air quality analysis.

*Fourth*, the FHWA failed to mitigate any of the adverse environmental impacts it did identify in New Jersey.  As the FHWA is now forced to admit, it identified four New Jersey counties with environmental justice concerns that warrant place-based mitigation measures (Bergen, Essex, Hudson, and Union), *see* FHWA Opp. at 19, but required no actual commitment of mitigation funding for them—or, indeed, for *any* New Jersey communities at all.  By contrast, the Bronx has been guaranteed more than $20 million in mitigation funding even though the Final EA concluded that traffic in New Jersey's Bergen County will be *two to four times greater* than in the Bronx, and Bergen County will experience increased levels in every major category of air pollutants, including carcinogens, if this congestion pricing scheme goes into effect. DOT_0000378; DOT_0036838; DOT_0036840–41; DOT_0036854.  The possibility that a New York agency may later decide to right this obvious wrong by considering whether to allocate some mitigation funding to New Jersey, rather than continuing to support only its home communities, is not the "sufficient detail" NEPA requires.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); *O'Reilly v. U.S. Army Corps. of Eng'rs*, 477 F.3d 225, 230 (5th Cir. 2007).

*Fifth*, the FHWA and MTA misleadingly suggest that they complied with their statutory obligations to consult New Jersey stakeholders because their plans were generally accessible to the public and because New Jersey transportation agencies were invited to select meetings along the way.  That, once again, is too little, too late.  In reality, the FHWA and MTA gave the public only 44 days for review and comment on a more than 4,000-page Draft EA setting forth a proposal for the first-ever congestion pricing scheme in our nation's history.  That boils down to reading 100 pages of dense material a day for 44 days straight just to get through the entirety of the

document without taking into account the time needed to develop and submit detailed written comments on a novel and sweeping proposal.  That mountain of paper cannot bury the fact that this process was fundamentally flawed and that its failure to meaningfully include interested stakeholders was fatal. Furthermore, although the FHWA admits that New Jersey transportation agencies were consulted, they were not the only "relevant agencies" for NEPA purposes.  Other agencies that were clearly relevant—namely, the New Jersey Department of Environmental Protection ("NJDEP") and the New Jersey Department of Health ("NJDOH")—were never consulted.  But the FHWA treated New York differently.  When the FHWA held meetings to discuss air quality impacts, environmental impacts, and public health concerns, it did not invite *any* of the New Jersey agencies responsible for addressing environmental or health impacts to attend (NJDEP and NJDOH), but it invited their New York counterparts.  The FHWA was legally obligated to consult with New Jersey as an interested stakeholder "early," and often.  40 C.F.R. § 1506.6(a); 23 C.F.R. §§ 771.105(d), 771.111(e), 771.119(b).  It did not.  The consequences of that exclusion should not be borne by the party that was deliberately shut out.

*Sixth*, the FHWA now admits that it did not consider *any* substantive alternatives to the MTA's proposed congestion pricing scheme because none of the alternatives presented by the Project Sponsors allegedly fulfilled the MTA's enormous revenue requirements.[2]  That approach was yet another NEPA failure because, in every case on which the FHWA purports to rely, the agency considered multiple alternatives, each of which met the desired revenue threshold.  Here,

---

[2]   In fact, according to a recent Congressional study issued by U.S. Representative Josh Gottheimer's office, the congestion pricing scheme now recommended by the TMRB would raise $3.4 billion in its first year alone— more than three times the MTA's publicly-stated annual goal of $1 billion—meaning an even bigger windfall for New York's mass transit system, largely at the expense of New Jersey commuters.  JOSH GOTTHEIMER, THE IMPACT OF MTA'S CONGESTION TAX ON NJ FAMILIES (2024), https://d12t4t5x3vyizu.cloudfront.net/gottheimer.house.gov/uploads/2024/01/Congestion-Tax-Report-The-Impact-of-MTAs-Congestion-Tax-on-NJ-Families-Gottheimer.pdf.

the analysis was not only unreasonably narrow, but also was done specifically so only the congestion pricing scheme could survive.  The FHWA now attempts to defend its cursory analysis of only one alternative, claiming that it was properly "rejected" based on an outdated study done in 2008—more than a decade before the TMA was passed in 2019—without any more recent supplemental analysis done by the FHWA.  FHWA Opp. at 38; MTA Opp. at 26.  By asking this Court to defer to a decision based on studies from non-agency actors *over a decade* before this project was even contemplated, without engaging in its own independent analysis, the FHWA asks for deference to its *inaction*.  That cannot satisfy NEPA's mandate that agencies "study, develop, and describe" alternatives.  *Rankin v. Coleman*, 394 F.Supp.647, 659 (E.D.N.C. 1975).

*Finally*, the FHWA admits that no conformity analysis was performed for New Jersey's State Implementation Plan ("SIP"), even though one was performed for New York and at least three affected maintenance and non-attainment areas include both New Jersey and New York.  FHWA Opp. at 15, 17, 45.  The FHWA and MTA attempt to justify that omission by doubling down on their Final EA, suggesting the air quality analysis can be converted into a conformity analysis.  MTA Opp. at 49; FHWA Opp. at 46–47.  But the NEPA air quality analysis and the Clean Air Act ("CAA") conformity analysis are two distinct and separate regulatory requirements, and compliance with one does not excuse noncompliance with the other.  By making this argument, the FHWA has effectively admitted that it failed to comply with the CAA's requirements.

For these reasons, this Court should grant New Jersey's summary judgment motion, deny the FHWA and MTA's cross-motions, and enjoin the MTA's congestion pricing scheme from going forward until a full EIS is properly prepared and completed.  That EIS should thoroughly consider and address the actual scheme the MTA intends to implement and the concerns of all interested stakeholders, including New Jersey and its adversely affected communities.

## II.    **ADDITIONAL FACTS**

Additional important facts have developed in the short time since this suit was filed.  These developments underscore that the approval of the congestion pricing scheme gave MTA carte blanche to do what it wanted, even if the final proposal bore no meaningful resemblance to any of the range of schemes at least nominally assessed as part of the Final EA or FONSI.

### A.    **After This Suit Was Filed, The TMRB Recommended a New Tolling Scheme That Is Not One of the Seven Analyzed in the Final EA or FONSI**

On November 30, 2023, the TMRB issued its final recommendation for the tolling scheme (the "TMRB Recommendation").[3]  The recommendation differs substantially from any of the seven tolling scenarios analyzed in the Final EA or FONSI.  For example: the TMRB Recommendation (i) extends peak-hour pricing from 5:00 a.m. to 9:00 p.m. on weekdays, even though each of the Final EA's scenarios analyze peak hours of only 6:00 a.m. to 8:00 p.m. (with an exception of mid-day hours under Scenario F), *compare* TMRB Recommendation at 18–19, *with* DOT_0036292; (ii) sets the base toll at $15 for peak passenger vehicles, even though none of the seven tolling scenarios analyzed a $15 toll, *compare* TMRB Recommendation at 17, *with* DOT_0036292 (analyzing $9, $10, $12, $14, $19, and $23 peak tolls); (iii) includes a $5 crossing credit for traveling through the Lincoln and Holland Tunnels, but no credit for the George Washington Bridge, even though the Final EA considered higher crossing credits, *compare* TMRB Recommendation at 24–25, *with* DOT_0004586 (analyzing crossing credits between to $6.55 and

---

3    Both FHWA and MTA introduced the recommendation as evidence of FHWA's continued oversight of the congestion pricing scheme, permitting New Jersey to respond to this point.  FHWA Opp. at 8 n.6 (linking to TMRB Recommendation at https://new.mta.info/document/127761; MTA Opp. at 9–10 n.8, 32 n.24.  Courts routinely consider evidence outside the administrative record to ensure that NEPA's values were upheld by an agency decision.  *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14–15 (2d Cir. 1997) (collecting cases); *Nio v. U.S. Dep't of Homeland Sec.*, 385 F. Supp. 3d 44, 61–62 (D.D.C. 2019).  A court may consider materials that were unavailable when the administrative record was prepared if they "illuminate[] the original decision or show[] 'that the Agency proceeded upon assumptions that were entirely fictional or utterly without scientific support.'"  *Id.* at 62 (citation omitted).

$13.10); and (iv) exempts licensed taxis and for-hire vehicles ("FHVs") from the daily toll and instead recommends a per-ride toll for each passenger trip, even though the Final EA never evaluated the impact of a per-ride toll, *compare* TMRB Recommendation at 8, *with* DOT_0036292.

None of these proposed components have been subject to environmental review, either individually or as a comprehensive tolling scheme. To the contrary, the TMRB Recommendation introduces entirely new elements—including per-ride tolls for taxis and FHVs—and substantially changes other, previously-analyzed ones—by, for example, extending peak-hour pricing and adopting unreviewed standard toll amounts.[4]

III.   **FHWA AND MTA ARE NOT ENTITLED TO DEFERENCE AND MISAPPLY THE STANDARD OF REVIEW**

While FHWA and MTA are right that agency decisions are generally entitled to deference, they are wrong in suggesting that deference equates to rubberstamping those decisions. The Administrative Procedure Act's ("APA") standard of review, while deferential, does "not oblige[] [courts] to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 347 (3d Cir. 2007); *O'Reilly*, 477 F.3d at 230 ("judicial review" of "agency's environmental analysis" is not "a rubber stamp"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050–51 (D.C. Cir. 2021) (citing cases). Although "[d]ifferent policy choices are acceptable . . . [c]oercing [those

---

[4]   The TMRB Recommendation is unlikely to change after New York's procedural process because the TBTA has openly expressed its approval of the recommendation, and MTA Chairman Lieber cautioned his board against any changes. *See* Stephen Nessen and Clayton Guse, *Don't Expect Changes to MTA's Congestion Pricing Even After Final Public Review, Gothamist* (Dec. 8, 2023), https://gothamist.com/news/changes-to-mtas-congestion-pricing-nyc-nj (Chairman Lieber: "If you change one aspect . . . . the whole thing starts to unravel or fall apart.").

choices] through the process without analysis is not." *Cal. v. Bernhardt*, 472 F. Supp. 3d 573, 624 (N.D. Cal. 2020). "The [c]ourt cannot excuse [the agency's] total failure to analyze or explain [a] critical point." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1259 (W.D. Wash. 1999); *see also W.R. Grace & Co. v. EPA*, 261 F.3d 330, 338 (3d Cir. 2001) (agency decision must be remanded if the "record before the agency does not support the agency action").

Ultimately, "deference accorded [to] an agency's scientific or technical expertise is not unlimited" and therefore, "deference is not owed if the agency has completely failed to address some factor consideration of which was essential to making an informed decision." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) (alterations in original). And "[d]eference need not be afforded where NEPA's basic requirements are not met." *Bernhardt*, 472 F. Supp. 3d at 624. The court must confirm "that no arguably significant consequences have been ignored" and an agency assessment may be insufficient if "deficiencies are significant enough to undermine informed public comment and informed decision-making." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 58 (D.D.C. 2019) (citations omitted).

In undertaking this review, courts review questions of law—including whether an agency's review process complied with NEPA—*de novo*. *E.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 23 (D.C. Cir. 2013). In reviewing factual matters, the reviewing court must undertake a "thorough, probing, in-depth review and a searching and careful inquiry into the record," *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 203 (1st Cir. 1999) at 482 (cleaned up), and assess whether the agency's decision was based on "a consideration of the relevant factors," *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001). Thus, the agency "cannot reach whatever conclusion it likes and then defend it with vague allusions to its own expertise; instead, the agency must support its conclusion

with demonstrable reasoning based on the facts in the record." *Sierra Club v. EPA*, 972 F.3d 290, 298 (3d Cir. 2020).

IV.    **ARGUMENT**

A.    **The Final EA and FONSI Must Be Vacated Because FHWA Did Not Evaluate the Tolling Scheme MTA Intends to Implement**

As an initial matter, the Final EA and FONSI must be vacated because FHWA admits that it still must conduct additional environmental review and analysis of the TMRB's proposed tolling scheme.  FHWA Opp. at 8 n.6.  NEPA requires that an agency continue to take a "hard look" at the environmental effects of its planned action even after the agency grants initial approval.  *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 374 (1989); 42 U.S.C. §§ 4321 *et seq.* ("NEPA").  In so doing, an agency must determine whether any "changes, new circumstances, or new information beyond what has already been examined" require supplemental environmental review, *Lemon v. McHugh*, 668 F. Supp. 2d 133, 142 (D.D.C. 2009), and prepare a supplemental EIS or EA when, *e.g.*, an agency "makes substantial changes to the proposed action that are relevant to environmental concerns," 40 C.F.R. § 1502.9(d)(1).

Although FHWA claims that it intends to re-evaluate "whether any differences between the final tolls and the alternatives examined in the Final EA warrant additional environmental review or analysis," FHWA Opp. at 8 n.6, that additional review or analysis is not optional, it is obligatory.  23 C.F.R. § 771.129.  Where, as here, the project design (and therefore project scope, impacts, and mitigation requirements) has materially changed, the re-evaluation process *requires* extensive documentation, new environmental studies, and interagency coordination.[5]  And though

---

[5]  FHWA guidance details the requirements of this re-evaluation process.  FHWA must, among other things, (i) "clearly document the change that triggers the reevaluation"; (ii) "document the changes in environmental impacts or mitigation . . . and describe how the impact will be different from what was previously described"; and (iii) "determine whether the original environmental decision remains valid after comprehensively

MTA suggests (in a footnote) that any challenge is premature, that argument is meritless and prejudicial to New Jersey's NEPA claims. The facts compel the Court to set aside the FONSI pending supplemental environmental review now.

*First*, unless this Court intervenes and vacates the FONSI, the TMRB Recommendation will be implemented without any meaningful consideration of environmental impacts in New Jersey. MTA's prematurity argument is sophistry at best because, by its own admission, that recommendation is unlikely to change. TBTA has already determined that the scheme will "go [] live in late Spring [2024]," and its Chairman has warned against changes to that recommendation because "[i]f you change one aspect . . . the whole thing starts to unravel or fall apart."[6] Moreover, MTA has already installed 60% of the tolling infrastructure and has stated that it will continue construction during the public review process.[7] Unless the Court considers the effect of the TMRB Recommendation now, the tolling scheme will be a *fait accompli*.

*Second*, although FHWA contends it will undertake a re-evaluation process, that re-evaluation process does not cure the failure to carry out an evaluation in the first place. FHWA cannot deem valid tolling elements that were never analyzed by the Final EA, and NEPA requires that an EIS be prepared in this circumstance.[8] *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273 (1st Cir. 1996), for example, held that the relevant agency should have conducted a supplemental EIS where the final proposal for a ski resort was "configured differently" than previously-analyzed

---

considering the changes." FHWA, NEPA Re-Evaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), & Federal Transit Administration (FTA) (2019), https://www.environment.fhwa.dot.gov/legislation/nepa/Reevaluation_guidance_08142019.aspx.

6   MTA Board Meeting - 12/6/2023, YouTube (Dec. 6, 2023), https://www.youtube.com/watch?v=0pfJ-S9myBk at 1:40:22.

7   Press Release, MTA, MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule (Dec. 6, 2023), https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.

8   FHWA, NEPA Re-Evaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), & Federal Transit Administration (FTA) (2019), https://www.environment.fhwa.dot.gov/legislation/nepa/Reevaluation_guidance_08142019.aspx.

alternatives. *Id.* at 1293. The final proposal, among other things, widened existing trails, developed entirely new trails, and moved a large lodge facility's location. *Id.* at 1292. Like in *Dubois*, because the TMRB Recommendation differs substantially from the seven scenarios analyzed in the Final EA, and because public commenters did not have the opportunity to consider the "wholly new problems posed by the new" congestion pricing scheme, it cannot be approved without supplemental review. *Id.* at 1293; *Cal. v. Block*, 690 F.2d 753, 772 (9th Cir. 1982) (supplemental review required where substantial changes in final project proposal "could not be fairly anticipated" and "seriously dilute[ed] the relevance of public comment on the draft . . . alternatives").

This Court cannot ignore the failure to carry out any EIS at all, particularly given that the TMRB Recommendation both (1) introduces entirely new elements to the congestion pricing scheme, including per-ride tolls for taxis and FHVs; and (2) substantially changes previously-analyzed elements, extending peak-hour pricing and applying unevaluated standard toll amounts and crossing credits. Even if an EIS had been done, this recommendation, if adopted, would require a supplemental EIS because nothing in the Final EA "so much as hinted at" these new and changed elements, and "there is no direct or reliable way to compare the [environmental] effects of these changes" to those elements previously analyzed. *N.M. ex rel. Richardson v. Bureau of Land Mgm't*, 565 F.3d 683, 707 (10th Cir. 2009). At least some of TMRB's changes will plainly have adverse environmental impacts. Most prominently, the extension of peak-hour pricing by an additional two hours every day will divert more traffic out of the CBD and into New Jersey than the Final EA and FONSI predicted (and ignored). Other changes—like crossing credits for drivers travelling through the Lincoln and Holland Tunnels, but not across the George Washington Bridge—may also cause adverse environmental impacts in Hudson County, where traffic will be

diverted to the tunnels to take advantage of the credit.  But without any environmental review, the exact impact of these decisions is unknown.  *Id.*

Moreover, to the extent FHWA and MTA rely on New Jersey's purportedly inadequate participation during the public comment period, that comment period is now meaningless because the Final EA did not analyze the TMRB Recommendation.  FHWA and MTA cannot insulate this new scheme from the statutorily mandated analysis by challenging the sufficiency of New Jersey's participation in a public comment period that is now irrelevant.  *Block*, 690 F.2d at 772.[9]

For these reasons, the Final EA and FONSI must be vacated and FHWA must complete an EIS that properly and fully considers the impacts of the actual tolling scheme to be implemented.

B.     **FHWA's "Methodological" Choices Obscure Adverse Impacts in New Jersey and Should Not Be Given Deference**

FHWA repeatedly abused its discretion, arbitrarily drawing lines as to which areas to study and what data to analyze.  In doing so, FHWA did not appropriately "examine the environmental effects" of the congestion pricing scheme, and its FONSI is "not supported by substantial evidence on the record."  *N.Y. v. Nuclear Regul. Comm'n*, 681 F.3d 471, 478–79 (D.C. Cir. 2012).  As a result of these arbitrary methodological choices, FHWA failed to take a hard look at the scheme's environmental impacts and its conclusions are entitled to no deference.[10]

---

[9]   The public comment period on the TMRB Recommendation is pursuant to the New York State Administrative Procedure Act, and thus is not a replacement for the public comment period mandated under NEPA.  *Block*, 690 F.2d at 771 ("NEPA requires . . .  public participation in the evaluation of the environmental consequences of a major federal action.").

[10]  FHWA's case law is limited to cases where deference is afforded to an agency's subject matter expertise, not general decisions about the underlying scope of environmental analysis required by NEPA.  *E.g., Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) (deference to predictions made "at the frontiers of science"); *Druid Hills Civic Ass'n, Inc. v. FHWA*, 772 F.2d 700, 711 (11th Cir. 1985) (deference to analysis of mathematical computations); *Twp. Of Springfield v. Lewis*, 702 F.2d 426, 441 (3d Cir. 1983) (deference to traffic projections); *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 671 (D. Md. 2007) (deference to use of highly technical measurements).  Moreover, FHWA cannot claim expertise regarding congestion pricing when this would be the nation's first ever congestion pricing scheme.

1.      **New Jersey Did Not Waive Its Claims Regarding Air Quality Impacts**

As an initial matter, New Jersey never waived its argument that FHWA's methodology was unsound.  To preserve an issue for judicial review, a plaintiff must state their claim with "sufficient clarity to allow the decision maker to understand and rule on the issue raised."  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 968 (9th Cir. 2006).  New Jersey did just that.

On September 23, 2022—during the public comment period on the Draft EA—Governor Murphy wrote to FHWA explaining that the Draft EA suffered from a "lack of analysis . . . on how this program will affect New Jersey" and attached comments from the New Jersey Department of Transportation ("NJDOT"), New Jersey Transit Corporation ("NJT"), and New Jersey Turnpike Authority ("NJTA").  DOT_0007772.  Those comments warned of the "need" to study new traffic patterns that would result in New Jersey due to the congestion pricing scheme because those patterns may have adverse "environmental impacts," including on "air and noise."  DOT_0007773.

During the second public comment period, after the Final EA and Draft FONSI were published,[11] New Jersey again raised this issue.  On June 12, 2023, Governor Murphy wrote to FHWA, explaining that the anticipated increased emissions in Bergen County and other areas of New Jersey "necessitate[ed] further study and identification." DOT_0040853.  There can be no dispute that FHWA was "provided sufficient notice . . . to afford it the opportunity to rectify" the adverse impacts identified by New Jersey.  *Native Ecosys. Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002) (NEPA's exhaustion requirement satisfied when a party "clearly expressed concern" during public comment that agency "fail[ed] to specify adequate procedures" to measure adverse impacts).

---

[11]   To the extent FHWA and MTA now contend that there was no formal comment period during this period, that is a red herring.  Both FHWA and MTA admit that they "reviewed additional [comments] received during th[e] period" of "May 12, 2023 to June 12, 2023."  ECF No. 33-1 at 9; FHWA Opp. at 40 n.30.

2.     **FHWA's Regional Air Quality Analysis of Two New Jersey Counties Is Entitled to No Deference and Is Arbitrary and Capricious**

FHWA's "methodological" choice to review only two New Jersey counties in its regional air quality analysis is not entitled to deference, was erroneous, and did not comply with the "hard look" standard.   As an initial matter, FHWA employed a contradictory methodology when evaluating air quality in New Jersey counties as compared to New York counties.   For its regional analysis, FHWA selected 12 counties from its initial 28-county study area, including only two from New Jersey—Bergen and Hudson—the counties expected to have the largest increase and decrease in VMT as a result of the congestion pricing scheme, respectively.   DOT_0036827–28.[12] FHWA now justifies its choice to limit its review to only those two counties because "[u]sing the two New Jersey counties that would experience the greatest positive and negative impact offers a reasonable means of predicting impacts state-wide."  FHWA Opp. at 24.  FHWA fails to explain why it also chose to analyze *ten* New York counties in its regional analysis.  DOT_0036827–28. If statewide air quality impacts in New Jersey can be reasonably predicted by analyzing just two counties, the same should hold true for New York.   While FHWA may have a choice among reasonable methodologies, its choice must nonetheless be "reasonable and adequately explained." *Sierra Club. v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).  It was not here.

The arbitrariness of these two selection methodologies is highlighted by FHWA's identification of communities with environmental justice ("EJ") concerns.   The 12 counties included in the regional air quality analysis were allegedly chosen because they represent the "area[s] where VMT would change as a result of the CBD Tolling Alternative."  DOT_0036827. Likewise, FHWA chose a 10-county EJ analysis area based on "where the greatest change in traffic volumes and [VMT] are predicted to occur."  DOT_0036958.  These metrics are nearly identical.

---

12   Notably, the original 28-county regional study included fourteen New Jersey counties—half of the entire area.

Yet despite this, the EJ study included four, not two, New Jersey counties—Bergen, Hudson, Essex, and Union.  DOT_0036958–59; *see also* FHWA Opp. at 19.  FHWA then determined that six census tracts in Essex County merited place-based mitigation measures due to adverse air quality impacts.  DOT_0007326–27; MTA Opp. at 41.  Those results underscore the flaws in the air quality analysis:  The EJ study included ***twice*** as many New Jersey counties as the air quality analysis—and there was no stand-alone air quality analysis in the EJ study.  But, based on its EJ study, FHWA concluded that mitigation for air quality impacts may be appropriate in census tracts that were never included in the standalone air quality analysis.  And, even after these findings, FHWA did not reevaluate the air quality analysis.  These choices are completely arbitrary.  *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 194 (4th Cir. 2005) ("[A]gency's hard look should include neither researching in a cursory manner nor sweeping negative evidence under the rug."); *see also Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) ("[W]hen conducting an environmental justice analysis, an agency's delineation of the area potentially affected by the project must be reasonable and adequately explained[.]").

### 3.  FHWA's Regional Air Quality Analysis Based on Tolling Scenario A Only Is Entitled to No Deference and Is Arbitrary and Capricious

FHWA admits that the Final EA's purpose was to "consider[] a range of tolling scenarios with different attributes to identify the range of effects that may occur" under the scheme.  FHWA Opp. at 11 (cleaned up); DOT_0036272.  But by analyzing only the effects of Tolling Scenario A in New Jersey, the Final EA fails to identify or consider the adverse effects that could occur under a different tolling scheme.  This decision is entitled to no deference and shows FHWA failed to take a "hard look" at the real range of tolling scenarios.  FHWA misleadingly asserts that "any other tolling scenario would result in lesser or fewer negative effects," FHWA Opp. at 12 (citation omitted), despite evidence that New Jersey will in fact experience greater negative effects under

*nearly all* other scenarios, Opening Br. at 27–28.  Even MTA admits that Tolling Scenarios E and G had the greatest impacts on truck and non-truck diversions, respectively.  MTA Opp. at 40.

FHWA also challenges New Jersey's calculations of VMT increases, even though that data came directly from the Final EA.  FHWA Opp. at 25–27.  MTA, in particular, dismisses the additional VMT New Jersey will experience as "de minimis," but never explains how the impact is "insignificant" when *hundreds of thousands of additional vehicle miles* would be traveled in New Jersey *every day* under other tolling scenarios.  *Compare* MTA Opp. at 32–33, *with* Opening Br. at 28 (identifying three tolling scenarios that would cause over 100,000 additional daily VMT in New Jersey compared to Tolling Scenario A).  FHWA likewise suggests that New Jersey's math is wrong—it is not—but does not dispute that New Jersey would experience greater daily VMT under other tolling schemes.  FHWA Opp. at 26.[13]  It is indisputable that this increase would have larger and worse impacts in New Jersey—and that those impacts that were not analyzed in the Final EA.

FHWA defends its choice to analyze only Tolling Scenario A by arguing this scenario would "result in the greatest potential negative effects" at a regional level and that it did not have to analyze the worst-case tolling scenario for New Jersey.  FHWA Opp. at 25.  This is false.  "[T]he mere possibility that a project's overall emissions calculation will be favorable because of an 'offset . . . elsewhere' does not excuse the [agency] 'from making emissions estimates' in the first place."  *Food & Water Watch v. Fed. Energy Reg. Comm'n*, 28 F.4th 277, 289 (D.C. Cir. 2022) (citation omitted); 74 C.F.R. § 650.4(k)(2)(i) ("A significant effect may exist even if the Federal

---

[13]  FHWA suggests that a U.S. Bureau of Labor Statistics formula should be used to compare VMT differences between the various tolling schemes.  FHWA Opp. at 26.  Not so.  That formula is used to show percentage differences across time, as acknowledged by FHWA.  *Id.*  ("subtract[] the earlier [] value from the later one").  New Jersey's math is correct because it compares the relative impacts of Tolling Scenario A to other tolling scenarios.  Compared to Tolling Scenario A, traffic increases in New Jersey (and attendant negative air quality) may be up to twenty times worse if another tolling scheme is ultimately adopted.  Opening Br. at 28.

agency believes that on balance the effect will be beneficial.").  Moreover, this runs contrary to FHWA's commitment to "identify the *range* of effects that may occur" from implementation, DOT_0000394 (emphasis added), and directly conflicts with EPA guidance to analyze *all* potential adverse effects of the Project, DOT_0041095 (EPA cautioning that "[b]enefits in the form of reductions in pollutants in one area do not negate the potential increases . . . in other regions."). Thus, FHWA's choice to tie the regional air quality analysis to Tolling Scenario A alone violates NEPA by "brushing away" FHWA's own findings of worse traffic impacts under other tolling scenarios. *N.Y.*, 681 F.3d at 481.  As such, FHWA is not entitled to deference on this point, and it must conduct an EIS considering all scenarios, including the TMRB Recommendation.

### 4.   FHWA's "Hot-Spot" Analysis Is Entitled to No Deference and Is Arbitrary and Capricious

As explained in New Jersey's Opening Brief, FHWA only analyzed **four** traffic intersections in New Jersey out of ***102*** intersections *total*—each in Hudson County and in specific spots expected to see a decrease in traffic and improved air quality.  Opening Br. at 31.  FHWA cannot explain this decision, and it further demonstrates FHWA's failure to take a "hard look" at the environmental impacts of the tolling scheme.  To the contrary, it admits that it did not conduct similar analyses of intersections in Bergen County or other counties expected to see an increase in traffic (and a decrease in attendant air quality).  Neither FHWA nor MTA dispute this deficiency in the Final EA, let alone offer a compelling reason for it.[14]  MTA Opp. at 28–29, 35; FHWA Opp. at 14, 27–28.  Instead, both contend that excluding Bergen County—and particularly intersections

---

[14]   MTA suggests that New Jersey had a duty to identify such intersections for analysis.  MTA Opp. at 29 n.22. That is incorrect.  MTA cannot shift FHWA's obligations under NEPA to New Jersey.  *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975) ("Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs. It is the federal agency, not environmental action groups or local government, which is required by NEPA to produce an EIS.").  Such a rule would put challengers in the impossible position of being forced to do the agency's job or lose the right to challenge it for its inaction.

approaching the George Washington Bridge—from the "hot-spot" analysis was permissible because "'traffic at those intersections connects primarily to regional highways and not local streets.'" FHWA Opp. at 14 n.13 (quoting DOT_0036475).  But neither FHWA nor MTA explain why this distinction matters.  Whether traffic connects to a highway or local street, it has the same air quality impacts on the population living nearby.[15]  FHWA itself admits that sites around the George Washington Bridge "demonstrated the ***highest*** [Annual Average Daily Traffic ("AADT")] and the highest increase in heavy-duty diesel trucks" of any area under any tolling scenario.  *Id.* at 28 (quoting DOT_0036864) (emphasis added).  Likewise, EPA warned that a microscale analysis like the one in Hudson County was also needed in Bergen County.[16]  DOT_0045029.

In response, FHWA argues that it adequately analyzed the I-95 area west of the George Washington Bridge through a "highway link analysis."  FHWA Opp. at 16–17.  This analysis, though, is woefully inadequate in at least two regards.  *First*, it is limited to a review of predicted particulate matter (i.e., 24-hour $PM_{10}$ and 24-hour and annual $PM_{2.5}$)—and unlike the hot-spot analysis, contains no analysis of carbon monoxide levels, volatile organic compounds, nitrogen oxides, or sulfur dioxide, all of which are pollutants emitted by vehicles that harm human health.  DOT_0036864–65.[17]  *Second*, the highway link analysis erroneously evaluated environmental impacts based on only Tolling Scenario C, DOT_0036865—despite evidence that other tolling scenarios would cause greater AADT and truck traffic west of the George Washington Bridge,

---

[15]  Elsewhere, the Final EA explains that no microscale analysis was performed because "traffic would be expected to stay on the highways and would be utilizing multiple on/off ramps" such that "the potential traffic effects at any single intersection would be expected to be small."  DOT_0007927.  This reasoning fails to consider the aggregate effect on air quality of vehicles utilizing multiple on/off ramps in a single community.

[16]  FHWA and MTA imply that EPA concurred with the issuance of the Final EA, MTA Opp. at 12, yet admit that FHWA did not conduct a microscale analysis in Bergen County as recommended by EPA, MTA Opp. at 35; FHWA Opp. at 14 n.13.

[17]  MTA suggests that this analysis "demonstrated that the Project would not result in exceedances of NAAQS."  MTA Opp. at 30–31.  But in support of that suggestion, MTA cites only the review of the particulate matter NAAQS, not the carbon monoxide NAAQS (much less the NAAQS for all criteria pollutants).  *Id.*

DOT_0036869; Opening Br. at 23.  For example, Tolling Scenario B would result in an increase

of approximately 23,845 total vehicles and nearly 600 trucks in New Jersey *per day* compared to

Tolling Scenario C.  DOT_0036869; DOT_0036942 (admitting that "Tolling Scenario B would

result in the greatest increase in truck trips on I-95 in Bergen County").  Thus, FHWA's arbitrary

choice to evaluate particulate matter under only Tolling Scenario C is fatal to its air quality

analysis.   As New Jersey has explained, FHWA's highway link analysis shows predicted

particulate matter *exceeding* EPA's proposed NAAQS near the George Washington Bridge.

Opening Br. at 37.  If FHWA had actually conducted the required analysis and analyzed particulate

matter under Tolling Scenario B, these numbers would have increased.  Because FHWA has no

basis for ignoring greater adverse impacts in New Jersey under other tolling scenarios, its decision

to do so should be given no deference.  *Nat'l Audubon Soc'y*, 422 F.3d at 194; *W. Watersheds

Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013).

*     *     *

At every step, FHWA made arbitrary choices that undermined its methodology and the

validity of its conclusions.  FHWA cherrypicked one tolling scenario and two counties in New

Jersey to study air quality, performed a hotspot analysis on only four New Jersey intersections out

of 102, and undertook a highway link analysis for *one* part of *one* highway in *one* area.  FHWA

never provided a rational reason for its methodological choices, nor could it have.  Accordingly,

FHWA's failure to take a hard look is entitled to no deference and its decision should be vacated.

## C.   FHWA Failed to Adequately Explain Why Identified Impacts on Air Quality in New Jersey Should Be Deemed Insignificant

FHWA also cannot explain its conclusion that the identified adverse impacts on New Jersey

do not warrant an EIS.  FHWA cannot concede even the obvious—erroneously stating that Bergen

County "is likely to receive the *least* benefits from the Project," despite ample evidence showing

22

Bergen County will in fact receive *no* benefits and instead will suffer adverse traffic and air quality impacts.  FHWA Opp. at 18, 28–30 (emphasis added).

FHWA and MTA's counterarguments are unavailing.  They each contend that traffic and air quality effects will be minimal, even though certain communities in New Jersey will see significant changes.  FHWA Opp. at 30; MTA Opp. at 28; Opening Br. at 28.  FHWA's suggestion that New Jersey will experience only a 0.2% increase in VMT regionally belies the fact that, locally, certain areas in New Jersey will see thousands more vehicles and hundreds of trucks *every day*.  *Compare* FHWA Opp. at 27, *with* DOT_0036869 (AADT increase west of I-95 in Bergen). It is exactly these types of changes an agency must consider under NEPA—and that FHWA did not.  *Rittenhouse*, 305 F.3d at 973 ("[T]he choice of analysis scale . . . cannot be arbitrary").

FHWA and MTA next claim that because the hot-spot analysis and highway link analysis did not predict exceedance of the particulate matter NAAQS, the expected increase in traffic (and attendant air quality impacts) is *per se* insignificant.  FHWA Opp. at 30; MTA Opp. at 31 (citing hot-spot analysis).  As an initial point, this argument fails because FHWA admits it did not (i) conduct a hot-spot analysis of intersections in New Jersey where traffic was expected to increase, or (ii) analyze the worst-case scenario for New Jersey in its highway link analysis.[18]  FHWA Opp. at 30, 34; *see supra* IV.B.  As such, FHWA's particulate matter findings are an inaccurate prediction of NAAQS compliance.

Moreover, FHWA and MTA attempt to argue that the NAAQS are the definitive standard by which to measure public health impacts, FHWA Opp. at 6, 30; MTA Opp. at 31, but the cases they cite simply stand for the proposition that an agency may defer to NAAQS values as *one* factor

---

[18]  The document FHWA cites for support that it found no significant impacts in New Jersey shows instead FHWA's admission of a potential adverse impact on New Jersey communities with EJ concerns due to increased truck volumes.  DOT_0037014 ("Truck Volume Changes" and "Changes in emissions related to truck traffic diversions" may cause a "Potential adverse effect to environmental justice populations").

in whether a project will have a significant impact on human health. *E.g., Barnes v. FAA*, 865 F.3d 1266, 1273 (9th Cir. 2017) (FAA may defer to EPA on factual question of what level of lead is safe for children); *Coal. for Healthy Ports v. U.S. Coast Guard*, 2015 WL 7460018, at *25 (S.D.N.Y. Nov. 24, 2015) (localized adverse effects may occur despite compliance with NAAQS). While an agency may rely upon predicted NAAQS values when it has "determined that the Project will not worsen air quality or negatively affect implementation of the NAAQS," that is not the case here. *NAACP Erie Unit 2262 v. FHWA*, 648 F. Supp. 3d 576, 592 (W.D. Pa. 2022).

To the contrary, FHWA has readily admitted that air quality will *worsen* in parts of New Jersey, and FHWA's highway link analysis (regardless of its faults) shows an increase in particulate matter near the George Washington Bridge. FHWA Opp. at 28 (admitting that the area of Bergen County near the George Washington Bridge would see highest AADT and truck traffic increases of any area assessed in the Final EA); DOT_0036865 (showing resultant increases in $PM_{2.5}$ and $PM_{10}$). Moreover, it ignores the current reality of air quality in New Jersey—Bergen, Essex, and Union Counties (three counties in which FHWA determined that adverse impacts may occur) are all in non-compliance with the ozone NAAQS and in maintenance for the carbon monoxide and $PM_{2.5}$ NAAQS. DOT_0036821. "The question . . . is not whether the [Project] will result in a release of [pollutants] in excess of the NAAQS, but whether the increased emissions will have a significant impact on the environment." *WildEarth Guards. v. Off. of Surface Mining, Reclam., & Enf't*, 104 F. Supp. 3d 1208, 1227 (D. Colo. 2015). EPA—the agency that promulgates the NAAQS—warned FHWA about this during the public comment period, explaining that:

> "[T]he Project Sponsors must recognize and acknowledge that compliance with the [NAAQS] does not equate to no potential impacts and localized harm to human health and the environment . . . [T]he impacts of the Project's air emissions, specifically regarding increased truck traffic, need to be evaluated beyond EPA's prevailing public health air quality standards or benchmarks."

DOT_0045028; *see also* DOT_0041095.  Because FHWA should have analyzed *all* adverse impacts (regardless of predicted NAAQS) and offers no meaningful explanation for not avoiding such review, the Final EA and FONSI should be vacated.

D.    **The Final EA and FONSI Failed to Take a Hard Look at Adverse Impacts on New Jersey's Communities with Environmental Justice Concerns**

The Final EA and FONSI must also be vacated because they insufficiently assessed impacts on New Jersey's communities with EJ concerns.  FHWA and MTA cannot (and do not) demonstrate that their methodology was sound or their analysis satisfied NEPA's "hard look."

FHWA is federally mandated to "make achieving environmental justice part of [its] mission[]."  Exec. Order No. 14,008, 3 C.F.R. §477 (2022).  Accordingly, "[t]o the greatest extent practicable and permitted by law," FHWA must "identify[] and address[] . . . disproportionately high adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations[.]"  Exec. Order No. 12,898, 3 C.F.R. § 859 (1995).  That mandate is crucial in the context of NEPA review.[19]

FHWA shirked that mandate and failed to adequately evaluate the impacts of the proposed congestion pricing scheme on communities with EJ concerns.  It arbitrarily: (1) discounted New Jersey's Environmental Justice Mapping, Assessment and Protection Tool ("Mapping Tool"); (2) failed to use New Jersey's definition for communities with EJ concerns; (3) relied on a limited study area to assess changes in traffic volumes; and (4) assessed only predicted traffic changes and not attendant environmental and health impacts that would exacerbate preexisting pollutants and chronic disease burdens.

---

[19]  FHWA, Guidance on Environmental Justice and NEPA (2011) https://www.environment.fhwa.dot.gov/env_topics/ej/guidance_ejustice-nepa.aspx [hereinafter 2011 FHWA Guidance]; CEQ, Environmental Justice: Guidance Under the National Environmental Policy Act 1 (1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf [hereinafter 1997 CEQ Guidance].

As an initial matter, FHWA and MTA wrongly assert that New Jersey forfeited its arguments regarding New Jersey's Mapping Tool and New Jersey's definition for communities with EJ concerns.  FHWA Opp. at 32; MTA Opp. at 43.  In fact, New Jersey raised (and thus preserved) both issues in its June 12, 2023 letter to FHWA, which preceded publication of the Final FONSI.  DOT_0040852–54; *Rittenhouse*, 305 F.3d at 965 (NEPA claim preserved where public commentor "fairly described" grievances regarding adequacy of agency's analysis).

FHWA and MTA's remaining arguments on these issues are equally unpersuasive.

*First*, as New Jersey previously explained, the Mapping Tool would have more precisely reflected existing localized environmental and public health stressors in New Jersey by providing data on census block groups, rather than census tracts.  Opening Br. at 35.  That matters because census block groups permit a more refined analysis as they encompass much smaller areas than census tracts.  *Id.*  But despite its own NEPA guidance, FHWA employed less precise federal data and mapping tools that obscured the full extent of the scheme's localized impacts.  2011 FHWA Guidance (cautioning that "[s]mall clusters or dispersed populations of low-income or minority persons "should not be overlooked").

FHWA does not attempt to justify its decision to discount New Jersey's Mapping Tool; it merely argues that it should now be afforded deference.  FHWA Opp. at 32-33.  But the cases FHWA cites do not absolve FHWA, and the facts show that it did not take the requisite "hard look."  Rather, the case law demonstrates only that courts may defer to an agency's "*reasoned decision*."  *E.g.*, *Marsh*, 490 U.S. at 378 (emphasis added) (recognizing that "courts should not automatically defer . . . without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision"); *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (deferring to agency's decision to limit geographic scope of noise

impacts analysis "because significant noise impacts are [necessarily] limited to the vicinity of the airport"). Here, FHWA's decision was neither reasoned nor justified.

*Second*, FHWA arbitrarily neglected to use New Jersey's definition for communities with EJ concerns, thus excluding some communities from its EJ impact analysis. Opening Br. at 35–36 (comparing New Jersey and FHWA definitions). As New Jersey explained, the State's definition properly encompasses a broader number of overburdened communities, *id.* at 35, and thus, would have identified additional communities with EJ concerns in, *e.g.*, Tenafly, Bergen County, which FHWA's underinclusive definition arbitrarily excluded, *contra* MTA Opp. at 44.[20] MTA—but not FHWA—misleadingly claims that FHWA's definition was "informed by" the New Jersey's Environmental Justice Screen, which incorporates New Jersey's definition for communities with EJ concerns. MTA Opp. at 38. But while FHWA may have known about New Jersey's definition, it certainly did not rely on it or even explain its reason for not doing so. DOT_0006977. FHWA and MTA cannot deny that New Jersey's localized definition is both in line with the 1997 CEQ Guidance and would better assess the impacts of an unprecedented, large-scale congestion pricing scheme on smaller communities. FHWA Opp. at 33; MTA Opp. at 40.

Nevertheless, MTA claims that FHWA could not have adopted New Jersey's statutory definition because it would not have "allowed a comparison of effects across the study area." MTA Opp. at 43. But FHWA could have easily identified EJ communities at this more granular level because census block group-level data on minority populations and household income levels *are*

---

[20] *Compare* DOT_0007137 (showing census tract 055100 is *not* labeled an EJ community under FHWA's definition), *with Environmental Justice Mapping, Assessment and Protection Tool*, https://experience.arcgis.com/experience/548632a2351b41b8a0443cfc3a9f4ef6 (showing census block group 3400372420, which is within tract 055100, *is* labeled an EJ community under New Jersey's definition).

available for every census block group in the nation.[21]  For the same reason, MTA's reliance on *Mid States Coalition for Progress v. Surface Transportation Board* is misplaced.  345 F.3d 520 (8th Cir. 2003).  The Eighth Circuit held that an agency did not need to use data "available at a level finer than that of census block group" because such data would be available "for some, but not all, communities," *id.* at 541, but expressly recognized that "data at the census block group level [is] the smallest geographic unit for which data on both race and income [can be] obtained"— and that is precisely the level of data that New Jersey's definition demands. *Id.*[22]

*Third*, FHWA arbitrarily limited its analysis of traffic volume changes in communities with EJ concerns to four New Jersey counties (Bergen, Essex, Hudson, and Union).  FHWA only used the 28-county study area to assess "increased costs (tolls), changes in trip time, and changes in transit conditions."  MTA Opp. at 37; FHWA Opp. at 15.  FHWA then used a smaller 10-county study area to assess potential traffic volume increases in communities with EJ concerns, which included only four New Jersey counties.  MTA Opp. at 37; FHWA Opp. at 33.  According to MTA, these counties were selected because they represented "where the greatest change in traffic volumes/VMT are predicted to occur."  MTA Opp. at 37.  Yet nowhere does the EA explain the basis for this conclusion.  *Contra Vecinos para el Bienestar*, 6 F.4th at 1330 ("When conducting an environmental justice analysis, an agency's delineation of the area potentially affected by the

---

[21]   Census Bureau, *Census Bureau Releases New American Community Survey 5-Year Estimates,* (2020) https://www.census.gov/newsroom/press-releases/2020/acs-5-year.html ("Beginning in 2010, ACS 5-year estimates have been released annually for all geographies down to the block-group level."); DOT_0036956 (FHWA relied on 2015-2019 ACS 5-year estimates to identify EJ populations).

[22]   In its attempt to argue New Jersey's definition is untenable, MTA also cites a single footnote in the Final EA, which states that certain CDC data and the BPM (*i.e.*, the dataset used to calculate potential traffic changes) are only available at the census tract level.  MTA Opp. at 43 (citing DOT_0007263, n.40).  However, FHWA could have relied on New Jersey's data on preexisting pollutant and chronic disease burdens at the census block group level.  *See supra* 26-27.  Neither FHWA nor MTA claim that similar data is unavailable for neighboring states.  Moreover, to the extent certain data is in fact only available at the census tract level, FHWA could have identified EJ communities at the census block group-level, and then included any census tracts in which one or more block group qualifies as an EJ community in its impacts analysis.

project must be 'reasonable and adequately explained,' . . . and include a 'rational connection between the facts found and the decision made.'") (citation omitted). Moreover, the record indicates that these four counties do not include those predicted to have the greatest increases in traffic volumes/VMT. Instead, under Tolling Scenario A, Essex, Hudson, and Union Counties are predicted to experience the greatest *decreases* in VMT. DOT_0036830. Passaic, Middlesex, Monmouth, Mercer, Hunterdon, Morris, and Warren Counties, however, are predicted to have VMT *increases* under Tolling Scenario A in either or both 2023 and 2045, but FHWA never explains why it did not evaluate impacts on communities with EJ concerns in any of them. *Id.*

*Fourth*, FHWA's analysis did not include a localized assessment of air quality impacts on communities with EJ concerns. Rather, FHWA only assessed potential truck and non-truck highway traffic increases in a subset of communities across four New Jersey counties. This failed to satisfy the "hard look" standard. *O'Reilly v. All State Fin. Co.*, 2023 WL 6635070, at *7 (5th Cir. Oct. 12, 2023). The Final EA includes only two air quality analyses, both of which are deficient and neither of which analyze the tolling scheme from an EJ perspective. *See supra* IV.B. This meant that FHWA *never* assessed how identified traffic increases could exacerbate preexisting pollutant and chronic disease burdens in communities with EJ concerns. *O'Reilly*, 2023 WL 6635070, at *7 (agency must "consider how the incremental effects of the project might compound . . . preexisting environmental concerns").

*Fifth*, FHWA impermissibly limited its assessment of highway traffic increases to a subset of identified communities with EJ concerns—*i.e.*, those with preexisting pollutant burdens at or above the 80th percentile or preexisting health burdens at or above the 66.66th percentile compared to national values. DOT_0007296, DOT_0007301, DOT_0007311. And for purposes of evaluating the need for place-based mitigation, FHWA assessed an even smaller subset of

communities—those with preexisting pollutant or chronic health burdens at or above the 90th percentile. DOT_0007296. As a result, traffic increases and mitigation in multiple communities with EJ concerns were never assessed. For example, although all ten census tracts in Fort Lee were identified as communities with EJ concerns, MTA Opp. at 44; DOT_0007131, only some were included in FHWA's analysis. DOT_0007301; DOT_0007311. Likewise, FHWA inexplicably failed to assess potential traffic impacts on non-highway roads, such as intersections near highway ramps, even though they may also experience traffic increases. As a result, FHWA identified only four New Jersey locations with census tracts warranting place-based mitigation: Orange, East Orange, Newark, and Fort Lee. FHWA Opp. at 34; MTA Opp. at 41.

Take, for example, Bayonne. There, FHWA only evaluated highway traffic increases in a subset of census tracts within each community; concluded that within those tracts, traffic would increase; but nonetheless failed to consider how that could impact air quality and exacerbate preexistent pollutant and chronic disease burdens. DOT_0007283 (showing rates of preexisting chronic diseases); DOT_0007302 (4 census tracts evaluated for potential highway traffic increases); DOT_0007320 (same for mitigation); DOT_0007359 (13 census tracts and preexisting disparities in each). This type of inadequate analysis renders the Final EA utterly deficient.

FHWA and MTA repeatedly argue that the FONSI and Final EA looked at the regional impacts of air quality over a large planning area. *E.g.*, MTA Opp. at 28, 35–36; FHWA Opp. at 15–20, 33–35. But that does not negate FHWA's responsibility to take a "hard look" at the tolling scheme's impacts on many New Jersey communities with EJ concerns, including those in Fort Lee, Union City, East Newark, Bayonne, Elizabeth, and Perth Amboy. *Contra* MTA Opp. at 47–48. Essentially, FHWA's solution to pollution is dilution.

E.     **FHWA Admits that It Committed to No Concrete Measures to Mitigate Significant Environmental Impacts in New Jersey**

FHWA and MTA dismiss the adverse air quality and EJ impacts FHWA identified in New Jersey by claiming that they can be ameliorated down the road by "place-based mitigation," to be determined after the TBTA adopts a final tolling scheme.  FHWA Opp. at 31; MTA Opp. at 42.  That implicit admission that the FONSI neither committed to nor evaluated mitigation measures for New Jersey alone is grounds to vacate the Final EA and FONSI.

A FONSI premised on mitigation "***shall*** state any ***enforceable mitigation*** requirements or ***commitments*** that will be undertaken to avoid significant impacts."  40 C.F.R. § 1501.6(c) (emphasis added).  In other words, a FONSI requires an explanation of "commit[ed]" mitigation and how that mitigation will be "enforce[ed]." *Id.*; *Md.-Nat'l Capital Park & Plan. Comm. v. U.S. Postal Serv.*, 487 F.2d 1029, 1040 (D.C. Cir. 1973) (requiring agency to "convincingly establish[] that changes in the project have sufficiently minimized [adverse impacts].").  Mitigation measures must also be "discussed in ***sufficient detail*** to ensure that environmental consequences have been fairly evaluated," *Robertson*, 490 U.S. at 352, and "listing" possible mitigation measures or a "perfunctory description" is not enough.  *League Wild. Defs./Blue Mtns. Biod. Proj. v. Forsgren*, 309 F.3d 1181, 1192 (9th Cir. 2002); *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).  Despite this, FHWA dropped the ball, and its mitigation measures fail scrutiny for at least five reasons.[23]

*First*, any potential mitigation measures in New Jersey are entirely hypothetical.  FHWA and MTA admit that specific mitigation will depend on "additional environmental review," out of

---

[23] Both EPA and New Jersey expressly raised the mitigation requirements to FHWA during the public comment period.  DOT_0045034 (EPA advising that Project Sponsors "commit to clear mitigation measures with timelines, how each of the measures would be implemented, and the expected reduction in significant and adverse impacts that would be realized after implementation"); DOT_0007773 (New Jersey requesting that mitigation measures specifically addressing adverse impacts in New Jersey be identified).

which "[p]lace-based mitigation measures in New Jersey *could* include" various items proposed in the FONSI.  MTA Opp. at 42 (emphasis added); *see also id.* at 45 ("[F]inal sites for place-based mitigation will be selected *once the final tolling structure is adopted*.") (emphasis added); FHWA Opp. at 31.  But FHWA and MTA do not explain why they can commit now to $20 million in mitigation in the Bronx but nothing in New Jersey, DOT_0036929, even though traffic increases in New Jersey will be *two to four times greater* in Bergen County than in the Bronx, DOT_0000378, and even though MTA admitted that "the EA found that *absent mitigation*, traffic diversions in certain particularly overburdened environmental justice communities could constitute an adverse effect."  MTA Opp. at 40.[24]  The mere possibility of mitigation is insufficient under NEPA and comes nowhere close to the "sufficient detail" required by law.  *Robertson*, 490 U.S. at 351; *see also* 23 C.F.R. § 771.105 (FHWA policy that "measures necessary to mitigate adverse impacts be incorporated into the action").  Moreover, FHWA cannot claim that any mitigation argument is not yet "ripe"—NEPA requires that a federal agency thoroughly analyze all potential mitigation measures *before* issuing a FONSI.  *E.g.*, 40 C.F.R. § 1501.6(c).

*Second*, neither the FONSI nor the Final EA include any "discuss[ion] in sufficient detail to ensure that" the proposed mitigation addressed environmental consequences in New Jersey. *Robertson*, 490 U.S. at 352.  In *O'Reilly v. U.S. Army Corps of Engineers*, for example, an EA acknowledged, without further analysis, that a project would cause long term impacts on traffic, that specific measures "may be required," and that congestion areas "may need to be altered."  477

---

24  Even if FHWA's non-committal references to hypothetical mitigation measures were sufficient (and they are not), FHWA and MTA ignore that the *four* New Jersey communities identified for place-based mitigation measures would be forced to effectively compete with the *fourteen* New York communities that are eligible for the exact same measures, thereby decreasing the likelihood that even those few New Jersey communities will receive any place-based mitigation.  While FHWA and MTA may suggest this is mere conjecture, doing so would only reaffirm that FHWA and MTA have not committed to any enforceable mitigation measures for New Jersey.  In other words, neither FHWA, MTA, New Jersey nor the Court know whether New Jersey will be afforded mitigation.  And at present, all signs point to no.

F.3d at. 233.  The EA "fail[ed] to sufficiently demonstrate that the mitigation measures adequately address and remediate the adverse impacts" because it simply "list[ed] the potentially significant adverse impacts" and "provide[d] only cursory detail as to what those measures are and how they serve to reduce those impacts to a less-than-significant level." *Id.* at 234.  So too here.  FHWA has merely listed potential mitigation measures with *no* analysis as to how these measures will "reduce the project's effects" in New Jersey.  *Id.* at 234; *San Luis Valley Ecosys. Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1245–46 (D. Colo. 2009) (FONSI is arbitrary and capricious where, "significant mitigation measures . . . were not even developed, much less evaluated" and it was "unclear from [the] record whether the agency really evaluated the efficacy" of the proposed mitigation).  FHWA cannot show otherwise.

*Third*, because the FONSI and Final EA lack this necessary analysis, New Jersey and other stakeholders cannot evaluate the possible mitigation measures.  FHWA and MTA complain of New Jersey's alleged inadequate participation in the process, but New Jersey had no opportunity to evaluate whether potential mitigation measures would or could actually mitigate adverse effects throughout the State.  *Richardson*, 565 F.3d at 708 ("A public comment period is beneficial only to the extent the public has meaningful information on which to comment.").

*Fourth*, while MTA asserts that "the Project Sponsors will determine the appropriate sites for place-based mitigation" with "local implementing agencies," MTA Opp. at 42, neither FHWA nor MTA have responded to New Jersey's concern that New Jersey agencies have been denied a meaningful opportunity to participate in these discussions to date.  Opening Br. at 36, 41.[25]  *No* New Jersey agency has been contacted about implementing *any* possible mitigation measures.

---

[25]  MTA claims that New Jersey agencies should have asked to be involved in the NEPA process, but did not. MTA Opp. at 21.  That is wrong as a matter of fact (New Jersey expressed its desire to participate, *see, e.g.*, DOT_0007773) and as a matter of law (NEPA puts the onus on the entity seeking to implement the scheme to develop a robust public comment process, not on those affected by it).

And FHWA and MTA cannot explain why only New York-based agencies are listed in the FONSI to implement the mitigation measures. ECF No. 67-7. Instead, FHWA delegated its responsibility to ensure actual and effective mitigation to New York to decide after the tolling scheme is implemented. That flips NEPA on its head and gut its mitigation requirement.

*Fifth*, MTA's argument that certain regional mitigation measures will benefit New Jersey is meritless. MTA Opp. at 41–42. The Final EA never explains how the regional mitigation measures would reduce impacts in New Jersey to an insignificant level. Nor do FHWA or MTA argue that is the case. In fact, by identifying four New Jersey communities as warranting place-based mitigation, the Final EA implicitly admits that regional mitigation measures would *not* sufficiently minimize the scheme's impacts there. *O'Reilly*, 477 F.3d at 234 (EA unlawful where it "fails to sufficiently demonstrate that the mitigation measures adequately address and remediate the [identified] adverse impacts so that they will not significantly affect the environment."). FHWA and MTA's admission that certain areas in New Jersey warrant place-based mitigation but refusal to commit to enforceable measures renders the EA wholly deficient and requires vacatur.

F.   **New Jersey Communities and Agencies Were Not Adequately Consulted to the Extent Required by NEPA**

As both FHWA and MTA admit, the CEQ regulations required FHWA to "involve . . . State . . . and local governments" and "relevant agencies . . . to the extent practicable" while preparing an EA and to "make *diligent* efforts" to involve the public in the NEPA process. 40 C.F.R. §§ 1501.5(e), 1506.6(a); FHWA Opp. at 41; MTA Opp. at 18; *see also Block*, 690 F.2d at 769 ("Agencies are . . . obliged to adhere to the procedures mandated by NEPA."). FHWA failed to do so here and violated critical NEPA requirements in the process.[26]

---

26   New Jersey notes at the outset that the TMRB Recommendation was not one of the seven tolling scenarios evaluated in the EA and therefore New Jersey was provided *no* opportunity to meaningfully comment on this tolling scheme during the public process required by NEPA.

1.      **New Jersey Communities Were Not Provided with a Sufficient Opportunity for Public Comment and Input**

FHWA and MTA misleadingly suggest that FHWA complied with its statutory requirements to consult New Jersey's communities in part because its plans were accessible to the public.  FHWA Opp. at 39; MTA Opp. at 16–17.  But "[g]rudging, pro forma compliance will not do."  *Ctr. for Bio. Div. v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (citation omitted).  FHWA relies on the fact that it and the Project Sponsors hosted two webinars on the project and three webinars regarding EJ issues in New Jersey, and it "provided for electronic access" to the Draft EA and made physical copies "available for public inspection" at locations in New Jersey.  FHWA Opp. at 39.  But electronic access to a highly-technical 4,000-page document or a handful of informational webinars does not satisfy NEPA's requirement for meaningful engagement.  *E.g.*, *Robertson*, 490 U.S. at 350 (NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.").

FHWA further relies on the public's opportunity to comment on the Draft EA.  FHWA Opp. at 40.  As an initial matter, neither FHWA nor MTA acknowledge that the 44-day public comment period was too short given the length and complexity of the over 4,000-page Draft EA (a page number, which, in itself, ought to have counseled FHWA to conduct an EIS rather than issue a FONSI).  An agency should provide for a longer comment period when its decision is of great controversy and requires the public to review specific materials from the agency.  *E.g.*, *Estate of Smith v. Bowen*, 656 F. Supp. 1093, 1097-98 (D. Colo. 1987) (60-day comment period inadequate where the proposed regulation involved such "great numbers of interested persons and organizations . . . that a reasonable time [to comment] would include time for groups and organizations to go through their own bureaucratic processes to arrive at their comments.").  Here,

FHWA and MTA gave commenters a mere *44 days* to review and comment on an over 4,000-page Draft EA setting forth seven different possible proposals for the first congestion pricing scheme in the nation. Review alone—without preparing public comment—would have required reading around 100 pages per day. DOT_0036152. And although FHWA relies on six public hearings on the Draft EA, FHWA Opp. at 40, those hearings were held over a single week, in a clear attempt to rush through the process and attract as little public participation as possible. There is no question that this project involved "great numbers of interested persons and organizations" and thus required more time for participation in the NEPA process, not less. *Bowen*, 656 F. Supp. at 1098.

Moreover, FHWA's reliance on *Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers* for the contention that there is "no minimum level of public comment and participation required by the regulations" is unavailing. FHWA Opp. at 43 (citing 524 F.3d 938, 953 (9th Cir. 2008)). There, the court explained that what constitutes "adequate information depends on the circumstances," and "the regulations 'require that the public be given as much environmental information as is practicable, prior to completion of the EA, so that the public has a sufficient basis to address those subject areas that the agency must consider in preparing the EA." *Id.* at 953 (quotation omitted). Whether FHWA satisfied a non-existent minimum standard for public participation is not relevant: the question is whether FHWA provided the public "as much information as [was] practicable." *Ohio Valley Env'tl Coal. v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783, 810 (S.D. W. Va. 2009). It did not.[27]

---

[27] FHWA also relies on *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 518–20 (D.C. Cir. 2010), for the assertion that a "posting notice" in its office and online was sufficient for adequate public consultation. FHWA Opp. at 43. There, however, the court explicitly highlighted that the public had notice of the project and opportunity to comment on the EAs for *eleven months*. *Id.* at 519. Here, Defendants provided only *44 days* for the public to comment on the Draft EA, and in no way suggested (until now) that comments received after that period would be reviewed. Further, the projects at issue in *Salazar* involved site-specific applications that the public could individually comment on, whereas here, the EA put forth seven tolling schemes (contemplated there could be an eight), and we now know none are the tolling scheme in the TMRB Recommendation.

2.      **New Jersey Did Not Waive Its Consultation Argument**

MTA asserts that New Jersey waived its argument about adequate agency consultation by purportedly failing to raise this argument pre-litigation.  MTA Opp. at 21–22.  Not so.  Governor Murphy's September 23, 2022 letter explicitly stated "New Jersey was inadequately consulted" by the Project Sponsors, especially compared to the numerous "Federal and New York State agencies [that] were consulted."  DOT_0007773.  Governor Murphy reiterated that grievance in his June 2023 letter to FHWA, noting the "utter lack of adequate outreach to New Jersey" during the Draft EA process "inhibit[ed] meaningful comment with appropriate technical data [from New Jersey agencies] as to the impact of the [Project] on New Jersey roads, transit facilities and ridership, [and] the health of vulnerable communities [in New Jersey]."  DOT_0040857–58.  FHWA and MTA clearly had sufficient notice of New Jersey's claims.  *Great Basin*, 456 F.3d at 968.

3.      **FHWA Failed to Adequately Consult the Relevant New Jersey Agencies as Required by Statute**

FHWA also failed to satisfy the requirement that it adequately consult with New Jersey agencies.  As described above, agencies must "involve . . . State . . . and local governments" and "relevant agencies . . . to the extent practicable" while preparing an EA. 40 C.F.R. § 1501.5(e).[28] FHWA claims that it did so by holding "numerous meetings" with New Jersey agencies "on a

---

[28] FHWA attempts to rely on *Delaware Department of Natural Resources & Environmental Control v. U.S. Army Corps of Engineers*, 685 F.3d 259 (3d Cir. 2012) to contend that Section 1501.5(e) sets forth a minimum threshold for public and agency participation and it satisfied that standard. FHWA Opp. at 43. That is an erroneous interpretation. "[T]he procedural requirements prescribed in NEPA and its implementing regulations are to be strictly interpreted '***to the fullest extent possible***' in accord with the policies embodied in the Act." 42 U.S.C. § 4332(1) (emphasis added).  FHWA offers no reason why it would not have been "practicable" to involve the public or New Jersey agencies more fully.  In any event, this case is wholly distinct because there, the court found that the agency satisfied public review requirements where it offered a 30-day period for public comment on a 179-page EA.

variety of topics, including conformity and air quality analysis." FHWA Opp. at 9. But those meetings failed to include all "relevant agencies" that FHWA was responsible for consulting.[29]

Neither FHWA nor MTA provide any case law suggesting that FHWA can circumvent the statutory requirement to consult all relevant agencies before issuing a FONSI. FHWA, in fact, now admits that it entirely failed to consult New Jersey's principal environmental and public health agencies, NJDEP and NJDOH—instead, it consulted only NJDOT, NJT, NJTA, the Port Authority of New York and New Jersey, and the New Jersey Transportation Planning Authority ("NJTPA"). FHWA Opp. at 9. NJDEP and NJDOH are clearly "relevant agencies" for the purposes of NEPA review, and in particular should have been invited to FHWA's meetings involving conformity and air quality analysis—and thus *environmental* and *public health* outcomes. And given their exclusion, it is completely reasonable that the other consulted New Jersey agencies did not ask questions on those topics. *Contra* FHWA Opp. at 41–42; MTA Opp. at 16–17.

Furthermore, the onus was not, as MTA continues to argue, on New Jersey agencies to reach out to FHWA with their concerns about the project or "voice their desire for additional involvement." MTA Opp. at 21. Rather, as MTA acknowledges (but FHWA does not), 23 C.F.R. § 771.111(e) requires that "[o]ther States . . . that may be significantly affected by the action or by any of the alternatives *must* be notified early and their views solicitated." *Id.* at 20 (emphasis added). And neither MTA nor FHWA can adequately explain why they did not "*at the earliest appropriate time*, begin consultation with interested agencies . . . to advise them of the scope of the project . . . [d]etermine which aspects of the proposed action have potential for social,

---

[29] Moreover, FHWA's citation to DOT_0037044 provides no support for its claim that it met with New Jersey agencies about conformity and air quality analysis. At best, the citation shows that FHWA invited certain New Jersey agencies to informational sessions meant "to introduce the EA process . . . prior to the EA Notice of Availability." Contrary to FHWA's assertion, DOT_0037044 lists only New York agencies involved in meetings on conformity and an undefined "Interagency Coordination Group" to discuss air quality impacts.

economic, or environmental impact[, and] identify alternatives and measures that might mitigate adverse environmental impacts." 23 C.F.R. § 771.119(b) (emphasis added).  These requirements make clear that FHWA was required to reach out to interested stakeholders, but did not do so.[30]

MTA's contention that New Jersey agencies (NJDEP and NJDOH) should have requested to be designated a "participating or cooperating agency" is similarly misplaced.  MTA Opp. at 21–22.  40 C.F.R. § 1501.8(a) allows, but does not require, a state or local agency "with special expertise with respect to any environmental issue" to be a cooperating agency by agreement with the lead agency.  With MTA at the wheel, New Jersey did not and could not reach any such agreement with FHWA to implement this project—because as MTA and FHWA assert multiple times, this is a project being implemented in New York, by statute, and the legislature did not provide for New Jersey's participation.  *Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. U.S. Fish & Wildlife Serv.*, 2005 WL 8164390 at *14 (D.N.M. Jan. 31, 2005) (explaining that it is the responsibility of the lead agency to decide whether to enter into an agreement to designate a State or local agency as a cooperating agency); *see also* MTA Opp. at 22 ("[I]t is entirely within the lead agency's discretion to identify participating agencies.").  Even though, as MTA notes, the Project Sponsors "invited five agencies with representatives from New Jersey to participate in the NEPA process," MTA Opp. at 22, that participation was—by design—limited in scope to high-level

---

[30] FHWA suggests that it was "incumbent upon [New Jersey's agencies] who wish to participate to structure their participation so that it is meaningful" and that New Jersey's agencies failed to meet this standard.  FHWA Opp. at 41 (citing *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978)).  However, FHWA's principal authority for this proposition does not actually help its case.  In *Vermont Yankee*, the organization's participation was not meaningful because it "ma[de] cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seek[s] to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'" 435 U.S. at 554.  New Jersey repeatedly brought the issue of inadequate consultation of its agencies to FHWA's and Project Sponsors' attention.  *See supra* IV.F.2.  Moreover, the organization in *Vermont Yankee* was not a state agency and thus the federal agency did not need to comply with state entity consultation requirements.

meetings and webinars about the EA process.  DOT_0037043–44.  This is not the same as signing an agreement to be cooperating agencies—that is, partners—on the project.

Finally, FHWA's argument that it "greatly exceeded EA public review requirements" and "met the standard that would ordinarily be required for an EIS" is flawed.  FHWA Opp. at 42–43.  The statutory requirements for an EA and EIS on public participation are vastly different.  When preparing an EIS, an agency is required to engage in a scoping process, the lead agency must invite all "likely" affected State and local agencies, "publish a notice of intent to prepare an [EIS] in the Federal Register," include a "request for identification of potential alternatives, information, and analyses relevant to the proposed action," and "directly transmit" a draft EIS to relevant state and local government agencies to comment.  40 C.F.R. § 1501.9; 23 C.F.R. § 771.123(i)(2).  There is no dispute that these requirements were not met here.  Accordingly, FHWA did not meet its affirmative obligations to consult New Jersey and its agencies when preparing the EA, let alone the legal requirements for an EIS.  23 C.F.R. §771.119(b).

### G. FHWA and MTA Admit They Did Not Seriously Consider Any Alternatives

#### 1. The Project's Purpose and Need Were Too Narrowly Defined

FHWA and MTA urge the court to afford FHWA "considerable deference" in defining the project's purpose and need.  MTA Opp. at 22; FHWA Opp. at 35.  This deference is not limitless.  Multiple Circuit Courts agree that an agency cannot rely on deference to "define the objectives of [their] action[s] in terms so unreasonably narrow that only one alternative from among the environmentally benign ones . . . would accomplish the goals of the agency's action[.]"  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010).[31]

---

[31] *See also Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012); *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1212 (11th Cir. 2012); *Sierra Club v. Fed. Highway Admin.*, 435 F. App'x 368, 374 (5th Cir. 2011); *City of Bridgeton v. FAA*, 212 F.3d 448, 458 (8th Cir. 2000); *Simmons v. U.S. Army*

Even the cases MTA cites confirm that "the 'purpose and need' . . . ***must*** be defined to embrace a ***range of possible solutions*** beyond the specific project that the planning process has generated. Otherwise, the outcome of the assessment seems to be ***pre-determined***, with the proposed project being the only 'alternative' that meets its own 'purpose and need.'" *Jones v. Peters*, 2007 WL 2783387, at *18 (D. Utah Sept. 21, 2007) (cleaned up) (emphasis added); MTA Opp. at 22–23. But instead of defining the purpose to credibly evaluate a "range of possible solutions" to meet MTA's revenue goal, the Final EA was drafted to ensure a "predetermined" outcome and limit consideration to only the CBD tolling scheme. *Jones*, 2007 WL 2783387, at *18.[32]

In fact, in all of the cases FHWA and MTA cite, the purpose and need (including financial goals) did not preclude the agency from evaluating more than one alternative. FHWA Opp. at 36–37.[33] That is because NEPA bars agencies from "narrowly defin[ing] [a project's] purpose and need so as to winnow down the alternatives until only the desired one survives."[34] *Klamath-*

---

*Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991); *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983).

[32] FHWA cites *Busey*, 938 F.2d, for the proposition that Congress did not intend for agencies to determine a project's goals. FHWA Opp. at 37. But the Seventh Circuit declined to follow *Busey* in that regard, explaining that, "[t]he federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role." *Simmons*, 120 F.3d at 666.

[33] *E.g.*, *Indian River Cnty. v. Dep't of Transp.*, 348 F.Supp.3d 17, 53–54 (D.D.C. 2018) (four alternative routes); *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 703 (3d Cir. 1999) (four alternatives); *Nat'l Res. Def. Council, Inc. v. FAA*, 564 F.3d 549, 557 (2d Cir. 2009) (seven alternatives); *see also* MTA Opp. at 23; *Cachil Dehe Band of Wintun Indians of Coluso Indian Comm. v. Zinke*, 889 F.3d 584, 604 (9th Cir. 2018) (five alternatives); *Stand Up for California! v. U.S. Dep't of Interior*, 919 F. Supp.2d 51, 77 (D.D.C. 2013) (five alternatives); *Protect Lake Pleasant, LLC v. Connor*, 2010 WL 5638735, at *15 (D. Ariz. July 30, 2010) (three alternatives. The cases MTA cites for its proposition that revenue goals can factor into rejecting alternatives are also inapposite. MTA Opp. at 23. While FHWA was permitted to consider MTA's revenue requirement in its purpose and need statement, it could not reject outright alternatives other that the tolling scheme capable of satisfying this requirement (as it did here). *See infra* IV.G.2.

[34] The cases that FHWA cites in support of its contention that it could not consider alternatives given the TMA's revenue requirements are inapposite because in each, alternatives were insufficient for wholly distinct reasons. *E.g.*, *Vermont Yankee*, 435 U.S. at 552 (rejecting "energy conservation" as an alternative to a nuclear power plant); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1172 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003) (the alternative required the cooperation of at least 10 county, city, and other local governments); *Latin Ams. for Soc. and Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 470 (6th Cir. 2014) (approval for the project was needed from a foreign government); *Nat. Res. Def. Council v.*

*Siskiyou Windlands Ctr. v. U.S. Forest Serv.*, 373 F.Supp.2d 1069, 1088 (E.D. Cal. 2004).   To

accept FHWA and MTA's argument that the statute could—and did—limit the purpose and need

to no end would lead to absurd results: any governmental project sponsor could limit the range of

alternatives considered by passing limiting legislation to ensure only the proposed project is

considered.[35]   That would eviscerate the purpose of NEPA.[36]   *Wilderness Soc., Ctr. For Native*

*Ecosystems v. Wisely,* 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) ("Consideration of reasonable

alternatives is 'the heart' of the NEPA process.") (citation omitted); *see also Calvert Cliffs'*

*Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n.*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)

(consideration of alternatives "ensures that the 'most intelligent, optimally beneficial decision will

ultimately be made").

## 2.   FHWA Admits that It Did Not Take a Hard Look at Alternatives

Even if FHWA was entitled to deference in defining the purpose and need, its alternative

analysis does not rise to the requisite "hard look" standard and was woefully inadequate and

arbitrary and capricious for at least three reasons.   *First*, FHWA does not address New Jersey's

argument that it dismissed outright all other alternatives without conducting an independent

evaluation as required by NEPA.   Opening Br. at 46–47; *Idaho Conservation League v. Lannom*,

200 F. Supp. 3d 1077, 1091 (D. Idaho 2016), *amended,* 2017 WL 242474 (D. Idaho Jan. 18, 2017)

---

*F.A.A.*, 564 F.3d 549, 557 (2d Cir. 2009) (the revenue requirement was based in federal law); *Protect Our Parks, Inc. v. Buttigieg*, 2021 WL 3566600, at *13 (N.D. Ill. Aug. 12, 2021), *aff'd*, 39 F.4th 389 (7th Cir. 2022) (decision to locate a library was not a decision requiring federal review).

[35]   Moreover, the TMRB Recommendation undercuts this argument.   Previously, FHWA interpreted the TMA to require an entry-and-exit tolling approach to account for vehicles that "remain in" the CBD overnight. DOT_0000369.   While FHWA considered the Act's revenue requirement to be non-negotiable, it is clear neither FHWA nor MTA gave this so-called requirement no credence: the TMRB Recommendation eschews entry-and-exit tolls for a single-entry toll.   TMRB Recommendation at 8.

[36]   FHWA's contention that it lacks "veto power" to "resolve fundamental policy disputes" misses the mark. FHWA Opp. at 37.   New Jersey disagrees with more than just the "policy" of the Project Sponsors, but with FHWA's abdication of its responsibility to independently evaluate alternatives.   *E.g., High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1223 (10th Cir. 2020).

("[A]gencies should rigorously explore and objectively evaluate all reasonable alternatives that relate to the purposes of the project[.]").   Instead, FHWA says it "summarized previous studies and concepts considered by New York official and stakeholder and advocacy groups."   FHWA Opp. at 35.   But FHWA cannot rely on outdated studies (i.e., from 2008), and "concepts" from stakeholders who have an incentive to ensure MTA meets its revenue goals.   FHWA Opp. at 35; MTA Opp. at 26; *Am. Rivers. & Ala. Rivers All. v. FERC*, 895 F.3d 32, 50–51 (D.C. Cir. 2018) (rejecting agency reliance on a "more-than-decade-old-survey" provided by project sponsor without "any independent verification").   Because FHWA relied on studies from *over a decade ago* without any independent analysis, there is no reasoned agency decision for this Court to defer to.   *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 569 (D.C. Cir. 2016).   In reality, FHWA seeks deference to agency *inaction*.   This falls far short of NEPA's mandate that agencies "study, develop, and describe" alternatives.   *Rankin*, 394 F. Supp. at 659.

*Second*, it is irrelevant whether the court applies the standard for evaluating alternatives in an EA versus an EIS.   The standard is the same.   *Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*, 177 F. Supp. 3d 146, 156 (D.D.C. 2016) (applying the standard applicable to an EIS to an EA and citing cases).   As an initial matter, only MTA makes this argument.   MTA Opp. at 25.   Moreover, the Final EA includes **one page** explaining why all 10 alternatives were rejected.   DOT_0036268.   That does not rise to this level of "rigorous[] explor[ation]" required by law.   *Openlands v. U.S. Dep't of Transp.*, 124 F. Supp. 3d 796, 805 (N.D. Ill. 2015); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) (EA must include "environmental impacts of the proposed action and alternatives") (citing 40 C.F.R. § 1508.9(b)).

*Third*, FHWA's attempt to defend its cursory analysis of alternatives also fails.   FHWA Opp. at 35–38.   Alternative T-2 (a proposal to toll the currently un-tolled East and Harlem River

Bridges) was rejected because it would not meet MTA's revenue threshold even though it would have reduced congestion and "could" generate comparable revenue.   FHWA Opp. at 38; DOT_0036265–68.  FHWA doubles down on the Final EA's reasoning, reiterating that there is no agreement or law in place that would direct the revenue from those tolls to MTA.  FHWA Opp. at 38.[37]  However, it ignores that there was no agreement to toll the streets South of 60th street (as the congestion pricing scheme does) until of course there was; if FHWA found this a reasonable alternative, New York could have passed a law to provide as much.  *NRDC v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972) ("The mere fact that an alternative requires legislative implementation does not automatically establish it as beyond the domain of what is required for discussion"); *Env'tl Def. Fund, Inc. v. Froehlke*, 473 F.2d 346, 351 (8th Cir. 1972) (rejecting argument that "it was not necessary to discuss in greater detail [an] alternative . . . because [it] was a separate project requiring separate Congressional authorization.").[38]

Furthermore, FHWA laments that Alternative T-2 would "adversely affect local trips between the South Bronx and Harlem/Washington Heights," which "could" negatively impact the economy in these "two environmental justice communities" based on the 2008 study.  FHWA Opp. at 38 (citing DOT_0036268).  As explained, it was erroneous for FHWA to rely on a 2008 study,

---

[37]  In support of this argument, FHWA cites *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168 (3d Cir. 2000).  There, the alternative location was rejected for fact-specific reasons inapplicable here, including because it would violate a development plan already in place, it was closer to resources on the National Register of Historic Places, and it would have required expensive alterations to the sewer system.  *Id*. at 183; FHWA Opp. at 38.

[38]  It is not even clear that legislative action would be necessary; all that would likely be required is for New York City and MTA to enter into a memorandum of understanding, which is exactly what MTA and NYC are going to do here.  *E.g.*, *Interagency Memoranda of Understanding (MOU)s*, NYC DCAS Citywide Admin. Serv. https://www.nyc.gov/site/dcas/about/interagency-memoranda-of-understanding-mous.page (last visited Jan. 12, 2024); *see also* N.Y. Veh. & Traf. Law § 1704(2-a) (directing TBTA and NYDOT to enter into a memorandum of understanding "for purposes of coordinating the planning, design, installation, construction and maintenance of the central business district tolling infrastructure including required signage."); *id*. §§ 1704(3)(a-b).  This hardly seems rises to the level of "unfeasible." 43 C.F.R. § 46.420(b) (range of reasonable alternatives must include "technically and economically practical or feasible" alternatives).

but moreover, FHWA ignores that the congestion pricing scheme imposes *serious* adverse environmental and economic impacts on the Bronx—so much so that over $20 million dollars in mitigation has been committed to it.  DOT_0037018; DOT_0000382.  FHWA's failure to consider Alternative T-2 means that we cannot know whether similar (or even lesser) mitigation measures would have been sufficient to mitigate the impacts on "two environmental justice communities."[39]  Further, FHWA's concern for alleged negative "economic" impacts on these communities is undercut by another conclusion of the 2008 study: this alternative "would reduce vehicle emissions in these neighborhoods."  DOT_0001768.  "[T]he existence of [this] viable but unexamined alternative renders an EA inadequate."  *Abbey*, 719 F.3d at 1050.[40]

In sum, once MTA determined that no other alternative would satisfy its $15 billion revenue requirement, the result was pre-determined: other ways to reduce congestion would be dismissed as "unreasonable."  However, NEPA does not permit agencies to work backwards from their preferred result at the expense of environmental and other interests.[41]

---

[39]  Indeed, the EPA requested more information on why Alternative T-2 was not analyzed in much detail.  DOT_0044940 ("EPA requests more information on why Alternative T-2 is listed as "depends" for Objectives 3 & 4 without much more detail expressed in Note 5" and that the "Current selection matrix [Table 2-2] suggests an all-or-nothing decision strategy that minimizes long-term congestion reduction.").

[40]  It is quite ironic that FHWA states that Alternative T-2 was rejected also because it "would not address trips that start and end within Manhattan," FHWA Opp. at 38, when we now know that the TMRB Recommendation for the tolling scheme is not going to toll trips that start and end within the CBD, *see supra* II.A.

[41]  On December 15, 2023, two groups of amici curiae submitted motions for leave to file amicus curiae briefs in support of Defendants' cross-motion for summary judgment.  ECF Nos. 73, 78.  Both amicus briefs argue that congestion pricing is beneficial to New York and the surrounding region, but neither addresses the two legal issues before this Court: (1) whether the Final EA and FONSI violate NEPA and are arbitrary and capricious under the APA; and (2) whether FHWA's failure to perform a conformity analysis for New Jersey's SIP violates the CAA.  The Court need not consider the immaterial arguments raised in these briefs.  Moreover, both briefs are premised on evidence outside of the administrative record that the Court may not consider.  *E.g.*, ECF No. 73 at 14–26 (discussing the Newark Bay-Hudson County Extension Improvement Program, which is not related to the congestion pricing scheme and involves an in-kind replacement of an existing bridge in New Jersey.  In any event, New Jersey is complying with all required federal and state environmental reviews).

H.   **FHWA's Failure to Conduct a Transportation Conformity Analysis in Violation of the Clean Air Act Was Arbitrary and Capricious**

The CAA (42 U.S.C. §§ 7401 *et seq.*) requires FHWA to conduct a conformity analysis and determination for the tolling scheme.  42 U.S.C. § 7506; 40 C.F.R. § 93.102(a)(1)(iii)[42]; Opening Br. at 47–48.  That conformity analysis assesses a project's impact on the SIP—the CAA-required plan that New Jersey must develop to reduce or control air pollution in order to maintain or attain compliance with the NAAQS.  A conformity analysis is required for "all nonattainment and maintenance areas" and their corresponding SIPs.  40 C.F.R. §§ 93.102(a)(1)(iii), 93.102(b) ("The provisions of this subpart shall apply in all nonattainment and maintenance areas for transportation-related criteria pollutants for which the area is designated nonattainment or has a maintenance plan").

While FHWA performed a conformity analysis for New York's SIP, it did not perform one for New Jersey's SIP, even though at least three maintenance and nonattainment areas impacted by the congestion pricing scheme span both New York *and* New Jersey (and Connecticut).  Opening Br. at 48 (listing the (1) New York-Northern New Jersey-Long Island, NY-NJ-CT $PM_{2.5}$ Maintenance Area; (2) New York-Northern New Jersey-Long Island, NY-NJ-CT Ozone Nonattainment Area; and (3) New York-Northern New Jersey-Long Island, NY-NJ-CT Carbon Monoxide maintenance area).  Neither FHWA or MTA dispute that fact,[43] and, as explained below, FHWA and MTA's other excuses for this failure are entirely unpersuasive.

---

[42]  Strangely, FHWA argues that New Jersey relied on the wrong conformity analysis provision in its introductory discussion of the CAA's conformity requirements.  ECF 79-1, at 46.  But New Jersey also cited 40 C.F.R. § 93.102(a)(1)(iii), which appears in Subpart A, where, as FHWA explains "the regulations applicable to transportation projects are found."  *Id.*; *see also* 67-1, at 47 (citing 40 C.F.R. § 93.102(a)(1)(iii)).

[43]  MTA cites *Conservation Law Foundation, Inc. v. Department of Airforce*, claiming that it "held that an agency need not make a conformity determination for a state neighboring the one where the project's physical construction is located."  MTA Opp. at 49 (*citing* 864 F. Supp. 265, 277–78 (D.N.H. 1994) (subsequent history omitted)).  But the court never addressed the merits of that issue, because "[a]t the time the [agency] was formulating its conformity determination, there were no EPA conformity regulations available for guidance"

1.    **New Jersey Did Not Waive Its Conformity Argument**

FHWA and MTA's argument that New Jersey "waived its conformity argument by failing to raise it in comments to the draft EA" fails, FHWA Opp. at 45; MTA Opp. at 48–49, but regardless, the CAA and its "regulations dictate" that a conformity analysis was required. *Food & Water Watch v. U.S. Dep't of Agric.*, 2019 WL 2423833, at *6 (D.D.C. June 10, 2019); *see also* 40 C.F.R. § 93.102(a)(1)(iii).

New Jersey explicitly raised concerns about CAA compliance to FHWA, explaining that "continuing elevated levels of $PM_{2.5}$ in the Fort Lee [area] could contribute to a classification of nonattainment when EPA implements the new lower $PM_{2.5}$ NAAQS." DOT_0040856.  In other words, New Jersey raised to FHWA that the tolling scheme could cause particulate matter levels in Fort Lee to exceed the EPA's standards such that the area would be designated as nonattainment for federal air quality standards.  This goes to the heart of why a conformity analysis was needed: it was critical to ensure the tolling scheme would not hinder New Jersey's ability to comply with the CAA.  Thus, New Jersey did not waive its CAA claim.[44]

Even if New Jersey had not raised this issue during the public comment period (it did), sometimes an issue is "so obvious" that "there is no need for a commentator to point [it] out specifically in order to preserve its ability to challenge a proposed action."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004).  That is the case here, where the CAA and its regulations

---

and the court thus "provid[ed] . . . substantial deference" to the agency's conformity determination. *Conservation Law Found.*, 864 F. Supp. at 277.  It never held that an agency is *not* required to make a conformity determination for neighboring states.  Further, this case reflects the state of the law prior to recent conformity regulations and has since been overruled by more recent interpretations, Opening Br. at 49 n.45, which hold that conformity requirements do not stop at state lines.  *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1235 (10th Cir. 2021) (recognizing "[n]onattainment areas may encompass territory in multiple states . . . . For example, several PM2.5 nonattainment areas cross state boundaries") (citing 40 C.F.R. § 7407(d)(1)(A)(i)).

[44]   In fact, the New York State Department of Transportation sent FHWA a letter requesting approval of new transportation conformity determinations for four areas—three included parts of New Jersey.  DOT_0039319.

require a conformity analysis before "[t]he approval, funding, or implementation of FHWA/FTA projects." 40 C.F.R. § 93.102(a)(1)(iii).  "The agency's responsibilities under that regulation are obvious." *Food & Water Watch*, 2019 WL 2423833, at *6.  Moreover, as is also the case here, where an agency has "independent knowledge of the issues that concerned Plaintiff . . . there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action."  *ʻIlioʻulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006).  Here, FHWA had independent knowledge that the tolling scheme would impact conformity in New Jersey and additional analysis was needed.

> ## 2. FHWA's Air Quality Analysis in the Final EA Is Not an Adequate Substitute for the Transportation Conformity Analysis Required By the CAA

Both FHWA and MTA invoke the Final EA's air quality analysis to defend their failure to carry out any conformity analysis.  In essence, they argue that their efforts to comply with one set of statutory requirements should excuse their failure to comply with others.  MTA Opp. at 49; FHWA Opp. at 46–47.  Not so.  The NEPA air quality analysis and the CAA conformity analysis are two distinct and separate regulatory requirements.  Under NEPA, agencies assess air quality impacts using a comparative analysis, which "typically includes the results of air quality emissions modeling showing the projected emissions of criteria pollutants and [mobile source air toxic emissions] for each of the action alternatives and for the 'No Action' alternative."  Center for Environmental Excellence, *Practitioner's Handbook, Addressing Air Quality Issues in the NEPA Process for Highway Projects* (2017) at 15, https://environment.transportation.org/wp-content/uploads/2021/04/ph18-1-ol.pdf [hereinafter CEE Handbook].

In contrast, a conformity analysis under the CAA assesses a transportation project's impacts on a SIP.  "In most cases, a SIP contains an inventory of existing emissions, projections of future emissions . . . , and an identification of measures that will be taken to reduce the emissions

in order to reach attainment by the statutory deadline."[45]  In addition, an SIP "defines the total allowable level of emissions of a specific pollutant, and then allocates a portion of that total to emissions from highway and transit vehicles," and "include[s] specific projects and programs that the state has committed to implement to reduce emissions from transportation sources—for example, improving public transportation or adding high occupancy vehicle (HOV) lanes."  CEE Handbook at 3–4.  Thus, unlike the air quality analysis in the Final EA, a conformity analysis for New Jersey's SIP would have assessed how an increase in emissions would impact the State's specific emissions budget, and the SIP's specific mitigation and control measures.

Relying on a handful of inapposite cases, MTA appears to argue that courts apply a sort of "harmless error" test to the failure to perform the statutorily-required conformity analysis.  MTA Opp. at 49 n.38.  Setting aside this implicit admission that FHWA and MTA did not perform the required conformity analysis, FHWA and MTA cannot possibly claim that this error did not affect FHWA's decision.  None of MTA's cases save the day for Defendants here, where a federal agency wholly failed to conduct the required conformity analysis and determination for a SIP.  *E.g.*, *Del. Riverkeeper Network v. U.S. Army Corps of Engineers*, 869 F.3d 148, 162 (3d Cir. 2017) (no CAA claim); *Stand Up for California!*, 204 F. Supp. 3d at 319 (rejecting plaintiff's argument for use of its own emissions model instead of the one that the agency used); *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 703 (D. Md. 2007) (a challenge to the method of calculation in a conformity determination).[46]

---

[45]  James E. McCarthy, *CRS Reports: Transportation Conformity Under the Clean Air Act*, at 1 (May 21, 2015), https://crsreports. congress.gov/product/pdf/R/R44050/2.

[46]  Both FHWA and MTA also argue they were not required to consult with New Jersey's agencies because 40 C.F.R. § 93.105(a)(2) does not apply to them.  MTA Opp. at 50; FHWA Opp. at 46.  FHWA and MTA read the implications of this provision too narrowly.  That regulation places an affirmative obligation on FHWA to ensure the required processes for consultation by "[metropolitan planning organizations] and State departments of transportation . . . with State air agencies, local air quality and transportation agencies" are properly followed

V.   **CONCLUSION**

For all these reasons, the Court should grant Plaintiff's Motion for Summary Judgment,

deny Defendants' and Intervenor-Defendants' Cross-Motions for Summary Judgment, and enjoin

the congestion pricing scheme from going forward until a full EIS is prepared and completed.

Dated:  New York, New York                By:  */s/ Randy M. Mastro*
        January 12, 2023                        Randy M. Mastro (NJ Bar No. 011681982)
                                                Craig Carpenito (NJ Bar No. 027102000)
                                                Jessica Benvenisty (*pro hac vice*)
                                                Lauren Myers (*pro hac vice*)
                                                KING & SPALDING LLP
                                                1185 Avenue of the Americas
                                                New York, New York 10036
                                                Tel. (212) 556-2100

                                                Peter Hsiao (*pro hac vice*)
                                                KING & SPALDING LLP
                                                633 West Fifth Street, Suite 1600
                                                Los Angeles, CA 90071
                                                Tel. (213) 433-4355

                                                Cynthia AM Stroman (*pro hac vice*)
                                                KING & SPALDING LLP
                                                1700 Pennsylvania Avenue, NW, Suite 900
                                                Washington, DC 20006-4704
                                                Tel. (202) 737-0500

                                                *Attorneys for Plaintiff*

---

and that such processes occur before conformity determinations are made.  40 C.F.R. § 93.105(a)(2).  Because
FHWA cannot approve a transportation plan without a proper conformity determination, it makes no sense that
New Jersey would be excluded from this process.  And as the language of § 93.105(a)(2) explains, the processes
for "reasonable opportunity for consultation" must "includ[e] consultation on" the conformity decision.
Therefore, it was FHWA's responsibility to ensure that the underlying conformity analysis process included
consultation with relevant state agencies, such as NJDEP here.