# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY, | Civ. No. 2:23-cv-03885-LMG-LDW |

STATE OF NEW JERSEY,

           *Plaintiff,*

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, FEDERAL HIGHWAY
ADMINISTRATION, SHAILEN BHATT, in
his official capacity as Administrator of the
Federal Highway Administration, and
RICHARD J. MARQUIS, in his official
capacity as Division Administrator of the New
York Division of the Federal Highway
Administration,

           *Defendants,*

    and

THE METROPOLITAN TRANSPORTATION
AUTHORITY and THE TRIBOROUGH
BRIDGE AND TUNNEL AUTHORITY,

           *Intervenor-Defendants.*

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CROSS MOTION
FOR SUMMARY JUDGMENT BY INTERVENOR-DEFENDANTS THE
METROPOLITAN TRANSPORTATION AUTHORITY AND THE TRIBOROUGH
BRIDGE AND TUNNEL AUTHORITY**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT .................................................................................. 1

I.    The Challenge to the Proposed Tolling Structure Is Premature. ......................................... 3

II.   New Jersey's Participation Claims Are Meritless. ............................................................ 7

III.  New Jersey's Challenges to the Alternatives Analysis Are Meritless. .............................. 10

   A.   The Project's Purpose and Need Were Properly Defined. ............................................ 10

   B.   The Project Sponsors Took a Hard Look at All Reasonable Alternatives. ................... 11

IV.   New Jersey's Challenges to the EA's Air Quality Analysis Are Meritless. ..................... 12

   A.   New Jersey's Methodological Challenges Fail. ............................................................ 13

   B.   FHWA Adequately Explained Its Non-Significance Determination. ........................... 16

V.    The Final EA's Exhaustive Environmental Justice Analysis Complied with NEPA. ....... 18

VI.   The Project Sponsors Committed to Robust, Binding Mitigation. .................................. 21

VII.  New Jersey's Unpreserved CAA Conformity Challenge Is Meritless. ............................ 23

CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*Am. Rivers & Ala. Rivers Alliance v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018)...................................................................12

*Brodsky v. U.S. Nuclear Regul. Comm'n*,
   704 F.3d 113 (2d Cir. 2013) ....................................................................1

*Cal. ex rel Imperial Cnty. Air Pollution Control District v. U.S. Dep't of the Interior*,
   767 F.3d 781 (9th Cir. 2014) ...................................................................25

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
   449 F.2d 1109 (D.C. Cir. 1971)...............................................................11

*Citizens Against Burlington, Inc. v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991).................................................................10

*Citizens for Balanced Env't & Transp., Inc. v. Volpe*,
   650 F.2d 455 (2d Cir. 1981) ....................................................................12

*City of N.Y. v. U.S. Dep't of Transp.*,
   715 F.2d 732 (2d Cir. 1983) ....................................................................10

*Coal. for Sustainable 520 v. U.S. Dep't of Transp.*,
   881 F. Supp. 2d 1243 (W.D. Wash. 2012) .............................................15

*Communities Against Runway Expansion, Inc. v. FAA*,
   355 F.3d 678 (D.C. Cir. 2004).................................................................19

*Conservation L. Found., Inc. v. Dep't of Air Force*,
   864 F. Supp. 265 (D.N.H. 1994) .............................................................24

*Ctr. for Bio. Diversity v. FHWA*,
   2017 WL 2375706 (C.D. Cal. May 11, 2017) ..........................................6

*Ctr. for Bio. Diversity v. U.S. Forest Serv.*,
   349 F.3d 1157 (9th Cir. 2003) ...................................................................9

*Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*,
   685 F.3d 259 (3d Cir. 2012) .....................................................................1

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ....................................................................... *passim*

*Env't Defense Fund, Inc. v. Froehlke*,
   473 F.2d 346 (8th Cir. 1972) ...................................................................12

*Estate of Smith v. Bowen*,
   656 F. Supp. 1093 (D. Colo. 1987) ...........................................................9

*Food & Water Watch v. FERC,*
28 F.4th 277 (D.C. Cir. 2022) ............................................14

*In re Niaspan Antitrust Litig.,*
67 F.4th 118 (3d Cir. 2023) ......................................... *passim*

*Jones v. Peters,*
2007 WL 2783387 (D. Utah Sept. 21, 2007) .........................10

*Lat. Ams. for Soc. & Econ. Dev. v. FHWA,*
756 F.3d 447 (6th Cir. 2014) .........................................12

*'Ilio'ulaokalani Coal. v. Rumsfeld,*
464 F.3d 1083 (9th Cir. 2006) ........................................24

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989) ...............................................6, 17

*Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.,*
55 F. Supp. 3d 316 (E.D.N.Y. 2014) ..................................22

*Nat'l Park Hospitality Ass'n v. U.S. Dept. of the Interior,*
538 U.S. 803 (2003) ...............................................4, 7

*Nat'l Parks and Conservation Ass'n v. BLM,*
606 F.3d 1058 (9th Cir. 2010) ........................................10

*Nat'l Post Office Collaborate v. Donahoe,*
2014 WL 6686691 (D. Conn. Nov. 26, 2014) ........................11

*NRDC v. Morton,*
458 F.2d 827 (D.C. Cir. 1972)........................................12

*Nevada v. Dep't of Energy,*
457 F.3d 78 (D.C. Cir. 2006) ..........................................4

*Norton v. S. Utah Wilderness Alliance,*
542 U.S. 55 (2004) ....................................................7

*Oh. Valley Env't Coal. v. U.S. Army Corps of Eng'rs,*
674 F. Supp. 2d 783 (S.D. W. Va. 2009) ..............................9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank,*
693 F.3d 1084 (9th Cir. 2012) ........................................22

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) ............................................9, 14, 21

*Shenandoah Valley Network v. Capka,*
669 F.3d 194 (4th Cir. 2012) ...........................................6

*Sierra Club v. FHWA*,
    435 F. App'x 368 (5th Cir. 2011) ...................................................................10

*Sierra Club v. FHWA*,
    2018 WL 1610304 (D. Colo. Apr. 3, 2018) ...................................................17

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017)................................................................14, 16, 18

*Sierra Club, Inc. v. Bostick*,
    787 F.3d 1043 (10th Cir. 2015) .............................................................13, 24

*Simmons v. U.S. Army Corps. of Eng'rs*,
    120 F.3d 664 (7th Cir. 1997) ......................................................................10

*Slockish v. FHWA*,
    2020 WL 8617636 (D. Or. Apr. 1, 2020) ......................................................18

*St. Johns Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
    462 F. Supp. 3d 1256 (M.D. Fla. 2020) ........................................................24

*Texas v. United States*,
    523 U.S. 296 (1998) ......................................................................................4

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d (D.C. Cir. 2010) ......................................................................21, 22

*Trenton Threatened Skies, Inc. v. FAA*,
    90 F.4th 122 (3d Cir. 2024) .........................................................................18

*Twp. of Bordentown v. FERC*,
    903 F.3d 234 (3d Cir. 2018) .....................................................................1, 17

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ...............................................................................13, 24

*Vill. of Logan v. U.S. Dep't of Interior*,
    2013 WL 12084730 (D.N.M. Jan. 14, 2013) .................................................18

*Webster v. USDA*,
    685 F.3d 411 (4th Cir. 2012) ......................................................................10

*WildEarth Guards. v. U.S. Off. of Surface Mining, Reclam., & Enf't*,
    104 F. Supp. 3d 1208 (D. Colo. 2015) ..........................................................17

*Wilderness Soc., Ctr. For Native Ecosystems v. Wisely*,
    524 F. Supp. 2d 1285 (D. Colo. 2007) ...........................................................11

## STATUTES

5 U.S.C. § 706(2)(A)..............................................................................................2

42 U.S.C. § 7409(b)(1) ................................................................................17

42 U.S.C. § 7506(c)(1)(B) ............................................................................25

**OTHER AUTHORITIES**

23 C.F.R. §§ 771 *et seq.* ......................................................................... *passim*

40 C.F.R. § 91.123 ......................................................................................15

40 C.F.R. § 95.105(a)(2) ..............................................................................25

40 C.F.R. § 1501 *et seq.* ........................................................................ *passim*

40 C.F.R. § 1502.4(b)(2) ...............................................................................6

40 C.F.R. § 1506.6(a) ....................................................................................8

EPA, Guideline for Modeling Carbon Monoxide for Roadway Intersections (1992) .............15, 16

EPA, PM Hot-Spot Guidance (Oct. 2021) ..................................................15

NEPA Reevaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), and Federal Transit Administration (FTA) (2019) ................6

## PRELIMINARY STATEMENT

Signaling the weakness of its case, New Jersey's reply/opposition brief pivots to a new argument beyond the scope of this action.  That new argument assumes that the tolling structure recommended by the Traffic Mobility Review Board ("TMRB") and currently undergoing public review and comment under the State Administrative Procedure Act ("SAPA") will be adopted by the Triborough Bridge and Tunnel Authority ("TBTA"), and that the Federal Highway Administration ("FHWA") will undertake no evaluation of such tolling structure pursuant to the National Environmental Policy Act ("NEPA").  This claim is premature.  It is also refuted by the Finding of No Significant Impact ("FONSI"), which expressly states that any final adopted tolling structure will be subject to further evaluation to ensure that the FONSI remains valid.

In a similar vein, New Jersey has been constrained to acknowledge that the FONSI does provide mitigation for diversion effects in New Jersey environmental justice ("EJ") communities as part of the $155 million mitigation commitment, but prophesizes that such mitigation will not occur because the Project Sponsors (and FHWA) will renege on their commitments.  This premature assertion is unsupported by the record and borders on conspiracy theory.

New Jersey's attempts to overcome the deferential standard of review the Administrative Procedure Act ("APA") affords NEPA decisions also fail.  While the State acknowledges that substantial deference, ECF No. 86 ("Pl. Reply Br.") 10, it argues (contrary to law) that the Court should overturn methodological and technical choices clearly within FHWA's and/or the Environmental Protection Agency's ("EPA's") fields of expertise.  Courts do not review NEPA decisions *de novo* but must limit their review to "procedural regularity" and whether a FONSI is arbitrary and capricious, *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 118 (2d Cir. 2013); agencies' sole duty is to "look hard at the environmental effects of their decisions."  *Twp. of Bordentown v. FERC*, 903 F.3d 234, 248 (3d Cir. 2018)*; see Del. Dep't of Nat. Res. & Env't*

*Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 271 (3d Cir. 2012) (citing 5 U.S.C. § 706(2)(A); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004)).

New Jersey fails to identify any aspects of the Final Environmental Assessment (the "EA") for the Central Business District Tolling Program (the "CBD Tolling Program" or "Project") that fail the "hard look" standard.  The EA analyzed representative worst-case impacts across many impact categories and determined that, applying mitigation, even those worst cases would not be significant.  It is instructive to compare the thoroughness of the administrative record evaluating a project that will generate overall reductions in traffic and pollution to the New Jersey Turnpike Authority's ("NJTA's") 2023 Environmental Impact Statement ("EIS") for the doubling of travel lanes between Interchanges 14 and 14a on the Turnpike (the "14-14a EIS").[1]  The 14-14a EIS's EJ air pollution analysis, comprising all of one paragraph, looked only at communities within one quarter mile of the project location and determined that there would be no disproportionately high and adverse effect on any EJ communities because there would be no exceedances of National Ambient Air Quality Standards ("NAAQS").[2]  This cursory discussion pales in comparison to the Final EA (Appendix 17D) for this Project, which looked at even tiny increases in highway traffic across a broad study area despite the lack of predicted NAAQS exceedances, and resulted in $155 million in mitigation commitments to benefit communities with *pre-existing* pollution and chronic disease burdens.  Yet New Jersey hypocritically decries the Final EA as insufficiently protective.

New Jersey's complaint that its agencies were not sufficiently included in the NEPA process is absurd.  The State acknowledges its agencies did not provide substantive input, including on many of the issues raised in this lawsuit, when given early and multiple opportunities,

---

[1]     https://www.njta.com/media/7714/draft-environmental-impact-statement-for-newark-bay-hudson-county-extension-improvements-program-14-to-14a.pdf.
[2] *Id.* at 39, 59.

and sought no role in developing the EA.  New Jersey now argues only that its agencies were not obligated to participate.  True, but they cannot place blame for their own inaction on FHWA or the Project Sponsors, who exceeded regulatory participation requirements.

Equally meritless is New Jersey's challenge to the scope of alternatives considered.  The law is clear that revenue generation has a proper place within a project's purpose and need, requiring no analysis to reject concepts that would not generate significant revenue.  New Jersey presses tolling only East River bridges, which would seemingly allow New Jersey drivers to avoid paying tolls, but which was rejected on several grounds set forth in the Final EA.

New Jersey forfeited most, if not all, of its principal arguments by not raising them during the NEPA process when they could have been addressed, as were the thousands of comments that were submitted.  New Jersey cannot belatedly raise new issues and expect to undo years of work that more than satisfied NEPA's requirements.

## ARGUMENT

### I.   The Challenge to the Proposed Tolling Structure Is Premature.

New Jersey's reply focuses primarily on a premature argument that is outside of the scope of this action: namely, that because the TMRB's recommended tolling structure does not exactly mirror one of the seven tolling scenarios analyzed in the EA and FONSI, the Court must immediately vacate the FONSI, order FHWA to conduct a reevaluation (notwithstanding the agency's stated commitment and preexisting obligation to do so), *and* order the preparation of an EIS, all before the final tolling structure is known.  Pl. Reply Br. 3–4, 12–15.  New Jersey's change in focus demonstrates that its moving arguments lack merit.  Moreover, the target of New Jersey's new challenge is, by the State's own admission, a proposal that has not been finalized under New York State law or authorized by FHWA.  As such, these challenges are not ripe.

Because a court should not issue premature judgments based on abstract disagreements, a

case is not ripe for judicial intervention when the alleged injuries are too speculative or might never occur. *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003); *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotation marks omitted).  "[F]inal agency action pursuant to the [APA] is a crucial prerequisite to ripeness." *Nevada v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006) (holding demand to supplement an EIS was unripe where "uncertainty makes it plainly premature for us to review an interim transportation plan that may never materialize").

New Jersey acknowledges that the TMRB's proposal is not final, but simply a "recommendation" to the full TBTA Board. *See* Pl. Reply Br. 3 (conceding that the structure "still awaits TBTA approval").  The recommended tolling structure must undergo a ratemaking process pursuant to SAPA, which will include four public hearings and 76 days for public comment.[3]   The TBTA Board then may vote to adopt the proposed tolling structure or a different structure.

FHWA's regulations provide for reevaluation prior to any federal approval if the project changes following a FONSI.  23 C.F.R. § 771.129.  Accordingly, the FONSI committed to reevaluate of the tolling structure ultimately adopted by TBTA "to determine if the decision made in the FONSI is still valid.  This requires that the TBTA demonstrate to FHWA that the effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA and that the mitigation is still valid."  (AR 394.)  Only once the reevaluation—and any further NEPA review arising from it—has concluded will FHWA authorize tolling to commence.  (AR 393–94.)

New Jersey insists that, "[u]nless the Court considers the effect of the TMRB's

---

[3] (AR 393–94); https://new.mta.info/press-release/mta-announces-details-of-congestion-pricing-public-comment-period.

Recommendation now, the tolling scheme will be a fait accompli." Pl. Reply Br. 13. New Jersey cites a statement from the TBTA Chair warning against changes to the recommendation because they could create greater environmental effects or require raising toll rates to counterbalance discounts or credits, *id.*, but the Chair does not control the votes of the Board's 23 members, who deliberated on the proposed structure before voting (non-unanimously) to propose it for public review.[4]   New Jersey also suggests, erroneously, that the ongoing installation of tolling infrastructure predetermines the final tolling structure and prejudices New Jersey's ability to challenge that structure. The tolling infrastructure, the installation of which began in mid-2023[5], is the physical equipment necessary to detect vehicles entering the CBD; it has no determinant effect on the toll structure.

Even if the TBTA Board ultimately adopts the TMRB's recommendation, any NEPA challenge to the final tolling structure would not ripen until after FHWA completes its reevaluation. Indeed, the reevaluation process will directly answer New Jersey's premature questions regarding the consistency of the final tolling structure with the range of scenarios analyzed in the EA and their environmental effects. New Jersey complains that the TMRB recommendation differs from the seven scenarios analyzed in the EA, speculating (without evidence) on the one hand that "at least some" of these changes "will have adverse environmental impacts," while complaining on the other hand that "there is no direct or reliable way to compare the environmental effects of these changes to those elements previously analyzed absent a supplemental EIS." Pl. Reply Br. 14. But that is precisely what the reevaluation process will do.

---

[4] https://www.youtube.com/watch?v=0pfJ-S9myBk.
[5] *See* Erica Brosnan, *MTA Activates Contract to Install Congestion Pricing Tolls*, Spectrum News NY1 (June 28, 2023), https://ny1.com/nyc/manhattan/transit/2023/06/28/mta-activates-contract-to-install-congestion-pricing-tolls. The infrastructure installation is unrelated to the release of the TMRB recommendation.

FHWA's NEPA regulations specifically contemplate project changes between the issuance of environmental documents and final agency action because such changes are commonplace. Thus, the regulations account for situations that may require a meaningful reevaluation to confirm that the environmental document in question "remains valid" when the final agency decision is made. *Id.*; *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 196 (4th Cir. 2012) (agencies may conduct a "tiered" or multiphase analysis "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review"); *Ctr. for Bio. Diversity v. FHWA*, 2017 WL 2375706, at *27 (C.D. Cal. May 11, 2017) (holding FHWA may consider build alternatives that provided for the flexibility to include different design options in the future); 40 C.F.R. § 1502.4(b)(2). FHWA guidance further provides that "[t]he project sponsor is responsible for providing the Agency with relevant information regarding project changes or new circumstances that could affect the validity of the environmental document or decision," and that "[f]ield reviews, additional environmental studies (as necessary), and coordination with other agencies should be undertaken as appropriate to analyze any new impacts or issues."[6]

The EA and FONSI used the tiering/reevaluation model. Because the final tolling structure depends on all of the foregoing processes, in order to evaluate the full range of potential effects of the CBD Tolling Program, the EA considered seven tolling scenarios varying in terms of toll rates, exemptions, crossing credits, and discounts. (AR 37263 [EA 2–31].) For each analysis area, the EA quantitatively analyzed representative worst-case scenarios. (AR 37262–66 [EA 2-30–34].) Because the final adopted tolling structure may not exactly match any one of the EA scenarios, the

---

[6] NEPA Reevaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), and Federal Transit Administration (FTA) 2–3 (Aug. 14, 2019), https://www.environment.fhwa.dot.gov/legislation/nepa/reevaluation_guidance_08142019.pdf.

FONSI contemplated reevaluation to ensure the conclusions of the FONSI and the mitigation are still valid, or that further NEPA review occurs, before tolling authority is granted.  (AR 394.)

New Jersey demands that the Court "compel" FHWA to conduct the very reevaluation that the FONSI already requires.  *See* Pl. Reply Br. 4, 12.  Not only does New Jersey put the cart before the horse, as there is no final tolling structure to reevaluate, but Section 706(1) of the APA only authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed;" i.e., when an agency has failed to complete a discrete agency action that it is required to take.  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004).  To the extent New Jersey seeks to challenge FHWA's *future* reevaluation of a yet-to-be-finalized tolling structure, that would waste judicial resources in the pursuit of a "premature adjudication" of "abstract disagreement[s]."  *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807.  Moreover, the very premise of this argument ignores the backstop in the FONSI addressing exactly the concerns New Jersey is raising.[7]

## II.     New Jersey's Participation Claims Are Meritless.

New Jersey complains that the Draft EA public comment period was too short for interested parties to provide meaningful comments,[8] yet praises its own "lengthy, substantive comments" during that comment period.  Pl. Reply Br. 3.  These inconsistent arguments fail to establish any

---

[7] Because this argument is not ripe and the administrative record for the reevaluation of any forthcoming final adopted tolling structure has not been developed, Intervenor-Defendants do not address in detail the ways in which New Jersey asserts the TMRB recommendation differs from the tolling scenarios evaluated in the Final EA.  However, to the extent any of allegedly different elements are included in the final adopted tolling structure, Intervenor-Defendants reserve the right to refute New Jersey's arguments in any subsequent litigation that might challenge tolling authority for the adopted structure.  While premature, the State's assertions are also wrong.  For example, one of the purported "changes" that New Jersey cites—crossing credits for the Lincoln and Holland Tunnels but not the George Washington Bridge—was included in three of the EA's seven tolling scenarios.  *See* Pl. Reply Br. 14.  (AR 36292 [EA 2–31].)  The EA also evaluated a range of base toll rates between approximately \$9 and \$23 (*id.*); the TMRB's recommended \$15 base toll rate falls in the middle.

[8] New Jersey has apparently abandoned its other baseless public participation arguments, such as the falsity that the Final EA did not respond to all comments.  Pl. Br. 43.

procedural deficiency.  The 44-day official public comment period afforded greater time than required under the relevant regulations.  23 C.F.R. § 771.119(c).  Moreover, public engagement extended far beyond the official comment period.  When the Draft EA was published in August 2022, FHWA and the Project Sponsors had already held 19 early outreach meetings and two regional transportation meetings; they began accepting comments on the Project in September 2021.   (AR 39267–70, 41617–20, 41634–38, 37044 [EA 18-3], 37046–47 [EA 18-5–6].)  Comments submitted after the official comment period had ended were also considered.  (AR 3688–4155 [EA App. 18B].)

New Jersey continues to argue that FHWA and the Project Sponsors violated regulations governing agency participation.  Seeking to avoid its forfeiture of this argument, the State points to a question posed in Governor Murphy's September 23, 2022 letter, asking "[w]hy weren't New Jersey agencies similarly consulted…"  Pl. Reply Br. 37.  That question did not provide notice that New Jersey claimed regulatory violations addressing agency participation.  It also did not assert the need to proactively include the New Jersey Department of Environmental Protection ("NJDEP") and New Jersey Department of Health ("NJDOH") as participating or cooperating agencies, given that these agencies never sought participation or even submitted comments on the Draft EA.  *See Pub. Citizen*, 541 U.S. at 764–65.  New Jersey's reference to Governor Murphy's statements in his June 12, 2023 letter is likewise unavailing.  Comments raised for the first time during the public availability period on the Final EA under 40 C.F.R. § 1501.6(a)(2) do not preserve issues for judicial review.  Intervenor-Defendants' Br. 15, 43.

New Jersey invents additional requirements not found in the regulations, claiming that 40 C.F.R. § 1506.6(a) and 23 C.F.R. §§ 771.105(d), 771.111(e) and 771.119(b) required consultation with New Jersey "often."  Pl. Reply Br. 7.  None of the cited regulations address how frequently

consultation must occur.   FHWA and the Project Sponsors' extensive outreach complied with applicable regulations.   New Jersey has not, and cannot, explain why none of its agencies provided substantive comments, asked meaningful questions during numerous meetings to which they were invited, reached out with information they thought relevant, or requested additional involvement. The cases New Jersey cites to support its claim are also inapposite; most of them do not concern the regulations that the State claims were violated.[9]

New Jersey concedes that "New Jersey transportation agencies were consulted" during the NEPA process, but complains that NJDEP and NJDOH were not.   Pl. Reply Br. 7, 38.   Such a claim is hypocritical, given that neither entity sought involvement or even bothered to comment during the Draft EA comment period.   (AR 7773 [EA 18C-320].)   Indeed, neither agency submitted comments until June 12, 2023—almost a year after the formal comment period ended and almost two years after early outreach began.   (AR 40844–58.)   New Jersey's claim that it could not seek more involvement under 40 C.F.R § 1501.8(a) because the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act") does not provide for New Jersey involvement in developing the CBD Tolling Program, is preposterous.   Pl. Reply Br. 39.   The Act in no way constrains NEPA rights.

New Jersey argues that FHWA and the Project Sponsors purposely kept New Jersey agencies' involvement "high level" instead of making them "cooperating agencies—that is, partners—on the project."   Pl. Reply Br. 40.   Cooperating agencies are not "partners" on a project.

---

[9]   *See Ctr. for Bio. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (alleged failure of the lead agency to disclose responsible scientific opposition in a Final EIS); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (relevant information must be made available to the public); *Estate of Smith v. Bowen*, 656 F. Supp. 1093, 1097–98 (D. Colo. 1987) (no prior outreach before a proposed rule was published and the notice failed to include information required for meaningful comment); *Oh. Valley Env't Coal. v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783, 810 (S.D. W. Va. 2009) (noting that the public must have "the relevant environmental information…*before* the close of the public comment period").

They provide input during the environmental review process.  They also have an obligation to "participate in the NEPA process at the earliest practicable time," which no New Jersey agencies (certainly not NJDEP or NJDOH) demonstrated a willingness to do.  40 C.F.R. § 1501.8(b)(i).  FHWA and the Project Sponsors actively engaged New Jersey agencies in the year leading up to the publication of the Draft EA, through the issuance of the FONSI.  *See* Intervenor-Defendants' Br. 5–14, 16–21.  FHWA and the Project Sponsors cannot be faulted for the New Jersey agencies' disinterest until the EA was final, when they could critique rather than contribute.[10]

### III.   New Jersey's Challenges to the Alternatives Analysis Are Meritless.

#### A.   The Project's Purpose and Need Were Properly Defined.

New Jersey attempts to invent a new standard requiring the artificial tailoring of the purpose and need for a project in order to accommodate multiple possible alternatives, rather than defining purpose and need according to the project's actual goals.  Pl. Reply Br. 41 n.33.  None of the cases New Jersey cites supports this argument.[11]  Additionally, in challenging the inclusion of

---

[10] In a proposed amicus brief, Bergen County argues (wrongly) that FHWA failed to conduct outreach in Bergen County; in fact, public meetings and other information were advertised in the Bergen Record, and two of the EA repositories were in Bergen County.  Bergen County Amicus Brief ("Bergen Amicus"), ECF 81-1, at 8.  (AR 37046, 37058–61 [EA 18-5, 18-17–20].)

[11] Pl. Reply Br. 40–41 (citing *Jones v. Peters*, 2007 WL 2783387, at *19 (D. Utah Sept. 21, 2007) (rejecting claims that the purpose and need of two transportation projects were defined too narrowly); *Nat'l Parks and Conservation Ass'n v. BLM*, 606 F.3d 1058, 1072 (9th Cir. 2010) (agency's use of private party's unreasonably narrow objectives in its purpose and need statement violated NEPA because it "foreordain[ed] approval of [a] land exchange" to that party); *Webster v. USDA*, 685 F.3d 411, 423–24 (4th Cir. 2012) (purpose and need statement was not unreasonably narrow where it was consistent with legislative authorization); *Sierra Club v. FHWA*, 435 F. App'x 368, 374–75 (5th Cir. 2011) (purpose and need statement did not foreclose considering reasonable alternatives); *Simmons v. U.S. Army Corps. of Eng'rs*, 120 F.3d 664, 669–704 (7th Cir. 1997) (purpose was too narrow where it precluded a single source water supply alternative without considering its benefits and disadvantages); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 198 (D.C. Cir. 1991) (FAA appropriately defined the goal for the project and eliminated alternatives that would not accomplish that goal); *City of N.Y. v. U.S. Dep't of Transp.*, 715 F.2d 732, 743–44 (2d Cir. 1983) (noting that "a pertinent guide for identifying an appropriate definition of an agency's objective [is] the legislative grant of power underlying the proposed action" and that agencies may consider a narrower range of alternatives in an EA)).

the Traffic Mobility Act's revenue requirements in the Project's purpose and need, New Jersey fails to cite a single relevant case, whereas courts have repeatedly upheld such purposes. *See* Intervenor-Defendants' Br. 23–25.[12]   New Jersey also hypocritically ignores the failure to consider, in the 14-14a EIS, any alternatives that would not widen the roadway (such as public transportation improvements).[13]

**B. The Project Sponsors Took a Hard Look at All Reasonable Alternatives.**

New Jersey makes inconsistent and inaccurate statements regarding the EA's consideration of alternatives and ignores the deferential "rule of reason" treatment afforded agencies when determining the scope of alternatives. *Nat'l Post Office Collaborate v. Donahoe*, 2014 WL 6686691, at \*23 (D. Conn. Nov. 26, 2014). The State first claims the Final EA failed to consider "any" alternatives, Pl. Reply Br. 7, but then concedes that it did consider other alternatives, claiming the EA rejected them based solely on a "study done in 2008…," *id.* at 8. In fact, the EA evaluated eleven preliminary alternatives for their ability to meet the Project purpose and need. New Jersey's claim that the Final EA only included one page explaining why alternatives were rejected is also incorrect. An entire appendix is dedicated to discussing preliminary alternatives. (*See* AR 36263–68, 4515–88 [EA 2-2–7, App. 2A-1–2E-4].) Moreover, 40 C.F.R. § 1501.5(c)(2) requires only that an EA "briefly discuss" the reasons why an alternative was eliminated.

Most of the preliminary alternatives would not raise any significant revenue and thus no updated analysis was needed to determine they would not meet the purpose and need of the Project.

---

[12] Neither of the cases New Jersey cites are on point. *See Wilderness Soc., Ctr. for Native Ecosystems v. Wisely*, 524 F. Supp. 2d 1285, 1311–12 (D. Colo. 2007) (finding an agency's rejection of an alternative violated NEPA after it failed to even "briefly discuss" why it was being eliminated); *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971) (allegations that the Commission's regulations did not satisfy the requirements of NEPA); Pl. Reply Br. 42.
[13] 14-14a EIS at 13–22.

*See* Intervenor-Defendants' Br. 23–24.  FHWA and the Project Sponsors also had rational reasons to reject Alternative T-2 (the tolling of only East River bridges rather than all routes into the CBD), and did not solely rely on the 2008 Congestion Mitigation Commission Study in doing so.[14]  In addition to Alternative T-2 not creating a funding source for MTA capital improvements and requiring additional major actions—each a sufficient reason to eliminate this alternative[15]—the Final EA further explained that in order to reach revenue needs without tolling all entry points to the CBD, toll rates would have to be higher than the highest rates studied in the EA, which would cause greater diversions and burdens to low-income drivers than the CBD Tolling Alternative.  *See* Intervenor-Defendants' Br. 26–27, 26 n.19.  (AR 7943 [EA App. 18C-490].)

## IV.    New Jersey's Challenges to the EA's Air Quality Analysis Are Meritless.

New Jersey cannot credibly dispute that its technical objections to the EA air quality analysis are matters within FHWA's and EPA's technical expertise, which therefore warrant deference.  *See, e.g.*, *Lat. Ams. for Soc. & Econ. Dev. v. FHWA*, 756 F.3d 447 (6th Cir. 2014); *see also Citizens for Balanced Env't & Transp., Inc. v. Volpe*, 650 F.2d 455, 462 (2d Cir. 1981) (holding that court does not sit as a super-agency to review expert agency judgements *de novo*). The State's arguments—even if preserved—fail to prove that FHWA's decisions were arbitrary.

---

[14] New Jersey's reliance on *American Rivers & Alabama Rivers Alliance v. FERC*, 895 F.3d 32 (D.C. Cir. 2018), is unavailing.  The plaintiff in that case did not challenge the alternatives analysis; rather, the court objected to use of a more-than-decade-old survey in the agency's impact analysis as the agency's "only cited evidence."  *Id.* at 50.

[15] T-2 is not contemplated by existing law and would require State legislation and/or complex agreements between the State and City to allow its toll revenues to be used for transit improvements. (AR 36268 [EA 2-7]; 7943 [EA 18C-490].)  *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972) and *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346 (8th Cir. 1972), cited by New Jersey, Pl. Reply Br. 44, support the propriety of rejecting alternatives requiring legislative action.  *Morton* explicitly held that no "extended discussion" of alternatives "deemed only remote and speculative" given "basic changes required in statutes and policies," is needed, 458 F.2d at 837–38, and *Froehlke* held that such alternatives can be rejected as long as "the reasons for the choice of a course of action are clear," 473 F.2d at 350, as the EA provided.  (AR 36263–68 [EA 2-2–7].)

### A. New Jersey's Methodological Challenges Fail.

Many of New Jersey's challenges to the EA's air quality analysis were not preserved because the State failed to exhaust administrative remedies. *See* Intervenor-Defendants' Br. 31–33. In an attempt to refute this bar, New Jersey cites vague references in its comment letters to a purported "lack of analysis…on how this program will affect New Jersey" and the need to assess "air and noise." Pl. Reply Br. 16 (citing AR 7772–73). Such statements did not "alert[] the agency to [its] position and contentions, in order to allow the agency to give the issue meaningful consideration." *Pub. Citizen*, 541 U.S. at 764 (internal quotation marks omitted); *see Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1051 (10th Cir. 2015) ("objections must specifically raise the issue presented"). New Jersey argues in a footnote that requiring it to object with specificity would force it to "do the agency's job." Pl. Reply Br. 20 n.14. But New Jersey cannot sit back during the NEPA process and then raise new objections in litigation. *See Pub. Citizen*, 541 U.S. at 764; *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553–54 (1978).

None of New Jersey's comments objected to the scope of the regional air quality analysis or its use of Tolling Scenario A. (AR 7768, 7772–75 [EA App. 18C-315, 18C-319–22], 40844–58.) Those claims are thus forfeited. They are also meritless. New Jersey argues that the regional air quality analysis should have included additional counties, without demonstrating how that argument undermines the FONSI. Pl. Reply Br. 17–18. The county-level analysis "was conducted to show the differences between the No Action Alternative and the CBD Tolling Alternative, whereas the local analysis demonstrated that the hot-spot requirements are satisfied for Project-level conformity" under the Clean Air Act ("CAA"), and therefore the determination of significance under NEPA. (AR 36827 [EA 10-10].) The EA explained that the two New Jersey counties in the 12-county study area—Bergen and Hudson—were those projected to see the largest changes in vehicle miles traveled ("VMT"). (AR 36828 [EA 10-11].) The Best Practices Model

predicted that other New Jersey counties would see smaller increases in VMT than Bergen, less than 0.5 percent.  (AR 36830 [EA 10-13].)  And the two counties New Jersey complains were excluded—Essex and Union—were projected to see a *decrease* in VMT (and therefore emissions). (*Id.*)  Moreover, EPA and FHWA approved the geographic scope of the analysis.  (AR 41088.)[16]

New Jersey next challenges the use of Tolling Scenario A in the regional air quality inventory.  The Final EA explained the use of Tolling Scenario A because it "would result in the smallest reduction of VMT" at the regional level and "would have the lowest beneficial effect on regional air quality."  (AR 36828 [EA 10-11].)  In other words, FHWA selected Tolling Scenario A because it was a regional "worst case" scenario.  New Jersey now claims that NEPA requires regional analyses for other tolling scenarios, but the county-wide changes in VMT that New Jersey identifies are tiny—no more than 0.2% compared to the No-Action Alternative.  Intervenor-Defendants' Br. 32–33.  NEPA does not require the type of "worst case analysis" that New Jersey belatedly demands for each individual county, *see Robertson*, 490 U.S. at 354, nor is this a case in which FHWA impermissibly failed to model emissions at all, like *Food & Water Watch v. FERC*, 28 F.4th 277, 289 (D.C. Cir. 2022).  New Jersey's unexhausted challenge reflects a methodological difference of opinion, which does not give rise to a NEPA claim.  *Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017).  Nor would modeling each additional scenario have resulted in a different outcome, as the regional analysis was not used to determine significance or the need for mitigation.

New Jersey challenges the scope of the microscale hot-spot analysis, which evaluated 102

---

[16] New Jersey complains that more New York counties (10) were included in the local study area than New Jersey Counties (2).  That ratio correlates to the approximately 15.3% of vehicles that enter the CBD via New Jersey crossings.  (AR 36349 [EA 4A-10].)  New Jersey also notes that the local EJ study area included slightly different counties; however, that study area focused not on county-level changes, but on localized effects.  (AR 36958 [EA 17-5].)

intersections throughout the study area deemed to have the greatest potential for increased traffic. (AR 7927 [EA App. 18C-474]; *see also* AR 36475, 4647–74 [EA 4B-82, App. 4B.1].)  Federal guidance affirms this approach, instructing that if conformity with NAAQS "is demonstrated" at "multiple locations that are expected to have the highest air quality concentrations,…then it can be assumed that conformity is met in the entire project area."[17]  New Jersey nonetheless claims that additional hot spots should have been analyzed in Bergen County, but as the Final EA repeatedly explained, local intersections west of the George Washington Bridge were not included because traffic at those intersections connects primarily to regional highways.  (AR 36475 [EA 4B-82]; *see also* AR 7927 [EA App. 18C-474].)  Because traffic at individual intersections would be dispersed, intersection analysis would not have shown the worst-case potential impacts in Bergen County.  (*Id*.)  The EA instead used a highway-link analysis to evaluate the area west of the George Washington Bridge, which was the link predicted to have the highest potential overall annual average daily traffic ("AADT") from among all links for all scenarios in the study area; this analysis, along with modeling conducted for two other highway link hot spots, demonstrated that the Project would not result in exceedances of applicable NAAQS.  (AR 36863–65 [EA 10-46–48].)  New Jersey's challenge "amounts to no more than a disagreement with the choice of locations to be monitored" which "does not give rise to a claim under NEPA."  *Coal. for a Sustainable 520 v. U.S. Dep't of Transp.*, 881 F. Supp. 2d 1243, 1260 (W.D. Wash. 2012).[18]

New Jersey directs two new attacks at the highway link analysis that it did not raise in the

---

[17]  EPA, PM Hot-Spot Guidance 20 (Oct. 2021), http://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1013C6A.pdf; AR 36832–33 [EA 10-15–16]; *see also* 40 C.F.R. § 91.123; EPA, Guideline for Modeling Carbon Monoxide for Roadway Intersections 3-3 (1992), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=2000F7L2.pdf.
[18]  New Jersey cites EPA's comments on the Draft EA regarding the potential need for additional hot spots in Bergen County, Pl. Reply Br. 21, though after the Project Sponsors explained the basis for the highway link analysis, EPA praised the Final EA, (AR 45366).

NEPA process or in its opening brief, and which are therefore forfeited. *See In re Niaspan Antitrust Litig.*, 67 F.4th 118, 135 (3d Cir. 2023). New Jersey argues that FHWA improperly limited the highway link analysis to particulate matter. Pl. Reply Br. 21. This was because particulate matter is associated with diesel trucks, which concentrate on highways, whereas carbon monoxide is of greater concern at intersections, where vehicles accumulate and idle. (AR 36863–65 [EA 10-46–48]; 7255 [EA App. 17D-7].)[19] Next, New Jersey argues that "the highway link analysis erroneously" studied "only Tolling Scenario C," and claims (incorrectly) that Tolling Scenario B would have shown higher impacts. Pl. Reply Br. 21–23.[20] In fact, the highway link analysis "*evaluated every highway link under every scenario* and selected those sites that demonstrated the highest AADT and the highest increase in heavy-duty diesel trucks." (AR 36864 [EA 10-47].) In other words, the EA used Scenario C for the George Washington Bridge link because it was the "worst-case" segment for AADT under the "worst-case" tolling scenario. (AR 36868 [EA 10-51]; 6846 [EA App. 10-42].)[21] FHWA, EPA, and the interagency consultation group approved the hot-spot approach, including the highway-link analysis. (AR 36863–65 [EA 10-46–48]; 45366.) New Jersey's belated attack on these entirely rational methodological choices cannot overcome the deference afforded to expert agencies. *Sierra Club*, 867 F.3d at 1370.[22]

## B. FHWA Adequately Explained Its Non-Significance Determination.

New Jersey claims FHWA did not adequately explain its determination that the Project's

---

[19] *See* EPA, Guideline for Modeling Carbon Monoxide for Roadway Intersections, at 1–5.

[20] To support its assertion that Scenario B should have been used instead, New Jersey refers to *state-wide* changes in AADT rather than localized changes at *highway links*, which is the relevant inquiry, and the page it cites does not even support its factual contention. (AR 36869 [EA 10-52].)

[21] New Jersey cites EPA's *proposed* NAAQS, but agencies are not required to consider proposed regulatory standards. Intervenor-Defendants' Br. 46–47. Notably, the 14-14a EIS also did not compare predicted levels of $PM_{2.5}$ with the proposed Turnpike widening to the proposed NAAQS. *See* 14-14a EIS at 124.

[22] Bergen County falsely asserts that traffic was not modeled on various roads in Bergen; potential changes in traffic were modeled throughout the study area. (AR 36342 [EA 4A-3].)

air quality impacts were not significant, Pl. Reply Br. 22–25, though the State does not dispute that significance determinations are a "classic example of a factual dispute the resolution of which implicates substantial agency expertise," *Marsh*, 490 U.S. at 376 (1989).  The Court "may not substitute its judgment for that of the agency as to the environmental consequences of its actions." *Twp. of Bordentown*, 903 F.3d at 248 (cleaned up).  Although New Jersey counties would collectively see tiny increases in vehicular traffic under certain tolling scenarios—no more than 0.2% (AR 36354, 36360 [EA 4A-15, 4A-21])—FHWA determined there would be no significant impact on air quality because the Project would not cause exceedances of NAAQS, which are set with "an adequate margin of safety…to protect public health," 42 U.S.C. § 7409(b)(1).

New Jersey argues that compliance with NAAQS—the only quantitative standard for determining significance—is just "one factor" agencies can use.  Pl. Reply Br. 23–24.  Yet the State concedes that "the case law is nearly unanimous that federal agencies may rely on NAAQS compliance to conclude that human health will not be seriously affected by a transportation project." *Sierra Club v. FHWA*, 2018 WL 1610304, at *7 (D. Colo. Apr. 3, 2018); Intervenor-Defendants' Br. 31.[23]  Moreover, the FONSI did not solely rely on compliance with NAAQS. Chapter 17 and its appendices studied potential, even minimal, effects on vulnerable communities with high preexisting pollution and chronic disease burdens, an analysis that EPA praised.  (AR 36954–37041 [EA 17]; 7243–7440 [EA App. 17D]; 45366.)  The 14-14a EIS, which relies solely on compliance with NAAQS to find that no air quality mitigation was needed for the doubling of lanes in an EJ corridor, pales in comparison.

---

[23] The only case New Jersey cites on this issue, *WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation, & Enforcement*, 104 F. Supp. 3d 1208, 1227 (D. Colo. 2015), was vacated on appeal and did not concern determinations of significance under NEPA.  652 Fed. App'x. 717 (10th Cir. 2016).

**V.     The Final EA's Exhaustive Environmental Justice Analysis Complied with NEPA.**

New Jersey claims that the FONSI must be set aside because the EA did not use a New

Jersey-specific Mapping Tool or New Jersey's statutory definition for EJ communities.  Pl. Reply

Br. 26–28.  New Jersey concedes that it did not raise this issue during the public comment period;

therefore, it was not preserved.  *See Slockish v. FHWA*, 2020 WL 8617636, *33 (D. Or. Apr. 1,

2020); *Vill. of Logan*, 2013 WL 12084730, at *3 (D.N.M. Jan. 14, 2013).

Moreover, this argument challenges reasonable methodological choices squarely within

FHWA's discretion.  New Jersey says that its Mapping Tool would have provided data on census

*block groups*, rather than census *tracts*.  However, the Final EA used census tracts given the scope

of the study area—in which over 70% of the 3,106 census tracts were identified as EJ communities

(AR 7251 [EA App. 17D-3])—and the fact that chronic disease data for New Jersey was available

only at the census tract level.  (AR 7263, 7270 [EA App. 17D-15 n.40, App. 17D-22]).  While

New Jersey belatedly proposes ways these data gaps could have been filled with unspecified "New

Jersey[] data," Pl. Reply Br. 28 n.22, this belated flyspecking cannot overcome the deference

afforded FHWA's methodological choices.  *Sierra Club*, 867 F.3d at 1367–68.  Indeed, the Third

Circuit recently affirmed an EJ analysis using census tract, effectively rejecting this very

argument.  *Trenton Threatened Skies, Inc. v. FAA*, 90 F.4th 122, 139 (3d Cir. 2024).

New Jersey claims that using a state-specific definition of EJ communities would have

yielded "additional communities with EJ concerns," citing (for the first time) a *single* census block

group in Tenafly that New Jersey claims was "arbitrarily excluded" out of all of the block groups

in the *3,106* census tracts analyzed in the local EJ study area.  Pl. Reply Br. 27–28.  (AR 6995,

7137 [EA App. 17B-11, 17C-133].)  Tellingly, that one block group is within a census tract not

expected to see an increase in traffic proximity, proving that using New Jersey's definition would

not have changed the analysis.  (AR 7293–97 [EA App 17D-45–49].)  Moreover, using a uniform

federal definition made more sense in a multi-state study area.  (AR 7263 [EA 17D-15 n.40].)

Fundamentally, NEPA did not compel FHWA to adopt New Jersey's preferred definition, and

New Jersey has cited no authority suggesting otherwise.  *See, e.g.*, *Communities Against Runway

Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004).  Moreover, this exemplifies how New

Jersey's decision not to participate in the process at an earlier time leaves it without the ability to

complain.  If it believed local information was important, it should have timely shared such

information rather than seeking later to undo years of analysis.

The remainder of New Jersey's EJ arguments fare no better.  New Jersey argues that

FHWA "arbitrarily limited" its EJ study area to four New Jersey counties.[24]  Pl. Reply Br. 28–29.

Again, New Jersey never raised this in the administrative process or in its opening brief, thus

forfeiting this claim.  *See Niaspan*, 67 F.4th at 135.  Even if this issue were preserved, the EA

explained that the study area included the counties "where the greatest changes in traffic volumes

and [VMT]" and "localized effects (such as changes in traffic volumes, air emissions, or noise)"

are projected to occur based on the EPA-approved traffic modeling.  (AR 36958 [EA 17-5].)  The

State notes that some New Jersey counties within the study area would see decreases in VMT, but

the same is true of three New York counties (AR 36829 [EA 10-12]); the other counties New

Jersey asserts should have been included would see minute changes (less than 0.34%) (AR 36830

[EA 10-13]).  Such methodological disputes do not support a NEPA claim.

New Jersey asserts that the Final EA "did not include a localized assessment of air quality

impacts on communities with EJ concerns."  Pl. Reply Br. 29.  Not so.  The Final EA contains an

exhaustive analysis of how changes in traffic patterns could affect EJ communities with preexisting

---

[24] Notably, while this Project's local study area spanned 10 counties, the EJ analysis in the 14-14a EIS stopped at *1320 feet* from the project.  14-14a EIS at 39.

pollutant and chronic disease burdens.  (AR 36981–96 [EA 17-28–43]; 7283–7326 [EA App. 17D-35–78].)  In addition, the microscale intersection and highway link locations in New Jersey were in EJ communities.  (AR 36498, 36864, 6997 [EA 4B-105, 10-47, App. 17B-13].)

Finally, New Jersey tries out a medley of new, unpreserved arguments that the EJ analysis was unduly narrow.  New Jersey challenges the thresholds the EA used to identify communities with high preexisting pollutant and chronic health burdens, Pl. Reply Br. 30, but these thresholds were derived from authoritative federal guidance and accepted by both FHWA and EPA, (AR 7283–87, 7313 [EA App. 17D-35–39, 65]; 45366).  More fundamentally, because the EA predicted no exceedances of NAAQS, the EJ analysis was tailored to communities with high preexisting pollutant and chronic disease burdens, where FHWA and EPA were concerned that even small changes in traffic could have cumulative effects when combined with pre-existing burdens.  (AR 7249–50 [EA App 17D-1–2].)  And regional mitigation commitments will benefit all highway-adjacent communities, including by expanding the conversion of old, more polluting, trucks to newer electric, hybrid, or clean diesel vehicles.  (AR 7322 [EA App. 17D-74].)

New Jersey states that the EA "inexplicably failed to assess potential traffic impacts on non-highway roads," Pl. Reply Br. 30, but the EA explained that potential traffic diversions (particularly truck diversions) would concentrate on highways and be dispersed on other roads, (AR 7255, 7288–92, 7303 [EA App. 17D-7, 40–44, 55]; 36475 [EA 4B-82]; *see also* AR 7927 [EA App. 18C-474]).  None of New Jersey's nit-picking arguments prove that the EA was "utterly deficient," Pl. Reply Br. 30; to the contrary, the EA applied sophisticated traffic and air quality modeling to study areas projected to see the greatest effects from the Project.[25]

---

[25] While New Jersey pillories the Final EA's hundreds of pages of EJ analyses, the EJ analysis for air quality in the 14-14a EIS was confined to a single paragraph, relied solely on compliance with NAAQS to find no significant impacts, and offered no mitigation.  *See* 14-14a EIS at 59–61.

**VI.     The Project Sponsors Committed to Robust, Binding Mitigation.**

New Jersey repeatedly proclaimed in its opening brief that the FONSI's binding mitigation commitments "would only mitigate impacts in New York" and "[t]here is no indication that there will be any commitment of funds for mitigation in New Jersey." *See, e.g.*, Pl. Br. 6.  Conceding this was wrong, Intervenor-Defendants' Br. 44–46, New Jersey now pivots to a new set of challenges to the mitigation program that its opening brief did not raise and are therefore forfeited, *see Niaspan*, 67 F.4th at 135.  Moreover, these arguments fail.

First, the mitigation program is not "entirely hypothetical."  Pl. Reply Br. 31.  The Final EA contains a detailed description of the $155 million mitigation package.  (AR 37016–20, 7322–26 [EA 17-63–67, App. 17D-74–78].)  The FONSI incorporates these measures and makes them enforceable conditions of tolling authority.  (AR 383–91.)   The EA well satisfies NEPA's requirement that mitigation be "discussed in sufficient detail to ensure that the environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352; *see* 40 C.F.R. § 1501.6(c) (requiring a FONSI to "state any enforceable mitigation requirements or commitments"); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010) ("NEPA [does] not force agencies to make detailed, unchangeable mitigation plans….").

New Jersey next complains that the specific locations for mitigation in New Jersey have not been determined.  Pl. Reply Br. 32–34.  The EA explained that because the "specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario," (AR 36994 [EA 17-41]), once the final tolling structure is adopted, the Project Sponsors will work with various stakeholders to select optimal sites for place-based mitigation, (AR 37017–20, 7328 [EA 17-64–67, App. 17D-80]).  This process forms part of an "adaptive management" program recommended by EPA to monitor "the efficacy of mitigation [and] stakeholder consultation, and [make] adjustments as warranted."  (AR 37017 [EA 17-64], 45366.)  Courts

regularly uphold adaptive management programs such as this one.  *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 517 ("[F]ixed mitigation measures and an adaptive management plan…amply fulfill[ed] NEPA's mandate to discuss mitigation measures"); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1104 (9th Cir. 2012); *Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 365 (E.D.N.Y. 2014).[26]

New Jersey professes "concern" that its state and local agencies will not be consulted on the mitigation program.  Pl. Reply Br. 33–34.  The Final EA and FONSI, however, recognize the role local agencies will have in identifying projects and sites for place-based mitigation.  (AR 37017–20, 7328 [EA 17-64–67, App. 17D-80].)  This argument is also premature; the Project Sponsors have not yet started selecting place-based mitigation sites.  New Jersey also complains that New York agencies will implement the mitigation, Pl. Reply Br. 34, but mitigation will principally be implemented by TBTA (which will fund most of it), together with "relevant state and local agencies," which will include New Jersey agencies with jurisdiction over specific projects (AR 37018 [EA 17-65]).  FHWA regulations expressly make project sponsors "responsible for implementing…mitigation measures," subject to FHWA's "stewardship and oversight."  23 C.F.R. § 771.109(b)(1).  New Jersey's unfounded distrust of the Project Sponsors and FHWA to fulfill their obligations does not prove a violation of the "hard look" standard.

New Jersey next raises a new argument that the Final EA does not adequately explain how

---

[26] New Jersey points out that expansion of an asthma case management program and creation of an asthma center will be implemented in the Bronx.  Pl. Reply Br. 32.  Like other place-based mitigation measures, the precise location for the center has not yet been determined.  These measures were identified for location in the South Bronx because stakeholders who engaged in the outreach process (unlike New Jersey) specifically advocated for them.  Pre-existing pollution and chronic disease burdens there are particularly high, and more pronounced than in Bergen County, particularly with respect to asthma.  (AR 36989, 36994–96 [EA 17-36, 17-41–43]; 7273 [EA App. 17D-25]; 7275 [EA App. 17D-27]; 7277–79 [EA App. 17D-29–31].)

regional mitigation will reduce impacts in New Jersey.  Pl. Reply Br. 34.  Even if New Jersey had not forfeited this argument by failing to raise it in its opening brief, *see Niaspan*, 67 F.4th at 135, New Jersey misses the point of the EJ analysis and mitigation program, which was to address concerns that certain communities already bear disproportionate pollution and chronic disease burdens due to preexisting development patterns (AR 36982 [EA 17-29]; 7249–51, 7262–87 [EA App. 17D-1–3, 14–39]).  Although the effects on public health from the Project cannot be quantified, and it will not cause exceedances of health-based NAAQS, the Project Sponsors committed to mitigation to address *preexisting* burdens where the Project could have even a minimal impact.  (AR 37016–20, 7322–26 [EA 17-63–67, App. 17D-74–78].)

The EA explained how each of the regional mitigation measures would benefit New Jersey. (AR 7321–23 [EA App. 17D-73–75]; 37016–18 [EA 17-63–65].)  For example, traffic modeling showed that further reducing overnight toll rates is expected to "avoid a substantial portion of projected truck diversions, as many of these diverted trucks are expected to occur during the overnight hours."  (AR 37017 [EA 17-64].)  The EA also notes that the conversion of 500 older, more polluting trucks "could yield reductions of roughly one ton of PM2.5 and 30 tons of NOx per year" throughout the region.  (AR 7322 [EA App. 17D-74].)  FHWA determined that with the identified mitigation, the Project would not have disproportionately high and adverse effects on EJ communities.  (AR 37026 [EA 17-73]; 45366.)  New Jersey has failed to prove that this expert decision was arbitrary or capricious.

## VII.    New Jersey's Unpreserved CAA Conformity Challenge Is Meritless.

New Jersey does not dispute that it was required to raise its CAA conformity challenge in comments during the NEPA process to preserve the issue.  Pl. Br. 47–48.  Instead, New Jersey now argues that it did preserve this challenge through a line in its June 2023 comment letter that referenced EPA's proposed (but not adopted) NAAQS for PM2.5.  (AR 40856.)  But this letter was

submitted nearly a year after the formal comment period ended.  *See Sierra Club*, 787 F.3d at 1051; *Pub. Citizen*, 541 U.S. at 764.  And *no* comments demanded a formal conformity determination for New Jersey.  (AR 7768, 7772–75 [EA App. 18C-315, 18C-319–22]; 40844–58.) Forfeiture precludes precisely this kind of ambush.  *See Vt. Yankee*, 435 U.S. at 553–54.

New Jersey next invokes a narrow exception for errors "so obvious that there is no need for a commentator to point [it] out specifically in order to preserve its ability to challenge a proposed action."  *Pub. Citizen*, 541 U.S. at 765.  This exception does not apply.  Out of 70,000 comments on the Draft EA, including from EPA, the agency responsible for CAA conformity, not a single one even hinted at the issue New Jersey claims is "obvious."  Pl. Reply Br. 47–48.  Indeed, the only case relevant to this issue holds that an agency need *not* make a conformity determination for a state that neighbors a project.  *Conservation L. Found., Inc. v. Dep't of Air Force*, 864 F. Supp. 265, 277 (D.N.H. 1994) (subsequent history omitted).[27]  Courts have held that the "obviousness" exception does not apply in such circumstances.  *See Pub. Citizen*, 541 U.S. at 765 (holding that challenge to alternatives analysis was not "obvious"); *St. Johns Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 462 F. Supp. 3d 1256, 1296 (M.D. Fla. 2020) (holding that plaintiff "would be hard-pressed" to make an obviousness argument when no commenter raised issue). New Jersey also claims that FHWA had "independent knowledge that the [Project] would impact conformity in New Jersey,"[28] but the EA found that the Project would *not* cause any exceedances of NAAQS in New Jersey.  (AR 36868 [EA 10-51].)

---

[27] New Jersey attempts to distinguish this case on the ground that subsequent EPA regulations undermine its holding.  Pl. Reply Br. 46–47 n.43.  But the fact that New Jersey must parse the case so finely proves that this issue was not "obvious."

[28] New Jersey cites *'Ilio'ulaokalani Coalition v. Rumsfeld* for the "independent knowledge" exception, but the record there was "replete with evidence," including internal agency comments and emails, showing "that the [agency] recognized the specific shortfall" those plaintiffs identified. 464 F.3d 1083, 1092–93 (9th Cir. 2006).  New Jersey has identified no such evidence here.

The CAA challenge also fails because the Final EA supports the conformity finding that New Jersey now demands. *See* Intervenor-Defendants' Br. 49 and n.39. New Jersey argues that the EA's air quality analysis cannot be used to make a conformity determination, suggesting that they are fundamentally different. The State quotes secondary sources summarizing the contents of a State Implementation Plan, in an attempt to show that a project-level conformity analysis required something more than comparison to NAAQS. Pl. Reply Br. 48–49. The CAA, however, defines "conformity" to mean that the activity will not (i) "cause or contribute to any new violation" of NAAQS, (ii) "increase the frequency or severity of any existing violation," or (iii) "delay timely attainment of any standard." 42 U.S.C. § 7506(c)(1)(B). That is precisely what the EA found. (AR 36868 [EA 10-51].) Conformity determinations are commonly incorporated into NEPA documents. *See, e.g.*, *Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 799 (9th Cir. 2014). Effectively, New Jersey's complaint is the absence of "or New Jersey" from the express conformity determination in the Final EA. But such a complaint is not sufficient. New Jersey fails to identify any flaws in the EA's technical analysis and has provided no basis to compel FHWA to make a second formal conformity determination.[29]

## CONCLUSION

For the reasons set forth above and in Intervenor-Defendants' opening brief, the Court should grant Intervenor-Defendants' Cross-Motion for Summary Judgment.

---

[29] New Jersey also cannot maintain a claim that FHWA failed to provide a "reasonable opportunity for consultation" because, as New Jersey concedes, the regulations place that obligation on "[metropolitan planning organizations] and state departments of transportation," *not* FHWA. 40 C.F.R. § 95.105(a)(2). New Jersey invents a non-existent requirement that FHWA "ensure" the regulation is followed. Pl. Reply Br. 49–50 n.46. In any event, New Jersey had ample opportunity to participate in a multi-year outreach campaign, and on the few occasions that New Jersey agencies participated, their questions were promptly answered. (AR 40570–71.)

Dated: January 26, 2024

Respectfully submitted,

*/s/ Daniel Chorost*
Daniel Chorost
Mark A. Chertok*
Elizabeth Knauer*
John F. Nelson*
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, NY 10022
(212) 421-2150
dchorost@sprlaw.com
mchertok@sprlaw.com
eknauer@sprlaw.com
jnelson@sprlaw.com

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan*
Gabrielle E. Tenzer*
Kaplan Hecker & Fink LLP
350 Fifth Avenue
New York, NY 10118
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com

Raymond P. Tolentino*
Kate Harris*
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
rtolentino@kaplanhecker.com
kharris@kaplanhecker.com

*Counsel for Intervenor-Defendants the
Metropolitan Transportation Authority and
the Triborough Bridge and Tunnel Authority*

*Admitted pro hac vice*