minimizes long-term congestion reduction.
  o EPA recommends the EA discuss combinations of the alternatives shown in Table 2-1 that cumulatively could achieve the objectives and project's purpose and need.
• EPA would like more clarity on statements made about coordination with EPA regarding our *"areas of expertise with respect to methodologies for documenting environmental conditions and assessing effects."* (Section 3.2) To our knowledge, EPA Region 2's Air & Radiation Division (ARD) was only involved in one meeting on August 29, 2019, during which there was no clear project scope identified and therefore no support from EPA was necessary at the time. Since then, coordination with EPA did not occur until the meeting in September 2021 at which EPA was informed about the forthcoming EA, but no other expertise support was requested. This record should be clarified and updated accordingly.
  o According to 6 CRR-NY Chapter III Subpart A Part 240: Transportation Conformity, interagency consultation is required prior to deciding that a project is not subject to a quantitative PM2.5 hot spot analysis.
  o EPA would also like clarity on the level of coordination with other Federal, State and New York City agencies with respect to preparation of this Pre- DEA.

## Congestion Relief

• The description of the project need should clearly establish why congestion is an issue that needs to be addressed in the CBD. Currently, there is no substantial justification besides unreliable travel time, rather there should be a discussion on environmental and public health benefits (air quality, safety, etc.) (Section 1.4.1)
  o Reducing congestion is one mechanism to improve air quality. Improvements in air quality standards should have been quantified.
• Traffic improvements do not show significant improvement with the proposed action; only a change of 0.3% VMT in NY (some counties showed an increase) while the change in New Jersey and Connecticut showed less than a 0.1% difference.
  o The EA did not clearly provide the data and explanation of toll and non-toll MSAT differences. This information should be made accessible in the EA to allow for a thorough evaluation.
• EPA would like clarification and justification on the selection of intersections and highway segments considered. The EA did not describe a detailed emission analysis of all intersections in the regional study area.
  o As over half of the intersections are in communities with EJ concerns, a more complete analysis should be presented.
  o The screening analysis showed reductions in trucks at specifically targeted intersections, but the EA fails to account for where the trucks are ultimately going (likely to other intersections not analyzed).
  o Additionally, EPA believes the indirect impacts associated with traffic diversions from the CBD should have been more thoroughly evaluated, particularly in regions that are already overburdened by traffic congestion.

[5]

## Socioeconomic Impacts

EPA reviewed the recorded public meetings led by MTA that took place in 2021. We would like to amplify the following comments that have yet to be addressed by the preferred alternative in the Pre-DEA:

- Potential disproportionate impact on hurt lower-income residents (paraphrased by EPA):
  - Could motorcycles be exempted from tolls similar to other congestion pricing models?
  - Consider an itemization of net revenue due to people who will opt to take public transportation as a mitigation measure.
  - Have low-income residents of outer boroughs of NYC been considered in impacts?
    - Many are forced to drive due to living in a transportation desert and have no other reasonable option other than to drive into Manhattan. ("Two-Fare Zones")
  - Consider low-income residents who are disabled and unable to commute via the subway but will be impacted by tolls to travel outside of the CBD.
  - Can dynamic tolling be applied to the CBDTP based on congestion level and time of day within the district?
  - Will the proposed action have an impact on school options due to the potentially prohibitive cost of accessibility to schools for residents of the CBD? (i.e. school buses, carpooling, etc.)
- Traffic may be displaced into other areas of the city, including the FDR Drive and Upper Manhattan. Parking will be displaced to Upper Manhattan and cause significant deterioration in traffic patterns and air quality there.
  - EPA requests more clarity on why the project will choose to exempt the FDR Drive as traffic diversion will result in continued air pollution in many residential neighborhoods along the East River including in communities with Environmental Justice concerns.
- EPA suggests that the EA include the data to support the claims that other models of congestion pricing have been successful.
- EPA suggests that FHWA look further into the MTA Capital Program to determine if acceptance into the VPPP will result in long-term improvements for the entire New York Metropolitan Area, which includes 28 counties as identified in the Pre-DEA.
  - Given the current operating deficit, there is concern that this will not improve the financial situation of MTA.
- EPA suggests that FHWA properly address adverse impacts to small businesses who operate within the CBD.
  - Increasing travel costs due to congestion pricing are likely to be displaced onto the consumer, affecting not only car owners, but also non-car owners and inflating costs of goods and services in an already overpriced city.
  - The increased costs of deliveries, etc. could hurt small businesses, further exacerbating the difficult situation caused by COVID.
- NYC should address other reasons for congestion before imposing more tolls (e.g. double parking, electric bikes, blocking the box).
- The State of New Jersey was not represented on the review board and therefore, the state, whose residents will experience impacts, was not afforded the ability to influence the project.

[6]

- EPA suggests that FHWA conduct more public workshops about the project during the public comment period, similar to community engagement practices during the I-81 Viaduct Project Public Comment period.
  - Additionally, EPA recommends that future public comment forums should be offered at varied times so day/night shift workers are able to participate.
- EPA concurs with the impact on taxi drivers and encourages FHWA and project sponsors to offer more clarity on how this impact will be mitigated to manage both taxi and for-hire vehicle access to the CBD.
- EPA encourages FHWA to consult with another federal agency with expertise in socioeconomic impact of tolling to conduct a more thorough review.

## Environmental Justice (EJ) and Impacted Communities

The Council on Environmental Quality, which oversees implementation of the National Environmental Policy Act, has promulgated a guidance document to assist agencies in implementing environmental justice principles (See Environmental Justice Guidance under the National Environmental Policy Act, Council on Environmental Quality, December 10, 1997).

- Communities with EJ concerns are often composed of marginalized people of color/minority ethnicity, low-income/poor, rural, immigrant/refugee, and indigenous populations who live in areas disproportionately burdened by environmental hazards and stressors, unhealthy land uses, psychosocial stressors, and historical traumas, all of which drive environmental health disparities. Given the distribution of communities with EJ concerns within the regional study area, the implications of the CBDTP could result in an increased cumulative burden experienced by the community.
  - EPA acknowledges that the Pre-DEA includes an entire chapter (Chapter 17) dedicated to a discussion and analysis of issues affecting communities with EJ concerns. According to the Pre-DEA, the proposed action is generally deemed to produce no adverse effects on EJ populations, except for taxi and for-hire vehicle (FHV) drivers. However, this general finding seems to contradict the adverse traffic effects identified in Section 17.3.2.3.
    - For these areas, the Pre-DEA states adverse effects "could be avoided or minimized through implementation of Transportation Demand Measures, such as lane management, motorist information, and signage. In addition, tolling modifications could potentially reduce diversions (e.g., lower discounts and fewer exemptions and crossing credits similar, to Tolling Scenarios A, B, and C)." It would be helpful to elaborate on these measures and describe how lane management, motorist information, and signage address the anticipated adverse traffic effects.

DOT_0044943

- o Adverse or beneficial air quality impacts associated with the proposed action and/or changing traffic patterns were not sufficiently considered in the Pre-DEA.
  - The EA should clearly demonstrate current non-attainment or maintenance areas that overlap with EJ communities.
  - Additionally, NAAQS attainment alone may not ensure there is no localized harm to populations with EJ concerns. Since communities with EJ concerns also bear the disproportionate burden of other environmental and psychosocial stressors that drive disparities, further baseline description of such stressors within these communities might be warranted. For example, asthma rates, air pollution exposure, and lead-based paint exposure might be higher in these communities. EPA's EJ Screen 2.0 tool provides information on twelve different EJ Indexes that combine indicators with demographic data to characterize potential areas of EJ concern.
- o While the Pre-DEA commits to post-implementation monitoring of traffic patterns, EPA recommends FHWA consider deploying all practicable reductions and mitigation measures to address traffic-related impacts to air quality in EJ communities.

*Noise and vibration effects on communities with EJ concerns:*

- No anticipated adverse noise effects were reported for evaluated areas. Projected noise level increases are below the City Environmental Quality Review (CEQR) Technical Manual threshold of three decibels, which represents the doubling of traffic passenger car equivalent volume from the No Action Alternative condition.
  - o However, noise level increases occurring adjacent to the Queens-Midtown Tunnel were projected to range from 2.7 to 2.9 decibels, which is close to the CEQR threshold.
- Noise pollution has been directly linked to health effects. Problems related to noise include stress-related illnesses, high blood pressure, speech interference, hearing loss, sleep disruption, and lost productivity (EPA's Noise Effects Handbook, 1991).
- Additional analysis post-implementation might be beneficial to obtain more accurate measures of noise level increase and potential adverse effects on communities with EJ concerns.

*Linguistic Isolation within communities with EJ concerns:*

- A Project Fact Sheet is available in English, Spanish, Chinese, Haitian Creole, Bengali, Korean, Italian, Portuguese, and Russian. For all virtual public meetings, American Sign Language interpretation was provided and closed captioning in English was available in real-time.
- EPA recommends that translation services be made available in languages other than English to engage linguistically isolated populations. This should not be restricted to a translation request process prior to the meeting.

DOT_0044944

**Analysis of Reasonably Foreseeable Effects**

The Council on Environmental Quality's (CEQ) NEPA regulations state that effects *"…may include effects that are later in time or farther removed in distance from the proposed action or alternatives. Effects include ecological… aesthetic, historical, cultural, economic… social, or health impacts."(40 CFR § 1508.1(g)).*

EPA suggests that FHWA consider all effects of the proposed action on the population in the overall geographic study area, including those outside of the CBD (There are 28 counties identified in the EA).

**Mitigation Measures**

EPA is concerned with a lack of commitment to mitigation, particularly given the potential adverse impacts to traffic and increased cumulative burden experienced by communities with EJ concerns. Current proposed mitigation measures in the EA include signal timing adjustments, station improvements at subway stations, and sidewalk modifications, which were considered to address potentially adverse effects associated with traffic, rail, and pedestrian capacities.

EPA recommends additional mitigation measures be considered including, but not limited to:

- Develop a traffic management plan to reduce the health and safety impacts.
- Develop an air monitoring plan, the purpose of which is to protect community members from unsafe levels of airborne fugitive emissions associated with construction activities or emissions associated with vehicle traffic.

[End of EPA Comments]

[9]

DOT_0044945

**From:** "Laurita, Matthew" <Laurita.Matthew@epa.gov>

**To:** "Lentlie, Patrick (DOT)" <Patrick.Lentlie@dot.ny.gov>, "Sheehan, Michael P (DEC)" <michael.sheehan@dec.ny.gov>, "gautam.mani@dot.gov" <gautam.mani@dot.gov>, "anna.price@dot.gov" <anna.price@dot.gov>, "Daniel.moser@dot.gov" <daniel.moser@dot.gov>, "Black, Lily" <Black.Lily@epa.gov>, "Burns, Donald (FTA)" <Donald.Burns@dot.gov>, "Anukwe, Uzoma (FTA)" <uzoma.anukwe@dot.gov>

**Cc:** "Smith, Terry (DOT)" <Terry.Smith@dot.ny.gov>, "Leslie, Catherine S. (DOT)" <Catherine.Leslie@dot.ny.gov>, "Nelson, Debra (DOT)" <Debra.Nelson@dot.ny.gov>, "Neerackal, George (DOT)" <George.Neerackal@dot.ny.gov>, "Nierenberg, Daniel R (DOT)" <Daniel.Nierenberg@dot.ny.gov>, "Savage, Laura E (DOT)" <Laura.Savage@dot.ny.gov>

**Subject:** RE: CBDTP Air Quality ICG Meeting: Presentation and proposed methodology

**Date:** Fri, 22 Apr 2022 11:56:25 +0000

**Importance:** Normal

---

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Patrick,

Thanks for the opportunity to review. We have a few questions and thoughts, but nothing that would be a red flag:

- Just a note that EPA reserves the right to request review of the modeling inputs/outputs and design value calculations during the review of the Air Quality technical report.
- What will be the source of the age distribution data for the heavy-duty long-haul diesel trucks? Please confirm whether you will be using local or MOVES default data.
- For the RFK Bridge analysis location, can you confirm that the emissions from the nearby Astoria Generating Station are reasonably assumed to be reflected in the background PM concentrations? Please clarify the location(s) of the monitor(s) being used for the background data.

If, after review by the ICG, all agencies concur that the analyses show that all three locations would not result in violations of any of the relevant NAAQS, EPA agrees that no further analysis or consultation would be needed.

Thanks,

Matt

**Matt Laurita**
Deputy Director, Air and Radiation Division |
Chief, Technology, Transportation, and Radiation Branch
EPA Region 2 (NY, NJ, PR, VI, and 8 Tribal Nations)
(212) 637-3895 (O) | (646) 939-2435 (M)

---

**From:** Lentlie, Patrick (DOT) <Patrick.Lentlie@dot.ny.gov>
**Sent:** Thursday, April 21, 2022 8:48 AM
**To:** Sheehan, Michael P (DEC) <michael.sheehan@dec.ny.gov>; gautam.mani@dot.gov; anna.price@dot.gov; Daniel.moser@dot.gov; Laurita, Matthew <Laurita.Matthew@epa.gov>; Black, Lily <Black.Lily@epa.gov>; Burns, Donald (FTA) <Donald.Burns@dot.gov>; Anukwe, Uzoma (FTA) <uzoma.anukwe@dot.gov>
**Cc:** Smith, Terry (DOT) <Terry.Smith@dot.ny.gov>; Leslie, Catherine S. (DOT) <Catherine.Leslie@dot.ny.gov>; Nelson, Debra (DOT) <Debra.Nelson@dot.ny.gov>; Neerackal, George (DOT) <George.Neerackal@dot.ny.gov>; Nierenberg, Daniel R (DOT) <Daniel.Nierenberg@dot.ny.gov>; Savage, Laura E (DOT) <Laura.Savage@dot.ny.gov>
**Subject:** RE: CBDTP Air Quality ICG Meeting: Presentation and proposed methodology

Good morning NYS ICG for air quality conformity,

As requested during the ICG meeting on April 19, the MTA added more detail regarding the proximity of sensitive receptors to the roadways at the selected sites. See Appendix B in the revised attachment.

Also, in the Main Body (Step 5, Item c), the original version sent on April 18 stated that the receptors will be placed up to *1,000 meters* (approximately 3,280 feet) from the source of emissions. This section was revised to specify receptors

will be placed up to *300 meters* (approximately 1,000 feet) from the source of emissions. 300 meters is still consistent with the USEPA guidance (i.e. at least 100 meters from the project).

The April 19 presentation is also included as Appendix A. These are the only changes to the materials sent on April 18. Please let me know if you concur with the approach to the analysis, or if you have any comments, by Friday, April 22. Please also let me know if you agree no further consultation is required if the completed analysis predicts the design concentrations are less than the relevant NAAQS.

Thank you,

Patrick

**Patrick Lentlie**
Environmental Specialist 2, Environmental Science Bureau
**New York State Department of Transportation**
50 Wolf Rd, POD 4-1, Albany, NY 12232
(518) 457-0212 | Patrick.Lentlie@dot.ny.gov
www.dot.ny.gov



---

**From:** Lentlie, Patrick (DOT)
**Sent:** Monday, April 18, 2022 5:58 PM
**To:** Sheehan, Michael P (DEC) <michael.sheehan@dec.ny.gov>; gautam.mani@dot.gov; anna.price@dot.gov; Daniel.moser@dot.gov; laurita.matthew@epa.gov; Black, Lily <Black.Lily@epa.gov>; Burns, Donald (FTA) <Donald.Burns@dot.gov>; Anukwe, Uzoma (FTA) <uzoma.anukwe@dot.gov>
**Cc:** Smith, Terry (DOT) <Terry.Smith@dot.ny.gov>; Leslie, Catherine S. (DOT) <Catherine.Leslie@dot.ny.gov>; Nelson, Debra (DOT) <Debra.Nelson@dot.ny.gov>; Neerackal, George (DOT) <George.Neerackal@dot.ny.gov>; Savage, Laura E (DOT) <Laura.Savage@dot.ny.gov>
**Subject:** CBDTP Air Quality ICG Meeting: Presentation and proposed methodology

NYS ICG for air quality conformity,

The MTA presentation and proposed methodology for considering the local effects of the Central Business District Tolling Program on air quality are attached for your information and review.

Thanks,

Patrick

**Patrick Lentlie**
Environmental Specialist 2, Environmental Science Bureau
**New York State Department of Transportation**
50 Wolf Rd, POD 4-1, Albany, NY 12232
(518) 457-0212 | Patrick.Lentlie@dot.ny.gov
www.dot.ny.gov



**From:** "C. de Cerreno, Allison" <allison.cdecerreno@mtahq.org>
**To:** "Lentlie, Patrick (DOT)" <Patrick.Lentlie@dot.ny.gov>
**Cc:** "Angel, Nichola" <nangel@mtabt.org>, "Flax, Leah" <leah.flax@mtabt.org>, "Wojnar, Michael" <mwojnar@mtahq.org>, "Nelson, Debra (DOT)" <Debra.Nelson@dot.ny.gov>, "gautam.mani@dot.gov" <gautam.mani@dot.gov>, "laurita.matthew@epa.gov" <laurita.matthew@epa.gov>, "Lentlie, Patrick (DOT)" <Patrick.Lentlie@dot.ny.gov>, "anna.price@dot.gov" <anna.price@dot.gov>, "Moser, Daniel (FTA)" <daniel.moser@dot.gov>, "Black, Lily" <Black.Lily@epa.gov>, "Burns, Donald (FTA)" <Donald.Burns@dot.gov>, "Anukwe, Uzoma (FTA)" <uzoma.anukwe@dot.gov>, "Smith, Terry (DOT)" <Terry.Smith@dot.ny.gov>, "Leslie, Catherine S. (DOT)" <Catherine.Leslie@dot.ny.gov>, "Nierenberg, Daniel R (DOT)" <Daniel.Nierenberg@dot.ny.gov>, "Savage, Laura E (DOT)" <Laura.Savage@dot.ny.gov>, "Neerackal, George (DOT)" <George.Neerackal@dot.ny.gov>
**Subject:** Re: CBDTP Air Quality ICG Meeting: Presentation and proposed methodology
**Date:** Mon, 25 Apr 2022 18:52:13 +0000
**Importance:** Normal

---

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

We thank the members of the ICG and will follow up as requested.

**Allison L. C. de Cerreño, Ph.D.**
**Deputy Chief Operating Officer**
**Metropolitan Transportation Authority**
2 Broadway, 23rd floor • NY, NY 10004
T: 646-252-7750 • M: 646-899-3735
E: allison.cdecerreno@mtahq.org

---

**From:** Lentlie, Patrick (DOT) <Patrick.Lentlie@dot.ny.gov>
**Sent:** Monday, April 25, 2022 12:55:41 PM
**To:** C. de Cerreno, Allison <allison.cdecerreno@mtahq.org>
**Cc:** Angel, Nichola <nangel@mtabt.org>; Flax, Leah <leah.flax@mtabt.org>; Wojnar, Michael <mwojnar@mtahq.org>; Nelson, Debra (DOT) <Debra.Nelson@dot.ny.gov>; gautam.mani@dot.gov <gautam.mani@dot.gov>; laurita.matthew@epa.gov <laurita.matthew@epa.gov>; Lentlie, Patrick (DOT) <Patrick.Lentlie@dot.ny.gov>; anna.price@dot.gov <anna.price@dot.gov>; Moser, Daniel (FTA) <daniel.moser@dot.gov>; Black, Lily <Black.Lily@epa.gov>; Burns, Donald (FTA) <Donald.Burns@dot.gov>; Anukwe, Uzoma (FTA) <uzoma.anukwe@dot.gov>; Smith, Terry (DOT) <Terry.Smith@dot.ny.gov>; Leslie, Catherine S. (DOT) <Catherine.Leslie@dot.ny.gov>; Nierenberg, Daniel R (DOT) <Daniel.Nierenberg@dot.ny.gov>; Savage, Laura E (DOT) <Laura.Savage@dot.ny.gov>; Neerackal, George (DOT) <George.Neerackal@dot.ny.gov>
**Subject:** RE: CBDTP Air Quality ICG Meeting: Presentation and proposed methodology

Allison,

The ICG concurs with the methodology used to identify the three locations for the CBDTP particulate matter hot-spot analysis. The ICG also concurs that if, after review of the analysis results and documentation, the three locations return values that do not violate the relevant NAAQS, then no further consultation with the ICG is required. This concurrence comes with the condition that the following comments are satisfactorily addressed:

- The USEPA and involved agencies reserve the right to request review of the modeling inputs/outputs and design value calculations during the review of the Air Quality technical report. Accordingly, the NYSDOT recommends the input files and relevant documentation be provided as soon as possible.

DOT_0044966

- Provide the source of age distribution data for the heavy-duty long-haul diesel trucks and confirm whether it is local or MOVES default data.
- For the RFK Bridge analysis location, confirm that the emissions from the nearby Astoria Generating Station are reasonably assumed to be reflected in the background PM concentrations
- Please specify the location(s) of the monitor(s) being used for the background concentrations used in the analysis.

If you have any questions, please let me know.

Thanks,

Patrick

**Patrick Lentlie**
Environmental Specialist 2, Environmental Science Bureau
**New York State Department of Transportation**
50 Wolf Rd, POD 4-1, Albany, NY 12232
(518) 457-0212 | Patrick.Lentlie@dot.ny.gov
www.dot.ny.gov

logo3

**From:** C. de Cerreno, Allison <allison.cdecerreno@mtahq.org>
**Sent:** Friday, April 22, 2022 8:40 PM
**To:** Lentlie, Patrick (DOT) <Patrick.Lentlie@dot.ny.gov>
**Subject:** Re: CBDTP Air Quality ICG Meeting: Presentation and proposed methodology

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Hi Patrick,
Any word from the agencies?
Allison

**Allison L. C. de Cerreño, Ph.D.**
**Deputy Chief Operating Officer**
**Metropolitan Transportation Authority**
2 Broadway, 23rd floor • NY, NY 10004
T: 646-252-7750 • M: 646-899-3735
E: allison.cdecerreno@mtahq.org

**From:** Lentlie, Patrick (DOT) <Patrick.Lentlie@dot.ny.gov>
**Sent:** Thursday, April 21, 2022 8:47:33 AM
**To:** Sheehan, Michael P (DEC) <michael.sheehan@dec.ny.gov>; gautam.mani@dot.gov <gautam.mani@dot.gov>; anna.price@dot.gov <anna.price@dot.gov>; Moser, Daniel (FTA) <daniel.moser@dot.gov>; laurita.matthew@epa.gov <laurita.matthew@epa.gov>; Black, Lily <Black.Lily@epa.gov>; Burns, Donald (FTA) <Donald.Burns@dot.gov>; Anukwe, Uzoma (FTA) <uzoma.anukwe@dot.gov>
**Cc:** Smith, Terry (DOT) <Terry.Smith@dot.ny.gov>; Leslie, Catherine S. (DOT) <Catherine.Leslie@dot.ny.gov>; Nelson, Debra (DOT) <Debra.Nelson@dot.ny.gov>; Neerackal, George (DOT) <George.Neerackal@dot.ny.gov>; Nierenberg, Daniel R (DOT) <Daniel.Nierenberg@dot.ny.gov>; Savage, Laura E (DOT) <Laura.Savage@dot.ny.gov>
**Subject:** RE: CBDTP Air Quality ICG Meeting: Presentation and proposed methodology

Good morning NYS ICG for air quality conformity,

As requested during the ICG meeting on April 19, the MTA added more detail regarding the proximity of sensitive receptors to the roadways at the selected sites. See Appendix B in the revised attachment.

Also, in the Main Body (Step 5, Item c), the original version sent on April 18 stated that the receptors will be placed up to *1,000 meters* (approximately 3,280 feet) from the source of emissions. This section was revised to specify receptors will be placed up to *300 meters* (approximately 1,000 feet) from the source of emissions. 300 meters is still consistent with the USEPA guidance (i.e. at least 100 meters from the project).

The April 19 presentation is also included as Appendix A. These are the only changes to the materials sent on April 18. Please let me know if you concur with the approach to the analysis, or if you have any comments, by Friday, April 22. Please also let me know if you agree no further consultation is required if the completed analysis predicts the design

concentrations are less than the relevant NAAQS.

Thank you,

Patrick

**Patrick Lentlie**
Environmental Specialist 2, Environmental Science Bureau
**New York State Department of Transportation**
50 Wolf Rd, POD 4-1, Albany, NY 12232
(518) 457-0212 | Patrick.Lentlie@dot.ny.gov
www.dot.ny.gov

logo3

**From:** Lentlie, Patrick (DOT)
**Sent:** Monday, April 18, 2022 5:58 PM
**To:** Sheehan, Michael P (DEC) <michael.sheehan@dec.ny.gov>; gautam.mani@dot.gov; anna.price@dot.gov; Daniel.moser@dot.gov; laurita.matthew@epa.gov; Black, Lily <Black.Lily@epa.gov>; Burns, Donald (FTA) <Donald.Burns@dot.gov>; Anukwe, Uzoma (FTA) <uzoma.anukwe@dot.gov>
**Cc:** Smith, Terry (DOT) <Terry.Smith@dot.ny.gov>; Leslie, Catherine S. (DOT) <Catherine.Leslie@dot.ny.gov>; Nelson, Debra (DOT) <Debra.Nelson@dot.ny.gov>; Neerackal, George (DOT) <George.Neerackal@dot.ny.gov>; Savage, Laura E (DOT) <Laura.Savage@dot.ny.gov>
**Subject:** CBDTP Air Quality ICG Meeting: Presentation and proposed methodology

NYS ICG for air quality conformity,

The MTA presentation and proposed methodology for considering the local effects of the Central Business District Tolling Program on air quality are attached for your information and review.

Thanks,

Patrick

**Patrick Lentlie**
Environmental Specialist 2, Environmental Science Bureau
**New York State Department of Transportation**
50 Wolf Rd, POD 4-1, Albany, NY 12232
(518) 457-0212 | Patrick.Lentlie@dot.ny.gov
www.dot.ny.gov

logo3

Confidentiality Note: This e-mail, and any attachment to it, may contain privileged and confidential information and is intended for the use of the individual(s) or entity named on the e-mail. Unauthorized disclosure of this message is prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and destroy this message and all copies thereof, including all attachments.

**NYS Air Quality Conformity Interagency Consultation Group (ICG)**
**April 13, 2022**
**Meeting Notes**

**Attendees**

| | |
|---|---|
| AGFTC: | Aaron Frankenfeld |
| CDTC: | Chris Bauer, Chaim Simon |
| GBNRTC: | Rich Guarino, Matt Grabau |
| GTC: | Jim Stack, Alex Kone |
| NYMTC: | Deb Nelson, Mary Byrne, Ali Afshar, Afolabi Aiyedun |
| OCTC: | Lauren Bennett |
| WJCTC: | Kris Reff |
| FHWA: | Gautam Mani |
| FTA: | Dan Moser |
| USEPA: | Matt Laurita, Lily Black |
| NYSDEC: | Mike Sheehan |
| NYSDOT: | Mark DeRocco (Region 2) Jonathan Hill (MO-Planning), Patrick Lentlie (MO-ESB), Harriet Lewis (MO-Planning), George Neerackal (MO-ESB), Laura Savage (MO-ESB), Jason Shank (MO-ESB),Greg Wichser (R-1) |

1. **State Implementation Plan (SIP) for air quality updates from NYSDEC**
   - **2008 Ozone SIP**
   - **2008 Ozone Motor Vehicle Emissions Budgets**
   - **2015 Ozone SIP**
   - **CO SIP for New York Metro Area – end of maintenance period?**
   - **1997 Ozone "Orphan Area" SIP revision pathways**
   - **2006 PM 2.5 24-hour Maintenance Plan**

**2008 Ozone National Ambient Air Quality Standard (NAAQS):** The New York Metropolitan Area (NYMA) was initially classified "moderate" nonattainment for the 2008 ozone standard and failed to attain the standard by the required attainment date.  The area was reclassified to "serious" non-attainment effective September 23, 2019.  Based on certified 2018-2020 ozone monitoring data, the area did not attain the standard by the required attainment date (July 20, 2021).  Therefore, pursuant to Clean Air Act Section 181, the USEPA has proposed the area be re-classified to "severe" nonattainment for the 2008 Ozone NAAQS with an attainment date of July 20, 2027. Consistent with all 2008 Ozone SIPs with a mid-ozone season attainment date, the attainment demonstration will be based on a 2026 calendar year projection.

A key future consideration for NYMTC and its member agencies is, pursuant to CAA Section 185, this SIP will be required to include Transportation Control Measures (TCMs) if the future year vehicle miles of travel (VMT) growth rates outpace reductions in vehicle emissions rates.   NYSDEC does not anticipate VMT growth to exceed the rate of reduction in emission rates but wants affected stakeholders to be aware of this requirement for severe nonattainment areas.

The link to the proposed USEPA rule is:
https://www.federalregister.gov/documents/2022/04/13/2022-07509/determinations-of-attainment-by-the-attainment-date-extension-of-the-attainment-date-and

---

DOT_0044977

In addition, USEPA has not yet acted on the SIP revision submitted for the "serious" nonattainment classification, except for starting a review of the motor vehicle emissions budgets as noted below.

**2008 Ozone SIP Update from USEPA:**  The USEPA initiated its adequacy review of the new motor vehicle emission budgets for both the New York State and New Jersey portions of the NYMA 2008 ozone nonattainment area. The public review comment period began on March 8, 2022 and ended on April 8, 2022.  No public comments were received. The USEPA is reviewing the NYSDEC's MOVES files.

**2015 Ozone SIP Update:**  The NYMA is currently classified "moderate" nonattainment for the 2015 ozone standard with a 2024 attainment deadline NYSDEC is in the process of developing its SIP submission using a 2017 base year and 2023 projection. This will be the first inventory and emissions budget based on MOVES3.If , the NYMA does not attain (attainment based on 2021, 2022 and 2023 design value calculation) it will be re-classified ("bumped up") to "serious" nonattainment for the 2015 standard with a August 2027 attainment date.  It is anticipated that this future action will align the attainment dates for the 2008 and 2015 standards.  Thus, daily VOC and NOx emissions budgets will have a 2026 milestone.  The base year and projection year will be discussed if the area fails to attain.

**1971 Carbon Monoxide (CO) SIP Update:**  The NYSDEC submitted the second 10-year carbon monoxide (CO) "Limited Maintenance Plan" SIP for the New York Metropolitan Area in 2013. At the conclusion of the second 10-year maintenance plan, conformity requirements for CO will no longer apply to transportation plans, programs and projects in the NYMA.  No formal actions are required to be undertaken by the USEPA or NYSDEC once the date is met.  The main substantive effect of the conclusion of the Maintenance Period is that project level CO "hot-spot" conformity requirements will no longer apply.

NYSDOT, NYSDEC and USEPA will confer to determine the exact date when the maintenance period will conclude.

**1997 Ozone "Orphan" Nonattainment Area SIP Revision Pathways:**  The Buffalo, Watertown, Rochester, Capital District and Poughkeepsie areas remain classified nonattainment for the 1997 ozone standard and subject to transportation conformity requirements as specified in Transportation Conformity Guidance for the South Coast II Court Decision (EPA-420-B-18-050 November 2018).  NYSDEC did not submit a redesignation and maintenance plan for these areas prior to the revocation of the 1997 ozone standard. Thus, there is not a current pathway for the USEPA to act on a redesignation request or maintenance plan from the State.  NYSDEC and USEPA are working to find pathway and will update this group once more information is available.

**2006 24-hour PM$_{2.5}$ NAAQS Maintenance Plan:**  NYSDEC is prioritizing completion and submittal of the 2nd ten-year Maintenance Plan for the NYS portion of the New York-Northern New Jersey-Long Island, NY-NJ-CT PM$_{2.5}$ area. NYSDEC will again advise this group once they have determined the base year and projection year for this SIP.

DOT_0044978

2. **Transportation Improvement Program Updates and timing of project lists for ICG review:**  The MPOs are still awaiting the lists of State-sponsored candidate projects. Hence the schedules of project lists and conformity documentation for ICG review  and the timing of public comment periods remain uncertain.  Most Upstate MPOs and Capital Program do not expect any non-exempt projects to be included in the new TIPs.  The GTC TIP is likely to include at least one non-exempt project.

   To spread out the workload for the ICG agency representatives, NYMTC staff will provide a partial project list with proposed air quality classifications for ICG review.

3. **NYMTC and OCTC Regional Emissions Analyses for new FFY 2023-2027 TIPs**
   NYMTC expects to lock-in its planning assumptions in early May and anticipates public review of the draft TIP and conformity documentation to begin on July 25.  PFAC is scheduled to adopt the conformity determination on August 25. The Council is scheduled to adopt the new TIP on September 9.

   The OCTC is planning to release its draft TIP and conformity determination on July 6 and adopt on August 9.  No new non-exempt projects are anticipated.  Repurposed funding for a park and ride lot is likely but the project is not expected to be regionally significant.

4. **GTC TIP Amendments:**  The ICG concurred with the air quality classifications for the following new projects, as proposed by GTC staff:
   - **PIN 482308, Add 10 New On-Demand Vehicles**
     - Air Quality Classification:  Exempt (Code B 10 – Purchase new buses and rail cars to replace existing vehicles or for minor expansions [<10%] of the fleet)
   - **PIN 482309, Garage D Design and Environmental**
     - Air Quality Classification:  Exempt (Code B 8 – Reconstruction or renovation of transit buildings & structures [i.e.: rail or bus buildings, storage & maintenance facilities, stations, terminals, ancillary structures])
   - **PIN 482310, Connection Hubs – Phase II**
     - Air Quality Classification:  Exempt (Code B 7 – Construction of small passenger shelters and information kiosks)

5. **Next meeting:**  The next ICG meeting is scheduled for June 8, 2022, at 9AM.  Another meeting may be scheduled during the intervening time.

DOT_0044979



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

September 22, 2022

Rick Marquis
FHWA NY Division Administrator
Federal Highway Administration
Leo O'Brien Building
11A Clinton Ave, Suite 719
Albany, NY 12207

Ronald Epstein
Executive Deputy Commissioner/CFO
New York State Department of Transportation
50 Wolf Road
Albany, NY 12232

Allison L. C. de Cerreño, Ph.D.
Deputy Chief Operating Officer
Metropolitan Transportation Authority
2 Broadway, 23rd Floor
New York, NY 10004

William Carry
Assistant Commissioner for Policy
NYC Department of Transportation
55 Water Street, 9th Floor
New York, NY 10041

RE: Draft Environmental Assessment– Central Business District Tolling Program, New York, NY

Dear Mr. Marquis, Mr. Epstein, Dr. de Cerreño, and Mr. Carry,

In accordance with our responsibilities under Section 309 of the Clean Air Act and the National Environmental Policy Act (NEPA), the United States Environmental Protection Agency (EPA) has reviewed the Draft Environmental Assessment (EA) prepared by the Federal Highway Administration (FHWA or Lead Agency) in coordination with New York State Department of Transportation, and Metropolitan Transportation Authority (together referred to as Project Sponsors), for the Central Business District Tolling Program (CBDTP or the Project) in New York. The CAA Section 309 role is unique to EPA, providing EPA the authority to review and comment in writing on the environmental impact of any major Federal agency action and to make EPA's written comments available to the public.

EPA understands the purpose of the Project is to reduce traffic congestion in the Manhattan Central Business District (CBD), which encompasses the geographic area of Manhattan south of 60th Street, in a manner that will generate revenue for future transportation improvements. The Draft EA has been developed to address potential impacts associated with the CBDTP and the wider regional study area, which consists of twenty-eight counties where most of the trips to and from the CBD originate or terminate. EPA recognizes that congestion pricing has been used as a traffic reduction strategy and is anticipated to bring varied benefits to the CBD.

EPA focused its review on the preferred alternative, Zone-Based Pricing. EPA appreciates the opportunity to engage early with the Project Sponsors and continues to support a thorough NEPA public process as a cooperating agency on the Project. This Draft EA has incorporated EPA's feedback, most notably with respect to public accessibility and transparency, regarding expanded mesoscale and local air quality analyses. Furthermore, we commend FHWA for improving the clarity of some of the major findings by including an Executive Summary available in nine different languages and presenting information in tabular or visual formats for public engagement and understanding of the Project.

Due to the insufficiency of data in the Draft EA around localized and disproportionate air quality impacts in the surrounding area, EPA is unable to confirm that impacts are less than significant without appropriate mitigation. EPA remains concerned about the potential for adverse air quality impacts on communities in areas outside the CBD—*e.g.*, Bronx County, Bergen County, and Richmond County—where the analysis in the Draft EA projects that traffic congestion will likely worsen due to Project implementation. EPA recommends that the analysis of these sensitive areas in the Draft EA be improved, and appropriate mitigation be identified to ensure adverse impacts are less than significant, especially given the historical environmental justice (EJ) concerns and cumulative impacts to the affected communities.

EPA recommends the Project Sponsors include more robust air quality modeling to assess localized Project impacts in areas of EJ concern which will inform development of mitigation measures. The Project Sponsors should also engage in more robust community outreach to consider mitigation. EPA recommends the Project Sponsors use data evaluated in the EA to include mitigation measures, rather than rely on post-implementation monitoring to inform mitigation decisions.

Addressing these issues is incumbent on the Lead Agency and Project Sponsors. In accordance with Executive Order 12898's mandate, federal agencies must "to the greatest extent practicable and permitted by law," make EJ part of their mission, "by identifying and addressing, as appropriate, disproportionately high, and adverse human health or environmental effects of [their] programs, policies, and activities." EO 14008 requires federal agencies to "make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related, and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[1]  In addition, the Council on Environmental Quality's NEPA EJ guidance states that agencies, among other things: i) "should consider the composition of the affected area, to determine whether [communities with EJ concerns] are present …, and if so whether there may be disproportionately high and adverse human health or environmental effects…"; and ii) "should consider relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards…"[2] Finally, New York State's (the State) Climate Leadership and Community Protection Act (CLCPA), requires the State to address disproportionate impacts and reduce the burden to Disadvantaged Communities (DAC). Given the potential impacts identified in the Draft EA, and any future impacts not clearly identified, especially to communities with EJ concerns, EPA believes further investigation and analysis could lead to more thorough, comprehensive, and targeted mitigation measures from the Project.

EPA recommends that FHWA clarify and expand upon the following subjects in the Final EA and provide mitigation measures in accordance with EPA's enclosed detailed comments to better address: the alternatives analysis; direct, indirect, and cumulative impacts; impacts on communities with EJ concerns; and mitigation commitments to address significant adverse impacts during and after implementation of the proposed action. Based on the impacts disclosed and mitigation considered in the Draft EA, significant impacts to communities with EJ concerns must be appropriately mitigated to meet the requirement of the mitigated Finding of No Significant Impact (FONSI) pursuant to 40 CFR §1501.6(c). As discussed in our detailed comments, EPA has

[1] Executive Order 14008 on Tackling the Climate Crisis at Home and Abroad (Jan. 27, 2021).
[2] Council on Environmental Quality (CEQ) EJ Guidance Under NEPA (1997) pg. 9.

DOT_0045025

determined that additional analysis should be conducted to identify mitigation measures to reduce disproportionate, significant impacts to communities with EJ concerns. Lead Agency and Project Sponsors should include concrete mitigation requirements as commitments in its decision document. EPA also recommends that FHWA make the draft FONSI available for public review.

EPA has included in the detailed comments proposed methods to address mitigation. The Lead Agency and Project Sponsors should implement suggestions and proposed mitigation strategies introduced by representatives from communities with EJ concerns, the EJ Technical Advisory Group and the EJ Stakeholder Working Group throughout the scoping and public comment period. These suggestions address quality of life considerations that impact "human health, economic, and social effects of federal actions" as is required by NEPA by: reducing emissions and vehicle miles traveled; increasing alternative transportation options; and enhancing public and mass transit for all users while advancing green infrastructure in the New York Metropolitan Area.

EPA looks forward to a response from your team and an opportunity to review the final documents. We are committed to working with the Lead Agency and Project Sponsors through completion of the NEPA process. Should you have any questions or would like clarification, please contact David Kluesner, Director of EPA Region 2 Strategic Programs Office at Kluesner.Dave@epa.gov or (212) 637-3653.

Sincerely,

Lisa F. Gardia
Regional Administrator
US Environmental Protection Agency, Region 2

Enclosure

DOT_0045026

*[Page Left Intentionally Blank]*

DOT_0045027

**United States Environmental Protection Agency Detailed Comments**
*Draft Environmental Assessment*
*Central Business District Tolling Program – New York, NY*

## Air Quality

Based on our review of the Draft EA, EPA recommends that Project Sponsors fully disclose Air Quality impacts to the regional and local communities in the study area. Additionally, EPA recommends that air quality analyses should include the entire study area, especially those where traffic increases and pollutant increases are anticipated. EPA offers the following comments to consider:

- EPA recommends that the Project Sponsors to reduce potential increases in air pollution and other impacts from increased vehicle traffic through a comprehensive mitigation package for all scenarios under consideration. In considering impacts, the Project Sponsors must recognize and acknowledge that compliance with the National Ambient Air Quality Standards (NAAQS) does not equate to no potential impacts and localized harm to human health and the environment. Executive Order 14008 requires agencies to make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related, and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts.[1] Air pollution contributes to a wide variety of adverse health effects. Numerous scientific studies have linked particle pollution exposure to a variety of problems [including premature death in people with heart or lung disease] ... [and increased asthma attacks].[2] For these reasons, the impacts of the Project's air emissions, specifically regarding increased truck traffic, need to be evaluated beyond EPA's public health air quality standards or benchmarks.
    - o While EPA has issued formal designations as "attainment" or nonattainment" regarding certain criteria air pollutants, these designations may not always be representative of all localized air quality impacts and resulting health disparities. For instance, previously unidentified "hot spots" that exceed the level of the $PM_{2.5}$ NAAQS may exist even in areas designated as attainment. The regional area impacted by the study is currently following a maintenance plan after previously having not attained the $PM_{2.5}$ NAAQS. Therefore, increased traffic or new traffic and pollution hotspots could threaten the regional area's current attainment status.
    - o EPA encourages the Project Sponsors to complete an analysis of localized impacts in areas that may not meet the New York State Environmental Quality Review Act (SEQRA) criteria for adverse effects located in communities with EJ concerns to determine the potential impacts on existing air quality and subsequent public health.
- EPA appreciates the Project Sponsors' additional completion of three hot spot analyses (pg. 10-47) completed for the Draft EA based on previous discussions with the NEPA review team throughout the scoping process of the Project.
- The Draft EA analyzed 102 intersections (pg. 10-43) as part of the microscale hot spot screening analysis. These intersections are the same as those analyzed in the local intersection transportation analysis and were selected based on expected increases in traffic. EPA suggests the rationale for using these intersections for the microscale air quality screening analysis should be further clarified in the Final EA.

[1] Executive Order 14008 on Tackling the Climate Crisis at Home and Abroad (Jan. 27, 2021).
[2] https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm.

DOT_0045028

- EPA recommends the Project Sponsors include a more expansive microscale screening analysis of intersections with an increase in traffic and additional intersections to encompass all local counties. This should include Richmond County and Bergen County, which show projected increases in air pollutants in both 2023 and 2045.
- EPA acknowledges that the microscale screening analysis (pg. 10-42) rules out the need for hot spot analysis. EPA notes that benefits in some areas do not mean that disproportionate adverse impacts do not occur elsewhere. All potential adverse impacts should be identified, explained, and analyzed, irrespective of benefits to other areas.
- Although Table 10-13 provides the results of the microscale screening, this table may be more beneficial if specific data or illustrative quantitative information is provided.

**Environmental Justice**

Based on our review of the Draft EA. EPA's comments regarding Environmental Justice (EJ) focuses on three key components:

1. *Tolling Impacts* – While the Draft EA acknowledges the disproportionate impact of tolling on communities with EJ concerns, EPA recommends that the Final EA and Draft FONSI include more sufficient mitigation methods to be implemented to ensure these impacts are less than significant.
2. *Localized Traffic Impacts* – The Draft EA does not identify the disproportionate impact of the circumferential traffic diversions to roadways in communities with EJ concerns and its subsequent impact on the air quality in particularly near road communities. EPA recommends the Final EA and Draft FONSI clearly identifies these impacts and sufficient mitigation to be implemented that ensures these impacts are less than significant.
3. *Cumulative Impacts* – In order to meet NEPA regulations,[3] cumulative impacts must be considered throughout the entirety of the Final EA, most notably in the chapter on Environmental Justice.

*Tolling Impacts*

- EPA recommends that the Project Sponsors pursue a toll policy that would waive all tolls upfront for low-income drivers residing both within and outside the CBD in addition to relying on tax credits. Waiting for an annual tax credit may present a hardship for many low-income drivers due to their inability to cover the costs of this new expense prior to recouping the expenses annually via tax credits. If waiving all tolls for low-income drivers is determined not practicable, EPA recommends developing a tiered approach for tolls that is dependent on income level.
- The Draft EA does not adequately address the identified disproportionate impact to low-income drivers residing outside the CBD. While a tax credit is proposed for low-income drivers residing within the CBD, this proposal excludes drivers residing outside the CBD. The United States Department of Transportation (DOT) Order 5610.2C states that "DOT officials will ensure that any of their respective programs, policies or activities that will have

---

[3] Effective May 20, 2022, CEQ updated the CEQ NEPA Implementing Regulations 40 CFR §1508.1 "Definition" to reinstate the definition of "cumulative effects" as a requirement for NEPA analysis. CEQ noted in the preamble that *"the deletion of the definition of "cumulative impacts" in the 2020 rule did not absolve agencies from evaluating reasonably foreseeable cumulative effects, and therefore, it is unclear that the deletion would narrow the scope of effects analyzed by agencies."* (Federal Register Vol. 87, No. 78, page 23463).

DOT_0045029

a disproportionately high and adverse effect on minority populations or low-income populations will only be carried out if further mitigation measures or alternatives that would avoid or reduce the disproportionately high and adverse effect are not practicable." EPA recommends the Final EA be updated to discuss and identify appropriate mitigation to ensure impacts to drivers residing outside of the CBD is less than significant.

- Although mitigation is proposed to waive the $10 E-Z Pass deposit fee and establish a bi-annual EJ Community Group, EPA believes these measures do not sufficiently address the potential costs associated from new tolls. EPA recommends developing proposed mitigation to adequately address this disproportionate impact. If there is no practicable mitigation that could address increased tolls to low-income residents outside the CBD, please state this clearly in the Final EA.
- EPA urges that the selected method for reduced tolling for residents and low-income drivers into the CBD should be widely advertised to ensure qualified populations are able to take advantage of these benefits.
- EPA recommends identifying which alternatives have the most and the least adverse impacts on communities with EJ concerns. EPA encourages the Project Sponsors to select a tolling scenario that minimizes adverse impacts to low-income and minority communities. Additionally, the Final EA should provide a thorough description of any adverse impacts to low-income and minority communities resulting from each of tolling scenarios being considered.
- EPA encourages the FHWA or Lead Agency to consult with internal or external partners with expertise in socioeconomic impacts of tolling to conduct an independent review. Many claims are made throughout the Draft EA of the impact of tolling scenarios on economic conditions, particularly on communities with EJ concerns and low-income drivers.

### Localized Traffic Impacts

- EPA recommends the Lead Agency provide a comparative analysis of potential air quality impacts between the general population and minority communities and low-income populations throughout the study area. While local traffic volume comparisons were provided in Chapters 4a and 17, the air quality evaluation was only conducted at a county level. Communities with EJ concerns are already disproportionately impacted across cumulative environmental, health, socioeconomic and climate stressors. The Project may exacerbate the disproportionate impacts, and as such, EPA recommends the Final EA include further comparison as noted below.
  - As Figures 17-7, 17-8, and 17-9 display, there are considerable increases in Roadway Vehicle-Miles Traveled (VMT) in and adjacent to tracts identified as communities with significant EJ concerns.
  - Traffic diversion may result in continued or increased air pollution in many residential neighborhoods along the East River, including in communities with EJ concerns, like the South Bronx and Washington Heights. All tolling scenarios suggest a potential increase in vehicle and truck traffic in some areas outside the CBD tolling areas. In some scenarios, the South Bronx could see as much as an additional 700 truck trips per day (p. 4A-42). Increases were also found to impact neighborhoods in Richmond County, NY and Bergen County, NJ. Projected benefits for the CBD are not expected to offset these impacts in outside areas (p. 4A-30).
- EPA recommends the Project Sponsors adequately identify adverse impacts to populations with EJ concerns. We appreciate the detailed modeling conducted for ten highway segments most likely to experience an increase in traffic (see Section 17.6.1.1 and Table 17.3).

DOT_0045030

However, the EA states that all ten segments analyzed are within or adjacent to EJ census tracts. Furthermore, eight of the ten segments would result in increased delays and queues in peak hours and three of the segments would constitute adverse effects on traffic conditions according to SEQRA impact criteria. These identified adverse traffic congestion impacts appear to be predominantly borne by communities of color or low-income populations (given all identified increases occur within or adjacent to communities with EJ concerns). Additionally, at a minimum, the three segments meeting SEQRA impact criteria appear to be appreciably greater in magnitude than the congestion impacts experienced by the general public .

- The Draft EA states that "Traffic modeling for the Project indicates that the CBD Tolling Alternative would result in some traffic diversions around Manhattan, into the Bronx and northern New Jersey and Staten Island in all tolling scenarios. These circumferential diversions are due to implementation of the tolling in the Manhattan CBD, as drivers and trucks traveling to and from Long Island and Pennsylvania would divert around Manhattan to avoid the tolling in the Manhattan CBD" (p. 17-29). The Draft EA also states that "...environmental justice communities experiencing the largest increases in traffic volumes, including trucks, from circumferential diversions would be along I-95 in northern New Jersey and in Queens at the approach to the Robert F. Kennedy Bridge" (p. 17-31).
    - o EPA recommends the Project Sponsors clearly identify the increased traffic congestion in these highway segments as disproportionately high and adverse to communities of color and low-income populations as well as commit to implementation of measurable mitigation measures to address these impacts that will be shouldered primarily by communities with EJ concerns.
- Project Sponsors should incorporate community and workgroup feedback such as prioritizing the servicing of zero-emission buses in areas of significant EJ concerns that would be adversely impacted by the Project . While EPA recognizes this ongoing effort as part of MTA's 2020-2024 capital program, EPA encourages MTA to partner with other public and private mass transit bus entities to expand benefits throughout the entire study area, beyond the CBD.

## Cumulative Impacts

- Consideration of cumulative impacts is foundational to an EJ analysis. CEQ's EJ Guidance lists cumulative impacts as one of a handful of factors agencies should consider when determining whether an impact is disproportionately high and adverse. EPA recommends that the Project Sponsors provide more detailed analysis of cumulative effects in accordance with definition from CEQ updated NEPA Implementing Procedures (40 CFR § 1508.1(g)(3)). Executive Order 14008 clarified the importance of considering cumulative impacts: "Agencies shall make achieving EJ part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts." Executive Order 12898 Section 3-301(b) provides that whenever practicable and appropriate, the environmental human health analyses shall identify multiple and cumulative exposures.
    - o It is unclear whether or to what extent cumulative impacts were considered during the EJ analysis for air and other potential impacts to communities with EJ concerns. Several communities within the study area are already experiencing adverse and disproportionately high human health effects. A more robust analysis of impacts would clarify whether the Project would add to these disproportionately high health effects.

DOT_0045031

- o EPA recommends that the Final EA further analyze cumulative impacts in communities with EJ concerns to determine the potential for significant adverse impacts and identify appropriate mitigation to ensure impacts are less than significant.
- EPA appreciates the ongoing inclusion of the EJ Technical Advisory Group (EJ TAG) to continue months after implementation of the proposed action. We recommend that the Project Sponsors commit to a schedule for consulting the working group, sharing results from monitoring conducted after implementation, and using feedback from these meetings to influence changes to the program as needed in the EA. The sponsors should also allow for public comment on any future or new projects that address impacts beyond the Final EA.
  - o EPA recommends the EJ TAG meet to address substantive EJ concerns during tolling scenario selection, implementation, and after implementation of an action. EPA further recommends the EJ TAG meet on a quarterly basis to track and communicate progress.
  - o EPA encourages the Project Sponsors to provide opportunities for the EJ TAG to participate in discussions of actual impacts during the monitoring period and provide opportunities for the public to provide first-hand accounts of observed impacts. These commitments and accountability measures should also be clearly outlined in the EA.
  - o EPA recommends the Projects Sponsors create an interagency working group in tandem with the ongoing EJ Technical Advisory Group (TAG) to implement potential projects that arise from mitigation be created to provide a holistic planning approach to address community-identified needs.
- EPA recommends the Project Sponsors consult with existing groups at the federal and local levels that currently work to address impacts of traffic on communities with EJ concerns. Collaboration with federal and local agencies will permit for a visible and accurate portrayal of the air quality impacts seen by the Project as well as arriving at solutions that address the full range of impacts and have the full support of the whole of government to meet EO directives and CEQ guidance.
  - o For example, Project Sponsors should consider incorporating monitoring results captured by the New York State Department of Environmental Conservation's 2022-23 Statewide Community Air Monitoring Initiative where through a contract with Aclima will be measuring air pollution from sources such as cars, diesel trucks, construction equipment, commercial sources and industrial facilities. The EJ TAG can assist in identifying and defining specific areas for monitoring.
- As discussed above, EPA recommends the Project Sponsors consider Air Quality impacts and its effects on existing health disparities, including asthma at additional intersections in communities with EJ concerns. Based on existing toxics levels and information from EJScreen, these impacts may be disproportionate. Modeling by the Lead Agency and Project Sponsors should be used to identify and propose direct mitigation to address potential impacts.
- EPA recommends that the Final EA clearly discuss how relevant existing conditions in communities with EJ concerns across cumulative environmental, health, socioeconomic and climate stressors were considered when determining whether impacts are disproportionately high and adverse. Table 17-11 states the Bronx, Richmond, and Bergen Counties are all projected to experience increases from the CBD tolling alternatives for criteria pollutants and MSATs in the Year 2023 and the Year 2045. EPA's EJScreen tool and NYC's Environmental and Health Data Portal indicates numerous Block Groups (BGs) in these areas that may already be heavily overburdened from the types of impacts relevant to the

DOT_0045032

project, including the following based on EJ percentiles compared to other BGs across the nation:

- ○ Bronx County BG 360050051002:
  - ▪ 97th% PM 2.5
  - ▪ 99th% diesel PM
  - ▪ 98th% air toxics cancer risk
  - ▪ 99th% air toxics respiratory hazard index
  - ▪ 95th% traffic proximity
- ○ Richmond County BG 360850040002:
  - ▪ 98% PM2.5
  - ▪ 99% diesel PM
  - ▪ 98% air toxics cancer risk
  - ▪ 98% air toxics respiratory hazard index
  - ▪ 97% traffic proximity
- ○ Bergen County BG 340170145013:
  - ▪ 96% PM2.5
  - ▪ 96% diesel PM
  - ▪ 98% air toxics cancer risk
  - ▪ 98% air toxics respiratory hazard index
  - ▪ 96% traffic proximity

- EPA recommends the Project Sponsors consider using applicable tools common to the health impact assessment process as part of the monitoring and mitigation plan including in the FONSI, to better identify the intensity of impacts on specific communities already experiencing significant stressors to human health, identify and implement appropriate mitigation to ensure impacts are less than significant, and monitor the effectiveness of the mitigation measures.
- Certain communities within the regional study area have existing stressors that need to be considered in identifying mitigation to ensure impacts are less than significant. Each of the three block groups discussed above have been denied services through the discriminatory practice of redlining as they were classified as "D-Hazardous" in the Homeowners' Loan Corporation neighborhood ranking system. The Bronx and East Harlem bear the greatest disproportionate impacts in New York City with respect to asthma rates in both children and adults, including other health outcomes.
  - ○ The pediatric rates (estimated annual rate per 10,000 residents) of asthma emergency department visits and hospitalizations in the Bronx are 416.5 and 52.7 respectively.
  - ○ In East Harlem, the pediatric rates of asthma emergency department visits and hospitalizations are 485.3 and 52.2.
  - ○ Richmond County also bears asthma disparities for both adults and children. The pediatric rates of asthma emergency department visits and hospitalizations are 157.5 and 29.9 respectively. Additionally, in Richmond County the asthma rate is 90 among public school children ages 5 to 14 years of age.
- NYS's Climate Leadership and Community Protection Act (CLCPA), requires the State to address disproportionate impacts and reduce the burden to Disadvantaged Communities (DAC). The Project Sponsors (of a New York State project) should comply with the CLCPA in an effort to reduce the impacts from climate change while increasing benefits to DAC and communities with EJ concerns and identify conditions for compliance in the FONSI.
- EPA understands the Project Sponsors describe the overall benefits of the CBDTP as outweighing the impacts. However, the benefits and costs are unevenly distributed, with some costs falling disproportionately on overburdened communities. EPA recommends that

DOT_0045033

the Project Sponsors thoroughly evaluate claims that the Project benefits outweigh impacts. EPA recommends that Project Sponsors look at all potential impacts in detail and support their claims with both local and regional justification. EPA is concerned that the Draft EA relies on potentially dated and inaccurate data around future modal shifts.

- o EPA recommends that the Final EA include standardized data to reflect the impact of the COVID-19 pandemic on modes of transportation within and outside of the CBD.
- o We recognize that the COVID-19 pandemic has now been ongoing for over two years and assessments can and have been made regarding work from home policies, remote learning capabilities and other impacts on transportation within and outside of the CBD.

**Mitigation**

While EPA supports the purpose and need of congestion pricing, we encourage the Project Sponsors to ensure the preferred alternative equitably minimizes adverse impacts across the entire study area. CEQ regulations define mitigation as "measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects" (40 CFR § 1508.1(g)(3)). EPA recommends the Project Sponsors consider proposed comprehensive mitigation packages particularly focused on reducing impacts to areas with EJ concerns for each tolling scenario, or at a minimum for the ones being seriously considered. EPA's key recommendations for mitigation in a FONSI include:

1. *Clarify Monitoring Strategy* – EPA recommends the Project Sponsors specifically articulate in their monitoring plans the thresholds of significant and adverse impact that would trigger implementation of mitigation to ensure impacts are less than significant.
2. *Communicate Commitments* – EPA recommends that proposed monitoring plans commit to clear mitigation measures with timelines, how each of the measures would be implemented, and the expected reduction in significant and adverse impacts that would be realized after implementation.

- According to Table 16-1, the Project Sponsors will conduct monitoring programs and implement potential mitigation measures if thresholds are exceeded. However, it is unclear how the described mitigation measures would improve impacts to resource areas or what potential adverse impacts might arise from implementation of such measures. Further information about these mitigation measures and their ability to decrease impacts from the tolling program should be included in the Final EA.
- As mentioned earlier, in conducting this monitoring project EPA recommends mitigating for all impacts and increases in VMTs or truck traffic beyond compliance with the Clean Air Act NAAQS thresholds.
  - o Transportation Demand Management measures are discussed as an option to be implemented if monitoring shows adverse impacts after implementation of a tolling scenario. EPA requests the Project Sponsors specifically articulate thresholds of significant and adverse impact that would trigger potential mitigation measures, how each of the measures would be implemented, and the expected reduction in adverse impacts that would be realized after implementation.
- EPA recommends that commitments currently described as "enhancements" that require monitoring should be included in a monitoring plan, not as mitigation. EPA recommends that data gathered from the monitoring plan be provided in an easily accessible format for public review.

DOT_0045034

- The Draft EA states that MTA is currently transitioning its fleet to zero-emission buses and is committed to prioritizing traditionally underserved communities and those impacted by poor air quality and climate change in the deployment of these vehicles. EPA recommends that FHWA include a commitment in the FONSI that deployment of zero-emission buses will be prioritized to traditionally underserved communities and NYS designated Disadvantaged Communities that will be impacted by increased traffic, in particular increased truck traffic, by the Project.
- EPA recommends the Project Sponsors incorporate Project design elements that were not carried forward as reasonable alternatives as design elements or mitigation measures to ensure that impacts do not cause significant effects on the human environment.
  - "Agencies may consider stating in the NEPA document that an alternative developed from the elements of the other alternatives may be considered. In this case, the alternatives may be structured to enable comparison of key elements across the alternatives (e.g., a modular analytic approach)" (NEPA Promising Practices, Section 4.3, p. 18).
- EPA recommends that the Project Sponsors and Lead Agency incorporate suggestions for mitigation provided by community groups and EJ stakeholders. Several examples of these suggestions include: installing green infrastructure components to reduce pollution and extreme heat; promoting the electrification of trucks including at the Hunts Point Market; equitable deployment of zero-emission buses; and advancing regional strategies to move towards renewable energy.
  - EPA recommends commitments to mitigation also be documented in a Community Benefit Agreement to strengthen commitments to the community.
- The Promising Practices for EJ Methodologies in NEPA Reviews (2016) report recommends developing an adaptive management plan and conducting implementation and effectiveness monitoring when mitigation measures are proposed to address impacts to minority and low-income populations. By using effectiveness monitoring, an agency and community can learn if the mitigation measures are providing the predicted outcomes. An adaptive management plan can provide agencies with a means for taking corrective action if mitigation implementation or effectiveness monitoring indicates the measures are not achieving the intended outcomes.
  - As described above, the recommended interagency working group to address actions that are proposed by the EJ TAG could utilize this methodology in its approach to implement appropriate mitigation of impacts identified by ongoing monitoring data.

DOT_0045035

**From:** "Marquis, Rick (FHWA)" <Rick.Marquis@dot.gov>
**To:** "Lynch, Michael (FHWA)" <michael.lynch@dot.gov>, "FHWA-OfficialBrief (FHWA)" <FHWA-Official.Brief@dot.gov>, "Biondi, Emily (FHWA)" <Emily.Biondi@dot.gov>
**Cc:** "Rusnak, Allison (FHWA)" <Allison.Rusnak@dot.gov>, "Walters, Joan (FHWA)" <Joan.Walters@dot.gov>, "Dean, Heather (FHWA)" <Heather.Dean@dot.gov>, "Sosa, Mayela (FHWA)" <Mayela.Sosa@dot.gov>, "Santiago, Damaris (FHWA)" <Damaris.Santiago@dot.gov>, "Clark, Robert (FHWA)" <Robert.Clark@dot.gov>, "Fleury, Nicolle (FHWA)" <Nicolle.Fleury@dot.gov>, "Vaughn-Fair, Sharon (FHWA)" <Sharon.Vaughn-Fair@dot.gov>, "Turner, Derrell (FHWA)" <Derrell.Turner@dot.gov>
**Subject:** RE: Congestion Pricing Call with Gov Murphy Background Materials Request
**Date:** Fri, 26 May 2023 19:02:46 +0000
**Importance:** Normal

---

Here are suggest bullets related to impacts on NJ with the impact on NJ being considered the diversion issue.  I tried to simplify for the purposes of the briefing and have provided additional info and sources in the EA to help with others in reviewing.

Michael – could you or others in HPL incorporate as needed?

**Diversion Effects**
- Under all tolling scenarios, vehicle miles traveled (VMT) would increase by 0 to 0.2 percent in New Jersey.
- All tolling scenarios would divert some CBD through-traffic to circumferential routes
- Adding discounts, crossing credits, or exemptions results in higher tolls, which leads to more diversions
  - Tolling Scenarios D, E, and F (which have high crossing credits and therefore a higher toll) would result in higher circumferential diversions than the other tolling scenarios
  - Examples of resulting effects:
    - Longer auto and truck travel times from Central New Jersey would result from increased traffic on the Staten Island Expressway
    - Diversions would occur in Northern New Jersey and Southern Orange in Tolling Scenarios C, D, E (which have credits only at the tunnels) as traffic would move from the GWB to the Lincoln and Holland Tunnels to take advantage of the tunnel crossing credits.
- Adding crossing credits also changes the balance of contributions to traffic in the CBD
  - Tolling scenarios with crossing credits have less effect on reducing traffic to the CBD from NJ
  - In Tolling scenarios D, E, and F, higher crossing credits lead to NJ contributing 21.4%-21.9% of the total trips to the CBD, but only 7.8%-11.8% of the total revenue

Supporting and additional information:

**VMT Effects**

- Under the CBD Tolling Alternative, vehicle miles traveled (VMT) would increase by 0 to 0.2 percent in New Jersey in all tolling scenarios, and there would be no potential adverse traffic effects on highway segments or intersections. (**Subchapter 4A, "Transportation: Regional Transportation Effects and Modeling"** provides further information about the potential changes in VMT by tolling scenario; **Subchapter 4B, "Highways and Local Intersections"** documents the highway and intersection analysis.)

- VMT increases in New Jersey would occur mostly in Bergen and Middlesex Counties, from increased diversions to and from the George Washington Bridge and Outerbridge Crossing for through-trips

avoiding the Manhattan CBD toll. (**See Tables 4B-23, 4B-24, 25, and 4B-26** for the effects on hourly volumes, density, and LOS.)

## Diversion Effects

- All tolling scenarios would divert some Manhattan CBD through-traffic traveling between Brooklyn, Queens, Long Island, and points in New Jersey and beyond to circumferential routes.
- Higher overall CBD tolls under Tolling Scenarios D, E, and F would result in higher circumferential diversions compared to Tolling Scenarios A, B, C, and G, with lower CBD tolls.
  - Due to reduced congestion, auto travel times to the Manhattan CBD would be faster in each tolling scenario from most areas of the region compared to the No Action Alternative. However, some trips would experience longer auto travel times to the Manhattan CBD due to increased diversionary trips avoiding the Manhattan CBD.
  - Longer auto and truck travel times from Central New Jersey would result from increased traffic on the Staten Island Expressway.
- In tolling scenarios with crossing credits (Tolling Scenarios C, D, and E), diversions would occur in Northern New Jersey and Southern Orange because traffic would move to the Lincoln and Holland Tunnels from the George Washington Bridge to take advantage of the tunnel crossing credits.
  - However, traffic volumes at the Lincoln and Holland Tunnels still decrease in all scenarios.

## Environmental Justice

- As a result of traffic diversions as drivers seek to avoid the new toll, some environmental justice communities would experience lower traffic volumes; others would see increases in traffic. Following publication of the EA in August 2022, and based on public comments and input from the Environmental Justice Technical Advisory Group, the Project Sponsors conducted additional analysis related to these potential diversions as documented in **Appendix 17D, "Technical Memorandum."**

- The environmental justice communities experiencing the largest increases in traffic volumes, including trucks, from circumferential diversions would be along I-95 in northern New Jersey and in Queens at the approach to the Robert F. Kennedy Bridge.
  - The **Technical Memorandum** analyzes the Project's effect from some truck trips diverting around the Manhattan CBD in the 10-county environmental justice study area, Tolling Scenario E is analyzed as it has the maximum truck diversions by volume for all census tracts in the 10-county environmental justice study area. Under Tolling Scenario E there are projected both increased and decreased truck trips:
    - Increased truck trips adjacent to census tracts in Bergen County in New Jersey (I-95).
    - Decreased truck trips adjacent to environmental justice census tracts in Bergen County in New Jersey (I-95 and I-78)

- The specific census tracts with pre-existing air pollutant and chronic disease burdens that would benefit from reduced traffic, and those affected by increased traffic would vary somewhat, but the identified communities remain largely the same across tolling scenarios.
  - Notably, under Tolling Scenario G, Fort Lee would not experience increases.
  - To address potential Project-related traffic diversions, related air pollutants, and associated health effects, the Project Sponsors have committed to a package of regional and place-based mitigation for communities which may experience Project-related increases in traffic. To fund these mitigation measures the Project Sponsors have committed $155 million over 5 years as described in **Section 17D-7.2, "Mitigation Measures"** of the **Technical Memorandum** (and also summarized in other chapters of the Final EA including the **Executive Summary; Chapter 16,"Summary of Effects"; Chapter 17, "Environmental Justice";** and **Appendix 18A, "Response to Frequently Received Comments"**).

- With respect to potential increases in truck traffic, those communities that already experience either pre-existing pollutant or chronic disease burdens at or above the 90th percentile, compared to the nation, would

benefit from regional mitigation measures.

- Communities that already experience both pre-existing pollutant and chronic disease burdens above the 90th percentile, compared to the nation, would benefit from the regional measures as well as place-based mitigation.
  - The following New Jersey communities (as illustrated in **Figure 17D-18** and listed in **Table 17D-17** of the **Technical Memorandum**) could have census tracts that would merit place-based mitigation: Orange, East Orange, Newark, and Fort Lee.

---

**From:** Marquis, Rick (FHWA)
**Sent:** Friday, May 26, 2023 10:15 AM
**To:** Lynch, Michael (FHWA) <michael.lynch@dot.gov>; FHWA-OfficialBrief (FHWA) <FHWA-Official.Brief@dot.gov>; Biondi, Emily (FHWA) <Emily.Biondi@dot.gov>
**Cc:** Rusnak, Allison (FHWA) <Allison.Rusnak@dot.gov>; Walters, Joan (FHWA) <Joan.Walters@dot.gov>; Dean, Heather (FHWA) <Heather.Dean@dot.gov>; Sosa, Mayela (FHWA) <Mayela.Sosa@dot.gov>; Santiago, Damaris (FHWA) <Damaris.Santiago@dot.gov>; Clark, Robert (FHWA) <Robert.Clark@dot.gov>; Fleury, Nicolle (FHWA) <Nicolle.Fleury@dot.gov>; Vaughn-Fair, Sharon (FHWA) <Sharon.Vaughn-Fair@dot.gov>; Turner, Derrell (FHWA) <Derrell.Turner@dot.gov>
**Subject:** RE: Congestion Pricing Call with Gov Murphy Background Materials Request

Per separate communications with Michael, I understand the request is for impacts on NJ and the impact on NJ is considered the diversion issue.  Also that my deadline is Tuesday for others to review.

---

**From:** Marquis, Rick (FHWA)
**Sent:** Friday, May 26, 2023 9:53 AM
**To:** Lynch, Michael (FHWA) <michael.lynch@dot.gov>; FHWA-OfficialBrief (FHWA) <FHWA-Official.Brief@dot.gov>; Biondi, Emily (FHWA) <Emily.Biondi@dot.gov>
**Cc:** Rusnak, Allison (FHWA) <Allison.Rusnak@dot.gov>; Walters, Joan (FHWA) <Joan.Walters@dot.gov>; Dean, Heather (FHWA) <Heather.Dean@dot.gov>; Sosa, Mayela (FHWA) <Mayela.Sosa@dot.gov>; Santiago, Damaris (FHWA) <Damaris.Santiago@dot.gov>; Clark, Robert (FHWA) <Robert.Clark@dot.gov>; Fleury, Nicolle (FHWA) <Nicolle.Fleury@dot.gov>; Vaughn-Fair, Sharon (FHWA) <Sharon.Vaughn-Fair@dot.gov>; Turner, Derrell (FHWA) <Derrell.Turner@dot.gov>
**Subject:** RE: Congestion Pricing Call with Gov Murphy Background Materials Request

I will work on a added bullet on diversions for others to review including Emily.

---

**From:** Lynch, Michael (FHWA) <michael.lynch@dot.gov>
**Sent:** Friday, May 26, 2023 9:39 AM
**To:** Marquis, Rick (FHWA) <Rick.Marquis@dot.gov>; FHWA-OfficialBrief (FHWA) <FHWA-Official.Brief@dot.gov>; Biondi, Emily (FHWA) <Emily.Biondi@dot.gov>
**Cc:** Rusnak, Allison (FHWA) <Allison.Rusnak@dot.gov>; Walters, Joan (FHWA) <Joan.Walters@dot.gov>; Dean, Heather (FHWA) <Heather.Dean@dot.gov>; Sosa, Mayela (FHWA) <Mayela.Sosa@dot.gov>; Santiago, Damaris (FHWA) <Damaris.Santiago@dot.gov>; Clark, Robert (FHWA) <Robert.Clark@dot.gov>; Fleury, Nicolle (FHWA) <Nicolle.Fleury@dot.gov>; Vaughn-Fair, Sharon (FHWA) <Sharon.Vaughn-Fair@dot.gov>; Turner, Derrell (FHWA) <Derrell.Turner@dot.gov>
**Subject:** RE: Congestion Pricing Call with Gov Murphy Background Materials Request

Good Morning,

Gloria has asked that the diversion information be included with the briefing. I believe @Biondi, Emily (FHWA) is the POC for this? Attached is the latest draft, could you please add that information to the document?

Thank you!

- Michael

---

**From:** Marquis, Rick (FHWA) <Rick.Marquis@dot.gov>
**Sent:** Wednesday, May 24, 2023 2:01 PM
**To:** Lynch, Michael (FHWA) <michael.lynch@dot.gov>; FHWA-OfficialBrief (FHWA) <FHWA-Official.Brief@dot.gov>
**Cc:** Rusnak, Allison (FHWA) <Allison.Rusnak@dot.gov>; Walters, Joan (FHWA) <Joan.Walters@dot.gov>; Dean, Heather (FHWA) <Heather.Dean@dot.gov>; Sosa, Mayela (FHWA) <Mayela.Sosa@dot.gov>; Santiago, Damaris (FHWA) <Damaris.Santiago@dot.gov>; Clark, Robert (FHWA) <Robert.Clark@dot.gov>; Fleury, Nicolle (FHWA) <Nicolle.Fleury@dot.gov>; Vaughn-Fair, Sharon (FHWA) <Sharon.Vaughn-Fair@dot.gov>; Biondi, Emily (FHWA) <Emily.Biondi@dot.gov>; Turner, Derrell (FHWA) <Derrell.Turner@dot.gov>
**Subject:** RE: Congestion Pricing Call with Gov Murphy Background Materials Request

I have updated the talking points with changes tracked.  And I have replaced the other attachments that included letters from the NJ and NY members with the letter from Governor Murphy and the responses contained in the Final EA.

I am adding Emily Biondi, Nicolle Fleury and Sharon Vaugh-Fair (I believe Sharon is on leave this week) in case they want to review/weigh in.

Let me know if any questions or need anything else.

Rick


Richard J. Marquis
Division Administrator
U.S. DOT/Federal Highway Administration, New York Division
11A Clinton Avenue, Suite 719
Albany, NY 12207
Email:  rick.marquis@dot.gov
Ph:  518.431.8897
Cell:  617.413.6675

---

**From:** Marquis, Rick (FHWA)
**Sent:** Wednesday, May 24, 2023 1:13 PM
**To:** Lynch, Michael (FHWA) <michael.lynch@dot.gov>; Santiago, Damaris (FHWA) <Damaris.Santiago@dot.gov>; Clark, Robert (FHWA) <Robert.Clark@dot.gov>
**Cc:** FHWA-OfficialBrief (FHWA) <FHWA-Official.Brief@dot.gov>; Rusnak, Allison (FHWA) <Allison.Rusnak@dot.gov>; Walters, Joan (FHWA) <Joan.Walters@dot.gov>; Dean, Heather (FHWA) <Heather.Dean@dot.gov>; Sosa, Mayela (FHWA) <Mayela.Sosa@dot.gov>
**Subject:** RE: Congestion Pricing Call with Gov Murphy Background Materials Request

Adding Mayela.

I will review the attached for any needed updates.

Rick

---

**From:** Lynch, Michael (FHWA) <michael.lynch@dot.gov>
**Sent:** Wednesday, May 24, 2023 12:46 PM
**To:** Marquis, Rick (FHWA) <Rick.Marquis@dot.gov>; Santiago, Damaris (FHWA) <Damaris.Santiago@dot.gov>; Clark,

Robert (FHWA) <Robert.Clark@dot.gov>
**Cc:** FHWA-OfficialBrief (FHWA) <FHWA-Official.Brief@dot.gov>; Rusnak, Allison (FHWA) <Allison.Rusnak@dot.gov>; Arnold, Robert (FHWA) <Robert.Arnold@dot.gov>; Walters, Joan (FHWA) <Joan.Walters@dot.gov>; Dean, Heather (FHWA) <Heather.Dean@dot.gov>
**Subject:** Congestion Pricing Call with Gov Murphy Background Materials Request

Good Afternoon,

The Secretary will be having a call with Governor Murphy to discuss the NYC Congestion Pricing Program and OST has requested background materials for a briefing. I have attached the latest items that we had here, could you please provide us with what you have and/or update the attached?

We don't have a due date requested from OST yet but it looks like the call will be June 1 or 2, we will update you as soon as we hear back further.

Thank you!

- Michael

Michael Lynch
FHWA Office of Legislative Affairs
 and Policy Communications
(202) 366-0602
Michael.Lynch@dot.gov

| | |
|---|---|
| **From:** | Garcia, Lisa |
| **To:** | rick.marquis@dot.gov |
| **Cc:** | Nick Choubah; C. de Cerreno, Allison; Pavlik, Monica (FHWA); wcarry@dot.nyc.gov; Glenn, Olivia; Mugdan, Walter |
| **Subject:** | CBDTP- EPA"s final review |
| **Date:** | Wednesday, March 15, 2023 7:26:54 PM |
| **Attachments:** | image002.png |
| | image003.png |

Dear Rick,

EPA appreciates our continued collaborative efforts toward the publication for public notice of a Final EA on the Central Business District Tolling Program (CBDTP). We have reviewed the updated Administrative Draft provided to us on March 1, and acknowledge the improvements throughout the NEPA process, specifically to address potential impacts of the proposed action on communities with environmental justice concerns, including:

- Inclusion of the EJ Technical Memorandum,
- Improved clarity regarding mitigation commitments to address disproportionately high and adverse impacts both within and outside the Central Business District,
- Additional low-income driver mitigation,
- Placed-based mitigation to respond to the potential public health impacts in neighborhoods that may experience an increase in vehicular traffic, and
- Incorporating an adaptive management approach.

EPA encourages FHWA and the Project Sponsors to consider including a commitment to develop an Adaptive Management Plan (AMP) during and/or after selection of the final tolling structure by the Traffic Mobility Review Board (TMRB) to:

- Assess and evaluate the feasibility of all mitigation based on the final tolling structure,
- Determine the best way to adjust for potential impacts throughout the entire lifecycle of the final project, and
- Continue to encourage ongoing meaningful public engagement and input, especially in potentially impacted communities and areas of EJ concern.

EPA offers to remain available to assist the Lead Agency, Project Sponsors, the Technical Advisory Group and the TMRB with the overall implementation of the CBDTP and the development of an AMP (as set forth by CEQ guidelines) based on the final tolling structure.

Thank you for your efforts to publish for public notice a Final EA that will adequately meet NEPA's goals of transparency across government agencies and the public. We look forward to continuing our engagement with FHWA and the Project Sponsors. Please let me know if you have any questions.

Thank you,

Lisa F. Garcia

---

Lisa F. Garcia
Regional Administrator, U.S. EPA Region 2



U.S. Environmental Protection Agency, Region 2 Office
*NY, NJ, PR, USVI, and Eight Indian Nations*
**Office of the Regional Administrator**
290 Broadway, 26th Floor

New York, NY 10007
212.637.5000 (Office)

DOT_0045367

**From:** Angel, Nichola
**Sent:** Thursday, April 28, 2022 1:15 PM
**To:** Colangelo-Bryan, Jeremy C. (CPLNJCB) <JColangelo-bryan@njtransit.com>; DeGraffe, Clarelle <cdegraffe@panynj.gov>; mokeane <mokeane@panynj.gov>; jstarace@panynj.gov; reisenst@panynj.gov; Siegel, Beth <bsiegel@panynj.gov>; jburkhar@panynj.gov; dmcshane@panynj.gov; jchiu@panynj.gov; Wong, Gregory B. <gwong@panynj.gov>; mdicules@panynj.gov; Kriegel, Russell <rkriegel@panynj.gov>; Safer, Mathew A. (CCAPMAS) <MSafer@njtransit.com>; Kearns, Alan D. (CCAPADK) <AKearns@njtransit.com>; Viqueira, William (CFINWXV) <WViqueira@njtransit.com>
**Cc:** C. de Cerreno, Allison <allison.cdecerreno@mtahq.org>; Schreibman, Lisa <Lisa.Schreibman@nyct.com>; Krantz, Jay <Jay.Krantz@nyct.com>; Wojnar, Michael <mwojnar@mtahq.org>; Lennon, Lawrence <Lawrence.Lennon@mtacd.org>; Desantis, Romolo <Romolo.Desantis@mtacd.org>; Ian McNamara <ian.mcnamara@wsp.com>; mark.walker@wsp.com; Hannah Brockhaus <hbrockhaus@fhistudio.com>
**Subject:** RE: CBDTP-PANYNJ/NJT on Hoboken Follow up

Hi Jeremy & Clarelle,
I hope NJT and PATH staff has had a chance to take a closer look at the analysis. We would like to have a follow up discussion next week. Please let me know which of the following options work best for you and your team:

**May 4**
1:00p – 2:00p
3:00p – 4:00p

**May 6**
1:00p – 2:00p

Thanks.

**Regards,**
**Nichola Angel**
*Acting Vice President, ITS & Tolling &*
*Assistant Vice President, CBD Tolling Program*
**MTA Bridges & Tunnels | Executive Office**
(T): 646-252-7107 | (C): 646-357-2121

**From:** Colangelo-Bryan, Jeremy C. (CPLNJCB) <JColangelo-bryan@njtransit.com>
**Sent:** Thursday, April 7, 2022 3:49 PM
**To:** Angel, Nichola <nangel@mtabt.org>; DeGraffe, Clarelle <cdegraffe@panynj.gov>; mokeane <mokeane@panynj.gov>; jstarace@panynj.gov; reisenst@panynj.gov; Siegel, Beth <bsiegel@panynj.gov>; jburkhar@panynj.gov; dmcshane@panynj.gov; jchiu@panynj.gov; Wong,

Gregory B. <gwong@panynj.gov>; mdicules@panynj.gov; Kriegel, Russell <rkriegel@panynj.gov>;
Safer, Mathew A. (CCAPMAS) <MSafer@njtransit.com>; Kearns, Alan D. (CCAPADK)
<AKearns@njtransit.com>; Viqueira, William (CFINWXV) <WViqueira@njtransit.com>
**Cc:** C. de Cerreno, Allison <allison.cdecerreno@mtahq.org>; Schreibman, Lisa
<Lisa.Schreibman@nyct.com>; Krantz, Jay <Jay.Krantz@nyct.com>; Wojnar, Michael
<mwojnar@mtahq.org>; Lennon, Lawrence <Lawrence.lennon@mtacd.org>; Desantis, Romolo
<Romolo.Desantis@mtacd.org>; Ian McNamara <ian.mcnamara@wsp.com>;
mark.walker@wsp.com; Hannah Brockhaus <hbrockhaus@fhistudio.com>
**Subject:** RE: CBDTP-PANYNJ/NJT on Hoboken Follow up

Good afternoon,

Thank you for your time in meeting with us on this topic. On behalf of NJT and PATH, please find
comments below:

1. Monitoring congestion levels as noted is reasonable, but we will review the numbers again and
   confirm that we are comfortable with what is being stated as 'normal' levels, as well as what
   increased level of activity would trigger mitigation and the stated threshold for 'adverse
   effects' as noted. Lastly, we should confer on what monitoring would be appropriately
   characterized as "periodic."

2. We do not believe that signage as noted will have a beneficial impact. We have direct experience
   that actively encouraging use of Stair 3/5 has a negligible effect on customer behavior, even
   with signage in place. We should investigate other potential mitigations.

3. The reference to development may not be accurate, or potentially the language below is a bit
   ambiguous. To clarify, the planned development would not trigger NJT Rail to PATH moves
   (the prime source of Stair 1/02 activity) as it is located to the west. It is not clear what sort of
   development could be located in such a way as to add to the activity on that stair.

Thank you,
Jeremy


**From:** Angel, Nichola <nangel@mtaot.org>
**Sent:** Friday, March 18, 2022 5:31 PM
**To:** DeGraffe, Clarelle <cdegraffe@panynj.gov>; mokeane <mokeane@panynj.gov>;
jstarace@panynj.gov; reisenst@panynj.gov; Siegel, Beth <bsiegel@panynj.gov>;
jburkhar@panynj.gov; dmcshane@panynj.gov; jchiu@panynj.gov; Wong, Gregory B.
<gwong@panynj.gov>; mdicules@panynj.gov; Colangelo-Bryan, Jeremy C. (CPLNJCB) <JColangelo-
bryan@njtransit.com>; Kriegel, Russell <rkriegel@panynj.gov>; Safer, Mathew A. (CCAPMAS)
<MSafer@njtransit.com>; Kearns, Alan D. (CCAPADK) <AKearns@njtransit.com>; Viqueira, William
(CFINWXV) <WViqueira@njtransit.com>
**Cc:** C. de Cerreno, Allison <allison.cdecerreno@mtahq.org>; Schreibman, Lisa
<lisa.schreibman@nyct.com>; Krantz, Jay <Jay.Krantz@nyct.com>; Wojnar, Michael
<mwojnar@mtahq.org>; Lennon, Lawrence <llennon@mtahq.org>; Desantis, Romolo
<Romolo.Desantis@mtacd.org>; Ian McNamara <ian.mcnamara@wsp.com>;
mark.walker@wsp.com; Hannah Brockhaus <hbrockhaus@fhistudio.com>

**Subject:** CBDTP-PANYNJ/NJT on Hoboken Follow up

> **CAUTION:** This e-mail originated from outside of NJ TRANSIT. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good evening all,

Thank you for meeting with the Central Business District Tolling Program (CBDTP) team on Friday, March 11, 2022. Attached is a copy of the presentation that was shared with the group during the meeting. As discussed, we are also providing an Excel file "CBDTP Hoboken 2022-03-16.xlsx" with passenger assignments and preliminary analysis developed for Hoboken Terminal and PATH station. As discussed, this information is privileged and confidential and we appreciate your treating is at such.

As we explained, the analysis shows that under two of the six scenarios in the Action Alternative, the CBD Tolling Program may result in an adverse effect on PATH stair 01/02 at Hoboken during the AM peak period. Again, this would be expected to occur only if CBDTP Scenarios E or F or a similar tolling structure is adopted by the TBTA Board. Notably, these are the toll structures that have higher toll crossing credits associated with them. And, importantly, the passenger volumes are based on pre-COVID data, so we would not anticipate these effects until passenger volumes rebound to prior levels.

In year 2023 without the CBDTP, the estimated AM peak hour pedestrian volume on Stair 01/02 is 5,404 people in both directions, combined. An adverse effect was determined to occur if 268 or more people are added to that base volume, so that an AM peak hour volume of 5,672 people or more on Stair 01/02 would indicate an adverse effect due to the CBDTP if Scenario E or F or a similar tolling structure is implemented.

As pedestrian volumes at Hoboken are currently below their pre-pandemic levels, the recommended action to mitigate a CBDTP-generated effect is first to periodically monitor AM peak period activity and congestion on the Stair 01/02 and determine if activity is approaching levels projected in the analysis. If that level of pedestrian activity is recorded, then improved signage and wayfinding measures to direct some portion of the pedestrians to use PATH Stair 3 or Stair 5 instead of Stair 01/02 would be implemented.

This mitigation would only be applicable if tolling Scenario E or F or a similar tolling structure were implemented.

This mitigation would not be applicable if a significant development occurs at or near Hoboken Terminal that would be expected to add a comparable number of pedestrians to stair 01/02 in the AM peak hour.

During our meeting, Jeremy Colangelo-Bryan and Clarelle DeGraffe expressed concern over whether new signage and wayfinding could effectively direct people away from Stair 01/02 to stairs 03 or 05 based on NJT's and PANYNJ's experience during the "Summer of Hell" in 2017. While we understand that this wayfinding improvement would not result in a wholesale change in passenger routings, we believe that it has the potential to divert a small portion equal to the relatively small CBDTP incremental effect on the stair.

Please reach out if there are questions.

Regards,
**Nichola Angel**
*Acting Vice President, ITS & Tolling &*
*Assistant Vice President, CBD Tolling Program*
**MTA Bridges & Tunnels | Executive Office**
2 Broadway, 23th Floor, New York, NY 10004
(E):nangel@mtabt.org | (W) www.mta.info
(T): 646-252-7107 | (C): 646-357-2121

Confidentiality Note: This e-mail, and any attachment to it, may contain privileged and confidential
information and is intended for the use of the individual(s) or entity named on the e-mail.
Unauthorized disclosure of this message is prohibited. If you have received this message in error,
please notify the sender immediately by return e-mail and destroy this message and all copies
thereof, including all attachments.
NOTICE: THIS E-MAIL AND ANY ATTACHMENTS CONTAIN INFORMATION FROM THE PORT
AUTHORITY OF NEW YORK AND NEW JERSEY AND AFFILIATES. IF YOU BELIEVE YOU HAVE RECEIVED
THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY, PERMANENTLY DELETE THIS E-
MAIL (ALONG WITH ANY ATTACHMENTS), AND DESTROY ANY PRINTOUTS.
NOTICE: THIS E-MAIL AND ANY ATTACHMENTS CONTAIN INFORMATION FROM THE PORT
AUTHORITY OF NEW YORK AND NEW JERSEY AND AFFILIATES. IF YOU BELIEVE YOU HAVE RECEIVED
THIS E-MAIL IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY, PERMANENTLY DELETE THIS E-
MAIL (ALONG WITH ANY ATTACHMENTS), AND DESTROY ANY PRINTOUTS.