# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | No. 23-3885 |
| TRANSPORTATION, *et al.,* | ) | Hon. Brian R. Martinotti |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| METROPOLITAN TRANSPORTATION | ) | |
| AUTHORITY, *et al.,* | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

LEGAL AND FACTUAL BACKGROUND ........................................................ 2

    I.     The National Environmental Policy Act ................................................ 2

    II.    The Clean Air Act ................................................................................ 5

    III.   Factual Background ............................................................................. 7

         A.     Passage of the Traffic Mobility Act ........................................... 7

         B.     Development of the Final EA ...................................................... 8

         C.     The Final Environmental Assessment ...................................... 10

         D.     The Final FONSI ...................................................................... 21

STANDARD OF REVIEW ............................................................................... 21

ARGUMENT ..................................................................................................... 22

    I.     FHWA Thoroughly Analyzed the Project's Anticipated Effects on Air
         Quality in New Jersey ...................................................................... 22

         A.     Particularly Given the Deference Due to Agency Choice of
             Methodology, the State's Challenges to the Final EA's Air Quality
             Methodology Are Meritless ...................................................... 23

         B.     FHWA's Analysis and Conclusions Regarding the Effects of the
             Project on Air Quality are Reasonable and Supported by the Record ...... 29

    II.    FHWA Conducted a Thorough Analysis of Potential Effects on
         Environmental Justice Communities .................................................. 32

    III.   FHWA Reasonably Confined its Review of Alternatives to Those Options
         That Could be Enacted by the TBTA ................................................ 35

    IV.   FHWA Provided Ample Opportunities for Participation for the New Jersey
         Public and State Agencies ................................................................. 38

         A.     The New Jersey Public Was Afforded a Meaningful Opportunity for
             Engagement and Comment ...................................................... 39

         B.     New Jersey State Agencies Had a Meaningful Opportunity to
             Comment on the Project but Did Not Avail Themselves of That
             Opportunity ............................................................................. 41

        C.      FHWA Implemented a Robust Public Review Process ............................ 42

    V.      The State's Conformity Argument, if Not Waived, Is Inapposite ........................ 45

CONCLUSION ...................................................................................................................... 47

# TABLE OF AUTHORITES

Page(s)

**Cases**

*API v. EPA*,
   683 F.3d 382 (D.C. Cir. 2012) ................................................................. 31

*Audubon Naturalist Soc'y of the Central Atlantic States, Inc. v. U.S. Dep't of Transp.*,
   524 F. Supp. 2d 642 (D. Md. 2007) .......................................................... 25

*Audubon Soc'y v. Salazar*,
   829 F. Supp. 2d 273 (D. Del. 2011) .......................................................... 35

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
   462 U.S. 87 (1983) ................................................................. 21, 23, 40

*Bering Strait Citizens for Responsible Res. Dev. v. United States Army Corps of Eng'rs*,
   524 F.3d 938 (9th Cir. 2008) .................................................................. 43

*Citizens Against Burlington, Inc. v. Busey.*,
   938 F.2d 190 (D.C. Cir. 1991) ................................................................. 37

*Citizens for Smart Growth v. Peters*,
   716 F. Supp. 2d 1215 (S.D. Fla. 2010) ...................................................... 37

*City of Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) ............................................................ 22, 45

*Cmtys. Against Runway Expansion, Inc. v. F.A.A.*,
   355 F.3d 678 (D.C. Cir. 2004) ................................................................. 32

*Comanche Nation of Okla. v. Zinke*,
   754 Fed. App'x 768 (10th Cir. 2018) ........................................................ 44

*Comite de Apoyo a Los Trabajadores Agricolas v. Perez*,
   46 F. Supp. 3d 550 (E.D. Pa. 2014) ......................................................... 31

*Concerned Citizens All. v. Slater*,
   176 F.3d 686 (3d. Cir. 1999) .................................................................. 36

*Delta Const. Co. v. E.P.A.*,
   783 F.3d 1291 (D.C. Cir. 2015) ................................................................. 7

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) .............................................................................. 6

*Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*,
   772 F.2d 700 (11th Cir. 1985) ................................................................. 27

*Grunewald v. Jarvis*,
   776 F.3d 893 (D.C. Cir. 2015) ................................................................. 37

*Gunpowder Riverkeeper v. FERC*,
   807 F.3d 267 (D.C. Cir. 2015) ................................................... 5

*Indian River Cnty. v. Dep't of Transp.*,
   348 F. Supp. 3d 17 (D.D.C. 2018) ........................................... 37

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
   119 F.3d 1070 (3d. Cir. 1997) ................................................ 28

*Kootenai Tribe of Idaho v. Veneman*,
   313 F.3d 1094 (9th Cir. 2002) ................................................ 39

*Kootenai Tribe v. Veneman*,
   142 F. Supp. 2d 1231 (D. Idaho 2001) .................................. 39

*Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
   858 F. Supp. 2d 839 (E.D. Mich. 2012) ................................. 25

*Latin Ams. for Soc. and Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
   756 F.3d 447 (6th Cir. 2014) .................................................. 36

*Limerick Ecology Action, Inc. v. U.S. Nuclear Reg. Comm'n*,
   869 F.2d 719 (3d Cir. 1989) ................................................... 34

*Maiden Creek Assoc., L.P. v. U.S. Dep't of Transp.*,
   823 F.3d 184 (3d Cir. 2016) ............................................... 3, 5

*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360 (1989) ............................................................ 4, 33

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
   783 F.3d 1301 (D.C. Cir. 2015) ............................................. 21

*NAACP Erie Unit 2262 v. Fed. Highway Admin.*,
   648 F. Supp. 3d 576 (W.D. Pa. 2022) ................................... 30

*Nat. Res. Def. Council v. F.A.A.*,
   564 F.3d 549 (2d Cir. 2009) ................................................... 36

*Nat'l Indian Youth Council v. Andrus*,
   501 F. Supp. 649 (D.N.M. 1980) ............................................. 4

*Nat'l Mining Ass'n v. Zinke*,
   877 F.3d 845 (9th Cir. 2017) .................................................. 38

*Neto v. Thompson*,
   506 F. Supp. 3d 239 (D.N.J. 2020) ....................................... 22

*New Jersey, Dep't of Env't Prot. v. U.S. Army Corps of Engr's*
   No. 09-5591, 2011 WL 115878 (D.N.J. Jan. 13, 2011) .............. 5, 6, 22

*NVE, Inc. v. Dep't of Health and Human Servs.*,
   436 F.3d 182 (3d Cir. 2006) ................................................... 26

*Parks, Inc. v. Buttigieg*,
  No. 21-2006, 2021 WL 3566600 (N.D. Ill. Aug. 12, 2021) .................................. 37

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
  636 F. Supp. 3d 33 (D.D.C. 2022) ...................................... 33

*Riverkeeper Network v. F.E.R.C.*,
  753 F.3d 1304 (D.C. Cir. 2014) .................................................... 3

*Riverkeeper Network v. Penn. Dep't of Transp.*,
  No. 18-4508, 2020 WL 4937263 (E.D. Pa. Aug. 21, 2020) .................. 35

*Riverkeeper Network v. U.S. Army Corps of Eng'rs*,
  869 F.3d 148 (3d Cir. 2017) ............................................ 32, 45

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..................................................... 3, 38

*SBC Inc. v. FCC*,
  414 F.3d 486 (3d Cir. 2005) ............................................ 21

*Senville v. Peters*,
  327 F. Supp. 2d 335 (D. Vt. 2004) .................................... 30

*Sierra Club v. E.P.A.*,
  129 F.3d 137 (D.C. Cir. 1997) .......................................... 6

*Sierra Club v. Fed. Energy Reg. Comm'n*,
  867 F.3d 1357 (D.C. Cir. 2017) ....................................... 23

*Soc'y Hill Towers Owners' Ass'n v. Rendell*,
  210 F.3d 168 (3d Cir. 2000) ........................................... 38

*Spiller v. White*,
  352 F.3d 235 (5th Cir. 2003) ........................................... 4

*State Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*,
  685 F.3d 259 (3d Cir. 2012) .............................. 3, 29, 38, 43

*State ex rel. Siegelman v. U.S. Envtl. Prot. Agency*,
  911 F.2d 499 (11th Cir. 1990) ......................................... 39

*Suburban Trails, Inc. v. New Jersey Transit Corp.*,
  800 F.2d 361 (3d Cir. 1986) ........................................... 31

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ......................................... 43

*Tinicum Twp. v. U.S. Dep't of Transp.*,
  685 F.3d 288 (3d Cir. 2012) ...................................... 24, 29

*Twp. of Belleville v. Fed. Transit Admin.*,
  30 F. Supp. 2d 782 (D.N.J. 1998) ..................................... 21

*Twp. of Bordentown v. FERC*,
   903 F.3d 234 (3d Cir. 2018) ................................................................. 21

*Twp. of Springfield v. Lewis*,
   702 F.2d 426 (3d. Cir. 1983) ............................................................... 23

*United Boatmen v. Locke*,
   No. 09-5628, 2010 WL 2951712 (D.N.J. July 22, 2010) ..................... 26

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
   305 F.3d 1152 (10th Cir. 2002) ........................................................... 37

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978).............................................. 3, 32, 35, 36, 41, 45

**Statutes**

5 U.S.C. § 706(2)(A)................................................................................ 21

23 U.S.C. § 134(i)(3) ............................................................................... 46

42 U.S.C. § 4321 ....................................................................................... 1

42 U.S.C. § 4332(2)(C) ............................................................................. 3

42 U.S.C. § 7401 ................................................................................... 1, 5

42 U.S.C. § 7407 ....................................................................................... 6

42 U.S.C. § 7410 ....................................................................................... 6

42 U.S.C. § 7410(a)(1).............................................................................. 6

42 U.S.C. § 7506(c)(1)(A) ........................................................................ 6

42 U.S.C. § 7506(c)(1)(B) ........................................................................ 6

42 U.S.C. § 7506(c)(2)(D) ........................................................................ 6

42 U.S.C. § 7407(d)(3)(E) ........................................................................ 6

42 U.S.C. § 7408 ....................................................................................... 5

N.J. Stat. § 26:2C-8.11 ........................................................................... 46

**Regulations**

23 C.F.R. § 771 ......................................................................................... 4

23 C.F.R. § 771.115 ............................................................................. 3, 4, 5

23 C.F.R. § 771.119 ..................................................................... 39, 43, 44

23 C.F.R. § 771.119(b) ............................................................................. 4

23 C.F.R. § 771.119(g)-(h) ....................................................................... 4

23 C.F.R. § 771.119(h) ........................................................................... 44

23 C.F.R. § 771.123(i)(2) ........................................................................................... 44

23 C.F.R. § 771.19 ....................................................................................................... 44

23 C.F.R. §§ 771.123-125 ........................................................................................... 44

40 C.F.R. § 1500 ............................................................................................................ 4

40 C.F.R. § 1501.6(c) .................................................................................................... 4

40 C.F.R. § 93.105(a)(2) ............................................................................................. 46

40 C.F.R. § 93.150(b) ................................................................................................. 46

40 C.F.R. §§ 93.116 .................................................................................................. 7, 17

40 C.F.R. 52.1670(c)-(d) .............................................................................................. 6

40 C.F.R. 93.101 ........................................................................................................... 6

40 C.F.R. Part 50 ........................................................................................................... 5

40 C.F.R. Part 52 ........................................................................................................... 6

40 CFR § 1501.5 ..................................................................................................... 41, 43

90 C.F.R. § 93.109(a) ................................................................................................. 45

90 C.F.R. § 93.109(b)-(c) ........................................................................................... 45

**Other Authorities**

Executive Order 11,514 ................................................................................................ 3

# TABLE OF ACRONYMS

| AADT | Annual Average Daily Traffic |
|------|------------------------------|
| APA | Administrative Procedure Act |
| CAA | Clean Air Act |
| CBD | Manhattan Central Business District |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FHWA | Federal Highway Administration |
| FONSI | Finding of No Significant Impact |
| GHG | Greenhouse Gas |
| MSAT | Priority Mobile Source Air Toxics |
| MTA | Metropolitan Transportation Authority |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NJDEP | New Jersey Department of Environmental Protection |
| NJTA | New Jersey Turnpike Authority |
| NJTPA | North Jersey Transportation Planning Authority |
| NYMTC | New York Metropolitan Transportation Council |
| SIP | State Implementation Plan |
| TBTA | Triborough Bridge and Tunnel Authority |
| TMRB | Traffic Mobility Review Board |
| VMT | Vehicle Miles Travelled |
| VPPP | Value Pricing Pilot Program |

## INTRODUCTION

Plaintiff the State of New Jersey ("the State") disagrees with the State of New York's decision to implement the nation's first cordon congestion pricing program for the Manhattan Central Business District ("CBD") Tolling Program ("the Project").  Mere policy disagreement, however, is insufficient to support the State's environmental claims against Federal Defendants.[1] And rather than support its claims by otherwise engaging with the robust record at issue, the State instead relies on superficial arguments or selective interpretation of the record.  Against those, the record reflects that the Federal Highway Administration ("FHWA") fully considered the effects of the Project on New Jersey communities and fully included New Jersey and its residents in the environmental review process.  The State's claims therefore fail, particularly accounting for the deferential standard of review applicable here.

Specifically, the State challenges FHWA's issuance of a Final Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for the Project.  The State alleges that the Final EA and FONSI overlook or minimize the negative effects the Project will have on New Jersey, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, and the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq*.  But, as described below, the State's arguments ignore the record, and do not constitute the type of procedural violations that NEPA provides a remedy for.

The State particularly takes issue with FHWA's: (1) analysis of the Project's impacts on air quality in New Jersey; (2) consideration of New Jersey environmental justice communities;

---

[1]     Defendants are the U.S. Department of Transportation ("DOT"), the Federal Highway Administration, Shailen Bhatt, in his official capacity as Administrator of FHWA, and Richard J. Marquis, in his official capacity as Division Administrator of the New York Division of FHWA.

(3) assessment of alternatives; (4) public participation process; and (5) failure to conduct the conformity analysis required by the CAA.  Each allegation is belied by the record.  As to the first and second, FHWA's air quality and environmental justice analyses were based on reasonable methodologies that are entitled to deference, and the scope of those analyses was exhaustive. Particularly as to environmental justice, FHWA responded to community concerns by preparing an additional in-depth analysis of the anticipated effects of the Project on communities— including in New Jersey—that might experience increased truck traffic due to the Project and proposing targeted mitigation for those locations.  Third, the Final EA looked at reasonable alternatives, accounting for the fact that the Project was initiated by a New York State statute that required any congestion pricing proposal ultimately achieve certain revenue-generating goals.  Fourth, FHWA conducted extensive coordination and outreach, including to New Jersey State agencies and the public, that more than met NEPA's requirements.  Fifth, the State fails to provide any basis for questioning FHWA's conformity analysis.

In sum, FHWA arrived at an informed and well-considered decision that more than meets the applicable statutory and regulatory requirements.  Although the State disagrees with the outcome, mere disagreement is not a basis upon which to grant relief under NEPA or the CAA. Because the State has otherwise failed to provide a record basis for the Court to rule in its favor, the Court should grant summary judgment to Defendants on all counts and deny the State's motion for summary judgment.

**LEGAL AND FACTUAL BACKGROUND**

I.      **The National Environmental Policy Act**

Congress enacted NEPA to ensure federal agencies consider the environmental consequences of projects before committing resources and to facilitate agencies' communication

2

with the public about their environmental analyses.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-52 (1989); *see also State Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Eng'rs* ("*DNREC*"), 685 F.3d 259, 269-70 (3d Cir. 2012).  The Supreme Court has clarified that NEPA is a procedural statute that does not mandate substantive results. *Robertson*, 490 U.S. at 350-51.  Rather, it is designed "to insure a fully informed and well-considered decision" in the examination of potential environmental impacts of a proposed agency action.  *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."  *Robertson*, 490 U.S. at 350; *see also id*. at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action.").  As a result, "[c]ourts may not use their review of an agency's environmental analysis to second-guess substantive decisions committed to the discretion of the agency."  *Del. Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).

To meet these goals, federal agencies must assess the effects of proposed major federal actions on the human environment.  *See* 42 U.S.C. § 4332(2)(C); Executive Order No. 11,514, 35 Fed. Reg. 4247 (Mar. 7, 1970).  NEPA requires that one of three classes of review be conducted, depending upon, in part, the expected extent of the environmental impact.  *See Maiden Creek Assoc., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 188 (3d Cir. 2016).  First, actions that do not individually or cumulatively have a significant environmental effect are entitled to a Categorical Exclusion from further environmental analysis.  23 C.F.R. § 771.115.[2]  Second, where an action

---

[2]      NEPA created the Council of Environmental Quality ("CEQ") within the Executive Office of the President and granted CEQ the authority to issue regulations effectuating NEPA. CEQ regulations are "mandatory" for all federal agencies and are entitled to "substantial

may have a significant impact on the environment, an agency must prepare an EA to determine whether preparation of a further environmental impact statement ("EIS") is necessary.  23 C.F.R. § 771.115.  The EA is a concise document intended to help the agency "[d]etermine which aspects of the proposed action have potential for social, economic, or environmental impact; identify alternatives and measures that might mitigate adverse environmental impacts; and identify other environmental review and consultation requirements that should be performed concurrently with the EA."  23 C.F.R. § 771.119(b).  If an agency determines that an EIS is not required, the agency must set forth its reasons in a FONSI.  23 C.F.R. § 771.119(g)-(h); *see also* 40 C.F.R. § 1501.6(c) (noting a FONSI may rely on mitigation measures to find "no significant impacts").  Alternatively, if the project will "significantly affect the environment," the agency must prepare an EIS.  23 C.F.R. § 771.115(a).

But NEPA's requirements do not elevate form over substance.  Instead, if "requiring the preparation of an EIS [ ] would be a waste of time and resources" an EA can be treated as "function[ally]" an EIS.  *Spiller v. White*, 352 F.3d 235, 245 n.6 (5th Cir. 2003).  This is particularly where an:

> EA [ ] has all the hallmarks of an EIS: there were public hearings and costly, extensive, and comprehensive environmental studies which produced reams of material data . . . [such that] . . . it is unclear whether the time and expense required to prepare an EIS after an EA will result in any incremental benefits.

*Id.*; *see also Nat'l Indian Youth Council v. Andrus*, 501 F. Supp. 649, 656-57 (D.N.M. 1980).

So too, NEPA analyses are necessarily fact specific.  *See, e.g.*, *Blue Mountains Biodiversity Project v. Trulock*, 2023 U.S. Dist. LEXIS 93208, at *51 (D. Or. April 27, 2023)

---

deference."  *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 372 (1989); *see also* 40 C.F.R. § 1500, *et seq*.  In addition, agencies have promulgated their own NEPA regulations tailored to the agency functions at issue.  The regulations cited here are FHWA's implementing NEPA regulations.  *See* 23 C.F.R. § 771, *et seq*.

(agency decision "to conduct EIS in other projects provide little support for its duty to conduct an EIS here."). Thus, the projects identified by the State require large-scale construction or major improvements to existing infrastructure and therefore fit within categories that FHWA's regulations identify as likely to require an EIS. *See* 23 C.F.R. § 771.115(a).[3] But none of those elements are present here.

Finally, economic concerns are not within the scope of NEPA. *See Maiden Creek*, 823 F.3d at 194 ("The vast majority of NEPA authority makes clear that economic injury alone does not satisfy the statute's zone of interests test."); *see also Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015) ("[t]he zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone.").

## II.    The Clean Air Act

The CAA was enacted to protect and enhance air quality in the United States. *See* 42 U.S.C. § 7401, *et seq*. The CAA requires EPA to establish national ambient air quality standards ("NAAQS") for certain common air pollutants, commonly known as "criteria pollutants." *See* 42 U.S.C. §§ 7408 and 7409(a). The EPA has established NAAQS for sulfur dioxide, particulate matter, carbon monoxide, ozone, nitrogen dioxide, and lead. 40 C.F.R. Part 50; *New Jersey, Dep't of Env't Prot. v. U.S. Army Corps of Engr's* ("*NJDEP*"), No. 09-5591, 2011 WL 115878, at *11 (D.N.J. Jan. 13, 2011).

---

[3]    For instance, the Chesapeake Bay Crossing Study aims to build a new bridge or expand the existing bridge. *See* Chesapeake Bay Crossing Study Tier 1 FEIS/ROD (April 14, 2022), *available at* https://www.baycrossingstudy.com/tier-2-study-process/tier-1-study-completed/tier1-feis-rod). Likewise, the Hood River Bridge Replacement Project is an effort to replace aging infrastructure. *See* FHWA, Suppl. Draft EIS, Hood River – White Salmon Interstate Bridge Replacement Project (Nov. 2020), *available at* https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=314171.

The CAA also directs each state to develop a state implementation plan ("SIP") to comply with the NAAQS set by EPA.  42 U.S.C. § 7407; 42 U.S.C. § 7410; *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004).[4]  Among other things, SIPs must "provide[] for implementation, maintenance, and enforcement" of the NAAQS within their borders.  42 U.S.C. § 7410(a)(1).  Regulatory and nonregulatory provisions approved by the EPA into New York's SIP can be found at 40 C.F.R. Part 52, Subpart HH.  *See also* 40 C.F.R. 52.1670(c)-(d).

Further, Section 7506(c) of the CAA prevents Federal agencies from, among other things, approving any activity that "does not conform to an implementation plan after it has been approved or promulgated under [CAA] section 7410."  42 U.S.C. § 7506(c)(1); *see also Public Citizen*, 541 U.S. at 771; *NJDEP*, 2011 WL 115878, at *12.  An agency must accordingly conduct a "conformity analysis" to assess whether a federal action will interfere with a state's plan for "eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of such standards."  42 U.S.C. § 7506(c)(1)(A).  Federal agencies must also ensure proposed actions will not cause or contribute in any area to new NAAQS violations, increase the severity or frequency of existing violations, or delay timely attainment of NAAQS or any required emission reductions or other milestones.  42 U.S.C. § 7506(c)(1)(B).  CAA Section 7506(c) includes requirements for transportation plans, improvement programs, and projects, respectively.  Further, EPA has promulgated implementing regulations located at 40 C.F.R. Part 93, subpart A.  *See* 40 C.F.R. § 93.109(b) (describing

---

[4]     Areas with air quality that meets the NAAQS for a pollutant are designated as "attainment" for that pollutant.  42 U.S.C. § 7407(d)(1)(A)(ii).  Areas that do not meet the NAAQS or that contribute "to ambient air quality in a nearby area" that does not meet the NAAQS for a pollutant are designated "nonattainment" areas.  42 U.S.C. § 7407(d)(1)(A)(i); *Sierra Club v. E.P.A.*, 129 F.3d 137, 138 (D.C. Cir. 1997).  When a nonattainment area has achieved the relevant NAAQS, it may be redesignated to attainment.  42 U.S.C. §§ 7407(d)(3)(E), 7505a.  Such areas are referred to as "maintenance areas."  *See* 40 C.F.R. 93.101.

requirements specific to transportation projects.  And for carbon monoxide and particulate matter nonattainment or maintenance areas, agencies must conduct hotspot analyses for certain projects to establish localized concentrations of each pollutant.  40 C.F.R. §§ 93.116 and 93.123.

As with NEPA, the CAA only protects environmental, not economic, interests.  *See Delta Const. Co. v. E.P.A.*, 783 F.3d 1291, 1300 (D.C. Cir. 2015) ("financial interests" outside CAA's zone of interest).

### III.    Factual Background

#### A.  Passage of the Traffic Mobility Act

The genesis of the Project is the passage of the [New York Metropolitan Transportation Authority ("MTA")] Reform and Traffic Mobility Act ("the Traffic Mobility Act" or "the Act") in April 2019, DOT_2400.  The New York State legislature found that "traffic congestion in the city of New York ranks second worst among cities in the United States and third worst among cities in the world."  DOT_2403.  As a result, the legislature determined that creation of a "program to establish tolls for vehicles entering or remaining in the most congested area of the state" was "necessary and a [ ] matter of substantial state concern."  *Id.*  The Act authorized the Triborough Bridge and Tunnel Authority ("TBTA") to establish a tolling program in the Manhattan CBD,[5] with the goals of "reducing traffic congestion within the CBD and funding capital projects," with tolls set to, at a minimum, "provide for sufficient revenues . . . to fund [15] billion dollars for capital projects for the 2020 to 2024 MTA capital program . . . ."  DOT_2407.  The Act also sets forth various exemptions that must be included in the tolling program, such as

---

[5]      The CBD is defined as: "the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York state route 9A otherwise known as the 'West Side highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West St."  DOT_2405.

that passenger vehicles may not be charged more than once per day, that emergency vehicles are

exempt, and that the TBTA implement a plan for credits and exemptions for for-hire vehicles.

*Id.*

The Act also established the Traffic Mobility Review Board ("TMRB"), which will

"make a recommendation regarding the [CBD] toll amounts to be established," to be "submitted

to the [TBTA] for consideration . . . ." DOT_2415. The TMRB's recommendation should

account for factors such as traffic patterns, traffic mitigation measures, operating costs, public

impact, public safety, hardships, vehicle type, discounts for motorcycles, peak and off-peak rates

and environmental impacts, including but not limited to air quality and emissions trends. *Id.*; *see*

*also* DOT_36272. "Informed by the TMRB's recommendation, the TBTA Board [will] approve

and adopt a final toll structure following a public hearing in accordance with the State

Administrative Procedure Act." *Id.*[6]

### B. Development of the Final EA

Based on passage of the Act, on June 17, 2019, the Project Sponsors[7] submitted an

expression of interest to FHWA seeking approval of the Project under the federal Value Pricing

Pilot Program ("VPPP"), DOT_38307. The VPPP is a means by which FHWA can "provide

tolling authority to state, regional, or local governments to implement congestion pricing

---

[6]     The TMRB issued its recommendation on November 30, 2023, *see*
https://new.mta.info/document/127761, and on December 6, 2023, the TBTA Board commenced
the rate-making process under the New York State Administrative Procedure Act. *See*
https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-
business-district-tolling-rate. Once the toll structure is finalized FHWA will need to determine
whether any differences between the final tolls and the alternatives examined in the Final EA
warrant additional environmental review or analysis. DOT_394.

[7]     The Project Sponsors are the MTA, the New York State Department of Transportation,
and the New York City Department of Transportation.

programs." DOT_36154; *see also* DOT_36243. Review under NEPA is a precondition to finalizing a VPPP tolling agreement. DOT_36243.

From there, FHWA and the Project Sponsors worked to review additional information relevant to consideration of the VPPP proposal, such as the choice of traffic modeling methodology, DOT_38886, determine the appropriate class of NEPA review (here, an EA), DOT_40972, agree on a plan for conducting the NEPA review, DOT_41006, and develop the draft EA. *See, e.g.*, DOT_40190 (FHWA comments on pre-draft EA).

Development of the draft EA also included coordination with, and input from, numerous federal and state agencies, including, as relevant here, the New Jersey Department of Transportation, New Jersey Transit, the New Jersey Turnpike Authority, the Port Authority of New York and New Jersey, and the North Jersey Transportation Planning Authority ("NJTPA"). DOT_37043. During the NEPA process FHWA held numerous meetings with those agencies on a variety of topics, including conformity and air quality analysis. DOT_37044.

In addition, the Project Sponsors formed an Air Quality Interagency Consultation Group ("Interagency Group") to ensure the Project's conformity analysis adhered to the CAA. DOT_41604-5. The Interagency Group consisted of FHWA, EPA, MTA, the Federal Transit Administration, the New York State Department of Transportation, the New York State Department of Environmental Conservation, and the New York Metropolitan Transportation Council ("NYMTC"). *Id.* The Interagency Group was consulted on the methodology for completing both the regional and local aspects of the conformity analysis, including ensuring the Project was included in NYMTC's regional emissions analysis and approving the hot-spot screening protocol. *Id.*; *see also* DOT_6854.

FHWA also conducted several "early outreach webinars to obtain public input for

9

consideration," DOT_37046 (including five in New Jersey, DOT_37047), and engaged an

Environmental Justice Technical Advisory Group and an Environmental Justice Stakeholder

Working Group.  DOT_37048.  That engagement resulted in at least 11 meetings among those

groups, DOT_37048-49.[8]  Further, FHWA considered 7,338 public comments received during

early outreach activities, DOT_37049-56.

The draft EA was published on July 29, 2022, DOT_37149, and FHWA provided for

public comment on the draft EA between August 10, 2022, and September 23, 2022.

DOT_37057.  During the public comment period FHWA hosted six virtual public hearings in

August 2022.  DOT_37062.

In preparing the Final EA, FHWA considered the "nearly 70,000 public input

submissions on the [draft] EA," including "more than 14,000 individual submissions," "oral

testimony at the public hearings, letters, e-mails, voicemails, and submissions via an electronic

form."  DOT_37063; *see also* DOT_37063-64 (describing Appendix 18A as containing "the full

set of comment submissions with responses to each comment").

### C.  The Final Environmental Assessment

The Final EA was published on May 5, 2023, DOT_36150, *et seq*., and totals 958 pages,

with thousands of pages of appendices.  The Project's purpose is described as "reduc[ing] traffic

congestion in the Manhattan CBD in a manner that will generate revenue for future

transportation improvements, pursuant to acceptance into FHWA's VPPP," DOT_36251, and the

need for the Project is to address "increased traffic congestion and delays, slowing travel and

---

[8]      The Technical Advisory Group was made up of 16 groups, including the New Jersey
Environmental Justice Alliance.  DOT_37037.  The Group held 7 different meetings on a variety
of topics.  DOT_37037-39.  The Stakeholder Working Group included 27 interested individuals
and held three meetings.  DOT_37039-40.  FHWA also hosted 9 environmental justice webinars.
DOT_37035-37.

jeopardizing the vitality of the area." DOT_36253.[9]  Accordingly, the Final EA identified the

following objectives for the Project: (1) "[r]educe daily vehicle-miles traveled (VMT) within the

Manhattan CBD; (2) "[r]educe the number of vehicles entering the Manhattan CBD daily"; (3)

"[c]reate a funding source for capital improvements and generate sufficient annual net revenues

to fund $15 billion for capital projects for the MTA capital program"; and (4) "[e]stablish a

tolling program consistent with the purposes underlying the [Act]." DOT_36259.  "With the

CBD Tolling Alternative, TBTA would toll vehicles entering or remaining in the Manhattan

CBD via a cashless tolling system."  DOT_36270.

     Given the range of potential scenarios that could result from the TBTA's ultimate tolling

plan, the Final EA "considers a range of tolling scenarios with different attributes to identify the

range of effects that may occur."  DOT_36272.  Although all scenarios have common features,

the scenarios "vary in their assumptions about other factors, such as the amount of the toll for the

different types of vehicles, the times tolls would be imposed, exemptions from tolling, crossing

credits for tolls paid on other toll tunnels and bridges, and discounts in the form of 'caps' on the

number of tolls per 24-hour period to be applied to different types of vehicles."  DOT_36291;

*see also* DOT_36291-95 (charting and describing 8 separate scenarios, lettered "A" through

"G"); DOT_36301 (summarizing scenarios).[10]

---

[9]     One group estimated congestion costs the region $100 billion over five years.  *Id.*  This is
because "[t]he low travel speeds and unreliable travel times to, from, and within the Manhattan
CBD increase auto commute times, erode worker productivity, reduce bus and paratransit service
quality, raise the cost of deliveries and the overall cost of doing business, and delay emergency
vehicles."  DOT_36257.

[10]    "By examining different tolling scenarios, the Project Sponsors aim to give the [TMRB]
flexibility in identifying a toll schedule that it will recommend to the TBTA Board, while
ensuring that this EA identifies effects and addresses mitigation to minimize potential adverse
effects associated with certain tolling scenarios."  DOT_36940.

The Final EA analyzes effects using regional and local study areas.  For the regional study area the Final EA applies a 28-county area "incorporated in the Best Practice Model (BPM), which is the New York City region's primary long-range travel forecasting model [ ]." DOT_36304.  That study area includes 14 New Jersey counties located near the proposed Project.  *Id.* (including Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union, and Warren counties).  Second, the Final EA uses "multiple local study areas" depending on the analysis in question.  DOT_36304.  Within that structure the Final EA provides effects covering two time periods: 2023, when the Project was estimated to be fully operational; and 2045, a long-term planning horizon date. DOT_36036.

In that framework, the Final EA analyzes 12 separate resource areas, including five transit sub-areas.  DOT_36158-66.  "For each of these [areas], this EA describes the effects of the tolling scenario that would result in the greatest potential negative effects for that particular topic of analysis."  DOT_36306.  "This methodology results in the most potential negative effects of the CBD Tolling Alternative, and other tolling scenarios would result in lesser or fewer negative effects."  *Id.*  Relevant resource areas (traffic, air quality, and environmental justice) are discussed in more detail below.

> i.      *Traffic*

The Final EA analyzes using the Best Practices Model, which is an "activity-based model that simulates the number and type of journeys made on an average weekday in the region by each resident."  DOT_36342.[11]  The model uses the VMT metric, which "conveys the change in

---

[11]    "The [Model] is a complex transportation model, created by [NYMTC], used to predict future conditions . . . Metropolitan planning organizations [ ] are responsible for modeling and documenting their region's compliance with the [CAA], and they use transportation models for

the aggregate level of driving or traffic that would occur within the BPM's modeled area,"

DOT_36345, to look at changes in daily vehicular traffic entering Manhattan, as well as changes

in daily VMT region-wide. DOT_36344-46; *see also* DOT_36394 (noting focus on "regional

highways at points where they would experience the greatest potential effect of shifts in travel

and roadways near Manhattan CBD access points and circumferential routes that avoid the

Manhattan CBD."); DOT_36413-16 (describing methodology for determining adverse highway

effects).

Overall, the traffic analysis showed the Project would result in significant decreases in

vehicles entering Manhattan, DOT_36351, and minor decreases in regional VMT, DOT_36354-

60, with negligible increases in VMT for New Jersey. *Id.*[12]; *see also* DOT_36358 (the Project

would substantially reduce the number of vehicles crossing into Manhattan from New Jersey);

DOT_36918 (identifying .2% change to New Jersey traffic). All scenarios would consequently

"result in traffic pattern changes that would support congestion relief." DOT_36363; *see also*

DOT_36372 (under all scenarios "daily VMT would decline across the 28-county region");

DOT_36392 (summarizing traffic effects).

Relevant here, the Final EA did not identify adverse traffic effects to any New Jersey

---

that purpose. NYMTC's transportation planning model is based on data from the 2010 Census, traffic and transit ridership data, household surveys, and comprehensive projects of social and economic trends for the regional study area to project travel behavior in future years." DOT_36308-09. The BPM roadway model contains "more than 61,000 links that include local streets, interstates, and freeways." DOT_36342. It is intended to "create[] a realistic analysis that is based on the various decisions (e.g. mode, purpose, destination, frequency, location of intermediate stops, and time of day) made by travelers between these locations informed by employment and demographic data from NYMTC." *Id.*

[12] The minor increase (ranging from 0 to .2%) is set against the fact that VMT is expected to increase by 10.6% in New Jersey between 2023 and 2045 in the no-action scenario. DOT_36349.

approaches to Manhattan. DOT_36416; *see also* DOT_36441-44 (Holland Tunnel);
DOT_36444-48 (Lincoln Tunnel); DOT_36448-52 (George Washington Bridge); DOT_36458-
61 (Eastern Spur of I-95 New Jersey Turnpike); DOT_36471 (noting no "adverse effect" on
George Washington Bridge). And as to intersections, the Final EA examined four locations in
New Jersey, DOT_36476,[13] and determined that "none . . . would have an increase in delay."
DOT_36490.

In sum, FHWA determined that "the overall effects of the CBD Tolling Alternative along
highways used to access the Manhattan CBD would be beneficial for all tolling scenarios,"
DOT_36502, and that "[m]ost intersections would experience a decrease in traffic volumes and
delays under all tolling scenarios." DOT_36503; *see also* DOT_36295. However, FHWA
acknowledged that "[t]he CBD Tolling Alternative could cause localized increases in traffic on
highway segments and at local intersections because some drivers would alter their trip or divert
around the Manhattan CBD to avoid the toll." DOT_36916.

                          *ii.    Air Quality*

The Final EA's analysis of air quality effects proceeds directly from its analysis of traffic
effects, given that "changes in regional air quality emissions burden are directly related to
changes in VMT." DOT_36828; *see also* DOT_36345 ("Changes in VMT are correlated with
changes in level of service, air quality, and noise . . . .").

The Final EA examines three major air quality effects: (1) the six "criteria pollutants"

---

[13]    FHWA explained that "[t]he local intersections at the New Jersey . . . approach[ ] to the
George Washington Bridge and the New Jersey approach to the Lincoln Tunnel were not
included because traffic at those intersections connects primarily to regional highways and not
local streets." DOT_36475.

covered under NAAQS, DOT_36819-20[14]; (2) hazardous air pollutants, particularly those compounds designated as "priority mobile source air toxics (MSAT), which account for substantial contributions from mobile sources and are among the national- and regional-scale cancer risk drivers or contributions and non-cancer hazard contributors," DOT_36822; and (3) greenhouse gas ("GHG") emissions.  DOT_36826.

While "[t]he regional study area for the Project includes 28 counties" which "represent the main catchment area for trips to and from the Manhattan CBD and therefore the area where VMT would change as a result of the [Project]," DOT_36827, to identify "concentrated areas of change," *id*., FHWA's air quality analysis used a 12-county sub-area, including Hudson and Bergen counties in New Jersey."  DOT_36827-28; *see also* DOT_36828 (sub-area includes "those counties in New Jersey that are predicted to have the largest increase in VMT (Bergen County) and the largest decrease in VMT (Hudson County) . . .").  Within that study area the Final EA presents both regional (mesoscale) and local (microscale) analyses: "[t]he mesoscale analysis was conducted to show the differences between the No Action Alternative and the CBD Tolling Alternative, whereas the local analysis demonstrated that the hot-spot requirements are satisfied for Project-level conformity per the CAA as well as for NEPA."  DOT_36827.  That analysis was conducted using tolling Scenario A, "because it is the tolling scenario that would result in the smallest reduction of VMT compared to the No Action Alternative," DOT_36828, and would accordingly "have the lowest beneficial effect on regional air quality because changes in regional air quality emissions are directly related to changes in VMT."  DOT_36828; *see also* DOT_36830 (explaining change in VMT for New Jersey counties under Scenario A).

---

[14]     All counties in the 28-county area were in attainment for Lead and Nitrogen Dioxide, but most of the region is classified as "nonattainment for the 2008 and 2015 [ozone] NAAQS" and as "maintenance areas" for carbon monoxide and PM 2.5.  *Id*.

For the regional analysis, the Final EA explains that "[i]n all analysis years, the overall regional VMT and emission burdens would be lower under the CBD Tolling Alternative than the No Action Alternative."  DOT_36838; *see also* DOT_36839; DOT_36834-36 (noting Final EA used EPA monitoring locations "closest to the regional study area," including three New Jersey locations).  The Final EA acknowledges, however, that while Hudson County would experience decreases in pollutants in both 2023 and 2045, Bergen County would experience estimated increases.  *Id.*; *see also* DOT_36840-41 (regional tables); DOT_36842-51 (tables showing criteria pollutants).  So too with mobile source toxics, when looking at the entire 12-county study area, those pollutants would be lower under the [Project] compared to the No Action Alternative."  DOT_36852; *but see* DOT_36852-53 (noting increase in mobile source toxics for Bergen County and decrease for Hudson County); DOT_36854-55.[15]

For the local analysis, "a screening analysis was conducted primarily based on Tolling Scenario D . . . the tolling scenario that would have the highest traffic volume increases on the local streets . . ."  DOT_36831-32; *see also id.* at DOT_36832-33 (describing carbon monoxide and quantitative particulate matter analysis).  All intersections "passed the screening criteria" by demonstrating emissions lower than the relevant NAAQS.  DOT_6815-22; *see also* DOT_36838.[16]

Further, FHWA conducted a "highway link analysis" to respond to concerns from

---

[15]    The Final EA notes, though, that because of various EPA rulemakings requiring "cleaner fuels and cleaner engines" and "new vehicle emissions standards and lowered the sulfur content of gasoline," "overall reductions in MSAT are expected regardless of Project scenario." DOT_36822.

[16]    "Of the 43 intersections that are located in environmental justice communities . . . 74 percent would experience a decrease of heavy-duty diesel vehicles.  For those that are predicted to experience an increase, the change was less than the screening threshold of 10 or more diesel vehicles in the peak period."  DOT_36860.

communities based on potential air quality impacts from "increases in truck traffic" due to the

Project. DOT_36833. As the Final EA explained, "the Project would result in traffic diversions

around Manhattan, into the Bronx and northern New Jersey and Staten Island." DOT_36859.

"These diversions would be most pronounced . . . at the George Washington Bridge, and into

northern New Jersey." *Id*.[17] "To address these concerns, the Project team conducted detailed

microscale PM analyses . . . ." *Id*.; *see also* DOT_36864 ("this screening analysis evaluated

every highway link under every scenario and selected those sites that demonstrated the highest

[Annual Average Daily Traffic ("AADT")] and the highest increase in heavy-duty diesel trucks .

. .," including I-95 west of the George Washington Bridge). The analysis determined, however,

that each location would remain below the applicable NAAQS after implementation of the

Project. DOT_36865.

Finally, as to conformity, FHWA explained that the "Project was included in the regional

emissions analysis for NYMTC's most recent Transportation Conformity Determination."

DOT_36866. FHWA determined that "NYMTC's 2022-2050 Plan and 2020-2040

[Transportation Improvement Program] conform" to the New York SIP and thus satisfy the

CAA. *Id*. Further, and because the Project was included in a conforming Transportation

Improvement Program, FHWA conducted the above intersection and highway link analyses for

the Project to address "the hot-spot analysis requirements for CO and PM in 40 CFR 93.116 and

123." *Id*. FHWA also committed to "monitor air quality for the life of the Project through . . . a

citywide network of roughly 100 sensors" to confirm any air emissions conform to the relevant

NAAQS. DOT_36865.

---

[17]     Some environmental justice communities would experience decrease in traffic volume,
including "in those portions of New Jersey to the south of the Lincoln Tunnel." *Id*.

In sum, FHWA found that "for all tolling scenarios, the changes in traffic volumes, including changes in truck trips, would not result in regional or localized exceedances of [NAAQS], and there would be no adverse effects on air quality . . . ."  DOT_36942; *see also* DOT_36925 (summarizing air quality effects on New Jersey due to truck traffic diversions); DOT_36838 ("in all analysis years, the overall regional VMT and emission burdens would be lower under the CBD Tolling Alternative than the no Action Alternative.").

### iii.  Environmental Justice

The Final EA also contains a detailed discussion of potential environmental justice effects, including a separate "Technical Memorandum" to address additional concerns that developed during the NEPA process.  DOT_36954; *see also* DOT_36989-90 (Technical Memorandum); DOT_7243 (the Memorandum "more completely address comments from the [EPA] and from members of the public relating to effects of traffic diversions, both increases and decreases, on environmental justice communities that are already burdened by pre-existing air pollution and associated health risks.").

FHWA initially evaluated environmental justice effects by identifying the minority and low-income populations in the study area,[18] determining adverse effects, accounting for mitigation measures, providing for public comment, and considering mitigation.  DOT_36955-56.  FHWA specifically looked at the potential impacts of increased traffic on the air quality in environmental justice communities.  DOT_36981; DOT_36982 (noting regional and local traffic diversion).  Overall, FHWA found that "[i]n New Jersey . . . environmental justice areas would

---

[18]      FHWA identified environmental justice populations using U.S. Census Bureau data, DOT_36956, applied against the definitions in USDOT Order 5610.C and FHWA Order 6640.23A.  DOT_36961; *see also* DOT_36965 (identifying relevant New Jersey census tracts); DOT_6971-74 (methodology); DOT_6974 (describing low-income threshold); DOT_6979 (noting New Jersey income threshold in accordance).

experience similar or deeper reductions in VMT compared to non-environmental justice areas for all tolling scenarios."  DOT_36985; DOT_36986-88 (graphic representation of changes); DOT_36373-75; *see also* DOT_7299-303 (description of methodology).  As such, FHWA determined that the Project would not have adverse effects on environmental justice communities due to traffic, DOT_37010, or regional or local air quality.  DOT_37014; *see also* DOT_36858 (showing predicated changes in VMT near environmental justice communities).

      Nonetheless, FHWA considered specific concerns that "the CBD Tolling Alternative would divert traffic to circumferential highways around the Manhattan CBD and that these additional vehicles would adversely affect the nearby neighborhoods, including by degrading air quality and increasing noise."  DOT_36957.  To account for those concerns, FHWA conducted additional studies to assess how "changes in traffic" would impact "environmental justice populations that already have high levels, compared to national norms, of pre-existing pollutant or chronic disease burdens."  DOT_36990; *see also* DOT_36958-59 (noting additional study areas, including New Jersey counties such as Essex and Union, "where the greatest change in traffic volumes and [VMT] are predicted to occur").[19]

      That analysis determined that "[i]ncreases in truck traffic in currently overburdened environmental justice communities, relative to national percentiles, would constitute [a potential] adverse effect.  The effects would vary in magnitude depending on the additional volume of truck traffic and the extent of pre-existing pollutant and chronic disease burdens."  DOT_36993; *see also* DOT_37009 (potential adverse effects based on traffic); DOT_37014 (same);

---

[19]     These already-burdened communities were defined as "the environmental justice census tracts where individuals experience at least one pre-existing pollutant burden and at least one pre-existing chronic disease burden at or above the 90th percentile nationally, and where truck proximity could increase as a result of the Project."  DOT_36993; *see also* DOT_36990 (census tracts).

DOT_37030 (summarizing effects and mitigation measures).

Because of those burdens, "[t]he Project Sponsors [ ] committed to a package of . . . measures to mitigate these potential adverse effects on environmental justice populations, regardless of the tolling structure eventually adopted . . . ." DOT_36996. Those measures include both regional measures to reduce truck diversions and emissions and "place-based mitigation," DOT_37017-18, which include measures such as roadside vegetation, parks and greenspace, and air filtration in schools. DOT_37018-20; *see also* DOT_36993-94 (identifying census tracts for place-based mitigation based on high pre-existing burden and increase in traffic). Five of the place-based mitigation measures are "flexible in where they can be implemented," and placement will be determined once a final tolling structure is adopted based on a process that "includes both additional analysis and community input." DOT_37017 (noting process will include "needs assessments and feasibility screening to determine the range of possibilities"); *see also* DOT_37016 ("The specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario."); DOT_37030 (noting locations for mitigation, including locations in New Jersey); DOT_37033 (identifying Orange, East Orange, Newark, and Fort Lee, New Jersey as "communities that could have census tracts that merit place-based mitigation"). Based on those additional mitigation measures FHWA expects the Project "would not result in adverse effects on environmental justice communities as a result of increased truck traffic." DOT_37020.

In sum, the Final EA "identifies locations where . . . [the Project] could increase traffic, adding to the pre-existing burdens on potentially vulnerable communities" and "identifies a package of mitigation measures to address potential traffic diversions and associated pollutant emissions or health effects resulting from the Project, to avoid creating a disproportionately high

20

and adverse effect." DOT_7250.

### D. The Final FONSI

Along with the Final EA, FHWA published a draft FONSI on May 8, 2023, DOT_36142, with feedback open from May 12 to June 12, 2023. DOT_393. Prior to publication of the Final FONSI, FHWA held meetings with Federal and New York State agencies, regional transportation agencies, and the environmental justice Stakeholder Working Group and Technical Advisory Group. DOT_401. FHWA issued the Final FONSI on June 23, 2023, after determining that "no new substantive issues" were raised by any public submissions. DOT_393.

### STANDARD OF REVIEW

Under the APA, a court must uphold an agency action unless the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). This standard is "deferential" and "presumes the validity of agency action." *SBC Inc. v. FCC*, 414 F.3d 486, 496 (3d Cir. 2005). To that end, the sufficiency of an EA or an agency's decision to issue a FONSI is analyzed under a "rule of reason" standard. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322-23 (D.C. Cir. 2015). Under that review standard, courts have "repeatedly refused to flyspeck the agency's findings in search of any deficiency . . . ." *Id.*; *see also Twp. of Bordentown v. FERC*, 903 F.3d 234, 260 (3d Cir. 2018). Said differently, a "[c]ourt's task is solely to determine whether the "[agency's] [FONSI] was reasonable when considered in light of the relevant provisions of NEPA . . . ." *Twp. of Belleville v. Fed. Transit Admin.*, 30 F. Supp. 2d 782, 804 (D.N.J. 1998). And a court must be at its "most deferential" when the challenged action is "within the agency's expertise." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).

The CAA conformity analysis is similarly reviewed under the arbitrary and capricious standard. *See NJDEP*, 2011 WL 115878, at \*4; *see also City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002).

Summary judgment is "the proper mechanism" to resolve cases under the APA. *Neto v. Thompson*, 506 F. Supp. 3d 239, 244 (D.N.J. 2020) (citation omitted).

## ARGUMENT

At base, the State's arguments only facially engage with the extensive analysis provided by FHWA in the Final EA and largely ignore the record. Each argument is therefore meritless, particularly given the deferential standard of review applicable here and NEPA's procedural nature. There are at least five issues with the State's claims.

First, FHWA conducted an exhaustive analysis of the anticipated effects of the Project on air quality, encompassing New Jersey communities. Second, and similarly, the Final EA assessed in detail potential effects on environmental justice communities and proposed targeted mitigation (again including locations in New Jersey) to ameliorate any adverse effects. Third, FHWA reasonably considered the requirements of New York law in determining the feasibility of various preliminary alternatives. Fourth, FHWA and the Project Sponsors provided New Jersey citizens and agencies with ample opportunities to provide input on the NEPA process; that the State chose not to fully avail itself of those chances does not call into question FHWA's process for obtaining public input. Fifth, and if not waived, the State fails to set out a colorable argument that FHWA's conformity determination violated the CAA. Each of these points is discussed in more detail below.

## I.     FHWA Thoroughly Analyzed the Project's Anticipated Effects on Air Quality in New Jersey.

In various claims, the State contends that the Final EA improperly analyzed the effects of

22

the Project on the air quality in New Jersey communities. Specifically, it argues FHWA improperly: (1) selected the geographic scope for the air pollution analysis, Plaintiff's Mem. Supp. Mot. Sum. J. ("Pl.'s Mem.") at 27, 29-30 (ECF No. 67-1); (2) applied a methodology that under-represented effects on New Jersey, *id*. at 27-28; (3) limited its analysis of local air quality effects, *id*. at 31-32; (4) discounted as insignificant the effects of the Project on air pollution in New Jersey communities, *id*. at 22; (5) failed to propose adequate mitigation in response to those effects, *id*. at 24; and (6) ignored EPA comments on the draft EA as to the scope of the air quality analysis, *id*. at 32.

Those concerns can be sorted into two baskets: challenges to the methodology employed by FHWA, and challenges to FHWA's analysis of the anticipated effects of the Project. For the reasons described below, each is without merit.

### A. Particularly Given the Deference Due to Agency Choice of Methodology, the State's Challenges to the Final EA's Air Quality Methodology Are Meritless.

The State's methodological challenges each fall short, particularly because courts must defer to an agency's reasonable choice of methodology and the methodologies used by FHWA meet that standard. *See Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017); *see also Baltimore Gas & Electric Co.*, 462 U.S. at 103 (court must "generally be at its most deferential" when an agency "is making predictions[] within its area of special expertise," including "scientific determination, as opposed to simple findings of fact"); *Twp. of Springfield v. Lewis*, 702 F.2d 426, 441 (3d. Cir. 1983) (deferring to traffic studies that "were well within the realm of accuracy") (citation omitted).

First, the State claims the "geographic scope of the Final EA and FONSI was unduly narrow . . . ." Pl.'s Mem. at 26. In particular, the State argues that the choice to use a 12-county study area for air quality effects, rather than the larger 28-county study area employed elsewhere

in the Final EA, caused FHWA to "ignore the [Project's] effects in 12 New Jersey counties . . . ," such as Hudson and Essex.  *Id.* at 29.  So too, the State alleges that the Final EA under-represents regional air quality effects given it fails to analyze 74 census tracts in New Jersey that will have adverse VMT because of the Project.  *Id.* at 30.

The State, however, misunderstands the reasonable manner in which FHWA determined the scope of the analysis in the Final EA.  While the Final EA does provide certain data across additional New Jersey counties, *see* DOT_36821; DOT_36834-36, it presents a 12-county study area to "focus on [ ] those segments . . . across the 12-county region *where the largest benefits and effects would be expected*."  DOT_36823-24 (emphasis added).  In other words, the various air quality analyses were focused on areas likely to experience the "most concentrated . . . change."  DOT_36827; *see also* DOT_36830 (indicating New Jersey counties with highest and lowest change in traffic).  Thus, rather than ignore New Jersey, the air quality analysis focuses on the Project's anticipated effects and identifies the two counties (Hudson and Bergen) showing the greatest effects to permit the reader to extrapolate effects on other New Jersey counties.  This methodological choice is more than appropriate given that "[w]hile additional data might enable a more detailed environmental analysis, NEPA does not require maximum detail.  Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information."  *Tinicum Twp. v. U.S. Dep't of Transp.*, 685 F.3d 288, 296 (3d Cir. 2012).  Using the two New Jersey counties that would experience the greatest positive and negative impact offers a reasonable means of predicting impacts state-wide.  Finally, as to the State's allegation that FHWA ignored certain environmental justice census tracts, the air quality analysis relevant to environmental justice (described in more detail below) uses a 10-county study area (including the areas the State claims were ignored) based on an approved

Federal methodology. DOT_36960; *see also* DOT_36858-59 (showing tracts in northern New Jersey).

Second, the State takes issue with the Final EA's use of Tolling Scenario A in conducting the regional air quality analysis. Pl.'s Mem. at 27. The State claims that use of that Scenario under-represents changes in traffic in New Jersey by focusing on reductions in regional VMT over state-wide VMT, and that the Final EA also misrepresents changes in that metric. *Id*. at 27-28. As an initial matter, the State once again appears to misunderstand that the intention behind using one model scenario for each resource area was to permit the reader to understand the worst-case outcome of the Project, because the Final EA presents the "tolling scenario that would result in the greatest potential negative effects for that particular topic of analysis." DOT_36306.

And to the extent this claim rests on challenges to the traffic modeling in the Final EA, the Court owes deference to FHWA because such analysis "requires a high level of technical expertise, and the Court must defer to the informed discretion of the responsible federal agencies in such a situation." *Audubon Naturalist Soc'y of the Central Atlantic States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 671 (D. Md. 2007); *see also Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 858 F. Supp. 2d 839, 855 (E.D. Mich. 2012). Specifically, FHWA explained that "Tolling Scenario A was used for the mesoscale, MSAT, and GHG analyses because it is the tolling scenario that would result in the smallest reduction of VMT compared to the No Action Alternative. Therefore, Tolling Scenario A would have the lowest beneficial effect on regional air quality because changes in regional air quality emissions burden are directly related to changes in VMT." DOT_36828. FHWA therefore reasonably tied its *regional* air quality analysis to *regional* changes in VMT, given the link between the two factors.

Moreover, the calculations proffered by the State to support its claim that "New Jersey will experience traffic increases (and attendant negative air quality) *up to twenty times worse* if the MTA picks one of the other six scenarios," Pl.'s Mem. at 28, are facially inaccurate, not to mention belied by the analysis in the Final EA. Without referencing its specific calculations, the State claims that "Tolling Scenarios C through G would cause VMT to increase by 1012%, 920%, 517%, 1130% and 381%, respectively, compared to Tolling Scenario A." *Id*. at 27; *see also id.* at 28 (claiming effects would worsen by 2045). But the State's math is simply wrong. As the U.S. Bureau of Labor Statistics explains, a percentage increase is derived by "subtract[ing] the earlier [ ] value from the later one, then divid[ing] that difference by the earlier [ ] value, and finally multiply]ing] the result by 100."[20] Here, using that formula, the 2023 difference between Scenarios A and C in expected VMT for New Jersey is 0.16%, not the 1,012% claimed by the State (97,748,567 – 97,594,939 = 153,628 / 97,594,939 = 0.00157 x 100 = 0.157). As such, the Court should simply disregard the State's erroneous argument on this point.[21]

In contrast with the State's unsupported assertions, the Final EA provides *accurate* comparisons of the percent change in VMT when comparing the No Action Alternative to

---

[20]     *Available at* https://www.bls.gov/cpi/factsheets/calculating-percent-changes.htm (last accessed Dec. 14, 2023).

[21]     So too, the Court should disregard so-called "exhibits" submitted by the State, given that "[i]n a challenge to administrative action under the APA, the administrative record cannot normally be supplemented." *NVE, Inc. v. Dep't of Health and Human Servs.*, 436 F.3d 182, 189 (3d Cir. 2006). Plaintiffs have made no effort to supplement the record with the materials they include as exhibits, nor could they, since the agency's record is entitled to a presumption of regularity and the State has offered no basis to deviate from that standard here. *See United Boatmen v. Locke*, No. 09-5628, 2010 WL 2951712, at *2 (D.N.J. July 22, 2010). Moreover, it is unclear why the State cited to exhibits in its Complaint, rather than the record lodged by FHWA; the Court should refer to the agency record, as its review "is limited to the administrative record." *NVE*, 436 F.3d at 190.

26

various Scenarios.  DOT_36354; DOT_36360.  Those calculations demonstrate that, on a state-wide level, choice of one Scenario over another would have a miniscule difference as to New Jersey.  Specifically, "VMT would increase by less than 0.2 percent in New Jersey in all tolling scenarios . . . ."  DOT_36352.  On this point, as with others, the Court should defer to the calculations of the expert agency, not the *post hoc* arguments of the State's counsel.  *See Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 711 (11th Cir. 1985) ("the court is not a 'super professional transportation analyst' charged with the duty of determining the propriety of competing methodologies" but rather must "determine whether the [analysis] furnishes the 'statutory minima' required by NEPA.").

Third, the State challenges the Final EA's "microscale" analysis because it "analyzed only four intersections in New Jersey . . . to evaluate potential carbon monoxide and particular matter."  Pl.'s Mem. at 31 (emphasis removed).  The State claims the Final EA failed to consider intersections in Bergen County because such an analysis would "not have yielded a favorable outcome."  *Id.*

But this argument overlooks that intersections for the air quality analysis were chosen based on the Final EA's traffic analysis, which explained that "[t]he local intersections at the New Jersey . . . approach[ ] to the George Washington Bridge and the New Jersey approach to the Lincoln Tunnel were not included because traffic at those intersections connects primarily to regional highways and not local streets."  DOT_36475; *compare with* DOT_36441 (analyzing four intersections "along 12th Street in Jersey City" leading to Holland Tunnel); *see also* DOT_36860-61 (noting those four intersections passed screening analysis).[22]  However, rather

---

[22]     The Final EA explained that "a local level analysis . . . resulted in no intersections requiring a detailed analysis because they all passed the screening criteria."  DOT_36838.

than ignore Bergen County based on this distinction, FHWA instead chose to perform additional analyses at or around the George Washington Bridge given it was one of "those sites that demonstrated the highest AADT and the highest increase in heavy-duty diesel trucks." DOT_36864 (noting preparation of highway screening analysis); *see* DOT_36404; DOT_36470; *see also* DOT_36833.[23]  Given that explanation in the record, the State's argument that the Final EA ignored Bergen County is facially erroneous.

Fourth, the State claims FHWA's methodology was improper because it "ignored" recommendations from the EPA.  Pl.'s Mem. at 32.  In particular, the State claims the EPA encouraged FHWA to include intersections in Bergen County expected to experience an increase in VMT, but that FHWA "ignored" the EPA's advice.  *Id.*  That argument misrepresents FHWA's response to the EPA's comments and overlooks the additional analysis in the Final EA. The State is correct that the EPA recommended FHWA "include a more expansive microscale screening analysis" to include Bergen County.  DOT_7922.  In response, FHWA noted that it had undertaken additional research to "broaden the analysis," DOT_7926, including producing the environmental justice Technical Memorandum that includes additional highway truck traffic emissions studies.  *Id.*  And it described the methodology behind the intersection selection and screening analysis, DOT_7927, as well as additional efforts to target mitigation measures. DOT_7929.  FHWA thus more than satisfied the requirement that it take cooperating agency

---

[23]    The State also claims its argument applies equally to the Final EA's analysis of noise. Pl.'s Mem. at 32 n.35.  As an initial matter, the Court should ignore this argument as it was only raised in a footnote.  *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d. Cir. 1997) ("arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").  Moreover, that argument is incorrect on the merits.  *See* DOT_36878 (comparing traffic effects to noise effects); DOT_36883-85 (showing little to no increase in street-level noise).

comments "seriously," *Tinicum Twp.* 685 F.3d at 295 (citation omitted), particularly given that the EPA itself "acknowledged the improvements" made between the draft and Final EA, "specifically [those] to address potential impacts of the proposed action on communities with environmental justice concerns." DOT_45637. In sum, FHWA "gave serious consideration and reasonable responses to each of the EPA's concerns," particularly given "the lead agency . . . has some latitude to determine the level of analytical detail necessary to support an informed decision and to adequately disclose air quality impacts to the public." *Tinicum Twp.*, 685 F.3d at 298.

**B. FHWA's Analysis and Conclusions Regarding the Effects of the Project on Air Quality are Reasonable and Supported by the Record.**

As described below, FHWA thoroughly analyzed the effects of the Project on air pollution in New Jersey communities. NEPA requires no more. *See DNREC*, 685 F.3d at 276 (hard look standard only requires agency review be "sufficient").

The State takes issue with two aspects of FHWA's analysis. First, it claims that the Final EA improperly discounted the effects of increased air pollution on certain areas of New Jersey. Pls.' Mem. at 22. Second, the State claims that the Final EA does not provide for mitigation in New Jersey. Pls.' Mem. at 24. Each is incorrect, and rebutted by the analysis in the Final EA.

First, reading FHWA's conclusions out of context, the State selectively highlights various figures in the Final EA.[24] For example, the State references anticipated increases in levels of NAAQS pollutants for Bergen County, *id.*, and claims it is "impossible," to know whether other New Jersey counties will experience similar or worse impacts. But because Bergen County

---

[24]    It is unclear where the State believes the Final EA refers to the Project's impacts on New Jersey air quality as "insignificant," since the State provides no citation for that proposition. *See* Pl.'s Mem. at 22-23.

represents the New Jersey County that is likely to receive the least benefits from the Project in terms of reduced traffic, all other counties will experience either positive effects or, at minimum, less negative air quality effects.  As a result, a reader can readily extrapolate those effects to other counties by virtue of comparing those counties' expected changes in VMT to Bergen County's.  *See* DOT_36830.

Moreover, the State's argument overlooks how FHWA assessed air quality effects.  The Final EA looked at air quality on a region-wide level, DOT_36866, and determined the Project would lower the overall emissions and mobile air toxics burdens in the region.  DOT_36838, DOT_36852-53.  As to New Jersey, FHWA determined that the Project would result in, at most, a .2% change in VMT.  DOT_36853-54; DOT_36359-60.  Accordingly, county-wide air quality effects in New Jersey would be minimal.  *See Senville v. Peters*, 327 F. Supp. 2d 335, 359 (D. Vt. 2004) (finding that where  project "will not alter overall congested VMT by a significant amount over the next twenty years . . . Plaintiffs have not established a substantial likelihood that there will be significant new air quality impacts"); *NAACP Erie Unit 2262 v. Fed. Highway Admin.*, 648 F. Supp. 3d 576, 592 (W.D. Pa. 2022) (affirming finding of no significant air quality impacts where project would not "negatively affect implementation of [NAAQS]").

And as to local impacts, the Final EA explained that all intersections passed the screening criteria.  DOT_36860.  Similarly, as to the highway link study, the worst-case scenario (*i.e.*, the area with the highest AADT increase and increase in truck traffic)—the portion of I-95 west of the George Washington Bridge—the Project still resulted in no violation of the applicable NAAQS.  DOT_37014; *see also* DOT_36865 (explaining all link analyses resulted in findings below NAAQS).  Indeed, the table cited by the State, Pl.'s Mem. at 23 (claiming the FONSI "never explains why air quality impacts in Bergen County will be insignificant"), references the

results of that very highway link study.  *Compare* DOT_378 (FONSI) *with* DOT_36869.  Thus, the State's claim that the FONSI's conclusion was unsupported is inaccurate; instead, the FONSI simply references analysis that is described in detail elsewhere in the Final EA.  DOT_36864; DOT_36925.[25]

Second, as to mitigation, the Court should find that this argument is not yet ripe for judicial review given place-based mitigation will be necessitated by, and thus determined by, the final tolling rate and structure adopted by the TBTA.  *See Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361, 365, 367 (3d Cir. 1986) (noting "status of currently pending state and federal administrative proceedings is an important consideration" because the fact "that a contingency exists [] makes judicial review premature").  As the State acknowledges, Pl.'s Mem. at 28 n.32 (noting final tolling scenario could differ from Final EA's scenarios), the ultimate tolling proposal will determine the effects of the Project, and, in turn, the mitigation necessary to ameliorate those effects.  DOT_36925; DOT_36929.  Given that, this issue is not ripe for review until the tolling structure is finalized.  *See Comite de Apoyo a Los Trabajadores Agricolas v. Perez*, 46 F. Supp. 3d 550, 565 (E.D. Pa. 2014) (noting matter not ripe where agency had "not fully developed and formalized the policies and choices to be made"); *see also API v. EPA*, 683 F.3d 382, 389 (D.C. Cir. 2012) (noting court should wait to rule until agency's regulatory revision was complete).

Regardless, and contrary to the State's contention, the Final EA identifies where place-based mitigation may be applied to New Jersey communities, depending on the tolling rates and structure ultimately adopted by the TBTA.  *See* DOT_383 (summarizing place-based mitigation);

---

[25]     To the extent the State's argument relates to air quality effects on environmental justice communities in Bergen County, that analysis is discussed below in Section II.

DOT_391 (noting specific census tracts); DOT_ 36929; DOT_36936.  Indeed, the Final EA

explains that the "Project Sponsors have committed to a package of mitigation measures to

address adverse air-quality-related effects on environmental justice communities from traffic

diversions due to the Project."  DOT_36943.

## II.    FHWA Conducted a Thorough Analysis of Potential Effects on Environmental Justice Communities.

The State also takes issue with the Final EA's specific analysis of effects on

environmental justice communities in New Jersey.  Here, as elsewhere, the State's claims fail

against FHWA's reasoned and thorough analysis.

First, the State argues that FHWA improperly discounted New Jersey's specific

"mapping tool" which would have "more precisely" reflected environmental justice communities

in New Jersey.  Pl.'s Mem. at 35.  As an initial matter, this issue was not raised in New Jersey's

comments on the draft EA, *see* DOT_7772-75, and is thus waived, given that "a challenger who

claims that an agency failed to consider an environmentally preferable alternative must generally

raise that alternative in its comments."  *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*,

869 F.3d 148, 155 (3d Cir. 2017); *see also Vt. Yankee*, 435 U.S. at 553 (noting "participation" in

agency process must be "meaningful, so that it alerts the agency to the [party's] position and

contentions").

Moreover, the State's argument again implicates the principle that an agency's "choice

among reasonable analytical methodologies is entitled to deference."  *Cmtys. Against Runway*

*Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004) (deferring to agency's

environmental justice analysis).  Here, FHWA defined the relevant environmental justice

communities using U.S. census data, DOT_6968-69, in keeping with 1997 guidance from the

Council on Environmental Quality ("CEQ"), which provide that "[m]inority populations should

be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis." *Environmental Justice: Guidance Under the Nat'l Env't Pol'y Act* at 25-26 (Dec. 10, 1997) ("1997 Guidance")[26]; *see also* DOT_36961 (citing USDOT Order 5610.2C and FHWA Order 6440.23A). Indeed, that guidance specifically permitted use of census data. *See* 1997 Guidance at 14. Thus, and notwithstanding the State's preferred methodology, FHWA applied established definitions and guidance to define the environmental justice communities, meeting NEPA's requirements. *See, e.g.*, *Marsh*, 490 U.S. at 378 ("[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *see also Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 60 (D.D.C. 2022) (concluding methodology "showing that minority populations were determined to be present in an area when the 'percentage of minority group or low-income population exceeded 50 percent of the county population, or was 'meaningfully greater' than the general population of the county'" met NEPA's hard look standard).[27] And even setting methodology aside, a significant number of New Jersey counties were included in the local study area. DOT_36963 (including Bergen, Essex, Hudson, and Union Counties).

Second, the State claims the "Final EA failed to account for how traffic diversions would

---

[26]     *Available at* https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf (last accessed December 14, 2023).

[27]     To the extent the State raises concerns regarding outreach to "New Jersey communities with environmental justice concerns," Pl.'s Mem. at 36, those arguments are addressed below regarding public input.

exacerbate preexisting public health and environmental conditions in these [environmental justice] communities" and failed to commit to place-based mitigation measures. Pl.'s Mem. at 36-38.

FHWA, however, produced a detailed analysis of potential effects on environmental justice communities, including by looking at increased traffic congestion, DOT_36978-81, and changes in air quality, DOT_36981-84. And although the State claims FHWA did not "expand the hot-spot" analysis to Fort Lee, New Jersey, Pl.'s Mem. at 37, the Final EA includes a highway segment analysis in Fort Lee, in lieu of the hot-spot analysis applicable to intersections. DOT_36984. This choice of methodology is more than sufficient. *See Limerick Ecology Action, Inc. v. U.S. Nuclear Reg. Comm'n*, 869 F.2d 719, 747 (3d Cir. 1989) (court should not "substitute [its] judgment for that of the [agency], which considered the whole range of issues and developed a considerable record").

Given those results, place-based mitigation is available for several locations in New Jersey, depending on the tolling rate and structure that is ultimately adopted by the TBTA. DOT_37016-20; *see also* DOT_7319-20 (identifying New Jersey communities). The Final EA also explained the specific regional and place-based mitigation measures under consideration. DOT_7322-24; *see also* DOT_7327 (specific mitigation commitments). Again, FHWA was clear that New Jersey census tracts that may merit mitigation include locations in Orange, East Orange, Newark, and Fort Lee. DOT_37030.

Third, the State claims the Final EA "failed to address" certain New Jersey communities with "preexisting pollution and chronic disease burdens" such as Union City. Pls' Mem. at 38. But the Final EA analyzes effects in those specific communities. DOT_36992-96. And far from "cursory," FHWA's Technical Memorandum analyzes the impact of increases in traffic in

34

environmental justice communities, including Union City, Bayonne, Elizabeth, and Perth Amboy, among others.  *See* DOT_7250; DOT_7253; DOT_7269 (identifying municipalities with pollutant and chronic disease burdens); DOT_7282-83 (denoting specific New Jersey municipalities); DOT_7287 (mapping environmental justice communities); DOT_72301-32 (New Jersey environmental justice communities that could experience truck traffic increases); DOT_72311 (same as to non-truck traffic increases).  As a result, FHWA recommended mitigation for several New Jersey locations.  DOT_7320; DOT_7326.  Thus, the State's arguments are facially refuted by the extensive analysis in the Final EA.

### III.     FHWA Reasonably Confined its Review of Alternatives to Those Options That Could be Enacted by the TBTA.

At base, FHWA structured its consideration of alternatives on the practical reality that the Project was required by New York State law to meet certain traffic reduction and revenue-generating criteria.  This choice was reasonable, given an agency's "considerable discretion to define the purpose and need of a project."  *Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273, 281 (D. Del. 2011) (quotation omitted); *see also Del. Riverkeeper Network v. Penn. Dep't of Transp.*, No. 18-4508, 2020 WL 4937263, at *18 (E.D. Pa. Aug. 21, 2020) (granting "the purpose and need statement the deference it is due").

Against that, the State claims that FHWA should not have included a "funding objective," consistent with the Traffic Mobility Act in the purpose and need definition given it was not a "key environmental" objective of the Project.  Pl.'s Mem. at 45.

But "an agency is not required to consider 'remote and speculative' alternatives."  *Vt. Yankee*, 435 U.S. at 551 (citation omitted).  FHWA summarized previous studies and concepts considered by "New York official and stakeholder and advocacy groups," DOT_36262-63, as well as a variety of "[c]ongestion pricing strategies" that included tolls and non-toll options.

DOT_36264-65.  Those strategies were then screened against the objectives of reducing VMT,

reducing the number of vehicles entering the Manhattan CBD, and generating $15 billion in

revenue for MTA capital projects.  DOT_36266.[28]  Only the CBD Tolling Program met all three

requirements.  DOT_36266-68.

Given the requirements of the Traffic Mobility Act, an alternative that did not generate

the necessary revenue *could not* be adopted by the TBTA.  DOT_2407 (noting TBTA "shall"

ensure final tolling structure will generate requisite revenue).  FHWA therefore had no obligation

to further consider those alternatives resulting in less revenue because the range of alternatives

that must be considered by an agency is "bounded by some notion of feasibility."  *Vt. Yankee*,

435 U.S. at 551; *see also Concerned Citizens All. v. Slater*, 176 F.3d 686, 706 (3d. Cir. 1999)

("where the agency has examined a breadth of alternatives but has excluded from consideration

alternatives that would not meet the goals of the project, the agency has satisfied NEPA").

Alternatives that could not have been adopted by the TBTA are definitionally unfeasible.

Indeed, numerous courts have found that an agency has no obligation to consider an alternative

that cannot be actualized.  *See Latin Ams. for Soc. and Econ. Dev. v. Adm'r of Fed. Highway

Admin.*, 756 F.3d 447, 470 (6th Cir. 2014) ("it is not a violation of NEPA for an agency to

decline to consider further an alternative if the agency is unlikely to secure required approval to

move forward with that alternative."); *Nat. Res. Def. Council v. F.A.A.*, 564 F.3d 549, 557 (2d

Cir. 2009) ("FAA reasonably concluded that projects . . . did not present workable alternatives

because they were unlikely to secure permit approval from [state agency]."); *Utahns for Better

Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1172 (10th Cir. 2002) (no need to consider

---

[28]    The Final EA used a reduction of 5 percent as a meaningful reduction in VMT, and a 10
percent reduction in vehicles entering the CBD as the threshold for reducing traffic entering the
Manhattan CBD.  DOT_36266

alternative where "a number of local and regional governmental entities whose cooperation would be necessary to make an alternative land use scenario a reality" had "declined to alter their plans"); *Indian River Cnty. v. Dep't of Transp.*, 348 F. Supp. 3d 17, 54 (D.D.C. 2018) (consideration of applicant's "financial model" in evaluating alternatives was "appropriate"); *Protect our Parks, Inc. v. Buttigieg*, No. 21-2006, 2021 WL 3566600, at *13 (N.D. Ill. Aug. 12, 2021) (noting Federal agencies had no obligation to consider alternative sites where they could not force city to use those sites).

So too, the idea that FHWA should have ignored the Project Sponsors' goals (and, indirectly, state legislative direction) is contrary to the principle that "Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be." *Citizens Against Burlington, Inc. v. Busey.*, 938 F.2d 190, 200 (D.C. Cir. 1991); *see also Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1224 (S.D. Fla. 2010) ("the relationship of . . . FHWA to the [municipal sponsor] should be one that is premised on the idea that the representatives of the community are best situated to make the decisions regarding transportation planning for their community").  Indeed, and to the extent the State challenges consideration of the Project Sponsors' goals due to disagreement with those goals rather than concern about the scope of the environmental analysis, changes of agency policy are beyond the scope of this litigation.  *See, e.g.*, *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) ("NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes." (citation omitted)).  Said differently, "NEPA does not confer veto power on potentially affected state or local governments, each with its own economic interests."  *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 877 (9th Cir. 2017).

In addition, the State claims the Final EA did not provide a sufficient rationale for dismissing certain alternatives. Pl.'s Mem. at 46. In particular, the State claims FHWA: (1) failed to provide an explanation for rejecting carpooling strategies; and (2) rejected "Alternative T-2" based on invalid environmental justice concerns. *Id*. Each is misplaced. As to the first, FHWA explained that carpooling strategies would "prohibit single-occupancy vehicles from entering Manhattan south of 60th Street weekdays, 6. a.m. to 10 a.m." DOT_36265. Because that strategy would not generate revenue, it was rejected as not meeting the Project's funding element. DOT_36267. As to the second, Alternative T-2 would have established "a toll on the currently untolled East River and Harlem River crossings to Manhattan." DOT_36265. FHWA explained, however, that this alternative would not meet the funding objective because "there is no law or agreement in place between the City of New York and MTA that would direct the revenue to MTA to support the Capital Program." DOT_36268. Moreover, the agency noted that this alternative "would not address trips that start and end within Manhattan" and would "adversely affect local trips between the South Bronx and Harlem/Washington Heights, which could result in a local adverse economic impact in two environmental justice communities." *Id*. This explanation more than satisfies NEPA's requirement that an agency provide an explanation regarding dismissed alternatives. *See Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 183 (3d Cir. 2000).

## IV.     FHWA Provided Ample Opportunities for Participation for the New Jersey Public and State Agencies.

One of NEPA's twin aims is to facilitate agencies' communication with the public. *See Robertson*, 490 U.S. at 350-52; *see also DNREC*, 685 F.3d at 269-270. As a result, NEPA requires that the public have "a meaningful opportunity to learn about and to comment on the proposed actions." *State ex rel. Siegelman v. U.S. Envtl. Prot. Agency*, 911 F.2d 499, 504 (11th

Cir. 1990); *see also Allegany Envtl. Action v. Westinghouse Elec. Corp.*, 1998 U.S. Dist. LEXIS 1892, \*20-21 (W.D. Pa. 1998).[29]  Here, although the State argues participation for both the New Jersey public and State agencies was insufficient, FHWA implemented a robust process for obtaining public input that more than satisfies NEPA's requirements.

### A.  The New Jersey Public Was Afforded a Meaningful Opportunity for Engagement and Comment.

The State and its constituents had a meaningful opportunity to both learn about and provide comments on the Project's NEPA review.  In fact, FHWA and the Project Sponsors provided an opportunity for public participation at every step in the process.  For example, during the scoping process the Project Sponsors conducted ten "Early Outreach webinars"— including two assigned to New Jersey—to provide education about the Project and an opportunity for comment.  *See* DOT_37045-45.  In addition, the Project Sponsors also conducted nine additional Environmental Justice Webinars, with three specifically dedicated to New Jersey. DOT_0037046.  And when the draft EA was published, FHWA provided for electronic access, DOT_37056, and physical copies were made "available for public inspection," *see* 23 C.F.R. § 771.119, at the FHWA office in Trenton, New Jersey, at libraries in ten New Jersey counties, and

---

[29]      The State cites to a single case from the District of Idaho to support its arguments on public participation.  *See Kootenai Tribe v. Veneman*, 142 F. Supp. 2d 1231 (D. Idaho 2001). But the holding the State relies upon is not good law.  That court's analysis was explicitly overruled by the Ninth Circuit, which found that "the [agency] did provide the public with extensive, relevant information on the [rule.]"  *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1116 (9th Cir. 2002).  Further, although the State specifically relies on that district court's formulation of what constitutes a meaningful opportunity for participation, the Ninth Circuit "conclude[d] that the [agency] allowed adequate time for meaningful public debate and comment." *Id*.

in government offices in 14 New Jersey counties (such as the Bergen County Clerk's Office).
*See* DOT_37057-61.

So too, the New Jersey public had the opportunity to comment on the draft EA during six
hearings held between August 25-31, 2022.  *See* DOT_37062.  Notice of these public hearings
was advertised online, through social media, through a database and email list, and through
media outlets in the 28-county study area, including several New Jersey-specific outlets.  *See*
DOT_37046.  Over 1,700 people attended, and 552 individuals made oral comments, including
New Jersey government officials such as Congressman Gottheimer, Representative of New
Jersey's 5th District, DOT_42393, other stakeholders such as directors of nonprofit associations,
*see* DOT_41973, and management of private bus and other transit companies.  *See* DOT_42828;
DOT_43124; DOT_43124; DOT_43145; DOT_43276.

FHWA and Project Sponsors also received nearly 70,000 public input submissions during
the formal public comment period, including 14,000 individual comments from oral testimony,
letters, emails, voicemails, and submissions via an electronic comment form.  *See* DOT_37063.
Among these were extensive written comments submitted by New Jersey Governor Murphy on
behalf of a variety of State agencies.  DOT_7772-75.[30]

This extensive opportunity for comment more than satisfies NEPA's requirement that the
agency "inform the public that it has indeed considered environmental concerns in its
decisionmaking process." *Balt. Gas & Elec. Co.*, 462 U.S. at 97.  Against that, the State argues
public participation was insufficient based on the length of the comment period and unspecified
"insufficient responses."  Pl.'s Mem. at 40-41.  But those complaints are belied by the scope of

---

[30]     Governor Murphy also submitted additional comments in the period after the final EA
was issued and before the FONSI was finalized.  *See* DOT_40844-58.

the process, including the expanded comment period and thorough agency responses to comments provided in Appendix 18.  *See* DOT_7454-36141.

### B.  New Jersey State Agencies Had a Meaningful Opportunity to Comment on the Project but Did Not Avail Themselves of That Opportunity.

When preparing an environmental assessment, "agencies shall involve the public . . . state. . . and local governments . . . to the extent practicable."  40 CFR § 1501.5.  That said, "it is incumbent upon [those] who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the [participants'] position and contentions."  *Vt. Yankee*, 435 U.S. at 553.  Here, four New Jersey entities were identified as participating agencies: three state transportation agencies (the New Jersey Department of Transportation, New Jersey Transit, and the New Jersey Turnpike Authority), and one regional transportation agency, NJTPA.  *See* DOT_37043.  As with the public, these agencies were presented with an opportunity to participate at meetings during each stage of the NEPA process between September 2021 and May 2023.  Each meeting included a brief presentation and an opportunity to both ask questions and provide comments such that the State's contention that "these meetings were essentially briefings," Pl.'s Mem. at 40, is factually inaccurate.

But New Jersey officials chose not to use those forums.  First, at the September 10, 2021, meeting, nine officials representing three of the four New Jersey agencies invited to attend the meeting were present.  After the initial presentation, one New Jersey official asked about "how CBD tolling would impact buses, specifically the large number of charter and private buses in the city," and another asked whether eastern Pennsylvania was included in the scope of the traffic analysis.  DOT_41620.  Second, at the meeting on March 11, 2022, MTA gave a presentation regarding the scope and purpose of the Project.  Contrary to the State's assertion that this meeting was convened "only to discuss the limited issue of potential increases . . . at a

41

single stairway at the Hoboken Terminal," Pl.'s Mem. at 42, MTA's presentation explained that

it conducted an overall analysis of "incremental passenger volumes" at NJ Transit and Path

Stations to determine which stations may be affected by increased transit usage due to the

Project. DOT_39964.  MTA completed the presentation by taking questions and feedback; only

one New Jersey official had a comment (regarding concerns over signage).  DOT_39958.  Third,

at the August 2, 2022, meeting (regarding the draft EA), eight officials representing all four

agencies were present.  No New Jersey official asked questions or offered comments.

DOT_41634-41638; *see also* Pl.'s Mem. at 42 (acknowledging "time was given for questions").

Fourth and finally, on May 11, 2023 (regarding the Final EA and draft FONSI), five officials

from three of the four agencies were present.  One New Jersey official asked where to find the

Final EA, whether the Powerpoint presentation slides from the meeting would be made available

after the meeting, and whether there would be any public meetings during the 30-day comment

period on the draft FONSI.  DOT_43818-43821.  A second asked whether the meeting's virtual

chat and a summary of the meeting would be shared with participants.  *Id.*  None of those

questions go to the issues raised by the State now.  In contrast, officials from other jurisdictions

asked substantive questions about the timeline for implementation of the Project, specifics

regarding the FONSI, and offered comments on the final EA and draft FONSI.  *See id.*

Thus, despite ample opportunities to offer feedback, only two New Jersey officials asked

substantive questions over nearly two years of meetings.  The State's complaint that its agencies

should have been provided additional opportunities to participate therefore rings hollow.

### C.  FHWA Implemented a Robust Public Review Process.

Nor was FHWA required to provide more opportunities for input, given the Project's

public participation far exceeded the threshold requirements for an EA.  In fact, the public

process met the standard that would ordinarily be required for an EIS, which means that the State has already received the level of participation they seek in this lawsuit.  *See* Compl. ¶ 158 (ECF No. 1).

FHWA greatly exceeded EA public review requirements provided in both CEQ and its own regulations.  As the Third Circuit has acknowledged, under the CEQ regulations, "there are no notice requirements, pre-circulation requirements, or instructions about the public comments process" applicable to EAs.  *See DNREC*, 685 F.3d at 272.  Instead, agencies need only involve the public, including "state . . . and local governments" "to the extent practicable."  40 C.F.R. § 1501.5.  For example, in *DNREC*, the court found that the agency was "transparent, clear, and inclusive" when it: (1) posted notice of an environmental review; (2) summarized changes to the project; and (3) offered a 30-day period for public comment after the Final EA was released.  *See* 685 F.3d at 272.[31]  And even though FHWA's regulations impose further requirements, *see* 23 C.F.R. § 771.119 (requiring public comment for 30 days), the process here exceeded even that standard.  Thus, although the State appears to argue that FHWA erred in not including the New Jersey Department of Environmental Protection ("NJDEP") and New Jersey Department of Health in regional stakeholder meetings, Pl.'s Mem. at 41, FHWA went beyond its regulatory

---

[31]     Other Circuits have echoed this holding.  In the Ninth Circuit, there is no "minimum level of public comment and participation required by the regulations governing the EA and FONSI process."  *Bering Strait Citizens for Responsible Res. Dev. v. United States Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008) (citation omitted).  Similarly, the D.C. Circuit found that the agency "adequately fulfilled" its mandate to "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" for an EA by posting notice in its offices and online.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 518-520 (D.C. Cir. 2010).

obligations by scheduling meetings to affirmatively educate and seek feedback from state and local agencies. *See* 23 C.F.R. § 771.19.[32]

Indeed, public participation regarding the Project has met and exceeded FHWA's standard for an EIS. *See, e.g.*, 23 C.F.R. § 771.123(i)(2) (FHWA need only transmit the draft EIS to appropriate state and local government agencies and offer a chance to comment). By scheduling meetings to affirmatively educate and seek feedback from state and local agencies, FHWA went beyond its regulatory obligation. The chart below summarizes the requirements in FHWA's regulations for preparation of EAs and EISs compared with this Project.

| Legal Requirement | EA[33] | EIS[34] | Project |
|---|---|---|---|
| Circulate Draft Document for Comment | ✓[35] | ✓ | ✓ |
| Make Draft Document Available for Public Inspection | ✓ | ✓ | ✓ |
| Final Document Available 15 Days Before Public Hearing | ✓ | ✓ | ✓ |
| Public Hearing | X | ✓ | ✓ |
| Circulate Draft for Comment by Appropriate State and Local Agencies | X | ✓ | ✓ |
| Final document transmitted to any persons, organizations, or agencies that made substantive comments on the draft document (including through electronic means). | X | ✓ | ✓ |
| Public Comment Period | 30 days | 45 days | 44 days |

---

[32]   Additionally, an agency "possesses discretion in determining which [state and local] bodies to consult." *Comanche Nation of Okla. v. Zinke*, 754 Fed. App'x 768, 775 (10th Cir. 2018). Thus, despite the State's suggestions to the contrary, the fact that FHWA conducted more meetings with New York agencies than New Jersey agencies or that certain agencies were not invited to meetings are not indicative of NEPA violations.

[33]   Information in this column documents the public participation procedures required by FHWA's regulations for an EA. *See* 23 C.F.R. § 771.119.

[34]   Information in this column documents the public participation procedures required by FHWA's regulations an EIS. *See* 23 C.F.R. §§ 771.123-125.

[35]   This action is only required if the agency anticipates issuing a FONSI. *See* 23 C.F.R. § 771.119(h).

As this makes clear, FHWA provided EIS-level participation, going well beyond what was legally required (*e.g.*, by holding 19 public hearings during the scoping process and by conducting meetings with state and local agency stakeholders at every stage of the process). As a result, the State's arguments are meritless.

## V.    The State's Conformity Argument, if Not Waived, Is Inapposite.

First, the State waived its conformity argument by failing to raise it in comments to the draft EA. *See City of Olmsted Falls v. F.A.A.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (petitioner "has waived this Clean Air Act claim by failing to challenge the [agency's methodology during the administrative proceedings"); *Del. Riverkeeper Network,* 869 F.3d at 155; *see also Vt. Yankee*, 435 U.S. at 553. On July 29, 2022, FHWA published the draft EA, including Chapter 10, Air Quality. DOT_37769-819. Section 10.4 of Chapter 10 is titled "TRANSPORTATION CONFORMITY DETERMINATION," DOT_37816, and "conformity" appears 20 times in the text of that chapter. *Id.* FHWA's draft conformity determination was therefore clearly included in the draft EA and ripe for comment. *See* DOT_37057 (detailing comment period). Despite this ample notice, the State never requested that FHWA conduct a conformity analysis related to the New Jersey SIP or that FHWA consult any New Jersey agencies before making a conformity determination; indeed, neither set of comments submitted by the State mentions conformity at all. *See* DOT_7772-75; DOT_40844-58. The State has therefore waived its conformity arguments.

And even if the State had not waived its conformity arguments, those arguments fail because the conformity determination for a transportation project such as this one does not

require analysis of any SIP.  *See* 40 C.F.R. § 93.109(b).[36]  The State therefore erroneously cites

the requirements for transportation plans and transportation improvement programs as applicable

to the Project.  40 C.F.R. § 93.109(b)-(c).  But the transformation conformity requirements are

implemented differently for different types of actions under the CAA and EPA's transportation

conformity rules.  *Id.*

Further, the State incorrectly relies on 40 C.F.R. § 93.150(b) to support its claim that "the

CAA requires FHWA to conduct a conformity analysis and determination for all new

transportation projects."  Pl.'s Mem. at 47.  40 C.F.R. § 93.150(b), however, only applies to

general federal actions and is inapplicable to specific transportation projects.  *See* 40 C.F.R. Part

93, Subpart B.  Instead, the regulations applicable to transportation projects are found in 40

C.F.R. Part 93, Subpart A.  The State accordingly provides no legal basis for its assertion that

FHWA is required to conduct a conformity analysis for the New Jersey SIP.

Similarly, the State's argument that FHWA was required to consult New Jersey agencies

before making a SIP conformity determination is deficient on its face because the consultation

requirement the State cites describes requirements for revisions of state SIPs, not individual

project conformity determinations.  Pl.'s Mem. at 49 (citing 40 C.F.R. § 93.105(a)(2)).[37]

All that said, FHWA's conformity analysis by no means ignored New Jersey.  FHWA

conducted hot-spot analyses for carbon monoxide, PM 2.5, and PM 10 at locations in New

---

[36]     As shown in 40 C.F.R. § 93.109(b), Table 1, "Conformity Criteria," transportation
projects require hot-spot analyses for carbon monoxide, PM 2.5, and PM 10 in compliance with
40 C.F.R. § 93.116, not a *conformity analysis for any SIP.*

[37]     In addition, the State does not identify why consultation provisions for conformity
determinations in New York's SIP would require FHWA to contact or consult with NJDEP for
this type of action.  And N.J. Stat. § 26:2C-8.11 only describes NJDEP's duties to regulate air
pollution generally.  Pl.'s Mem. at 49.

Jersey, DOT_37810-14, and conducted highway link analyses (again including locations in New

Jersey) to ensure the Project would not cause violations of the carbon monoxide, PM 2.5, or PM

10 NAAQS.  DOT_37814-15.  Further FHWA confirmed it will "monitor air quality for the life

of the Project" to confirm any air emissions conform to the relevant NAAQS.  DOT_37815.

    In sum, the State waived its conformity arguments by not asserting them during the

public comment process.  And even if the arguments were not waived the State has presented no

basis to support its contentions.

## CONCLUSION

    For the foregoing reasons, the Court should grant Defendants' cross-motion for summary

judgement and deny Plaintiff's motion for summary judgment.

Respectfully submitted,

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ GREOGRY M. CUMMING*
GREGORY M. CUMMING
SHARI HOWARD
SAMANTHA PELTZ
Trial Attorneys
Environment & Natural Resources Division
150 M St., N.E.
Washington, D.C. 20002
(202) 305-0457 (phone)
(202) 598-0414 (cell)
gregory.cumming@usdoj.gov
shari.howard@usdoj.gov
samantha.peltz@usdoj.gov

ALEX SILAGI
Assistant United States Attorney
District of New Jersey
United States Attorney's Office
970 Broad Street, 7th Floor

Newark, New Jersey 07102
973-353-6001 (phone)
alex.silagi@usdoj.gov

*Counsel for Defendants*