**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STATE OF NEW JERSEY, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) No. 23-3885 (LNG-LDW) |
| TRANSPORTATION, *et al.*, | ) |
| | ) |
| *Defendants*, | ) |
| | ) |
| and | ) |
| | ) |
| METROPOLITAN TRANSPORTATION | ) |
| AUTHORITY, *et al.*, | ) |
| | ) |
| *Defendant-Intervenor*. | ) |
| | ) |

**DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION**
**FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

    I.     The State's New Claim Regarding FHWA's Re-Evaluation of the Final
         Tolling Structure is Unripe and Without Merit, or Has Been Waived ................... 3

    II.    FHWA's Methodological Choices Were Reasonable and Well-Supported ........... 7

         A.    The Court Should Defer to FHWA's Technical Expertise ........................ 7

         B.    FHWA Reasonably Determined the Scope of the Final EA's Air
              Quality Analysis ............................................................................... 8

         C.    FHWA's Environmental Justice Analysis Was Thorough and
              Reasonable .................................................................................... 13

    III.   FHWA Appropriately Assessed the Project's Effects on Air Quality ................. 16

    IV.   The Final EA Commits to Implementation of Effective Mitigation Measures .... 17

    V.    FHWA Exceeded the Regulatory Requirements for Public Participation ........... 20

    VI.   FHWA Appropriately Assessed Only Realistic Alternatives .............................. 22

    VII.  If Not Waived, the State's Conformity Argument is Unpersuasive ................... 24

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITES

Page(s)

**Cases**

*Audubon Naturalist Soc'y of the Central Atlantic States, Inc. v. U.S. Dep't of Transp.*,
524 F. Supp. 2d 642 (D. Md. 2007) ............................................ 10

*Bergen Cnty. v. Dole*,
620 F. Supp. 1009 (D.N.J. 1985) .............................................. 20

*Border Power Plant Working Grp. v. Dep't of Energy*,
260 F. Supp. 2d 997 (S.D. Cal. 2003)................................... 16, 17

*CEC Energy Co., Inc. v. Pub. Serv. Comm'n of Virgin Islands*,
891 F.2d 1107 (3d Cir 1989) ................................................... 4

*Citizens for Balanced Env't and Transp., Inc. v. Volpe*,
650 F.2d 455 (2d Cir. 1981) ................................................... 13

*City of Angoon v. Hodel*,
803 F.2d 1016 (9th Cir. 1986) ................................................ 23

*City of Crossgate v. U.S. Dep't of Veterans Affs.*,
526 F. Supp. 3d 239 (W.D. Ky. 2021) ....................................... 6

*City of Olmsted Falls, OH v. F.A.A.*,
292 F.3d 261 (D.C. Cir. 2002) ................................................ 25

*Clairton Sportsmen's Club v. Penn. Turnpike Comm'n*,
882 F. Supp. 455 (W.D. Pa. 1995)........................................... 22

*Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*,
576 Fed. App'x 477 (6th Cir. 2014) ......................................... 23

*Coal. on Sensible Transp. v. Dole*,
826 F.2d 60 (D.C. Cir. 1987)................................................... 3

*Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.*,
279 F. Supp. 3d 898 (D. Ariz. 2017) ......................................... 9

*Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.*,
522 F.2d 107 (D.C. Cir. 1975).................................................. 3

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004).............................................................. 24

*Dine Citizens Against Ruining Our Env't v. Klein*,
676 F. Supp. 2d 1198 (D. Colo. 2009)....................................... 5

*Earth Island Inst. v. Muldoon*,
630 F. Supp. 3d 1312 (E.D. Cal. 2022) ...................................... 6

*HonoluluTraffic.com v. Fed. Transit Admin.*,
   742 F.3d 1222 (9th Cir. 2014) .................................................................. 24

*In re Fosamax Products Liab. Litig. (No. II)*,
   751 F.3d 150 (3d Cir. 2014) ...................................................................... 5

*Krasniqi v. Dibbins*,
   558 F. Supp. 3d 168 (D.N.J. 2021) ........................................................... 24

*Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
   858 F. Supp. 2d 839 (E.D. Mich. 2012) .................................................... 7

*Marsh v. Oregon Nat. Resources Council*,
   490 U.S. 360 (1989) ................................................................................. 7

*Montlake Cmty. Club v. Mathis*,
   No. C17-1780-JCC, 2019 WL 3928732 (W.D. Wash. Aug. 20, 2019) ......... 5

*NAACP Erie Unit 2262 v. Fed. Highway Admin.*,
   648 F. Supp. 3d 576 (W.D. Pa. 2022) ....................................................... 18

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) .................................................................. 22

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009) ................................................................... 20

*Peachlum v. City of York*,
   333 F.3d 429 (3d Cir. 2003) ..................................................................... 4

*Prisons, Inc. v. U.S. Dep't of Just.*,
   197 F. Supp. 2d 226 (W.D. Penn. 2001) ................................................... 6

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ................................................................................. 21

*Sierra Club v. Fed. Highway Admin.*,
   No. 17-CV-1661-WJM-MEH, 2018 WL 1610304 (D. Colo. Apr. 3, 2018) ... 16

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ............................................................... 16

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ................................................................................. 8

*South Trenton Residents Against 29 v. Fed. Highway Admin.*,
   176 F.3d 658 (3d Cir. 1999) ..................................................................... 5

*State Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*,
   685 F.3d 259 (3d Cir. 2012) ................................................................ 20, 21

*Tinicum Twp. v. U.S. Dep't of Transp.*,
   685 F.3d 288 (3d Cir. 2012) ..................................................................... 8

*Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*,
  90 F.4th 122 (3d Cir. 2024) ...................................................................... 3, 7, 14, 20

*Twp. of Bordentown v. FERC*,
  903 F.3d 234 (3d Cir. 2018) ...................................................................... 18

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Defense Council*,
  435 U.S. 519 (1978) .................................................................................. 8, 24

*Yorkshire Towers, Co., L.P. v. U.S. Dep't of Transp.*,
  No. 11 CIV. 1058 TPG, 2011 WL 6003959 (S.D.N.Y. Dec. 1, 2011) ...................... 5

*Zubik v. Sebelius*,
  911 F. Supp. 2d 314 (D.D.C. 2012) .......................................................... 3

**Statutes**

23 U.S.C. § 139(l)(1) ...................................................................................... 5

42 U.S.C. § 4321 ............................................................................................ 1

42 U.S.C. § 7401 ............................................................................................ 2

**Regulations**

23 C.F.R. § 771.119 ........................................................................................ 6

23 C.F.R. § 771.119(d) ................................................................................... 13, 20

23 C.F.R. § 771.119(h) ................................................................................... 13

23 C.F.R. § 771.129 ........................................................................................ 5

23 C.F.R. § 771.130 ........................................................................................ 5

40 C.F.R. § 1501.14(b) ................................................................................... 22, 23

40 C.F.R. § 1501.6(a)(2) ................................................................................ 13

40 C.F.R. § 93.109(b) ..................................................................................... 25

40 C.F.R. § 93.116 .......................................................................................... 25

7 C.F.R. § 650.4 ............................................................................................. 11

# TABLE OF ACRONYMS[i]

| | |
|---|---|
| AADT | Annual Average Daily Traffic |
| APA | Administrative Procedure Act |
| CAA | Clean Air Act |
| CBD | Manhattan Central Business District |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FHWA | Federal Highway Administration |
| FONSI | Finding of No Significant Impact |
| ICG | Interagency Consultation Group |
| MSAT | Mobile Source Air Toxics |
| MTA | Metropolitan Transportation Authority |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NYSDOT | New York State Department of Transportation |
| SIP | State Implementation Plan |
| TBTA | Triborough Bridge and Tunnel Authority |
| VMT | Vehicle Miles Travelled |

---

[i]    *See also* ECF No. 79-1 at viii.

## INTRODUCTION

At base, the State of New Jersey ("the State") seeks repeal of the New York State law authorizing the Manhattan Central Business District ("CBD") Tolling Program ("the Project"). But that is not a remedy the State can obtain in this litigation. And though the State seeks an order requiring Federal Defendants[1] to prepare an Environmental Impact Statement ("EIS") on remand, the Final Environmental Assessment ("EA") they challenge is—in the first instance—compliant with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq*., not to mention the functional equivalent of an EIS in content and scope. Faced with those obstacles, the State instead advances several arguments untethered from the administrative record.

For the first time, the State takes the position that the Final EA is presumptively invalid because FHWA will re-evaluate its findings based on the tolling scenario ultimately adopted by the Triborough Bridge and Tunnel Authority ("TBTA"). But any claim that the forthcoming supplemental review is inadequate now is patently unripe. And the State's new position, if not time-barred, also overlooks that it is appropriate for an agency to assess the information it has available and then conduct a supplemental review based on later factual developments.

Further, the State ultimately fails to identify a meaningful flaw in the Final EA. First, although the State questions FHWA's methodological choices in designing the air quality and environmental justice studies, the agency thoroughly explained its determinations, and those choices are entitled to deference.

---

[1] Defendants are the U.S. Department of Transportation ("DOT"), the Federal Highway Administration ("FHWA"), Shailen Bhatt, in his official capacity as Administrator of FHWA, and Richard J. Marquis, in his official capacity as Division Administrator of the New York Division of FHWA.

Second, although the State argues FHWA overlooked certain air quality impacts, that claim ignores that the community-level effects the State identifies were captured through the environmental justice analysis, while the broader air quality analysis instead looked at various regional and local effects.  Similarly, although the State claims that the environmental justice analysis was too narrow, that review was suitably responsive to specific community concerns.

Third, while the State has changed course from arguing that no mitigation is allocated to New Jersey communities to now claiming there is "no actual commitment" for those measures, the record instead reflects FHWA's firm commitment to implementing mitigation and provides a detailed analysis of the basis for the chosen measures.

Fourth, New Jersey was not "deliberately shut out of" the development of the Final EA. Instead, the State had numerous chances to participate in the NEPA process and cannot now claim error because it chose to structure its participation in a limited fashion.

Fifth, the State fails to contend with the logic that FHWA had no responsibility to consider alternatives that never would have been enacted by the TBTA because they did not meet the New York Traffic Mobility Act's revenue generation requirement.  Further, FHWA reasonably rejected certain alternatives as not meeting the Project's purpose and need.

Finally, and if not waived, the State's arguments as to the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, continue to rely on inapposite requirements.

In sum, the State fails to identify actual (and meaningful) errors in the analysis in the Final EA.

## ARGUMENT

As one court has explained, "[t]he NEPA process involves an almost endless series of judgment calls . . . [including] relating to the detail in which specific items should be discussed .

. . It is of course always possible to explore a subject more deeply and to discuss it more thoroughly.  The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."  *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  Said differently, the Third Circuit recently stated that "we have interpreted NEPA as 'merely intended to make decision makers aware of the potential environmental ramifications of their actions.'"  *Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*, 90 F.4th 122, 132 (3d Cir. 2024) (citation omitted).  Given that framework, the so-called errors identified by the State are, at bottom, improper disagreements with FHWA's analytical choices.  But, as described below, those choices accord with NEPA's requirements.

**I.      The State's New Claim Regarding FHWA's Re-Evaluation of the Final Tolling Structure is Unripe and Without Merit, or Has Been Waived.**

The State tries to manufacture a violation of NEPA by claiming that, although FHWA has committed to re-evaluating the Final EA based on the final tolling scenario eventually enacted by the TBTA, that forthcoming re-evaluation is presumptively invalid.  But given FHWA has not yet finalized any re-evaluation (and of course cannot do so until the TBTA's administrative process is complete), the State's allegation is facially premature.[2]  *See Zubik v. Sebelius*, 911 F. Supp. 2d 314, 325-26 (D.D.C. 2012) (noting agency's intent to amend regulations rendered challenge unripe) (citing *Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.*, 522 F.2d 107, 125 (D.C. Cir. 1975) ("If the [agency's] position is likely to be . . . modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision."))  The State attempts to

---

[2]      The TBTA is presently engaged in rulemaking under the New York State Administrative Procedure Act and is soliciting comments on the proposed tolling structure through March 11, 2024.  *See* https://new.mta.info/project/CBDTP.

manufacture ripeness by claiming that the final tolling scenario is unlikely to change as a result of the TBTA's rulemaking, Pls.' Opp'n to Defs.' Mot. Sum. J. ("Pls.' Opp'n") at 13 (ECF No. 86); however, for purposes of Plaintiffs' NEPA claims, which challenge *federal agency action*, the operative determination is FHWA's re-evaluation of the Final EA, which cannot be completed until the TBTA enacts a final tolling scenario. *See* DOT_7328 & n.113 ("Following the adoption of a final toll structure by TBTA . . . modeling of the adopted tolling structure will be undertaken to compare potential effects to the EA analyses."); *see also CEC Energy Co., Inc. v. Pub. Serv. Comm'n of Virgin Islands*, 891 F.2d 1107, 1110 (3d Cir 1989) (action unripe where "[agency's] decision constitutes no more than a . . . prerequisite to definitive agency action").

Similarly, although Plaintiffs contend that any supplemental review is presumptively invalid because aspects of the final tolling scenario "will plainly have adverse environmental impacts," Pls.' Opp'n at 14, FHWA must make that determination in the first instance before the Court may assess its sufficiency. *See Peachlum v. City of York*, 333 F.3d 429, 434 (3d Cir. 2003) (a "final administrative determination is favored under the ripeness doctrine. The basic reason . . . is to prevent the courts, 'through avoidance of premature adjudication, from entangling themselves in abstract disagreements' over administrative problems, and to enable the agency to proceed without judicial interruption until an administrative determination has been formalized." (citation omitted)). The State admits as much, acknowledging that the "exact impact" of the final tolling scenario is currently "unknown." *Id*. at 15.

Indeed, the very purpose of FHWA's re-evaluation process is to "determine whether an environmental document or decision remains valid for Agency decisionmaking."[3] *See also*

---

[3]     *NEPA Re-Evaluation Joint Guidance* (Aug. 14, 2019) at 1, *available at* https://www.environment.fhwa.dot.gov/legislation/nepa/reevaluation_guidance_08142019.pdf.

*South Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 661 (3d Cir. 1999) ("[t]he purpose of the Reevaluation was to determine whether . . . a [s]upplemental [NEPA review] was necessary."). The State's argument would improperly prejudge that review. *See, e.g.*, *Dine Citizens Against Ruining Our Env't v. Klein*, 676 F. Supp. 2d 1198, 1215 (D. Colo. 2009) (finding "supplementation claim with respect to these two [ongoing] actions is not ripe"). Until FHWA completes its re-evaluation, there is no agency action that Plaintiffs may claim is contrary to 23 C.F.R. §§ 771.129 or 771.130.[4]

Alternatively, to the extent the State is arguing that the Final EA is invalid merely by virtue of the need for FHWA to prepare a re-evaluation, that claim is waived. *See* Pls.' Opp'n at 12-14. This allegation is not found in the State's Complaint, *see* ECF No. 1 at 55-63, nor in its opening brief, *see* ECF No. 67-1 at i-ii (Table of Contents). *See In re Fosamax Products Liab. Litig. (No. II)*, 751 F.3d 150, 158 (3d Cir. 2014) (Party's "reply brief arguments, which go beyond the scope of [Complaint] and are outside of anything addressed in the opening brief, must be seen as waived."). And even if not forfeited, this new argument (which amounts to a *de facto* amendment of the State's Complaint) is time-barred under 23 U.S.C. § 139(l)(1), which provides that a claim challenging certain transportation projects must be filed within 150 days of notice of a final agency action in the Federal Register. Here, the State's deadline to do so was November 27, 2023. 88 Fed. Reg. 123 (June 28, 2023); *see also Yorkshire Towers, Co., L.P. v. U.S. Dep't of Transp.*, No. 11 CIV. 1058 TPG, 2011 WL 6003959, at *5-6 (S.D.N.Y. Dec. 1, 2011) (applying § 139 statute of limitations and distinguishing between time-barred claim

---

[4]      Indeed, the State's argument is truly a separate claim altogether, one that must be brought in a new complaint if it ripens. *See, e.g.*, *Montlake Cmty. Club v. Mathis*, No. C17-1780-JCC, 2019 WL 3928732, at *3 (W.D. Wash. Aug. 20, 2019). To that end, although the State claims that consideration of this issue now is necessary for it to obtain judicial review before the Project goes into effect, the State can challenge any supplemental review at a later date.

challenging main NEPA decision and timely claim challenging failure to supplement based on new information).

Further, Plaintiffs' insinuation that the need for a re-evaluation renders the Final EA invalid is incorrect. *See* Pls.' Opp'n at 12-13. Instead, "agencies, almost uniformly, do get a second chance under NEPA . . . [A]gencies are regularly permitted to prepare supplemental environmental documents, even after they have already committed to a project." *Citizens Advisory Comm. on Priv. Prisons, Inc. v. U.S. Dep't of Just.*, 197 F. Supp. 2d 226, 249 (W.D. Penn. 2001); *see also id*. (NEPA provisions "allowing supplemental documentation demonstrate that neither agencies nor information are perfect and, at times, corrections and reevaluations are needed."). Moreover, Plaintiffs overlook that the Final EA "describes the effects of the tolling scenario that would result in the greatest potential negative effects for that particular topic," DOT_36306, such that re-evaluation will not compromise the public's ability to gauge the environmental effects of the Project. *See* 23 C.F.R. § 771.119 (EA must determine "which aspects of the proposed action have the potential for . . . environmental impacts").

And "tiering" does not render an initial NEPA document invalid. Instead, courts have explained that "NEPA regulations allow agencies to 'tier' later NEPA documents to earlier NEPA documents so that the agency can 'avoid some of the burdens of the NEPA process.'" *Earth Island Inst. v. Muldoon*, 630 F. Supp. 3d 1312, 1339 (E.D. Cal. 2022). "The later NEPA documents 'concentrate on issues specific to the current proposal' while the earlier NEPA documents are broader and 'cover matters more general in nature.'" *Id*. (citations omitted); *see also City of Crossgate v. U.S. Dep't of Veterans Affs.*, 526 F. Supp. 3d 239, 250 (W.D. Ky. 2021) ("NEPA permits agencies [to] tier their NEPA documents . . . An agency may tier by scope (*e.g.*,

from a programmatic to a site-specific statement) . . . or it may tier by stages (*e.g.*, from the 'need' or 'site selection' stage to later stages such as mitigation[.]")).

In sum, nothing about FHWA's determination to reevaluate the Final EA based on the final tolling scenario selected by the TBTA is arbitrary or capricious.

## II.    FHWA's Methodological Choices Were Reasonable and Well-Supported.

A.    The Court Should Defer to FHWA's Technical Expertise.

Although the State argues otherwise, Pls.' Opp'n at 10-11, disputes regarding an agency's analytical methodology are properly viewed through the framework of deference.  *See Trenton Threatened Skies*, 90 F.4th at 131.  In particular, the State argues that FHWA is not entitled to deference as to the "scope of environmental analysis," only to "decisions based on an agency's subject matter expertise."  Pls.' Opp'n at 4.  But this is a distinction without a difference.  As an initial matter, FHWA's determinations as to the content of the traffic and air quality analyses are plainly entitled to deference. *See Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 858 F. Supp. 2d 839, 855 (E.D. Mich. 2012) ("[T]he FHWA's technical methodologies, including its traffic projections, are entitled to substantial deference and are subject only to a reasonableness review.").  And the "scope" of that analysis necessarily relied on the agency's subject-matter expertise, including assessing the Project's projected effects on traffic diversion to determine how widely effects would be felt.  *See, e.g.*, DOT_36450 (noting increase in traffic on George Washington Bridge); DOT_36458 (explaining ramifications of increase in traffic on Eastern spur of I-95).  Thus, the State's proffered distinction falls flat.

Moreover, FHWA's claim of deference derives from the Supreme Court's explanation that where a "factual dispute . . . implicates substantial agency expertise" a court should "defer to 'the informed discretion of the responsible federal agencies.'"  *Marsh v. Oregon Nat. Resources*

*Council*, 490 U.S. 360, 376-77 (1989) (citation omitted).  But, as the Court remarked, "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence.'"  *Id*. at 367 n.23.  Thus, whether this Court grants FHWA deference or assesses the Final EA for the "thoroughness evident in its consideration," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), makes no difference here given FHWA's high quality analysis.

      B.  <u>FHWA Reasonably Determined the Scope of the Final EA's Air Quality Analysis.</u>

      Deference aside, the State claims that FHWA "arbitrarily" drew lines as to which areas to study and which data to analyze.  Pls.' Opp'n at 15.  But FHWA thoroughly and reasonably explained the basis for the EA's air quality analysis.  Defs.' Mem. Supp. Mot. Sum. J. ("Defs.' Mem.") at 23-29 (ECF No. 79-1); *see Tinicum Twp. v. U.S. Dep't of Transp.*, 685 F.3d 288, 298 (3d Cir. 2012) (agency has "latitude to determine the level of analytical detail necessary to support an informed decision and to adequately disclose air quality impacts to the public.").  As described below, the State's arguments are unpersuasive for four separate reasons.

      First, the State waived these arguments.  Pls.' Opp'n at 16.  It claims, contrary to established precedent, that general concerns raised in a single comment letter are sufficient.  *See* DOT_7772 (noting only that the air quality analysis "warrant[ed] further consideration").  But "administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'"  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Defense Council*, 435 U.S. 519, 553 (1978).  The State ran afoul of exactly that prohibition by referring only to issues that generally "warranted" consideration but providing no additional detail.

Second, the State argues that inclusion of more New York counties than New Jersey counties in the sub-regional air quality analysis renders that methodology arbitrary.  Pls.' Opp'n at 17.  But FHWA explained that the choice of a 12-county sub-region was based on a methodological decision to "identify the most concentrated areas of change" within the 28-county regional study area.  DOT_36827; *see also* DOT_36842.  That led to the choice to identify the New York and New Jersey counties with the largest predicted increases and decreases in vehicle miles traveled ("VMT").  DOT_36828.  The calculations in the Final EA support that choice given that many New York counties demonstrated greater aggregate changes in VMT.  *See* DOT_36354, DOT_36360.

Further, the State conflates the EA's air quality and environmental justice analyses.  Pls.' Opp'n at 17.  For the latter, FHWA employed a 10-county region "consisting of New York City and the five adjacent counties where the greatest change in traffic volumes and [VMT] are predicted to occur."  DOT_36958.  Although the State correctly notes that the metrics between the analyses are similar, it overlooks that their *purpose* was different: the air quality analysis was intended to assess certain regional and local air quality effects, DOT_36827, while the environmental justice analysis was intended to identify, at the census tract level, where relevant populations might suffer adverse effects from the Project.  DOT_36955-56.  That difference supports FHWA's choices, because the air quality analysis could support extrapolation to other areas, while the environmental justice analysis could not (given it was based on localized detail).  *See Concerned Citizens and Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 926 (D. Ariz. 2017) (explaining it was reasonable that "[w]ithin the analysis sections for each specific resource, the EA discusses the geographic scope considered" given "courts need only consider whether the agency 'has offered a reasonable justification for why it drew the line

where it did.'" (citation omitted)).[5]  Indeed, the Final EA explained the need for additional detail

on the latter given "[t]he census tracts where increases or decreases [in truck traffic] would occur

are often in the same neighborhoods and towns."  DOT_36994.

Third, and similarly, the State argues that FHWA's use of Scenario A to model air quality

effects was arbitrary.  Pls.' Opp'n at 18-19.  Scenario A was chosen, however, because it was the

"tolling scenario predicted to result in the smallest change in VMT compared to the No Action

Alternative."  DOT_36838; *see also* DOT_36353-54.  The State claims that choice was improper

because "Tolling Scenarios E and G had the greatest impacts on truck and non-truck diversions,

respectively."  Pls.' Opp'n at 19.  Maybe so, but the choice of Scenario A was intended to

capture *all traffic* effects on air quality on a *region-wide* basis, given that "changes in regional air

quality emissions burden are directly related to changes in VMT."  DOT_36828.  The State's

position, on the other hand, would balkanize the air quality analysis by applying different

scenarios to different aspects of traffic occurring in different regions.  FHWA's reasoned

decision to choose a different approach is entitled to deference.  *See Audubon Naturalist Soc'y of

the Central Atlantic States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 674-75 (D. Md.

2007) ("estimate of aggregate emissions across the study area" was reasonable).

Similarly, although the State claims that use of Scenario A underrepresented the increase

in New Jersey VMT, it cannot contest that the increase amounts to, at most, less than one-fifth of

---

[5]      The State also complains that certain census tracts in Essex County that were identified
for place-based mitigation were not specifically included in the air quality analysis.  Pls.' Opp'n
at 18.  This overlooks the difference between the air quality and environmental justice analyses.
As to the former, a reader could easily extrapolate the county-wide effects in Essex County by
comparing that County's predicted VMT changes to those in Bergen and Hudson Counties and
the attendant predicted changes in air quality.  *Compare* DOT_36830 (-.44% change in VMT for
Essex County and -2.45% for Hudson County) *with* DOT_36840 (changes in emissions).

one percent.  *See* DOT_36354 (noting increase of VMT in New Jersey of .2% under Scenarios C, D, and F).  Thus, although the State suggests another tolling scenario would be "up to twenty times worse," Pls.' Opp'n at 19 n.13, it remains entirely unclear how it reached that conclusion. *See* Defs.' Mem. at 26.  So too, the State's citation to "74 C.F.R. § 650.4(k)(2)(i)" is inapposite: the regulation the State appears to refer to, 7 C.F.R. § 650.4, governs the U.S. Department of Agriculture's National Resources Conservation Service.  And the State's continued reliance on comments from the U.S. Environmental Protection Agency ("EPA") remains misplaced given FHWA engaged in additional analysis responsive to those comments.  *See* Defs.' Mem. at 28-29.

Fourth, the State fails to clearly articulate why it believes that FHWA's hot spot analysis is insufficient.  On the one hand, it argues FHWA did not explain its decision to analyze four intersections in New Jersey.  Pls.' Opp'n at 20.  But the State tacitly acknowledges the explanation offered by FHWA[6] in contending that "[w]hether traffic connects to a highway or local street, it has the same air quality impacts on the population living nearby."  Pls.' Opp'n at 21.  Even taking that position as true (and the State provides no support), FHWA analyzed the effects on the communities at issue through a highway link analysis, since highways are the thoroughfare by which traffic from the Project will primarily impact communities in Bergen County.  *See* Defs.' Mem. at 27-28.  Although the State insinuates that EPA disagreed, FHWA explained its methodological choices, DOT_7926, and EPA acknowledged the "improvements" made to the EA based on changes from the draft to final versions.  DOT_45637.

---

[6]     FHWA explained that "[t]he local intersections at the New Jersey . . . approach[ ] to the George Washington Bridge and the New Jersey approach to the Lincoln Tunnel were not included because traffic at those intersections connects primarily to regional highways and not local streets."  DOT_36475; *see also* DOT_7927 (response to EPA comments).

On the other hand, the State acknowledges the highway link analysis but claims it was insufficient because of the types of emissions studied. Pls.' Opp'n at 21 (claiming that the highway link analysis was "limited to a review of predicted particular matter ["PM"]" and "contains no analysis of carbon monoxide levels, volatile organic compounds, nitrogen oxides, or sulfur dioxide . . . ."). But this distinction is misplaced. First, it ignores that the hot spot analysis was conducted in conformance with EPA guidance and approved by EPA and the Air Quality Interagency Consultation Group ("ICG").[7] *See* DOT_6854 ("This analysis will be performed in accordance with the [EPA's] Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas (EPA-420-B-21-037, October 2021)."); DOT_6854 (ICG concurrence); DOT_44959 (EPA concurrence). Second, it overlooks that the highway link analysis reasonably focused on particulate matter as the emissions source of most concern with respect to diesel truck traffic. DOT_6841; DOT_3673 ("These segments were selected based on the potential increases in diesel-truck traffic that might occur due to the Project, community concern, and/or existing high volumes of Annual Average Daily Traffic.").[8] Third, Scenario C was chosen for the New Jersey highway link location because it would result in the overall highest maximum Annual Average Daily Traffic ("AADT"). DOT_6846. Nonetheless, the Final EA plainly disclosed that Scenario B

---

[7] The ICG consisted of FHWA, EPA, the Metropolitan Transportation Authority, the Federal Transit Administration, the New York State Department of Transportation ("NYSDOT"), the New York State Department of Environmental Conservation, and the New York Metropolitan Transportation Council.

[8] *See also* DOT_7255 ("Although all motor vehicles produce air pollutants, emissions from trucks are of particular concern to near road air quality because they are predominantly powered by diesel fuel. Exhaust from diesel engines contains a mixture of gases and solid particles, broadly referred to as diesel [PM], that contains toxic compounds which can be harmful to peoples' health."). Indeed, the State's own comment letter raised concerns with "emissions from truck avoidance . . . ." DOT_7774.

would have the greatest effect on truck traffic west of the George Washington Bridge. DOT_36869. And, regardless, the State's conclusion that use of a different scenario would show exceedances of the relevant National Ambient Air Quality Standards ("NAAQS") is misplaced—instead, the EA concluded that "all levels" were "below the applicable NAAQS" for the highway link analysis. DOT_36865.

In sum, a court is not "required, equipped nor inclined to resolve the fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation [that the project] is the most viable solution to projected traffic needs in the future." *See Citizens for Balanced Env't and Transp., Inc. v. Volpe*, 650 F.2d 455, 462 (2d Cir. 1981). So too here: FHWA made reasonable methodological choices and reached reasonable conclusions. No more is required.

C. FHWA's Environmental Justice Analysis Was Thorough and Reasonable.

In its most recent brief, the State appears to now claim that FHWA's environmental justice analysis was insufficient because the State disagrees with the agency's methodological choices. But each point of disagreement is either legally insufficient, belied by the record, or both. Defs.' Mem. at 32-35.

As an initial matter, the State concedes that it failed to raise concerns regarding the population definitions used in the EA until *after* the Final EA was published. Pls.' Opp'n at 26 (admitting the State did not raise these concerns until June 12, 2023). But such notice is insufficient given that it did not come at a time when those concerns could have been incorporated in the Final EA or addressed in FHWA's response to comments. *Compare* 23 C.F.R. §§ 771.119(d) (public comment for EAs), *with* § 771.119(h) (agency *may* provide EA for public "review" prior to issuance of FONSI); *see also* 40 C.F.R. 1501.6(a)(2) (noting agency

may make FONSI available for "public review"); DOT_36142 (notice of availability).  Thus, the

State's time to submit substantive comments on the draft EA was during the formal comment

period.

Further, the State fails to provide any legal basis for why FHWA was required to use the

State's preferred mapping tool, population definitions, or geographic scope.  Pls.' Opp'n at 26-

28.  As to the first, the Third Circuit recently affirmed use of census tracts, thus disposing of this

issue.  *See Trenton Threatened Skies*, 90 F.4th at 139 ("The FAA's decision to use census tract

data, corroborated by the EPA's modeling tool, was reasonable.").  As to the second, FHWA

reasonably relied on the federal definition of environmental justice communities; that the State

prefers a different definition is not controlling.  *See id.* (crediting agency's use of "CEQ's

guidance document instructing how to conduct an EJ analysis").  Indeed, the State's claim that

FHWA needed to "justify" its choice is a red herring; it obscures both that the State never raised

this issue during the comment period and that FHWA is entitled to the "presumption of

regularity," such that "[c]ourts may 'presume that what appears regular is regular, [with] the

burden shifting to the attacker to show the contrary.'"  *Id.* at 131 (citations omitted).  As to the

third, the EA reasonably explained that the geographic scope of the environmental justice study

area was intended to capture "New York City and the five adjacent counties where the greatest

change in traffic volumes and [VMT] are predicted to occur."  DOT_36958; *see also id.*

(referring to area of "localized effects").

The State also claims that the environmental justice analysis did not include "a localized

assessment of air quality impacts."  Pls.' Opp'n at 29.  But the State overlooks that the explicit

purpose of the environmental justice Technical Memorandum (Appendix 17D) was to assess the

"effects on traffic proximate to environmental justice communities and resulting emissions and

potential *associated health effects*."  DOT_36990 (emphasis added).  And FHWA's decision to

focus the environmental justice analysis on "highway traffic increases," Pls.' Opp'n at 29, was

the direct result of "[m]embers of the Environmental Justice Technical Advisory Group"

requesting "additional information on the Project's potential to increase the number of trucks on

highways outside the Manhattan CBD."  DOT_36981; *see also* DOT_36954 (noting response to

concerns during "extensive public outreach").  Thus, that choice was far from arbitrary.  When

compared to the detailed assessment in the Technical Memorandum, DOT_7243-7440, the

State's insistence that "FHWA *never* assessed how increased traffic increases could exacerbate

preexisting pollutant and chronic disease burdens in" environmental justice communities, Pls.'

Opp'n at 29, finds no support in the record.

　　　Finally, the State contends that FHWA improperly chose a subset of environmental

justice communities as eligible for place-based mitigation.  *Id.* at 29-30.  But FHWA explained:

> To identify locations for mitigation to address Project effects, the Project Sponsors
> determined that it would be appropriate to follow the Council on Environmental
> Quality's Climate and Economic Justice Screening Tool's (CEJST) methodology
> for identifying communities in the 10-county local study area that are at or above
> the 90th percentile for either pre-existing pollutant or chronic disease burdens, and
> which may also experience increases in truck traffic proximity as a result of the
> Project.  Due to the nature of this region and the distribution of both environmental
> justice census tracts and the level of pre-existing burdens, the environmental justice
> census tracts with either pre-existing pollutant or chronic disease indicators that
> could experience truck traffic increases are the same whether applying the 80th and
> 66.66th percentiles, or the 90th percentile.

DOT_3674 & n.39; *see also* DOT_7313.  Against that, the State provides no evidence for its

claim that FHWA's determination was "impermissible."  Pls.' Opp'n at 29.  Nor did FHWA

withhold data for communities that did not meet the final threshold for mitigation; instead, the

EA provides detailed maps and information.  *See, e.g.*, DOT_36986-88, DOT_36989

(summarizing Technical Memorandum).  Indeed, although the State highlights Bayonne, New

Jersey as a community overlooked by FHWA's methodology, the Technical Memorandum

explicitly identifies that community on several occasions. DOT_7282-83, DOT_7302, 7320. In sum, it is unclear what more of a "hard look" at this issue would have entailed. *See Sierra Club v. FERC*, 867 F.3d 1357, 1369 (D.C. Cir. 2017) (environmental review that "discussed the intensity, extent, and duration of the [action's] environmental effects, and also separately discussed the fact that those effects will disproportionately fall on environmental-justice communities" satisfied "hard look" standard).

## III.     FHWA Appropriately Assessed the Project's Effects on Air Quality.

At base, the State would have the Court reach the conclusion that any impact on air quality is a significant effect warranting preparation of an EIS. Not so. *See* Defs.' Mem. at 29-32. Instead, significance is context-specific, particularly when, as here, mitigation is afforded to ameliorate adverse effects. *See Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1023 (S.D. Cal. 2003) ("The significance of an impact under NEPA has less to do with its measurability and everything to do with the context of the impact.").

As an initial matter the State de-contextualizes increases in traffic, *see* Pls.' Opp'n at 23 (referring to daily increases of "thousands more vehicles and hundreds of trucks"), but those increases result in only minimal aggregate increases in traffic state-wide and decreases across the overall region. *See* DOT_36829-30. Accordingly, despite those negligible increases, FHWA concluded that "the overall regional VMT and emission burdens" would be lower under the Project, DOT_36838, "no intersections" required a detailed analysis, *id.*, and "there were no violations of the NAAQS." DOT_36868. FHWA's conclusion was thus well-supported.

The State also overlooks that courts have consistently found that air quality effects that do not result in expected exceedances of NAAQS are *per se* insignificant. *See, e.g.*, *Sierra Club v. Fed. Highway Admin.*, No. 17-CV-1661-WJM-MEH, 2018 WL 1610304, at *7 (D. Colo. Apr.

3, 2018) ("the case law is nearly unanimous that federal agencies may rely on NAAQS compliance to conclude that human health will not be seriously affected by a transportation project." (citing cases)). Thus, FHWA's conclusion was even more reasonable. And the State's argument that FHWA needed to go further in assessing health effects is contradicted by the purpose of an air quality analysis. *See Border Power Plant*, 260 F. Supp. 2d at 1020 n.15 ("Air quality is regulated primarily because poor air quality has been linked to health impacts. Thus, an evaluation of whether the actions affect air quality necessarily involves an evaluation of the health impacts of the actions resulting from air pollution.").[9]

## IV.    The Final EA Commits to Implementation of Effective Mitigation Measures.

Despite the Final EA's thorough discussion of mitigation measures, the State takes the position that FHWA's analysis is presumptively invalid because finalization of mitigation measures will depend on the final tolling scenario that is adopted by the TBTA. But each of the State's arguments instead cuts against it. *See* Defs.' Mem. at 31-32.

First, the State claims that "mitigation measures in New Jersey are entirely hypothetical," Pls.' Opp'n at 31, and that it does not know whether mitigation will be "afforded" to New Jersey communities. *Id.* at 32 n.24. But even assuming the State is correct, its allegations would not become ripe until the mitigation was foregone. *See* pp. 3-4 above. As FHWA has explained, however, the "specific census tracts that would" merit mitigation "change slightly depending on the tolling scenario." DOT_7325. Accordingly:

> After toll rates are set, a process that includes both additional analyses and community input will take place to determine the sites of the place-based mitigation (e.g., in which schools to install air filtration units, or on what roadway to plant vegetation). This will require coordination between the Project Sponsors, the

---

[9]    The State also argues that FHWA minimizes the air quality effects in parts of Bergen County by overlooking the existing public health burden. Pls.' Opp'n at 24. But this argument confuses the Final EA's air quality and environmental justice analyses. *See* p. 9 above.

Environmental Justice Community Group (representing the 10-county environmental justice study area), the relevant communities receiving the place-based mitigation, and local implementing agencies and will include needs assessment and feasibility screening to determine the range of possibilities . . . .

DOT_7328; *see also* DOT_3685.  To the extent the State contends mitigation is insufficient, that argument is simply premature.[10]

The State's arguments also misread the Final EA.  While the specific communities entitled to mitigation may shift depending on the contours of the final tolling structure, the overall mitigation package has been identified and committed to.  *See* DOT_36930-37; DOT_7321-22 ("If the Project receives Federal approval, the Project Sponsors *will* implement mitigation measures to address the potential adverse effects to communities that are already overburdened by pre-existing air pollution and chronic diseases . . . To fund these mitigation measures the Project Sponsors have committed $155 million over five years." (emphasis added)); DOT_7324.  Such an approach is entirely appropriate.  *See Twp. of Bordentown v. FERC*, 903 F.3d 234, 259 (3d Cir. 2018) ("Nor must the proposed mitigation be included in the original EA in order to pass muster under NEPA."); *NAACP Erie Unit 2262 v. Fed. Highway Admin.*, 648 F. Supp. 3d 576, 588 (W.D. Pa. 2022) ("courts have determined that it is proper for agencies to approve projects 'even though conditioned on further development of mitigation measures.'" (citation omitted)).  While the specific contours of mitigation remain fluid, the overall commitment is fixed and binding.

---

[10]    So too, the State complains it has not been invited to participate in discussions about placement of mitigation.  Pls.' Opp'n at 33.  But because implementation of those measures will not begin until *after* the specific census tracts are identified based on the final tolling scenario, the State's concern on this issue is similarly untimely.  Moreover, the State provides no textual basis for why its comment letter indicated a "desire to participate."  DOT_7773.

Second, and contrary to the State's claims, Pls.' Opp'n at 32, the record demonstrates that FHWA thoroughly explained the basis for various mitigation measures, including their predicted effectiveness. For example, as to regional mitigation measures, the EA explains that the "overnight toll for trucks and other vehicles is reduced to at or below 50 percent of the peak toll from at least 12:00 a.m. to 4:00 a.m., to decrease the incentive[e] for trucks to bypass the Manhattan CBD by diverting elsewhere across the 10-county environmental justice study area." DOT_7322; *see also* DOT_7323. As to place-based mitigation, the EA explains, for example, that "[t]wo greening mitigation measures—the installation of roadside vegetation to improve near-road air quality and the renovation of parks and greenspaces—would help to improve community well-being and can have multiple other benefits such [as] reducing air temperatures, preventing stormwater runoff, and increasing social interaction. If properly designed, roadside vegetation can also improve near-road air quality." DOT_7325. Further, "[t]he installation of air filtration units in schools near highways with truck traffic increases would help to mitigate effects at schools, which are sensitive receptor sites." DOT_7328; *see also* DOT_7327 (listing place-based mitigation measures); DOT_3684-87 (describing mitigation measures).[11]

Further, development of the mitigation measures relied heavily on input from the Environmental Justice Technical Advisory Group. *See* DOT_40514. FHWA and the Project Sponsors solicited suggestions for mitigation measures, DOT_41519-21, responded accordingly, DOT_41527-28, proposed new measures, DOT_41534, and finalized a mitigation package. DOT_41557-61; *see also* DOT_41571-73 (detailing final mitigation commitments). This

---

[11] The State's claim that it was not afforded sufficient opportunity to comment on specific mitigation measures rings hollow when the State failed to comment *whatsoever* on mitigation. *See* DOT_7772-75. Indeed, FHWA acknowledged making changes to the mitigation measures based on public comment. DOT_7321. Thus, the State cannot argue its participation would have been futile.

collaborative process further supports the appropriateness of the identified mitigation. *See Bergen Cnty. v. Dole*, 620 F. Supp. 1009, 1061 (D.N.J. 1985) ("Mitigation measures and design features are frequently finalized, added or changed as a result of public input and agency comment.").

In sum, the Final EA appropriately explains the Project Sponsors' mitigation commitments, describes why certain measures will be utilized, and reflects that mitigation was responsive to community input. *See Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 205 (4th Cir. 2009) (finding mitigation measures reasonable where they "reflect the [agency's] determinations of the most appropriate and practicable means of compensating for anticipated impacts"); *see also Trenton Threatened Skies*, 90 F.4th at 139.

## V.    FHWA Exceeded the Regulatory Requirements for Public Participation.

Although the State presses that FHWA offered inadequate opportunities for public participation, the record plainly reflects otherwise. *See* Defs.' Mem. at 39-41.[12]  Indeed, the State offers no specific criticism of what additional steps FHWA should have taken, other than complaining that the comment period was too short (even though that period exceeded what is required by regulation, *see* 23 C.F.R. § 771.119(d)).  But the Third Circuit has explained that "there are no notice requirements, pre-circulation requirements, or instructions about the public comments process" applicable to EAs. *Del. Dep't of Natural Res. & Env't Control v. U.S. Army Corps of Eng'rs* (*DNREC*), 685 F.3d 259 (3d Cir. 2012).  Though the State claims "electronic access" to NEPA documents and "informational webinars" are insufficient public engagement,

---

[12]    While the State alleges that FHWA's compliance was "grudging," Pls.' Opp'n at 35, the record instead reflects that the agency took its obligation to provide for public participation seriously and engaged in numerous attempts at public outreach, hardly indica of mere *pro forma* compliance.

Pls.' Opp'n at 35, the case it cites in support, *Robertson v. Methow Valley Citizens Council*, explains that NEPA only requires that "relevant information will be made available to the larger audience . . . ."  490 U.S. 332, 350 (1989).  Why electronic access and webinars fail to meet that standard is left unanswered, particularly given that the State also acknowledges the six public hearings held on the Project.  Pls.' Opp'n at 36.  And though the State claims that FHWA improperly "relies on the public's opportunity to comment on the Draft EA," Pls.' Opp'n at 35, that reliance, is, of course, eminently reasonable.  *See DNREC*, 685 F.3d at 269-70.[13]

The State's criticisms of outreach to New Jersey agencies are similarly inapt.  Though the State contends FHWA did not adequately seek New Jersey's input, Pls.' Opp'n at 38, it is not as if New Jersey was ignored; the State admits that four New Jersey-based agencies were consulted, and Governor Murphy also received an individual briefing on the Project from DOT Secretary Buttigieg.  DOT_45346; *see also* DOT_37044 (noting September 10, 2021, meeting to "introduce the EA process").  Moreover, it is unclear why the State did not submit concerns from those agencies (if they had any) in its comment letter on the draft EA.  And while the State claims it "repeatedly brought the issue of inadequate consultation of its agencies to FHWA's" attention, Pls.' Opp'n at 39 n.30, the State provides no support for that proposition, and instead refers only to its general comment letters.  *See id*. at 37.  To put a fine point on it, the State provides no record citation to indicate that—after FHWA provided initial outreach at the genesis of the NEPA process—the State questioned whether other New Jersey agencies should participate.  That absence is telling, and dispositive.

---

[13]    The State also misconstrues FHWA's comparison of the participation requirements between EISs and EAs, *see* Defs.' Mem. at 44; FHWA offered that comparison to note that the public comment process for the Project was as expansive as it would have been if the agency had instead prepared an EIS.

In sum, the State claims that FHWA could have provided the public more information but fails to articulate what that information was.  And it claims that New Jersey should have been consulted more, even though the State did not avail itself of the opportunities that were available.  Against that, the thorough public participation provided by FHWA more than satisfied the standard for preparation of an EA.  *See* Defs.' Mem. at 40-45.

## VI.    FHWA Appropriately Assessed Only Realistic Alternatives.

At base, the State's arguments attempt to elide a simple fact: no iteration of the Project could become operational if it did not satisfy the explicit statutory requirements of the Traffic Mobility Act.  *See* Pls.' Opp'n at 41 & n.33-34.  Thus, FHWA properly included those revenue generation requirements in the Project's purpose and need, since satisfaction of the Act is a *per se* requirement for feasibility.  Defs.' Mem. at 36-37.  Similarly, the State implies that consideration of only one alternative is *per se* inappropriate, but courts have held to the contrary.  *See, e.g.*, *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("the [NEPA] regulation does not impose a numerical floor on alternatives to be considered").  Finally, although the State raises the specter of legislative limitations on consideration of alternatives, FHWA hardly rubber-stamped the Project Sponsors' purpose and need definition.  *See* DOT_39214-19.

Second, the State takes issue with FHWA's explanation for the rejection of alternatives, claiming the agency should have performed additional independent analysis.  Pls.' Opp'n at 42-43.  But an agency is only required to "briefly discuss" the reasons alternatives are eliminated from detailed analysis.  40 C.F.R. § 1502.14(a); *see Clairton Sportsmen's Club v. Penn. Turnpike Comm'n*, 882 F. Supp. 455, 477-78 (W.D. Pa. 1995) (finding that even "sparse but relevant considerations" regarding feasibility of dismissed alternative were sufficient given

"inevitable weeding out" that occurs during NEPA process); *see also Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 Fed. App'x 477, 490 (6th Cir. 2014) (finding dismissal of alternative appropriate where it was not "both financially feasible and able to meet the Project's Purpose and Need Statement").  To that end, the State conflates the standards for comparison of full alternatives with those initially rejected.  *Compare* 40 C.F.R. § 1502.14(a) (alternatives eliminated from detailed study must only be "briefly" discussed) *with* 40 C.F.R. § 1501.14(b) (agency must "[d]iscuss each alternative considered *in detail*" (emphasis added)).

Third, the State continues to argue that FHWA's rationale for rejecting Alternative T-2 was insufficient.  Pls.' Opp'n at 43-44.  In particular, the State argues that "New York could have passed a law" directing revenue from alternative sources to the MTA to satisfy the Traffic Mobility Act's revenue generation threshold.  *Id*. at 44.  But at the time of the publication of the Final EA no such agreement existed.  *See City of Angoon v. Hodel*, 803 F.2d 1016, 1021 n.2 (9th Cir. (1986) (alternative requiring legislative action will "qualify for inclusion . . . only in very rare circumstances").  Moreover, although the State claims that the discussion regarding rejection of Alternative T-2 was insufficient, Pls.' Opp'n at 45, FHWA explained that:

> In Alternative T-2, the tolling of currently free crossings plus the lack of a Manhattan CBD toll would be expected to have additional diversionary effects.  In order to reach revenue needs without tolling all entry points to the CBD, toll rates would have to be even higher than the highest toll rates studied in the EA. Therefore, Alternative T-2 would cause not only diversions but burden low-income drivers, in comparison to the CBD Tolling Alternative.  Therefore, Alternative T-2 would neither be reasonable nor designed to reduce adverse effects and need not be advanced for further analysis. Finally, Alternative T-2 is not contemplated by existing law and would require State legislation and/or complex agreements between the State and City to allow toll revenues to be used for transit improvements.

DOT_7943; *see also* DOT_ 29202 ("[T]he 2008 New York City Traffic Congestion Mitigation

Commission Study identified a number of disadvantages to a plan like [Alternative T-2] . . . .").[14]

These explanations are more than sufficient.

## VII.    If Not Waived, the State's Conformity Argument is Unpersuasive.

Despite its arguments to the contrary, the State fails to demonstrate that it raised its

conformity arguments during the comment period for the draft EA.  Pls.' Opp'n at 47-48.  First,

although the State cites a vague, speculative statement in its comment letter about PM2.5 in Fort

Lee, *id*. at 47, it did not request a conformity analysis for the New Jersey State Implementation

Plan ("SIP"), that New Jersey agencies be consulted, or otherwise link PM levels and the New

Jersey SIP.  *Id*. at 47, 49 n.46; *see Vt. Yankee*, 435 U.S. at 553 (comment should be "meaningful,

so that it alerts the agency to the [party's] position and contentions").

Second, the State claims there are "obvious" issues with the Project's conformity analysis

such that it needed not raise those issues in its comments.  Pls.' Opp'n at 47.  But the draft EA

provided FHWA's position that the transportation conformity analysis and determination were

complete for the Project.  DOT_37816-19; Defs.' Mem. at 45.  Without a comment from the

State (or anyone else), FHWA had no knowledge or reason to assume the validity of that

assessment was at issue.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004).  As

such, this Court should find that the State waived its conformity arguments.  *See Krasniqi v.

Dibbins*, 558 F. Supp. 3d 168, 182, n.10 (D.N.J. 2021) ("[C]ourts should not topple over

administrative decisions unless the administrative body not only has erred but has erred against

objection made at the time appropriate under its practice" (internal citation omitted)); *see also*

---

[14]    So too, the State is incorrect that reliance on a 2008 New York study was improper, given "an agency does not violate NEPA by refusing to discuss alternatives already rejected in prior state studies."  *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1231 (9th Cir. 2014).

*City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (CAA claims waived as not "challenged . . . during the administrative proceedings").

And even if not waived, the State's assertion that the Project requires a conformity analysis related to the New Jersey SIP is incorrect. Pls.' Opp'n at 49. First, the State continues to conflate the requirements for transportation plans and programs with the requirements for transportation projects. *See* Defs.' Mem. at 45-46.[15] Second, and similarly, the State's claim that FHWA "wholly failed to conduct the required conformity analysis" is unfounded. Pls.' Opp'n at 49. Instead, the Project's conformity analysis included hot-spot analyses for carbon monoxide, PM2.5 and PM10 in accordance with 40 C.F.R. § 93.116, and FHWA consulted the ICG on conformity. *See* 40 C.F.R. § 93.109(b) (transportation project requirements); *see also* DOT_36866-68 (conformity analysis); DOT_37810-14, DOT_36859-63 (hot-spot analysis); DOT_1176-80, DOT_41604-05; DOT_44933 (ICG consultation). Third, the State provides no support for its argument that FHWA failed to consult the appropriate agencies. Pls.' Opp'n at 49 n.46; *see also* Defs.' Mem. at 46.

In sum, if not waived, the State failed to demonstrate FHWA otherwise failed to comply with the CAA's conformity requirements for transportation projects.

## CONCLUSION

For the foregoing reasons, as well as those in Defendants' Cross-Motion for Summary Judgment, the Court should grant summary judgment to Defendants on all counts.

---

[15]     The State's reliance on NYSDOT's letter to FHWA requesting approval of three New York transportation programs and one transportation plan illustrates the State's confusion. Pls.' Opp'n at 47 n.44. Any projected emissions from transportation plans or programs are evaluated to ensure no exceedances of any relevant SIP emissions budget(s) would result. 40 CFR § 93.109(b). But transportation *projects* (such as this one) that fall under the umbrella of a transportation improvement program need not be individually evaluated against a SIP.

Respectfully submitted,

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ GREGORY M. CUMMING*
GREGORY M. CUMMING
SHARI HOWARD
SAMANTHA PELTZ
Trial Attorneys
Environment & Natural Resources Division
150 M St., N.E.
Washington, D.C. 20002
(202) 305-0457 (phone)
(202) 598-0414 (cell)
gregory.cumming@usdoj.gov
shari.howard@usdoj.gov
samantha.peltz@usdoj.gov

ALEX SILAGI
Assistant United States Attorney
District of New Jersey
United States Attorney's Office
970 Broad Street, 7th Floor
Newark, New Jersey 07102
973-353-6001 (phone)
alex.silagi@usdoj.gov

*Counsel for Defendants*