```
 1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2

 3  ━━━━━━━━━━━━━━━━━━━━━━━━

    STATE OF NEW JERSEY, et al,     CIVIL ACTION NUMBER:
 4
         Plaintiff,                 2:23-cv-03885-LMG-LDW
 5
    v.                              ORAL ARGUMENT
 6
    UNITED STATES DEPARTMENT OF
 7  TRANSPORTATION, et al,

 8       Defendant.
    ━━━━━━━━━━━━━━━━━━━━━━━━
 9       Frank Lautenberg Post Office & U.S. Courthouse
         2 Federal Square
10       Newark, New Jersey 07102
         Wednesday, April 3, 2024
11       Commencing at 9:34 a.m.

12  B E F O R E:          THE HONORABLE LEO M. GORDON
                          UNITED STATES COURT OF INTERNATIONAL TRADE
13

14  A P P E A R A N C E S

15       KING & SPALDING, LLP
         BY:  RANDY M. MASTRO, ESQUIRE
16       BY:  LAUREN MYERS, ESQUIRE
         1185 Avenue of the Americas, LLP
17       New York, New York 10036
         For the Plaintiff
18
         NAGEL RICE, LLP
19       BY:  BRUCE NAGEL, ESQUIRE
         BY:  RANDEE M. MATLOFF, ESQUIRE
20       BY:  ANDREW NEES, ESQUIRE
         103 Eisenhower Parkway,  Suite 201
21       Roseland, New Jersey 07068
         For the Plaintiffs Consolidated
22
                     Melissa A. Mormile
23                   Official Court Reporter
                melissa_mormile@njd.uscourts.gov
24                     (973) 776-7710
    Proceedings recorded by mechanical stenography; transcript
25  produced by computer-aided transcription.
```

```
 1   (Continuing)

 2   A P P E A R A N C E S:

 3        UNITED STATES ATTORNEY'S OFFICE
          DOJ-ENRD
 4        NATURAL RESOURCES SECTION
          BY:  GREGORY MARTIN CUMMING, ESQUIRE
 5        BY:  SAMANTHA PELTZ, ESQUIRE
          150 M. Street, N.E.
 6        Washington, DC 20002
          For the Defendants
 7

 8        UNITED STATES ATTORNEY'S OFFICE
          BY:  ALEX D. SILAGI, ESQUIRE
 9        970 Broad Street
          Newark, New Jersey 07102
10        For the Defendants

11

12        UNITED STATES ATTORNEY'S OFFICE
          DOJ-ENRD
13        BY:  SHARI HOWARD, ESQUIRE
          150 M. Street, N.E. 4th Floor
14        Washington D.C., 20002
          For the Defendants

15

16        SIVE, PAGET & RIESEL, P.C.
          BY:  MARK A. CHERTOK, ESQUIRE
17        BY:  ELIZABETH KNAUER, ESQUIRE
          BY:  JOHN F. NELSON, ESQUIRE
18        560 Lexington Avenue, 15th Floor
          New York, New York 10022
19        For the Intervenor Defendants

20                   -and-

21        KAPLAN HECKER & FINK LLP
          BY:  ROBERTA A. KAPLAN, ESQUIRE
22        BY:  KATE HARRIS, ESQUIRE
          350 Fifth Avenue - 63rd Floor
23        New York, New York 10118
          For the Intervenor Defendants

24

25
```

```
 1    (Continuing)

 2    A P P E A R A N C E S:

 3

 4         JOHN REICHMAN LAW, LLC
           BY:  JOHN REICHMAN, ESQ.
 5         56 Oakwood Avenue
           Montclair, New Jersey 07043
 6         For Amicus Empower NJ, New Jersey Policy Perspective,
      Health Professionals & Allied Employees, Clean Water
 7    Action, Turnpike Trap Coalition, Hudson County Complete
      Street, Soma Action, Unitarian Universalist Faith Action NJ,
 8    Pinelands Preservation Alliance, Bike North Bergen,
      Ecopoetry.org, Don't Gas the Meadowlands, Isles, Inc., Bike JC,
 9    SafestreetsJC, 350 NJ-Rockland, Hackensack Riverkeeper, Inc.,
      People Over Pipelines, Fund for a Better Waterfront, Newark
10    Green Team, Action Together New Jersey, New Jersey Association
      of Railroad Passengers, BlueWaveNJ, Bike Soma, Newark Science
11    and Sustainability, Inc., Our Revolution NJ, BII UC, Friends
      of Liberty State Park, New Jersey Environmental Lobby, New
12    Jersey Work Environment Council, New Jersey citizen Action,
      South Ward Environmental Alliance, New Jersey Working Family
13    Party, and Bike Hoboken

14

15         KRAMER LEVIN NAFTALIS & FRANKEL, LLP
           BY:  ANDREW OTIS, ESQ.
16         1177 Avenue of the Americas
           New York, New York 10036
17         For the Amicus Environmental Defense Fund

18         BERGEN COUNTY - COUNTY COUNSEL OFFICE
           BY:  DAVID MATEEN ESQ.
19         One Bergen County Plaza, 5th Floor
           Hackensack, New Jersey 07601
20         For the Amicus - County of Bergen

21

22

23

24

25
```

```
 1                    I N   D E X

 2              RIPENESS

 3    BY                         PAGE

 4    Mr. Mastro                 6, 64

 5    Mr. Cumming                32, 74

 6    Mr. Chertok                49, 80

 7

 8              NEPA

 9    BY                         PAGE

10    Mr. Mastro                 84, 174

11    Mr. Cumming                128, 182

12    Ms. Knauer                 150, 191

13    Mr. Chertok                167

14

15          NEPA - Air Quality and Environmental Justice

16    BY                         PAGE

17    Mr. Mastro                 197

18    Mr. Cumming                233

19    Ms. Knauer                 257

20

21

22

23

24

25
```

1          (This matter was held before the Honorable Leo M.

2   Gordon, of the United States Court of International Trade.)

3          THE COURT:  We are now in the matter of case number 23

4   Civ. 3885; *State of New Jersey, et al v. United States*

5   *Department of Transportation, et al*.

6          Counsel, please enter your appearance beginning with

7   plaintiff.

8          MR. MASTRO:  Your Honor, Randy M. Mastro and my

9   colleague, Lauren Myers, on behalf of the plaintiff State of

10  New Jersey.

11         MR. CUMMING:  Good morning, your Honor.

12         Gregory Cumming, from the Department of Justice, on

13  behalf of the federal defendants.  With me are Samantha Peltz

14  and Shari Howard.  Thank you.

15         MR. CHERTOK:  Good morning, your Honor.

16         Mark Chertok, Sive Paget & Reisel, for the defendants

17  intervenor MTA and TBTA.  And with me today are Elizabeth

18  Knauer and Jack Nelson and Robbie Kaplan and Kate Harris from

19  the Kaplan Hecker & Fink.

20         THE COURT:  Okay.  Ladies and gentlemen, please, to

21  make sure that -- because this is an old building, please make

22  sure even if you rise from your seats to either tilt up the

23  microphone or bring it closer to you or I will be more than

24  happy to let you sit down so you can speak into the microphone.

25         It is important for everybody to be able to hear every

```
 1   comment made by every single participant in this proceeding.

 2         Thank you, Mr. Chertok.

 3         Next -- next up.  The Amici.

 4         Plaintiff Amici.

 5           MR. NAGEL:  Good morning, Judge.

 6         Bruce Nagel, Randee Matloff and Andrew Nees, for Amicus

 7   Sokolich plaintiffs.

 8           THE COURT:  Defendant Amici.

 9           MR. REICHMAN:  John Reichman, of John Reichman Law, on

10   behalf of the 34 New Jersey transportation community

11   environmental groups.

12           MR. MATEEN:  Good morning, your Honor.

13         David Mateen, from Bergen County Counsel Office, on

14   behalf of Amici Bergen County.

15           THE COURT:  Okay.  Anyone else wish to be heard?

16   Okay.

17         All right.  We are on the issue of ripeness.

18         Mr. Mastro, and the clock begins.  You have, according

19   to our notes, 45 minutes.  How do you wish to allocate your

20   time?

21           MR. MASTRO:  Your Honor, 40 minutes now, five minutes

22   reserved for rebuttal, please.

23           THE COURT:  Okay.

24           MR. MASTRO:  Thank you, your Honor.  And if I may hand

25   up some slides that I will be referring to.
```

1          Your Honor, we are so appreciative of this opportunity

2     over the next two days to present the important issues that go

3     to the heart of this case on behalf of the State of New Jersey,

4     the governor of New Jersey, the people of New Jersey, who are

5     directly implicated by this unprecedented scheme.

6          Your Honor, first by the way of introduction, a few

7     words.  What this case is and isn't about.  It isn't about

8     whether you like or don't like congestion pricing, although

9     passions run high on both sides.  It is not about whether the

10    MTA and New York stand to make a boat load of money from

11    congestion pricing.  That's conceded.

12         Your Honor, what this case is about is whether a proper

13    environmental review was done under NEPA of the environmental

14    impacts to the entire region, not just New York State.  Whether

15    the federal government, through the FHWA at the behest of the

16    project sponsor, New York's MTA took the hard look that federal

17    law requires into the adverse environmental impacts on air

18    quality, on Environmental Justice Communities that are already

19    among those that have the highest pollution and chronic disease

20    rates in the entire region, not just New York State.  Whether

21    they took the hard look into mitigation measures to ameliorate

22    those impacts and provided for specific mediation, remediation,

23    and mitigation measures and funding throughout the entire

24    region, not just New York.  And whether they took the hard look

25    at alternatives.  Not just the one focused on the MTA making

1    $15 billion for its New York capital program.

2          And, your Honor, what makes it even worse is whether

3    they took the hard look at the actual proposal that was adopted

4    because they didn't adopt it until last week.  So I look --

5          THE COURT:  So, Mr. Mastro, let me stop you just to

6    make sure I understand.

7          You use the word "they."  Okay.

8          Who is the they?  The Federal Highway Administration?

9    The MTA?  Or both?

10          MR. MASTRO:  Your Honor, I use the word "they" because

11    it is both since the MTA participated in the study that was

12    done.  But the obligation under federal law underneath it,

13    let's be clear, it's the Federal Highway Administration's

14    obligation as the federal authority approving the project to go

15    forward.  And the Federal Highway Authority can't just rely on

16    what its fed by the MTA, including fed as an objective $15

17    billion for its capital program.

18          THE COURT:  So --

19          MR. MASTRO:  The Federal Highway Administration has to

20    do its own assessment and approve the project on its own.

21          THE COURT:  So just to be clear, the hard look that

22    you are emphasizing needs to be done by the FHWA.  Correct?

23          MR. MASTRO:  Correct, your Honor.

24          THE COURT:  Okay.

25          MR. MASTRO:  Absolutely right.

1          THE COURT:  Now, I have a question about the number,

2    the dollar amount.  Because you talk about 15 billion.  Right?

3    I have seen other references to 1 billion or 1.5 billion.

4        So the question is:  Is the 15 billion a cumulative

5    number over time?  Or is it a per-year estimate?

6          MR. MASTRO:  Your Honor, the 15 billion comes from the

7    MTA's capital program, the current capital program, to fund

8    projects in that capital program.  To be accumulated over time.

9          THE COURT:  Okay.

10          MR. MASTRO:  The --

11          THE COURT:  I just want to be sure.  Thank you for the

12    clarification.

13        And Mr. Chertok or Ms. Knauer, will be asked the same

14    exact question.

15          MR. MASTRO:  Understood, your Honor.

16          THE COURT:  Because I am an equal opportunity

17    questioner.

18          MR. MASTRO:  I understand, your Honor.  And the MTA

19    will tell you they intend to raise at least a billion, between

20    a billion and a billion and a half a year.  Congressman

21    Gottheimer did his own study and found it was $3 billion a year

22    they will be raising.  But we don't have to decide that

23    question today.

24          THE COURT:  No.

25          MR. MASTRO:  Everyone realizes the MTA is going to

1   make a boatload of money for New York alone.

2          THE COURT:  That's an interesting term of legal art,

3   "boatload."  I am sure if I look in Black's legal dictionary, I

4   will find an appropriate definition.

5          MR. MASTRO:  There you go.  I could say bus load or

6   subway load, but it is boatload.

7          THE COURT:  Truck load, whatever.

8          MR. MASTRO:  So, your Honor, let's come to the last

9   point I was making, which was how could they have taken the

10  hard look at this actual proposal when it wasn't even finalized

11  until last week?  And that -- that ties into ripeness.  And I'm

12  going to come to that in just one second.

13         But let me finish the introduction by saying this, I --

14  I -- I start from this intuitive premise.  This is a first of

15  its kind congestion pricing scheme in the nation's history.

16  Shouldn't it have undergone a full environmental review

17  including an environmental impact statement?  New York's

18  congestion pricing proposal is unprecedented.  And affects the

19  most congested area in the most congested Metropolitan region

20  in this country, the central business district of Manhattan.

21  That is undisputed.  Yet, the FHWA somehow, in other words of

22  the MTA chair, quote, fast-tracked the MTA's environmental

23  process, end quote for this unprecedented scheme and then found

24  this FHWA.  Found it presented no potential significant impacts

25  warranting a comprehensive environmental review, which would

1  include an environmental impact statement as should have been

2  required under NEPA for a project of this unique scope and

3  scale.

4       Your Honor, it is mind boggling if not breathtaking that

5  somehow the FHWA concluded no significant environmental impacts

6  cutting a full environmental review short on this

7  unprecedented, one-of-a-kind, first in history scheme.

8       Rather, the FAA worked backwards to achieve a

9  predetermined outcome.

10          THE COURT:  FHWA.

11          MR. MASTRO:  FHWA.

12          THE COURT:  Not the FAA.

13          MR. MASTRO:  No.  FHWA, your Honor.  To achieve a

14 predetermined outcome in New York's favor, issuing a -- what we

15 call a FONSI, but your Honor knows that means a finding of no

16 significant impact, even though it recognized throughout its

17 review that there are measurable adverse effects on air quality

18 and Environmental Justice Communities throughout New Jersey.

19 That it said in its final yea, quote, may need mitigation, end

20 quote, and, quote, could merit place-based mitigation, end

21 quote.

22       Now, the case law is legion.  Ninth Circuit recently in

23 the *Environmental Defense Center* case said, quote, an EIS must

24 be prepared if there are substantial questions regarding

25 whether an agency's proposed action may have significant

1   impacts.  This record is rife with substantial, more than

2   substantial, questions of impacts.

3        THE COURT:  So what was the context of that case,

4   Mr. Mastro?  Didn't that case involve a significant

5   construction project with respect to infrastructure?  Right?

6        I appreciate the language.  I appreciate the holding of

7   the case or what you have quoted from the case.  But context.

8   How does that context apply here?

9        MR. MASTRO:  Your Honor, it did involve construction,

10  but so has congestion pricing all around Manhattan.

11       THE COURT:  Well, wait.  There is construction.  And

12  there is infrastructure.  Right?  The case that you cited, is

13  it -- is it improvements to existing systems or is it a

14  significant modification or change to infrastructure?

15       MR. MASTRO:  Your Honor, as I understand the case and

16  my colleagues will correct me if I misspeak, but as I

17  understand it, it was an offshore fracking case.

18       THE COURT:  Okay.

19       MR. MASTRO:  And, your Honor, I respectfully suggest,

20  and we will get into this more later in -- in the argument,

21  that what is an insignificant or significant impact depends

22  upon context.  It depends upon degree.  And whether it is an

23  off-shore fracking project, a new construction project, a

24  modification, a change in a tolling scheme, we're going to come

25  to that.  There have been many tolling schemes that were

1  changed and FHWA required full EISs.  Your Honor, the fact of

2  the matter is, looking at this record, there are impacts,

3  measurable impacts on air quality and Environmental Justice

4  Communities throughout New Jersey that are not dealt with at

5  all because there is no mitigation provided here.  And that is

6  something that not only should the FHWA not ignore --

7       THE COURT:  There is no mitigation provided here to

8  New Jersey.

9       MR. MASTRO:  Correct.

10       THE COURT:  Right.  But it's not -- it's not a

11  circumstance where there is no mitigation at all.

12       MR. MASTRO:  Which makes it even worse, your Honor.

13  Because, again, citing the case law and the Supreme Court told

14  us in the *Bordentown* case, where there was not a finding of a

15  violation in the review process, but that was because there was

16  mitigation provided.  And what the Supreme Court held there was

17  that an agency may use mitigation measures, quote, As a

18  mechanism to reduce environmental impacts below the level of

19  significance, end quote, when, quote, Proposed mitigation

20  measures are supported by substantial evidence and discussed in

21  sufficient detail to ensure that environmental consequences

22  have been fairly evaluated.

23       Your Honor hit on it directly.  They did that in

24  New York.  They did it in the Bronx to the tune of 35 million

25  to the South Bronx and to Hunts Point.  They did it to the tune

1  of 155 million in regional mitigation almost all of which is

2  directly tied to New York infrastructure.  But your Honor --

3          THE COURT:  So, Mr. Mastro --

4          MR. MASTRO:  -- for New Jersey, zero.

5          THE COURT:  Mr. Mastro, I apologize if my questions

6  took us down this road.

7          MR. MASTRO:  No problem.

8          THE COURT:  We're into a significant discussion about

9  mitigation:  And we're -- you're ten minutes plus into your

10  first 40 minutes, and we should be talking about ripeness.  I

11  don't intend to manage your initial presentation here, but at

12  some point, we're going to touch on these other topics like

13  mitigation.  So you are free to continue how you wish, but at

14  some point, either you are going to get to ripeness or I'm

15  going to pull you into getting to ripeness.

16          MR. MASTRO:  I -- I appreciate that, your Honor.  The

17  ripeness discussion actually can be relatively brief.  But I

18  will come to that in a moment.  Just give me a few more

19  seconds.

20          My point being no mitigation for New Jersey.  No funding

21  for New Jersey.  A -- a wish and a prayer that it may come

22  later.  That is not the hard look.  That's not taking care of

23  New Jersey.  That doesn't allow you to do a FONSI without doing

24  a full EIS.

25          And, your Honor, as I mentioned before, they only looked

1    at one alternative.  They looked at the one that the MTA said

2    that is the one that raises 15 billion.  That also requires

3    vacatur and remand, like the failure to provide mitigation for

4    New Jersey.

5            And it's -- it's the case that the -- the MTA is looking

6    to raise 15 billion for its capital program.  There are other

7    proposals that if they had considered them, if they sought

8    legislative approval like they got for congestion pricing,

9    could have been viable and they would provide the same

10   environmental benefits and issues.  They didn't do that.  They

11   just said this is the only one.  The FHWA said this is the only

12   one that raises the MTA's 15 billion.  I am sorry, your Honor,

13   that is not a proper environmental review.  New York is getting

14   its revenue, but no revenue is going to New Jersey.  No revenue

15   to New Jersey's mass transit even though there will be more

16   demands on New Jersey mass transit as a result of congestion

17   pricing.  It is intended to push people into mass transit.

18           THE COURT:  So, Mr. Mastro, if some portion of the $15

19   billion is going to New Jersey to support New Jersey Transit

20   rail or bus or other wise, you wouldn't be standing before me

21   making the argument you just made?

22           MR. MASTRO:  I would not be making an argument that

23   New Jersey was negatively impacted both environmentally and

24   financially.

25           THE COURT:  So you are not --

1          MR. MASTRO:  But I am making -- sorry.

2          THE COURT:  Hold on.

3      So is it your position that the raising of revenue is,

4  in fact, a fundamental flaw here that was driving the

5  decision-making by the MTA and the Federal Highway

6  Administration?

7          MR. MASTRO:  It is definitely our position that the

8  raising of that amount of revenue --

9          THE COURT:  So it is not the raising of the revenue;

10  it is the amount of revenue.

11          MR. MASTRO:  To preclude consideration of other

12  alternatives.

13          THE COURT:  What is a reasonable number, Mr. Mastro?

14  14 billion?  12 billion?  7 billion?

15      What is the number that strains the bounds of

16  reasonableness in your client's mind?

17          MR. MASTRO:  We are going to come to this agreement in

18  great detail, but I would say two things in response to that,

19  your Honor.

20      One is if there was some sharing for regional burden,

21  that would make a difference.  That's why I said that.

22          THE COURT:  So 15 billion is not objectionable if

23  there was sharing?

24          MR. MASTRO:  If it generated --

25          THE COURT:  Yes or no, Mr. Mastro?

1        MR. MASTRO:  If there had been sharing a reasonable

2   level for New Jersey, which is arguably paying most of the

3   freight for this, that might have been a more --

4        THE COURT:  Environmentally paying --

5        MR. MASTRO:  Environmentally and New Jersey crossing,

6   the New Jersey crossings.  The New Jersey crossings are going

7   to be a substantial percentage of the revenue generated.

8        THE COURT:  Okay.

9        MR. MASTRO:  So that would make a difference in that

10  argument, not on the environmental side.  On the environmental

11  side, you would still have mitigation issues on air quality and

12  Environmental Justice Communities that are not addressed but on

13  the financial side, yes, if there had been sharing of a

14  reasonable amount, that would make a difference, but they

15  didn't even consider alternatives.

16       THE COURT:  But the revenue from the river crossings

17  inures to the Port Authority.  It is once the vehicle enters

18  the confines of the central business district that the price is

19  then paid to the MTA by whoever is crossing the rivers.

20  Correct?

21       MR. MASTRO:  As your Honor knows, when they cross the

22  Holland and the Lincoln, they go immediately into the zone.

23       THE COURT:  Right.

24       MR. MASTRO:  It is not a question of they can do an

25  off ramp into the river.

1          THE COURT:  Right.

2          MR. MASTRO:  Thank you, your Honor.

3          But the point is that the FAA acknowledged this as a,

4     quote, First proposal in the nation to manage congestion to

5     cordon pricing, and it issued a finding of no significant

6     impact and green lit a project to go forward before the actual

7     tolling scheme was finalized and approved last week.

8          The MTA chose its actual tolling --

9          THE COURT:  Approved by the MTA, not by the FHWA.

10         MR. MASTRO:  Correct.  But the FHWA green lit

11    something that didn't exist yet and turned out to be different

12    in material ways from any scenario they considered

13    hypothetically.

14         THE COURT:  Right.  But there is still -- are steps in

15    the process, right, that the FHWA must undertake.

16         MR. MASTRO:  Correct.  Exactly my point, your Honor.

17    They have admitted that they, quote, Will need to do additional

18    environmental review of the actual tolling scheme, end quote

19         This is yet another reason why there should be a vacatur

20    and a remand.  This was done backwards to a predetermined

21    outcome.

22         Now let's talk about ripeness because that leads to

23    logically into ripeness.

24         Your Honor, let's took at the timeline because ripeness

25    is the refuge of federal officials who want to avoid review of

1  their actual decisions.  The FHWA has the audacity to argue

2  here that this case wasn't ripe because it hadn't developed its

3  final recommendation and then approved its final tolling scheme

4  when we brought this lawsuit.  But, of course, the FHWA issued

5  a finding of no significant impact without that fundamental

6  piece of information in their possession and the clock starts

7  to run when that FONSI is issued.  Even the FHWA admits the

8  time ran out in November to challenge the FONSI.

9         So we sued when we had to sue knowing the flaws.  There

10  was a final EA.  There was a final FONSI.  We know the flaws in

11  it, one of them being that you hadn't even issued a final plan

12  and approved a final plan yet your FHWA is green lighting the

13  MTA when it didn't even do that.

14         Your Honor, it is almost an absurd argument to argue

15  based on this timeline that New Jersey did anything other than

16  assert its right in a timely way, and it is even more

17  offensive, frankly, for my worthy adversaries to argue that you

18  shouldn't even consider the final plan because that was not in

19  existence yet.  That's not part of the administrative record.

20  They can't have it both ways.

21         The issue is was the case ripe to be brought challenging

22  the FONSI?  Absolutely.  Based on the record here, we had every

23  right to go to Court, had to go to Court to challenge the

24  final.

25              THE COURT:  In your view, is there any dispute that

1   the FONSI was a final agency action under the law and that this

2   suit was brought on a timely basis?

3         MR. MASTRO:  Zero.

4         THE COURT:  Do you believe there is any dispute from

5   government or Defendant Intervenor on that point?

6         MR. MASTRO:  I don't think there could be any

7   legitimate one, your Honor.  I am surprised the ripeness

8   argument was even raised.

9        But more to the point, I think the case law -- let's

10   flip to the next slide.  Then I will come to the case law.

11        It is true that what they issued, your Honor, what they

12   finally decided just last week, having only made the

13   recommendation a little earlier than that, okay, what they

14   finally decided was materially different than any of the

15   scenarios that were studied, any of the seven that were studied

16   by the FHWA.

17        Of course, this environmental review needs a do-over.

18   Of course, it needs to be vacated and remanded because of those

19   fundamental differences.

20        Very quickly, $15 as the final recommendation.  That's

21   at the higher end of the seven scenarios in the final EA.  But

22   even more to the point, they expanded the peak hours from

23   5:00 a.m. to 9:00 p.m., two hours longer, 12.5 percent more

24   time per weekday of tolling than in any of the seven scenarios

25   in the final EA.  Of course, that is a material significant

1   change.  Of course, it means there will be more diversion of

2   traffic and the like because they have literally expanded the

3   tolling period by 12 and a half percent, two hours a weekday.

4          The crossing credit, they lowered the crossing credit

5   from anything that was in the scenarios to only $5 when you

6   cross through the Holland and the Lincoln.  This also is going

7   to encourage diversion, and where does that diversion go?  The

8   diversion is predominantly more traffic in New Jersey.

9          So these are material changes in what they finally

10  approved and for your Honor not to consider that, for them to

11  suggest that it is outside the administrative record so you

12  shouldn't consider it is, frankly, offensive.

13         The fact of the matter is, and this case law, again, is

14  legion on these points, the First Circuit in the *Dubois* case

15  said that substantial changes are relevant to environmental

16  concerns and they require agency analysis and presentation of

17  those changes to the public for review and comment.  That never

18  happened here because the final toll ing scheme is so different

19  than what was adopted.

20         And the fact of the matter is that when there are new

21  elements like this, when there are substantial changes in

22  components combined that were never subject to environmental

23  review, the FONSI has to be vacated and remanded on that basis

24  for further review.

25         The Tenth Circuit has put it very, very clearly.  It has

1  said that -- in similar circumstances, *Richardson* case, it said

2  that it is not a case where the components were fully analyzed.

3  There was -- it wasn't just a recombination.  Said an agency

4  is, quote, Required to issue a supplement analyzing the of

5  impacts, end quote, when, quote, there is no direct or reliable

6  way to compare the fragmentation effects to the effects of

7  reconstructions analyzed.

8          And the DC District Court says the same.  The agency

9  must do over.  Must have a remand to, quote, Take a hard look

10  to determine whether any changes, new circumstances, or new

11  information beyond what was already examined and the final

12  FONSI needs to be supplemented.

13          Your Honor, as Judge Wolfson said in this courthouse or

14  maybe it was the one across the street, he said this in the

15  *Congregation Kolell* case very recently while still on the

16  bench, quote, Ripeness, therefore is peculiarly a question of

17  timing as cases may later become ready for adjudication even if

18  deemed premature on the issue of presentation, end quote.

19          In other words, even if you were to credit, and

20  respectfully you should not, that when we brought this case, we

21  didn't even know what the final scheme was, so it was

22  premature.  It is not anymore.  We all know what the final

23  scheme is.  They told you what the final scheme is.  We've had

24  the recommendation.  We briefed it.  They raised it in their

25  own briefing that they have a recommendation that was adopted

1   and chair, you know, Janno Lieber, said you couldn't change

2   anything in it because it is basically in stone.  They raised

3   it.  We responded to it.  So it is part of this case, part of

4   this case, their final recommendation which was then adopted in

5   very much the terms of the recommendation has been part of this

6   case, part of the briefings of this case.  You could not ignore

7   it and it compels vacatur and a remand.

8          Your Honor --

9          THE COURT:  We are going to get to this in the remedy

10  portion of the argument.

11         MR. MASTRO:  We are, your Honor.

12         THE COURT:  -- Mr. Mastro, but I'm going to just put

13  it out there, plant it in your mind, and you can talk to me

14  about it tomorrow.

15         MR. MASTRO:  Certainly.

16         THE COURT:  It requires vacatur.  What is the it that

17  requires being vacated?  Are we talking about a final

18  recommendation that has not yet been considered by the Federal

19  Highway Administration.  So the question is what am I vacating?

20  Am I vacating the FONSI?  The choice of words matters.

21         MR. MASTRO:  Yes, your Honor.

22         THE COURT:  You are using broad pronouncements.

23      "It."  "They." A little specificity would help.

24         MR. MASTRO:  I understand, your Honor.  I didn't mean

25  to --

1          THE COURT:  I don't need to guess as to what you want

2    me to do.

3          MR. MASTRO:  No.  And I want to be crystal clear.  We

4    will talk about it more.

5          You have to vacate the EA and the FONSI.

6          THE COURT:  I have to vacate the final EA and the

7    FONSI upon which the FONSI was built.

8          MR. MASTRO:  And on this issue, remand for the hard

9    look necessary at the actual final proposal, which is

10   materially different than any of the scenarios studied, so that

11   they have to do that hard look of the environmental impacts and

12   what mitigation is necessary to address this proposal, which

13   will involve a lot more diversion of traffic because of the

14   more onerous terms of a longer tolling period and a lower

15   crossing credit and a higher toll in general.

16         So, your Honor --

17         THE COURT:  You are at about 15 minutes to go,

18   Mr. Mastro.

19         MR. MASTRO:  I am not even going to need all of them,

20   your Honor.  I want to finish with the following.

21         THE COURT:  I am just trying to be kind and courteous

22   to let you know where you are at on the clock.

23         MR. MASTRO:  And it is so appreciated because the time

24   tends to get away from me, your Honor.

25         It is important to recall that events that -- this is

1   the DC Circuit in the *Nio* case, events that transpired after

2   the challenged action may be considered if they bear upon

3   issues before the Court.

4        How could they not be more clearly bearing on issues

5   before the Court?  New Jersey could not have waived these

6   arguments because we didn't actually know what the final

7   tolling scheme was until the recommendation was made, which was

8   only made in a time period where after the FONSI we had to sue

9   when the FONSI was issued within 150 days or we would have been

10  time barred.

11       So literally what my worthy adversary's position would

12  be is that I -- I had no case and that I waived my case because

13  they issued their recommendation and then approved this after a

14  statute of limitations would have run on the FONSI.  That can't

15  possibly be the state of the law.

16       Finally, your Honor, what I'm saying about vacating and

17  remanding is -- is based, in part, on admissions that have been

18  made in this case.

19       Let's go to the next slide, please.

20       The FHWA admits it, quote, will need, end quote, to do,

21  quote, additional environmental review of the finalized tolling

22  structure, which it should have done in the first place before

23  issuing a FONSI, green lighting this project to go forward.

24       The exact -- the exact quote that they use is, quote,

25  once the toll structure is finalized, FHWA will need to

1  determine whether any differences between the final tolls and

2  the alternatives examined in the final EA warrant additional

3  environmental review or analysis.

4        They have to do the work.  They have to take the hard

5  look.  They have to do the hard work.  But, your Honor, they --

6  they can't say we didn't know what the final was -- what the

7  final plan was going to be, but we approved it anyway.  They

8  have to do the hard look and the hard work that NEPA requires.

9        So the ripeness argument is totally meritless and now

10 there has to be vacatur and remand of this final EIA, in this

11 final FONSI, to take that hard look and do that hard work to

12 review the environmental impacts of the actual proposal that

13 was adopted.

14        THE COURT:  So, Mr. Mastro, there is now a window of

15 time for the Federal Highway Administration to consider the

16 final action, right, the final recommendation.  Correct?

17 That's what -- we're in that period of time now.  Correct?

18        MR. MASTRO:  We're in a period of time where they

19 could issue some, you know, back-of-the-envelope, slapdash, go

20 forward.  And guess what that's going to be, your Honor?

21        THE COURT:  No, no.  Mr. Mastro, I appreciate your

22 commentary, but it is just a very simple question.

23        MR. MASTRO:  Yes, your Honor.

24        THE COURT:  The final recommendation has been passed

25 on to the Federal Highway Administration, and we are now in a

1   period in which the Federal Highway Administration has to

2   consider that final recommendation.  Correct?

3          MR. MASTRO:  Theoretically, that's correct, your

4   Honor.  We don't know what the Federal Highway Administration

5   is doing, but I look forward to hearing what they say.

6          THE COURT:  All right.

7          MR. MASTRO:  And I would simply --

8          THE COURT:  Would you acknowledge that under the

9   appropriate regs that the Federal Highway Administration has

10  the authority to prepare a supplemental EIS or EA when

11  substantial changes to the proposed action are made which are

12  relevant to the environmental concerns?

13         So isn't there now -- well, answer my question first and

14  then I will ask a follow-up.

15         Right, 40 CFR 1502.9(d)1.

16         MR. MASTRO:  I understand, your Honor.

17         THE COURT:  All right.  So isn't this the period of

18  time in which the agency has to look to see if there were

19  substantial changes and determine if there were relevant --

20  those substantial changes are relevant to environmental

21  concerns and if they determine yes, then they are to prepare a

22  supplemental EA or EIS.

23         MR. MASTRO:  Your Honor is correct that theoretically

24  the FHWA could do that during this period.  I respectfully --

25         THE COURT:  So don't you think if they're under that

1   obligation, that part of that obligation would involve the

2   legal standard of a hard look?

3          MR. MASTRO:  It would definitely involve the legal

4   standard of a hard look.

5          THE COURT:  Okay.  So right now we're speculating.

6   Correct?  None of us know.  Neither you nor I nor Mr. Cumming

7   nor Mr. Chertok know what the Federal Highway Administration is

8   contemplating doing.  Correct?

9          MR. MASTRO:  Your Honor, I...

10         THE COURT:  I appreciate your prognostication.  But

11  the hard facts are we're in a period of time of speculation.

12  Are we not?  And there is an opportunity legally for the

13  Federal Highway Administration to do exactly what you're

14  suggesting they need to do.

15         MR. MASTRO:  Your Honor, I -- I respectfully submit

16  that the way this has transpired to date, the Federal Highway

17  Administration could not correct the defects of an

18  environmental review in the next two months by doing additional

19  work, just looking at the changes in the proposal.

20         THE COURT:  So you're saying the regulation is a

21  nullity because in your view it is impossible for the Federal

22  Highway Administration to do that which it's obligated to do

23  under the regulations?

24         MR. MASTRO:  No, your Honor.

25         I am saying the context matters.

1          THE COURT:  Okay.

2          MR. MASTRO:  That's what we are going to find out.

3          And in this context where the Federal Highway

4    Administration already seems to have approached this as a

5    predetermined outcome and rushed out the FONSI instead of doing

6    a full environmental review, despite the obvious measurable air

7    quality and Environmental Justice Community impacts that are

8    not mitigated at all in this plan in New Jersey, that it

9    couldn't possibly do a bona fide hard look of how these

10   additional changes, which will exacerbate the air quality and

11   Environmental Justice Community concerns because the final

12   project is even worse than any scenarios considered.  It can't

13   possibly green light the project in two months doing that

14   limited review.

15         And the fact of the matter is this is part and parcel of

16   why the EA and the FONSI need to be vacated and remanded and

17   they need to start from scratch.  There is not a shred of

18   mitigation, there is not any consideration of alternatives,

19   their air quality impacts exacerbated by this, their

20   Environmental Justice Community is treated worse now, it will

21   have worse impacts because of this and the diversion of traffic

22   to New Jersey that results from it.

23         They didn't consider New Jersey adequately.  They didn't

24   do the hard look on New Jersey.  They didn't give a dime of

25   committed mitigation to New Jersey.  They can't be trusted in

1    two months to have -- and we will not be able to see that they

2    took a hard look at how these changes affected all of those

3    other things.

4          THE COURT:  Okay.  So, Mr. Mastro, don't take my hard

5    question to be any indication of whether I agree or disagree

6    because now I'm going to look at Mr. Cumming and I'm going to

7    say to him, Mr. Cumming, I am an equal opportunity questioner

8    and you're going to get the same question from me, to which you

9    have to answer.

10         So I am probing the metes and bounds of what you're

11   arguing, Mr. Mastro, because I'm looking for the roadmap to get

12   one side or the other to the answer that they want.  And in

13   order to do that, I need to understand where the strengths and

14   weaknesses lie in your respective arguments.

15         So don't take anything away from my hard questions to

16   you.

17         MR. MASTRO:  I -- your Honor, I understand.  And

18   please don't take away from my passion on behalf of the people

19   of New Jersey that this process was fundamentally flawed and

20   they can't fix it in two months now by taking even worse

21   onerous tolling scheme that will cause more diversion of

22   traffic in New Jersey and more air quality problems, and more

23   Environmental Justice Communities to be affected worse.

24         They can't possibly fix that.  They can't correct that.

25   They have to have a vacatur and a remand and do a full

1  environmental impact statement.  That's our fundamental bottom
2  line, your Honor.  Thank you.
3       THE COURT:  Okay.  You are very welcome.
4       A request to all counsel, please, I appreciate your
5  passion.  Our court reporter appreciates your passion.  But
6  I've got to ask you to take a little bit of a deep breath and
7  just pace yourself a little bit more so that we can get a
8  complete record.  Okay?
9       Thank you, Mr. Mastro.
10      Just by way of note, you have about nine minutes left.
11 So your rebuttal can be a little bit more than five minutes.
12      Mr. Cumming -- Mr. Cumming, I'm going to beg your
13 indulgence for one minute.
14          MR. MASTRO:  Your Honor, this is their entire slide
15 deck.
16          THE COURT:  I will deal with it in a moment,
17 Mr. Mastro.
18          MR. MASTRO:  No problem.
19          THE COURT:  Mr. Mastro, we're going to have a couple
20 of questions for you in rebuttal.
21      All right.  Now, let me take a look at what Mr. Cumming
22 has prepared.
23      And, Mr. Cumming, help me out here.
24      This is a lengthy PowerPoint.  It appears that the
25 pages -- the slides -- are not numbered.

1        So which portion of this is going to deal with ripeness?

2        Or is this just an FYI for everybody to have at the

3   beginning of the day because it looks like, as I leaf through,

4   the first section deals with mitigation, which is not until

5   later in our proceeding.

6        So help everyone out, including the Court, if you would

7   be so kind.

8        MR. CUMMING:  Thank you, your Honor.  Only the first

9   two pages are relevant to this morning.

10        THE COURT:  To this morning on ripeness.

11        MR. CUMMING:  To what I'm about to talk about right

12   now.

13        In the interest of not passing out multiple documents,

14   your Honor, this -- this is our -- the slides that we will use

15   throughout the day today.

16        THE COURT:  Okay.

17        MR. CUMMING:  But I am not intending to cover more

18   than the first two slides this morning.

19        THE COURT:  All right.  Very good.

20        Mr. Cumming, you have, if I remember correctly,

21   25 minutes.

22        MR. CUMMING:  I would like to reserve five minutes.

23        THE COURT:  You want to reserve five.

24        Okay.  You are on the clock for 20 minutes.

25        MR. CUMMING:  Thank you, your Honor.

1          I would like to briefly set the stage for what this case

2  is about and why the Federal Highway Administration, and what

3  I'm going to refer to as Federal Highway --

4          THE COURT:  I'm sorry.  What are you going to refer

5  to?

6          MR. CUMMING:  Federal Highways.

7          THE COURT:  Federal Highways.

8          MR. CUMMING:  To avoid having to say the acronym

9  repeatedly today.

10          THE COURT:  No problem.

11          MR. CUMMING:  In an effort to decrease congestion in

12  Lower Manhattan, as well as to raise funding for public

13  transportation capital improvements, the New York State

14  legislature passed a law requiring MTA to implement the

15  congestion pricing plan.

16          Because that plan necessarily involved tolls on what are

17  called federal-aid highways, MTA submitted a letter of interest

18  to federal highways asking for the project to be approved under

19  what's called the Value Pricing Pilot Program, or VPPP, which

20  provides states the ability to impose tolls on those

21  federal-aid roads.

22          As part of that approval, Federal Highways was required

23  to conduct a review of the project under the National

24  Environmental Policy Act, NEPA, and the Clean Air Act.

25          The agency, in turn, exhaustively examined the

1    predicated effects of the project on 12 different resource

2    areas and various areas of the Greater New York City

3    Metropolitan area, compiled detailed data on regional and local

4    effects at issue and environmental assessment and a finding of

5    no significant impact.

6             THE COURT:  Mr. Cumming, two things.  Lift up the mic

7    a tiny bit.  Kindly projet a little bit more and slow down by

8    about 10 percent.

9             MR. CUMMING:  Thank you, your Honor.

10            Your Honor has heard a lot about the ongoing state

11   administrative process to establish a toll schedule, which

12   Mr. Mastro just talked about.

13            And while I don't want to suggest the Court is precluded

14   from taking judicial notice of state actions, I'll note that

15   that state process and the tolling schedule that was recently

16   adopted are not part of the record in this case.  The record

17   ends with the issuance of the FONSI in June of 2023.

18            To the extent that is relevant to a later lawsuit

19   challenging the re-evaluation or subsequent agency action, that

20   is for plaintiff to determine if they should so choose.  But

21   the fact that, you know, this tolling schedule is not part of

22   the record and under black letter principles of administrative

23   law, it is not relevant to the Court's consideration of the

24   claims brought by plaintiffs.

25            Mr. Mastro also made a couple points about congestion

1  pricing and it being the first in the nation.

2       While it is true this is the first what I will call

3  cordoned-type congestion pricing program, congestion pricing is

4  not new.  States across the country use various forms of

5  congestion pricing, such as variable tolls on highways, what

6  are called hot lanes.

7       Congestion pricing is a pricing mechanism to induce

8  driver demand.  This isn't some novel concept.  Now, the scale

9  may be different here, but the type of action isn't.

10      That's relevant to the Federal Highways' analysis

11 because Federal Highways has expertise in evaluating driver

12 demand based on tolls.  And they used what's called -- what I

13 will talk about this afternoon, the best practices model to

14 evaluate those effects.  So --

15      THE COURT:  So the prior administrative

16 precedent/practice in dealing with tolling schemes that are

17 adjusted to address traffic flows?

18      MR. CUMMING:  Yes, your Honor.

19      THE COURT:  Okay.  We will talk about that past

20 practice when it is appropriate.

21      MR. CUMMING:  Yes, your Honor.

22      And I will just note, Mr. Mastro referenced a case

23 involving the Bureau Offshore Energy Management.  I will

24 respectfully submit that offshore ocean fracking is slightly

25 different than adjusting pricing on roadways to induce

1    driver -- changes in driver behavior.  As I will talk about

2    throughout today and tomorrow, the State's opposition

3    ultimately failed to contend with the record and instead rests

4    on speculation.  And their arguments accordingly fail to

5    establish that Federal Highways acted unreasonably in issuing

6    the FONSI.

7         We would accordingly ask the Court to grant summary

8    judgment to defendants to defend this.

9         Briefly, your Honor --

10        THE COURT:  So the plaintiff's claim is predicated on

11   arbitrary and capricious?

12        MR. CUMMING:  Yes.

13        THE COURT:  So in your view, arbitrary and capricious

14   translates to reasonableness?

15        MR. CUMMING:  Arbitrary and capricious is the standard

16   language used by the Court.

17        THE COURT:  I know, but what does -- it's a word

18   formula.

19        MR. CUMMING:  It is.

20        THE COURT:  So what does it -- what does it mean?

21   Right?  How have the Courts dealt with it?  You know, how is

22   this Court supposed to get its arms around that standard?  And

23   so the simple question is:  What does arbitrary and capricious

24   translate to, in your view upon reviewing the case law?  Is it

25   reasonableness?

1          MR. CUMMING:  Standard translates to whether the Court

2    can discern that the agency looked at the relevant factors --

3          THE COURT:  Now, that's reasoned decision-making.  All

4    right.  That is the discernible path.  So let's start at the

5    beginning, Mr. Cumming.

6          There is a spectrum of judicial review.  Right?  There

7    is de novo at this end.  Right?  Which means the Court is the

8    finder of fact and the determiner of law.  Right?  And then we

9    get in administrative record situations like we are here.  And

10   there is fact-finding which is defined as substantial evidence.

11   Right?  And -- and there's Supreme Court law that tells us what

12   substantial evidence means -- that it is a qualitative

13   evaluation, not a quantitative evaluation.  And that the Court

14   can't substitute its judgment, et cetera, et cetera, et cetera.

15         And at the end of the day, if the agency's fact-finding

16   is reasonable, even though it is not the most reasonable or the

17   only reasonable, so long as it is reasonable, the Court must

18   affirm.  Then we get into issues of law, procedure and due

19   process, et cetera.  Substantial evidence, in accordance with

20   law, abuse of discretion, arbitrary and capricious.

21         The question is:  When you start getting into this

22   administrative record area, the directions from the Supreme

23   Court are fairly specific to the Courts.  It strikes me from

24   all the reading that I have done, treatises and otherwise, that

25   we're talking about a band of reasonableness.  And the only

1  question is the degree to which the plaintiffs have to

2  demonstrate that the agency's action was unreasonable.  Right?

3  So if you are at the far end of the spectrum and arbitrary and

4  capricious is at the far end of the spectrum, for plaintiffs to

5  prevail, they have to demonstrate that the agency's

6  decision-making was unreasonable.  But it's because it's in a

7  more deferential circumstance.  Right?  It is kind of -- they

8  have to show that the agency decision was more unreasonable.

9  Right?  And I am talking about it in terms of lay description,

10 not pure legal.

11     My question to you is:  Do you agree that we're dealing

12 with a question of reasonableness in the application of the

13 arbitrary and capricious standard?

14     MR. CUMMING:  I agree with your Honor that plaintiffs

15 have to demonstrate unreasonable agency action.

16     THE COURT:  Fine.

17     MR. CUMMING:  Okay.  To the extent, your Honor, after

18 Your Honor's -- after our last status conference, I did some

19 research and there is a case *Northwest Bypass Group* 470 F Supp.

20 2d 30, which uses the treatises your Honor described and looks

21 at the difference between the two standards.  So ultimately I

22 agree with your Honor.

23     THE COURT:  Okay.  Thank you, Mr. Cumming.  So we are

24 dealing with looking at, through a lens of reasonableness,

25 whether the agency's decision-making here meets that standard.

```
 1            MR. CUMMING:  Yes, your Honor.

 2            THE COURT:  Right.  And that is added to by certain

 3    language that's found either in the statutes, the regs, or the

 4    case law about what the agency is supposed to do by way of

 5    example, the hard look.

 6            MR. CUMMING:  Correct, your Honor.

 7            THE COURT:  Right?

 8            MR. CUMMING:  And I'll note --

 9            THE COURT:  And then we're going to probe as we go

10    along what the agency believes and what plaintiff believes and

11    maybe even what the defendant intervenors believe, right,

12    constitutes hard look.  Right?  It is not defined.  So the

13    question is what are the factors?  What are the elements that

14    the Court needs to look at to determine whether the agency

15    decision-making was reasonable in light of what's required of

16    it in terms of a hard look.

17            MR. CUMMING:  Correct, your Honor.

18            THE COURT:  Okay.

19            MR. CUMMING:  I will just add two points and then move

20    on to -- to ripeness.

21        NEPA is a procedural statute, not a substantive one.  So

22    it controls the means by which the agency makes -- does its

23    analysis, but it doesn't control the ultimate outcome.  An

24    agency could ultimately choose -- an -- an alternative with a

25    worse environmental outcome so long as the analysis supporting
```

1    that choice is -- meets the -- meets the standard.

2         One extra gloss is Courts have noted that they are not

3    required to flyspeck agency decisions under the arbitrary and

4    capricious standard.

5              THE COURT:  Keep your voice up, please, Mr. Cumming.

6              MR. CUMMING:  Sorry, your Honor?

7              THE COURT:  Keep your voice up, please.

8              MR. CUMMING:  Okay.  Thank you, your Honor.

9         Moving on to ripeness and re-evaluation.

10             THE COURT:  So flyspeck -- let me just jump back.

11   Flyspeck translates into the Court is not supposed to

12   substitute its fact-finding for that of the agency.  It is

13   not to substitute its judgment with respect to the agency

14   decision-making.  That's what you mean by flyspecking?

15             MR. CUMMING:  Correct, your Honor.

16             THE COURT:  Okay.

17             MR. CUMMING:  The final EA examined eight different

18   tolling scenarios from each resource area and looked at -- and

19   for each resource area, used the tolling scenario that was

20   result in the worst possible outcome for that resource.

21        With a commitment to re-evaluate based on the final

22   tolling schedule that was adopted by the MTA.

23        At face the state is asking the Court to rule that the

24   forthcoming re-evaluation is improper now before the agency has

25   a chance to examine what the final tolling schedule looks like

1    and plug it into the models used to create the final EA and see

2    where the numbers come out.  That is as black letter principles

3    of administrative law hold improper.  That it is prudentially

4    unripe to prejudge the agency's decision-making.  When the

5    final re-evaluation is finished, plaintiffs will have an

6    opportunity to challenge it then if they disagree with the

7    conclusion.

8         The conclusion could be that when those numbers are

9    plugged in, the agency has to prepare supplemental EA or even

10   go to the level of an environmental impact statement.  But we

11   don't know that.  I don't know that.  Mr. Mastro doesn't know

12   that.  And I don't think the agency knows that given that the

13   tolling schedule was adopted a week ago.

14         THE COURT:  Let's stop for a moment and just do a

15   little housekeeping.

16         Since our first gathering, we talked about a timeline of

17   events.  We are heading down towards the end of the -- of that

18   timeline.  So to the degree that we know, it would be helpful

19   to illuminate the Court.  So we have the final decision by the

20   Triborough Bridge and Tunnel Authority, communicated by the MTA

21   to the Federal Highway Administration.  Correct?

22         MR. CUMMING:  Correct.

23         THE COURT:  That is the final recommendation.

24         MR. CUMMING:  Yes.

25         THE COURT:  We are now in a period which we all

1  acknowledge would occur in April and May of the re-evaluation

2  consideration by the Federal Highway Administration.  Correct?

3        MR. CUMMING:  Yes.

4        THE COURT:  Refresh my recollection.

5        Is there a specific time period in any regulation that

6  says that the decision must be made by point X?

7        MR. CUMMING:  Not to my knowledge.

8        THE COURT:  So at this juncture, we are approximating

9  that this process will take somewhere in the range of 60 days?

10        MR. CUMMING:  Correct.

11        THE COURT:  But it could be 40 days or it could be 120

12  days.  We just don't know at this juncture.

13        MR. CUMMING:  No, we do not.

14        THE COURT:  Okay.  When this process is at an end, the

15  Federal Highway Administration will issue a written decision?

16        MR. CUMMING:  I am not sure what form the decision

17  will take or be communicated to MTA at the moment.

18        THE COURT:  Will it be published in the Federal

19  Register?

20        MR. CUMMING:  I am also not sure of that, your Honor.

21  It will be public --

22        THE COURT:  So how is somebody supposed to know that

23  there is final agency action with respect to the re-evaluation

24  that could be challenged, and, therefore, an appropriate

25  statute of limitations begins to run?

1          MR. CUMMING:  Well, two ways, your Honor.  One is --

2    and I will defer to my colleagues from MTA on this, but I

3    assume that determination will be communicated --

4          THE COURT:  Why defer to your colleagues from the MTA.

5    It is the FHWA's decision.  You have to know when the final

6    decision occurs and when you get notice of it.

7          MR. CUMMING:  One way, your Honor, is that the VPPP

8    agreement, which is the agreement that has to be signed before

9    the tolls go into effect, cannot be signed until the NEPA

10   process is finished.

11         THE COURT:  Well, I understand that the next step

12   after the Federal Highway Administration re-evaluation decision

13   is made that there is a period of time for the sponsors and the

14   Federal Highway Administration to enter into an agreement.  And

15   whether that takes two weeks or two months, again, that time

16   period is not specified in the regs, to the best of my

17   recollection.  Correct?

18         MR. CUMMING:  That's true, your Honor.

19         THE COURT:  Okay.  And so is the notice, I'm going to

20   use the word "notice," is the notice of the final agency

21   determination and re-evaluation triggered by the final decision

22   by the Federal Highway Administration, or is it triggered by

23   the signing of the agreement with the sponsors?  Because I

24   assume that agreement spells out the terms and conditions which

25   the Federal Highway Administration is setting forth to allow

1    the sponsors to proceed with the project?

2          MR. CUMMING:  I believe so, your Honor.

3          THE COURT:  Okay.

4          MR. CUMMING:  The VPPP agreement is the next final

5    agency action.  So to the extent that you are asking about the

6    event from which statute of limitations and other obligations

7    flow, it is the signing of the VPPP agreement.  That is the

8    final action.

9          THE COURT:  That is the final -- in your view.  And

10   that is confirmed by case law?

11         MR. CUMMING:  I believe so, your Honor.

12       And we don't dispute Mr. Mastro's point.  The FONSI was

13   a final agency action as well.

14         THE COURT:  Right.  And your view is we're here today

15   to discuss the strengths and weaknesses and the agency

16   decision-making around the EA and the FONSI and nothing else?

17         MR. CUMMING:  Correct, your Honor.

18         THE COURT:  Okay.

19         MR. CUMMING:  To the extent that there are concerns

20   about decision-making that postdate that, those are not in this

21   case.

22         THE COURT:  That's your position.

23         MR. CUMMING:  Yes, your Honor.

24         THE COURT:  There may well be case law that says

25   subsequent events can be considered.

1           MR. CUMMING:  Correct, your Honor.

2           THE COURT:  All right.  And so my question to you is:

3      How do you distinguish those cases?

4           MR. CUMMING:  I am not sure the context of the DDC

5      case that Mr. Mastro cited.  But I think in general, standard

6      principles of administrative law are the record ends at the

7      time of the final agency action now.  And could it be

8      supplemented?  Yes.

9           Plaintiffs have not moved to do that.  Could it be --

10          THE COURT:  Plaintiffs have not moved to supplement

11     the record?

12          MR. CUMMING:  The record.  No, your Honor.

13          THE COURT:  Okay.

14          MR. CUMMING:  The record is the record before the

15     Court at the moment.  If plaintiff --

16          THE COURT:  I think Ms. Pelts is coming up to hand you

17     a note.

18          MR. CUMMING:  And the record is triggered by -- by

19     what is the final agency action since there has been none since

20     the FONSI, that's where the record is today.

21          THE COURT:  So you're saying there's a discrete

22     cut-off point with the issuance of a FONSI, any subsequent

23     administrative actions creates a new discrete cut-off point

24     which may be challenged legally in court?

25          MR. CUMMING:  Yes, your Honor.

1                THE COURT:  Okay.

2           Continue.

3                MR. CUMMING:  Plaintiffs make the point that this

4    re-evaluation process is somehow unusual.  It is not.  It is

5    provided for in Federal Highway's regulations, cases around the

6    country have upheld approvingly the use of a re-evaluation tool

7    to decide how the agency should proceed.

8                THE COURT:  Mr. Cumming, Mr. Mastro talked about

9    context.

10          Help me out a little bit to the degree that you may

11   know.

12          How many FONSIs are there roughly in a year?  In any

13   given -- we will talk calendar year or you can say fiscal --

14   you know, federal government fiscal year.  It doesn't matter.

15          In a 12-month period, what are we talking about?

16               MR. CUMMING:  Many, your Honor.

17               THE COURT:  Well, many is relative.  Is many 20?  Is

18   many 120?  Is many 320?

19               MR. CUMMING:  Across the federal government, your

20   Honor, I suspect it is 320 or more.

21               THE COURT:  Okay.  Each one of those triggers a

22   re-eval?

23               MR. CUMMING:  No, your Honor.

24               THE COURT:  How many re-evals are we dealing with

25   roughly in the course of a year?

```
 1              MR. CUMMING:  I don't know the answer, your Honor.

 2              THE COURT:  So context helps.  Maybe sometime between

 3    today and tomorrow you could garner a little information that

 4    may help contextually.

 5              MR. CUMMING:  Sure.  Let me provide some context just

 6    from personal experience, your Honor.

 7              THE COURT:  Sure.

 8              MR. CUMMING:  Anecdotal, but I represent the Federal

 9    Aviation Administration in its licensing of SpaceX's rockets.

10    The agency has issued numerous re-evaluations over the last

11    two years related to that project.

12              THE COURT:  Okay.  Well, when we get into the topic of

13    the re-evals, we will talk about that.

14         Anything more, Mr. Cumming, on ripeness?

15              MR. CUMMING:  Last point, your Honor, the idea that

16    the need to re-evaluate renders the final EA invalid I don't

17    think has merit for two reasons.  One, re-evaluations are a

18    tool that is provided in the regulations, and they are a tool

19    that's been upheld by Courts.

20         Second, there is this concept called --

21              THE COURT:  But it is not discretionary.  Right?  The

22    agency doesn't have the authority to choose when it does a

23    re-evaluation.  Correct?

24              MR. CUMMING:  No, your Honor.  Well, let me back up,

25    your Honor.
```

1           If the agency chooses not to conduct a re-evaluation

2    when it needed to, it could be subject to what's called a

3    failure to act claim under the APA.

4           THE COURT:  Right.

5           MR. CUMMINGS:  To the extent the --

6           THE COURT:  There's a 5 706 agency inaction or failure

7    to take action when required by law.

8           MR. CUMMING:  Correct, your Honor.  So to the extent

9    that, for instance, Federal Highways is conducting a

10   re-evaluation here, but it states it did not do so.  That was a

11   legal avenue.

12          THE COURT:  It is a 5 702.

13          MR. CUMMING:  Correct, your Honor.

14          THE COURT:  706 is the remedy section.

15          MR. CUMMING:  Mr. Mastro made the point that the

16   tolling schedule -- the final tolling schedule enacts

17   substantial changes.  That is exactly what the agency is

18   supposed to look at.  Does it do that and --

19          THE COURT:  As required by the reg that I noted

20   earlier.

21          MR. CUMMING:  Correct, your Honor.

22          THE COURT:  Because we have a substantial change.

23   Right?  And the question is:  What does that yield in terms of

24   the Federal Highway Administration's consideration?  Does it

25   have an environmental impact, and, if so, does it rise to the

1   level that would trigger a supplemental EA or EIS?

2          MR. CUMMING:  Correct, your Honor.  But that is

3   exactly the initial inquiry and analysis that is -- that the

4   agency in the first instance needs to engage in.

5          THE COURT:  Is that a siloed process, or is their

6   input allowed from any of the participants in the underlying

7   process?

8          MR. CUMMING:  I believe it is a siloed process, your

9   Honor.

10          THE COURT:  Well, we will probe that a little bit more

11   down the road.

12          MR. CUMMING:  Thank you.

13          THE COURT:  Anything more, Mr. Cumming?

14      Mr. Chertok, you are eager to arise.  We will let you

15   come on up to the lectern.

16          MR. CHERTOK:  Thank you.

17          THE COURT:  Per our agreement, you have 20 minutes.

18          MR. CHERTOK:  I'll reserve five, your Honor.

19          THE COURT:  You're going to reserve five, so

20   15 minutes.

21      You may proceed.

22          MR. CHERTOK:  Thank you, your Honor.  Let me just get

23   myself organized a bit.

24      Listening to Mr. Mastro, it becomes quite clear that

25   this case for New Jersey is about money.  That's a political

1   issue, a policy issue.  It is not part of NEPA.

2        So now let's move on to the second part of New Jersey's

3   arguments.

4          THE COURT:  Well, Mr. Chertok, it depends upon how one

5   defines money.  Right?  It seems to me that a fair amount of

6   the briefing here deals with one of the considerations in the

7   various tolling schemes, which speaks of revenue generation.

8        In my mind, revenue equals money.  So the case is, to a

9   certain extent, about money.  Maybe it is about how the money

10  is shared, but I am not sure you can stand here and tell me the

11  case is not about money.

12         MR. CHERTOK:  The case from New Jersey's perspective

13  is that they are not getting a share of the revenues that would

14  be generated, and they are quite unhappy that the New York

15  Legislature enacted legislation which, of course, binds the MTA

16  and says there are two purposes to congestion pricing, two

17  basic purposes, one is to reduce congestion in the most

18  congested urban area in the country, as Mr. Mastro

19  acknowledged, and, two, to raise a stable source of funding for

20  the MTA for its capital improvements.  That figure in the

21  legislation is $15 billion.

22         THE COURT:  Over a period of time.

23         MR. CHERTOK:  Over a period of time, yes, absolutely.

24         THE COURT:  But not over the life cycle.

25         MR. CHERTOK:  Your Honor asked about $1 billion and

1    that is the rough surrogate for what would need to be raised in

2    a given year to meet the $15 billion goal.

3            THE COURT:  Over a reasonable period of time of 10 to

4    15 years.

5            MR. CHERTOK:  Correct.

6        Let's get into the second part of New Jersey's argument,

7    which really conflates a number of points.  First, they say the

8    FONSI is inadequate, and they say it is inadequate because it

9    doesn't identify impacts in New Jersey and at the same time it

10   doesn't provide mitigation in New Jersey.  But in order to

11   provide mitigation, presumably, the EA shows there are impacts

12   in New Jersey and, indeed, the analysis in the EA is extensive

13   and detailed and goes into impacts on probably a dozen resource

14   areas throughout the region, including New Jersey.  So

15   New Jersey's point there is that the EA is not adequate.  We

16   will be discussing that later.

17       Then their second point is that there is no mitigation

18   in New Jersey.  That's quite a statement.  They started out

19   their case by saying there was no mitigation, period.  Then in

20   their reply brief they sort of acknowledge but they said it

21   wasn't clear.

22       Well, the FONSI is very clear.  There are commitments to

23   mitigation both in the region, which will benefit New Jersey

24   and for certain place -- locations in New Jersey.  The precise

25   census tracts that will be included will be determined after

1    the re-evaluation.  So the notion that there is not mitigation

2    is not correct.

3         There also -- they argue --

4         THE COURT:  The point is the final mitigation is yet

5    to be determined in your view.

6         MR. CHERTOK:  The final mitigation will be fine tuned,

7    if I can use that term to determine the precise census tracts

8    that will receive place-based mitigation, such as air filters

9    in schools and things -- and restoration of trees and things

10   along those lines.

11        THE COURT:  We will probe this a little bit more when

12   we get to the mitigation argument.

13        MR. CHERTOK:  Yes.  But this is important for the

14   Court, I think, to understand that the myth that there is no

15   mitigation is exactly that, a myth and a hyperbole.

16        Then New Jersey makes the argument that there should be

17   a vacatur because the proposal wasn't evaluated in the EA.

18   Now, what the EA did --

19        THE COURT:  Their proposal or the final

20   recommendation?

21        MR. CHERTOK:  I'm sorry.

22        They -- New Jersey's position is that the proposal just

23   adopted by the TBTA board was not the exact proposal that was

24   evaluated in the EA.

25        THE COURT:  Right.  It is not one of the seven that

1    were listed.  It is a --

2            MR. CHERTOK:  That's correct.

3            THE COURT:  It is a variation on the -- my words, not

4    plaintiff's words, it is a variation on the theme that was not

5    fully examined or considered at the time of the EA.

6            MR. CHERTOK:  Well, I would take a bit of issue with

7    that, that description, because what was done was that there

8    were seven scenarios with different types of parameters,

9    different tolls, different credits, different caps, different

10   exemptions.  Those types of things.

11           THE COURT:  So I will roll back my statement and just

12   say it was a variation on the theme and the specifics of that

13   were not specifically, the specifics of the ultimate -- what I

14   will call the eighth tolling scheme were not specifically fully

15   examined during the EA process.

16           MR. CHERTOK:  They were examined, but you used the

17   word fully, which is the one I quarrel with --

18           THE COURT:  Okay.

19           MR. CHERTOK:  -- because there were variations and

20   ranges and what the EA did is take the representative worst

21   case impacts for the dozen or more resource areas, including

22   traffic and air quality, and say, Okay, let's do the worst.

23   Here is the worst that could happen from these different

24   parameters.

25           THE COURT:  Okay.  Again, I'll roll it back a little

1    bit more and just say it was a variation on the themes.

2         MR. CHERTOK:  Fair enough.

3         THE COURT:  Thank you for the clarification,

4    Mr. Chertok.

5         MR. CHERTOK:  No problem, your Honor.

6         So that is what they are saying is not a proposal.  What

7    they are really saying is that you should do an environmental

8    impact statement because this precise proposal was not

9    addressed in the EA.

10        I would point out that that is putting the cart before

11   the horse.  It is not uncommon.  In fact, it is very common for

12   projects to change, which is why the FHWA, Federal Highway, has

13   their regulations, which provide for re-evaluation both before

14   and after initial decisions.  That's precisely what's happening

15   here.

16        The argument that was made by New Jersey --

17        THE COURT:  Let me just clarify in my own mind,

18   Mr. Chertok.

19        The after I get.  Right?

20        The before, are you talking about the 30-day period

21   prior to the issuance of the FONSI where there is public

22   availability?

23        MR. CHERTOK:  No, your Honor.

24        THE COURT:  Is that what you are talking about, the

25   before review?

1          MR. CHERTOK:  What I am saying is after a FONSI is

2    issued but before the agency decides, for example, here, to

3    excute the VPPP agreement, as it is called, projects may

4    change.

5          THE COURT:  I get that.

6          You said there is a period before and after for

7    re-evaluation.  That after re-evaluation period I fully

8    understand.  Right?  The recommendation has been issued, and it

9    is now before the Federal Highway Administration in a period of

10   re-evaluation.

11         What I'm trying to understand is what is the period of

12   re-evaluation before that you just referred to?

13         MR. CHERTOK:  When a project changes.  Here, the

14   project was slightly refined by the adoption of the final

15   tolling structure last week.

16         THE COURT:  I am sorry for being thick, Mr. Chertok.

17         MR. CHERTOK:  It must be me, your Honor, not you.

18         THE COURT:  I understand the process.

19         We go from a draft EA to a final EA or an EIS.  Right?

20   Then we get the issuance of a FONSI.  Right?

21         So once the FONSI issues, are you saying there is a

22   period of re-evaluation before the recommendation is made?

23         MR. CHERTOK:  I am not sure what you are -- there is a

24   recommendation -- let me try.

25         THE COURT:  Stop one second.

1          Melissa, can you read back Mr. Chertok's statement,

2     please, where he makes reference to a period before and after.

3          (Record read.)

4          THE COURT:  Right.  I need to understand what the

5     before means.

6          MR. CHERTOK:  If an agency issues a FONSI, which, by

7     the way, is almost invariably the result of a NEPA evaluation,

8     almost every -- most projects are the subject of FONSIs and

9     EAs, not EISs.  Putting that aside, that in this case, there is

10    a FONSI.  There has been a refinement to the proposal and,

11    therefore, that refinement is subject to re-evaluation.

12         THE COURT:  The refinement comes in the form of what?

13         MR. CHERTOK:  The refinement here is the adoption by

14    the TBTA Board of the final tolling structure.

15         THE COURT:  So the evaluation period that you are

16    referring to after the FONSI is an opportunity for -- for

17    example, in this case, the MTA to refine its proposal and then

18    the Federal Highway Administration, after the issuance of the

19    proposal, has a formal, under the regulations, re-evaluation

20    period?

21         MR. CHERTOK:  Right.  That's what's going to happen.

22         THE COURT:  Okay.

23         MR. CHERTOK:  I was just referring to projects change

24    all the time.  And if you look at the cases, for example, that

25    plaintiff has cited, they make a big deal, for example, about

1    the First Circuit case where you had the ski -- the ski area

2    that was -- the project was modified.

3         Two things.  In those cases, the agency did their

4    re-evaluation, that was then challenged.  The Court determined

5    in that case that the changes were so material, changing the

6    location of the entire ski lodge, widening a lot of trails,

7    changing the location of trails would obviously -- obviously

8    impact the wild life, which was the heart of that impact

9    analysis, that they couldn't just do -- they had to do more

10   than say that nothing more was needed.  But those cases all

11   have a determination.

12        And what plaintiff wants to do is they don't want that

13   re-evaluation to occur.  They want to have everything start all

14   over again.  And their goal is because they claim this will be

15   a slapdash operation, I believe those are plaintiff's counsel's

16   words, and a back-of-the-envelope calculation or estimate.

17        But whatever it is, it is not going to be that because

18   the agency is going to do, in our understanding, a meaningful

19   look at those changes.  And they will issue --

20        THE COURT:  Well, that is your surmise.  Right?

21        Until the agency does what it does, we don't know

22   whether, in fact, it's going to do what you're opining that

23   they are doing.

24        MR. CHERTOK:  Well, since the agency -- the agency --

25   the regulations provide that the applicant has to submit the

1    basis.  I do know what we plan to submit, which will not be a

2    back-of-the-envelope estimate or a slapdash submission.

3         It will address the issues.

4         THE COURT:  Right.

5         MR. CHERTOK:  And it will hopefully show that the

6    impacts of the refined tolling structure are not -- are

7    consistent with the impacts that are shown in the EA.

8         THE COURT:  Right.  But that's what you're going to

9    do.  You have -- as -- as the applicant, you have no control

10   over what the agency is going to do.

11        MR. CHERTOK:  That's right.  We cannot control the

12   results, and it's possible the FHWA may determine that more

13   analysis is needed.  But that is, in our view, for the agency

14   in the first instance to decide and the -- New Jersey is asking

15   your Honor to effectively make that decision.

16        And a fair question is why is New Jersey so adamant

17   about not wanting the re-evaluation that they asked for in

18   their first set of papers?

19        The reason is they want something more.  They want delay

20   because, as your Honor knows, delay is the handmaiden of

21   project opponents.

22        (Reporter clarification.)

23        MR. CHERTOK:  So that was really what's happening

24   here.  And if -- if you look --

25        THE COURT:  You have about four minutes, Mr. Chertok.

```
1          MR. CHERTOK:  I don't get any time back from our
2    colloquy.
3          THE COURT:  I stopped the clock.
4          MR. CHERTOK:  Fair enough.
5       If you look at what plaintiff presented as slide 8 on
6    your slide deck, they claim --
7          THE COURT:  Hold on.
8          MR. CHERTOK:  Sure.
9          THE COURT:  That is the one with the -- the criteria
10   and the seven scenarios?
11         MR. CHERTOK:  Correct.
12         THE COURT:  Yes, the chart.
13      Go ahead.
14         MR. CHERTOK:  They -- this is what they claim shows
15   there is such a substantial impact that the Court should
16   intervene in the process and substitute its judgment for that
17   of the agency.
18      Base toll, they have a bunch of tolls.  The final one is
19   recommended.  It is not a recommendation, it is now a
20   determination, it is 15.  That's right within the range of the
21   tolls.
22      They say there is going to be longer time of peak
23   tolling.  That's correct.
24      Except they then say this is going to cause horrendous
25   diversion.  Well, they don't know that.  New Jersey hasn't
```

1    studied it.  They haven't done any modeling.  Indeed, the

2    record is most -- is most auspicious in its lack of any

3    meaningful submissions by New Jersey, despite their long-term

4    interest in opposing the project.

5         And if you look at crossing credits, the credits are --

6    go from zero, not what's said here, but zero from the one

7    scenario A up to 13.

8         THE COURT:  I'm --

9         MR. CHERTOK:  So the point, your Honor --

10        THE COURT:  Mr. Chertok, stop.

11    The slide represents from $6.55 to $13.10.

12        MR. CHERTOK:  The slide is incorrect, your Honor.

13        THE COURT:  That's what I am trying to determine.

14        Okay.

15        MR. MASTRO:  How is it incorrect?

16        THE COURT:  That -- you know what, gentlemen, you

17    can -- Mr. Mastro, you have a perfect opportunity to come up in

18    your rebuttal and rebut what Mr. Chertok said.  We are not

19    getting into crosstalk right now.  Got it?

20        MR. MASTRO:  Got it, your Honor.

21        MR. CHERTOK:  But most importantly, your Honor, it --

22    the point is that the scenarios consider these types of factors

23    and those are going to be considered in the re-evaluation.

24        Do -- does the change, the refinement in the tolling

25    structure, does that cause an inconsistent description of

1    impacts and, therefore, the FONSI is no longer valid?

2         That's what's supposed to be done and New Jersey is

3    fighting hard to avoid that and the reasons are clear.  It's

4    delay.  Delay.  Delay.

5         THE COURT:  All right.  Mr. Chertok, in anticipation

6    of what may be a potentially fiery set of conversation, all

7    right, it is your position that -- one, two, three -- the

8    credits box of $6.55 to $13.10 is inaccurate on the bottom

9    number?

10        MR. CHERTOK:  Right.  I'm not saying it is

11   intentional, your Honor.

12        THE COURT:  I am sorry.

13        MR. CHERTOK:  I am saying it is an error.  I'm not --

14        THE COURT:  No, no.  Just you know what?  Let me

15   finish and then we'll figure out what you're saying.

16        MR. CHERTOK:  Sorry.

17        THE COURT:  You made reference to the fact that $6.55

18   is not an accurate number and that the number, in your view, is

19   zero based on one of the scenarios.  Correct?

20        MR. CHERTOK:  That's correct.

21        THE COURT:  Okay.  Can you tell the Court which

22   scenario has the zero dollar figure?

23        And then when you get up for rebuttal, if you can, refer

24   to the specific document in the record that contains that

25   information.

1      MR. CHERTOK:  Scenario A, your Honor.  And we'll --
2  we'll pull the document as needed.
3      But the most important point, your Honor, is not the
4  exquisite detail, but that the scenarios assessed in the EA had
5  a range of credits.
6      THE COURT:  Right.
7      MR. CHERTOK:  And, therefore, the impact of those
8  credits was assessed.
9      THE COURT:  No.  But your point is that $5 is within
10  the range.  Right?  And at first blush, looking at slide 7 from
11  Mr. Mastro, it's below the range.
12      And so what you're doing is pointing out to the Court
13  that there is -- there may well be an inaccuracy here and that
14  in your view, based upon examination of scenario A, the range
15  starts at zero and does go up to -- to $13.10, that the floor
16  is not $6.55, as represented in this slide.
17      MR. CHERTOK:  That's correct.  But I would not get
18  hung up on that -- what I will consider an inadvertent error.
19      The point is that the scenarios look at all of these
20  different parameters.
21      THE COURT:  No, I get that, Mr. Chertok.  And we're
22  going to talk about this later.  But the point is you are
23  saying that there is a reasonableness associated with looking
24  at the range and the selection of a credit dollar amount was
25  reasonable given that range.

1          There is a discrepancy as to what the range is.  Right?

2   Trying to figure out what the range is does affect,

3   potentially, the argument -- the argument around reasonableness

4   and whether the decision-making here was reasonable and

5   followed a discernable --

6          MR. CHERTOK:  Two points on that, your Honor, if I

7   might.  I don't think it effects at all --

8          THE COURT:  Because this is after the fact.

9          MR. CHERTOK:  -- the viability of the EA.

10         THE COURT:  Right.  Okay.

11         MR. CHERTOK:  What this goes to is ripeness and

12  whether or not it is zero or $6.55 doesn't matter because the

13  point is that the FHWA will do its reevaluation and consider

14  the actual numbers.

15         THE COURT:  Right.

16         MR. CHERTOK:  And determine whether it makes a

17  difference in their description of impact in the EA and in the

18  decision in the FONSI.

19         THE COURT:  Right.  But this is part of the

20  decision-making after the fact.  Not before.

21         MR. CHERTOK:  That's correct, your Honor.

22         THE COURT:  Okay.  Thank you.

23       Mr. Mastro, before you get up, I need your indulgence

24  for about 30 seconds.

25         MR. MASTRO:  Certainly, your Honor.

```
 1              (Recess taken 11:01 a.m. to 11:02 a.m.)
 2              THE COURT:  Okay.  Mr. Mastro, you're up.  Five
 3   minutes.
 4              MR. MASTRO:  I think it was nine, your Honor.
 5              THE COURT:  Nine, that's right.  You had a little time
 6   left.
 7              MR. MASTRO:  I'll take every minute I can get.  I
 8   really appreciate it.
 9              THE COURT:  Trust me.  We may be here more than nine
10   minutes, but we will see.
11              MR. MASTRO:  No problem.  I am happy to answer any
12   questions the Court has.
13         Just to be clear, your Honor, so as my -- I have a lot
14   of respect for Mr. Chertok, it was not a mistake.  We -- we
15   cite exactly where in the record we got these figures from,
16   DOT_0004586.
17         Under scenario A, it says not applicable.  I don't know
18   what that means for sure, but in most scenarios there is
19   specifically listed a dollar figure and they're all higher than
20   $5.
21         But putting this in some perspective, I don't think it
22   takes a -- much imagination, although apparently more
23   imagination than Mr. Chertok has --
24              THE COURT:  Let's dial that back, Mr. Mastro.
25              MR. MASTRO:  Yes.  But, your Honor --
```

1          THE COURT:  We don't need personal commentary about

2   any other counsel in the room.

3          MR. MASTRO:  It is not personal commentary, your

4   Honor.  I didn't -- I certainly didn't mean it as offense.

5          THE COURT:  Mr. Mastro, he got it.  We've all known

6   each other for a long time.

7          MR. MASTRO:  We do.

8          THE COURT:  I get it.

9      Move on.

10         MR. MASTRO:  We do.

11     Your Honor, increasing by 12 and a half percent the

12  number of hours every day that tolling is going to be in

13  effect, every weekday, you know, two extra hours, that has an

14  effect on diversion.

15     Now, Mr. Chertok says, oh, well, I don't know that, how

16  can I know that?  Yet, he says in two months they're -- they're

17  going to slapdash something out and tell you, oh, it doesn't

18  make any difference.

19     Well, that's why you need to study it.  That's why it

20  should have been studied before a FONSI was issued.  It,

21  obviously, to any reasonable mind, has an effect upon the

22  derivative impacts to increase the tolling scheme 12 and a half

23  percent more every day.

24         THE COURT:  But, Mr. Mastro, what you are arguing to

25  me is merits.  Right?

1          I think we're all in agreement here.  There was final

2    agency action with respect to the FONSI and the question, which

3    was properly challenged within the statute of limitations, and

4    that's why we're here.

5          And now there are subsequent events that have occurred.

6    All right.  There is one argument that those have not yet

7    ripened into final agency action.  That's the defendant's side

8    of the V, right, and there's the plaintiff's the side of the V

9    in which you are saying to me these subsequent events are

10   relevant enough that, under case law, they need to be

11   considered.

12         And that's the issue that I am being asked to decide on

13   ripeness.  Is it inside the boundaries or is it outside the

14   boundaries?

15         MR. MASTRO:  Correct, your Honor.  I am not asking you

16   to substitute your judgment for anyone.

17         Is it a substantial change?  He challenged that it was a

18   substantial change.  I -- I would respectfully submit that

19   choosing on the high end of the tolling, adding 12-and-a-half

20   percent two extra hours a day to the tolling hours, and

21   choosing a lower credit than in most of the scenarios if not

22   all of the scenarios, that that combination, in particular,

23   especially the tolling hours, that requires re-examination.

24         THE COURT:  And so what you're saying to me is those

25   are relevant facts --

```
 1              MR. MASTRO:  Correct.
 2              THE COURT:  -- which have developed after final agency
 3    action that the Court needs to consider to sweep up into this
 4    current appeal?
 5              MR. MASTRO:  Absolutely, correct, your Honor.  And let
 6    me just say this --
 7              THE COURT:  Thank you.
 8              MR. MASTRO:  Let me just say this.
 9         I heard Mr. Cumming say, okay, this -- this process
10    that's being done now will be done in a silo.  That we didn't
11    seek to supplement the record.  Well, in a silo there is no
12    public comment being sought.
13              THE COURT:  Well, we will go down that road.  Won't
14    we, Mr. Mastro?
15              MR. MASTRO:  Yes.  Yes, we are, because this is my
16    point.
17         This silo over the next two months, where there is no
18    public review and no scrutiny of how these changes affect the
19    scheme, that's what makes this so fundamentally flawed.
20         I have to say this, your Honor, let's go to the next
21    slide.  Mr. Chertok, again, a dear friend, but one who told
22    you -- I am trying to quote him exactly.  Quote, It is almost
23    invariably the outcome of a NEPA review that a FONSI is issued.
24         Well, my God, I have been doing this a long time too.  I
25    have been in government.  That is not invariably the case.
```

1          And let's just talk about what the FHWA has done.

2          THE COURT:  Well, Mr. Mastro, you kind of got at a

3    question that I was asking Mr. Cumming to which he didn't have

4    the best information.  Right?  And he has to get it from his

5    client and that is contextual.

6          MR. MASTRO:  Correct.

7          THE COURT:  The Court is trying to get a handle on

8    just where we're at, EAs, FONSIs, what is the volume.  Right?

9    We need definition of context.

10          I appreciate your broad statements.  I appreciate

11    Mr. Chertok's broad statements, but nobody has enough data yet

12    to help me understand what's going on here in terms of the

13    volume or the pressures associated in order to determine

14    whether -- and -- and each one is a case-by-case determination

15    as to whether enough attention was -- was paid and whether the

16    reasoning of the decision-making, right, whether there was a

17    discernible path.  The rest of it is all nice context, but it

18    doesn't speak to just specifically what's going on here.

19          MR. MASTRO:  Couldn't agree more.

20          And it is correct.  You know I appreciate Mr. Cumming's

21    acknowledging he doesn't have an answer for you on how often a

22    re-eval happens.

23          Now, Mr. Chertok said that's putting the cart before the

24    horse.  Actually, the way I always understood it, and when I

25    was in government making these decisions, the way I did it was

1   I made a decision and then we did an environmental review.

2   Okay.  It is not putting the cart before the horse.  What I

3   would say, not cart before the horse, I would say predetermined

4   outcome and then working backwards to get to that result and to

5   support that result no matter what.  Even as you are changing

6   the scheme to make it worse and more adversely impactful on the

7   environment by the end of the day.

8          And, your Honor, here we are.  This is all gotten off

9   the FHWA's website and is alleged in our -- in our pleading.

10  Okay.

11          THE COURT:  You are on what slide number, please?

12          MR. MASTRO:  This is slide 23.  And, your Honor --

13          THE COURT:  Okay.

14          MR. MASTRO:  I will be using it this afternoon, but

15  because it came up --

16          THE COURT:  Right.

17          MR. MASTRO:  -- or later this morning.  But because it

18  came up, I just wanted to go right to it.  Okay.

19          The FHWA has determined that more than 110 projects

20  require a comprehensive EIS pursuant to NEPA over the last

21  decade.  Okay.  That's more than ten a year.  But not this one.

22  Even though it is unprecedented in scale and scope.

23          And I appreciate that Mr. Cumming says, oh, there are

24  variable tolls that occur.  But then he had to admit this is

25  pretty darn unique in New York City, the greatest city in the

1    world, the most congested city in the world, that you will

2    forgive me if I have high affection for New York City as a

3    former deputy mayor.  But it is happening in an unprecedented

4    scale and scope in a unique way over a huge swath of congestive

5    Manhattan.  It is so unique, yet 110 other projects, more than

6    110, have required a full EIS, according to FHWA.

7          Since January 2020 alone, 20 FHWA-approved projects

8    required a full EIS.  Four of them in the last four years

9    involved tolling schemes requiring an EIS.  Where the tolling

10   scheme at issue merely changed or was of far less consequence

11   than the novel tolling scheme here.  For example, went from a

12   manual tolling to electronic.  Okay.  I mean, look at the

13   examples.  Chesapeake Bay Crossing, building new corridor, and

14   changing tolling facilities.  Same thing, Hood River, White

15   Salmon changing tolling facilities to electronic tolling.

16   Building a new connector and tolling alternatives, Lafayette.

17         And then highway project in Maryland replacing an

18   existing bridge and two high occupancy tolling lanes.

19         THE COURT:  And which of those four examples involved

20   border states?

21         MR. MASTRO:  Well, your Honor, I --

22         THE COURT:  Any of them?

23         MR. MASTRO:  I -- I think your Honor, it would -- it

24   would be the case that they do.  My colleagues are going to

25   tell me exactly which ones.  I am sure the one in Maryland did.

1  And she is going to pass me a note on which other ones did.

2  And they are on the FHWA's website.

3        THE COURT:  In the interim, Mr. Mastro, because we are

4  just about at nine minutes, with the TBTA Board having voted to

5  approve that TMRB recommendation for a final tolling scheme,

6  defendants represent that there is more administrative process

7  to come.  We agree?

8        MR. MASTRO:  That's what's been represented.

9        THE COURT:  Specifically, it appears that the FHWA

10 must now re-evaluate the final EA in light of the recommended

11 final tolling scheme structure.  Correct?

12       MR. MASTRO:  Correct.

13       THE COURT:  And the description in your reply brief is

14 that the regulation, 23 CFR §771.129, is obligatory under the

15 circumstances presented.  Correct?

16       MR. MASTRO:  Correct, your Honor.

17       THE COURT:  So only after conclusion of that

18 re-evaluation will the FHWA reach agreement with the project

19 sponsors under the VPPP.  Correct?

20       MR. MASTRO:  That's correct.

21       THE COURT:  And then take final action allowing the

22 tolling scheme to commence.  Right?

23       MR. MASTRO:  Correct, your Honor.  Yes.

24       THE COURT:  So given all of this, coupled with the

25 fact that plaintiff's action here challenges federal agency

1    action, why should the Court step in to exercise judicial

2    review over an administrative process that does not yet appear

3    to be finalized?

4          MR. MASTRO:  Because, your Honor, the FONSI was final.

5    The FONSI being the predicate for the subsequent activities

6    which have only made the environmental impacts worse and the

7    need for mitigation even greater even though none is provided

8    or specified.  That is not a myth.  It is a reality.  There is

9    not a single mitigation dollar committed to New Jersey at this

10   point.

11         There is nothing they can do in that final two-month

12   period that is going to solve the inherent problems you are

13   going to hear about all day in the air quality analysis, the

14   Environmental Justice Communities analysis, lack of mitigation,

15   failure to consider alternatives, you are going to have myriad

16   reasons why they can't possibly in those two months fix those

17   problems and I heard the concession by Mr. Cumming that, yes,

18   before New Jersey challenged the FONSI on time, that was the

19   final approval of this project.  It was done prematurely in our

20   view because the final plan was not yet announced and it is

21   even worse than what we could have imagined.

22         THE COURT:  So to reiterate something that we talked

23   about a little bit ago, it is your view that the post-FONSI

24   developments are relevant to the significant issues being

25   presented in your challenge to the FONSI?

```
 1              MR. MASTRO:  Absolutely, your Honor.

 2              THE COURT:  Okay.

 3              MR. MASTRO:  And they go to the -- the large amount of

 4    additional work that has to be done here that requires a full

 5    EIS.

 6         Your Honor, if I may just do one --

 7              THE COURT:  I will give you 30 seconds, Mr. Mastro.

 8              MR. MASTRO:  Thank you.

 9         You asked about the standard.  And whether it is a

10    reasonableness standard.  And it is.  It's whether there was a

11    rational basis or rational decisions made and a synonym in the

12    dictionary is reasonableness.  It's about whether they did

13    things in a rational, reasonable way.  It is arbitrary,

14    capricious, or irrational.

15         And, your Honor, the standard changes.  The burden

16    changes.  When they choose to do a FONSI, they have to make a

17    convincing statement.  Okay.  The EIS must be prepared if there

18    are substantial questions regarding whether an agency's

19    proposed action may have significant impacts.  They have to

20    make a convincing statement.

21              THE COURT:  Well --

22              MR. MASTRO:  It is on them.  That burden is on them.

23              THE COURT:  That is the burden on the administrative

24    process.  Right?  It doesn't necessarily change the burden in

25    judicial review.  It is what is subject to question during the
```

```
 1   judicial review.
 2           MR. MASTRO:  Correct, your Honor.  But when one talks
 3   about our burden --
 4           THE COURT:  Mr. Mastro, we will get to the rest of
 5   this in due course.
 6           MR. MASTRO:  I understand.  I wanted to share that
 7   with your Honor.
 8           THE COURT:  I understand.  You are at your limit.  I
 9   am more than happy to give you more time in due course.  All
10   right.
11           MR. MASTRO:  Thank you, your Honor.
12           THE COURT:  Mr. Cumming, you are up.
13           MR. CUMMING:  Thank you.
14       To briefly first address Mr. Mastro's point about the
15   other projects.  For instance --
16           THE COURT:  You are talking about the four comparative
17   projects that I -- that the Court alluded to in question to his
18   slide?
19           MR. CUMMING:  Correct, your Honor.
20       For instance, the Chesapeake Bay Crossings' study aims
21   to build a new bridge across the Chesapeake Bay.
22           THE COURT:  Is that a border state case?
23           MR. CUMMING:  A border state case, your Honor?
24           THE COURT:  Yeah, two states, like we have here, New
25   York and New Jersey.
```

```
1              MR. CUMMING:  No -- no, your Honor.  That would be --
2              THE COURT:  It is solely within the confines of
3    Delaware?
4              MR. CUMMING:  Of Maryland.
5              THE COURT:  Of Maryland.  I'm sorry.
6              MR. CUMMING:  I believe so, your Honor.  23CFR771115A
7    notes that projects that are -- require large scale
8    construction may require the preparation of an EIS.  That is
9    not a factor that is present here.
10             THE COURT:  Okay.  Cases 2, 3, and 4.
11             MR. CUMMING:  The Hood River Bridge Replacement
12   Project, it is a bridge replacement project.  I believe the
13   slide referred to it as a tolling project.  I don't think
14   that's a fair representation of that project.
15             THE COURT:  Border state case or not?
16             MR. CUMMING:  I don't believe so, your Honor.  I
17   believe that is within Oregon.
18        I will look up the other -- I don't have the other two
19   cases in front of me but, regardless, your Honor.  And we cite
20   to a case that notes an agency decision to conduct an EIS in
21   other projects provides little support for its duty to conduct
22   an EIS in a project before the Court, which is to say NEPA
23   reviews are by virtue of the -- being project specific, they
24   are specific to the project.  They are not easily extrapolated.
25        I take your Honor's question about the frequency of
```

1    re-evaluations, and we will get you an answer.

2              THE COURT:  Okay.

3              MR. CUMMING:  Two final points.

4              THE COURT:  Sure.

5              MR. CUMMING:  We go back and forth, but there are two

6    main claims relevant to ripeness, one is can the Court find

7    that the tolling schedule -- the final tolling schedule

8    necessitates preparation of a supplemental EA or EIS now before

9    Federal Highway has, in the first instance, had the opportunity

10   to analyze whether it affects a substantial change.  That claim

11   is unripe because --

12             THE COURT:  That claim is?

13             MR. CUMMING:  Unripe, your Honor.

14             THE COURT:  Okay.

15             MR. CUMMING:  -- because the agency has to make that

16   decision in the first instance under its regulations and

17   guidelines.

18             THE COURT:  The Court, in your view, may not preempt

19   the agency and substitute its judgment for that of the agency.

20             MR. CUMMING:  Correct, your Honor.  That is what the

21   Supreme Court said in *National Park Hospitality Association.*

22        Second, the question is -- Mr. Mastro raises the issue

23   of whether the EA is somehow invalid by virtue of the need to

24   conduct a re-evaluation.  That claim is also incorrect.

25        The EA, as Mr. Chertok talks about, analyzes the worst

1  case scenario for each resource.  The Supreme Court said in

2  *Baltimore Gas* in 1983 that the purposes of NEPA -- the twin

3  purposes are to inform the decision-maker and inform the

4  public.  By looking at the worst case scenario for each

5  resource area, the final EA does that.  The need to conduct a

6  re-evaluation does not render that analysis invalid and the

7  need to conduct further analysis by itself isn't unusual.

8         Agencies frequently do what's called tiering where they

9  look at the programmatic outcome of a project and then analyze

10  specific iterations of that project in subsequent analyses.

11  That's an analogous situation of what's being done here.

12         THE COURT:  Anything further, Mr. Cumming?

13         MR. CUMMING:  No.  Thank you, your Honor.

14         THE COURT:  Don't go anyplace.

15         So my suspicion is you do not have the answer to this,

16  but it would be, shall we say, contextually helpful.

17         You made reference in your main presentation to tolling

18  schemes that present variable pricing in order to manage

19  congestion.  It would be helpful to have a couple of examples

20  of where that was considered and what the practice of the

21  Federal Highway Administration was in reaching the decision one

22  way or the other on those tolling schemes.  Okay?

23         Something that you said in answer to our earlier

24  colloquy has me a bit concerned.

25         You seem to indicate that the re-eval decision gets

1  collapsed into the agreement and is not until the agreement is

2  signed that there is final agency action that's challengeable

3  with respect to the re-evaluation.

4       I am not quite sure how to square that.  It just doesn't

5  quite ring true to me.

6          MR. CUMMING:  I may have misspoken, your Honor.

7          THE COURT:  Again, I don't know that you are going to

8  have the answer for me right now.  I would humbly suggest to

9  you that whoever you need to talk to, let's get a little

10 clarity around this process because I think it will be helpful

11 on a contextual basis.

12      The other thing is I accept or at least wise I accept

13 that I heard that you said that there is no regulation that

14 governs the time period for the re-evaluation, but it can't be

15 that loose.  Right?

16      There has to be a reasonable expectation or something

17 based on past practice or something posted somewhere that at

18 least informs the public of how to manage its expectation or at

19 least sponsors or applicants how to manage their expectation

20 and plan for roughly how long this process may take and whether

21 there are certain circumstances under which, theoretically, an

22 extension of time would be appropriate with -- because the

23 matter is, my words, right, extraordinarily complicated.

24      You haven't given me anything that leaves me comfortable

25 with being able to get my hands around how this process works

1    in any way.  Assuming I agree with you, right, that it is not

2    ripe, right, that there aren't circumstances post the FONSI

3    that allow me to reach into this and pull it in.  Right?  We

4    need to be able to manage expectations of the public, right, so

5    that they can plan to take whatever steps they need to take in

6    response to this contemplated administrative action.  So it may

7    or may not be directly relevant to what we have here.  I have

8    to still cross that bridge, but I think it would be helpful to

9    at least contextually put some of this on the record.

10           MR. CUMMING:  My understanding, your Honor, the agency

11   is well aware of MTA's desired timeline for implementing

12   tolling.  I do not know of anything that alters the sort of

13   60-day time frame that we gave the Court during the last status

14   conference.

15           Two --

16           THE COURT:  I think some clarity around notice and how

17   it works with respect to that final decision also would be

18   helpful.

19           MR. CUMMING:  I will get that for you.

20           THE COURT:  Thank you, Mr. Cumming.  I appreciate it.

21          Mr. Chertok, you are up.  Five minutes and then we take

22   a break, ladies and gentlemen.

23           MR. CHERTOK:  First of all, your Honor, an

24   administrative matter, the record document number

25   DOT_0036292 --

1          THE COURT:  Mr. Chertok, are we talking about slide 7?

2          MR. CHERTOK:  The infamous credit.

3          THE COURT:  And we're talking about one of the

4    footnotes at the bottom of that page?

5          MR. CHERTOK:  No.  We are talking about the page, and

6    there is columns that say credits and there are a bunch of

7    scenarios.

8          THE COURT:  You are talking about the administrative

9    record document with the chart of the credits?

10         MR. CHERTOK:  I am just giving your Honor the cite.

11         THE COURT:  Sure.

12         MR. CHERTOK:  And a number of scenarios in addition

13   to A, when it talks about credits, says no.  I think that word

14   is pretty clear.

15         THE COURT:  Again, the record citation, please.

16         MR. CHERTOK:  Sure.  0036292.

17         THE COURT:  It is the same one noted in footnote 1 on

18   slide 7.  Okay.  Thank you.

19         MR. CHERTOK:  Sure.

20       Second, I think one of the points to make here is that

21   each project is different and the fact that there may have been

22   an EIS for one project doesn't mean there should be an EIS for

23   another because the need for an EIS depends upon the impacts of

24   a proposal, not so much the nature of the proposal.

25         THE COURT:  Isn't that a restatement of language with

1   respect to the NEPA that it is supposed to be a case-by-case

2   determination?

3        MR. CHERTOK:  Yes, and I am perfectly happy with that

4   recitation, your Honor.

5        Mr. Mastro makes a big deal that this is a

6   precedent-setting case because it arguably is the first cordon

7   pricing, but that has a real advantage because here you have a

8   very detailed environmental assessment and it will obviously be

9   discussed in more detail this afternoon, studies, a dozen

10  resource areas, found there are a few potential significant

11  impacts and has provided mitigation for them.

12        That would set the stage for, perhaps, other cities

13  around the country being able to do congestion pricing, which

14  is a plus in this age of climate change, because this project

15  has a regional benefit.  Despite New Jersey's assertions, it

16  benefits the region environmentally and economically and that

17  is something that should be looked at positively because it may

18  set the roadmap for other cities in this country to do the same

19  type of thing.

20        THE COURT:  Isn't that a policy argument, Mr. Chertok?

21        The question is:  If it is, where does that fit into the

22  equation under the appropriate regulations, statutes or

23  standards?

24        MR. CHERTOK:  It fits in because --

25        THE COURT:  Well, let's answer the first question.

```
 1          Is it a policy argument?

 2          MR. CHERTOK:  It is partly policy, but it is also

 3   relevant because the reason there was a second review here only

 4   for review, not commenting of the proposed FONSI and the final

 5   EA is because this was viewed as a precedent-setting project,

 6   and FHWA looked at that conservatively and took that extra step

 7   for public involvement.

 8          THE COURT:  Did the FHWA speak to that specifically in

 9   their EA or the FONSI?

10          MR. CHERTOK:  I believe they did in the FONSI, your

11   Honor, to explain why there was a second period.

12          THE COURT:  Okay.  So when we get to that substantive

13   part of the argument, illuminating me as to where would be most

14   helpful and if not, acknowledging that it was not specifically

15   addressed but also --

16          MR. CHERTOK:  The regulation was.  I don't recall

17   whether the FONSI referenced that regulation, but there was a

18   second public -- there was a public availability period.

19          THE COURT:  We are going to talk when we get there

20   about just exactly what that public availability period means

21   and whether it is actually illusory.

22          MR. CHERTOK:  Well, it is available.  It is not

23   illusory, but whatever.

24          THE COURT:  Well, you know, we will talk about it when

25   we get there.  The Court has got a whole bunch of questions
```

```
 1   about that.

 2           MR. CHERTOK:  Thank you, your Honor.

 3           THE COURT:  You are welcome.

 4       Mr. Mastro, you can't help yourself, can you?

 5           MR. MASTRO:  I am so sorry, your Honor.  I'm so sorry,

 6   but you asked me a question, and I always want to give you the

 7   right answer.

 8           THE COURT:  Then come to the podium, please.  I will

 9   give you 45 seconds.

10           MR. MASTRO:  Thank you, your Honor.

11           THE COURT:  Then the court reporter needs a break.

12           MR. MASTRO:  I understand.  I will speak very slowly

13   this time.

14       The Hood River Project involved changing tolling

15   facilities to an all electronic tolling facility at the

16   Oregon/Washington border.

17           THE COURT:  Thank you, Mr. Mastro.

18           MR. MASTRO:  Thank you, your Honor.

19           THE COURT:  We do have a border state example.

20           MR. MASTRO:  Thank you.

21           THE COURT:  It is 11:30.  We will be in recess

22   ten minutes.  It is five minutes shorter than planned because I

23   want to get us as close to on schedule as we can.

24       Stay seated, please.  Thank you.

25           (Recess taken 11:29 a.m. to 11:41 a.m.)
```

1         THE COURT:  Mr. Mastro, we are on the issue of NEPA

2    other than air quality.  We are going to proceed for a period

3    of time with just affirmative arguments, and then we are going

4    to break for lunch.

5         MR. MASTRO:  Yes, your Honor.

6         THE COURT:  You have 60 minutes all told.  The

7    question is:  What do you need?

8         MR. MASTRO:  Your Honor, I would like to reserve ten,

9    and I'm handing up --

10         THE COURT:  So you are on the clock for 50 minutes.

11         MR. MASTRO:  Thank you, your Honor.

12    I am handing up some NEPA overview charts and then as I

13    do each issue, I will hand up more charts.

14    Thank you, your Honor.

15    Your Honor, I want to begin where we ended.

16    What I heard from my worthy adversaries concerns me

17    because, apparently, you are not -- when can you review their

18    final decision, until it becomes a fait accompli?  And they

19    turn the switch in mid-June.

20    At each phase they talk about how, oh, it is not ripe

21    for review.  It is not ripe for review.  It is not ripe for

22    review.  We know what it is.  We know what's going to be

23    implemented, and it directly affects the quality and scope of

24    environmental review that was already done in the EA and the

25    FONSI.

1        And I've heard we had a right to challenge the FONSI.

2   That is the predicate for the final plan, and these are

3   additional elements that make it even clearer that a FONSI was

4   issued prematurely and not even on a plan of a severe

5   implication.

6        So I think we're where we're supposed to be now,

7   reviewing a FONSI and an EA that were final, and the additional

8   elements that have come out since, the actual final tolling

9   scheme, which should have been known and released by the time

10  they did a FONSI and the FHWA should not have issued a FONSI

11  until it actually knew the specifics.

12       But now that it does, now that it is out there, whatever

13  additional work they are doing doesn't change the fundamental

14  flaws in the environmental review process.  And let's talk

15  about those under NEPA.

16       A quick overview of NEPA.  It's -- and I am now going to

17  talk about the -- focus in particular on the regulations,

18  40 CFR Section 1501.6.  If an action is not likely to have

19  significant effects or the significance of effects is unknown,

20  then you can do an EA instead of a comprehensive EIS.  But the

21  agency is only supposed to issue a finding of no significant

22  impact based on an EA if, quote, the proposed action will not

23  have significant effects, end quote.

24       And the FONSI, quote, shall state the authority for any

25  mitigation.  If the agency finds no significant impacts based

1    on mitigation, the mitigated FONSI, meaning the mitigation

2    provided for in the FONSI, shall state any enforceable

3    mitigation requirements or commitments that will be undertaken

4    to avoid significant impacts.

5            We're going to come to this in a minute.

6            Where in this FONSI are those mitigation requirements

7    and commitments for New Jersey?  It is not a myth.  It's not

8    there.

9            So the -- trust me, something may come later, New York

10   officials will decide what -- what leftovers to sprinkle on

11   New Jersey later, so trust us.  That ain't the way NEPA is

12   supposed to work.

13           The FONSI -- to issue the FONSI has to state the

14   mitigation measures, the requirements, and commitments that

15   will be undertaken to avoid impacts.

16             THE COURT:  So, Mr. Mastro, you are saying to me that

17   in your view the regulations or the NEPA scheme in a border

18   state situation requires there to be statements of mitigation

19   with respect to the effects, significant effects, on both

20   states in a border situation?

21             MR. MASTRO:  Without question, your Honor.  I don't

22   understand --

23             THE COURT:  Now, I -- that's fine.

24           You are saying it requires it in a border state

25   situation --

```
 1            MR. MASTRO:  Absolutely.
 2            THE COURT:  -- and so now the very simple question:
 3    Where does it say that?
 4            MR. MASTRO:  It's not there.
 5            THE COURT:  Not in the FONSI.
 6            MR. MASTRO:  Oh, okay.
 7            THE COURT:  You are saying to me that the scheme,
 8    regulation, or statute, or past practice, whichever you choose,
 9    requires, mandates, obligates there to be statements of --
10    there needs to be a mitigation plan for the respective border
11    states, in this circumstance two of them, New York and
12    New Jersey.
13        And my simple question is:  If you agree with that
14    statement, where is that obligation?  Where is that
15    requirement?
16        Where is that mandate found?
17        Give me the language, statute, or otherwise.
18            MR. MASTRO:  I will, your Honor.
19        The FHWA is a federal agency, it's looking at the
20    regional effects.  And that's in their regs.  They're supposed
21    to look at national, regional, or local effects depending upon
22    the nature of the project.
23        I don't actually think it is in dispute, and I think
24    Mr. Cumming will acknowledge, and the EA acknowledges, it was
25    incumbent upon them to look at the effects on the region.
```

1          The regional study --

2          THE COURT:  So you are saying that the scheme and the

3     use of the word regional directs the FHWA to look at both

4     states in a border situation?

5          MR. MASTRO:  Correct, your Honor.

6          I think if you look at 40 CFR §1501.3(b), you will see

7     that there is language there that says in considering the

8     potentially effected environment, agencies should consider the

9     effected area, whether national, regional, or local.

10         And in this EA, they define this as the regional study

11    area as 28 counties, 14 of them are in New Jersey, 12 are

12    New York, and two are Connecticut.

13         So I think that is not in dispute at all that that was

14    required.

15         Now, your Honor, talking a little bit more about --

16         THE COURT:  So did they look -- you are not standing

17    here and saying to me they didn't look at the region at all.

18         MR. MASTRO:  I am not, your Honor.

19         THE COURT:  You are saying to me that when they looked

20    at the region and made their mitigation determination, you

21    don't believe that their reach was as extensive as it needed to

22    be.

23         MR. MASTRO:  When it came to New Jersey, your Honor?

24         THE COURT:  Yes.

25         MR. MASTRO:  Absolutely.  14 counties in the region,

1  yet in each element -- and you're going to hear a lot more

2  about this -- they cabined the actual review to a small number

3  of counties, a small number of communities.

4       And then when it came time for mitigation, there is tons

5  of mitigation in here for New York.

6       There is $35 million in Bronx County mitigation for

7  South Bronx and Hunts Point.  Not a single commitment of a

8  dollar to New Jersey.  Not a single explanation of what

9  mitigation will be necessary and how it will be done.

10      And what I just read to your Honor from the regs, and

11 Mr. Chertok essentially admitted that, yeah, there is a lot of

12 adverse effects in New Jersey and that mitigation will come

13 later.  That's not how it works.

14      Okay.  If the agency finds no significant impacts based

15 on mitigation, the mitigated FONSI shall state any enforceable

16 mitigation requirements or commitments that will be undertaken

17 to avoid significant impacts.

18      Your Honor, the case law couldn't be clearer.  I cited

19 *Environmental Defense Center* before.  An EIS must be prepared

20 if there are substantial questions regarding whether an

21 agency's proposed action may have significant impacts.

22      I think you have already had an acknowledgment there

23 are.  There may be significant impacts in New Jersey, such that

24 a number of communities there could or may get mitigation

25 later.  They should have been provided for now.

1          And I will also be explaining to you later how they

2    cabined the search in New Jersey to limit those, even though

3    there are many other Environmental Justice Communities and a

4    lot of adverse --

5          THE COURT:  Take a deep breath, Mr. Mastro.  Slow down

6    just a tad.

7          Let's have respect for our very capable court reporter.

8          MR. MASTRO:  So much to say, so -- so much time.

9          So I will take the time.

10         Your Honor, let's -- let's continue briefly with this.

11         I mentioned this earlier, the federal agency, the FHWA,

12   it bears the burden in the first instance when it issues a

13   FONSI.  That's cutting the process short.

14         It's got to make a convincing statement of the reasons

15   why it did that instead of doing a comprehensive EIS.  That is

16   the law and that's --

17         THE COURT:  Wait, wait, wait.

18         Where do I find the word convincing?  I understand

19   reasoned decision-making.

20         Where do we find the word convincing?  Statute?

21   Regulation?  Supreme Court case?  Third Circuit case?

22         Help me out here, Mr. Mastro.

23         MR. MASTRO:  Of course.

24         You find it in the case law, including the *Environmental*

25   *Defense Center* case, Ninth Circuit, just two years ago, in

1  which it said, quote -- direct quote, if the agency does not

2  prepare an EIS, it must submit a convincing statement of

3  reasons.

4          THE COURT:  Okay.  So help me understand that term, a

5  convincing statement.

6        What are my benchmarks?  What are my road markers to

7  understand how I am supposed to judge whether something is

8  convincing or not?

9        What am I supposed to take into consideration?

10        Again, convincing, it's a nice adjective.  Right?  What

11  am I supposed to do with it?

12          MR. MASTRO:  There are other cases that have gone into

13  greater detail in this regard, your Honor, in the Ninth Circuit

14  and in other circuits.

15        More recently in Monmouth County --

16          THE COURT:  So, Mr. Mastro, help illuminate me.

17          MR. MASTRO:  Yes.

18          THE COURT:  Right.

19        So what are those benchmarks and why in this

20  circumstance does the FONSI not meet those benchmarks to

21  therefore equate to a failure to submit a convincing statement.

22          MR. MASTRO:  Again, that case cite is 595 F Supp. 3d

23  713.

24        Your Honor, the case explains the convincing statement

25  of reasons has to explain why the impacts would not be

1  significant.  It has got to explain why they wouldn't be

2  significant.  It has to acknowledge the risk of the project.

3  And then, why the project should not move forward without first

4  determining whether those impacts could have a sufficient

5  effect that you should do a full EIS.

6       And that is a standard, a very low bar.  If they may

7  have significant impacts, they are supposed to do an EIS.  And

8  here, they found measurable impacts in -- in the final EA.

9  Found measurable impacts, negative impacts, on air quality and

10  Environmental Justice Communities in whole counties and in

11  several, up to 15 communities, in the few -- in the few

12  counties that were studied.

13       THE COURT:  You just enumerated several factors or

14  considerations.  Correct?

15       MR. MASTRO:  Yes, your Honor.

16       THE COURT:  Okay.  Let's take them one at a time.

17       All right.  So for clarity's sake, tell me what the

18  first one is again.

19       MR. MASTRO:  For clarity's sake, the convincing

20  statement has to be why the environmental impacts will not be

21  significant.

22       THE COURT:  Okay.  So the first standard is in looking

23  at whether something is a convincing statement, is whether they

24  address the environmental impacts.  Correct?

25       MR. MASTRO:  Address them and made a convincing case

1   that they, quote, may not be significant.  May not.  It is may.

2   It is not even that you have to show they will not be.  They

3   may not be.

4           THE COURT:  Right.  Right.  It is a permissive

5   statement.  You don't -- you don't have to come with definitive

6   certainty.

7           MR. MASTRO:  Right.

8           THE COURT:  Okay.

9           MR. MASTRO:  But if they may be significant -- if they

10  may be significant, you have to do a full EIS.  You can't cut

11  the process short.

12          THE COURT:  Well, no.  What you're saying is that the

13  FHWA has to address whether there may be significant impacts

14  and whether they did or didn't goes to whether their statement

15  is convincing.  Correct?

16          MR. MASTRO:  It does, your Honor.  But if -- if they

17  conclude there may be -- and I believe we will show you

18  later -- there is no way to conclude on this record anything

19  other than that there may be significant impacts in certain

20  New Jersey communities, an EIS must be --

21          THE COURT:  I understand the consequence.  I get it.

22  Right.

23      And you enumerated that or repeated it several times

24  that it is clearly ringing in my head.  Right?

25      What I am try ing to get at is you're saying to me that

```
 1  there are certain boxes certain benchmarks that the agency must

 2  check and you're saying to me they didn't do that.

 3          MR. MASTRO:  Correct.

 4          THE COURT:  Correct?

 5      So I am trying to understand what those benchmarks are,

 6  all right, and you're telling me that they have to address in

 7  the FONSI whether or -- whether the -- whether the substantial

 8  question is raised that there -- that environmental impacts may

 9  occur.  Correct?

10      That's one of the things they're required to look at and

11  address.  Right?

12          MR. MASTRO:  They -- in fact, they have to conclude --

13  they have to provide a convincing statement that they will not

14  be significant.

15          THE COURT:  No, no.  But that is the outcome.  That's

16  the outcome.

17      They have to look at environmental impacts --

18          MR. MASTRO:  Correct, your Honor.

19          THE COURT:  -- and whether they may.  Right?  Whether

20  they may?

21          MR. MASTRO:  Yes, your Honor.

22          THE COURT:  And then whether -- when they do that,

23  they come out and they make a statement that contains their

24  reasoning as to why they went one way or the other.  Correct?

25          MR. MASTRO:  Correct.
```

1          THE COURT:  And that statement must be convincing in

2    order to withstand muster.  Correct?

3          MR. MASTRO:  Correct, your Honor.

4          THE COURT:  All right.  What I'm trying to understand

5    is what is it that I am supposed to look at to determine

6    whether that statement that they made is convincing or not.

7    That's what I am trying to get an understanding of.

8          And then secondly, in your view, if that statement is

9    not convincing, where is the failure of the agency statement

10   around that factor.

11         MR. MASTRO:  Okay.  So, your Honor, you're going to

12   the heart of it, which is one of the factors --

13         THE COURT:  I guess I have to have some credit for

14   having studied and be ready to have a conversation with you.

15         MR. MASTRO:  That goes to the study of significance.

16         So, the NEPA regulations changed more recently in 2020

17   to provide a more flexible standard to analyze the potentially

18   effected environment.

19         THE COURT:  That is a result of the CEQ?

20         MR. MASTRO:  Yes.  And the degree of the effects.

21   And, again, you do that on a regional basis for this kind of

22   plan.

23         There is case law that spells it out more specifically.

24   And this is the *Indigenous Peoples Case of Coastal Bend in the*

25   *Southern District of Texas*, the Courts generally consider four

1   components in making this determination about whether the

2   action would not significantly effect the environment that the

3   government should look at, has it accurately identified the

4   relevant environmental concern, that we are in a posture where

5   the relevant environmental concerns have been raised.  Has it

6   taken a hard look at the problem in preparing its FONSI or EA?

7   And I think this is where we differ, obviously.

8        We say they did not take that hard look.  They had more

9   of a predetermined outcome to appease the sponsor, New York's

10  MTA.

11       And now are they able to make a convincing case for a

12  finding of no significant impact?  That the project will not

13  have significant impact.

14       We say they do not make a -- a convincing case.  It is

15  quite the opposite.  They make admissions of impacts that may

16  be significant, so they should have to do an environmental

17  impact statement.

18       And finally, have they shown that even if there is an

19  impact of true significance, and I believe there are many

20  impacts in this record and you will hear more about that today,

21  where that's evident throughout New Jersey.  An EIS is,

22  nevertheless, unnecessary because changes or safeguards in the

23  project sufficiently reduce the impact to a minimum.  That is

24  where the mitigation measure comes in.  That is why the case

25  law says if they are going to have a FONSI and they are not

1   going to find significant impacts, that they have -- but there

2   is going to be impacts, they have to provide the specific

3   mitigation measures and detail and the dollars associated with

4   them that will address those impacts, sufficiently reduce them

5   to a minimum such that they could still issue a FONSI.

6        That didn't happen here at all, your Honor.  So that

7   comes to the core of the dispute.

8        THE COURT:  So, Mr. Mastro, where does the concept of

9   reasonable alternatives fit into this construct?

10       MR. MASTRO:  It is also part of what the agency is

11  required to do as a matter of taking a hard look.  And we're

12  going to come to that because this is -- this is in this

13  section.

14       THE COURT:  And in your view, did they consider

15  alternatives?

16       MR. MASTRO:  No.  They considered no alternatives.

17  They basically said this is the only one.  The -- the MTA has a

18  voracious appetite for, you will forgive me, your Honor, I use

19  colloquial phrases, picking the pocket of its neighbors.  Just

20  today in the New York times, they -- they are going to charge

21  750,000 to the New York City Marathon, that's a not-for-profit,

22  just because they use the bridge one day, the Verrazzano Bridge

23  for running across.  The FHWA just deferred to the MTA for its

24  wish list $15 billion for its capital program and its capital

25  program alone.

1          And there are alternatives.  I am going to explain them.

2   And one of them they found, it's just as good on the

3   environment, it helps a lot on the environment, you know, you

4   have higher tolls on roadways and you have tolls on bridges and

5   roadways that don't have tolls right now.  But they said, oh,

6   we have to go back and get legislation on that.  Okay.  That's

7   not going to work because we need legislation.  Well, they got

8   legislation for this.

9          THE COURT:  So --

10         MR. MASTRO:  So they could get legislation for that.

11         THE COURT:  Clarify something for me, Mr. Mastro.

12         I asked you a question about alternatives.  And I

13  thought I heard you say that they didn't consider alternatives.

14         MR. MASTRO:  Did not.

15         THE COURT:  And so any alternatives that you are going

16  to talk about are those from your client's perspective that

17  could have or should have been considered?

18         MR. MASTRO:  Should have been considered.  Your Honor,

19  they basically dismissed.

20         THE COURT:  And did you ever posit those at any point

21  during the administrative process?

22         MR. MASTRO:  Your Honor, it was raised that

23  alternatives should have been addressed and weren't.  They

24  dismissed them all in a footnote basically.

25         THE COURT:  It was raised.  It was raised by some

1   submission by the State of New Jersey or its executive agencies

2   during the process?

3              MR. MASTRO:  Yes.  The --

4              THE COURT:  It is a simple yes or no.

5              MR. MASTRO:  It wasn't in New Jersey's comment letter,

6   but it was an issue that was in the draft EA and in the final

7   EA.

8              THE COURT:  So -- but, Mr. Mastro, if the

9   consideration of alternatives is an important part of this

10  process, right, and New Jersey was exorcised about the process,

11  right, it didn't raise it.

12             MR. MASTRO:  Your Honor, New Jersey's comment letters

13  talked about the effects and huge impacts on New Jersey.  That

14  is an understandable focus.

15         I think the issue for purposes of Court review, is some

16  issues are apparent on the face of the EA and everyone knows

17  about them.

18         And we raised, we definitely raised that with the FHWA,

19  this one plan just for the MTA and that -- the EA listed 12

20  possible projects.  The EPA raised it in its comment letter.

21  It is not like it is not in the case and it wasn't in the case.

22  But, understandably, New Jersey's comment letters focused on

23  the adverse environmental impacts on New Jersey.  And I am

24  going to come to that, your Honor, so if I -- if I can please

25  address that when I come to alternatives.

1          THE COURT:  So all right.  We are about halfway

2    through.  So go ahead.

3          MR. MASTRO:  Your Honor --

4       Let's go to slide 18, please.

5          The final EA and FONSI recognize the schemes effects on

6    air quality in New Jersey and particularly many of its

7    Environmental Justice Communities, which may need mitigation.

8    I am going to come to this more, your Honor, when we come to

9    the mitigation section.  But over there on the right-hand side,

10   this comes right out of the administrative record, all the

11   mentions that are being taken and they relate, basically,

12   exclusively to New York.  And, in particular, Bronx County

13   which includes Hunts Point, 35 million, but over 100 million

14   more for projects that talk about things that will be done in

15   New York.

16          Going to the other side of the ledger, Bronx County also

17   from the administrative record, compared to Bergen County,

18   Bergen County has increases in every measured air pollutant at

19   the county level.  Every one.  Bronx County has increases in

20   two, but not two others.  Yet, New York took care of its own,

21   the MTA took care of its own.  Not a single committed dollar to

22   Bergen County.  Not a single committed mitigation measure to

23   Bergen County.  Not even a discussion in the EA or FONSI that

24   Bergen County, as a whole, would get mitigation funding or

25   measures.  Only the Bronx.

1          Now, your Honor, let's talk about mitigation.  I will

2     hand up some slides on mitigation.

3          Okay.  First up, as previously noted, the regs require

4     enforceable mitigation requirements and commitments.

5          Next slide, please.  Thank you.

6          And these commitments have to be stated in a FONSI.

7     They are not stated here.

8          And an EIS must be prepared if there may be significant

9     impacts and they have not been mitigated.  It -- it doesn't

10    suffice to say something may warrant mitigation.  Something

11    could require mitigation.  A mere list of mitigation measures.

12    Not a perfunctory description or conclusory language.  You have

13    to spell out the mitigation measures and the funding and the

14    specific areas that will be mitigated and funded and how that

15    will work in order to reach any reasoned judgment that you are

16    addressing impacts.  So the admission that there are towns in

17    New Jersey that may or could require or merit mitigation

18    funding, but it hasn't been provided, and trust us, we'll --

19    we'll get to that later, that is the antithesis of what NEPA

20    requires and is not proper mitigation.

21         This is no myth.  There is not a word in there that says

22    what mitigation measures and what specific dollars are going to

23    be allocated to New Jersey.

24            THE COURT:  So, Mr. Mastro, it is my understanding

25    that $155 million has been committed in mitigation over the

1    first five years of the life of the proposed tolling scheme.

2    Is that your understanding?

3         MR. MASTRO:  That's true, your Honor.

4         THE COURT:  Okay.  Is it your position that zero of

5    those dollars are dedicated to addressing any issues west of

6    the Hudson River?

7         MR. MASTRO:  Yes, your Honor.

8         There is not a single dollar that says it is for

9    New Jersey or it is for Bergen County or it's for East Orange,

10   Newark, Orange, Fort Lee.

11        THE COURT:  Got it.

12        MR. MASTRO:  Okay.  And there is the chart.  Show me

13   on there where it says anything about New Jersey.

14        And by the way, in almost every instance, they are

15   obviously New York centric.  They talk about specific New York

16   programs or New York neighborhoods, including the Bronx and

17   Hunts Point in the Bronx, 35 million out of that 155.

18        THE COURT:  Okay.

19        MR. MASTRO:  Let's -- let's go to slide 28, please.

20   Okay.

21        Bergen County, no committed mitigation measures funding

22   for New Jersey at all in this plan, even though the EA found an

23   increase in all pollutants in Bergen County.

24        Let me just -- on the chart we just showed you, your

25   Honor, there is a reference.  I will say this, there is a

1    reference in the FONSI that says that there could, could be

2    some mitigation out of this pool for New Jersey.  That ain't

3    good enough.  That it could merit place-based mitigation in

4    some places in New Jersey.  That ain't good enough.  That is

5    not what NEPA requires.  There has to be specific mitigation

6    measures, specific funding, specific places to issue a FONSI

7    where you recognize that there may be significant impacts.

8            Next slide, please.

9            Let's talk a little bit about this, the Bronx and Bergen

10   County.  Bergen County, the EA found an increase of all

11   pollutants across the board.  Yet, the FONSI says never mind,

12   there won't be adverse air quality effects from truck diversion

13   or potential adverse effects in Bergen County overall without

14   explaining that.  Well, then someone tell me why in every

15   category in 2023, Bergen County is going to see increases in

16   daily truck traffic and daily vehicle traffic and some pretty

17   horrible things, like nitrogen oxide, carbon monoxide, carbon

18   dioxide.  Those particulates that turn the air brown and

19   orange.  Every category hugely up, yet -- and much higher in

20   every category than the Bronx.  But not a single dollar for

21   Bergen County.  Not a single mitigation measure.  And in fact,

22   in the FONSI, instead of trying to step away from the actual

23   data -- on what planet is that rational?  That's arbitrary and

24   capricious.

25           And the final EA also found that 15 Environmental

1    Justice Communities in New Jersey that, quote, may need

2    mitigation.  But then it kept changing the data and saying we

3    are going to look at, you know, higher -- higher levels, only

4    certain counties, only certain issues.  They got it down to

5    four.  Fort Lee, Orange, East Orange, and Newark that, quote,

6    could merit place-based mitigation.  And guess what?  They

7    didn't get any committed mitigation funding or mitigation

8    measures in the final EA either.  So mitigation, they needed

9    it, but did not provide it.  You can't issue a FONSI.

10              THE COURT:  All right.

11              MR. MASTRO:  Let's go to the next slide, please.

12              THE COURT:  No.  Let's stop here for a moment.  So

13   help me understand, Mr. Mastro.  So there is a lot of data

14   bandied about with respect to what I will call the geographic

15   scope.  Right?  The region it includes some areas, you know,

16   Connecticut, includes areas of New Jersey, there are some

17   references to X number of communities, and in other instances Y

18   number of communities.  In some instances we're talking about

19   14 counties which tend to be the central northern part of

20   New Jersey.  In other instances we're talking about 12

21   counties.

22              So from your perspective looking at the region what part

23   of New Jersey should constitute the New Jersey portion of the

24   region?  So I can figure out whether there is consistency or

25   inconsistency in the fact-finding and the decision-making in

1  the FONSI.  If you had a magic wand, Mr. Mastro, and you were

2  making this decision how would you define the part of

3  New Jersey that should be considered across the board in

4  dealing with mitigation and alternatives?

5          MR. MASTRO:  Your Honor, I think there are some clear

6  defining lines and they will become apparent as we continue to

7  go through these slides, but the regional study area was 28

8  counties.

9          THE COURT:  No, but that was beyond New Jersey.  It

10 wasn't -- there is only 21 counties in the State of New Jersey.

11 And trust me, you know, the counties that the southern and far

12 western parts of the state are not likely considered part of

13 the New York Metropolitan region.

14         MR. MASTRO:  Correct, your Honor.

15       And, again, there are two components here.  Air quality

16 and Environmental Justice.

17         THE COURT:  Right.

18         MR. MASTRO:  The regional study area had 12 counties

19 in New York and 14 in New Jersey.

20         THE COURT:  Right.

21         MR. MASTRO:  So that was considered to be possible for

22 study.  Right?

23       Then you go to air quality.  What did they do?  They

24 studied ten out of the 12 counties in New York.  Almost all of

25 them.  Right?  What did they do in New Jersey?  Out of 14

1    counties, they studied two, Hudson and Bergen.

2              THE COURT:  Stop right there.

3         I take from what you are saying that the decision to

4    examine two out of the 14 counties was unreasonable.

5              MR. MASTRO:  Correct, your Honor.

6              THE COURT:  And so it is not necessarily enough,

7    Mr. Mastro, to throw mud at the wall and say X is unreasonable.

8    Right?

9         If you want the agency to give you an outcome that you

10   want, one would think you might posit a reasoned or reasonable

11   alternative to them.

12             In your view, what is that reasonable alternative beyond

13   two?

14             MR. MASTRO:  Again, we're going to come to some of

15   this, but, your Honor --

16             THE COURT:  No, no.  Let's come to it now.

17             MR. MASTRO:  When you look at the comparative data --

18             THE COURT:  Mr. Mastro, it is an easy question.  You

19   start with 14.  They looked at two.

20        What is the number that would constitute your reasonable

21   alternative?  Is it seven?  Is it 12?  Is it 21?  What is it?

22             MR. MASTRO:  Your Honor, there are --

23             THE COURT:  You start with 14 as your premise.

24             MR. MASTRO:  There should have been at least seven in

25   New Jersey based on the data compared to the New York counties

1   that were studied that warranted being part of the air quality

2   study.  I'm going to go through all of them, but I will tell

3   you the names.

4           THE COURT:  14 is a starting -- is a reasonable

5   starting point.  Then what you are saying is given the data,

6   the 14 could have been culled down to some lesser number.  At

7   this moment, your representation is possibly seven.

8           MR. MASTRO:  Correct, your Honor.  I am happy to give

9   the names, Middlesex, Monmouth, Passaic, Essex, Union, and

10  Morris.

11          THE COURT:  And not Bergen?

12          MR. MASTRO:  I am sorry.  It is eight, your Honor.  I

13  was -- Bergen and --

14          THE COURT:  Not Hudson?

15          MR. MASTRO:  Your Honor, Bergen and Hudson were the

16  two that were studied.

17          THE COURT:  Okay.

18          MR. MASTRO:  The two that were studied and Bergen,

19  they screwed it up because they said --

20          THE COURT:  Bergen, Hudson, and now you want to add

21  seven more on top of it.

22          MR. MASTRO:  Six more, your Honor.

23          THE COURT:  Six more.

24          So that gets to eight, and your position is that's the

25  good, reasonable alternative?

1          MR. MASTRO:  Based on the data, and I am going to show

2    you why I picked those, but based on --

3          THE COURT:  Mr. Mastro, maybe you ought to look at

4    your associate.  She's nodding her head up and down, which

5    tells me there is a real simple answer to the question.

6          MR. MASTRO:  Yes.  Yes.

7          THE COURT:  Very good.

8          MR. MASTRO:  Yes.

9          THE COURT:  You are learning, Mr. Mastro.

10         MR. MASTRO:  Very good.

11         THE COURT:  I am thrilled.

12       Now you can continue.

13         MR. MASTRO:  And on Environmental Justice --

14         THE COURT:  And you have got ten minutes -- you have

15   got 15.  I am sorry, Mr. Mastro.  You've got 15.

16         MR. MASTRO:  Let's continue.  Next chart.

17       You have Bergen in the outer years up in every category,

18   a lot more than the Bronx but the Bronx got committed

19   mitigation funding.

20       Next slide, every category increases in Bergen, not in

21   the Bronx but Bronx got committed mitigation funding.  Bergen

22   got nothing.

23       Next slide, every category, Bergen, worse, worse

24   differentials.  You know, it's going to have more impact than

25   the Bronx, but it got nothing.  And then same thing on average

1    daily traffic.  Same thing on air quality.

2           THE COURT:  And nothing about Hudson, which is

3    included in this --

4           MR. MASTRO:  Hudson is on this chart.  Hudson is among

5    those that was considered.

6           THE COURT:  Nothing about the other six counties?

7           MR. MASTRO:  Not on this particular chart that may

8    need mitigation.  We are going to come to that.

9           THE COURT:  We are going to come to that.

10          Okay.  We will continue.

11          MR. MASTRO:  Next, they have the regional-based

12   commitments, but they are all New York oriented.  They are not

13   anything specific for New Jersey.

14          Now, four Environmental Justice Communities -- they have

15   got four Environmental Justice Communities that they say

16   could -- in the final FONSI, could merit place-based mitigation

17   but yet they are provided no mitigation measures or no

18   mitigation funding.

19          Next --

20          THE COURT:  Wait.  Let's -- hold on.

21          There are four towns --

22          MR. MASTRO:  Four towns.

23          THE COURT:  -- Orange, East Orange, Newark, and

24   Fort Lee.

25          MR. MASTRO:  Correct.

1          THE COURT:  How do we square this?

2          MR. MASTRO:  I don't --

3          THE COURT:  Just -- let me finish.

4      Orange is located where?

5          MR. MASTRO:  Orange is in --

6          THE COURT:  Essex County.

7          MR. MASTRO:  They are all in Essex County.

8          THE COURT:  No, they are not all in Essex.

9          MR. MASTRO:  Orange, East Orange, and Newark are in

10  Essex and Fort Lee is in Bergen.

11          THE COURT:  So, Mr. Mastro, how do we square this

12  since most of the data seems to be looking at Bergen and

13  Hudson County?

14      There is no Hudson County town.  Right?  There's one

15  Bergen County town and three of the four are in Essex County.

16      To what extent was the FHWA made aware that this data

17  didn't square?

18          MR. MASTRO:  It definitely was made aware that this

19  data didn't square --

20          THE COURT:  By the State of New Jersey or one of its

21  constituent executive agencies?

22          MR. MASTRO:  -- in our protest letters about air

23  quality and not studying sufficiently the air quality.

24      And, your Honor, we are going to come to Bayonne should

25  have been.  All of these towns here, your Honor, the EA said

1    may need mitigation.  But then, in arbitrary fashion, it kept

2    redefining the scope to conclude eventually that only those

3    four that I mentioned could merit.

4           THE COURT:  Well, in arbitrary fashion.

5           So are you suggesting that there was no authority for

6    there to be a continuous process in which some things could

7    change as matters were brought to the attention of the

8    Federal Highway Administration?

9           MR. MASTRO:  No, your Honor.

10          What I am suggesting is this is what they concluded may

11   need mitigation as they were defining the tracts

12   90th percentile for chronic disease burdens or pollutants that

13   met the burdens.  They then added daily truck traffic, still

14   the same 15, but then they decided only those four towns could

15   merit mitigation funding and it is not at all clear because

16   they seem to have all 15 in these three counties that seem to

17   have met the parameters of having over 90 percent -- 90

18   percentile in pollution and chronic disease burdens and

19   increased truck traffic.

20          THE COURT:  Mr. Mastro, are any of those four towns

21   what I would call significant access points to the river

22   crossings to get one from New Jersey to Manhattan?

23          MR. MASTRO:  Yes.  Yes, absolutely, your Honor.

24   Fort Lee, of course, is right on the border.

25          THE COURT:  What is the relevance of the other three

1  towns?

2        MR. MASTRO:  Because they are Environmental Justice

3  Communities and there will be increased daily truck traffic

4  leading onto the main highways and then leading into the

5  city --

6        THE COURT:  All right.

7        MR. MASTRO:  -- including from Newark where we just

8  came in.

9        But, also, your Honor, when you look at Bayonne, Bayonne

10  is in exactly the same category as the others.

11        THE COURT:  But it was not included.

12        MR. MASTRO:  Even though it has more truck traffic,

13  six percent than the ones chosen.  These are irrational things

14  that I have no explanation for, but I will be very interested

15  to see if they can explain.

16        THE COURT:  But were they raised specifically to the

17  attention of the Federal Highway Administration?

18        MR. MASTRO:  We raised the air quality analysis.  The

19  Environmental Justice Community Analysis that was done was

20  deficient because it was leaving off New Jersey towns.

21        I am going to come --

22        THE COURT:  With specific references to communities

23  like Bayonne?

24        MR. MASTRO:  There were specific references to the

25  need for more communities to be added, your Honor.

 1          THE COURT:  But that doesn't -- I mean, I guess the --

 2   I get it.  That is a reasonable argument, but, again,

 3   Mr. Mastro, the question is if you want the agency to come to a

 4   conclusion that you and your client want one would think that

 5   you would provide them with a path to get there and identify

 6   the communities that you think are affected and deserve

 7   mitigation.

 8          The question is:  Did you do it in a manner that puts

 9   the agency on notice that it has to consider information that

10   detracts from its findings?

11          MR. MASTRO:  Your Honor, I will go through the comment

12   letters and show you where we commented.

13          THE COURT:  It is just a simple question.

14          Did you do it or not?  That's all.

15          If I need the pinpoints, I will ask you.

16          MR. MASTRO:  Your Honor, we did talk about the need to

17   be more granular on the air quality analysis, and we did talk

18   about specific counties.

19          As to whether we mentioned Bayonne as opposed to Bergen

20   and Fort Lee, I don't -- yes, I am being told that yes, we did.

21   So I will get you the citations.  Now the EPA, most definitely

22   did, your Honor --

23          THE COURT:  Okay.

24          MR. MASTRO:  -- did talk about those particular

25   issues.

1          Let's keep going.  Let's go to slide 37.

2          Again, we are looking at what was provided but nothing

3    to those towns.

4          Go ahead.

5          Again, the Bronx, you know, these are towns all

6    similarly situated.  They didn't get any committed mitigation

7    funding.

8          Essex County should have been considered along with

9    Hudson and Bergen and it has many of the same issues, but, for

10   some reason it was not considered even though Orange, East

11   Orange, and Newark are all in Essex County and FHWA found they

12   could merit place-based mitigation.  So Essex County wasn't.

13         Bergen County wasn't.

14         The Bronx County was.

15         We talked about Bayonne before.  This is some of the

16   data on Bayonne.  It qualified for mitigation like everyone

17   else did.  It was not listed by the FHWA for potential

18   mitigation, and there is no explanation for it.

19         There is the EPA that warned in its letter that there

20   had to be clear mitigation measures with timelines how each of

21   the measures would be implemented, expected reduction in

22   significant adverse impacts, particularly focused on reducing

23   impacts to areas with EJ concerns for each tolling scenario and

24   implementation of mitigation to ensure impacts are less than

25   significant.

1        EPA recommended to include the mitigation measures

2   rather than rely on post implementation monitoring to inform

3   mitigation decisions.

4        So it specifically pointed out that more needed to be

5   done on the Environmental Justice Communities.

6        THE COURT:  Did the State of New Jersey endorse the

7   EPA's comments to the Federal Highway Administration?

8        MR. MASTRO:  We essentially endorsed those comments.

9   Next.

10       The fact of the matter is that the FHWA and MTA --

11       THE COURT:  Mr. Mastro, it would be helpful if you

12   spoke into the mic and looked at me.

13       MR. MASTRO:  Yes, your Honor.

14       THE COURT:  I understand that that may be an audience

15   over there that you wish to speak to, but you are trying to

16   help me understand.

17       MR. MASTRO:  I understand.  There is not much of an

18   audience.  I am just running out of time, your Honor, so I am

19   trying --

20       THE COURT:  You can always ask for a little leniency

21   from the Court.

22       MR. MASTRO:  I would really appreciate that, your

23   Honor.  We are almost done.

24       THE COURT:  Well, you have six minutes to go.  We'll

25   figure out where we are at as we get to the end.

1           MR. MASTRO:  I'm hugely appreciative.

2           So, your Honor, this basically all comes to the

3   bottom-line point that I have been making from the beginning.

4           I challenge them to tell you where there is any specific

5   mitigation measures and mitigation funding provided for any

6   New Jersey State, county, community, where there are

7   recognitions in this EA and FONSI that there may be mitigation

8   necessary and that towns could merit mitigation funding, but

9   nothing specific at all -- and, again, I cited chapter and

10  verse the case law that you have to do that.

11          The federal agency has to do that in a proper legal

12  process if it's going to issue a FONSI.  It has to tell you how

13  it is going to mitigate those problems and how much money it's

14  going to spend to do it.  Very specific.

15          THE COURT:  Okay.  Mr. Mastro, we have spent the

16  lion's share of your time on mitigation.

17          And I am happy to give you some more time on mitigation.

18  However, some point are we getting to the issue of

19  alternatives?

20          MR. MASTRO:  Yes, your Honor.  I am just about to pass

21  that up.  Thank you.

22          THE COURT:  Okay.  Would you prefer, Mr. Mastro, that

23  I hold my questions until after you have talked about

24  alternatives or would you like me to pose any question I have

25  about mitigation.  Or do you want me to hold them to the end

```
 1   where I can ask you questions about both mitigation and
 2   alternatives?
 3            MR. MASTRO:  Your Honor is being very kind.
 4        I would like to get a very short alternatives
 5   presentation.
 6            THE COURT:  Okay.
 7            MR. MASTRO:  And then you can ask me any questions.  I
 8   would welcome it.
 9            THE COURT:  Go for it.  We have about ten minutes to
10   go here.
11            MR. MASTRO:  Thank you.  Appreciate it, your Honor.
12        Your Honor, this is pretty straightforward.
13        Consideration of reasonable alternatives is at the heart
14   of a NEPA process.  That's what the case law tells us.
15        You can't narrowly define a project's purpose to avoid
16   considering any other alternatives.  And the mere fact that
17   there may be legislation required does not automatically
18   establish that you shouldn't -- you can't -- you don't have to
19   consider that alternative.
20        Here, basically there was one alternative presented
21   to -- to raise $15 billion for the MTA capital program and
22   essentially, next slide, the FHWA deferred to that, even
23   though zone-based pricing includes cordon and area pricing.
24   That's the alternative they wanted.
25        Even though pricing on full roadways and variable tolls
```

1    and extra tolls on bridges and tunnels, not tolled now, that

2    potentially could have raised a lot of money and also it would

3    provide the environmental benefits of the plan, but it required

4    legislation.

5         So the FHWA said, well, then you don't have to do that

6    because you already got legislation for the one thing.  That is

7    not proper under NEPA, to just defer to the sponsoring agency,

8    the MTA, and say I am only going to look at the one alternative

9    because, you know, there are others, but you would have to get

10   legislation.  That doesn't cut it, your Honor.

11        Let's please go on.

12        As you can see -- next slide, please.

13        As you can see, we are going to go to footnote 4.  This

14   is the pricing of full roadways and whether that was an

15   alternative that should have at least been studied.

16        Next slide.

17        THE COURT:  So, Mr. Mastro, are you saying to the

18   Court that there were other alternative -- there were other

19   reasonable alternatives posited to the FHWA?

20        MR. MASTRO:  Yes, your Honor.

21        That warranted study, at least, and full exploration.

22   And that T-2 is that very alternative, your Honor.  And they

23   even say that it would reduce congestion in a footnote.  It

24   would reduce congestion and could raise toll revenues

25   equivalent to project objectives.  However, there is no law or

1    agreement in place that would direct the revenue to MTA to

2    support the capital program.

3         Your Honor, they had to go to the legislature in

4    New York to get legislation for congestion pricing.  They could

5    go back to the legislature and try and get increased tolling

6    and graduated tolling on major roadways.  They didn't even

7    attempt to do that.  They just said it is not there now, so

8    forget it.

9         And then they cited to a 15-year-old study about, you

10   know, whether there were issues about trips and whether it

11   would have adverse economic impacts on the South Bronx and

12   Harlem.

13        There was no study done because they just rejected the

14   alternative out of hand.

15             THE COURT:  And what was the basis of the rejection,

16   Mr. Mastro?

17             MR. MASTRO:  It was that it wouldn't raise the revenue

18   because they didn't have the legislative authorization.

19             THE COURT:  All right.  You explain that the FHWA's

20   and the MTA's focus on generating revenue as an objective did

21   not justify the rejection of the alternative congestion

22   reduction plans.  Is that correct?

23             MR. MASTRO:  Correct, your Honor.  Especially this

24   one.

25             THE COURT:  And then you further maintain that the

1   FHWA improperly defined the project's purpose in such a narrow

2   fashion that no reasonable alternative to the desired plan

3   could be feasibly considered.

4            MR. MASTRO:  Correct, your Honor.

5            THE COURT:  So the question to you is:  Where can I

6   find this narrow construction that you are referring to?

7            MR. MASTRO:  Your Honor can find it in the EA,

8   chapter 2, table 22.  It dismissed every -- every alternative

9   in a footnote and --

10           THE COURT:  And so your view is that is not reasoned

11  decision-making.

12           MR. MASTRO:  Absolutely, your Honor.

13           THE COURT:  Okay.

14           MR. MASTRO:  The FHWA dismissed the T-2 alternative,

15  even though it meets the objectives environmentally and could

16  potentially meet the revenue objectives if they went back to

17  the state legislature.  Didn't even try.

18        And they dismissed that in a footnote.

19        So that's not reasoned hard-look analysis that's

20  required for alternatives.

21        And, your Honor --

22           THE COURT:  Well, you have conflated two things,

23  Mr. Mastro.

24        Hard look is what the agency is required to do in their

25  examination.  Right?  Reasoned decision-making is did they

1   explain in a manner that I can get from point A to point B, and
2   is that reasonably discernible without them having to dot every
3   I and cross every T.
4          So the question that I have for you is:  Which is it or
5   is it both?
6          MR. MASTRO:  Your Honor, it's -- it's really both.
7   They are two sides of the same coin.  They arbitrarily rejected
8   them and then what they -- they put out as the rationale --
9          THE COURT:  Didn't adequately explain.
10         MR. MASTRO:  Didn't adequately explain.
11         THE COURT:  Okay.
12         MR. MASTRO:  And the EPA raised this very
13   specifically, your Honor.  The EPA, DOT_00044940 --
14         THE COURT:  The federal EPA.  Correct?
15         MR. MASTRO:  The federal EPA said -- it requested more
16   information on alternative 2 -- alternative T-2.
17         THE COURT:  Anything else on alternatives?
18         MR. MASTRO:  No, your Honor.
19         THE COURT:  Just stay there one second, Mr. Mastro.
20         MR. MASTRO:  Of course, your Honor.
21         THE COURT:  Mr. Mastro.
22         MR. MASTRO:  Yes, your Honor.
23         THE COURT:  Let's take mitigation.
24         Isn't it too early for the Court to address your
25   concerns about the alleged failure to provide adequate

1    mitigation for New Jersey?

2         Secondly, should the Court not wait to consider such

3    arguments until after the project sponsors and the FHWA have

4    made final determinations as to how they plan to implement the

5    general mitigation plans that are set forth in the final EA and

6    the FONSI?

7              MR. MASTRO:  I am really glad, your Honor --

8              THE COURT:  So the first question is:  Is it too

9    early?

10        And the second question is:  Don't we need to see what

11   the final plans are before we figure out whether there is

12   adequate mitigation or not?

13             MR. MASTRO:  The short answer to both questions is no.

14             THE COURT:  Good.

15             MR. MASTRO:  And no.

16             THE COURT:  Great.

17             MR. MASTRO:  For a change, short answer.  I will sit

18   down.

19             THE COURT:  Good.

20             MR. MASTRO:  No, no.  If I could explain briefly.

21             THE COURT:  No, no.  No is good.

22        You may.  Go ahead.

23             MR. MASTRO:  Your Honor, the case law that we have

24   cited from many circuits is that you can't issue a FONSI that

25   reflects that there -- there may be needs for mitigation

1    without addressing the mitigation.

2         And here, they did not -- it is in the regs.  It's in

3    the case law.  They have to put into the FONSI the specific

4    mitigation measures and the funding for the specific areas and

5    the specific projects that will be undertaken for mitigation to

6    be able to issue the finding of no significant impact.

7         THE COURT:  And in your view, that has to be because

8    of the requirement of a convincing statement?

9         MR. MASTRO:  Completely, your Honor.

10        And the fact of the matter is that this is like

11   three-card monte.  Okay.  Oh, 15 communities may require it.

12   Oh, no, swish, swish, swish.  Oh, now we're going to say only

13   four communities may require it.  And Bergen County, which had

14   all of that terrible stuff happening to it in every category,

15   unlike the Bronx, which we gave 35 million to, they -- we are

16   not even going to consider them at all.

17        Okay.  And there we are and they say we are New York,

18   trust us.

19        Now, I love my brothers in New York.  I used to be one

20   of city government's -- honored to serve public servants.

21        THE COURT:  We appreciate your service to the public,

22   Mr. Mastro.

23        MR. MASTRO:  But that is not how it works.  Okay.

24        There is no "on the come."  There is no, "trust me, it

25   may come later or it could come later."  That is not how it

1   works and there never should have been a FONSI issued without

2   that in chapter and verse for what needed to happen in

3   New Jersey.

4       As I have just explained in the mitigation section,

5   mitigation needed to happen in a lot more of New Jersey than

6   even they conceded.

7           THE COURT:  So no and no was a good answer.  Right,

8   Mr. Mastro?

9           MR. MASTRO:  Yes.

10          THE COURT:  Now, we're going to turn to alternatives.

11          MR. MASTRO:  Okay.  Please.

12          THE COURT:  Is there any case precedent on need for

13  new legislation and whether that is a sufficient excuse?

14          MR. MASTRO:  So -- so, your Honor, this is the *NRDC v.*

15  *Morton* case, the DC Circuit, 458 F.2d 827, page 837,

16  DC Circuit, 1972.

17      Quote, the mere fact that an alternative requires

18  legislative implementation does not automatically establish it

19  as beyond the domain of what is required for discussion.

20      Have the discussion.  Probe the likelihood.  But don't

21  just say I got -- I want 15 million -- 15 billion now and I'm

22  not going to consider anything else good enough.  That's not

23  the way it works.

24          THE COURT:  With respect to your argument regarding

25  that the FHWA failed to adequately consider alternatives, it

1    appears undisputed that the revenue generating objective of the

2    project sponsors was a significant basis for why certain

3    alternatives were rejected.

4           Do you agree with that statement?

5           MR. MASTRO:  Completely.

6           THE COURT:  Why is this not a reasonable basis for the

7    agencies to reject the proposed alternatives, especially in

8    light of the obligation under the Traffic Mobility Act to

9    ensure that the final tolling structure would generate the

10   requisite revenue?

11          MR. MASTRO:  Well, what a wonderful self-fulfilling

12   prophecy that would be.  If New York could just dictate to the

13   region, New Jersey suddenly give me hundreds of millions of

14   dollars a year so I could pay for my capital program.

15          I see Mr. Lieber back there, he's grinning like the

16   Cheshire cat that he's going to get $15 billion.  But you can't

17   define the project on a financial basis alone and then not

18   consider anything else.

19          THE COURT:  But the project wasn't defined by a

20   financial basis alone.  Right?  We -- we had talked about

21   this -- sorry, we may have talked about this a few minutes ago.

22   Right?  There were multiple objectives, right, those objectives

23   were reducing the VMT, reducing the number of vehicles entering

24   the Manhattan CBD, and generating the billions of dollars in

25   revenue for the MTA capital projects.  Right?

```
 1          MR. MASTRO:  But --

 2          THE COURT:  So there is not just one objective.  It

 3   may well be that somebody has to tell me.  Whether all of the

 4   objectives treated equally?  Was one given more significance

 5   than the other?  So you can't say that the revenue generating

 6   objective was the sole objective.

 7          MR. MASTRO:  Your Honor, I didn't say it was the sole

 8   objective.  Although my old friend said that, you know, my

 9   client was all about the money.  My client isn't all about the

10   money.  My client is about fairness and responsible treatment

11   when it comes to huge environmental impacts on New Jersey.

12          Your Honor, the fact --

13          THE COURT:  And, trust me, as I said earlier, I am an

14   equal opportunity questioner.  So the defendants are going to

15   have to answer some of the same questions.

16          MR. MASTRO:  Your Honor, there are at least three of

17   the alternatives.  That chart I showed you earlier, at least

18   three of the alternatives meet the two environmental

19   objectives, including T-2, that we have been talking about.

20   All right.  They all meet the environmental objectives.  Here

21   you go, all four and all five meets, meet, meets, meets.  Oh,

22   which is the one that doesn't meet?  It's the financial

23   objective because they set it pie in the sky.  My God, this

24   would be such a windfall for the MTA for capital projects it

25   wants to do.  God bless them.  New Jersey doesn't get to do
```

1  capital projects with that money.

2          THE COURT:  So we are at a stop time.  We are at 50

3  minutes.

4          MR. MASTRO:  I understand, your Honor, but I wanted

5  to --

6          THE COURT:  Thank you, Mr. Mastro.

7          MR. MASTRO:  Can I give you one more case on that

8  point?

9          THE COURT:  Sure.

10          MR. MASTRO:  Thank you, your Honor.  *Simmons v. Army*

11  *Corps of Engineers* Seventh Circuit 120 F.3d 664th.  An agency

12  cannot restrict its analysis to those alternative means by

13  which a particular applicant can reach its individual goals.

14  It's got to exercise a degree of skepticism in dealing with

15  self-serving statements from a prime beneficiary of the

16  project.  That's the problem with the financial --

17          THE COURT:  Okay.

18          MR. MASTRO:  -- goal.

19          THE COURT:  We are at 12:45 approximately.  We are 15

20  minutes over our schedule.  Rather than proceed with

21  affirmative arguments from defendants and defendant

22  intervenors, we will recess for lunch.  We will come back in 45

23  minutes at 1:30.  We will pick up with the affirmative

24  arguments from defendant and defendant intervenors.  And then

25  proceed immediately to rebuttal.

1          Anybody have anything they need to bring to the Court's

2     attention before we recess for lunch?  Going once.  Twice.

3     Enjoy your lunch, folks.

4                    (Lunch recess taken at 12:44 p.m.)

5                         AFTERNOON SESSION

6                    (In open court at 1:35 p.m.)

7          THE COURT:  Mr. Cumming, we will hear from you for 30

8     minutes.  I will assume you will reserve some amount of time.

9          MR. CUMMING:  Yes, your Honor.  Thank you.  I could

10    reserve ten minutes, please.

11         THE COURT:  Okay.  So I have you on the clock for 20

12    minutes.

13         MR. CUMMING:  Thank you, your Honor.

14         I'm going to pick up where we left off which is

15    alternatives, and then I'll -- I'll shift to mitigation

16    shortly.

17         THE COURT:  Hold on one second.  Let me get to my spot

18    because I am sure as an equal opportunity questioner, I will

19    have some things I want to discuss with you.

20         You are on, Mr. Cumming.

21         MR. CUMMING:  If I could make two arguments as to

22    mitigation -- or alternatives.  Excuse me.

23         The first is that inclusion of the traffic mobility acts

24    funding criteria or revenue generation criteria as part of the

25    project's purpose and need was improper.  The second was that

1   Federal Highway should have analyzed alternative T-2 in more

2   detail.  I will go through both of those in order.

3        As to the inclusion of the funding criteria, the

4   reasonableness of a purpose and needs statement go -- looks

5   also at the feasibility of alternatives.  And alternatives that

6   could not be enacted by MTA because they did not meet the

7   requirements of the New York State law are per se infeasible

8   and therefore did not need to be carried forward further into

9   the environmental assessment.

10          THE COURT:  And in your view, that comports with the

11  case law?

12          MR. CUMMING:  Yes, your Honor.

13          THE COURT:  That provides the -- the fact that seeking

14  legislation is not an excuse.  Correct?

15          MR. CUMMING:  Plaintiffs make the argument -- this is

16  for alternative T-2.

17          THE COURT:  Okay.

18          MR. CUMMING:  That this alternative could have, you

19  know, been feasible if -- if legislation had been passed.

20       Now, first of all, the Ninth Circuit has said an

21  alternative that requires legislative action will qualify for

22  inclusion only in rare circumstances.  I don't think plaintiffs

23  meet the burden of showing those circumstances exist here.  But

24  moreover, that is not the only reason alternative T-2 was not

25  assessed in further detail.

1    There is a detailed explanation in the record at

2  DOT_7943 where Federal Highway explained an alternative T-2

3  would be expected to have additional diversionary effects and

4  that in order to reach the revenue needs -- so even if there

5  was legislation, in order for that alternative to meet the

6  revenue needs without tolling all the entry points because it

7  would only be tolling the east and Harlem River side of

8  Manhattan, the toll would need to be even higher than the

9  highest toll assessed in the final EA.  And because of that,

10  that would burden low income drivers, it would have additional

11  effects on diverting traffic to Environmental Justice

12  Communities, and have other adverse effects.  All to say that

13  alternative was not reasonable to be carried forward in the

14  final EA, setting aside the issue of prospective legislation.

15    Going back to the inclusion of the revenue goal as one

16  of the purpose and need statements, that is entirely proper.

17  The Courts have noted that, you know, the financial feasibility

18  of alternatives is appropriate to include in the projects

19  purpose and need.  That is the Sixth Circuit.  And the state

20  sort of in doing so conflates the standard for what you have to

21  do to assess a full alternative and one that was initially

22  rejected.  The CEQ regulation is clear.  Alternatives that are

23  eliminated from detail study need to only be briefly discussed

24  versus discussing alternatives in detail for those moved

25  forward into the EA.

1          THE COURT:  Are you pausing to give me an opportunity

2     to ask you a question?  Or are you getting ready to transition

3     to another topic?

4          MR. CUMMING:  Both, your Honor.

5          THE COURT:  Okay.

6          MR. CUMMING:  If the Court has no further questions on

7     alternative --

8          THE COURT:  No, I have questions.

9          MR. CUMMING:  I suspect you do.

10         THE COURT:  Okay.  So, Mr. Cumming, defendants

11    maintain that the Federal Highway Administration and the

12    project sponsors were permitted to define the objectives of the

13    project and to consider alternatives in line with those

14    objectives.

15       Do you agree with that?

16         MR. CUMMING:  Yes.

17         THE COURT:  Okay.  Plaintiff points out that multiple

18    courts have ruled that agencies may not, quote, define the

19    objectives of their actions in terms so unreasonably narrow

20    that only one alternative from among the environmentally benign

21    and would accomplish the goals of the agency's action.  And

22    this is quoting *National Parks* from the Ninth Circuit.  Right?

23       You would agree that is an accurate reflection of that

24    opinion?

25         MR. CUMMING:  I believe so, your Honor.

1          THE COURT:  Okay.  So why should the Court not agree

2    with plaintiff that a revenue-generating objective of $15

3    billion is unreasonably narrow given that such a condition led

4    to one and only one alternative that the project sponsors have

5    allegedly indicated is their preferred outcome?  Why should

6    that prevent the Court from -- I'm -- I'm sorry.

7          Why -- why should the Court not agree with the

8    plaintiff -- I got my question a little cockeyed here -- being

9    reasonable?  Why is that -- why isn't -- why is that one

10   objective reasonable?  Why is that not too narrowly defined

11   that it doesn't provide equal opportunity for -- well, wrong

12   phrase -- why does that not -- why does that prevent other

13   reasonable alternatives from being considered?

14          MR. CUMMING:  Because --

15          THE COURT:  Because I garbled it up, I will start over

16   again, Mr. Cumming.

17          MR. CUMMING:  I understand your question, your Honor.

18          THE COURT:  Okay.  Good.  Thank you.

19          MR. CUMMING:  Alternatives that could not become law

20   are not reasonable alternatives.

21          THE COURT:  Okay.

22          MR. CUMMING:  There is no need for the agency to

23   assess alternatives that had no possibility of becoming law.

24          And --

25          THE COURT:  And so that -- if that ultimately reduced

1    the list of alternatives to one, then so be it.

2           MR. CUMMING:  Consideration of an alternative and the

3    no action alternative is proper.  There's -- there's no per se

4    number of alternatives that needs to be considered in the NEPA

5    cases.  And Courts have been consistent in that holding.

6           And to the extent that what plaintiffs are asking is for

7    the Court to rule on a reasonableness of the New York State

8    law, that's not part of NEPA.  That is a different legal

9    challenge in a different case.

10          And for instance, we cite to Southern District of

11   Florida noting that Federal Highway's relationship to the

12   sponsor is one that's premised in the idea that representatives

13   of the community are best situated to make decisions regarding

14   the transportation planning of that community.  So there's some

15   federalism has some concerns inherent here too.  Federal

16   Highways isn't in a position to tell New York State legislature

17   how they should, you know, conduct their business.

18          THE COURT:  While these decisions are interrelated,

19   there may be other forums and other cases that would have to be

20   pursued in order to challenge some of those inter-related

21   underpinnings.

22          MR. CUMMING:  Correct, your Honor.

23          As your Honor is aware, plaintiffs have floated Dormant

24   Commerce Clause challenges, there are challenges in the

25   southern district that raise claims of New York State

```
 1   constitution.  There are other avenues.
 2           THE COURT:  But those are not before us today and
 3   tomorrow?
 4           MR. CUMMING:  They are not.
 5           THE COURT:  Okay.  You may change topics now.
 6           MR. CUMMING:  Yes, your Honor.
 7        Thank you for the court's indulgence.
 8           THE COURT:  Just hold one second.
 9           (Discussion held off the record.)
10           THE COURT:  All right.  Mr. Cumming, if you have it
11   easily at hand, you have a Ninth Circuit case that you referred
12   to, a Sixth Circuit case that you referred to, and a Southern
13   District of Florida.  If you have those, and just read them
14   into the record, that would be helpful.
15           MR. CUMMING:  Thank you, your Honor.  The Southern
16   District of Florida case is *Citizens for Smart Growth v. Peters*
17   17 -- 716 F Supp. 2d 1215.
18           THE COURT:  What year?
19           MR. CUMMING:  2010 at pin site 1224.
20           THE COURT:  Okay.  The Ninth Circuit case?
21           MR. CUMMING:  Hold on, your Honor.  Just a second,
22   your Honor.
23           THE COURT:  That's okay.
24           MR. CUMMING:  *Native Eco Systems counsel v. U.S.*
25   *Forest Service, 428 F. 3d 1233* at 1246 from 2005.
```

1          And the Sixth Circuit case *Coalition for Advancement of*

2   *Regional Transportation v. Federal Highway Administration 576*

3   *federal appendix 477* at 490 from 2014.

4          THE COURT:  Just keep your voice up a little bit, Mr.

5   Cumming, it would be appreciated.

6          Okay.  You may -- Ms. Peltz give you something else that

7   you want to read?

8          MR. CUMMING:  One more Sixth Circuit case.  Apologies,

9   your Honor.  *Latin Americans for Social and Economic*

10  *Development v. Federal Highway Administration, 756F. 3rd 447* at

11  470 from 2014.

12         THE COURT:  Okay.  Thank you.

13         MR. CUMMING:  Thank you.

14         THE COURT:  On to mitigation, Mr. Cumming.

15         MR. CUMMING:  I am going to defer talking to some

16  extent about the specific methodology that led to mitigation

17  into later this afternoon.  Because it is essentially

18  downstream of the traffic, air quality, and Environmental

19  Justice analysis, and those I think will hopefully be, it will

20  be more productive to present that in order to the Court.

21         THE COURT:  Let me give you a tiny bit of a heads-up

22  because you mentioned the key buzzword, the methodology.  To

23  the degree that you want to answer this now or you want to hold

24  it for your presentations later, you will tell me.

25         Are we talking about a choice of methodology and whether

1    that choice comports with the statute or regulation, therefore,

2    a legal issue?  Or are we talking about no dispute as to the

3    choice of methodology, and we're discussing the application of

4    that methodology to the facts and circumstances of this case?

5    In which case, we're dealing with a substantial evidence

6    question relative to fact-finding.

7            MR. CUMMING:  Dealing with the first, your Honor, to

8    the extent that plaintiff's challenge that the agency used an

9    appropriate methodology to assess what mitigation to --

10           THE COURT:  So the question then under that

11   circumstance is:  Is that methodology appropriate under the

12   statute?

13           MR. CUMMING:  Yes.

14           THE COURT:  Very good.  I'll look forward to your

15   commentary the -- later this afternoon.

16           MR. CUMMING:  Setting aside methodology, which I will

17   address later --

18           THE COURT:  Right.

19           MR. CUMMING:  -- the final EA describes specific

20   mitigation measures and where they are likely to be located

21   with the understanding that final determination of the specific

22   location will depend on the final tolling schedule.

23           THE COURT:  Mr. Cumming, project, keep your voice up,

24   please.

25           MR. CUMMING:  Apologies, your Honor.

```
 1        If your Honor would return to our slides, and it is
 2   page -- again, apologies for the numbering, after the main --
 3            THE COURT:  Just what's the title of the slide?
 4            MR. CUMMING:  Regional mitigation.
 5            THE COURT:  It's the third page in?
 6            MR. CUMMING:  Yes, your Honor.
 7            THE COURT:  Go ahead, Mr. Cumming.
 8            MR. CUMMING:  One bucket of mitigation commitments are
 9   the regional mitigation commitments.
10        Now these are, as the title says, regional.  They're
11   efforts to reduce truck diversions to expand clean truck
12   programs, expand delivery hours.  Those are...
13            THE COURT:  Let's stop right there because I need some
14   help.
15        It seems like a fair portion of the briefing and
16   discussion is around trucks.  There are trucks and there are
17   nontrucks, and so why the focus on trucks as compared to all
18   vehicles or why the focus on trucks as compared to nontrucks?
19        If this is not the appropriate time to discuss it, you
20   will tell me and we will get to it at that time.  But in order
21   for me to get my hands around this, I need to try to understand
22   why the focus is all on trucks.  I think I can answer the
23   question, but I'm not the person in the possession of the
24   information that would lead me to be a 100 percent comfortable
25   with how I think I can answer the question.
```

1              MR. CUMMING:  My understanding is the specific

2     emissions from diesel truck traffic are the emissions of

3     highest concern.  That is the focus, and, specifically,

4     particulate matter emissions from diesel truck traffic are --

5              THE COURT:  Even though that truck traffic may not

6     represent the majority of traffic that is coming through the

7     areas, the geographic areas of concern?

8              MR. CUMMING:  I will get into this more in detail

9     later, your Honor.

10             THE COURT:  Okay.

11             MR. CUMMING:  But my understanding is that the other

12    traffic is captured more generally in the regional analysis and

13    the specific analysis looks more at truck traffic because the

14    particulate matter does not spread as far from the highway.  So

15    you are looking at more localized areas of concern.

16             THE COURT:  Now I will ask you the same question I

17    asked Mr. Mastro.

18        Regional, how are we defining this and help me square

19    what I will call different geographic areas of concern at

20    different steps in this process?

21        So I understand regional initially, 28 counties, right,

22    up into Connecticut, New York, New Jersey, et cetera.  Correct?

23             MR. CUMMING:  Correct.

24             THE COURT:  Then somewhere along the line, the 28

25    became a lesser number and may, and in fact, even become a

1    lesser number from there.

2         Help me understand regional, the definition, and how do

3    I square away these different descriptions of the region for

4    different -- for theoretically, perhaps, different purposes

5    within the EA or the FONSI.

6         MR. CUMMING:  Your Honor said it correctly.  They do

7    serve different purposes.

8         I plan to address that more in detail later, but --

9         THE COURT:  That's fine.

10        MR. CUMMING:  -- for -- for purposes of mitigation,

11   the mitigation commitments are downstream from the localized

12   Environmental Justice analysis, which is --

13        THE COURT:  Explain that again because I am not quite

14   sure I follow.

15        MR. CUMMING:  There are two levels of Environmental

16   Justice analysis in the final EA.  The first assesses changes

17   in traffic and, thus, changes in emission in EJ and nonEJ

18   communities.  So you can look at it as a disparate impact

19   analysis, essentially.

20        There, the final EA found no difference between those

21   two communities.  In other words, traffic would change in EJ

22   and nonEJ communities in relatively equal number.

23        Second --

24        THE COURT:  If I translate that back, just

25   hypothetically, if there was a change in traffic patterns in

1    Environmental Justice Communities by 12 and a half percent,

2    you're saying that the finding demonstrated that there was

3    approximately that same rate of change in non-Environmental

4    Justice Communities?

5         MR. CUMMING:  Correct.  And I will present the Court

6    with slides to that effect later.

7         The other part of the EJ analysis was a local census

8    tract analysis looking at specific communities where there was

9    expected to be truck traffic increases in Environmental Justice

10   census tracts.

11        So if the Court turns to -- I believe two more pages to

12   Environmental Justice census tract where truck traffic

13   proximity could increase.

14        THE COURT:  Yes.

15        MR. CUMMING:  The Court will see various numbers --

16   apologies they're not incredibly clear, but the Court will see

17   various numbers in red coloring on the map.  Those are the

18   census tracts adjacent to highways where there was an expected

19   increase in diesel truck traffic.

20        THE COURT:  The red outline geographically, you would

21   describe that as what counties?

22        MR. CUMMING:  I apologize, your Honor.  There's a red

23   outline for the central business district.

24        THE COURT:  That's the central business district.  So

25   you said red.  So my eyes immediately went to that.  Then I

1    realized it is the CBD.

2            MR. CUMMING:  Yes.  Apologies.  I guess I should --

3            THE COURT:  Help me understand what you are talking

4    about.

5            MR. CUMMING:  I guess I should say a more orange

6    color.  So if your Honor looks to the left beyond where the

7    label for Hudson County is and then your Honor continues

8    looking to the left, you will see a number ten --

9            THE COURT:  Correct.

10           MR. CUMMING:  -- which identifies -- and then you will

11   see sort of red, orange little blocking coloring below and to

12   the left of that number.

13           THE COURT:  Yes.

14           MR. CUMMING:  Those are the census tracts in Orange,

15   East Orange, and Newark that were identified as meeting the

16   threshold for place-based mitigation.

17           THE COURT:  Yet they have no proximity to one of the

18   three access points to Manhattan from New Jersey, or four

19   access points depending upon how you look at it, down towards

20   Perth Amboy or Bayonne.  Right?  But Orange, East Orange, and

21   Newark are not proximate to the tunnel crossings.

22           MR. CUMMING:  Correct, your Honor.

23           THE COURT:  And Fort Lee is.

24           MR. CUMMING:  Yes.  And Fort Lee is also identified

25   number 11.

1          THE COURT:  Number 11.

2          MR. CUMMING:  And this was based on the -- again, the

3   methodology that looked at -- and I will talk about this later

4   as well -- looked at what are called highway links, so segments

5   of highway, and then modeled those links for expected truck

6   traffic increases essentially caused by trucks diverting around

7   the central business district through New Jersey.

8          THE COURT:  Okay.

9       Continue.

10          MR. CUMMING:  If your Honor turns back one page to

11   place-based mitigation commitments, these are the commitments

12   in the final EA for mitigation in those communities, assuming

13   the final tolling schedule does not alter the effects in a way

14   that changes the census tracts that were identified.

15          THE COURT:  What is the funding source of the

16   mitigation in these communities assuming the Court accepts that

17   those are the only communities or that -- I don't want to say

18   the Court -- that is actually wrong.

19       Assuming that those are the only communities who are

20   subject to mitigation, what is the funding source for that

21   mitigation?

22          MR. CUMMING:  MTA funding commitment, I believe, from,

23   in part, the tolls from the project.

24          THE COURT:  The MTA is going to be sharing in some

25   form or fashion --

1          Mr. Chertok, make a note because you are going to have

2     to answer the same question.

3          -- their funding sources to mitigate environmental

4     concerns in New Jersey.

5          MR. CUMMING:  Yes.

6          THE COURT:  So the representation from Mr. Mastro that

7     no mitigation monies are coming to New Jersey is not -- does

8     not agree with what you are saying to me right now?

9          MR. CUMMING:  Yes, your Honor.

10         THE COURT:  Is there an indication somewhere in the EA

11    or the FONSI of that financial commitment by the MTA with

12    respect to mitigating in these four communities?

13         MR. CUMMING:  Yes, your Honor.  I believe the FONSI

14    includes a list of those communities in the mitigation

15    commitments.

16         THE COURT:  The communities are included in the

17    mitigation comments, but does that mitigation -- do the

18    mitigation comments provide assurance/comfort that funds will,

19    in fact, be forthcoming to address that mitigation?

20         MR. CUMMING:  I believe it does, your Honor.  The

21    final EA describes repeatedly a commitment to mitigation.

22         THE COURT:  So when you come back up for rebuttal, a

23    little bit of help as to where I can find that would be most

24    helpful.

25         Ms. Peltz, go ahead and start looking.

1          Continue, Mr. Cumming.

2           MR. CUMMING:  Mr. Mastro described how there was no

3    discussion of efficacy of the mitigation or why the mitigation

4    was chosen.  That is also not reflected in the record.

5           At DOT_7321 to 25 is a, I think, pretty thorough

6    discussion of the specific place-based mitigation commitments,

7    why they were chosen and how they are expected to help

8    alleviate the adverse effects that were identified through the

9    Environmental Justice methodology.  Those include air

10   filtration in schools within a certain distance of highways,

11   various green space initiatives and the like.

12          THE COURT:  Continue.

13          MR. CUMMING:  It is also, your Honor, it's important

14   to note, the mitigation -- the record reflects the mitigation

15   commitments were developed in consultation with what was called

16   the Environmental Justice technical advisory group, which was a

17   group of, I believe, 16 community organizations that worked

18   with MTA and Federal Highways on Environmental Justice and

19   mitigation measures.  That included the New Jersey

20   Environmental Justice Alliance, and there are slides in the

21   record.  I'm happy to provide your Honor citation s that

22   indicate that development of mitigation really was an iterative

23   community-based process.

24          THE COURT:  With these 16 entities, and forgive me if

25   I am mixing apples and oranges, would these 16 entities be

1  considered participating parties in the underlying

2  administrative proceeding?  Or are they cooperating parties in

3  the administrative proceeding?

4          MR. CUMMING:  I do believe that's mixing apples and

5  oranges technically, but I would say they were cooperating

6  parties, though I --

7          THE COURT:  So under the regulatory or statutory

8  regime, if they were cooperating, they have certain rights that

9  are more limited than those who might be viewed as

10 participating parties?

11         MR. CUMMING:  I believe that's right, your Honor, but

12 I would be happy to discuss that during participation tomorrow.

13         THE COURT:  Okay.  That's fine.

14         MR. CUMMING:  Another point, your Honor, to -- as to

15 sort of there is no commitment as to how the mitigation will be

16 placed, the EA at 37017 describes that after the actual toll

17 rates are adopted, a process that includes both additional

18 analyses and community input will take place to determine the

19 sites of other five-based -- place-based mitigation measures.

20 For instance, in which schools would install air filtration

21 units or on what roadways to plant vegetation.  This will

22 require coordination between the project sponsors, the

23 Environmental Justice Community group, and relevant communities

24 receiving the place-based mitigation and local implementing

25 agencies.  And will include needs assessments and feasibility

```
 1    screening to determine the range of possibilities.
 2            THE COURT:  Okay.
 3            MR. CUMMING:  So the other side of the coin, and
 4    Mr. Mastro makes the point that mitigation is not, you know,
 5    drilled down to the level specificity they believe is
 6    necessary.  Their other point is that flexibility is an asset.
 7    There is an intention that this is a community-based and
 8    community-led process to determine where the mitigation will be
 9    most effective.
10            THE COURT:  Is there a specific dollar amount
11    committed to the mitigation in the four identified New Jersey
12    communities?
13            MR. CUMMING:  No, your Honor.
14            THE COURT:  Okay.  So now my question is:  Why the
15    differentiated treatment for the New Jersey communities as
16    compared to the $20 million in mitigation that's been committed
17    to the Bronx?
18        And how do you justify it?
19            MR. CUMMING:  One answer, your Honor.
20            THE COURT:  And is that not arbitrary?
21            MR. CUMMING:  No, your Honor, it is not.  And there
22    are a couple reasons for that.
23        One is that, frankly, determining that -- that
24    arbitrariness is premature to the extent that -- I mean, if
25    there is a final mitigation commitment to New Jersey that is
```

1    very limited.

2           THE COURT:  All right.  But let's roll it back.

3           There has been a mitigation commitment and a defined

4    dollar amount to the Bronx.

5           What prevented that same determination -- what

6    prevented -- what prevented that same determination being made

7    with respect to the four New Jersey communities?

8           Isn't that differentiated treatment?

9           MR. CUMMING:  No, your Honor.  With the Court's

10   indulgence.

11          THE COURT:  Which by its face, if it is differentiated

12   treatment, it potentially rises to the level of arbitrariness.

13          MR. CUMMING:  So, Mr. Mastro showed you a slide from

14   appendix 17D at DOT_7320.

15          THE COURT:  Well, I may know a lot of things about

16   this case, Mr. Cumming, but I don't know which of

17   Mr. Mastro's -- or which of his four handouts you are talking

18   about.  So at least give me the name of the cover page so I can

19   figure it out and follow what you're saying.

20          Just -- there is an orange page right in the front, just

21   tell me which one.

22          MR. CUMMING:  Mitigation, your Honor.

23          THE COURT:  Mitigation.  Very good.

24          Okay.  Slides have numbers.

25          Which one are we talking about?

1           MR. CUMMING:  We are talking about slide number 35,

2    your Honor.

3           THE COURT:  Okay.  Go for it, Mr. Cumming.

4           MR. CUMMING:  Mr. Mastro makes the point that Bergen

5    County, you know, did not get the same mitigation as the Bronx

6    and points to the percent change on the far right-hand corner,

7    and that is the percent change in daily truck volume, which

8    ranges --

9           (Reporter clarification.)

10          MR. CUMMING:  Which ranges from 2 to 6 percent, I

11   believe, if I'm reading it.

12          THE COURT:  Nope.  There's a --

13          MR. CUMMING:  Thank you, your Honor.

14          THE COURT:  -- 12 percent number.

15          MR. CUMMING:  You are correct, your Honor.

16          THE COURT:  It is actually 12 percent number twice.

17          MR. CUMMING:  If your Honor turns back to the prior

18   page, which was not included in the slides, which is DOT_7319,

19   that's not in Mr. Mastro's slides.

20          THE COURT:  Oh, okay.

21          MR. CUMMING:  I am just giving you the citation for

22   it.

23          THE COURT:  Oh, okay.

24          MR. CUMMING:  It notes that the Bronx has two

25   locations at least that are 14 percent and 11 percent in that

1  same increase.  And there are other location -- there is

2  another location in New York City that has 103 percent

3  increase.

4      I think if the Court is looking for a reason basis for

5  why there was fixed -- a fixed commitment to certain areas in

6  New York City versus Bergen County, at this point in time,

7  without having fleshed out the Bergen County mitigation, that's

8  one answer.  The percentage --

9      THE COURT:  The 12 percent is not that dramatically

10 different from 14 percent in two locales in the Bronx.

11     So, again, what caused the differentiated treatment?  Is

12 there an explanation for that?

13     MR. CUMMING:  Respectfully, your Honor, it is

14 12 percent in one location in Bergen County.

15     THE COURT:  It's 12 percent in one location in Hudson

16 County, which is not within the enumerated list.

17     MR. CUMMING:  No, it is not, your Honor.

18     THE COURT:  Okay.  So the answer is you don't really

19 have an answer.

20     MR. CUMMING:  I hope to give you a better one during

21 rebuttal, your Honor.

22     THE COURT:  Okay.  Thank you, Mr. Cumming.

23     Mr. Chertok or Ms. Knauer, whom am I having the pleasure

24 of hearing from?

25     MR. CHERTOK:  Ms. Knauer, your Honor.

```
 1            THE COURT:  Okay.
 2       Ms. Knauer, according to my list -- we're, I think, 20
 3  minutes.  No.  We are 30 minutes.
 4       And how are you divvying up your time?
 5            MS. KNAUER:  So -- and Mr. Chertok, I think, will come
 6  up and address alternatives.  I am going to address mitigation
 7  first, just to keep that colloquy going.
 8            THE COURT:  So between those two --
 9            MS. KNAUER:  So we would like to reserve five minutes
10  for rebuttal.
11            THE COURT:  Okay.  So roughly --
12            MS. KNAUER:  Or any extra time.
13            THE COURT:  Roughly 12 minutes or so on the two
14  different topics, mitigation versus alternatives.
15       Okay.  And that's -- okay.  And that's Ms. Knauer.
16       Okay.
17            MS. KNAUER:  So I think we are handing out a couple of
18  pages from the -- from the administrative record.
19       Can you change -- I'm sorry.
20       I wanted to put something up on the screen.  Could you
21  change this to input 1, please.
22            THE COURT:  All right.
23            MS. KNAUER:  Okay.
24            THE COURT:  Wait, wait.
25       Hold on, Ms. Knauer.
```

1          MS. KNAUER:  So I just wanted to put the -- the page

2     from the EA, which lists all of the -- all of the mitigation

3     measures for Environmental Justice, which was really the -- the

4     crux of Mr. Mastro's and New Jersey's complaint.

5          And as Mr. Cumming said, the -- the analysis does -- or

6     I'm sorry.

7          The mitigation commitments do flow from the

8     Environmental Justice analysis, which we'll be presenting in

9     the next section.

10         So, you know, in terms of how we reached the locations

11    for mitigation, we can go into more detail later, but I am

12    happy to answer any questions from the Court.

13         But I think first I just want to talk about --

14         THE COURT:  So just let me understand this, just to

15    make sure that I have this clear in my mind.

16         It was the MTA's decision about mitigation relative to

17    the Environmental Justice considerations, which were then fed

18    to the Federal Highway Administration.

19         MS. KNAUER:  No, not at all, your Honor.

20         THE COURT:  Okay.

21         MS. KNAUER:  No.  I mean, I think it was a

22    consultation process between -- you know, the MTA helped

23    prepare the document, but it was in --

24         THE COURT:  But it is the Federal Highway

25    Administration's decision.

1          MS. KNAUER:  Ultimate decision.

2      When I say we, I meant the collective we.

3          THE COURT:  Yes.  I understand.

4      But the Court is not being asked to review MTA

5  decisions.  The Court is being asked to review Federal Highway

6  Administration's decisions on mitigation and Environmental

7  Justice, and part of those considerations were fed by the MTA

8  through a consultation process with the Federal Highway

9  Administration.

10          MS. KNAUER:  There was an analysis prepared under --

11  under the consultation of FHWA, also with EPA input, which

12  resulted in identifying the location -- the locations where --

13  where mitigation was warranted and then there was a

14  consultation process among FHWA, EPA, with EPA input, the

15  project sponsors, not just MTA, TBTA, but also city DOT and

16  state DOT, and the Environmental Justice Technical Advisory

17  Group.

18          THE COURT:  So you are up here explaining this entire

19  process to me.

20      And as a consequence, you are defending the Federal

21  Highway Administration's decision on mitigation --

22          MS. KNAUER:  Correct.

23          THE COURT:  -- and the identification of these

24  communities.

25      But at the end of the day, it is not the MTA's decision

1    that's being defended, it's the Federal Highway

2    Administration's decision being defended.

3              MS. KNAUER:  Correct.

4              THE COURT:  So you cannot speak for the Federal

5    Highway Administration.  That's only Mr. Cumming's

6    responsibility.

7              MS. KNAUER:  I can't speak for the Federal Highway

8    Administration.  I can speak to the sufficiency of the EA and

9    the FONSI on behalf of the MTA and TBTA.

10             THE COURT:  Okay.  I just want to make sure you and I

11   are on the same page as to what I may be expecting to hear from

12   you.

13             MS. KNAUER:  But I -- I can provide some embellishment

14   of -- of what -- how Mr. Cumming, I think, describes the

15   mitigation measures as laid out in the EA and committed to in

16   the FONSI.

17         And I -- I will first say that Mr. Cumming is correct.

18   The mitigation funding will largely come from project revenues.

19   So it will be MTA tolling revenues that will be going into

20   mitigating effects both in New York and New Jersey.

21             THE COURT:  So I will ask you the question I asked

22   Mr. Cumming, which I cued you to.

23             MS. KNAUER:  Yes.

24             THE COURT:  How do we have such specificity around

25   mitigation funding for the Bronx and no number with respect to

1    the four identified communities in New Jersey?

2           MS. KNAUER:  I can jump to that issue or I can sort of

3    lay out how New Jersey is -- that there is a commitment to

4    mitigation funding that includes effects in New Jersey.

5           THE COURT:  I'll let you do your presentation, just

6    don't lose sight of the question.

7           MS. KNAUER:  I will not.  I will not.  That is

8    certainly part of my presentation as it was a major comment by

9    New Jersey.

10          So first, I just want to emphasize that there are two

11   types of mitigation that were identified for Environmental

12   Justice Communities in the EA.

13          One was regional mitigation and that -- I don't think

14   that you and Mr. Cumming discussed that to a great extent, but

15   it is very important.

16          So one of the measures for -- there is a $20 million

17   commitment to clean trucks, which means basically replacing old

18   diesel burning trucks with new cleaner burning trucks, or

19   retrofitting their engines to reduce their emissions.

20          That will benefit communities throughout the area that

21   are -- that may -- you know, where trucks may be diverted from

22   the project or even where they may not.

23          THE COURT:  Stop.  Stop.

24          MS. KNAUER:  Yes.

25          THE COURT:  What area because there is lots of numbers

1   being bandied about, 28 counties, 16 counties, 12 counties, X

2   number of towns, Y number of towns.

3        It's a nice statement within the area, but help me

4   understand how to grasp that concept of either within the

5   region or within the area.

6        Where are those monies being dedicated?

7        MS. KNAUER:  The -- the funding will be for -- will be

8   given to truck companies, truck owners, or truck drivers to

9   replace their trucks.  The eligibility is that they --

10       THE COURT:  Within the -- within the 28-county region

11   or some smaller --

12       MS. KNAUER:  It would -- they must -- the eligibility

13   requirement is that they drive 70 percent of their vehicle

14   miles traveled within the New York, New Jersey, and Connecticut

15   tri-state region because as I am sure you recognize, trucks

16   that are drive -- the trucks that would be diverted by this

17   program are trucks that are -- not trucks that are making

18   deliveries from point A to point B in Manhattan, they're

19   trucks --

20       THE COURT:  So that is a broader definition than

21   regional as discussed earlier today.

22       MS. KNAUER:  I think -- I think regional -- it's

23   regional mitigation because it will affect -- it will affect

24   communities throughout the region, including in New Jersey

25   where trucks drive.

1          THE COURT:  New Jersey, Connecticut, New York, beyond

2     the 28 counties that may have been identified.

3          MS. KNAUER:  It will because most of the trucks are

4     probably coming from even further afield, that's true.  But

5     they -- it will certainly benefit New Jersey.

6          Another one of the regional mitigation measures which

7     was to expand the -- the New York City DOT off-hours delivery

8     program which -- and -- and simultaneous with that a reduced

9     overnight toll beyond that which was studied in the EA, to

10    reduce the incentive for trucks that travel through the area

11    overnight to divert from the CBD and take alternate routes.

12    And the modeling showed that actually quite a few -- or a large

13    chunk of the trucks that would be -- would be diverted through

14    the program are traveling in the overnight hours.  So those

15    trucks would be less likely to divert.  So it's -- it's that

16    commitment, which is a reduction of $30 million in the

17    anticipated toll revenue, so it is really a $30 million

18    commitment will benefit New Jersey, as well as New York and

19    elsewhere.  It is reducing --

20          THE COURT:  So --

21          MS. KNAUER:  So this is directly reducing the impacts

22    of the project.

23          THE COURT:  So this is basically an incentive to

24    adjust the flow in the truck arena to hours of the day when the

25    toll is less, therefore lessening the congestion in the CBD?

1          MS. KNAUER:  That's one aspect of it.

2          Another aspect of it is that trucks that are already

3    traveling in the overnight are less likely to divert routes

4    because they won't be paying as high of a toll.  Because

5    really, the -- the effects of the project that everybody is

6    concerned about and that the Environmental Justice analysis

7    looked at are the effects of trucks that would ordinarily, you

8    know, or today in the no-action scenario go through the CBD.

9    And they would be diverted to other routes because they don't

10   want to pay the toll.  If the toll is much lower as was

11   committed to in the EA, they are less likely to divert.  So

12   directly reducing the effects of the tolling project.

13         So those are -- those are three regional mitigation

14   measures that were committed to in the FONSI.

15         And all of these, just to clarify and answer one

16   question that you asked, the government --

17         THE COURT:  So help me understand.  I am just trying

18   to grasp everything here.

19         Diversion in the -- the -- the adjustments in overnight

20   will have two aspects to it, one of which affects delivery into

21   the CBD, and the other aspect of it is to lessen the likelihood

22   of diversion to some route other than going through the CBD and

23   periods of time other than the overnight?

24         MS. KNAUER:  No.  During the overnight.

25         THE COURT:  During the overnight.

1           MS. KNAUER:  Yes, because there are many trucks that

2    travel through because the CBD is very congested during the

3    day, but in the overnight time, there are many trucks -- say if

4    a truck is traveling from New Jersey to Long Island.

5           THE COURT:  Right.

6           MS. KNAUER:  They may travel through the CBD because

7    it is not --

8           THE COURT:  Right.

9           MS. KNAUER:  -- it is less congested at that time.

10           THE COURT:  Whereas, with the overnight --

11           MS. KNAUER:  They had a higher --

12           THE COURT:  Instead of them going up over the top or

13    the GW Bridge and then coming down into --

14           MS. KNAUER:  Right.

15           THE COURT:  -- Long Island some other way, thereby

16    enhancing the potential environmental impact, I'm going up over

17    the top --

18           MS. KNAUER:  Right.

19           THE COURT:  -- right, there is an -- I get it.

20           MS. KNAUER:  Precisely.

21        So those -- and -- and those regional mitigation

22    measures will, as I said, benefit all communities and the

23    place-based mitigation measures were focused on a specific

24    group of communities which were identified as having not only

25    high and pre-existing pollution burdens, and we will get to

this, I think, later this afternoon about exactly how the --

what the methodology was, but also having very high chronic

disease burdens in those communities.

     So that is how, and if you look at, I think, it is

Document 38, so that -- I think this is just the actual page

from the EA.  I think this was also in the government's slides.

     But this -- these are -- these are the communities that

were identified as having not only high pollutant burdens, but

high chronic disease burdens that were identified as warranting

place-based mitigation.

     THE COURT:  Is this slide the one that features figure

17D-18?

     MS. KNAUER:  Yes.  Exactly.

     THE COURT:  Okay.

     MS. KNAUER:  It's the same -- it's the same slide that

I just feel more comfortable looking an it in the context --

     THE COURT:  Okay.

     MS. KNAUER:  -- of the EA.

     And so these place-based mitigation measures include

some measures that were, as you noted and Mr. Mastro has noted

many times, were identified in the Bronx.  And I will get to

the reasons for that.

     And some measures which were not identified that could

be applied at various locations, including locations, or, you

know, the Bronx isn't the only part of New York that has some

1   of these communities with -- with overburdened -- with these

2   chronic disease burdens and pollutant burdens that warrant

3   place-based mitigations.  There were other areas of New York as

4   well that were -- there weren't specific measures identified.

5       And then there are a few in New Jersey.  I think there

6   are seven census tracts in New Jersey that were identified for

7   place-based mitigation and within four different

8   municipalities.

9       So the ones that can be applied anywhere depending on a

10  consultation process which Mr. Cumming alluded to and I can

11  describe further, are the roadside vegetation, renovating parks

12  and green space, and installing air filtration units in schools

13  near highways.  And those all have demonstrable effects on

14  public health and certainly the installation of air filtration

15  is a direct mitigation of air quality impacts.

16      I do want to just take a step back and as I think we

17  will get into it later, but really this mitigation was -- was

18  identified for these communities because of pre-existing

19  burdens.

20      The effects of the project are pretty low everywhere,

21  the magnitude is very low.  But, you know, in consultation with

22  FHWA and EPA and the Environmental Justice Technical Advisory

23  Group, it was determined that notwithstanding that because this

24  area is beset with pre-existing burdens from, you know, prior

25  highway projects that, you know, that have affected communities

1   for a long time, that adding even -- this is -- these are, you

2   know, these truck traffic proximity additions are of any

3   amount.  There was no sort of screening or -- or magnitude

4   threshold for where it was -- it was strictly based on

5   pre-existing burdens where any amount of new trucks would be.

6          THE COURT:  So let's stop right there.

7       I think what I hear you saying to me is that the

8   pre-existing burden factor seemed to weigh very heavily on the

9   identification of the four communities in New Jersey who were

10  to receive mitigation.

11         MS. KNAUER:  Correct.  That was -- that was the, you

12  know, with any amount of truck traffic being introduced and the

13  fact that they had pre-existing chronic disease burdens.

14  Basically, the whole area has pre-existing pollutant burdens

15  above 90 percentile, so the real deciding factor is chronic

16  disease burdens.

17         And if you compare the number of census tracts in

18  New Jersey that have those pre-existing chronic disease burdens

19  at the 90th percentile to the ones in the Bronx, it's -- the --

20  the difference is stark.

21         There are -- I am sorry.  I am just trying to find my

22  exact numbers here.

23         But basically 69 percent of the -- of the census tracts

24  that were identified for place-based mitigation under this

25  methodology are in the Bronx.  13 percent are in New Jersey.

1          THE COURT:  So, Ms. Knauer, this may be appropriate

2    for later today or perhaps even tomorrow, the methodology with

3    census tracts as opposed to census blocks.  Correct?

4          MS. KNAUER:  Yes.  And I was planning to get to that

5    later, but that --

6          THE COURT:  Well, I will just posit a question again.

7          MS. KNAUER:  Yes.

8          THE COURT:  You can think about it.

9          MS. KNAUER:  I can --  I can -- but I am prepared to

10   respond now, I think.

11         THE COURT:  Well, maybe this question is better for

12   Mr. Mastro thanks to you.  Right?

13         If the data was run on census block as opposed to census

14   tract, is there a difference in the outcome and the number of

15   communities and municipalities that might be viewed as having

16   to require or having need for mitigation from an Environmental

17   Justice perspective?

18         MS. KNAUER:  I don't believe so, your Honor.

19         The analysis was done using census tracts.

20         I will point out that the proponent of the use of census

21   blocks rather than census tracts New Jersey identified in

22   their -- they didn't raise this issue in their comments on the

23   draft EA, which they had the opportunity to do, but when

24   they -- when they brought it up in the litigation, they

25   mentioned one census block that they believe might have been

1   included.

2        However, that census block was in a tract which has a

3   reduction -- the analysis showed they have a reduction in truck

4   traffic proximity.  And the proximity values are really only

5   available with using the best practices model at the tract

6   level.  So I think the answer must be no.  Because otherwise we

7   would have heard that from New Jersey.

8        So I do not believe the outcome would have changed.

9           THE COURT:  So we're at about roughly 15 minutes.

10          MS. KNAUER:  Okay.

11          THE COURT:  I am happy to give you a little leeway,

12  but I know you want to leave some time for Mr. Chertok and

13  reserve some rebuttal time.

14          MS. KNAUER:  Right.  I do --

15          THE COURT:  So just give me a sense of how much longer

16  you think you will need.

17          MS. KNAUER:  I just want to address a couple of the

18  points that you raised with Mr. Cumming.

19       In terms of where in the FONSI the commitment was stated

20  to put mitigation in these New Jersey communities.

21          THE COURT:  Did we hear Henry -- Henry Winkler's voice

22  when the FONSI was speaking?

23          MS. KNAUER:  All the time, your Honor.

24       That can be found at DOT_0000391, which is the summary

25  of effects and mitigation measures that the FONSI commits to.

1   And it includes a list of the communities where place-based

2   mitigation would be implemented.

3           And I just -- I just want to be -- to clarify something

4   in terms of the perceived deferral of that commitment.

5           The commitment to implement place-based mitigation in

6   those communities is not deferred.  It is committed to.

7           The what's -- what needs to still happen is a

8   consultation process following the identification of specific

9   census tracts is a consultation that where -- where the

10  analysis of the final adopted tolling structure reveals truck

11  traffic proximity effects.  But the -- then there will be a

12  consultation process not only among New York agencies, but with

13  any, as -- as the -- and if we could just go back to Document

14  41.

15          THE COURT:  But was that done with respect to the

16  Bronx, where the MTA has already made a $20 million commitment?

17          MS. KNAUER:  That -- the Bronx commitments all arose

18  out of consultation with the Environmental Justice Technical

19  Advisory Group.  I mean, not -- not only is the Bronx a much

20  more highly-burdened area to begin with and will receive more

21  effected census tracts from the project, but they did also, you

22  know, communicate specific opportunities for mitigation in

23  their area.

24          But they're --

25          THE COURT:  And that's why there was differentiated

1  treatment with respect to the four New Jersey communities?

2         MS. KNAUER:  I don't think it is differentiated

3  treatment, your Honor.  I think there were specific measures

4  that were identified, but in terms of the monetary commitment,

5  I don't think it's differentiated because I think there is many

6  more census tracts that are affected in the Bronx.  I don't

7  think -- it is just that there are specific measures identified

8  in the Bronx through that consultation process.  The New Jersey

9  representation on the -- on the technical assistance group did

10 not propose any specific measures in the New Jersey

11 communities.  Those, you know, could have been considered, but

12 they weren't proposed.  But the Bronx had, you know, some

13 specific opportunities that were feasible.  And --

14         THE COURT:  The Bronx folks took affirmative steps and

15 what you're saying is the New Jersey folks did not.

16         MS. KNAUER:  Not to the same extent, your Honor, not

17 with that level of specificity.

18         THE COURT:  Anything else, Ms. Knauer?

19         MS. KNAUER:  I think that was it unless you had any --

20         THE COURT:  I do.

21         MS. KNAUER:  -- further questions that I didn't

22 address.

23         THE COURT:  There is this lingering question of

24 whether it's too early for a plaintiff's challenge on

25 mitigation because the mitigation plans have not yet fully

1    rolled out from the final recommendation, obviously, pending

2    the approval of the Federal Highway Administration.

3           Is there a date for a determination or a bright line for

4    final action that will signal the plaintiff's claim is ripe?

5    Or is that still a TBD?

6           MS. KNAUER:  Well, I will differentiate between the

7    plaintiff's claim asserted in the litigation that no mitigation

8    is committed to in New Jersey, and I say that claim is ripe and

9    it is unmeritorious.

10          THE COURT:  Okay.

11          MS. KNAUER:  Because there is a commitment to

12   mitigation in New Jersey.

13          To the extent that New Jersey wishes to quibble with

14   specific mitigation measures, that may or may not be advanced

15   in specific municipalities of New Jersey.  Yes, I guess that is

16   not ripe.  That will be -- but they also have the opportunity

17   to affect what mitigation measures are implemented there

18   through further consultation with TBTA.

19          THE COURT:  Is there a sense of when that process --

20   assume for the sake of argument everything stays on target for

21   a June 15th green light, turn the switch on.

22          Do we have any sense as to at what point thereafter this

23   consultative process might begin and how long it might take and

24   then, ultimately, how long will it take for dollars to flow to

25   these affected communities, whether it's just the four or some

1   other number?

2          MS. KNAUER:  Well, I think that we are expecting it

3   will be just the four unless additional mitigation measures are

4   required or as a result of the re-evaluation, but that -- I

5   think that process will begin imminently.  It will -- knowing

6   that the same communities are likely to be affected by the

7   adopted tolling structure, I believe it is the TBTA's intent to

8   begin soon try -- beginning with the outreach.

9          THE COURT:  Okay.

10         MS. KNAUER:  But, certainly, it will follow from the

11  re-evaluation and the identification of specific census tracts,

12  which will help inform specific locations as well as the

13  agencies.

14         THE COURT:  Thank you, Ms. Knauer.

15         MS. KNAUER:  Thank you.

16         THE COURT:  Mr. Chertok, alternatives.

17         MR. CHERTOK:  Thank you, your Honor.  This will be

18  very brief because we agree with Mr. Cumming's description.

19         I just want to emphasize a few points.

20         First of all, the revenue criteria for a review of

21  whether an alternative is reasonable, it is not only

22  appropriate because many -- a number of Courts have found that

23  revenue goals are perfectly appropriate to use.  They are cited

24  in our brief, and there are a few that I can give you the names

25  of now.  We can give you the cites during the break rather than

1    taking up time now.

2          They are basically --

3          THE COURT:  You can provide it to my clerks at the

4    podium.

5          MR. CHERTOK:  Yes.  With this memory out of page 23,

6    there it is.  *Cachil Dehe Band of Winton Indians* out of the

7    Ninth Circuit; *Stand Up for California* in the DC Circuit;

8    *Protect Lake Pleasant* in Arizona; and as well as the *Busey*

9    case, the *Citizens Against* Burlington v. *Busey* in the DC

10   Circuit.  There, the Court not only found revenue to be an

11   appropriate goal, but it also had only one other alternative

12   besides the no action that was considered.

13         So the notion that you cannot use revenue and you cannot

14   only have one alternative are just not the law of the land

15   under NEPA, and we've given a number of cases in our brief that

16   show that's not unusual.

17         THE COURT:  Is it your sense, Mr. Chertok, from

18   reading these cases that the Court was looking at revenue among

19   a series of objectives and was according -- or maybe the agency

20   was according, perhaps, equal weight to all of those

21   objectives?  Or is it your sense from reading these cases that

22   the Court was endorsing that revenue could have greater weight

23   than any of the other objectives?

24         MR. CHERTOK:  No.  I believe that in all of those

25   cases that there is a purpose and need that was assessed and

1   based on that purpose in need, adopted by the agency.  Then if

2   one of the criteria was revenue generation or something akin to

3   that, that was given the same weight as other criteria related

4   from the -- related -- or derived from the purpose and need.

5          THE COURT:  Revenue was not or could not be the

6   predominant objective?

7          MR. CHERTOK:  It could be the only reason.

8      Let's assume there were three criteria and the only one

9   that was not met was revenue, that would be a reason to say

10  this is not a reasonable alternative because it does not

11  achieve the purpose and need and, therefore, need not be

12  evaluated in detail.

13         THE COURT:  Okay.

14         MR. CHERTOK:  The fact that led to the other point,

15  your Honor, is that Mr. Mastro referred to the *NRDC v. Morton*,

16  *National Resources Defense Council v. Morton*, he read you a

17  sentence.  But you should look at the full paragraph on the

18  page because it talks about how that is one criterion in terms

19  of legislation.  But you don't act -- you don't expect a

20  full-blown piece of legislation to be enacted.  It depends on

21  the circumstances.

22         Here, I would add, that it took at least 15 years before

23  the New York Legislation adopted congestion pricing.  So going

24  back to them for the change to allow the bridge tolling, which

25  Mr. Mastro has postulated as his favorite alternative, is not

1    necessarily reasonable but, more importantly, that alternative

2    that Mr. Cumming pointed out was rejected for multiple reasons,

3    including the fact that if you -- you needed to toll within

4    Manhattan and if you don't toll within Manhattan, that will

5    cause more diversions, including to New Jersey, and, therefore,

6    there will be more impacts on low income communities and there

7    will be a much higher toll.

8        THE COURT:  Mr. Chertok, what I hear you saying is

9    what plaintiff's have quoted to the Court may well be accurate,

10   but you are requesting that the Court look at that sentence

11   within the whole context of where that sentence came from in

12   the opinion.

13       MR. CHERTOK:  That's correct, your Honor.

14       THE COURT:  Okay.

15       MR. CHERTOK:  It's just not -- one can find sentences

16   under NEPA cases to match almost anything, one would like to

17   say, so, and, particularly, from the Ninth Circuit, I would

18   add.

19       So, I would view those cases with some degree of

20   skepticism.

21       THE COURT:  Given how prolific all Courts are in

22   writing today, my suspicion is that statement could be applied

23   to many things.

24       MR. CHERTOK:  That holds a special place.

25       THE COURT:  Do not run, Mr. Chertok.

1          Would you be kind enough to give me some sense or some

2    explanation as to how the objectives for the project were

3    determined and by whom?

4          MR. CHERTOK:  They were determined by the FHWA with

5    some input from the applicant, which is typically the case, but

6    the statute defined the principle purpose and need.  The

7    purpose and need, as defined in this statute, was to reduce

8    congestion in the CBD and to provide a stable source of income

9    for the MTA capital projects.  So that set the stage for the

10   principle purpose and need.

11         In addition, FHWA and the applicant developed two other

12   criteria in terms of the reductions of vehicle miles traveled

13   in the CBD and the reduction in congestion.

14         THE COURT:  Was the discussion of those objectives

15   available for public comment before they became concretized?

16         MR. CHERTOK:  The legislation was established well

17   before the environmental review reprocess.

18         THE COURT:  Right.

19         MR. CHERTOK:  So, the only additions were the more

20   refined criteria for the reduction of vehicle miles traveled

21   and the reduction of congestion in --

22         THE COURT:  Were those subject to any inputs other

23   than from the MTA as the applicant?

24         MR. CHERTOK:  Well, they were project sponsored, but

25   they were part of the draft EA that was set out for public

1   comment.

2          THE COURT:  That was then subject to comment?

3          MR. CHERTOK:  Yes.  Yes.

4          THE COURT:  Okay.

5          MR. CHERTOK:  Let me just correct one thing I said,

6   your Honor.  The T-2 alternative, which would toll the bridges,

7   I think New Jersey likes it because it probably would not

8   result in tolling of New Jersey residents, only New York

9   residents --

10         THE COURT:  At any point --

11         MR. CHERTOK:  -- just to clarify.

12         THE COURT:  -- did the Federal Highway Administration

13  express concern to you as the applicant that the revenue

14  generating objective may pose an obstacle to allow for the

15  consideration of reasonable alternatives?

16         MR. CHERTOK:  No.  Because I think, and as Mr. Cumming

17  can speak for FHWA, that the federal government often has this

18  type of situation where there is legislation and that

19  legislation sets the parameters for a proposal.

20         Now, I would add that, remember, there is always a

21  no-action alternative.

22         THE COURT:  Right.

23         MR. CHERTOK:  And that means the government has the

24  option of saying no.

25         THE COURT:  Not to be redundant here but just to make

1   clear for the record, do you know if any interested party

2   raised such a concern, and if so, how that was addressed

3   outside of the comment period on the draft EA?

4          MR. CHERTOK:  I don't know whether there were

5   submissions made, emails sent.  There was a lot of publicity,

6   so I don't know if those particular concerns were made.

7          THE COURT:  Mr. Cumming may be in a better position to

8   answer that.

9          MR. CHERTOK:  Because there is legislation, there is a

10  constraint on what the purpose and need can be for an

11  alternative analysis.  It doesn't do much good to say, okay,

12  the only objective here is to reduce congestion in the CBD by

13  some specified percentage and say we will go forward with that

14  when that would not achieve the goal of the statute, which is

15  what drives this.

16         THE COURT:  Okay.

17         MR. CHERTOK:  That's why the alternatives that

18  Mr. Mastro described and in his brief describes a number of

19  others saying they should have been analyzed, they would not

20  meet the purpose and need of the project.

21         THE COURT:  The statute you are referring to is the

22  New York State statute?

23         MR. CHERTOK:  The Traffic Mobility Act, yes, your

24  Honor.

25         THE COURT:  Thank you.  I appreciate it.

```
 1          Mr. Mastro, hold on one second.

 2          Mr. Mastro.

 3            MR. MASTRO:  Thank you, your Honor.

 4            THE COURT:  You reserved --

 5            MR. MASTRO:  Ten minutes.

 6            THE COURT:  Ten minutes?

 7            MR. MASTRO:  Yes, your Honor, and I will go as quickly

 8   as I can but not speak so quickly that we can't get it down.

 9          Your Honor, I heard both FHWA's counsel, MTA's counsel

10   say, yes, there is committed mitigation.  Then you asked how

11   much money for New Jersey?  What dollars do New Jersey

12   communities get?  There was no answer of specific dollars.

13          Why Bronx, not New Jersey?  It was either no answer or

14   there was a lot of bad stuff in the Bronx and there is also

15   some bad stuff in New Jersey.  We will take care of New Jersey

16   later.  The Bronx, apparently, did a better job of protesting.

17          That's not how the process works, okay, or they had

18   better local officials to get them the money upfront.  That is

19   not how it works.

20          I am going to test those propositions that you heard

21   about what they are telling you now with a straight face was a

22   commitment of mitigation funding for New Jersey.  Let's take a

23   look.

24          Go ahead.  Page 29.  Here is a slide.  I will approach

25   the slide, your Honor.
```

1          Tell me where, where in that entire group, either

2     regional mitigation or place-based mitigation, it says

3     New Jersey or any New Jersey community?  It ain't there.

4          And the only place New Jersey is mentioned is a little

5     footnote down here about schools near highways, filtration

6     systems could, could be deployed in New Jersey.

7          There you see it, Bronx got $20 million.  Also,

8     Hunts Point, which is in the Bronx, got 15.  So it is really

9     35 million for the Bronx committed right up front, your Honor,

10    could be deployed.

11         When I make a commitment, when I make a commitment to

12    you, when I made a commitment when I was Deputy Mayor of

13    New York City, I said, I commit to do this.  This is what I am

14    going to do.  This is what you get.  This is the money you get.

15         I have to say, your Honor, they didn't make a commitment

16    the way I understand the word.  I don't know how they could

17    have said it to you here.

18         Let's go to the next slide.

19         You want to know what they actually said?  What they are

20    telling you now is a commitment.  You can take it to the bank.

21    All right?

22         This is the actual language about the four communities,

23    Orange, East Orange, Newark --

24            THE COURT:  Mr. Mastro.

25            MR. MASTRO:  Yes, your Honor.

1          THE COURT:  Please tell me what slide.

2          MR. MASTRO:  I'm sorry, your Honor.  It is slide 37.

3          THE COURT:  You may continue.

4          MR. MASTRO:  Thank you, your Honor.

5      Orange, East Orange, Newark, and Fort Lee.

6      What does the EA actually say?  The EA actually says the

7  following communities could have census tracts that would merit

8  place-based mitigation.  Could've, would've, should've.  That

9  doesn't sound like a commitment to me, your Honor.

10         And that's not the words I use when I make a commitment.

11         And I just have to say this, your Honor.  Same thing in

12 the FONSI.  DOT_00003391.  Exactly the same language used in

13 the FONSI.

14         I challenge them when they get back up here in their

15 five minutes to tell you where there is any more specific

16 language than that because that ain't a commitment.

17         When I come into court, I don't tell Courts that a

18 commitment has been made when using language like that.

19         Now, your Honor, it is worse than that.

20         Let's go to the next slide.

21         We are only talking about these four communities because

22 they've already admitted --

23         THE COURT:  Again, help me out.

24         MR. MASTRO:  Slide 35, your Honor.  35.

25         THE COURT:  Thank you.

1          MR. MASTRO:  They've admitted that those four

2    communities, East Orange, Newark, Orange, and Fort Lee, they've

3    admitted that they are -- now they say it is committed.  That

4    they could merit place-based mitigation.

5          But, your Honor, it is so much worse than that because

6    before that they admitted that they were Environmental Justice

7    Communities that included those four that, quote, may need

8    mitigation, end quote, again, not a commitment of mitigation,

9    but rather pointing out that there are 15 communities in three

10   counties, including those four, that may need mitigation.  No

11   commitment of mitigation.

12         And, frankly, your Honor, where is the explanation?

13         When they get up in their five minutes, have them tell

14   you why the 15 fell to four.  Like that's some magic, you know,

15   talismanic number.  There it is.  Look at this.

16         They showed you this here, tracts by pre-existing

17   pollutant or chronic disease burdens above the 90th percentile,

18   all 15 of them fall into that category.

19         Ms. Knauer said there were only seven census tracts in

20   New Jersey that fell in that category.  I counted 30 just on

21   this chart among the 15.

22         And, your Honor, they said, oh, it is truck traffic.

23   Well, you know, it's truck traffic.  There is also vehicle

24   traffic.  But let's just focus on truck traffic.

25         Look at this.  Look at the truck traffic volume changes,

1    up, up, up, including places like Bayonne, which isn't even in

2    the conversation here.  And others going up 6 percent or more.

3    Palisades Park, up 12 percent.

4         Your Honor, where is the explanation?  I am waiting to

5    hear the explanation.

6         How, on a principled basis, they went from 15 to four

7    and then gave them nothing when they admitted there may be a

8    need for mitigation on the 15 and that there could merit

9    mitigation on the four.  Not a dollar.  Not a plan.  Nothing.

10        And we have pointed out to your Honor already the case

11   law is clear.  FHWA's own regs say you are supposed to state

12   the authority for any mitigation.

13        This is slide 19, please.

14        You know, if the agency finds no significant impact

15   based on mitigation, you know, they better state any

16   enforceable mitigation requirements or commitments that will be

17   undertaken to avoid significant impacts.

18        Where is the discussion?  Where is the detail that is

19   required under the case law that explains the mitigation for

20   New Jersey communities.

21        Where is it?

22         THE COURT:  So, Mr. Mastro, help me understand what

23   you're suggesting.

24        I think I get from it that your view is there is no

25   reasonably discernible path to connect the dots to demonstrate

1   a commitment to mitigation.

2           MR. MASTRO:  Correct.

3           THE COURT:  Okay.

4           MR. MASTRO:  There is no commitment to mitigation.

5           THE COURT:  Well...

6       And if you were writing this if you were me, and the EA

7   and the FONSI are a final exam turned in to you in your role as

8   an adjunct law school professor class, right, what level of

9   paper are you looking for?

10      Are you looking for an A paper where every I is dotted,

11  T is crossed?  Are you looking for something else?

12      What does the law require that they give us?

13      Look at it through that lens and instead of you being

14  there, you're sitting here.

15      What am I supposed to be looking for?

16          MR. MASTRO:  Understood, your Honor.

17      First of all, as the professor, I would give the EA and

18  the FONSI an F because they don't talk about mitigation dollars

19  or measures in any detail for New Jersey.

20          THE COURT:  So they get the concept, but not the drill

21  down, and that's what the failing of the paper is.

22          MR. MASTRO:  Absolutely, your Honor.  They get a

23  concept that they have to talk about mitigation in the

24  abstract, but then they don't actually discuss it in sufficient

25  detail.  It doesn't have to be perfect.  It doesn't have to be

1   the A-plus paper that -- if -- they have to comply with the law

2   which says, if you issue a FONSI and there are adverse

3   environmental impacts, you are recognizing -- you have to

4   provide it in sufficient detail the mitigation measures and the

5   dollars you are going to spend where and how so that we can

6   have comfort.

7           THE COURT:  Okay.  I got you.

8       Where does it say the specific dollars in the plans?

9   Where is that required?

10          MR. MASTRO:  Well, your Honor, in the regs itself it

11  says enforceable mitigation requirements or commitments.

12      I understand that to mean commitment to a particular

13  plan and funding it, okay, because commitments mean nothing

14  without dollars, your Honor.

15          THE COURT:  I get you understand that, or that's what

16  you want to be understood.

17      Where is the support for that?  Is it in some case law

18  precedent?  Where is it spelled out that I can hang my hat on

19  what you said and give you the relief that you are asking for?

20          MR. MASTRO:  Your Honor, in case after case, it talks

21  about the mitigation measures.  The mitigation requirements or

22  commitments have to be spelled out in sufficient detail.

23          THE COURT:  Lead with your best case on that.

24      What do you want me to hang my hat on?

25          MR. MASTRO:  Well, your Honor, I think it is

1   absolutely right that you can hang your hat on the many cases.

2          THE COURT:  And Lauren is writing you an answer, so

3   maybe you want to turn over your right shoulder and let the --

4   let your trusted number two -- maybe Lauren wants to come up

5   and talk to me and answer the questions.

6          MR. MASTRO:  She probably -- she probably does, your

7   Honor.

8          But I am going -- on this page 19, the *O'Reilly* case,

9   absolutely.  And I -- I think you get the point, there is no

10  mitigation measures described for East Orange, Newark, Orange,

11  or Fort Lee.

12         Even if you assumed that it was only those four, even

13  though it is really 15 that may need mitigation, there is no

14  mitigation measures described at all whether it is a dollars

15  question or -- or measures just means you have got to describe

16  the steps you're going to take, although they seem to

17  understand, your Honor, that it's not only description but

18  dollars because as I showed you --

19         THE COURT:  Mr. Mastro, one more minute.

20         MR. MASTRO:  Yes, your Honor.

21         As I showed you before, there is 155 million in there

22  with various New York projects, including 35 for the Bronx.

23  And they describe what's going to be done, who is going to do

24  it -- by the way, all New York State agencies or city agencies

25  and the specific dollars associated with it.

1          So if they know how to do it for New York because it's a

2     New York MTA, they could have done it for New Jersey.  They

3     didn't.  It has got to be vacated and remanded.

4          THE COURT:  That may well be a question of engagement.

5          So let's stop right there, Mr. Mastro.

6          Hold on ten seconds.

7          We are done, Mr. Mastro.  I appreciate it.

8          MR. MASTRO:  Your Honor --

9          THE COURT:  No.  You're done.

10          MR. MASTRO:  I was going to give you those citations.

11          THE COURT:  You can, at the break, give them to the

12     clerks.

13          MR. MASTRO:  I will because --

14          THE COURT:  I treat you the same way I treated

15     Mr. Chertok.

16          MR. MASTRO:  No problem.

17          New Jersey did comment on these things and so did the

18     EPA.

19          THE COURT:  Mr. Mastro.

20          MR. MASTRO:  Okay.  Thank you.

21          THE COURT:  Quit while you are ahead.

22          MR. MASTRO:  Thank you, your Honor.  I appreciate it.

23          THE COURT:  Mr. Cumming.

24          MR. CUMMING:  Thank you, your Honor.

25          To address the case law point first, Mr. Mastro had

1   *Township of Bordentown*, Third Circuit case, up on his slide

2   show.

3        From that case, the Court said, quote, nor must the

4   proposed mitigation even be included in the original EA in

5   order to pass muster under NEPA, close quote.  So the idea that

6   if mitigation is fleshed out through re-evaluation or down the

7   line, that's okay.

8        THE COURT:  So what you're saying to me is what

9   Mr. Chertok said to me, which is context.

10       Read the quote, read the case, and read it in the

11  context of what else was said.

12       MR. CUMMING:  Mr. Mastro referred to *O'Reilly*, I read

13  it last night.  The mitigation described by the Court was vague

14  at best.  I think compared to the description of how the

15  specific measures will be implemented here, it -- it is

16  distinguishable on its face.

17       THE COURT:  So now my question, Mr. Cumming:  Why the

18  identification of specific dollars relative to the Bronx and

19  silence in any specificity with respect to New Jersey?  And why

20  is that okay?

21       MR. CUMMING:  Two points, your Honor.

22       The first is a distinguishing funding source, which I

23  think -- and, again, context --

24       THE COURT:  Whoa, whoa, whoa.

25       A distinguishing funding source?  The money is all

1    coming from the same place, the MTA.

2          What distinguishing funding source?

3            MR. CUMMING:  That is not true, your Honor.

4        So the 15 million --

5            THE COURT:  Well, are you tell -- so what Mr. Chertok

6    and Ms. -- and Ms. Knauer told me is not correct.

7            MR. CUMMING:  Well, I believe -- I will provide some

8    context here, your Honor.  I don't mean to -- to question their

9    representation.

10          The $15 million for the Hunts Point refrigeration unit,

11   that is a federal grant to the New York City Department of

12   Transportation.

13          THE COURT:  So it is not coming out of revenue from

14   the CBD tolling scheme?

15            MR. CUMMING:  No, it is not.

16            THE COURT:  Separate revenue?

17            MR. CUMMING:  Separate revenue.

18            THE COURT:  Okay.

19            MR. CUMMING:  Now, it is included here as a mitigation

20   measure that will reduce the effects in the Bronx, but if you

21   are --

22            THE COURT:  Why hasn't anybody told me until 3 o'clock

23   in the afternoon that what we're talking about in terms of

24   mitigation can come from various funding sources other than the

25   revenue generated from the tolling scheme?

```
1           MR. CUMMING:  Thankfully my clients and co-counsel
2    know more than I do, your Honor.
3           THE COURT:  Well, okay.
4           MR. CUMMING:  That is included.
5        Now, so, if your Honor's question is why is there sort
6    of disparate funding from the CBD tolls.
7           THE COURT:  It is not even disparate funding.  There
8    is a specific amount with respect to the Bronx and no number
9    whatsoever with respect to the four identified communities from
10   New Jersey.
11          MR. CUMMING:  And I -- and to that point, Ms. Knauer's
12   point about the number of census tracts is correct.  There is a
13   difference, a substantial difference and that's recognized in
14   the final EA.
15          THE COURT:  I can understand that making a difference
16   in the amount of funding.  Right?
17       You can stand up here and say to me there is more census
18   tracts in the Bronx, therefore, they are entitled to
19   $20 million and there are substantially fewer tracts identified
20   in the four New Jersey communities and, therefore, they are
21   entitled to an amount less than $20 million.  I get it.
22       I could -- I can accept that but it's zero and not only
23   in terms of a dollar amount, there is no mention of any money
24   with respect to the New Jersey communities and my question is:
25   Why?
```

1        MR. CUMMING:  One point.

2        THE COURT:  It is your decision that's defended.

3   Right?  You are standing here defending the EA and the FONSI.

4   So you have to tell me why do you have enough information, why

5   is it okay to specify a number for the Bronx and not for the

6   four affected communities in New Jersey?

7        MR. CUMMING:  My understanding, as Ms. Knauer said, is

8   that specific project, the -- the Bronx Asthma Center, which is

9   the now -- if we take out the 15 million to Hunts Point --

10       THE COURT:  Yes.

11       MR. CUMMING:  -- a different funding source.

12       THE COURT:  Right.  So now we are down to $5 million.

13       MR. CUMMING:  We are down to $20 million.

14       THE COURT:  No.  There was $20 million for the Bronx.

15   You take out $15 million, it's five.

16       MR. MASTRO:  There are two, no.

17       THE COURT:  Or there -- are we talking about two

18   completely different things.  So there is $35 million for the

19   Bronx?

20       MR. MASTRO:  Yes.

21       MR. CUMMING:  There are two separate things.

22       THE COURT:  Okay.  So now --

23       MR. CUMMING:  If you can --

24       THE COURT:  They capped at 15, we are now at 20.

25       MR. CUMMING:  If you could remind Mr. Mastro, I don't

1  need him to answer for me.

2          THE COURT:  Mr. Cumming, I can manage everybody in the

3  courtroom.

4          MR. CUMMING:  Thank you.

5          THE COURT:  Mr. Mastro, it is not the first time.

6  Right?  Just keep a lid on it.  You will have an ample

7  opportunity to answer questions when I recognize you.

8  Otherwise, we are not in a debate society where you get to

9  counterpoint each other whenever you feel like it, got it?

10          MR. MASTRO:  Absolutely, your Honor.

11          THE COURT:  If not I will ask Ms. Myers to get up and

12  make the next presentation.

13          MR. MASTRO:  She will be making one soon.

14          THE COURT:  Okay.  Mr. Cumming, I apologize for

15  Mr. Mastro.  All right.  You may continue.

16          MR. CUMMING:  It is $20 million, your Honor.

17          THE COURT:  Okay.

18          MR. CUMMING:  My understanding is Ms. Knauer said it

19  is a specific project that was brought forward during the

20  Environmental Justice Technical Advisory Group process.

21          THE COURT:  All right.  So the justification is that

22  there was more engagement relative to the Bronx which enabled

23  the identification of a specific project and a dollar amount

24  which was not present with respect to the four New Jersey

25  communities.  Correct?

1          MR. CUMMING:  That's my understanding.  And that's not

2     to say that that process will not exist down the line, but the

3     final EA describes specifically the creation of an

4     Environmental Justice Community Group to do precisely that

5     process for the mitigation identified for New Jersey, and the

6     amounts based on community input and where it is going to be

7     most valuable.

8          THE COURT:  Okay.

9          MR. CUMMING:  It is supposed to be a bottom up

10    process, not Federal Highways plucking locations out of it.

11         THE COURT:  But we still don't know how much money is

12    committed out of the $1 billion a year, theoretically, right,

13    to mitigation regardless of the community and what state that

14    community is in?

15         MR. CUMMING:  We don't.  If your Honor is looking for

16    the specificity one to one, that is not there yet, but the case

17    law.

18         THE COURT:  But it will be down the road.

19         MR. CUMMING:  That is my understanding.

20         THE COURT:  As a result of whatever the final decision

21    is by the Federal Highway Administration.

22         MR. CUMMING:  Yes.

23         THE COURT:  And once the Federal Highway

24    Administration gives the go-ahead, the negotiations on

25    mitigation and the dollar amounts committed will be under the

```
 1   aegis of the MTA?

 2           MR. CUMMING:  Yes, your Honor.

 3           THE COURT:  No review by the Federal Highway

 4   Administration.

 5           MR. CUMMING:  I am not sure what review would be

 6   included in the final VPPP agreement --

 7           THE COURT:  Okay.

 8           MR. CUMMING:  -- that is not --

 9           THE COURT:  All right.

10           MR. CUMMING:  -- before me or the Court yet.

11           THE COURT:  Okay.

12           MR. CUMMING:  Thank you, your Honor.

13           THE COURT:  Before you go, Mr. Cumming.

14       So Mr. Cumming, Ms. Knauer made some reference to the

15   fact that there's some difference -- or in justification for

16   the $20 million that's going to the Bronx.  Right?  And there

17   was a justification specified somewhere.  Correct?

18           MR. CUMMING:  Yes.

19           THE COURT:  Did the Federal Highway Administration

20   make that determination and specification and is it found

21   somewhere?

22           MR. CUMMING:  Yes, your Honor.

23           THE COURT:  In the EA or -- or the FONSI?

24           MR. CUMMING:  The technical memorandum to the final

25   EA, it is DOT_7325.
```

```
 1          THE COURT:  It is -- this is a document by
 2  incorporation by reference, right, from the EA to this other
 3  report?
 4          MR. CUMMING:  This is part of the EA.
 5          THE COURT:  Oh, it is part of it.
 6          MR. CUMMING:  It is an appendix.
 7          THE COURT:  It's in the appendices but it is not in
 8  text of the EA.
 9      The EA makes a reference somehow to this report which
10  provides the justification for the difference for the --
11  approval of the mitigation project in the Bronx as opposed to
12  anyplace else?
13          MR. CUMMING:  The mitigation section of the
14  Environmental Justice chapter cross references the technical --
15          THE COURT:  Right.  So it is a cross reference.  It is
16  not a specific statement in the EA itself.
17          MR. CUMMING:  I believe, your Honor, there is also a
18  statement to that effect in the final EA.
19          THE COURT:  Which may be more than sufficient.  Right?
20          MR. CUMMING:  Yes.
21          THE COURT:  Which may be more than sufficient under
22  the reasonably discernable path.
23          MR. CUMMING:  And cases upheld, your Honor, that in
24  NEPA documents incorporation to appendices --
25          THE COURT:  Right.
```

1           MR. CUMMING: -- is proper.

2           THE COURT:  Yes.

3           MR. CUMMING:  It is all one record.

4           THE COURT:  Right.

5       Thank you, Mr. Cumming.

6           MR. CUMMING:  Thank you, your Honor.

7           THE COURT:  Ms. Knauer or Mr. Chertok, who am I going

8   to have the pleasure of.

9           MS. KNAUER:  It's me.

10      I -- I just take great issue with the proposition that

11  there are no dollar amounts committed to.  There are -- I think

12  we had the slide up before and it's in front of your Honor of

13  the very specific dollar amounts that are committed to for each

14  type of mitigation measure.

15      So there are -- there are dollar amounts.  There are

16  locations as well.  There is a process contemplated by the

17  document for further community engagement with the

18  environmental community group and with relevant agencies in

19  those communities to identify the specific locations.  But

20  there is a -- a full commitment if one looks at the -- the EA

21  at -- where the mitigation measures are described in detail at

22  the DOT_7322 through 7324, there are specific statements that

23  the project sponsors are committing $55 million in regional

24  mitigation measures that would reduce truck diversions,

25  decrease emissions resulting from trucks, and reduce traffic.

1   As we discussed, those measures will benefit New Jersey.

2        And there is a statement that in addition to the

3   regional mitigation commitments, the project sponsors are

4   committing to $100 million in place-based mitigation measures

5   which includes several types of measures, which can be

6   implemented in New Jersey.

7            THE COURT:  Can be but does not --

8            MS. KNAUER:  And will be and will be.

9            THE COURT:  Right.  Excuse me.

10       Mr. Mastro, did you mumble something?

11           MR. MASTRO:  I was talking to my colleague.

12           THE COURT:  Mr. Mastro, please don't put me in a

13  position where I have to say something again.

14           MR. MASTRO:  Of course, your Honor.

15           THE COURT:  We still have several hours this afternoon

16  and tomorrow.  Do not put me in a position where we have a

17  conversation.

18       Do you understand?

19           MR. MASTRO:  I do, your Honor.

20           THE COURT:  Do not do it again.

21       Excuse me, Ms. Knauer, I apologize.

22           MS. KNAUER:  Thank you, your Honor.

23       I will say that with respect to one specific community,

24  the EA recognizes that because there is one census tract in

25  Fort Lee for which the worst case tolling scenario reflected an

1   increase in truck traffic proximity and one highly burdened

2   location -- one highly burdened census tract, that was not the

3   case for every tolling scenario.  There was one tolling

4   scenario, scenario G, where that would not happen.  They would

5   not have the increase in truck traffic proximity.  So there was

6   a recognition in the EA that there -- that that one community

7   could possibly not require mitigation.

8          But generally speaking, there was a full commitment to

9   the dollar amounts.  There was a full commitment to the

10  location -- the communities where the mitigation would be

11  implemented. It was just leaving up to a further process, the

12  exact locations, the exact schools, the exact parks.

13         THE COURT:  Right.  That -- that is drilled down.

14  That is not before us.

15         MS. KNAUER:  But that -- but that does not negate the

16  full commitment that is expressed in the EA and will be

17  required as a condition of the VPPP authorization.

18         I also just wanted to address --

19         THE COURT:  Wait.  Just give me a moment.

20         Is that commitment, I will accept that your

21  representation is correct and accurate.  Is that

22  representation, is that commitment contained in broad terms

23  like the word regional?  Or is it contained in words with some

24  relative specificity?  Right?  That it could be reasonably

25  discerned?  Right?  That that commitment is -- is as to the

```
 1    affected communities in New Jersey without specifically

 2    enumerating them?

 3              MS. KNAUER:  They are specifically enumerated --

 4              THE COURT:  They are --

 5              MS. KNAUER:  -- in the FONSI.

 6              THE COURT:  Okay.

 7              MS. KNAUER:  Yes.

 8              THE COURT:  Okay.

 9              MS. KNAUER:  So I don't think you need to -- you don't

10    need --

11              THE COURT:  I don't have to enter from another

12    document.

13              MS. KNAUER:  Exactly.  Those are listed in the summary

14    of effects and mitigation measures in the FONSI decision

15    document.

16              THE COURT:  Okay.

17              MS. KNAUER:  And I think there was a question raised

18    by Mr. Mastro about the different types of communities.  I

19    think that it's probably better to get to you in the next

20    segment when we discuss the full methodology on Environmental

21    Justice.

22         I did want to point out in terms of the importance of

23    the Bronx but also the relevance of the engagement process with

24    the EJTAG, the Technical Advisory Group, that Environmental

25    Justice comprises not only an impact analysis and mitigation
```

1   but also a very important part of the Environmental Justice

2   policy is public engagement.

3        So from the very beginning of this process, before the

4   draft EA was issued, the EJTAG was assembled so that input

5   could be undertaken.  FHWA participated in all of those efforts

6   as well as the project sponsors.  So that I think to suggest

7   that there was some kind of behind the scenes or backroom deal

8   with communities in the Bronx, that's absolutely not true.

9        THE COURT:  I don't think that was intimated or

10  inferred in any way.

11       MS. KNAUER:  I'm glad.  I just wanted to make that

12  clear, but it was an appropriate part of the Environmental

13  Justice effort in the process.

14       THE COURT:  Okay.  Thank you, Ms. Knauer.

15       MS. KNAUER:  Thank you, your Honor.

16       THE COURT:  We are at roughly 3:15.  We are an hour

17  behind schedule.

18       We have air quality Environmental Justice coming up, and

19  we have two hours committed to that and then roughly an hour

20  with respect to Amici.  So at that rate, we are going to be

21  here until 6:30.

22       The question is:  I can see us doing air quality and

23  Environmental Justice.  We will then have been at it quite a

24  long period of time.  We can continue and push on or we can

25  reserve Amici until first thing tomorrow morning.

1          Mr. Mastro.

2          MR. MASTRO:  Your Honor, I think it would be wonderful

3   if we did the air quality, Environmental Justice today.

4          THE COURT:  I am not suggesting that we not do it.

5   The only question is whether we do Amici today or tomorrow

6   morning.

7          MR. MASTRO:  I think it might make more sense, given

8   the late hour, that maybe we do Amici tomorrow.

9          THE COURT:  Okay.  Mr. Cumming.

10         MR. CUMMING:  No preference, your Honor.

11         THE COURT:  Mr. Chertok.

12         MR. CHERTOK:  No preference, your Honor.

13         THE COURT:  Any comment from Amici?

14         MR. OTIS:  I would appreciate it.  Thank you, sir.

15         MR. REICHMAN:  Tomorrow is fine.

16         THE COURT:  Tomorrow?  Fine.

17       Mr. Mateen, tomorrow?

18         MR. MATEEN:  Yes.

19         THE COURT:  Amici?

20         MR. OTIS:  Tomorrow makes sense, your Honor.

21         THE COURT:  That's fine.

22       Folks, a ten-minute recess.  We will be back in shortly

23   before 3:30 to begin again.

24          (Recess taken 3:15 p.m. to 3:28 p.m.)

25         THE COURT:  We will get to the meat and potatoes.

1          NEPA, air quality and Environmental Justice.

2          We have scheduled two hours, 60, 30, and 30.

3          Mr. Mastro, how do you want to break your time?

4           MR. MASTRO:   15 and ten, your Honor, please.

5           THE COURT:   Ladies and gentlemen, I will tell you that

6     we are at a hard stop at 5:29.  So I am going to give you as

7     much of your allotted time as possible.  I may have to shrink

8     you a touch.

9          If I ask you too many questions that start to extend

10    things and if I feel in any way, shape, or form that it is

11    going to cause difficulty, we may, in fact, hold rebuttal for

12    tomorrow, but I have a long-standing commitment that I cannot

13    break since it is a meeting that I am running.

14         Mr. Mastro, let us begin.

15         Are we doing air quality or Environmental Justice first?

16    Or are they so interrelated that you are just going to weave

17    your way back and forth?

18          MR. MASTRO:   We are starting with air quality, your

19    Honor.

20          I am handing up to the Court some slides.  Thank you.

21          As your Honor said, this is the meat and potatoes, but I

22    just wanted to make one last point on the topic that we were

23    just discussing and that's that Ms. Knauer referred you to an

24    appendix to the EA and said that's where the commitment is made

25    to mitigation for New Jersey.  I have read it.  I know your

1    Honor has or will.

2         The only specific reference to New Jersey or any

3    New Jersey communities, specifically, Orange, East Orange,

4    Newark, and Fort Lee, is exactly the same language that we have

5    quoted to you previously, I have, that, you know, it is a list

6    of communities that, quote, Could have census tracts that would

7    merit place-based mitigation.  Could.  That's not a commitment.

8         Let's talk about air quality, your Honor, because there

9    are many inexplicable inconsistencies in the air quality

10   analysis, and I want to get right to it.

11        Your Honor, there are five independent reasons that

12   require vacatur and remand in the air quality analysis.

13        It excluded 12 New Jersey counties.  It only studied air

14   pollution under one tolling scenario, scenario A out of seven.

15   It found pollutants will increase in all six categories in

16   Bergen County, but there is no explanation how the increases

17   will be mitigated or, alternatively, why they do not require

18   mitigation because Bergen County got none.

19        Then they do two special analyses.  They do something

20   they called a hotspot air quality analysis, cherry-picked four

21   locations in one county, a county expected to see a decrease in

22   congestion, compared to 98 other locations studied in New York.

23   Only these four in New Jersey where they expected to see a

24   decrease and saw a decrease.

25        And then on their highway link analysis, this was

1    something they did specially for Bergen County, about trucks.

2    They studied air pollution only in two categories --

3            THE COURT:  Stop, Mr. Mastro.

4            MR. MASTRO:  Yes, your Honor.

5            THE COURT:  You talk about trucks.  Do you agree with

6    the earlier colloquy about trucks and nontrucks and that the

7    focus is appropriate on trucks because of the density of the

8    particles or the higher amount of particles with respect to

9    diesel fuel, and, therefore, trucks is an appropriate surrogate

10   for this analysis?

11           MR. MASTRO:  I don't agree that it is a complete

12   substitute for this analysis.  There are communities where

13   vehicle miles traveled will increase, but they focus on trucks

14   instead because they cherry-picked to get a better result.  I

15   think it is --

16           THE COURT:  The answer to my question is the fact that

17   the data analysis focused solely on trucks is unreasonable and

18   it should have had a broader focus of trucks and nontrucks.

19           MR. MASTRO:  Absolutely, your Honor.  And that's what

20   their highway link analysis was about and that's what --

21           THE COURT:  And where do you say that in your brief?

22   Where did you say that on the administrative record to the

23   agencies?

24           MR. MASTRO:  We did talk about in our brief and

25   Mr. Myers will get the cites, but we did talk about this

1    cherry-picking analysis.

2           THE COURT:  Did you raise it with the agency?

3           MR. MASTRO:  With the agency, your Honor, there was

4    back and forth on the types of analyses they had.

5           THE COURT:  Not the answer to my question.

6        You either did or you didn't.  Did you raise it with the

7    agency during the administrative process that led to the EA and

8    the FONSI?

9           MR. MASTRO:  Your Honor, I don't know whether it was

10   in our comment letter, but it was a subject of -- raised at --

11   with the agency, including by the EPA, and we provided

12   citations that when a party has raised issues in the

13   administrative record, we can argue those in Court, even if

14   they weren't specifically the ones that we raised.

15        So it was definitely raised, whether this was --

16          THE COURT:  It looks like Ms. Myers is about to hand

17   you a note, which may help you out here.

18          MR. MASTRO:  The June 23 letter, actually.

19          THE COURT:  Which was rejected.

20          MR. MASTRO:  We raised it.  We raised the hotspot

21   analysis and that it wasn't done for Bergen, that Bergen had a

22   highway link analysis.  So it was definitely raised.

23        Thank you, your Honor.

24          THE COURT:  Whether that letter should or should not

25   be in the administrative record is something we are going to

1   talk about down the road.

2            MR. MASTRO:  I'm sure we are.

3            THE COURT:  It is in the record, but the question is

4   whether it was considered by the agency or properly rejected.

5            MR. MASTRO:  We are going to come to that.

6            THE COURT:  We are going to come to that.

7            MR. MASTRO:  It was submitted on the last day that you

8   were allowed to submit to be heard.

9            Next slide, please.

10           These are -- I think we can skip over this.  Your Honor

11  knows one of these phrases already, but let's come to the

12  study.

13           There were 12 New Jersey counties that were excluded.

14  There were only two New Jersey counties included in the air

15  quality study, 12 New Jersey counties that were part of the

16  regional group but were excluded.

17           As I previously mentioned to your Honor, when it comes

18  to air quality, there were six other New Jersey counties that

19  we believe should have been included based on the data.

20           New York --

21            THE COURT:  Stop.

22            MR. MASTRO:  Yes, your Honor.

23            THE COURT:  Stop.  Let's make sure we are all talking

24  about the same thing.

25           We started with 14, correct --

```
 1            MR. MASTRO:  Yes.
 2            THE COURT:  -- somewhere along the line in this
 3  process?
 4            MR. MASTRO:  Yes.
 5            THE COURT:  All of which are in Central Jersey and
 6  above.  Correct?
 7            MR. MASTRO:  Yes.  Some of them are a little more.
 8            THE COURT:  Slightly down the shore, but we are not
 9  talking about the southern part of the state or the far western
10  part.
11            MR. MASTRO:  We are not talking Ocean, no.
12            THE COURT:  From those 14, the only two that were
13  included were Bergen and --
14            MR. MASTRO:  Hudson.
15            THE COURT:  -- Hudson even though communities that
16  were viewed as for which Environmental Justice was a
17  consideration, are contained in another county.
18            MR. MASTRO:  Correct, your Honor.
19            THE COURT:  You are saying to those two counties -- by
20  the way, no community in Hudson County was included in the
21  Environmental Justice locations.  Correct?
22            MR. MASTRO:  Correct.
23            THE COURT:  You're saying in addition to those two,
24  Bergen and Hudson, six others of the remaining ten needed to be
25  included.
```

1          MR. MASTRO:  Correct, your Honor.  That is going to

2    become readily apparent in just a minute.  I have to say they

3    have no qualms about, you know, looking at almost every

4    New York County.

5          There are 12 New York counties in the region, and they

6    analyzed air quality in ten of them but in New Jersey, only two

7    out of 14.

8          Now, this gives you a feel for what --

9           THE COURT:  The they is whom?

10          MR. MASTRO:  FHWA.  Sorry.  I didn't mean to --

11          THE COURT:  That's all right.

12          MR. MASTRO:  Please, let's go to the next slide.

13          Here we are.  This is important to see.

14          They studied -- the FHWA studied Suffolk and Putnam.

15   You can see Suffolk and Putnam in terms of level of vehicle

16   miles traveled in -- both for the coming year and through 2045.

17   You can see Suffolk goes down.  Putnam goes down quite a bit.

18   They were studied.

19          But when it comes to New Jersey, Middlesex, Monmouth,

20   and Passaic, they should have been studied.  They are going up.

21   In the first year, they all went up.  In the outer years,

22   Middlesex and Monmouth went up.  Passaic was flat, but why were

23   they excluded?  Well, they have bigger problems in terms of the

24   miles traveled increasing whereas Suffolk and Putnam don't.

25   They got included, but they didn't have that issue.

1          Next, your Honor, Essex and Middlesex have comparable

2     shares of commuters to the CBD as Suffolk and Essex, Morris,

3     Union, Middlesex, and Monmouth have more than Putnam and

4     Rockland yet they were not studied while Suffolk, Putnam, and

5     Rockland were.

6          Next, please.

7          The EPA has National Ambient Air Quality Standards.

8     This is an important indicator that has to be -- that you have

9     to attain or you have to maintain because you have been below

10    it and then you reached it, so you have to maintain.  And

11    nonattainment is a really bad thing.

12         Let's continue.

13           THE COURT:  That's slide 62.  Correct?

14           MR. MASTRO:  Yes.

15         Now we are on slide 63, which shows us attainment and

16    nonattainment.  Putnam studied was attainment in all

17    categories.  So better than all New Jersey counties because

18    every New Jersey county had some nonattainment particularly as

19    it pertains to ozone layer.

20           THE COURT:  Nonattainment meaning not meeting the

21    NAAQS standards?

22           MR. MASTRO:  Exactly.  So those are the ones that need

23    study the most.

24         Rockland and Suffolk are the same as Mercer, Middlesex,

25    Monmouth, Morris, Somerset, and Union and worse than Passaic in

1   at least one category, yet Suffolk got studied --

2            THE COURT:  So differentiated treatment across the

3   counties without an explanation as to why?

4            MR. MASTRO:  Correct, your Honor.

5        Next.  The --

6            THE COURT:  Despite the fact that different counties

7   check the boxes differently on carbon monoxide, ozones,

8   particulate matter, and sulfur dioxide?

9            MR. MASTRO:  Absolutely.  One would think for the

10  issuance of a FONSI, one would be overinclusive in the studies

11  to make sure there weren't any significant adverse impacts or

12  else you have to do an EIS.

13           THE COURT:  Well, that's the hope for, but not

14  necessarily required.

15           MR. MASTRO:  Your Honor, I think that they're -- when

16  you're presented with data that may present significant

17  impacts, you have to study it.

18       If there may be significant impacts, that's what court

19  after court has said, you better do your EIS.  You can't do a

20  FONSI.

21       Next, the FHWA did not study air quality impacts in

22  74 New Jersey census tracts and excluded counties expecting VMT

23  increases and worsening air quality.

24       There are all the ones listed, all of those counties.

25  Double hit.  Didn't study them.

1          Next.

2              THE COURT:  So does this presume that you're okay with

3     the study on the basis of census tracts, as opposed to city --

4     city blocks?  Census blocks?

5              MR. MASTRO:  No, your Honor.  We will come to that

6     when we get to Environmental Justice Communities.

7              THE COURT:  Okay.

8              MR. MASTRO:  It's not -- it's not the case that

9     New Jersey said we do census blocks.  They said you should use

10    our definitions --

11             THE COURT:  Tools.

12             MR. MASTRO:  -- and tools, and you didn't use ours.

13    And you would have found on blocks that -- they are measurable,

14    your Honor, so -- but I will come to that.

15             THE COURT:  So you're saying accepting what they did

16    and applying that here is the result and it shows 74 -- 74

17    tracts were not studied.

18             MR. MASTRO:  Correct.  Yes, your Honor.

19        Next.

20             Now, they only looked at one scenario, scenario A.  All

21    right.  Look at those other scenarios, B, C, D, E, and F.  In

22    all 14 New Jersey counties up, up, up, up, up in the VMT.

23             Now, they say they chose scenario A because it would

24    result overall in the smallest reduction of VMT and have the

25    lowest beneficial effect on regional air quality.  That's when

```
 1   you look at New York.
 2        When you look at New Jersey, it is up, up, up, up, up in
 3   every other scenario.  Except for G.
 4        Next.
 5            THE COURT:  Well, but let's take that.
 6        All right.  So we're talking about millions of vehicle
 7   mileage tracking.  Right?
 8            MR. MASTRO:  Yes, we are, your Honor.
 9            THE COURT:  We will start with the two numbers, 97.
10   So we're talking about 97 million.  Correct?
11            MR. MASTRO:  Yes, your Honor.
12            THE COURT:  So we are talking about a gradation,
13   right, with respect to 97 million; and it is a range of
14   somewhere between 590,000, right, and 700 -- it looks like
15   68,000.  97 million 594 under -- or 590 under scenario B, all
16   the way up to 97 million 768 in scenario F.  All right?
17        So we have a low end and a high end, but it's all
18   97 million.  Right?  And it is within what appears to be about
19   174,000 miles.  All right?
20        So if you start with 97,594 -- or 590, I'm sorry -- at
21   the bottom and the top is 97,768, so that's ten, plus 100,000,
22   plus 68.  It's 178,000 miles.
23        Out of 97 million, you are saying to me that that is a
24   significant percentage deferential that somehow or other makes
25   scenario A -- disqualifies scenario A.
```

1          Aren't they close enough in range that, you know,

2    scenario A is a reasonable representative of that range?

3          MR. MASTRO:  Your Honor, I actually read it a little

4    differently.

5          THE COURT:  So educate me, please.

6          MR. MASTRO:  So I am looking, your Honor -- this is

7    for 2023 that your Honor is reading.  The miles are going to go

8    up by 2045.  They are going to go up.

9          THE COURT:  To 100 -- so they're going to go up

10   10 million.

11        Or almost 11 million.

12        MR. MASTRO:  Right.

13        THE COURT:  And that you're saying is a significant

14   enough differential --

15        MR. MASTRO:  Correct.

16        THE COURT:  -- to warrant looking at other scenarios.

17        MR. MASTRO:  Correct, your Honor.

18        THE COURT:  Okay.

19        MR. MASTRO:  All right.  Now, next, your Honor, let's

20   keep going.

21        There is an argument that the two counties that were

22   chosen for New Jersey were because one had the biggest increase

23   in VMT.  One had the biggest decrease in VMT.

24        But, your Honor, what about Bergen County?  There we are

25   again.

1          Go.

2          Bergen County compared to the Bronx, up, 2023, in every

3  category.

4          The Bronx is not up, even if it had pre-existing

5  conditions in some categories, it is not up anywhere near what

6  Bergen County is.

7          Please, next.

8          By 2045, you know, three times more.

9            THE COURT:  Slide number?

10           MR. MASTRO:  68, your Honor.

11         Three times more by 2045 in Bergen than the Bronx.

12         Let's just go through some particular pretty bad adverse

13  environmental impacts.

14         On 69, carbon monoxide and particulate matter 2.5.

15  Three times greater than in the Bronx, Bergen County.

16         70, nitrogen oxide.  Actually, the slide says four times

17  greater.  It is really more like six times greater than the

18  Bronx.  No committed mitigation funding.

19         Bergen County will experience increases -- next slide --

20  in average daily traffic two to four times greater than the

21  Bronx, depending on the scenario, yet received no committed

22  mitigation funding.

23         And of 102 total hot spots studied, the FHWA

24  cherry-picked only four in New Jersey, all from Hudson, all

25  expect ing less traffic and improved air quality.

1          Next slide, please.

2          Now, you can -- you can see there are lots of hot spots,

3    but they only looked at this -- these four in Hudson.

4          Next.

5          On air quality impacts, there is 104 New Jersey census

6    tracts expecting to see increases in vehicle miles traveled.

7    And worsening air quality, not studied.

8          The special highway link analysis for Bergen County,

9    also skewed.  There, they chose to do -- instead of tolling

10   scenario A, they chose tolling scenario C.

11         Well, let's go to the next slide.

12         But it is actually tolling scenario A for Bergen that is

13   the worst case scenario, yet they switched to C.  There are no

14   explanations provided for why they -- back and forth on

15   scenarios and this effort to get around Bergen County.

16         THE COURT:  So help me out here.  All right.  You are

17   pointing out these.

18         They are nice taglines.  All right.

19         MR. MASTRO:  Yes, your Honor.

20         THE COURT:  Talk to me about what this means relative

21   to what I have to decide.

22         All right.  What are you saying to me, Mr. Mastro?

23         Are we talking about problems in reasoned

24   decision-making?  Are we talking about somehow or other

25   inconsistency in the basis of the evaluation of the data

1   because there is a shift from one scenario to another?

2        Again, Mr. Mastro, I remind you, you want an outcome

3   from me.  You have got to give me the path to get there in

4   light of the buckets that we talked about and the standards

5   applicable.

6        These are nice taglines.

7        What do they mean in terms of what you want me to decide

8   and where the weaknesses are that lead me to a conclusion that

9   the EA and/or the FONSI are not reasoned decision-making or

10   they fail to account for certain things.

11        MR. MASTRO:  Every one of these slides goes to whether

12   these were reasonable decision-making and whether the carve out

13   and the choices that were made were arbitrary, capricious, and

14   irrational given the data.

15        So we have not just used the tagline title.  We have

16   given you exactly where it is in the EA data proving that it

17   made no sense not to have looked at certain counties, not to

18   have looked at certain census tracts, not to have looked at

19   Bergen County.

20        THE COURT:  All right.  Let's talk about this for a

21   minute.

22        This data is from the final EA?

23        MR. MASTRO:  Absolutely, in every respect.

24        THE COURT:  Okay.

25        MR. MASTRO:  Ms. Myers is confirming.

1          THE COURT:  When you became aware of this data and

2     inconsistencies, did you have an opportunity to raise these

3     with the FHWA, and did you do so in a manner that put them on

4     notice that there were comments that you made that potentially

5     needed to be addressed because you found fault with their

6     decision-making?

7          MR. MASTRO:  Yes, your Honor.

8          Both the EPA and the EPA's comments, we can piggyback

9     on.  You have a right to raise those points.  And

10    Governor Murphy in letters on September 22, 2023, and June 12,

11    2023, let's go to -- well, we are already ahead of me.  Here we

12    are.

13         THE COURT:  Let's just -- let's -- stop.

14         Those are two letters.  Were they both -- did they --

15    you're representing to me that those comments or those letters

16    spelled out these concerns?

17         These deficiencies?  Correct.

18         MR. MASTRO:  Yes.

19         THE COURT:  Were both letters accepted?  Rejected?

20         Let's make it clear.

21         We have two letters.  I know one letter was rejected

22    because it was -- the other one was accepted?

23         MR. MASTRO:  Absolutely, your Honor.

24         THE COURT:  Okay.

25         MR. MASTRO:  It was written after the draft.

```
 1            THE COURT:  Right.
 2            MR. MASTRO:  And before the final September 22,
 3   2023 -- '22.  '22, there is a typo in this slide.
 4            THE COURT:  That's what I thought.  That's why I got
 5   confused.
 6            MR. MASTRO:  It's my fault.  I will take the typo on
 7   me.
 8            THE COURT:  All right.  So the draft is in September
 9   of 2022.
10            MR. MASTRO:  Yes.
11            THE COURT:  This is the EA we're talking about.
12   Correct?
13            MR. MASTRO:  Yes.
14            THE COURT:  And the final is issued in June of 2023.
15            MR. MASTRO:  Yes.
16            THE COURT:  Your client, the governor, submitted a
17   comment letter -- they submit -- you submit one comment letter,
18   right, early on?
19            MR. MASTRO:  Yes.  Yes, your Honor.
20            THE COURT:  You submitted a second one, which is the
21   one that's in controversy that we're going to talk about.
22   Correct?
23            MR. MASTRO:  We are going to talk about that, your
24   Honor.  Yes.
25            THE COURT:  And it is clear from the first letter that
```

1   you raised these concerns.

2           MR. MASTRO:  Yes.

3           THE COURT:  So they're properly before the agency.

4           MR. MASTRO:  Completely right, your Honor.  Look at

5   what we are talking about, new traffic patterns, new traffic

6   patterns, air quality analyses show negative results.

7           THE COURT:  Well, so we are talking about slide number

8   79.  Correct?

9           MR. MASTRO:  Number 81, your Honor.

10          THE COURT:  Okay.  Again, helpful to identify what we

11  are talking about because I have 72-year-old eyes, as described

12  in one article.  And since we're at about 12 font on the

13  screen, I need to know what slide we're on.

14          MR. MASTRO:  Yes, your Honor.  We're on --

15          THE COURT:  We're on slide 81.

16          MR. MASTRO:  We're on slide 81.

17          And your Honor will see on slide 81, it talks about the

18  air quality analyses showing negative results in New Jersey.

19  It talks about all sorts of toxins and increases and decreases

20  in Bergen and Hudson, and then potential adverse air quality

21  effects and truck avoidance to the CBD.

22          And up top, earlier on it talks about the new traffic

23  patterns potentially having environmental impact on air and

24  noise in other areas.  More than enough notice for the EPA to

25  know -- I mean for the FHWA to know they need to do that.

1          And, your Honor, I just have to correct one thing.  They

2     didn't reject the Governor's June 12, 2023, letter.  They

3     couldn't reject it because it was submitted within the period

4     -- the FHWA provided for submitting additional information

5     before they issued the final FONSI.

6          So it will be interesting to hear how they think there

7     is something wrong with actually submitting a letter before the

8     final FONSI -- within the date period they specified you could

9     submit comments, including June 12, 2023.  We will come back to

10    that.

11         Now, your Honor, let's look at the EPA letter, too,

12    because EPA put them on notice of all of this.

13         This is slide 78.

14         EPA more robust air quality modeling to assess localized

15    project impacts.  Exactly what we are talking here about, all

16    of those census tracts, insufficiency of data.  EPA unable to

17    confirm impacts.  EPA remains concerned about the potential for

18    adverse air quality impacts on communities in areas outside the

19    CBD, Bergen County.  Appropriate mitigation be identified to

20    ensure adverse impacts are less than significant.  More

21    screening on a micro scale basis.  Additional intersections to

22    encompass all localities.

23         Your Honor, they could not have been on more notice to

24    do a more robust air quality analysis along the lines we have

25    just discussed.  And their own data shows the irrationality of

1    the choices made, the cabining.  It wasn't a hard look at those

2    impacts in New Jersey focusing on only two counties and only

3    limited areas there.

4           Next we're going --

5             THE COURT:  Slow down.

6           Accepting that the letter, the June letter, gave the

7    Federal Highway Administration appropriate notice of the

8    concerns from the State of New Jersey?  Are you saying to the

9    Court that when the final EA issued, that the FHWA did not

10   explain in that document the concerns raised candidly by your

11   client or perhaps anyone else.  We will just stay focused on

12   your client, did not explain why the -- the facts contained in

13   your letter which theoretically detracted from their

14   decision-making, you're saying to the Court they did not

15   reasonably address that detracting material?

16            MR. MASTRO:  Yes.

17          Now, if we can go on to Environmental Justice.

18            THE COURT:  We can go on to Environmental Justice.

19            MR. MASTRO:  Thank you, your Honor.

20            THE COURT:  You learned.

21            MR. MASTRO:  I did, your Honor.

22            THE COURT:  Answer a question --

23            MR. MASTRO:  I did.  I did.

24            THE COURT:  -- with one word.

25            MR. MASTRO:  This is educational for me today as well,

1   thank you.

2        Your Honor, when it came to Environmental Justice

3   Communities there are two issues.

4        THE COURT:  Hold, Mr. Mastro.

5        Okay.  You may continue, Mr. Mastro.  Environmental --

6   hold on.  Let me look.  I may have a question.

7        You know what, I will save my couple of questions until

8   after -- oh, no. Hold on.  Let's do this now.

9        So, Mr. Mastro, one critical area of dispute appears to

10  be the relevance of the NAAQS compliance in the FHWA's air

11  quality analysis.

12       MR. MASTRO:  Yes.

13       THE COURT:  In your view, as an agency finding that

14  the project would not cause exceedances of the NAAQS,

15  sufficient to justify an agency conclusion that there would be

16  no significant impact?

17       MR. MASTRO:  No, your Honor.  Because you will have to

18  look on a regional -- on a regional basis and when you look at

19  New Jersey, there is not compliance with the NAAQS in any of

20  the counties.

21       THE COURT:  Okay.  Given the fact that you responded

22  no, how do you respond to defendant's argument highlighting,

23  quote, Nearly unanimous agreement in the case law that federal

24  agencies may rely on NAAQS compliance to conclude that human

25  health will not be seriously affected by a transportation

1   project and we are quoting -- they quoted the *Sierra Club* case

2   from 2018 from in the district court in Colorado.

3          MR. MASTRO:  I am not challenging case law, your

4   Honor, I'm challenging the -- they couldn't have rationally

5   reached that conclusion as to New Jersey given that there

6   wasn't mass compliance with any county in New Jersey.  So, it's

7   an irrational conclusion to reach about part of the region that

8   had to be studied by sort of sweeping it under the rug as if

9   it's, you know, part of ten counties in New York and only two

10  in New Jersey that are considered.  When you look at all of the

11  New Jersey counties they don't have NAAQS compliance at all.

12  They are all missing the ozone layer and many of them missing

13  other categories.

14          THE COURT:  All right.

15          MR. MASTRO:  It just isn't a rational conclusion.

16          THE COURT:  Okay.  To the extent that you maintain

17  that the NAAQS are but one factor in the analysis of

18  significance, can you -- can you point the Court to any case in

19  which the FHWA has concluded that a project would not exceed

20  the NAAQS but, nevertheless, the agency found a likely

21  significant impact?

22          MR. MASTRO:  Well, your -- your Honor, you are saying

23  that here they found -- you met the NAAQS, but yet they found

24  significant impacts in parts of New York.

25          So I guess you can do that.  Right?  So I don't think

1    that's inconsistent with the case law.

2        The significant impacts whether or not there is

3    compliance with the NAAQS, there are many environmental factors

4    that one considers and many pollutants that one considers.  I

5    don't consider that argument to really address many of the

6    concerns that we have raised about what the data shows about

7    New Jersey and its disparate treatment vis-á-vis New York.

8        Your Honor --

9            THE COURT:  Okay.  Go on.

10           MR. MASTRO:  Thank you, your Honor.

11       Let's put up slide 84 real quick.  Come on.  84, please.

12   Thank you.

13       Your Honor, the FHWA did not fulfill its mandate both in

14   terms of methodology because it didn't accept New Jersey's

15   methodology.  It decided -- it decided that it was going to

16   have its own methodology and not a -- and said we should just

17   have standards across the board.

18       But New Jersey --

19           THE COURT:  Well, wait you're saying they defined

20   their own methodology out of the air?

21           MR. MASTRO:  No, they came up with a different

22   methodology than either New York or New Jersey specifically

23   uses.

24           THE COURT:  Are you saying that they don't have the

25   discretion to do that?

1          MR. MASTRO:  We're saying, your Honor, that I think it

2     would have been a reasonable course and New Jersey said this,

3     is to use New Jersey's Environmental Justice criteria and

4     mandates in New Jersey.  You use New York's in New York.  The

5     FHWA rejected that.

6          THE COURT:  Is there case law or administrative

7     precedent to support that proposition?

8          MR. MASTRO:  There -- there is, your Honor, case law

9     that talks about whether the analysis is -- is adequate under

10    the circumstances.  It is an unusual circumstance.

11         THE COURT:  We are not talking about adequacy of the

12    analysis.  We are talking about a choice of methodology.  The

13    question is:  Does the agency maintain the discretion to make a

14    choice of methodology?  Or are you saying to the Court that the

15    agency is required in a situation where there are border states

16    to use the methodology propounded that's appropriate under -- I

17    assume you are talking about the SIP for New Jersey for one

18    state and the SIP methodology for the other state.

19         Are the FHWA hands tied?  Do they have any discretion?

20         MR. MASTRO:  The FHWA's hands are not tied.  But they

21    have to document their analysis and why they made that choice.

22    And I respectfully suggest they didn't do that.

23         THE COURT:  And you're saying to the Court that they

24    didn't justify --

25         MR. MASTRO:  Correct, your Honor.

1          THE COURT:  No -- that lacked reasoned decision-making

2   to support the methodical choice that they made and applied?

3          MR. MASTRO:  Correct, your Honor.

4       And New Jersey --

5          THE COURT:  Only as to New Jersey or as to both

6   states?

7          MR. MASTRO:  New Jersey complained about it, your

8   Honor.

9          THE COURT:  Okay.

10          MR. MASTRO:  I don't know whether New York did or not.

11          THE COURT:  Fine.

12          MR. MASTRO:  Now, let's go to slide 90.

13       Now we have to talk about, you know, how the study was

14   done and why it was unreasonable and irrational in many

15   respects, just like the air quality.

16          THE COURT:  So, we are talking about application of

17   the methodology?

18          MR. MASTRO:  Correct, your Honor.  Correct.

19       Your Honor, the FHWA chose for the Environmental Justice

20   study area, you know, to look at four New Jersey counties out

21   of 14 only 28 percent from the regional study.  Whereas in

22   New York, once again, they did a lot more in New York.  They

23   did six out of 12, 50 percent.

24          THE COURT:  They are allowed to differentiate in your

25   view, choose one set of counties for air quality and another

1    set of counties, even though there may be overlap, for

2    Environmental Justice?  Or are you saying to the Court they

3    must be consistent in both --

4            MR. MASTRO:  I am saying --

5            THE COURT:  In their choices?

6            MR. MASTRO:  I am saying that they have to have, you

7    know, reasonable rationales for doing that and the slides that

8    will follow and the data that comes out of the report I think

9    will show you it was irrational.

10           Please.  Okay.

11           THE COURT:  No, but answer my question, Mr. Mastro.

12           All right.  You've brought to the Court's attention and

13   are maintaining that the use of two counties in the air quality

14   study was unreasonable.  Right?  You said they should have

15   added more, six more.  Right?

16           MR. MASTRO:  Yes, your Honor.

17           THE COURT:  And now in -- in this circumstance, they

18   upped it from -- from two to four.  You're saying to me that

19   they should have added more counties.  Correct?  And,

20   therefore, even four is unreasonable here.

21           MR. MASTRO:  Correct, your Honor.

22           THE COURT:  Now, assuming, assuming for the sake of

23   argument, right, that they used the same number of counties

24   in -- stop.  Actually different question.

25           My question is:  Assume they did eight in one and six in

1   another, and they chose to use a different number, are you

2   saying to me that they need to be consistent, either the case

3   law, the statutory or regulatory scheme or past practice

4   requires some consistency so there can be apples to apples

5   comparisons?  Right?  So if they choose X number in one

6   circumstance, do they by necessity have to choose that same

7   number in the second circumstance?  Or do they have the

8   discretion to vary the number?  And what you're concerned about

9   is they didn't pick the right number?

10          MR. MASTRO:  Your Honor, what I am concerned about is

11   not whether they had discretion to decide eight versus ten or

12   six versus eight.

13       I am saying they made irrational distinctions to

14   overstudy in New York and leave out New Jersey counties and

15   communities and census tracts that are Environmental Justice

16   Communities in New Jersey counties that have worse consequences

17   than New York.  You have to go with the data.

18          THE COURT:  So you're saying the number selection has

19   to be based upon the facts and circumstances presented in each

20   state.  And so it is okay for them to pick one number from

21   New York and a different number from New Jersey, one could be

22   higher or lower than the other.  Correct?

23          MR. MASTRO:  I am saying they don't have to pick the

24   same number from each, but I am saying, your Honor, in no

25   uncertain terms that you have to go with the data.  There has

1  to be a rationale.  There has to be reason.  There has to be

2  the hard look.  And when the data shows you there are more

3  New Jersey counties that have -- have Environmental Justice

4  Community census tracts and they have worse impacts, but you

5  studied New York counties anyway that don't, and -- or to the

6  same level, but you exclude New Jersey counties, you haven't

7  possibly done the deep dive you need to do to honor, the legal

8  obligations.

9          THE COURT:  So you're saying the FHWA did not explain,

10  again, back to the standard, did not reasonably explain the

11  differentiation given the data?

12          MR. MASTRO:  Correct, your Honor.

13      Why they cherry-pick only those four counties and then

14  ended up only considering three for Environmental Justice.

15      Your Honor, again, it is the same counties.  Traffic

16  volumes increase in Middlesex, Monmouth, and Passaic.

17          Essex and Union have their unique issues.  They were not

18  included in the air quality explanation.  The EA does not

19  explain why only Bergen and Hudson were included other than to

20  say one had the biggest increase and one had the largest

21  decrease, but there are other counties in between who the

22  ramifications of this from an Environmental Justice standpoint

23  and air quality standpoint have more severe impacts than

24  New York counties that were studied.

25          Next slide, please.

1          This just gives you a feel for the Environmental Justice

2     tracts.  Every one of those counties has Environmental Justice

3     census tracts.

4          Thank you.

5          Here we are.  Here we are looking at the counties, if I

6     may approach.

7          There you are.  You have Passaic.  It's got 58 percent

8     minority, 32 percent low income.  Middlesex, Mercer, 50 percent

9     minority, 56 percent minority.  They, in some cases, are larger

10    minority populations than counties that were chosen, Bergen,

11    for example.

12         Next.

13         Went over this before, the scenario was chosen for truck

14    travel.  It is not the worst case scenario for Bergen.  It is

15    actually number D.

16         Next.

17         Your Honor, pre-existing health burdens in these

18    New Jersey Environmental Justice Communities, the EA failed to

19    adequately account for high traffic diversions, which will

20    exacerbate those pre-existing health burdens in New Jersey

21    Environmental Justice Communities, and you can see on this page

22    they are reported in so many major areas.

23         Next.

24         We discussed this before.  They chose to look at tolling

25    scenario A, even though three other tolling scenarios show

1    greater impacts.

2         Next.

3         THE COURT:  Towards the mic a little bit, please.

4         MR. MASTRO:  Certainly, your Honor.

5         The -- we have -- we started the analysis.  The EA

6    reports on -- to try and narrow the field, to narrow the number

7    of New Jersey communities that it would even consider further

8    from mitigation.  It goes through a series of steps to try and

9    reduce the number of communities to consider and then it

10   doesn't really allow for any explanation as to how it got from

11   15 to four.

12        Here we are.  Essex, Hudson, and Union, now we are not

13   even considering one of the four counties originally that they

14   were going to talk about.

15        Go ahead.

16        Here we are.  In every category that the -- they started

17   with 66 percentile in chronic disease and 80 percentile in

18   existing pollutants.  They looked at truck volume traffic up in

19   every category, but that yielded 15 New Jersey communities.

20   Didn't look at any of those other counties where they have

21   large minority populations, large low income populations, more

22   than Bergen.  Didn't look at any of those.  So this is an

23   incomplete list, irrational list to begin with, but now we are

24   down to these 15.  On that basis, lower levels of pollutants

25   and chronic disease.  So they upped the ante.

1        Go ahead, please.

2        They upped the ante to 90 percent.  If you are above the

3   90th percentile on pollutants pre-existing or chronic disease

4   pre-existing, you may need mitigation.  They have the truck

5   volume, but it is the same 15 places.

6        So they meet the criteria of above the 90th percentile

7   in pollutants or chronic disease, all 15.  They meet the truck

8   traffic issue.  They all go up in truck traffic.  Some of these

9   cities go up much more in truck traffic.  They all have census

10  tracts that qualify as an Environmental Justice Communities.

11  We talked about this before.  There are 30 of them just there,

12  but there are dozens more in New Jersey in other counties that

13  weren't considered even though truck volume will go up and they

14  are in the high percentages on -- high percentiles on

15  pollutants and chronic disease.

16       Next.

17          THE COURT:  Hold on.  Go back one second, please.

18       What slide are you talking about?

19          MR. MASTRO:  We were on slide 101, your Honor.

20          THE COURT:  I got it.

21          MR. MASTRO:  Thank you, your Honor.

22       Now we come to the conclusion.  They keep moving the

23  needle to try and get to their conclusion and then they get it

24  down to the four.  They just -- I don't quite understand why

25  when 15 met those criteria.  They don't explain it.  So that's

1  a problem.  They limited it the county areas too much.  That's

2  a problem.  These are all irrational, unreasonable choices, not

3  the hard look that needs to be made.  But now we're down to the

4  four Environmental Justice tracts.

5        What about Bayonne?  Bayonne was listed as one of the

6  ones that may need mitigation.  Bayonne has more Environmental

7  Justice tracts than all of those other four except for Newark,

8  and its daily truck traffic is six percent higher than any of

9  those four.  And, you know, now with cherry-picking and moving

10  the needle, they are down to just those four and Bayonne is

11  out.

12        What is the explanation for that?  I would like to hear

13  when they get up here, them tell you what the explanation is

14  for that.

15        Your Honor, we believe that it was unreasonable,

16  arbitrary, and capricious for the final EA to assess

17  pre-existing pollutants or chronic disease levels at levels

18  above 90 percent that included 15 New Jersey communities with

19  Environmental Justice census tracts from those three counties,

20  not looking at any of the other counties and not give any

21  distinguishing rationale why only four communities out of -- in

22  those three counties are, you know, said to be in a position of

23  could potentially merit place-based mitigation.

24        That is the quote, could potentially, quote, merit-based

25  place mitigation without distinguishing among those 15

1   explaining why and then to not provide any actual mitigation

2   measures or commitment, that includes funding, to any of those

3   four, to any of those 15, to any of the many other New Jersey

4   communities where we showed you they have census tracts that

5   constitute Environmental Justice Communities.  It is an

6   irrational process to its core to try and get to a

7   predetermined outcome that there is very little of New Jersey

8   that could even potentially get mitigation.

9        Your Honor, last slide, 104, we start with an unduly

10  narrow environmental justice definition not using New Jersey's

11  method.  They only studied four New Jersey counties.  They only

12  studied the impacts on those four counties under one tolling

13  scenario.  Then they went down to three counties, and they

14  studied at the 80th percentile for pollution, 66.6th percentile

15  for chronic diseases.  They still had 15 communities left in

16  those three counties.  They moved the needle to focus on census

17  tracts that were in the 90th percentile on pollutants or

18  chronic disease burden, and then they moved the needle again to

19  focus on truck volume increases but still came up with the same

20  15 communities.

21       And, then, as far as we can tell, inexplicably,

22  arbitrarily, reduced that group to four communities that could

23  merit place-based mitigation but no mitigation was committed.

24  That is the height of irrationality.  That is not the heart of

25  what NEPA requires.

1          Thank you, your Honor.

2              THE COURT:  Don't go anyplace.

3              MR. MASTRO:  I won't.

4              THE COURT:  Are you saying that they offered no

5     explanation for why they went from 15 to four?  Or are you

6     saying that whatever the explanation was, it was unreasonable?

7              MR. MASTRO:  Your Honor, I am saying a combination of

8     both because I --

9              THE COURT:  It can't be.  They either failed to

10    explain or their explanation was unreasonable in its

11    inadequacy.

12             MR. MASTRO:  So I reserve some time for rebuttal.  I

13    believe that they did not explain how they got to four from 15

14    and provide any rational basis for doing that and that it's not

15    supported by any data.  The 15 all met the same criteria.

16             THE COURT:  Then you've answered my question.

17             MR. MASTRO:  But I will have an answer for you if they

18    get up here and try --

19             THE COURT:  Now we'll see.

20             MR. MASTRO:  -- to explain themselves.

21             THE COURT:  Okay.  Don't go anyplace.

22             MR. MASTRO:  I am not going anywhere, your Honor.  I

23    am yours for as long as you want me.

24             THE COURT:  Well, my wife might have something to say

25    about that, Mr. Mastro.

1              MR. MASTRO:  Mine too, your Honor.

2              THE COURT:  So two things you didn't cover, which is

3    the decision to utilize census tract data versus census block

4    data.  You obliquely referred to it, and so I would like you to

5    give me two minutes from the time you say you are ready to

6    go --

7              MR. MASTRO:  I am ready, your Honor.

8              THE COURT:  -- as to what your position is on

9    census tract versus census block.

10          When you get to the mic --

11             MR. MASTRO:  Yes, your Honor.

12             THE COURT:  Okay.

13             MR. MASTRO:  So, your Honor, New Jersey has a

14   management plan and a mapping tool that breaks it down even to

15   census block group, and they have been able to do that very

16   effectively.  This was made known in the review process, and

17   New Jersey's letter on June 12, 2023, made specific reference

18   to its mapping tools not being used, and we believe that that's

19   a more accurate way to drill down, and we believe that EPA, and

20   I showed you their letter, encouraged the drilling down.  In

21   fact, the FHWA has internal guidance that --

22             THE COURT:  But isn't that a methodological choice --

23             MR. MASTRO:  It is.

24             THE COURT:  -- that is left to the expertise of the

25   agency?

1          MR. MASTRO:  It is, your Honor, and it is not the

2    basis on which we are saying the whole thing should be thrown

3    out.

4          THE COURT:  So just because the census block data

5    approach might yield something, in your view, more reasonable,

6    does that make the use of the census tract data methodology

7    unreasonable?

8          MR. MASTRO:  No.  What makes the use of the census

9    tract methodology unreasonable is the dozens and dozens and

10   dozens of census tracts in Environmental Justice Communities

11   who had pollutant rates and chronic disease rates pre-existing

12   at the highest levels that weren't considered at all because of

13   the irrational cabining and narrowing.

14         THE COURT:  So you're saying the application of the

15   census tract methodology yielded an unreasonable outcome for

16   which the agency has not given you an adequate explanation?

17         MR. MASTRO:  Yes.

18         THE COURT:  On to the second question, the process of

19   choosing one screening tool over another.  Two minutes of

20   comment.

21         MR. MASTRO:  Well, your Honor, I think this is in the

22   same category.

23         THE COURT:  I think so, but I need to hear you tell me

24   it.

25         MR. MASTRO:  I think this is in the same category,

 1   your Honor.

 2        We are arguing to you that the screening -- we thought

 3   we had a better screening tool, but the screening tool --

 4        THE COURT:  Just because you think you have a better

 5   screening tool does not make the screening tool choice by the

 6   FHWA unreasonable.  Your argument is the application of that

 7   screening tool yielded outcomes that, in your view, are

 8   unreasonable.

 9        MR. MASTRO:  Completely, your Honor.  The cabining,

10   the narrowing, the inexplicable narrowing and not considering

11   anything other than four counties, then three counties, then

12   66 percent and 80 percent and then 90 percent and then truck

13   traffic.

14        THE COURT:  Okay.

15        MR. MASTRO:  It is outrageous what they did.

16        THE COURT:  I got it.

17        MR. MASTRO:  Thank you, your Honor.

18        THE COURT:  Thank you.

19   Mr. Cumming.

20        MR. CUMMING:  Thank you, your Honor.

21        I am going to go back to square one a little bit in this

22   analysis.  So if your Honor could please take a look at our

23   slide deck, and there is a slide starting with the 28 County

24   Region.  I would like to start there, if possible.

25        THE COURT:  Well, you have to give me a hand here.

```
 1            MR. CUMMING:  It is the -- I apologize, your Honor.

 2            THE COURT:  Give me the title of the page.

 3            MR. CUMMING:  28 County Region, your Honor, it is a --

 4            THE COURT:  Roughly how far in?  A quarter?  A third?

 5   A half?

 6            MR. CUMMING:  It is about a third of the way in.

 7            THE COURT:  Got it.

 8         It says DOT_0036341, Figure 4A-1 at the bottom left.

 9            MR. CUMMING:  Correct, your Honor.

10            THE COURT:  Okay.

11            MR. CUMMING:  I will be going sequentially through

12   this, so, hopefully, it will be easy.

13            THE COURT:  You got it.

14            MR. CUMMING:  As your Honor is aware.

15            THE COURT:  Hold on one second, one last thing.

16         We are talking about 30 minutes here.  So I'm

17   assuming --

18            MR. CUMMING:  Five minutes, please, for rebuttal.

19            THE COURT:  -- 25.

20         Okay.

21            MR. CUMMING:  Thank you.

22            THE COURT:  Go.

23            MR. CUMMING:  The air quality analysis here flows from

24   the traffic analysis because how much traffic there is impacts

25   the emissions from the vehicles.  So I am going to start with
```

1    traffic and work my way through some methodological building

2    blocks of the EA.

3         The EA was constructed -- the methodology was

4    constructed using this best practices model, which is the

5    federally recognized model for charting traffic changes in the

6    New York Metropolitan region.  This simulates the numbers and

7    types of journeys made on an average weekday in the region, and

8    it contains more than 61,000 roadway links, highways, local

9    streets, interstates, and freeways.  Tolls are one input into

10   the model.  So, in other words, we can plug in the tolls in the

11   project and see how the traffic changes accordingly.

12        It uses the VMT metric, which predicts aggregate

13   driving.

14        If your Honor could turn to the next page, sort of an

15   important but side point, it says traffic is projected to grow

16   in the region without the project.

17        So if you look at New Jersey, there is a 10.6 percent

18   increase in traffic that's projected from 2023 to 2045.  That

19   increase is important to putting the numbers that Mr. Mastro

20   had up on the screen in context, which your Honor was noticed.

21        The next page.

22        The project is expected to work.  It is expected to

23   decrease the number of vehicles entering the Manhattan Central

24   Business District per day.  Depending on the tolling scenario,

25   that number changes.

1          But in any event, the number of vehicles traveling from

2     New Jersey to New York is projected to decrease.

3          On the next page, your Honor, is the daily VMT per

4     scenario.

5          Now, as your Honor noted for New Jersey counties, the

6     change is relatively small.  It is 97 million under all the

7     scenarios.  It changes by 150 --

8               THE COURT:  150,000.

9               MR. CUMMING:  Give or take.

10         On the next page, your Honor, again, that translates to

11    a .2 percent change for New Jersey as a whole.  So I would

12    contest Mr. Mastro's view that the selection of one scenario or

13    another for New Jersey -- for the 14 counties looked at in the

14    aggregate is a substantial difference.

15         Same holds true, your Honor, on the next page under the

16    2045 projection.

17         Again, 107 million to about 108 million.  Again,

18    relatively small difference between the different scenarios.

19         And on the next page, your Honor, again, the same

20    .1 percent.

21              THE COURT:  Well, across the scenarios at that

22    particular point in time is relatively modest, but there is

23    more than a modest gain over the 20 -- roughly 21 or 22-year

24    period.  Correct?  From roughly 97 million and change to

25    107 million and change.

1          MR. CUMMING:  That's true, your Honor.  But, again,

2     that has to be looked at in the context of the no-action

3     alternative.

4          THE COURT:  Right.

5          MR. CUMMING:  Which also projects -- again, the no

6     action alternative is 107 million.

7          THE COURT:  Right.  So in either -- either of these

8     two slides, across the scenarios at a particular point in time,

9     there is not a great variation in the number.  It is a modest

10     percentage in differential.

11          MR. CUMMING:  Yes, your Honor.

12          THE COURT:  Okay.

13          MR. CUMMING:  The next page, your Honor, is the

14     percentage change for the VMT in 2045.

15          Again, your Honor, a -- you know, a relatively

16     insignificant difference per scenario.  Again, that's -- and

17     then I will move on here.

18          The intersection analysis that Mr. Mastro talked about

19     is on the next page.  It shows the intersections that were

20     assessed.

21          Now, Mr. Mastro is right that there are only four

22     intersections in New Jersey.  That's because the areas of

23     New Jersey where the traffic flows in and out of New York and

24     the other areas connects to highways and not local streets.

25          Now, we will talk about that in the highway link

1   analysis in a minute.

2         THE COURT:  Say that again, please.

3         MR. CUMMING:  Traffic that is entering or leaving

4   Manhattan from or to New Jersey, other than in the area of the

5   Holland Tunnel, connects to highways rather than local

6   intersections.

7         THE COURT:  Oh, I got it.

8      So you're saying that the entranceway -- when you get to

9   the toll booth -- as you approach the toll booth or as you exit

10  the Holland Tunnel, you are on surface streets, not highway,

11  when you come out of the Holland -- when you enter or come out

12  of the Holland Tunnel.

13        MR. CUMMING:  That's my understanding, your Honor.

14  That is why those four intersections were selected.

15     Mr. Mastro made the point --

16        THE COURT:  That is where the key traffic lights are

17  located, outside the Holland -- outside the Holland Tunnel.

18  Going in or coming out.

19        MR. CUMMING:  Mr. Mastro made the point that

20  difference scenarios are used.  Yes, in accordance with the

21  EA's philosophy of choosing the worst case outcome for each

22  area of analysis.

23     So for intersections, the EA used scenario D because it

24  had the highest -- it was sort of the median scenario for

25  adverse impacts overall and had the highest number of negative

1    impacts for the majority of intersections in Manhattan.

2           Then on the next page, your Honor, this highway

3    analysis.  This is sort of the third part of the traffic

4    analysis that will feed into the air quality analysis.

5           Here, Federal Highways performed a screening to find

6    highway segments with traffic increases which use scenario D

7    because it had larger peak volume increases.  And there were --

8           THE COURT:  You are on the page labeled, Highways

9    leading to Manhattan CBD.

10          MR. CUMMING:  Yes, your Honor.  Yes.

11          THE COURT:  Okay.  The page before -- the slide before

12   is Analytical approach.

13          MR. CUMMING:  Yes.  That shows how Federal Highways

14   chose the specific highway links that were assessed for

15   traffic.

16          THE COURT:  Okay.  So your -- your comments you just

17   made are at -- about the page entitled, Highways leading to the

18   Manhattan CBD.

19          MR. CUMMING:  Correct, your Honor.

20          And, your Honor, the agency looked at the three highways

21   leading to the Manhattan CBD and found there was no adverse

22   effect on traffic.

23          And this is a side point, your Honor.  I will move on.

24          THE COURT:  No adverse effect on traffic under a

25   tolling scheme.  And you used scenario D --

```
 1            MR. CUMMING:  Correct.

 2            THE COURT:  -- as the worst case scenario to determine

 3   that?

 4            MR. CUMMING:  Yes.

 5            THE COURT:  Okay.

 6            MR. CUMMING:  Now, Mr. Mastro said the final EA used

 7   scenario A when looking at the regional air quality effects.

 8   That's because scenario A was the scenario with the, I guess,

 9   worst case outcome across the region.  Okay.

10            And this is for the regional level analysis.  So we're

11   comparing aggregate decrease or increase in traffic across the

12   region with the aggregate change in emissions across the

13   region.

14            THE COURT:  So if there is a theme to what you are

15   saying to me, is that what the Federal Highway Administration

16   did in conducting its analysis when it got to the various

17   points in its analysis, it looked across the scenarios to

18   determine which one presented the worst case scenario relative

19   to the element or factor that the Federal Highway

20   Administration was considering at that juncture in its

21   analysis.

22            MR. CUMMING:  Correct.

23            THE COURT:  Okay.  Got it.

24          Proceed.

25            MR. CUMMING:  Mr. Mastro makes the point that there
```

1    were only two counties from New Jersey.

2         THE COURT:  Well, actually, let's drop back.

3         I am sorry to interrupt you, Mr. Cumming.

4         In the course of doing that, is that approach part of

5    the best practices model?

6         MR. CUMMING:  No.  The best practices model is the

7    underlying technical tool to perform that analysis.

8         THE COURT:  Okay.  So is that approach, though, of

9    switching or choosing the scenario that presents the worst

10   case, has that approach been approved somewhere, either in

11   court decisions or does it reflect a typical practice that the

12   agency has employed.

13        And if the answer to the first question is no and if the

14   answer to the second question is no, then the question is:  Did

15   the agency depart from some practice that it had in this

16   scenario?

17        So first question is:  Is there any case precedent to

18   approve this movement among scenarios in looking at the worst

19   case circumstances?

20        MR. CUMMING:  I am not aware of one.

21        THE COURT:  Okay.  Is there any past practice of the

22   agency with which this choice is consistent?

23        MR. CUMMING:  I am not aware, but I will ask and get

24   you an answer tomorrow.

25        THE COURT:  And so if the answer to the question is --

1    is no, then that implies that there was a practice and the

2    agency may well have departed here.

3         And if it did, where in the EA or the FONSI is the

4    justification or explanation for doing so?

5         MR. CUMMING:  I don't agree it departed, your Honor,

6    because of the purpose --

7         THE COURT:  Okay.  So you're saying the answer to my

8    question is there may have been no practice.  And if there was

9    a practice, the agency didn't depart.

10        But you have got to get me an answer to that question

11   because you have to ask somebody else.

12        MR. CUMMING:  As Mr. Chertok said -- and I will ask

13   the agency, your Honor.

14        But as Mr. Chertok said, NEPA analyses are one-off to

15   some degree.  And here --

16        THE COURT:  Well, they are not one-off.  So that's not

17   what Mr. Chertok said because I engaged him in the question.

18        The question was:  Are they a case-by-case

19   determination?  Right?

20        Case-by-case determination is very different than a

21   one-off.

22        One-off implies that there is a practice and there

23   was -- there was a departure.  That's not what Mr. Chertok and

24   I were talking about.

25        He fully concurred, right, that the NEPA analysis is a

1   case-by-case determination dominated by the individual facts

2   and circumstances presented.

3       MR. CUMMING:  Let me try to rephrase, your Honor.

4       THE COURT:  Be my guest.

5       MR. CUMMING:  The purpose -- the purpose of this

6   document --

7       THE COURT:  Right.  Your job is to educate me and help

8   me understand.

9       Because just like I said to Mr. Mastro, you want me to

10  get to a certain outcome, you have got to tell me how to get

11  there.  I need to be able to probe the metes and bounds, right,

12  to figure out where the strengths and weaknesses lie because

13  you want me to come out with the best possible, well-reasoned

14  decision.

15      MR. CUMMING:  Given the structure of this document, it

16  came out with a range of tolling scenarios under consideration.

17      THE COURT:  Right.

18      MR. CUMMING:  The way for this document to present

19  decision-makers and the public with the worst case outcome and

20  for -- to allow the agency to gauge that outcome and determine

21  whether there were significant impacts was to engage in a

22  resource-area-by-resource-area analysis.

23      THE COURT:  And, Mr. Cumming, don't take anything from

24  my questions that in any way, shape, or form that I've decided

25  whether that approach is reasonable or unreasonable.

1        I am trying to garner a framework in which to make my

2   decision as to whether that approach is reasonable, even if it

3   is a brand-new approach or whether it is unreasonable.

4        I have to judge it in context to what the agency may

5   have done in the past or in context of whether there is a court

6   decision that validates what the agency is doing or not.

7        I am seeking information so that I can make a decision

8   as to whether the agency's outcome here, the practice that it

9   followed, right, is reasonable or unreasonable.

10          MR. CUMMING:  Given the structure of how the document

11  was presented.

12          THE COURT:  Right.

13          MR. CUMMING:  And where the tolling scenario was, this

14  was the way to give the Federal Highways' decision-maker who

15  signed the FONSI the worst case look.

16          THE COURT:  That may be a perfectly legitimate policy

17  methodological choice.

18          MR. CUMMING:  I believe it is, your Honor.

19          THE COURT:  Okay.  And I am asking you just to help me

20  figure out whether, in fact, it was.

21       So where are we?  Vehicle miles traveled in the regional

22  study areas or are we beyond there?

23          MR. CUMMING:  Yes.  We are.  We are there.

24       No action in the scenario A, your Honor.

25          THE COURT:  Right.

1          MR. CUMMING:  Mr. Mastro questions why there were only

2    two counties included from New Jersey in the 12 counties

3    regional study here.

4          THE COURT:  Yes.

5          MR. CUMMING:  The answer is that Bergen and Hudson

6    Counties were the two poles of the New Jersey emission -- or

7    excuse me traffic outcomes.

8       So if your Honor --

9          THE COURT:  The two poles --

10         MR. CUMMING:  The highest and lowest.

11         THE COURT:  Okay.

12         MR. CUMMING:  With Bergen having the greatest increase

13   in traffic and Hudson having the greatest decrease in traffic.

14   Okay.  But New Jersey as a whole, the counties, if your Honor

15   turns to the next page, it shows New Jersey counties, the range

16   fairly narrow from, you know, .28, .25 percent on either --

17   either end, Hudson is minus 2.45, Bergen is 1.10.  They are in

18   a fairly narrow band of percentage in change in traffic.

19         THE COURT:  Right.  So Hudson has the greatest

20   diminution at 2.45 percent.  Bergen has the greatest increase

21   at 1.0 percent.  And the rest of the numbers are below one

22   percent and candid ly below .50 percent.

23         MR. CUMMING:  That's right.  The agency made the

24   reasonable decision that the decision-maker and reader could

25   extrapolate the effects of the air quality analysis and other

```
 1   New Jersey counties from those two poles, the highest and

 2   lowest given how tightly banded they were.

 3             THE COURT:  Okay.  Where are we going next?

 4             MR. CUMMING:  Next page, your Honor.

 5             THE COURT:  Mesoscale?

 6             MR. CUMMING:  Yes.  This is the emissions burden.  So,

 7   again, I'm going to get into why did the agency find there was

 8   no significant impact region wide.  Well -- well, this is why.

 9   The -- the percent difference change for emissions was, again,

10   less than one percent or one percent or less for essentially

11   every emission on this chart.

12             THE COURT:  In the year just gone by?

13             MR. CUMMING:  Correct, your Honor.  And then if you

14   look at 2045 which is on the right-hand side, it is blocked out

15   in red, we're at 1.3 percent is the highest increase.

16        While we are on this topic, Mr. Mastro made the point

17   that --

18             THE COURT:  Well, hold on a minute.

19        These are all minus numbers in each column.  Right?

20             MR. CUMMING:  Yes, your Honor.

21             THE COURT:  So you're saying that there is a decrease,

22   not an increase.

23             MR. CUMMING:  I am, your Honor.

24             THE COURT:  Okay.  All right.

25             MR. CUMMING:  Regionally the project decreases
```

1    emissions.  That's why there is no significant impact region

2    wide.  And we don't need the addition frankly -- you can reach

3    that conclusion without needing the other New Jersey counties

4    because they are banded so tightly together.  There is not an

5    outlier that's going to throw that extrapolation off.

6              THE COURT:  They are -- they are banded so tightly

7    together --

8              MR. CUMMING:  They --

9              THE COURT:  No. No. Hold on.  They are banded so

10   tightly together because of the numbers?  Or they are banded so

11   tightly together because of the geographic proximity to each

12   other?

13             MR. CUMMING:  Numbers, your Honor.

14             THE COURT:  Numbers.  In other words, they are banded

15   so tightly together within the range of numbers calculated?

16             MR. CUMMING:  You said it better than I did, thank

17   you.

18             THE COURT:  Okay.  Thank you.

19             MR. CUMMING:  Okay.  In the last part of -- let me

20   back up, your Honor, before I turn to the next slide.  Then

21   there was an analysis of intersections using the four

22   intersections in New Jersey and the others I showed you.

23             THE COURT:  I am lost.  We were at mesoscale emission

24   burdens.

25             MR. CUMMING:  I am not referring to a specific slide,

1  your Honor.

2          THE COURT:  Okay.  All right.

3          MR. CUMMING:  Apologies.  I am referring to --

4          THE COURT:  So what you are commenting on is back a

5  couple of pages where you identified the four intersections

6  outside the Holland Tunnel?

7          MR. CUMMING:  Yes.

8          THE COURT:  Okay.

9          MR. CUMMING:  Federal Highways screened all the

10  intersections including those four using what's called a

11  hotspot analysis.  That is a term of art.  It is not something

12  the agency made up.  It is agency terminology for looking at

13  emissions at -- at where vehicles are more stationary and found

14  that they all passed the screening protocol that was

15  established.  And then --

16          THE COURT:  So the agency examined all of the

17  intersections?

18          MR. CUMMING:  Yes.

19          THE COURT:  Help me understand what that means.  All

20  of the intersections where, what criteria did they use, did the

21  agency explain that?

22          MR. CUMMING:  Yes.

23          THE COURT:  Okay.

24          MR. CUMMING:  Yes, your Honor.  That's -- that's in

25  the -- both the traffic sections and in the air quality

1    sections of the EA.  Essentially the agency looked for the 102

2    intersections --

3            THE COURT:  Across all 14 counties?

4            MR. CUMMING:  Yes.

5            THE COURT:  Okay.

6            MR. CUMMING:  That were most likely to experience

7    increases in traffic and then screen those 102 versus the EPA's

8    hotspot protocol.

9            THE COURT:  Thank you for that explanation.

10           MR. CUMMING:  You're welcome, your Honor.

11        Last, the agency did the highway link analysis which

12   focused on truck traffic.  It looked, and Mr. Mastro made this

13   point about choosing scenario C, that was the scenario where --

14   and we are talking about I-95 west of the GWB.  That is the

15   worst highway location in the New Jersey county with the

16   greatest expected increase in traffic.  So sort of the -- I

17   guess you can call it exemplar for the county's traffic

18   increase.  They screened that for particular --

19           THE COURT:  For the county's traffic increase meaning

20   Bergen County?

21           MR. CUMMING:  Correct, your Honor.

22           THE COURT:  Okay.

23           MR. CUMMING:  They screened that location against the

24   particulate matter, national air quality standard, the NAAQS

25   and found it passed the NAAQS.

1          THE COURT:  So they screened that location.

2          MR. CUMMING:  Yes.

3          THE COURT:  Meaning some point just west of the toll

4    plaza area from the GW Bridge that is at the gateway to Bergen

5    County?  Or someplace further west of that point whether it is

6    a mile, two miles, three miles down the road?

7          MR. CUMMING:  It is further west, your Honor.

8          THE COURT:  Okay.

9          MR. CUMMING:  I don't know -- there is a map that

10   shows specifically where it is.

11         THE COURT:  Okay.  But it is beyond the confines of

12   the borders of Fort Lee?

13         MR. CUMMING:  I believe the location is within Fort

14   Lee, your Honor.

15         THE COURT:  Okay.  Then that is not miles down the

16   road.

17         MR. CUMMING:  Okay.

18         THE COURT:  But that's okay.  It is probably where

19   there is the intersection of the variety of roads and exit

20   ramps.

21         MR. CUMMING:  Then in that Environmental Justice, if

22   your Honor can turn to three slides down.

23         THE COURT:  Well, let's hold for 30 seconds.  Okay.

24   We will turn to Environmental Justice, thank you, Mr. Cumming,

25   for your indulgence.

1          MR. CUMMING:  If your Honor sees the slide that says
2    "Environmental Justice study area."
3          THE COURT:  Yes.
4          MR. CUMMING:  So that's the study area of ten counties
5    included for Environmental Justice.  Mr. Mastro takes issue
6    with that.
7          THE COURT:  Now we are at a different number?
8          MR. CUMMING:  We are.
9          THE COURT:  Right?  We started solely in New Jersey.
10   Right?  You know, theoretically across the region we started
11   with 28.  In New Jersey there is 14.  Now we're down to a
12   number less than 14.
13         MR. CUMMING:  We are.
14         THE COURT:  We are down to ten.
15         MR. CUMMING:  We are.
16         THE COURT:  Okay.  And I assume that there is some
17   basis and explanation for how we got from 14 to ten.
18         MR. CUMMING:  This is geographic location, your Honor.
19   These are the -- these are the New Jersey counties closest to
20   the central business district.  And --
21         THE COURT:  So that is an explanation.  That is based
22   on data for why they were chosen.
23         MR. CUMMING:  And the reason is, your Honor, the
24   Environmental Justice analysis doesn't only look at air
25   quality.  It looks at economic impacts on low income drivers.

1          So proximity to the central business district is

2     important to that analysis because you are looking at the

3     effect of tolls on low income drivers who have to travel into

4     the city for work.  That is why they chose that geographic

5     location among other factors.

6          THE COURT:  Okay.

7          MR. CUMMING:  Your Honor, turn to the next page, this

8     shows the Environmental Justice census tracts and the entire

9     region.  On the next page, then zooming in more specifically on

10    New Jersey.  I apologize.

11         THE COURT:  It seems to me that we are looking,

12    Environmental Justice census tracts, there is clearly a

13    significant concentration across the ten counties enumerated.

14    I guess the question is there seems to be a significant

15    concentration in the counties other than the ten enumerated.  I

16    guess that leads to the question of, okay, why were they

17    discounted.

18         MR. CUMMING:  They weren't, your Honor.

19         THE COURT:  And I am assuming that the answer to that

20    question is because they were not in close proximity to

21    Manhattan.

22         MR. CUMMING:  They weren't discounted, your Honor.

23         THE COURT:  They weren't?

24         MR. CUMMING:  I am glad you asked.

25         If you turn two slides later where it says,

1    "Environmental Justice impacts under all tolling scenarios."

2         THE COURT:  Yes.

3         MR. CUMMING:  The bottom highlighted in red in

4    New Jersey and Long Island counties Environmental Justice areas

5    would experience similar or deeper reductions in VMT compared

6    to non-Environmental Justice areas for all tolling scenarios.

7         THE COURT:  In English, what does that mean?

8         MR. CUMMING:  It is essentially a disparate impact

9    analysis, your Honor.  So they looked at -- Federal Highways

10   looked at Environmental Justice Communities versus

11   non-Environmental Justice Communities and compared how traffic

12   would -- would change in each.  If your Honor turns to the next

13   page, you asked whether the other New Jersey counties were

14   discounted from this analysis.  They were not.  This includes

15   all 14 New Jersey counties.  And this is the change in

16   Environmental Justice census tracts showing between zero and .2

17   percent increase in traffic.

18        THE COURT:  So, again, what's something -- something

19   appears to be clearly below a half a percent.

20        MR. CUMMING:  Yes.

21        THE COURT:  So not wanting to put words in your mouth,

22   but what I am likely to hear from you is not a significant

23   impact.

24        MR. CUMMING:  When you look at the next page, your

25   Honor, you asked me earlier today how they compare to

1    non-Environmental Justice census tracts.  This is a zero to 2.2

2    increase for a non-Environmental Justice census tracts.  In

3    other words --

4              THE COURT:  So relatively similar.

5              MR. CUMMING:  No disparate impact.  Now, Mr. Mastro

6    brought up comments from the EPA.  They were addressed by doing

7    the local census tract level truck traffic increase analysis

8    that we talked about with respect to mitigation.  And that

9    was -- that was the specific local Environmental Justice

10   analysis that led to the identification of the mitigation

11   communities.  So there's two parts of the Environmental Justice

12   analysis.  The state conflates them.  There's the regional,

13   what I will call disparate impact analysis, we just talked

14   about.  And then there is the local census tract level

15   screening to identify communities that could experience truck

16   traffic increases.

17             THE COURT:  Okay.  Anything more?

18             MR. CUMMING:  A few quick points, your Honor.  And

19   then I'll --

20             THE COURT:  I'm sorry?

21             MR. CUMMING:  A few quick points, your Honor --

22             THE COURT:  Yes, sir.

23             MR. CUMMING:  When talking about methodology, this is

24   an area where the Courts have consistently referred to

25   expertise and judgment.  As I just walked through, the

1   methodology here was based on Federal Highways' expertise using

2   standardized models.  We would ask the Court to defer to it.

3            THE COURT:  Okay.

4            MR. CUMMING:  Mr. Mastro brought up census tracts

5   versus census blocks.

6            THE COURT:  Well, the Court brought it up and asked a

7   question.

8            MR. CUMMING:  The Third Circuit has found as of three

9   months ago that use of census tracts pursuant to CEQ guidance

10  is reasonable.  Same goes for the screening tool.  Mr. Mastro

11  wonders how did we get to the 90th percentile for screening

12  Environmental Justice census tracts for mitigation.  Well,

13  that's using a screening tool provided by this council on

14  environmental quality, the national expert in NEPA.

15           THE COURT:  You will give my clerks the Third Circuit

16  cite.

17           MR. CUMMING:  It is *Trenton Threatened Skies*.  It is

18  in a brief in a number of locations.

19           THE COURT:  Okay.  Thank you.

20           MR. CUMMING:  Similarly as the Third Circuit said in

21  2012, NEPA does not require maximum detail.  It requires

22  agencies to make a series of line drawing decisions based on

23  the significance and usefulness of additional information.  The

24  agency, as I believe I walked through, did that here.

25           THE COURT:  So, Mr. Cumming, what you outlined here in

1   some form or fashion is spelled out in a reasonably discernible

2   manner in the documents in the administrative record, most

3   likely in the EA?

4           MR. CUMMING:  Yes.

5           Chapter 4 on traffic, chapter 10 on air quality, chapter

6   17 on Environmental Justice --

7           THE COURT:  And highlights many of these --

8           MR. CUMMING:  -- say what I --

9           THE COURT:  -- same --

10          MR. CUMMING:  -- say what I said here today.

11          THE COURT:  Okay.

12          MR. CUMMING:  Appendix 17D provides the screening for

13  the place-based mitigation.

14          THE COURT:  Okay.

15          Anything further?

16          MR. CUMMING:  On that point, the state brings up the

17  EPA comments.

18          It's true the EPA had concerns on the draft EA.  Those

19  were addressed, and there is EPA correspondence in the record

20  acknowledging the improvements made by the Federal Highways in

21  response to those comments.

22          THE COURT:  Okay.  I am going to reserve any questions

23  for you, Mr. Cumming, until tomorrow on rebuttal.

24          MR. CUMMING:  I appreciate it, your Honor.

25          THE COURT:  Ms. Knauer or Mr. Chertok.

1          MS. KNAUER:  We will give you a few more things, which

2    I may refer to --

3          THE COURT:  Is there a test on this in the morning?

4          MS. KNAUER:  I won't be testing you.  I think you are

5    the only one who gets to issue the tests.

6          I think in a lot of places in his presentation

7    Mr. Mastro used the technical term really bad effects.  I think

8    I would like to -- referring back to some of the data that

9    Mr. Cumming presented, actually, the air quality effects that,

10   if any, that the -- the negative air quality effects, if any,

11   that are predicted in the EA are really tiny.

12         And I think that was reflected in the -- for the

13   regional admissions analysis that was conducted, for example,

14   for Bergen County, that less than one percent increase in any

15   pollutant.  And that was the worst case county for VMT

16   increases.  All the other New Jersey counties were predicted to

17   be much lower.

18         I just want to put that in perspective, that we don't

19   have a situation of really bad effects.

20         THE COURT:  Ms. Knauer, hold on.  I just got the

21   documents, and --

22         MS. KNAUER:  I am not referring to --

23         THE COURT:  No, no.  Just -- please.  I am slightly

24   confused here, and I don't wish to be confused.

25         So I have one two-page document that begins with

1    table 10-8.

2         MS. KNAUER:  I am not going to be necessarily dealing

3    with them in order, and I might not use them all at all.

4         THE COURT:  Just be kind enough to indulge me because

5    I have multiple copies of things, and I am not quite sure why.

6         So I have one document, two pages, Table 10-8 Dealing

7    with Tolling Scenario A, analysis year 2023.

8         I am supposed to have one version of that or two

9    versions of it.

10        MS. KNAUER:  I think it should just be one.

11        THE COURT:  And I have something labeled Table 10-11,

12   Tolling Scenario A, Analysis Year 2023, a single piece of

13   paper.  I have Table 10-12, Mobile Source Air Toxic Emissions

14   Scenario A, Analysis year 2045.

15        Then I have a two-page document that appears to be a

16   copy of an email regarding CBD TP EPA's final review.

17        MS. KNAUER:  Right.  That's the final EPA that --

18        THE COURT:  Then I have a single-page document labeled

19   Highway Link Analysis Maximum AADT.

20        MS. KNAUER:  Yes.  Then you --

21        THE COURT:  Then I just have a --

22        MS. KNAUER:  -- also have some other things that I

23   gave you earlier.

24        THE COURT:  Then I have an extra copy of one document.

25   That's all.

```
1              MS. KNAUER:  Apologies, your Honor, for the confusion.

2              THE COURT:  Go ahead.

3              MS. KNAUER:  Returning to the air quality effects of

4    this project, if -- most of them are positive.

5              They are decreasing in many cases in New Jersey,

6    including New York, but the negative effects on air quality are

7    really, really small.  And so for New Jersey to take the

8    position that any added air pollution in any location

9    necessarily requires an EIS, it is not -- that is not what the

10   law is and it was within FHWA's discretion to determine that

11   these tiny, tiny effects are not significant and do not require

12   an EIS.

13             I am just -- as an introduction, FHWA then went beyond

14   that finding to look at specific effects on the Environmental

15   Justice Communities with pre-existing burdens because they

16   are -- have specific sensitivity and that was undertaken

17   pursuant to the Environmental Justice executive orders.

18             I will make -- if you will indulge me, I will make one

19   short policy argument here.

20             Our world right now is facing a climate crisis and if

21   every project that is designed to effectuate mitigation of

22   climate change requires an EIS, we will never get there.  We

23   will never solve climate change.

24             So just I want to, you know -- that the Court's ruling

25   in this case could set a precedent that if any Environmental
```

1    Justice --

2            THE COURT:  You think?

3            MS. KNAUER:  Just so -- I'm sure you're aware of that.

4            THE COURT:  As in Mr. Mastro's words, this congestion

5    pricing scheme is the first of its kind in the country, and I

6    think Mr. Chertok or you referred to the fact that there are

7    other cities looking at this.

8        You think?

9            MS. KNAUER:  However, it is not the first highway

10   project, and it is certainly not the first project to have --

11   to add additional traffic in various locations, which are the

12   effects that we're talking about, while decreasing it in

13   others.

14       I also want to address the point of forfeiture.

15       I think your Honor has referenced -- or asked New Jersey

16   several times on their comments that they've made in the

17   litigation, were those things that you raised in the

18   administrative process.

19           THE COURT:  Forfeiture?  I am not quite sure I

20   understand.

21           MS. KNAUER:  Under the Supreme Court precedent of

22   *Public Citizen v. DOT* concerning requirement -- or waiver,

23   forfeiture or exhaustion of administrative remedies.

24           THE COURT:  All right.  It is exhaustion waiver.

25           MS. KNAUER:  Exhaustion waiver.

1          THE COURT:  I've never heard the term forfeiture used.

2          MS. KNAUER:  It is used in some of the case law, but

3     I'll -- I can use -- waiver is fine.

4          THE COURT:  No, no.  It is fine.  I know what you are

5     talking about.

6          If you want to use forfeiture, use forfeiture.  I

7     just...

8          MS. KNAUER:  So New Jersey submitted comments on the

9     draft EA.  Those comments, I think Mr. Mastro had put up an

10    excerpt from them, but they mentioned traffic effects, which

11    were obviously studied in the EA.

12         They did not propose or even mention a different

13    methodology for identifying Environmental Justice Communities.

14    They didn't comment on any aspect of the air quality analysis

15    methodology including the study areas that were used.  They

16    didn't request a study of potential impacts on health outcomes

17    or demand that the census -- census blocks rather than tracts

18    be used to identify Environmental Justice Communities.

19         Then after the final EA was issued, New Jersey put in an

20    additional letter, which was about nine months after the first

21    one, and they still didn't comment on any aspect of the air

22    quality methodology.  They mentioned that the EA disclosed

23    effects on air quality, but they didn't say you should have

24    used a different study area.  You should have studied a

25    different scenario.  No comment to that effect.  I just wanted

1    to clarify that.

2         I think Mr. Cumming went through the different air

3    quality analyses that were undertaken.

4         In response to your Honor's question about using

5    different scenarios for different worst cases, that was

6    absolutely appropriate and conservative.  I have been

7    practicing environmental impact review for almost 25 years.

8    That is always done.  You are always looking at the worst case

9    scenario to determine --

10        THE COURT:  Then I am going to ask you the question I

11   asked Mr. Cumming.

12        If you have been practicing for 25 years and it has

13   always been, give me -- give me a basis in which to say this is

14   okay.

15        Is it approved in court precedent?  Third Circuit?

16   Supreme Court?  Ninth Circuit?  DC --

17        MS. KNAUER:  It wasn't an issue that was raised by

18   plaintiff as an objection.  So we didn't research the

19   precedent, but I am sure that we could find some if your Honor

20   is interested.  I am sure there are cases that recognize that

21   methodology.

22        THE COURT:  Is it a best practice or past practice of

23   the agency for which there are 23 citations to --

24        MS. KNAUER:  Again, this wasn't an objection raised by

25   New Jersey.  But if your Honor is interested, I am sure that we

1    can find some examples.

2                THE COURT:  Well --

3                MS. KNAUER:  I will say that it is --

4                THE COURT:  -- I will leave it to you to decide what I

5    am interested in.

6                MS. KNAUER:  -- typical methodology.

7           But this is a fairly unique project in the sense of

8    there were different scenarios that were studied.

9                THE COURT:  But that's exactly the point, Ms. Knauer.

10   It is a unique project.

11               MS. KNAUER:  But not -- I shouldn't -- I shouldn't --

12   I used -- I shouldn't have used that word.

13               THE COURT:  Okay.

14               MS. KNAUER:  It is not --

15               THE COURT:  Well, why don't you run it back and...

16               MS. KNAUER:  There are other projects that have used

17   different scenarios, so I wouldn't say it is unprecedented.

18               THE COURT:  So the answer to your question is yes.

19               MS. KNAUER:  Yes.

20               THE COURT:  My curiosity would be satisfied if you

21   gave me some basis because if I -- I -- you know, I am asking

22   you, be me.  Write the opinion.  Wouldn't you want me to say

23   that there is some basis to approve the choices?

24               MS. KNAUER:  Of course, but I just would want --

25               THE COURT:  So find it for me and give it to me.

1              MS. KNAUER:  But in terms of the reasonableness of the

2      methodology, isn't it most appropriate to be looking at the

3      worst case effects with --

4              THE COURT:  I am not disputing you in terms of its

5      reasonableness or logic.

6          I am just saying if you want me to say yes you have got

7      to tell me how to get there.  Right?

8          So if this is something that the National Highway

9      Administration has been using, you have 25 years worth of

10     experience in seeing these environmental impact cases, just

11     give me something that allows me to say this is kosher and we

12     will move on.

13             MS. KNAUER:  I will say that there are -- the

14     different analyses, we're looking at different effects and,

15     therefore, that is why the different scenarios were more

16     conservative.  For example, on a county-wide basis, one

17     scenario -- or in this case region wide, one scenario had

18     higher VMT -- or lower VMT decreases on a regionalized basis.

19     That was scenario A.

20         For the local intersection analyses, there were

21     different scenarios, mostly for scenario D, that caused the

22     most traffic at intersections.

23         For -- there are three highway links that were looked

24     at.  Different scenarios were looked at for each of those.

25     That was based on a screening of the worst link, worst scenario

1  for three different metrics.

2      So in the case of the I-95 one, that was the highest

3  overall AADT of any scenario, any link in the whole network.

4  And that's -- and even at that worst -- of the worst case

5  location, worst case scenario, it wasn't -- there was no

6  exceedance of the PM2.5 or PM10 standards, which was the

7  important concern for truck diversions because that's the --

8  sort of the top-line pollutant that diesel trucks emit.

9      THE COURT:  So trucks as opposed to trucks and

10  nontrucks gives you a worst case scenario.

11      MS. KNAUER:  Well, actually, this looked at -- this

12  was looking at highest overall traffic at that location.  I am

13  just saying that the pollutant of greatest concern was the one

14  that --

15      THE COURT:  But emanates mostly from truck traffic?

16      MS. KNAUER:  Truck, but they looked at all --

17      THE COURT:  Right.  No.  I understand.

18      MS. KNAUER:  -- emissions in the modeling.

19      The modeling looked at all emission sources, not just

20  trucks, and it still did not exceed the EPA's health-based

21  standard.

22      In terms of the study areas for the air quality stud y

23  area, again, there were different study areas.  So there is the

24  regional one, which looked at two counties in New Jersey, ten

25  counties in New York.  Mr. Cumming explained the basis for that

1  but then the -- for the intersections, and then I just

2  explained how the highway links were chosen.

3       I was trying not to duplicate Mr. Cumming's

4  presentation.  I am sorry.

5            THE COURT:  That is much appreciated.  Take your time.

6            MS. KNAUER:  I think New Jersey, while it did not --

7  acknowledges that it did not comment on the study areas, it

8  mentioned EPA's comment letter which did raise, you know, a

9  question about the number of intersections that were studied.

10 And that was responded to in the response to comments portion

11 of the EA explaining that, as Mr. Cumming pointed out, the --

12 the -- within New Jersey, the major traffic diversions will be

13 on highways.  So it was more appropriate to study the highway

14 link than -- than intersections.

15      We studied 102 intersections, again, the worst -- worst

16 case look determined that those wouldn't have an exceedance of

17 pollutants of the -- of the ambient air quality standards, and

18 that's -- that's a methodology that is reflected in EPA's

19 hotspot guidance that says you should look at the worst case.

20 And then if -- if those show effects, then you can go beyond

21 that.  But you don't need to once the worst case locations

22 don't show adverse effects, which was the case here.

23      So there was no real point in doing more intersections

24 just to screen them out, like the -- the original 102 were.

25           The EPA then, as I think one of the documents that you

1   are provided with, which I don't know if you want to put that

2   up on -- that's document 28 in our -- that -- that was the EPA

3   response which ultimately determined that the -- they were

4   satisfied with the analysis.

5           THE COURT:  This is the email that's in the set of

6   documents.

7           MS. KNAUER:  Yes.  Yes.  So I think -- I think while

8   New Jersey is piggybacking on EPA's comments, their comments

9   were addressed to EPA's satisfaction and -- and New Jersey did

10  not actually raise that in either of its comment letters.

11          Now, I will go on to Environmental Justice analysis,

12  unless your Honor -- you have more questions about air quality.

13          THE COURT:  So EPA made comments, and then there was a

14  follow-up communication between the EPA and the Federal Highway

15  Administration --

16          MS. KNAUER:  Correct.

17          THE COURT:  -- in which the EPA responds to an

18  explanation provided to it by the Federal Highway

19  Administration relative to EPA's concerns and the EPA says this

20  makes sense to us, it is reasonable.  We're fine.

21          MS. KNAUER:  Correct.  And I mean, there also was an

22  additional analysis that was included in the final EA, the

23  Environmental Justice analysis, which helps, I think,

24  address -- many of EPA 's comments were concerned with impacts

25  on Environmental Justice Communities.

```
1              THE COURT:  And this exchange of information is
2    reflected in the Federal Highway Administration's response to
3    the comments in the appropriate place in the EA.
4              MS. KNAUER:  In appendix 18C, yeah.  The -- the
5    response to EPA's comments and then that -- that email back is
6    in the administrative record.
7              THE COURT:  Okay.  Environmental Justice.
8              MS. KNAUER:  Right.  Environmental Justice.
9         So Environmental Justice, it's a federal policy.  It is
10   not actually enshrined in law or regulation, but it is
11   regularly incorporated in NEPA reviews, as it was here.
12        And --
13             THE COURT:  It has been incorporated as a practice --
14             MS. KNAUER:  As a practice.
15             THE COURT:  -- in NEPA reviews.
16             MS. KNAUER:  Right.  And -- and, you know, it has been
17   the subject of much litigation and, you know, I think the -- in
18   fact, the *Trenton Threatened Skies*, recent Third Circuit
19   decision, concerned an Environmental Justice analysis.  So it
20   is often reviewed by Courts as well.
21        But under the -- you know, the similar arbitrary and
22   capricious standard that applies to NEPA.
23             THE COURT:  Right.
24             MS. KNAUER:  So I am not --
25             THE COURT:  Nobody is arguing whether Environmental
```

1    Justice analysis should have been undertaken.

2         Where what's being argued here is what, in fact, took

3    place and whether the considerations yielded a reasonable

4    determination and whether there was reasoned decision-making

5    explaining what the agency did in the course of its

6    Environmental Justice consideration.

7         MS. KNAUER:  And what the -- what the agency did was

8    it took -- it first started out with the identification of

9    Environmental Justice Communities, which is one of the concerns

10   that New Jersey has raised.

11        Those, I think -- about 70 percent of the -- identified

12   as Mr. Cumming said, a reasonable study area, but then focused

13   more in for the -- the air quality and traffic effect issue on

14   a ten-county study area where the BPM modeling showed that the

15   most likely localized diversionary effects on highways would

16   occur.

17        THE COURT:  Ten-county area in New Jersey, not across

18   the region.

19        MS. KNAUER:  No.  Ten-county area across the region,

20   including four counties in New Jersey.

21        THE COURT:  Okay.

22        MS. KNAUER:  And, you know, about -- just in terms of

23   the -- the identification of Environmental Justice Communities,

24   it was about 70 percent of all census tracts in the entire area

25   were identified as Environmental Justice Communities.  I don't

1    think we missed any by not using New Jersey's state specific

2    methodology.

3              THE COURT:  Census block.

4              MS. KNAUER:  Well, not only census block.  They refer

5    to their own mapping tool, which only -- I believe only

6    addresses New York -- New Jersey counties, so it couldn't have

7    been used for the entire region.

8              Instead, FHWA, in consultation with EPA, decided to use

9    its -- you know, the federally available mapping data, as well

10   as some fairly conservative measures which align actually with

11   New Jersey's measures of minority population and low income.

12             THE COURT:  So the chosen methodology meets the

13   purpose for utilizing the -- the chosen methodology meets the

14   intended purpose of using a mapping methodology, whichever one

15   may be chosen.  And you saying that the federally chosen one

16   basically meets most of the purposes outlined by the argument

17   that the New Jersey methodology should have been used.

18             MS. KNAUER:  Yeah.  This was another comment that

19   New Jersey didn't make until it -- until after the analysis had

20   been done.  You know, after the -- the communities had been

21   identified and the analysis had been done.  They had -- they

22   made the comment on the final EA, which, you know, they could

23   have introduced it earlier if they had some -- but again, I

24   think the only metric that their tool uses that was not used in

25   the -- in the FHWA analysis is English language proficiency.

1           THE COURT:  Okay.  So you're saying almost all of the

2    metrics mirror one another regardless of the mapping tool

3    methodology.

4           MS. KNAUER:  And -- and we -- and the analysis did not

5    miss a census tract as a result.  It's, again, a highly -- it

6    identified all of -- many, many census tracts in the study area

7    as Environmental Justice.  About 70 percent of the total.

8           THE COURT:  Right.

9           MS. KNAUER:  So in terms of the -- the effects study

10   that was done in appendix 17D for determining where mitigation

11   may be warranted because of highway diversions from the

12   project, the -- the way that the -- first, we took the -- the

13   analysis took the entire Environmental Justice study area and

14   looked at where there were chronic disease burdens and

15   pollutant burdens, at percentiles -- at percentiles above the

16   percentile thresholds that are used in the EPA EJ screen tool

17   for environment -- for pollutant burdens and CDC Environmental

18   Justice initiative -- I believe I am using -- I am saying the

19   acronym correctly -- tool for chronic disease burdens.

20          The CDC data were specifically used because they covered

21   New Jersey and EPA's data set does not.  I am not sure why.

22          We looked at -- so the -- the EPA EJ screen cites sort

23   of a -- of greater concern threshold of 80 percent.  The CDC

24   uses a threshold of 66 percent.

25          And if we -- do we have document 35?

1          I am not sure if I gave this one to you, but this shows

2     a map of all of the census tracts that meet those criteria

3     within the study area.

4          Or just look at -- maybe put up document 36 then.

5          I think you have this one, your Honor.  It was given to

6     you before.  It is DOT_7297.

7          These are -- this is a map of the Environmental Justice

8     census tracts in the study area that could either experience

9     increases or decreases of what's called truck traffic

10    proximity, which is a distance and population weighted measure

11    of how close truck traffic is to a certain population center

12    within a census tract.

13         And that's explained in greater detail in the -- in

14    the -- I won't belabor in how it is calculated, but it

15    basically provides an idea of, like, the total distance

16    weighted truck traffic that is going through a census tract.

17         So it takes account of the proximity, which is -- which

18    is how, you know, pollutants affect people more greatly when

19    they are closer to them.

20              THE COURT:  This is 17D-15.

21              MS. KNAUER:  Yes.  So this -- this shows all of the

22    census tracts that either have high pollutant burdens or high

23    chronic disease burdens within the study area that would also

24    experience either decreases in truck traffic proximity.  Those

25    are sort of the lavender gray census tracts.

```
 1         So you see that large parts of New Jersey will actually

 2   benefit from the project in Environmental Justice areas.

 3         And then the orangier ones are ones that would

 4   experience any level of increase in truck traffic proximity.

 5             THE COURT:  And this is in the four-county area?

 6             MS. KNAUER:  Well, it's a ten-county area, including

 7   four counties in New Jersey, which were identified as those

 8   which are more likely to have increases in traffic along

 9   highways.

10             THE COURT:  Okay.

11             MS. KNAUER:  Which, you know, as a -- as a matter of

12   Environmental Justice, the reason that we're concerned about

13   these pre-existing burdens is because of the effects of

14   locating highway -- past location of highways within these

15   communities.

16         Which would be minimally, but somewhat affected by the

17   project either negatively or positively.

18             THE COURT:  You have about five minutes, Ms. Knauer.

19             MS. KNAUER:  Oh, I didn't -- was that -- I didn't ask

20   to reserve time.  So is that my...

21             THE COURT:  That's with reserving time for rebuttal.

22             MS. KNAUER:  Okay.  Okay.  Thank you.

23             THE COURT:  I figured you need five to seven minutes

24   on rebuttal.  So...

25             MS. KNAUER:  So there were, I think, among these in
```

1   New Jersey, there were -- I think Mr. Mastro said 15 -- 15

2   either with -- either pollutant or chronic disease burdens that

3   were identified in New Jersey as having truck traffic

4   increases.

5           THE COURT:  Communities.  15 -- I mean --

6           MS. KNAUER:  Sorry.  Correct.

7           THE COURT:  Okay.

8           MS. KNAUER:  Basically within the same -- I think the

9   same municipalities that the -- anyway.

10          So not all of those communities -- so basically the

11  whole area suffers from high pollution burdens.

12          But if we go to document 38 in our -- which is DOT_7324,

13  which I think we also presented earlier today.

14          This explains how we get from 15 --

15          THE COURT:  17D-18?

16          MS. KNAUER:  Correct.  Yeah.  To four.

17          And so all of those 15 were identified -- identified as

18  where -- as locations where mitigation was warranted.  Those --

19  and we, therefore, have the -- the regional mitigation elements

20  that we described earlier that will -- that will benefit all of

21  those areas.

22          In order to locate really highly burdened areas that

23  have also chronic disease burdens, we looked at a subset -- or

24  the analysis looked at a subset of those -- of those census

25  tracts, which had chronic disease burdens as well as pollutant

1    burdens.  So that's the difference.  That's where you get to

2    four because -- because many of the census tracts that were

3    identified in the first step have high pollution burdens, but

4    not high chronic disease burdens.

5            So we are looking to -- the project and FHWA are looking

6    to direct mitigation to the locations where it will most

7    benefit communities that have poor health outcomes as a result

8    of past planning decisions.

9            THE COURT:  Anything else?

10           MS. KNAUER:  I think we talked about the mitigation

11   earlier and the commitments that were made.

12           So if you have any other questions I will be happy to

13   answer them.

14           THE COURT:  I'm going to reserve my questions --

15           MS. KNAUER:  Okay.

16           THE COURT:  -- for rebuttal tomorrow.

17           MS. KNAUER:  Thank you.

18           THE COURT:  Okay.  As we approach the bottom of the --

19   you're fine.  You're fine.  Yeah.

20           Okay.  I need to talk a little bit about some logistical

21   issues.  First things first, it is my understanding that at

22   least one counsel, if not more have ordered daily transcripts.

23   Is that correct?

24           Somebody is nodding a head.

25           MS. KAPLAN:  It is my understanding, your Honor, that

1    we have.

2           THE COURT:  Somebody's ordered transcript with --

3       Melissa, tell me.  Right?  Don't we have a daily

4    transcript ordered for today.

5           THE REPORTER:  I believe so. But I'm going to be

6    honest, the email didn't come to me, it was forwarded and I

7    didn't look at who it was from.

8           THE COURT:  All right.  So I will ask the question.

9    Right?  Rather than us guessing, did anybody order daily

10   transcripts?

11          MS. KAPLAN:  If we haven't, I'll -- I'll volunteer, we

12   will.

13          THE COURT:  I don't necessarily know that you -- that

14   you, right?  I am not asking for a volunteer.  I am trying to

15   understand some logistical things because my -- you -- you want

16   to do daily transcript, I don't have a problem with it.

17          What I do have a problem with is it may well have errors

18   in it.  All right.  And I want to make sure that we have a

19   process where somebody has enough time to read them, submit

20   corrections, so that we can get the transcript certified.

21          Somebody has ordered, theoretically, two-hour transcript

22   after we close business tomorrow.

23          So all I'm trying to figure out is who wants transcript

24   and when you want it, so we can have an orderly process of

25   dealing with corrections before it gets posted on the docket as

1    a public document.  That's all I'm trying to sort out.  So help

2    me out here.

3         MS. KAPLAN:  So speaking solely for my -- for our

4    client, your Honor, we would like a daily transcript.  I saw

5    the look on the Court Reporter's face.  So we don't want to

6    unduly burden you in any way.  So whenever you can get it.

7         And we are happy to work out with the other parties a

8    procedure for getting corrections and getting a certified

9    transcript on the docket.

10        THE COURT:  Okay.  So do we want to do daily

11   transcripts on both days so that Melissa doesn't have to go

12   insane after hours?  Which means daily transcript for tomorrow

13   would show up on Friday, as opposed to somewhere around 8 or 9

14   o'clock tomorrow night?

15        MS. KAPLAN:  I think that will be fine, your Honor.

16        THE COURT:  Okay.

17        Melissa, are you okay?

18        THE REPORTER:  I'm okay.

19        THE COURT:  Okay.  You are more than welcome to look

20   at the transcript.  All right.  Until it goes on the docket,

21   all right, and until we get changes and corrections approved,

22   all right, it stays with you.  Everybody got that?

23        MS. KAPLAN:  Understood.

24        THE COURT:  Corrections, whatever they are, we got to

25   document them in a letter or a motion.  So if there is 125

1    changes to the transcript that you want done, identify them in

2    those where you agree with the changes, identify them in those

3    where you can't agree, and what the possible alternative

4    interpretations of the language in the transcript might mean.

5    You will give it, file it with the Court, I will decide, and

6    then I will give instruction to the court reporter and then we

7    will get the transcript certified and on the docket.

8         Does that work for everybody?

9         Okay.

10         Tomorrow we start at 9:30.  I'm going to try to keep us

11   a little bit more on track.  We are not bad today.  But you

12   should be aware of starting around lunchtime there will be many

13   more people in and around the environments of the courthouse as

14   tomorrow afternoon is the investiture proceeding for Judge

15   Semper, one of the newer District Court judges here in

16   New Jersey.

17         So it may put a lot of pressure on where -- what may be

18   available time wise in the neighborhood for you to eat.  So

19   just be aware that there is going to be a lot of foot traffic

20   in the area.  And so if you don't want to be hungry and you

21   want to -- and you are not bringing your lunch or having it

22   delivered here, right, or meeting somebody who is delivering it

23   here, you may find a few more people out in the eateries which

24   are not plentiful within a couple of blocks of the court.

25         Okay.  Before we conclude, is there anything that anyone

1    wishes to raise with the Court?

2         Mr. Mastro, anything from the plaintiff?

3         MR. MASTRO:  No, your Honor.  Other than Ms. Myers

4    will be speaking tomorrow so she won't have to pass me notes.

5         THE COURT:  The question is will you pass her notes as

6    the mentor?

7         Mr. Nagel, on behalf of plaintiff Amici?  Mr. Nagel,

8    any --

9         So Ms. Matloff.

10        MS. MATLOFF:  He had to run out, but we have nothing.

11        THE COURT:  Okay.  Fine.  Thank you.

12        Mr. Cumming.

13        MR. CUMMING:  Nothing, your Honor.

14        THE COURT:  Mr. Chertok or Ms. Knauer.

15        MR. CHERTOK:  One issue which I think we can take up

16   tomorrow morning, are these documents which appear to be

17   essentially briefs and not just descriptions of the record, but

18   essentially arguments that were not made before.

19        But I will defer that to tomorrow morning.

20        THE COURT:  I will hear what you have to say.  I am

21   going to -- I going to give you my reaction right now.  Subject

22   to change.  They were illustrative.  Right?  The briefs are the

23   briefs.  If something wasn't contained in the brief, trust me

24   to be smart enough to know the difference and we will go from

25   there.  If you think that it requires a more formal

1    presentation to me and I need to address it more specifically,

2    I will be more than happy to do it.

3            MR. CHERTOK:  That's fine, your Honor.

4            THE COURT:  Okay.  Ms. Kaplan, you have been quite

5    quiet all day.  Anything you wish to raise with the Court?

6            MS. KAPLAN:  Nothing at all, your Honor.

7            THE COURT:  Defendant Amici?  No, I'm sorry.

8    Mr. Mateen?

9            MR. MATEEN:  Nothing further.

10           THE COURT:  Okay.

11           MR. OTIS:  Just clarification, your Honor, we are

12   going to start tomorrow with rebuttal on air quality and EJ --

13           THE COURT:  Correct.  And then we will go to Amici

14   presentation on day one issues.  And then we will head into

15   New Jersey participation and Clean Air Act and then remedy and

16   then Amici argument on day 2 issues and then closing.

17           MR. OTIS:  Thank you.

18           THE COURT:  And hopefully we will move fast enough so

19   Mr. Mastro can catch a super powered car to get him to

20   Philadelphia in time for his board meeting at University of

21   Pennsylvania Law School.

22           If not, he will have to get some special dispensation

23   from his client with lights and sirens or a helicopter to get

24   him there.  Or he is just going to be late.

25           MR. MASTRO:  That was the old days, your Honor.  No

1   more.

2          THE COURT:  Okay.  Going once.  Going twice.  Anything

3   more from anybody?  Thank you all.

4          I appreciate your professionalism and interaction and

5   cooperation with the Court today.  It was very meaningful and

6   much appreciated.

7                    (Concluded at 5:28 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [1] - 192:4
**$13.10** [3] - 60:11, 61:8, 62:15
**$15** [12] - 8:1, 8:16, 15:18, 20:20, 50:21, 51:2, 97:24, 117:21, 125:16, 132:2, 184:10, 186:15
**$155** [1] - 101:25
**$20** [10] - 146:16, 154:16, 164:16, 175:7, 185:19, 185:21, 186:13, 186:14, 187:16, 189:16
**$30** [2] - 156:16, 156:17
**$35** [2] - 89:6, 186:18
**$5** [1] - 64:20
**$55** [1] - 191:23
**$6.55** [5] - 60:11, 61:8, 61:17, 62:16, 63:12

## '

**'22** [2] - 213:3

## 0

**0036292** [1] - 80:16
**07043** [1] - 3:5
**07068** [1] - 1:21
**07102** [2] - 1:10, 2:9
**07601** [1] - 3:19

## 1

**1** [6] - 9:3, 50:25, 80:17, 150:21, 188:12, 236:20
**1.0** [1] - 245:21
**1.10** [1] - 245:17
**1.3** [1] - 246:15
**1.5** [1] - 9:3
**10** [4] - 34:8, 51:3, 208:10, 256:5
**10-11** [1] - 258:11
**10-12** [1] - 258:13
**10-8** [2] - 258:1, 258:6
**10.6** [1] - 235:17
**100** [3] - 100:13, 137:24, 208:9
**100,000** [1] - 207:21
**10022** [1] - 2:18
**10036** [2] - 1:17, 3:16
**101** [1] - 227:19
**10118** [1] - 2:22
**102** [5] - 209:23,

249:1, 249:7, 266:15, 266:24
**103** [2] - 1:20, 149:2
**104** [2] - 210:5, 229:9
**107** [3] - 236:17, 236:25, 237:6
**108** [1] - 236:17
**11** [4] - 141:25, 142:1, 148:25, 208:11
**110** [3] - 69:19, 70:5, 70:6
**1177** [1] - 3:15
**1185** [1] - 1:16
**11:01** [1] - 64:1
**11:02** [1] - 64:1
**11:29** [1] - 83:25
**11:30** [1] - 83:21
**11:41** [1] - 83:25
**12** [31] - 16:14, 21:3, 34:1, 65:11, 65:22, 88:11, 99:19, 104:20, 105:18, 105:24, 106:21, 140:1, 148:14, 148:16, 149:9, 149:14, 149:15, 150:13, 155:1, 178:3, 198:13, 201:13, 201:15, 203:5, 212:10, 214:12, 215:2, 215:9, 221:23, 231:17, 245:2
**12-and-a-half** [1] - 66:19
**12-month** [1] - 46:15
**12.5** [1] - 20:23
**120** [3] - 42:11, 46:18, 127:11
**1215** [1] - 134:17
**1224** [1] - 134:19
**1233** [1] - 134:25
**1246** [1] - 134:25
**125** [1] - 277:25
**128** [1] - 4:11
**12:44** [1] - 128:4
**12:45** [1] - 127:19
**13** [2] - 60:7, 161:25
**14** [24] - 16:14, 88:11, 88:25, 104:19, 105:19, 105:25, 106:4, 106:19, 106:23, 107:4, 107:6, 148:25, 149:10, 201:25, 202:12, 203:7, 206:22, 221:21, 236:13, 249:3, 251:11, 251:12, 251:17, 253:15

**15** [54] - 9:2, 9:4, 9:6, 15:2, 15:6, 15:12, 16:22, 24:17, 49:20, 51:4, 59:20, 92:11, 103:25, 108:15, 111:14, 111:16, 123:11, 124:21, 127:19, 163:9, 169:22, 175:8, 177:9, 177:14, 177:18, 177:21, 178:6, 178:8, 181:13, 184:4, 186:9, 186:24, 197:4, 226:11, 226:19, 226:24, 227:5, 227:7, 227:25, 228:18, 228:25, 229:3, 229:15, 229:20, 230:5, 230:13, 230:15, 274:1, 274:5, 274:14, 274:17
**15-year-old** [1] - 119:9
**150** [5] - 2:5, 2:13, 4:12, 25:9, 236:7
**150,000** [1] - 236:8
**1501.6** [1] - 85:18
**1502.9(d)1** [1] - 27:15
**155** [3] - 14:1, 102:17, 181:21
**15th** [2] - 2:17, 166:21
**16** [4] - 144:17, 144:24, 144:25, 155:1
**167** [1] - 4:13
**17** [2] - 134:17, 256:6
**174** [1] - 4:10
**174,000** [1] - 207:19
**178,000** [1] - 207:22
**17D** [3] - 147:14, 256:12, 271:10
**17D-15** [1] - 272:20
**17D-18** [2] - 159:12, 274:15
**18** [1] - 100:4
**182** [1] - 4:11
**18C** [1] - 268:4
**19** [2] - 178:13, 181:8
**191** [1] - 4:12
**197** [1] - 4:16
**1972** [1] - 124:16
**1983** [1] - 77:2
**1:30** [1] - 127:23
**1:35** [1] - 128:6

## 2

**2** [8] - 1:9, 75:10,

120:8, 121:16, 148:10, 236:11, 253:16, 280:16
**2.2** [1] - 254:1
**2.45** [2] - 245:17, 245:20
**2.5** [1] - 209:14
**20** [8] - 32:24, 46:17, 49:17, 70:7, 128:11, 150:2, 186:24, 233:6
**20002** [2] - 2:6, 2:13
**2005** [1] - 134:25
**201** [1] - 1:20
**2010** [1] - 134:19
**2012** [1] - 255:21
**2014** [2] - 135:3, 135:11
**2018** [1] - 218:2
**2020** [2] - 70:7, 95:16
**2022** [1] - 213:9
**2023** [14] - 34:17, 103:15, 208:7, 209:2, 212:10, 212:11, 213:3, 213:14, 215:2, 215:9, 231:17, 235:18, 258:7, 258:12
**2024** [1] - 1:10
**2045** [9] - 203:16, 208:8, 209:8, 209:11, 235:18, 236:16, 237:14, 246:14, 258:14
**21** [3] - 105:10, 106:21, 236:23
**22** [3] - 120:8, 212:10, 213:2
**22-year** [1] - 236:23
**23** [6] - 5:3, 69:12, 71:14, 168:5, 200:18, 262:23
**233** [1] - 4:17
**23CFR771115A** [1] - 75:6
**25** [7] - 32:21, 144:5, 234:19, 245:16, 262:7, 262:12, 264:9
**257** [1] - 4:18
**28** [13] - 88:11, 102:19, 105:7, 138:21, 138:24, 155:1, 156:2, 221:21, 233:23, 234:3, 245:16, 251:11, 267:2
**28-county** [1] - 155:10
**29** [1] - 174:24
**2:23-cv-03885-LMG-**

## LDW

**LDW** [1] - 1:4
**2d** [2] - 38:20, 134:17

## 3

**3** [4] - 1:10, 9:21, 75:10, 184:22
**30** [11] - 38:20, 63:24, 73:7, 128:7, 150:3, 177:20, 197:2, 227:11, 234:16, 250:23
**30-day** [1] - 54:20
**32** [2] - 4:5, 225:8
**320** [2] - 46:18, 46:20
**34** [1] - 6:10
**35** [6] - 13:24, 100:13, 102:17, 123:15, 148:1, 175:9, 176:24, 181:22, 271:25
**350** [2] - 2:22, 3:9
**36** [1] - 272:4
**37** [2] - 114:1, 176:2
**37017** [1] - 145:16
**38** [2] - 159:5, 274:12
**3885** [1] - 5:4
**3:15** [2] - 195:16, 196:24
**3:28** [1] - 196:24
**3:30** [1] - 196:23
**3d** [2] - 91:22, 134:25
**3rd** [1] - 135:10

## 4

**4** [3] - 75:10, 118:13, 256:5
**40** [6] - 6:21, 14:10, 27:15, 42:11, 85:18, 88:6
**41** [1] - 164:14
**428** [1] - 134:25
**447** [1] - 135:10
**45** [3] - 6:19, 83:9, 127:22
**458** [1] - 124:15
**470** [2] - 38:19, 135:11
**477** [1] - 135:3
**49** [1] - 4:6
**490** [1] - 135:3
**4A-1** [1] - 234:8
**4th** [1] - 2:13

## 5

**5** [5] - 21:5, 48:6, 48:12, 62:9, 186:12
**50** [5] - 84:10, 127:2, 221:23, 225:8,

245:22
**56** [2] - 3:5, 225:9
**560** [1] - 2:17
**576** [1] - 135:2
**58** [1] - 225:7
**590** [2] - 207:15, 207:20
**590,000** [1] - 207:14
**594** [1] - 207:15
**595** [1] - 91:22
**5:00** [1] - 20:23
**5:28** [1] - 281:7
**5:29** [1] - 197:6
**5th** [1] - 3:19

## 6

**6** [3] - 4:4, 148:10, 178:2
**60** [3] - 42:9, 84:6, 197:2
**60-day** [1] - 79:13
**61,000** [1] - 235:8
**62** [1] - 204:13
**63** [1] - 204:15
**63rd** [1] - 2:22
**64** [1] - 4:4
**66** [3] - 226:17, 233:12, 271:24
**66.6th** [1] - 229:14
**664th** [1] - 127:11
**68** [2] - 207:22, 209:10
**68,000** [1] - 207:15
**69** [2] - 161:23, 209:14
**6:30** [1] - 195:21

## 7

**7** [4] - 16:14, 62:10, 80:1, 80:18
**70** [5] - 155:13, 209:16, 269:11, 269:24, 271:7
**700** [1] - 207:14
**702** [1] - 48:12
**706** [2] - 48:6, 48:14
**713** [1] - 91:23
**716** [1] - 134:17
**72-year-old** [1] - 214:11
**7324** [1] - 191:22
**74** [4] - 4:5, 205:22, 206:16
**750,000** [1] - 97:21
**756F** [1] - 135:10
**768** [1] - 207:16
**776-7710** [1] - 1:24
**78** [1] - 215:13
**79** [1] - 214:8

## 8

**8** [2] - 59:5, 277:13
**80** [4] - 4:6, 226:17, 233:12, 271:23
**80th** [1] - 229:14
**81** [4] - 214:9, 214:15, 214:16, 214:17
**827** [1] - 124:15
**837** [1] - 124:15
**84** [3] - 4:10, 219:11

## 9

**9** [1] - 277:13
**90** [7] - 111:17, 161:15, 221:12, 227:2, 228:18, 233:12
**90th** [7] - 111:12, 161:19, 177:17, 227:3, 227:6, 229:17, 255:11
**97** [9] - 207:9, 207:10, 207:13, 207:15, 207:16, 207:18, 207:23, 236:6, 236:24
**97,594** [1] - 207:20
**97,768** [1] - 207:21
**970** [1] - 2:9
**973** [1] - 1:24
**98** [1] - 198:22
**9:00** [1] - 20:23
**9:30** [1] - 278:10
**9:34** [1] - 1:11

## A

**A-plus** [1] - 180:1
**a.m** [6] - 1:11, 20:23, 64:1, 83:25
**AADT** [2] - 258:19, 265:3
**ability** [1] - 33:20
**able** [9] - 5:25, 30:1, 78:25, 79:4, 81:13, 96:11, 123:6, 231:15, 243:11
**absolutely** [1] - 8:25, 19:22, 50:23, 67:5, 73:1, 87:1, 88:25, 111:23, 120:12, 179:22, 181:1, 181:9, 187:10, 195:8, 199:19, 205:9, 211:23, 212:23, 262:6
**abstract** [1] - 179:24
**absurd** [1] - 19:14

**abuse** [1] - 37:20
**accept** [5] - 78:12, 185:22, 193:20, 219:14
**accepted** [2] - 212:19, 212:22
**accepting** [2] - 206:15, 216:6
**accepts** [1] - 142:16
**access** [3] - 111:21, 141:18, 141:19
**accompli** [1] - 84:18
**accomplish** [1] - 131:21
**accordance** [2] - 37:19, 238:20
**according** [5] - 6:18, 70:6, 150:2, 168:19, 168:20
**accordingly** [3] - 36:4, 36:7, 235:11
**account** [3] - 211:10, 225:19, 272:17
**accumulated** [1] - 9:8
**accurate** [5] - 61:18, 131:23, 170:9, 193:21, 231:19
**accurately** [1] - 96:3
**achieve** [4] - 11:8, 11:13, 169:11, 173:14
**acknowledge** [5] - 27:8, 42:1, 51:20, 87:24, 92:2
**acknowledged** [2] - 18:3, 50:19
**acknowledges** [2] - 87:24, 266:7
**acknowledging** [3] - 68:21, 82:14, 256:20
**acknowledgment** [1] - 89:22
**acronym** [2] - 33:8, 271:19
**act** [2] - 48:3, 169:19
**Act** [5] - 33:24, 125:8, 173:23, 280:15
**acted** [1] - 36:5
**ACTION** [1] - 1:3
**action** [39] - 11:25, 20:1, 25:2, 26:16, 27:11, 34:19, 35:9, 38:2, 38:15, 42:23, 44:5, 44:8, 44:13, 45:7, 45:19, 48:7, 66:2, 66:7, 67:3, 71:21, 71:25, 72:1, 73:19, 78:2, 79:6, 85:18, 85:22, 89:21, 96:2, 129:21,

131:21, 133:3, 157:8, 166:4, 168:12, 172:21, 237:2, 237:6, 244:24
**Action** [5] - 3:7, 3:7, 3:10, 3:12
**actions** [3] - 34:14, 45:23, 131:19
**activities** [1] - 72:5
**acts** [1] - 128:23
**actual** [16] - 8:3, 10:10, 18:6, 18:8, 18:18, 19:1, 24:9, 26:12, 63:14, 85:8, 89:2, 103:22, 145:16, 159:5, 175:22, 229:1
**adamant** [1] - 58:16
**add** [6] - 39:19, 107:20, 169:22, 170:18, 172:20, 260:11
**added** [6] - 39:2, 111:13, 112:25, 222:15, 222:19, 259:8
**adding** [2] - 66:19, 161:1
**addition** [5] - 80:12, 171:11, 192:2, 202:23, 247:2
**additional** [19] - 18:17, 25:21, 26:2, 28:18, 29:10, 73:4, 85:3, 85:7, 85:13, 130:3, 130:10, 145:17, 167:3, 215:4, 215:21, 255:23, 260:11, 261:20, 267:22
**additions** [2] - 161:2, 171:19
**address** [26] - 24:12, 35:17, 58:3, 74:14, 92:24, 92:25, 93:13, 94:6, 94:11, 97:4, 99:25, 121:24, 136:17, 139:8, 143:19, 150:6, 163:17, 165:22, 182:25, 193:18, 216:15, 219:5, 260:14, 267:24, 280:1
**addressed** [9] - 17:12, 54:9, 82:15, 98:23, 173:2, 212:5, 254:6, 256:19, 267:9
**addresses** [1] - 270:6
**addressing** [3] -

101:16, 102:5, 123:1
**adequacy** [1] - 220:11
**adequate** [5] - 51:15, 121:25, 122:12, 220:9, 232:16
**adequately** [5] - 29:23, 121:9, 121:10, 124:25, 225:19
**adjacent** [1] - 140:18
**adjective** [1] - 91:10
**adjudication** [1] - 22:17
**adjunct** [1] - 179:8
**adjust** [1] - 156:24
**adjusted** [1] - 35:17
**adjusting** [1] - 35:25
**adjustments** [1] - 157:19
**Administration** [48] - 8:8, 8:19, 16:6, 23:19, 26:15, 26:25, 27:1, 27:4, 27:9, 28:7, 28:13, 28:17, 28:22, 29:4, 33:2, 41:21, 42:2, 42:15, 43:12, 43:14, 43:22, 43:25, 47:9, 55:9, 56:18, 77:21, 111:8, 112:17, 115:7, 131:11, 135:2, 135:10, 151:18, 152:9, 153:5, 153:8, 166:2, 172:12, 188:21, 188:24, 189:4, 189:19, 216:7, 240:15, 240:20, 264:9, 267:15, 267:19
**Administration's** [7] - 8:13, 48:24, 151:25, 152:6, 152:21, 153:2, 268:2
**administrative** [31] - 19:19, 21:11, 34:11, 34:22, 35:15, 37:9, 37:22, 41:3, 45:6, 45:23, 71:6, 72:2, 73:23, 79:6, 79:24, 80:8, 98:21, 100:10, 100:17, 145:2, 145:3, 150:18, 199:22, 200:7, 200:13, 200:25, 220:6, 256:2, 260:18, 260:23, 268:6
**admission** [1] - 101:16
**admissions** [3] -

25:17, 96:15, 257:13
**admit** [1] - 69:24
**admits** [2] - 19:7, 25:20
**admitted** [7] - 18:17, 89:11, 176:22, 177:1, 177:3, 177:6, 178:7
**adopt** [1] - 8:4
**adopted** [14] - 8:3, 21:19, 22:25, 23:4, 26:13, 34:16, 40:22, 41:13, 52:23, 145:17, 164:10, 167:7, 169:1, 169:23
**adoption** [2] - 55:14, 56:13
**advanced** [1] - 166:14
**Advancement** [1] - 135:1
**advantage** [1] - 81:7
**adversaries** [2] - 19:17, 84:16
**adversary's** [1] - 25:11
**adverse** [21] - 7:17, 11:17, 89:12, 90:4, 99:23, 103:12, 103:13, 114:22, 119:11, 130:12, 144:8, 180:2, 205:11, 209:12, 214:20, 215:18, 215:20, 238:25, 239:21, 239:24, 266:22
**adversely** [1] - 69:6
**Advisory** [5] - 152:16, 160:22, 164:19, 187:20, 194:24
**advisory** [1] - 144:16
**aegis** [1] - 189:1
**affect** [6] - 63:2, 67:18, 155:23, 166:17, 272:18
**affected** [11] - 30:2, 30:23, 113:6, 160:25, 165:6, 166:25, 167:6, 186:6, 194:1, 217:25, 273:16
**affection** [1] - 70:2
**affects** [4] - 10:18, 76:10, 84:23, 157:20
**affirm** [1] - 37:18
**afield** [1] - 156:4
**AFTERNOON** [1] - 128:5
**afternoon** [9] - 35:13, 69:14, 81:9, 135:17,

136:15, 159:1, 184:23, 192:15, 278:14
**age** [1] - 81:14
**Agencies** [1] - 77:8
**agencies** [14] - 88:8, 99:1, 110:21, 125:7, 131:18, 145:25, 164:12, 167:13, 181:24, 191:18, 199:23, 217:24, 255:22
**agency** [112] - 13:17, 20:1, 21:16, 22:3, 22:8, 27:18, 33:25, 34:19, 37:2, 38:8, 38:15, 39:4, 39:10, 39:14, 39:22, 39:24, 40:3, 40:12, 40:13, 40:24, 41:9, 41:12, 42:23, 43:20, 44:5, 44:13, 44:15, 45:7, 45:19, 46:7, 47:10, 47:22, 48:1, 48:6, 48:17, 49:4, 55:2, 56:6, 57:3, 57:18, 57:21, 57:24, 58:10, 58:13, 59:17, 66:2, 66:7, 67:2, 71:25, 75:20, 76:15, 76:19, 78:2, 79:10, 85:21, 85:25, 87:19, 89:14, 90:11, 91:1, 94:1, 95:9, 97:10, 106:9, 113:3, 113:9, 116:11, 118:7, 120:24, 127:11, 132:22, 136:8, 168:19, 169:1, 178:14, 200:2, 200:3, 200:7, 200:11, 201:4, 214:3, 217:13, 217:15, 218:20, 220:13, 220:15, 231:25, 232:16, 239:20, 241:12, 241:15, 241:22, 242:2, 242:9, 242:13, 243:20, 244:4, 244:6, 245:23, 246:7, 248:12, 248:16, 248:21, 249:1, 249:11, 255:24, 262:23, 269:5, 269:7
**agency's** [10] - 11:25, 37:15, 38:2, 38:5, 38:25, 41:4, 73:18, 89:21, 131:21, 244:8

**aggregate** [4] - 235:12, 236:14, 240:11, 240:12
**ago** [5] - 41:13, 72:23, 90:25, 125:21, 255:9
**agree** [20] - 30:5, 38:11, 38:14, 38:22, 68:19, 71:7, 79:1, 87:13, 125:4, 131:15, 131:23, 132:1, 132:7, 143:8, 167:18, 199:5, 199:11, 242:5, 278:2, 278:3
**agreement** [17] - 16:17, 43:8, 43:14, 43:23, 43:24, 44:4, 44:7, 49:17, 55:3, 66:1, 71:18, 78:1, 119:1, 189:6, 217:23
**ahead** [13] - 59:13, 100:2, 114:4, 122:22, 137:7, 143:25, 174:24, 182:21, 188:24, 212:11, 226:15, 227:1, 259:2
**aid** [2] - 33:17, 33:21
**aided** [1] - 1:25
**aims** [1] - 74:20
**ain't** [5] - 86:11, 103:2, 103:4, 175:3, 176:16
**Air** [5] - 4:14, 33:24, 204:7, 258:13, 280:15
**air** [88] - 7:17, 11:17, 13:3, 17:11, 29:6, 29:10, 29:19, 30:22, 52:8, 53:22, 72:13, 84:2, 92:9, 100:6, 100:18, 103:12, 103:18, 105:15, 105:23, 107:1, 109:1, 110:22, 110:23, 112:18, 113:17, 135:18, 144:9, 145:20, 160:12, 160:14, 160:15, 195:18, 195:22, 196:3, 197:1, 197:15, 197:18, 198:8, 198:9, 198:12, 198:13, 198:20, 199:2, 201:14, 201:18, 203:6, 205:21, 205:23, 206:25, 209:25, 210:5, 210:7, 214:6, 214:18, 214:20,

214:23, 215:14, 215:18, 215:24, 217:10, 219:20, 221:15, 221:25, 222:13, 224:18, 224:23, 234:23, 239:4, 240:7, 245:25, 248:25, 249:24, 251:24, 256:5, 257:9, 257:10, 259:3, 259:6, 259:8, 261:14, 261:21, 261:23, 262:2, 265:22, 266:17, 267:12, 269:13, 280:12
**akin** [1] - 169:2
**al** [4] - 1:3, 1:7, 5:4, 5:5
**ALEX** [1] - 2:8
**align** [1] - 270:10
**alleged** [2] - 69:9, 121:25
**allegedly** [1] - 132:5
**alleviate** [1] - 144:8
**Alliance** [3] - 3:8, 3:12, 144:20
**Allied** [1] - 3:6
**allocate** [1] - 6:19
**allocated** [1] - 101:23
**allotted** [1] - 197:7
**allow** [7] - 14:23, 43:25, 79:3, 169:24, 172:14, 226:10, 243:20
**allowed** [3] - 49:6, 201:8, 221:24
**allowing** [1] - 71:21
**allows** [1] - 264:11
**alluded** [2] - 74:17, 160:10
**almost** [13] - 14:1, 19:14, 56:7, 56:8, 67:22, 102:14, 105:24, 115:23, 170:16, 203:3, 208:11, 262:7, 271:1
**alone** [5] - 10:1, 70:7, 97:25, 125:17, 125:20
**alter** [1] - 142:13
**alternate** [1] - 156:11
**alternative** [48] - 15:1, 39:24, 106:11, 106:12, 106:21, 107:25, 117:19, 117:20, 117:24, 118:8, 118:15, 118:18, 118:22,

119:14, 119:21, 120:2, 120:8, 120:14, 121:16, 124:17, 127:12, 129:1, 129:16, 129:18, 129:21, 129:24, 130:2, 130:5, 130:13, 130:21, 131:7, 131:20, 132:4, 133:2, 133:3, 167:21, 168:11, 168:14, 169:10, 169:25, 170:1, 172:6, 172:21, 173:11, 237:3, 237:6, 278:3
**alternatively** [1] - 198:17
**alternatives** [52] - 7:25, 16:12, 17:15, 26:2, 29:18, 70:16, 72:15, 97:9, 97:15, 97:16, 98:1, 98:12, 98:13, 98:15, 98:23, 99:9, 99:25, 105:4, 116:19, 116:24, 117:2, 117:4, 117:13, 117:16, 118:19, 120:20, 121:17, 124:10, 124:25, 125:3, 125:7, 126:17, 126:18, 128:15, 128:22, 129:5, 130:18, 130:22, 130:24, 131:13, 132:13, 132:19, 132:20, 132:23, 133:1, 133:4, 150:6, 150:14, 167:16, 172:15, 173:17
**alters** [1] - 79:12
**ambient** [1] - 266:17
**Ambient** [1] - 204:7
**Amboy** [1] - 141:20
**ameliorate** [1] - 7:21
**Americans** [1] - 135:9
**Americas** [2] - 1:16, 3:15
**Amici** [14] - 6:3, 6:4, 6:8, 6:14, 195:20, 195:25, 196:5, 196:8, 196:13, 196:19, 279:7, 280:7, 280:13, 280:16
**Amicus** [4] - 3:6, 3:16, 3:20, 6:6
**amount** [19] - 9:2,

16:8, 16:10, 17:14,
50:5, 62:24, 73:3,
128:8, 146:10,
147:4, 161:3, 161:5,
161:12, 185:8,
185:16, 185:21,
185:23, 187:23,
199:8
**amounts** [6] - 188:6,
188:25, 191:11,
191:13, 191:15,
193:9
**ample** [1] - 187:6
**analogous** [1] - 77:11
**analyses** [10] - 77:10,
145:18, 198:19,
200:4, 214:6,
214:18, 242:14,
262:3, 264:14,
264:20
**Analysis** [4] - 112:19,
258:12, 258:14,
258:19
**analysis** [96] - 21:16,
26:3, 35:10, 39:23,
39:25, 49:3, 51:12,
57:9, 58:13, 72:13,
72:14, 77:6, 77:7,
112:18, 113:17,
120:19, 127:12,
135:19, 138:12,
138:13, 139:12,
139:16, 139:19,
140:7, 140:8, 151:5,
151:8, 152:10,
157:6, 162:19,
163:3, 164:10,
173:11, 194:25,
198:10, 198:12,
198:20, 198:25,
199:10, 199:12,
199:17, 199:20,
200:1, 200:21,
200:22, 210:8,
215:24, 217:11,
218:17, 220:9,
220:12, 220:21,
226:5, 233:22,
234:23, 234:24,
237:18, 238:1,
238:22, 239:3,
239:4, 240:10,
240:16, 240:17,
240:21, 241:7,
242:25, 243:22,
245:25, 247:21,
248:11, 249:11,
251:24, 252:2,
253:9, 253:14,
254:7, 254:10,

254:12, 254:13,
257:13, 258:7,
261:14, 267:4,
267:11, 267:22,
267:23, 268:19,
269:1, 270:19,
270:21, 270:25,
271:4, 271:13,
274:24
**Analytical** [1] - 239:12
**analyze** [3] - 76:10,
77:9, 95:17
**analyzed** [5] - 22:2,
22:7, 129:1, 173:19,
203:6
**analyzes** [1] - 76:25
**analyzing** [1] - 22:4
**and..** [1] - 263:15
**Andrew** [1] - 6:6
**ANDREW** [2] - 1:20,
3:15
**anecdotal** [1] - 47:8
**announced** [1] - 72:20
**answer** [50] - 27:13,
30:9, 30:12, 47:1,
64:11, 68:21, 76:1,
77:15, 77:23, 78:8,
81:25, 83:7, 108:5,
122:13, 122:17,
124:7, 126:15,
135:23, 137:22,
137:25, 143:2,
146:19, 149:8,
149:18, 149:19,
151:12, 157:15,
163:6, 173:8,
174:12, 174:13,
181:2, 181:5, 187:1,
187:7, 199:16,
200:5, 216:22,
222:11, 230:17,
241:13, 241:14,
241:24, 241:25,
242:7, 242:10,
245:5, 252:19,
263:18, 275:13
**answered** [1] - 230:16
**ante** [2] - 226:25,
227:2
**anticipated** [1] -
156:17
**anticipation** [1] - 61:5
**antithesis** [1] - 101:19
**anyplace** [4] - 77:14,
190:12, 230:2,
230:21
**anyway** [3] - 26:7,
224:5, 274:9
**APA** [1] - 48:3
**Apologies** [1] - 135:8

**apologies** [6] -
136:25, 137:2,
140:16, 141:2,
248:3, 259:1
**apologize** [6] - 14:5,
140:22, 187:14,
192:21, 234:1,
252:10
**apparent** [3] - 99:16,
105:6, 203:2
**appeal** [1] - 67:4
**appear** [2] - 72:2,
279:16
**appearance** [1] - 5:6
**appease** [1] - 96:9
**appendices** [2] -
190:7, 190:24
**appendix** [7] - 135:3,
147:14, 190:6,
197:24, 256:12,
268:4, 271:10
**appetite** [1] - 97:18
**apples** [4] - 144:25,
145:4, 223:4
**applicable** [2] - 64:17,
211:5
**applicant** [7] - 57:25,
58:9, 127:13, 171:5,
171:11, 171:23,
172:13
**applicants** [1] - 78:19
**application** [5] -
38:12, 136:3,
221:16, 232:14,
233:6
**applied** [4] - 159:24,
160:9, 170:22, 221:2
**applies** [1] - 268:22
**apply** [1] - 12:8
**applying** [1] - 206:16
**Appreciate** [1] -
117:11
**appreciate** [20] - 12:6,
14:16, 26:21, 28:10,
31:4, 64:8, 68:10,
68:20, 69:23, 79:20,
115:22, 123:21,
173:25, 182:7,
182:22, 196:14,
256:24, 281:4
**appreciated** [4] -
24:23, 135:5, 266:5,
281:6
**appreciates** [1] - 31:5
**appreciative** [2] - 7:1,
116:1
**approach** [12] -
174:24, 225:6,
232:5, 238:9,
239:12, 241:4,

241:8, 241:10,
243:25, 244:2,
244:3, 275:18
**approached** [1] - 29:4
**appropriate** [24] -
10:4, 27:9, 35:20,
42:24, 78:22, 81:22,
130:18, 136:9,
136:11, 137:19,
162:1, 167:22,
167:23, 168:11,
195:12, 199:7,
199:9, 215:19,
216:7, 220:16,
262:6, 264:2,
266:13, 268:3
**approval** [5] - 15:8,
33:22, 72:19, 166:2,
190:11
**approve** [4] - 8:20,
71:5, 241:18, 263:23
**approved** [12] - 18:7,
18:9, 19:3, 19:12,
21:10, 25:13, 26:7,
33:18, 70:7, 241:10,
262:15, 277:21
**approving** [1] - 8:14
**approvingly** [1] - 46:6
**approximating** [1] -
42:8
**April** [2] - 1:10, 42:1
**arbitrarily** [2] - 121:7,
229:22
**arbitrariness** [2] -
146:24, 147:12
**arbitrary** [16] - 36:11,
36:13, 36:15, 36:23,
37:20, 38:3, 38:13,
40:3, 73:13, 103:23,
111:1, 111:4,
146:20, 211:13,
228:16, 268:21
**are..** [1] - 137:12
**area** [48] - 10:19, 34:3,
37:22, 40:18, 40:19,
50:18, 57:1, 77:5,
88:9, 88:11, 105:7,
105:18, 117:23,
154:20, 154:25,
155:3, 155:5,
156:10, 160:24,
161:14, 164:20,
164:23, 217:9,
221:20, 238:4,
238:22, 243:22,
250:4, 251:2, 251:4,
254:24, 261:24,
265:23, 269:12,
269:14, 269:17,
269:19, 269:24,

271:6, 271:13,
272:3, 272:8,
272:23, 273:5,
273:6, 274:11,
278:20
**areas** [33] - 34:2,
51:14, 53:21, 81:10,
101:14, 104:15,
104:16, 114:23,
123:4, 138:7,
138:15, 138:19,
149:5, 160:3,
214:24, 215:18,
216:3, 225:22,
228:1, 237:22,
237:24, 244:22,
253:4, 253:6,
261:15, 265:22,
265:23, 266:7,
273:2, 274:21,
274:22
**arena** [1] - 156:24
**arguably** [2] - 17:2,
81:6
**argue** [5] - 19:1,
19:14, 19:17, 52:3,
200:13
**argued** [1] - 269:2
**arguing** [4] - 30:11,
65:24, 233:2, 268:25
**argument** [30] - 12:20,
15:21, 15:22, 17:10,
19:14, 20:8, 23:10,
26:9, 51:6, 52:12,
52:16, 54:16, 63:3,
66:6, 81:20, 82:1,
82:13, 113:2,
124:24, 129:15,
166:20, 208:21,
217:22, 219:5,
222:23, 233:6,
259:19, 270:16,
280:16
**ARGUMENT** [1] - 1:5
**arguments** [10] - 25:6,
30:14, 36:4, 50:3,
84:3, 122:3, 127:21,
127:24, 128:21,
279:18
**arise** [1] - 49:14
**Arizona** [1] - 168:8
**arms** [1] - 36:22
**Army** [1] - 127:10
**arose** [1] - 164:17
**art** [2] - 10:2, 248:11
**article** [1] - 214:12
**aside** [3] - 56:9,
130:14, 136:16
**aspect** [5] - 157:1,
157:2, 157:21,

261:14, 261:21
**aspects** [1] - 157:20
**assembled** [1] - 195:4
**assert** [1] - 19:16
**asserted** [1] - 166:7
**assertions** [1] - 81:15
**assess** [5] - 130:21, 132:23, 136:9, 215:14, 228:16
**assessed** [7] - 62:4, 62:8, 129:25, 130:9, 168:25, 237:20, 239:14
**assesses** [1] - 139:16
**assessment** [4] - 8:20, 34:4, 81:8, 129:9
**assessments** [1] - 145:25
**asset** [1] - 146:6
**assistance** [1] - 165:9
**associate** [1] - 108:4
**associated** [4] - 62:23, 68:13, 97:3, 181:25
**Association** [2] - 3:10, 76:21
**assume** [8] - 43:3, 43:24, 128:8, 166:20, 169:8, 220:17, 222:25, 251:16
**assumed** [1] - 181:12
**assuming** [5] - 79:1, 142:12, 142:16, 142:19, 222:22, 234:17, 252:19
**assurance/comfort** [1] - 143:18
**Asthma** [1] - 186:8
**attain** [1] - 204:9
**attainment** [2] - 204:15, 204:16
**attempt** [1] - 119:7
**attention** [5] - 68:15, 111:7, 112:17, 128:2, 222:12
**ATTORNEY'S** [3] - 2:3, 2:8, 2:11
**audacity** [1] - 19:1
**audience** [2] - 115:14, 115:18
**auspicious** [1] - 60:2
**authority** [6] - 8:14, 27:10, 47:22, 85:24, 111:5, 178:12
**Authority** [3] - 8:15, 17:17, 41:20
**authorization** [2] - 119:18, 193:17
**automatically** [2] -

117:17, 124:18
**availability** [3] - 54:22, 82:18, 82:20
**available** [5] - 82:22, 163:5, 171:15, 270:9, 278:18
**Avenue** [5] - 1:16, 2:17, 2:22, 3:5, 3:15
**avenue** [1] - 48:11
**avenues** [1] - 134:1
**average** [3] - 108:25, 209:20, 235:7
**Aviation** [1] - 47:9
**avoid** [8] - 18:25, 33:8, 61:3, 86:4, 86:15, 89:17, 117:15, 178:17
**avoidance** [1] - 214:21
**aware** [11] - 79:11, 110:16, 110:18, 133:23, 212:1, 234:14, 241:20, 241:23, 260:3, 278:12, 278:19

# B

**back-of-the-envelope** [3] - 26:19, 57:16, 58:2
**backroom** [1] - 195:7
**backwards** [3] - 11:8, 18:20, 69:4
**bad** [7] - 174:14, 174:15, 204:11, 209:12, 257:7, 257:19, 278:11
**Baltimore** [1] - 77:2
**band** [2] - 37:25, 245:18
**Band** [1] - 168:6
**banded** [6] - 246:2, 247:4, 247:6, 247:9, 247:10, 247:14
**bandied** [2] - 104:14, 155:1
**bank** [1] - 175:20
**bar** [1] - 92:6
**barred** [1] - 25:10
**base** [1] - 59:18
**based** [59] - 11:20, 19:15, 19:22, 25:17, 35:12, 40:21, 52:8, 61:19, 62:14, 78:17, 85:22, 85:25, 89:14, 103:3, 104:6, 106:25, 108:1, 108:2, 109:11, 109:16, 114:12, 117:23, 141:16,

142:2, 142:11, 144:6, 144:23, 145:19, 145:24, 146:7, 158:23, 159:10, 159:19, 160:3, 160:7, 161:4, 161:24, 164:1, 164:5, 169:1, 175:2, 176:8, 177:4, 178:15, 188:6, 192:4, 198:7, 201:19, 223:19, 228:23, 228:24, 229:23, 251:21, 255:1, 255:22, 256:13, 264:25, 265:20
**basic** [1] - 50:17
**basis** [27] - 20:2, 21:23, 58:1, 73:11, 78:11, 95:21, 119:15, 125:2, 125:6, 125:17, 125:20, 149:4, 178:6, 206:3, 210:25, 215:21, 217:18, 226:24, 230:14, 232:2, 251:17, 262:13, 263:21, 263:23, 264:16, 264:18, 265:25
**Bay** [3] - 70:13, 74:20, 74:21
**Bayonne** [13] - 110:24, 112:9, 112:23, 113:19, 114:15, 114:16, 141:20, 178:1, 228:5, 228:6, 228:10
**bear** [1] - 25:2
**bearing** [1] - 25:4
**bears** [1] - 90:12
**became** [3] - 138:25, 171:15, 212:1
**become** [5] - 22:17, 105:6, 132:19, 138:25, 203:2
**becomes** [2] - 49:24, 84:18
**becoming** [1] - 132:23
**beg** [1] - 31:12
**begin** [8] - 84:15, 164:20, 166:23, 167:5, 167:8, 196:23, 197:14, 226:23
**beginning** [6] - 5:6, 32:3, 37:5, 116:3, 167:8, 195:3

**begins** [3] - 6:18, 42:25, 257:25
**behalf** [8] - 5:9, 5:13, 6:10, 6:14, 7:3, 30:18, 153:9, 279:7
**behavior** [1] - 36:1
**behest** [1] - 7:15
**behind** [2] - 195:7, 195:17
**belabor** [1] - 272:14
**believes** [2] - 39:10
**below** [7] - 13:18, 62:11, 141:11, 204:9, 245:21, 245:22, 253:19
**bench** [1] - 22:16
**benchmarks** [5] - 91:6, 91:19, 91:20, 94:1, 94:5
**Bend** [1] - 95:24
**beneficial** [1] - 206:25
**beneficiary** [1] - 127:15
**benefit** [10] - 51:23, 81:15, 154:20, 156:5, 156:18, 158:22, 192:1, 273:2, 274:20, 275:7
**benefits** [5] - 15:10, 81:16, 118:3
**benign** [1] - 131:20
**BERGEN** [1] - 3:18
**Bergen** [69] - 3:8, 3:19, 3:20, 6:13, 6:14, 100:17, 100:18, 100:22, 100:23, 100:24, 102:9, 102:21, 102:23, 103:9, 103:10, 103:13, 103:15, 103:21, 106:1, 107:11, 107:13, 107:15, 107:18, 107:20, 108:17, 108:20, 108:21, 108:23, 110:10, 110:12, 110:15, 113:19, 114:9, 114:13, 123:13, 148:4, 149:6, 149:7, 149:14, 198:16, 198:18, 199:1, 200:21, 202:13, 202:24, 208:24, 209:2, 209:6, 209:11, 209:15, 209:19, 210:8, 210:12, 210:15, 211:19, 214:20,

215:19, 224:19, 225:10, 225:14, 226:22, 245:5, 245:12, 245:17, 245:20, 249:20, 250:4, 257:14
**beset** [1] - 160:24
**best** [12] - 35:13, 43:16, 68:4, 133:13, 163:5, 180:23, 183:14, 235:4, 241:5, 241:6, 243:13, 262:22
**better** [13] - 149:20, 162:11, 173:7, 174:16, 174:18, 178:15, 194:19, 199:14, 204:17, 205:19, 233:3, 233:4, 247:16
**Better** [1] - 3:9
**between** [14] - 9:19, 26:1, 38:21, 47:2, 139:20, 145:22, 150:8, 151:22, 166:6, 207:14, 224:21, 236:18, 253:16, 267:14
**beyond** [11] - 22:11, 105:9, 106:12, 124:19, 141:6, 156:1, 156:9, 244:22, 250:11, 259:13, 266:20
**big** [2] - 56:25, 81:5
**bigger** [1] - 203:23
**biggest** [3] - 208:22, 208:23, 224:20
**BII** [1] - 3:11
**Bike** [4] - 3:8, 3:8, 3:10, 3:13
**billion** [28] - 8:1, 8:17, 9:2, 9:3, 9:4, 9:6, 9:19, 9:20, 9:21, 15:2, 15:6, 15:12, 15:19, 16:14, 16:22, 50:21, 50:25, 51:2, 97:24, 117:21, 124:21, 125:16, 132:3, 188:12
**billions** [1] - 125:24
**binds** [1] - 50:15
**bit** [23] - 31:6, 31:7, 31:11, 34:7, 46:10, 49:10, 49:23, 52:11, 53:6, 54:1, 72:23, 77:24, 88:15, 103:9, 135:4, 135:21, 143:23, 203:17, 226:3, 233:21,

275:20, 278:11
**black** [2] - 34:22, 41:2
**Black's** [1] - 10:3
**bless** [1] - 126:25
**block** [9] - 162:13, 162:25, 163:2, 231:3, 231:9, 231:15, 232:4, 270:3, 270:4
**blocked** [1] - 246:14
**blocking** [1] - 141:11
**blocks** [10] - 162:3, 162:21, 206:4, 206:9, 206:13, 235:2, 255:5, 261:17, 278:24
**blown** [1] - 169:20
**BlueWaveNJ** [1] - 3:10
**blush** [1] - 62:10
**Board** [2] - 56:14, 71:4
**board** [5] - 52:23, 103:11, 105:3, 219:17, 280:20
**boat** [1] - 7:10
**boatload** [3] - 10:1, 10:3, 10:6
**boggling** [1] - 11:4
**bona** [1] - 29:9
**booth** [2] - 238:9
**Bordentown** [2] - 13:14, 183:1
**border** [13] - 70:20, 74:22, 74:23, 75:15, 83:16, 83:19, 86:17, 86:20, 86:24, 87:10, 88:4, 111:24, 220:15
**borders** [1] - 250:12
**bottom** [9] - 31:1, 61:8, 80:4, 116:3, 188:9, 207:21, 234:8, 253:3, 275:18
**bottom-line** [1] - 116:3
**boundaries** [2] - 66:13, 66:14
**bounds** [3] - 16:15, 30:10, 243:11
**box** [1] - 61:8
**boxes** [2] - 94:1, 205:7
**BPM** [1] - 269:14
**brand** [1] - 244:3
**brand-new** [1] - 244:3
**break** [7] - 79:22, 83:11, 84:4, 167:25, 182:11, 197:3, 197:13
**breaks** [1] - 231:14
**breath** [2] - 31:6, 90:5
**breathtaking** [1] -

11:4
**Bridge** [5] - 41:20, 75:11, 97:22, 158:13, 250:4
**bridge** [6] - 70:18, 74:21, 75:12, 79:8, 97:22, 169:24
**bridges** [3] - 98:4, 118:1, 172:6
**brief** [11] - 14:17, 51:20, 71:13, 167:18, 167:24, 168:15, 173:18, 199:21, 199:24, 255:18, 279:23
**briefed** [1] - 22:24
**briefing** [3] - 22:25, 50:6, 137:15
**briefings** [1] - 23:6
**briefly** [6] - 33:1, 36:9, 74:14, 90:10, 122:20, 130:23
**briefs** [3] - 279:17, 279:22, 279:23
**bright** [1] - 166:3
**bring** [2] - 5:23, 128:1
**bringing** [1] - 278:21
**brings** [1] - 256:16
**broad** [4] - 23:22, 68:10, 68:11, 193:22
**Broad** [1] - 2:9
**broader** [2] - 155:20, 199:18
**Bronx** [64] - 13:24, 13:25, 89:6, 89:7, 100:12, 100:16, 100:19, 100:25, 102:16, 102:17, 103:9, 103:20, 108:18, 108:21, 108:25, 114:5, 114:14, 119:11, 123:15, 146:17, 147:4, 148:5, 148:24, 149:10, 153:25, 159:21, 159:25, 161:19, 161:25, 164:16, 164:17, 164:19, 165:6, 165:8, 165:12, 165:14, 174:13, 174:14, 174:16, 175:7, 175:8, 175:9, 181:22, 183:18, 184:20, 185:8, 185:18, 186:5, 186:8, 186:14, 186:19, 187:22, 189:16, 190:11,

194:23, 195:8, 209:2, 209:4, 209:11, 209:15, 209:18, 209:21
**brothers** [1] - 123:19
**brought** [12] - 19:4, 19:21, 20:2, 22:20, 34:24, 111:7, 162:24, 187:19, 222:12, 254:6, 255:4, 255:6
**brown** [1] - 103:18
**BRUCE** [1] - 1:19
**Bruce** [1] - 6:6
**bucket** [1] - 137:8
**buckets** [1] - 211:4
**build** [1] - 74:21
**building** [4] - 5:21, 70:13, 70:16, 235:1
**built** [1] - 24:7
**bunch** [3] - 59:18, 80:6, 82:25
**burden** [13] - 16:20, 73:15, 73:22, 73:23, 73:24, 74:3, 90:12, 129:23, 130:10, 161:8, 229:18, 246:6, 277:6
**burdened** [4] - 164:20, 193:1, 193:2, 274:22
**burdens** [35] - 111:12, 111:13, 111:18, 158:25, 159:3, 159:8, 159:9, 160:2, 160:19, 160:24, 161:5, 161:13, 161:14, 161:16, 161:18, 177:17, 225:17, 225:20, 247:24, 259:15, 271:14, 271:15, 271:17, 271:19, 272:22, 272:23, 273:13, 274:2, 274:11, 274:23, 274:25, 275:1, 275:3, 275:4
**Bureau** [1] - 35:23
**Burlington** [1] - 168:9
**burning** [2] - 154:18
**bus** [2] - 10:5, 15:20
**Busey** [2] - 168:8, 168:9
**Business** [1] - 235:24
**business** [9] - 10:20, 17:18, 133:17, 140:23, 140:24, 142:7, 251:20, 252:1, 276:22
**buzzword** [1] - 135:22

**BY** [19] - 1:15, 1:16, 1:19, 1:19, 1:20, 2:4, 2:5, 2:8, 2:12, 2:16, 2:16, 2:17, 2:21, 2:21, 3:4, 3:15, 3:18, 4:3, 4:15
**Bypass** [1] - 38:19

## C

**cabined** [2] - 89:2, 90:2
**cabining** [3] - 216:1, 232:13, 233:9
**Cachil** [1] - 168:6
**calculated** [2] - 247:15, 272:14
**calculation** [1] - 57:16
**calendar** [1] - 46:13
**California** [1] - 168:7
**candid** [1] - 245:22
**candidly** [1] - 216:10
**cannot** [7] - 43:9, 58:11, 127:12, 153:4, 168:13, 197:12
**capable** [1] - 90:7
**capital** [17] - 8:1, 8:17, 9:7, 9:8, 15:6, 33:13, 50:20, 97:24, 117:21, 119:2, 125:14, 125:25, 126:24, 127:1, 171:9
**capped** [1] - 186:24
**capricious** [13] - 36:11, 36:13, 36:15, 36:23, 37:20, 38:4, 38:13, 40:4, 73:14, 103:24, 211:13, 228:16, 268:22
**caps** [1] - 53:9
**captured** [1] - 138:12
**car** [1] - 280:19
**carbon** [4] - 103:17, 205:7, 209:14
**card** [1] - 123:11
**care** [4] - 14:22, 100:20, 100:21, 174:15
**carried** [2] - 129:8, 130:13
**cart** [4] - 54:10, 68:23, 69:2, 69:3
**carve** [1] - 211:12
**Case** [1] - 95:24
**case** [156] - 5:3, 7:3, 7:7, 7:12, 11:22, 11:23, 12:3, 12:4, 12:7, 12:12, 12:15, 12:17, 13:13, 13:14,

15:5, 19:2, 19:21, 20:9, 20:10, 21:13, 21:14, 22:1, 22:2, 22:15, 22:20, 23:3, 23:4, 23:6, 25:1, 25:12, 25:18, 33:1, 34:16, 35:22, 36:24, 38:19, 39:4, 44:10, 44:21, 44:24, 45:5, 49:25, 50:8, 50:11, 50:12, 51:19, 53:21, 56:9, 56:17, 57:1, 57:5, 66:10, 67:25, 68:14, 70:24, 74:22, 74:23, 75:15, 75:20, 77:1, 77:4, 81:1, 81:6, 89:18, 90:21, 90:24, 90:25, 91:22, 91:24, 92:25, 95:23, 96:11, 96:14, 96:24, 99:21, 116:10, 117:14, 122:23, 123:3, 124:12, 124:15, 127:7, 129:11, 133:9, 134:11, 134:12, 134:16, 134:20, 135:1, 135:8, 136:4, 136:5, 147:16, 168:9, 171:5, 178:10, 178:19, 180:17, 180:20, 180:23, 181:8, 182:25, 183:1, 183:3, 183:10, 188:16, 192:25, 193:3, 206:8, 210:13, 217:23, 218:1, 218:3, 218:18, 219:1, 220:6, 220:8, 223:2, 225:14, 238:21, 240:2, 240:9, 240:18, 241:10, 241:17, 241:19, 242:18, 242:20, 243:1, 243:19, 244:15, 257:15, 259:25, 261:2, 262:8, 264:3, 264:17, 265:2, 265:4, 265:5, 265:10, 266:16, 266:19, 266:21, 266:22
**case-by-case** [5] - 68:14, 81:1, 242:18, 242:20, 243:1
**cases** [24] - 22:17, 45:3, 46:5, 56:24, 57:3, 57:10, 75:10,

75:19, 91:12, 133:5,
133:19, 168:15,
168:18, 168:21,
168:25, 170:16,
170:19, 181:1,
190:23, 225:9,
259:5, 262:5,
262:20, 264:10
**cat** [1] - 125:16
**catch** [1] - 280:19
**categories** [5] -
198:15, 199:2,
204:17, 209:5,
218:13
**category** [16] - 103:15,
103:19, 103:20,
108:17, 108:20,
108:23, 112:10,
123:14, 177:18,
177:20, 205:1,
209:3, 226:16,
226:19, 232:22,
232:25
**caused** [3] - 142:6,
149:11, 264:21
**CBD** [21] - 125:24,
141:1, 156:11,
156:25, 157:8,
157:21, 157:22,
158:2, 158:6, 171:8,
171:13, 173:12,
184:14, 185:6,
204:2, 214:21,
215:19, 239:9,
239:18, 239:21,
258:16
**CDC** [3] - 271:17,
271:20, 271:23
**census** [81] - 51:25,
52:7, 140:7, 140:10,
140:12, 140:18,
141:14, 142:14,
160:6, 161:17,
161:23, 162:3,
162:13, 162:19,
162:20, 162:21,
162:25, 163:2,
164:9, 164:21,
165:6, 167:11,
176:7, 177:19,
185:12, 185:17,
192:24, 193:2,
198:6, 205:22,
206:3, 206:4, 206:9,
210:5, 211:18,
215:16, 223:15,
224:4, 225:3, 227:9,
228:19, 229:4,
229:16, 231:3,
231:9, 231:15,

232:4, 232:6, 232:8,
232:10, 232:15,
252:8, 252:12,
253:16, 254:1,
254:2, 254:7,
254:14, 255:4,
255:5, 255:9,
255:12, 261:17,
269:24, 270:3,
270:4, 271:5, 271:6,
272:2, 272:8,
272:12, 272:16,
272:22, 272:25,
274:24, 275:2
**Center** [4] - 11:23,
89:19, 90:25, 186:8
**center** [1] - 272:11
**Central** [2] - 202:5,
235:23
**central** [8] - 10:20,
17:18, 104:19,
140:23, 140:24,
142:7, 251:20, 252:1
**centric** [1] - 102:15
**CEQ** [3] - 95:19,
130:22, 255:9
**certain** [18] - 39:2,
50:9, 51:24, 78:21,
93:19, 94:1, 104:4,
125:2, 144:10,
145:8, 149:5,
211:10, 211:17,
211:18, 243:10,
272:11
**certainly** [9] - 23:15,
63:25, 65:4, 154:8,
156:5, 160:14,
167:10, 226:4,
260:10
**certainty** [1] - 93:6
**certified** [3] - 276:20,
277:8, 278:7
**cetera** [5] - 37:14,
37:19, 138:22
**CFR** [4] - 27:15, 71:14,
85:18, 88:6
**chair** [2] - 10:22, 23:1
**challenge** [11] - 19:8,
19:23, 41:6, 72:25,
85:1, 116:4, 133:9,
133:20, 136:8,
165:24, 176:14
**challengeable** [1] -
78:2
**challenged** [7] - 25:2,
42:24, 45:24, 57:4,
66:3, 66:17, 72:18
**challenges** [3] -
71:25, 133:24
**challenging** [4] -

19:21, 34:19, 218:3,
218:4
**chance** [1] - 40:25
**change** [39] - 12:14,
12:24, 21:1, 23:1,
48:22, 54:12, 55:4,
56:23, 60:24, 66:17,
66:18, 73:24, 76:10,
81:14, 85:13, 111:7,
122:17, 134:5,
139:21, 139:25,
140:3, 148:6, 148:7,
150:19, 150:21,
169:24, 236:6,
236:11, 236:24,
236:25, 237:14,
240:12, 245:18,
246:9, 253:12,
253:15, 259:22,
259:23, 279:22
**changed** [4] - 13:1,
70:10, 95:16, 163:8
**changes** [31] - 21:9,
21:15, 21:17, 21:21,
22:10, 27:11, 27:19,
27:20, 28:19, 29:10,
30:2, 36:1, 48:17,
55:13, 57:5, 57:19,
67:18, 73:15, 73:16,
96:22, 139:16,
139:17, 142:14,
177:25, 235:5,
235:11, 235:25,
236:7, 277:21,
278:1, 278:2
**changing** [7] - 57:5,
57:7, 69:5, 70:14,
70:15, 83:14, 104:2
**chapter** [7] - 116:9,
120:8, 124:2,
190:14, 256:5
**charge** [1] - 97:20
**chart** [10] - 59:12,
80:9, 102:12,
102:24, 108:16,
109:4, 109:7,
126:17, 177:21,
246:11
**charting** [1] - 235:5
**charts** [2] - 84:12,
84:13
**check** [2] - 94:2, 205:7
**cherry** [6] - 198:20,
199:14, 200:1,
209:24, 224:13,
228:9
**cherry-pick** [1] -
224:13
**cherry-picked** [1] -
198:20, 199:14,

209:24
**cherry-picking** [2] -
200:1, 228:9
**Chertok** [46] - 4:6,
4:13, 5:16, 6:2, 9:13,
28:7, 49:14, 50:4,
54:4, 54:18, 55:16,
58:25, 60:10, 60:18,
61:5, 62:21, 64:14,
64:23, 65:15, 67:21,
68:23, 76:25, 79:21,
80:1, 81:20, 89:11,
143:1, 149:23,
150:5, 163:12,
167:16, 168:17,
170:8, 170:25,
182:15, 183:9,
184:5, 191:7,
196:11, 242:12,
242:14, 242:17,
242:23, 256:25,
260:6, 279:14
**CHERTOK** [90] - 2:16,
5:15, 49:16, 49:18,
49:22, 50:12, 50:23,
50:25, 51:5, 52:6,
52:13, 52:21, 53:2,
53:6, 53:16, 53:19,
54:2, 54:5, 54:23,
55:1, 55:13, 55:17,
55:23, 56:6, 56:13,
56:21, 56:23, 57:24,
58:5, 58:11, 58:23,
59:1, 59:4, 59:8,
59:11, 59:14, 60:9,
60:12, 60:21, 61:10,
61:13, 61:16, 61:20,
62:1, 62:7, 62:17,
63:6, 63:9, 63:11,
63:16, 63:21, 79:23,
80:2, 80:5, 80:10,
80:12, 80:16, 80:19,
81:3, 81:24, 82:2,
82:10, 82:16, 82:22,
83:2, 149:25,
167:17, 168:5,
168:24, 169:7,
169:14, 170:13,
170:15, 170:24,
171:4, 171:16,
171:19, 171:24,
172:3, 172:5,
172:11, 172:16,
172:23, 173:4,
173:9, 173:17,
173:23, 196:12,
279:15, 280:3
**Chertok's** [2] - 56:1,
68:11
**Chesapeake** [3] -

209:24
**Cheshire** [1] - 125:16
**choice** [13] - 23:20,
40:1, 135:25, 136:1,
136:3, 220:12,
220:14, 220:21,
221:2, 231:22,
233:5, 241:22,
244:17
**choices** [5] - 211:13,
216:1, 222:5, 228:2,
263:23
**choose** [8] - 34:20,
39:24, 47:22, 73:16,
87:8, 221:25, 223:5,
223:6
**chooses** [1] - 48:1
**choosing** [6] - 66:19,
66:21, 232:19,
238:21, 241:9,
249:13
**chose** [9] - 18:8,
206:23, 210:9,
210:10, 221:19,
223:1, 225:24,
239:14, 252:4
**chosen** [12] - 112:13,
144:4, 144:7,
208:22, 225:10,
225:13, 251:22,
266:2, 270:12,
270:13, 270:15
**chronic** [26] - 7:19,
111:12, 111:18,
159:2, 159:9, 160:2,
161:13, 161:15,
161:18, 177:17,
226:17, 226:25,
227:3, 227:7,
227:15, 228:17,
229:15, 229:18,
232:11, 271:14,
271:19, 272:23,
274:2, 274:23,
274:25, 275:4
**chunk** [1] - 156:13
**Circuit** [30] - 11:22,
21:14, 21:25, 25:1,
57:1, 90:21, 90:25,
91:13, 124:15,
124:16, 127:11,
129:20, 130:19,
131:22, 134:11,
134:12, 134:20,
135:1, 135:8, 168:7,
168:10, 170:17,
183:1, 255:8,
255:15, 255:20,
262:15, 262:16,
268:18

**circuits** [2] - 91:14, 122:24
**circumstance** [9] - 13:11, 38:7, 87:11, 91:20, 136:11, 220:10, 222:17, 223:6, 223:7
**circumstances** [13] - 22:1, 22:10, 71:15, 78:21, 79:2, 129:22, 129:23, 136:4, 169:21, 220:10, 223:19, 241:19, 243:2
**citation** [3] - 80:15, 144:21, 148:21
**citations** [4] - 113:21, 182:10, 200:12, 262:23
**cite** [6] - 64:15, 75:19, 80:10, 91:22, 133:10, 255:16
**cited** [8] - 12:12, 45:5, 56:25, 89:18, 116:9, 119:9, 122:24, 167:23
**cites** [3] - 167:25, 199:25, 271:22
**cities** [4] - 81:12, 81:18, 227:9, 260:7
**citing** [1] - 13:13
**Citizen** [1] - 260:22
**citizen** [1] - 3:12
**Citizens** [2] - 134:16, 168:9
**city** [9] - 69:25, 70:1, 112:5, 123:20, 152:15, 181:24, 206:3, 206:4, 252:4
**City** [9] - 34:2, 69:25, 70:2, 97:21, 149:2, 149:6, 156:7, 175:13, 184:11
**Civ** [1] - 5:4
**CIVIL** [1] - 1:3
**claim** [1] - 36:10, 48:3, 57:14, 59:6, 59:14, 76:10, 76:12, 76:24, 166:4, 166:7, 166:8
**claims** [3] - 34:24, 76:6, 133:25
**clarification** [5] - 9:12, 54:3, 58:22, 148:9, 280:11
**clarify** [6] - 54:17, 98:11, 157:15, 164:3, 172:11, 262:1
**clarity** [2] - 78:10, 79:16

**clarity's** [2] - 92:17, 92:19
**class** [1] - 179:8
**Clause** [1] - 133:24
**Clean** [3] - 3:6, 33:24, 280:15
**clean** [2] - 137:11, 154:17
**cleaner** [1] - 154:18
**clear** [20] - 8:13, 8:21, 24:3, 49:24, 51:21, 51:22, 61:3, 64:13, 80:14, 105:5, 111:15, 114:20, 130:22, 140:16, 151:15, 173:1, 178:11, 195:12, 212:20, 213:25
**clearer** [2] - 85:3, 89:18
**clearly** [5] - 21:25, 25:4, 93:24, 252:12, 253:19
**clerks** [3] - 168:3, 182:12, 255:15
**client** [10] - 68:5, 113:4, 126:9, 126:10, 213:16, 216:11, 216:12, 277:4, 280:23
**client's** [2] - 16:16, 98:16
**clients** [1] - 185:1
**climate** [4] - 81:14, 259:20, 259:22, 259:23
**clock** [7] - 6:18, 19:6, 24:22, 32:24, 59:3, 84:10, 128:11
**close** [6] - 83:23, 183:5, 208:1, 252:20, 272:11, 276:22
**closer** [2] - 5:23, 272:19
**closest** [1] - 251:19
**closing** [1] - 280:16
**Club** [1] - 218:1
**co** [1] - 185:1
**co-counsel** [1] - 185:1
**Coalition** [2] - 3:7, 135:1
**Coastal** [1] - 95:24
**cockeyed** [1] - 132:8
**coin** [2] - 121:7, 146:3
**collapsed** [1] - 78:1
**colleague** [2] - 5:9, 192:11
**colleagues** [4] - 12:16, 43:2, 43:4,

70:24
**collective** [1] - 152:2
**colloquial** [1] - 97:19
**colloquy** [4] - 59:2, 77:24, 150:7, 199:6
**color** [1] - 141:6
**Colorado** [1] - 218:2
**coloring** [2] - 140:17, 141:11
**column** [1] - 246:19
**columns** [1] - 80:6
**combination** [2] - 66:22, 230:7
**combined** [1] - 21:22
**comfort** [1] - 180:6
**comfortable** [3] - 78:24, 137:24, 159:16
**coming** [10] - 45:16, 138:6, 143:7, 156:4, 158:13, 184:1, 184:13, 195:18, 203:16, 238:18
**commence** [1] - 71:22
**Commencing** [1] - 1:11
**comment** [27] - 6:1, 21:17, 67:12, 99:5, 99:12, 99:20, 99:22, 113:11, 154:8, 171:15, 172:1, 172:2, 173:3, 182:17, 196:13, 200:10, 213:17, 232:20, 261:14, 261:21, 261:25, 266:7, 266:8, 267:10, 270:18, 270:22
**commentary** [4] - 26:22, 65:1, 65:3, 136:15
**commented** [1] - 113:12
**commenting** [2] - 82:4, 248:4
**comments** [23] - 115:7, 115:8, 143:17, 143:18, 162:22, 212:4, 212:8, 212:15, 215:9, 239:16, 254:6, 256:17, 256:21, 260:16, 261:8, 261:9, 266:10, 267:8, 267:13, 267:24, 268:3, 268:5
**Commerce** [1] - 133:24

**commit** [1] - 175:13
**commitment** [45] - 40:21, 89:7, 142:22, 143:11, 143:21, 145:15, 146:25, 147:3, 149:5, 154:3, 154:17, 156:16, 156:18, 163:19, 164:4, 164:5, 164:16, 165:4, 166:11, 174:22, 175:11, 175:12, 175:15, 175:20, 176:9, 176:10, 176:16, 176:18, 177:8, 177:11, 179:1, 179:4, 180:12, 191:20, 193:8, 193:9, 193:16, 193:20, 193:22, 193:25, 197:12, 197:24, 198:7, 229:2
**commitments** [24] - 51:22, 86:3, 86:7, 86:14, 89:16, 101:4, 101:6, 109:12, 137:8, 137:9, 139:11, 142:11, 143:15, 144:6, 144:15, 151:7, 164:17, 178:16, 180:11, 180:13, 180:22, 192:3, 275:11
**commits** [1] - 163:25
**committed** [28] - 29:25, 72:9, 100:21, 100:22, 101:25, 102:21, 104:7, 108:18, 108:21, 114:6, 146:11, 146:16, 153:15, 157:11, 157:14, 164:6, 166:8, 174:10, 175:9, 177:3, 188:12, 188:25, 191:11, 191:13, 195:19, 209:18, 209:21, 229:23
**committing** [2] - 191:23, 192:4
**common** [1] - 54:11
**communicate** [1] - 164:22
**communicated** [3] - 41:20, 42:17, 43:3
**communication** [1] - 267:14

**Communities** [36] - 7:18, 11:18, 13:4, 17:12, 30:23, 72:14, 90:3, 92:10, 100:7, 104:1, 109:14, 109:15, 112:3, 115:5, 130:12, 140:1, 140:4, 154:12, 177:7, 206:6, 217:3, 223:16, 225:18, 225:21, 227:10, 229:5, 232:10, 253:10, 253:11, 259:15, 261:13, 261:18, 267:25, 269:9, 269:23, 269:25
**communities** [86] - 89:3, 89:24, 92:11, 93:20, 104:17, 104:18, 112:22, 112:25, 113:6, 123:11, 123:13, 139:18, 139:21, 139:22, 140:8, 142:12, 142:16, 142:17, 142:19, 143:12, 143:14, 143:16, 145:23, 146:12, 146:15, 147:7, 152:24, 154:1, 154:20, 155:24, 158:22, 158:24, 159:3, 159:7, 160:1, 160:18, 160:25, 161:9, 162:15, 163:20, 164:1, 164:6, 165:1, 165:11, 166:25, 167:6, 170:6, 174:12, 175:22, 176:7, 176:21, 177:2, 177:9, 178:20, 185:9, 185:20, 185:24, 186:6, 187:25, 191:19, 193:10, 194:1, 194:18, 195:8, 198:3, 198:6, 199:12, 202:15, 215:18, 223:15, 226:7, 226:9, 226:19, 228:18, 228:21, 229:4, 229:15, 229:20, 229:22, 254:11, 254:15, 270:20, 273:15, 274:5, 274:10, 275:7

**Community** [7] - 29:7, 29:11, 29:20, 112:19, 145:23, 188:4, 224:4
**community** [18] - 6:10, 116:6, 133:13, 133:14, 144:17, 144:23, 145:18, 146:7, 146:8, 175:3, 188:6, 188:13, 188:14, 191:17, 191:18, 192:23, 193:6, 202:20
**community-based** [2] - 144:23, 146:7
**community-led** [1] - 146:8
**commuters** [1] - 204:2
**companies** [1] - 155:8
**comparable** [1] - 204:1
**comparative** [2] - 74:16, 106:17
**compare** [3] - 22:6, 161:17, 253:25
**compared** [10] - 100:17, 106:25, 137:17, 137:18, 146:16, 183:14, 198:22, 209:2, 253:5, 253:11
**comparing** [1] - 240:11
**comparisons** [1] - 223:5
**compels** [1] - 23:7
**compiled** [1] - 34:3
**complained** [1] - 221:7
**complaint** [1] - 151:4
**complete** [2] - 31:8, 199:11
**Complete** [1] - 3:7
**completely** [5] - 123:9, 125:5, 186:18, 214:4, 233:9
**compliance** [6] - 217:10, 217:19, 217:24, 218:6, 218:11, 219:3
**complicated** [1] - 78:23
**comply** [1] - 180:1
**components** [4] - 21:22, 22:2, 96:1, 105:15
**comports** [2] - 129:10, 136:1
**comprehensive** [4] - 10:25, 69:20, 85:20, 90:15
**comprises** [1] - 194:25
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**conceded** [2] - 7:11, 124:6
**concentration** [2] - 252:13, 252:15
**concept** [6] - 35:8, 47:20, 97:8, 155:4, 179:20, 179:23
**concern** [10] - 96:4, 138:3, 138:7, 138:15, 138:19, 172:13, 173:2, 265:7, 265:13, 271:23
**concerned** [8] - 77:24, 157:6, 215:17, 223:8, 223:10, 267:24, 268:19, 273:12
**concerning** [1] - 260:22
**concerns** [20] - 21:16, 27:12, 27:21, 29:11, 44:19, 84:16, 96:5, 114:23, 121:25, 133:15, 143:4, 173:6, 212:16, 214:1, 216:8, 216:10, 219:6, 256:18, 267:19, 269:9
**concession** [1] - 72:17
**conclude** [6] - 93:17, 93:18, 94:12, 111:2, 217:24, 278:25
**Concluded** [1] - 281:7
**concluded** [1] - 11:5, 111:10, 218:19
**conclusion** [12] - 41:7, 41:8, 71:17, 113:4, 211:8, 217:15, 218:5, 218:7, 218:15, 227:22, 227:23, 247:3
**conclusory** [1] - 101:12
**concretized** [1] - 171:15
**concurred** [1] - 242:25
**condition** [2] - 132:3, 193:17
**conditions** [1] - 43:24, 209:5
**conduct** [8] - 33:23, 48:1, 75:20, 75:21, 76:24, 77:5, 77:7, 133:17
**conducted** [1] - 257:13
**conducting** [2] - 48:9, 240:16
**conference** [2] - 38:18, 79:14
**confines** [3] - 17:18, 75:2, 250:11
**confirm** [1] - 215:17
**confirmed** [1] - 44:10
**confirming** [1] - 211:25
**conflated** [1] - 120:22
**conflates** [3] - 51:7, 130:20, 254:12
**confused** [3] - 213:5, 257:24
**confusion** [1] - 259:1
**congested** [6] - 10:19, 50:18, 70:1, 158:2, 158:9
**congestion** [31] - 7:8, 7:11, 10:15, 10:18, 12:10, 15:8, 15:16, 18:4, 33:11, 33:15, 34:25, 35:3, 35:5, 35:7, 50:16, 50:17, 77:19, 81:13, 118:23, 118:24, 119:4, 119:21, 156:25, 169:23, 171:8, 171:13, 171:21, 173:12, 198:22, 260:4
**congestive** [1] - 70:4
**Congregation** [1] - 22:15
**Congressman** [1] - 9:20
**connect** [1] - 178:25
**Connecticut** [5] - 88:12, 104:16, 138:22, 155:14, 156:1
**connector** [1] - 70:16
**connects** [2] - 237:24, 238:5
**consequence** [3] - 70:10, 93:21, 152:20
**consequences** [2] - 13:21, 223:16
**conservative** [3] - 262:6, 264:16, 270:10
**conservatively** [1] - 82:6
**consider** [27] - 17:15, 19:18, 21:10, 21:12, 26:15, 27:2, 29:23, 60:22, 62:18, 63:13, 67:3, 72:15, 88:8, 95:25, 97:14, 98:13, 113:9, 117:19, 122:2, 123:16, 124:22, 124:25, 125:18, 131:13, 219:5, 226:7, 226:9
**consideration** [13] - 16:11, 29:18, 34:23, 42:2, 48:24, 91:9, 99:9, 117:13, 133:2, 172:15, 202:17, 243:16, 269:6
**considerations** [5] - 50:6, 92:14, 151:17, 152:7, 269:3
**considered** [29] - 15:7, 18:12, 23:18, 25:2, 29:12, 44:25, 53:5, 60:23, 66:11, 77:20, 97:16, 98:17, 98:18, 105:3, 105:12, 105:21, 109:5, 114:8, 114:10, 120:3, 132:13, 133:4, 145:1, 165:11, 168:12, 201:4, 218:10, 227:13, 232:12
**considering** [6] - 88:7, 117:16, 224:14, 226:13, 233:10, 240:20
**considers** [2] - 219:4
**consistency** [2] - 104:24, 223:4
**consistent** [5] - 58:7, 133:5, 222:3, 223:2, 241:22
**consistently** [1] - 254:24
**Consolidated** [1] - 1:21
**constituent** [1] - 110:21
**constitute** [3] - 104:23, 106:20, 229:5
**constitutes** [1] - 39:12
**constitution** [1] - 134:1
**constraint** [1] - 173:10
**construct** [1] - 97:9
**constructed** [2] - 235:3, 235:4
**construction** [6] - 12:5, 12:9, 12:11, 12:23, 75:8, 120:6
**consultation** [14] - 144:15, 151:22, 152:8, 152:11, 152:14, 160:10, 160:21, 164:8, 164:9, 164:12, 164:18, 165:8, 166:18, 270:8
**consultative** [1] - 166:23
**contained** [5] - 193:22, 193:23, 202:17, 216:12, 279:23
**contains** [3] - 61:24, 94:23, 235:8
**contemplated** [2] - 79:6, 191:16
**contemplating** [1] - 28:8
**contend** [1] - 36:3
**contest** [1] - 236:12
**context** [22] - 12:3, 12:7, 12:8, 12:22, 28:25, 29:3, 45:4, 46:9, 47:2, 47:5, 68:9, 68:17, 159:16, 170:11, 183:9, 183:11, 183:23, 184:8, 235:20, 237:2, 244:4, 244:5
**contextual** [2] - 68:5, 78:11
**contextually** [3] - 47:4, 77:16, 79:9
**continue** [15] - 14:13, 46:2, 90:10, 105:6, 108:12, 108:16, 109:10, 142:9, 144:1, 144:12, 176:3, 187:15, 195:24, 204:12, 217:5
**continues** [1] - 141:7
**Continuing** [2] - 2:1, 3:1
**continuous** [1] - 111:6
**control** [3] - 39:23, 58:9, 58:11
**controls** [1] - 39:22
**controversy** [1] - 213:21
**conversation** [4] - 61:6, 95:14, 178:2, 192:17
**convincing** [22] - 73:17, 73:20, 90:14,

90:18, 90:20, 91:2,
91:5, 91:8, 91:10,
91:21, 91:24, 92:19,
92:23, 92:25, 93:15,
94:13, 95:1, 95:6,
95:9, 96:11, 96:14,
123:8
**cooperating** [3] -
145:2, 145:5, 145:8
**cooperation** [1] -
281:5
**coordination** [1] -
145:22
**copies** [1] - 258:5
**copy** [2] - 258:16,
258:24
**cordon** [3] - 18:5,
81:6, 117:23
**cordoned** [1] - 35:3
**cordoned-type** [1] -
35:3
**core** [2] - 97:7, 229:6
**corner** [1] - 148:6
**Corps** [1] - 127:11
**correct** [133] - 8:22,
8:23, 12:16, 13:9,
17:20, 18:10, 18:16,
26:16, 26:17, 27:2,
27:3, 27:23, 28:6,
28:8, 28:17, 30:24,
39:6, 39:17, 40:15,
41:21, 41:22, 42:2,
42:10, 43:17, 44:17,
45:1, 47:23, 48:8,
48:13, 48:21, 49:2,
51:5, 52:2, 53:2,
59:11, 59:23, 61:19,
61:20, 62:17, 63:21,
66:15, 67:1, 67:5,
68:6, 68:20, 71:11,
71:12, 71:15, 71:16,
71:19, 71:20, 71:23,
74:2, 74:19, 76:20,
88:5, 92:14, 92:24,
93:15, 94:3, 94:4,
94:9, 94:18, 94:24,
94:25, 95:2, 95:3,
105:14, 106:5,
107:8, 109:25,
119:22, 119:23,
120:4, 121:14,
129:14, 133:22,
138:22, 138:23,
140:5, 141:9,
141:22, 148:15,
152:22, 153:3,
153:17, 161:11,
162:3, 170:13,
172:5, 179:2, 184:6,
185:12, 187:25,

189:17, 193:21,
201:25, 202:6,
202:18, 202:21,
202:22, 203:1,
204:13, 205:4,
206:18, 207:10,
208:15, 208:17,
212:17, 213:12,
213:22, 214:8,
215:1, 220:25,
221:3, 221:18,
222:19, 222:21,
223:22, 224:12,
234:9, 236:24,
239:19, 240:1,
240:22, 249:21,
267:16, 267:21,
274:6, 274:16,
275:23, 280:13
**Correct** [1] - 246:13
**corrections** [5] -
276:20, 276:25,
277:8, 277:21,
277:24
**correctly** [1] - 32:20,
139:6, 271:19
**correspondence** [1] -
256:19
**corridor** [1] - 70:13
**could've** [1] - 176:8
**council** [1] - 255:13
**Council** [2] - 3:12,
16:16
**Counsel** [1] - 6:13
**counsel** [8] - 5:6,
31:4, 65:2, 134:24,
174:9, 185:1, 275:22
**COUNSEL** [1] - 3:18
**counsel's** [1] - 57:15
**counted** [1] - 177:20
**counterpoint** [1] -
187:9
**counties** [98] - 88:11,
88:25, 89:3, 92:10,
92:12, 104:4,
104:19, 104:21,
105:8, 105:10,
105:11, 105:18,
105:24, 106:1,
106:4, 106:25,
109:6, 111:16,
113:18, 138:21,
140:21, 155:1,
156:2, 177:10,
198:13, 201:13,
201:14, 201:15,
201:18, 202:19,
203:5, 204:17,
205:3, 205:6,
205:22, 205:24,

206:22, 208:21,
211:17, 216:2,
217:20, 218:9,
218:11, 221:20,
221:25, 222:1,
222:13, 222:19,
222:23, 223:14,
223:16, 224:3,
224:5, 224:6,
224:13, 224:15,
224:21, 224:24,
225:2, 225:5,
225:10, 226:13,
226:20, 227:12,
228:19, 228:20,
228:22, 229:11,
229:12, 229:13,
229:16, 233:11,
236:5, 236:13,
241:1, 245:2,
245:14, 245:15,
246:1, 247:3, 249:3,
251:4, 251:19,
252:13, 252:15,
253:4, 253:13,
253:15, 257:16,
265:24, 265:25,
269:20, 270:6, 273:7
**Counties** [1] - 245:6
**country** [7] - 10:20,
35:4, 46:6, 50:18,
81:13, 81:18, 260:5
**County** [60] - 3:7,
3:19, 3:20, 6:13,
6:14, 89:6, 91:15,
100:12, 100:16,
100:17, 100:18,
100:19, 100:22,
100:23, 100:24,
102:9, 102:21,
102:23, 103:10,
103:13, 103:15,
103:21, 110:6,
110:7, 110:13,
110:14, 110:15,
114:8, 114:11,
114:12, 114:13,
114:14, 123:13,
141:7, 148:5, 149:6,
149:7, 149:14,
149:16, 198:16,
198:18, 199:1,
202:20, 203:4,
208:24, 209:2,
209:6, 209:15,
209:19, 210:8,
210:15, 211:19,
215:19, 233:23,
234:3, 249:20,
250:5, 257:14
**county** [16] - 100:19,

116:6, 198:21,
202:17, 204:18,
218:6, 228:1,
249:15, 257:15,
264:16, 269:14,
269:17, 269:19,
273:5, 273:6
**COUNTY** [2] - 3:18
**county's** [2] - 249:17,
249:19
**county-wide** [1] -
264:16
**couple** [9] - 31:19,
34:25, 77:19,
146:22, 150:17,
163:17, 217:7,
248:5, 278:24
**coupled** [1] - 71:24
**course** [17] - 19:4,
20:17, 20:18, 20:25,
21:1, 46:25, 50:15,
74:5, 74:9, 90:23,
111:24, 121:20,
192:14, 220:2,
241:4, 263:24, 269:5
**Court** [90] - 1:23, 5:2,
13:13, 13:16, 19:23,
22:8, 25:3, 25:5,
32:6, 34:13, 36:7,
36:16, 36:22, 37:1,
37:7, 37:11, 37:13,
37:17, 37:23, 39:14,
40:11, 40:23, 41:19,
45:15, 52:14, 57:4,
59:15, 61:21, 62:12,
64:12, 67:3, 68:7,
72:1, 74:17, 75:22,
76:6, 76:18, 76:21,
77:1, 79:13, 82:25,
90:21, 99:15,
115:21, 118:18,
121:24, 122:2,
131:6, 132:1, 132:6,
132:7, 133:7,
135:20, 140:5,
140:11, 140:15,
140:16, 142:16,
142:18, 149:4,
151:12, 152:4,
152:5, 168:10,
168:18, 168:22,
170:9, 170:10,
183:3, 183:13,
189:10, 197:20,
200:13, 216:9,
216:14, 218:18,
220:14, 220:23,
222:2, 255:2, 255:6,
260:21, 262:16,
277:5, 278:5,

278:15, 279:1,
280:5, 281:5
**COURT** [921] - 1:1,
1:12, 5:3, 5:20, 6:8,
6:15, 6:23, 8:5, 8:18,
8:21, 8:24, 9:1, 9:9,
9:11, 9:16, 9:24,
10:2, 10:7, 11:10,
11:12, 12:3, 12:11,
12:18, 13:7, 13:10,
14:3, 14:5, 14:8,
15:18, 15:25, 16:2,
16:9, 16:13, 16:22,
16:25, 17:4, 17:8,
17:16, 17:23, 18:1,
18:9, 18:14, 19:25,
20:4, 23:9, 23:12,
23:16, 23:22, 24:1,
24:6, 24:17, 24:21,
26:14, 26:21, 26:24,
27:6, 27:8, 27:17,
27:25, 28:5, 28:10,
28:20, 29:1, 30:4,
31:3, 31:16, 31:19,
32:10, 32:16, 32:19,
32:23, 33:4, 33:7,
33:10, 34:6, 35:15,
35:19, 36:10, 36:13,
36:17, 36:20, 37:3,
38:16, 38:23, 39:2,
39:7, 39:9, 39:18,
40:5, 40:7, 40:10,
40:16, 41:14, 41:23,
41:25, 42:4, 42:8,
42:11, 42:14, 42:18,
42:22, 43:4, 43:11,
43:19, 44:3, 44:9,
44:14, 44:18, 44:22,
44:24, 45:2, 45:10,
45:13, 45:16, 45:21,
46:1, 46:8, 46:17,
46:21, 46:24, 47:2,
47:7, 47:12, 47:21,
48:4, 48:6, 48:12,
48:14, 48:19, 48:22,
49:5, 49:10, 49:13,
49:17, 49:19, 50:4,
50:22, 50:24, 51:3,
52:4, 52:11, 52:19,
52:25, 53:3, 53:11,
53:18, 53:25, 54:3,
54:17, 54:24, 55:5,
55:16, 55:18, 55:25,
56:4, 56:12, 56:15,
56:22, 57:20, 58:4,
58:8, 58:25, 59:3,
59:7, 59:9, 59:12,
60:8, 60:10, 60:13,
60:16, 61:5, 61:12,
61:14, 61:17, 61:21,
62:6, 62:9, 62:21,

63:8, 63:10, 63:15,
63:19, 63:22, 64:2,
64:5, 64:9, 64:24,
65:1, 65:5, 65:8,
65:24, 66:24, 67:2,
67:7, 67:13, 68:2,
68:7, 69:11, 69:13,
69:16, 70:19, 70:22,
71:3, 71:9, 71:13,
71:17, 71:21, 71:24,
72:22, 73:2, 73:7,
73:21, 73:23, 74:4,
74:8, 74:12, 74:16,
74:22, 74:24, 75:2,
75:5, 75:10, 75:15,
76:2, 76:4, 76:12,
76:14, 76:18, 77:12,
77:14, 78:7, 79:16,
79:20, 80:1, 80:3,
80:8, 80:11, 80:15,
80:17, 80:25, 81:20,
81:25, 82:8, 82:12,
82:19, 82:24, 83:3,
83:8, 83:11, 83:17,
83:19, 83:21, 84:1,
84:6, 84:10, 86:16,
86:23, 87:2, 87:5,
87:7, 88:2, 88:16,
88:19, 88:24, 90:5,
90:17, 91:4, 91:16,
91:18, 92:13, 92:16,
92:22, 93:4, 93:8,
93:12, 93:21, 94:4,
94:15, 94:19, 94:22,
95:1, 95:4, 95:13,
95:19, 97:8, 97:14,
98:9, 98:11, 98:15,
98:20, 98:25, 99:4,
99:8, 100:1, 101:24,
102:4, 102:11,
102:18, 104:10,
104:12, 105:9,
105:17, 105:20,
106:2, 106:6,
106:16, 106:18,
106:23, 107:4,
107:11, 107:14,
107:17, 107:20,
107:23, 108:3,
108:7, 108:9,
108:11, 108:14,
109:2, 109:6, 109:9,
109:20, 109:23,
110:1, 110:3, 110:6,
110:8, 110:11,
110:20, 111:4,
111:20, 111:25,
112:6, 112:11,
112:16, 112:22,
113:1, 113:13,
113:23, 115:6,

115:11, 115:14,
115:20, 115:24,
116:15, 116:22,
117:6, 117:9,
118:17, 119:15,
119:19, 119:25,
120:5, 120:10,
120:13, 120:22,
121:9, 121:11,
121:14, 121:17,
121:19, 121:21,
121:23, 122:8,
122:14, 122:16,
122:19, 122:21,
123:7, 123:21,
124:7, 124:10,
124:12, 124:24,
125:6, 125:19,
126:2, 126:13,
127:2, 127:6, 127:9,
127:17, 127:19,
128:7, 128:11,
128:17, 129:10,
129:13, 129:17,
131:1, 131:5, 131:8,
131:10, 131:17,
132:1, 132:15,
132:18, 132:21,
132:25, 133:18,
134:2, 134:5, 134:8,
134:10, 134:18,
134:20, 134:23,
135:4, 135:12,
135:14, 135:21,
136:10, 136:14,
136:18, 136:23,
137:3, 137:5, 137:7,
137:13, 138:5,
138:10, 138:16,
138:24, 139:9,
139:13, 139:24,
140:14, 140:20,
140:24, 141:3,
141:9, 141:13,
141:17, 141:23,
142:1, 142:8,
142:15, 142:24,
143:6, 143:10,
143:16, 143:22,
144:12, 144:24,
145:7, 145:13,
146:2, 146:10,
146:14, 146:20,
147:2, 147:11,
147:15, 147:23,
148:3, 148:12,
148:14, 148:16,
148:20, 148:23,
149:9, 149:15,
149:18, 149:22,
150:1, 150:8,

150:11, 150:13,
150:22, 150:24,
151:14, 151:20,
151:24, 152:3,
152:18, 152:23,
153:4, 153:10,
153:21, 153:24,
154:5, 154:23,
154:25, 155:10,
155:20, 156:1,
156:20, 156:23,
157:17, 157:25,
158:5, 158:8,
158:10, 158:12,
158:15, 158:19,
159:11, 159:14,
159:17, 161:6,
162:1, 162:6, 162:8,
162:11, 163:9,
163:11, 163:15,
163:21, 164:15,
164:25, 165:14,
165:18, 165:20,
165:23, 166:10,
166:19, 167:9,
167:14, 167:16,
168:3, 168:17,
169:5, 169:13,
170:8, 170:14,
170:21, 170:25,
171:14, 171:18,
171:22, 172:2,
172:4, 172:10,
172:12, 172:22,
172:25, 173:7,
173:16, 173:21,
173:25, 174:4,
174:6, 175:24,
176:1, 176:3,
176:23, 176:25,
178:22, 179:3,
179:5, 179:20,
180:7, 180:15,
180:23, 181:2,
181:19, 182:4,
182:9, 182:11,
182:14, 182:19,
182:21, 182:23,
183:8, 183:17,
183:24, 184:5,
184:13, 184:16,
184:18, 184:22,
185:3, 185:7,
185:15, 186:2,
186:10, 186:12,
186:14, 186:17,
186:22, 186:24,
187:2, 187:5,
187:11, 187:14,
187:17, 187:21,
188:8, 188:11,

188:18, 188:20,
188:23, 189:3,
189:7, 189:9,
189:11, 189:13,
189:19, 189:23,
190:1, 190:5, 190:7,
190:15, 190:19,
190:21, 190:25,
191:2, 191:4, 191:7,
192:7, 192:9,
192:12, 192:15,
192:20, 193:13,
193:19, 194:4,
194:6, 194:8,
194:11, 194:16,
195:9, 195:14,
195:16, 196:4,
196:9, 196:11,
196:13, 196:16,
196:19, 196:21,
196:25, 197:5,
199:3, 199:5,
199:16, 199:21,
200:2, 200:5,
200:16, 200:19,
200:24, 201:3,
201:6, 201:21,
201:23, 202:2,
202:5, 202:8,
202:12, 202:15,
202:19, 202:23,
203:9, 203:11,
204:13, 204:20,
205:2, 205:6,
205:13, 206:2,
206:7, 206:11,
206:15, 207:5,
207:9, 207:12,
208:5, 208:9,
208:13, 208:16,
208:18, 209:9,
210:16, 210:20,
211:20, 211:24,
212:1, 212:13,
212:19, 212:24,
213:1, 213:4, 213:8,
213:11, 213:14,
213:16, 213:20,
213:25, 214:3,
214:7, 214:10,
214:15, 216:5,
216:18, 216:20,
216:22, 216:24,
217:4, 217:13,
217:21, 218:14,
218:16, 219:9,
219:19, 219:24,
220:6, 220:11,
220:23, 221:1,
221:5, 221:9,
221:11, 221:16,

221:24, 222:5,
222:11, 222:17,
222:22, 223:18,
224:9, 226:3,
227:17, 227:20,
230:2, 230:4, 230:9,
230:16, 230:19,
230:21, 230:24,
231:2, 231:8,
231:12, 231:22,
231:24, 232:4,
232:14, 232:18,
232:23, 233:4,
233:14, 233:16,
233:18, 233:25,
234:2, 234:4, 234:7,
234:10, 234:13,
234:15, 234:19,
234:22, 236:8,
236:21, 237:4,
237:7, 237:12,
238:2, 238:7,
238:16, 239:8,
239:11, 239:16,
239:24, 240:2,
240:5, 240:14,
240:23, 241:2,
241:8, 241:21,
241:25, 242:7,
242:16, 243:4,
243:7, 243:17,
243:23, 244:12,
244:16, 244:19,
244:25, 245:4,
245:9, 245:11,
245:19, 246:3,
246:5, 246:12,
246:18, 246:21,
246:24, 247:6,
247:9, 247:14,
247:18, 247:23,
248:2, 248:4, 248:8,
248:16, 248:19,
248:23, 249:3,
249:5, 249:9,
249:19, 249:22,
250:1, 250:3, 250:8,
250:11, 250:15,
250:18, 250:23,
251:3, 251:7, 251:9,
251:14, 251:16,
251:21, 252:6,
252:11, 252:19,
252:23, 253:2,
253:7, 253:18,
253:21, 254:4,
254:17, 254:20,
254:22, 255:3,
255:6, 255:15,
255:19, 255:25,
256:7, 256:9,

*United States District Court of New Jersey*
*I certify the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*
**/s/ Melissa A. Mormile   05/15/2024**

256:11, 256:14, 256:22, 256:25, 257:3, 257:20, 257:23, 258:4, 258:11, 258:18, 258:21, 258:24, 259:2, 260:2, 260:4, 260:19, 260:24, 261:1, 261:4, 262:10, 262:22, 263:2, 263:4, 263:9, 263:13, 263:15, 263:18, 263:20, 263:25, 264:4, 265:9, 265:15, 265:17, 266:5, 267:5, 267:13, 267:17, 268:1, 268:7, 268:13, 268:15, 268:23, 268:25, 269:17, 269:21, 270:3, 270:12, 271:1, 271:8, 272:20, 273:5, 273:10, 273:18, 273:21, 273:23, 274:5, 274:7, 274:15, 275:9, 275:14, 275:16, 275:18, 276:2, 276:8, 276:13, 277:10, 277:16, 277:19, 277:24, 279:5, 279:11, 279:14, 279:20, 280:4, 280:7, 280:10, 280:13, 280:18, 281:2

**court** [14] - 31:5, 45:24, 83:11, 90:7, 128:6, 176:17, 205:18, 205:19, 218:2, 241:11, 244:5, 262:15, 278:6, 278:24
**court's** [1] - 134:7
**Court's** [5] - 34:23, 128:1, 147:9, 222:12, 259:24
**courteous** [1] - 24:21
**courthouse** [2] - 22:13, 278:13
**Courthouse** [1] - 1:9
**courtroom** [1] - 187:3
**courts** [1] - 131:18
**Courts** [12] - 36:21, 37:23, 40:2, 47:19, 95:25, 130:17, 133:5, 167:22,

170:21, 176:17, 254:24, 268:20
**cover** [3] - 32:17, 147:18, 231:2
**covered** [1] - 271:20
**create** [1] - 41:1
**creates** [1] - 45:23
**creation** [1] - 188:3
**credit** [8] - 21:4, 22:19, 24:15, 62:24, 66:21, 80:2, 95:13
**credits** [9] - 53:9, 60:5, 61:8, 62:5, 62:8, 80:6, 80:9, 80:13
**crisis** [1] - 259:20
**criteria** [16] - 59:9, 128:24, 129:3, 167:20, 169:2, 169:3, 169:8, 171:12, 171:20, 220:3, 227:6, 227:25, 230:15, 248:20, 272:2
**criterion** [1] - 169:18
**critical** [1] - 217:9
**cross** [6] - 17:21, 21:6, 79:8, 121:3, 190:14, 190:15
**crossed** [1] - 179:11
**crossing** [6] - 17:5, 17:19, 21:4, 24:15, 60:5
**Crossing** [1] - 70:13
**crossings** [5] - 17:6, 17:16, 111:22, 141:21
**Crossings'** [1] - 74:20
**crosstalk** [1] - 60:19
**crux** [1] - 151:4
**crystal** [1] - 24:3
**cued** [1] - 153:22
**culled** [1] - 107:6
**CUMMING** [310] - 2:4, 5:11, 32:8, 32:11, 32:17, 32:22, 32:25, 33:6, 33:8, 33:11, 34:9, 35:18, 35:21, 36:12, 36:15, 36:19, 37:1, 38:14, 38:17, 39:1, 39:6, 39:8, 39:17, 39:19, 40:6, 40:8, 40:15, 40:17, 41:22, 41:24, 42:3, 42:7, 42:10, 42:13, 42:16, 42:20, 43:1, 43:7, 43:18, 44:2, 44:4, 44:11, 44:17, 44:19, 44:23, 45:1, 45:4, 45:12, 45:14,

45:18, 45:25, 46:3, 46:16, 46:19, 46:23, 47:1, 47:5, 47:8, 47:15, 47:24, 48:8, 48:13, 48:15, 48:21, 49:2, 49:8, 49:12, 74:13, 74:19, 74:23, 75:1, 75:4, 75:6, 75:11, 75:16, 76:3, 76:5, 76:13, 76:15, 76:20, 77:13, 76:9, 79:10, 79:19, 128:9, 128:13, 128:21, 129:12, 129:15, 129:18, 131:4, 131:6, 131:9, 131:16, 131:25, 132:14, 132:17, 132:19, 132:22, 133:2, 133:22, 134:4, 134:6, 134:15, 134:19, 134:21, 134:24, 135:8, 135:13, 135:15, 136:7, 136:13, 136:16, 136:19, 136:25, 137:4, 137:6, 137:8, 138:1, 138:8, 138:11, 138:23, 139:6, 139:10, 139:15, 140:5, 140:15, 140:22, 141:2, 141:5, 141:10, 141:14, 141:22, 141:24, 142:2, 142:10, 142:22, 143:5, 143:9, 143:13, 143:20, 144:2, 144:13, 145:4, 145:11, 145:14, 146:3, 146:13, 146:19, 146:21, 147:9, 147:13, 147:22, 148:1, 148:4, 148:10, 148:13, 148:15, 148:17, 148:21, 148:24, 149:13, 149:17, 149:20, 182:24, 183:12, 183:21, 184:3, 184:7, 184:15, 184:17, 184:19, 185:1, 185:4, 185:11, 186:1, 186:7, 186:11, 186:13, 186:21, 186:23, 186:25, 187:4, 187:16,

187:18, 188:1, 188:9, 188:15, 188:19, 188:22, 189:2, 189:5, 189:8, 189:10, 189:12, 189:18, 189:22, 189:24, 190:4, 190:6, 190:13, 190:17, 190:20, 190:23, 191:1, 191:3, 191:6, 196:10, 233:20, 234:1, 234:3, 234:6, 234:9, 234:11, 234:14, 234:18, 234:21, 234:23, 236:9, 237:1, 237:5, 237:11, 237:13, 238:3, 238:13, 238:19, 239:10, 239:13, 239:19, 240:1, 240:4, 240:6, 240:22, 240:25, 241:6, 241:20, 241:23, 242:5, 242:12, 243:3, 243:5, 243:15, 243:18, 244:10, 244:13, 244:18, 244:23, 245:1, 245:5, 245:10, 245:12, 245:23, 246:4, 246:6, 246:13, 246:20, 246:23, 246:25, 247:8, 247:13, 247:16, 247:19, 247:25, 248:3, 248:7, 248:9, 248:18, 248:22, 248:24, 249:4, 249:6, 249:10, 249:21, 249:23, 250:2, 250:7, 250:9, 250:13, 250:17, 250:21, 251:1, 251:4, 251:8, 251:13, 251:15, 251:18, 251:23, 252:7, 252:18, 252:22, 252:24, 253:3, 253:8, 253:20, 253:24, 254:5, 254:18, 254:21, 254:23, 255:4, 255:8, 255:17, 255:20, 256:4, 256:8, 256:10, 256:12, 256:16, 256:24, 279:13

**cumming** [2] - 4:5, 4:17
**Cumming** [69] - 4:11, 5:12, 28:6, 30:6, 30:7, 31:12, 31:21, 31:23, 32:20, 34:6, 37:5, 38:23, 40:5, 46:8, 47:14, 49:13, 67:9, 68:3, 69:23, 72:17, 74:12, 77:12, 79:20, 87:24, 128:7, 128:20, 131:10, 132:16, 134:10, 135:5, 135:14, 136:23, 137:7, 144:1, 147:16, 148:3, 149:22, 151:5, 153:14, 153:17, 153:22, 154:14, 160:10, 163:18, 170:2, 172:16, 173:7, 182:23, 183:17, 187:2, 187:14, 189:13, 189:14, 191:5, 196:9, 233:19, 241:3, 243:23, 250:24, 255:25, 256:23, 257:9, 262:2, 262:11, 265:25, 266:11, 269:12, 279:12
**Cumming's** [4] - 68:20, 153:5, 167:18, 266:3
**CUMMINGS** [1] - 48:5
**cumulative** [1] - 9:4
**curiosity** [1] - 263:20
**current** [2] - 9:7, 67:4
**cut** [4] - 45:22, 45:23, 93:10, 118:10
**cut-off** [2] - 45:22, 45:23
**cutting** [2] - 11:6, 90:13
**cycle** [1] - 50:24

# D

**D.C** [1] - 2:13
**daily** [16] - 103:16, 109:1, 111:13, 112:3, 148:7, 209:20, 228:8, 236:3, 275:22, 276:3, 276:9, 276:16, 277:4, 277:10, 277:12
**darn** [1] - 69:25

**data** [40] - 34:3, 68:11, 103:23, 104:2, 104:13, 106:17, 106:25, 107:5, 108:1, 110:12, 110:16, 110:19, 114:16, 162:13, 199:17, 201:19, 205:16, 210:25, 211:14, 211:16, 211:22, 212:1, 215:16, 215:25, 219:6, 222:8, 223:17, 223:25, 224:2, 224:11, 230:15, 231:3, 231:4, 232:4, 232:6, 251:22, 257:8, 270:9, 271:20, 271:21
**date** [3] - 28:16, 166:3, 215:8
**David** [1] - 6:13
**DAVID** [1] - 3:18
**days** [7] - 7:2, 25:9, 42:9, 42:11, 42:12, 277:11, 280:25
**DC** [8] - 2:6, 22:8, 25:1, 124:15, 124:16, 168:7, 168:9, 262:16
**DDC** [1] - 45:4
**de** [1] - 37:7
**deal** [5] - 31:16, 32:1, 56:25, 81:5, 195:7
**dealing** [10] - 35:16, 38:11, 38:24, 46:24, 105:4, 127:14, 136:5, 136:7, 258:2, 276:25
**Dealing** [1] - 258:6
**deals** [2] - 32:4, 50:6
**dealt** [2] - 13:4, 36:21
**dear** [1] - 67:21
**debate** [1] - 187:8
**decade** [1] - 69:21
**decide** [10] - 9:22, 46:7, 58:14, 66:12, 86:10, 210:21, 211:7, 223:11, 263:4, 278:5
**decided** [7] - 20:12, 20:14, 111:14, 219:15, 243:24, 270:8
**decides** [1] - 55:2
**deciding** [1] - 161:15
**decision** [63] - 16:5, 37:3, 38:6, 38:8, 38:25, 39:15, 40:14,

41:4, 41:19, 42:6, 42:15, 42:16, 43:5, 43:6, 43:12, 43:21, 44:16, 44:20, 58:15, 63:4, 63:18, 63:20, 68:16, 69:1, 75:20, 76:16, 77:3, 77:21, 77:25, 79:17, 84:18, 90:19, 104:25, 105:2, 106:3, 120:11, 120:25, 151:16, 151:25, 152:1, 152:21, 152:25, 153:2, 186:2, 188:20, 194:14, 210:24, 211:9, 211:12, 212:6, 216:14, 221:1, 231:3, 243:14, 243:19, 244:2, 244:6, 244:7, 244:14, 245:24, 268:19, 269:4
**decision-maker** [3] - 77:3, 244:14, 245:24
**decision-makers** [1] - 243:19
**decision-making** [23] - 16:5, 37:3, 38:6, 38:25, 39:15, 40:14, 41:4, 44:16, 44:20, 63:4, 63:20, 68:16, 90:19, 104:25, 120:11, 120:25, 210:24, 211:9, 211:12, 212:6, 216:14, 221:1, 269:4
**decisions** [13] - 19:1, 40:3, 54:14, 68:25, 73:11, 115:3, 133:13, 133:18, 152:5, 152:6, 241:11, 255:22, 275:8
**deck** [3] - 31:15, 59:6, 233:23
**decrease** [12] - 33:11, 191:25, 198:21, 198:24, 208:23, 224:21, 235:23, 236:2, 240:11, 245:13, 246:21
**decreases** [5] - 214:19, 246:25, 264:18, 272:9, 272:24
**decreasing** [2] - 259:5, 260:12
**dedicated** [2] - 102:5, 155:6

**deemed** [1] - 22:18
**deep** [3] - 31:6, 90:5, 224:7
**deeper** [1] - 253:5
**defects** [1] - 28:17
**defend** [1] - 36:8
**Defendant** [3] - 1:8, 20:5, 280:7
**defendant** [5] - 6:8, 39:11, 127:21, 127:24
**defendant's** [2] - 66:7, 217:22
**Defendants** [5] - 2:6, 2:10, 2:14, 2:18, 2:23
**defendants** [7] - 5:13, 5:16, 36:8, 71:6, 126:14, 127:21, 131:10
**defended** [3] - 153:1, 153:2, 186:2
**defending** [2] - 152:20, 186:3
**Defense** [5] - 3:16, 11:23, 89:19, 90:25, 169:16
**defer** [6] - 43:2, 43:4, 118:7, 135:15, 255:2, 279:19
**deferential** [2] - 38:7, 207:24
**deferral** [1] - 164:4
**deferred** [3] - 97:23, 117:22, 164:6
**deficiencies** [1] - 212:17
**deficient** [1] - 112:20
**define** [6] - 88:10, 105:2, 117:15, 125:17, 131:12, 131:18
**defined** [9] - 37:10, 39:12, 120:1, 125:19, 132:10, 147:3, 171:6, 171:7, 219:19
**defines** [1] - 50:5
**defining** [3] - 105:6, 111:11, 138:18
**definitely** [6] - 16:7, 28:3, 99:18, 110:18, 113:21, 200:15, 200:22
**definition** [5] - 10:4, 68:9, 139:2, 155:20, 229:10
**definitions** [1] - 206:10
**definitive** [1] - 93:5

**degree** [9] - 12:22, 38:1, 41:18, 46:10, 95:20, 127:14, 135:23, 170:19, 242:15
**Dehe** [1] - 168:6
**Delaware** [1] - 75:3
**delay** [5] - 58:19, 58:20, 61:4
**delivered** [1] - 278:22
**deliveries** [1] - 155:18
**delivering** [1] - 278:22
**delivery** [3] - 137:12, 156:7, 157:20
**demand** [3] - 35:8, 35:12, 261:17
**demands** [1] - 15:16
**demonstrable** [1] - 160:13
**demonstrate** [4] - 38:2, 38:5, 38:15, 178:25
**demonstrated** [1] - 140:2
**density** [1] - 199:7
**depart** [2] - 241:15, 242:9
**departed** [2] - 242:2, 242:5
**Department** [3] - 5:5, 5:12, 184:11
**DEPARTMENT** [1] - 1:6
**departure** [1] - 242:23
**deployed** [2] - 175:6, 175:10
**deputy** [1] - 70:3
**Deputy** [1] - 175:12
**derivative** [1] - 65:22
**derived** [1] - 169:4
**describe** [4] - 140:21, 160:11, 181:15, 181:23
**described** [9] - 38:20, 144:2, 173:18, 181:10, 181:14, 183:13, 191:21, 214:11, 274:20
**describes** [6] - 136:19, 143:21, 145:16, 153:14, 173:18, 188:3
**description** [9] - 38:9, 53:7, 60:25, 63:17, 71:13, 101:12, 167:18, 181:17, 183:14
**descriptions** [2] - 139:3, 279:17
**deserve** [1] - 113:6

**designed** [1] - 259:21
**desired** [2] - 79:11, 120:2
**despite** [4] - 29:6, 60:3, 81:15, 205:6
**detail** [22] - 13:21, 16:18, 62:4, 81:9, 91:13, 97:3, 129:2, 129:25, 130:23, 130:24, 138:8, 139:8, 151:11, 169:12, 178:18, 179:19, 179:25, 180:4, 180:22, 191:21, 255:21, 272:13
**detailed** [4] - 34:3, 51:13, 81:8, 130:1
**determination** [17] - 43:3, 43:21, 57:11, 59:20, 68:14, 81:2, 88:20, 96:1, 136:21, 147:5, 147:6, 166:3, 189:20, 242:19, 242:20, 243:1, 269:4
**determinations** [1] - 122:4
**determine** [20] - 22:10, 26:1, 27:19, 27:21, 34:20, 39:14, 52:7, 58:12, 60:13, 63:16, 68:13, 95:5, 145:18, 146:1, 146:8, 240:2, 240:18, 243:20, 259:10, 262:9
**determined** [9] - 51:25, 52:5, 57:4, 69:19, 160:23, 171:3, 171:4, 266:16, 267:3
**determiner** [1] - 37:8
**determining** [3] - 92:4, 146:23, 271:10
**detracted** [1] - 216:13
**detracting** [1] - 216:15
**detracts** [1] - 113:10
**developed** [4] - 19:2, 67:2, 144:15, 171:11
**Development** [1] - 135:10
**development** [1] - 144:22
**developments** [1] - 72:24
**dial** [1] - 64:24
**dictate** [1] - 125:12
**dictionary** [2] - 10:3, 73:12
**diesel** [6] - 138:2,

138:4, 140:19,
154:18, 199:9, 265:8
**differ** [1] - 96:7
**difference** [21] -
16:21, 17:9, 17:14,
38:21, 63:17, 65:18,
139:20, 161:20,
162:14, 185:13,
185:15, 189:15,
190:10, 236:14,
236:18, 237:16,
238:20, 246:9,
275:1, 279:24
**differences** [2] -
20:19, 26:1
**different** [53] - 18:11,
20:14, 21:18, 24:10,
34:1, 35:9, 35:25,
40:17, 53:8, 53:9,
53:23, 62:20, 80:21,
133:8, 133:9,
138:19, 138:20,
139:3, 139:4, 139:7,
149:10, 150:14,
160:7, 186:11,
186:18, 194:18,
205:6, 219:21,
222:24, 223:1,
223:21, 236:18,
242:20, 251:7,
261:12, 261:24,
261:25, 262:2,
262:5, 263:8,
263:17, 264:14,
264:15, 264:21,
264:24, 265:1,
265:23
**differential** [2] -
208:14, 237:10
**differentials** [1] -
108:24
**differentiate** [2] -
166:6, 221:24
**differentiated** [8] -
146:15, 147:8,
147:11, 149:11,
164:25, 165:2,
165:5, 205:2
**differentiation** [1] -
224:11
**differently** [2] - 205:7,
208:4
**difficulty** [1] - 197:11
**dime** [1] - 29:24
**diminution** [1] -
245:20
**dioxide** [2] - 103:18,
205:8
**direct** [5] - 22:5, 91:1,
119:1, 160:15, 275:6

**directions** [1] - 37:22
**directly** [7] - 7:5,
13:23, 14:2, 79:7,
84:23, 156:21,
157:12
**directs** [1] - 88:3
**disagree** [2] - 30:5,
41:6
**discern** [1] - 37:2
**discernable** [2] - 63:5,
190:22
**discerned** [1] - 193:25
**discernible** [5] - 37:4,
68:17, 121:2,
178:25, 256:1
**disclosed** [1] - 261:22
**discounted** [3] -
252:17, 252:22,
253:14
**discrepancy** [1] - 63:1
**discrete** [2] - 45:21,
45:23
**discretion** [7] - 37:20,
219:25, 220:13,
220:19, 223:8,
223:11, 259:10
**discretionary** [1] -
47:21
**discuss** [6] - 44:15,
128:19, 137:19,
145:12, 179:24,
194:20
**discussed** [8] - 13:20,
81:9, 130:23,
154:14, 155:21,
192:1, 215:25,
225:24
**discussing** [4] -
51:16, 130:24,
136:3, 197:23
**discussion** [10] - 14:8,
14:17, 100:23,
124:19, 124:20,
137:16, 144:3,
144:6, 171:14,
178:18
**Discussion** [1] - 134:9
**disease** [25] - 7:19,
111:12, 111:18,
159:3, 159:9, 160:2,
161:13, 161:16,
161:18, 177:17,
226:17, 226:25,
227:3, 227:7,
227:15, 228:17,
229:18, 232:11,
271:14, 271:19,
272:23, 274:2,
274:23, 274:25,
275:4

**diseases** [1] - 229:15
**dismissed** [5] - 98:19,
98:24, 120:8,
120:14, 120:18
**disparate** [7] - 139:18,
185:6, 185:7, 219:7,
253:8, 254:5, 254:13
**dispensation** [1] -
280:22
**dispute** [8] - 19:25,
20:4, 44:12, 87:23,
88:13, 97:7, 136:2,
217:9
**disputing** [1] - 264:4
**disqualifies** [1] -
207:25
**distance** [3] - 144:10,
272:10, 272:15
**distinctions** [1] -
223:13
**distinguish** [1] - 45:3
**distinguishable** [1] -
183:16
**distinguishing** [5] -
183:22, 183:25,
184:2, 228:21,
228:25
**DISTRICT** [2] - 1:1, 1:1
**District** [7] - 22:8,
95:25, 133:10,
134:13, 134:16,
235:24, 278:15
**district** [9] - 10:20,
17:18, 133:25,
140:23, 140:24,
142:7, 218:2,
251:20, 252:1
**dive** [1] - 224:7
**diversion** [12] - 21:1,
21:7, 21:8, 24:13,
29:21, 30:21, 59:25,
65:14, 103:12,
157:19, 157:22
**diversionary** [2] -
130:3, 269:15
**diversions** [7] -
137:11, 170:5,
191:24, 225:19,
265:7, 266:12,
271:11
**divert** [4] - 156:11,
156:15, 157:3,
157:11
**diverted** [4] - 154:21,
155:16, 156:13,
157:9
**diverting** [2] - 130:11,
142:6
**divvying** [1] - 150:4
**do-over** [1] - 20:17

**docket** [4] - 276:25,
277:9, 277:20, 278:7
**document** [26] -
61:24, 62:2, 79:24,
80:9, 151:23, 190:1,
191:17, 194:12,
194:15, 216:10,
220:21, 243:6,
243:15, 243:18,
244:10, 257:25,
258:6, 258:15,
258:18, 258:24,
267:2, 271:25,
272:4, 274:12,
277:1, 277:25
**Document** [2] - 159:5,
164:13
**documents** [7] -
32:13, 190:24,
256:2, 257:21,
266:25, 267:6,
279:16
**DOJ** [2] - 2:3, 2:12
**DOJ-ENRD** [2] - 2:3,
2:12
**dollar** [19] - 9:2, 61:22,
62:24, 64:19, 72:9,
89:8, 100:21, 102:8,
103:20, 146:10,
147:4, 178:9,
185:23, 187:23,
188:25, 191:11,
191:13, 191:15,
193:9
**dollars** [16] - 97:3,
101:22, 102:5,
125:14, 125:24,
166:24, 174:11,
174:12, 179:18,
180:5, 180:8,
180:14, 181:14,
181:18, 181:25,
183:18
**domain** [1] - 124:19
**dominated** [1] - 243:1
**done** [37] - 7:13, 8:12,
8:22, 18:20, 25:22,
37:24, 53:7, 60:1,
61:2, 67:10, 68:1,
72:19, 73:4, 77:11,
84:24, 89:9, 100:14,
112:19, 115:5,
115:23, 119:13,
162:19, 164:15,
181:23, 182:2,
182:7, 182:9,
200:21, 221:14,
224:7, 244:5, 262:8,
270:20, 270:21,
271:10, 278:1

**Dormant** [1] - 133:23
**DOT** [4] - 152:15,
152:16, 156:7,
260:22
**dot** [1] - 121:2
**DOT_00003391** [1] -
176:12
**DOT_0000391** [1] -
163:24
**DOT_00044940** [1] -
121:13
**DOT_0004586** [1] -
64:16
**DOT_0036292** [1] -
79:25
**DOT_0036341** [1] -
234:8
**DOT_7297** [1] - 272:6
**DOT_7319** [1] - 148:18
**DOT_7320** [1] - 147:14
**DOT_7321** [1] - 144:5
**DOT_7322** [1] - 191:22
**DOT_7324** [1] - 274:12
**DOT_7325** [1] - 189:25
**DOT_7943** [1] - 130:2
**dots** [1] - 178:25
**dotted** [1] - 179:10
**double** [1] - 205:25
**down** [41] - 5:24, 14:6,
34:7, 41:17, 49:11,
67:13, 90:5, 104:4,
107:6, 108:4,
122:18, 141:19,
146:5, 158:13,
174:8, 175:5,
179:21, 183:6,
186:12, 186:13,
188:2, 188:18,
193:13, 201:1,
202:8, 203:17,
216:5, 226:24,
227:24, 228:3,
228:10, 229:13,
231:14, 231:19,
231:20, 250:6,
250:15, 250:22,
251:11, 251:14
**downstream** [2] -
135:18, 139:11
**dozen** [3] - 51:13,
53:21, 81:9
**dozens** [4] - 227:12,
232:9, 232:10
**draft** [10] - 55:19, 99:6,
162:23, 171:25,
173:3, 195:4,
212:25, 213:8,
256:18, 261:9
**dramatically** [1] -
149:9

drawing [1] - 255:22
drill [2] - 179:20, 231:19
drilled [2] - 146:5, 193:13
drilling [1] - 231:20
drive [3] - 155:13, 155:16, 155:25
driver [4] - 35:8, 35:11, 36:1
drivers [4] - 130:10, 155:8, 251:25, 252:3
drives [1] - 173:15
driving [1] - 16:4, 235:13
drop [1] - 241:2
Dubois [1] - 21:14
due [3] - 37:18, 74:5, 74:9
duplicate [1] - 266:3
during [14] - 27:24, 53:15, 73:25, 79:13, 98:21, 99:2, 145:12, 149:20, 157:24, 157:25, 158:2, 167:25, 187:19, 200:7
duty [1] - 75:21

## E

EA [131] - 19:10, 20:21, 20:25, 24:5, 24:6, 26:2, 27:10, 27:22, 29:16, 40:17, 41:1, 41:9, 44:16, 47:16, 49:1, 51:11, 51:12, 51:15, 52:17, 52:18, 52:24, 53:5, 53:15, 53:20, 54:9, 55:19, 58:7, 62:4, 63:9, 63:17, 71:10, 76:8, 76:23, 76:25, 77:5, 82:5, 82:9, 84:24, 85:7, 85:20, 85:22, 87:24, 88:10, 92:8, 96:6, 99:6, 99:7, 99:16, 99:19, 100:5, 100:23, 102:22, 103:10, 103:25, 104:8, 110:25, 116:7, 120:7, 122:5, 130:9, 130:14, 130:25, 136:19, 139:5, 139:16, 139:20, 142:12, 143:10, 143:21, 145:16, 151:2, 153:8, 153:15, 154:12,

156:9, 157:11, 159:6, 159:18, 162:23, 171:25, 173:3, 176:6, 179:6, 179:17, 183:4, 185:14, 186:3, 188:3, 189:23, 189:25, 190:2, 190:4, 190:8, 190:9, 190:16, 190:18, 191:20, 192:24, 193:6, 193:16, 195:4, 197:24, 200:7, 211:9, 211:16, 211:22, 213:11, 216:9, 224:18, 225:18, 226:5, 228:16, 235:2, 235:3, 238:23, 240:6, 242:3, 249:1, 256:3, 256:18, 257:11, 261:9, 261:11, 261:19, 261:22, 266:11, 267:22, 268:3, 270:22
EA's [1] - 238:21
eager [1] - 49:14
early [4] - 121:24, 122:9, 165:24, 213:18
EAs [2] - 56:9, 68:8
easily [2] - 75:24, 134:11
East [12] - 102:9, 104:5, 109:23, 110:9, 114:10, 141:15, 141:20, 175:23, 176:5, 177:2, 181:10, 198:3
east [1] - 130:7
easy [2] - 106:18, 234:12
eat [1] - 278:18
eateries [1] - 278:23
Eco [1] - 134:24
economic [2] - 119:11, 251:25
Economic [1] - 135:9
economically [1] - 81:16
Ecopoetry.org [1] - 3:8
educate [2] - 208:5, 243:7
educational [1] - 216:25
effect [14] - 43:9, 65:13, 65:14, 65:21, 92:5, 96:2, 140:6,

190:18, 206:25, 239:22, 239:24, 252:3, 261:25, 269:13
effected [4] - 88:8, 88:9, 95:18, 164:21
effective [1] - 146:9
effectively [2] - 58:15, 231:16
effects [58] - 11:17, 22:6, 34:1, 34:4, 35:14, 63:7, 85:19, 85:23, 86:19, 87:20, 87:21, 87:25, 89:12, 95:20, 99:13, 100:5, 103:12, 103:13, 130:3, 130:11, 130:12, 142:13, 144:8, 153:20, 154:4, 157:5, 157:7, 157:12, 160:13, 160:20, 163:25, 164:11, 184:20, 194:14, 214:21, 240:7, 245:25, 257:7, 257:9, 257:10, 257:19, 259:3, 259:6, 259:11, 259:14, 260:12, 261:10, 261:23, 264:3, 264:14, 266:20, 266:22, 269:15, 271:9, 273:13
effectuate [1] - 259:21
efficacy [1] - 144:3
effort [3] - 33:11, 195:13, 210:15
efforts [2] - 137:11, 195:5
EIA [1] - 26:10
eight [6] - 40:17, 107:12, 107:24, 222:25, 223:11, 223:12
eighth [1] - 53:14
EIS [34] - 11:23, 14:24, 27:10, 27:22, 49:1, 55:19, 69:20, 70:6, 70:8, 70:9, 73:5, 73:17, 75:8, 75:20, 75:22, 76:8, 80:22, 80:23, 85:20, 89:19, 90:15, 91:2, 92:5, 92:7, 93:10, 93:20, 96:21, 101:8, 205:12, 205:19, 259:9, 259:12, 259:22
Eisenhower [1] - 1:20

EISs [2] - 13:1, 56:9
either [23] - 5:22, 14:14, 39:3, 104:8, 155:4, 174:13, 175:1, 200:6, 219:22, 223:2, 230:9, 237:7, 241:10, 245:16, 245:17, 267:10, 272:8, 272:22, 272:24, 273:17, 274:2
EJ [7] - 114:23, 139:17, 139:21, 140:7, 271:16, 271:22, 280:12
EJTAG [2] - 194:24, 195:4
electronic [3] - 70:12, 70:15, 83:15
element [2] - 89:1, 240:19
elements [5] - 21:21, 39:13, 85:3, 85:8, 274:19
eligibility [2] - 155:9, 155:12
eliminated [1] - 130:23
ELIZABETH [1] - 2:16
Elizabeth [1] - 5:17
elsewhere [1] - 156:19
email [4] - 258:16, 267:5, 268:5, 276:6
emails [1] - 173:5
emanates [1] - 265:15
embellishment [1] - 153:13
emission [5] - 139:17, 245:6, 246:11, 247:23, 265:19
Emissions [1] - 258:13
emissions [12] - 138:2, 138:4, 154:19, 191:25, 234:25, 240:12, 246:6, 246:9, 247:1, 248:13, 265:18
emit [1] - 265:8
emphasize [2] - 154:10, 167:19
emphasizing [1] - 8:22
employed [1] - 241:12
Employees [1] - 3:6
Empower [1] - 3:6
enabled [1] - 187:22
enacted [3] - 50:15, 129:6, 169:20

enacts [1] - 48:16
encompass [1] - 215:22
encourage [1] - 21:7
encouraged [1] - 231:20
end [25] - 10:23, 11:19, 11:20, 13:19, 18:18, 20:21, 22:5, 22:18, 25:20, 37:7, 37:15, 38:3, 38:4, 41:17, 42:14, 66:19, 69:7, 85:23, 115:25, 116:25, 152:25, 177:8, 207:17, 245:17
ended [2] - 84:15, 224:14
endorse [1] - 115:6
endorsed [1] - 115:8
endorsing [1] - 168:22
ends [2] - 34:17, 45:6
Energy [1] - 35:23
enforceable [5] - 86:2, 89:15, 101:4, 178:16, 180:11
engage [2] - 49:4, 243:21
engaged [1] - 242:17
engagement [5] - 182:4, 187:22, 191:17, 194:23, 195:2
Engineers [1] - 127:11
engines [1] - 154:19
English [2] - 253:7, 270:25
enhancing [1] - 158:16
enjoy [1] - 128:3
ENRD [2] - 2:3, 2:12
enshrined [1] - 268:10
ensure [4] - 13:21, 114:24, 125:9, 215:20
enter [4] - 5:6, 43:14, 194:11, 238:11
entering [3] - 125:23, 235:23, 238:3
enters [1] - 17:17
entire [11] - 7:14, 7:20, 7:23, 31:14, 57:6, 152:18, 175:1, 252:8, 269:24, 270:7, 271:13
entirely [1] - 130:16
entities [2] - 144:24, 144:25
entitled [3] - 185:18, 185:21, 239:17

entranceway [1] - 238:8
entry [1] - 130:6
enumerated [6] - 92:13, 93:23, 149:16, 194:3, 252:13, 252:15
enumerating [1] - 194:2
envelope [3] - 26:19, 57:16, 58:2
environment [7] - 69:7, 88:6, 95:18, 96:2, 98:3, 271:17
Environment [1] - 3:12
environmental [66] - 6:11, 7:13, 7:17, 10:16, 10:17, 10:22, 10:25, 11:1, 11:5, 11:6, 13:18, 13:21, 15:10, 15:13, 17:10, 18:18, 20:17, 21:15, 21:22, 24:11, 25:21, 26:3, 26:12, 27:12, 27:20, 28:18, 29:6, 31:1, 34:4, 39:25, 41:10, 48:25, 54:7, 69:1, 72:6, 81:8, 84:24, 85:14, 92:20, 92:24, 94:8, 94:17, 96:4, 96:5, 96:16, 99:23, 118:3, 126:11, 126:18, 126:20, 129:9, 143:3, 158:16, 171:17, 180:3, 191:18, 209:13, 214:23, 217:5, 219:3, 229:10, 255:14, 262:7, 264:10
Environmental [129] - 3:11, 3:12, 3:16, 4:14, 7:18, 11:18, 11:23, 13:3, 17:12, 29:7, 29:11, 29:20, 30:23, 33:24, 72:14, 89:19, 90:3, 90:24, 92:10, 100:7, 103:25, 105:16, 108:13, 109:14, 109:15, 112:2, 112:19, 115:5, 130:11, 135:18, 139:12, 139:15, 140:1, 140:3, 140:9, 140:12, 144:9, 144:16, 144:18, 144:20, 145:23,

151:3, 151:8, 151:17, 152:6, 152:16, 154:11, 157:6, 160:22, 162:16, 164:18, 177:6, 187:20, 188:4, 190:14, 194:20, 194:24, 195:1, 195:12, 195:18, 195:23, 196:3, 197:1, 197:15, 202:16, 202:21, 206:6, 216:17, 216:18, 217:2, 220:3, 221:19, 222:2, 223:15, 224:3, 224:14, 224:22, 225:1, 225:2, 225:18, 225:21, 227:10, 228:4, 228:6, 228:19, 229:5, 232:10, 250:21, 250:24, 251:2, 251:5, 251:24, 252:8, 252:12, 253:1, 253:4, 253:6, 253:10, 253:11, 253:16, 254:1, 254:2, 254:9, 254:11, 255:12, 256:6, 259:14, 259:17, 259:25, 261:13, 261:18, 267:11, 267:23, 267:25, 268:7, 268:8, 268:9, 268:19, 268:25, 269:6, 269:9, 269:23, 269:25, 271:7, 271:13, 271:17, 272:7, 273:2, 273:12
environmentally [6] - 15:23, 17:4, 17:5, 81:16, 120:15, 131:20
environments [1] - 278:13
EPA [38] - 99:20, 113:21, 114:19, 115:1, 121:12, 121:13, 121:14, 121:15, 152:11, 152:14, 160:22, 182:18, 200:11, 204:7, 212:8, 214:24, 215:11, 215:12, 215:14, 215:16, 215:17,

231:19, 254:6, 256:17, 256:18, 256:19, 258:17, 266:25, 267:2, 267:13, 267:14, 267:17, 267:19, 267:24, 270:8, 271:16, 271:22
EPA's [12] - 115:7, 212:8, 249:7, 258:16, 265:20, 266:8, 266:18, 267:8, 267:9, 267:19, 268:5, 271:21
equal [7] - 9:16, 30:7, 126:14, 128:18, 132:11, 139:22, 168:20
equally [1] - 126:4
equals [1] - 50:8
equate [1] - 91:21
equation [1] - 81:22
equivalent [1] - 118:25
error [2] - 61:13, 62:18
errors [1] - 276:17
especially [3] - 66:23, 119:23, 125:7
ESQ [3] - 3:4, 3:15, 3:18
ESQUIRE [14] - 1:15, 1:16, 1:19, 1:19, 1:20, 2:4, 2:5, 2:8, 2:12, 2:16, 2:16, 2:17, 2:21, 2:21
essentially [11] - 89:11, 115:8, 117:22, 135:17, 139:19, 142:6, 246:10, 249:1, 253:8, 279:17, 279:18
Essex [13] - 107:9, 110:6, 110:7, 110:8, 110:10, 110:15, 114:8, 114:11, 114:12, 204:1, 204:2, 224:17, 226:12
establish [4] - 34:11, 36:5, 117:18, 124:18
established [2] - 171:16, 248:15
estimate [3] - 9:5, 57:16, 58:2
et [9] - 1:3, 1:7, 5:4, 5:5, 37:14, 37:19, 138:22
eval [3] - 46:22, 68:22,

77:25
evals [2] - 46:24, 47:13
evaluate [4] - 35:14, 40:21, 47:16, 71:10
evaluated [4] - 13:22, 52:17, 52:24, 169:12
evaluating [1] - 35:11
evaluation [39] - 34:19, 37:13, 40:9, 40:24, 41:5, 42:1, 42:23, 43:12, 43:21, 46:4, 46:6, 47:23, 48:1, 48:10, 52:1, 54:13, 55:7, 55:10, 55:12, 55:22, 56:7, 56:11, 56:15, 56:19, 57:4, 57:13, 58:17, 60:23, 71:18, 76:24, 77:6, 78:3, 78:14, 167:4, 167:11, 183:6, 210:25
evaluations [3] - 47:10, 47:17, 76:1
event [2] - 44:6, 236:1
events [6] - 24:25, 25:1, 41:17, 44:25, 66:5, 66:9
eventually [1] - 111:2
everywhere [1] - 160:20
evidence [5] - 13:20, 37:10, 37:12, 37:19, 136:5
evident [1] - 96:21
exacerbate [2] - 29:10, 225:20
exacerbated [1] - 29:19
exact [8] - 9:14, 25:24, 52:23, 161:22, 193:12
exactly [19] - 18:16, 28:13, 48:17, 49:3, 52:15, 64:15, 67:22, 70:25, 82:20, 112:10, 159:1, 159:13, 176:12, 194:13, 198:4, 204:22, 211:16, 215:15, 263:9
exam [1] - 179:7
examination [3] - 62:14, 66:23, 120:25
examine [2] - 40:25, 106:4
examined [8] - 22:11, 26:2, 33:25, 40:17, 53:5, 53:15, 53:16, 248:16

example [10] - 39:5, 55:2, 56:17, 56:24, 56:25, 70:11, 83:19, 225:11, 257:13, 264:16
examples [4] - 70:13, 70:19, 77:19, 263:1
exceed [2] - 218:19, 265:20
exceedance [2] - 265:6, 266:16
exceedances [1] - 217:14
except [3] - 59:24, 207:3, 228:7
excerpt [1] - 261:10
exchange [1] - 268:1
exclude [1] - 224:6
excluded [5] - 198:13, 201:13, 201:16, 203:23, 205:22
exclusively [1] - 100:12
Excuse [1] - 128:22
excuse [5] - 124:13, 129:14, 192:9, 192:21, 245:7
excute [1] - 55:3
executive [3] - 99:1, 110:21, 259:17
exemplar [1] - 249:17
exemptions [1] - 53:10
exercise [2] - 72:1, 127:14
exhaustion [2] - 260:23, 260:24
Exhaustion [1] - 260:25
exhaustively [1] - 33:25
exist [3] - 18:11, 129:23, 188:2
existence [1] - 19:19
existing [21] - 12:13, 70:18, 158:25, 160:18, 160:24, 161:5, 161:8, 161:13, 161:14, 161:18, 177:16, 209:4, 225:17, 225:20, 226:18, 227:3, 227:4, 228:17, 232:11, 259:15, 273:13
exit [2] - 238:9, 250:19
exorcised [1] - 99:10
expand [3] - 137:11, 137:12, 156:7
expanded [2] - 20:22,

21:2
**expect** [2] - 169:19, 209:25
**expectation** [3] - 78:16, 78:18, 78:19
**expectations** [1] - 79:4
**expected** [11] - 114:21, 130:3, 140:9, 140:18, 142:5, 144:7, 198:21, 198:23, 235:22, 249:16
**expecting** [4] - 153:11, 167:2, 205:22, 210:6
**experience** [9] - 47:6, 209:19, 249:6, 253:5, 254:15, 264:10, 272:8, 272:24, 273:4
**expert** [1] - 255:14
**expertise** [4] - 35:11, 231:24, 254:25, 255:1
**explain** [21] - 82:11, 91:25, 92:1, 98:1, 112:15, 119:19, 121:1, 121:9, 121:10, 122:20, 139:13, 216:10, 216:12, 224:9, 224:10, 224:19, 227:25, 230:10, 230:13, 230:20, 248:21
**explained** [5] - 124:4, 130:2, 265:25, 266:2, 272:13
**explaining** [6] - 90:1, 103:14, 152:18, 229:1, 266:11, 269:5
**explains** [3] - 91:24, 178:19, 274:14
**explanation** [24] - 89:8, 112:14, 114:18, 130:1, 149:12, 171:2, 177:12, 178:4, 178:5, 198:16, 205:3, 224:18, 226:10, 228:12, 228:13, 230:5, 230:6, 230:10, 232:16, 242:4, 249:9, 251:17, 251:21, 267:18
**explanations** [1] - 210:14
**exploration** [1] -

118:21
**express** [1] - 172:13
**expressed** [1] - 193:16
**exquisite** [1] - 62:4
**extend** [1] - 197:9
**extension** [1] - 78:22
**extensive** [2] - 51:12, 88:21
**extent** [16] - 34:18, 38:17, 44:5, 44:19, 48:5, 48:8, 50:9, 110:16, 133:6, 135:16, 136:8, 146:24, 154:14, 165:16, 166:13, 218:16
**extra** [7] - 40:2, 65:13, 66:20, 82:6, 118:1, 150:12, 258:24
**extraordinarily** [1] - 78:23
**extrapolate** [1] - 245:25
**extrapolated** [1] - 75:24
**extrapolation** [1] - 247:5
**eyes** [2] - 140:25, 214:11

## F

**F.2d** [1] - 124:15
**F.3d** [1] - 127:11
**FAA** [3] - 11:8, 11:12, 18:3
**face** [6] - 40:23, 99:16, 147:11, 174:21, 183:16, 277:5
**facilities** [3] - 70:14, 70:15, 83:15
**facility** [1] - 83:15
**facing** [1] - 259:20
**fact** [42] - 13:1, 16:4, 21:13, 21:20, 29:15, 34:21, 37:8, 37:10, 37:15, 40:12, 54:11, 57:22, 61:17, 63:8, 63:20, 71:25, 80:21, 94:12, 103:21, 104:25, 115:10, 117:16, 123:10, 124:17, 126:12, 129:13, 136:6, 138:25, 143:19, 161:13, 169:14, 170:3, 189:15, 197:11, 199:16, 205:6, 217:21,

231:21, 244:20, 260:6, 268:18, 269:2
**fact-finding** [5] - 37:10, 37:15, 40:12, 104:25, 136:6
**factor** [6] - 75:9, 95:10, 161:8, 161:15, 218:17, 240:19
**factors** [7] - 37:2, 39:13, 60:22, 92:13, 95:12, 219:3, 252:5
**facts** [6] - 28:11, 66:25, 136:4, 216:12, 223:19, 243:1
**fail** [2] - 36:4, 211:10
**failed** [4] - 36:3, 124:25, 225:18, 230:9
**failing** [1] - 179:21
**failure** [7] - 15:3, 48:3, 48:6, 72:15, 91:21, 95:9, 121:25
**fair** [6] - 50:5, 54:2, 58:16, 59:4, 75:14, 137:15
**fairly** [6] - 13:22, 37:23, 245:16, 245:18, 263:7, 270:10
**fairness** [1] - 126:10
**fait** [1] - 84:18
**Faith** [1] - 3:7
**fall** [1] - 177:18
**Family** [1] - 3:12
**far** [9] - 38:3, 38:4, 70:10, 105:11, 138:14, 148:6, 202:9, 229:21, 234:4
**fashion** [5] - 111:1, 111:4, 120:2, 142:25, 256:1
**fast** [2] - 10:22, 280:18
**fast-tracked** [1] - 10:22
**fault** [2] - 212:5, 213:6
**favor** [1] - 11:14
**favorite** [1] - 169:25
**feasibility** [3] - 129:5, 130:17, 145:25
**feasible** [2] - 129:19, 165:13
**feasibly** [1] - 120:3
**features** [1] - 159:11
**fed** [4] - 8:16, 151:17, 152:7
**Federal** [81] - 1:9, 8:8, 8:13, 8:15, 8:19, 16:5, 23:18, 26:15,

26:25, 27:1, 27:4, 27:9, 28:7, 28:13, 28:16, 28:21, 29:3, 33:2, 33:3, 33:6, 33:7, 33:22, 35:10, 35:11, 36:5, 41:21, 42:2, 42:15, 42:18, 43:12, 43:14, 43:22, 43:25, 46:5, 47:8, 48:9, 48:24, 54:12, 55:9, 56:18, 76:9, 77:21, 111:8, 112:17, 115:7, 129:1, 130:2, 131:11, 133:11, 133:15, 135:2, 135:10, 144:18, 151:18, 151:24, 152:5, 152:8, 152:20, 153:1, 153:4, 153:7, 166:2, 172:12, 188:10, 188:21, 188:23, 189:3, 189:19, 216:7, 239:5, 239:13, 240:15, 240:19, 244:14, 248:9, 253:9, 255:1, 256:20, 267:14, 267:18, 268:2
**federal** [22] - 5:13, 7:15, 7:16, 8:12, 8:14, 18:25, 33:17, 33:18, 33:21, 46:14, 46:19, 71:25, 87:19, 90:11, 116:11, 121:14, 121:15, 135:3, 172:17, 184:11, 217:23, 268:9
**federal-aid** [2] - 33:17, 33:21
**federalism** [1] - 133:15
**federally** [3] - 235:5, 270:9, 270:15
**feed** [1] - 239:4
**fell** [2] - 177:14, 177:20
**few** [14] - 7:6, 14:18, 81:10, 92:11, 125:21, 156:12, 160:5, 167:19, 167:24, 254:18, 254:21, 257:1, 278:23
**fewer** [1] - 185:19
**FHWA** [78] - 7:15, 8:22, 10:21, 10:24, 11:5, 11:10, 11:11,

11:13, 13:1, 13:6, 15:11, 18:9, 18:10, 18:15, 19:1, 19:4, 19:7, 19:12, 20:16, 25:20, 25:25, 27:24, 54:12, 58:12, 63:13, 68:1, 69:19, 70:6, 70:7, 71:9, 71:18, 82:6, 82:8, 85:10, 87:19, 88:3, 90:11, 93:13, 97:23, 99:18, 110:16, 114:11, 114:17, 115:10, 117:22, 118:5, 118:19, 120:1, 120:14, 122:3, 124:25, 152:11, 152:14, 160:22, 171:4, 171:11, 172:17, 195:5, 203:10, 203:14, 205:21, 209:23, 212:3, 214:25, 215:4, 216:9, 218:19, 219:13, 220:5, 220:19, 221:19, 224:9, 231:21, 233:6, 259:13, 270:8, 270:25, 275:5
**FHWA's** [9] - 43:5, 69:9, 71:2, 119:19, 174:9, 178:11, 217:10, 220:20, 259:10
**FHWA-approved** [1] - 70:7
**fide** [1] - 29:9
**field** [1] - 226:6
**fiery** [1] - 61:6
**Fifth** [1] - 2:22
**fighting** [1] - 61:3
**figure** [13] - 50:20, 61:15, 61:22, 63:2, 64:19, 104:24, 115:25, 122:11, 147:19, 159:11, 243:12, 244:20, 276:23
**Figure** [1] - 234:8
**figured** [1] - 273:23
**figures** [1] - 64:15
**file** [1] - 278:5
**filters** [1] - 52:8
**filtration** [5] - 144:10, 145:20, 160:12, 160:14, 175:5
**final** [125] - 11:19, 19:3, 19:10, 19:11, 19:12, 19:18, 19:24,

20:1, 20:20, 20:21, 20:25, 21:18, 22:11, 22:21, 22:22, 22:23, 23:4, 23:17, 24:6, 24:9, 25:6, 26:1, 26:2, 26:6, 26:7, 26:10, 26:11, 26:16, 26:24, 27:2, 29:11, 40:17, 40:21, 40:25, 41:1, 41:5, 41:19, 41:23, 42:23, 43:5, 43:20, 43:21, 44:4, 44:8, 44:9, 44:13, 45:7, 45:19, 47:16, 48:16, 52:4, 52:6, 52:19, 55:14, 55:19, 56:14, 59:18, 66:1, 66:7, 67:2, 71:5, 71:10, 71:11, 71:21, 72:4, 72:11, 72:19, 72:20, 76:3, 76:7, 77:5, 78:2, 79:17, 82:4, 84:18, 85:2, 85:7, 85:8, 92:8, 99:6, 100:5, 103:25, 104:8, 109:16, 122:4, 122:5, 122:11, 125:9, 130:9, 130:14, 136:19, 136:21, 136:22, 139:16, 139:20, 142:12, 142:13, 143:21, 146:25, 164:10, 166:1, 166:4, 179:7, 185:14, 188:3, 188:20, 189:6, 189:24, 190:18, 211:22, 213:2, 213:14, 215:5, 215:8, 216:9, 228:16, 240:6, 258:16, 258:17, 261:19, 267:22, 270:22
**finalized** [5] - 10:10, 18:7, 25:21, 25:25, 72:3
**finally** [5] - 20:12, 20:14, 21:9, 25:16, 96:18
**financial** [7] - 17:13, 125:17, 125:20, 126:22, 127:16, 130:17, 143:11
**financially** [1] - 15:24
**finder** [1] - 37:8
**findings** [1] - 113:10
**fine** [17] - 38:16, 52:6, 86:23, 139:9,

145:13, 196:15, 196:16, 196:21, 221:11, 261:3, 261:4, 267:20, 275:19, 277:15, 279:11, 280:3
**finish** [4] - 10:13, 24:20, 61:15, 110:3
**finished** [2] - 41:5, 43:10
**Fink** [1] - 5:19
**FINK** [1] - 2:20
**First** [3] - 18:4, 21:14, 57:1
**first** [58] - 7:6, 10:14, 11:7, 14:10, 25:22, 27:13, 32:4, 32:8, 32:18, 35:1, 35:2, 41:16, 49:4, 51:7, 58:14, 58:18, 62:10, 74:14, 76:9, 76:16, 79:23, 81:6, 81:25, 90:12, 92:3, 92:18, 92:22, 101:3, 102:1, 122:8, 128:23, 129:20, 136:7, 139:16, 150:7, 151:13, 153:17, 154:10, 167:20, 179:17, 182:25, 183:22, 187:5, 195:25, 197:15, 203:21, 213:25, 241:13, 241:17, 260:5, 260:9, 260:10, 261:20, 269:8, 271:12, 275:3, 275:21
**fiscal** [2] - 46:13, 46:14
**fit** [2] - 81:21, 97:9
**fits** [1] - 81:24
**five** [20] - 6:21, 31:11, 32:22, 32:23, 49:18, 49:19, 64:2, 79:21, 83:22, 102:1, 126:21, 145:19, 150:9, 176:15, 177:13, 186:15, 198:11, 234:18, 273:18, 273:23
**five-based** [1] - 145:19
**fix** [3] - 30:20, 30:24, 72:16
**fixed** [2] - 149:5
**flat** [1] - 203:22
**flaw** [1] - 16:4
**flawed** [2] - 30:19, 67:19

**flaws** [3] - 19:9, 19:10, 85:14
**fleshed** [2] - 149:7, 183:6
**flexibility** [1] - 146:6
**flexible** [1] - 95:17
**flip** [1] - 20:10
**floated** [1] - 133:23
**Floor** [4] - 2:13, 2:17, 2:22, 3:19
**floor** [1] - 62:15
**Florida** [3] - 133:11, 134:13, 134:16
**flow** [4] - 44:7, 151:7, 156:24, 166:24
**flows** [3] - 35:17, 234:23, 237:23
**flyspeck** [3] - 40:3, 40:10, 40:11
**flyspecking** [1] - 40:14
**focus** [13] - 85:17, 99:14, 119:20, 137:17, 137:18, 137:22, 138:3, 177:24, 199:7, 199:13, 199:18, 229:16, 229:19
**focused** [8] - 7:25, 99:22, 114:22, 158:23, 199:17, 216:11, 249:12, 269:12
**focusing** [1] - 216:2
**folks** [4] - 128:3, 165:14, 165:15, 196:22
**follow** [6] - 27:14, 139:14, 147:19, 167:10, 222:8, 267:14
**follow-up** [2] - 27:14, 267:14
**followed** [2] - 63:5, 244:9
**following** [3] - 24:20, 164:8, 176:7
**FONSI** [113] - 11:15, 14:23, 19:7, 19:8, 19:10, 19:22, 20:1, 21:23, 22:12, 23:20, 24:5, 24:7, 25:8, 25:9, 25:14, 25:23, 26:11, 29:5, 29:16, 34:17, 36:6, 44:12, 44:16, 45:20, 45:22, 51:8, 51:22, 54:21, 55:1, 55:20, 55:21, 56:6, 56:10, 56:16, 61:1, 63:18, 65:20,

66:2, 67:23, 72:4, 72:5, 72:18, 72:23, 72:25, 73:16, 79:2, 82:4, 82:9, 82:10, 82:17, 84:25, 85:1, 85:3, 85:7, 85:10, 85:24, 86:1, 86:2, 86:6, 86:13, 87:5, 89:15, 90:13, 91:20, 94:7, 96:6, 96:25, 97:5, 100:5, 100:23, 101:6, 103:1, 103:6, 103:11, 103:22, 104:9, 105:1, 109:16, 116:7, 116:12, 122:6, 122:24, 123:3, 124:1, 139:5, 143:11, 143:13, 153:9, 153:16, 157:14, 163:19, 163:22, 163:25, 176:12, 176:13, 179:7, 179:18, 180:2, 186:3, 189:23, 194:5, 194:14, 200:8, 205:10, 205:20, 211:9, 215:5, 215:8, 242:3, 244:15
**FONSIs** [3] - 46:12, 56:8, 68:8
**font** [1] - 214:12
**foot** [1] - 278:19
**footnote** [7] - 80:17, 98:24, 118:13, 118:23, 120:9, 120:18, 175:5
**footnotes** [1] - 80:4
**FOR** [1] - 1:1
**Forest** [1] - 134:25
**forfeiture** [6] - 260:14, 260:19, 260:23, 261:1, 261:6
**forget** [1] - 119:8
**forgive** [3] - 70:2, 97:18, 144:24
**form** [6] - 42:16, 56:12, 142:25, 197:10, 243:24, 256:1
**formal** [2] - 56:19, 279:25
**former** [1] - 70:3
**forms** [1] - 35:4
**formula** [1] - 36:18
**Fort** [15] - 102:10, 104:5, 109:24, 110:10, 111:24, 113:20, 141:23,

141:24, 176:5, 177:2, 181:11, 192:25, 198:4, 250:12, 250:13
**forth** [6] - 43:25, 76:5, 122:5, 197:17, 200:4, 210:14
**forthcoming** [2] - 40:24, 143:19
**forums** [1] - 133:19
**forward** [12] - 8:15, 18:6, 25:23, 26:20, 27:5, 92:3, 129:8, 130:13, 130:25, 136:14, 173:13, 187:19
**forwarded** [1] - 276:6
**Four** [1] - 109:22
**four** [75] - 58:25, 70:8, 70:19, 74:16, 95:25, 104:5, 109:14, 109:15, 109:21, 110:15, 111:3, 111:14, 111:20, 123:13, 126:21, 141:18, 143:12, 146:11, 147:7, 147:17, 154:1, 160:7, 161:9, 165:1, 166:25, 167:3, 175:22, 176:21, 177:1, 177:7, 177:10, 177:14, 178:6, 178:9, 181:12, 185:9, 185:20, 186:6, 187:24, 198:20, 198:23, 209:16, 209:20, 209:24, 210:3, 221:20, 222:18, 222:20, 224:13, 226:11, 226:13, 227:24, 228:4, 228:7, 228:9, 228:10, 228:21, 229:3, 229:11, 229:12, 229:22, 230:5, 230:13, 233:11, 237:21, 238:14, 247:21, 248:5, 248:10, 269:20, 273:5, 273:7, 274:16, 275:2
**four-county** [1] - 273:5
**fracking** [3] - 12:17, 12:23, 35:24
**fragmentation** [1] - 22:6
**frame** [1] - 79:13

framework [1] - 244:1
Frank [1] - 1:9
FRANKEL [1] - 3:14
frankly [5] - 19:17, 21:12, 146:23, 177:12, 247:2
free [1] - 14:13
freeways [1] - 235:9
freight [1] - 17:3
frequency [1] - 75:25
frequently [1] - 77:8
Friday [1] - 277:13
friend [2] - 67:21, 126:8
Friends [1] - 3:11
front [4] - 75:19, 147:20, 175:9, 191:12
fuel [1] - 199:9
fulfill [1] - 219:13
fulfilling [1] - 125:11
full [22] - 10:16, 11:6, 13:1, 14:24, 29:6, 30:25, 70:6, 70:8, 73:4, 92:5, 93:10, 117:25, 118:14, 118:21, 130:21, 169:17, 169:20, 191:20, 193:8, 193:9, 193:16, 194:20
full-blown [1] - 169:20
fully [7] - 22:2, 53:5, 53:14, 53:17, 55:7, 165:25, 242:25
fund [1] - 9:7
Fund [2] - 3:9, 3:16
fundamental [5] - 16:4, 19:5, 20:19, 31:1, 85:13
fundamentally [2] - 30:19, 67:19
funded [1] - 101:14
funding [41] - 7:23, 14:20, 33:12, 50:19, 100:24, 101:13, 101:18, 102:21, 103:6, 104:7, 108:19, 108:21, 109:18, 111:15, 114:7, 116:5, 116:8, 123:4, 128:24, 129:3, 142:15, 142:20, 142:22, 143:3, 153:18, 153:25, 154:4, 155:7, 174:22, 180:13, 183:22, 183:25, 184:2, 184:24, 185:6,

185:7, 185:16, 186:11, 209:18, 209:22, 229:2
funds [1] - 143:18
FYI [1] - 32:2

# G

gain [1] - 236:23
garbled [1] - 132:15
garner [2] - 47:3, 244:1
Gas [2] - 3:8, 77:2
gateway [1] - 250:4
gathering [1] - 41:16
gauge [1] - 243:20
general [3] - 24:15, 45:5, 122:5
generally [3] - 95:25, 138:12, 193:8
generate [1] - 125:9
generated [4] - 16:24, 17:7, 50:14, 184:25
generating [6] - 119:20, 125:1, 125:24, 126:5, 132:2, 172:14
generation [3] - 50:7, 128:24, 169:2
gentlemen [4] - 5:20, 60:16, 79:22, 197:5
geographic [6] - 104:14, 138:7, 138:19, 247:11, 251:18, 252:4
geographically [1] - 140:20
given [24] - 41:12, 46:13, 51:2, 62:25, 71:24, 78:24, 107:5, 126:4, 132:3, 155:8, 168:15, 169:3, 170:21, 196:7, 211:14, 211:16, 217:21, 218:5, 224:11, 232:16, 243:15, 244:10, 246:2, 272:5
glad [3] - 122:7, 195:11, 252:24
gloss [1] - 40:2
go-ahead [1] - 188:24
goal [6] - 51:2, 57:14, 127:18, 130:15, 168:11, 173:14
goals [3] - 127:13, 131:21, 167:23
God [3] - 67:24, 126:23, 126:25
GORDON [1] - 1:12

gordon [1] - 5:2
Gottheimer [1] - 9:21
government [10] - 7:15, 20:5, 46:14, 46:19, 67:25, 68:25, 96:3, 157:16, 172:17, 172:23
government's [2] - 123:20, 159:6
governor [2] - 7:4, 213:16
Governor [1] - 212:10
Governor's [1] - 215:2
governs [1] - 78:14
gradation [1] - 207:12
graduated [1] - 119:6
grant [2] - 36:7, 184:11
granular [1] - 113:17
grasp [2] - 155:4, 157:18
gray [1] - 272:25
great [5] - 16:18, 122:16, 154:14, 191:10, 237:9
Greater [1] - 34:2
greater [10] - 72:7, 91:13, 168:22, 209:15, 209:17, 209:20, 226:1, 271:23, 272:13
greatest [7] - 69:25, 245:12, 245:13, 245:19, 245:20, 249:16, 265:13
greatly [1] - 272:18
green [8] - 18:6, 18:10, 19:12, 25:23, 29:13, 144:11, 160:12, 166:21
Green [1] - 3:10
Gregory [1] - 5:12
GREGORY [1] - 2:4
grinning [1] - 125:15
Group [7] - 38:19, 152:17, 160:23, 164:19, 187:20, 188:4, 194:24
group [10] - 144:16, 144:17, 145:23, 158:24, 165:9, 175:1, 191:18, 201:16, 229:22, 231:15
groups [1] - 6:11
grow [1] - 235:15
Growth [1] - 134:16
guess [13] - 24:1, 26:20, 95:13, 104:6, 113:1, 141:2, 141:5,

166:15, 218:25, 240:8, 249:17, 252:14, 252:16
guessing [1] - 276:9
guest [1] - 243:4
guidance [3] - 231:21, 255:9, 266:19
guidelines [1] - 76:17
GW [2] - 158:13, 250:4
GWB [1] - 249:14

# H

Hackensack [2] - 3:9, 3:19
half [7] - 9:20, 21:3, 65:11, 65:22, 140:1, 234:5, 253:19
halfway [1] - 100:1
hand [11] - 6:24, 45:16, 84:13, 100:9, 101:2, 119:14, 134:11, 148:6, 200:16, 233:25, 246:14
handing [4] - 84:9, 84:12, 150:17, 197:20
handle [1] - 68:7
handmaiden [1] - 58:20
handouts [1] - 147:17
hands [4] - 78:25, 137:21, 220:19, 220:20
hang [3] - 180:18, 180:24, 181:1
happy [13] - 5:24, 64:11, 74:9, 81:3, 107:8, 116:17, 144:21, 145:12, 151:12, 163:11, 275:12, 277:7, 280:2
hard [37] - 7:16, 7:21, 7:24, 8:3, 8:21, 10:10, 14:22, 22:9, 24:8, 24:11, 26:4, 26:5, 26:8, 26:11, 28:2, 28:4, 28:11, 29:9, 29:24, 30:2, 30:4, 30:15, 39:5, 39:12, 39:16, 61:3, 96:6, 96:8, 97:11, 120:19, 120:24, 197:6, 216:1, 224:2, 228:3
hard-look [1] - 120:19
Harlem [2] - 119:12, 130:7
Harris [1] - 5:18

HARRIS [1] - 2:21
hat [3] - 180:18, 180:24, 181:1
head [4] - 93:24, 108:4, 275:24, 280:14
heading [1] - 41:17
heads [1] - 135:21
heads-up [1] - 135:21
health [7] - 160:14, 217:25, 225:17, 225:20, 261:16, 265:20, 275:7
Health [1] - 3:6
health-based [1] - 265:20
hear [15] - 5:25, 72:13, 89:1, 96:20, 128:7, 153:11, 161:7, 163:21, 170:8, 178:5, 215:6, 228:12, 232:23, 253:22, 279:20
heard [13] - 6:15, 34:10, 67:9, 72:17, 78:13, 84:16, 85:1, 98:13, 163:7, 174:9, 174:20, 201:8, 261:1
hearing [2] - 27:5, 149:24
heart [5] - 7:3, 57:8, 95:12, 117:13, 229:24
heavily [1] - 161:8
Hecker [1] - 5:19
HECKER [1] - 2:20
height [1] - 229:24
held [3] - 5:1, 13:16, 134:9
helicopter [1] - 280:23
help [29] - 23:23, 31:23, 32:6, 46:10, 47:4, 68:12, 83:4, 90:22, 91:4, 91:16, 104:13, 115:16, 137:14, 138:18, 139:2, 141:3, 143:23, 144:7, 155:3, 157:17, 167:12, 176:23, 178:22, 200:17, 210:16, 243:7, 244:19, 248:19, 277:1
helped [1] - 151:22
helpful [11] - 41:18, 77:16, 77:19, 78:10, 79:8, 79:18, 82:14, 115:11, 134:14, 143:24, 214:10

**helps** [3] - 47:2, 98:3, 267:23
**Henry** [2] - 163:21
**high** [18] - 7:9, 66:19, 70:2, 70:18, 157:4, 158:25, 159:2, 159:8, 159:9, 207:17, 225:19, 227:14, 272:22, 274:11, 275:3, 275:4
**higher** [14] - 20:21, 24:15, 64:19, 98:4, 103:19, 104:3, 130:8, 158:11, 170:7, 199:8, 223:22, 228:8, 264:18
**highest** [11] - 7:19, 130:9, 138:3, 232:12, 238:24, 238:25, 245:10, 246:1, 246:15, 265:2, 265:12
**highlighted** [1] - 253:3
**highlighting** [1] - 217:22
**highlights** [1] - 256:7
**highly** [5] - 164:20, 193:1, 193:2, 271:5, 274:22
**highly-burdened** [1] - 164:20
**highway** [22] - 70:17, 138:14, 142:4, 142:5, 160:25, 198:25, 199:20, 200:22, 210:8, 237:25, 238:10, 239:2, 239:6, 239:14, 249:11, 249:15, 260:9, 264:23, 266:2, 266:13, 271:11, 273:14
**Highway** [61] - 8:8, 8:13, 8:15, 8:19, 16:5, 23:19, 26:15, 26:25, 27:1, 27:4, 27:9, 28:7, 28:13, 28:16, 28:22, 29:3, 33:2, 33:3, 41:21, 42:2, 42:15, 43:12, 43:14, 43:22, 43:25, 48:24, 54:12, 55:9, 56:18, 76:9, 77:21, 111:8, 112:17, 115:7, 129:1, 130:2, 131:11, 135:2, 135:10, 151:18, 151:24, 152:5,

152:8, 152:21, 153:1, 153:5, 153:7, 166:2, 172:12, 188:21, 188:23, 189:3, 189:19, 216:7, 240:15, 240:19, 258:19, 264:8, 267:14, 267:18, 268:2
**Highway's** [2] - 46:5, 133:11
**highways** [16] - 33:17, 33:18, 35:5, 112:4, 140:18, 144:10, 160:13, 175:5, 235:8, 237:24, 238:5, 239:20, 266:13, 269:15, 273:9, 273:14
**Highways** [16] - 33:6, 33:7, 33:22, 35:11, 36:5, 48:9, 133:16, 144:18, 188:10, 239:5, 239:8, 239:13, 239:17, 248:9, 253:9, 256:20
**Highways'** [3] - 35:10, 244:14, 255:1
**history** [2] - 10:15, 11:7
**hit** [2] - 13:23, 205:25
**Hoboken** [1] - 3:13
**hold** [23] - 16:2, 41:3, 59:7, 109:20, 116:23, 116:25, 128:17, 134:8, 134:21, 135:23, 150:25, 174:1, 182:6, 197:11, 217:4, 217:6, 217:8, 227:17, 234:15, 246:18, 247:9, 250:23, 257:20
**holding** [2] - 12:6, 133:5
**holds** [2] - 170:24, 236:15
**Holland** [9] - 17:22, 21:6, 238:5, 238:10, 238:11, 238:12, 238:17, 248:6
**honest** [1] - 276:6
**Honor** [501] - 5:8, 5:11, 5:15, 6:12, 6:21, 6:24, 7:1, 7:6, 7:12, 8:2, 8:10, 8:23, 9:6, 9:15, 9:18, 10:8, 11:4, 11:13, 11:15, 12:9, 12:15, 12:19, 13:1, 13:12, 13:23,

14:2, 14:16, 14:25, 15:12, 16:19, 17:21, 18:2, 18:16, 18:24, 19:14, 20:7, 20:11, 21:10, 22:13, 23:8, 23:11, 23:21, 23:24, 24:16, 24:20, 24:24, 25:16, 26:5, 26:20, 26:23, 27:4, 27:16, 27:23, 28:9, 28:15, 28:24, 30:17, 31:2, 31:14, 32:8, 32:14, 32:25, 34:9, 34:10, 35:18, 35:21, 36:9, 38:14, 38:17, 38:20, 38:22, 39:1, 39:6, 39:17, 40:6, 40:8, 40:15, 42:20, 43:1, 43:7, 43:18, 44:2, 44:11, 44:17, 44:23, 45:1, 45:12, 45:25, 46:16, 46:20, 46:23, 47:1, 47:6, 47:15, 47:24, 47:25, 48:8, 48:13, 48:21, 49:2, 49:9, 49:18, 49:22, 50:25, 54:5, 54:23, 55:17, 58:15, 58:20, 60:9, 60:12, 60:20, 60:21, 61:11, 62:1, 62:3, 63:6, 63:21, 63:25, 64:4, 64:13, 64:25, 65:4, 65:11, 66:15, 67:5, 67:20, 69:8, 69:12, 70:21, 70:23, 71:16, 71:23, 72:4, 73:1, 73:6, 73:15, 74:2, 74:7, 74:11, 74:19, 74:23, 75:1, 75:6, 75:16, 75:19, 76:13, 76:20, 77:13, 78:6, 79:10, 79:23, 80:10, 81:4, 82:11, 83:2, 83:5, 83:10, 83:18, 84:5, 84:8, 84:11, 84:14, 84:15, 86:21, 87:18, 88:5, 88:15, 88:18, 88:23, 89:10, 89:18, 90:10, 91:13, 91:24, 92:15, 93:16, 94:18, 94:21, 95:3, 95:11, 97:6, 97:18, 98:18, 98:22, 99:12, 99:24, 100:3, 100:8, 101:1, 102:3, 102:7, 102:25, 105:5, 105:14, 106:5, 106:15, 106:22, 107:8, 107:12, 107:15, 107:22,

110:24, 110:25, 111:9, 111:23, 112:9, 112:25, 113:11, 113:16, 113:22, 115:13, 115:18, 115:23, 116:2, 116:20, 117:3, 117:11, 117:12, 118:10, 118:20, 118:22, 119:3, 119:23, 120:4, 120:7, 120:12, 120:21, 121:6, 121:13, 121:18, 121:20, 121:22, 122:7, 122:23, 123:9, 124:14, 126:7, 126:12, 126:16, 127:4, 127:10, 128:9, 128:13, 129:12, 131:4, 131:25, 132:17, 133:22, 133:23, 134:6, 134:15, 134:21, 134:22, 135:9, 136:7, 136:25, 137:1, 137:6, 138:9, 139:6, 140:22, 141:6, 141:7, 141:22, 142:10, 143:9, 143:13, 143:20, 144:13, 144:21, 145:11, 145:14, 146:13, 146:19, 146:21, 147:9, 147:22, 148:2, 148:13, 148:15, 148:17, 149:13, 149:17, 149:21, 149:25, 151:19, 162:18, 163:23, 165:3, 165:16, 167:17, 169:15, 170:13, 172:6, 173:24, 174:3, 174:7, 174:9, 174:25, 175:9, 175:15, 175:25, 176:2, 176:4, 176:9, 176:11, 176:19, 176:24, 177:5, 177:12, 177:22, 178:4, 178:10, 179:16, 179:22, 180:10, 180:14, 180:20, 180:25, 181:7, 181:17, 181:20, 182:8, 182:22, 182:24,

183:21, 184:3, 184:8, 185:2, 187:10, 187:16, 188:15, 189:2, 189:12, 189:22, 190:17, 190:23, 191:6, 191:12, 192:14, 192:19, 192:22, 195:15, 196:2, 196:10, 196:12, 196:20, 197:4, 197:19, 197:21, 198:1, 198:8, 198:11, 199:4, 199:19, 200:3, 200:9, 200:23, 201:10, 201:17, 201:22, 202:18, 203:1, 204:1, 205:4, 205:15, 206:5, 206:14, 206:18, 207:8, 207:11, 208:3, 208:6, 208:7, 208:17, 208:19, 208:24, 209:10, 210:19, 212:7, 212:23, 213:19, 213:24, 214:4, 214:9, 214:14, 214:17, 215:1, 215:11, 215:23, 216:19, 216:21, 217:2, 217:17, 218:4, 218:22, 219:8, 219:10, 219:13, 220:1, 220:8, 220:25, 221:3, 221:8, 221:18, 221:19, 222:16, 222:21, 223:10, 223:24, 224:12, 224:15, 225:17, 226:4, 227:19, 227:21, 228:15, 229:9, 230:1, 230:7, 230:22, 231:1, 231:7, 231:11, 231:13, 232:1, 232:21, 233:1, 233:9, 233:17, 233:20, 233:22, 234:1, 234:3, 234:9, 234:14, 235:14, 235:20, 236:3, 236:5, 236:10, 236:15, 236:19, 237:1, 237:11, 237:13, 237:15, 238:13, 239:2,

239:10, 239:19,
239:20, 239:23,
242:5, 242:13,
243:3, 244:18,
244:24, 245:8,
245:14, 246:4,
246:13, 246:20,
246:23, 247:13,
247:20, 248:1,
248:24, 249:10,
249:21, 250:7,
250:14, 250:22,
251:1, 251:18,
251:23, 252:7,
252:18, 252:22,
253:9, 253:12,
253:25, 254:18,
254:21, 256:24,
259:1, 260:15,
262:19, 262:25,
267:12, 272:5,
275:25, 277:4,
277:15, 279:3,
279:13, 280:3,
280:6, 280:11,
280:25
**honor** [1] - 224:7
**Honor's** [4] - 38:18,
75:25, 185:5, 262:4
**HONORABLE** [1] -
1:12
**Honorable** [1] - 5:1
**honored** [1] - 123:20
**Hood** [3] - 70:14,
75:11, 83:14
**hope** [2] - 149:20,
205:13
**hopefully** [4] - 58:5,
135:19, 234:12,
280:18
**horrendous** [1] -
59:24
**horrible** [1] - 103:17
**horse** [4] - 54:11,
68:24, 69:2, 69:3
**Hospitality** [1] - 76:21
**hot** [3] - 35:6, 209:23,
210:2
**hotspot** [5] - 198:20,
200:20, 248:11,
249:8, 266:19
**hour** [4] - 195:16,
195:19, 196:8,
276:21
**hours** [16] - 20:22,
20:23, 21:3, 65:12,
65:13, 66:20, 66:23,
137:12, 156:7,
156:14, 156:24,
192:15, 195:19,

197:2, 277:12
**housekeeping** [1] -
41:15
**HOWARD** [1] - 2:12
**Howard** [1] - 5:14
**Hudson** [27] - 3:7,
102:6, 106:1,
107:14, 107:15,
107:20, 109:2,
109:4, 110:13,
110:14, 114:9,
141:7, 149:15,
202:14, 202:15,
202:20, 202:24,
209:24, 210:3,
214:20, 224:19,
226:12, 245:5,
245:13, 245:17,
245:19
**huge** [3] - 70:4, 99:13,
126:11
**hugely** [2] - 103:19,
116:1
**human** [1] - 217:24
**humbly** [1] - 78:8
**hundreds** [1] - 125:13
**hung** [1] - 62:18
**hungry** [1] - 278:20
**Hunts** [7] - 13:25,
89:7, 100:13,
102:17, 175:8,
184:10, 186:9
**hyperbole** [1] - 52:15
**hypothetically** [2] -
18:13, 139:25

**I**

**I-95** [2] - 249:14, 265:2
**I.** [1] - 28:9
**idea** [4] - 47:15,
133:12, 183:5,
272:15
**identification** [9] -
152:23, 161:9,
164:8, 167:11,
183:18, 187:23,
254:10, 269:8,
269:23
**identified** [35] - 96:3,
141:15, 141:24,
142:14, 144:8,
146:11, 154:1,
154:11, 156:2,
158:24, 159:8,
159:9, 159:21,
159:23, 160:4,
160:6, 160:18,
161:24, 162:21,
165:4, 165:7, 185:9,

185:19, 188:5,
215:19, 248:5,
269:11, 269:25,
270:21, 271:6,
273:7, 274:3,
274:17, 275:3
**identifies** [1] - 141:10
**identify** [8] - 51:9,
113:5, 191:19,
214:10, 254:15,
261:18, 278:1, 278:2
**identifying** [2] -
152:12, 261:13
**ignore** [2] - 13:6, 23:6
**illuminate** [2] - 41:19,
91:16
**illuminating** [1] -
82:13
**illusory** [2] - 82:21,
82:23
**illustrative** [1] -
279:22
**imagination** [2] -
64:22, 64:23
**imagined** [1] - 72:21
**immediately** [3] -
17:22, 127:25,
140:25
**imminently** [1] - 167:5
**impact** [39] - 10:17,
11:1, 11:16, 12:21,
18:6, 19:5, 31:1,
34:5, 41:10, 48:25,
54:8, 57:8, 59:15,
62:7, 63:17, 85:22,
96:12, 96:13, 96:17,
96:19, 96:23,
108:24, 123:6,
139:18, 158:16,
178:14, 194:25,
214:23, 217:16,
218:21, 246:8,
247:1, 253:8,
253:23, 254:5,
254:13, 262:7,
264:10
**impacted** [1] - 15:23
**impactful** [1] - 69:6
**impacts** [92] - 7:14,
7:17, 7:22, 10:24,
11:5, 12:1, 12:2,
13:2, 13:3, 13:18,
22:5, 24:11, 26:12,
29:7, 29:19, 29:21,
51:9, 51:11, 51:13,
53:21, 58:6, 58:7,
61:1, 65:22, 72:6,
73:19, 80:23, 81:11,
85:25, 86:4, 86:15,
89:14, 89:17, 89:21,

89:23, 91:25, 92:4,
92:7, 92:8, 92:9,
92:20, 92:24, 93:13,
93:19, 94:8, 94:17,
96:15, 96:20, 97:1,
97:2, 97:4, 99:13,
99:23, 101:9,
101:16, 103:7,
114:22, 114:23,
114:24, 119:11,
126:11, 156:21,
160:15, 170:6,
178:17, 180:3,
205:11, 205:17,
205:18, 205:21,
209:13, 210:5,
215:15, 215:17,
215:18, 215:20,
216:2, 218:24,
219:2, 224:4,
224:23, 226:1,
229:12, 234:24,
238:25, 239:1,
243:21, 251:25,
253:1, 261:16,
267:24
**implement** [3] - 33:14,
122:4, 164:5
**implementation** [3] -
114:24, 115:2,
124:18
**implemented** [7] -
84:23, 114:21,
164:2, 166:17,
183:15, 192:6,
193:11
**implementing** [2] -
79:11, 145:24
**implicated** [1] - 7:5
**implication** [1] - 85:5
**implies** [2] - 242:1,
242:22
**importance** [1] -
194:22
**important** [15] - 5:25,
7:2, 24:25, 52:13,
62:3, 99:9, 144:13,
154:15, 195:1,
203:13, 204:8,
235:15, 235:19,
252:2, 265:7
**importantly** [2] -
60:21, 170:1
**impose** [1] - 33:20
**impossible** [1] - 28:21
**improper** [3] - 40:24,
41:3, 128:25
**improperly** [1] - 120:1
**improved** [1] - 209:25
**improvements** [4] -

12:13, 33:13, 50:20,
256:20
**inaccuracy** [1] - 62:13
**inaccurate** [1] - 61:8
**inaction** [1] - 48:6
**inadequacy** [1] -
230:11
**inadequate** [2] - 51:8
**inadvertent** [1] - 62:18
**Inc** [3] - 3:8, 3:9, 3:11
**incentive** [2] - 156:10,
156:23
**include** [6] - 11:1,
115:1, 130:18,
144:9, 145:25,
159:19
**included** [24] - 51:25,
109:3, 112:11,
143:16, 144:19,
148:18, 163:1,
177:7, 183:4,
184:19, 185:4,
189:6, 201:14,
201:19, 202:13,
202:20, 202:25,
203:25, 224:18,
224:19, 228:18,
245:2, 251:5, 267:22
**includes** [1] - 100:13,
104:15, 104:16,
117:23, 143:14,
145:17, 154:4,
164:1, 192:5, 229:2,
253:14
**including** [23] - 8:16,
10:17, 32:6, 51:14,
53:21, 90:24,
102:16, 112:7,
126:19, 155:24,
159:24, 170:3,
170:5, 177:10,
178:1, 181:22,
200:11, 215:9,
248:10, 259:6,
261:15, 269:20,
273:6
**inclusion** [4] - 128:23,
129:3, 129:22,
130:15
**income** [8] - 130:10,
170:6, 171:8, 225:8,
226:21, 251:25,
252:3, 270:11
**incomplete** [1] -
226:23
**inconsistencies** [2] -
198:9, 212:2
**inconsistency** [2] -
104:25, 210:25
**inconsistent** [2] -

60:25, 219:1
**incorporated** [2] -
268:11, 268:13
**incorporation** [2] -
190:2, 190:24
**incorrect** [3] - 60:12,
60:15, 76:24
**increase** [29] - 65:22,
102:23, 103:10,
140:13, 140:19,
149:1, 149:3, 193:1,
193:5, 198:15,
199:13, 208:22,
224:16, 224:20,
235:18, 235:19,
240:11, 245:12,
245:20, 246:15,
246:22, 249:16,
249:18, 249:19,
253:17, 254:2,
254:7, 257:14, 273:4
**increased** [3] -
111:19, 112:3, 119:5
**increases** [20] -
100:18, 100:19,
103:15, 108:20,
140:9, 142:6,
198:16, 205:23,
209:19, 210:6,
214:19, 229:19,
239:6, 239:7, 249:7,
254:16, 257:16,
272:9, 273:8, 274:4
**increasing** [2] - 65:11,
203:24
**incredibly** [1] - 140:16
**incumbent** [1] - 87:25
**indeed** [2] - 51:12,
60:1
**independent** [1] -
198:11
**Indians** [1] - 168:6
**indicate** [2] - 77:25,
144:22
**indicated** [1] - 132:5
**indication** [2] - 30:5,
143:10
**indicator** [1] - 204:8
**Indigenous** [1] - 95:24
**individual** [2] -
127:13, 243:1
**induce** [2] - 35:7,
35:25
**indulge** [2] - 258:4,
259:18
**indulgence** [5] -
31:13, 63:23, 134:7,
147:10, 250:25
**inexplicable** [2] -
198:9, 233:10

**inexplicably** [1] -
229:21
**infamous** [1] - 80:2
**infeasible** [1] - 129:7
**inferred** [1] - 195:10
**inform** [4] - 77:3,
115:2, 167:12
**information** [13] -
19:6, 22:11, 47:3,
61:25, 68:4, 113:9,
121:16, 137:24,
186:4, 215:4, 244:7,
255:23, 268:1
**informs** [1] - 78:18
**infrastructure** [4] -
12:5, 12:12, 12:14,
14:2
**ing** [3] - 21:18, 93:25,
209:25
**inherent** [2] - 72:12,
133:15
**initial** [3] - 14:11, 49:3,
54:14
**initiative** [1] - 271:18
**initiatives** [1] - 144:11
**input** [9] - 49:6,
145:18, 150:21,
152:11, 152:14,
171:5, 188:6, 195:4,
235:9
**inputs** [1] - 171:22
**inquiry** [1] - 49:3
**insane** [1] - 277:12
**inside** [1] - 66:13
**insignificant** [2] -
12:21, 237:16
**install** [1] - 145:20
**installation** [1] -
160:14
**installing** [1] - 160:12
**instance** [11] - 48:9,
49:4, 58:14, 74:15,
74:20, 76:9, 76:16,
90:12, 102:14,
133:10, 145:20
**instances** [3] -
104:17, 104:18,
104:20
**instead** [10] - 29:5,
36:3, 85:20, 90:15,
103:22, 158:12,
179:13, 199:14,
210:9, 270:8
**instruction** [1] - 278:6
**insufficiency** [1] -
115:16
**intend** [2] - 9:19,
14:11
**intended** [2] - 15:17,
270:14

**intending** [1] - 32:17
**intent** [1] - 167:7
**intention** [1] - 146:7
**intentional** [1] - 61:11
**inter** [1] - 133:20
**inter-related** [1] -
133:20
**interaction** [1] - 281:4
**interest** [3] - 32:13,
33:17, 60:4
**interested** [5] -
112:14, 173:1,
262:20, 262:25,
263:5
**interesting** [2] - 10:2,
215:6
**interim** [1] - 71:3
**internal** [1] - 231:21
**International** [1] - 5:2
**INTERNATIONAL** [1] -
1:12
**interpretations** [1] -
278:4
**interrelated** [2] -
133:18, 197:16
**interrupt** [1] - 241:3
**intersection** [3] -
237:18, 250:19,
264:20
**intersections** [20] -
215:21, 237:19,
237:22, 238:6,
238:14, 238:23,
239:1, 247:21,
247:22, 248:5,
248:10, 248:17,
248:20, 249:2,
264:22, 266:1,
266:9, 266:14,
266:15, 266:23
**interstates** [1] - 235:9
**intervene** [1] - 59:16
**Intervenor** [2] - 2:18,
2:23, 20:5
**intervenor** [1] - 5:17
**intervenors** [3] -
39:11, 127:22,
127:24
**intimated** [1] - 195:9
**introduced** [2] -
161:12, 270:23
**introduction** [3] - 7:6,
10:13, 259:13
**intuitive** [1] - 10:14
**inures** [1] - 17:17
**invalid** [3] - 47:16,
76:23, 77:6
**invariably** [3] - 56:7,
67:23, 67:25
**investiture** [1] -

278:14
**involve** [5] - 12:4,
12:9, 24:13, 28:1,
28:3
**involved** [4] - 33:16,
70:9, 70:19, 83:14
**involvement** [1] - 82:7
**involving** [1] - 35:23
**irrational** [11] - 73:14,
112:13, 211:14,
218:7, 221:14,
222:9, 223:13,
226:23, 228:2,
229:6, 232:13
**irrationality** [2] -
215:25, 229:24
**Island** [3] - 158:4,
158:15, 253:4
**Isles** [1] - 3:8
**issuance** [6] - 34:17,
45:22, 54:21, 55:20,
56:18, 205:10
**issue** [41] - 6:17,
19:21, 22:4, 22:18,
24:8, 26:19, 34:4,
42:15, 50:1, 53:6,
57:19, 66:12, 70:10,
76:22, 84:1, 84:13,
85:21, 86:13, 97:5,
99:6, 99:15, 103:6,
104:9, 116:12,
116:18, 122:24,
123:6, 130:14,
136:2, 154:2,
162:22, 180:2,
191:10, 203:25,
227:8, 251:5, 257:5,
262:17, 269:13,
279:15
**issued** [20] - 18:5,
19:4, 19:7, 19:11,
20:11, 25:9, 25:13,
47:10, 55:2, 55:8,
65:20, 67:23, 85:4,
85:10, 124:1, 195:4,
213:14, 215:5,
216:9, 261:19
**issues** [23] - 7:2,
15:10, 17:11, 25:3,
25:4, 37:18, 55:21,
56:6, 58:3, 72:24,
90:12, 99:16, 102:5,
104:4, 113:25,
114:9, 119:10,
200:12, 217:3,
224:17, 275:21,
280:14, 280:16
**issuing** [3] - 11:14,
25:23, 36:5
**iterations** [1] - 77:10

**iterative** [1] - 144:22
**itself** [3] - 77:7,
180:10, 190:16

## J

**Jack** [1] - 5:18
**Janno** [1] - 23:1
**January** [1] - 70:7
**JC** [1] - 3:8
**JERSEY** [2] - 1:1, 1:3
**Jersey** [277] - 1:10,
1:21, 2:9, 3:5, 3:6,
3:10, 3:11, 3:12,
3:12, 3:19, 5:4, 5:10,
6:10, 7:3, 7:4, 11:18,
13:4, 13:8, 14:4,
14:20, 14:21, 14:23,
15:4, 15:14, 15:16,
15:19, 15:23, 17:2,
17:5, 17:6, 19:15,
21:8, 25:5, 29:8,
29:22, 29:23, 29:24,
29:25, 51:9, 51:10,
51:12, 51:14, 51:18,
51:23, 51:24, 52:16,
54:16, 58:14, 58:16,
59:25, 60:3, 61:2,
72:9, 72:18, 74:25,
86:7, 86:11, 87:12,
88:11, 88:23, 89:8,
89:12, 89:23, 90:2,
93:20, 96:21, 99:1,
99:10, 99:13, 99:23,
100:6, 101:17,
101:23, 102:9,
102:13, 102:22,
103:2, 103:4, 104:1,
104:16, 104:20,
104:23, 105:3,
105:9, 105:10,
105:19, 105:25,
106:25, 109:13,
110:20, 111:22,
112:20, 115:6,
116:6, 122:1, 124:3,
124:5, 125:13,
126:11, 126:25,
138:22, 141:18,
142:7, 143:4, 143:7,
144:19, 146:11,
146:15, 146:25,
147:7, 153:20,
154:1, 154:3, 154:4,
154:9, 155:14,
155:24, 156:1,
156:5, 156:18,
158:4, 160:5, 160:6,
161:9, 161:18,
161:25, 162:21,

163:7, 163:20,
165:1, 165:8,
165:10, 165:15,
166:8, 166:12,
166:13, 166:15,
170:5, 172:7, 172:8,
174:11, 174:13,
174:15, 174:22,
175:3, 175:4, 175:6,
177:20, 178:20,
179:19, 182:2,
182:17, 183:19,
185:10, 185:20,
185:24, 186:6,
187:24, 188:5,
192:1, 192:6, 194:1,
197:25, 198:2,
198:3, 198:13,
198:23, 201:13,
201:14, 201:15,
201:18, 202:5,
203:6, 203:19,
204:17, 204:18,
205:22, 206:9,
206:22, 207:2,
208:22, 209:24,
210:5, 214:18,
216:2, 216:8,
217:19, 218:5,
218:6, 218:10,
218:11, 219:7,
219:18, 219:22,
220:2, 220:4,
220:17, 221:4,
221:5, 221:7,
221:20, 223:14,
223:16, 223:21,
224:3, 224:6,
225:18, 225:20,
226:7, 226:19,
227:12, 228:18,
229:3, 229:7,
229:11, 231:13,
235:17, 236:2,
236:5, 236:11,
236:13, 237:22,
237:23, 238:4,
241:1, 245:2, 245:6,
245:14, 245:15,
246:1, 247:3,
247:22, 249:15,
251:9, 251:11,
251:19, 252:10,
253:4, 253:13,
253:15, 257:16,
259:5, 259:7,
260:15, 261:8,
261:19, 262:25,
265:24, 266:6,
266:12, 267:8,
267:9, 269:10,

269:17, 269:20,
270:6, 270:17,
270:19, 271:21,
273:1, 273:7, 274:1,
274:3, 278:16,
280:15
**Jersey's** [17] - 15:15,
50:2, 50:12, 51:6,
51:15, 52:22, 81:15,
99:5, 99:12, 99:22,
151:4, 219:14,
220:3, 229:10,
231:17, 270:1,
270:11
**job** [2] - 174:16, 243:7
**John** [2] - 6:9
**JOHN** [3] - 2:17, 3:4,
3:4
**journeys** [1] - 235:7
**judge** [2] - 91:7, 244:4
**Judge** [3] - 6:5, 22:13,
278:14
**judges** [1] - 278:15
**judgment** [8] - 36:8,
37:14, 40:13, 59:16,
66:16, 76:19,
101:15, 254:25
**judicial** [5] - 34:14,
37:6, 72:1, 73:25,
74:1
**jump** [2] - 40:10,
154:2
**juncture** [3] - 42:8,
42:12, 240:20
**June** [10] - 34:17,
84:19, 166:21,
200:18, 212:10,
213:14, 215:2,
215:9, 216:6, 231:17
**just..** [1] - 261:7
**justice** [1] - 229:10
**Justice** [123] - 4:14,
5:12, 7:18, 11:18,
13:3, 17:12, 29:7,
29:11, 29:20, 30:23,
72:14, 90:3, 92:10,
100:7, 104:1,
105:16, 108:13,
109:14, 109:15,
112:2, 112:19,
115:5, 130:11,
135:19, 139:12,
139:16, 140:1,
140:4, 140:9,
140:12, 144:9,
144:16, 144:18,
144:20, 145:23,
151:3, 151:8,
151:17, 152:7,
152:16, 154:12,

157:6, 160:22,
162:17, 164:18,
177:6, 187:20,
188:4, 190:14,
194:21, 194:25,
195:1, 195:13,
195:18, 195:23,
196:3, 197:1,
197:15, 202:16,
202:21, 206:6,
216:17, 216:18,
217:2, 220:3,
221:19, 222:2,
223:15, 224:3,
224:14, 224:22,
225:1, 225:2,
225:18, 225:21,
227:10, 228:4,
228:7, 228:19,
229:5, 232:10,
250:21, 250:24,
251:2, 251:5,
251:24, 252:8,
252:12, 253:1,
253:4, 253:6,
253:10, 253:11,
253:16, 254:1,
254:2, 254:9,
254:11, 255:12,
256:6, 259:15,
259:17, 260:1,
261:13, 261:18,
267:11, 267:23,
267:25, 268:7,
268:8, 268:9,
268:19, 269:1,
269:6, 269:9,
269:23, 269:25,
271:7, 271:13,
271:18, 272:7,
273:2, 273:12
**justification** [5] -
187:21, 189:15,
189:17, 190:10,
242:4
**justify** [4] - 119:21,
146:18, 217:15,
220:24

### K

**Kaplan** [3] - 5:18,
5:19, 280:4
**KAPLAN** [8] - 2:20,
2:21, 275:25,
276:11, 277:3,
277:15, 277:23,
280:6
**Kate** [1] - 5:18
**KATE** [1] - 2:21
**keep** [10] - 40:5, 40:7,

114:1, 135:4,
136:23, 150:7,
187:6, 208:20,
227:22, 278:10
**kept** [2] - 104:2, 111:1
**key** [2] - 135:22,
238:16
**kind** [12] - 10:15, 11:7,
24:21, 32:7, 38:7,
68:2, 95:21, 117:3,
171:1, 195:7, 258:4,
260:5
**kindly** [1] - 34:7
**KING** [1] - 1:15
**Knauer** [26] - 4:12,
4:18, 5:18, 9:13,
149:23, 149:25,
150:2, 150:15,
150:25, 162:1,
165:18, 167:14,
177:19, 184:6,
186:7, 187:18,
189:14, 191:7,
192:21, 195:14,
197:23, 256:25,
257:20, 263:9,
273:18, 279:14
**KNAUER** [125] - 2:16,
150:5, 150:9,
150:12, 150:17,
150:23, 151:1,
151:19, 151:21,
152:1, 152:10,
152:22, 153:3,
153:7, 153:13,
153:23, 154:2,
154:7, 154:24,
155:7, 155:12,
155:22, 156:3,
156:21, 157:1,
157:24, 158:1,
158:6, 158:9,
158:11, 158:14,
158:18, 158:20,
159:13, 159:15,
159:18, 161:11,
162:4, 162:7, 162:9,
162:18, 163:10,
163:14, 163:17,
163:23, 164:17,
165:2, 165:16,
165:19, 165:21,
166:6, 166:11,
167:2, 167:10,
167:15, 191:9,
192:8, 192:22,
193:15, 194:3,
194:5, 194:7, 194:9,
194:13, 194:17,
195:11, 195:15,

257:1, 257:4,
257:22, 258:2,
258:10, 258:17,
258:20, 258:22,
259:1, 259:3, 260:3,
260:9, 260:21,
260:25, 261:2,
261:8, 262:17,
262:24, 263:3,
263:6, 263:11,
263:14, 263:16,
263:19, 263:24,
264:1, 264:13,
265:11, 265:16,
265:18, 266:6,
267:7, 267:16,
267:21, 268:4,
268:8, 268:14,
268:16, 268:24,
269:7, 269:19,
269:22, 270:4,
270:18, 271:4,
271:9, 272:21,
273:6, 273:11,
273:19, 273:22,
273:25, 274:6,
274:8, 274:16,
275:10, 275:15,
275:17
**Knauer's** [1] - 185:11
**knowing** [2] - 19:9,
167:5
**knowledge** [1] - 42:7
**known** [3] - 65:5, 85:9,
231:16
**knows** [6] - 11:15,
17:21, 41:12, 58:20,
99:16, 201:11
**Kolell** [1] - 22:15
**kosher** [1] - 264:11
**KRAMER** [1] - 3:14

### L

**label** [1] - 141:7
**labeled** [3] - 239:8,
258:11, 258:18
**lack** [2] - 60:2, 72:14
**lacked** [1] - 221:1
**ladies** [3] - 5:20,
79:22, 197:5
**Lafayette** [1] - 70:16
**laid** [1] - 153:15
**Lake** [1] - 168:8
**land** [1] - 168:14
**lanes** [2] - 35:6, 70:18
**language** [14] - 12:6,
36:16, 39:3, 80:25,
87:17, 88:7, 101:12,
175:22, 176:12,

**leads** [2] - 18:22, 252:16
**leaf** [1] - 32:3
**learned** [1] - 216:20
**learning** [1] - 108:9
**least** [5] - 9:19, 78:12, 78:18, 78:19, 79:9, 106:24, 118:15, 118:21, 126:16, 126:17, 147:18, 148:25, 169:22, 205:1, 275:22
**leave** [3] - 163:12, 223:14, 263:4
**leaves** [1] - 78:24
**leaving** [3] - 112:20, 193:11, 238:3
**lectern** [1] - 49:15
**led** [6] - 132:3, 135:16, 146:8, 169:14, 200:7, 254:10
**ledger** [1] - 100:16
**Lee** [15] - 102:10, 104:5, 109:24, 110:10, 111:24, 113:20, 141:23, 141:24, 176:5, 177:2, 181:11, 192:25, 198:4, 250:12, 250:14
**leeway** [1] - 163:11
**left** [9] - 31:10, 64:6, 128:14, 141:6, 141:8, 141:12, 229:15, 231:24, 234:8
**leftovers** [1] - 86:10
**legal** [10] - 10:2, 10:3, 28:2, 28:3, 38:10, 48:11, 116:11, 133:8, 136:2, 224:7
**legally** [2] - 28:12, 45:24
**legion** [2] - 11:22, 21:14
**Legislation** [1] - 169:23
**legislation** [22] - 50:15, 50:21, 98:6, 98:7, 98:8, 98:10, 117:17, 118:4, 118:6, 118:10, 119:4, 124:13, 129:14, 129:19, 130:5, 130:14, 169:19, 169:20, 171:16, 172:18, 172:19, 173:9
**legislative** [4] - 15:8,

176:16, 176:18, 198:4, 270:25, 278:4
**large** [6] - 73:3, 75:7, 156:12, 226:21, 273:1
**largely** [1] - 153:18
**larger** [2] - 225:9, 239:7
**largest** [1] - 224:20
**last** [19] - 8:4, 10:8, 10:11, 18:7, 20:12, 38:18, 47:10, 47:15, 55:15, 69:20, 70:8, 79:13, 183:13, 197:22, 201:7, 229:9, 234:15, 247:19, 249:11
**late** [2] - 196:8, 280:24
**Latin** [1] - 135:9
**Lauren** [3] - 5:9, 181:2, 181:4
**LAUREN** [1] - 1:16
**Lautenberg** [1] - 1:9
**lavender** [1] - 272:25
**Law** [2] - 6:9, 280:21
**LAW** [1] - 3:4
**law** [56] - 7:17, 8:12, 11:22, 13:13, 20:1, 20:9, 20:10, 21:13, 25:15, 33:14, 34:23, 36:24, 37:8, 37:11, 37:18, 37:20, 39:4, 41:3, 44:10, 44:24, 45:6, 48:7, 66:10, 89:18, 90:16, 90:24, 95:23, 96:25, 116:10, 117:14, 118:25, 122:23, 123:3, 129:7, 129:11, 132:19, 132:23, 133:8, 168:14, 178:11, 178:19, 179:8, 179:12, 180:1, 180:17, 182:25, 188:17, 217:23, 218:3, 219:1, 220:6, 220:8, 223:3, 259:10, 261:2, 268:10
**lawsuit** [2] - 19:4, 34:18
**lay** [2] - 38:9, 154:3
**layer** [2] - 204:19, 218:12
**lead** [3] - 137:24, 180:23, 211:8
**leading** [5] - 112:4, 239:9, 239:17, 239:21

119:18, 124:18, 129:21
**legislature** [5] - 33:14, 119:3, 119:5, 120:17, 133:16
**Legislature** [1] - 50:15
**legitimate** [2] - 20:7, 244:16
**lengthy** [1] - 31:24
**leniency** [1] - 115:20
**lens** [2] - 38:24, 179:13
**LEO** [1] - 1:12
**Leo** [1] - 5:1
**less** [14] - 70:10, 114:24, 156:15, 156:25, 157:3, 157:11, 158:9, 185:21, 209:25, 215:20, 246:10, 251:12, 257:14
**lessen** [1] - 157:21
**lessening** [1] - 156:25
**lesser** [3] - 107:6, 138:25, 139:1
**letter** [24] - 33:17, 34:22, 41:2, 99:5, 99:20, 114:19, 200:10, 200:18, 200:24, 212:21, 213:17, 213:25, 215:2, 215:7, 215:11, 216:6, 216:13, 231:17, 231:20, 261:20, 266:8, 277:25
**letters** [10] - 99:12, 99:22, 110:22, 113:12, 212:10, 212:14, 212:15, 212:19, 212:21, 267:10
**level** [16] - 13:18, 17:2, 41:10, 49:1, 100:19, 146:5, 147:12, 163:6, 165:17, 179:8, 203:15, 224:6, 240:10, 254:7, 254:14, 273:4
**levels** [6] - 104:3, 139:15, 226:24, 228:17, 232:12
**LEVIN** [1] - 3:14
**Lexington** [1] - 2:17
**Liberty** [1] - 3:11
**licensing** [1] - 47:9
**lid** [1] - 187:6
**lie** [2] - 30:14, 243:12
**Lieber** [2] - 23:1, 125:15

**life** [3] - 50:24, 57:8, 102:1
**lift** [1] - 34:6
**light** [6] - 29:13, 39:15, 71:10, 125:8, 166:21, 211:4
**lighting** [2] - 19:12, 25:23
**lights** [2] - 238:16, 280:23
**likelihood** [2] - 124:20, 157:21
**likely** [13] - 85:18, 105:12, 136:20, 156:15, 157:3, 157:11, 167:6, 218:20, 249:6, 253:22, 256:3, 269:15, 273:8
**limit** [2] - 74:8, 90:2
**limitations** [4] - 25:14, 42:25, 44:6, 66:3
**limited** [5] - 29:14, 145:9, 147:1, 216:3, 228:1
**Lincoln** [2] - 17:22, 21:6
**line** [10] - 31:2, 116:3, 131:13, 138:24, 166:3, 183:7, 188:2, 202:2, 255:22, 265:8
**lines** [3] - 52:10, 105:6, 215:24
**lingering** [1] - 165:23
**Link** [1] - 258:19
**link** [9] - 198:25, 199:20, 200:22, 210:8, 237:25, 249:11, 264:25, 265:3, 266:14
**links** [6] - 142:4, 142:5, 235:8, 239:14, 264:23, 266:2
**lion's** [1] - 116:16
**list** [10] - 97:24, 101:11, 133:1, 143:14, 149:16, 150:2, 164:1, 198:5, 226:23
**listed** [7] - 53:1, 64:19, 99:19, 114:17, 194:13, 205:24, 228:5
**listening** [1] - 49:24
**lists** [1] - 151:2
**lit** [2] - 18:6, 18:10
**literally** [2] - 21:2, 25:11
**litigation** [4] - 162:24,

166:7, 260:17, 268:17
**LLC** [1] - 3:4
**LLP** [5] - 1:15, 1:16, 1:18, 2:20, 3:14
**load** [4] - 7:10, 10:5, 10:6, 10:7
**Lobby** [1] - 3:11
**local** [13] - 34:3, 87:21, 88:9, 140:7, 145:24, 174:18, 235:8, 237:24, 238:5, 254:7, 254:9, 254:14, 264:20
**locales** [1] - 149:10
**localities** [1] - 215:22
**localized** [4] - 138:15, 139:11, 215:14, 269:15
**locate** [1] - 274:22
**located** [3] - 110:4, 136:20, 238:17
**locating** [1] - 273:14
**location** [20] - 57:6, 57:7, 136:22, 149:1, 149:2, 149:14, 149:15, 152:12, 193:2, 193:10, 249:15, 249:23, 250:1, 250:13, 251:18, 252:5, 259:8, 265:5, 265:12, 273:14
**locations** [19] - 51:24, 148:25, 151:10, 152:12, 159:24, 167:12, 188:10, 191:16, 191:19, 193:12, 198:21, 198:22, 202:21, 255:18, 260:11, 266:21, 274:18, 275:6
**lodge** [1] - 57:6
**logic** [1] - 264:5
**logically** [1] - 18:23
**logistical** [2] - 275:20, 276:15
**long-standing** [1] - 197:12
**long-term** [1] - 60:3
**look** [98] - 7:16, 7:21, 7:24, 8:3, 8:4, 8:21, 10:3, 10:10, 14:22, 22:9, 24:9, 24:11, 26:5, 26:8, 26:11, 27:5, 27:18, 28:2, 28:4, 29:9, 29:24, 30:2, 30:6, 31:21, 39:5, 39:12, 39:14,

39:16, 48:18, 56:24,
57:19, 58:24, 59:5,
60:5, 62:19, 70:12,
75:18, 77:9, 87:21,
87:25, 88:3, 88:6,
88:16, 88:17, 94:10,
94:17, 95:5, 96:3,
96:6, 96:8, 97:11,
104:3, 106:17,
108:3, 112:9, 118:8,
120:19, 120:24,
136:14, 139:18,
141:19, 159:4,
169:17, 170:10,
174:23, 177:15,
177:25, 179:13,
206:21, 207:1,
207:2, 214:4,
215:11, 216:1,
217:6, 217:18,
218:10, 221:20,
224:2, 225:24,
226:20, 226:22,
228:3, 233:22,
235:17, 244:15,
246:14, 251:24,
253:24, 259:14,
266:16, 266:19,
272:4, 276:7, 277:5,
277:19

**looked** [36] - 14:25,
15:1, 37:2, 40:18,
81:17, 82:6, 88:19,
106:19, 115:12,
142:3, 142:4, 157:7,
206:20, 210:3,
211:17, 211:18,
226:18, 236:13,
237:2, 239:20,
240:17, 249:1,
249:12, 253:9,
253:10, 264:23,
264:24, 265:11,
265:16, 265:19,
265:24, 271:14,
271:22, 274:23,
274:24

**looking** [42] - 13:2,
15:5, 28:19, 30:11,
38:24, 62:10, 62:23,
77:4, 87:19, 92:22,
104:22, 110:12,
114:2, 138:15,
140:8, 141:8,
143:25, 149:4,
159:16, 168:18,
179:9, 179:10,
179:11, 179:15,
188:15, 203:3,
208:6, 208:16,
225:5, 228:20,

240:7, 241:18,
248:12, 252:2,
252:11, 260:7,
262:8, 264:2,
264:14, 265:12,
275:5

**looks** [10] - 32:3,
38:20, 40:25, 129:4,
138:13, 141:6,
191:20, 200:16,
207:14, 251:25

**loose** [1] - 78:15

**lose** [1] - 154:6

**lost** [1] - 247:23

**love** [1] - 123:19

**low** [11] - 92:6,
130:10, 160:20,
160:21, 170:6,
207:17, 225:8,
226:21, 251:25,
252:3, 270:11

**Lower** [1] - 33:12

**lower** [7] - 24:14,
66:21, 157:10,
223:22, 226:24,
257:17, 264:18

**lowered** [1] - 21:4

**lowest** [3] - 206:25,
245:10, 246:2

**Lunch** [1] - 128:4

**lunch** [5] - 84:4,
127:22, 128:2,
128:3, 278:21

**lunchtime** [1] - 278:12

**ly** [1] - 245:22

## M

**magic** [2] - 105:1,
177:14

**magnitude** [2] -
160:21, 161:3

**main** [4] - 76:6, 77:17,
112:4, 137:2

**maintain** [6] - 119:25,
131:11, 204:9,
204:10, 218:16,
220:13

**maintaining** [1] -
222:13

**major** [4] - 119:6,
154:8, 225:22,
266:12

**majority** [2] - 138:6,
239:1

**maker** [3] - 77:3,
244:14, 245:24

**makers** [1] - 243:19

**manage** [7] - 14:11,
18:4, 77:18, 78:18,

78:19, 79:4, 187:2

**Management** [1] -
35:23

**management** [1] -
231:14

**mandate** [2] - 87:16,
219:13

**mandates** [2] - 87:9,
220:4

**Manhattan** [18] -
10:20, 12:10, 33:12,
70:5, 111:22,
125:24, 130:8,
141:18, 155:18,
170:4, 235:23,
238:4, 239:1, 239:9,
239:18, 239:21,
252:21

**manner** [4] - 113:8,
121:1, 212:3, 256:2

**manual** [1] - 70:12

**map** [4] - 140:17,
250:9, 272:2, 272:7

**mapping** [6] - 231:14,
231:18, 270:5,
270:9, 270:14, 271:2

**Marathon** [1] - 97:21

**Mark** [1] - 5:16

**MARK** [1] - 2:16

**markers** [1] - 91:6

**MARTIN** [1] - 2:4

**Maryland** [4] - 70:17,
70:25, 75:4, 75:5

**mass** [4] - 15:15,
15:16, 15:17, 218:6

**MASTRO** [380] - 1:15,
5:8, 6:21, 6:24, 8:10,
8:19, 8:23, 8:25, 9:6,
9:10, 9:15, 9:18,
9:25, 10:5, 10:8,
11:11, 11:13, 12:9,
12:15, 12:19, 13:9,
13:12, 14:4, 14:7,
14:16, 15:22, 16:1,
16:7, 16:11, 16:17,
16:24, 17:1, 17:5,
17:9, 17:21, 17:24,
18:2, 18:10, 18:16,
20:3, 20:6, 23:11,
23:15, 23:21, 23:24,
24:3, 24:8, 24:19,
24:23, 26:18, 26:23,
27:3, 27:7, 27:16,
27:23, 28:3, 28:9,
28:15, 28:24, 29:2,
30:17, 31:14, 31:18,
60:15, 60:20, 63:25,
64:4, 64:7, 64:11,
64:25, 65:3, 65:7,
65:10, 66:15, 67:1,

67:5, 67:8, 67:15,
68:6, 68:19, 69:12,
69:14, 69:17, 70:21,
70:23, 71:8, 71:12,
71:16, 71:20, 71:23,
72:4, 73:1, 73:3,
73:8, 73:22, 74:2,
74:6, 74:11, 83:5,
83:10, 83:12, 83:18,
83:20, 84:5, 84:8,
84:11, 86:21, 87:1,
87:4, 87:6, 87:18,
88:5, 88:18, 88:23,
88:25, 90:8, 90:23,
91:12, 91:17, 91:22,
92:15, 92:19, 92:25,
93:7, 93:9, 93:16,
94:3, 94:12, 94:18,
94:21, 94:25, 95:3,
95:11, 95:15, 95:20,
97:10, 97:16, 98:10,
98:14, 98:18, 98:22,
99:3, 99:5, 99:12,
100:3, 102:3, 102:7,
102:12, 102:19,
104:11, 105:5,
105:14, 105:18,
105:21, 106:5,
106:14, 106:17,
106:22, 106:24,
107:8, 107:12,
107:15, 107:18,
107:22, 108:1,
108:6, 108:8,
108:10, 108:13,
108:16, 109:4,
109:7, 109:11,
109:22, 109:25,
110:2, 110:5, 110:7,
110:9, 110:18,
110:22, 111:9,
111:23, 112:2,
112:7, 112:12,
112:18, 112:24,
113:11, 113:16,
113:24, 115:8,
115:13, 115:17,
115:22, 116:1,
116:20, 117:3,
117:7, 117:11,
118:20, 119:17,
119:23, 120:4,
120:7, 120:12,
120:14, 121:6,
121:10, 121:12,
121:15, 121:18,
121:20, 121:22,
122:7, 122:13,
122:15, 122:17,
122:20, 122:23,
123:9, 123:23,

124:9, 124:11,
124:14, 125:5,
125:11, 126:1,
126:7, 126:16,
127:4, 127:7,
127:10, 127:18,
174:3, 174:5, 174:7,
175:25, 176:2,
176:4, 176:24,
177:1, 179:2, 179:4,
179:16, 179:22,
180:10, 180:20,
180:25, 181:6,
181:20, 182:8,
182:10, 182:13,
182:16, 182:20,
182:22, 186:16,
186:20, 187:10,
187:13, 192:11,
192:14, 192:19,
196:2, 196:7, 197:4,
197:18, 199:4,
199:11, 199:19,
199:24, 200:3,
200:9, 200:18,
200:20, 201:2,
201:5, 201:7,
201:22, 202:1,
202:4, 202:7,
202:11, 202:14,
202:18, 202:22,
203:1, 203:10,
203:12, 204:14,
204:22, 205:4,
205:9, 205:15,
206:5, 206:8,
206:12, 206:18,
207:8, 207:11,
208:3, 208:6,
208:12, 208:15,
208:17, 208:19,
209:10, 210:19,
211:11, 211:23,
211:25, 212:7,
212:18, 212:23,
212:25, 213:2,
213:6, 213:10,
213:13, 213:15,
213:19, 213:23,
214:2, 214:4, 214:9,
214:14, 214:16,
216:16, 216:19,
216:21, 216:23,
216:25, 217:12,
217:17, 218:3,
218:15, 218:22,
219:10, 219:21,
220:1, 220:8,
220:20, 220:25,
221:3, 221:7,
221:10, 221:12,

221:18, 222:4,
222:6, 222:16,
222:21, 223:10,
223:23, 224:12,
226:4, 227:19,
227:21, 230:3,
230:7, 230:12,
230:17, 230:20,
230:22, 231:1,
231:7, 231:11,
231:13, 231:23,
232:1, 232:8,
232:17, 232:21,
232:25, 233:9,
233:15, 233:17,
279:3, 280:25
**Mastro** [134] - 4:4,
4:10, 4:16, 5:8, 6:18,
8:5, 12:4, 14:3, 14:5,
15:18, 16:13, 16:25,
23:12, 24:18, 26:14,
26:21, 30:4, 30:11,
31:9, 31:17, 31:19,
34:12, 34:25, 35:22,
41:11, 45:5, 46:8,
48:15, 49:24, 50:18,
60:17, 62:11, 63:23,
64:2, 64:24, 65:5,
65:24, 67:14, 68:2,
71:3, 73:7, 74:4,
76:22, 81:5, 83:4,
83:17, 84:1, 86:16,
90:5, 90:22, 91:16,
97:8, 98:11, 99:8,
101:24, 104:13,
105:1, 106:7,
106:18, 108:3,
108:9, 108:15,
110:11, 111:20,
113:3, 115:11,
116:15, 116:22,
118:17, 119:16,
120:23, 121:19,
121:21, 123:22,
124:8, 127:6,
138:17, 143:6,
144:2, 146:4,
147:13, 148:4,
159:20, 162:12,
169:15, 169:25,
173:18, 174:1,
174:2, 175:24,
178:22, 181:19,
182:5, 182:7,
182:19, 182:25,
183:12, 186:25,
187:5, 187:15,
192:10, 192:12,
194:18, 196:1,
197:3, 197:14,
199:3, 210:22,

211:2, 217:4, 217:5,
217:9, 222:11,
230:25, 235:19,
237:18, 237:21,
238:15, 238:19,
240:6, 240:25,
243:9, 245:1,
246:16, 249:12,
251:5, 254:5, 255:4,
255:10, 257:7,
261:9, 274:1, 279:2,
280:19
**Mastro's** [7] - 44:12,
74:14, 147:17,
148:19, 151:4,
236:12, 260:4
**match** [1] - 170:16
**MATEEN** [4] - 3:18,
6:12, 196:18, 280:9
**Mateen** [3] - 6:13,
196:17, 280:8
**material** [5] - 18:12,
20:25, 21:9, 57:5,
216:15
**materially** [2] - 20:14,
24:10
**MATLOFF** [2] - 1:19,
279:10
**Matloff** [2] - 6:6, 279:9
**matter** [20] - 5:1, 5:3,
13:2, 21:13, 21:20,
29:15, 46:14, 63:12,
69:5, 78:23, 79:24,
97:11, 115:10,
123:10, 138:4,
138:14, 205:8,
209:14, 249:24,
273:11
**matters** [3] - 23:20,
28:25, 111:7
**maximum** [1] - 255:21
**Maximum** [1] - 258:19
**mayor** [1] - 70:3
**Mayor** [1] - 175:12
**Meadowlands** [1] -
3:8
**mean** [20] - 23:24,
36:20, 40:14, 65:4,
70:12, 80:22, 113:1,
146:24, 151:21,
164:19, 180:12,
180:13, 184:8,
203:10, 211:7,
214:25, 253:7,
267:21, 274:5, 278:4
**meaning** [4] - 86:1,
204:20, 249:19,
250:3
**meaningful** [3] -
57:18, 60:3, 281:5

**means** [15] - 11:15,
21:1, 37:7, 37:12,
39:22, 56:5, 64:18,
82:20, 127:12,
154:17, 172:23,
181:15, 210:20,
248:19, 277:12
**meant** [1] - 152:2
**measurable** [6] -
11:17, 13:3, 29:6,
92:8, 92:9, 206:13
**measure** [6] - 96:24,
100:22, 103:21,
184:20, 191:14,
272:10
**measured** [1] - 100:18
**measures** [56] - 7:21,
7:23, 13:17, 13:20,
86:14, 97:3, 100:25,
101:11, 101:13,
101:22, 102:21,
103:6, 104:8,
109:17, 114:20,
114:21, 115:1,
116:5, 123:4,
136:20, 144:19,
145:19, 151:3,
153:15, 154:16,
156:6, 157:14,
158:22, 158:23,
159:19, 159:20,
159:23, 160:4,
163:25, 165:3,
165:7, 165:10,
166:14, 166:17,
167:3, 179:19,
180:4, 180:21,
181:10, 181:14,
181:15, 183:15,
191:21, 191:24,
192:1, 192:4, 192:5,
194:14, 229:2,
270:10, 270:11
**meat** [2] - 196:25,
197:21
**mechanical** [1] - 1:24
**mechanism** [2] -
13:18, 35:7
**median** [1] - 238:24
**mediation** [1] - 7:22
**meet** [14] - 51:2,
91:20, 120:16,
126:18, 126:20,
126:21, 126:22,
129:6, 129:23,
130:5, 173:20,
227:6, 227:7, 272:2
**meeting** [5] - 141:15,
197:13, 204:20,
278:22, 280:20

**meets** [10] - 38:25,
40:1, 120:15,
126:21, 270:12,
270:13, 270:16
**Melissa** [5] - 1:22,
56:1, 276:3, 277:11,
277:17
**melissa_mormile@
njd.uscourts.gov** [1]
- 1:23
**memorandum** [1] -
189:24
**memory** [1] - 168:5
**mention** [2] - 185:23,
261:12
**mentioned** [11] -
14:25, 90:11, 111:3,
113:19, 135:22,
162:25, 175:4,
201:17, 261:10,
261:22, 266:8
**mentions** [1] - 100:11
**mentor** [1] - 279:6
**Mercer** [2] - 204:24,
225:8
**mere** [3] - 101:11,
117:16, 124:17
**merely** [1] - 70:10
**merit** [17] - 11:20,
47:17, 101:17,
103:3, 104:6,
109:16, 111:3,
111:15, 114:12,
116:8, 176:7, 177:4,
178:8, 198:7,
228:23, 228:24,
229:23
**merit-based** [1] -
228:24
**meritless** [1] - 26:9
**merits** [1] - 65:25
**Mesoscale** [1] - 246:5
**mesoscale** [1] -
247:23
**met** [6] - 111:13,
111:17, 169:9,
218:23, 227:25,
230:15
**metes** [2] - 30:10,
243:11
**method** [1] - 229:11
**methodical** [1] - 221:2
**methodological** [3] -
231:22, 235:1,
244:17
**methodology** [43] -
135:16, 135:22,
135:25, 136:3,
136:4, 136:9,
136:11, 136:16,

142:3, 144:9, 159:2,
161:25, 162:2,
194:20, 219:14,
219:15, 219:16,
219:20, 219:22,
220:12, 220:14,
220:16, 220:18,
221:17, 232:6,
232:9, 232:15,
235:3, 254:23,
255:1, 261:13,
261:15, 261:22,
262:21, 263:6,
264:2, 266:18,
270:2, 270:12,
270:13, 270:14,
270:17, 271:3
**metric** [2] - 235:12,
270:24
**metrics** [2] - 265:1,
271:2
**Metropolitan** [4] -
10:19, 34:3, 105:13,
235:6
**mic** [4] - 34:6, 115:12,
226:3, 231:10
**micro** [1] - 215:21
**microphone** [2] -
5:23, 5:24
**mid** [1] - 84:19
**mid-June** [1] - 84:19
**Middlesex** [8] - 107:9,
203:19, 203:22,
204:1, 204:3,
204:24, 224:16,
225:8
**might** [13] - 17:3, 63:7,
106:10, 145:9,
162:15, 162:25,
166:23, 196:7,
230:24, 232:5,
258:3, 278:4
**mile** [1] - 250:6
**mileage** [1] - 207:7
**miles** [14] - 155:14,
171:12, 171:20,
199:13, 203:16,
203:24, 207:19,
207:22, 208:7,
210:6, 244:21,
250:6, 250:15
**million** [45] - 13:24,
14:1, 89:6, 100:13,
101:25, 102:17,
123:15, 124:21,
146:16, 154:16,
156:16, 156:17,
164:16, 175:7,
175:9, 181:21,
184:4, 184:10,

185:19, 185:21,
186:9, 186:12,
186:13, 186:14,
186:15, 186:18,
187:16, 189:16,
191:23, 192:4,
207:10, 207:13,
207:15, 207:16,
207:18, 207:23,
208:10, 208:11,
236:6, 236:17,
236:24, 236:25,
237:6
**millions** [2] - 125:13,
207:6
**mind** [8] - 11:4, 16:16,
23:13, 50:8, 54:17,
65:21, 103:11,
151:15
**mine** [1] - 231:1
**minimally** [1] - 273:16
**minimum** [2] - 96:23,
97:5
**minority** [6] - 225:8,
225:9, 225:10,
226:21, 270:11
**minus** [2] - 245:17,
246:19
**minute** [9] - 31:13,
64:7, 86:5, 181:19,
196:22, 203:2,
211:21, 238:1,
246:18
**minutes** [47] - 6:19,
6:21, 14:9, 14:10,
24:17, 31:10, 31:11,
32:21, 32:22, 32:24,
49:17, 49:20, 58:25,
64:3, 64:10, 71:4,
79:21, 83:22, 84:6,
84:10, 108:14,
115:24, 117:9,
125:21, 127:3,
127:20, 127:23,
128:8, 128:10,
128:12, 150:3,
150:9, 150:13,
163:9, 174:5, 174:6,
176:15, 177:13,
231:5, 232:19,
234:16, 234:18,
273:18, 273:23
**mirror** [1] - 271:2
**miss** [1] - 271:5
**missed** [1] - 270:1
**missing** [2] - 218:12
**misspeak** [1] - 12:16
**misspoken** [1] - 78:6
**mistake** [1] - 64:14
**mitigate** [2] - 116:13,

143:3
**mitigated** [6] - 29:8,
86:1, 89:15, 101:9,
101:14, 198:17
**mitigating** [2] -
143:12, 153:20
**mitigation** [271] - 7:21,
7:23, 11:19, 11:20,
13:5, 13:7, 13:11,
13:16, 13:17, 13:19,
14:1, 14:9, 14:13,
14:20, 15:3, 17:11,
24:12, 29:18, 29:25,
32:4, 51:10, 51:11,
51:17, 51:19, 51:23,
52:1, 52:4, 52:6,
52:8, 52:12, 52:15,
72:7, 72:9, 72:14,
81:11, 85:25, 86:1,
86:3, 86:6, 86:14,
86:18, 87:10, 88:20,
89:4, 89:5, 89:6,
89:9, 89:12, 89:15,
89:16, 89:24, 96:24,
97:3, 100:7, 100:9,
100:22, 100:24,
101:1, 101:2, 101:4,
101:10, 101:11,
101:13, 101:17,
101:20, 101:22,
101:25, 102:21,
103:2, 103:3, 103:5,
103:21, 104:2,
104:6, 104:7, 104:8,
105:4, 108:19,
108:21, 109:8,
109:16, 109:17,
109:18, 111:1,
111:11, 111:15,
113:7, 114:6,
114:12, 114:16,
114:18, 114:20,
114:24, 115:1,
115:3, 116:5, 116:7,
116:8, 116:16,
116:17, 116:25,
117:1, 121:23,
122:1, 122:5,
122:12, 122:25,
123:1, 123:4, 123:5,
124:4, 124:5,
128:15, 128:22,
135:14, 135:16,
136:9, 136:20,
137:4, 137:8, 137:9,
139:10, 139:11,
141:16, 142:11,
142:12, 142:16,
142:20, 142:21,
143:7, 143:14,
143:17, 143:18,

143:19, 143:21,
144:3, 144:6,
144:14, 144:19,
144:22, 145:15,
145:19, 145:24,
146:4, 146:8,
146:11, 146:16,
146:25, 147:3,
147:22, 147:23,
148:5, 149:7, 150:6,
150:14, 151:2,
151:7, 151:11,
151:16, 152:6,
152:13, 152:21,
153:15, 153:18,
153:25, 154:4,
154:11, 154:13,
155:23, 156:6,
157:13, 158:21,
158:23, 159:10,
159:19, 160:7,
160:15, 160:17,
161:10, 161:24,
162:16, 163:20,
163:25, 164:2,
164:5, 164:22,
165:25, 166:7,
166:12, 166:14,
166:17, 167:3,
174:10, 174:22,
175:2, 176:8, 177:4,
177:8, 177:10,
177:11, 178:8,
178:9, 178:12,
178:15, 178:16,
178:19, 179:1,
179:4, 179:18,
179:23, 180:4,
180:11, 180:21,
181:10, 181:13,
181:14, 183:4,
183:6, 183:13,
184:19, 184:24,
188:5, 188:13,
188:25, 190:11,
190:13, 191:14,
191:21, 191:24,
192:3, 192:4, 193:7,
193:10, 194:14,
194:25, 197:25,
198:7, 198:18,
209:18, 209:22,
215:19, 226:8,
227:4, 228:6,
228:23, 228:25,
229:1, 229:8,
229:23, 254:8,
254:10, 255:12,
256:13, 259:21,
271:10, 274:18,
274:19, 275:6,

275:10
**mitigations** [1] - 160:3
**mixing** [2] - 144:25,
145:4
**Mobile** [1] - 258:13
**mobility** [1] - 128:23
**Mobility** [2] - 125:8,
173:23
**model** [7] - 35:13,
163:5, 235:4, 235:5,
235:10, 241:5, 241:6
**modeled** [1] - 142:5
**modeling** [6] - 60:1,
156:12, 215:14,
265:18, 265:19,
269:14
**models** [2] - 41:1,
255:2
**modest** [3] - 236:22,
236:23, 237:9
**modification** [2] -
12:14, 12:24
**modified** [1] - 57:2
**moment** [8] - 14:18,
31:16, 41:14, 42:17,
45:15, 104:12,
107:7, 193:19
**monetary** [1] - 165:4
**money** [19] - 7:10,
10:1, 49:25, 50:5,
50:8, 50:9, 50:11,
116:13, 118:2,
126:9, 126:10,
127:1, 174:11,
174:18, 175:14,
183:25, 185:23,
188:11
**monies** [2] - 143:7,
155:6
**monitoring** [1] - 115:2
**Monmouth** [7] - 91:15,
107:9, 203:19,
203:22, 204:3,
204:25, 224:16
**monoxide** [3] -
103:17, 205:7,
209:14
**Montclair** [1] - 3:5
**monte** [1] - 123:11
**month** [1] - 72:11
**months** [10] - 28:18,
29:13, 30:1, 30:20,
43:15, 65:16, 67:17,
72:16, 255:9, 261:20
**moreover** [1] - 129:24
**Mormile** [1] - 1:22
**morning** [13] - 5:11,
5:15, 6:5, 6:12, 32:9,
32:10, 32:18, 69:17,
195:25, 196:6,

257:3, 279:16,
279:19
**Morris** [3] - 107:10,
204:2, 204:25
**Morton** [3] - 124:15,
169:15, 169:16
**most** [29] - 10:19,
17:2, 37:16, 50:17,
56:8, 60:2, 60:21,
62:3, 64:18, 66:21,
70:1, 82:13, 110:12,
113:21, 143:23,
146:9, 156:3, 188:7,
204:23, 249:6,
256:2, 259:4, 264:2,
264:22, 269:15,
270:16, 275:6
**mostly** [2] - 264:21,
265:15
**motion** [1] - 277:25
**mouth** [1] - 253:21
**move** [8] - 39:19, 50:2,
65:9, 92:3, 237:17,
239:23, 264:12,
280:18
**moved** [5] - 45:9,
45:10, 130:24,
229:16, 229:18
**movement** [1] -
241:18
**moving** [3] - 40:9,
227:22, 228:9
**MR** [788] - 5:8, 5:11,
5:15, 6:5, 6:9, 6:12,
6:21, 6:24, 8:10,
8:19, 8:23, 8:25, 9:6,
9:10, 9:15, 9:18,
9:25, 10:5, 10:8,
11:11, 11:13, 12:9,
12:15, 12:19, 13:9,
13:12, 14:4, 14:7,
14:16, 15:22, 16:1,
16:7, 16:11, 16:17,
16:24, 17:1, 17:5,
17:9, 17:21, 17:24,
18:2, 18:10, 18:16,
20:3, 20:6, 23:11,
23:15, 23:21, 23:24,
24:3, 24:8, 24:19,
24:23, 26:18, 26:23,
27:3, 27:7, 27:16,
27:23, 28:3, 28:9,
28:15, 28:24, 29:2,
30:17, 31:14, 31:18,
32:8, 32:11, 32:17,
32:22, 32:25, 33:6,
33:8, 33:11, 34:9,
35:18, 35:21, 36:12,
36:15, 36:19, 37:1,
38:14, 38:17, 39:1,

39:6, 39:8, 39:17,
39:19, 40:6, 40:8,
40:15, 40:17, 41:22,
41:24, 42:3, 42:7,
42:10, 42:13, 42:16,
42:20, 43:1, 43:7,
43:18, 44:2, 44:4,
44:11, 44:17, 44:19,
44:23, 45:1, 45:4,
45:12, 45:14, 45:18,
45:25, 46:3, 46:16,
46:19, 46:23, 47:1,
47:5, 47:8, 47:15,
47:24, 48:5, 48:8,
48:13, 48:15, 48:21,
49:2, 49:8, 49:12,
49:16, 49:18, 49:22,
50:12, 50:23, 50:25,
51:5, 52:6, 52:13,
52:21, 53:2, 53:6,
53:16, 53:19, 54:2,
54:5, 54:23, 55:1,
55:13, 55:17, 55:23,
56:6, 56:13, 56:21,
56:23, 57:24, 58:5,
58:11, 58:23, 59:1,
59:4, 59:8, 59:11,
59:14, 60:9, 60:12,
60:15, 60:20, 60:21,
61:10, 61:13, 61:16,
61:20, 62:1, 62:7,
62:17, 63:6, 63:9,
63:11, 63:16, 63:21,
63:25, 64:4, 64:7,
64:11, 64:25, 65:3,
65:7, 65:10, 66:15,
67:1, 67:5, 67:8,
67:15, 68:6, 68:19,
69:12, 69:14, 69:17,
70:21, 70:23, 71:8,
71:12, 71:16, 71:20,
71:23, 72:4, 73:1,
73:3, 73:8, 73:22,
74:2, 74:6, 74:11,
74:13, 74:19, 74:23,
75:1, 75:4, 75:6,
75:11, 75:16, 76:3,
76:5, 76:13, 76:15,
76:20, 77:13, 78:6,
79:10, 79:19, 79:23,
80:2, 80:5, 80:10,
80:12, 80:16, 80:19,
81:3, 81:24, 82:2,
82:10, 82:16, 82:22,
83:2, 83:5, 83:10,
83:12, 83:18, 83:20,
84:5, 84:8, 84:11,
86:21, 87:1, 87:4,
87:6, 87:18, 88:5,
88:18, 88:23, 88:25,
90:8, 90:23, 91:12,

91:17, 91:22, 92:15,
92:19, 92:25, 93:7,
93:9, 93:16, 94:3,
94:12, 94:18, 94:21,
94:25, 95:3, 95:11,
95:15, 95:20, 97:10,
97:16, 98:10, 98:14,
98:18, 98:22, 99:3,
99:5, 99:12, 100:3,
102:3, 102:7,
102:12, 102:19,
104:11, 105:5,
105:14, 105:18,
105:21, 106:5,
106:14, 106:17,
106:22, 106:24,
107:8, 107:12,
107:15, 107:18,
107:22, 108:1,
108:6, 108:8,
108:10, 108:13,
108:16, 109:4,
109:7, 109:11,
109:22, 109:25,
110:2, 110:5, 110:7,
110:9, 110:18,
110:22, 111:9,
111:23, 112:2,
112:7, 112:12,
112:18, 112:24,
113:11, 113:16,
113:24, 115:8,
115:13, 115:17,
115:22, 116:1,
116:20, 117:3,
117:7, 117:11,
118:20, 119:17,
119:23, 120:4,
120:7, 120:12,
120:14, 121:6,
121:10, 121:12,
121:15, 121:18,
121:20, 121:22,
122:7, 122:13,
122:15, 122:17,
122:20, 122:23,
123:9, 123:23,
124:9, 124:11,
124:14, 125:5,
125:11, 126:1,
126:7, 126:16,
127:4, 127:7,
127:10, 127:18,
128:9, 128:13,
128:21, 129:12,
129:15, 129:18,
131:4, 131:6, 131:9,
131:16, 131:25,
132:14, 132:17,
132:19, 132:22,
133:2, 133:22,

134:4, 134:6,
134:15, 134:19,
134:21, 134:24,
135:8, 135:13,
135:15, 136:7,
136:13, 136:16,
136:19, 136:25,
137:4, 137:6, 137:8,
138:1, 138:8,
138:11, 138:23,
139:6, 139:10,
139:15, 140:5,
140:15, 140:22,
141:2, 141:5,
141:10, 141:14,
141:22, 141:24,
142:2, 142:10,
142:22, 143:5,
143:9, 143:13,
143:20, 144:2,
144:13, 145:4,
145:11, 145:14,
146:3, 146:13,
146:19, 146:21,
147:9, 147:13,
147:22, 148:1,
148:4, 148:10,
148:13, 148:15,
148:17, 148:21,
148:24, 149:13,
149:17, 149:20,
149:25, 167:17,
168:5, 168:24,
169:7, 169:14,
170:13, 170:15,
170:24, 171:4,
171:16, 171:19,
171:24, 172:3,
172:5, 172:11,
172:16, 172:23,
173:4, 173:9,
173:17, 173:23,
174:3, 174:5, 174:7,
175:25, 176:2,
176:4, 176:24,
177:1, 179:2, 179:4,
179:16, 179:22,
180:10, 180:20,
180:25, 181:6,
181:20, 182:8,
182:10, 182:13,
182:16, 182:20,
182:22, 182:24,
183:12, 183:21,
184:3, 184:7,
184:15, 184:17,
184:19, 185:1,
185:4, 185:11,
186:1, 186:7,
186:11, 186:13,
186:16, 186:20,

186:21, 186:23,
186:25, 187:4,
187:10, 187:13,
187:16, 187:18,
188:1, 188:9,
188:15, 188:19,
188:22, 189:2,
189:5, 189:8,
189:10, 189:12,
189:18, 189:22,
189:24, 190:4,
190:6, 190:13,
190:17, 190:20,
190:23, 191:1,
191:3, 191:6,
192:11, 192:14,
192:19, 196:2,
196:7, 196:10,
196:12, 196:14,
196:15, 196:18,
196:20, 197:4,
197:18, 199:4,
199:11, 199:19,
199:24, 200:3,
200:9, 200:18,
200:20, 201:2,
201:5, 201:7,
201:22, 202:1,
202:4, 202:7,
202:11, 202:14,
202:18, 202:22,
203:1, 203:10,
203:12, 204:14,
204:22, 205:4,
205:9, 205:15,
206:5, 206:8,
206:12, 206:18,
207:8, 207:11,
208:3, 208:6,
208:12, 208:15,
208:17, 208:19,
209:10, 210:19,
211:11, 211:23,
211:25, 212:7,
212:18, 212:23,
212:25, 213:2,
213:6, 213:10,
213:13, 213:15,
213:19, 213:23,
214:2, 214:4, 214:9,
214:14, 214:16,
216:16, 216:19,
216:21, 216:23,
216:25, 217:12,
217:17, 218:3,
218:15, 218:22,
219:10, 219:21,
220:1, 220:8,
220:20, 220:25,
221:3, 221:7,
221:10, 221:12,

221:18, 222:4,
222:6, 222:16,
222:21, 223:10,
223:23, 224:12,
226:4, 227:19,
227:21, 230:3,
230:7, 230:12,
230:17, 230:20,
230:22, 231:1,
231:7, 231:11,
231:13, 231:23,
232:1, 232:8,
232:17, 232:21,
232:25, 233:9,
233:15, 233:17,
233:20, 234:1,
234:3, 234:6, 234:9,
234:11, 234:14,
234:18, 234:21,
234:23, 236:9,
237:1, 237:5,
237:11, 237:13,
238:3, 238:13,
238:19, 239:10,
239:13, 239:19,
240:1, 240:4, 240:6,
240:22, 240:25,
241:6, 241:20,
241:23, 242:5,
242:12, 242:3,
243:5, 243:15,
243:18, 244:10,
244:13, 244:18,
244:23, 245:1,
245:5, 245:10,
245:12, 245:23,
246:4, 246:6,
246:13, 246:20,
246:23, 246:25,
247:8, 247:13,
247:16, 247:19,
247:25, 248:3,
248:7, 248:9,
248:18, 248:22,
248:24, 249:4,
249:6, 249:10,
249:21, 249:23,
250:2, 250:7, 250:9,
250:13, 250:17,
250:21, 251:1,
251:4, 251:8,
251:13, 251:15,
251:18, 251:23,
252:7, 252:18,
252:22, 252:24,
253:3, 253:8,
253:20, 253:24,
254:5, 254:18,
254:21, 254:23,
255:4, 255:8,
255:17, 255:20,

256:4, 256:8, 256:10, 256:12, 256:16, 256:24, 279:3, 279:13, 279:15, 280:3, 280:9, 280:11, 280:17, 280:25

**MS** [131] - 150:5, 150:9, 150:12, 150:17, 150:23, 151:1, 151:19, 151:21, 152:1, 152:10, 152:22, 153:3, 153:7, 153:13, 153:23, 154:2, 154:7, 154:24, 155:7, 155:12, 155:22, 156:3, 156:21, 157:1, 157:24, 158:1, 158:6, 158:9, 158:11, 158:14, 158:18, 158:20, 159:13, 159:15, 159:18, 161:11, 162:4, 162:7, 162:9, 162:18, 163:10, 163:14, 163:17, 163:23, 164:17, 165:2, 165:16, 165:19, 165:21, 166:6, 166:11, 167:2, 167:10, 167:15, 191:9, 192:8, 192:22, 193:15, 194:3, 194:5, 194:7, 194:9, 194:13, 194:17, 195:11, 195:15, 257:1, 257:4, 257:22, 258:2, 258:10, 258:17, 258:20, 258:22, 259:1, 259:3, 260:3, 260:9, 260:21, 260:25, 261:2, 261:8, 262:17, 262:24, 263:3, 263:6, 263:11, 263:14, 263:16, 263:19, 263:24, 264:1, 264:13, 265:11, 265:16, 265:18, 266:6, 267:7, 267:16, 267:21, 268:4, 268:8, 268:14, 268:16, 268:24, 269:7, 269:19, 269:22, 270:4, 270:18, 271:4,

271:9, 272:21, 273:6, 273:11, 273:19, 273:22, 273:25, 274:6, 274:8, 274:16, 275:10, 275:15, 275:17, 275:25, 276:11, 277:3, 277:15, 277:23, 279:10, 280:6

**MTA** [55] - 5:17, 7:10, 7:16, 7:25, 8:9, 8:11, 8:16, 9:18, 9:25, 10:22, 15:1, 15:5, 16:5, 17:19, 18:8, 18:9, 19:13, 33:14, 33:17, 40:22, 41:20, 42:17, 43:2, 43:4, 50:15, 50:20, 56:17, 96:10, 97:17, 97:23, 99:19, 100:21, 115:10, 117:21, 118:8, 119:1, 125:25, 126:24, 129:6, 142:22, 142:24, 143:11, 144:18, 151:22, 152:4, 152:7, 152:15, 153:9, 153:19, 164:16, 171:9, 171:23, 182:2, 184:1, 189:1

**MTA's** [8] - 9:7, 10:22, 15:12, 79:11, 119:20, 151:16, 152:25, 174:9

**mud** [1] - 106:7

**multiple** [3] - 32:13, 125:22, 131:17, 170:2, 258:5

**mumble** [1] - 192:10

**municipalities** [4] - 160:8, 162:15, 166:15, 274:9

**Murphy** [1] - 212:10

**must** [19] - 11:23, 18:15, 22:9, 37:17, 42:6, 55:17, 71:10, 73:17, 89:19, 91:2, 93:20, 94:1, 95:1, 101:8, 155:12, 163:6, 183:3, 222:3

**muster** [2] - 95:2, 183:5

**my..** [1] - 273:20

**Myers** [6] - 5:9, 187:11, 199:25, 200:16, 211:25, 279:3

**MYERS** [1] - 1:16

**myriad** [1] - 72:15

**myth** [5] - 52:14, 52:15, 72:8, 86:7, 101:21

# N

**N.E** [2] - 2:5, 2:13

**NAAQS** [12] - 204:21, 217:10, 217:14, 217:19, 217:24, 218:11, 218:17, 218:20, 218:23, 219:3, 249:24, 249:25

**NAFTALIS** [1] - 3:14

**Nagel** [3] - 6:6, 279:7

**NAGEL** [3] - 1:18, 1:19, 6:5

**name** [1] - 147:18

**names** [3] - 107:3, 107:9, 167:24

**narrow** [9] - 120:1, 120:6, 131:19, 132:3, 226:6, 229:10, 245:16, 245:18

**narrowing** [3] - 232:13, 233:10

**narrowly** [2] - 117:15, 132:10

**nation** [2] - 18:4, 35:1

**nation's** [1] - 10:15

**National** [6] - 33:23, 76:21, 131:22, 169:16, 204:7, 264:8

**national** [4] - 87:21, 88:9, 249:24, 255:14

**native** [1] - 134:24

**NATURAL** [1] - 2:4

**nature** [2] - 80:24, 87:22

**near** [3] - 160:13, 175:5, 209:5

**Nearly** [1] - 217:23

**necessarily** [8] - 33:16, 73:24, 106:6, 170:1, 205:14, 258:2, 259:9, 276:13

**necessary** [5] - 24:9, 24:12, 89:9, 116:8, 146:6

**necessitates** [1] - 76:8

**necessity** [1] - 223:6

**need** [81] - 11:19, 18:17, 24:1, 24:19, 25:20, 25:25, 28:14, 29:16, 29:17, 30:13, 47:16, 51:1, 56:4, 63:23, 65:1, 65:19,

66:10, 68:9, 72:7, 76:23, 77:5, 77:7, 78:9, 79:4, 79:5, 80:23, 84:7, 98:7, 100:7, 104:1, 109:8, 111:1, 111:11, 112:25, 113:15, 113:16, 122:10, 124:12, 128:1, 128:25, 129:8, 130:8, 130:16, 130:19, 130:23, 132:22, 137:13, 137:21, 162:16, 163:16, 168:25, 169:1, 169:4, 169:11, 171:6, 171:7, 171:10, 173:10, 173:20, 177:7, 177:10, 178:8, 181:13, 187:1, 194:9, 194:10, 204:22, 214:13, 214:25, 223:2, 224:7, 227:4, 228:6, 232:23, 243:11, 247:2, 266:21, 273:23, 275:20, 280:1

**needed** [12] - 48:2, 57:10, 58:13, 62:2, 88:21, 104:8, 115:4, 124:2, 124:5, 170:3, 202:24, 212:5

**needing** [1] - 247:3

**needle** [4] - 227:23, 228:10, 229:16, 229:18

**needs** [17] - 8:22, 20:17, 20:18, 22:12, 39:14, 49:4, 67:3, 83:11, 87:10, 122:25, 129:4, 130:4, 130:6, 133:4, 145:25, 164:7, 228:3

**NEES** [1] - 1:20

**Nees** [1] - 6:6

**negate** [1] - 193:15

**negative** [6] - 92:9, 214:6, 214:18, 238:25, 257:10, 259:6

**negatively** [2] - 15:23, 273:17

**negotiations** [1] - 188:24

**neighborhood** [1] - 278:18

**neighborhoods** [1] - 102:16

**neighbors** [1] - 97:19

**NELSON** [1] - 2:17

**Nelson** [1] - 5:18

**NEPA** [41] - 4:8, 4:14, 7:13, 11:2, 26:8, 33:24, 39:21, 43:9, 50:1, 56:7, 67:23, 69:20, 75:22, 77:2, 81:1, 84:1, 84:12, 85:15, 85:16, 86:11, 86:17, 95:16, 101:19, 103:5, 117:14, 118:7, 133:4, 133:8, 168:15, 170:16, 183:5, 190:24, 197:1, 229:25, 242:14, 242:25, 255:14, 255:21, 268:11, 268:15, 268:22

**network** [1] - 265:3

**never** [7] - 21:17, 21:22, 103:11, 124:1, 259:22, 259:23, 261:1

**nevertheless** [2] - 96:22, 218:20

**NEW** [2] - 1:1, 1:3

**new** [17] - 12:23, 21:20, 22:10, 35:4, 45:23, 70:13, 70:16, 74:21, 124:13, 154:18, 161:5, 182:17, 214:5, 214:22, 244:3

**New** [389] - 1:10, 1:17, 1:21, 2:9, 2:18, 2:22, 3:5, 3:6, 3:10, 3:11, 3:12, 3:12, 3:16, 3:19, 5:4, 5:10, 6:10, 7:3, 7:4, 7:10, 7:14, 7:16, 7:20, 7:24, 8:1, 10:1, 10:17, 11:14, 11:18, 13:4, 13:8, 13:24, 14:2, 14:4, 14:20, 14:21, 14:23, 15:4, 15:13, 15:14, 15:15, 15:16, 15:19, 15:23, 17:2, 17:5, 17:6, 19:15, 21:8, 25:5, 29:8, 29:22, 29:23, 29:24, 29:25, 30:19, 30:22, 33:13, 34:2, 49:25, 50:2, 50:12, 50:14, 51:6, 51:9, 51:10, 51:12, 51:14, 51:15, 51:18, 51:23, 51:24, 52:16, 52:22, 54:16, 58:14,

58:16, 59:25, 60:3, 61:2, 69:25, 70:2, 72:9, 72:18, 74:24, 74:25, 81:15, 86:7, 86:9, 86:11, 87:11, 87:12, 88:11, 88:12, 88:23, 89:5, 89:8, 89:12, 89:23, 90:2, 93:20, 96:9, 96:21, 97:20, 97:21, 99:1, 99:5, 99:10, 99:12, 99:13, 99:22, 99:23, 100:6, 100:12, 100:15, 100:20, 101:17, 101:23, 102:9, 102:13, 102:15, 102:16, 102:22, 103:2, 103:4, 104:1, 104:16, 104:20, 104:23, 105:3, 105:9, 105:10, 105:13, 105:19, 105:24, 105:25, 106:25, 109:12, 109:13, 110:20, 111:22, 112:20, 115:6, 116:6, 119:4, 122:1, 123:17, 123:19, 124:3, 124:5, 125:12, 125:13, 126:11, 126:25, 129:7, 133:7, 133:16, 133:25, 138:22, 141:18, 142:7, 143:4, 143:7, 144:19, 146:11, 146:15, 146:25, 147:7, 149:2, 149:6, 151:4, 153:20, 154:1, 154:3, 154:4, 154:9, 155:14, 155:24, 156:1, 156:5, 156:7, 156:18, 158:4, 159:25, 160:3, 160:5, 160:6, 161:9, 161:18, 161:25, 162:21, 163:7, 163:20, 164:12, 165:1, 165:8, 165:10, 165:15, 166:8, 166:12, 166:13, 166:15, 169:23, 170:5, 172:7, 172:8, 173:22, 174:11, 174:13, 174:15, 174:22, 175:3, 175:4, 175:6,

175:13, 177:20, 178:20, 179:19, 181:22, 181:24, 182:1, 182:2, 183:19, 184:11, 185:10, 185:20, 185:24, 186:6, 187:24, 188:5, 192:1, 192:6, 194:1, 197:25, 198:2, 198:3, 198:13, 198:22, 198:23, 201:13, 201:14, 201:15, 201:18, 201:20, 203:4, 203:5, 203:6, 203:19, 204:17, 204:18, 205:22, 206:9, 206:22, 207:1, 207:2, 208:22, 209:24, 210:5, 214:18, 216:2, 216:8, 217:19, 218:5, 218:6, 218:9, 218:10, 218:11, 218:24, 219:7, 219:14, 219:18, 219:22, 220:2, 220:3, 220:4, 220:17, 221:4, 221:5, 221:7, 221:10, 221:20, 221:22, 223:14, 223:16, 223:17, 223:21, 224:3, 224:5, 224:6, 224:24, 225:18, 225:20, 226:7, 226:19, 227:12, 228:18, 229:3, 229:7, 229:10, 229:11, 231:13, 231:17, 235:6, 235:17, 236:2, 236:5, 236:11, 236:13, 237:22, 237:23, 238:4, 241:1, 245:2, 245:6, 245:14, 245:15, 246:1, 247:3, 247:22, 249:15, 251:9, 251:11, 251:19, 252:10, 253:4, 253:13, 253:15, 257:16, 259:5, 259:6, 259:7, 260:15, 261:8, 261:19, 262:25, 265:24, 265:25, 266:6, 266:12,

267:8, 267:9, 269:10, 269:17, 269:20, 270:1, 270:6, 270:11, 270:17, 270:19, 271:21, 273:1, 273:7, 274:1, 274:3, 278:16, 280:15
**Newark** [18] - 1:10, 2:9, 3:9, 3:10, 102:10, 104:5, 109:23, 110:9, 112:7, 114:11, 141:15, 141:21, 175:23, 176:5, 177:2, 181:10, 198:4, 228:7
**newer** [1] - 278:15
**next** [66] - 6:3, 7:2, 20:10, 25:19, 28:18, 43:11, 44:4, 67:17, 67:20, 101:5, 103:8, 104:11, 108:16, 108:20, 108:23, 109:11, 109:19, 115:9, 117:22, 118:12, 118:16, 151:9, 175:18, 176:20, 187:12, 194:19, 201:9, 203:12, 204:1, 204:6, 205:5, 205:21, 206:1, 206:19, 207:4, 208:19, 209:7, 209:19, 210:1, 210:4, 210:11, 216:4, 224:25, 225:12, 225:16, 225:23, 226:2, 227:16, 235:14, 235:21, 236:3, 236:10, 236:15, 236:19, 237:13, 237:19, 239:2, 245:15, 246:3, 246:4, 247:20, 252:7, 252:9, 253:12, 253:24
**nice** [5] - 68:17, 91:10, 155:3, 210:18, 211:6
**night** [2] - 183:13, 277:14
**nine** [6] - 31:10, 64:4, 64:5, 64:9, 71:4, 261:20
**Ninth** [9] - 11:22, 90:25, 91:13, 129:20, 131:22, 134:11, 134:20,

168:7, 170:17
**ninth** [1] - 262:16
**Nio** [1] - 25:1
**nitrogen** [2] - 103:17, 209:16
**NJ** [4] - 3:6, 3:7, 3:9, 3:11
**NJ-Rockland** [1] - 3:9
**no-action** [3] - 157:8, 172:21, 237:2
**nobody** [2] - 68:11, 268:25
**noise** [1] - 214:24
**non** [5] - 140:3, 253:6, 253:11, 254:1, 254:2
**non-Environmental** [5] - 140:3, 253:6, 253:11, 254:1, 254:2
**nonattainment** [4] - 204:11, 204:16, 204:18, 204:20
**none** [4] - 28:6, 45:19, 72:7, 198:18
**nonEJ** [2] - 139:17, 139:22
**nontrucks** [5] - 137:17, 137:18, 199:6, 199:18, 265:10
**North** [1] - 3:8
**northern** [1] - 104:19
**Northwest** [1] - 38:19
**not-for-profit** [1] - 97:21
**note** [9] - 31:10, 34:14, 35:22, 39:8, 45:17, 71:1, 143:1, 144:14, 200:17
**noted** [8] - 40:2, 48:19, 80:17, 101:3, 130:17, 159:20, 236:5
**notes** [6] - 6:19, 75:7, 75:20, 148:24, 279:4, 279:5
**nothing** [16] - 44:16, 57:10, 72:11, 108:22, 108:25, 109:2, 109:6, 114:2, 116:9, 178:7, 178:9, 180:13, 279:10, 279:13, 280:6, 280:9
**notice** [12] - 34:14, 43:6, 43:19, 43:20, 79:16, 113:9, 212:4, 214:24, 215:12, 215:23, 216:7
**noticed** [1] - 235:20
**noting** [1] - 133:11
**notion** [2] - 52:1,

168:13
**notwithstanding** [1] - 160:23
**novel** [2] - 35:8, 70:11
**November** [1] - 19:8
**novo** [1] - 37:7
**NRDC** [2] - 124:14, 169:15
**nullity** [1] - 28:21
**NUMBER** [1] - 1:3
**number** [71] - 5:3, 9:1, 9:5, 16:13, 16:15, 51:7, 61:9, 61:18, 65:12, 69:11, 79:24, 80:12, 89:2, 89:3, 89:24, 104:17, 104:18, 106:20, 107:6, 125:23, 133:4, 138:25, 139:1, 139:22, 141:8, 141:12, 141:25, 142:1, 148:1, 148:14, 148:16, 153:25, 155:2, 161:17, 162:14, 167:1, 167:22, 168:15, 173:18, 177:15, 181:4, 185:8, 185:12, 186:5, 209:9, 214:7, 214:9, 222:23, 223:1, 223:5, 223:7, 223:8, 223:9, 223:18, 223:20, 223:21, 223:24, 225:15, 226:6, 226:9, 235:23, 235:25, 236:1, 237:9, 238:25, 251:7, 251:12, 255:18, 266:9
**numbered** [1] - 31:25
**numbering** [1] - 137:2
**numbers** [17] - 41:2, 41:8, 63:14, 140:15, 140:17, 147:24, 154:25, 161:22, 207:9, 235:6, 235:19, 245:21, 246:19, 247:10, 247:13, 247:14, 247:15
**numerous** [1] - 47:10

## O

**o'clock** [2] - 184:22, 277:14
**O'Reilly** [2] - 181:8,

183:12
**Oakwood** [1] - 3:5
**objection** [2] - 262:18, 262:24
**objectionable** [1] - 16:22
**objective** [13] - 8:16, 119:20, 125:1, 126:2, 126:6, 126:8, 126:23, 132:2, 132:10, 169:6, 172:14, 173:12
**objectives** [16] - 118:25, 120:15, 120:16, 125:22, 126:4, 126:19, 126:20, 131:12, 131:14, 131:19, 168:19, 168:21, 168:23, 171:2, 171:14
**obligated** [1] - 28:22
**obligates** [1] - 87:9
**obligation** [6] - 8:12, 8:14, 28:1, 87:14, 125:8
**obligations** [2] - 44:6, 224:8
**obligatory** [1] - 71:14
**obliquely** [1] - 231:4
**obstacle** [1] - 172:14
**obvious** [1] - 29:6
**obviously** [8] - 57:7, 65:21, 81:8, 96:7, 102:15, 166:1, 261:11
**occupancy** [1] - 70:18
**occur** [5] - 42:1, 57:13, 69:24, 94:9, 269:16
**occurred** [1] - 66:5
**occurs** [1] - 43:6
**ocean** [2] - 35:24, 202:11
**OF** [4] - 1:1, 1:3, 1:6, 1:12
**off-hours** [1] - 156:7
**off-shore** [1] - 12:23
**offense** [1] - 65:4
**offensive** [2] - 19:17, 21:12
**offered** [1] - 230:4
**OFFICE** [4] - 2:3, 2:8, 2:11, 3:18
**Office** [2] - 1:9, 6:13
**Official** [1] - 1:23
**officials** [3] - 18:25, 86:10, 174:18
**Offshore** [1] - 35:23
**offshore** [2] - 12:17,

35:24
**often** [3] - 68:21, 172:17, 268:20
**old** [4] - 5:21, 126:8, 154:17, 280:25
**once** [8] - 17:17, 25:25, 55:21, 128:2, 188:23, 221:22, 266:21, 281:2
**One** [1] - 3:19
**one** [198] - 7:25, 10:12, 11:7, 15:1, 15:2, 15:11, 15:12, 16:20, 19:11, 20:7, 22:14, 30:12, 31:13, 39:21, 40:2, 43:1, 43:7, 46:21, 47:17, 50:4, 50:6, 50:17, 52:25, 53:17, 55:25, 59:9, 59:18, 60:6, 61:7, 61:19, 66:6, 67:21, 68:14, 69:21, 70:25, 73:6, 74:2, 76:6, 77:21, 80:3, 80:17, 80:20, 80:22, 92:16, 92:18, 94:10, 94:24, 95:12, 97:17, 97:22, 98:2, 99:19, 100:19, 106:10, 110:14, 110:20, 111:22, 113:4, 117:20, 118:6, 118:8, 119:24, 121:19, 123:19, 126:2, 126:4, 126:22, 127:7, 128:17, 130:15, 130:21, 131:20, 132:4, 132:9, 133:1, 133:12, 134:8, 135:8, 137:8, 141:17, 142:10, 146:19, 146:23, 147:21, 147:25, 149:8, 149:14, 149:15, 149:20, 154:13, 154:16, 156:6, 157:1, 157:15, 157:20, 159:11, 162:25, 168:11, 168:14, 169:2, 169:8, 169:18, 170:15, 170:16, 172:5, 174:1, 181:19, 186:1, 187:13, 188:16, 191:3, 191:20, 192:23, 192:24, 193:1, 193:2, 193:3, 193:6,

197:22, 198:14, 198:21, 201:11, 205:1, 205:9, 205:10, 206:20, 208:22, 208:23, 211:1, 211:11, 212:21, 212:22, 213:17, 213:20, 213:21, 214:12, 215:1, 216:24, 217:9, 218:17, 219:4, 220:17, 221:25, 222:25, 223:5, 223:20, 223:21, 224:20, 225:2, 226:13, 227:17, 228:5, 229:12, 232:19, 233:21, 234:15, 235:9, 236:12, 240:18, 241:20, 242:14, 242:16, 242:21, 242:22, 245:21, 246:10, 257:5, 257:14, 257:25, 258:6, 258:8, 258:10, 258:24, 259:18, 261:21, 264:16, 264:17, 265:2, 265:13, 265:24, 266:25, 269:9, 270:14, 270:15, 271:2, 272:1, 272:5, 275:22, 278:15, 279:15, 280:14
**one-of-a-kind** [1] - 11:7
**one-off** [4] - 242:14, 242:16, 242:21, 242:22
**onerous** [2] - 24:14, 30:21
**ones** [11] - 70:25, 71:1, 112:13, 160:9, 161:19, 200:14, 204:22, 205:24, 228:6, 273:3
**ongoing** [1] - 34:10
**open** [1] - 128:6
**operation** [1] - 57:15
**opining** [1] - 57:22
**opinion** [3] - 131:24, 170:12, 263:22
**opponents** [1] - 58:21
**opportunities** [2] - 164:22, 165:13
**opportunity** [16] - 7:1, 9:16, 28:12, 30:7, 41:6, 56:16, 60:17,

76:9, 126:14, 128:18, 131:1, 132:11, 162:23, 166:16, 187:7, 212:2
**opposed** [7] - 113:19, 162:3, 162:13, 190:11, 206:3, 265:9, 277:13
**opposing** [1] - 60:4
**opposite** [1] - 96:15
**opposition** [1] - 36:2
**option** [1] - 172:24
**ORAL** [1] - 1:5
**Orange** [20] - 102:9, 104:5, 109:23, 110:9, 114:10, 114:11, 141:14, 141:15, 141:20, 175:23, 176:5, 177:2, 181:10, 198:3
**orange** [10] - 102:10, 103:19, 110:4, 110:5, 110:9, 141:5, 141:11, 141:20, 147:20, 176:5
**oranges** [2] - 144:25, 145:5
**orangier** [1] - 273:3
**order** [16] - 30:13, 51:10, 68:13, 77:18, 95:2, 101:15, 129:2, 130:4, 130:5, 133:20, 135:20, 137:20, 183:5, 258:3, 274:22, 276:9
**ordered** [4] - 275:22, 276:2, 276:4, 276:21
**orderly** [1] - 276:24
**orders** [1] - 259:17
**ordinarily** [1] - 157:7
**Oregon** [1] - 75:17
**Oregon/Washington** [1] - 83:16
**organizations** [1] - 144:17
**organized** [1] - 49:23
**oriented** [1] - 109:12
**original** [2] - 183:4, 266:24
**originally** [1] - 226:13
**otherwise** [4] - 37:24, 87:17, 163:6, 187:8
**OTIS** [5] - 3:15, 196:14, 196:20, 280:11, 280:17
**ought** [1] - 108:3
**outcome** [26] - 11:9, 11:14, 18:21, 29:5, 39:23, 39:25, 40:20, 67:23, 69:4, 77:9,

94:15, 94:16, 96:9, 106:9, 132:5, 162:14, 163:8, 211:2, 229:7, 232:15, 238:21, 240:9, 243:10, 243:19, 243:20, 244:8
**outcomes** [4] - 233:7, 245:7, 261:16, 275:7
**outer** [2] - 108:17, 203:21
**outlier** [1] - 247:5
**outline** [2] - 140:20, 140:23
**outlined** [2] - 255:25, 270:16
**outrageous** [1] - 233:15
**outreach** [1] - 167:8
**outside** [7] - 21:11, 66:13, 173:3, 215:18, 238:17, 248:6
**overall** [5] - 103:13, 206:24, 238:25, 265:3, 265:12
**overburdened** [1] - 160:1
**overinclusive** [1] - 205:10
**overlap** [1] - 222:1
**overnight** [10] - 156:9, 156:11, 156:14, 157:3, 157:19, 157:23, 157:24, 157:25, 158:3, 158:10
**overstudy** [1] - 223:14
**overview** [2] - 84:12, 85:16
**own** [12] - 8:20, 9:21, 22:25, 54:17, 100:20, 100:21, 118:11, 215:25, 219:16, 219:20, 270:5
**owners** [1] - 155:8
**oxide** [2] - 103:17, 209:16
**ozone** [2] - 204:19, 218:12
**ozones** [1] - 205:7

**P**

**P.C** [1] - 2:15
**p.m** [6] - 20:23, 128:4, 128:6, 196:24, 281:7
**pace** [1] - 31:7

page [39] - 80:4, 80:5, 124:15, 137:2, 137:5, 142:10, 147:18, 147:20, 148:18, 151:1, 153:11, 159:5, 168:5, 169:18, 174:24, 181:8, 225:21, 234:2, 235:14, 235:21, 236:3, 236:10, 236:15, 236:19, 237:13, 237:19, 239:2, 239:8, 239:11, 239:17, 245:15, 246:4, 252:7, 252:9, 253:13, 253:24, 257:25, 258:15, 258:18
PAGE [4] - 4:3, 4:9, 4:15
pages [6] - 31:25, 32:9, 140:11, 150:18, 248:5, 258:6
Paget [1] - 5:16
PAGET [1] - 2:15
paid [2] - 17:19, 68:15
Palisades [1] - 178:3
paper [5] - 179:9, 179:10, 179:21, 180:1, 258:13
papers [1] - 58:18
paragraph [1] - 169:17
parameters [1] - 53:8, 53:24, 62:20, 111:17, 172:19
parcel [1] - 29:15
Park [3] - 3:11, 76:21, 178:3
Parks [1] - 131:22
parks [2] - 160:11, 193:12
Parkway [1] - 1:20
part [43] - 19:19, 23:3, 23:5, 23:6, 25:17, 28:1, 29:15, 33:22, 34:16, 34:21, 50:1, 50:2, 51:6, 63:19, 82:13, 97:10, 99:9, 104:19, 104:22, 105:2, 105:12, 107:1, 128:24, 133:8, 140:7, 142:23, 152:7, 154:8, 159:25, 171:25, 190:4, 190:5, 195:1, 195:12, 201:15, 202:9, 202:10,

218:7, 218:9, 239:3, 241:4, 247:19
participant [1] - 6:1
participants [1] - 49:6
participated [2] - 8:11, 195:5
participating [2] - 145:1, 145:10
participation [2] - 145:12, 280:15
particles [2] - 199:8
particular [12] - 66:22, 85:17, 100:12, 109:7, 113:24, 127:13, 173:6, 180:12, 209:12, 236:22, 237:8, 249:18
particularly [4] - 100:6, 114:22, 170:17, 204:18
particulate [5] - 138:4, 138:14, 205:8, 209:14, 249:24
particulates [1] - 103:18
parties [5] - 145:1, 145:2, 145:6, 145:10, 277:7
partly [1] - 82:2
parts [4] - 105:12, 218:24, 254:11, 273:1
Party [1] - 3:13
party [2] - 173:1, 200:12
pass [5] - 71:1, 116:20, 183:5, 279:4, 279:5
Passaic [6] - 107:9, 203:20, 203:22, 204:25, 224:16, 225:7
passed [5] - 26:24, 33:14, 129:19, 248:14, 249:25
Passengers [1] - 3:10
passing [1] - 32:13
passion [3] - 30:18, 31:5
passions [1] - 7:9
past [9] - 35:19, 78:17, 87:8, 223:3, 241:21, 244:5, 262:22, 273:14, 275:8
path [6] - 37:4, 68:17, 113:5, 178:25, 190:22, 211:3
patterns [1] - 139:25, 214:5, 214:6, 214:23

pausing [1] - 131:1
pay [2] - 125:14, 157:10
paying [3] - 17:2, 17:4, 157:4
peak [3] - 20:22, 59:22, 239:7
peculiarly [1] - 22:16
pelts [1] - 45:16
PELTZ [1] - 2:5
Peltz [3] - 5:13, 135:6, 143:25
pending [1] - 166:1
Pennsylvania [1] - 280:21
People [1] - 3:9
people [6] - 7:4, 15:17, 30:18, 272:18, 278:13, 278:23
Peoples [1] - 95:24
per [8] - 9:5, 20:24, 49:17, 129:7, 133:3, 235:24, 236:3, 237:16
per-year [1] - 9:5
perceived [1] - 164:4
percent [59] - 20:23, 21:3, 34:8, 65:11, 65:23, 66:20, 111:17, 112:13, 137:24, 140:1, 148:6, 148:7, 148:10, 148:14, 148:16, 148:25, 149:2, 149:9, 149:10, 149:14, 149:15, 155:13, 161:23, 161:25, 178:2, 178:3, 221:21, 221:23, 225:7, 225:8, 225:9, 227:2, 228:8, 228:18, 233:12, 235:17, 236:11, 236:20, 245:16, 245:20, 245:21, 245:22, 246:9, 246:10, 246:15, 253:17, 253:19, 257:14, 269:11, 269:24, 271:7, 271:23, 271:24
percentage [7] - 17:7, 149:8, 173:13, 207:24, 237:10, 237:14, 245:18
percentages [1] - 227:14
percentile [14] -

111:12, 111:18, 161:15, 161:19, 177:17, 226:17, 227:3, 227:6, 229:14, 229:17, 255:11, 271:16
percentiles [3] - 227:14, 271:15
perfect [2] - 60:17, 179:25
perfectly [3] - 81:3, 167:23, 244:16
perform [1] - 241:7
performed [1] - 239:5
perfunctory [1] - 101:12
perhaps [5] - 81:12, 139:4, 162:2, 168:20, 216:11
period [38] - 21:3, 24:14, 25:8, 26:17, 26:18, 27:1, 27:17, 27:24, 28:11, 41:25, 42:5, 43:13, 43:16, 46:15, 50:22, 50:23, 51:3, 51:19, 54:20, 55:6, 55:7, 55:9, 55:11, 55:22, 56:2, 56:15, 56:20, 72:12, 78:14, 82:11, 82:18, 82:20, 84:2, 173:3, 195:24, 215:3, 215:8, 236:24
periods [1] - 157:23
permissive [1] - 93:4
permitted [1] - 131:12
person [1] - 137:23
personal [3] - 47:6, 65:1, 65:3
Perspective [1] - 3:6
perspective [6] - 50:12, 64:21, 98:16, 104:22, 162:17, 257:18
pertains [1] - 204:19
Perth [1] - 141:20
Peters [1] - 134:16
phase [1] - 84:20
Philadelphia [1] - 280:20
philosophy [1] - 238:21
phrase [1] - 132:12
phrases [2] - 97:19, 201:11
pick [6] - 127:23, 128:14, 223:9, 223:20, 223:23, 224:13
picked [4] - 108:2,

198:20, 199:14, 209:24
picking [3] - 97:19, 200:1, 228:9
pie [1] - 126:23
piece [3] - 19:6, 169:20, 258:12
piggyback [1] - 212:8
piggybacking [1] - 267:8
Pilot [1] - 33:19
pin [1] - 134:19
Pinelands [1] - 3:8
pinpoints [1] - 113:15
Pipelines [1] - 3:9
place [37] - 11:20, 25:22, 51:24, 52:8, 103:3, 104:6, 109:16, 114:12, 119:1, 141:16, 142:11, 144:6, 145:18, 145:19, 145:24, 158:23, 159:10, 159:19, 160:3, 160:7, 161:24, 164:1, 164:5, 170:24, 175:2, 175:4, 176:8, 177:4, 184:1, 192:4, 198:7, 228:23, 228:25, 229:23, 256:13, 268:3, 269:3
place-based [27] - 11:20, 52:8, 103:3, 104:6, 109:16, 114:12, 141:16, 142:11, 144:6, 145:19, 145:24, 158:23, 159:10, 159:19, 160:3, 160:7, 161:24, 164:1, 164:5, 175:2, 176:8, 177:4, 192:4, 198:7, 228:23, 229:23, 256:13
placed [1] - 145:16
places [5] - 103:4, 103:6, 178:1, 227:5, 257:6
Plaintiff [2] - 1:4, 1:17
plaintiff [15] - 5:7, 5:9, 6:4, 34:20, 39:10, 45:15, 56:25, 57:12, 59:5, 131:17, 132:2, 132:8, 262:18, 279:2, 279:7
plaintiff's [10] - 36:10, 53:4, 57:15, 66:8, 71:25, 136:8, 165:24, 166:4,

166:7, 170:9
**Plaintiffs** [1] - 1:21
**plaintiffs** [13] - 6:7,
34:24, 38:1, 38:4,
38:14, 41:5, 45:9,
45:10, 46:3, 129:15,
129:22, 133:6,
133:23
**plan** [24] - 19:11,
19:12, 19:18, 26:7,
29:8, 33:15, 33:16,
58:1, 72:20, 78:20,
79:5, 85:2, 85:4,
87:10, 95:22, 99:19,
102:22, 118:3,
120:2, 122:4, 139:8,
178:9, 180:13,
231:14
**planet** [1] - 103:23
**planned** [1] - 83:22
**planning** [3] - 133:14,
162:4, 275:8
**plans** [5] - 119:22,
122:5, 122:11,
165:25, 180:8
**plant** [2] - 23:13,
145:21
**Plaza** [1] - 3:19
**plaza** [1] - 250:4
**pleading** [1] - 69:9
**Pleasant** [1] - 168:8
**pleasure** [2] - 149:23,
191:8
**plentiful** [1] - 278:24
**plucking** [1] - 188:10
**plug** [2] - 41:1, 235:10
**plugged** [1] - 41:9
**plus** [5] - 14:9, 81:14,
180:1, 207:21,
207:22
**PM10** [1] - 265:6
**PM2.5** [1] - 265:6
**pocket** [1] - 97:19
**podium** [2] - 83:8,
168:4
**point** [71] - 10:9,
14:12, 14:14, 14:20,
18:3, 18:16, 20:5,
20:9, 20:22, 42:6,
44:12, 45:22, 45:23,
46:3, 47:15, 48:15,
51:15, 51:17, 52:4,
54:10, 60:9, 60:22,
62:3, 62:9, 62:19,
62:22, 63:13, 67:16,
72:10, 74:14, 98:20,
107:5, 116:3,
116:18, 121:1,
127:8, 145:14,
146:4, 146:6, 148:4,

149:6, 155:18,
162:20, 166:22,
169:14, 172:10,
181:9, 182:25,
185:11, 185:12,
186:1, 194:22,
197:22, 218:18,
235:15, 236:22,
237:8, 238:15,
238:19, 239:23,
240:25, 246:16,
249:13, 250:3,
250:5, 256:16,
260:14, 263:9,
266:23
**Point** [7] - 13:25, 89:7,
100:13, 102:17,
175:8, 184:10, 186:9
**pointed** [4] - 115:4,
170:2, 178:10,
266:11
**pointing** [3] - 62:12,
177:9, 210:17
**points** [20] - 21:14,
34:25, 39:19, 51:7,
63:6, 76:3, 80:20,
111:21, 130:6,
131:17, 141:18,
141:19, 148:6,
163:18, 167:19,
183:21, 212:9,
240:17, 254:18,
254:21
**poles** [3] - 245:6,
245:9, 246:1
**policy** [8] - 50:1,
81:20, 82:1, 82:2,
195:2, 244:16,
259:19, 268:9
**Policy** [2] - 3:6, 33:24
**political** [1] - 49:25
**pollutant** [14] -
100:18, 159:8,
160:2, 161:14,
177:17, 232:11,
257:15, 265:8,
265:13, 271:15,
271:17, 272:22,
274:2, 274:25
**pollutants** [14] -
102:23, 103:11,
111:12, 198:15,
219:4, 226:18,
226:24, 227:3,
227:7, 227:15,
228:17, 229:17,
266:17, 272:18
**pollution** [9] - 7:19,
111:18, 158:25,
198:14, 199:2,

229:14, 259:8,
274:11, 275:3
**pool** [1] - 103:2
**poor** [1] - 275:7
**population** [3] -
270:11, 272:10,
272:11
**populations** [3] -
225:10, 226:21
**Port** [1] - 17:17
**portion** [6] - 15:18,
23:10, 32:1, 104:23,
137:15, 266:10
**pose** [2] - 116:24,
172:14
**posit** [3] - 98:20,
106:10, 162:6
**posited** [1] - 118:19
**position** [15] - 16:3,
16:7, 25:11, 44:22,
52:22, 61:7, 102:4,
107:24, 133:16,
173:7, 192:13,
192:16, 228:22,
231:8, 259:8
**positive** [1] - 259:4
**positively** [2] - 81:17,
273:17
**possession** [2] - 19:6,
137:23
**possibilities** [1] -
146:1
**possibility** [1] -
132:23
**possible** [8] - 40:20,
58:12, 99:20,
105:21, 197:7,
233:24, 243:13,
278:3
**possibly** [8] - 25:15,
29:9, 29:13, 30:24,
72:16, 107:7, 193:7,
224:7
**post** [3] - 72:23, 79:2,
115:2
**Post** [1] - 1:9
**post-FONSI** [1] -
72:23
**postdate** [1] - 44:20
**posted** [2] - 78:17,
276:25
**postulated** [1] -
169:25
**posture** [1] - 96:4
**potatoes** [2] - 196:25,
197:21
**potential** [8] - 10:24,
81:10, 103:13,
114:17, 158:16,
214:20, 215:17,

261:16
**potentially** [12] - 61:6,
63:3, 88:8, 95:17,
118:2, 120:16,
147:12, 212:4,
214:23, 228:23,
228:24, 229:8
**powered** [1] - 280:19
**PowerPoint** [1] -
31:24
**practice** [17] - 35:20,
77:20, 78:17, 87:8,
223:3, 241:11,
241:15, 241:21,
242:1, 242:8, 242:9,
242:22, 244:8,
262:22, 268:13,
268:14
**practices** [5] - 35:13,
163:5, 235:4, 241:5,
241:6
**practicing** [2] - 262:7,
262:12
**prayer** [1] - 14:21
**pre** [18] - 158:25,
160:18, 160:24,
161:5, 161:8,
161:13, 161:14,
161:18, 177:16,
209:4, 225:17,
225:20, 227:3,
227:4, 228:17,
232:11, 259:15,
273:13
**pre-existing** [18] -
158:25, 160:18,
160:24, 161:5,
161:8, 161:13,
161:14, 161:18,
177:16, 209:4,
225:17, 225:20,
227:3, 227:4,
228:17, 232:11,
259:15, 273:13
**precedent** [10] - 81:6,
82:5, 124:12,
180:18, 220:7,
241:17, 259:25,
260:21, 262:15,
262:19
**precedent-setting** [2]
- 81:6, 82:5
**precedent/practice**
[1] - 35:16
**precise** [3] - 51:24,
52:7, 54:8
**precisely** [3] - 54:14,
158:20, 188:4
**preclude** [1] - 16:11
**precluded** [1] - 34:13

**predetermined** [7] -
11:9, 11:14, 18:20,
29:5, 69:3, 96:9,
229:7
**predicate** [2] - 72:5,
85:2
**predicated** [2] - 34:1,
36:10
**predicted** [2] - 257:11,
257:16
**predicts** [1] - 235:12
**predominant** [1] -
169:6
**predominantly** [1] -
21:8
**preempt** [1] - 76:18
**prefer** [1] - 116:22
**preference** [2] -
196:10, 196:12
**preferred** [1] - 132:5
**prejudge** [1] - 41:4
**premature** [3] - 22:18,
22:22, 146:24
**prematurely** [2] -
72:19, 85:4
**premise** [2] - 10:14,
106:23
**premised** [1] - 133:12
**preparation** [2] - 75:8,
76:8
**prepare** [5] - 27:10,
27:21, 41:9, 91:2,
151:23
**prepared** [7] - 11:24,
31:22, 73:17, 89:19,
101:8, 152:10, 162:9
**preparing** [1] - 96:6
**present** [8] - 7:2, 75:9,
77:18, 135:20,
140:5, 187:24,
205:16, 243:18
**presentation** [12] -
14:11, 21:16, 22:18,
77:17, 117:5, 154:5,
154:8, 187:12,
257:6, 266:4, 280:1,
280:14
**presentations** [1] -
135:24
**presented** [12] -
10:24, 59:5, 71:15,
72:25, 117:20,
205:16, 223:19,
240:18, 243:2,
244:11, 257:9,
274:13
**presenting** [1] - 151:8
**presents** [1] - 241:9
**Preservation** [1] - 3:8
**pressure** [1] - 278:17

**pressures** [1] - 68:13
**presumably** [1] - 51:11
**presume** [1] - 206:2
**pretty** [7] - 69:25, 80:14, 103:16, 117:12, 144:5, 160:20, 209:12
**prevail** [1] - 38:5
**prevent** [2] - 132:6, 132:12
**prevented** [3] - 147:5, 147:6
**previously** [3] - 101:3, 198:5, 201:17
**price** [1] - 17:18
**pricing** [27] - 7:8, 7:11, 10:15, 10:18, 12:10, 15:8, 15:17, 18:5, 33:15, 35:1, 35:3, 35:5, 35:7, 35:25, 50:16, 77:18, 81:7, 81:13, 117:23, 117:25, 118:14, 119:4, 169:23, 260:5
**Pricing** [1] - 33:19
**prime** [1] - 127:15
**principle** [2] - 171:6, 171:10
**principled** [1] - 178:6
**principles** [3] - 34:22, 41:2, 45:6
**probe** [5] - 39:9, 49:10, 52:11, 124:20, 243:11
**probing** [1] - 30:10
**problem** [12] - 14:7, 31:18, 33:10, 54:5, 64:11, 96:6, 127:16, 182:16, 228:1, 228:2, 276:16, 276:17
**problems** [6] - 30:22, 72:12, 72:17, 116:13, 203:23, 210:23
**procedural** [1] - 39:21
**procedure** [2] - 37:18, 277:8
**proceed** [7] - 44:1, 46:7, 49:21, 84:2, 127:20, 127:25, 240:24
**proceeding** [5] - 6:1, 32:5, 145:2, 145:3, 278:14
**Proceedings** [1] - 1:24
**process** [67] - 10:23, 13:15, 18:15, 30:19,

34:11, 34:15, 37:19, 42:9, 42:14, 43:10, 46:4, 49:5, 49:7, 49:8, 53:15, 55:18, 59:16, 67:9, 71:6, 72:2, 73:24, 78:10, 78:20, 78:25, 85:14, 90:13, 93:11, 98:21, 99:2, 99:10, 111:6, 116:12, 117:14, 138:20, 144:23, 145:17, 146:8, 151:22, 152:8, 152:14, 152:19, 160:10, 164:8, 164:12, 165:8, 166:19, 166:23, 167:5, 174:17, 187:20, 188:2, 188:5, 188:10, 191:16, 193:11, 194:23, 195:3, 195:13, 200:7, 202:3, 229:6, 231:16, 232:18, 260:18, 276:19, 276:24
**produced** [1] - 1:25
**productive** [1] - 135:20
**professionalism** [1] - 281:4
**Professionals** [1] - 3:6
**professor** [2] - 179:8, 179:17
**proficiency** [1] - 270:25
**profit** [1] - 97:21
**prognostication** [1] - 28:10
**program** [15] - 8:1, 8:17, 9:7, 9:8, 15:6, 35:3, 97:24, 97:25, 117:21, 119:2, 125:14, 155:17, 156:8, 156:14
**Program** [1] - 33:19
**programmatic** [1] - 77:9
**programs** [2] - 102:16, 137:12
**Project** [2] - 75:12, 83:14
**project** [89] - 7:16, 8:14, 8:20, 11:2, 12:5, 12:23, 18:6, 25:23, 29:12, 29:13, 33:18, 33:23, 34:1, 44:1, 47:11, 55:13,

55:14, 57:2, 58:21, 60:4, 70:17, 71:18, 72:19, 75:12, 75:13, 75:14, 75:22, 75:23, 75:24, 77:9, 77:10, 80:21, 80:22, 81:14, 82:5, 87:22, 92:2, 92:3, 96:12, 96:23, 118:25, 122:3, 125:2, 125:17, 125:19, 127:16, 131:12, 131:13, 132:4, 136:23, 142:23, 145:22, 152:15, 153:18, 154:22, 156:22, 157:5, 157:12, 160:20, 164:21, 171:2, 171:24, 173:20, 186:8, 187:19, 187:23, 190:11, 191:23, 192:3, 195:6, 215:15, 217:14, 218:1, 218:19, 235:11, 235:16, 235:22, 246:25, 259:4, 259:21, 260:10, 263:7, 263:10, 271:12, 273:2, 273:17, 275:5
**project's** [3] - 117:15, 120:1, 128:25
**projected** [3] - 235:15, 235:18, 236:2
**projection** [1] - 236:16
**projects** [24] - 9:8, 54:12, 55:3, 56:8, 56:23, 69:19, 70:5, 70:7, 74:15, 74:17, 75:7, 75:21, 99:20, 100:14, 123:5, 125:25, 126:24, 127:1, 130:18, 160:25, 171:9, 181:22, 237:5, 263:16
**projet** [1] - 34:7
**prolific** [1] - 170:21
**pronouncements** [1] - 23:22
**proper** [8] - 7:12, 15:13, 101:20, 116:11, 118:7, 130:16, 133:3, 191:1
**properly** [3] - 66:3, 201:4, 214:3
**prophecy** [1] - 125:12
**proponent** [1] - 162:20

**proposal** [20] - 8:3, 10:10, 10:18, 18:4, 24:9, 24:12, 26:12, 28:19, 52:17, 52:19, 52:22, 52:23, 54:6, 54:8, 56:10, 56:17, 56:19, 80:24, 172:19
**proposals** [1] - 15:7
**propose** [2] - 165:10, 261:12
**Proposed** [1] - 13:19
**proposed** [10] - 11:25, 27:11, 73:19, 82:4, 85:22, 89:21, 102:1, 125:7, 165:12, 183:4
**proposition** [2] - 191:10, 220:7
**propositions** [1] - 174:20
**propounded** [1] - 220:16
**prospective** [1] - 130:14
**Protect** [1] - 168:8
**protest** [1] - 110:22
**protesting** [1] - 174:16
**protocol** [2] - 248:14, 249:8
**provide** [24] - 15:3, 15:9, 47:5, 51:10, 51:11, 54:13, 57:25, 94:13, 95:17, 97:2, 104:9, 113:5, 118:3, 121:25, 132:11, 143:18, 144:21, 153:13, 168:3, 171:8, 180:4, 184:7, 229:1, 230:14
**provided** [20] - 7:22, 13:5, 13:7, 13:16, 46:5, 47:18, 72:7, 81:11, 86:2, 89:25, 101:18, 109:17, 114:2, 116:5, 200:11, 210:14, 215:4, 255:13, 267:1, 267:18
**provides** [6] - 33:20, 75:21, 129:13, 190:10, 256:12, 272:15
**proving** [1] - 211:16
**proximate** [1] - 141:21
**proximity** [15] - 140:13, 141:17, 161:2, 163:4, 164:11, 193:1, 193:5, 247:11, 252:1, 252:20,

272:10, 272:17, 272:24, 273:4
**prudentially** [1] - 41:3
**public** [21] - 21:17, 33:12, 42:21, 54:21, 67:12, 67:18, 77:4, 78:18, 79:4, 82:7, 82:18, 82:20, 123:20, 123:21, 160:14, 171:15, 171:25, 195:2, 243:19, 277:1
**Public** [1] - 260:22
**publicity** [1] - 173:5
**published** [1] - 42:18
**pull** [3] - 14:15, 62:2, 79:3
**pure** [1] - 38:10
**purpose** [20] - 117:15, 120:1, 128:25, 129:4, 130:16, 130:19, 168:25, 169:1, 169:4, 169:11, 171:6, 171:7, 171:10, 173:10, 173:20, 242:6, 243:5, 270:13, 270:14
**purposes** [9] - 50:16, 50:17, 77:2, 77:3, 99:15, 139:4, 139:7, 139:10, 270:16
**pursuant** [3] - 69:20, 255:9, 259:17
**pursued** [1] - 133:20
**push** [2] - 15:17, 195:24
**put** [20] - 21:25, 23:12, 79:9, 121:8, 123:3, 150:20, 151:1, 163:20, 192:12, 192:16, 212:3, 215:12, 219:11, 253:21, 257:18, 261:9, 261:19, 267:1, 272:4, 278:17
**Putnam** [7] - 203:14, 203:15, 203:17, 203:24, 204:3, 204:4, 204:16
**puts** [1] - 113:8
**putting** [6] - 54:10, 56:9, 64:21, 68:23, 69:2, 235:19

---

## Q

**qualified** [1] - 114:16
**qualify** [2] - 129:21, 227:10

**qualitative** [1] - 37:12
**Quality** [2] - 4:14, 204:7
**quality** [78] - 7:18, 11:17, 13:3, 17:11, 29:7, 29:10, 29:19, 30:22, 53:22, 72:13, 84:2, 84:23, 92:9, 100:6, 103:12, 105:15, 105:23, 107:1, 109:1, 110:23, 112:18, 113:17, 135:18, 160:15, 195:18, 195:22, 196:3, 197:1, 197:15, 197:18, 198:8, 198:9, 198:12, 198:20, 201:15, 201:18, 203:6, 205:21, 205:23, 206:25, 209:25, 210:5, 210:7, 214:6, 214:18, 214:20, 215:14, 215:18, 215:24, 217:11, 221:15, 221:25, 222:13, 224:18, 224:23, 234:23, 239:4, 240:7, 245:25, 248:25, 249:24, 251:25, 255:14, 256:5, 257:9, 257:10, 259:3, 259:6, 261:14, 261:22, 261:23, 262:3, 265:22, 266:17, 267:12, 269:13, 280:12
**qualms** [1] - 203:3
**quantitative** [1] - 37:13
**quarrel** [1] - 53:17
**quarter** [1] - 234:4
**questioner** [4] - 9:17, 30:7, 126:14, 128:18
**questions** [28] - 11:24, 12:2, 14:5, 30:15, 31:20, 64:12, 73:18, 82:25, 89:20, 116:23, 117:1, 117:7, 122:13, 126:15, 131:6, 131:8, 151:12, 165:21, 181:5, 187:7, 197:9, 217:7, 243:24, 245:1, 256:22, 267:12, 275:12, 275:14

**quibble** [1] - 166:13
**quick** [4] - 85:16, 219:11, 254:18, 254:21
**quickly** [3] - 20:20, 174:7, 174:8
**quiet** [1] - 280:5
**quit** [1] - 182:21
**quite** [14] - 49:24, 50:14, 51:18, 78:4, 78:5, 96:15, 139:13, 156:12, 195:23, 203:17, 227:24, 258:5, 260:19, 280:4
**quote** [45] - 10:22, 10:23, 11:19, 11:20, 11:21, 11:23, 13:17, 13:19, 18:4, 18:17, 18:18, 22:4, 22:5, 22:9, 22:16, 22:18, 25:20, 25:21, 25:24, 67:22, 85:22, 85:23, 85:24, 91:1, 93:1, 104:1, 104:5, 124:17, 131:18, 177:7, 177:8, 183:3, 183:5, 183:10, 198:6, 217:23, 228:24
**quoted** [4] - 12:7, 170:9, 198:5, 218:1
**quoting** [2] - 131:22, 218:1

---

# R

**rail** [1] - 15:20
**Railroad** [1] - 3:10
**raise** [18] - 9:19, 15:6, 33:12, 50:19, 99:11, 117:21, 118:24, 119:17, 133:25, 162:22, 200:2, 200:6, 212:2, 212:9, 266:8, 267:10, 279:1, 280:5
**raised** [33] - 20:8, 22:24, 23:2, 51:1, 94:8, 96:5, 98:22, 98:25, 99:18, 99:20, 112:16, 112:18, 118:2, 121:12, 163:18, 173:2, 194:17, 200:10, 200:12, 200:14, 200:15, 200:20, 200:22, 214:1, 216:10, 219:6, 260:17, 262:17, 262:24, 269:10

**raises** [3] - 15:2, 15:12, 76:22
**raising** [4] - 9:22, 16:3, 16:8, 16:9
**ramifications** [1] - 224:22
**ramp** [1] - 17:25
**ramps** [1] - 250:20
**ran** [1] - 19:8
**Randee** [1] - 6:6
**RANDEE** [1] - 1:19
**Randy** [1] - 5:8
**RANDY** [1] - 1:15
**range** [17] - 42:9, 59:20, 62:5, 62:10, 62:11, 62:14, 62:24, 62:25, 63:1, 63:2, 146:1, 207:13, 208:1, 208:2, 243:16, 245:15, 247:15
**ranges** [3] - 53:20, 148:8, 148:10
**rare** [1] - 129:22
**rate** [2] - 140:3, 195:20
**rates** [4] - 7:20, 145:17, 232:11
**rather** [9] - 11:8, 115:2, 127:20, 162:21, 167:25, 177:9, 238:5, 261:17, 276:9
**rational** [6] - 73:11, 73:13, 103:23, 218:15, 230:14
**rationale** [3] - 121:8, 224:1, 228:21
**rationales** [1] - 222:7
**rationally** [1] - 218:4
**re** [46] - 34:19, 40:9, 40:21, 40:24, 41:5, 42:1, 42:23, 43:12, 43:21, 46:4, 46:22, 46:24, 47:10, 47:13, 47:16, 47:17, 47:23, 48:1, 48:10, 52:1, 54:13, 55:7, 55:10, 55:12, 56:11, 56:19, 57:4, 57:13, 60:23, 66:23, 68:22, 71:10, 71:18, 76:1, 76:24, 77:6, 77:25, 78:3, 78:14, 167:4, 167:11, 183:6
**re-eval** [3] - 46:22, 68:22, 77:25
**re-evals** [2] - 46:24, 47:13
**re-evaluate** [3] -

40:21, 47:16, 71:10
**re-evaluation** [34] - 34:19, 40:9, 40:24, 41:5, 42:1, 42:23, 43:12, 43:21, 46:4, 46:6, 47:23, 48:1, 48:10, 52:1, 54:13, 55:7, 55:10, 55:12, 55:22, 56:11, 56:19, 57:4, 57:13, 58:17, 60:23, 71:18, 76:24, 77:6, 78:3, 78:14, 167:4, 167:11, 183:6
**re-evaluations** [3] - 47:10, 47:17, 76:1
**re-examination** [1] - 66:23
**reach** [8] - 71:18, 79:3, 88:21, 101:15, 127:13, 130:4, 218:7, 247:2
**reached** [3] - 151:10, 204:10, 218:5
**reaching** [1] - 77:21
**reaction** [1] - 279:21
**read** [36] - 56:1, 56:3, 89:10, 134:13, 135:7, 169:16, 183:10, 183:12, 197:25, 208:3, 276:19
**reader** [1] - 245:24
**readily** [1] - 203:2
**reading** [5] - 37:24, 148:11, 168:18, 168:21, 208:7
**ready** [5] - 22:17, 95:14, 131:2, 231:5, 231:7
**real** [5] - 81:7, 108:5, 161:15, 219:11, 266:23
**reality** [1] - 72:8
**realized** [1] - 141:1
**realizes** [1] - 9:25
**really** [26] - 51:7, 54:7, 58:23, 64:8, 115:22, 121:6, 122:7, 144:22, 149:18, 151:3, 156:17, 157:5, 160:17, 163:4, 175:8, 181:13, 204:11, 209:17, 219:5, 226:10, 257:7, 257:11, 257:19, 259:7, 274:22
**reason** [11] - 18:19, 58:19, 82:3, 114:10, 129:24, 149:4,

169:7, 169:9, 224:1, 251:23, 273:12
**reasonable** [47] - 16:13, 17:1, 17:14, 37:16, 37:17, 39:15, 51:3, 62:25, 63:4, 65:21, 73:13, 78:16, 97:9, 106:10, 106:12, 106:20, 107:4, 107:25, 113:2, 117:13, 118:19, 120:2, 125:6, 130:13, 132:9, 132:10, 132:13, 132:20, 167:21, 169:10, 170:1, 172:15, 208:2, 211:12, 220:2, 222:7, 232:5, 243:25, 244:2, 244:9, 245:24, 255:10, 267:20, 269:3, 269:12
**reasonableness** [14] - 16:16, 36:14, 36:25, 37:25, 38:12, 38:24, 62:23, 63:3, 73:10, 73:12, 129:4, 133:7, 264:1, 264:5
**reasonably** [7] - 121:2, 178:25, 190:22, 193:24, 216:15, 224:10, 256:1
**reasoned** [12] - 37:3, 90:19, 101:15, 106:10, 120:10, 120:19, 120:25, 210:23, 211:9, 221:1, 243:13, 269:4
**reasoning** [2] - 68:16, 94:24
**reasons** [10] - 47:17, 61:3, 72:16, 90:14, 91:3, 91:25, 146:22, 159:22, 170:2, 198:11
**rebut** [1] - 60:18
**rebuttal** [18] - 6:22, 31:11, 31:20, 60:18, 61:23, 127:25, 143:22, 149:21, 150:10, 163:13, 197:11, 230:12, 234:18, 256:23, 273:21, 273:24, 275:16, 280:12
**receive** [3] - 52:8, 161:10, 164:20
**received** [1] - 209:21

**receiving** [1] - 145:24
**recent** [1] - 268:18
**recently** [5] - 11:22, 22:15, 34:15, 91:15, 95:16
**recess** [5] - 83:21, 127:22, 128:2, 128:4, 196:22
**Recess** [3] - 64:1, 83:25, 196:24
**recitation** [1] - 81:4
**recognition** [1] - 193:6
**recognitions** [1] - 116:7
**recognize** [5] - 100:5, 103:7, 155:15, 187:7, 262:20
**recognized** [3] - 11:16, 185:13, 235:5
**recognizes** [1] - 192:24
**recognizing** [1] - 180:3
**recollection** [2] - 42:4, 43:17
**recombination** [1] - 22:3
**recommendation** [21] - 19:3, 20:13, 20:20, 22:24, 22:25, 23:4, 23:5, 23:18, 25:7, 25:13, 26:16, 26:24, 27:2, 41:23, 52:20, 55:8, 55:22, 55:24, 59:19, 71:5, 166:1
**recommended** [3] - 59:19, 71:10, 115:1
**reconstructions** [1] - 22:7
**Record** [1] - 56:3
**record** [48] - 12:1, 13:2, 19:19, 19:22, 21:11, 31:8, 34:16, 34:22, 36:3, 37:9, 37:22, 45:6, 45:11, 45:12, 45:14, 45:18, 45:20, 60:2, 61:24, 64:15, 67:11, 79:9, 79:24, 80:9, 80:15, 93:18, 96:20, 100:10, 100:17, 130:1, 134:9, 134:14, 144:4, 144:14, 144:21, 150:18, 173:1, 191:3, 199:22, 200:13, 200:25, 201:3, 256:2, 256:19, 268:6,

279:17
**recorded** [1] - 1:24
**red** [7] - 140:17, 140:20, 140:22, 140:25, 141:11, 246:15, 253:3
**redefining** [1] - 111:2
**reduce** [15] - 13:18, 50:17, 96:23, 97:4, 118:23, 118:24, 137:11, 154:19, 156:10, 171:7, 173:12, 184:20, 191:24, 191:25, 226:9
**reduced** [3] - 132:25, 156:8, 229:22
**reducing** [6] - 114:22, 125:23, 156:19, 156:21, 157:12
**reduction** [9] - 114:21, 119:22, 156:16, 163:3, 171:13, 171:20, 171:21, 206:24
**reductions** [2] - 171:12, 253:5
**redundant** [1] - 172:25
**reevaluation** [1] - 63:13
**refer** [5] - 33:3, 33:4, 61:23, 257:2, 270:4
**reference** [11] - 56:2, 61:17, 77:17, 102:25, 103:1, 189:14, 190:2, 190:9, 190:15, 198:2, 231:17
**referenced** [3] - 35:22, 82:17, 260:15
**references** [5] - 9:3, 104:17, 112:22, 112:24, 190:14
**referred** [10] - 55:12, 75:13, 134:11, 134:12, 169:15, 183:12, 197:23, 231:4, 254:24, 260:6
**referring** [6] - 6:25, 56:16, 56:23, 120:6, 173:21, 247:25, 248:3, 257:8, 257:22
**refine** [1] - 56:17
**refined** [3] - 55:14, 58:6, 171:20
**refinement** [5] - 56:10, 56:11, 56:12, 56:13, 60:24
**reflect** [1] - 241:11

**reflected** [5] - 144:4, 192:25, 257:12, 266:18, 268:2
**reflection** [1] - 131:23
**reflects** [2] - 122:25, 144:14
**refresh** [1] - 42:4
**refrigeration** [1] - 184:10
**refuge** [1] - 18:25
**reg** [1] - 48:19
**regard** [1] - 91:13
**regarding** [6] - 11:24, 73:18, 89:20, 124:24, 133:13, 258:16
**regardless** [3] - 75:19, 188:13, 271:2
**regime** [1] - 145:8
**region** [37] - 7:14, 7:20, 7:24, 10:19, 51:14, 51:23, 81:16, 87:25, 88:17, 88:20, 88:25, 104:15, 104:22, 104:24, 105:13, 125:13, 139:3, 155:5, 155:10, 155:15, 155:24, 203:5, 218:7, 235:6, 235:7, 235:16, 240:9, 240:12, 240:13, 246:8, 247:1, 251:10, 252:9, 264:17, 269:18, 269:19, 270:7
**Region** [2] - 233:24, 234:3
**regional** [45] - 14:1, 16:20, 34:3, 81:15, 87:20, 87:21, 88:1, 88:3, 88:9, 88:10, 95:21, 105:7, 105:18, 109:11, 137:4, 137:9, 137:10, 138:12, 138:18, 138:21, 139:2, 154:13, 155:21, 155:22, 155:23, 156:6, 157:13, 158:21, 175:2, 191:23, 192:3, 193:23, 201:16, 206:25, 217:18, 221:21, 240:7, 240:10, 244:21, 245:3, 254:12, 257:13, 265:24, 274:19
**Regional** [1] - 135:2

**regional-based** [1] - 109:11
**regionalized** [1] - 264:18
**regionally** [1] - 246:25
**Register** [1] - 42:19
**regs** [9] - 27:9, 39:3, 43:16, 87:20, 89:10, 101:3, 123:2, 178:11, 180:10
**regularly** [1] - 268:11
**regulation** [11] - 28:20, 42:5, 71:14, 78:13, 82:16, 82:17, 87:8, 90:21, 130:22, 136:1, 268:10
**regulations** [11] - 28:23, 46:5, 47:18, 54:13, 56:19, 57:25, 76:16, 81:22, 85:17, 86:17, 95:16
**regulatory** [2] - 145:7, 223:3
**REICHMAN** [4] - 3:4, 3:4, 6:9, 196:15
**Reichman** [2] - 6:9
**Reisel** [1] - 5:16
**reiterate** [1] - 72:22
**reject** [3] - 125:7, 215:2, 215:3
**rejected** [10] - 119:13, 121:7, 125:3, 130:22, 170:2, 200:19, 201:4, 212:19, 212:21, 220:5
**rejection** [2] - 119:15, 119:21
**relate** [1] - 100:11
**related** [4] - 47:11, 133:20, 169:3, 169:4
**relationship** [1] - 133:11
**relative** [9] - 46:17, 136:6, 151:16, 183:18, 187:22, 193:24, 210:20, 240:18, 267:19
**relatively** [7] - 14:17, 139:22, 236:6, 236:18, 236:22, 237:15, 254:4
**released** [1] - 85:9
**relevance** [3] - 111:25, 194:23, 217:10
**relevant** [19] - 21:15, 27:12, 27:19, 27:20, 32:9, 34:18, 34:23, 35:10, 37:2, 66:10, 66:25, 72:24, 76:6,

79:7, 82:3, 96:4, 96:5, 145:23, 191:18
**reliable** [1] - 22:5
**relief** [1] - 180:19
**rely** [3] - 8:15, 115:2, 217:24
**remaining** [1] - 202:24
**remains** [1] - 215:17
**remand** [8] - 15:3, 18:20, 22:9, 23:7, 24:8, 26:10, 30:25, 198:12
**remanded** [4] - 20:18, 21:23, 29:16, 182:3
**remanding** [1] - 25:17
**remediation** [1] - 7:22
**remedies** [1] - 260:23
**remedy** [3] - 23:9, 48:14, 280:15
**remember** [2] - 32:20, 172:20
**remind** [2] - 186:25, 211:2
**render** [1] - 77:6
**renders** [1] - 47:16
**renovating** [1] - 160:11
**repeated** [1] - 93:23
**repeatedly** [2] - 33:9, 143:21
**rephrase** [1] - 243:3
**replace** [1] - 155:9
**Replacement** [1] - 75:11
**replacement** [1] - 75:12
**replacing** [2] - 70:17, 154:17
**reply** [2] - 51:20, 71:13
**report** [3] - 190:3, 190:9, 222:8
**reported** [1] - 225:22
**Reporter** [2] - 1:23, 148:9
**reporter** [5] - 31:5, 58:22, 83:11, 90:7, 278:6
**REPORTER** [2] - 276:5, 277:18
**Reporter's** [1] - 277:5
**reports** [1] - 226:6
**represent** [3] - 47:8, 71:6, 138:6
**representation** [7] - 75:14, 107:7, 143:6, 165:9, 184:9, 193:21, 193:22
**representative** [2] - 53:20, 208:2
**representatives** [1] -

133:12
**represented** [2] - 62:16, 71:8
**representing** [1] - 212:15
**represents** [1] - 60:11
**reprocess** [1] - 171:17
**request** [2] - 31:4, 261:16
**requested** [1] - 121:15
**requesting** [1] - 170:10
**require** [17] - 21:16, 69:20, 75:7, 75:8, 101:3, 101:11, 101:17, 123:11, 123:13, 145:22, 162:16, 179:12, 193:7, 198:12, 198:17, 255:21, 259:11
**required** [23] - 11:2, 13:1, 33:22, 39:15, 40:3, 48:7, 48:19, 70:6, 70:8, 88:14, 94:10, 97:11, 117:17, 118:3, 120:20, 120:24, 124:19, 167:4, 178:19, 180:9, 193:17, 205:14, 220:15
**Required** [1] - 22:4
**requirement** [4] - 87:15, 123:8, 155:13, 260:22
**requirements** [9] - 86:3, 86:6, 86:14, 89:16, 101:4, 129:7, 178:16, 180:11, 180:21
**requires** [20] - 7:17, 15:2, 23:16, 23:17, 26:8, 66:23, 73:4, 86:18, 86:24, 87:9, 101:20, 103:5, 124:17, 129:21, 223:4, 229:25, 255:21, 259:9, 259:22, 279:25
**requiring** [2] - 33:14, 70:9
**requisite** [1] - 125:10
**research** [2] - 38:19, 262:18
**reserve** [14] - 32:22, 32:23, 49:18, 49:19, 84:8, 128:8, 128:10, 150:9, 163:13, 195:25, 230:12,

256:22, 273:20, 275:14
**reserved** [2] - 6:22, 174:4
**reserving** [1] - 273:21
**residents** [2] - 172:8, 172:9
**resource** [1] - 34:1, 40:18, 40:19, 40:20, 51:13, 53:21, 77:1, 77:5, 81:10, 243:22
**resource-area-by-resource-area** [1] - 243:22
**RESOURCES** [1] - 2:4
**Resources** [1] - 169:16
**respect** [28] - 12:5, 40:13, 42:23, 64:14, 66:2, 78:3, 79:17, 81:1, 86:19, 90:7, 104:14, 124:24, 143:12, 147:7, 153:25, 164:15, 165:1, 183:19, 185:8, 185:9, 185:24, 187:24, 192:23, 195:20, 199:8, 207:13, 211:23, 254:8
**respectfully** [8] - 12:19, 22:20, 27:24, 28:15, 35:24, 66:18, 149:13, 220:22
**respective** [2] - 30:14, 87:10
**respects** [1] - 221:15
**respond** [2] - 162:10, 217:22
**responded** [3] - 23:3, 217:21, 266:10
**responds** [1] - 267:17
**response** [8] - 16:18, 79:6, 256:21, 262:4, 266:10, 267:3, 268:2, 268:5
**responsibility** [1] - 153:6
**responsible** [1] - 126:10
**rest** [3] - 68:17, 74:4, 245:21
**restatement** [1] - 80:25
**restoration** [1] - 52:9
**restrict** [1] - 127:12
**rests** [1] - 36:3
**result** [14] - 15:16, 40:20, 56:7, 69:4, 69:5, 95:19, 167:4,

172:8, 188:20, 199:14, 206:16, 206:24, 271:5, 275:7
**resulted** [1] - 152:12
**resulting** [1] - 191:25
**results** [4] - 29:22, 58:12, 214:6, 214:18
**retrofitting** [1] - 154:19
**return** [1] - 137:1
**returning** [1] - 259:3
**reveals** [1] - 164:10
**revenue** [39] - 15:14, 16:3, 16:8, 16:9, 16:10, 17:7, 17:16, 50:7, 50:8, 119:1, 119:17, 119:20, 120:16, 125:1, 125:10, 125:25, 126:5, 128:24, 130:4, 130:6, 130:15, 132:2, 156:17, 167:20, 167:23, 168:10, 168:13, 168:18, 168:22, 169:2, 169:5, 169:9, 172:13, 184:13, 184:16, 184:17, 184:25
**revenue-generating** [1] - 132:2
**revenues** [4] - 50:13, 118:24, 153:18, 153:19
**review** [47] - 7:13, 10:16, 10:25, 11:6, 11:17, 13:15, 15:13, 18:18, 18:25, 20:17, 21:17, 21:23, 21:24, 25:21, 26:3, 26:12, 28:18, 29:6, 29:14, 33:23, 37:6, 54:25, 67:18, 67:23, 69:1, 72:2, 73:25, 74:1, 82:3, 82:4, 84:17, 84:21, 84:22, 84:24, 85:14, 89:2, 99:15, 152:4, 152:5, 167:20, 171:17, 189:3, 189:5, 231:16, 258:16, 262:7
**reviewed** [1] - 268:20
**reviewing** [2] - 36:24, 85:7
**reviews** [3] - 75:23, 268:11, 268:15
**Revolution** [1] - 3:11
**RICE** [1] - 1:18

**Richardson** [1] - 22:1
**RIESEL** [1] - 2:15
**rife** [1] - 12:1
**right-hand** [3] - 100:9, 148:6, 246:14
**rights** [1] - 145:8
**ring** [1] - 78:5
**ringing** [1] - 93:24
**ripe** [9] - 19:2, 19:21, 79:2, 84:20, 84:21, 166:4, 166:8, 166:16
**ripened** [1] - 66:7
**ripeness** [19] - 6:17, 10:11, 14:10, 14:14, 14:15, 14:17, 18:22, 18:23, 18:24, 20:7, 26:9, 32:1, 32:10, 39:20, 40:9, 47:14, 63:11, 66:13, 76:6
**RIPENESS** [1] - 4:2
**Ripeness** [1] - 22:16
**rise** [2] - 5:22, 48:25
**rises** [1] - 147:12
**risk** [1] - 92:2
**River** [5] - 70:14, 75:11, 83:14, 102:6, 130:7
**river** [3] - 17:16, 17:25, 111:21
**Riverkeeper** [1] - 3:9
**rivers** [1] - 17:19
**road** [8] - 14:6, 49:11, 67:13, 91:6, 188:18, 201:1, 250:6, 250:16
**roadmap** [2] - 30:11, 81:18
**roads** [2] - 33:21, 250:19
**roadside** [1] - 160:11
**roadway** [1] - 235:8
**roadways** [7] - 35:25, 98:4, 98:5, 117:25, 118:14, 119:6, 145:21
**Robbie** [1] - 5:18
**ROBERTA** [1] - 2:21
**robust** [2] - 215:14, 215:24
**rockets** [1] - 47:9
**Rockland** [4] - 3:9, 204:4, 204:5, 204:24
**role** [1] - 179:7
**roll** [3] - 53:11, 53:25, 147:2
**rolled** [1] - 166:1
**room** [1] - 65:2
**Roseland** [1] - 1:21
**rough** [1] - 51:1
**roughly** [11] - 46:12, 46:25, 78:20,

150:11, 150:13, 163:9, 195:16, 195:19, 234:4, 236:23, 236:24
**route** [1] - 157:22
**routes** [3] - 156:11, 157:3, 157:9
**rug** [1] - 218:8
**rule** [2] - 40:23, 133:7
**ruled** [1] - 131:18
**ruling** [1] - 259:24
**run** [8] - 7:9, 19:7, 25:14, 42:25, 162:13, 170:25, 263:15, 279:10
**running** [3] - 97:23, 115:18, 197:13
**rushed** [1] - 29:5

## S

**safeguards** [1] - 96:22
**SafestreetsJC** [1] - 3:9
**sake** [4] - 92:17, 92:19, 166:20, 222:22
**Salmon** [1] - 70:15
**SAMANTHA** [1] - 2:5
**Samantha** [1] - 5:13
**satisfaction** [1] - 267:9
**satisfied** [2] - 263:20, 267:4
**save** [1] - 217:7
**saw** [2] - 198:24, 277:4
**scale** [6] - 11:3, 35:8, 69:22, 70:4, 75:7, 215:21
**scenario** [65] - 18:12, 40:19, 60:7, 61:22, 62:1, 62:14, 64:17, 77:1, 77:4, 114:23, 157:8, 192:25, 193:3, 193:4, 198:14, 206:20, 206:23, 207:3, 207:15, 207:16, 207:25, 208:2, 209:21, 210:10, 210:12, 210:13, 211:1, 225:13, 225:14, 225:25, 229:13, 235:24, 236:4, 236:12, 237:16, 238:23, 238:24, 239:6, 239:25, 240:2, 240:7, 240:8,

240:18, 241:9,
241:16, 244:13,
244:24, 249:13,
261:25, 262:9,
264:17, 264:19,
264:21, 264:25,
265:3, 265:5, 265:10
**Scenario** [3] - 258:7,
258:12, 258:14
**scenarios** [38] - 20:15,
20:21, 20:24, 21:5,
24:10, 29:12, 40:18,
53:8, 59:10, 60:22,
61:19, 62:4, 62:19,
64:18, 66:21, 66:22,
80:7, 80:12, 206:21,
208:16, 210:15,
225:25, 236:7,
236:18, 236:21,
237:8, 238:20,
240:17, 241:18,
243:16, 253:1,
253:6, 262:5, 263:8,
263:17, 264:15,
264:21, 264:24
**scenes** [1] - 195:7
**schedule** [15] - 34:11,
34:15, 34:21, 40:22,
40:25, 41:13, 48:16,
76:7, 83:23, 127:20,
136:22, 142:13,
195:17
**scheduled** [1] - 197:2
**scheme** [33] - 7:5,
10:15, 10:23, 11:7,
12:24, 18:7, 18:18,
19:3, 21:18, 22:21,
22:23, 25:7, 30:21,
53:14, 65:22, 67:19,
69:6, 70:10, 70:11,
71:5, 71:11, 71:22,
85:9, 86:17, 87:7,
88:2, 102:1, 184:14,
184:25, 223:3,
239:25, 260:5
**schemes** [7] - 12:25,
35:16, 50:7, 70:9,
77:18, 77:22, 100:5
**school** [1] - 179:8
**School** [1] - 280:21
**schools** [6] - 52:9,
144:10, 145:20,
160:12, 175:5,
193:12
**Science** [1] - 3:10
**scope** [6] - 11:2,
69:22, 70:4, 84:23,
104:15, 111:2
**scratch** [1] - 29:17
**screen** [7] - 150:20,

214:13, 235:20,
249:7, 266:24,
271:16, 271:22
**screened** [4] - 248:9,
249:18, 249:23,
250:1
**screening** [18] - 146:1,
161:3, 215:21,
232:19, 233:2,
233:3, 233:5, 233:7,
239:5, 248:14,
254:15, 255:10,
255:11, 255:13,
256:12, 264:25
**screwed** [1] - 107:19
**scrutiny** [1] - 67:18
**se** [2] - 129:7, 133:3
**search** [1] - 90:2
**seated** [1] - 83:24
**seats** [1] - 5:22
**second** [25] - 10:12,
47:20, 50:2, 51:6,
51:17, 55:25, 76:22,
80:20, 82:3, 82:11,
82:18, 121:19,
122:10, 128:17,
128:25, 134:8,
134:21, 139:23,
174:1, 213:20,
223:7, 227:17,
232:18, 234:15,
241:14
**secondly** [2] - 95:8,
122:2
**seconds** [6] - 14:19,
63:24, 73:7, 83:9,
182:6, 250:23
**SECTION** [1] - 2:4
**section** [7] - 32:4,
48:14, 97:13, 100:9,
124:4, 151:9, 190:13
**Section** [1] - 85:18
**sections** [2] - 248:25,
249:1
**see** [29] - 27:18, 30:1,
41:1, 64:10, 88:6,
103:15, 112:15,
118:12, 118:13,
122:10, 125:15,
140:15, 140:16,
141:8, 141:11,
175:7, 195:22,
198:21, 198:23,
203:13, 203:15,
203:17, 210:2,
210:6, 214:17,
225:21, 230:19,
235:11, 273:1
**seeing** [1] - 264:10
**seek** [1] - 67:11

**seeking** [2] - 129:13,
244:7
**seem** [4] - 77:25,
111:16, 181:16
**sees** [1] - 251:1
**segment** [1] - 194:20
**segments** [2] - 142:4,
239:6
**selected** [1] - 238:14
**selection** [3] - 62:24,
223:18, 236:12
**self** [2] - 125:11,
127:15
**self-fulfilling** [1] -
125:11
**self-serving** [1] -
127:15
**Semper** [1] - 278:15
**sense** [11] - 163:15,
166:19, 166:22,
168:17, 168:21,
171:1, 196:7,
196:20, 211:17,
263:7, 267:20
**sensitivity** [1] - 259:16
**sent** [1] - 173:5
**sentence** [3] - 169:17,
170:10, 170:11
**sentences** [1] - 170:15
**separate** [3] - 184:16,
184:17, 186:21
**September** [3] -
212:10, 213:2, 213:8
**sequentially** [1] -
234:11
**series** [3] - 168:19,
226:8, 255:22
**seriously** [1] - 217:25
**servants** [1] - 123:20
**serve** [2] - 123:20,
139:7
**Service** [1] - 134:25
**service** [1] - 123:21
**serving** [1] - 127:15
**SESSION** [1] - 128:5
**set** [14] - 33:1, 58:18,
61:6, 81:12, 81:18,
122:5, 126:23,
171:9, 171:25,
221:25, 222:1,
259:25, 267:5,
271:21
**sets** [1] - 172:19
**setting** [5] - 43:25,
81:6, 82:5, 130:14,
136:16
**seven** [14] - 20:15,
20:21, 20:24, 52:25,
53:8, 59:10, 106:21,
106:24, 107:7,

107:21, 160:6,
177:19, 198:14,
273:23
**Seventh** [1] - 127:11
**several** [6] - 92:11,
92:13, 93:23, 192:5,
192:15, 260:16
**severe** [2] - 85:4,
224:23
**shall** [4] - 77:16,
85:24, 86:2, 89:15
**shape** [2] - 197:10,
243:24
**share** [3] - 50:13,
74:6, 116:16
**shared** [1] - 50:10
**shares** [1] - 204:2
**SHARI** [1] - 2:12
**Shari** [1] - 5:14
**sharing** [5] - 16:20,
16:23, 17:1, 17:13,
142:24
**shift** [2] - 128:15,
211:1
**shore** [2] - 12:23,
202:8
**short** [7] - 11:6, 90:13,
93:11, 117:4,
122:13, 122:17,
259:19
**shorter** [1] - 83:22
**shortly** [2] - 128:16,
196:22
**should've** [1] - 176:8
**shoulder** [1] - 181:3
**show** [15] - 38:8, 58:5,
93:2, 93:17, 102:12,
108:1, 113:12,
168:16, 183:2,
214:6, 222:9,
225:25, 266:20,
266:22, 277:13
**showed** [2] - 102:24,
126:17, 147:13,
156:12, 163:3,
177:16, 181:18,
181:21, 229:4,
231:20, 247:22,
269:14
**showing** [3] - 129:23,
214:18, 253:16
**shown** [2] - 58:7,
96:18
**shows** [14] - 51:11,
59:14, 204:15,
206:16, 215:25,
219:6, 224:2,
237:19, 239:13,
245:15, 250:10,
252:8, 272:1, 272:21

**shred** [1] - 29:17
**shrink** [1] - 197:7
**side** [13] - 17:10,
17:11, 17:13, 30:12,
66:7, 66:8, 100:9,
100:16, 130:7,
146:3, 235:15,
239:23, 246:14
**sides** [2] - 7:9, 121:7
**Sierra** [1] - 218:1
**sight** [1] - 154:6
**signal** [1] - 166:4
**signed** [4] - 43:8,
43:9, 78:2, 244:15
**significance** [7] -
13:19, 85:19, 95:15,
96:19, 126:4,
218:18, 255:23
**significant** [65] -
10:24, 11:5, 11:16,
11:25, 12:4, 12:14,
12:21, 14:8, 18:5,
19:5, 20:25, 34:5,
72:24, 73:19, 81:10,
85:19, 85:21, 85:23,
85:25, 86:4, 86:19,
89:14, 89:17, 89:21,
89:23, 92:1, 92:2,
92:7, 92:21, 93:1,
93:9, 93:10, 93:13,
93:19, 94:14, 96:12,
96:13, 96:16, 97:1,
101:8, 103:7,
111:21, 114:22,
114:25, 123:6,
125:2, 178:14,
178:17, 205:11,
205:16, 205:18,
207:24, 208:13,
215:20, 217:16,
218:21, 218:24,
219:2, 243:21,
246:8, 247:1,
252:13, 252:14,
253:22, 259:11
**significantly** [1] - 96:2
**signing** [2] - 43:23,
44:7
**SILAGI** [1] - 2:8
**silence** [1] - 183:19
**silo** [3] - 67:10, 67:11,
67:17
**siloed** [2] - 49:5, 49:8
**similar** [4] - 22:1,
253:5, 254:4, 268:21
**similarly** [2] - 114:6,
255:20
**simmons** [1] - 127:10
**simple** [7] - 26:22,
36:23, 87:2, 87:13,

99:4, 108:5, 113:13
**simply** [1] - 27:7
**simulates** [1] - 235:6
**simultaneous** [1] - 156:8
**single** [11] - 6:1, 72:9, 89:7, 89:8, 100:21, 100:22, 102:8, 103:20, 103:21, 258:12, 258:18
**single-page** [1] - 258:18
**SIP** [2] - 220:17, 220:18
**sirens** [1] - 280:23
**sit** [2] - 5:24, 122:17
**site** [1] - 134:19
**sites** [1] - 145:19
**sitting** [1] - 179:14
**situated** [2] - 114:6, 133:13
**situation** [8] - 77:11, 86:18, 86:20, 86:25, 88:4, 172:18, 220:15, 257:19
**situations** [1] - 37:9
**SIVE** [1] - 2:15
**Sive** [1] - 5:16
**six** [14] - 107:22, 107:23, 109:6, 112:13, 115:24, 198:15, 201:18, 202:24, 209:17, 221:23, 222:15, 222:25, 223:12, 228:8
**Sixth** [4] - 130:19, 134:12, 135:1, 135:8
**skepticism** [2] - 127:14, 170:20
**skewed** [1] - 210:9
**ski** [3] - 57:1, 57:6
**Skies** [2] - 255:17, 268:18
**skip** [1] - 201:10
**sky** [1] - 126:23
**slapdash** [4] - 26:19, 57:15, 58:2, 65:17
**slide** [70] - 20:10, 25:19, 31:14, 59:5, 59:6, 60:11, 60:12, 62:10, 62:16, 67:21, 69:11, 69:12, 74:18, 75:13, 80:1, 80:18, 100:4, 101:5, 102:19, 103:8, 104:11, 108:20, 108:23, 114:1, 117:22, 118:12, 118:16, 137:3,

147:13, 148:1, 159:11, 159:15, 174:24, 174:25, 175:18, 176:1, 176:2, 176:20, 176:24, 178:13, 183:1, 191:12, 201:9, 203:12, 204:13, 204:15, 209:9, 209:16, 209:19, 210:1, 210:11, 213:3, 214:7, 214:13, 214:15, 214:16, 214:17, 215:13, 219:11, 221:12, 224:25, 227:18, 227:19, 229:9, 233:23, 239:11, 247:20, 247:25, 251:1
**slides** [19] - 6:25, 31:25, 32:14, 32:18, 101:2, 105:7, 137:1, 140:6, 144:20, 147:24, 148:18, 148:19, 159:6, 197:20, 211:11, 222:7, 237:8, 250:22, 252:25
**slightly** [4] - 35:24, 55:14, 202:8, 257:23
**slow** [3] - 34:7, 90:5, 216:5
**slowly** [1] - 83:12
**small** [5] - 89:2, 89:3, 236:6, 236:18, 259:7
**smaller** [1] - 155:11
**smallest** [1] - 206:24
**smart** [1] - 279:24
**Smart** [1] - 134:16
**so..** [1] - 273:24
**Social** [1] - 135:9
**society** [1] - 187:8
**Sokolich** [1] - 6:7
**sole** [2] - 126:6, 126:7
**solely** [4] - 75:2, 199:17, 251:9, 277:3
**solve** [2] - 72:12, 259:23
**Soma** [2] - 3:7, 3:10
**someone** [1] - 103:14
**someplace** [1] - 250:5
**Somerset** [1] - 204:25
**sometime** [1] - 47:2
**somewhat** [1] - 273:16
**somewhere** [10] - 42:9, 78:17, 138:24, 143:10, 189:17,

189:21, 202:2, 207:14, 241:10, 277:13
**soon** [2] - 167:8, 187:13
**sorry** [26] - 15:12, 16:1, 33:4, 40:6, 52:21, 55:16, 61:12, 61:16, 75:5, 83:5, 107:12, 108:15, 125:21, 132:6, 150:19, 151:6, 161:21, 176:2, 203:10, 207:20, 241:3, 254:20, 266:4, 274:6, 280:7
**sort** [17] - 51:20, 79:12, 130:20, 141:11, 145:15, 154:2, 161:3, 185:5, 218:8, 235:14, 238:24, 239:3, 249:16, 265:8, 271:22, 272:25, 277:1
**sorts** [1] - 214:19
**sought** [2] - 15:7, 67:12
**sound** [1] - 176:9
**Source** [1] - 258:13
**source** [8] - 50:19, 142:15, 142:20, 171:8, 183:22, 183:25, 184:2, 186:11
**sources** [3] - 143:3, 184:24, 265:19
**South** [4] - 3:12, 13:25, 89:7, 119:11
**southern** [3] - 105:11, 133:25, 202:9
**Southern** [4] - 95:25, 133:10, 134:12, 134:15
**space** [2] - 144:11, 160:12
**SpaceX's** [1] - 47:9
**SPALDING** [1] - 1:15
**speaking** [4] - 163:22, 193:8, 277:3, 279:4
**speaks** [1] - 50:7
**special** [4] - 170:24, 198:19, 210:8, 280:22
**specially** [1] - 199:1
**specific** [67] - 7:22, 37:23, 42:5, 61:24, 75:23, 75:24, 77:10, 97:2, 101:14, 101:22, 102:15,

103:5, 103:6, 109:13, 112:22, 112:24, 113:18, 116:4, 116:9, 116:14, 123:3, 123:4, 123:5, 135:16, 136:19, 136:21, 138:1, 138:13, 140:8, 144:6, 146:10, 158:23, 160:4, 164:8, 164:22, 165:3, 165:7, 165:10, 165:13, 166:14, 166:15, 167:11, 167:12, 174:12, 176:15, 180:8, 181:25, 183:15, 183:18, 185:8, 186:8, 187:19, 187:23, 190:16, 191:13, 191:19, 191:22, 192:23, 198:2, 231:17, 239:14, 247:25, 254:9, 259:14, 259:16, 270:1
**specifically** [22] - 53:13, 53:14, 64:19, 68:18, 71:9, 82:8, 82:14, 95:23, 112:16, 115:4, 121:13, 138:3, 188:3, 194:1, 194:3, 198:3, 200:14, 219:22, 250:10, 252:9, 271:20, 280:1
**specification** [1] - 189:20
**specificity** [7] - 23:23, 146:5, 153:24, 165:17, 183:19, 188:16, 193:24
**specifics** [3] - 53:12, 53:13, 85:11
**specified** [5] - 43:16, 72:8, 173:13, 189:17, 215:8
**specify** [1] - 186:5
**spectrum** [3] - 37:6, 38:3, 38:4
**speculating** [1] - 28:5
**speculation** [2] - 28:11, 36:4
**spell** [1] - 101:13
**spelled** [4] - 180:18, 180:22, 212:16, 256:1
**spells** [2] - 43:24,

95:23
**spend** [2] - 116:14, 180:5
**spent** [1] - 116:15
**sponsor** [3] - 7:16, 96:9, 133:12
**sponsored** [1] - 171:24
**sponsoring** [1] - 118:7
**sponsors** [14] - 43:13, 43:23, 44:1, 71:19, 78:19, 122:3, 125:2, 131:12, 132:4, 145:22, 152:15, 191:23, 192:3, 195:6
**spot** [1] - 128:17
**spots** [2] - 209:23, 210:2
**spread** [1] - 138:14
**sprinkle** [1] - 86:10
**square** [8] - 78:4, 110:1, 110:11, 110:17, 110:19, 138:18, 139:3, 233:21
**Square** [1] - 1:9
**stable** [2] - 50:19, 171:8
**stage** [3] - 33:1, 81:12, 171:9
**Stand** [1] - 168:7
**stand** [3] - 7:10, 50:10, 185:17
**standard** [21] - 28:2, 28:4, 36:15, 36:22, 37:1, 38:13, 38:25, 40:1, 40:4, 45:5, 73:9, 73:10, 73:15, 92:6, 92:22, 95:17, 130:20, 224:10, 249:24, 265:21, 268:22
**standardized** [1] - 255:2
**standards** [7] - 38:21, 81:23, 204:21, 211:4, 219:17, 265:6, 266:17
**Standards** [1] - 204:7
**standing** [4] - 15:20, 88:16, 186:3, 197:12
**standpoint** [2] - 224:22, 224:23
**stark** [1] - 161:20
**start** [17] - 10:14, 29:17, 37:4, 37:21, 57:13, 106:19, 106:23, 132:15, 143:25, 197:9,

207:9, 207:20,
229:9, 233:24,
234:25, 278:10,
280:12
**started** [7] - 51:18,
201:25, 226:5,
226:16, 251:9,
251:10, 269:8
**starting** [5] - 107:4,
107:5, 197:18,
233:23, 278:12
**starts** [2] - 19:6, 62:15
**State** [16] - 3:11, 5:4,
5:9, 7:3, 33:13, 99:1,
105:10, 110:20,
115:6, 116:6, 133:7,
133:16, 133:25,
173:22, 181:24,
216:8
**STATE** [1] - 1:3
**state** [33] - 7:14, 7:20,
25:15, 34:10, 34:14,
34:15, 40:23, 74:22,
74:23, 75:15, 83:19,
85:24, 86:2, 86:13,
86:18, 86:24, 89:15,
105:12, 120:17,
129:7, 130:19,
152:16, 155:15,
178:11, 178:15,
188:13, 202:9,
220:18, 223:20,
254:12, 256:16,
270:1
**State's** [1] - 36:2
**statement** [35] - 10:17,
11:1, 31:1, 41:10,
51:18, 53:11, 54:8,
56:1, 73:17, 73:20,
87:14, 90:14, 91:2,
91:5, 91:21, 91:24,
92:20, 92:23, 93:5,
93:14, 94:13, 94:23,
95:1, 95:6, 95:8,
95:9, 96:17, 123:8,
125:4, 129:4, 155:3,
170:22, 190:16,
190:18, 192:2
**statements** [7] -
68:10, 68:11, 86:18,
87:9, 127:15,
130:16, 191:22
**States** [2] - 5:2, 5:4
**states** [10] - 33:20,
35:4, 48:10, 70:20,
74:24, 86:20, 87:11,
88:4, 220:15, 221:8
**STATES** [6] - 1:1, 1:6,
1:12, 2:3, 2:8, 2:11
**stationary** [1] - 248:13

**status** [2] - 38:18,
79:13
**statute** [15] - 25:14,
39:21, 42:25, 44:6,
66:3, 87:8, 87:17,
90:20, 136:1,
136:12, 171:6,
171:7, 173:14,
173:21, 173:22
**statutes** [2] - 39:3,
81:22
**statutory** [2] - 145:7,
223:3
**stay** [3] - 83:24,
121:19, 216:11
**stays** [2] - 166:20,
277:22
**stenography** [1] - 1:24
**step** [6] - 43:11, 72:1,
82:6, 103:22,
160:16, 275:3
**steps** [6] - 18:14, 79:5,
138:20, 165:14,
181:16, 226:8
**still** [14] - 17:11,
18:14, 22:15, 79:8,
97:5, 111:13, 164:7,
166:5, 188:11,
192:15, 229:15,
229:19, 261:21,
265:20
**stone** [1] - 23:2
**stop** [18] - 8:5, 41:14,
55:25, 60:10,
104:12, 106:2,
127:2, 137:13,
154:23, 161:6,
182:5, 197:6, 199:3,
201:21, 201:23,
212:13, 222:24
**stopped** [1] - 59:3
**straight** [1] - 174:21
**straightforward** [1] -
117:12
**strains** [1] - 16:15
**Street** [3] - 2:5, 2:9,
3:7
**street** [2] - 2:13, 22:14
**streets** [3] - 235:9,
237:24, 238:10
**strengths** [3] - 30:13,
44:15, 243:12
**strictly** [1] - 161:4
**strikes** [1] - 37:23
**structure** [12] - 25:22,
25:25, 55:15, 56:14,
58:6, 60:25, 71:11,
125:9, 164:10,
167:7, 243:15,
244:10

**stud** [1] - 265:22
**studied** [38] - 20:15,
24:10, 60:1, 65:20,
92:12, 95:14,
105:24, 106:1,
107:1, 107:16,
107:18, 118:15,
156:9, 198:13,
198:22, 199:2,
203:14, 203:18,
203:20, 204:4,
204:16, 205:1,
206:17, 209:23,
210:7, 218:8, 224:5,
224:24, 229:11,
229:12, 229:14,
261:11, 261:24,
263:8, 266:9, 266:15
**studies** [2] - 81:9,
205:10
**study** [45] - 8:11, 9:21,
65:19, 74:20, 88:1,
88:10, 95:15, 105:7,
105:18, 105:22,
107:2, 118:21,
119:9, 119:13,
130:23, 201:12,
201:15, 204:23,
205:17, 205:21,
205:25, 206:3,
221:13, 221:20,
221:21, 222:14,
244:22, 245:3,
251:2, 251:4,
261:15, 261:16,
261:24, 265:22,
265:23, 266:7,
266:13, 269:12,
269:14, 271:6,
271:9, 271:13,
272:3, 272:8, 272:23
**studying** [1] - 110:23
**stuff** [3] - 123:14,
174:14, 174:15
**subject** [11] - 21:22,
48:2, 56:8, 56:11,
73:25, 142:20,
171:22, 172:2,
200:10, 268:17,
279:21
**submission** [2] - 58:2,
99:1
**submissions** [2] -
60:3, 173:5
**submit** [12] - 28:15,
35:24, 57:25, 58:1,
66:18, 91:2, 91:21,
201:8, 213:17,
215:9, 276:19
**submitted** [6] - 33:17,

201:7, 213:16,
213:20, 215:3, 261:8
**submitting** [2] - 215:4,
215:7
**subsequent** [7] -
34:19, 44:25, 45:22,
66:5, 66:9, 72:5,
77:10
**subset** [2] - 274:23,
274:24
**substantial** [25] -
11:24, 12:1, 12:2,
13:20, 17:7, 21:15,
21:21, 27:11, 27:19,
27:20, 37:10, 37:12,
37:19, 48:17, 48:22,
59:15, 66:17, 66:18,
73:18, 76:10, 89:20,
94:7, 136:5, 185:13,
236:14
**substantially** [1] -
185:19
**substantive** [2] -
39:21, 82:12
**substitute** [7] - 37:14,
40:12, 40:13, 59:16,
66:16, 76:19, 199:12
**subway** [1] - 10:6
**suddenly** [1] - 125:13
**sue** [2] - 19:9, 25:8
**sued** [1] - 19:9
**suffers** [1] - 274:11
**suffice** [1] - 101:10
**sufficiency** [1] - 153:8
**sufficient** [9] - 13:21,
92:4, 124:13,
179:24, 180:4,
180:22, 190:19,
190:21, 217:15
**sufficiently** [3] -
96:23, 97:4, 110:23
**Suffolk** [8] - 203:14,
203:15, 203:17,
203:24, 204:2,
204:4, 204:24, 205:1
**suggest** [6] - 12:19,
21:11, 34:13, 78:8,
195:6, 220:22
**suggesting** [5] -
28:14, 111:5,
111:10, 178:23,
196:4
**suit** [1] - 20:2
**Suite** [1] - 1:20
**sulfur** [1] - 205:8
**summary** [3] - 36:7,
163:24, 194:13
**super** [1] - 280:19
**Supp** [3] - 38:19,
91:22, 134:17

**supplement** [3] - 22:4,
45:10, 67:11
**supplemental** [5] -
27:10, 27:22, 41:9,
49:1, 76:8
**supplemented** [2] -
22:12, 45:8
**support** [7] - 15:19,
69:5, 75:21, 119:2,
180:17, 220:7, 221:2
**supported** [2] - 13:20,
230:15
**supporting** [1] - 39:25
**supposed** [20] - 36:22,
39:4, 40:11, 42:22,
48:18, 61:2, 81:1,
85:6, 85:21, 86:12,
87:20, 91:7, 91:9,
91:11, 92:7, 95:5,
178:11, 179:15,
188:9, 268:8
**Supreme** [9] - 13:13,
13:16, 37:11, 37:22,
76:21, 77:1, 90:21,
260:21, 262:16
**surface** [1] - 238:10
**surmise** [1] - 57:20
**surprised** [1] - 20:7
**surrogate** [2] - 51:1,
199:9
**suspect** [2] - 46:20,
131:9
**suspicion** [2] - 77:15,
170:22
**Sustainability** [1] -
3:11
**swath** [1] - 70:4
**sweep** [1] - 67:3
**sweeping** [1] - 218:8
**swish** [3] - 123:12
**switch** [2] - 84:19,
166:21
**switched** [1] - 210:13
**switching** [1] - 241:9
**synonym** [1] - 73:11
**Systems** [1] - 134:24
**systems** [2] - 12:13,
175:6

## T

**T-2** [9] - 118:22,
120:14, 121:16,
126:19, 129:1,
129:16, 129:24,
130:2, 172:6
**Table** [3] - 258:6,
258:11, 258:13
**table** [2] - 120:8, 258:1
**tad** [1] - 90:6

**tagline** [1] - 211:15
**taglines** [2] - 210:18, 211:6
**talismanic** [1] - 177:15
**talks** [9] - 74:2, 76:25, 80:13, 169:18, 180:20, 214:17, 214:19, 214:22, 220:9
**target** [1] - 166:20
**TBD** [1] - 166:5
**TBTA** [7] - 5:17, 52:23, 56:14, 71:4, 152:15, 153:9, 166:18
**TBTA's** [1] - 167:7
**Team** [1] - 3:10
**Technical** [5] - 152:16, 160:22, 164:18, 187:20, 194:24
**technical** [6] - 144:16, 165:9, 189:24, 190:14, 241:7, 257:7
**technically** [1] - 145:5
**ten** [28] - 14:9, 69:21, 83:22, 84:8, 105:24, 108:14, 117:9, 128:10, 141:8, 174:5, 182:6, 196:22, 197:4, 202:24, 203:6, 207:21, 218:9, 223:11, 251:4, 251:14, 251:17, 252:13, 252:15, 265:24, 269:14, 269:17, 269:19, 273:6
**Ten** [1] - 174:6
**ten-county** [4] - 269:14, 269:17, 269:19, 273:6
**ten-minute** [1] - 196:22
**tend** [1] - 104:19
**tends** [1] - 24:24
**Tenth** [1] - 21:25
**term** [7] - 10:2, 52:7, 60:3, 91:4, 248:11, 257:7, 261:1
**terminology** [1] - 248:12
**terms** [28] - 23:5, 24:14, 38:9, 39:16, 43:24, 48:23, 68:12, 131:19, 151:10, 163:19, 164:4, 165:4, 169:18, 171:12, 184:23, 185:23, 193:22,

194:22, 203:15, 203:23, 211:7, 219:14, 223:25, 264:1, 264:4, 265:22, 269:22, 271:9
**terrible** [1] - 123:14
**test** [2] - 174:20, 257:3
**testing** [1] - 257:4
**tests** [1] - 257:5
**Texas** [1] - 95:25
**text** [1] - 190:8
**thankfully** [1] - 185:1
**THE** [923] - 1:1, 1:12, 5:3, 5:20, 6:8, 6:15, 6:23, 8:5, 8:18, 8:21, 8:24, 9:1, 9:9, 9:11, 9:16, 9:24, 10:2, 10:7, 11:10, 11:12, 12:3, 12:11, 12:18, 13:7, 13:10, 14:3, 14:5, 14:8, 15:18, 15:25, 16:2, 16:9, 16:13, 16:22, 16:25, 17:4, 17:8, 17:16, 17:23, 18:1, 18:9, 18:14, 19:25, 20:4, 23:9, 23:12, 23:16, 23:22, 24:1, 24:6, 24:17, 24:21, 26:14, 26:21, 26:24, 27:6, 27:8, 27:17, 27:25, 28:5, 28:10, 28:20, 29:1, 30:4, 31:3, 31:16, 31:19, 32:10, 32:16, 32:19, 32:23, 33:4, 33:7, 33:10, 34:6, 35:15, 35:19, 36:10, 36:13, 36:17, 36:20, 37:3, 38:16, 38:23, 39:2, 39:7, 39:9, 39:18, 40:5, 40:7, 40:10, 40:16, 41:14, 41:23, 41:25, 42:4, 42:8, 42:11, 42:14, 42:18, 42:22, 43:4, 43:11, 43:19, 44:3, 44:9, 44:14, 44:18, 44:22, 44:24, 45:2, 45:10, 45:13, 45:16, 45:21, 46:1, 46:8, 46:17, 46:21, 46:24, 47:2, 47:7, 47:12, 47:21, 48:4, 48:6, 48:12, 48:14, 48:19, 48:22, 49:5, 49:10, 49:13, 49:17, 49:19, 50:4, 50:22, 50:24, 51:3, 52:4, 52:11, 52:19, 52:25,

53:3, 53:11, 53:18, 53:25, 54:3, 54:17, 54:24, 55:5, 55:16, 55:18, 55:25, 56:4, 56:12, 56:15, 56:22, 57:20, 58:4, 58:8, 58:25, 59:3, 59:7, 59:9, 59:12, 60:8, 60:10, 60:13, 60:16, 61:5, 61:12, 61:14, 61:17, 61:21, 62:6, 62:9, 62:21, 63:8, 63:10, 63:15, 63:19, 63:22, 64:2, 64:5, 64:9, 64:24, 65:1, 65:5, 65:8, 65:24, 66:24, 67:2, 67:7, 67:13, 68:2, 68:7, 69:11, 69:13, 69:16, 70:19, 70:22, 71:3, 71:9, 71:13, 71:17, 71:21, 71:24, 72:22, 73:2, 73:7, 73:21, 73:23, 74:4, 74:8, 74:12, 74:16, 74:22, 74:24, 75:2, 75:5, 75:10, 75:15, 76:2, 76:4, 76:12, 76:14, 76:18, 77:12, 77:14, 78:7, 79:16, 79:20, 80:1, 80:3, 80:8, 80:11, 80:15, 80:17, 80:25, 81:20, 81:25, 82:8, 82:12, 82:19, 82:24, 83:3, 83:8, 83:11, 83:17, 83:19, 83:21, 84:1, 84:6, 84:10, 86:16, 86:23, 87:2, 87:5, 87:7, 88:2, 88:16, 88:19, 88:24, 90:5, 90:17, 91:4, 91:16, 91:18, 92:13, 92:16, 92:22, 93:4, 93:8, 93:12, 93:21, 94:4, 94:15, 94:19, 94:22, 95:1, 95:4, 95:13, 95:19, 97:8, 97:14, 98:9, 98:11, 98:15, 98:20, 98:25, 99:4, 99:8, 100:1, 101:24, 102:4, 102:11, 102:18, 104:10, 104:12, 105:9, 105:17, 105:20, 106:2, 106:6, 106:16, 106:18, 106:23, 107:4, 107:11, 107:14, 107:17, 107:20, 107:23, 108:3,

108:7, 108:9, 108:11, 108:14, 109:2, 109:6, 109:9, 109:20, 109:23, 110:1, 110:3, 110:6, 110:8, 110:11, 110:20, 111:4, 111:20, 111:25, 112:6, 112:11, 112:16, 112:22, 113:1, 113:13, 113:23, 115:6, 115:11, 115:14, 115:20, 115:24, 116:15, 116:22, 117:6, 117:9, 118:17, 119:15, 119:19, 119:25, 120:5, 120:10, 120:13, 120:22, 121:9, 121:11, 121:14, 121:17, 121:19, 121:21, 121:23, 122:8, 122:14, 122:16, 122:19, 122:21, 123:7, 123:21, 124:7, 124:10, 124:12, 124:24, 125:6, 125:19, 126:2, 126:13, 127:2, 127:6, 127:9, 127:17, 127:19, 128:7, 128:11, 128:17, 129:10, 129:13, 129:17, 131:1, 131:5, 131:8, 131:10, 131:17, 132:1, 132:15, 132:18, 132:21, 132:25, 133:18, 134:2, 134:5, 134:8, 134:10, 134:18, 134:20, 134:23, 135:4, 135:12, 135:14, 135:21, 136:10, 136:14, 136:18, 136:23, 137:3, 137:5, 137:7, 137:13, 138:5, 138:10, 138:16, 138:24, 139:9, 139:13, 139:24, 140:14, 140:20, 140:24, 141:3, 141:9, 141:13, 141:17, 141:23, 142:1, 142:8, 142:15, 142:24, 143:6, 143:10, 143:16, 143:22,

144:12, 144:24, 145:7, 145:13, 146:2, 146:10, 146:14, 146:20, 147:2, 147:11, 147:15, 147:23, 148:3, 148:12, 148:14, 148:16, 148:20, 148:23, 149:9, 149:15, 149:18, 149:22, 150:1, 150:8, 150:11, 150:13, 150:22, 150:24, 151:14, 151:20, 151:24, 152:3, 152:18, 152:23, 153:4, 153:10, 153:21, 153:24, 154:5, 154:23, 154:25, 155:10, 155:20, 156:1, 156:20, 156:23, 157:17, 157:25, 158:5, 158:8, 158:10, 158:12, 158:15, 158:19, 159:11, 159:14, 159:17, 161:6, 162:1, 162:6, 162:8, 162:11, 163:9, 163:11, 163:15, 163:21, 164:15, 164:25, 165:14, 165:18, 165:20, 165:23, 166:10, 166:19, 167:9, 167:14, 167:16, 168:3, 168:17, 169:5, 169:13, 170:8, 170:14, 170:21, 170:25, 171:14, 171:18, 171:22, 172:2, 172:4, 172:10, 172:12, 172:22, 172:25, 173:7, 173:16, 173:21, 173:25, 174:4, 174:6, 175:24, 176:1, 176:3, 176:23, 176:25, 178:22, 179:3, 179:5, 179:20, 180:7, 180:15, 180:23, 181:2, 181:19, 182:4, 182:9, 182:11, 182:14, 182:19, 182:21, 182:23, 183:8, 183:17,

183:24, 184:5,
184:13, 184:16,
184:18, 184:22,
185:3, 185:7,
185:15, 186:2,
186:10, 186:12,
186:14, 186:17,
186:22, 186:24,
187:2, 187:5,
187:11, 187:14,
187:17, 187:21,
188:8, 188:11,
188:18, 188:20,
188:23, 189:3,
189:7, 189:9,
189:11, 189:13,
189:19, 189:23,
190:1, 190:5, 190:7,
190:15, 190:19,
190:21, 190:25,
191:2, 191:4, 191:7,
192:7, 192:9,
192:12, 192:15,
192:20, 193:13,
193:19, 194:4,
194:6, 194:8,
194:11, 194:16,
195:9, 195:14,
195:16, 196:4,
196:9, 196:11,
196:13, 196:16,
196:19, 196:21,
196:25, 197:5,
199:3, 199:5,
199:16, 199:21,
200:2, 200:5,
200:16, 200:19,
200:24, 201:3,
201:6, 201:21,
201:23, 202:2,
202:5, 202:8,
202:12, 202:15,
202:19, 202:23,
203:9, 203:11,
204:13, 204:20,
205:2, 205:6,
205:13, 206:2,
206:7, 206:11,
206:15, 207:5,
207:9, 207:12,
208:5, 208:9,
208:13, 208:16,
208:18, 209:9,
210:16, 210:20,
211:20, 211:24,
212:1, 212:13,
212:19, 212:24,
213:1, 213:4, 213:8,
213:11, 213:14,
213:16, 213:20,
213:25, 214:3,

214:7, 214:10,
214:15, 216:5,
216:18, 216:20,
216:22, 216:24,
217:4, 217:13,
217:21, 218:14,
218:16, 219:9,
219:19, 219:24,
220:6, 220:11,
220:23, 221:1,
221:5, 221:9,
221:11, 221:16,
221:24, 222:5,
222:11, 222:17,
222:22, 223:18,
224:9, 226:3,
227:17, 227:20,
230:2, 230:4, 230:9,
230:16, 230:19,
230:21, 230:24,
231:2, 231:8,
231:12, 231:22,
231:24, 232:4,
232:14, 232:18,
232:23, 233:4,
233:14, 233:16,
233:18, 233:25,
234:2, 234:4, 234:7,
234:10, 234:13,
234:15, 234:19,
234:22, 236:8,
236:21, 237:4,
237:7, 237:12,
238:2, 238:7,
238:16, 239:8,
239:11, 239:16,
239:24, 240:2,
240:5, 240:14,
240:23, 241:2,
241:8, 241:21,
241:25, 242:7,
242:16, 243:4,
243:7, 243:17,
243:23, 244:12,
244:16, 244:19,
244:25, 245:4,
245:9, 245:11,
245:19, 246:3,
246:5, 246:12,
246:18, 246:21,
246:24, 247:6,
247:9, 247:14,
247:18, 247:23,
248:2, 248:4, 248:8,
248:16, 248:19,
248:23, 249:3,
249:5, 249:9,
249:19, 249:22,
250:1, 250:3, 250:8,
250:11, 250:15,
250:18, 250:23,

251:3, 251:7, 251:9,
251:14, 251:16,
251:21, 252:6,
252:11, 252:19,
252:23, 253:2,
253:7, 253:18,
253:21, 254:4,
254:17, 254:20,
254:22, 255:3,
255:6, 255:15,
255:19, 255:25,
256:7, 256:9,
256:11, 256:14,
256:22, 256:25,
257:3, 257:20,
257:23, 258:4,
258:11, 258:18,
258:21, 258:24,
259:2, 260:2, 260:4,
260:19, 260:24,
261:1, 261:4,
262:10, 262:22,
263:2, 263:4, 263:9,
263:13, 263:15,
263:18, 263:20,
263:25, 264:4,
265:9, 265:15,
265:17, 266:5,
267:5, 267:13,
267:17, 268:1,
268:7, 268:13,
268:15, 268:23,
268:25, 269:17,
269:21, 270:3,
270:12, 271:1,
271:8, 272:20,
273:5, 273:10,
273:18, 273:21,
273:23, 274:5,
274:7, 274:15,
275:9, 275:14,
275:16, 275:18,
276:2, 276:5, 276:8,
276:13, 277:10,
277:16, 277:18,
277:19, 277:24,
279:5, 279:11,
279:14, 279:20,
280:4, 280:7,
280:10, 280:13,
280:18, 281:2
**theme** [3] - 53:4,
53:12, 240:14
**themes** [1] - 54:1
**themselves** [1] -
230:20
**theoretically** [8] -
27:3, 27:23, 78:21,
139:4, 188:12,
216:13, 251:10,
276:21

**thereafter** [1] - 166:22
**thereby** [1] - 158:15
**therefore** [17] - 22:16,
42:24, 56:11, 61:1,
62:7, 91:21, 129:8,
136:1, 156:25,
169:11, 170:5,
185:18, 185:20,
199:9, 222:20,
264:15, 274:19
**they've** [4] - 176:22,
177:1, 177:2, 260:16
**thick** [1] - 55:16
**Third** [7] - 90:21,
183:1, 255:8,
255:15, 255:20,
262:15, 268:18
**third** [4] - 137:5,
234:4, 234:6, 239:3
**thorough** [1] - 144:5
**Threatened** [2] -
255:17, 268:18
**three** [27] - 61:7,
110:15, 111:16,
111:25, 123:11,
126:16, 126:18,
141:18, 157:13,
169:8, 177:9, 209:8,
209:11, 209:15,
224:14, 225:25,
228:19, 228:22,
229:13, 229:16,
233:11, 239:20,
250:6, 250:22,
255:8, 264:23, 265:1
**three-card** [1] - 123:11
**threshold** [4] - 141:16,
161:4, 271:23,
271:24
**thresholds** [1] -
271:16
**thrilled** [1] - 108:11
**throughout** [10] -
7:23, 11:16, 11:18,
13:4, 32:15, 36:2,
51:14, 96:21,
154:20, 155:24
**throw** [2] - 106:7,
247:5
**thrown** [1] - 232:2
**tied** [3] - 14:2, 220:19,
220:20
**tiering** [1] - 77:8
**ties** [1] - 10:11
**tightly** [6] - 246:2,
247:4, 247:6,
247:10, 247:11,
247:15
**tilt** [1] - 5:22
**timeline** [5] - 18:24,

19:15, 41:16, 41:18,
79:11
**timelines** [1] - 114:20
**timely** [2] - 19:16, 20:2
**timing** [1] - 22:17
**tiny** [5] - 34:7, 135:21,
257:11, 259:11
**title** [4] - 137:3,
137:10, 211:15,
234:2
**TMRB** [1] - 71:5
**today** [24] - 5:17, 9:23,
32:15, 33:9, 36:2,
44:14, 45:20, 47:3,
96:20, 97:20, 134:2,
155:21, 157:8,
162:2, 170:22,
196:3, 196:5,
216:25, 253:25,
256:10, 274:13,
276:4, 278:11, 281:5
**Together** [1] - 3:10
**together** [5] - 247:4,
247:7, 247:10,
247:11, 247:15
**toll** [22] - 21:18, 24:15,
25:25, 34:11, 59:18,
118:24, 130:8,
130:9, 145:16,
156:9, 156:17,
156:25, 157:4,
157:10, 170:3,
170:4, 170:7, 172:6,
238:9, 250:3
**tolled** [1] - 118:1
**tolling** [88] - 12:24,
12:25, 18:7, 18:8,
18:18, 19:3, 20:24,
21:3, 24:14, 25:7,
25:21, 30:21, 34:15,
34:21, 35:16, 40:18,
40:19, 40:22, 40:25,
41:13, 48:16, 50:7,
53:14, 55:15, 56:14,
58:6, 59:23, 60:24,
65:12, 65:22, 66:19,
66:20, 66:23, 70:9,
70:11, 70:12, 70:14,
70:15, 70:16, 70:18,
71:5, 71:11, 71:22,
75:13, 76:7, 77:17,
77:22, 79:12, 83:14,
83:15, 85:8, 102:1,
114:23, 119:5,
119:6, 125:9, 130:6,
130:7, 136:22,
142:13, 153:19,
157:12, 164:10,
167:7, 169:24,
172:8, 184:14,

184:25, 192:25,
193:3, 198:14,
210:9, 210:10,
210:12, 225:24,
225:25, 229:12,
235:24, 239:25,
243:16, 244:13,
253:1, 253:6
**Tolling** [2] - 258:7,
258:12
**tolls** [20] - 26:1, 33:16,
33:20, 35:5, 35:12,
43:9, 53:9, 59:18,
59:21, 69:24, 98:4,
98:5, 117:25, 118:1,
142:23, 185:6,
235:9, 235:10, 252:3
**tomorrow** [27] - 23:14,
36:2, 47:3, 134:3,
145:12, 162:2,
192:16, 195:25,
196:5, 196:8,
196:15, 196:16,
196:17, 196:20,
197:12, 241:24,
256:23, 275:16,
276:22, 277:12,
277:14, 278:10,
278:14, 279:4,
279:16, 279:19,
280:12
**tons** [1] - 89:4
**took** [16] - 7:16, 7:21,
7:24, 8:3, 14:6,
18:24, 30:2, 82:6,
100:20, 100:21,
165:14, 169:22,
269:2, 269:8,
271:12, 271:13
**tool** [18] - 46:6, 47:18,
231:14, 232:19,
233:3, 233:5, 233:7,
241:7, 255:10,
255:13, 270:5,
270:24, 271:2,
271:16, 271:19
**tools** [3] - 206:11,
206:12, 231:18
**top** [6] - 107:21,
158:12, 158:17,
207:21, 214:22,
265:8
**top-line** [1] - 265:8
**topic** [4] - 47:12,
131:3, 197:22,
246:16
**topics** [3] - 14:12,
134:5, 150:14
**total** [3] - 209:23,
271:7, 272:15

**totally** [1] - 26:9
**touch** [2] - 14:12,
197:8
**towards** [3] - 41:17,
141:19, 226:3
**town** [2] - 110:14,
110:15
**towns** [13] - 101:16,
109:21, 109:22,
110:25, 111:14,
111:20, 112:1,
112:20, 114:3,
114:5, 116:8, 155:2
**Township** [1] - 183:1
**Toxic** [1] - 258:13
**toxin** [1] - 214:19
**TP** [1] - 258:16
**track** [1] - 278:11
**tracked** [1] - 10:22
**tracking** [1] - 207:7
**tract** [17] - 140:8,
140:12, 162:14,
163:2, 163:5,
192:24, 193:2,
231:3, 231:9, 232:6,
232:9, 232:15,
254:7, 254:14,
271:5, 272:12,
272:16
**tracts** [58] - 51:25,
52:7, 111:11,
140:10, 140:18,
141:14, 142:14,
160:6, 161:17,
161:23, 162:3,
162:19, 162:21,
164:9, 164:21,
165:6, 167:11,
176:7, 177:16,
177:19, 185:12,
185:18, 185:19,
198:6, 205:22,
206:3, 206:17,
210:6, 211:18,
215:16, 223:15,
224:4, 225:2, 225:3,
227:10, 228:4,
228:7, 228:19,
229:4, 229:17,
232:10, 252:8,
252:12, 253:16,
254:1, 254:2, 255:4,
255:9, 255:12,
261:17, 269:24,
271:6, 272:2, 272:8,
272:22, 272:25,
274:25, 275:2
**TRADE** [1] - 1:12
**Trade** [1] - 5:2
**traffic** [101] - 21:2,

21:8, 24:13, 29:21,
30:22, 35:17, 53:22,
103:16, 109:1,
111:13, 111:19,
112:3, 112:12,
128:23, 130:11,
135:18, 138:2,
138:4, 138:5, 138:6,
138:12, 138:13,
139:17, 139:21,
139:25, 140:9,
140:12, 140:19,
142:6, 161:2,
161:12, 163:4,
164:11, 177:22,
177:23, 177:24,
177:25, 191:25,
193:1, 193:5,
209:20, 209:25,
214:5, 214:22,
224:15, 225:19,
226:18, 227:8,
227:9, 228:8,
233:13, 234:24,
235:1, 235:5,
235:11, 235:15,
235:18, 237:23,
238:3, 238:16,
239:3, 239:6,
239:15, 239:22,
239:24, 240:11,
245:7, 245:13,
245:18, 248:25,
249:7, 249:12,
249:16, 249:17,
249:19, 253:11,
253:17, 254:7,
254:16, 256:5,
260:11, 261:10,
264:22, 265:12,
265:15, 266:12,
269:13, 272:9,
272:11, 272:16,
272:24, 273:4,
273:8, 274:3, 278:19
**Traffic** [2] - 125:8,
173:23
**trails** [2] - 57:6, 57:7
**transcript** [14] - 1:24,
276:2, 276:4,
276:16, 276:20,
276:21, 276:23,
277:4, 277:9,
277:12, 277:20,
278:1, 278:4, 278:7
**transcription** [1] -
1:25
**transcripts** [3] -
275:22, 276:10,
277:11

**transit** [3] - 15:15,
15:16, 15:17
**Transit** [1] - 15:19
**transition** [1] - 131:2
**translate** [2] - 36:24,
139:24
**translates** [4] - 36:14,
37:1, 40:11, 236:10
**transpired** [2] - 25:1,
28:16
**Transportation** [3] -
5:5, 135:2, 184:12
**TRANSPORTATION**
[1] - 1:7
**transportation** [4] -
6:10, 33:13, 133:14,
217:25
**Trap** [1] - 3:7
**travel** [5] - 156:10,
158:2, 158:6,
225:14, 252:3
**traveled** [8] - 155:14,
171:12, 171:20,
199:13, 203:16,
203:24, 210:6,
244:21
**traveling** [4] - 156:14,
157:3, 158:4, 236:1
**treat** [1] - 182:14
**treated** [3] - 29:20,
126:4, 182:14
**treatises** [2] - 37:24,
38:20
**treatment** [9] - 126:10,
146:15, 147:8,
147:12, 149:11,
165:1, 165:3, 205:2,
219:7
**trees** [1] - 52:9
**Trenton** [2] - 255:17,
268:18
**tri** [1] - 155:15
**tri-state** [1] - 155:15
**Triborough** [1] - 41:20
**trigger** [1] - 49:1
**triggered** [3] - 43:21,
43:22, 45:18
**triggers** [1] - 46:21
**trips** [1] - 119:10
**truck** [57] - 10:7,
103:12, 103:16,
111:13, 111:19,
112:3, 112:12,
137:11, 138:2,
138:4, 138:5,
138:13, 140:9,
140:12, 140:19,
142:5, 148:7, 155:8,
156:24, 158:4,
161:2, 161:12,

163:3, 164:10,
177:22, 177:23,
177:24, 177:25,
191:24, 193:1,
193:5, 214:21,
225:13, 226:18,
227:4, 227:7, 227:8,
227:9, 227:13,
228:8, 229:19,
233:12, 249:12,
254:7, 254:15,
265:7, 265:15,
265:16, 272:9,
272:11, 272:16,
272:24, 273:4, 274:3
**trucks** [39] - 137:16,
137:17, 137:18,
137:22, 142:6,
154:17, 154:18,
154:21, 155:9,
155:15, 155:16,
155:17, 155:19,
155:25, 156:3,
156:10, 156:13,
156:15, 157:2,
157:7, 158:1, 158:3,
161:5, 191:25,
199:1, 199:5, 199:6,
199:7, 199:9,
199:13, 199:17,
199:18, 265:8,
265:9, 265:20
**true** [12] - 20:11, 35:2,
43:18, 78:5, 96:19,
102:3, 156:4, 184:3,
195:8, 236:15,
237:1, 256:18
**trust** [9] - 64:9, 86:9,
86:11, 101:18,
105:11, 123:18,
123:24, 126:13,
279:23
**trusted** [2] - 29:25,
181:4
**try** [13] - 55:24, 93:25,
119:5, 120:17,
137:21, 167:8,
226:6, 226:8,
227:23, 229:6,
230:18, 243:3,
278:10
**trying** [19] - 24:21,
55:11, 60:13, 63:2,
67:22, 68:7, 94:5,
95:4, 95:7, 103:22,
115:15, 115:19,
157:17, 161:21,
244:1, 266:3,
276:14, 276:23,
277:1

**tune** [2] - 13:24, 13:25
**tuned** [1] - 52:6
**Tunnel** [6] - 41:20, 238:5, 238:10, 238:12, 238:17, 248:6
**tunnel** [1] - 141:21
**tunnels** [1] - 118:1
**turn** [12] - 33:25, 84:19, 103:18, 124:10, 166:21, 181:3, 235:14, 247:20, 250:22, 250:24, 252:7, 252:25
**turned** [2] - 18:11, 179:7
**Turnpike** [1] - 3:7
**turns** [5] - 140:11, 142:10, 148:17, 245:15, 253:12
**twice** [3] - 128:2, 148:16, 281:2
**twin** [1] - 77:2
**two** [104] - 7:2, 16:18, 20:23, 21:3, 28:18, 29:13, 30:1, 30:20, 32:9, 32:18, 34:6, 38:21, 39:19, 43:1, 43:15, 47:11, 47:17, 50:16, 50:19, 57:3, 61:7, 63:6, 65:13, 65:16, 66:20, 67:17, 70:18, 72:11, 72:16, 74:24, 75:18, 76:3, 76:5, 79:15, 87:11, 88:12, 90:25, 100:20, 105:15, 106:1, 106:4, 106:13, 106:19, 107:16, 107:18, 120:22, 121:7, 126:18, 128:21, 139:15, 139:21, 140:11, 148:24, 149:10, 150:8, 150:13, 154:10, 157:20, 171:11, 181:4, 183:21, 186:16, 186:17, 186:21, 195:19, 197:2, 198:19, 199:2, 201:14, 202:12, 202:19, 202:23, 203:6, 207:9, 208:21, 209:20, 212:14, 212:21, 216:2, 217:3, 218:9, 222:13, 222:18,

231:2, 231:5, 232:19, 237:8, 241:1, 245:2, 245:6, 245:9, 246:1, 250:6, 252:25, 254:11, 257:25, 258:6, 258:8, 258:15, 265:24, 276:21
**two-hour** [1] - 276:21
**two-month** [1] - 72:11
**two-page** [2] - 257:25, 258:15
**type** [5] - 35:3, 35:9, 81:19, 172:18, 191:14
**types** [6] - 53:8, 53:10, 60:22, 154:11, 192:5, 194:18, 200:4, 235:7
**typical** [2] - 241:11, 263:6
**typically** [1] - 171:5
**typo** [2] - 213:3, 213:6

**U**

**U.S** [2] - 1:9, 134:24
**UC** [1] - 3:11
**ultimate** [3] - 39:23, 53:13, 152:1
**ultimately** [6] - 36:3, 38:21, 39:24, 132:25, 166:24, 267:3
**unable** [1] - 215:16
**unanimous** [1] - 217:23
**uncertain** [1] - 223:25
**uncommon** [1] - 54:11
**under** [49] - 7:13, 8:12, 11:2, 20:1, 27:8, 27:25, 28:23, 33:18, 33:23, 34:22, 40:3, 48:3, 56:19, 64:17, 66:10, 71:14, 71:19, 76:16, 78:21, 81:22, 85:15, 118:7, 125:8, 136:10, 136:11, 145:7, 152:10, 152:11, 161:24, 168:15, 170:16, 178:19, 183:5, 188:25, 190:21, 198:14, 207:15, 218:8, 220:9, 220:16, 229:12, 236:6, 236:15, 239:24, 243:16, 253:1, 260:21, 268:21

**undergone** [1] - 10:16
**underlying** [3] - 49:6, 145:1, 241:7
**underneath** [1] - 8:12
**underpinnings** [1] - 133:21
**understandable** [1] - 99:14
**understandably** [1] - 99:22
**understood** [5] - 9:15, 68:24, 179:16, 180:16, 277:23
**undertake** [1] - 18:15
**undertaken** [9] - 86:3, 86:15, 89:16, 123:5, 178:17, 195:5, 259:16, 262:3, 269:1
**undisputed** [2] - 10:21, 125:1
**unduly** [2] - 229:9, 277:6
**unhappy** [1] - 50:14
**Union** [5] - 107:9, 204:3, 204:25, 224:17, 226:12
**unique** [7] - 11:2, 69:25, 70:4, 70:5, 224:17, 263:7, 263:10
**unit** [1] - 184:10
**Unitarian** [1] - 3:7
**UNITED** [6] - 1:1, 1:6, 1:12, 2:3, 2:8, 2:11
**United** [2] - 5:2, 5:4
**units** [2] - 145:21, 160:12
**Universalist** [1] - 3:7
**University** [1] - 280:20
**unknown** [1] - 85:19
**unless** [3] - 165:19, 167:3, 267:12
**unlike** [1] - 123:15
**unmeritorious** [1] - 166:9
**unnecessary** [1] - 96:22
**unprecedented** [7] - 7:5, 10:18, 10:23, 11:7, 69:22, 70:3, 263:17
**unreasonable** [22] - 38:2, 38:6, 38:8, 38:15, 106:4, 106:7, 199:17, 221:14, 222:14, 222:20, 228:2, 228:15, 230:6, 230:10, 232:7, 232:9, 232:15, 233:6,

233:8, 243:25, 244:3, 244:9
**unreasonably** [3] - 36:5, 131:19, 132:3
**unripe** [3] - 41:4, 76:11, 76:13
**unusual** [4] - 46:4, 77:7, 168:16, 220:10
**up** [111] - 5:22, 6:3, 6:25, 27:14, 34:6, 40:5, 40:7, 45:16, 47:24, 49:15, 60:7, 60:17, 61:23, 62:15, 62:18, 63:23, 64:2, 67:3, 69:15, 69:18, 74:12, 75:18, 79:21, 84:9, 84:12, 84:13, 92:11, 101:2, 101:3, 103:19, 107:19, 108:4, 108:17, 116:21, 127:23, 128:14, 132:15, 135:4, 135:21, 136:23, 138:22, 143:22, 150:4, 150:6, 150:20, 152:18, 158:12, 158:16, 162:24, 168:1, 175:9, 176:14, 177:13, 178:1, 178:2, 178:3, 181:4, 183:1, 185:17, 187:11, 188:9, 191:12, 193:11, 195:18, 197:20, 203:20, 203:21, 203:22, 206:22, 207:2, 207:16, 208:8, 208:9, 209:2, 209:4, 209:5, 214:22, 219:11, 219:21, 224:14, 226:18, 227:8, 227:9, 227:13, 228:13, 229:19, 230:18, 235:20, 247:20, 248:12, 254:6, 255:4, 255:6, 256:16, 261:9, 267:2, 267:14, 272:4, 277:13, 279:15
**Up** [1] - 168:7
**upfront** [1] - 174:18
**upheld** [3] - 46:6, 47:19, 190:23
**upped** [1] - 222:18, 226:25, 227:2
**urban** [1] - 50:18

**usefulness** [1] - 255:23
**uses** [5] - 38:20, 219:23, 235:12, 270:24, 271:24
**utilize** [1] - 231:3
**utilizing** [1] - 270:13

**V**

**vacate** [2] - 24:5, 24:6
**vacated** [5] - 20:18, 21:23, 23:17, 29:16, 182:3
**vacating** [3] - 23:19, 23:20, 25:16
**vacatur** [8] - 15:3, 18:19, 23:7, 23:16, 26:10, 30:25, 52:17, 198:12
**vague** [1] - 183:13
**valid** [1] - 61:1
**validates** [1] - 244:6
**valuable** [1] - 188:7
**Value** [1] - 33:19
**values** [1] - 163:4
**variable** [4] - 35:5, 69:24, 77:18, 117:25
**variation** [5] - 53:3, 53:4, 53:12, 54:1, 237:9
**variations** [1] - 53:19
**variety** [1] - 250:19
**various** [11] - 34:2, 35:4, 50:7, 140:15, 140:17, 144:11, 159:24, 181:22, 184:24, 240:16, 260:11
**vary** [1] - 223:8
**vegetation** [2] - 145:21, 160:11
**vehicle** [11] - 17:17, 103:16, 155:13, 171:12, 171:20, 177:23, 199:13, 203:15, 207:6, 210:6, 244:21
**vehicles** [6] - 125:23, 137:18, 234:25, 235:23, 236:1, 248:13
**Verrazzano** [1] - 97:22
**verse** [2] - 116:10, 124:2
**version** [1] - 258:8
**versions** [1] - 258:9
**versus** [10] - 130:24, 149:6, 150:14, 223:11, 223:12,

231:3, 231:9, 249:7, 253:10, 255:5
**viability** [1] - 63:9
**viable** [1] - 15:9
**view** [27] - 19:25, 28:21, 36:13, 36:24, 44:9, 44:14, 52:5, 58:13, 61:18, 62:14, 72:20, 72:23, 76:18, 86:17, 95:8, 97:14, 106:12, 120:10, 123:7, 129:10, 170:19, 178:24, 217:13, 221:25, 232:5, 233:7, 236:12
**viewed** [4] - 82:5, 145:9, 162:15, 202:16
**violation** [1] - 13:15
**virtue** [2] - 75:23, 76:23
**vis-á-vis** [1] - 219:7
**VMT** [13] - 125:23, 205:22, 206:22, 206:24, 208:23, 235:12, 236:3, 237:14, 253:5, 257:15, 264:18
**voice** [5] - 40:5, 40:7, 135:4, 136:23, 163:21
**volume** [9] - 68:8, 68:13, 148:7, 177:25, 226:18, 227:5, 227:13, 229:19, 239:7
**volumes** [1] - 224:16
**volunteer** [2] - 276:11, 276:14
**voracious** [1] - 97:18
**voted** [1] - 71:4
**VPPP** [8] - 33:19, 43:7, 44:4, 44:7, 55:3, 71:19, 189:6, 193:17

## W

**wait** [10] - 12:11, 90:17, 109:20, 122:2, 150:24, 193:19, 219:19
**waiting** [1] - 178:4
**waived** [2] - 25:5, 25:12
**waiver** [4] - 260:22, 260:24, 260:25, 261:3
**walked** [2] - 254:25, 255:24

**wall** [1] - 106:7
**wand** [1] - 105:1
**wants** [4] - 57:12, 126:25, 181:4, 276:23
**Ward** [1] - 3:12
**warned** [1] - 114:19
**warrant** [4] - 26:2, 101:10, 160:2, 208:16
**warranted** [5] - 107:1, 118:21, 152:13, 271:11, 274:18
**warranting** [2] - 10:25, 159:9
**Washington** [2] - 2:6, 2:13
**Water** [1] - 3:6
**Waterfront** [1] - 3:9
**ways** [3] - 18:12, 19:20, 43:1
**weaknesses** [4] - 30:14, 44:15, 211:8, 243:12
**weave** [1] - 197:16
**website** [2] - 69:9, 71:2
**Wednesday** [1] - 1:10
**week** [6] - 8:4, 10:11, 18:7, 20:12, 41:13, 55:15
**weekday** [4] - 20:24, 21:3, 65:13, 235:7
**weeks** [1] - 43:15
**weigh** [1] - 161:8
**weight** [3] - 168:20, 168:22, 169:3
**weighted** [2] - 272:10, 272:16
**welcome** [5] - 31:3, 83:3, 117:8, 249:10, 277:19
**well-reasoned** [1] - 243:13
**well..** [1] - 179:5
**west** [5] - 102:5, 249:14, 250:3, 250:5, 250:7
**western** [2] - 105:12, 202:9
**whatsoever** [1] - 185:9
**whereas** [3] - 158:10, 203:24, 221:21
**whichever** [2] - 87:8, 270:14
**White** [1] - 70:14
**Whoa** [1] - 183:24
**whoa** [2] - 183:24
**whole** [10] - 82:25,

92:10, 100:24, 161:14, 170:11, 232:2, 236:11, 245:14, 265:3, 274:11
**wide** [4] - 246:8, 247:2, 264:16, 264:17
**widening** [1] - 57:6
**wife** [1] - 230:24
**wild** [1] - 57:8
**windfall** [1] - 126:24
**window** [1] - 26:14
**Winkler's** [1] - 163:21
**Winton** [1] - 168:6
**wise** [3] - 15:20, 78:12, 278:18
**wish** [8] - 6:15, 6:19, 14:13, 14:21, 97:24, 115:15, 257:24, 280:5
**wishes** [2] - 166:13, 279:1
**withstand** [1] - 95:2
**Wolfson** [1] - 22:13
**wonderful** [2] - 125:11, 196:2
**wonders** [1] - 255:11
**word** [14] - 8:7, 8:10, 36:17, 43:20, 53:17, 80:13, 88:3, 90:18, 90:20, 101:21, 175:16, 193:23, 216:24, 263:12
**words** [16] - 7:7, 10:21, 22:19, 23:20, 53:3, 53:4, 57:16, 78:23, 139:21, 176:10, 193:23, 235:10, 247:14, 253:21, 254:3, 260:4
**works** [8] - 78:25, 79:17, 89:13, 123:23, 124:1, 124:23, 174:17, 174:19
**world** [3] - 70:1, 259:20
**worse** [18] - 8:2, 13:12, 29:12, 29:20, 29:21, 30:20, 30:23, 39:25, 69:6, 72:6, 72:21, 108:23, 176:19, 177:5, 204:25, 223:16, 224:4
**worsening** [2] - 205:23, 210:7
**worst** [32] - 40:20, 53:20, 53:22, 53:23,

76:25, 77:4, 192:25, 210:13, 225:14, 238:21, 240:2, 240:9, 240:18, 241:9, 241:18, 243:19, 244:15, 249:15, 257:15, 262:5, 262:8, 264:3, 264:25, 265:4, 265:5, 265:10, 266:15, 266:19, 266:21
**worth** [1] - 264:9
**worthy** [3] - 19:17, 25:11, 84:16
**would've** [1] - 176:8
**write** [1] - 263:22
**writing** [3] - 170:22, 179:6, 181:2
**written** [2] - 42:15, 212:25

## Y

**year** [17] - 9:5, 9:20, 9:21, 46:12, 46:13, 46:14, 46:25, 51:2, 69:21, 125:14, 134:18, 188:12, 203:16, 203:21, 246:12, 258:7, 258:14
**Year** [1] - 258:12
**years** [11] - 47:11, 51:4, 70:8, 90:25, 102:1, 108:17, 169:22, 203:21, 262:7, 262:12, 264:9
**yield** [4] - 48:23, 232:5
**yielded** [4] - 226:19, 232:15, 233:7, 269:3
**York** [92] - 1:17, 2:18, 2:22, 3:16, 7:10, 7:14, 7:20, 7:24, 8:1, 10:1, 13:24, 14:2, 15:13, 33:13, 34:2, 50:14, 69:25, 70:2, 74:25, 86:9, 87:11, 88:12, 89:5, 97:20, 97:21, 100:12, 100:15, 100:20, 102:15, 102:16, 105:13, 105:19, 105:24, 106:25, 109:12, 119:4, 123:17, 123:19, 125:12, 129:7, 133:7, 133:16, 133:25, 138:22, 149:2, 149:6,

153:20, 155:14, 156:1, 156:7, 156:18, 159:25, 160:3, 164:12, 169:23, 172:8, 173:22, 175:13, 181:22, 181:24, 182:1, 182:2, 184:11, 198:22, 201:20, 203:4, 203:5, 207:1, 218:9, 218:24, 219:7, 219:22, 220:4, 221:10, 221:22, 223:14, 223:17, 223:21, 224:5, 224:24, 235:6, 236:2, 237:23, 259:6, 265:25, 270:6
**York's** [5] - 7:16, 10:17, 11:14, 96:9, 220:4
**yourself** [2] - 31:7, 83:4

## Z

**zero** [12] - 14:4, 20:3, 60:6, 61:19, 61:22, 62:15, 63:12, 102:4, 185:22, 253:16, 254:1
**zone** [2] - 17:22, 117:23
**zone-based** [1] - 117:23
**zooming** [1] - 252:9

## §

**§1501.3(b** [1] - 88:6
**§771.129** [1] - 71:14