1                    **UNITED STATES DISTRICT COURT**
                     **FOR THE DISTRICT OF NEW JERSEY**
2

3   ────────────────────────────

    **STATE OF NEW JERSEY, et al,**        **CIVIL ACTION NUMBER:**
4
         **Plaintiff,**                    **2:23-cv-03885-LMG-LDW**
5
     **v.**                                **ORAL ARGUMENT**
6

7   **UNITED STATES DEPARTMENT OF**
    **TRANSPORTATION, et al,**

8        **Defendant.**
    ────────────────────────────
9        **Frank Lautenberg Post Office & U.S. Courthouse**
         **2 Federal Square**
10       **Newark, New Jersey 07102**
         **Thursday, April 4, 2024**
11       **Commencing at 9:32 a.m.**

12  **B E F O R E:**        **THE HONORABLE LEO M. GORDON**
                           **UNITED STATES COURT OF INTERNATIONAL TRADE**
13

14  **A P P E A R A N C E S**

15       KING & SPALDING, LLP
         BY:  RANDY M. MASTRO, ESQUIRE
16       BY:  LAUREN MYERS, ESQUIRE
         1185 Avenue of the Americas, LLP
17       New York, New York 10036
         For the Plaintiff
18
         NAGEL RICE, LLP
19       BY:  BRUCE NAGEL, ESQUIRE
         BY:  RANDEE M. MATLOFF, ESQUIRE
20       103 Eisenhower Parkway,  Suite 201
         Roseland, New Jersey 07068
21       For the Plaintiffs Consolidated

22                       Melissa A. Mormile
                        Official Court Reporter
23             melissa_mormile@njd.uscourts.gov
                          (973) 776-7710
24  Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.
25

```
 1   (Continuing)

 2   A P P E A R A N C E S:

 3        UNITED STATES ATTORNEY'S OFFICE
          DOJ-ENRD
 4        NATURAL RESOURCES SECTION
          BY:  GREGORY MARTIN CUMMING, ESQUIRE
 5        BY:  SAMANTHA PELTZ, ESQUIRE
          150 M. Street, N.E.
 6        Washington, DC 20002
          For the Defendants
 7

 8        UNITED STATES ATTORNEY'S OFFICE
          BY:  ALEX D. SILAGI, ESQUIRE
 9        970 Broad Street
          Newark, New Jersey 07102
10        For the Defendants

11

12        UNITED STATES ATTORNEY'S OFFICE
          DOJ-ENRD
13        BY:  SHARI HOWARD, ESQUIRE
          150 M. Street, N.E. 4th Floor
14        Washington D.C., 20002
          For the Defendants

15

16        SIVE, PAGET & RIESEL, P.C.
          BY:  MARK A. CHERTOK, ESQUIRE
17        BY:  ELIZABETH KNAUER, ESQUIRE
          BY:  JOHN F. NELSON, ESQUIRE
18        560 Lexington Avenue, 15th Floor
          New York, New York 10022
19        For the Intervenor Defendants

20                     -and-

21        KAPLAN HECKER & FINK LLP
          BY:  ROBERTA A. KAPLAN, ESQUIRE
22        BY:  KATE HARRIS, ESQUIRE
          350 Fifth Avenue - 63rd Floor
23        New York, New York 10118
          For the Intervenor Defendants

24

25
```

(Continuing)

**A P P E A R A N C E S:**


    JOHN REICHMAN LAW, LLC
    BY:  JOHN REICHMAN, ESQ.
    56 Oakwood Avenue
    Montclair, New Jersey 07043
    For Amicus Empower NJ, New Jersey Policy Perspective,
Health Professionals & Allied Employees, Clean Water
Action, Turnpike Trap Coalition, Hudson County Complete
Street, Soma Action, Unitarian Universalist Faith Action NJ,
Pinelands Preservation Alliance, Bike North Bergen,
Ecopoetry.org, Don't Gas the Meadowlands, Isles, Inc., Bike JC,
SafestreetsJC, 350 NJ-Rockland, Hackensack Riverkeeper, Inc.,
People Over Pipelines, Fund for a Better Waterfront, Newark
Green Team, Action Together New Jersey, New Jersey Association
of Railroad Passengers, BlueWaveNJ, Bike Soma, Newark Science
and Sustainability, Inc., Our Revolution NJ, BII UC, Friends
of Liberty State Park, New Jersey Environmental Lobby, New
Jersey Work Environment Council, New Jersey citizen Action,
South Ward Environmental Alliance, New Jersey Working Family
Party, and Bike Hoboken


    KRAMER LEVIN NAFTALIS & FRANKEL, LLP
    BY:  ANDREW OTIS, ESQ.
    1177 Avenue of the Americas
    New York, New York 10036
    For the Amicus Environmental Defense Fund


    BERGEN COUNTY - COUNTY COUNSEL OFFICE
    BY:  DAVID MATEEN ESQ.
    One Bergen County Plaza, 5th Floor
    Hackensack, New Jersey 07601
    For the Amicus - County of Bergen

```
1                      I N   D E X

2                Rebuttal
       BY                          PAGE
3      Ms. Knauer                  7, 41, 53
       Mr. Cumming                 15, 33, 52, 55
4      Mr. Mastro                  17

5                Amici
       BY                          PAGE
6      Mr. Mateen                  56
       Mr. Nagel                   58
7      Mr. Reichman                65
       Mr. Otis                    71
8
            NEPA - New Jersey Participation
9      BY                          PAGE
       Ms. Myers                   80, 162
10     Mr. Cumming                 114, 173
       Mr. Chertok                 137, 175
11
                Clean Air Act
12     BY                          PAGE
       Mr. Mastro                  178, 207
13     Ms. Howard                  184, 213
       Ms. Knauer                  202, 214
14
                Remedy
15     BY                          PAGE
       Mr. Mastro                  217
16     Mr. Cumming                 230
       Mr. Chertok                 236
17
                Amici
18     BY                          PAGE
       Mr. Mateen                  238
19     Ms. Matloff                 241
       Mr. Reichman                241
20     Mr. Otis                    244

21              Closing
       BY                          PAGE
22     Mr. Mastro                  246
       Mr. Chertok                 252
23     Mr. Cumming                 255

24

25
```

1          (This matter was held before the Honorable Leo M.

2   Gordon, of the United States Court of International Trade.)

3          THE COURT:  You may be seated.

4      Good morning, everyone.

5      We are going to pick up where we left off yesterday.

6      I have one or two administrative things that I wish to

7   take care of before we commence the proceeding.

8          Yesterday there was a discussion around the number of

9   counties that were, I think, initially looked at, and there may

10  have been a reference to 28 counties, and I may have misspoken

11  and said that it was 26 counties.

12         Mr. Cumming, I suspect you are in the best position to

13  clarify for the Court what the correct number is.

14         MR. CUMMING:  I believe it is 28, but I will defer to

15  Ms. Knauer on that.

16         MS. KNAUER:  28 is correct.

17         THE COURT:  28 is correct?

18         MS. KNAUER:  For the regional study area.

19         THE COURT:  Melissa, would you please note the number

20  should be 28 instead of 26.

21      Very good.

22      We are going to pick up this morning with our finishing

23  comments on air quality and environmental justice.  Things

24  might have appeared a tiny bit rushed at the end of the day.

25         Ms. Knauer, I'm going to give you about seven minutes to

1   finish your affirmative argument.

2          Then Mr. Cumming, I'm going to ask you to approach the

3   podium and address issues where there were questions yesterday

4   when you were not at the moment able to provide answers.  I

5   trust that you have got the appropriate clarifications.  You

6   will advise the Court and other counsel appropriately.

7          Then we will proceed to rebuttal so everybody will be on

8   a common footing.

9          Any objections?

10          One last thing, Mr. Chertok, at the end of yesterday's

11   proceeding, you raised a question about the slides that were

12   being presented to the Court yesterday.  I would ask that you

13   hold any colloquy with the Court about that until we get

14   towards the end of today.  Then I will entertain any comments

15   or requests from you before we do closing argument, and then we

16   will proceed to closing argument.

17          Does that work for you?

18             MR. CHERTOK:  That's fine, your Honor.  Thank you.

19             THE COURT:  You are welcome.

20          Does any counsel have any other administrative or quasi

21   administrative issue that they wish to address with the Court

22   before we commence with argument this morning?  Plaintiff or

23   plaintiff intervenors?

24             MR. MASTRO:  No, your Honor.

25             THE COURT:  Government defendants?

```
 1        MR. CUMMING:  No, your Honor.

 2        THE COURT:  Defendant intervenor?

 3        MR. CHERTOK:  No, your Honor.

 4        THE COURT:  Defendant Amici?

 5        MR. OTIS:  No, your Honor.

 6        THE COURT:  Ms. Knauer, you are up for seven minutes.

 7     Before you start, are you intending to hand out

 8  anything?

 9        MS. KNAUER:  Yes.  We have one handout for everybody

10  and then there is one page from the record that we don't have

11  enough copies for everyone, but it is from the administrative

12  record.  Everyone should have it.

13        THE COURT:  Are any of these documents duplicative of

14  what you handed out yesterday before you began --

15        MS. KNAUER:  No.

16        THE COURT:  -- your presentation?

17        MS. KNAUER:  No.  It is an additional document.

18        THE COURT:  Thank you.

19        MR. MASTRO:  Your Honor, I am sorry.  I have been

20  handed something.  I don't know what it is or where it is from.

21        MS. KNAUER:  I will explain it.

22        MR. MASTRO:  We are going outside the administrative

23  record?

24        THE COURT:  You know what?  Mr. Mastro, I appreciate

25  your concern.
```

1      Let Ms. Knauer refer to these and if you have an

2  objection, we will deal with it.  This is in the form of a

3  PowerPoint presentation.  It may be the other side of the same

4  coin raised by Mr. Chertok, so I will be more than happy to

5  hear either of you or both of you at an appropriate point in

6  time.

7          MS. KNAUER:  I will say that this material was

8  referenced in our briefing.  So it's not something that's being

9  introduced today.

10          THE COURT:  That is not the question, Ms. Knauer.

11          MS. KNAUER:  I will -- I can --

12          THE COURT:  If it is in the record, it is in the

13  record.  If it is not in the record, I will ask you to

14  acknowledge that it is not in the record and the Court will

15  deal with it appropriately.

16          MS. KNAUER:  Okay.  Thank you, your Honor.

17          This is in the record.

18          As we were concluding yesterday, I think that the

19  question on the table that had been raised by Mr. Mastro was in

20  terms of the Environmental Justice Communities with truck

21  traffic proximity increases.  There were sort of two lists in

22  the EA, one of a greater number and one of a lesser number,

23  which was identified for place-based mitigation.

24          So I think we were all getting a little tired at the end

25  of the day.  So I just wanted to go over that one more time and

1    also to point to the Court to one more table that's in the EA

2    that lays that out with a little bit more clarity.

3          Again, just to review, this was the map that shows all

4    of the environmental justice tracts with high pre-existing

5    burdens that had either increases or decreases in truck traffic

6    proximity.

7          The orange ones are the ones that were identified to

8    have increases in truck traffic proximity with either chronic

9    disease or pollutant burdens.  As I said yesterday, basically

10   the entirety of the study area has high pollutant burdens.

11         Then just going to the next map, so this is the -- these

12   are the communities or the census tracts that have both high

13   pre-existing pollutants and chronic disease burdens at the

14   90th percentile.  These were the ones that were identified for

15   place-based mitigation.  That is the difference.

16         If you could just --

17           THE COURT:  Let's roll back.

18         The first map, in short form language, relative to

19   New Jersey is the 15 communities and the second map is the four

20   communities?

21           MS. KNAUER:  Sorry.  15 census tracts and seven census

22   tracts.  I don't know if the communities and municipalities are

23   different.  I think they might still be in the same four

24   municipalities.

25         In any event, that explains the difference.  There is

```
1    also a table.  I think Mr. Mastro had presented a table that
2    listed all of the census tracts, all of the communities that
3    had -- and all of the burdens sort of mixed together.  This was
4    to present the sort of first set of census tracts and
5    communities that were affected.
6         And then what was not presented yesterday by either
7    Mr. Mastro or myself is another table that's in the EA, which
8    clarifies the census tracts and communities that were within
9    the chronic disease subset.
10             THE COURT:  That's the table from yesterday's
11   material.
12             MS. KNAUER:  This is the table from yesterday.  You
13   see that it says, Number of Tracts by Number of Pre-Existing
14   Pollutants or Chronic Disease Burden.
15             THE COURT:  Well, you can see it.  Unfortunately, I
16   have old, tired eyes, so I am at a little bit of a
17   disadvantage.
18             MS. KNAUER:  I'm sorry.  I don't think we included
19   that in our handouts.
20             THE COURT:  What, that I have old 72-year old tired
21   eyes?
22             MS. KNAUER:  I did hand you the -- I think the one
23   that you haven't seen before.
24             THE COURT:  This is in new table for today?
25             MS. KNAUER:  Correct.  That one, it includes only the
```

1   census tracts and communities that were identified as also

2   having high chronic disease burdens.  Those were the ones that

3   because they -- the mitigation was directed towards addressing

4   communities that would be affected by the project but also have

5   pre-existing chronic disease burdens that -- you know,

6   essentially, the concern over any air quality effects is human

7   health.  So those were the ones that were identified

8   specifically for place-based mitigation recognizing that the

9   regional mitigation measures would also benefit the other

10   communities.

11        THE COURT:  You are about halfway through your time,

12   Ms. Knauer.

13        MS. KNAUER:  So the other question that the Court had

14   posed yesterday concerning the air-quality analysis

15   specifically was the different scenarios that were used as

16   worst cases for the different types of analyses, and I did want

17   to preface that New Jersey has not questioned the use of

18   different worst cases.  I think they actually are advocating

19   that even more worst case scenarios should be used in the

20   regional analysis on a county-by-county level.  So I think this

21   was a question that the Court asked.

22        We did -- it was challenging to find exactly analogous

23   cases on an overnight basis, but I did want to point the Court

24   to a case that I think the most on point one that we cited in

25   our reply brief, which was *Coalition for a Sustainable 520 v.*

1  *U.S. DOT* 881 F Supp.  2d 1243 from the Western District of

2  Washington in 2012.

3      That really, while it didn't involve the use of

4  different worst case scenarios because the project didn't --

5  you know, the EIS in that instance wasn't examining a project

6  that had multiple potential scenarios.  It did recognize the

7  reasonableness of the agency's use of worst case intersections

8  for the hot spot analysis, as was done in this case in

9  accordance with EPA's hotspot PM 2.5 hotspot analysis

10 methodology.

11     Then there are also a number of other cases just

12 recognizing the concept of using the worst case analysis in

13 NEPA reviews, worst case scenario in NEPA reviews.

14     And then the one thing -- so the other handout that I

15 wanted to present, because the Court has been, I think, in many

16 instances asking for greater context around other types of

17 reviews on highway projects and others.  I wanted to put some

18 of the challenges that New Jersey has raised in the context of

19 reviews that they have done, and one --

20          THE COURT:  The reviews that...

21          MS. KNAUER:  That New Jersey has completed more

22 recently, and then this was an EIS for a recent highway

23 project, the 14 --

24          THE COURT:  Stop.

25          This does not have a DOT number, so this document is not

1    in the record?

2         MS. KNAUER:  That's correct.

3         It is not in the administrative record.  It was

4    referenced in our brief, our reply brief, however.  So it's

5    not -- we're not bringing up a new argument.

6         THE COURT:  Go ahead.

7         Mr. Mastro, you rose.

8         MS. KNAUER:  I am sorry.  I can't see behind me.

9         THE COURT:  I wanted to let you finish your sentence

10   before I...

11        Mr. Mastro, you wish to be heard?

12        MR. MASTRO:  I am sorry, your Honor.

13        This document is not only a part of the administrative

14   record, it wasn't in the context of a federal project.

15        This was something that New Jersey did itself in

16   connection with a New Jersey-related project.  It has nothing

17   to do with this case and while I want to give lots of latitude

18   and if she wants to present it, I just want you to understand

19   the context to give it the weight it deserves, which is zero.

20        THE COURT:  Ms. Knauer, you may continue.

21        MS. KNAUER:  I will note that Mr. Mastro, I think on

22   one of his slides yesterday, presented a list of other projects

23   that are not -- also not in the administrative record.

24        THE COURT:  Trust me, folks, when we get to the end of

25   the day or if you press earlier in the day, the Court has an

1    idea as to what it is going to say to you all, but I want to

2    hear what you have to say about -- shall I say any part of any

3    presentation that would be the equivalent of a PowerPoint

4    presentation about how the Court is going to deal with that.

5              MS. KNAUER:  I think that this document, which is

6    portions of the -- the EIS that New Jersey completed for

7    Turnpike interchanges 14 to 14A, which was -- included a

8    widening of that part of the Turnpike, does sort of put into

9    context some of the challenges that they have made here.

10             One of the challenges they have made is to the --

11             THE COURT:  One minute, Ms. Knauer.

12             MS. KNAUER:  -- environmental justice study area,

13   which in our case extended across -- even for the local study

14   area extended across ten counties.

15             Theirs was a quarter mile from the physical built

16   project, notwithstanding it was a highway project.

17             Their air-quality analysis for environmental justice

18   consists of one paragraph.  That's on the second page of the

19   handout and relies exclusively on compliance with the National

20   Ambient Air Quality Standards whereas the -- the environmental

21   justice analysis completed for -- for the CBD TP went way

22   beyond that in looking at the truck traffic proximity

23   increases.

24             THE COURT:  Thank you, Ms. Knauer.  I appreciate it.

25             Mr. Cumming, you are up to clarify and answer questions

1    the Court asked yesterday.

2         Mr. Cumming, I will give you seven minutes.

3          MR. CUMMING:  Your Honor, you asked whether the

4    re-evaluation will be published.

5         The answer is yes.  It will be available on MTA's

6    website as would the other NEPA documents in this case.

7         I have some numbers for your Honor about how other VPPP

8    agreement projects have been treated under NEPA.

9         There are -- I am looking at -- let's see here --

10   11 projects across the country.  Seven were analyzed under what

11   are called categorical exclusions.  Three were assessed under

12   EA FONSIs, like this project, and one was assessed under EIS.

13   That was the I-10 Highway project in, I believe, Austin, Texas,

14   which was a significant major construction project adding

15   numerous lanes.

16        Your Honor asked about how Federal Highway prepares NEPA

17   documents.  I am referencing the agency's fiscal year 2022

18   report to Congress.  That is the last available most accurate

19   public information.

20        The agency prepared 13,192 categorical exclusions,

21   952 documented categorical exclusions, 60 EAs and FONSIs and

22   eight EISs.

23         THE COURT:  This is contained in a document filed with

24   Congress by the Federal Highway Administration.  Correct?

25         MR. CUMMING:  Yes, your Honor.

1          THE COURT:  Is it a lengthy document or can this

2    information be extracted simply and provide it the Court and

3    the parties.

4          MR. CUMMING:  We are happy do to try to do that,

5    your Honor.

6          THE COURT:  Please do so by next Friday.

7          MR. CUMMING:  Yes, your Honor.

8          THE COURT:  Thank you.  I appreciate it.

9       Anything else, Mr. Cumming?

10         MR. CUMMING:  You asked how many re-evaluations the

11   agency conducts.  That information is not in the report to

12   Congress, but I talked to the agency and roughly 2- to 3,000

13   re-evaluations are conducted annually.

14      Your Honor asked about tolling projects and particularly

15   across state projects.  There is a recent decision from the

16   District of Maryland as of two weeks ago, Federal -- *Sierra*

17   *Club v. Federal Highway Administration*, 2024, Westlaw 1194382

18   that describes the 495 hot lane project stretching between

19   Virginia and Maryland across the Potomac River.  And this is

20   not a cross state project, but it is a similar tolling project.

21   Rhode Island installed variable tolling.  That project was

22   assessed an EA.  Again, this is not a VPPP program, but that

23   was assessed at 83 Federal Register 2867.

24         THE COURT:  Repeat that, please.  83 Fed Reg...

25         MR. CUMMING:  2867.

1          THE COURT:  Thank you.

2          MR. CUMMING:  There was no NEPA litigation about that

3    project, but there was commerce clause litigation about the

4    project and there is a case, *American Trucking Association,* 630

5    F Supp.  3d 357 from the District of Rhode Island in 2022, that

6    describes the project and notes that is also project that's

7    genesis was in a state legislative action.

8          THE COURT:  Okay.

9          MR. CUMMING:  Thank you, your Honor.

10          THE COURT:  Thank you.

11      We're now at rebuttal.  If my memory serves me

12    correctly, Mr. Mastro, you reserved 10 minutes.

13          MR. MASTRO:  Yes, your Honor.

14      Your Honor, I will start where we left off on past

15    practice just so we're clear.

16      All of this information pulled off --

17          THE COURT:  Mr. Mastro, do me a favor, please?

18          MR. MASTRO:  Yes.

19          THE COURT:  The microphone.  So pass out what you need

20    to pass out, and then you may proceed.

21      Mr. Mastro, you may proceed.  Ten minutes.

22          MR. MASTRO:  Thank you, your Honor.

23      I'll -- very briefly.

24          THE COURT:  Make sure you lift the mic up closer to

25    you, please.  Thank you.

```
 1              MR. MASTRO:  Yes, your Honor.

 2              THE COURT:  Appreciate it.

 3              MR. MASTRO:  Very briefly, following up on what FHWA's

 4    counsel just said, acknowledging that at least one of the

 5    projects he considers in the same class, FHWA did an EIS, this

 6    project, of course, being unprecedented in the nation's

 7    history.

 8         But I just want to point out, we have also had, over the

 9    last decade, at least eight other projects in New York State

10    that FHWA required having an EIS, including simply creating

11    an -- an additional access lane into JFK Airport.  I

12    respectfully suggest that a project of this magnitude --

13              THE COURT:  But those were all construction projects.

14    Correct?

15              MR. MASTRO:  Correct, your Honor.

16         But that is in this instance, I believe, since this is

17    the first of its kind, unprecedented scheme that is going to

18    have dramatic effects on Metropolitan area, will set a

19    precedent, as they pointed out, around the country.

20         I think that, you know, when you are doing that kind of

21    analysis, it is a distinction without a difference to say one

22    was a construction project or involved some element of

23    construction, as well as tolling -- that this major tolling

24    project is not in the same category.  And of course,

25    your Honor, in New York City we have seen the ample
```

```
1   construction to create a corridor all the way around 60th
2   Street all the way to the Battery, each side, West Side
3   Highway, FDR Drive of gantries, a lot of construction.  They
4   went ahead and did all of that.  It is not a no-construction
5   project.  It's cost many, many millions of dollars to do that.
6   This is not a no-construction project and we have comparable
7   examples that involve less, less of an impact and they require
8   an EIS like the JFK access lane.
9        Now, your Honor, let's go back to air quality and
10  Environmental Justice Communities.
11       Your Honor, I going to hand up the slides I am going to
12  be using.
13       Now, your Honor, you were told that the reason there
14  were only two New Jersey counties chosen for the air quality
15  study, as opposed to ten New York counties, was because Bergen
16  was highest, Hudson was lowest.  And what was in between was in
17  between, inconsequential.
18       Now, your Honor, the reason why that's arbitrary is
19  because they did that for New Jersey to minimize what they
20  looked at in New Jersey, but in New York, they didn't pick --
21  pick the highest and the lowest.  In New York, they picked ten,
22  even though the percentages on many of the counties are similar
23  to the fraction of a percent that many of these New Jersey
24  counties were.  But, your Honor, I'm going to point out to you
25  a couple of anomalies here.  All right.  Look at Middlesex
```

```
1    County, which wasn't studied at all in air quality or

2    environmental justice.  Nearly 15 million more mile -- vehicle

3    miles traveled by 2045.  Not studied at all and had, you know,

4    more than a third of a percent increase --

5              THE COURT:  So --

6              MR. MASTRO:  -- in vehicles.

7              THE COURT:  So, Mr. Mastro, if the study had been done

8    the same way in New York, just the high and the low --

9              MR. MASTRO:  Yes.

10             THE COURT:  -- would you still be here arguing

11   arbitrariness?

12             MR. MASTRO:  I -- I wouldn't because it would be

13   consistent.  But they didn't do that.  That is --

14             THE COURT:  That's --

15             MR. MASTRO:  -- why it is arbitrary.

16             THE COURT:  I am just probing the metes and bounds of

17   your argument, Mr. Mastro.

18             MR. MASTRO:  Well, your Honor, the meets and bounds

19   are clear.  She represented to you the incredible logic, but

20   it's arbitrary to do one thing for New Jersey and give them the

21   short end of the stick in the review, and do something very

22   different in New York.  That's the arbitrariness.  That is the

23   unreasonableness of it.

24             Now, if we could please go to the next slide.

25             She also told you that -- and, again, these are
```

1  arguments being made by the MTA even though this is an FHWA

2  project.  So the MTA seems to be back-ending the rationale for

3  things that the FHWA didn't necessarily explain in its own

4  documents or didn't explain here.

5          THE COURT:  So are you saying to me that that's a

6  problem because a rationale is being offered by someone other

7  than the agency in its published decision?

8          MR. MASTRO:  Post-hoc rationalizations, your Honor --

9          THE COURT:  Exemplarily.  Correct?

10          MR. MASTRO:  -- especially by the project.

11          THE COURT:  Yes.

12          MR. MASTRO:  Yes, that's an issue that you have to

13  look at every time these -- these post-hoc justifications are

14  made.

15          THE COURT:  No, I know what I am supposed to look at.

16  Are you arguing that that's the case here with the MTA's --

17          MR. MASTRO:  I am.

18          THE COURT:  -- position?

19          MR. MASTRO:  I am.  And if I can close the circle,

20  please.

21      She -- she also said to you --

22          THE COURT:  She has a name, Mr. Mastro.

23          MR. MASTRO:  Ms. Knauer -- Ms. Knauer also said the

24  choice and Mr. Cumming said it, too, the choice of the counties

25  for the environmental justice review was the counties closest

1   to the central business district.

2        Well, your Honor, we -- we know New Jersey counties.

3   Nassau is out here.  Passaic comes closer.  Middlesex, which we

4   just looked at, comes right up to the border.  And they're

5   actual large swaths of Passaic and Middlesex.  Middlesex, which

6   has the second-highest increase in volume of traffic, has more

7   than 50 percent more commuters going into the central business

8   district than Union.  It comes right up to here.  They didn't

9   consider Middlesex.

10       That's a rationale that isn't rational because there are

11  additional New Jersey counties that are even closer to the

12  central business district than some in New York that were

13  considered and that have, in fact, higher indicia of additional

14  vehicle miles that will occur by 2045, and more commuters into

15  the central business district, Middlesex County.  Irrational,

16  makes no sense not to have studied it.

17       Now, your Honor, coming up next we're going to talk

18  about census tracts.

19       Again, Middlesex County has more census tracts.

20  Meaning, where they are expecting, you know, worse outcomes.

21  More census tracts for environmental justice purposes.  Many

22  more than Essex County and almost triple the number in Union

23  County, ones that were studied.  Totally irrational not to

24  consider Middlesex County and the Environmental Justice

25  Communities there that might have -- should have qualified for

1  mitigation because they fit in all the categories.

2       Now, next, your Honor, the explanation that you were

3  given, amplified today by Ms. Knauer, this is what the

4  environmental assessment actually says, and that's DOT_0007319

5  to 20 in the administrative record.  It actually says that

6  all 15 of these communities in New Jersey, in those three

7  counties, didn't even look at Middlesex, but in those three

8  counties they have pre-existing pollutants or chronic disease

9  burdens above the 90th percentile and increased traffic levels

10 of -- over the period of the study.  They all may need

11 mitigation.  Okay.

12      Now sands have shifted, Ms. Knauer tells you what it

13 really means at the end of the day to narrow that list.  At the

14 end of the day they went with the 90th percentile in pollutants

15 and 90th percentile in chronic disease.

16      Next slide, please.

17      THE COURT:  No, hold on one second.  It is a question

18 I should have asked yesterday.  On the left side, where you

19 have the number of tracts --

20      MR. MASTRO:  Yes.

21      THE COURT:  -- in some instances you have zeros, and

22 in other instances there are blanks which I assume mean zeros,

23 but I want to make sure that that is the case and that there is

24 not some unintended nuance that I am missing.

25      MR. MASTRO:  Your Honor, this is out of the

1  administrative record directly.

2      As you can see, DOT_731 --

3      THE COURT:  I just want to make sure you and I are

4  understanding the --

5      MR. MASTRO:  I --

6      THE COURT:  -- reading of the document the exact same

7  way.

8      MR. MASTRO:  I am reading those blanks as zeros, your

9  Honor.  That's what --

10     THE COURT:  Okay.

11     MR. MASTRO:  And I am once again wondering why Bayonne

12 has four environmental justice census tracts that didn't get

13 any further consideration, but leaving that aside --

14     THE COURT:  Note, Mr. Cumming, just clarify for the

15 record that your understanding is exactly the same when you get

16 up, please; that the blanks mean zero.  If not, explain.  Go

17 ahead.

18     MR. MASTRO:  Okay.

19     THE COURT:  Yes, Bayonne has four identified tracts.

20     MR. MASTRO:  Again, the irrationality of that.  They

21 don't make the list.  But -- and there's no explanation anyone

22 has given here why not when it has more than many of the other

23 communities on this list, including three of the four that are

24 on the next list.

25     THE COURT:  Well, hold on.  No explanation given here,

1    here meaning in the record, as opposed to --

2              MR. MASTRO:  Correct.

3              THE COURT:  -- you're standing up and talking to the

4    Judge --

5              MR. MASTRO:  Correct, your Honor.  Correct.

6         Next, please.  So now this is the same list.  They may

7    need mitigation, okay, but now we're down to four.  And Ms.

8    Knauer's explanation, not offered by the FHWA, because the

9    documents in the administrative record go back and forth

10   between and/or or.  But she says that that means and.  You have

11   to have both over the 90th percentile in pollution and over the

12   90th percentile in chronic disease.  So we're now down to four

13   in New Jersey, even though all 15 may need mitigation.  But

14   even then the environmental assessment and FONSI simply say

15   that those four could merit place-based mitigation.

16        Here's the rub.  Here's the rub.  Where does it say in

17   any regs, where does it say anywhere that when you have found

18   that a community may need mitigation, that you can then keep

19   making further distinctions and say, I'm going to take them off

20   the list because these ones may need mitigation because there

21   is going to be significant impacts there.

22        But I'm not going to give to those other 11.  I'm going

23   to make distinctions to narrow the list more so I have to do

24   less mitigation and less places to mitigate.  And I don't have

25   to address the significant impacts in those communities.

1    Because they have environmental justice tracts.

2         They have at least either pollution levels above the

3    90th percentile or chronic disease above the 90th percentile,

4    and increased truck traffic to boot.  But I'm going, to make

5    arbitrary decisions so I have to spend less.  I am only going

6    to spend a certain amount of money.  So I'm going to make

7    further moving of the needle to narrow the list so I don't have

8    to cover those communities.  Even though I found -- FHWA

9    found --

10             THE COURT:  One minute, Mr. Mastro.

11             MR. MASTRO:  They need mitigation.

12         Yes.  This is so critically important, though, your

13   Honor.

14             THE COURT:  Mr. Mastro.

15             MR. MASTRO:  Yes.

16             THE COURT:  Right.  What's fair for one is fair for

17   the other.

18             MR. MASTRO:  Absolutely, your Honor.

19             THE COURT:  You asked for ten, you are getting ten.

20   You got one minute.

21             MR. MASTRO:  Thank you, your Honor.

22         So the point being that it's arbitrary.  It's

23   irrational.  It's unreasonable and it violates NEPA.  The

24   obligation under NEPA is to mitigate everywhere you found that

25   may have significant adverse environmental impacts.

1      You can't issue a FONSI unless you have mitigated there.

2      They continue to make distinctions to narrow a list

3 because they want it to only have it apply to a small pot of

4 money in a multi-billion dollar project.  It's irrational,

5 unfair, unreasonable, and it is not consistent with NEPA.  You

6 found --

7      THE COURT:  That is a good stopping point, Mr. Mastro.

8 You've run your ten.

9      MR. MASTRO:  Okay.

10      THE COURT:  Let's explore a couple of things that you

11 said.  I may not repeat it back exactly correct.  Then you are

12 more than welcome to clarify so I have a clear understanding.

13      So one of the things that you said a couple of moments

14 ago was, nowhere does it say that additional gradations can

15 occur.  Correct?

16      Do you need me to repeat?  Because --

17      MR. MASTRO:  No --

18      THE COURT:  -- Ms. Myers was whispering in your ear.

19      MR. MASTRO:  And she was and you said nowhere does it

20 say additional gradations.

21      THE COURT:  Correct.  And is that what you said?

22      MR. MASTRO:  I -- I want to make sure --

23      THE COURT:  Or you said distinctions.  Right?  In

24 other words, once they make the first cut, it can't make

25 further cuts.  Right?  The "and" versus the "or."

```
 1          MR. MASTRO:  Correct.  Once they've decided that it
 2  may need mitigation, they can't then decide oh, I'm going to
 3  put further --
 4          THE COURT:  You answered my question.
 5          MR. MASTRO:  Yes, your Honor.
 6          THE COURT:  You answered my question.
 7          MR. MASTRO:  Yes, your Honor.
 8          THE COURT:  So now the next part of this is, is there
 9  an affirmative prohibition in the statute or the regs that
10  comports with your statement?  Or is it your interpretation of
11  what the statute or the regs say?
12          MR. MASTRO:  Your Honor, we have --
13          THE COURT:  So let me phrase it differently.
14      What I think you are saying is there is no discretion on
15  the part of the agency to, once they identify that a community
16  or a tract needs mitigation, further differentiate.
17          MR. MASTRO:  That is -- that is what I believe the
18  regs require and --
19          THE COURT:  Well, so I'm going to ask you.
20      Show me the money.
21          MR. MASTRO:  Okay.  Your Honor --
22          THE COURT:  Show me the reg that that supports your
23  proposition.
24          MR. MASTRO:  Your Honor, I'm going to pull it up right
25  now.
```

1          THE COURT:  I appreciate your passion and I appreciate

2    your position, but you made a broad statement.

3          MR. MASTRO:  Your Honor --

4          THE COURT:  And if you want me to follow the path to

5    give you the outcome that you want, you have to show me what

6    supports --

7          MR. MASTRO:  Of course, Your Honor.

8          THE COURT:  -- your proposition.

9          MR. MASTRO:  Of course, Your Honor.  And please put up

10   on the slide for me FHWA's brief.

11         THE COURT:  You know what?

12         MR. MASTRO:  What?

13         THE COURT:  I don't need a whole lot of explanation.

14   Just identify the reg or the section in the regs that supports

15   your proposition.  It is real easy.  Give me a citation.  You

16   don't have to do show and tell with me.

17         MR. MASTRO:  Your Honor, 40 CFR, Section 1501.6(c) as

18   well as 40 CFR, Section 1501.3(a)3.

19         THE COURT:  Sorry.  1501.3(a)3.

20         MR. MASTRO:  40 CFR, Section 1501.6(c).

21         THE COURT:  Got that.

22         MR. MASTRO:  Quote, The FONSI, quote, Shall state the

23   authority for any mitigation and, quote, Any applicable

24   monitoring or enforcement provisions if the agency finds no

25   significant impacts based on mitigation, the mitigated FONSI

1  shall state any enforceable mitigation requirements or

2  commitments that will be undertaken to avoid significant

3  impacts.

4      Case law, *O'Reilly v. U.S. Army Corps of Engineers*, 477

5  F. 3d 225, Page 234, Fifth Circuit, 2007, held, An EA, quote,

6  Fails to sufficiently demonstrate that the mitigation measures

7  adequately address and remediate the adverse impacts where it

8  listed the potentially significant adverse impacts and provided

9  only cursory detail as to what those measures are and how they

10 serve to reduce those impacts to a less than significant level.

11     Your Honor, when I --

12        THE COURT:  That -- so tell me where those words say

13 that there is no authority to do additional gradations, right.

14 I heard what those things said, right.  Where does it prohibit

15 the FHWA from making further gradations?

16        MR. MASTRO:  Your Honor -- and, again, also the

17 *Bordentown* case in the Third Circuit, that the mitigation

18 measures as a mechanism to reduce environment impact levels

19 below level of significance, they have to be spelled out and

20 supported in the record.

21     Your Honor, once you have identified that there may be

22 significant impacts, and they said as to all 15 that they may

23 need mitigation, in order to issue a FONSI, an EA, they have

24 to, to pose mitigation for all 15.  They can't define certain

25 --

1            THE COURT:  So, Mr. Mastro, I get it.  But we have
2    shifting sands here.
3            First you are telling me there, in essence, no authority
4    for the agency to do what you have described as the "and."
5    Right?
6            I am asking you for regulatory support on that position.
7    You have given me what you think supports that position.  You
8    have now gone on to case law.  And you kind of wrap it up by
9    saying to me, they didn't explain.
10           But those are two completely different things.  Either
11   they have the authority to do what they did or they didn't.
12   That is a straight legal argument.  Right?  The fact that they
13   may not -- inherent in the -- in they didn't support that
14   decision is that the agency had the authority to do so.  But
15   they didn't provide, a reasoned explanation for why they did
16   what they did.
17           I have a real simple question for you.
18           Which is it?  Are you saying to me they don't have the
19   authority to do what they did?  Or are you saying they had the
20   authority to do what they did, and they just didn't explain it
21   reasonably?  That's what I am trying to get at.
22           You don't seem to be answering either of those --
23            MR. MASTRO:  I --
24            THE COURT:  -- questions directly.
25            MR. MASTRO:  I am answering it directly and firmly.

1        They did not have the authority.  After finding that

2   those 15 communities in New Jersey may need mitigation, they

3   did not have the authority to redefine the scope of what

4   mitigation they were going to provide.

5        The finding is firm.  The FHWA in its own papers, reply

6   brief Page 15, used the "or" standard and said if it had

7   pollutants above 90 percent or chronic disease, please take a

8   look.  They quoted from their own environmental assessment and

9   said that was the standard to be applied.

10       In applying that standard, 15 New Jersey communities

11  required mitigation, if we're going to have mitigation of

12  significant impacts.  And they arbitrarily then said, no, I'm

13  going to add another layer to it after I've found that they

14  already may need mitigation.

15       Clear finding.  And they put that and they said, oh, we

16  are going to define it down --

17           THE COURT:  So you're saying to the Court that the

18  standard is the "or" standard, and that they departed from that

19  standard to do an "and."  And in so doing, did not adequately

20  explain why they did it?

21           MR. MASTRO:  Correct, your Honor.

22       Having found that it -- there was --

23           THE COURT:  Well, we took ten minutes to get to there.

24  So I now clearly understand what you are arguing, and I

25  appreciate that.

```
 1            MR. MASTRO:  Well, I appreciate it.  I am sorry if
 2  I --
 3            THE COURT:  Thank you.
 4            MR. MASTRO:  -- wasn't clear.  I -- it's --
 5            THE COURT:  Well, you seem to be arguing with me about
 6  the premise behind my questions.  We finally got to where we
 7  needed to go.  And I appreciate it.
 8        So now we understand what you are actually arguing.
 9            MR. MASTRO:  I -- I am sorry that it -- if it came
10  across as if we were arguing about the premise of your
11  question.
12        I agreed with the premise of your question.  Having
13  found that it may need mitigation, they had no rights to then
14  do a redefinition to try and narrow the field.
15            THE COURT:  I got it, Mr. Mastro.
16            MR. MASTRO:  Thank you.
17            THE COURT:  We're done.
18            MR. MASTRO:  Thank you.
19            THE COURT:  Okay.  Mr. Cumming, you are up for ten
20  minutes.
21        Just hold on 30 seconds, Mr. Cumming.
22        Mr. Cumming, you are on the clock.
23            MR. CUMMING:  Thank you, Your Honor.
24        I'd just like to reiterate at the beginning, that
25  methodology, whether it's air quality or environmental justice,
```

1   is an area of need where Courts are most deferential to the

2   agency's decision-making.  That's been reiterated by the

3   Third Circuit as recently as two months ago as well as courts

4   around the country.  That is the framework through which the

5   Court has to assess plaintiff's arguments, which are, at base,

6   second-guessing the agency's methodology.

7        Your Honor asked yesterday about whether there are other

8   cases that used a similar range of scenarios.  And the answer

9   is, yes, there is an instructive case from District of Columbia

10  District Court, *Sierra Club V Watkins*, 808 F Supp. 852, that

11  discusses how the Department of Energy assessed the

12  environmental -- projected environmental effects of importing

13  spent fuel rods through ports on the East Coast.

14          THE COURT:  808 F Supp. 852 puts us back in the 1980s?

15          MR. CUMMING:  1991, Your Honor.

16          THE COURT:  '80s?  '90s?  Okay.

17          MR. CUMMING:  But Judge Lamberth's decision, I think,

18  and rationale remains true today, which is that plaintiff's

19  challenge -- and the Department of Energy used a model that did

20  not have a spike -- site-specific analysis, essentially, that

21  assessed a range of potential outcomes in different port

22  characteristics.

23        And there the Court found that that methodology was

24  acceptable because it conservatively estimated the risk by

25  choosing the worst-case variable in each category.  That's what

 1   the final EA did here.  It was a conservative document that

 2   looked at the -- the worst-case scenario in each basket of

 3   facts.

 4        Mr. Mastro also discussed how -- yesterday the

 5   pre-existing national ambient air quality violations in the

 6   region.  The fact that there are pre-existing violations is

 7   irrelevant to the NEPA analysis.

 8            THE COURT:  Is irrelevant?

 9            MR. CUMMING:  Irrelevant into looking at the effects.

10   And this from the Seventh Circuit, *Highway J Citizens Group v.*

11   *Mineta*, 349 F. 3d 938 at 954, Note 3.

12        There the agency looked at a construction project over a

13   river that had pre-existing pollutants.  Plaintiffs challenged

14   the fact that the NEPA project wouldn't clean up those

15   pollutants, and the Seventh Circuit found that was not

16   necessary.

17        What the project had to do was assess whether it would

18   make the pollutant burden worse, but it didn't have to clean up

19   pre-existing burdens in the area.  NEPA takes the status quo

20   and looks forward.  It is not retroactive.

21            THE COURT:  Mr. Cumming, that prospective look, as

22   opposed to retroactive look, is spelled out in language in the

23   statute or the legislative history and endorsed by the Courts?

24            MR. CUMMING:  Both, statute and endorsed by the

25   Courts.

1          THE COURT:  Okay.

2          MR. CUMMING:  Language of NEPA requires the analysis

3   of the effects of the proposed action.  Not all effects in the

4   area.

5          THE COURT:  You may not have that statutory language

6   at your fingertips, but it would be helpful to direct the Court

7   to where that language exists in the statute.

8          MR. CUMMING:  Will do, your Honor.

9          THE COURT:  Okay.

10          MR. CUMMING:  Mr. Mastro referred to the EPA comments

11   on this -- Mr. Mastro referred to the EPA's comments.  The

12   Third Circuit has said the agency's responsibility is to

13   consider them and take them seriously.

14          There is no doubt Federal Highways did that here.

15   That's what the Third Circuit has said is required.  It does

16   not have to adopt the comments wholesale, although Federal

17   Highways made substantial changes to the document based on EPA

18   concerns, but they certainly met the standards set out by the

19   Third Circuit.

20          THE COURT:  Which is no different than how any other

21   agency is supposed to behave under administrative law, correct?

22          MR. CUMMING:  Correct.  The point the Third Circuit

23   was making is that setting aside the EPA's expertise in air

24   quality does not elevate the agency to a role of a super veto

25   over the project.  Federal Highways was the lead agency, it had

1  to take their comments seriously.  It did so here.

2          THE COURT:  But in the end, it is treated like any

3  other citizen would be treated or entity that's offering

4  comments?

5          MR. CUMMING:  Correct.

6          THE COURT:  And the agency can choose to give it,

7  because of the EPA's expertise, appropriate weight?

8          MR. CUMMING:  The weight that comments are due.

9          THE COURT:  It deserves?

10         MR. CUMMING:  Yes.

11         THE COURT:  Yes.

12         MR. CUMMING:  Correct.

13     Mr. Mastro made points about the methodology for getting

14  to the environmental justice mitigation analysis.  As I touched

15  on yesterday, that was done using the Council on Environmental

16  Quality's climate and economic justice screening tool, which

17  sets out the percentiles at which you can screen communities

18  for significant effects.  That --

19         THE COURT:  I'm sorry.  Whose screening tool?

20         MR. CUMMING:  Council on Environmental Quality's

21  screening tool.

22         THE COURT:  Okay.

23         MR. CUMMING:  And that's -- and that was --

24         THE COURT:  Which is different than the EPA's

25  EJ screening tool, correct?

1           MR. CUMMING:  Yes, it is, your Honor.

2           THE COURT:  Okay.

3           MR. CUMMING:  Yes, it is.  I believe the CEQ tool is

4    more recent in response --

5           (Reporter clarification.)

6           MR. CUMMING:  -- the CEQ tool is more recent in

7    response to executive orders.  And that is set out at 36993 of

8    the record.

9        Last point, Your Honor.  Plaintiffs conflate air quality

10   and environmental justice with some frequency.  They were

11   different analyses intended to serve different purposes.

12       And as the EA explains, the Environmental Justice

13   Analysis required a level of granularity different from air

14   quality because in many communities there were increases and

15   decreases in traffic in the same community.  Thus, requiring an

16   analysis at the census tract level, rather than the overall air

17   quality analysis.

18          THE COURT:  Anything else, Mr. Cumming?

19          MR. CUMMING:  I have nothing further, your Honor.

20          THE COURT:  Okay.  One question and it is not on any

21   of the things that you have discussed in your rebuttal.  I want

22   to talk about local intersections.  All right?

23       So the plaintiff emphasizes that the FHWA only analyzed

24   four traffic intersections in New Jersey out of 102 total, and

25   contends that the FHWA's failure to conduct an additional

1   hotspot analysis -- I am sorry, additional hotspot analyses,

2   plural, right, was unreasonable.

3        The government's primary response on the merits provides

4   that the final EA repeatedly explained local intersections west

5   of the GW Bridge were not included because traffic at those

6   intersections connects primarily to regional highways.  Because

7   traffic at individual intersections would be disbursed,

8   intersection analysis would not have shown the worst case

9   potential impacts in Bergen County.

10       The EA, instead, used a highway link analysis to

11  evaluate the area west of the GW Bridge, which was the link

12  predicted to have the highest potential overall annual daily

13  traffic from among all links for all scenarios in the study

14  area.  This analysis, along with modeling conducted for two

15  other highway link hotspots, demonstrated that the project

16  would not result in exceedances of applicable NAAQS.

17       Is that a correct recitation?

18       MR. CUMMING:  It is, your Honor.

19       THE COURT:  Okay.  The plaintiff, however, maintains

20  that the highway link analysis was woefully inadequate as

21  compared to the hotspot analysis, as it is limited to a review

22  of predicted particulate matter, contains no analysis of carbon

23  monoxide levels, volatile organic compounds, nitrogen oxides or

24  sulfur dioxide, all of which are pollutants admitted by

25  vehicles that harm human health.

1          Is that a correct, to the best of your recollection,

2    recitation of what plaintiff argued in response?

3          MR. CUMMING:  Yes.

4          THE COURT:  Why should the Court conclude that highway

5    link analysis is a reasonable substitute or proxy for a hotspot

6    analysis given these distinctions?

7          MR. CUMMING:  I am glad you asked, your Honor, and I

8    have three citations to give you on that point.

9          First, your Honor asked about why we are concerned about

10   particulate matter with respect to diesel truck traffic.

11         The record at DOT_1164 provides some background on that

12   point.  It is fairly complex, and I don't know that I can -- I

13   will refer the Court to it rather than --

14         THE COURT:  That's fine.  Tell the Court what to look

15   at, and I will be happy to do so.

16         MR. CUMMING:  That describes the scientific basis for

17   what I was saying in layman's terms yesterday.

18         Two other citations, so the highway link analysis was

19   approved by the ICG Group, which is the air quality

20   consultation group in conformance with the EPA guidance.  There

21   are two record cites -- DOT_36864, referring to document

22   starting at DOT_36818 and DOT_6854, referring to document

23   starting at DOT_6805 -- that indicate the approval of the

24   highway link analysis by that group and its conformity with

25   standard EPA modeling techniques.  Your Honor asked why should

1    it find it reasonable, that's why.

2           THE COURT:  Thank you.

3           MR. CUMMING:  Thank you, your Honor.

4           THE COURT:  I appreciate it.

5       Ms. Knauer, I assume you are up in rebuttal.

6           MS. KNAUER:  Yes, your Honor.

7           THE COURT:  You are on the clock, Ms. Knauer.

8    Ten minutes.

9           MS. KNAUER:  Thank you, your Honor.

10       I think that the prevailing theme of New Jersey's

11   presentation is that this project requires an EIS because

12   New Jersey says it requires an EIS because it is a new kind of

13   project.

14       That's not what NEPA looks at.  NEPA looks at the

15   effects of the project and that's what the EA did and

16   determined that with mitigation, they were not significant.

17       So this is not a know-it -- "I know it when I see it"

18   standard.  It is an administrative law standard.

19           THE COURT:  You are saying to the Court that your

20   belief is that the general theme running through plaintiff's

21   presentation, plaintiff's affirmative case is it is because I

22   say it is.

23           MS. KNAUER:  And because it is a big project and

24   affects, you know, a highly populated area, which, I mean, a

25   lot of analysis was done for that very reason.

1          I think there was a colloquy between your Honor and

2    Mr. Mastro about the other highway projects that they were

3    comparing this one to, and you noted that those projects were

4    construction projects and Mr. Mastro said there is some

5    construction associated with this project.  That's true, there

6    is.  The effects of that were studied in the EA.  New Jersey

7    has not contested --

8               THE COURT:  But the construction --

9               MS. KNAUER:  It is minor.

10              THE COURT:  Well, it is not infrastructure -- well,

11   I'll actually, phrase --

12              MS. KNAUER:  It is not highway widening.

13              THE COURT:  -- it differently.

14              MS. KNAUER:  It is not highway widening.

15              THE COURT:  It is not infrastructure construction like

16   the other four projects were infrastructure construction.

17              MS. KNAUER:  Precisely.  It is, basically, adding

18   sensors and, in some case, some lamp posts.

19              THE COURT:  You mean when I look out my window from my

20   courthouse in New York and I see an extra rectangular box on

21   a --

22              MS. KNAUER:  Correct.

23              THE COURT:  -- traffic stanchion.

24              MS. KNAUER:  And that was all studied in the -- it was

25   all studied, you know, in the EA.  None of it is occurring in

1    New Jersey, and New Jersey didn't complain about it in their --

2    in this case.  So I think to bring it up now is beside the

3    point.

4              THE COURT:  Well, maybe not.

5              MS. KNAUER:  In terms of the air quality study area, I

6    think we have presented on the basis for choosing those two

7    counties.  That's in the record.  That was not something that

8    New Jersey opposed in its early comments or its draft EA

9    comments or in its comments on -- I don't believe it looked --

10   it talked about that in its comments even on the final EA, but

11   Middlesex County, I think Mr. --

12             THE COURT:  Let's hold on ten seconds, Ms. Knauer.

13        When was the point in time in the process where the two

14   counties were identified from the larger list?  At the time of

15   the draft EA?

16             MS. KNAUER:  Correct.

17             THE COURT:  It was identified, in your view, in

18   sufficient time that if anybody objected to the reduction in

19   the number of counties, it was presented with sufficient notice

20   that if somebody wanted to comment, that it should be.

21   Otherwise, it could have been done.

22             MS. KNAUER:  Absolutely.  I mean, the air quality

23   analysis presented in the draft EA, New Jersey didn't comment

24   on any aspect of it.

25             THE COURT:  But this is not a circumstance where

1   something changed from the draft EA to the final EA?

2           MS. KNAUER:  That's correct, your Honor.

3           In terms of Middlesex County, I think Mr. Mastro

4   suggested that the project would cause a

5   15 million-vehicle-miles-traveled increase in Middlesex County.

6   He was citing to the no-action condition in Middlesex County,

7   not to increases from the project.  I just wanted to put that

8   on the record.

9           In terms of the highway link analysis, Mr. Mastro

10  presented the -- I think we have this.  I might not have -- I

11  think I gave it to you yesterday, your Honor.  There was a page

12  that showed and it was -- it's similar to what Mr. Mastro

13  presented on the screen, which was a list of the links and the

14  scenarios, and the I-95 link, scenario C coming up as the worst

15  for overall average daily traffic.

16          THE COURT:  I-95 link in the Metropolitan New York

17  area leading to the CBD?

18          MS. KNAUER:  Leading to -- well --

19          THE COURT:  Leading to Manhattan.

20          MS. KNAUER:  -- leading to the George Washington

21  Bridge --

22          THE COURT:  Leading to the George Washington Bridge.

23          MS. KNAUER:  -- which doesn't go directly into the

24  CBD.

25          THE COURT:  Right.

1            MS. KNAUER:  Mr. Mastro highlighted that scenario A,

2    according to the list, would have a slightly higher increase in

3    trucks, but that was not the metric used to choose the I-95

4    location for the Highway Link Analysis.  The metric used for

5    that was highest overall annual average daily traffic.

6            There was another link chosen --

7            THE COURT:  And the pinpoint on that in the record is?

8            MS. KNAUER:  The point that -- the chart that

9    Mr. Mastro pointed to is DOT_6846, which presents -- it is in

10   that same --

11           THE COURT:  It's in that same chart?

12           MS. KNAUER:  The explanation is presented, I think,

13   right before that chart --

14           THE COURT:  Okay.

15           MS. KNAUER:  -- within the record.

16           THE COURT:  If we have any concerns, we will sort it

17   out.

18           MS. KNAUER:  Mr. Mastro suggested that my presentation

19   was a post-hoc rationalization of FHWA's decision-making in

20   terms of the Environmental Justice Analysis, that's absolutely

21   not true.

22           The -- I was merely pointed to parts of the record which

23   lays out the basis for FHWA's decision.

24           With respect to --

25           THE COURT:  So what you are saying to the Court is

1    your arguments appear in either the final EA or the FONSI, and

2    so what you were doing was ostensibly parroting that which the

3    FHWA had already said in writing.

4          MS. KNAUER:  Correct.  And just highlighting it for

5    the Court.

6          THE COURT:  You are not offering any new rationales in

7    support that were not found in the record.

8          MS. KNAUER:  Correct.  And the rational for the

9    identification of communities is found in the record at

10   DOT_7322 through 7328, which is the discussion in appendix 17D,

11   which is part of the EA, describing how FHWA determined which

12   communities -- and I will get to why there is a difference

13   between they warrant mitigation and that were identified for

14   place-based mitigation.  That is all laid out within those

15   pages of the EA.  I was not making a post-hoc rationalization

16   for them.

17         In terms -- I think that Mr. Mastro's argument that

18   there were certain communities, the 15 Census Tracts that were

19   identified as may warranting mitigation and that they were

20   limited then to seven, that's just not true.

21         He is completely ignoring the regional mitigation

22   measures, which were identified that would benefit all of those

23   census tracts, not just the seven.

24         The seven were identified for even greater attention

25   because they had chronic disease burdens above the

```
 1   90th percentile as well as pollutant burdens.

 2        Bayonne --

 3        THE COURT:  Are you saying to the Court that the

 4   broader number has been identified for mitigation purposes, but

 5   the smaller number has been identified in order to receive

 6   enhanced mitigation because of the presence of both the

 7   pollutants and the chronic disease?

 8        MS. KNAUER:  Precisely, your Honor, precisely.

 9        And that is laid out in the document and the rationale

10   for that are laid out in the pages that I just cited.

11        Bayonne, in particular, Mr. Mastro raised, that is an

12   area that has pollutant burdens but does not have the high

13   chronic disease burdens that some of the other census tracts --

14        THE COURT:  So Bayonne would fit into the first

15   category but not the second category?

16        MS. KNAUER:  Correct, but it will benefit from the

17   regional mitigation, including what I described yesterday, the

18   clean trucks initiative, the overnight toll discount, and

19   related measures.

20        So it is not that it is not -- it's not that mitigation

21   was not identified for those communities, it was.  And many

22   millions of dollars are going to be committed to it.  It is

23   just that those communities were not seen in terms of

24   pre-existing burdens as specifically warranting localized

25   mitigation within the communities themselves.
```

1          I also -- there was a discussion about -- I also just

2     want to note that the Environmental Justice Analysis, while

3     part of the EA and NEPA, it is not pursuant to any regulation.

4     It is, you know, a federal policy pursuant to executive orders.

5          So in terms of the mitigation that was identified there,

6     it wasn't really to specifically address significant adverse

7     impacts that were identified through the NEPA analysis, but to

8     recognize the importance of insuring that our ongoing federal

9     actions don't continue to adversely -- disproportionately

10    adversely affect environmental justice communities.

11         THE COURT:  So if I understand you correctly, and I

12    think Mr. Cumming may have said this yesterday as well, NEPA

13    has a set of requirements.  And then while not specifically

14    spelled out in NEPA, either overlaid or in conjunction with or

15    concomitant with NEPA is the executive order directive to deal

16    with environmental justice on top of whatever NEPA is

17    requiring.

18         MS. KNAUER:  Absolutely, your Honor.

19         And the NEPA analysis, the straight air quality analysis

20    found that the project would not create any new exceedances of

21    ambient air quality standards.  Therefore, no significant

22    adverse effects.

23         THE COURT:  So while theoretically -- interrelated --

24         MS. KNAUER:  Yes.

25         THE COURT:  -- some of the same considerations that go

1    into the air quality analysis are not necessarily the same

2    considerations that go into the Environmental Justice Analysis

3    because the Environmental Justice Analysis is required by

4    something other than NEPA.

5           MS. KNAUER:  Absolutely, your Honor.

6           And it adds on the consideration of pre-existing

7    burdens.  That is the important aspect of environmental justice

8    that is not --

9           THE COURT:  But those pre-existing burdens are not

10   something spelled out as a requirement in NEPA.  They are

11   spelled out in the executive order directive regarding

12   environmental justice.

13          MS. KNAUER:  They are recognized by the executive

14   order.

15          THE COURT:  Yes.

16          MS. KNAUER:  Yes, your Honor.

17          THE COURT:  Okay.  I have one more question for you,

18   Ms. Knauer.  Then I will let you join your colleagues.

19          The MTA argues that the EA considered seven potential

20   environmental justice screening tools, including the EPA's EJ

21   screening tool and the New Jersey environmental justice screen.

22          So my question to you is:  EPA has got expertise.

23   Right?  In this area?

24          MS. KNAUER:  Correct.

25          THE COURT:  Why were the EJ screen tool and New Jersey

1    environmental justice screen tool rejected in favor of

2    something else?

3            MS. KNAUER:  The New Jersey screen tool is for

4    New Jersey and a large part of the study area is not in

5    New Jersey.

6        So to use a data set that extended over the entire study

7    area, it was appropriate to use EPA's tool.

8            THE COURT:  But wasn't the EPA tool rejected?

9            MS. KNAUER:  Well, no, it was used to -- I mean,

10   the...

11           THE COURT:  I am not so sure I agree with that,

12   Ms. Knauer.

13           MS. KNAUER:  EPA's tool -- EPA's tool -- well, EPA's

14   tool can be used in different ways, but it was --

15           THE COURT:  But -- but -- but I mean, it's -- I get

16   the distinction about not using the New Jersey tool.

17           MS. KNAUER:  Right.

18           THE COURT:  I'm assuming that was explained in the EA

19   as to why the New Jersey tool --

20           MS. KNAUER:  The EA -- the EA explains the methodology

21   that was used to identify Environmental Justice Communities.

22   It was also explained in the draft EA --

23           THE COURT:  Right.

24           MS. KNAUER:  -- and was not commented on by New Jersey

25   at the time of the draft EA.

1          It -- it used the -- the methodologies familiar to --

2    that -- that come out of the executive order which specifies

3    minority and low income communities as the communities of

4    concern for Environmental Justice Analysis.

5          So the methodology is laid out in the EA explaining that

6    there was a threshold used for minorities which was either 50

7    percent -- 50 percent of the population within the census tract

8    or a greater amount then within the county, I believe.

9          THE COURT:  All right.  Wasn't the main consideration

10   the consistency across data sets so that there could be an

11   appropriate analysis or comparison?

12         MS. KNAUER:  Correct.  Correct.

13         THE COURT:  So that is why the New Jersey screening

14   tool was rejected --

15         MS. KNAUER:  Correct.

16         THE COURT:  -- because it didn't allow that but the

17   methodology that was chosen did allow that, including looking

18   at things like CDC data.  Correct?

19         MS. KNAUER:  Well, there's two -- there's two parts of

20   to it.  One was identifying the environmental justice census

21   tracts.  That was one thing.  And then -- then in order to

22   identify the highly burdened census tracts, EPA's EJ screen was

23   used for the pollutant burdens and the CDC tool was used for

24   the chronic disease burdens because the EJ screen didn't cover

25   New Jersey.

1          THE COURT:  Okay.

2          So the -- the problem with the EPA tool was that it

3     didn't cover New Jersey?

4          MS. KNAUER:  Correct.  For identifying chronic disease

5     burdens, specifically.

6          THE COURT:  Do you have any understanding as to why

7     the EJ tool did not cover New Jersey for determining chronic

8     disease?

9          MS. KNAUER:  I can only speculate that New Jersey

10    didn't provide their data to the EPA, but I really don't know.

11    I don't know the answer to that.

12         THE COURT:  Maybe Mr. Cumming knows the answer to that

13    question.

14         Thank you, Ms. Knauer.  I appreciate it.

15         MS. KNAUER:  Thank you, your Honor.

16         THE COURT:  Mr. Cumming, I may have asked Ms. Knauer

17    some things when I engaged in colloquy with her that perhaps

18    might be more appropriate for you to answer.

19         I will give you two minutes.

20         MR. CUMMING:  Thank you, your Honor.

21         What Ms. Knauer said at the end sounds right to me.  I

22    mean, the Federal Highway used methodology set out in CEQ

23    guidance documents pursuant to executive order to determine

24    which were environmental justice communities.  It then used

25    various screening tools to isolate those communities.

1          THE COURT:  Okay.

2          MR. CUMMING:  And then when -- when it came to

3   screening those communities for mitigation, used further CEQ --

4   recent CEQ guidance to see -- the CEJST -- and I may be saying

5   the acronym wrong.  So it is in appendix 17D.  It is set out

6   that the more recent CEQ guidance that was used to screen for

7   communities for mitigation.  I don't know the answer,

8   your Honor, to the New Jersey data in the EJ screening tool.

9          THE COURT:  Okay.

10          MR. CUMMING:  I don't know.

11          THE COURT:  All right.  Thank you.

12      Everybody stay put for a minute.

13      All right.  Ms. Knauer, I have a question for you to the

14   degree that you can comment on this.

15          MS. KNAUER:  Yes, your Honor.

16          THE COURT:  And that is the CEQ screening tools that

17   Mr. Cumming just discussed with the Court versus the EPA

18   screening tool.  Do you have any comments that you feel you can

19   add?

20          MS. KNAUER:  Well, I will add one point.  I think when

21   Mr. Cumming is referencing the CEQ tool, it -- it really uses

22   the same data set, as to my understanding, as the EJ screen and

23   CDC, but it -- it does identify the 90th percentile for

24   pollutant burdens and chronic disease burdens as those -- as --

25   as setting forth the threshold for which community benefits

1  from federal programs should be directed.

2       I will say that in this case, you know, and -- and I

3  think I mentioned yesterday that the EJ screen tool uses

4  an 80th percentile for identifying what it, you know, looks as

5  communities of concern for pollutant burden.  And the CDC tool

6  uses a 66th percentile for, you know, a high -- considering a

7  high chronic disease burden.

8       You know, in -- in terms of how the analysis played out,

9  it -- it does discuss the CEJST 90th percentile threshold as --

10  as a reason for looking at those certain communities for

11  mitigation.  However, you know, within this particular --

12  which, you know, the -- the FHWA determined was reasonable, but

13  in this particular study area, it really doesn't make a

14  difference which percentile and threshold you use.  It ends up

15  being the same census tracts.  So it didn't change the number

16  of census tracts for mitigation at all to use the 90th

17  percentile versus 80th or 66th.

18            THE COURT:  Okay.  Thank you.

19            MS. KNAUER:  But there -- but there was a rationale

20  laid out for FHWA for using that, which is the newest federal

21  guidance under environmental justice.

22            THE COURT:  Thank you.

23            MS. KNAUER:  Thank you, your Honor.

24            THE COURT:  Okay.  Mr. Cumming, you talked about

25  publication.

```
 1              MR. CUMMING:  Yes.

 2              THE COURT:  And you said that the re-eval is going to

 3   be published on the MTA website.

 4              MR. CUMMING:  Correct, your Honor.

 5              THE COURT:  Well, I guess I am curious.  It's an FHWA

 6   decision.  Why is it being published on the MTA website?  Is --

 7   I take from your statement, therefore, it is not being

 8   published on the FHWA website.

 9         And so my question is what's going on and why?

10              MR. CUMMING:  My understanding is Federal Highways

11   usually has the project sponsor publish the decision documents.

12   It doesn't make them any less federal documents.

13         I will note here, I think, your Honor, that's to the

14   public's advantage.  The EA documents have been available on

15   the MTA website.  They are widely reported on.  Everyone knows

16   where to find them.  This keeps it consistent with the rest of

17   the documents in this case and the rest of the information

18   about the project.

19              THE COURT:  Okay.  Thank you.

20              MR. CUMMING:  Thank you.

21              THE COURT:  All right, I'm going to give us a very

22   quick five-minute stretch break.  Then I'm going to hear

23   argument from Amici.  And then we will make our adjustments on

24   the schedule for the rest of the day.

25              (Recess taken 10:49 a.m. to 10:58 a.m.)
```

```
 1              THE COURT:  Be seated, please.

 2         Mr. Mateen, you are up first.

 3         Mr. Nagel, you are up second.

 4         On the defense side, Mr. Reichman --

 5              MR. REICHMAN:  Yes, your Honor.

 6              THE COURT:  All right.  You will be up first.

 7         Who is speaking on behalf of the other defendant amici?

 8              MR. OTIS:  I am, your Honor.  Mr. Otis.

 9              THE COURT:  Mr. Otis.  Okay.

10         I was just handed a document.  So who handed me a

11    document?

12              ATTORNEY FROM MR. MATEEN'S OFFICE:  Your Honor, I did,

13    for Mr. Mateen.

14              THE COURT:  Okay.  Very good.

15         Mr. Mateen, you may comment on anything that was

16    discussed yesterday or up until now.

17              MR. MATEEN:  Thank you, your Honor.

18              THE COURT:  You have ten minutes, you are on the

19    clock.

20              MR. MATEEN:  Thank you, your Honor.

21         First to be clear, the County of Bergen fully supports

22    and endorses the all of the arguments set forth by the

23    plaintiff State of New Jersey, both in its moving papers and

24    the arguments you heard yesterday, today, and the arguments

25    that you will hear later today.
```

1        The county's position is clear, the final environmental

2    assessment and finding of no significant impact was and -- was

3    not a reasoned decision given the data.  And every single

4    tolling scenario Bergen County will experience increases in

5    vehicles, miles traveled, average daily traffic, and air

6    quality.

7        It also -- I don't want to just reiterate points that

8    you already know.  I just want to emphasize that impacts on

9    Bergen County should have been deemed significant.  The

10   explanation for as to why they were not deemed significant is

11   missing from the administrative record.

12       And also there is no dispute that the Bronx is entitled

13   to mitigation.  Nothing that we're arguing seems to suggest

14   that they are not entitled to mitigation, but based on the

15   data, if not Bergen County, then who?  We're going to see far

16   more increases in -- under each measured category, but there

17   was zero dollars committed to Bergen County.  You asked the

18   question to both the FHWA and the MTA yesterday as to why there

19   was not a single dollar amount committed to Bergen County.  We

20   don't have an answer to that question.  The -- we just get the

21   run around that there may or there could be.

22       Ultimately, there still is $120 million in funding

23   available for mitigation efforts, but there is no sense or

24   indication that Bergen County will be receiving any of that

25   funding, and it is a concern to the nearly 1 million residents

1    in Bergen County, the seven municipalities, and we think that

2    the findings of the EA are not supported by the data, and we

3    submit to the Court that you should vacate the final

4    environmental assessment and the finding of no significant

5    impact.

6          Thank you, your Honor.

7          THE COURT:  Thank you, Mr. Mateen.

8          Mr. Nagel.

9          MR. NAGEL:  Per your Honor's prior order, representing

10   the town of Fort Lee and the class that has asserted claims in

11   this case.

12         I will focus my argument this morning on the incurable

13   defect in the FONSI and explain to your Honor that the law of

14   the Third Circuit requires that this plan not go forward.

15         As a starting point, the FONSI and this record provides

16   hard findings that have never been disputed and that is any

17   plan that goes into effect will seriously affect air quality in

18   six different metrics and will increase traffic and general

19   pollution for not only Fort Lee and Bergen County but for all

20   of the affected areas.

21         And with these findings, Judge, the only way to get

22   around it to move forward with the FONSI, to arrive at the

23   bottom line of no significant impact is there must be a linkage

24   of mitigation.  You must have mitigation in order to get to the

25   bottom line.

1          And what I say today is that that has not been done with

2     respect to Bergen County.  That is a fatal flaw that cannot be

3     cured.

4          I will just quickly remind the Court, and this really

5     extracts from the excellent presentation Mr. Mastro and his

6     slides, and, again, we adopt all of the arguments that have

7     been set forth for the last two days, but in the two counties

8     that have been receiving or will receive specific dollars and

9     where there is a plan in place, the metrics are absolutely

10    unrefutable.

11         Bergen County suffers the worst -- far worst than Bronx,

12    and the next slide if you could -- if you would, and suffers

13    far worst than New York counties.  And these two counties, on

14    the face of the FONSI, get $35 million for Bronx and $45

15    million for New York County and additional, specifically

16    targeted plans that help these two locales.

17         We, meaning Bergen County, my client, mayor of Fort Lee

18    and other towns in Bergen County, we get zero.  We get zero.

19    And that's been admitted.  It has been admitted by the

20    agencies.  We get zero.

21         The logical and impossibility that is presented by this

22    plan is obvious.

23         Without mitigation -- without mitigation funding and

24    without mitigation enforceable plans for Bergen County, which

25    by these charts is far more deserving than any of the New York

1  Counties that got money, there cannot be a supportable finding

2  of no significant impact.  It cannot be.  It is a flaw that

3  cannot be cured.  It is a flaw that requires an environmental

4  impact study to be done.  It is a flaw that requires this move

5  forward to stop and stop now.

6      I would like to focus on the law now.  I would like to

7  put this into perspective because we heard arguments for two

8  days.  We heard arguments.  Oh, there is a generalized

9  statement that you are going to get money.  There is a

10  generalized statement.  Oh, these plans may benefit you, but

11  that doesn't comport with the law, Judge.

12      And as your Honor focused this morning, as Mr. Mastro

13  aptly pointed out to your Honor, the starting point has got to

14  be 40 CFR 1501.6.  Now, why?  Why is that the starting point

15  for any analysis?

16      The heading of that CFR is findings of no significant

17  impact.  And what's critical about subsection C in that CFR

18  provision is that not once but on two separate occasions within

19  that provision there is reference to enforcement provisions.

20      It is critical under the law that any mitigation plan be

21  laid out in a way that we understand what it is and gives us

22  the right to enforce it.

23      And the second sentence of that provision specifically

24  says, If the agency finds no significant impacts based upon

25  mitigation, which, as I have said, it is undisputed, does not

1    exist for Bergen County.

2         The mitigated findings of no significant impact shall

3    state any enforceable -- again, I am using that word -- any

4    enforceable mitigation requirements or commitments that will be

5    undertaken.

6         THE COURT:  Mr. Nagel, you're saying that the

7    regulation imposes an affirmative duty.

8         MR. NAGEL:  Exactly.  I'm saying that duty was

9    breached, and I am saying it cannot be cured.

10        There is no place in that FONSI, no place where there is

11   ever any plan, any enforceable measure.  There is no place

12   whatsoever.  And the CFR provision requires, requires

13   commitments to be undertaken to avoid significant impact.

14        It does not leave open the question.  You cannot read

15   the plan and understand what it is New Jersey, Bergen County,

16   Hudson County, Union County, the affected counties, you cannot

17   read it without understanding there is nothing there.

18        Quite frankly, since I'm a Jersey boy in Jersey State,

19   you read this plan and you say for Bergen County and

20   New Jersey, where is the beef?  There is nothing there.  There

21   is no beef.  There is no roll.  There is no pickle.  There is

22   no special sauce.  There is nothing -- we don't get anything

23   and yet, and yet, New York does.

24        So we are far worse by the metrics on the board.  We are

25   far worse than all of the studies on pollutants, on increased

1   traffic, on every metric, and yet we get zero.

2       Now, I've heard for two days from the agency, oh, you

3   will get it in the future.  Oh, you can read the plan.  Oh, you

4   will share in it, but that doesn't comport with the law, Judge.

5       And I haven't heard a peep about the *Bordentown*

6   Third Circuit case, which gives us the standard when we look at

7   the viability of a mitigation plan.

8       THE COURT:  So illuminate the Court about *Bordentown*,

9   Mr. Nagel.

10      MR. NAGEL:  I will, Judge.

11      That is, as your Honor well knows, the New Jersey

12  pipeline case that was challenged monitoring wells,

13  interference with vegetation, et cetera.

14      What's so important about this case is it gives us the

15  language -- and recent, 2018, it gives us the language that I

16  believe is critical and dispositive in this case.

17      It tells us that in order for mitigation plan to be

18  viable, it must detail what the measures are.  It doesn't have

19  to be perfect, but it has to detail what the measures are.

20      Where can we find that in the FONSI?  It does not exist.

21      THE COURT:  Mr. Nagel, let me ask you this:  It has to

22  detail the measures.

23      Does the *Bordentown* case give us any sense as to what

24  the considerations are, what the parameters are, what the

25  factors are, for the Court to consider as to whether something

1    has sufficient detail?

2         MR. NAGEL:  Well, the answer to that is -- the answer

3    to that is yes, with the second half of the statement and

4    that's as follows:  The Court looked to the exact language that

5    I just hung my hat from of the CFR.  The Court, basically

6    looked to that enforcement language that appears twice in the

7    CFR.

8         And it says, at page 259, Mitigation measures will be

9    deemed sufficiently supported where, in quote, There are likely

10   to be adequately policed -- again, concept of enforcement --

11   such as where the mitigation members are -- measures are

12   included as mandatory conditions in a permit.

13        So in this case, they link the enforcement to the

14   granting of the construction permit.  Smart.

15        Where in this FONSI will you find anything that gives us

16   structure, which gives us an outline, and tells us how we can

17   enforce it?

18        No.  Counsel stands up and says, Oh, we will take care

19   of it in the future.

20        That does not comport with the law.

21        THE COURT:  So you're saying to me that the

22   defendant's view is too speculative in light of the language in

23   the *Bordentown* case coupled with the 1501.6 language.

24        MR. NAGEL:  That's precisely what I'm saying,

25   precisely.

1      I would like to hear at some point from my very educated

2  brethren on this side of the bench --

3      THE COURT:  Maybe you would think the Court might like

4  to hear.

5      MR. NAGEL:  This side of the bar, not the bench.

6      I would love to here how much money am I getting in the

7  future, and how do I test that, and how do I appeal it?  Do you

8  think for one minute, Judge, do you think for one minute with

9  three New York agencies identified as the sponsor in this case

10 that they are going to voluntarily share the MTA revenues with

11 us?  And what's the mechanism to get it?  How can I enforce

12 that, which is the legal requirement?  Legal requirement says

13 you need to set mitigation which is enforceable.  That's not

14 here in this case.

15     THE COURT:  Anything further, Mr. Nagel?

16     MR. NAGEL:  Yes.

17     THE COURT:  You have one minute.

18     MR. NAGEL:  I will do it in 42 seconds.

19 How, Judge?  How can any agency take a hard look at

20 something that doesn't exist?  There is no mitigation plan.

21 There is no mitigation money.  You can't take a hard look at

22 that.  This plan must fail.  We have wait ed many, many, many

23 years, Judge.  This has been around.  I think it was adopted

24 over ten years ago.  It has been kicking around in the

25 legislature, been kicking around in political circles.  We can

1  wait a little bit longer so that they can comply with the law.

2      Thank you, Judge.

3        THE COURT:  Thank you, Mr. Nagel.

4      Mr. Reichman.

5        MR. REICHMAN:  Good morning.  Thank you for allowing

6  the 34 New Jersey Amici, who include many of the leading

7  environmental and transportation groups in the state, to speak

8  today.

9      Amici strongly support the tolling program and believe

10 that the governor is not acting in the best interest of

11 New Jersey and, in particular, New Jersey commuters in suing to

12 stop the plan.

13     Tolling will benefit the vast majority of New Jersey

14 commuters more than 75 percent of whom use public

15 transportation to commute into the CBD.  This inconvenient fact

16 was ignored yesterday by the state in its hours of argument.

17     Approximately, 50 percent of New Jersey commuters,

18 including drivers, use the MTA once they get into the central

19 business district and will benefit from the MTA's capital

20 improvements and being able to breathe cleaner air.

21     And all the leading environmental groups in New Jersey

22 also support congestion pricing because it is a central

23 strategy to meet the state's climate goals.  One of those goals

24 is to reduce greenhouse gases by 50 percent by 2030 and a major

25 source of greenhouse gases in New Jersey are vehicles,

1   almost 40 percent of greenhouse gases in the state, by far and

2   away the largest source of greenhouse gases.

3        And one of the best, if not the best, available strategy

4   we have to reduce those greenhouse gases and toxic pollutants

5   is getting people out of their cars and into trains and buses,

6   and that's exactly what the tolling program is designed to do.

7        Now, Mr. Mastro at one point argued that the Court needs

8   to look at the totality of the circumstances in determining

9   whether to enjoin the program.

10       We agree.

11       When you view the totality of the program, it is crystal

12  clear that congestion pricing will benefit the entire region,

13  not just New Jersey, by reducing greenhouse gases and pollution

14  and traffic congestion, increasing revenue for New Jersey

15  Transit and making lives of the vast majority of New Jersey

16  commuters better.

17       Now, the poster child for this is Bayonne.  Bayonne came

18  up repeatedly during the presentations today.  Well, Bayonne,

19  you only have to look at a map, your Honor, to understand why

20  Bayonne would benefit so much from congestion pricing.

21       Bayonne is located on the turnpike expansion that runs

22  from Newark through Bayonne, through Jersey City into the

23  Holland Tunnel.  Congestion pricing is going to divert traffic

24  away from Bayonne, and that's why when the government went and

25  made its excellent -- or Federal Highways made their excellent

1  presentation yesterday, they showed how things like particulate

2  matter would be so much lower in all of Hudson County as a

3  result of congestion pricing.

4       And, really, your Honor, what New Jersey's argument

5  boils down to is that they want you to scrap a plan that's been

6  in -- decades in the making and that will hugely benefit the

7  entire region because there are a few census tracts in

8  Bergen County where truck traffic would be worse and a specific

9  dollar figure has not yet been pledged in mitigation.

10      Your Honor, accepting that argument would turn the

11  intent and purpose of NEPA on its head, and to use your Honor's

12  grading analogy, all that does is turn an A paper to an A-minus

13  paper.

14      In the limited time I have available, I want to focus on

15  the State's breathtaking cynicism and hypocrisy when it comes

16  to arguing that all highway projects require an EIS and not a

17  FONSI.

18      While the plaintiff argues that it is FHWA that's not

19  acting consistently with past practice, it is New Jersey, which

20  is taking the position that are complete ly contrary to the

21  ones that they are taking here with respect to a project that's

22  been referred to earlier, that's located less than five miles

23  away from here.

24      The Turnpike Authority, the state agency, is planning to

25  spend $10.7 billion --

```
 1              (Reporter Clarification.)

 2              -- billion with a B, to expand the Turnpike 8.1 mile

 3    section, again, that I noted runs from Newark through Bayonne

 4    through Jersey City to the Holland Tunnel.

 5              It is going to spend more than $6 million alone to

 6    replace the Newark Bay Bridge.  Tear it down and build two new

 7    bridges in the place, doubling the capacity of that bridge.

 8              And despite the massive amount of money being spent, how

 9    this project will change traffic patterns for generations.  And

10    by its own statements --

11              THE COURT:  Mr. Reichman, which project?  The MTA

12    tolling scheme or the billions of dollars to reconstruct the

13    Newark Bay extension of the Turnpike?

14              You said, This project, and you had mentioned two

15    projects.

16              MR. REICHMAN:  I'm sorry.

17              THE COURT:  I'm trying to follow your argument, and I

18    am trying to figure the reference back.

19              MR. REICHMAN:  Yes.

20              THE COURT:  So you have to help me out here.

21              MR. REICHMAN:  Yes.  I'm -- I am talking about the

22    Turnpike expansion project.

23              THE COURT:  Okay.

24              MR. REICHMAN:  That is 10.7 billion total.

25              THE COURT:  Right.  And the Newark Bay Bridge.  Right?
```

```
 1            MR. REICHMAN:  That's right.  More than $6 billion.

 2            THE COURT:  Right.

 3            MR. REICHMAN:  Now, that's a project, your Honor, that

 4   will -- will change traffic patterns for generations.  It is

 5   going to, obviously, increase traffic.  The state has admitted

 6   as much.

 7            Yet, what the -- what the state's position there is,

 8   that there -- they only need to do a FONSI.  They don't need to

 9   do an environmental impact statement, directly contradictory.

10   The very arguments that the state is making here.

11            Now, when MTA's counsel raised this morning the fact

12   that the position they are taking with respect to environmental

13   justice on that project is different from the position they are

14   taking here, Mr. Mastro stood up and said, ah, no, no, no,

15   don't consider that, that's -- that's not a federal project.

16   Well, that statement is demonstrably false.

17            The project includes the replacement of the bridge,

18   which requires a Coast Guard permit, which is why the Turnpike

19   Authority submitted to a -- what -- a draft EA in which they

20   specifically argued there is no need for an environmental

21   impact statement on a $10.7 billion highway expansion project.

22            So -- and I think probably the most cynical and

23   disingenuous part of New Jersey's summary judgment motion is it

24   is linking the tolling program to the destructive highway

25   practices of Robert Moses, such as his building the Cross Bronx
```

1  Expressway through the East Tremont area.  The tolling program

2  is the antithesis of the Moses approach.  It discourages

3  driving and incentivizes public transportation.

4       In contrast, it is New Jersey that's emulating Moses's

5  legacy when it is seeking to spend $10.7 billion to expand a

6  highway through one of the most densely populated parts of the

7  state.

8       Your Honor, I am running out of time, but I would say,

9  too, that this -- in the same way that the state is arguing

10  hypocritically with respect to the need for FONSI, it is acting

11  hypocritically in terms of arguing for the needs for

12  alternatives.

13       The -- the state has actually refused to consider any

14  alternatives when it comes to its own $10.7 billion highway

15  expansion.  The state's argued, for example, that the -- that

16  there should have been consideration of carpooling.  Well, they

17  completely rejected that alternative, wouldn't even consider it

18  when it comes to their own project.

19       Your Honor, I -- I do believe -- I will sum up.

20       THE COURT:  No, no.  One minute.

21       MR. REICHMAN:  Okay.  Yeah.  You -- you know,

22  your Honor has rightly said, well, you know, you should look

23  at -- at past practices of an agency, you know.  And -- and it

24  is one of the buckets that your Honor identified.

25       Well, perhaps even more relevant is the current practice

1  of New Jersey, where it is taking position after position

2  that's contrary to the ones that it is taking here.

3           THE COURT:  Thank you, Mr. Reichman.

4           MR. REICHMAN:  Thank you.

5           THE COURT:  Mr. Otis, you are up.

6           MR. OTIS:  Thank you, your Honor.

7           THE COURT:  You are on the clock.

8           MR. OTIS:  Your Honor, I have the privilege of

9  representing 11 groups that represent a broad range of

10 interests from environmental justice, including WE ACT for

11 Environmental Justice, the -- one of the oldest environmental

12 justice organizations in the Tri-State area and in the country,

13 ranging to the Real Estate Board of New York, all of which

14 support the congestion pricing program.  And they support it

15 because it battles the twin evils of the status quo, congestion

16 and air pollution.

17        Your Honor, I want to just take a minute and give the

18 Court a little more context about the program as a whole and

19 why my clients support it.  And I want to refer your Honor to

20 Table 10-11 and 10-12, which were given to you by the MTA.

21 They are marked DOT_0036855.

22        Shall we?

23           THE COURT:  Okay.

24           MR. OTIS:  This table --

25           THE COURT:  They were given to me today?

1          MR. OTIS:  They were given to you yesterday,

2    your Honor.

3          THE COURT:  Okay.  Walk me through --

4          MR. OTIS:  So -- okay.

5          THE COURT:  -- and we will take some notes.

6          MR. OTIS:  Sure.  What this table shows is VMT and a

7    bunch of air pollutants, they happen to be hazardous air

8    pollutants.  I am using this table because it is already in

9    evidence.  It could be other air pollutants as well.  These are

10   representative.

11         It shows the CBD only, the entire county, and then it

12   shows various study areas.  And it shows the reduction in VMT

13   in the base year of 2020 -- or the year 2023 in the

14   implementation of Scenario A.  And then it shows the reduction

15   in 2045.

16         The key point of this table, your Honor, tells the

17   entire story of the environmental assessment of the congestion

18   pricing program.  There are significant reductions in both VMT

19   and air -- air pollution in the CBD and Manhattan.  There are,

20   absolutely, some increases in Bergen County.  Also happened to

21   be larger increases in Staten Island, but I guess they didn't

22   hire Mr. Mastro, so their -- their -- you know, their increase

23   s are not part of this litigation.

24         So the point here is, your Honor, the overall region,

25   as has been said by my colleague Mr. Reichman, and by the MTA,

1    will benefit from the congestion pricing program.

2         Yes, there will be some potential diversionary impacts.

3    And those impacts are dealt with in the Mitigation section,

4    which I'm going to get to in a minute.

5         But this is consistent, your Honor, with what we have

6    seen in other congestion pricing programs that have been

7    implemented around the world.  The London program is an

8    excellent example.  Similar in size to the -- to the -- the

9    London congestion area, eight miles.  It is similar in size to

10   the New York congestion area.

11        London is the center -- business center and financial

12   center of -- of a given region, as is New York City.  There is

13   a cordon around the London congestion area, as there will be a

14   cordon around the central business district in New York City.

15        And what that program has shown since its implementation

16   in 2020 -- or in 2003, is a consistent reduction in both

17   vehicle miles traveled and pollution, with minimal, if any,

18   impacts in the surrounding area.

19        So I want to then talk about mitigation, your Honor.

20        THE COURT:  Well, before we do that.

21        MR. OTIS:  Yeah.

22        THE COURT:  So is the crux of your argument to focus

23   on the VMTs and the congestion and pollution issue or factor a

24   consideration, right, as opposed to revenue generation?

25        MR. OTIS:  No, your Honor, I want to get to that.

```
 1              THE COURT:  Okay.
 2              MR. OTIS:  Because we don't see funding for the MTA as
 3    merely revenue generation.
 4              As Mr. Reichman -- Reichman had -- or Reichman, I'm
 5    sorry, had suggested, and we -- and -- and we will say, we see
 6    funding as the -- of the MTA as an important part of this
 7    overall project.  It is a two-prong project, which is -- which
 8    is designed to --
 9              THE COURT:  But it is one of the key considerations --
10              MR. OTIS:  Absolutely.
11              THE COURT:  -- spelled -- spelled out, correct?
12              MR. OTIS:  Right.  That's right.
13              And -- and in addition -- raising money for the MTA is
14    not, as the plaintiffs would have you believe, lining the
15    pockets of Mr. Lieber, who they referenced when he was here
16    last time.  All they really needed to do was a put a monocle on
17    him, a top hat and some spats and put a wheelbarrow of money in
18    front of him and make him, your know, turn the MTA into a
19    money-grubbing machine.
20              No, your Honor.
21              The purpose of raising the money for the MTA is to make
22    transit more attractive, to encourage people to switch from
23    driving, one mode, driving their cars, to another mode, using
24    transit for all the benefits identified by Mr. Reichman.
25              So I -- we don't see it.  Our clients don't see that as,
```

```
 1   you know, simply a revenue generation and that's it.
 2        We believe that the benefits of the MTA funding will
 3   also accrue to the people from New Jersey who use the MTA.
 4   Those signal benefits, those signal changes that are going to
 5   improve throughput, through the MTA, will not automatically
 6   shut off when someone from New Jersey steps onto an MTA
 7   railcar.  Those 70 ADA projects that will be funded through
 8   this project will not -- the elevator will not stop working
 9   with somebody -- when somebody from New Jersey rolls up and
10   needs it to get from one part of the station to another.
11        So the notion that this is somehow a revenue grab for
12   the MTA and there is no benefit to New Jersey it just simply
13   not correct.
14        I do want to talk about mitigation, your Honor.  And I
15   do want to talk about two things.
16        You have heard a lot about the -- and I want to refer
17   to -- your Honor, you have seen this -- this chart a number of
18   times.  This is the mitigation chart.
19        And, your Honor, you have been told about the parts of
20   the CFR that require mitigation.  You have gone through the
21   language over and over again.  I'm not going to recite it, but
22   that language does not require a specific payment to a state
23   entity or a county entity.
24        Bergen County and the State of New Jersey have said to
25   you over and over again, where is the money?  We're not getting
```

1  any money.  We are not being paid.

2      The purpose of mitigation, your Honor, is to identify

3  effects and then develop programs to mitigate those effects,

4  and then to fund those programs.  And then, as counsel for

5  Bergen County said, to make them enforceable.

6      And that is in the Federal Highway's rules

7  at 23 CFR 771.109, which says, The FHWA will ensure that the

8  mitigations that are in the FONSI is accomplished as part of

9  its stewardship and oversight responsibilities.  So

10  incorporation of the mitigation into the FONSI achieves the

11  enforceability that it -- that Bergen County counsel required.

12      Now, I also, though, want to talk about, your Honor, the

13  State of New Jersey has said, well, it is all promises and

14  there is no real -- there is no real beef here.

15      THE COURT:  So if you don't want to talk about it,

16  don't talk about it.  You have two-and-a-half minutes to go,

17  talk about what you really need to talk about.

18      MR. OTIS:  No, I said I do want to talk about it.

19      THE COURT:  Okay.

20      MR. OTIS:  So I am going to talk about it.

21      So Table 17-16 provides a list of specific mitigation

22  activities.  Some are regional.  Some are local.  These guys

23  have complain -- I'm sorry.  The State of New Jersey and Bergen

24  County have complained that there is no specific payment to

25  them in this list.  But that's not the purpose, your Honor.

1        The purpose of these mitigation measures is to address

2   the impacts that were identified in the EA.

3        Furthermore, they have cited the EPA and said, well, the

4   EPA said there were a lot of problems with the draft

5   environmental assessment.  And they -- they also say that the

6   promise, the commitment to do future activities -- adaptive

7   management as it is called -- is insufficient.  Thank you,

8   your Honor.

9        I want to read to you from DOT_045366.  This is the

10  email that the EPA sent to the FHWA.  It is from Lisa Garcia.

11  And it -- it describes not only their approval of the revised

12  environmental assessment, but it says, EPA encourages FHWA and

13  the project sponsors to consider including a commitment to

14  develop an adaptive management plan during and/or after the

15  selection of the final tolling structure by the Traffic

16  Mobility Review Board to assess and evaluate the feasibility of

17  all mitigation based on the final tolling structure, determine

18  the best way to adjust for potential impacts throughout the

19  entire lifecycle of the final project.

20       My clients believe that this commitment to adaptively

21  manage going forward is key to the implementation of this

22  program.  And we have seen that in London, your Honor.

23           THE COURT:  So you are suggesting that the reading by

24  the plaintiffs is too narrow, and that the regulation creates a

25  scheme that envisions an iterative process?

1              MR. OTIS:  Yes, your Honor.

2         The regulation creates a scheme that requires the

3    development of mitigation measures to -- to mitigate identified

4    impacts.  Part of that process is an adapt -- can be an

5    adaptive management plan.  We view that as a positive.  It

6    happened in London.  There are a bunch of different dials that

7    administrators can use to adjust these -- these -- adjust the

8    impacts of a congestion pricing plan.  They do it in London.

9    They can do it here.

10         And with that, I conclude my remarks and --

11             THE COURT:  Thank you, Mr. Otis.

12             MR. OTIS:  -- and may respond to any questions you may

13   have.

14             THE COURT:  We're good.  Thank you.

15             MR. OTIS:  Thank you.

16             THE COURT:  You have answered the questions along the

17   way.

18         All right, ladies and gentlemen.  We are now

19   at 11 o'clock where we were, theoretically, supposed to be at

20   9:30 this morning.

21         We have two hours reserved for New Jersey participation.

22         My question to counsel on both sides is:  Do we need two

23   hours or do you think we might be able to do this in an hour

24   and a half, which would get us to 1 o'clock?

25         Ms. Myers, we will hear from you.

```
 1            MS. MYERS:  We --
 2            THE COURT:  I'm sorry.  So, Ms. Myers, we're going to
 3   hear from you?
 4            MS. MYERS:  Yes.
 5            THE COURT:  This is going to be your opportunity.
 6            MS. MYERS:  Yes.
 7            THE COURT:  Okay.  So my question to you is, we
 8   theoretically have reserved 60 minutes, can we do this in 40
 9   to 45 --
10            MS. MYERS:  Yes.
11            THE COURT:  -- including reserving rebuttal time?
12            MS. MYERS:  Yes.
13            THE COURT:  Okay.  Mr. -- Ms. Howard, are you up on
14   this?  Or is Mr. Cumming up on this?
15            MS. HOWARD:  No, your Honor, it is Mr. Cumming.
16            THE COURT:  Mr. Cumming, can we do this in roughly 15
17   to 20 minutes for --
18            MR. CUMMING:  Yes.
19            THE COURT:  -- for you?
20         Mr. Chertok, who is speaking on New Jersey
21   participation?
22            MR. CHERTOK:  I will, your Honor.
23            THE COURT:  So we scheduled 35.  Can we do this in
24   about 20 or 25?
25            MR. CHERTOK:  We should be able to.
```

1           THE COURT:  Okay.  Fine.  We are going take a

2    two-minute stretch break.  It is 11:33.  We back on the record

3    at 11:35.

4           (Recess taken 11:33 a.m. to 11:37 a.m.)

5           THE COURT:  We are back on.

6       Ms. Myers, you are up.  New Jersey participation.

7       Ms. Myers.

8           MS. MYERS:  Yes.

9           THE COURT:  How are you going to break your time?

10          MS. MYERS:  I am going to take 10 minutes for

11   rebuttal.

12          THE COURT:  So We are giving you 35 to start.

13          MS. MYERS:  Can you hear me?

14          THE COURT:  You are.  You are on the clock.

15       (An off-the-record discussion was held.)

16       MS. MYERS:  Thank you, your Honor.

17       We're going to talk about New Jersey agency consultation

18   and public participation.

19       To set the stage here, the federal government failed to

20   solicit New Jersey State and local agencies as it is required

21   to do under its own regulations and, therefore, failed to

22   afford New Jersey agencies a meaningful and early opportunity

23   to engage in substantive meetings and dialogue regarding the

24   impacts on New Jersey.

25          The FHWA --

```
 1          THE COURT:  Wait.  Stop.

 2          MS. MYERS:  Yes.

 3          THE COURT:  Some New Jersey agencies were contacted

 4  and did participate.

 5          MS. MYERS:  Yes.

 6          THE COURT:  Correct?

 7          MS. MYERS:  Yes.

 8          THE COURT:  So you're saying the obligation on the

 9  Federal Highway Administration is to find a way to identify

10  every state agency who may need to participate?

11          MS. MYERS:  No.  I'm saying that the federal

12  government's obligation is to consult the relevant agencies.

13  So if we look at the next slide.

14          THE COURT:  So if they consult some, but not all, then

15  they are in violation of what's required?

16          MS. MYERS:  If they don't consult the relevant

17  agencies who have the expertise to advise on a specific

18  project, then our position is that they did not.

19          THE COURT:  Who defines relevant?

20          MS. MYERS:  Sure.  So if you look at 40 CFR

21  Section 1501.5(e) and 1506.6(a).  First it says, The federal

22  regulations require FHWA to involve state and local government

23  and relevant agencies to the extent practicable.

24      So that is our starting standard.

25          THE COURT:  So that means there is some discretion and
```

 1  wiggle room for the FHWA?

 2        MS. MYERS:  Yes.  And then the next -- their provision

 3  states at 23 CFR 771.111(e), Other States that may be

 4  significantly affected by the action must be notified early and

 5  their views solicited by the applicant in cooperation with the

 6  FHWA.

 7        THE COURT:  So you, again, would you agree that there

 8  is some element of discretion here that can be exercised by the

 9  FHWA?  Or are you saying that there is an absolute mandatory

10  obligation?

11        MS. MYERS:  There is discretion, but I think their

12  discretion --

13        THE COURT:  And so what you are challenging is the

14  exercise -- is the reasonableness of the exercise of that

15  discretion?

16        MS. MYERS:  Exactly.

17        THE COURT:  Okay.  Continue.

18        MS. MYERS:  In exercising their discretion --

19      You can go to the next slide at 109.

20      Look at the chart of how many agencies the FHWA

21  consulted.  Let's start with New York.  Total number of

22  agencies or government offices consulted, 17.  I would like to

23  note that we have this information from what's available in the

24  record.  I'm not speculating that there may have been more

25  meetings with New York, though I suspect there were, but this

1   is what we have available based on what is in the

2   administrative record.  There were 17 agencies in total.  There

3   were four for New Jersey.  Number of environmental agencies

4   consulted, there were three from New York and zero from

5   New Jersey.  These are the types of agencies that should have

6   been consulted under the regulations and FHWA's exercising of

7   its discretion.  May be significantly affected.  They have to

8   consult the relevant agencies.  New Jersey department of

9   environmental protection --

10          THE COURT:  Well, you just used the mandatory word.

11  They have to.  A few moments ago you indicated there is some

12  discretion exercised by the Federal Highway Administration.  So

13  is it the hoped for position?  Or is it the required position?

14          MS. MYERS:  So the FHWA's regulation use both may and

15  must.  That is where the combo comes in here.

16          THE COURT:  Okay.  Are we talking about participating

17  entities or are we talking, as defined by the reg, about

18  cooperating entities?

19          MS. MYERS:  We are talking about participating.

20          THE COURT:  Okay.  Can an entity that believes that

21  the FHWA did not invite them self-nominate to be a

22  participating agency?

23          MS. MYERS:  Sure.  So we can talk about --

24          THE COURT:  And why didn't the New Jersey agencies who

25  were not selected initially self-nominate?

1          MS. MYERS:  First of all --

2          THE COURT:  They are all part of the executive branch

3     of the State of New Jersey.  Are they not?  I assume that they

4     communicate with each other particularly on a project of this

5     significance and importance.  So help me out here.

6          MS. MYERS:  Sure.  I -- I'll start with the first

7     question on participating versus cooperating, if that's okay.

8          THE COURT:  Okay.

9          MS. MYERS:  Okay.  So 40 CFR Section 1501.8(a), allows

10    but does not require a state or local agency with -- with

11    special expertise with respect to environmental issues to be a

12    cooperating agency by agreement with the lead agency.

13         That would be the FHWA here.

14         The MTA, who raised this argument for the first time in

15    their briefing, admits also in their briefing that, It is

16    entirely within the lead agency's discretion to identify the

17    participation -- the participating agencies, who is not

18    New Jersey's burden to insert itself into a federal review

19    process where the federal government included the relevant

20    New York agencies and did not include the relevant New Jersey

21    agencies.

22         THE COURT:  Do we know the criteria that the FHWA

23    utilized to determine who would be a participating entity on

24    either side of the river, or for that matter, any other place

25    in the Tri-State area?

```
1            MS. MYERS:  We do not know that.

2            THE COURT:  That was not explained in the EA or the

3    FONSI.  Correct?

4            MS. MYERS:  Correct.

5            THE COURT:  So it is a black box as to why, what the

6    rationale was for selecting a certain number with respect to

7    the State of New York and a different number with respect to

8    the State of New Jersey.

9            MS. MYERS:  But specifically with respect to the

10   environmental agencies.

11       We concede and recognize that New Jersey transportation

12   agencies were consulted.  We do not know why New Jersey

13   environmental and health agencies were not consulted. And we

14   don't have information on that latter part.

15           THE COURT:  And there is no explanation as to that

16   differentiation?

17           MS. MYERS:  Not as far as we are aware.

18           THE COURT:  Okay.  What is the make-up of the 17

19   agencies in New York?

20           MS. MYERS:  Sure.  So a -- a couple different

21   organizations.  If you look at --

22           THE COURT:  So from looking at your chart, there were

23   zero environmental agencies consulted in New Jersey.  All

24   right.  Is New Jersey's position that you are dissatisfied with

25   the consultation/selection process focusing on the
```

1   environmental agencies?  Or on the environmental agencies and

2   the transportation entities?  Or both?

3           MS. MYERS:  Our position is that we are dissatisfied

4   with the participation, or lack thereof, from the environmental

5   agency and the Department of Health.

6           THE COURT:  And the Department of Health.  Okay.

7           So we're not worried about any, my words, disparate

8   treatment with respect to the transportation entities, that's

9   not of your concern.

10          MS. MYERS:  Correct.  Though I will note that we do

11  raise in our briefs that NJTA, New Jersey Turnpike Authority is

12  not -- has a limited participation within that organization,

13  but we're not challenging whether or not they adequately

14  consulted New Jersey transportation agencies.

15          THE COURT:  Okay.  So we're concerned principally with

16  the lack of participation -- no, I'm going to choose a

17  different word -- the lack of involvement by the relevant

18  New Jersey environmental and health agencies.

19          MS. MYERS:  Correct.

20          THE COURT:  Did these New Jersey entities

21  participate -- were they involved in a -- as a cooperating

22  party in any way?

23          MS. MYERS:  No, your Honor.

24          THE COURT:  So they were outside the process as far as

25  the State of New Jersey's position is concerned?

```
 1          MS. MYERS:  Correct.

 2          THE COURT:  Continue, Ms. Myers.

 3          MS. MYERS:  Okay.  You asked, what are the 17 New York

 4  agencies.  We filed a chart on the docket at 136-3, which lists

 5  all of the agencies.  So the New York 17 were:  MTA --

 6          THE COURT:  No, just bucket them for me.

 7          MS. MYERS:  Okay.

 8          THE COURT:  Transportation versus health and

 9  environment.

10          MS. MYERS:  Of course.  So the break down of that is

11  here.

12      So three environmental agencies from New York on the

13  first --

14          THE COURT:  And zero for New Jersey.

15          MS. MYERS:  -- zero New Jersey, one of the public

16  health agencies from New York and zero from New Jersey.

17          THE COURT:  Okay.  So we have four that fit into the

18  double bucket of environment and health from New York.  Zero on

19  the part of New Jersey.

20          MS. MYERS:  Correct.

21          THE COURT:  Okay.  And we do not know the reasons as

22  to why Federal Highway Administration included those four and

23  chose not to include the relevant number from New Jersey.

24          MS. MYERS:  Correct.

25          THE COURT:  Continue.
```

1          MS. MYERS:  And the federal government, when it lists

2     the agencies that did participate -- that it did consult with

3     from New Jersey in its briefing, it does only list the

4     transportation agencies.  So it doesn't dispute, it is

5     undisputed that New Jersey DEP, Department of Environmental

6     Protection and DOH, Department of Health were not consulted

7     throughout this process.

8          THE COURT:  Okay.

9          MS. MYERS:  So that's the first part of our argument.

10         The second part, turning to the transportation agencies,

11    is what exactly were the transportation agencies invited to and

12    whether or not that rose to the level of diligent efforts as

13    required under the statute.

14         So this is a list of --

15         THE COURT:  So your terminology, diligent efforts?  Or

16    where does that -- where does that standard come from?

17         MS. MYERS:  Sure.  So that is from 40 CFR Section

18    1506.6(a) that I cited earlier.

19         THE COURT:  Okay.

20         MS. MYERS:  The New Jersey transportation agencies

21    were only invited to three informational briefings before the

22    draft EA was published.

23         The first meeting they were invited to was two years

24    after congestion pricing became law.  This was on

25    September 10, 2021, and they were invited to a virtual briefing

1    hosted by the project sponsors.

2         At this meeting, New York City Department of

3    Environmental Protection and New York City Mayor's Office of

4    Environmental Coordination were involved, but, again, like I

5    said earlier, DEP from New Jersey was not.

6         THE COURT:  Are there any posted practices or guidance

7    from the Federal Highway Administration that provide any sense

8    as to under what circumstances participating entities are going

9    to be invited to a meeting, or, for that matter, whether

10   cooperating parties may be invited to those same meetings?

11        MS. MYERS:  I am not aware of any specific ones but if

12   FHWA has ones, I am sure they will refer you to them.

13        THE COURT:  Ms. Myers, I am an equal opportunity

14   questioner.

15        MS. MYERS:  Of course.

16        THE COURT:  When the defendants get up here, I am

17   going to be asking the same questions.

18        MS. MYERS:  But I will note that I think the standard

19   here that we are looking at in evaluating the FHWA's actions

20   should be compared against what the project was looking at, so

21   what the final EA involved.

22        Obviously, it involved air quality.

23        We know, we just spent hours on that, and the

24   environmental justice and what they did vis-a-vis New York.

25        I am not suggesting that they needed to invite the same

1    amount of New Jersey agencies as they did New York agencies.

2    We fully recognize this is a project being implemented by

3    New York but going back to my first point, they should have

4    invited the relevant New Jersey agencies.

5            These are the meetings.

6            After --

7            THE COURT:  What you are looking for is some

8    understanding of the differentiation as to why and why not.

9            MS. MYERS:  And the differentiation, in our opinion,

10   was arbitrary and unlawful.

11           THE COURT:  I got it.

12           MS. MYERS:  The second meeting, March 11, 2022, the

13   MTA held a briefing with New Jersey Transit to discuss an

14   increase in pedestrian volume at a single stairway in the

15   Hoboken Terminal and PATH station -- which our transportation

16   agency went to, two meetings essentially -- before the draft EA

17   was prepared because then the third meeting was a mere six days

18   before publication of the draft EA.

19           And New Jersey --

20           THE COURT:  Is there something inherently wrong with

21   that time period?

22           Does it violate some regulation or practice or notion of

23   fairness?

24           MS. MYERS:  It violates a notion of fairness when you

25   compare it to the amount of meetings held before the draft EA

1  was published with New York.

2       THE COURT:  How do I draw the line?  Where do I draw

3  there line?

4       If six days is not enough, is seven days?  Is eight

5  days?  Is ten days?  Three weeks?

6       What is my benchmark?

7       You are me, Ms. Myers.  How do I address your point?

8  How do I write that in an opinion?

9       MS. MYERS:  Our argument is not that we're advocating

10 for a specific number of days that it should have been before.

11      We're highlighting the lack of meaningful engagement in

12 these meetings prior to the publication of what was essentially

13 --

14      THE COURT:  Not to the reasonableness of the proximity

15 to the EA.  Correct?

16      MS. MYERS:  Correct.

17      THE COURT:  Okay.

18      MS. MYERS:  So the draft EA was published on

19 August 10, 2022, and --

20      THE COURT:  So the six-day date is an example of what,

21 in your view, is unreasonable about the engagement process --

22      MS. MYERS:  Yes.

23      THE COURT:  -- not the fact that it was in such close

24 proximity that, somehow or other, the Court has to enunciate

25 some rule of reason that pushes that date back.

1          MS. MYERS:  Correct.

2          And we think it goes to -- which I will discuss later

3   with the comment letters -- the ability of our transportation

4   agencies, the ones who were invited, to meaningfully comment on

5   the materials when they were presented with them a mere

6   six days before they were published and then they

7   were 4,000 pages, and we will talk about the public comment

8   period in a bit, if that's okay.

9          THE COURT:  This is the public comment period

10  associated with...

11         MS. MYERS:  After the draft EA was published.

12         THE COURT:  After the draft, between the draft and the

13  final.

14         MS. MYERS:  Correct.

15         THE COURT:  Okay.

16         MS. MYERS:  So between the draft and the final,

17  New Jersey transportation agencies were not invited to any more

18  meetings.  After the draft EA was published on August 10, 2022,

19  before the final on May 5, 2023, no more meetings with the

20  transportation agencies.

21         THE COURT:  Inherent in that statement is that there

22  were meetings to which others were invited.

23         MS. MYERS:  We -- just looking at my list of dates.  I

24  am not aware, based on what is in the record of agenda on

25  meetings, how many occurred during the time of the draft and

1    the final.

2         THE COURT:  Let's just be basic.  I am not worried

3    about how many.

4         Were there meetings that occurred between the draft and

5    the final to which New Jersey representatives were not invited

6    or there were no meetings that occurred between the draft and

7    the final; therefore, nobody could have been invited?  Which is

8    it?

9         MS. MYERS:  There were meetings between the draft and

10   the final and New Jersey was not invited.

11        THE COURT:  We have got disparate treatment --

12        MS. MYERS:  Correct.

13        THE COURT:  -- for the same class of entities in terms

14   of their involvement as a participating party.

15        Correct?

16        MS. MYERS:  If we are considering New Jersey

17   transportation agencies as participating, yes.

18        THE COURT:  Right.  Because participating and

19   cooperating have two very different meanings with respect to

20   their rights regarding the process.

21        MS. MYERS:  Correct.

22        THE COURT:  We are focused on the rights associated

23   with participating parties fully understanding that the

24   environmental and health people are outside.

25        MS. MYERS:  Exactly.

1          THE COURT:  So any diminution of rights, we are

2     talking about as to the transportation entities.  The health

3     and environmental people couldn't be asserting those rights

4     because they weren't in the process to begin with.

5          MS. MYERS:  Exactly.

6          THE COURT:  I got it.

7          MS. MYERS:  On May 5, 2023, the final EA and draft

8     FONSI were published and on May 11th, New Jersey transportation

9     agencies were invited to a virtual briefing of the final EA but

10    at that point, the final EA was final.  The draft FONSI was --

11    the FONSI was still in draft form.

12         THE COURT:  Did the New Jersey transportation

13    entities, at any point between the draft and the final, assert

14    the issue of the exclusion of the environmental and health

15    agencies of New Jersey from the process?

16         MS. MYERS:  Yes.

17         THE COURT:  Did they provide notice and argument on

18    that issue?

19         MS. MYERS:  Yes.  There were in the

20    September 23, 2022, letter, which is at Bates DOT_0007772.  On

21    the first page of the letter, Governor Murphy writes that the

22    environmental assessment is long and complex.  It is 4,000

23    pages in total.  Six weeks at the end of the summer is

24    insufficient for review and comment.  Due to the lack of public

25    outreach, few New Jerseyans had the opportunity to comment on

1  the EA and --

2          THE COURT:  Did the FHWA respond to that comment?

3          MS. MYERS:  They did.

4          THE COURT:  The response to that comment is part of

5  what you are challenging as unreasonable.

6          MS. MYERS:  Yes, your Honor.

7          THE COURT:  Continue.

8          MS. MYERS:  Similarly, on page 4 of that letter, it is

9  re-raised again that there was not the same outreach to

10 New Jersey agencies as there were to New York agencies.

11         THE COURT:  You are a touch over halfway.

12         MS. MYERS:  Okay.  Great.

13      I would like to go to slide 112.

14      So you heard yesterday about this New Jersey

15 Environmental Justice Alliance.  Now, let's be clear about what

16 that is.

17      It is not a state agency.  It is not a local agency of

18 New Jersey.  It is a nonprofit, a 501(c)(3), that was invited

19 to participate in the Environmental Justice Technical Advisory

20 Group.

21      So our first issue with the reliance on the fact that

22 this organization participated is that they are not a state or

23 local agency as required under the federal regulations that I

24 mentioned earlier.

25         Second, when you look at --

1          THE COURT:  But are they any different than the

2    New York agencies that appear in the third column?  Are they

3    not 501(c)(3)s, and, therefore, don't they suffer the same

4    infirmity?

5          MS. MYERS:  So our second argument there is that there

6    are 11 on the New York side of the Hudson.  There is one on

7    this side.  So it is not that these are different.

8          THE COURT:  Well, I am looking at the name.  The name

9    does connote some difference.  Right?  There seems to be some

10   relative, what I will say specificity, on the New York side and

11   an alliance connotes that's a group representing a whole bunch

12   of subgroups.  So pure number counting, I am not quite sure I

13   understand your point.

14         MS. MYERS:  Our point is that it was unreasonable to

15   consult with 11.  Let's take the premise that they're all

16   nonprofit --

17         THE COURT:  How many groups in the alliance in

18   New Jersey?

19         MS. MYERS:  The New Jersey Environmental Alliance is

20   one group.

21         THE COURT:  It does not represent -- it doesn't have

22   constituent parts that have representatives from 15 other

23   groups.

24         I mean, you see my problem, Ms. Myers.  Right?  You have

25   got an entity described as an alliance, and the question is:

```
 1    Is that a single -- yes, it is a single entity, but is it a
 2    single stand-alone entity like the groups from New York?  Or is
 3    it made up of subgroups from which there is a representative
 4    from each one of those groups?  So the pure number counting may
 5    not fly as a matter of logic.
 6            MS. MYERS:  As far as I am aware, based on the
 7    research that we have done on the New Jersey Environmental
 8    Justice Alliance, because it is not part of the state, it is
 9    one organization that represents the alliance.  You can come
10    and be a part of it no matter where you are in the state.  It
11    doesn't say we are just South Jersey or we are just
12    North Jersey, but it is one group.
13          And I will mention that on the New York side there is a
14    New York City Environmental Justice Alliance.  So if the same
15    logic is going to apply --
16            THE COURT:  I understand.  I understand --
17            MS. MYERS:  Okay.
18            THE COURT:  -- but, you know, be careful about
19    categorical statements.
20            MS. MYERS:  Sure.
21          But I think our point remains that regardless, it is not
22    a state or local agency --
23            THE COURT:  We got it.
24            MS. MYERS:  -- that is required under the statute.
25          Let's talk a little bit about public participation.  We
```

1   turn to slide 114.

2          As I mentioned earlier, the NEPA regulations also

3   require the FHWA to make diligent efforts to involve the public

4   in preparing and implementing their NEPA procedures.

5          This includes public notice, public meetings, making the

6   documents available.

7              THE COURT:  So there is a set of benchmarks that where

8   we need to check the box to see whether diligent efforts were,

9   in fact, made.

10             MS. MYERS:  Correct.

11             THE COURT:  Are you representing that some of those

12  boxes were not checked?

13             MS. MYERS:  Yes, your Honor.

14             THE COURT:  They were not checked at all or you are

15  unhappy with the degree to which the boxes were checked?

16             MS. MYERS:  The latter.  We are unhappy with the

17  degree to which the boxes are checked.

18             THE COURT:  It is not a failure on the part of the

19  FHWA to do something.

20         It is the degree to which they did it that causes you to

21  stand here today.

22             MS. MYERS:  Yes.

23             THE COURT:  Okay.  That distinction is clear in your

24  briefs?

25             MS. MYERS:  Yes.  We don't challenge the public notice

1    period -- I'm sorry, we don't challenge that there was a public

2    notice period.  We challenge how many days that made --

3         THE COURT:  Are you talking about implementation,

4    which is a factual determination, as opposed to the legal duty

5    to carry out something?

6         MS. MYERS:  Exactly.

7         So we talk about in our briefs multiple times how the

8    FHWA gave the public 44 days to review a 4,000-page draft EA

9    setting forth, as you know, seven different tolling scenarios.

10        THE COURT:  So you argue that 44 days is unreasonable

11   and arbitrary.

12        MS. MYERS:  Correct.  Because --

13        THE COURT:  Now I will ask you the question I asked

14   you before.  You are me.  Where do I move the scale?  45 days?

15   46 days?  65 days?  165 days?  How do I draw the line?

16        MS. MYERS:  Sure.

17        I think that as we said multiple times, this is the

18   first project of the scale in the country.  Giving 44 days for

19   a 4,000-page document, that would equate to reading 100 pages a

20   day and then preparing your public comments would, in the time

21   given, is unreasonable.

22        THE COURT:  So by that argument, we should be holding

23   oral argument in this case sometime next year because I have

24   got a 48,000-page administrative record.

25        MS. MYERS:  Actually 4,000 pages is just the draft.

```
 1  The final -- the -- if you include the appendices there was
 2  more, but this is what the public had the opportunity to
 3  comment on and that is why we think giving them 44 days was
 4  inappropriate.
 5          THE COURT:  So, again, back to my question.
 6      You are me.  You want me to declare.  Right?  It is part
 7  of what you are going to be asking for in your relief.
 8  Mr. Mastro is going to stand up later this afternoon and talk
 9  to me about remedy, and he wants me to declare certain things.
10  Right?  What do I declare here?  If this is unreasonable, what
11  guidance do I give the agency?  What guidance do I give the
12  public as to where or how the line should be drawn?  It is not
13  enough to tell me it is unreasonable.  You want an outcome.
14  You have got to help me get there.
15          MS. MYERS:  Sure.
16      The regulations require that there is meaningful
17  consideration by the public.  That is 40 CFR 1506.6(a).
18          THE COURT:  What are the benchmarks?  How do I decide
19  that?  It has got to have some definitional framework.  At the
20  end of the day, it is about reasonableness.  I don't want to be
21  subjective.  The last thing we want here is subjective
22  application.  Right?  Because that leads to inconsistency.  We
23  don't want subjective standards because we want to have
24  consistent applications.  So the question is:  What is the
25  benchmark that I need to announce in order for there to be
```

1    consistent application?

2         MS. MYERS:  Our position is that what the FHWA offered

3    the public was not reasonable.

4         THE COURT:  I got it.

5         MS. MYERS:  We don't have --

6         THE COURT:  44 days doesn't work.  I got it.

7         Where do I draw the line, Ms. Myers?  You are me.  I

8    have got to leave this oral argument and go back into my

9    chambers with my legal team and I have to write the opinion

10   that gives you the answer you want.

11        How do I draw the line?

12        MS. MYERS:  The case law that we reviewed in

13   preparation for this argument is nowhere near the amount of

14   pages that this draft EA was.

15        THE COURT:  Tell me what the case law said and how

16   they -- and what they said that the benchmark should be.  Let's

17   assume that the amount of pages that needed to be reviewed in

18   one of these other cases is 2500 pages.

19        How did they draw the line?

20        MS. MYERS:  I'm going to -- this is the Ohio --

21        THE COURT:  I need help here, Ms. Myers.

22        MS. MYERS:  No.  I understand your question.

23        THE COURT:  I want to give you what you want.

24        MS. MYERS:  I completely understand your question.

25   Thank you.

1         The *Ohio Valley Environmental Coalition v. United States*
2    *Army Corp.*, 674 F Supp. 2d 783 from the District Court of the
3    Southern District of West Virginia in 2010, applying
4    Ninth Circuit precedent on public participation says that it
5    is, Even though the Ninth Circuit found the notice sufficient
6    in Bering Strait, the case reasoning supports plaintiff's claim
7    here where, quote, Considered in the totality of the
8    circumstances the mitigation was the most crucial issue in that
9    case.  As much information as practicable must be provided so
10   that a member of the public can weigh in on this decision.  The
11   weigh-in has to happen before the close of the public comment
12   period.
13        This standard, in our -- we submit that this is a
14   flexible standard that requires consideration in the totality
15   of the circumstances to make sure that the public has an
16   opportunity to comment before the close --
17            THE COURT:  Ms. Myers, I agree with you.  I will
18   enunciate that standard.
19        Now help me out on the specifics of what you want me to
20   write in the order.
21        44 day s is not enough.
22            MS. MYERS:  Correct.
23            THE COURT:  What is enough?  125 days?  365 days?
24   What is enough?
25            MS. MYERS:  Sure.

1           I would say closer to the 125 days to review the

2    entirety of the 4,000 pages.

3           THE COURT:  Thank you.  I appreciate you walking

4    through the process with me.

5           MS. MYERS:  No problem.

6           THE COURT:  We are at about six minutes to go.

7           MS. MYERS:  Let's turn to talking about the comment

8    letters because you heard a lot about how New Jersey did not

9    satisfy its participation by not raising things in its comment

10   letters.

11          So I am going to start with the September comment

12   letter, which is the one that was submitted in this, you

13   know, 44-day time period.  So that one is at the record -- at

14   DOT_0007772.

15          I will read you some excerpts to refute the arguments

16   that the government made and MTA made yesterday.

17          So if you look first at page 2 of that letter, the

18   comments state that the model used in the draft EA is not

19   capturing New Jersey dynamics.  Primarily, the regional impact

20   model is not well validated at the level of New Jersey, only a

21   generalized analysis was done in New Jersey.  It fails to

22   perform the fine-graded analysis of different markets within

23   New Jersey as it does with New York, which Mr. Mastro showed

24   multiple times the discrepancies between what they did in

25   New Jersey and New York.

1        It then talks about equity in environmental justice

2   concerns.

3        On the next page it talks about the air quality

4   analysis, and they show negative results.  It talks about new

5   traffic patterns that will need to be studied and how the

6   diversion of traffic will impact the environmental justice

7   communities.  That was also not there.

8        It talks about, in general, there was an insufficient

9   analysis for New Jersey and then it says, which I think is most

10  critical here, The draft EA at that time did not commit to any

11  mitigation.  The charts that we look at outlining

12  the 155 million, that was not in the draft.  And in

13  New Jersey's September letter, we say, What analysis has been

14  done to demonstrate that you anticipate the diversions and how

15  do you propose to mitigate those impacts?  And the EPA

16  similarly in its September letter raised this.

17       If you look at the final EA, you can tell because when

18  things were added from the draft to the final, they are both in

19  italics.

20       In this section on mitigation that we keep talking about

21  in appendix 17D where we go through the charts, that is bold

22  and italics before we get to the breakdown of the regional and

23  the place-based measures.

24       So the argument that New Jersey did not adequately

25  comment on the lack of mitigation is underscored by the fact --

1  is undercut by the fact that that information was not in the

2  draft EA.

3          THE COURT:  So is it your position that the

4  September 23rd letter contains sufficient information to

5  provide reasonable notice -- or to put the FHWA on notice as to

6  the areas of concern from the State of New Jersey, that they --

7  answer that question first.

8          MS. MYERS:  Yes.

9          THE COURT:  And that the language contained in that

10  letter was not mere illusions to things without sufficient

11  specificity to provide reasonable notice to the FHWA.

12          MS. MYERS:  Our position is that it was as specific as

13  it could be given the information that we were given.

14          THE COURT:  So, therefore, it is your position that in

15  no way, shape, or form, did the State of New Jersey fail to

16  notify the agency, nor fail to exhaust its administrative

17  remedies or waive any of the issues.

18          MS. MYERS:  Absolutely.

19       And the EPA went even further than our letter at

20  DOT_0045032.  It starts with a whole section on mitigation

21  continuing to 034 and how the project sponsors must propose a

22  comprehensive mitigation package particularly focused on

23  reducing the impacts to areas with environmental justice

24  concerns for each tolling scenario.

25          THE COURT:  Was that EPA letter filed before or after

1   the September 23 letter?

2          MS. MYERS:  Our letter and the EPA's letter were filed

3   on the same day, which was September 22.

4          THE COURT:  How did you alert the FHWA to the fact

5   that you were -- what I think you are going to say to me is you

6   are endorsing or incorporating by reference the comments from

7   the EPA?

8          MS. MYERS:  New Jersey wasn't given the EPA's comments

9   beforehand, but --

10         THE COURT:  You didn't see them until after the

11  publication of the final?

12         MS. MYERS:  No.  The comments were published, I am

13  pretty sure, in between the draft and the final.

14         THE COURT:  But once those comments were published,

15  that was, theoretically, outside the comment period.  Correct?

16         MS. MYERS:  Correct.  Well, I would like to discuss

17  the June letter briefly.

18         THE COURT:  Well, okay.

19         MS. MYERS:  I just want to note that there is

20  established case law, and I will get it from my pile, in the

21  Third Circuit that a party does not waive an issue if it was

22  either so obvious to the agency or someone else raised it, and

23  the EPA clearly raises this issue.

24         THE COURT:  Okay.  That is Third Circuit law.  At some

25  point, you will tell us what that case is.  We are going to

1    give you about two more minutes.

2         MS. MYERS:  It is 869 F.3d 148.  It is the *Delaware*

3    *Riverkeeper* case.

4         So the June letter -- you have heard that the June

5    letter should not be considered either but the FHWA and the MTA

6    admit that they had another public review period after the

7    final EA and the draft FONSI.  Now, the FONSI, as you know, is

8    a document that is supposed to explain mitigation.

9         THE COURT:  Well, they admitted that they had another

10   public review period.

11        My understanding is that there was a period of time in

12   which the final EA was publicly available.  Right?  We are

13   talking about the public availability period?

14        MS. MYERS:  Correct.  And the draft FONSI was

15   published at that time.

16        THE COURT:  What do the regs say about what is

17   permissible during that public availability period?  Or what is

18   the past practice?

19        Is there, in fact, an opportunity for the submission of

20   public comments?  Is it provided for in agency practice or in

21   regulation?  I mean, I am going to sit here and ask Mr. Cumming

22   what is supposed to go on during the public availability

23   period.  I'm not sure I know the answer to that because I am

24   not sure it is clear anywhere.

25        MS. MYERS:  I -- I agree with your Honor.  And I think

1    the relevant inquiry should be what FHWA and MTA said here.

2        They said there was a public comment period between

3    the -- the publication of the draft FONSI and the final.  And

4    they had an open date and a close date.  And they admit that

5    they reviewed the letters they received during that period.

6            THE COURT:  Was the June letter submitted...

7            MS. MYERS:  During that period.

8            THE COURT:  It was submitted during the public

9    availability period?

10           MS. MYERS:  Yes, between the draft FONSI and the final

11   FONSI.  And --

12           THE COURT:  And it was submitted shortly before the

13   close of that period.  Correct?

14           MS. MYERS:  Correct.

15           THE COURT:  Okay.

16           MS. MYERS:  And FHWA and MTA said they considered

17   them, they just didn't think anything needed to change.  So --

18           THE COURT:  Well, that's fine.  That is their

19   prerogative.

20           MS. MYERS:  I -- I don't -- I don't disagree, but they

21   can't now come in and say that the issues we raised were

22   waived.

23           THE COURT:  That is a different story.

24           MS. MYERS:  I agree.

25           THE COURT:  That is a completely different story.

1          I will give you one more minute to conclude.

2          MS. MYERS:  Just closing the loop there, I would like

3     to suggest that the Court should consider the June 12, 2023

4     letter.

5          One more thing I want to say about public comment before

6     we close.  You heard a lot about the supplemental review period

7     that's going on now.  There is no public comment on that -- on

8     that supplemental review.

9          There is going -- and the FHWA said yesterday it will be

10    done in a silo.  And now we know we have a final tolling scheme

11    that differs from the ones the public got to comment on.

12         I know we all disagree on the degree of difference

13    between the proposed and the final, but the truth remains that

14    the -- every component is different and there will be no public

15    comment on that.

16              THE COURT:  Okay.

17              MS. MYERS:  Thank you.

18              THE COURT:  You are welcome.  Hold on.  Hold on.

19              MS. MYERS:  Yes.

20              THE COURT:  Ms. Myers, don't go anywhere.

21         (An off-the-record discussion was held.)

22              THE COURT:  Ms. Meyers, if I can direct your attention

23    to slides 112 and 114.

24              MS. MYERS:  Yes.

25              THE COURT:  112 deals with the -- the -- the EJTAG

1   membership.

2           MS. MYERS:  Yes.

3           THE COURT:  Do these groups, or does the FHWA invite

4   them?

5           MS. MYERS:  I am not aware.

6           THE COURT:  Okay.

7       Mr. Cumming, same question for the ICG membership.  You

8   are not aware, self-nomination or FHWA invitation?

9           MS. MYERS:  I --

10          THE COURT:  Now you're trusting --

11          MS. MYERS:  They were --

12          THE COURT:  I am surprised Mr. Mastro is not writing

13  you notes.  He is supposed to reciprocate for all that you did

14  for him in the first day and a half.

15      Mr. Mastro.

16          MR. MASTRO:  She is doing a great job.  I don't need

17  to pass her anything.

18          THE COURT:  Well, what do we know?

19          MS. MYERS:  They were invited, both groups.

20          THE COURT:  By the FHWA.

21          MS. MYERS:  By the FHWA, yes.

22          THE COURT:  All right.  Was there a self-nomination

23  process?  Do we know?

24          MS. MYERS:  That we're not -- we're not aware.

25          THE COURT:  Okay.  Fine.  Slide 114 on the 44 days --

```
 1              MS. MYERS:  Yes.

 2              THE COURT:  -- did any New Jersey entity ask for an

 3    extension of time, was that even possible?

 4              MS. MYERS:  Yes, on the first page of our September

 5    letter, we said this was an insufficient amount of time, and

 6    then New Jersey Transit reiterated that and requested more

 7    time.

 8              THE COURT:  And the FHWA rejected that?

 9              MS. MYERS:  I'm pretty sure they gave more time than

10    originally contemplated, so the 44 days was the extension time.

11              THE COURT:  Well, now you have got me thoroughly

12    confused, Ms. Myers.

13              MS. MYERS:  I am sorry.

14              THE COURT:  You stood up here and you told me there

15    was a 44-day comment period and it is insufficient given the

16    volume of the documents.  And now you are telling me that an

17    extension was granted and that was the 44-day period.

18         So the question is what was the initial window?

19              MS. MYERS:  I am pretty sure it was 30 days, but I

20    will confirm that.

21         Yes, it was 30.  The initial window was 30 days due to

22    public --

23              THE COURT:  Now -- so now, Ms. Myers, you spent a fair

24    amount of the Court's time attempting to have the Court believe

25    that there was an insufficient amount of time granted to the
```

1  State of New Jersey and for that matter others to comment on

2  the volume of the documents.

3      And I was trying to identify what's a reasonable

4  benchmark asking you to put yourself in my shoes and figure out

5  how I am supposed to back this up.  And that's all for naught

6  because the period was 74 days.

7          MS. MYERS:  No.

8          THE COURT:  And the question is, is 74 days

9  insufficient?

10         MS. MYERS:  No, I'm -- I'm sorry.  I -- I absolutely

11 do not mean to confuse anyone.

12         THE COURT:  Well, you did.

13         MS. MYERS:  I -- I apologize.

14     We are not challenging -- the third --

15         THE COURT:  No, I understand.  But you are standing

16 here telling me -- leading the Court to believe that there was

17 an inadequate, unreasonable amount of time provided to comment.

18 And you led the Court to believe that was a 44-day period.

19         MS. MYERS:  No, it was -- it was 44 days.

20         THE COURT:  No, it was 74 days total.

21         MS. MYERS:  No, it wasn't.

22         THE COURT:  The initial 30, plus 44 given what you

23 just said.

24         MS. MYERS:  It went from 30 days --

25         THE COURT:  To 44 total?  So it was a 14 -day

1  extension?  Which is it?

2          MS. MYERS:  Correct, but that -- that left a total --

3          THE COURT:  Which is correct?  Let's start at the

4  beginning.

5       What was the initial comment period?

6          MS. MYERS:  30 days.

7          THE COURT:  All right.

8          MS. MYERS:  And then --

9          THE COURT:  Then it got extended.  Correct?

10         MS. MYERS:  Correct.

11         THE COURT:  What number of days was it, the amount of

12  days by which it was extended?

13         MS. MYERS:  14 --

14         THE COURT:  Uh-huh.

15         MS. MYERS:  -- which brings it to the 44.

16         THE COURT:  Right.  But that is not what you said to

17  me.

18         MS. MYERS:  That we are challenging -- we're

19  challenging that the 44 days was insufficient.

20         THE COURT:  I understand the explanation now.  And my

21  questions might have been quite different if you had said to

22  me, There was an initial 30-day period extended by 14 days

23  to 44.

24       You may have gotten to the same point that the 44 days

25  was inadequate.  But it got me down a path that was

1    inappropriate.  I got it.  I put your argument in context.  It
2    is fine.  I now understand.  I appreciate it.  We're done.
3           MS. MYERS:  I sincerely apologize for any confusion.
4           THE COURT:  It's quite all right.  Everybody makes
5    mistakes, Ms. Myers.
6           Nobody is perfect, including the bench.
7           That's why there are erasers on pencils because this is
8    a human endeavor.
9           So no offense taken.
10          Mr. Cumming.
11           MR. CUMMING:  Thank you, your Honor.
12           THE COURT:  No, I don't need anything from the day 1.
13           MR. CUMMING:  This is day 2, your Honor.
14           THE COURT:  All right.
15          Mr. Cumming, before you begin, I will make a general
16    comment for the benefit of everybody.
17          Word choices matter.  Words matter.  Please choose your
18    words carefully so that we're all on the same page with the
19    same understanding.
20          It is critically important.  I know everybody is doing
21    the best that they can and I appreciate it.  I'd rather you
22    take an extra ten seconds and think about what you are saying.
23          Gentlemen, I am not going to compete with sidebar
24    conversations.
25           MR. OTIS:  Sorry, your Honor.

1          THE COURT:  I am trying to say something for the

2     benefit of all.  Either we are paying attention or we are not

3     paying attention.

4          MR. OTIS:  Apologies.

5          THE COURT:  All right.  Word choices matter.  Let's

6     make sure everybody is on the same page.

7          If you are not a hundred percent sure, if you are caught

8     up in the moment, an extra ten seconds is not going to matter.

9     I am not holding everybody to the absolute precise second of

10    the allotted time.

11         The more we're on the same page, the better the

12    conversation is.  So take it for what it's worth.  Okay.

13         Mr. Cumming, you are up.

14         MR. CUMMING:  Thank you, your Honor.

15         I will just start with the comment period and then move

16    on.  It was a 30-day comment period extended by 14 days to 44

17    days.  Federal Highway's regulations provide for a 30-day

18    comment period.

19         I am not aware of a case and plaintiffs have not brought

20    one to the Court's attention that has found comment period

21    unreasonable when it exceeds that which is set out in

22    regulation.

23         THE COURT:  Is there past practice as to extensions

24    and what seems to fall within a reasoned and reasonable

25    parameter?

1          MR. CUMMING:  I believe it is a case-by-case basis,

2    your Honor.  I am not aware.

3          THE COURT:  Okay.  You do not believe given the

4    complexity and the volume of material here that an

5    overall 44-day period was unreasonable?

6          MR. CUMMING:  Sorry, your Honor.  Could you repeat the

7    question?

8          THE COURT:  I said given the complexity of the

9    material, and the novelty of this -- you know what?  I am not

10   going to misstate.

11         Melissa, would you be kind enough to read back my

12   question.

13                    (Record Read.)

14         MR. CUMMING:  It was a reasonable comment period

15   length, your Honor.  It exceeded that set out in regulations.

16   It is one day short of the regulatory length of comment period

17   for EISs.

18         Yes, I believe it is reasonable.

19         THE COURT:  Okay.  So EISs get a 45-day comment

20   period.  So in this circumstance on a comparative basis, it was

21   one day less than that.

22         MR. CUMMING:  Correct.

23         THE COURT:  Okay.  You may proceed.

24         MR. CUMMING:  Thank you.

25         If your Honor would turn to the fourth page of our slide

1    titled, Participating Agencies.

2            THE COURT:  Yes.

3        So as we get there, do you agree, Mr. Cumming, that

4    there is a differentiation between participating entities and

5    cooperating entities?

6            MR. CUMMING:  Yes.

7            THE COURT:  And they have different rights and

8    obligations under the regulatory scheme?

9            MR. CUMMING:  Yes.

10           THE COURT:  And that the parties that were listed on

11   the chart -- or the number of parties that were identified by

12   Ms. Myers on her chart were all participating entities with

13   those higher-level rights and obligations?

14           MR. CUMMING:  That is my understanding.

15           THE COURT:  Okay.  Very good.

16           MR. CUMMING:  You are looking at the same chart,

17   your Honor.

18           THE COURT:  Okay.

19           MR. CUMMING:  In a slightly different format.

20           THE COURT:  Okay.  Go ahead.

21           MR. CUMMING:  But the material is the same.

22       One thing I want to point out on the number of

23   participating agencies and state transportation agencies are

24   identified.  The North Jersey Transportation Planning

25   Authority, which is overlooked a bit by plaintiffs here is --

1   my understanding is that that is the New Jersey agency

2   responsible for administering the state's Clean Air Act --

3           THE COURT:  Okay.

4           MR. CUMMING:  -- state implementation plan.  So the

5   idea that there was not a New Jersey agency that was involved

6   in air quality as a participating agency, I don't think that's

7   accurate.

8       On the next page --

9           THE COURT:  Just let me -- what was that ten seconds?

10  You're talking which New Jersey agency deals with?

11          MR. CUMMING:  The right side of the -- the right side

12  chart, your Honor, the one, two, three, four, fifth down.

13          THE COURT:  New Jersey Transportation Planning

14  Authority.

15          MR. CUMMING:  Correct.

16          THE COURT:  Okay.  Got it.

17          MR. CUMMING:  On the next page, your Honor, there were

18  a number of opportunities for agency coordination.

19          THE COURT:  Well, what does that mean?

20          MR. CUMMING:  Agencies were invited to meet with

21  Federal Highways and project sponsors and to discuss issues

22  about -- about the EA.  So I want to --

23          THE COURT:  Is that a general invitation in the form

24  of some kind of public notice?  Are we talking about specific

25  and determination made by the FHWA to specifically invite

1    certain entities?  Or both?

2           MR. CUMMING:  These were the participating agencies

3    sometimes delineated by topic area depending on the topic of

4    conversation.  So of the participating --

5           THE COURT:  Of the participating agencies.  So the

6    first cut has been made, and on that first cut there were these

7    invitations that flow?

8           MR. CUMMING:  Correct.

9           THE COURT:  Continue.

10          MR. CUMMING:  I will note, your Honor, this is not an

11   exhaustive list.  In the record there are other meetings

12   referenced, but this is a good overview of agency coordination

13   at a high level.

14          THE COURT:  And which slide?

15          MR. CUMMING:  This is the opportunities for agency

16   coordination.

17          THE COURT:  Okay.  Fine.  That's what I thought.

18          MR. CUMMING:  There are other -- there are other

19   references in the record --

20          THE COURT:  Okay.

21          MR. CUMMING:  -- to agency coordination.  On the next

22   page, your Honor, for public participation, there were numerous

23   early outreach virtual webinars.

24          THE COURT:  Public participation as a participating

25   entity or public -- public involvement?

1          MR. CUMMING:  As a member of the public.

2          THE COURT:  As a member of the public.

3      So not fitting into either category of a participating

4  entity or a cooperating entity.  This is just the public in

5  general?

6          MR. CUMMING:  Yes, your Honor.

7          THE COURT:  That was done by some form of public

8  notice posted somewhere?

9          MR. CUMMING:  Yes.  The webinars were advertised.  I

10  believe the advertisements were translated into, I believe,

11  nine different languages.  There was interpretation offered.

12  There were phone dial-in options.

13          THE COURT:  But these were webinars in which

14  information was going out?

15          MR. CUMMING:  Yes.

16          THE COURT:  Was there any in?

17          MR. CUMMING:  Yes.

18          THE COURT:  Permitted?

19          MR. CUMMING:  Yes.  These were early outreach webinars

20  wheres there was the opportunity, I believe, for a two-minute

21  comment per public participants.

22          THE COURT:  A New Jersey agency that was not a

23  participating party could have involved itself in one of these

24  virtual webinars and offered comment?

25          MR. CUMMING:  I don't see what would have stopped

1   them, but I don't know the --

2          THE COURT:  No.  We don't know whether they did, but

3   the point is there was opportunity.

4          MR. CUMMING:  I believe so.

5          THE COURT:  Whether they chose to avail themselves of

6   it or not is a different issue.

7          MR. CUMMING:  They were publicly available.

8          THE COURT:  Okay.

9          MR. CUMMING:  I will note, your Honor, there were a

10  number of webinars that were specifically devoted to

11  environmental justice issues and even more than that, specific

12  environmental justice issues relevant to geographic regions.

13  So there were two -- three -- excuse me, New Jersey-specific

14  environmental justice webinars that were offered on those

15  issues specific to New Jersey.

16         On the next page, your Honor, there were hearings on the

17  draft EA, over 1,000 viewers of those presentations.

18         I want to note, your Honor, I am discussing the public

19  roadmap here.  I am going to come back to the agencies in a

20  minute, but these are opportunities for the public to

21  participate.

22         THE COURT:  Okay.

23         MR. CUMMING:  I will note at these hearings --

24         THE COURT:  Well, a nonparticipating agency could,

25  in fact -- or even a participating agency is, in fact, a member

1   of the public.  There is nothing that precludes them.  Correct?

2          MR. CUMMING:  There is not.  For instance,

3   Congressman Gottheimer spoke at one of the webinars -- or

4   public hearings.

5          Yes, your Honor.  It doesn't preclude you from speaking

6   regardless of your position.

7          THE COURT:  Can documents be submitted at these?  Or

8   is it just oral presentations?

9          MR. CUMMING:  I believe it is just oral presentation,

10  but I honestly don't know.

11         THE COURT:  Okay.  We will figure out that

12  differentiation if need be.

13         MR. CUMMING:  Now, comments received during the formal

14  comment period, this is the opportunity to submit formal

15  written comments.  To your Honor's question, can you submit

16  documents?  Yes, this is how you do it.

17         THE COURT:  Okay.  So it is two separate possibilities

18  for engagement.

19         MR. CUMMING:  Yes.

20         THE COURT:  One, oral presentation, like the noted

21  hearings for webinars proceeding that, and a process for formal

22  written comment.

23         MR. CUMMING:  Yes.

24         THE COURT:  Okay.  Were these running simultaneously

25  or sequentially?  Do we know?

1          MR. CUMMING:  These were running simultaneously.

2          THE COURT:  The oral presentation period was running

3     at the same time as the formal written comment period?

4          MR. CUMMING:  Correct.

5          THE COURT:  Okay.

6          MR. CUMMING:  The public comment period began on

7     August 10th and was -- 2022, and was extended to

8     September 23, 2022.  By looking back on the prior slide, the

9     webinars were held between August 25th and August 31st.

10         THE COURT:  They overlap.

11         MR. CUMMING:  They did.

12         Federal Highway received almost 70,000 public input

13    submissions, which included more than 22,000 individual

14    comments.  There were a lot of form letters that were

15    submitted.  So that's why the differential in numbers, but,

16    still, they received over 22,000 individual comments, many

17    included -- and they also included letters, emails, voicemails,

18    and submissions through an electronic submission form.  So

19    numerous avenues in which to make a comment on the draft EA.

20         Those comments were all responded to in appendix 18C of

21    the environmental assessment.

22         There is also appendix 18A, which is responses to

23    frequently received comments, which is included in the record

24    appendices provided to the Court, which provides detailed

25    answers to concerns that arose frequently among multiple

1   comments.

2        THE COURT:  We are about halfway through here.

3        MR. CUMMING:  Your Honor, in the next page, public

4   participation, this gets the point I was making about the

5   difference between the participation -- public participation

6   options of this project and what would be available under a

7   regular EA or an EIS.  This project was, essentially, the type

8   of public participation you would get with an EIS.

9        Next page, your Honor.

10       There was specific public participation from

11  environmental justice issues.  You talked with Ms. Myers about

12  the Environmental Justice Technical Advisory Group.  I believe

13  invitations were made.  Well, on the slide, sponsors

14  invited 37 groups to participate, 16 groups accepted the

15  invitation.

16       THE COURT:  Project sponsors meaning the MTA, not the

17  FHWA.  Correct?

18       MR. CUMMING:  Correct.  That's my understanding.

19       I do not know if more New Jersey agencies were invited

20  other than the New Jersey Environmental Justice Alliance.  I

21  don't think that information is in the record.

22       THE COURT:  Is it under the regulatory scheme, is it

23  the project sponsors' responsibility to identify and do the

24  inviting?  Or is it the FHWA's because of the nature of the

25  project, it was delegated to the MTA?  Do you know?

1          MR. CUMMING:  This type of engagement is not required

2     by the regulations.  This specific level of environmental

3     justice participation is not required by the regulations.

4          THE COURT:  Right.  This is an outgrowth of the

5     executive order.  Right?

6          MR. CUMMING:  This is an additive process.  It is not

7     prescribed by regulation.

8          THE COURT:  Right.  But I assume there is a practice

9     that somebody follows.

10          MR. CUMMING:  I think typically this -- typically this

11     is a project sponsor-led process because they are the ones with

12     the local knowledge in the area, not Federal Highways.

13          THE COURT:  So it is delegated because the project

14     sponsor has the, in essence, boots-on-the-ground local

15     knowledge.

16          MR. CUMMING:  Yes.  And that is how much of

17     Federal Highways works with state sponsors around the country.

18          THE COURT:  Thank you.

19          MR. CUMMING:  There was also an Environmental Justice

20     Stakeholder Working Group.  That was a self-nominated process.

21     Individuals could ask to participate, and they were allowed to

22     participate if they asked.

23          And as we noted yesterday, following --

24          THE COURT:  In essence, people can self-nominate to be

25     involved?

1          MR. CUMMING:  Correct.

2          THE COURT:  Okay.  So it works both ways,

3    self-nomination and project-sponsor invitation?

4          MR. CUMMING:  Yes.

5          And following completion of the NEPA process, there is

6    going to be an environmental justice community group that's

7    going to meet quarterly to discuss mitigation measures.

8          THE COURT:  Is there any discussion between the

9    project sponsors and the FHWA as to the criteria utilized to

10   create an invitation list?

11         MR. CUMMING:  I am not aware of any.

12         A few points specifically on the New Jersey agency

13   participation.

14         THE COURT:  So now we are shifting back from the

15   environmental side for which there are no regulations, to the

16   issue of a participating entity or agency, correct, for which

17   there is statutory and regulatory guidance?

18         MR. CUMMING:  There is regulatory guidance.

19         THE COURT:  Regulatory guidance.

20         MR. CUMMING:  Yes, your Honor.

21         THE COURT:  Okay.

22         MR. CUMMING:  I believe Third Circuit in -- at the

23   Department of -- *Delaware Department of Natural Resources and*

24   *Environmental Control,* 685 F.3rd 259, has found that public

25   participation that was far less than provided here meets NEPA's

 1   requirements.

 2          THE COURT:  Okay.  I am just trying to understand the

 3   process.

 4          MR. CUMMING:  I understand, your Honor.

 5          THE COURT:  So talk to me about the process of

 6   identifying the, quote, Participating parties -- or

 7   participating -- here participating agencies vis-à-vis

 8   New Jersey.

 9          MR. CUMMING:  The record at 37042 describes, in brief,

10   the process for narrowing down specific agencies with specific

11   expertise.

12          THE COURT:  So the agency has discretion.  It

13   exercised that discretion, and the exercise of that discretion

14   was described in what you are referring to --

15          MR. CUMMING:  Yes.

16          THE COURT:  -- at this moment.

17          MR. CUMMING:  I don't have the page in front of me,

18   but there's a cite from the Tenth Circuit in our brief that

19   notes the discretion given to agencies in making that

20   determination.

21          THE COURT:  Was the creation of the list, to the best

22   of your knowledge, uniform with respect to New York entities

23   identified and invited vis-à-vis New Jersey entities identified

24   and then invited?

25          You know, it is one thing to recite the standards or

1   benchmarks.  It is another thing about how they were applied

2   and whether they were applied consistently.

3        What I'm trying to figure out is were they applied

4   consistently?

5             MR. CUMMING:  I believe they were, your Honor.

6             THE COURT:  But we don't know whether that's fully

7   explained to whatever degree may pass muster in the EA.

8             MR. CUMMING:  I believe it is explained adequately in

9   the EA.

10            THE COURT:  Okay.  But it is explained.

11            MR. CUMMING:  Yes, your Honor.

12            THE COURT:  It is addressed.

13            MR. CUMMING:  Yes, Your Honor.  New Jersey --

14            THE COURT:  Ms. Myers, I guess the question back to

15  you on rebuttal is:  If it is not explained adequately, help me

16  understand why.

17            MR. CUMMING:  New Jersey -- and context is important,

18  your Honor.

19            THE COURT:  Yes, absolutely.

20            MR. CUMMING:  New Jersey wasn't ignored.  There were

21  four meetings with New Jersey agencies, Ms. Myers talked about

22  them.

23        At no point did any representative from New Jersey ask

24  for other New Jersey agencies to be included.  I think the

25  reasonableness of the decision has to look also at what

1  information the agencies were presented with.

2          THE COURT:  Well, like --

3          MR. CUMMING:  And --

4          THE COURT:  -- I have said before, if one wants a

5  particular outcome, and they think that the record is

6  inadequate to get to that outcome they have to help the

7  deciding entity, whether it is the agency or me as the Court,

8  to figure out how to get there.  Right?  That's the point you

9  are making.

10         MR. CUMMING:  That is exactly what the Supreme Court

11  said in *Vermont Yankee*.  You can't sandbag the agency by

12  waiting until the end.

13         The first meeting between New Jersey agencies, there

14  were some -- there were questions about how tolling would

15  impact buses.  The second, there was only one comment from

16  New Jersey agencies about signage.  The third, they asked no

17  questions.  The fourth, they asked about the availability of a

18  PowerPoint and where the final EA would be posted.

19         The record does not indicate that New Jersey utilized

20  the participation that was available to it.

21         Governor Murphy received a briefing from Secretary

22  Buttigieg about the project.  And New Jersey's comment letters

23  were responded to in detail.

24         THE COURT:  Both the -- the September letter and the

25  June letter?

1           MR. CUMMING:  Not the June letter, your Honor, and I

2   am happy to address that.

3           THE COURT:  Okay.  You have about three minutes left

4   in your time.

5           MR. CUMMING:  The Court's indulgence.

6           THE COURT:  No problem.

7           MR. CUMMING:  The difference between the September and

8   the June letters is explained by the

9   regulations.  23 CFR 771.119(d) describes the public comment

10  period for the EAs.  23 CFR 771.119(h) says, an agency may

11  provide an EA for public review prior to issuance of a FONSI.

12  That -- that is complemented by CEQ's regs.

13          THE COURT:  Well, we are going to get into what is

14  meant by a public availability period, but I will let you

15  continue.

16          MR. CUMMING:  Well, your Honor, I'm happy to address

17  that.

18          THE COURT:  No, no.  We will get there.

19          MR. CUMMING:  The regulations use different words,

20  basic principals of statutory interpretation.  If a regulation

21  wanted to say a comment period, that's what it would have said.

22          THE COURT:  Okay.

23          MR. CUMMING:  CEQ regs back that up, 40

24  CFR 1501.6(a)(2) noting an agency --

25          THE COURT:  So you can't publish a reg without notice

1  and comment that in some form or fashion describes the purpose

2  and intent of the proposed reg.  And then when the final reg is

3  published if there are comments that are received, those

4  comments need to be responded to in some manner.

5        And so, effectively, the notice and comment period is a

6  form of legislative history around the regulation.

7        So my question to you is:  What did the agency mean and

8  what did it intend when it created a public availability

9  period?  And what were the expectations of what that public

10  availability period would provide for, my words, interested

11  parties?  And is it just, oh, we are going to put it on display

12  and nothing more?

13        So help me out here, Mr. Cumming.

14        A public availability period cannot be a nullity, and it

15  can't create illusory rights.  So help me understand what is

16  the purpose of a public availability period.

17            MR. CUMMING:  First --

18            THE COURT:  I will accept that the regs say you can't

19  do comments during the public availability period.  Whether

20  that's right or wrong is a different issue.  I will accept your

21  statement.

22        What is the expectation that was created around the

23  creation of a public availability period?

24            MR. CUMMING:  One, it, obviously, lets the public know

25  the agency has or is close to reaching a final decision.

1            THE COURT:  Right.

2            MR. CUMMING:  Two, it lets the public review the draft

3    FONSI.

4            THE COURT:  Yes.

5            MR. CUMMING:  The public had the opportunity to, if

6    there were critical things missed in the FONSI, bring that to

7    the attention of the agency.

8            THE COURT:  How are they supposed to do that?

9            MR. CUMMING:  They submit written comments, like

10   New Jersey's.

11       Though, I -- that's why I think it is --

12           THE COURT:  So written comments are permitted during

13   the public availability period?

14           MR. CUMMING:  It is an option, but I want to

15   distinguish between comments on the FONSI and comments on the

16   draft EA.  Those are different documents out at different

17   times.  So to the extent that New Jersey is commenting on

18   the --

19           THE COURT:  But isn't the FONSI derivative of the

20   final EA?

21           MR. CUMMING:  The findings of no significance

22   certainly are derivative, but there --

23           THE COURT:  So if there is a glaring error in the

24   FONSI with respect to certain findings, isn't that glaring

25   error also in the final EA?  And isn't that if the comments

1    made as to the -- to the FONSI as to the glaring error, and the

2    glaring error emanates from the final EA, isn't the comment

3    period applicable to both?

4           MR. CUMMING:  It could be, your Honor.  That question

5    isn't before --

6           THE COURT:  Well, but that's not how the law works.

7    Right?

8           You know, then it makes it a very subjective process in

9    which, in some instances, it is okay to accept it and act on

10   it.  And in other instances, it is not.  That is not the intent

11   of administrative law.

12          Administrative law is intended to create certainty and

13   predictability for the participants in similar situations.

14          You are saying to me, on the one hand, it is okay.  And

15   on the other hand, it is not okay.  That is subjective.  That,

16   arguably, is arbitrary and capricious.  That is, arguably,

17   abuse of discretion.

18          Help me understand why it is okay in one circumstance

19   and not in another.

20          MR. CUMMING:  I do not agree it is arbitrary for the

21   agency to provide the required comment period on the draft EA,

22   as Federal Highway did here, and to provide the option for the

23   public to submit comments on the draft FONSI even though it was

24   not required.

25          THE COURT:  So when the public availability period

1   came, was it clear in the notice as to what interested members

2   of the public could and could not do?

3          MR. CUMMING:  I believe it was.  And I'll -- I am

4   happy to give you that cite during rebuttal.

5          THE COURT:  Okay.  So the agency made the roadmap for

6   what was permissible in terms of comments known to the public?

7          MR. CUMMING:  Yes.

8          THE COURT:  And in your words -- Ms. Peltz is nodding

9   her head up and down.  So, obviously, your surmise at least

10  comports with the understanding of your colleague.

11         MR. CUMMING:  Those -- those notice documents are in

12  the record, your Honor.

13         THE COURT:  Okay.  And those notice documents made it

14  clear that if there were any concerns with respect to the

15  FONSI, that was within bounds of comment -- written comments?

16         MR. CUMMING:  We will get you the specific language,

17  your Honor, but that is my understanding.

18         THE COURT:  And it was clear from that guidance and

19  direction that the comments were limited to the draft FONSI and

20  in no way, shape, or form, could implicate the EA unless, in my

21  words, there was some significant interconnectedness in which

22  the language from the draft FONSI was ostensively taken from

23  the EA?

24         MR. CUMMING:  Notices were clear.  It was not

25  reopening the comment period --

```
 1              THE COURT:  Okay.

 2              MR. CUMMING:  -- in the draft EA.

 3              THE COURT:  All right.  So let's talk about the second

 4    letter.  Right?

 5         How does the second letter relate to this process, if at

 6    all?

 7              MR. CUMMING:  The record reflects the agency reviewed

 8    that letter and the other letters, and found it did not --

 9              THE COURT:  And the other letters that came in during

10    the public availability period?

11              MR. CUMMING:  It's my understanding.

12              THE COURT:  Okay.  So the second letter is within

13    bounds in terms of being properly filed within the period?

14              MR. CUMMING:  It was submitted during the public

15    availability period, yes.

16              THE COURT:  Okay.  So that is not an issue.

17         The issue is that the agency said that it reviewed the

18    contents of the letter, and it did whatever it did.  It was not

19    going to make any changes on the basis of the content of the

20    Governor's second letter?

21              MR. CUMMING:  No.

22              THE COURT:  Okay.

23              MR. CUMMING:  It was not going to because the content

24    is the state's lawsuit today, which we disagree with.

25              THE COURT:  Okay.
```

```
1          MR. CUMMING:  That's why I'm standing here.

2          THE COURT:  All right.

3      What else?

4          MR. CUMMING:  Unless the Court has further questions.

5          THE COURT:  Hold on.

6      So, Mr. Cumming, I want to go back to a statement you

7  just made.

8          The Governor's second letter is, in essence, the lawsuit

9  today.  You made that comment.  Correct?

10          MR. CUMMING:  I did.

11          THE COURT:  If that is, in fact, the case, then how

12  can any of the issues that are being raised today, which were

13  raised in that letter, be waived?  FHWA is on notice.  Right?

14  How is there a waiver?

15          MR. CUMMING:  The waiver would -- would go to issues

16  that could have been addressed between the draft EA and the

17  final EA, I believe.  And I -- I will defer to MTA on the

18  waiver with -- everything else with respect to environmental

19  justice, where we have argued that there was no reference in

20  the state's September letter that would have allowed Federal

21  Highways to target -- to address the state's concerns about

22  environmental justice.

23          I believe that's the only issue for which we are arguing

24  waiver --

25              THE COURT:  Okay.
```

```
1            MR. CUMMING:  -- in our briefs.

2            THE COURT:  We will figure it out when we look at the

3    record, and we will go from there.  I appreciate it.

4            MR. CUMMING:  Thank you.

5            THE COURT:  Mr. Chertok, you are up.  You

6    have 25 minutes.  And if you want to start with the last point,

7    I will be happy to hear what you have to say.  If you have

8    other plans for how you want to proceed, that's fine, too.

9            MR. CHERTOK:  Well, I will try to address --

10           (Reporter clarification.)

11           MR. CHERTOK:  I will try to address some of

12   your Honor's questions and -- and comments.  I am not going to

13   repeat Mr. Cumming's presentation.

14           There were remarkably expansive opportunities for the

15   public and New Jersey or other state agencies to consult in the

16   process.  And I think it is very important to distinguish

17   between this notion of participating agencies and other

18   agencies, who even if they are not denominated as

19   participating, can still consult and comment and add during the

20   process.

21           So what you --

22           THE COURT:  All right.  Participating agencies have

23   some elevated status, but it doesn't preclude anybody who

24   doesn't have that status from engaging in the process, given

25   the public opportunity?
```

1          MR. CHERTOK:  Exactly.  So that -- that's the first

2     point here.

3          The second point is that there were multiple outreach

4     sessions of two types, as Mr. Cumming indicated.  One,

5     environmental justice groups.  And secondly, various state and

6     other agencies.

7          Now, that -- the -- New Jersey has made -- has talked

8     about the fact there is a disparity between New York and

9     New Jersey entities.  Let's talk about that.

10          I do recall Mr. Mastro describing extensive work being

11     done in New York City.  Now, it is not really extensive, as

12     Ms. Knauer explained, but it is on telephone poles and it is on

13     wires.

14          And that requires the input from New York City officials

15     because that work will only take place in New York City; ergo,

16     you would expect to have city agencies invited to participate

17     because of their knowledge of New York City.  That's --

18          THE COURT:  I think Mr. Mastro and the plaintiffs

19     would probably concede that point.

20          MR. CHERTOK:  Well, I will be glad to hear it.  I am

21     waiting.

22          THE COURT:  Well, he will have his -- Ms. Myers will

23     have an opportunity.

24          I think what we are going to do is we are going to hear

25     you, then we will take a lunch break.  And like we did

```
 1  yesterday --

 2          MR. CHERTOK:  Sure.

 3          THE COURT:  -- do rebuttal after lunch.

 4          MR. CHERTOK:  Right.  And that -- so that's one major

 5  point.

 6      Two is, it is kind of remarkable here.  You have

 7  New Jersey transportation agencies being specifically invited.

 8  And they, apparently, have no desire to comment.  They have no

 9  desire to pursue the matter.  They just ask a few questions and

10  then retire.

11      The governor meets with the secretary and nothing

12  further happens.  There is a meeting just before the draft EA

13  is released, which gives a preview of what's coming.  That is

14  inadequate.

15          Now, the real fact is here --

16          THE COURT:  That meeting is inadequate --

17          MR. CHERTOK:  For New Jersey.

18          THE COURT:  -- in plaintiff's view.  In plaintiff's

19  view.

20          MR. CHERTOK:  Right.  Even though it is designed to

21  give everyone a heads-up on what is coming down the pike on the

22  following week.

23      But let's go back to all of the outreach and all of the

24  opportunities.

25      We have a state that has considerable resources.
```

1   Presumably the executive office knows that it has agencies

2   called Department of Health and Department of Environmental

3   Protection, and presumably even the transportation agencies

4   know of their sister agencies.

5          THE COURT:  So the point I think you are getting to,

6   Mr. Chertok, is notice to the executive -- to one part of the

7   executive in New Jersey would suffice the notice to all of the

8   relevant agencies?

9          MR. CHERTOK:  That is only one aspect of it.

10         But the point is that New Jersey was certainly aware of

11  this project.  And did any of those other agencies that

12  presumably -- that were not specifically invited, did they pick

13  up a phone and call somebody at FHWA.  Or --

14         THE COURT:  So using Mr. Mastro's words, obviousness.

15         MR. CHERTOK:  Yes.  But it works in the other way

16  here.  Yes.  It is perfectly obvious that New Jersey could have

17  participated had they chosen to do so.  What New Jersey chose

18  to do is not participate.  And then put in the letter at

19  the 11th hour to try to preserve their claims for the lawsuit.

20  That's really what's happened here.  Because if you go back and

21  look at their first letter on the draft EA, it is remarkable

22  for what it doesn't say.

23         It doesn't raise issues about the methodology used in

24  the traffic study.  It just mentions that, don't like what was

25  done.  It doesn't talk about the regional analysis for traffic,

1   the highway analysis, the intersection analysis, all of which

2   come up in the litigation.

3        It doesn't talk about the air quality methodology for

4   regional impacts, for hotspots, for intersections, et cetera,

5   for highways.  It doesn't talk about the methodology used to

6   identify EJ populations and EJ communities.  All of that and

7   much other information was in the draft EA.  It doesn't even

8   raise a single -- it has a single passing comment in that -- in

9   those comment letters from the governor and the agencies about

10  you could probably do this by another way, by placards -- by

11  eliminating New York City government parking spaces --

12            THE COURT:  The first letter, you're talking about the

13  first letter in the --

14            MR. CHERTOK:  The first letter, I'm only talking about

15  the first letter.

16            THE COURT:  -- the representation from you that that

17  letter was inadequate to put the FHWA on notice as to the

18  breadth of issues of concern to the plaintiff.

19            MR. CHERTOK:  Absolutely.  With a carveout that Mr.

20  Cumming acknowledged and I agree with, that the full blown --

21  the full mitigation study was not there.  So that was

22  different.  But other than that --

23            THE COURT:  That is the lion's share of the difference

24  between the draft and the final EA.  Correct?

25            MR. CHERTOK:  That's right.  And that was done and if

1  you recall that Mr. Mastro specifically said -- well, he didn't

2  say we raised it.  He said EPA raised it.

3       THE COURT:  Right.  And the Court engaged him in a

4  colloquy about incorporation by reference.  I am not sure I

5  have gotten a response to whether there was, in fact, a written

6  document from the State of New Jersey that specifically

7  incorporated it by reference.  But I do have a case law cite

8  that says what was raised by one effectively is raised by all.

9       MR. CHERTOK:  But what's critical to remember is that

10  EPA --

11       THE COURT:  Excuse me one second.

12       MR. CHERTOK:  -- signed off.

13       THE COURT:  Excuse me one second.

14       MR. CHERTOK:  Pardon me, your Honor?

15       THE COURT:  Excuse me one second.

16       MR. CHERTOK:  Sure.

17       THE COURT:  Thank you for nodding your head up and

18  down that I have a reasonable memory, Mr. Mastro.

19       MR. MASTRO:  Thank you, your Honor.

20       MR. CHERTOK:  You notice I didn't argue with that

21  either.

22       THE COURT:  Well, I understand, Mr. Chertok.

23       And, you know, that's because you want a lesson in tying

24  a bow tie after the litigation is all over.

25       MR. CHERTOK:  You know, it will elongate my marriage.

1        So but -- but to get back to that point, that's right.

2   There was -- I don't recall any letter incorporating EPA, but

3   the main point was that EPA approved of the expanded analysis.

4   And that the --

5        THE COURT:  Well, they raised questions and concerns

6   initially and then after that got a response, they seem to

7   indicate that that response responded to their concerns.

8        MR. CHERTOK:  Exactly, your Honor, which would suggest

9   that if New Jersey is relying upon the concerns raised by EPA,

10  then New Jersey's concerns were equally addressed in the final

11  EA.

12        THE COURT:  You are asking for a -- an inference to be

13  drawn in that.

14        MR. CHERTOK:  Fair enough, your Honor.

15        But certainly there is a fairly good logic there that

16  could be applied.

17        Now, a couple of other issues --

18        THE COURT:  We will accept that that's --

19        MR. CHERTOK:  Yeah.

20        THE COURT:  -- an argument, a reasonable argument.

21        MR. CHERTOK:  So a couple of other points we want to

22  make here is that the -- this public availability period, which

23  is really not unusual for environmental documents and the --

24  the NEPA process or the state counterparts to that where

25  there's a draft document.  It's put out for public comment.

1   The document is then modified as appropriate and responses to

2   comments are prepared.  And then the revised version is put out

3   for the public information.  Not for comment period.

4   Otherwise, your Honor, this process never ends.

5        So here, for example, you have the draft EA was issued

6   in the spring of 2022.  Summer of 2022, pardon me.

7        And the -- the letter from New Jersey, it was September

8   of 2022.  The final EA came out the following -- in May, I

9   believe.  And we have a June letter.  Do we restart this

10  process?  Or is there some -- some concept of finality which is

11  what the comment period is designed to do.  Achieve some degree

12  of finality.  And the --

13       THE COURT:  So the argument from the government and

14  from you is that the draft EA is published.  It has a period of

15  time for which there is comment.  That time has run.  And you

16  then get the final EA.  And so any comments submitted after in

17  your view, is beyond the period of time provided for by comment

18  and finality should attach to the final EA absent something

19  that is so glaring that somehow or another there should be a

20  process to bring that to the attention of the Federal Highway

21  Administration for corrections.

22       MR. CHERTOK:  But there is a process.  The -- as

23  Mr. Cumming explained, the FHWA --

24       THE COURT:  Okay.

25       MR. CHERTOK:  -- reviewed those letters.

1          THE COURT:  Right.

2          MR. CHERTOK:  And if they had believed that there was

3    something in those letters that raised a fundamental flaw --

4          THE COURT:  In the EA. In the EA.

5          MR. CHERTOK: -- in the process.  EA or FONSI, that

6    would have been subject to address.

7          THE COURT:  So there is this public availability

8    period.  And if there is -- so the benchmark is if there is

9    something significant or glaring, theoretically that can be

10   brought to the attention of the FHWA during the public

11   availability period, but the primary purpose of the public

12   availability period is for comments on the draft FONSI.

13         MR. CHERTOK:  Yes.  But I also think the other primary

14   purpose of the public availability is public information.  A

15   fundamental premise underlying NEPA is to have the public

16   informed of what is going on and what is happening.  And that

17   is why you have public availability.

18         So the agency is not obligated to consider anything.

19         THE COURT:  So where do I draw the line on finality

20   with respect to the EA?

21         MR. CHERTOK:  On the issuance of the -- the end of the

22   comment period on the draft EA is where finality ends.

23   Otherwise, this process goes on indefinitely.

24         THE COURT:  Except, except during the public

25   availability -- there is an exception to that in the public

1  availability period if, in your words, there is something

2  glaring.

3        MR. CHERTOK:  The agencies have the discretion --

4        THE COURT:  Discretion.

5        MR. CHERTOK: -- but not the obligation.

6        THE COURT:  Obligation.  Got it.

7        MR. CHERTOK:  There is a difference.

8        THE COURT:  Yes.  Got it.

9        MR. CHERTOK:  And --

10       THE COURT:  The obligation, though, runs to the

11  comment period on the FONSI or not?

12       MR. CHERTOK:  On the EA.

13       THE COURT:  On -- no.  The obligation ends -- I got

14  it.

15       The public availability period ostensively is serving

16  three purposes, or two purposes.

17       It is providing notice to the public as to the final EA,

18  and it is providing an opportunity for comment on the draft

19  FONSI that is predicated on the final EA.

20       MR. CHERTOK:  There is no preclusion against

21  commenting, but it's not a comment period as it is on the draft

22  EA.

23       THE COURT:  I am not so sure that's what Mr. Cumming

24  said in response to my questions.

25       MR. CHERTOK:  Well, I think -- stated that there's a

1    preclusion --

2          THE COURT:  I think he said to that that there's a set

3    of guidance, right, that'll -- that is issued that allows for

4    comment during the 30-day window of public availability on the

5    draft FONSI.

6          MR. CHERTOK:  I think -- well, we will settle this

7    over lunch, but we'll -- and try to give you a --

8          THE COURT:  A clean answer.  Okay.  Continue.

9          MR. CHERTOK:  But there are cases, your Honor, that

10   indicate that comments submitted after a comment period and

11   during an availability period do not preserve issues.  The

12   Earlbaum case v. -- *Earlbaum v. New Jersey DEP*.  *Slockish v.*

13   *FHWA*, S-l-o-c-k-i-s-h.  And the *Village of Logan v. Department*

14   *of Interior*.  I will give you the cites after lunch,

15   your Honor.

16         THE COURT:  That's fine.

17      Are they Fed Supp cites or are they Fed cites?

18         MR. CHERTOK:  They are all -- all Westlaw.

19         THE COURT:  Okay.  But are they circuit or District

20   Court opinions?

21         MR. CHERTOK:  They are district.  All district courts.

22         THE COURT:  Okay.  That's fine.

23         MR. CHERTOK:  In addition there was a --

24         THE COURT:  Well, one last question.  Are any of those

25   circumstances similar to -- I won't call it identical -- are

1  they similar to the circumstances we have here?  Or are there

2  some distinctions.

3          MR. CHERTOK:  There were comments raised in the

4  availability period --

5          THE COURT:  Availability period.

6          MR. CHERTOK:  -- and the question was whether they

7  were preserved --

8          THE COURT:  Or not.  Okay.

9          MR. CHERTOK:  -- for litigation.

10          THE COURT:  Good.  Thank you.

11          MR. CHERTOK:  Sure.  There was also discussion about

12  the -- the time frame and the -- what's reasonable.  And just

13  to be clear, there was initially a 30-day comment period on the

14  draft EA that was extended to 44 days upon the request of

15  New Jersey and others.  I don't -- I don't think that's

16  disputed.

17          THE COURT:  Well --

18          MR. CHERTOK:  And then the dispute is whether or not

19  there should be a longer time.  I think --

20          THE COURT:  Right.

21          MR. CHERTOK:  -- New Jersey and --

22          THE COURT:  It is not disputed once we got it

23  clarified as when to what was going on.

24          MR. CHERTOK:  In any event, since I am familiar with

25  that, I wasn't that confused, luckily, but the main point is

1    that what they are saying is that it should be a nine-month

2    period, I believe, was suggested.

3         THE COURT:  Well, no.  I asked what is the benchmark?

4    So if 44 days is not enough how far back do we go?  I posited

5    some suggestions.  Is it 45 days?  Is it something else?  And

6    then I said, Is it 125 days, to which Ms. Myers responded that

7    would be reasonable or words to that effect.

8         MR. CHERTOK:  Okay.

9         THE COURT:  So it is not nine months.  It was about a

10   four-month period.

11        MR. CHERTOK:  I am pleased to hear that it was shorter

12   and somewhat more reasonable, but there is a case that

13   addresses the issue.

14        It was Court of Appeals decision out of the Ninth

15   Circuit that reversed the *Kootenai Tribe* case that was cited in

16   a New Jersey brief for the fact that there was only 12 days

17   allowed for public review.  There were no responses made to the

18   comments on the draft EA, et cetera.

19        And the Ninth Circuit reversed and indicated, basically,

20   that there is no viable challenge to a time frame as long as it

21   meets the minimum time frame.  And in that case --

22        THE COURT:  Yes.  But there is a period of time in

23   which whatever the minimum is, it is the same question in

24   reverse.  What is too short a period?  Where do you draw the

25   line?  Is it eight days?  Is it 12 days?

1          MR. CHERTOK:  The regulations have drawn the line at a

2     minimum of 30 days.

3          THE COURT:  Okay.

4          MR. CHERTOK:  So there is a line.

5          THE COURT:  There is a line that's been drawn.

6          MR. CHERTOK:  What this case said, which was relating

7     to the EIS, says the time frame is 45 days, that the extension

8     of the time frame was slightly over 50 percent and that was

9     perfectly appropriate and reasonable.

10         Here, the extension was just slightly under 50 percent.

11    So, by logic, that extension was a reasonable extension.

12         I do note that there were 70,000 comments, if I recall,

13    but to be fair, I think 50,000 were form letters.  So there are

14    perhaps 20,000 comments.  So 20,000 commenters were able to put

15    in meaningful and substantive comments in those 44 days but

16    New Jersey, with its vast resources and multiple agencies, was

17    unable to put in comments that addressed the merits of the

18    claim that they are raising today.  That seems a little

19    unusual.

20         THE COURT:  So Mr. Chertok, if you were sitting in

21    Mr. Mastro and Ms. Myers' chair, would their argument be

22    unreasonable to you?

23         MR. CHERTOK:  The argument that they --

24         THE COURT:  That 44 days was inadequate.

25         MR. CHERTOK:  Yes.  I have more years in the EIS world

1    than Ms. Knauer, but I will not state how many, but there are

2    frequently shorter time frames for more extensive and more

3    complicated documents.

4         It is the world of NEPA in which there's pressure to

5    move forward, whether a project is approved or denied, and not

6    have endless processes of public review, comment, revision,

7    comment, review, revision.  Because as I mentioned earlier,

8    delay kills projects.

9         That's what these regulations and that's what these --

10   the Courts are trying to avoid.

11        We need to keep this within realm.  It eventually needs

12   to end.

13        And here what you have is, basically, claims being made

14   at the 11th hour, at the end of the public availability period,

15   which are designed to allow New Jersey to raise claims they

16   could have raised before and did not.

17        THE COURT:  So let's assume they did raise them at

18   the 11th hour.

19        What if they raised them at the eighth hour?

20        MR. CHERTOK:  If they had raised them before the -- or

21   during the comment period, then every one of those comments

22   would have been addressed, but they did not raise them, and it

23   is impossible for FHWA and the project sponsors to respond to

24   comments not raised.  That's the purpose of the comment period,

25   to alert the agency.  So they rely on EPA's comments.  Those

1    comments were specifically addressed.  They were responded to.

2    And EPA was satisfied.

3            THE COURT:  Continue.

4            MR. CHERTOK:  That did not happen.

5        A couple of minor things, the only meetings that

6    occurred after the draft EA was issued were with environmental

7    justice groups.  There were no private meetings with New York

8    agencies.  They were only with the environmental justice

9    groups.

10           While we are speaking of environmental justice groups,

11   if New Jersey believed that other environmental justice groups

12   should have been notified, they could have informed MTA -- or

13   the project sponsors, rather, or the FHWA.  They did not.

14           If any of the other groups in New Jersey believed they

15   should participate, they could have requested that.

16   All 27 persons or entities that requested to participate in the

17   working group are members.  So there was no close-down or

18   shut-out of any type of public involvement or public

19   participation.

20           The -- I am not really -- sometimes I am not clear on

21   New Jersey's claim because sometimes it is the public, which I

22   don't think was actually raised, insufficient public outreach,

23   or whether it is only related to New Jersey agencies.  They've

24   conceded that transportation agencies participated, so I

25   believe it looks like it is narrowed down to DEP and DOH,

1    agencies that --

2         THE COURT:  I think we made that clear in the colloquy

3    with Ms. Myers.

4         MR. CHERTOK:  I am just refreshing my recollection

5    because the diligent effort regulation that was quoted refers

6    only to public participation, not to agencies.

7         Actually, New Jersey never raised the issue of the

8    criteria for identifying participating agencies, but I think we

9    addressed that more than enough, your Honor.

10        Overall -- and it is clear, obviously, that neither

11   DEP -- New Jersey DEP nor New Jersey DOH commented.  I suspect

12   if they were asked if they ever heard of this project during

13   that period prior to the end of the comment period on a draft

14   EA, their answer would be in the affirmative, but, of course,

15   since they didn't comment, there was no basis to ask that

16   question.

17        The long and short of this, your Honor, is that

18   New Jersey consciously chose not to participate actively,

19   whether as a participating agency or agencies or consultants or

20   commenting agencies.  They did not participate in this process.

21   That was a New Jersey decision.  They can't now shift it -- the

22   burden -- to FHWA and the project sponsors when they clearly

23   had no interest in partaking in the process.

24        I think the reason for that is clear in their reply

25   brief on page 39.  It says, and I am quoting, With MTA at the

1  wheel, New Jersey did not and could not reach any agreement

2  with FHWA to implement the project because as MTA and FHWA

3  assert multiple times, this project is being implemented in

4  New York by statute and the legislature did not provide for

5  New Jersey's participation.

6         That is a nonsensical statement because that legislation

7  in no way precludes New Jersey from participating.  That is

8  just a hollow excuse for their failure to participate in the

9  NEPA process and raise claims that they tell this Court are

10 critical, but they couldn't raise in the administrative

11 process.

12        Thank you, your Honor, unless you have any questions, of

13 course.

14        THE COURT:  No.  I think we will hold questions until

15 after lunch.  We will give you a couple of minutes to finish up

16 the affirmative presentation with questions from the Court.

17        MR. CHERTOK:  Thank you.

18        THE COURT:  We are at approximately 1:15.  We are

19 supposed to be beginning the next session right about now.

20        You all tell me.

21        Can you do what you need to do in a half hour, and we

22 can be back in at 1:45, 1:50?

23        Fine.  We will see you then.

24             (Lunch recess taken at 1:18 p.m.)

25                  AFTERNOON SESSION

1              (In open court at 1:49 p.m.)

2          THE COURT:  Have a seat, folks.

3          If they are late, they are late.  It is their problem.

4          Mr. Chertok, you are up.  I am going to give you five

5    more minutes on affirmative presentation, and then I am going

6    to, perhaps, ask you a question or two.

7          We are at 1:50, as I had suggested that's when we might

8    start.

9          Mr. Chertok, you are on the clock for five minutes.

10         You may begin.

11          MR. CHERTOK:  Thank you.  I'm going to be brief.

12         I just want to do one thing, which is -- other than

13   answer any questions, of course, and figure out how --

14         THE COURT:  I am glad you are able to continue to

15   laugh, Mr. Chertok, after almost two days.  It is a good thing.

16          MR. CHERTOK:  The June letter, the June 2023 letter --

17          THE COURT:  Yes.

18          MR. CHERTOK:  -- New Jersey has said it should count.

19         It should preserve their claims, et cetera, et cetera.

20   So let's look at the topics that are the subject of that

21   letter.  I'm going to take the letter that starts on page 40844

22   of the record.  I'm just going to look -- read from their

23   topics.

24         First is the final EA is the result of a failed process,

25   and New Jersey said they have a strong interest in

1  participating.  Nothing new.

2       Second, that the project scoping overlooked the unique

3  characteristics of the Manhattan CBD.  That certainly could

4  have been a comment on the draft EA because the Manhattan CBD

5  didn't change much in the interim between the draft EA and the

6  final EA.

7       Then they say FHWA and MTA didn't conduct adequate

8  outreach.

9       Once again, that certainly could have been raised and

10 was obliquely raised on the comments on the draft EA.

11      The next is the project's purpose and needs are too

12 narrow.

13          THE COURT:  Mr. Chertok, can you please stop?  There's

14 a problem with the microphone.

15          MR. CHERTOK:  Where did we leave off?

16          THE COURT:  I think you are making your third point, I

17 believe.

18          MR. CHERTOK:  I think the point was the unique scope

19 of the CBD, and my point was that --

20          THE COURT:  No.  It was the point before that.  You

21 had not used the phrase, unique scope of the CBD.

22          MR. CHERTOK:  The scoping of the project overlooked

23 the unique characteristics of the CBD, and my point was that

24 the CBD didn't change between the draft and final EA preventing

25 a comment in timely fashion on that issue.

1        The next is the FHWA and MTA didn't conduct adequate

2   outreach, which was an oblique comment made earlier, but,

3   certainly, if they didn't allegedly have sufficient outreach

4   and that was their claim, they could have raised that in

5   comments on the draft in more detail.

6        Next is the comment that the project's purpose and need

7   are too narrowly defined.  The purpose and need was clearly set

8   forth in the draft EA.

9        The next is several comments on the alleged inadequacies

10  in alternatives.  The alternatives were fully set out in the

11  EA.

12       Next is the EA didn't account for New Jersey

13  Transportation network and commuters, including revenue impacts

14  to New Jersey's agencies.

15            THE COURT:  I know it is not your letter, Mr. Chertok.

16  I don't know what that means.

17       Is there a sentence or two there that explains that to

18  me?

19            MR. CHERTOK:  Yes.

20            THE COURT:  I mean, I know what the words mean, but

21  this is the first time that's been mentioned in a day and a

22  half.  I am not quite sure I understand what that means.

23            MR. CHERTOK:  The assertion is that, basically, there

24  will be a greater number of commuters using New Jersey Transit

25  and will cost the state money to accommodate them.  Not a claim

1    raised in this litigation.

2         The next is impacts on the New Jersey DOT, and that

3    includes the affects on EJ communities and the mapping process,

4    which, of course, New Jersey could have raised in the draft

5    EI -- EA, the comments about census tracts and the mapping,

6    et cetera, that were raised.

7         And that the rest of the comments relate to air quality

8    impacts as a result of the diversion and the air quality

9    assessment was in the draft EA.

10        THE COURT:  So if -- I would summarize what you said

11   to me for the last three or four minutes.

12        One might characterize -- I am trying -- I am going to

13   potentially put words in your mouth.  You tell me whether you

14   agree.

15        You would be characterizing the letter as raising issues

16   which should have been raised with respect to the draft EA

17   because the only thing of significance that changed between the

18   draft EA and the final EA was the issues related to mitigation.

19        MR. CHERTOK:  Exactly with one slight caveat.  I would

20   say not only should have been raised, but could have been

21   raised.

22        But other than that, I concur.

23        THE COURT:  They had the opportunity to do so and in

24   your view, did not in that appropriate time period.

25        MR. CHERTOK:  Correct.

1          THE COURT:  Okay.  All right.

2          MR. CHERTOK:  Did you have any questions for me,

3     your Honor?

4          THE COURT:  I have to look at my notes.

5          MR. CHERTOK:  Okay.

6          THE COURT:  And I picked up the wrong piece of paper

7     perhaps.

8              (An off-the-record discussion was held.)

9          THE COURT:  Mr. Chertok, you made reference to, I

10    believe, three or four cases about preservation of claims?

11         MR. CHERTOK:  Correct, your Honor.

12         THE COURT:  All right.  So Mr. Chertok, did those

13    cases involve circumstances where comments were raised during

14    the public availability period and the Courts then said because

15    of that, they were not preserved?

16         MR. CHERTOK:  No, those were comments that were raised

17    after the expiration of the comment period on the draft

18    document.

19         THE COURT:  No, but that's not the question I asked.

20         MR. CHERTOK:  No, I am responding that they are not

21    exactly the same.

22         THE COURT:  Oh, okay.

23         MR. CHERTOK:  That -- I'm just trying to clarify that.

24         But in a way, if the Courts -- if the Courts would not

25    accept comments that were submitted late, but before the final

1   document had not been issued, and there was still an

2   opportunity for the agency to address the comments, it is even

3   worse that the comments came in after the final document was

4   issued for the public.

5             THE COURT:  Okay.

6             MR. CHERTOK:  So those cases support the notion that

7   the comments should have been in a timely fashion.

8             THE COURT:  If comments are made to the agency

9   reviewing, in this case, FHWA, and were responded to by the

10  agency, does the fact that the agency considered and responded

11  to them override the concept of the issues raised in those

12  comments not being preserved?

13        In other words, if the agency -- if the letter is in and

14  the agency chooses to address them, does that override the fact

15  the claim that those issues were not preserved?

16            MR. CHERTOK:  I am going to -- I am going to have to

17  ask you a question, your Honor, with all deference.  When you

18  say the letter, which are you referring to?

19            THE COURT:  No -- let's -- it's the three cases.

20            MR. CHERTOK:  Okay.  Okay.

21            THE COURT:  If you take the three cases --

22            MR. CHERTOK:  Okay.

23            THE COURT:  Right, and comments are responded to by

24  the agency --

25            MR. CHERTOK:  If the agency --

1          THE COURT:  -- responds, does that get rid of the --

2    the waive/not preserved?

3          MR. CHERTOK:  So, your Honor, I don't recall what

4    happened in each of those cases.

5          But the Court's made it clear the agency is not

6    obligated to consider those comments.

7          THE COURT:  Right.  Not obligated, but if they choose

8    to do so, then that eliminates part of the problem.

9          MR. CHERTOK:  Yes.  But the fact that they chose to do

10   so, it's -- you can't -- I think you can't construct that into

11   an argument, that if they did so in their discretion because

12   they thought it was important, suddenly then everything

13   becomes, you know, kosher --

14         THE COURT:  I understand.

15         MR. CHERTOK:  -- so to speak.  Okay.

16         THE COURT:  Bottom line, are you arguing that the

17   June 12th letter comments were waived?

18         MR. CHERTOK:  Yes.  Except for comments on the new

19   material in the final EA on --

20         THE COURT:  So anything, based on our colloquy --

21         MR. CHERTOK:  Yes.

22         THE COURT:  -- anything back before the new material,

23   in your view, is out; anything that deals with new material is

24   in?

25         MR. CHERTOK:  Correct.

```
 1            THE COURT:  Got it.  Thank you.

 2            MR. CHERTOK:  Thank you, your Honor.

 3            THE COURT:  Ms. Myers.

 4            MS. MYERS:  Thank you, your Honor.

 5            THE COURT:  So we're into rebuttal.

 6            MS. MYERS:  Yes, ten minutes.

 7            THE COURT:  Ten minutes.

 8            MS. MYERS:  Yeah.

 9            THE COURT:  Good.  You are on the clock.

10            MS. MYERS:  Okay.  I would like to start with the

11 notice of availability that was published for that comment

12 period, May 12, 2023 to June 12, 2023.  And --

13            THE COURT:  We're talking about the public

14 availability period.

15            MS. MYERS:  Correct.  And this is at DOT_0036142.

16            THE COURT:  Okay.

17            MS. MYERS:  And it states, quote, The official 30-day

18 public availability period for the final EA and draft FONSI for

19 the project will begin on May 12, 2023, and will end on

20 June 12, 2023.

21            THE COURT:  Do me a favor, read that again, please.

22            MS. MYERS:  Sure.

23         The official 30-day public availability period for the

24 final EA and the draft FONSI for the project will begin on

25 May 12, 2023, and will end on June 12, 2023.
```

1          THE COURT:  Okay.  Good.

2          MS. MYERS:  Nowhere in this notice does it say that if

3    you submit a letter during this period, the agency reserves its

4    discretion on whether or not to consider it, and then also

5    reserve its discretion on considering it and then deciding that

6    you still waived your arguments in --

7          THE COURT:  Okay.  Ms. Myers.

8          MS. MYERS:  -- the notice.

9          THE COURT:  Mr. Cumming got up here, and in response

10   to my questions, indicated that there was guidance, direction,

11   in the notice about what could or could not be commented on and

12   how.  That's a quick summary of what I believe we discussed in

13   the colloquy.

14        So my question to you is:  You read me the document.

15   You said to me publicly available from date X to date Y.  Is

16   there anything else that's included in that notice that you

17   take issue with or supports your claim with respect to what

18   could and could not be done during that 30-day period?

19        MS. MYERS:  Our claim is primarily based on what's not

20   listed here.

21        THE COURT:  Okay.  So tell me what is listed so I can

22   understand how to ask you a question about what's not listed.

23        MS. MYERS:  Sure.  So it starts off by saying notice

24   of availability --

25        THE COURT:  Right.

1          MS. MYERS:  -- of the final EA and draft.  FHWA lists

2     the agencies.  It says the name of the project.  It says the

3     TBTA and the project sponsors are issuing this notice to advise

4     the public of availability of the final EA and the -- the draft

5     FONSI.

6          THE COURT:  From date X to date Y.

7          MS. MYERS:  Right.  That the --

8          THE COURT:  Right.

9          MS. MYERS:  -- commentary is there.  So this the

10    intro.  It introduces the documents.  It says, The purpose of

11    the project is to reduce congestion in the CBD.  It says, In

12    compliance with the regulations on NEPA, the final EA.

13         THE COURT:  Does it list them or just is it a generic

14    statement?

15         MS. MYERS:  It cites 40 CFR -- parts 1500 to 1508 --

16         THE COURT:  Okay.

17         MS. MYERS:  -- the whole part.

18         THE COURT:  Okay.

19         MS. MYERS:  It says, The final EA was prepared to

20    evaluate the potential of and identify any environmental

21    impacts and mitigation for the project in consideration of

22    public and agency input, responds to comments received with the

23    draft EA.

24         THE COURT:  Right.

25         MS. MYERS:  And FHWA intends to apply 23 USC 13 -- 139

1   (1) limitations on claims, any decision it may issue with

2   respect to the project.

3        As the project requires, FHWA's approval, it's subject

4   to a different act of the Department of Transportation and FHWA

5   regulations.  In accordance with the regulations, FHWA makes a

6   *de minimis* impact finding for the project.  And then it says,

7   The availability of the final EA and draft FONSI, it says the

8   sentence I read to you.  It says where you can access it.  And

9   it gives websites and phone numbers.

10        THE COURT:  Does it say anything about the receipt of

11   comments on either document?

12        MS. MYERS:  No.

13        THE COURT:  There is -- there's -- so from what you

14   are reading, there is no guidance nor instruction?

15        MS. MYERS:  There is no guidance or instruction on

16   whether or not you submit a document, it will be considered.

17        THE COURT:  Well, whether even a document could be

18   submitted.

19        MS. MYERS:  Well, it opens the public availability

20   period.

21        THE COURT:  Right.

22        MS. MYERS:  And it --

23        THE COURT:  But it doesn't -- public availability is

24   public availability.  Right?  It means you get to look at it.

25   Right?  But it doesn't -- what I am asking you is, does it say

1   anything about what the public may do during that 30-day

2   window?  Other than look at it.

3        MS. MYERS:  It -- it uses the term public

4   availability.

5        THE COURT:  Okay.  It does not use the word comment.

6   It does not talk about the submission of comments.  It does not

7   talk about a document or a posting anywhere that would provide

8   guidance or instruction about the submission of comments.

9        MS. MYERS:  Correct.

10       THE COURT:  And it does not say in any way, shape, or

11  form that comments cannot be submitted.

12       MS. MYERS:  Correct.

13       THE COURT:  Okay.

14       Continue.

15       MS. MYERS:  The FHWA has said it read the comments

16  that were submitted during that period and made a determination

17  nothing needed to be changed to the document.

18       So, again, there was no notice to the members of the

19  public or New Jersey about whether or not these documents --

20  the letters submitted during the public availability period

21  would be considered or not.  They said they considered it, but

22  now they are saying we also waived our arguments.  And we are

23  saying that is unreasonable.

24       Second, I would like to talk about the EPA email that's

25  been cited a bunch of times -- a bunch of times.

1          This is at DOT_0045366.

2          THE COURT:  There's apparently two EPA documents,

3    right, there's the letter which you seem to indicate is the

4    State of New Jersey endorses.  And then there is a document

5    that I believe is an email that represents a summary of

6    whatever consultation took place between the FHWA and the EPA

7    regarding those initial comments.

8          MS. MYERS:  Correct.

9          THE COURT:  Okay.  And you are talking about that

10   second piece of correspondence?

11         MS. MYERS:  Yes.

12         THE COURT:  You may continue.

13         MS. MYERS:  The EPA says, quote, We reviewed the

14   updated draft and acknowledged the improvements.  But EPA

15   encourages FHWA and the project sponsors to consider including

16   a commitment to develop an adaptive management plan during or

17   after the final tolling schemes, access and evaluate the

18   feasibility of all mitigation, ongoing meaningful public

19   engagement, and develop their plan based on the final tolling

20   structure.

21         THE COURT:  So adaptive management plan is the more

22   formal, long form of mitigation?

23         MS. MYERS:  Yes.

24         THE COURT:  Okay.

25         MS. MYERS:  That the EPA refers to.  And my point of

1   bringing this up is it does not say that, you know, we outright

2   approve everything you did.  It is an acknowledgment of the

3   improvements.

4           THE COURT:  Right and --

5           MS. MYERS:  It is not a stamp --

6           THE COURT:  You're arguing to the Court that the

7   inferences of -- the inferences that the government would like

8   the Court to draw from that document, you disagree with.

9           MS. MYERS:  They are a little far stretched from what

10  the document says --

11          THE COURT:  Okay.

12          MS. MYERS:  -- in my opinion.

13      Third, you asked the government about which agencies

14  were invited to participate in the process.  And they cited you

15  to DOT_0037042 to 43.

16      This does not explain why they chose these agencies to

17  participate.  It lists the agencies that were invited to

18  participate, but it doesn't say we reached out to these types

19  of agencies because of why.  It does not give an explanation as

20  to why it invited these specific agencies.

21          Fourth --

22          THE COURT:  The conclusion without the rationale.

23          MS. MYERS:  Exactly.

24      The government also brought up the New Jersey Planning

25  Authority as one of the organizations that was invited to

```
 1   participate.  Sorry.  The North Jersey Transportation Planning
 2   Authority, as explained in the June comment letter.  That
 3   agency has indicated there were no presentations made to it
 4   outlining the specific impacts of the project and none of the
 5   other New Jersey agencies delegated their authority to this
 6   one.
 7          Finally a couple --
 8            THE COURT:  Let me just ask this question.
 9          There was a representation made to the Court that that
10   entity has within its penumbra -- I don't want to use the word
11   responsibilities, but the scope of what it deals with also
12   deals with environmental/health issues.  It's not just
13   transportation, quad transportation.
14            MS. MYERS:  I think the government said that that
15   agency also deals with the state implementation plan, not that
16   it also encompasses --
17            THE COURT:  The SIP.
18            MS. MYERS:  Exactly.  So we are obviously not
19   disputing that, but it is not the Environmental Protection --
20            THE COURT:  Right.
21            MS. MYERS:  -- And Health Agency --
22            THE COURT:  Right.
23            MS. MYERS:  --- that is primarily is in charge of the
24   state.
25            THE COURT:  Okay.
```

1        MS. MYERS:  Finally, there was some mentions about a

2  meeting between Governor Murphy and the secretary of

3  transportation.  That meeting occurred on May 26, 2023.  It was

4  after the final EA and the draft FONSI in that public

5  availability period and after the governor's call, as you can

6  tell by the timeline.  Two weeks later, the June letter comes

7  in.  And this email they cite outlines all of the concerns that

8  we've raised and that the governor raised in the June 12th

9  letter, that the talking points that were prepared for the

10  secretary, acknowledges the issues that we have with the

11  documents at the end of the day.

12        So I just wanted to make sure that the Court is aware of

13  the full contents of this email and the timing of how, after

14  the call, the comment letter came in.

15        THE COURT:  What is the implication?  The governor met

16  with the Secretary of Transportation.  So?  What am I supposed

17  to do with that?  What is the implication of that?  How does

18  that affect, one, the decision-making, or, two, what the Court

19  is supposed to do in reviewing the issue s in this case?

20        MS. MYERS:  I think that the reason the government

21  brought this up was to show that there was participation with

22  the governor's office and the state, and our response to that

23  is that yes, they had this conversation that outlined all of

24  our concerns and then they were memorialized in a letter.  So

25  it goes to show the reasonableness on behalf of the State of

```
 1   New Jersey in participating in the process and memorializing
 2   their concerns.
 3            THE COURT:  But if it was not memorialized in a
 4   letter, would there be any document in the record evidencing
 5   the fact that there was a meeting and, arguably, the topics
 6   that may have been discussed?
 7            MS. MYERS:  Yes.  That is at DOT_0045346.
 8            THE COURT:  So there are two documents in the record
 9   that evidence this meeting and the topics discussed, the
10   governor's letter and the document that you just referred to?
11            MS. MYERS:  I don't know if the governor's letter
12   specifically refers to the meeting, but I was acknowledging
13   that he sent the letter two weeks after -- two weeks after this
14   meeting.
15            THE COURT:  All right.  Let's roll this back to make
16   sure I have this correct.
17            There was a meeting.  What you have said to me is that
18   two weeks after this meeting, the governor sent a letter.
19            MS. MYERS:  Correct.
20            THE COURT:  Is that letter in any way, shape, or form
21   memorialize the fact that there was a meeting and the topics
22   discussed at that meeting?
23            MS. MYERS:  No, not specifically.
24            THE COURT:  The only memorialization is the last
25   document that you referred to, which is, in essence, a memo to
```

1   the file that emanated, I am assuming, from the secretary's

2   office and was transmitted to the Federal Highway

3   Administration?

4           MS. MYERS:  It is talking points from the New York

5   representative of DOT to other people at DOT and the talking

6   points are in the body of the email.  I think your Honor asked

7   about this a couple weeks ago for like the fulsome record,

8   where was the rest of the information here.

9           THE COURT:  Right.

10          MS. MYERS:  We are similarly just operating off of

11  what's in the record.  These are the DOT talking points.

12          THE COURT:  The New York State DOT or the New York

13  Office of the U.S. DOT?

14          MS. MYERS:  New York Office of the U.S. DOT.

15          THE COURT:  Who was, arguably, present at the meeting

16  with the governor and secretary or not?

17          MS. MYERS:  I do not know.

18          THE COURT:  I will draw whatever inferences I need to

19  draw from it, but you have clarified what's in the record and

20  what's not in the record.  I appreciate it.

21          MS. MYERS:  No problem.

22          THE COURT:  Anything more, Ms. Myers?

23          MS. MYERS:  No, your Honor.

24          THE COURT Thank you.  I appreciate it.

25          Mr. Cumming, you are up.

```
 1        How much time do we need, Mr. Cumming?  Seven minutes?
 2   Ten minutes?
 3        MR. CUMMING:  Probably about three, your Honor.  I
 4   have two very quick points.
 5        THE COURT:  Go ahead.
 6        MR. CUMMING:  And I will sit down.
 7        Your Honor asked for citations about the draft FONSI
 8   Ms. Myers provided the notice to.
 9        The draft FONSI itself is at 40615.  That does note that
10   the public could submit feedback about new information -- new
11   information in the draft FONSI.
12        THE COURT:  So somebody has to go dig through the
13   draft FONSI to find out that they have the authority to
14   comment?
15        MR. CUMMING:  They have the ability to submit
16   feedback.
17        THE COURT:  But the point is it is not in the notice.
18   You have got to go dig through the document itself, whether it
19   is on page 1 or page 2 or page 23, the point is there is no
20   indicia in the notice that you have to go look someplace else.
21   So if you don't happen to fully read the particular page in the
22   FONSI, right, you got no idea whether you can comment.
23        MR. CUMMING:  I believe that's true.
24        THE COURT:  Okay.
25        What page in the FONSI is the notification that you can
```

1    provide feedback?  Is it relatively upfront.

2         MR. CUMMING:  It is at 40615.  That is the pin cite to

3    the page within the document starting at DOT_40589.

4         THE COURT:  Is that the first page of the document,

5    the second page, the 13th page?  Do we know?

6         MR. CUMMING:  I don't know, your Honor.  I just looked

7    at it, but I don't remember what page it is at.  I apologize.

8         THE COURT:  Anything else, Mr. Cumming?

9         MR. CUMMING:  The FONSI itself --

10        THE COURT:  Hold on.  Ms. Peltz is coming to your

11   rescue.

12        MR. CUMMING:  I can't give you the specific page, but

13   that comment I referred to is at the end of the FONSI in what

14   is kind of a Q & A section of the document.

15        THE COURT:  It's at the end of the FONSI.

16        How many pages is the FONSI, roughly?

17        MR. CUMMING:  About 30.

18        THE COURT:  Okay.  I will accept it is what it is.

19        Whether or not it could have been done better, that is a

20   different question.

21        Anything else, Mr. Cumming?

22        MR. CUMMING:  I will just note on that point,

23   your Honor, the notice of availability is the availability of

24   the FONSI, so the public can review it.

25        THE COURT:  Right.

1          MR. CUMMING:  That is implied in the notice.

2          THE COURT:  You provided the opportunity in compliance

3     with the regulations.  Whether or not what you provided in

4     terms of notice, the Court will it figure out.

5          MR. CUMMING:  Nothing further.

6          THE COURT:  Well, it is why we're here.  Right?

7     People are arguing.  Reasonable people can differ, and my job

8     is to figure it out, and I will.

9          Anything more, Mr. Cumming?

10         MR. CUMMING:  Nothing further.

11         THE COURT:  Mr. Chertok, you are up.

12         MR. CHERTOK:  Just a couple of comments, your Honor.

13         The purpose of bringing up the meeting with the

14    secretary as well there was an earlier meeting -- let me back

15    up.

16         There is no reason that the comments that were made to

17    the secretary that are memorialized in the June 2023 letter

18    could not have made -- been made during the comment period.

19         Indeed, the --

20         THE COURT:  In your view.

21         MR. CHERTOK:  Well, I think in any fair view because

22    they were comments by 20,000 people on the contents of the

23    draft EA, including some of the issues that could have been

24    raised by New Jersey, but were not.

25         THE COURT:  Okay.

1          MR. CHERTOK:  I think it's fair to say they had the

2     opportunity.  They did not avail themselves of that

3     opportunity.

4          There was also a meeting with a deputy secretary of FHWA

5     prior to the September 2022 letter that was referenced.

6          THE COURT:  Is that memorialized in the record?

7          MR. CHERTOK:  Yes.  It is in the letter from the

8     governor in the September 9th letter, which is 7768.

9          The point is that New Jersey certainly had access if it

10    wanted it, and it could have raised these comments.

11         A couple of points that were raised earlier, the notice

12    of availability, the key reason for it is to inform the public

13    that after that period expires, the final FONSI may issue.

14    That is a public information purpose of the availability --

15    notice of availability.

16         Also, the draft EA only mentioned one comment period.

17    It didn't talk about multiple comment periods.  That's because

18    the regulations don't contemplate multiple periods.

19         THE COURT:  I thinks that's a fair point, Mr. Chertok,

20    but we have got an integrated process with multiple documents

21    whose issuance in draft and issuance in final build on one

22    another.

23         So I accept your comment for what it is, but I am not

24    quite sure that I am willing to accept it as an absolute

25    position as for all.

 1          MR. CHERTOK:  Fair enough, your Honor.

 2      I think that the main point is that there was nothing

 3  that barred New Jersey from commenting.

 4          THE COURT:  I accept that that's your position, and I

 5  understand it fully, and you have repeated it several times,

 6  and we have had an interchange about it.

 7          MR. CHERTOK:  In terms of the EPA letter and the fact

 8  that we're drawing unfair inferences from that --

 9          THE COURT:  I don't know that we're drawing unfair

10  inferences.  The question is:  Are we drawing any inferences

11  from it?

12          MR. CHERTOK:  Well, we are not drawing inferences.  We

13  are basing it on the letter.  The negative inferences are being

14  drawn by New Jersey, but the main comment --

15          THE COURT:  Well, are being suggested and argued to be

16  drawn by New Jersey.

17          MR. CHERTOK:  Fair enough.

18      The point -- the main point of EPA was to use an

19  adaptive management, and that is exactly what was included in

20  the mitigation program.  Ms. Knauer described that, so I don't

21  want to repeat her description, but it is in the document and

22  it provides for evaluation consistently of the impacts of the

23  project and adjustments about to be made, and it has a public

24  involvement component, which is the key areas that EPA focused

25  on.

1          So I think there is not much to say except I will

2    repeat, in danger of slightly angering your Honor,

3    New Jersey --

4             THE COURT:  Oh, come now.  I am a pussy cat.

5             MR. CHERTOK:  -- New Jersey had the opportunity.

6          It purposely, for whatever reason, did not avail itself,

7    and now it finds itself in the position of the petitioner in

8    *Vermont Yankee*, which is the traditional ambush case.

9          Thank you, your Honor.

10            THE COURT:  You're welcome, Mr. Chertok.

11         We are now done with New Jersey participation.

12         Clean Air Act, we will turn our attention to that.

13         Well, it looks like I have got the pleasure again of

14   Mr. Mastro.

15         Mr. Mastro, we are talking about 20 minutes and whatever

16   it is you need, you will tell me.

17            MR. MASTRO:  Yes, your Honor.  I am going to try to be

18   uncharacteristically brief.  I will reserve ten minutes because

19   I'm hoping to go ten minutes or less.

20            THE COURT:  Mr. Mastro, ten minutes or less.

21            MR. MASTRO:  The argument is pretty straightforward,

22   your Honor.

23            THE COURT:  Is it?

24            MR. MASTRO:  The Clean Air Act, it requires that there

25   be -- in this context, for the FHWA to approve, there has to be

1  compliance with the Clean Air Act and it requires when a state

2  has an implementation plan, that the state's implementation

3  plan, you know, that there be a conformity study for that

4  reason.

5          THE COURT:  Mr. Mastro, I have a real easy question.

6  It is based on an observation.

7      You have a PowerPoint presentation here involving the

8  Clean Air Act, which runs for approximately 15 slides.

9  Correct?

10         MR. MASTRO:  Yes.  I am going to use very few of them.

11         THE COURT:  Mr. Mastro, how many pages did you devote

12  to your arguments on clean air in your affirmative opening

13  brief and in your response/reply to the cross motion?

14         MR. MASTRO:  Very little, your Honor.

15         THE COURT:  And the answer is very little.  Maximum,

16  being generous, somewhere in the range of, perhaps,

17  three-and-a-half pages, during which there is nary a cite to

18  any case precedent.

19      So my question to you is:  How seriously do you want the

20  Court to take this issue when you didn't dedicate much of

21  anything to the argument in your affirmative brief and in your

22  reply brief?  What am I supposed to do?  This goes beyond the

23  scope of what is in your brief.

24         MR. MASTRO:  So, your Honor, some of that is because

25  I'm responding to arguments that they have raised about whether

1  this is --

2        THE COURT:  Mr. Mastro, you had the opportunity in

3  your reply to respond to their arguments.  You were about a

4  page.  Right?  What am I supposed to do with this?

5        MR. MASTRO:  Your Honor, I shouldn't be punished for

6  brevity.  I said this was a simple argument.

7        THE COURT:  No.  Come now, Mr. Mastro.  Don't accuse

8  the Court of punishing you.

9        MR. MASTRO:  I am not, your Honor.

10        THE COURT:  You made the --

11        MR MASTRO:  I'm making a joke.

12        THE COURT:  -- affirmative statement in a page and a

13  half.

14        MR. MASTRO:  Yes.

15        THE COURT:  And you didn't develop the argument.

16  Right?  There is very clear precedent that says if you avert to

17  an argument without development, the Court can deem it waived.

18        And so I am asking you why shouldn't I deem the argument

19  waived?

20        MR. MASTRO:  Because --

21        THE COURT:  You didn't care enough to develop the

22  argument.

23        MR. MASTRO:  Your Honor --

24        THE COURT:  Tell me that I'm wrong, and I will be

25  happy to be corrected.

```
 1              MR. MASTRO:  Thank you, your Honor.
 2         You are right that we didn't develop a lot -- spend a
 3    lot of pages on this argument because it is so straightforward.
 4         There was no conformity analysis done of conformity with
 5    New Jersey's state implementation plan, and that's required
 6    under the Clean Air Act.  So that's all we needed to say.
 7              THE COURT:  Really?
 8              MR. MASTRO:  They did it for New York.  They did it --
 9              THE COURT:  Really?
10              MR. MASTRO:  -- for New York, but they didn't do it
11    for New Jersey.
12              THE COURT:  So all you needed to do was generally
13    avert to the issue and leave it to the Court or the other
14    parties to do the development of the argument.
15              MR. MASTRO:  No, your Honor.
16         It is not -- it is not a debated question whether there
17    has to be a conformity analysis under a state implementation
18    plan.  They did it for New York, and --
19              THE COURT:  Disparate treatment?  Now you are arguing
20    differentiated treatment?  They did something for New York but
21    not for New Jersey.
22              MR. MASTRO:  They should have done it for both because
23    both --
24              THE COURT:  Did you make the point in your brief?
25              MR. MASTRO:  We did make the point, your Honor, that
```

1   they should have done it for New Jersey, too.  Absolutely, we

2   made that point.

3        And that's why I said I will take very little time here

4   today because most of what I might have to say would be

5   responding to their arguments --

6           THE COURT:  I think you are getting help from

7   Ms. Myers.

8           MR. MASTRO:  Well, I don't know if I am getting help.

9   I'm being told --

10          THE COURT:  Well, maybe you want to let her stand

11  there and answer the questions.

12          MR. MASTRO:  No, your Honor.

13       I am just being told two pages in the opening brief and

14  four in the reply.  That is not really your issue.

15       I am explaining to you --

16          THE COURT:  I will give you the benefit of the doubt

17  that you were double the number of pages that I referred to.

18          MR. MASTRO:  Your Honor, that is really not -- not the

19  issue.

20       I understand and your Honor asked at the beginning of

21  the case to emphasize the arguments that we thought were more

22  important.  We did that.  We have emphasized the NEPA claims.

23  We did not ignore the Clean Air Act claim, and we said it was a

24  very simple argument.

25          New Jersey has a state implementation plan in every

1    major category and every area, it doesn't meet the EPA's

2    standards on ozone layer and in many other categories, it is in

3    a maintenance status where it has to be monitored.  Therefore,

4    to just do New York, which doesn't have nonattainment in every

5    category under the EPA standards, but to not do New Jersey

6    where it actually has nonattainment in every county on ozone

7    layer and maintenance in others, it should have done

8    New Jersey, too, to comply with the Clean Air Act.  It is that

9    simple an argument.

10           So I didn't think I needed to go on page after page

11   after page to make it.

12           I certainly didn't waive it, but I didn't need to say a

13   lot to do it, and I stood up here at the outset to tell

14   your Honor I didn't need a lot of time on this issue, because

15   it is a simple argument.

16              THE COURT:  Okay.

17              MR. MASTRO:  Thank you, your Honor.

18              THE COURT:  If I made a misrepresentation as to what

19   you devoted in your argument, I apologize.

20              MR. MASTRO:  You did not, your Honor.  We did not

21   devote a lot of time to it, and I wasn't contesting that.  I

22   was saying that we devoted overwhelming amount of attention to

23   NEPA --

24              THE COURT:  Right.

25              MR. MASTRO:  -- the failure of any mitigation, the

1  failure to have any mitigation analysis, the failure to take

2  New Jersey into account and explain that.

3       And then I did Clean Air Act to say, you didn't even

4  look at the state implementation plan.

5            THE COURT:  It is a secondary level issue.  It is not

6  a primary level issue.

7            MR. MASTRO:  But that doesn't mean I waived it,

8  your Honor.

9            THE COURT:  That is a different story.

10            MR. MASTRO:  Thank you, your Honor.

11            THE COURT:  You are welcome.

12       Ms. Howard.

13            MS. HOWARD:  Thank you, your Honor.

14            THE COURT:  Okay.  Ms. Howard.

15            MS. HOWARD:  Thank you, your Honor.

16       Your Honor, I just want to state just about the

17  PowerPoint, that we would have similar concerns as the Court --

18            THE COURT:  We will deal with it at the end.

19            MS. HOWARD:  Thank you, your Honor.

20       Also, we would begin by saying that this conformity

21  argument was waived.  It was not preserved --

22            THE COURT:  Ms. Howard, do me a favor.

23            MS. HOWARD:  Yes, sir.

24            THE COURT:  Just take a deep breath, count to three,

25  relax.

```
 1            MS. HOWARD:  I feel relaxed.

 2            THE COURT:  I am not going to bite.  I'm not coming

 3  over there to that side of the bench.

 4         MS. HOWARD:  I don't feel like you are going to bite.

 5            Your Honor, my voice is actually suffering from an

 6  actual medical condition.

 7            THE COURT:  Okay.  All right.

 8            MS. HOWARD:  It seems labored, but that is just how I

 9  have to speak, but I feel relaxed.  I feel good.

10            THE COURT:  Good.  I want you to be comfortable up

11  there.

12            MS. HOWARD:  I just want to make sure they can hear

13  me.

14            THE COURT:  I want you to be comfortable up there.

15            MS. HOWARD:  I want to make sure I represent

16  Federal Highway appropriately on this matter, your Honor.

17            THE COURT:  Back to your point.

18         You believe the issue is waived?

19            MS. HOWARD:  Yes, your Honor.

20            THE COURT:  Tell me why.

21            MS. HOWARD:  Well, the draft environmental assessment

22  had the draft conformity analysis and determination there was

23  clearly marked and labeled.  Section 10.4 stated transportation

24  conformity determination.

25            So it was available.  And we've talked ad nauseam about
```

1   the time frames that this was available, but New Jersey did not

2   submit a comment saying that there needed to be a conformity

3   analysis devoted to the New Jersey State Implementation Plan,

4   or as your Honor refers to it, SIP.  That was nowhere in there.

5           THE COURT:  Let me ask you this question, Ms. Howard.

6           MS. HOWARD:  Yes, your Honor.

7           THE COURT:  Was there any change from the draft EA to

8   the final EA of any substance on conformity?

9           MS. HOWARD:  No, your Honor.

10          THE COURT:  So it is not as if the issue arose anew

11  because of a change in position?

12          MS. HOWARD:  No, your Honor, it did not.

13      Also, even though Mr. Mastro did not state it here

14  today, the second issue they raised about conformity in their

15  briefs was consultation with New Jersey agencies on conformity.

16  That, too, was not in their comments to the draft EA or draft

17  conformity analysis.

18      So we believe both of those arguments were waived.

19      But even if they were not waived, your Honor,

20  Federal Highways complied with the transportation conformity

21  regulations and those reg ulations can be found at 40 CFR

22  part 93, subpart A.

23      Your Honor, if you will turn to page 12 of our handout

24  from today, we have for you --

25          THE COURT:  Okay.  Hold on one second, among the pile

1    of documents I have...

2         Slide 12 entitled Conformity Criteria?

3           MS. HOWARD:  Yes, your Honor.

4           THE COURT:  Proceed.

5           MS. HOWARD:  This lays out what is required for

6    conformity analysis for transportation activities.

7         And when you look at this, you can see what was required

8    for projects, which is what this is, a transportation project.

9         Now, that is on the right-hand side of the slide.  A

10   project from a conforming plan and TIP, which is what this is,

11   TIP is Transportation Improvement Program, that requires that

12   it is in the currently conforming plan and TIP, that the

13   project has the hotspot analysis that we have been talking

14   about in this two-day presentation.

15        So the hotspot analysis is for carbon monoxide and

16   particulate matter, and, your Honor, that is what we did for

17   this project, and we included New Jersey counties in that

18   analysis.

19          THE COURT:  I don't think there is a dispute that you

20   included New Jersey counties.

21          MS. HOWARD:  Yes, your Honor.

22          THE COURT:  There may be a dispute as to which

23   counties or how many count ies, but there is not a dispute to

24   the fact that you included some New Jersey counties.

25          MS. HOWARD:  That's true, but also as it relates to

```
 1    conformity, that issue was not raised.  They said it needed to

 2    be done related to the New Jersey State Implementation Plan.

 3    And the point that I am trying to make is that for conformity

 4    for projects, you do not compare them to the State

 5    Implementation Plan.  You conduct the hotspot analysis that is

 6    required for that type of project.

 7         Now --

 8         THE COURT:  So you're saying that New Jersey is

 9    arguing that there has to be some comparison to the SIP between

10    the SIP and the TIP?  Or that New Jersey is arguing that there

11    has to be some comparison between the SIP and the TIP?  Or that

12    the TIP must -- is governed by the SIP?

13         MS. HOWARD:  So, your Honor, it would be helpful if we

14    talk about what a Transportation Improvement Program is,

15    because I think I am confusing you a little bit.

16         THE COURT:  Okay.

17         MS. HOWARD:  The Transportation Improvement Program is

18    conducted regionally.  It is a four-year look at all of the

19    projects that are being done for transportation in a

20    Metropolitan area.  That is not what this is.

21         This project is a singular project.  So for singular

22    projects, you do the hotspot analyses.  You don't do the

23    analysis of the project directly compared to the State

24    Implementation Plan.

25         THE COURT:  Let me see if I can unconfuse myself.
```

1          So the left-hand side deals with the TIP, which you just

2   said to me is on a regional basis.  Correct?

3          MS. HOWARD:  Yes, your Honor.

4          THE COURT:  On the right-hand side, we've got a

5   project, the top or the bottom?  From a conforming or from a

6   non -- not from a conforming plan?

7          MS. HOWARD:  Your Honor, this project is from a

8   conforming plan and TIP.  So that is what we focused on.

9          THE COURT:  So the -- the project emanates from a

10  conforming plan and TIP.  And is the evaluation that's laid out

11  here in 93114, 15, 16, and 17 is self-contained?  Is that what

12  you are telling me?

13         MS. HOWARD:  Yes, your Honor.

14         THE COURT:  Okay.

15         MS. HOWARD:  That is what is required for this

16  project.

17         THE COURT:  It has no relationship to nor draws

18  information from a SIP -- the New Jersey State SIP.

19         MS. HOWARD:  Not directly because the SIP comes in at

20  the TIP level and at the plan level.  The plan is a 20-year

21  look.  The TIP is the four-year look.

22         THE COURT:  All right.

23         MS. HOWARD:  And then you have individual projects --

24         THE COURT:  Okay.

25         MS. HOWARD:  -- which is this.

1              THE COURT:  Pyramid.

2              MS. HOWARD:  Pyramid.

3              THE COURT:  The top of the triangle is the SIP.  The

4    middle of the triangle is the SIP.  The individual --

5              MS. HOWARD:  TIP.

6              THE COURT:  I'm sorry.  It's the TIP.

7              MS. HOWARD:  Yes.

8              THE COURT:  I'm sorry.  No.  The SIP -- the SIP

9    informs the middle of the triangle, yes or not?

10             MS. HOWARD:  Yes, sir.

11             THE COURT:  The SIP does not inform the project

12   bottom-part of the triangle?

13             MS. HOWARD:  Not directly, no, sir.

14             THE COURT:  No, not directly.  Where as the top two

15   parts of the triangle, it does.

16             MS. HOWARD:  Yes, sir.

17             THE COURT:  Okay.  Now I got it.

18             MS. HOWARD:  And, your Honor, so New Jersey's argument

19   that Federal Highways was required to analyze this project

20   against New Jersey's State Implementation Plan has no legal

21   basis and New Jersey has not provided us with one.

22             Similarly, for their argument that we were required to

23   consult with several agencies from New Jersey, that -- they

24   haven't provided any legal basis for that.

25             So pending your questions, your Honor, I will just state

1  that New Jersey waived its conformity arguments and even if New

2  Jersey did not waive those conformity arguments, Federal

3  Highways did what it was supposed to do in accordance with the

4  federal transportation conformity regulations, which can be

5  found at 40 CFR part 93, subpart A.

6          THE COURT:  Ms. Howard, thank you for clarifying

7  things.

8      Can you either explain to me or point me to where in the

9  record I can find an explanation as to why a conformity

10 analysis was conducted for New York with respect to the

11 New York SIP and not the New Jersey SIP?

12         MS. HOWARD:  So your Honor --

13         THE COURT:  Assuming I am not confusing things.

14         MS. HOWARD:  If we could -- yes, your Honor.  It is

15 very confusing.  But if you look at DOT_0037816, that is

16 Section 10.4, Transportation Conformity and Determination.  It

17 discusses where the project was placed in the transportation

18 improvement program and that that program confirmed that the

19 project conformed to the SIP for New York.

20     So it wasn't directly on the project level.  And that is

21 an important distinction to make.

22         THE COURT:  I think you have to do that again for me,

23 Ms. Howard, because I am not quite sure I follow.

24         MS. HOWARD:  Yes, your Honor.

25     If -- if I may have one moment.  I -- I am not sure if I

1   have enough copies for everyone of this --

2           THE COURT:  Well --

3           MS. HOWARD:  -- because it might be easier.

4           THE COURT:  Help me understand.  May I?  Let's do

5   this.

6           MS. HOWARD:  Yes, sir.

7           THE COURT:  Because may be it is easier if --

8       The -- the conformity analysis with respect to

9   New York.

10          MS. HOWARD:  Yes.

11          THE COURT:  The top of the right column or the bottom

12  of the right column?

13          MS. HOWARD:  Top of the right column.

14          THE COURT:  New Jersey, top of the column or bottom of

15  the column?

16          MS. HOWARD:  New Jersey is not on this table.

17          THE COURT:  It is not.  It is not on this side?  I

18  thought that's what we --

19          MS. HOWARD:  New Jersey doesn't have a project, your

20  Honor.

21      So the project is the --

22          THE COURT:  But the project concerns or impacts

23  New Jersey.

24          MS. HOWARD:  Right.  And --

25          THE COURT:  But because it is a New York State

1   originating project, that defines which state it's a project

2   of.  Right?  Because it is emanating from New York State

3   statute.

4           MS. HOWARD:  Yes, your Honor.

5           THE COURT:  Okay.  So the -- the comparison or the

6   look-see with respect to the New York SIP is because it is a,

7   quote -- my quote, air quotes -- a New York project.  Not a

8   New Jersey project.  Therefore, the New Jersey SIP is not

9   relevant to the -- to the analysis on the top part of the chart

10  because it is a New York project that involves the New York

11  SIP.  So you can't -- you don't look outside the confines of

12  the, air quotes, defined project.

13          MS. HOWARD:  On the project level, that is correct.

14          THE COURT:  Okay.  I got it.  Okay.  So that is why

15  the distinction New York SIP versus -- versus New Jersey SIP.

16          MS. HOWARD:  Yes, your Honor.

17          THE COURT:  Okay.  So in support of its argument that

18  it sought a conformity analysis for New Jersey from the FHWA,

19  plaintiff highlights its letter in which it states that,

20  Continuing elevated levels of PM-2.5 in the Fort Lee area could

21  contribute to a classification of nonattainment when the EPA

22  implements the new lower PM-2.5 max.

23      Can you explain how the agency addressed plaintiff's

24  concern or at least how it explained the decision that

25  plaintiff's concern did not merit action given that it did not

1    conduct the conformity analysis for New Jersey?

2         MS. HOWARD:  Yes, your Honor.

3         Well, first I want to state that that statement was not

4    in response to the draft environmental assessment or draft

5    conformity analysis.  That was the June 12, 2023 letter that we

6    have been talking about.

7         THE COURT:  So your position is the agency never had

8    an opportunity to address the concern.

9         MS. HOWARD:  That is correct.

10        THE COURT:  Okay.

11        MS. HOWARD:  But even if they did, that concern is not

12   specific enough to alert the agency that New Jersey felt that

13   the agency needed to conduct a conformity analysis related to

14   the New Jersey State implementation plan.

15        THE COURT:  So what would be specific enough?  I mean,

16   the letter points out elevated levels of PM-2.5 in the Fort Lee

17   area.  It points out nonattainment.  And it points out when the

18   EPA implements new lower PM-2.5 max.

19        What more does the agency need in terms of specificity?

20        MS. HOWARD:  Well, the reason it is not specific

21   enough is because of the state of the law.

22        The law for the project says that hotspot analysis is

23   how you would address the issues in any area that pertains to

24   the project.

25        So we would not think that New Jersey wants an analysis

1   related to New Jersey State Implementation Plan because that is

2   not the state of the law.

3        So if they are asking for something that is outside of

4   what the law would tell us to do, then we would need to know

5   that specifically.  Because we would have no idea.  Reading

6   that one would think --

7              THE COURT:  So --

8              MS. HOWARD:  -- that perhaps it is hotspot analysis

9   under air quality.

10             THE COURT:  So what I think you are saying to me is

11  because they didn't use the magic words of hotspot analysis,

12  which is in the law, that that renders this not specific

13  enough?

14             MS. HOWARD:  No, it is not hotspot analysis.  But what

15  they are asking for is a direct comparison of this project to

16  New Jersey state.

17             THE COURT:  This project, meaning the New York

18  project.

19             MS. HOWARD:  The New York project.

20             THE COURT:  To New Jersey SIP standards.

21             MS. HOWARD:  Correct.

22             THE COURT:  Ah.

23             MS. HOWARD:  And -- and we would have no way of

24  knowing that because that would never be something that the

25  agency would do because the transportation --

1          THE COURT:  The agency -- it is not the agencies --

2    all right.

3          So now this leads to a different question.  All right.

4    Is this the first time that the agency is being asked to deal

5    with border state issues?  Right?

6          You have two states.  Right?  The project emanates in

7    one state, not in the other.  Is this the first time you are

8    dealing with these kinds of issues that would occur in a border

9    state situation?

10          MS. HOWARD:  No, your Honor.  It's not the first time.

11          THE COURT:  Since it is not the first time -- I guess

12    the question is what is the agency do when it is faced with a

13    border state situation?

14          What has been its practice?

15          MS. HOWARD:  In the conformity realm, the agency does

16    hotspot analyses at the project level for all the areas.  So

17    Connecticut is also involved in this.  So everywhere that's

18    involved --

19          THE COURT:  But it is at this level, at the TIP level.

20    Right?

21          MS. HOWARD:  Well, so your Honor, for the project, at

22    the project level --

23          THE COURT:  Right.

24          MS. HOWARD:  -- that is hotspot analysis.

25          THE COURT:  Right.  Let's stop right there.

```
 1            At the project level, you told me that the project is
 2   confined because it's, my air quotes, a New York project.
 3            MS. HOWARD:  Yes.
 4            THE COURT:  So therefore, the only hotspots the agency
 5   is going to look at are the hotspots inside of New York?
 6            MS. HOWARD:  No.
 7            THE COURT:  It is not going to look at hotspots
 8   outside of New York --
 9            MS. HOWARD:  No, your Honor.
10            THE COURT: -- even they are they are on the border?
11            MS. HOWARD:  No, your Honor.  They absolutely look at
12   hotspots outside of New York.  They look at --
13            THE COURT:  So they look at the hotspots outside of
14   New York but they don't use the -- the data or the -- the SIP
15   from that area outside of New York?
16            MS. HOWARD:  They do, but not at the project level.
17   So it gets very complex at the -- at the next level.
18            THE COURT:  Okay.  Now I am really lost.
19            MS. HOWARD:  What I am saying is for the project level
20   when you are doing conformity, you look at the hotspot analysis
21   and you also ensure that the project is included in the
22   Transportation Improvement Program.  At the Transportation
23   Improvement Program, that is a separate process.  Because they
24   are look ing at all the transportation projects for a regional
25   area to ensure that the air quality --
```

```
 1            THE COURT:  Okay.  I have to wind this back because,
 2  unfortunately, I hear what you are saying, but I am just not
 3  processing it.
 4            MS. HOWARD:  Yes, sir.
 5            THE COURT:  So let see if you can help me.
 6        So we have our triangle where the SIP gets pushed in at
 7  the top two levels and not at the bottom.
 8        So help me understand what to do with hotspot analysis.
 9  Because hotspot analysis come in -- forget hotspot analysis.
10  Does hotspot identification come in at the TIP level in the
11  middle?  Are hotspots identifiable at this above the project
12  level?
13            MS. HOWARD:  They are identifiable at the project
14  level.
15            THE COURT:  No. No. Answer my question.  I am going to
16  get to the project level.
17        Are there any hotspot -- is any hotspot identification
18  done at the TIP level, the middle level of the triangle?
19            MS. HOWARD:  So --
20            THE COURT:  Let me phrase it differently.
21        Is the only place that they do hotspot identification
22  and subsequent analysis at the project level?
23            MS. HOWARD:  Your -- your Honor --
24            THE COURT:  Or am I thoroughly confusing everything
25  and making it difficult?
```

1              MS. HOWARD:  Yes, it is somewhat confusing because in

2      order to answer the question in the way your Honor is posing

3      it, I would have to get into some other technical aspects of

4      what happens at the TIP level and the planning level that would

5      confuse further the issue because that becomes very technical.

6      But there has to be some analyses to determine whether or not

7      there will be compliance with the State Implementation Plan at

8      the TIP level and at the planning level.  And those are the

9      type of analyses they do, hot spot analyses are done, but it's

10     not just one project when you get to that level, because they

11     are looking at four years worth of projects at the TIP level

12     and are looking at 20 years' worth --

13             THE COURT:  So they look at the hot spots at the TIP

14     level?

15             MS. MYERS:  They do.

16             THE COURT:  Either they do or they don't.

17             MS. MYERS:  They do.

18             THE COURT:  Fine.  That's great.  That's all I need to

19     know.  They look at hot spots there.

20         Now you get to the project level.  Right?  The hot spots

21     that are looked at or identified at the TIP level, do they

22     carry down to the project level?

23             MS. HOWARD:  They do inform the project level because

24     that is how you would know where there are concerning areas.

25     But --

1          THE COURT:  And it is at that level that you then do

2    the hotspot analysis?

3          MS. HOWARD:  The project level?

4          THE COURT:  I'm sorry?

5          MS. HOWARD:  Or the TIP?

6          THE COURT:  The project level?

7          MS. HOWARD:  Yes, the project level you do the hotspot

8    analysis.

9          THE COURT:  Okay.  And what do you bring to the table

10   in doing that hotspot analysis at the project level?  Assume

11   for the sake of argument -- that's what we have here -- we have

12   three states:  Connecticut, New York, and New Jersey.

13         MS. HOWARD:  Yes, sir.

14         THE COURT:  I'm going to assume that hot spots have

15   been identified across those three states.  Yes?

16      And so when you are analyzing the hot spots, what's

17   brought to the table with respect to any SIP relative to the

18   three states?  Is any SIP brought to the table to conduct that

19   hotspot analysis?  No.

20         MS. HOWARD:  No, not in that way.

21         THE COURT:  Okay.

22         MS. HOWARD:  No, your Honor.

23         THE COURT:  Okay.  So you are conducting a hot spot

24   analysis?

25         MS. HOWARD:  Yes, your Honor.

 1          THE COURT:  Okay.  Tell me what do I need to be

 2   looking at in terms of -- what are the critical things that go

 3   into the hotspot analysis, right, for me to be able to say

 4   whether that is reasonable or not with respect to the

 5   conformity issue?

 6          MS. HOWARD:  Well, we do have the actual hotspot

 7   analysis that was conducted.  It is at Appendix 10 of the

 8   environmental assessment.

 9          And what they look at is to see whether or not there

10   will be any exceedances or increases in the --

11          THE COURT:  Is there anything that you are looking at

12   in state A or that you are bringing to the table to do that

13   analysis for state A that is different than what you are doing

14   for state B or state C?  Or is it the same considerations

15   across all three?

16          MS. HOWARD:  It is the same considerations --

17          THE COURT:  Okay.

18          MS. HOWARD:  -- across all three.

19          THE COURT:  Good.  Now you are helping me understand

20   what's going on.  This is good.

21          Keep going.

22          MS. HOWARD:  So you are looking to see if there are

23   any exceedances or any -- actually, it is any increases in any

24   of the identified pollutants to ensure that we will not be

25   impacting the national ambient air quality standards.

1      THE COURT:  Yes.

2      MS. HOWARD:  And so when you do that analysis and you

3  determine, as we did here for this project, that there will be

4  no increases or exceedances that need to have any sort of

5  control measures put in place, then you are able to say that

6  your project is compliant with Clean Act -- Clean Air Act

7  conformity.

8      THE COURT:  Okay.  Anything more?

9      MS. HOWARD:  Nothing further, your Honor.

10      THE COURT:  Okay.  You answered -- you helped me

11  understand the question, how to deal with the question.

12      I think we're good.  We're done.

13      MS. HOWARD:  Thank you, your Honor.

14      THE COURT:  Ms. Knauer.

15      MS. KNAUER:  I just would like to hand up -- I think

16  this is what Ms. Howard was referring to.  I don't have copies

17  for everybody, but it is a page from the EA Section 10.4,

18  the actual transportation conformity determination, because I

19  thought it would -- just might illustrate what was -- what

20  actually was done for this project.

21      THE COURT:  Well, I think out of fairness to

22  everybody, we are going to take a three-minute pause.

23      MS. KNAUER:  Okay.

24      THE COURT:  You want to go run a dozen copies, please.

25      (Pause.)

1          THE COURT:  It is just the front page.  Correct?

2          MS. KNAUER:  Yeah, it's -- yes, just that one page,

3    it's just that one paragraph --

4          THE COURT:  No, no.  Do we need to copy both sides?

5          MS. KNAUER:  Two paragraphs -- no.

6          THE COURT:  Just the front side, please.

7          MS. KNAUER:  I -- I can begin my portion of the

8    argument while we are waiting for that, if you would like,

9    your Honor.

10          THE COURT:  Are you going to refer to anything in that

11    document?

12          MS. KNAUER:  I -- I will -- I just -- while we are

13    waiting for that, I would just like to emphasize the fact that

14    in neither -- none of New Jersey's comments, either the ones on

15    the draft EA, nor the later ones, did they raise conformity

16    as -- as an issue.

17          THE COURT:  Okay.

18          MS. KNAUER:  And I think in their arguments in their

19    briefs, and I can anticipate that this will be what they might

20    say on rebuttal, was that this was such an obvious requirement

21    that it was -- didn't -- it couldn't be waived by failure to

22    exhaust.

23          That certainly doesn't apply here, where nobody raised

24    it.  If it was such an obvious requirement, not a single

25    person, including EPA, the agency charged with enforcing the

1  Clean Air Act, did not raise it.  And FHWA, which does

2  transportation conformity analyses for all of its projects,

3  didn't see it as an issue.

4      So I just -- I -- I think the obviousness exception to

5  the administrative exhaustion requirement does not apply here.

6      And I think the rest of what I want to say is better --

7  oh, here -- here we are.  I have one.

8          THE COURT:  Well, somebody has to give them out.

9          MS. KNAUER:  Oh.  Oh, I see.  Oh, I am sorry.  I

10  misunderstood.

11      My colleague will -- will pass them out.

12      May I begin or should we --

13          THE COURT:  No.  Wait another ten seconds.

14          MS. KNAUER:  Okay.

15          THE COURT:  All right.  Everybody who needs a copy has

16  gotten a copy?  Okay.

17      Go ahead.

18          MS. KNAUER:  So I think this just helps to illustrate

19  what Ms. Howard was explaining about the -- how the steps work

20  for a project conformity analysis.

21      First is the question of whether the project is already

22  included in a transportation improvement program that has been

23  determined as a whole to conform.  And that is in the first

24  paragraph under Section 10.4.  It refers to -- it says, The

25  project was included in the regional emissions analysis for

1  NYMTC's most recent transportation conformity determination.

2       So that was the conformity determination for NYMTC,

3  which is the region in which the project is located.  It is

4  TIP.  And -- and -- and it determined that that entire TIP,

5  which included the project, would not exceed regional -- would

6  not exceed its regional emissions budgets under the Clean Air

7  Act.

8       So it's not that there was any comparison of the project

9  to the New York State implementation plan.  It was -- it was

10  included in a regional analysis -- or conformity determination.

11       So as Ms. Howard said, once a project has been included

12  in a regional conformity determination, the only other thing

13  that Part 93 requires is the hot -- the hotspot analysis.

14       And here, as Ms. Howard explained, the hotspot analysis

15  was undertaken, determined not to exceed the national ambient

16  air quality standards, which both the regulations and case law

17  recognize is all that is needed for project level conformity.

18  And the -- and the conformity determination was made.

19       The hot spots included hot spots in New Jersey.  So it

20  was -- there was no differentiation between New York and

21  New Jersey as -- as -- as concerns the -- the conformity

22  determination here.

23            THE COURT:  As?

24            MS. KNAUER:  The conformity -- project level

25  conformity determination based on the hotspot analysis --

1          THE COURT:  Yes.  Okay.  So it is --

2          MS. KNAUER:  -- was conducted --

3          THE COURT:  No differentiation in the hotspot

4    analysis, which -- which led to the --

5          MS. KNAUER:  Right.

6          THE COURT:  -- conformity conclusion?

7          MS. KNAUER:  Right.  And -- and I will just point out

8    that the -- in terms of conformity with A or with the

9    applicable transportation or -- I am sorry.

10         THE COURT:  It is all right.

11         MS. KNAUER:  It -- it all -- there is certain --

12         THE COURT:  This is tough.  I had a hard time, so...

13         MS. KNAUER:  That there is no requirement of looking

14   at multiple transportation -- of conform -- of conformity

15   determinations being made with multiple transportation

16   improvement programs.

17       So it just -- it is -- it is just that once it is

18   determined to be in a conforming transportation improvement

19   program, the project can be determined in conformity based on

20   the hotspot analysis alone.

21         THE COURT:  Okay.

22         MS. KNAUER:  I think -- I think -- I just wanted to

23   provide your Honor with the --

24         THE COURT:  Okay.

25         MS. KNAUER:  -- actual determination that I think lays

1   out the steps that were --

2          THE COURT:  Okay.

3          MS. KNAUER:  -- that got to the point.

4          THE COURT:  Thank you.

5          MS. KNAUER:  Okay.

6          THE COURT:  I appreciate it.

7          MS. KNAUER:  I don't have anything further, except on

8   rebuttal.  We reserve the rest.

9          THE COURT:  Okay.  Very good.

10         MS. KNAUER:  Thank you.

11         THE COURT:  Mr. Mastro, I will be a lot more peaceful

12  in your rebuttal.

13         MR. MASTRO:  Not a problem, your Honor, I -- but now I

14  have to respond to the things that were said.

15         THE COURT:  Well, I --

16         MR. MASTRO:  So --

17         THE COURT:  I fully expect you to.

18         MR. MASTRO:  So, your Honor, first, you know, in --

19  we -- we complained in our opposition, Pages 48 and 49, that a

20  hotspot analysis is not the same as a conformity analysis.

21         And, your Honor, looking at one county, four hot spots

22  in one location in New Jersey, just in Hudson leading to the

23  tunnel, compared to 98 hot spots analyzed in New York.  Okay?

24  This is not a substitute for a conformity analysis, which is

25  supposed to look at the pre-existing conditions, how they are

1    going to be affected and looking forward, and how you meet the

2    different standards of --

3              THE COURT:  So, Mr. Mastro, help me.

4              MR. MASTRO:  -- attainment or nonattainment.

5              THE COURT:  I'm going to accept your representation

6    hotspot analysis differs from a conformity analysis.  Let's

7    probe that a little bit.

8         Is that because they are provided for in two, though

9    maybe interrelated, parts of the regulations?

10        In other words, you know, there is a part of the scheme

11   that talks about hotspot analysis.  And you have enunciated

12   standards that have to be applied.

13        And then once that is over with, you turn to a different

14   part of the scheme to deal with conformity, even though the

15   hotspot analysis may inform what goes on in the conformity

16   analysis, but the scheme has set up this demarcation that you

17   have told the Court should occur?

18             MR. MASTRO:  The demarcation we know must occur

19   because they did it for New York.

20        The explanation that you were given, including by MTA's

21   counsel going to the very document that describes it, actually

22   says what was done.  The conformity study that was done, the

23   language that was -- was put before you and it is in our

24   slides, it is actually quoted, says that it was in

25   conformity -- excuse me, your Honor --

1        THE COURT:  Sure.

2        MR. MASTRO:  -- to conform to the New York State

3  implementation plan.  It was not divorced from the New York

4  State implementation plan.  It was conforming with the New York

5  State implementation plan.

6        And look at New York --

7        THE COURT:  So let me ask you this, Mr. Mastro.

8        MR. MASTRO:  Sure.

9        THE COURT:  Can you get the conformity without a

10 hotspot analysis?

11        MR. MASTRO:  In fact, your Honor, as NEPA makes

12 very -- I mean as the Clean Air Act makes very clear,

13 conformity analysis is broader than this.  Okay?  It is not

14 limited to just the consideration of hot spots.

15        It is a broader analysis going back historically.  It is

16 not the same analysis.

17        And if they did it for New York, why didn't they do it

18 for New Jersey?  They have done it before.

19        Can we please have the slide to show that they have done

20 this on a project before.

21        THE COURT:  Involving New York and New Jersey or --

22        MR. MASTRO:  Yes, involving New York and New Jersey.

23        THE COURT:  Okay.

24        MR. MASTRO:  Just to point out, your Honor, New Jersey

25 has much more of a problem in this regard.  You just saw New

1   York on the board, there was no nonattainment for any New York

2   county.  Okay?  In New Jersey, there is nonattainment for every

3   category of ozone layer, and they are treading water

4   maintaining in many other major -- including hot-spots, Hudson

5   County.  So that is exactly why you need to do a conformity

6   analysis.

7          And, your Honor, we will put up, please, the project if

8   -- FHWA did this September, 2010.  It did an EIS for the Cross

9   Harbor Freight Program.  That is a New York/New Jersey project.

10         And they did a conformity analysis to show conformity

11  with New York State Implementation Plan and New Jersey State

12  Implementation Plan.

13         Your Honor, you pointed out exactly where in our letter

14  we talked about how -- in the governor's letter, he talked

15  about EPA standards and concern about that.

16         It is obvious that when you are referring to EPA

17  standards and those particular problems that should have been

18  obvious to an agency that does this all the time, that you are

19  talking about such a thing.

20         But then Ms. Knauer said nobody ever raised this issue.

21  Well, yes, they did.  New York State DOT, before we put it in a

22  comment letter -- go ahead, put it up, please.

23         New York State DOT, in September 2021, writing to the

24  FHWA said, It's a border issue.

25  New York/New Jersey/Connecticut, and this analysis should be

1    done at those border areas, particularly when it came to,

2    remember what I said, nonattainment for us -- ozone

3    nonattainment.  How do they do the ozone nonattainment when

4    New Jersey is nonattaining in every ozone category as opposed

5    to New York and Connecticut.

6          THE COURT:  Mr. Mastro, you raised the magic word

7    obvious.  Obviousness.

8          MR. MASTRO:  Yes, your Honor.

9          THE COURT:  How is the agency supposed to determine

10   obviousness?  Are there some benchmarks -- objective benchmarks

11   that provide, shall we say, clues to what could be viewed as

12   obvious?

13         MR. MASTRO:  Two things.  Two things.

14        First of all, we don't have to guess.  New York's own

15   Department of Transportation told them this had to be done.

16         THE COURT:  That's a fact in this case.

17        But how does one generally figure out whether something

18   is obvious, which, therefore, should trigger some obligation?

19         MR. MASTRO:  I think that it is sufficient for

20   someone -- a state putting in a letter of comments to refer to

21   EPA and EPA standards and particular chemicals and particles

22   that should be studied.  I think for a sophisticated agency

23   like FHWA, that's a trigger.  EPA has the Clean Air Act when

24   you are talking about air particles, ozone layer, and the like.

25         So, your Honor, that's why I think the case law and the

1   *Ilio'ulaokalani Coalition v. Rumsfeld* case, 464 F.3d 1083 1092

2   Ninth Circuit 2006, it says that some things are so obvious

3   that, quote, There is no need for a commentator to point them

4   out specifically in order to preserve its ability to challenge

5   a proposed action.

6        I suggest that pointing out that EPA and the particular

7   issues in terms of air quality standards, ozone,

8   particulate 25, being put on notice that New Jersey's concerned

9   about that and it is not being studied properly should have

10  triggered the obvious implication that you should do a

11  conformity study.

12       THE COURT:  Do you think these circumstances are on

13  all fours with the *Ilio'ulaokalani* case?

14       MR. MASTRO:  More than on all fours, your Honor,

15  because of this.  New York already told them they had to do to

16  it and they had to do it for the New York, New Jersey, and

17  Connecticut borders and including an ozone nonattainment, which

18  is a New Jersey issue.  So they knew it.  They just didn't do

19  it, and that's all I would say, your Honor.

20       THE COURT:  Thank you, Mr. Mastro.

21       MR. MASTRO:  I really appreciate it, your Honor.  I

22  appreciate your earlier comments, but my brevity occasionally,

23  I hope, won't be used against me.

24       Thank you, your Honor.

25       THE COURT:  Oh, come now.  Do you think I would tee up

1   something that would be obvious for an appeal?  I think I am a

2   little bit more experienced that that, Mr. Mastro.

3        Ms. Howard.

4           MS. HOWARD:  I do not think I reserved time.

5           THE COURT:  That's quite all right.  What I do for

6   one, I do for all.

7           MS. HOWARD:  Thank you, your Honor.  I will be --

8   well, attempt to be brief.

9        I wanted to start by discussing the project that

10  Mr. Mastro pointed out, the Cross Harbor.

11          THE COURT:  Are you talking about the prior

12  New York/New Jersey 2010 Harbor project?

13          MS. HOWARD:  Yes, your Honor.

14          THE COURT:  Okay.  Go for it.

15          MS. HOWARD:  First, I would like to point out that

16  that project was actually sited in both New York and

17  New Jersey.  So there was work being done in both places, which

18  is why --

19          THE COURT:  That is a factual distinction from what we

20  have here.

21          MS. HOWARD:  Yes, your Honor.

22       And, also, that project was in 2010, which is before the

23  Transportation Conformity Regulations were promulgated in 2012.

24       So now that we have these regulations, we know exactly

25  what is required on each level, and we have to keep in mind

1    that this is a project, your Honor.

2           Mr. Mastro pointed to EPA's letter and discusses the

3    plans in that letter.  That is not a project.  That is not this

4    project.

5           That is very different and the requirements at that

6    level, if you will look back at the last page of our

7    presentation, the table that we discussed, those requirements

8    are different.

9           The SIP does directly come into play, or State

10   Implementation Plan, at the plan level and at the TIP level, or

11   Transportation Improvement Program level.

12          But at the project level, as per the regulations that

13   were promulgated in 2012, you do a hotspot analysis.

14          So, your Honor, I would just state that the information

15   that you received from Mr. Mastro regarding the Cross Harbor

16   project is not applicable in this circumstance.  The

17   regulations tell us what we need to do and Federal Highways did

18   that, your Honor.

19          Pending your questions, that is all I have.

20             THE COURT:  I am good.  Thank you.

21          Ms. Knauer.

22             MS. KNAUER:  I don't have much, your Honor, either,

23   but I did just want to note that I think Mr. Mastro has

24   effectively conceded the legal point and then started talking

25   about the point concerning the extent of the hotspot analysis

1  that was done.  I think we covered that in the air quality

2  segment of the argument yesterday and earlier this morning, but

3  I will just point out that those -- the choice of locations for

4  those analyses are at the discretion of the agency as long as

5  they are on a reasoned basis.

6      We've explained where in the EA the reasoned basis for

7  those choices were made, and they did include locations in

8  New Jersey.

9      I think Mr. Mastro also did not consider in his recent

10  remarks the location in New Jersey that was specifically

11  included for highways, which looked at the highway location in

12  Bergen County, that was -- so it wasn't just the four

13  intersections that were included.

14      Again, it was based on EPA's guidance under its PM-2.5

15  hotspot methodology guidance, which explains the use of

16  worse-case locations and if they pass the -- not exceeding the

17  standards, you don't need to go further than that.

18          THE COURT:  Okay.  Thank you, Ms. Knauer.

19          MS. KNAUER:  I think that's it, your Honor.

20          THE COURT:  Folks, we are at about 3:10.  It's been a

21  long two days.

22      What we have left is remedy and then the Amici arguments

23  with respect to the substantive topics that we covered today

24  and then closing arguments.

25      I will give us about a seven to nine-minute break until

1    about 3:20 and then we are just going to plow through until the

2    end.

3          With a little luck, we will finish up somewhere in the

4    range of 4:30 to 5 o'clock.

5          So stretch your legs, get some water.

6          Check the facilities.

7          We will see you back here at 20 after.

8            (Recess taken 3:12 p.m. to 3:22 p.m.)

9            THE COURT:  Be seated.

10         Folks, we're heading into remedy.

11           Let me just give you all a tiny bit of a head's up.

12         You are going to talk to me about remedy, I think you

13   need to fully expect that I am going to ask you a question

14   about putting yourself in my shoes.  How do I write what you

15   are asking me to do?

16         So when you are up here making your presentation about

17   remedy, other than telling me to flat out affirm, I get it,

18   that's easy, but if you are asking me to do something

19   affirmatively, just don't tell it to me.  You are going to have

20   to tell me how I'm supposed to get there.

21         I may ask you a very specific question about what is

22   that supposed to look like when I sit down to write the

23   opinion.

24         Mr. Mastro, you are up.  Whether we need 40 minutes, you

25   will tell me.

1          MR. MASTRO:  I am going to start with your Honor's

2     question.  Let me just hand these up.

3          Thank you.

4          THE COURT:  Now what I just said is not anything

5     different than what I have said previously.

6          MR. MASTRO:  Understood, your Honor.

7          THE COURT:  Probably, candidly, is no different than

8     any of you have experienced in prior cases where a judge says

9     to you give me a draft order.

10         MR. MASTRO:  Your Honor, it is absolutely the case.

11         THE COURT:  Let's start with, we planned 40 minutes.

12         What do you think you really need?

13         MR. MASTRO:  Your Honor, I am hoping to do it in less.

14         THE COURT:  Well, let's start the clock and reserve

15     you ten minutes for afterwards.

16         MR. MASTRO:  Thank you.

17         THE COURT:  You are on the clock.

18         MR. MASTRO:  Thank you.

19         You asked the question, what specifically would we like

20     you to do and the basis for it?  We have been spending the past

21     two days explaining our basis for the arguments we are making,

22     but, your Honor, the FHWA did not take a hard look at the

23     congestion pricing scheme because it didn't even have a final

24     tolling scheme in front of it, which wasn't adopted until last

25     week.  So it could not have considered the full ramifications

1  of the environmental impact of a scheme that changed in

2  material ways.

3       It did not provide a convincing case in its FONSI

4  because it found adverse impacts on air quality and in

5  Environmental Justice communities, 15 of them in New Jersey,

6  that it then said, for arbitrary reasons I will explain in the

7  closing, reduced to four, and then it committed no actual

8  mitigation measures for funding to New Jersey.

9       And -- or any of these communities, including

10 Bergen County, Bayonne not even considered, Middlesex not even

11 consider, and the whole 15, not just the four.

12      And, your Honor, the FHWA did not explain how the impact

13 on the project of New Jersey will be reduced by any mitigation

14 measures to ameliorate the project's effects because it hasn't

15 committed any actual mitigation to New Jersey and explained any

16 actual mitigation to anyplace in New Jersey.  It is

17 fundamentally flawed.

18      Your Honor, it did not take the hard look and do what it

19 was supposed to do about alternatives because it accepted the

20 MTA's overriding object ive of raising $15 billion for its

21 capital program and said that that ruled everything else out.

22 That was arbitrary capricious, and irrational as well.

23      And, your Honor, we have also pointed out just today the

24 issues relating to inclusion of New Jersey in the process or

25 inadequate consultation with New Jersey, I should say, and the

1    Clean Air Act.

2         Your Honor, those are the core components of what we

3    would like a declaration, that this particular environmental

4    review did not do adequately, arbitrary, capricious,

5    irrational, and in violation of law and that there was not --

6         THE COURT:  So based on that, Mr. Mastro, you are

7    asking me, one, for a declaratory judgment.

8         MR. MASTRO:  Correct, your Honor.

9         THE COURT:  You want that declaratory judgment to

10   say...

11        MR. MASTRO:  I don't -- at the risk of repeating

12   myself, I want that declaratory judgment to say this particular

13   environmental assessment and FONSI, a finding of no significant

14   impact, has to be vacated and remanded for a full --

15        THE COURT:  Well, that's different than declaratory

16   judgment.  Declaratory judgment is I am making affirmative

17   statement that something was unlawful.  Right?  Or I am

18   declaring the state of X.  Right?

19        So you're saying to me you want a declaratory judgment

20   declaring that the EA and the FONSI are unlawful or unsupported

21   by substantial evidence or were unreasonable.

22        MR. MASTRO:  Yes, your Honor.

23        THE COURT:  And as a consequence of that declaration,

24   you want me to remand back to the Federal Highway

25   Administration -- Well, before I say that, do you want me to

1 vacate everything, and tell them to start over?

2          MR. MASTRO:  Your Honor, I -- I believe that you have

3 to vacate the environmental assessment and remand for them to

4 start over on each of the issues I just described.

5          THE COURT:  Okay.  So you want a declaratory judgment

6 and a remand.

7          MR. MASTRO:  Absolutely.

8          THE COURT:  Whether vacatur is appropriate --well, I

9 will deal with it.

10          MR. MASTRO:  And on each of those issues, your Honor,

11 you know, there should be a declaration that they did not do

12 the review necessary under NEPA, and that, therefore, there has

13 to be a vacatur and a remand.  Let me go a little bit into the

14 law on this, your Honor, because that is a key question here.

15          THE COURT:  Are you asking for an affirmative

16 injunction for the Court to order the agency to do a specific

17 thing?

18          MR. MASTRO:  We are asking that they be enjoined to do

19 a full environmental review including an environmental impact

20 statement.

21          THE COURT:  Okay.

22          MR. MASTRO:  Absolutely.

23          THE COURT:  You are looking for an affirmative

24 injunction.

25          MR. MASTRO:  Yes, your Honor.

```
 1            THE COURT:  Okay.
 2        Continue.
 3            MR. MASTRO:  And, your Honor, we believe that it is
 4  important --
 5        Let's go to the first slide, please.
 6        It's important to understand why vacatur and remand are
 7  required.  And, of course, we need the injunction, your Honor,
 8  because they are going to pull the switch in mid June.  They
 9  are chomping at the bit to pull the switch.
10            THE COURT:  An injunction enjoining the MTA from
11  pulling the switch is different than an affirmative injunction
12  ordering the Federal Highway Administration to undertake a
13  particular act.
14            MR. MASTRO:  It should be ordered to undertake a
15  particular act --
16            THE COURT:  Right.
17            MR. MASTRO:  -- to do a full environmental impact
18  statement.
19            THE COURT:  Right.
20            MR. MASTRO:  I want to make -- leave no doubt about
21  it.  And let me explain why.
22        As your Honor well knows, the APA provides that the
23  reviewing in Court shall hold unlawful and set aside agency
24  action --
25                    (Reporter admonition.)
```

222

1        MR. MASTRO:  -- agency action findings and conclusions

2   found to be arbitrary, capricious, and an abuse of discretion

3   or otherwise not in accordance with law.

4        The case law, including the *Environmental Defense Center*

5   case, which we cited to you before, and *Humane Society v.*

6   *Johanns* in the D.C. District Court, the first with being Ninth

7   Circuit.  The appropriate remedy is to vacate the inadequate EA

8   and that is the presumptive remedy.

9        Vacating a rule or action promulgating a violation of

10  NEPA is a standard remedy.  And it would subvert NEPA's purpose

11  under the *Standing Rock Sioux* case from the D.C. circuit to

12  give substantial ammunition to the agencies--

13                    (Reporter admonition.)

14        THE COURT:  Hold -- hold on.  Slow -- slow Mr. --

15        MR. MASTRO:  Sorry.

16        THE COURT:  I'm going to give you time, Mr. Mastro.

17        MR. MASTRO:  Okay.

18        THE COURT:  You are the one who is kind of working

19  against some artificial clock, but let's not make it difficult

20  for the court reporter, please.

21        MR. MASTRO:  Understood.  My apologies, Madam Court

22  Reporter.

23        You don't want to have a situation where the inadequate

24  EAs -- the inadequate EA stands, and they are working towards a

25  predetermined out come and, you know, purporting to conduct,

1  quote, unquote, a comprehensive review later.  They have to do

2  the job right.

3       And it's the case, under the case law, you know, that to

4  do anything less than that would make any new NEPA analysis

5  merely perfunctory or not actually informative of an agency

6  decision.  It is trying to, you know, put the finger in the

7  dike, you know, to get past this like a rubber stamp.  And

8  that's not what this Court is supposed to do.  I think on this

9  record there clearly are many issues, mitigation being first

10  and foremost among them, but also the failure to consider

11  alternatives.  The failure of actually considering the actual

12  proposal which turns out to be a lot worse in environmental

13  impacts than any of the scenarios studied.  For all of those --

14       THE COURT:  Take a breath, Mr. Mastro.  Just a tiny

15  bit.

16       MR. MASTRO:  Thank you, your Honor.

17       For all of those reasons, the -- the absolutely correct

18  remedy here is to vacate and to remand to do a full EIS.

19       Let's go to the next slide, please.

20       The remand without vacatur would be inappropriate

21  because the FHWA disregarded impacts, didn't provide mitigation

22  to address them, didn't explain its mitigation to address them

23  in the sufficient detail that NEPA requires.  And they have to

24  do that, especially for this, a first-in-the-nation

25  congestion-pricing scheme.  That's unprecedented.

1    The deficiencies in this particular EA are so pervasive,

2    particularly when it comes to mitigation and particularly when

3    it comes to the fact that the actual proposal that was final

4    was never even studied and they didn't even consider

5    alternatives.  They have got to do it over and do it right.

6    There is, yeah, as some cases have said, no possibility.

7         THE COURT:  Straight remand with an instruction for

8    them to do it over without vacatur somehow or other gives the

9    agency, gives viability to the EA or the FONSI?  I'm trying to

10   understand that.

11        If I declare that what they did was, in short form,

12   unlawful, and I remand it back to the Federal Highway

13   Administration to do it again, what does vacatur get us that

14   those two things don't?

15        MR. MASTRO:  I think what it gets us, your Honor, and

16   I am not quoting from the case law now, but the next slide will

17   have more case law on this point.  I mean, I think where it

18   gets us is the agency just trying to plug the gap s and not

19   doing the hard work, the hard look that it was supposed to do

20   in the first place.

21        When the problems are as pervasive and the flaws that

22   make this process illegal run so deep, that merely remanding

23   puts the agency on a course of thinking it can just plug little

24   gaps.  These are not little gaps.  This is a plan.  You heard

25   it.

1          THE COURT:  Ah.

2          MR. MASTRO:  You heard it.

3          THE COURT:  So let me see if I can translate this so I

4    understand it.

5          What you are saying to me is if I just remand, even

6    though I declared it unlawful, that there is a risk that the

7    agency would take that which was and correct that which was

8    fill in the gaps, right, which is different than my saying it

9    doesn't exist at all and you have to start all over again and

10   build it out.

11         MR. MASTRO:  So, your Honor, yes, but --

12         THE COURT:  Good.  We have a simple answer.

13         MR. MASTRO:  Let me --

14         THE COURT:  This is good.

15         MR. MASTRO:  Let me, as you know, I like to amplify my

16   answer.

17         THE COURT:  Okay.

18         MR. MASTRO:  Your Honor, yes, it would be inadequate

19   to remand.

20         THE COURT:  Alone without vacating.

21         MR. MASTRO:  Alone.  Not because they can just correct

22   on the remand.  The point is they are working from something

23   that is fundamentally flawed.  We have shown you an example

24   after example that the choices that were made of where to

25   study, where to focus, how to do that, how to put the analysis

1  together, how they -- they made these arbitrary irrational

2  decisions about who, at the end of the day, after all of those

3  contortions in New Jersey, how few places end up even on their

4  remediation -- remediation list and mitigation list, that

5  your Honor, they have to start from scratch.  They left whole

6  New Jersey counties out of their analysis on both air quality

7  and environmental justice.

8       THE COURT:  So you want me to make it go away as if it

9  never existed and tell the FHWA to start from square one.

10      MR. MASTRO:  I want them to start from square one in

11  taking the data they've collected and then collecting more data

12  for the areas that they excluded and analyzing them --

13      THE COURT:  That's what vacatur gets you.

14      MR. MASTRO:  -- all.  That's what vacatur gets me.

15      THE COURT:  That's what I need to know, Mr. Mastro.

16      MR. MASTRO:  Because -- because otherwise, your Honor,

17  they are just going to try --

18      THE COURT:  You are being rescued again.

19      MR. MASTRO:  All right.  Okay.  Well, this is a note

20  that now that you have seen it, I will read it.  I know you

21  know the answer.

22      THE COURT:  You don't have to.

23      MR. MASTRO:  So obviously without making sure the

24  FONSI remains in place, but your Honor can of course enjoin

25  them from --

```
 1            THE COURT:  Right.

 2            MR. MASTRO:  -- pulling the switch.

 3            THE COURT:  I got it.

 4            MR. MASTRO:  So thank you whoever sent me that.

 5         Anyway, your Honor, the -- the point is we believe we

 6    have proved in this case the problems run so deep.

 7            THE COURT:  Well, but that's for your oral argument.

 8    Let's talk about what you want me to do to get to the last page

 9    of my opinion, right?

10         You have told me.  You want a declaratory judgment.  You

11    want me to vacate that when exists, and you want me to tell

12    them to do it anew.

13         What else do you want?

14            MR. MASTRO:  And I just want to say one last thing

15    before I turn it over because I did tell you I want try and be

16    brief in this presentation.

17         It's not -- there -- there are many Courts that have

18    held, including the Ninth Circuit in the *Los Padres Forestwatch*

19    *v. US Forest* 25 F. 4th 649 (2002) just from two years ago that

20    the reviewing Court may not just remand and dictate to the

21    agency methods like, you have a certain amount of time to try

22    and plug the holes in the dike.  That's not the way to do this.

23    If they did it wrong in the first place and there are

24    fundamental flaws with the analysis, they have to do the

25    analysis over again.  That doesn't mean, your Honor, they start
```

1   without anything.  They have a lot of research.  They just

2   haven't used the base and expanded what they need to do.

3   Leaving out so many New Jersey counties, so many New Jersey

4   towns, so many impacts on New Jersey and no explanation for the

5   actual mitigation that's going to be done in any of them.

6         So, your Honor, that's really all that I have.  I will

7   have a lot to say at closing.

8            THE COURT:  Let me make sure I understand something.

9         So you talked to me about the *Los Padres* case.  Right?

10  As I read what you have here, you are not suggesting that I

11  remand with instructions in a way that directs the agency to do

12  very specific things.  You are asking me to follow the dictates

13  of the *Los Padres* case, which says I may not do those things.

14  Correct?

15           MR. MASTRO:  Except, your Honor, you have every right

16  to say they have to do a full environmental --

17           THE COURT:  No, no.  I understand.

18           MR. MASTRO:  -- impact statement.

19           THE COURT:  But I can't dictate thing like

20  methodology, et cetera.

21           MR. MASTRO:  No.  They -- no.

22           THE COURT:  They are charged with the expertise, and I

23  am supposed to let them utilize that expertise in conducting a

24  renewed EA/FONSI.

25           MR. MASTRO:  Well, actually, your Honor, you can

```
 1    direct them to do a new environmental impact statement.

 2            THE COURT:  I understand.  You're asking me to -- I

 3    can direct them to start the process anew.  I can't tell

 4    them -- I can tell them by when the process -- when the remand

 5    has to come back to me, right, but I am not supposed to tell

 6    them the steps and the specific things that they are supposed

 7    to do?

 8            MR. MASTRO:  Yes.  But -- yes.  You are not supposed

 9    to tell them you have to do it within three months or things

10    like that, but you have every right, based on the record here,

11    showing that there may be significant impacts on New Jersey in

12    so many ways that have not been accounted for here and have not

13    been remediated and no explanation of that, the law is crystal

14    clear under the Environmental Defense Centers case that you

15    can't do a FONSI.  You have to a full environmental impact

16    statement.  So you can remand with that instruction.

17            THE COURT:  Right.  That, I understand.

18            MR. MASTRO:  Great.

19            THE COURT:  I'm using the EA and the FONSI for -- and

20    it may be my mistake.  I am just using it as shorthand in this

21    circumstance.

22            MR. MASTRO:  I understand.  I want to be crystal

23    clear, your Honor.

24            There are circumstances in which there is a remand with

25    such an instruction to do a full environmental impact
```

```
 1  statement.  I think that the flaws are so great here that it
 2  should be both a powerful message, findings, and that they have
 3  to do it right this time, that there should be vacature and a
 4  remand, but there are cases that do say -- I am always an
 5  honest broker with this Court, that say remand to do a full
 6  environmental impact statement.
 7          THE COURT:  I got it.
 8          MR. MASTRO:  Thank you.
 9          THE COURT:  You are welcome.
10      Mr. Cumming.
11      MR. CUMMING:  Thank you, your Honor.  I am going to
12  approach things slightly differently and provide the Court with
13  what I think is the analytical framework through which the
14  Court should determine what remedy would be.  We, obviously,
15  think the Court should rule in favor of defendants, but I am
16  not going to belabor that point.
17          First, the Court has to decide --
18          THE COURT:  Would I expect anything other,
19  Mr. Cumming?  In the words of Mr. Mastro, it is obvious.
20          MR. CUMMING:  First, the Court has to -- first, the
21  Court has to determine whether --
22          THE COURT:  Do you want to take a second just to
23  chuckle, Mr. Cumming?
24          I'm trying really hard, folks, after two days to try to
25  keep this light and the fact that we've had some intense
```

1    moments along the way, and I appreciate that you are

2    cooperating in that regard.

3         MR. CUMMING:  First, the Court has to determine

4    whether the error is harmless.  That is the first step in

5    deciding.  So cases -- if there is minor errors, trivial

6    errors, errors of insignificance, that's the first step.

7         THE COURT:  Right.  And there is Supreme Court law

8    that guides the Court on whether something is harmless or not.

9    Yes?

10        MR. CUMMING:  Yes, but I don't have the cite in front

11   of me.

12        THE COURT:  It is all right.  It is just a general

13   question --

14        MR. CUMMING:  Yes.

15        THE COURT:  -- or comment.

16        MR. CUMMING:  Then the Court -- if the Court finds the

17   error isn't harmless, it has got to decide whether vacatur is

18   appropriate.  The common test across numerous circuits is from

19   a case called *Allied Signal* in the DC circuit.  That has been

20   applied in the Third Circuit by a case called *Comité de Apoyo a*

21   *Los Trabajadores Argiculas v. Perez* at 45 F Supp 3d 477 from

22   the Eastern District of Pennsylvania in 2014.

23        One of the issues in whether vacatur is appropriate is

24   the likelihood that the agency can reach the same conclusion on

25   remand.  So I don't want to prejudge that question by guessing

 1   where the Court may have concerns or not other than to say that

 2   that is, in our view, the critical factor here in how the Court

 3   applies *Allied Signal* and determining whether vacatur is

 4   appropriate.

 5        Then, if the Court does decide to remand, it should do

 6   so without specifying a level of review for the agencies

 7   required to make -- to take on remand.  In other words, it

 8   should not prejudge how the agencies should go about fixing the

 9   deficiencies identified by the Court.

10        Mr. Mastro's contention that the Court has to order

11   production of an EIS or should do that, both are incorrect.

12   There is a case from the Ninth Circuit, *Center for Biological*

13   *Diversity v. National Highway Traffic Safety Administration,*

14   538 F.3d 1172 from 2008, where the Ninth Circuit said you

15   should give the benefit of the doubt to the agency on whether

16   to redo the EA on remand unless the evidence is so overwhelming

17   that there was no way the agency could justify its FONSI

18   finding on remand.

19        That is the lens through which the Court should review

20   potential remedy in this case.

21        THE COURT:  So vacatur would be appropriate if the

22   Court concluded that under no circumstances the agency could

23   have reached a conclusion that it did.  If the Court finds

24   otherwise, then the remand.  I understand what you are saying.

25   I got it.

1          MR. CUMMING:  The point would be here even if the

2   Court decides to remand, the agency could determine that a

3   supplemental EA can fix the deficiencies and if the agency

4   chooses to do that, gets it wrong, then --

5          THE COURT:  There is a review process to fix that.

6          MR. CUMMING:  There is a review process.

7          THE COURT:  It is the level of specificity in terms of

8   directing in the remand the certain things the agency must do.

9          MR. CUMMING:  Yes.

10      I will also note Mr. Mastro talked about vacating the

11  EA.  I don't believe that's appropriate.

12      The FONSI is the decision document.  That is the

13  document that would be vacated.  That is the document that

14  allows the agency action to take place, the totals to take

15  place.

16      Mr. Mastro cited to *Los Padres* about whether --

17          THE COURT:  So let me kind of come full circle on

18  that.

19      So final agency action would be triggered by the

20  issuance of the FONSI, not by the issuance of the EA, and so

21  that's why, in your view, vacating the FONSI is appropriate,

22  because that's the decision document that ultimately triggered

23  judicial review.

24          MR. CUMMING:  Correct.

25          THE COURT:  Thank you.

1          Continue, please.

2              MR. CUMMING:  Mr. Mastro cited to the *Los Padres* in

3    the Ninth Circuit about how adding a time component on remand

4    is appropriate.

5              THE COURT:  I do remands all the time at the Court of

6    International Trade.  I understand whether one can and cannot

7    have a time limit on the remand.

8          The answer is we are not remanding into empty space.

9              MR. CUMMING:  The Courts are all over the map on that,

10   as your Honor is well aware.

11             THE COURT:  I am well aware of it.  Trust me, if

12   remand is going to happen here, we are not remanding into empty

13   space.  Everybody deserves to understand what's going to happen

14   next and roughly when.  Whether or not we can meet that is a

15   different story, which would be subject to additional motion

16   practice for extensions of time down the road.  I am not doing

17   -- trust me.  I will say it right now.

18         If a remand is warranted, giant-sized, capitalized I-F,

19   right, I am not remanding in any way, shape, or form, right,

20   with an unspecified report-back date.

21         What an appropriate report-back date would be is

22   something that you all will discuss with me if I get to that

23   circumstance.

24             MR. CUMMING:  Understood.

25             THE COURT:  It is not being open-ended because it

1    doesn't serve anybody's purpose here.

2            MR. CUMMING:  Understood.

3            THE COURT:  You are all entitled to an end point.

4            MR. CUMMING:  I think everyone in this case is in

5    agreement.

6            THE COURT:  I don't want to be here when I have great

7    grandchildren still deciding this case.  I have a long way to

8    go because I have a two-year old and a six-year old

9    grandchildren.

10            MR. CUMMING:  One last point, your Honor.

11        Mr. Mastro quoted the *Standing Rock Sioux* case from the

12    DC Circuit about how vacatur was necessary because it would

13    subvert NEPA's purpose.

14        At the time that -- that's the *Dakota Access Pipeline*

15    case.  At the time that decision issued, oil was flowing

16    through the pipeline.  Vacatur was necessary to stop the agency

17    action.

18        There is -- there are no tolls being collected today.

19            THE COURT:  Right.

20            MR. CUMMING:  So I don't think that case is comparable

21    for that reason among others.

22            THE COURT:  Very good.  Thank you, Mr. Cumming.

23            MR. CUMMING:  Thank you, your Honor.

24            THE COURT:  Mr. Chertok.

25            MR. CHERTOK:  Thank you, your Honor.  I will also be

1    very brief.

2         I am not going to go back into the case law, but I think

3    we just heard, basically, Mr. Mastro's closing summary.  I

4    guess we will hear it again.

5         THE COURT:  I did say we are not discussing the

6    merits.  So your hearing is working very well, Mr. Chertok.

7         MR. CHERTOK:  Yes, I did.

8         I was just going to say that their proposed remedy is

9    based on their view of the merits, which we've discussed for

10   two days and we are not going to repeat.  At least, I am not

11   going to repeat here.

12        THE COURT:  Right.

13        MR. CHERTOK:  I think there is a couple of other

14   issues.

15        First of all, the notion that it should be, assuming,

16   and I will put my big IF on as well, capital I, if there is a

17   decision that the EA is not -- is arbitrary and capricious,

18   which we believe the standard and we briefed that, if that's

19   the finding, the question is if there has to be a remand,

20   first, is there a vacatur?  And I think it depends on the

21   reason for the decision of arbitrary and capriciousness.

22        For example, if the Court found that there was not a

23   sufficient explanation, a sufficient connecting of the dots

24   from A to B for a particular issue, I don't believe that

25   requires a vacatur as opposed to a remand with instructions to

1   the agency to fill the gap.

2        THE COURT:  So in that regard, would you agree,

3   Mr. Chertok, that if the Court found that there was not an

4   adequate explanation that the Court is not in a position to

5   determine whether the EA was arbitrary and capricious or

6   unreasonable?  Because if I don't understand how and why they

7   got there, how can I determine whether it is or is not

8   reasonable?

9        MR. CHERTOK:  I think that's correct because your

10  rationale, presumably, would be that there wasn't a reasoned

11  elaboration of the decision, and you need that to be clarified.

12       THE COURT:  So until I get that clarification, I can't

13  determine whether vacatur is appropriate or not?

14       MR. CHERTOK:  That's right.  I think that's right.

15       The second point that they made about assuming, again,

16  it is arbitrary and capricious and it goes to, let's say, a

17  major issue.

18       THE COURT:  Right.

19       MR. CHERTOK:  Their notion the reason for an EIS has

20  all been based, essentially, on mitigation.  They want a

21  commitment of money for specific areas in New Jersey.  We've

22  heard that throughout.  Their position is there is no such

23  commitment.  We disagree.

24       That doesn't require an EIS.  That is well beyond the

25  need for an EIS and as Mr. Cumming indicated, there are few

1  cases that remand with a direction to prepare an EIS because

2  that is, in essence, the Court putting on the agency hat, which

3  I need not say more about it.

4      I think that's, basically, it.  We agree with

5  Mr. Cumming's analysis.  No reason to belabor the point.  I

6  think the fundamental disagreement is on the adequacy of the

7  EA.  We have a difference of opinion with New Jersey, which I

8  am sure will be expounded upon in the 15 minutes allocated for

9  summaries.

10     Thank you, your Honor, unless you have any questions.

11         THE COURT:  No, I do not.  Thank you.

12         I am not going to rebuttal.  I think the positions of

13 the parties are relatively clear.  I don't see any need for

14 rebuttal on remedy.

15     All right.  That gets us to Amici.

16     Mr. Mateen, you are first up.  Ten minutes with respect

17 to the substantive issues including remedy discussed today.

18         MR. MATEEN:  Thank you, your Honor.

19     Defendants -- defendant interveners were required to

20 involve local governments to the extent practical.  A review of

21 the record is not reveal -- reveal a shred of evidence of any

22 outreach to Bergen County or any Bergen County officials or any

23 localities in Bergen County.

24         THE COURT:  Now, tell me where I can find that

25 standard, "a shred of evidence."  Is that a term of legal art?

1          MR. MATEEN:  It's a term of art.  Not legal art.

2          THE COURT:  No. So -- so there is no scintilla of

3    evidence.  Right?

4          MR. MATEEN:  Correct.

5          THE COURT:  Okay.

6          MR. MATEEN:  I do note that in defendant intervenor's

7    reply brief they had a footnote where it says in a proposed

8    Amicus brief, Bergen County argues, parentheses, wrongly that

9    FHWA failed to conduct outreach in Bergen County.  In fact,

10   public meetings and other information were advertised in the

11   Bergen record and two of the EA repositories were in Bergen

12   County.

13        The repositories are listed under 37058 through 61.  And

14   there was only one Bergen County location where the draft EA

15   was made available to the public.  And that was the Bergen

16   County clerk's office.  It is not two like they said.  The EA

17   incorrectly claims that the North Bergen Free Public Library --

18         THE COURT:  So it is your view that that posting in

19   one locale in Bergen County made the notice inadequate?

20         MR. MATEEN:  Correct, your Honor.  The North Bergen

21   Free Public Library is not located in Bergen County.  EA says

22   it is.

23         THE COURT:  Is there a mandate as to the minimum

24   number of required places for posting for notice?

25         MR. MATEEN:  Not that I am aware of, your Honor.

1          THE COURT:  Okay.  So you are saying the exercise of

2     the agency's discretion in this circumstance was abusive in the

3     fact that it -- it basically only posted in one locale in

4     comparison to other counties?

5          MR. MATEEN:  Yes, and especially because the results

6     of the study show that Bergen County will see the most adverse

7     impacts.  And I don't think one location is enough to -- to get

8     that information out to the residence of Bergen County who will

9     be affected by any action the agency takes.

10         So -- was there a question, your Honor?

11         THE COURT:  Maybe, but I will let you continue.

12         MR. MATEEN:  But I -- I would concede that the error

13    to the list that the North Bergen Free Public Library is

14    located in Bergen County.  It is actually located in Hudson

15    County.  I would say that is harmless error in the draft

16    environmental assessment.

17         Ultimately, we do agree with the remedy sought by the

18    state of New Jersey.  We fully support the arguments they set

19    forth today.

20         And we thank your Honor for the time and consideration.

21         THE COURT:  You are welcome, Mr. Mateen.  Thank you

22    for your engagement.

23         I do not see Mr. Nagel.  So the question is, Ms.

24    Matloff, are you making the presentation?

25         MS. MATLOFF:  Yes, it is going to be extremely brief,

1    your Honor.

2         In support of the other plaintiff Amici.  And we're just

3    going to adopt the position of our noble colleagues both with

4    respect to the remedy and with respect to the merits.

5         THE COURT:  Thank you, Ms. Matloff.

6         Mr. Reichman, I assume I pronounced that correctly.  Is

7    it, Richman (phonetic)?

8         MR. REICHMAN:  It is actually Reichman.

9         THE COURT:  No, that's fine.

10        MR. REICHMAN:  I will answer to either.

11        THE COURT:  You know what, I stand corrected.  I

12   apologize for mispronouncing your name to begin with.

13        Mr. Reichman.

14        MR. REICHMAN:  Thank you, your Honor.

15        I will also be taking far less than ten minutes.

16        Let me turn to the issue of public participation.

17        Now, we previously showed that New Jersey's position

18   regarding the need for an EIS whenever there is a highway, its

19   position with respect to environmental justice, its position

20   with respect to alternatives cannot be squared at all with its

21   actual practices and policies with respect to its own $10.7

22   billion highway expansion project.

23        The same inconsistency and I would say hypocrisy extends

24   to the issue of public participation as well.

25        As we laid out in our Amici brief, the state has refused

1   to have any public participation of any meaningful kind with

2   respect to the Turnpike expansion.  As also refused to actually

3   even have participation, allow the participation of -- of

4   Jersey City.  This is the place where the bulk of the -- of the

5   Turnpike expansion --

6        THE COURT:  Mr. Reichman, I appreciate the passion

7   that you are bringing, but this is an apples-and-oranges

8   comparison.  The Court does not have the New Jersey Turnpike

9   Bay Bridge extension project before it.

10       I'm dealing with the decisions from the Federal Highway

11  Administration.  Now, I am more than happy to listen to

12  anything that you have to say in support.  If you want to tell

13  me that the State of New Jersey is taking an inconsistent

14  position with respect to matters in this matter I got it.

15  Right?

16       I gave you a lot of leeway earlier today on this.  I'm

17  not inclined at this juncture to give you the same leeway.  You

18  want to tell me something that's relative to the arguments made

19  today, and the issues before the Court today, I am all ears.  I

20  will give you my hundred percent attention.

21       MR. REICHMAN:  Your Honor, let me respectfully push

22  back on that for a minute.

23       So much of the argument today has been -- and yesterday

24  has been based -- based on past practices of a party.  Is

25  what --

```
 1          THE COURT:  No.  No, that's agency practice.  Right?
 2  Because agency practice creates expectations.
 3      Now, are you saying Mr. Mastro is barred from making the
 4  comments and arguments that he has made today because
 5  New Jersey has acted differently in a different project?
 6          MR. REICHMAN:  Yes, I am, your Honor.  I think --
 7          THE COURT:  He is barred from making the argument --
 8          MR. REICHMAN:  Barred -- barred is too strong, but I
 9  think it certainly relevant information.
10          THE COURT:  All right.  Mr. Reichman, I will give you
11  a little bit of leeway here --
12          MR. REICHMAN:  Okay.
13          THE COURT:  But not much.
14          MR. REICHMAN:  All right.  Well, let me -- you know, I
15  understand where the Court coming from.  So let me briefly talk
16  about remedy and address something that Mr. Mastro said in his
17  remedy argument.
18      He basically is saying that there are so many negative
19  impacts throughout New Jersey and so many ways that essentially
20  you have to blow the -- the whole process up.
21      And the fact of the matter is, Honor -- your Honor, I
22  have sat here for two days.  You have listened to two days of
23  argument.  And really, it is all vomit.  There is a single
24  place in Bergen County, okay, which is affected by truck
25  traffic because there is conceivably going to be more truck
```

1  traffic going over the GW Bridge.  They have not shown negative

2  impacts anywhere else in the state.  And I think the -- and

3  Federal Highways did a great job yesterday afternoon going

4  through all of the areas in New Jersey showing it.  Including

5  the areas like Hudson County where there will be far better

6  improved air, cleaner air, as a result of the tolling program.

7       So my only suggestion, your Honor, is that any remedy

8  short of affirmance should reflect the fact that there is a

9  very tiny problem that conceivably would need to be remedied

10 here.  And there is not negative impacts throughout New Jersey.

11      In fact, what would be negative is if this project was

12 not allowed to go forward, it would negatively effect the 75

13 percent of commuters who go into New York.  It would negatively

14 affect the air that most of New Jersey breathes.  And it would

15 negatively affect New Jersey's ability to reach its climate

16 goals.

17           THE COURT:  Thank you, Mr. Reichman.

18           MR. REICHMAN:  Thank you.

19           THE COURT:  Mr. Otis.

20           MR. OTIS:  Thank you, your Honor.

21      After two full days of discussion --

22           THE COURT:  How well we all know that.

23           MR. OTIS:  Yes, I intend to be extremely brief.

24      With regard to participation, look, my clients actively

25 participated in the process.  They have had no complaints about

1   the amount of available participation.  You saw a list of

2   environmental justice organizations, it included one that

3   participated in the advisory group.  It included one of my

4   clients.  So they are perfectly fine with the participation

5   process thus far.

6          With regard to remedy, your Honor.  Obviously, we think

7   that your drafting should be relatively simple, dismissed and

8   affirmed.  And that's it.

9          But I think it is important that your Honor consider

10  when deciding what sort of remedy to incur here that there is

11  an ongoing problem.  Right?  There is an ongoing congestion

12  problem.  There is an ongoing pollution problem.  Think of it

13  as a 102 hours of lost time and $1595 per driver per year.

14  This is from DOT_36197 in the EA that is happening per driver,

15  every day in the CBD and it needs to be changed.  My clients

16  feel like they have been working on this for 45 years.  Right?

17         So they feel like this is some -- a discussion that's

18  been going on for a long time.  There has been enough.  They

19  are ready to move forward.

20         And with that, I thank your Honor, unless you have any

21  questions.

22             THE COURT:  I have no questions, Mr. Otis.  Thank you

23  very much.

24             MR. OTIS:  Thank you.

25             THE COURT:  Okay.  Ladies and gentlemen, we are at the

1  point in time where I perceive there are two or three things

2  left.

3      One is the closing arguments.  Two, to deal with the

4  issue of all of the PowerPoint-esque presentations.  And any

5  final comments from me or requests from the parties.

6      I'd like to suggest that we take about a three-minute

7  stretch break.  Everybody can kind of get fresh air into their

8  lungs, so to speak.  And then we will come back at about 4:10.

9  And we will push through to the end.

10          (Recess taken 4:05 p.m. to 4:10 p.m.)

11          THE COURT:  Mr. Mastro, you are on the clock.

12          MR. MASTRO:  Thank you, your Honor.

13          THE COURT:  Seven minutes.

14          MR. MASTRO:  I think it was supposed to be 10, your

15  Honor.

16          THE COURT:  No. I sent a document out, you all signed

17  off on it.  It was seven, four, and four.

18          MR. MASTRO:  Oh, I am sorry, your Honor.

19      Yes, seven, four, and four.  I'm sorry.  I apologize.

20          THE COURT:  You are on the clock.  You are already

21  five seconds in.

22          MR. MASTRO:  Thank you, your Honor.  Thank you, your

23  Honor.

24      I -- I just want to say at the outset, how grateful we

25  are on behalf of the State of New Jersey that you have given us

1  so much time, you and your entire team and we are extremely

2  grateful for that.

3       Your Honor --

4          THE COURT:  You are very welcome.  Thank you for the

5  compliment on behalf of my team.  I appreciate it.

6       I have been greatly served by them and the fact that you

7  recognize what they've done to enable me to be ready to

8  participate these last two days, the fact that you are

9  recognizing it is greatly appreciated.

10         MR. MASTRO:  It comes from the heart, your Honor.

11      Thank you.

12      Your Honor, so much has been said.  I don't want to

13  repeat myself.  And I did go through some of the merits on the

14  remedy section.  But there are some things that -- that need to

15  be said because I left this courtroom last night and I heard

16  some things about, you know, passions run deep on both sides.

17  But I literally received dozens of emails, even calls -- I

18  don't know how they got my number -- people calling to thank

19  me, to thank the governor whose staff is here, to say thank you

20  for standing up for New Jersey.  I am proud.  My team is proud

21  and I am so proud of them for standing up for New Jersey.

22         THE COURT:  You're -- after yesterday's hearing

23  appearance in front of television cameras didn't generate that

24  outpouring of affection?

25         MR. MASTRO:  I -- I suspect it did after -- after

```
 1    Ms. Kaplan --

 2            THE COURT:  Well --

 3            MR. MASTRO: -- told the press she was going to win.

 4            THE COURT:  Listen, I am an equal opportunity

 5    commenter.

 6        And if Ms. Kaplan and Ms. Knauer and Mr. Chertok stand

 7    up and tell me that they got hundreds of e-mails and phone

 8    calls, I'm going to say the exact same thing.

 9            MR. MASTRO:  There you go.  I went after them, your

10    Honor.

11        To make a long story short, your Honor.  I want to focus

12    on some of the key elements here.  Because the reason why

13    vacatur and remand is appropriate here, and I understand with

14    some guardrails, but the reason why there has to be a full EIS

15    is because that is what the law requires when you have so many

16    significant impacts.  That is what Ninth Circuit said just two

17    years ago, not that older case that Mr. Cumming cited, but an

18    EIS must be prepared if there are substantial questions

19    regarding whether an agency's proposed action may have

20    significant impacts, end quote.  That's the *Environmental

21    Defense Center* case.

22        Your Honor, they basically now have been admitting in

23    respect after respect after respect in their presentation -- I

24    mean, my worthy adversaries -- that there are significant

25    impacts here potentially that need to be mitigated.
```

1    I have now heard them say -- even though their EA and

2  FONSI don't say it -- oh, yeah, we're going to -- we're going

3  to get to mitigation later.  There -- there is going to be

4  mitigation coming down the road.  The old trust me, New York.

5  New Jersey is supposed to trust New York.

6    Your Honor, this is the pivotal point.  And even with

7  that record, where first we had 15 -- go ahead.  Put them up.

8    First we had 15 cities in three counties out of four

9  studied.  We didn't have Middlesex studied, we didn't have

10  Passaic studied.  We didn't have a lot of counties studied in

11  New Jersey compared to New York, but we had 15 where this

12  particular EA says -- says they may need mitigation.

13    And then in what I will explain is arbitrary, okay,

14  they -- they narrow it to four because they don't want to have

15  to mitigate much in New Jersey.

16    And even then all they say about the four, Fort Lee,

17  East Orange, Newark, and City of Orange, is that they could

18  merit place-based mitigation.

19    Well, where are the explanations for these things?

20  They -- they funded the Bronx, came up with 35 million for the

21  Bronx right off the bat.  Right?

22    Nothing committed for New Jersey.

23    It is not just about -- New Jersey is not asking for a

24  dollar amount.  New Jersey is asking for mitigation, as is the

25  legal obligation under NEPA of FHWA to ensure, and the MTA to

 1   provide for their project because you have to mitigate what may

 2   be significant environmental impacts.

 3        And you have to do a full EIS when there may be

 4   significant impacts, and they basically stood up here and

 5   admitted to you that there are.

 6        They are trying to limit the universe because they want

 7   to spend less of the MTA's money.

 8        I understand, your Honor.

 9        They want to spend less of the MTA's money.  But what

10   was the explanation?

11        Now, your Honor, we talked about the doctrine of

12   post-hoc rationalizations.  And one thing that has been

13   painfully apparent here is the MTA has been running the show,

14   not the FHWA.  Because we heard Ms. Knauer tell us that, oh,

15   the reason why the Bronx got all that money is because there

16   was so much more problems in the Bronx.  So they stood up and

17   said that's why we gave the Bronx money now.  And the

18   New Jersey communities we will figure out later.

19        Guess what?  Where is that in the EA?  Where does it say

20   the rationale for giving the Bronx mitigation -- let's go to

21   the next slide -- is because they have so many problems, more

22   than anybody else.  It is not there.  You won't find it.

23        And, your Honor, she also --

24        THE COURT:  "She" is whom?

25        MR. MASTRO:  Ms. Knauer.  She also told you,

1    your Honor, Ms. Knauer, that the EA, the reason why those --

2    those 11 cities in New Jersey got taken off the list is because

3    the regional mitigation measures would supposedly satisfy them.

4         And she said that it was the change from "or" to "and"

5    that you had to have both pre-existing conditions, pollution

6    and chronic disease, over the 90th percentile.  And that

7    explains -- that is what the EA explains.  Right?

8         Guess what?  Show me where that is.  That is nowhere in

9    there.  These are post-hoc rationalizations to try and get the

10   dollar figure down for mitigation, but that is not the way it

11   works.

12        The way it works, your Honor, and the FHWA told us -- go

13   ahead -- the FHWA told us "or."  "Or," pollutants or chronic

14   disease.  And that that's where the mitigation was going to go.

15   That is at least those 15 New Jersey towns.

16        And, your Honor, the point of mitigation is not to do it

17   to a dollar figure, like this EA is doing to a dollar figure.

18        The point is to do it, this is what the FHWA is telling

19   you what the standard is.  Not the "and" that Ms. Knauer said.

20   The "or."

21        And you have 15 New Jersey cities.  And you have other

22   places not even studied.  And the point of mitigation is not to

23   mitigate to a dollar figure.  The point of mitigation is to

24   mitigate everywhere that you need to, to address what may be

25   significant impacts.  This EA is completely deficient in those

1  regards.

2       New Jersey will suffer environmentally in so many

3  communities.  And this is not the way the federal government or

4  the MTA should have conducted itself.

5       Your Honor, we beseech you, we implore you to put a stop

6  to this.  Make the FHWA and the MTA do it right and commit the

7  resources that are necessary to ensure there will not be

8  significant impacts in New Jersey.  That's what NEPA requires.

9  That's what we are asking for.

10       And we are so grateful to you for your consideration.

11  Thank you, your Honor.

12          THE COURT:  You are welcome, Mr. Mastro.  Thank you.

13       I am going to go slightly out of order.

14       Mr. Chertok or Ms. Knauer, who is going to make the

15  close?

16          MS. KNAUER:  Mr. Chertok.

17          THE COURT:  I am going to go with defendant intervenor

18  first.

19       And then I am going to give Mr. Cumming, as the defender

20  of the agency decision, the last word.

21          MR. CHERTOK:  Thank you, your Honor.  I will also echo

22  Mr. Mastro's appreciation for the time and effort you have put

23  in and the patience you have exhibited over the last two days,

24  including with me.

25          THE COURT:  You are very kind, Mr. Chertok.  It is

1    much appreciated.  And on behalf of my team, we say thank you

2    to you, too, as well.

3         MR. CHERTOK:  So let -- let's talk -- I have four --

4    four or five minutes, as I recall.

5         THE COURT:  Yes, sir.

6         MR. CHERTOK:  So one -- this is a critical project for

7    the region.  Even New Jersey doesn't deny that.  It will

8    provide environmental, transportation, air quality, economic

9    benefits for the entire region.

10        I would note that the National Environmental Policy Act

11   was amended to make sure that it is explained what would happen

12   if a project that benefits the environment is not approved.  So

13   there is a flip side here.  New Jersey only talks about the

14   supposed inadequacy of the assessment in terms of

15   municipalities, primarily in Bergen County.  The fact is

16   there's a major benefit for the region as a whole.

17        The revenues that are part of the purpose and need for

18   this project, and which are critiqued repeatedly by New Jersey

19   as inappropriate to consider, are there for a reason.  Not only

20   will transit improvements help New Jersey residents.  They will

21   also, obviously, help New York residents.

22        But they go to the capital plan, which are improvements

23   like making stations ADA-compliant.  Fixing over the -- the

24   over 100-year-old infrastructure of the subway system in New

25   York City, so that it can serve the general public, not just

1   New Yorkers.

2           Three, and I am going to go a little bit on the merits

3   here, there is no -- New Jersey's position, that there was no

4   hard look taken.  And they keep on repeat -- you know,

5   referring to these various figures, which they are trying to

6   manipulate.  But the fact is the methodology that was used was

7   the same for every part of the region.

8           And if there was a reduction in the number of

9   potentially affected communities, that was because the modeling

10  and the methodology used by an expert agency yielded that

11  result.

12          There was no foregone conclusion to make sure we cut New

13  -- that FHA -- FHWA cut New Jersey out of the formula.  That

14  just doesn't exist.  And that just is a conspiracy theory that

15  really has no place in this Court.

16          They talk about the so-called alternatives analysis.

17  But, of course, they never raised it when they could have.

18          They complain about the actual project.  But as we

19  discussed yesterday, there is going to be a re-evaluation that,

20  of course, New Jersey wants to preempt because they want to

21  have, essentially, the Court substitute for the agency.

22          None of that is proper.

23          The passion that New Jersey shows is admirable, but it

24  doesn't substitute for hard, legal analysis.  And the fact is,

25  beyond the fact that New Jersey waived -- waived virtually all

1  of their claims by purposely not participating in this process.

2       Putting that aside for a moment, their arguments on the

3  merits are extraordinarily weak.  They just cannot show that

4  this very detailed and exhaustive EA did not take a hard look

5  at the consequences and the environmental impacts of congestion

6  pricing.

7       And, yes, the analysis was so biased that FHWA

8  recognized some potential environmental impacts and has

9  provided mitigation for them.  If the -- if the interest was in

10  avoiding that, there would be no recognition of such impacts

11  and no commitment to $155 million.

12       Your Honor, in our view, the -- the matter is easily

13  resolved.  As one of the Amici said, it should be affirmed.

14       Thank you.

15       THE COURT:  Thank you, Mr. Chertok.

16       Mr. Cumming.

17       MR. CUMMING:  Thank you, your Honor.

18       First I would like to thank the Court, the courtroom

19  staff, marshals, court reporter for their time over the past

20  two days.

21       Regardless of the outcome, we appreciate the fulsome

22  opportunity to defend and explain the agency's position.

23       THE COURT:  Thank you for your recognition of the

24  team.  On their behalf, we say thank you.

25       MR. CUMMING:  This Court has had -- heard two sets of

1   arguments over the past two days.  One is based on the record,

2   precedent, and the applicable statutes and regulatory

3   authority.

4        The other is based on cherry-picked citations to the

5   record that were presented out of context and intended to serve

6   political expediency and manufacture errors in the record.

7        The Court should only give credence to the former.

8        This is because NEPA is not a vehicle to resolve

9   political disputes, policy differences, or confer a state to

10  veto power over a federal agency action.

11       As the Second Circuit has eloquently stated, NEPA was

12  not intended to place Courts in the position of resolving what

13  it termed fervid disagreements about the wisdom of

14  transportation programs.

15       Similarly, under the NEPA standard of review, Courts

16  have repeatedly refused to flyspeck the agency's findings in

17  search of a deficiency.  Instead, NEPA is intended to inform

18  decision-makers and the public.

19       The final EA more than meets that standard and we would

20  ask the Court to grant summary judgment to defendants on all

21  counts.

22       Thank you.

23        THE COURT:  Thank you, Mr. Cumming.

24       Ms. Howard and Mr. Chertok, you have raised concerns

25  about the electronic information and other paper documents

1  presented to the Court throughout this process.  In order --

2  well, you have raised concerns.

3       And, frankly, all of the parties have presented

4  documentation to the Court.  Whether it is within bounds or out

5  of bounds, that depends upon your own perspective.

6       I made a brief comment yesterday about how I intend to

7  handle it, but I am more than willing to spend a few minutes to

8  hear if you have other concerns and suggestions with respect to

9  how I deal with all of the material presented to the Court by

10  the three main parties in support of their oral presentations

11  throughout the past two days.

12       I have some additional comments, depending upon what you

13  all present to me, which may give you some further insight as

14  to how I intend to approach this.  But I am willing to hear

15  anything that you have to say one way or the other and any

16  suggestions that you need to make.

17       Mr. Chertok, you were the first person to raise the

18  concern.  I am more than happy to hear what you have to say.

19         MR. CHERTOK:  Thank you, your Honor.

20       Based on the most recent set of slides, we have 141

21  pages of PowerPoint presentation.  In essence, this is almost

22  three briefs at the 50-page limit that was -- that had been

23  submitted by the plaintiff.

24       And they have cherry-picked material.  Some of it is

25  from the record.  Some of it is their colloquy.

1        So must -- much -- or most, perhaps, because it is a

2   little hard to go through 141 pages overnight, most of this is

3   not part of the record.

4        The other presentations, I believe, are pages from the

5   record.  It is quite different to submit a page from the

6   administrative record for the convenience of the Court as

7   opposed to -- and the other parties -- as opposed to putting in

8   material that is not part of the record and, indeed, raises

9   arguments that were not even raised in the briefs that were

10  submitted.

11       So I --

12       THE COURT:  I appreciate that, Mr. Chertok.  What do

13  you want me to do?

14       MR. CHERTOK:  I think it ought to be put in your

15  circular file, your Honor.

16       THE COURT:  Thank you, Mr. Chertok.

17       MR. CHERTOK:  Thank you.

18       THE COURT:  Ms. Howard or Mr. Cumming.

19       MR. CUMMING:  First, we trust your Honor is well

20  familiar with what is the record and not, but two points on the

21  Clean Air Act and remedy --

22       THE COURT:  Boy, are you gullible, Mr. Cumming.

23       Yes, I know what is in the record.

24       MR. CUMMING:  -- on Clean Air Act and remedies to the

25  extent that those are -- were sur-reply-ish, I will call them.

```
 1            THE COURT:  Right.

 2            MR. CUMMING:  We would certainly -- to the extent the

 3    Court feels it needs to rely on them, we obviously request the

 4    opportunity to respond in writing as appropriate, if that need

 5    arises.

 6            THE COURT:  Okay.

 7            MR. CUMMING:  Thank you.

 8            THE COURT:  Mr. Mastro.

 9            MR. MASTRO:  Well, I was hoping to end on a kumbaya

10    moment, your Honor.

11            THE COURT:  Well, you never know, Mr. Mastro.  I am

12    still the ringmaster.  You never quite know.

13            MR. MASTRO:  There you go.

14         As your Honor knows, when something was presented that

15    was outside the record earlier today, I pointed out it was

16    outside the record and said, But this is argument.  They can

17    put up whatever they want and the Court can give it whatever

18    weight it is worth.

19         I have never had a case in my life, your Honor, where I

20    haven't used slides for a closing or major argument.  I have

21    had cases with Mr. Chertok where I had exactly the same kind of

22    presentations and he loved them, but now --

23            THE COURT:  You actually know each other?

24            MR. MASTRO:  We do.  We know each other well.

25         When I'm on his side, he loves those kind of slides.
```

1   And, by the way, your Honor --

2          THE COURT:  He still loves you, you know.

3          MR. MASTRO:  I understand.

4          THE COURT:  You are friends.  What you do for a living

5   is different than what you do on the personal side of the

6   equation.

7          MR. MASTRO:  It is not personal, your Honor.  It is

8   just business.

9          But to come to the point, every single statement -- many

10  of them are just blow-ups from the record, but every single

11  statement or quote is from a case or from the record and gives

12  the record citation.  It is intended as an aid to the Court,

13  but the Court can give it whatever weight or not, but to have a

14  motion that it should be --

15         THE COURT:  There is no motion.  It is just commentary

16  at the moment.

17         MR. MASTRO:  There you go.

18         To say it should be put in the round file, that is

19  really up to your Honor.

20         I have no problem with what they did.  I have no problem

21  with that they did.  I think the slides maybe were a little too

22  effective in their view, but we will leave that aside.

23         Your Honor is going to make a ruling at the end of the

24  day, and I don't think it is going to be based on what slides

25  Mr. Chertok, and Ms. Knauer, and the FHWA team used.

1          I think it is going to be based on your review of the

2     record, and these were simply intended as an aid to the Court.

3          So with that kumbaya moment, I hope we can all go home.

4            THE COURT:  Not quite, Mr. Mastro.

5          I didn't make a comment on this yesterday.

6          Whether one might believe that I would take it for what

7     it is worth as illustrative or demonstrative, that is part of

8     my thinking.

9          The other part of this is while this was not a trial, I

10    am very used to running bench trials without a jury and when

11    there are objections to testimony or documentary evidence based

12    on hearsay I am not going to instruct myself like I would a

13    jury.  But the lawyers are supposed to trust that I know enough

14    to differentiate between that which is hearsay and that which

15    is not.

16         Frankly, folks, at the end of the day, that's exactly

17    what I am going to do here.

18         If, in fact, I think that there is something that I am

19    going to look at -- I didn't say rely on -- there is something

20    that I'm going to look at that I believe require s some

21    additional comment in response, you know what I'm going to do.

22    You are going to get an email from Ms. Creegan or

23    Ms. Featherstone, and we are going to have a conversation, and

24    I am going to explain to you what my concern is, and I am going

25    to give you an opportunity to help educate me.

1     So you have to trust me at my word, folks, that I know

2  what I'm doing.  I know what to ignore and what not to ignore.

3     That is how I am going to handle this.

4     If you believe in any way, shape, or form that that is

5  not sufficient, speak now or forever hold your peace.

6          MR. CHERTOK:  From my perspective, we are comfortable

7  with that, your Honor.  I think it is important to point out

8  that these are -- I am not sure I call them effective.  I call

9  them very dense, however.

10     Thank you.

11          THE COURT:  Well, if we want to hold a session on what

12  is the appropriate use of PowerPoint and how to present it and

13  how many words or lines should be on a page and how big the

14  font should be, I am more than happy to do this because I do a

15  lot of CLE presentation work, and I know what's effective and

16  what isn't in terms of visuals, but that is your choice.

17     Anything else before the Court makes some closing

18  comments?

19          MR. MASTRO:  No, your Honor.

20          MR. CHERTOK:  No, your Honor.

21          THE COURT:  Ladies and gentlemen, we have been

22  together here for two full days.  We have had several sessions

23  before, status conferences, and we all have gotten to know each

24  other.

25     I may have seemed a bit harsh at times in terms of how

1   we were going to get through these two days.  Trust me, having

2   parameters makes people think about what they are going to say

3   and how they are going to present it.

4         Trust me.  I did not hold you to the specifics of

5   10 minutes, or 20 minutes, or 40 minutes, or seven minutes.  I

6   ran the clock, but there was always give and flexibility on my

7   side.

8         I tried to comport myself in such a way that I made sure

9   that I was fair and even-handed to everybody in terms of

10  presentation time, even to the point where you may have

11  perceived that I cut you off a little bit, particularly at the

12  end of the day or a break -- a significant break point in the

13  session, to provide additional time for you to feel like you

14  fully presented your argument.

15        I deeply believe in courtesy, dignity, and respect.

16        I very much appreciate the significant degree to which

17  you accorded that to each other and to the Court.

18        Yes.  Every once in a while, because we are humans, I

19  had to pull the reins a little bit, but all of it was intended

20  to get us to a point where we can get done at a reasonable

21  point in time each day and get through the material.

22        If you believed in any way, shape, or form that I

23  overstepped, that I somehow insulted you or offended you, you

24  have my deepest personal apology.  None of this was personal.

25  It was all business, and it was intended to get us through a

1   significant amount of material in a reasonable period of time

2   or else we would be here for a lot longer.

3          I am deeply appreciative of the time and effort that you

4   all put in to your briefs, to your presentations, to answering

5   my questions, to bantering back and forth with me, to entering

6   into a colloquy.  The more conversational this was, the more

7   instructive and helpful it was to me.

8          Candidly, when I teach law school classes, that's

9   exactly how I do it.  Conversation spotlights important things

10  and enables people to understand.

11         I told you at one point there are things about how I run

12  my show that are probably different than you have seen in a lot

13  of other judges.  At the end of the day, it is a process that

14  works for me.  I hope that it worked for you.

15         I am going to do my best to keep my word once we go

16  adjourn today.

17         I know what the timeline is.  It is roughly June 15th.

18  I know that you have obligated yourselves -- particularly, MTA

19  counsel -- to advise the Court if there is any significant

20  change in that timeline.

21         I am going to do my best and if I can't, I'm going to

22  let you know that I can't.

23         My team and I are going to do the best that we can to

24  get a decision out in sufficient time before the June 15th

25  deadline.

1          I can't tell you whether that's May 1st, May 15th,

2    June 1st, June 10th, but I'm not going to issue it at a point

3    in time where you have to stay up all night to figure out what

4    I said in order to figure out what the next steps are.  I will

5    do it in a sufficient amount of time to be respectful to all of

6    you so you can figure out what you need to do next whatever

7    that next may be.

8          If I have any concerns beforehand, you will get notice

9    from me and we will have a subsequent conversation.

10         The Court is deeply indebted to all of you for the time

11   and effort that you put in, both in paper, in preparation, and

12   over the last two days to educate me.  I can't do what I need

13   to do without that.

14         So I say thank you to you all.

15         I will ask one last time, any questions?

16         If there are none, Mr. Mastro, I am seven minutes late

17   to get you out of the building to your important board meeting

18   in Philadelphia.

19              MR. MASTRO:  Thank you, your Honor.

20              THE COURT:  It will be my distinct pleasure, whatever

21   the outcome here, to have any and all of you before me at

22   another case in the future.  If we are back together again

23   because of however this case ends, so be it.  If not, I look

24   forward to seeing you again under whatever the circumstances

25   may be.

1          I very much enjoyed our two days together.  I say

2     thank you and I am deeply appreciative.

3          MR. MASTRO:  Thank you, your Honor.

4          MR. CHERTOK:  Thank you, your Honor.

5          MS. KNAUER:  Thank you, your Honor.

6          MR. CUMMING:  Thank you, your Honor.

7     (Whereupon the proceedings are adjourned at 4:38 p.m.)

8                    *          *          *

9          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

10

11          I certify that the foregoing is a correct transcript

12     from the record of proceedings in the above-entitled matter.

13

14     /S/ Melissa A. Mormile RDR, CCR, CRCR          04/04/2024

15     Official Court Reporter                        Date

16

17

18

19

20

21

22

23

24

25

## $

**$120** [1] - 57:22
**$15** [1] - 218:20
**$155** [1] - 255:11
**$1595** [1] - 245:13
**$35** [1] - 59:14
**$45** [1] - 59:14

## '

**'80s** [1] - 34:16
**'90s** [1] - 34:16

## /

**/S** [1] - 266:14

## 0

**034** [1] - 105:21
**04/04/2024** [1] - 266:14
**07043** [1] - 3:5
**07068** [1] - 1:20
**07102** [2] - 1:10, 2:9
**07601** [1] - 3:19

## 1

**1** [4] - 57:25, 78:24, 114:12, 173:19
**1,000** [1] - 121:17
**10** [8] - 17:12, 80:10, 88:25, 91:19, 92:18, 201:7, 246:14, 263:5
**10-11** [1] - 71:20
**10-12** [1] - 71:20
**10.4** [4] - 185:23, 191:16, 202:17, 204:24
**10.7** [6] - 67:25, 68:24, 69:21, 70:5, 70:14, 241:21
**100** [1] - 99:19
**100-year-old** [1] - 253:24
**10022** [1] - 2:18
**10036** [2] - 1:17, 3:16
**10118** [1] - 2:22
**102** [2] - 38:24, 245:13
**103** [1] - 1:20
**1083** [1] - 212:1
**109** [1] - 82:19
**1092** [1] - 212:1
**10:49** [1] - 55:25
**10:58** [1] - 55:25
**10th** [2] - 123:7, 265:2
**11** [8] - 15:10, 25:22, 71:9, 78:19, 90:12,

**96:6, 96:15, 251:2**
**112** [3] - 95:13, 109:23, 109:25
**114** [3] - 98:1, 109:23, 110:25
**115** [1] - 4:10
**1172** [1] - 232:14
**1177** [1] - 3:15
**1185** [1] - 1:16
**1194382** [1] - 16:17
**11:33** [2] - 80:2, 80:4
**11:35** [1] - 80:3
**11:37** [1] - 80:4
**11th** [4] - 94:8, 140:19, 151:14, 151:18
**12** [12] - 109:3, 149:16, 149:25, 162:12, 162:19, 162:20, 162:25, 186:23, 187:2, 194:5
**1243** [1] - 12:1
**125** [3] - 102:23, 103:1, 149:6
**12th** [2] - 161:17, 170:8
**13** [1] - 164:25
**13,192** [1] - 15:20
**136-3** [1] - 87:4
**137** [1] - 4:10
**139** [1] - 164:25
**13th** [1] - 174:5
**14** [6] - 12:23, 14:7, 112:25, 113:13, 113:22, 115:16
**141** [2] - 257:20, 258:2
**148** [1] - 107:2
**14A** [1] - 14:7
**15** [25] - 4:3, 9:19, 9:21, 20:2, 23:6, 25:13, 30:22, 30:24, 32:2, 32:6, 32:10, 44:5, 46:18, 79:16, 96:22, 179:8, 189:11, 218:5, 218:11, 238:8, 249:7, 249:8, 249:11, 251:15, 251:21
**150** [2] - 2:5, 2:13
**1500** [1] - 164:15
**1501.3(a)3** [2] - 29:18, 29:19
**1501.5(e** [1] - 81:21
**1501.6** [2] - 60:14, 63:23
**1501.6(a)(2** [1] - 130:24
**1501.6(c** [1] - 29:17
**1501.6(c)** [1] - 29:20
**1501.8(a** [1] - 84:9

## 2

**2** [5] - 1:9, 16:12, 103:17, 114:13, 173:19
**2.5** [1] - 12:9
**20** [7] - 23:5, 79:17, 79:24, 178:15, 199:12, 216:7, 263:5
**20,000** [3] - 150:14, 175:22
**20-year** [1] - 189:20
**20002** [2] - 2:6, 2:13
**2002** [1] - 227:19
**2003** [1] - 73:16
**2006** [1] - 212:2
**2007** [1] - 30:5
**2008** [1] - 232:14
**201** [1] - 1:20
**2010** [4] - 102:3, 210:8, 213:12, 213:22
**2012** [3] - 12:2, 213:23, 214:13
**2014** [1] - 231:22
**2018** [1] - 62:15
**202** [1] - 4:13
**2020** [2] - 72:13, 73:16

**1506.6(a** [1] - 88:18
**1506.6(a)** [2] - 81:21, 100:17
**1508** [1] - 164:15
**155** [1] - 104:12
**15th** [4] - 2:17, 264:17, 264:24, 265:1
**16** [2] - 124:14, 189:11
**162** [1] - 4:9
**165** [1] - 99:15
**17** [7] - 4:4, 82:22, 83:2, 85:18, 87:3, 87:5, 189:11
**17-16** [1] - 76:21
**173** [1] - 4:10
**175** [1] - 4:10
**178** [1] - 4:12
**17D** [3] - 46:10, 53:5, 104:21
**184** [1] - 4:13
**18A** [1] - 123:22
**18C** [1] - 123:20
**1980s** [1] - 34:14
**1991** [1] - 34:15
**1:15** [1] - 154:18
**1:18** [1] - 154:24
**1:45** [1] - 154:22
**1:49** [1] - 155:1
**1:50** [2] - 154:22, 155:7
**1st** [2] - 265:1, 265:2

## 2021 [2] - 88:25, 210:23

**2021** [2] - 88:25, 210:23
**2022** [12] - 15:17, 17:5, 90:12, 91:19, 92:18, 94:20, 123:7, 123:8, 144:6, 144:8, 176:5
**2023** [14] - 72:13, 92:19, 94:7, 109:3, 155:16, 162:12, 162:19, 162:20, 162:25, 170:3, 175:17, 194:5
**2024** [2] - 1:10, 16:17
**2030** [1] - 65:24
**2045** [3] - 20:3, 22:14, 72:15
**207** [1] - 4:12
**213** [1] - 4:13
**215** [1] - 4:13
**217** [1] - 4:15
**22** [1] - 106:3
**22,000** [2] - 123:13, 123:16
**225** [1] - 30:5
**23** [9] - 76:7, 82:3, 94:20, 106:1, 123:8, 130:9, 130:10, 164:25, 173:19
**230** [1] - 4:16
**234** [1] - 30:5
**236** [1] - 4:16
**239** [1] - 4:18
**23rd** [1] - 105:4
**241** [2] - 4:19, 4:19
**245** [1] - 4:20
**247** [1] - 4:22
**25** [4] - 79:24, 137:6, 212:8, 227:19
**2500** [1] - 101:18
**252** [1] - 4:22
**255** [1] - 4:23
**259** [2] - 63:8, 126:24
**25th** [1] - 123:9
**26** [3] - 5:11, 5:20, 170:3
**27** [1] - 152:16
**28** [5] - 5:10, 5:14, 5:16, 5:17, 5:20
**2867** [2] - 16:23, 16:25
**2:23-cv-03885-LMG-LDW** [1] - 1:4
**2d** [2] - 12:1, 102:2

## 3

**3** [1] - 35:11
**3,000** [1] - 16:12
**30** [9] - 33:21, 111:19, 111:21, 112:22, 112:24, 113:6,

**150:2, 174:17**
**30-day** [9] - 113:22, 115:16, 115:17, 147:4, 148:13, 162:17, 162:23, 163:18, 166:1
**31st** [1] - 123:9
**34** [2] - 4:3, 65:6
**349** [1] - 35:11
**35** [3] - 79:23, 80:12, 249:20
**350** [2] - 2:22, 3:9
**357** [1] - 17:5
**365** [1] - 102:23
**36993** [1] - 38:7
**37** [1] - 124:14
**37042** [1] - 127:9
**37058** [1] - 239:13
**39** [1] - 153:25
**3:10** [1] - 215:20
**3:12** [1] - 216:8
**3:20** [1] - 216:1
**3:22** [1] - 216:8
**3d** [4] - 17:5, 30:5, 35:11, 231:21

## 4

**4** [2] - 1:10, 95:8
**4,000** [4] - 92:7, 94:22, 99:25, 103:2
**4,000-page** [2] - 99:8, 99:19
**40** [17] - 29:17, 29:18, 29:20, 60:14, 66:1, 79:8, 81:20, 84:9, 88:17, 100:17, 130:23, 164:15, 186:21, 191:5, 216:24, 217:11, 263:5
**40615** [2] - 173:9, 174:2
**40844** [1] - 155:21
**41** [1] - 4:3
**42** [1] - 64:18
**43** [1] - 168:15
**44** [20] - 99:8, 99:10, 99:18, 100:3, 101:6, 102:21, 110:25, 111:10, 112:19, 112:22, 112:25, 113:15, 113:19, 113:23, 113:24, 115:16, 148:14, 149:4, 150:15, 150:24
**44-day** [5] - 103:13, 111:15, 111:17, 112:18, 116:5

**45** [6] - 79:9, 99:14, 149:5, 150:7, 231:21, 245:16
**45-day** [1] - 116:19
**46** [1] - 99:15
**464** [1] - 212:1
**477** [2] - 30:4, 231:21
**48** [1] - 207:19
**48,000-page** [1] - 99:24
**49** [1] - 207:19
**495** [1] - 16:18
**4:05** [1] - 246:10
**4:10** [2] - 246:8, 246:10
**4:30** [1] - 216:4
**4:38** [1] - 266:7
**4th** [2] - 2:13, 227:19

**5**

**5** [3] - 92:19, 94:7, 216:4
**50** [7] - 22:7, 51:6, 51:7, 65:17, 65:24, 150:8, 150:10
**50,000** [1] - 150:13
**50-page** [1] - 257:22
**501(c)(3** [1] - 95:18
**501(c)(3)s** [1] - 96:3
**52** [1] - 4:3
**520** [1] - 11:25
**53** [1] - 4:3
**538** [1] - 232:14
**55** [1] - 4:3
**56** [2] - 3:5, 4:6
**560** [1] - 2:17
**58** [1] - 4:6
**5th** [1] - 3:19

**6**

**6** [2] - 68:5, 69:1
**60** [2] - 15:21, 79:8
**60th** [1] - 19:1
**61** [1] - 239:13
**630** [1] - 17:4
**63rd** [1] - 2:22
**649** [1] - 227:19
**65** [2] - 4:7, 99:15
**66th** [2] - 54:6, 54:17
**674** [1] - 102:2
**685** [1] - 126:24

**7**

**7** [1] - 4:3
**70** [1] - 75:7
**70,000** [1] - 123:12, 150:12

**71** [1] - 4:7
**72-year** [1] - 10:20
**7328** [1] - 46:10
**74** [3] - 112:6, 112:8, 112:20
**75** [2] - 65:14, 244:12
**771.109** [1] - 76:7
**771.111(e** [1] - 82:3
**771.119(d** [1] - 130:9
**771.119(h** [1] - 130:10
**776-7710** [1] - 1:23
**7768** [1] - 176:8
**783** [1] - 102:2

**8**

**8.1** [1] - 68:2
**80** [1] - 4:9
**808** [2] - 34:10, 34:14
**80th** [2] - 54:4, 54:17
**83** [2] - 16:23, 16:24
**852** [2] - 34:10, 34:14
**869** [1] - 107:2
**881** [1] - 12:1

**9**

**90** [1] - 32:7
**90th** [13] - 9:14, 23:9, 23:14, 23:15, 25:11, 25:12, 26:3, 47:1, 53:23, 54:9, 54:16, 251:6
**93** [3] - 186:22, 191:5, 205:13
**93114** [1] - 189:11
**938** [1] - 35:11
**952** [1] - 15:21
**954** [1] - 35:11
**970** [1] - 2:9
**973** [1] - 1:23
**98** [1] - 207:23
**9:30** [1] - 78:20
**9:32** [1] - 1:11
**9th** [1] - 176:8

**A**

**A-minus** [1] - 67:12
**a.m** [5] - 1:11, 55:25, 80:4
**ability** [4] - 92:3, 173:15, 212:4, 244:15
**able** [8] - 6:4, 65:20, 78:23, 79:25, 150:14, 155:14, 201:3, 202:5
**above-entitled** [1] - 266:12

**absent** [1] - 144:18
**absolute** [3] - 82:9, 115:9, 176:24
**absolutely** [18] - 26:18, 43:22, 45:20, 48:18, 49:5, 59:9, 72:20, 74:10, 105:18, 112:10, 128:19, 141:19, 182:1, 197:11, 217:10, 220:7, 220:22, 223:17
**abuse** [2] - 133:17, 222:2
**abusive** [1] - 240:2
**accept** [10] - 131:18, 131:20, 133:9, 143:18, 159:25, 174:18, 176:23, 176:24, 177:4, 208:5
**acceptable** [1] - 34:24
**accepted** [2] - 124:14, 218:19
**accepting** [1] - 67:10
**Access** [1] - 235:14
**access** [5] - 18:11, 19:8, 165:8, 167:17, 176:9
**accommodate** [1] - 157:25
**accomplished** [1] - 76:8
**accordance** [4] - 12:9, 165:5, 191:3, 222:3
**accorded** [1] - 263:17
**according** [1] - 45:2
**account** [2] - 157:12, 184:2
**accounted** [1] - 229:12
**accrue** [1] - 75:3
**accurate** [2] - 15:18, 118:7
**accuse** [1] - 180:7
**achieve** [1] - 144:11
**achieves** [1] - 76:10
**acknowledge** [1] - 8:14
**acknowledged** [2] - 141:20, 167:14
**acknowledges** [1] - 170:10
**acknowledging** [2] - 18:4, 171:12
**acknowledgment** [1] - 168:2
**acronym** [1] - 53:5
**Act** [20] - 4:11, 118:2, 178:12, 178:24, 179:1, 179:8, 181:6,

182:23, 183:8, 184:3, 202:6, 204:1, 205:7, 209:12, 211:23, 219:1, 253:10, 258:21, 258:24
**act** [4] - 133:9, 165:4, 221:13, 221:15
**ACT** [1] - 71:10
**acted** [1] - 243:5
**acting** [3] - 65:10, 67:19, 70:10
**action** [15] - 17:7, 36:3, 44:6, 82:4, 193:25, 212:5, 221:24, 222:1, 222:9, 233:14, 233:19, 235:17, 240:9, 248:19, 256:10
**ACTION** [1] - 1:3
**Action** [5] - 3:7, 3:7, 3:10, 3:12
**actions** [2] - 48:9, 89:19
**actively** [2] - 153:18, 244:24
**activities** [3] - 76:22, 77:6, 187:6
**actual** [13] - 22:5, 185:6, 201:6, 202:18, 206:25, 218:7, 218:15, 218:16, 223:11, 224:3, 228:5, 241:21, 254:18
**ad** [1] - 185:25
**ADA** [2] - 75:7, 253:23
**ADA-compliant** [1] - 253:23
**adapt** [1] - 78:4
**adaptive** [6] - 77:6, 77:14, 78:5, 167:16, 167:21, 177:19
**adaptively** [1] - 77:20
**add** [4] - 32:13, 53:19, 53:20, 137:19
**added** [1] - 104:18
**adding** [3] - 15:14, 42:17, 234:3
**addition** [2] - 74:13, 147:23
**additional** [14] - 7:17, 18:11, 22:11, 22:13, 27:14, 27:20, 30:13, 38:25, 39:1, 59:15, 234:15, 257:12, 261:21, 263:13
**additive** [1] - 125:6
**address** [21] - 6:3,

6:21, 25:25, 30:7, 48:6, 77:1, 91:7, 130:2, 130:16, 136:21, 137:9, 137:11, 145:6, 160:2, 160:14, 194:8, 194:23, 223:22, 243:16, 251:24
**addressed** [8] - 128:12, 136:16, 143:10, 150:17, 151:22, 152:1, 153:9, 193:23
**addresses** [1] - 149:13
**addressing** [1] - 11:3
**adds** [1] - 49:6
**adequacy** [1] - 238:6
**adequate** [3] - 156:7, 157:1, 237:4
**adequately** [8] - 30:7, 32:19, 63:10, 86:13, 104:24, 128:8, 128:15, 219:4
**adjourn** [1] - 264:16
**adjourned** [1] - 266:7
**adjust** [3] - 77:18, 78:7
**adjustments** [2] - 55:23, 177:23
**administering** [1] - 118:2
**Administration** [13] - 15:24, 16:17, 81:9, 83:12, 87:22, 89:7, 144:21, 172:3, 219:25, 221:12, 224:13, 232:13, 242:11
**administrative** [22] - 5:6, 6:20, 6:21, 7:11, 7:22, 13:3, 13:13, 13:23, 23:5, 24:1, 25:9, 36:21, 41:18, 57:11, 83:2, 99:24, 105:16, 133:11, 133:12, 154:10, 204:5, 258:6
**administrators** [1] - 78:7
**admirable** [1] - 254:23
**admit** [2] - 107:6, 108:4
**admits** [1] - 84:15
**admitted** [6] - 39:24, 59:19, 69:5, 107:9, 250:5
**admitting** [1] - 248:22
**admonition** [2] -

221:25, 222:13
**adopt** [3] - 36:16, 59:6, 241:3
**adopted** [2] - 64:23, 217:24
**advantage** [1] - 55:14
**adversaries** [1] - 248:24
**adverse** [7] - 26:25, 30:7, 30:8, 48:6, 48:22, 218:4, 240:6
**adversely** [2] - 48:9, 48:10
**advertised** [2] - 120:9, 239:10
**advertisements** [1] - 120:10
**advise** [4] - 6:6, 81:17, 164:3, 264:19
**advisory** [1] - 245:3
**Advisory** [2] - 95:19, 124:12
**advocating** [2] - 11:18, 91:9
**affect** [5] - 48:10, 58:17, 170:18, 244:14, 244:15
**affected** [10] - 10:5, 11:4, 58:20, 61:16, 82:4, 83:7, 208:1, 240:9, 243:24, 254:9
**affection** [1] - 247:24
**affects** [2] - 41:24, 158:3
**affirm** [1] - 216:17
**affirmance** [1] - 244:8
**affirmatively** [1] - 216:19
**affirmed** [2] - 245:8, 255:13
**afford** [1] - 80:22
**afternoon** [2] - 100:8, 244:3
**AFTERNOON** [1] - 154:25
**afterwards** [1] - 217:15
**agencies** [100] - 59:20, 64:9, 80:20, 80:22, 81:3, 81:12, 81:17, 81:23, 82:20, 82:22, 83:2, 83:3, 83:5, 83:8, 83:24, 84:17, 84:20, 84:21, 85:10, 85:12, 85:13, 85:19, 85:23, 86:1, 86:14, 86:18, 87:4, 87:5, 87:12, 87:16, 88:2, 88:4, 88:10, 88:11, 88:20, 90:1, 90:4,

92:4, 92:17, 92:20, 93:17, 94:9, 94:15, 95:10, 96:2, 117:23, 118:20, 119:2, 119:5, 121:19, 124:19, 127:7, 127:10, 127:19, 128:21, 128:24, 129:1, 129:13, 129:16, 137:15, 137:17, 137:18, 137:22, 138:6, 138:16, 139:7, 140:1, 140:3, 140:4, 140:8, 140:11, 141:9, 146:3, 150:16, 152:8, 152:23, 152:24, 153:1, 153:6, 153:8, 153:19, 153:20, 157:14, 164:2, 168:13, 168:16, 168:17, 168:19, 168:20, 169:5, 186:15, 190:23, 196:1, 222:12, 232:6, 232:8
**Agencies** [1] - 117:1
**Agency** [1] - 169:21
**agency** [120] - 15:20, 16:11, 16:12, 21:7, 28:15, 29:24, 31:4, 31:14, 35:12, 36:21, 36:24, 36:25, 37:6, 60:24, 62:2, 64:19, 67:24, 70:23, 80:17, 81:10, 83:22, 84:10, 84:12, 86:5, 90:16, 95:17, 95:23, 97:22, 100:11, 105:16, 106:22, 107:20, 118:1, 118:5, 118:6, 118:10, 118:18, 119:12, 119:15, 119:21, 120:22, 121:24, 121:25, 126:12, 126:16, 127:12, 129:7, 129:11, 130:10, 130:24, 131:7, 131:25, 132:7, 133:21, 134:5, 135:7, 135:17, 145:18, 151:25, 153:19, 160:2, 160:8, 160:10, 160:13, 160:14, 160:24, 160:25, 161:5, 163:3, 164:22, 169:3, 169:15, 193:23,

194:7, 194:12, 194:13, 194:19, 195:25, 196:1, 196:4, 196:12, 196:15, 197:4, 203:25, 210:18, 211:9, 211:22, 215:4, 220:16, 221:23, 222:1, 223:5, 224:9, 224:18, 224:23, 225:7, 227:21, 228:11, 231:24, 232:15, 232:17, 232:22, 233:2, 233:3, 233:8, 233:14, 233:19, 235:16, 237:1, 238:2, 240:9, 243:1, 243:2, 252:20, 254:10, 254:21, 256:10
**agency's** [10] - 12:7, 15:17, 34:2, 34:6, 36:12, 84:16, 240:2, 248:19, 255:22, 256:16
**agenda** [1] - 92:24
**ago** [8] - 16:16, 27:14, 34:3, 64:24, 83:11, 172:7, 227:19, 248:17
**agree** [13] - 50:11, 66:10, 82:7, 102:17, 107:25, 108:24, 117:3, 133:20, 141:20, 158:14, 237:2, 238:4, 240:17
**agreed** [1] - 33:12
**agreement** [4] - 15:8, 84:12, 154:1, 235:5
**ahead** [9] - 13:6, 19:4, 24:17, 117:20, 173:5, 204:17, 210:22, 249:7, 251:13
**aid** [2] - 260:12, 261:2
**aided** [1] - 1:24
**Air** [19] - 4:11, 14:20, 118:2, 178:12, 178:24, 179:1, 179:8, 181:6, 182:23, 183:8, 184:3, 202:6, 204:1, 205:6, 209:12, 211:23, 219:1, 258:21, 258:24
**air** [52] - 5:23, 11:6, 11:14, 14:17, 19:9, 19:14, 20:1, 33:25,

35:5, 36:23, 38:9, 38:13, 38:16, 40:19, 43:5, 43:22, 48:19, 48:21, 49:1, 57:5, 58:17, 65:20, 71:16, 72:7, 72:9, 72:19, 89:22, 104:3, 118:6, 141:3, 158:7, 158:8, 179:12, 193:7, 193:12, 195:9, 197:2, 197:25, 201:25, 205:16, 211:24, 212:7, 215:1, 218:4, 226:6, 244:6, 244:14, 246:7, 253:8
**air-quality** [2] - 11:14, 14:17
**Airport** [1] - 18:11
**al** [2] - 1:3, 1:7
**alert** [3] - 106:4, 151:25, 194:12
**ALEX** [1] - 2:8
**alleged** [1] - 157:9
**allegedly** [1] - 157:3
**Alliance** [6] - 3:8, 3:12, 96:19, 97:8, 97:14, 124:20
**alliance** [5] - 95:15, 96:11, 96:17, 96:25, 97:9
**Allied** [3] - 3:6, 231:19, 232:3
**allocated** [1] - 238:8
**allotted** [1] - 115:10
**allow** [4] - 51:16, 51:17, 151:15, 242:3
**allowed** [4] - 125:21, 136:20, 149:17, 244:12
**allowing** [1] - 65:5
**allows** [3] - 84:9, 147:3, 233:14
**almost** [5] - 22:22, 66:1, 123:12, 155:15, 257:21
**alone** [4] - 68:5, 97:2, 206:20, 225:21
**Alone** [1] - 225:20
**alternative** [1] - 70:17
**alternatives** [9] - 70:12, 70:14, 157:10, 218:19, 223:11, 224:5, 241:20, 254:16
**ambient** [4] - 35:5, 48:21, 201:25, 205:15
**Ambient** [1] - 14:20
**ambush** [1] - 178:8

**ameliorate** [1] - 218:14
**amended** [1] - 253:11
**American** [1] - 17:4
**Americas** [2] - 1:16, 3:15
**amici** [1] - 56:7
**Amici** [11] - 4:5, 4:17, 7:4, 55:23, 65:6, 65:9, 215:22, 238:15, 241:2, 241:25, 255:13
**Amicus** [4] - 3:6, 3:16, 3:20, 239:8
**ammunition** [1] - 222:12
**amount** [19] - 26:6, 51:8, 57:19, 68:8, 90:1, 90:25, 101:13, 101:17, 111:5, 111:24, 111:25, 112:17, 113:11, 183:22, 227:21, 245:1, 249:24, 264:1, 265:5
**ample** [1] - 18:25
**amplified** [1] - 23:3
**amplify** [1] - 225:15
**analogous** [1] - 11:22
**analogy** [1] - 67:12
**analyses** [10] - 11:16, 38:11, 39:1, 188:22, 196:16, 199:6, 199:9, 204:2, 215:4
**Analysis** [7] - 38:13, 45:4, 45:20, 48:2, 49:2, 49:3, 51:4
**analysis** [117] - 11:14, 11:20, 12:8, 12:9, 12:12, 14:17, 14:21, 18:21, 34:20, 35:7, 36:2, 37:14, 38:16, 38:17, 39:1, 39:8, 39:10, 39:14, 39:20, 39:21, 39:22, 40:5, 40:6, 40:18, 40:24, 41:25, 43:23, 44:9, 48:7, 48:19, 49:1, 51:11, 54:8, 60:15, 103:21, 103:22, 104:4, 104:9, 104:13, 140:25, 141:1, 143:3, 181:4, 181:17, 184:1, 185:22, 186:3, 186:17, 187:6, 187:13, 187:15, 187:18, 188:5, 188:23, 191:10, 192:8, 193:9,

193:18, 194:1,
194:5, 194:13,
194:22, 194:25,
195:8, 195:11,
195:14, 196:24,
197:20, 198:8,
198:9, 198:22,
200:2, 200:8,
200:10, 200:19,
200:24, 201:3,
201:7, 201:13,
202:2, 204:20,
204:25, 205:10,
205:13, 205:14,
205:25, 206:4,
206:20, 207:20,
207:24, 208:6,
208:11, 208:15,
208:16, 209:10,
209:13, 209:15,
209:16, 210:6,
210:10, 210:25,
214:13, 214:25,
223:4, 225:25,
226:6, 227:24,
227:25, 238:5,
254:16, 254:24,
255:7
**analytical** [1] - 230:13
**analyze** [1] - 190:19
**analyzed** [3] - 15:10,
38:23, 207:23
**analyzing** [2] - 200:16,
226:12
**ANDREW** [1] - 3:15
**anew** [3] - 186:10,
227:12, 229:3
**angering** [1] - 178:2
**announce** [1] - 100:25
**annual** [2] - 39:12,
45:5
**annually** [1] - 16:13
**anomalies** [1] - 19:25
**answer** [25] - 14:25,
15:5, 34:8, 52:11,
52:12, 52:18, 53:7,
57:20, 63:2, 101:10,
105:7, 107:23,
147:8, 153:14,
155:13, 179:15,
182:11, 198:15,
199:2, 225:12,
225:16, 226:21,
234:8, 241:10
**answered** [4] - 28:4,
28:6, 78:16, 202:10
**answering** [3] - 31:22,
31:25, 264:4
**answers** [2] - 6:4,
123:25

**anticipate** [2] -
104:14, 203:19
**antithesis** [1] - 70:2
**anyplace** [1] - 218:16
**anyway** [1] - 227:5
**APA** [1] - 221:22
**apologies** [2] - 115:4,
222:21
**apologize** [6] -
112:13, 114:3,
174:7, 183:19,
241:12, 246:19
**apology** [1] - 263:24
**Apoyo** [1] - 231:20
**apparent** [1] - 250:13
**appeal** [2] - 64:7,
213:1
**Appeals** [1] - 149:14
**appear** [2] - 46:1, 96:2
**appearance** [1] -
247:23
**appeared** [1] - 5:24
**appendices** [2] -
100:1, 123:24
**Appendix** [1] - 201:7
**appendix** [5] - 46:10,
53:5, 104:21,
123:20, 123:22
**apples** [1] - 242:7
**apples-and-oranges**
[1] - 242:7
**applicable** [6] - 29:23,
39:16, 133:3, 206:9,
214:16, 256:2
**applicant** [1] - 82:5
**application** [2] -
100:22, 101:1
**applications** [1] -
100:24
**applied** [7] - 32:9,
128:1, 128:2, 128:3,
143:16, 208:12,
231:20
**applies** [1] - 232:3
**apply** [5] - 27:3, 97:15,
164:25, 203:23,
204:5
**applying** [2] - 32:10,
102:3
**appreciate** [26] - 7:24,
14:24, 16:8, 18:2,
29:1, 32:25, 33:1,
33:7, 41:4, 52:14,
103:3, 114:2,
114:21, 137:3,
172:20, 172:24,
207:6, 212:21,
212:22, 231:1,
242:6, 247:5,
255:21, 258:12,

263:16
**appreciated** [2] -
247:9, 253:1
**appreciation** [1] -
252:22
**appreciative** [2] -
264:3, 266:2
**approach** [4] - 6:2,
70:2, 230:12, 257:14
**appropriate** [23] - 6:5,
8:5, 37:7, 50:7,
51:11, 52:18, 144:1,
150:9, 158:24,
220:8, 222:7,
231:18, 231:23,
232:4, 232:21,
233:11, 233:21,
234:4, 234:21,
237:13, 248:13,
259:4, 262:12
**appropriately** [3] -
6:6, 8:15, 185:16
**approval** [3] - 40:23,
77:11, 165:3
**approve** [2] - 168:2,
178:25
**approved** [4] - 40:19,
143:3, 151:5, 253:12
**April** [1] - 1:10
**aptly** [1] - 60:13
**arbitrarily** [1] - 32:12
**arbitrariness** [2] -
20:11, 20:22
**arbitrary** [19] - 19:18,
20:15, 20:20, 26:5,
26:22, 90:10, 99:11,
133:16, 133:20,
218:6, 218:22,
219:4, 222:2, 226:1,
236:17, 236:21,
237:5, 237:16,
249:13
**area** [34] - 5:18, 9:10,
14:12, 14:14, 18:18,
34:1, 35:19, 36:4,
39:11, 39:14, 41:24,
43:5, 44:17, 47:12,
49:23, 50:4, 50:7,
54:13, 70:1, 71:12,
73:9, 73:10, 73:13,
73:18, 84:25, 119:3,
125:12, 183:1,
188:20, 193:20,
194:17, 194:23,
197:15, 197:25
**areas** [12] - 58:20,
72:12, 105:6,
105:23, 177:24,
196:16, 199:24,
211:1, 226:12,

237:21, 244:4, 244:5
**Argiculas** [1] - 231:21
**arguably** [4] - 133:16,
171:5, 172:15
**argue** [2] - 99:10,
142:20
**argued** [6] - 40:2,
66:7, 69:20, 70:15,
136:19, 177:15
**argues** [3] - 49:19,
67:18, 239:8
**arguing** [17] - 20:10,
21:16, 32:24, 33:5,
33:8, 33:10, 57:13,
67:16, 70:9, 70:11,
136:23, 161:16,
168:6, 175:7,
181:19, 188:9,
188:10
**ARGUMENT** [1] - 1:5
**argument** [60] - 6:1,
6:15, 6:16, 6:22,
13:5, 20:17, 31:12,
46:17, 55:23, 58:12,
65:16, 67:4, 67:10,
68:17, 73:22, 84:14,
88:9, 91:9, 94:17,
96:5, 99:22, 99:23,
101:8, 101:13,
104:24, 114:1,
143:20, 144:13,
150:21, 150:23,
161:11, 178:21,
179:21, 180:6,
180:15, 180:17,
180:18, 180:22,
181:3, 181:14,
182:24, 183:9,
183:15, 183:19,
184:21, 190:18,
190:22, 193:17,
200:11, 203:8,
215:2, 227:7,
242:23, 243:7,
243:17, 243:23,
259:16, 259:20,
263:14
**arguments** [32] - 21:1,
34:5, 46:1, 56:22,
56:24, 59:6, 60:7,
60:8, 69:10, 103:15,
163:6, 166:22,
179:12, 179:25,
180:3, 182:5,
182:21, 186:18,
191:1, 191:2,
203:18, 215:22,
215:24, 217:21,
240:18, 242:18,
243:4, 246:3, 255:2,

256:1, 258:9
**arises** [1] - 259:5
**Army** [2] - 30:4, 102:2
**arose** [2] - 123:25,
186:10
**arrive** [1] - 58:22
**art** [3] - 238:25, 239:1
**artificial** [1] - 222:19
**aside** [5] - 24:13,
36:23, 221:23,
255:2, 260:22
**aspect** [3] - 43:24,
49:7, 140:9
**aspects** [1] - 199:3
**assert** [2] - 94:13,
154:3
**asserted** [1] - 58:10
**asserting** [1] - 94:3
**assertion** [1] - 157:23
**assess** [3] - 34:5,
35:17, 77:16
**assessed** [6] - 15:11,
15:12, 16:22, 16:23,
34:11, 34:21
**assessment** [18] -
23:4, 25:14, 32:8,
57:2, 58:4, 72:17,
77:5, 77:12, 94:22,
123:21, 158:9,
185:21, 194:4,
201:8, 219:13,
220:3, 240:16,
253:14
**associated** [3] - 42:5,
92:10, 93:22
**Association** [2] - 3:10,
17:4
**assume** [9] - 23:22,
41:5, 84:3, 101:17,
125:8, 151:17,
200:10, 200:14,
241:6
**assuming** [5] - 50:18,
172:1, 191:13,
236:15, 237:15
**attach** [1] - 144:18
**attainment** [1] - 208:4
**attempt** [1] - 213:8
**attempting** [1] -
111:24
**attention** [11] - 46:24,
109:22, 115:2,
115:3, 115:20,
132:7, 144:20,
145:10, 178:12,
183:22, 242:20
**ATTORNEY** [1] -
56:12
**ATTORNEY'S** [3] -
2:3, 2:8, 2:11

attractive [1] - 74:22
August [5] - 91:19, 92:18, 123:7, 123:9
Austin [1] - 15:13
authority [12] - 29:23, 30:13, 31:3, 31:11, 31:14, 31:19, 31:20, 32:1, 32:3, 169:5, 173:13, 256:3
Authority [7] - 67:24, 69:19, 86:11, 117:25, 118:14, 168:25, 169:2
automatically [1] - 75:5
avail [3] - 121:5, 176:2, 178:6
availability [49] - 107:13, 107:17, 107:22, 108:9, 129:17, 130:14, 131:8, 131:10, 131:14, 131:16, 131:19, 131:23, 132:13, 133:25, 135:10, 135:15, 143:22, 145:7, 145:11, 145:12, 145:14, 145:17, 145:25, 146:1, 146:15, 147:4, 147:11, 148:4, 148:5, 151:14, 159:14, 162:11, 162:14, 162:18, 162:23, 163:24, 164:4, 165:7, 165:19, 165:23, 165:24, 166:4, 166:20, 170:5, 174:23, 176:12, 176:14, 176:15
available [18] - 15:5, 15:18, 55:14, 57:23, 66:3, 67:14, 82:23, 83:1, 98:6, 107:12, 121:7, 124:6, 129:20, 163:15, 185:25, 186:1, 239:15, 245:1
Avenue [5] - 1:16, 2:17, 2:22, 3:5, 3:15
avenues [1] - 123:19
average [3] - 44:15, 45:5, 57:5
avert [2] - 180:16, 181:13
avoid [3] - 30:2, 61:13, 151:10
avoiding [1] - 255:10

aware [15] - 85:17, 89:11, 92:24, 97:6, 110:5, 110:8, 110:24, 115:19, 116:2, 126:11, 140:10, 170:12, 234:10, 234:11, 239:25

**B**

back-ending [1] - 21:2
background [1] - 40:11
bantering [1] - 264:5
bar [1] - 64:5
barred [3] - 177:3, 243:3, 243:7, 243:8
base [3] - 34:5, 72:13, 228:2
based [34] - 8:23, 9:15, 11:8, 25:15, 29:25, 36:17, 46:14, 57:14, 60:24, 77:17, 83:1, 92:24, 97:6, 104:23, 161:20, 163:19, 167:19, 179:6, 205:25, 206:19, 215:14, 219:6, 229:10, 236:9, 237:20, 242:24, 249:18, 256:1, 256:4, 257:20, 260:24, 261:1, 261:11
basic [2] - 93:2, 130:20
basing [1] - 177:13
basis [15] - 11:23, 40:16, 43:6, 45:23, 116:1, 116:20, 135:19, 153:15, 189:2, 190:21, 190:24, 215:5, 215:6, 217:20, 217:21
basket [1] - 35:2
bat [1] - 249:21
Bates [1] - 94:20
battery [1] - 19:2
battles [1] - 71:15
Bay [4] - 68:6, 68:13, 68:25, 242:9
Bayonne [14] - 24:11, 24:19, 47:2, 47:11, 47:14, 66:17, 66:18, 66:20, 66:21, 66:22, 66:24, 68:3, 218:10
became [1] - 88:24
becomes [2] - 161:13,

199:5
beef [3] - 61:20, 61:21, 76:14
beforehand [2] - 106:9, 265:8
began [2] - 7:14, 123:6
begin [9] - 94:4, 114:15, 155:10, 162:19, 162:24, 184:20, 203:7, 204:12, 241:12
beginning [4] - 33:24, 113:4, 154:19, 182:20
behalf [6] - 56:7, 170:25, 246:25, 247:5, 253:1, 255:24
behave [1] - 36:21
behind [2] - 13:8, 33:6
belabor [2] - 230:16, 238:5
belief [1] - 41:20
believes [1] - 83:20
below [1] - 30:19
bench [5] - 64:2, 64:5, 114:6, 185:3, 261:10
benchmark [1] - 91:6, 100:25, 101:16, 112:4, 145:8, 149:3
benchmarks [5] - 98:7, 100:18, 128:1, 211:10
benefit [16] - 11:9, 46:22, 47:16, 60:10, 65:13, 65:19, 66:12, 66:20, 67:6, 73:1, 75:12, 114:16, 115:2, 182:16, 232:15, 253:16
benefits [6] - 53:25, 74:24, 75:2, 75:4, 253:9, 253:12
BERGEN [1] - 3:18
Bergen [49] - 3:8, 3:19, 3:20, 19:15, 39:9, 56:21, 57:4, 57:9, 57:15, 57:17, 57:19, 57:24, 58:1, 58:19, 59:2, 59:11, 59:17, 59:18, 59:24, 61:1, 61:15, 61:19, 67:8, 72:20, 75:24, 76:5, 76:11, 76:23, 215:12, 218:10, 238:22, 238:23, 239:8, 239:9, 239:11, 239:14, 239:15, 239:17, 239:19, 239:20,

239:21, 240:6, 240:8, 240:13, 240:14, 243:24, 253:15
Bering [1] - 102:6
beseech [1] - 252:5
beside [1] - 43:2
best [11] - 5:12, 40:1, 65:10, 66:3, 77:18, 114:21, 127:21, 264:15, 264:21, 264:23
better [5] - 66:16, 115:11, 174:19, 204:6, 244:5
Better [1] - 3:9
between [37] - 16:18, 19:16, 19:17, 25:10, 42:1, 46:13, 92:12, 92:16, 93:4, 93:6, 93:9, 94:13, 103:24, 106:13, 108:2, 108:10, 109:13, 117:4, 123:9, 124:5, 126:8, 129:13, 130:7, 132:15, 136:16, 137:17, 138:8, 141:24, 156:5, 156:24, 158:17, 167:6, 170:2, 188:9, 188:11, 205:20, 261:14
beyond [5] - 14:22, 144:17, 179:22, 237:24, 254:25
biased [1] - 255:7
big [3] - 41:23, 236:16, 262:13
BII [1] - 3:11
Bike [4] - 3:8, 3:8, 3:10, 3:13
billion [10] - 27:4, 67:25, 68:2, 68:24, 69:1, 69:21, 70:5, 70:14, 218:20, 241:22
billions [1] - 68:12
Biological [1] - 232:12
bit [19] - 5:24, 9:2, 10:16, 65:1, 92:8, 97:25, 117:25, 188:15, 208:7, 213:2, 216:11, 220:13, 221:9, 223:15, 243:11, 254:2, 262:25, 263:11, 263:19
bite [2] - 185:2, 185:4
black [1] - 85:5

blanks [3] - 23:22, 24:8, 24:16
blow [2] - 243:20, 260:10
blow-ups [1] - 260:10
blown [1] - 141:20
BlueWaveNJ [1] - 3:10
board [3] - 61:24, 210:1, 265:17
Board [2] - 71:13, 77:16
body [1] - 172:6
boils [1] - 67:5
bold [1] - 104:21
boot [1] - 26:4
boots [1] - 125:14
boots-on-the-ground [1] - 125:14
Bordentown [5] - 30:17, 62:5, 62:8, 62:23, 63:23
border [7] - 22:4, 196:5, 196:8, 196:13, 197:10, 210:24, 211:1
borders [1] - 212:17
bottom [6] - 58:23, 58:25, 161:16, 189:5, 190:12, 192:11, 192:14, 198:7
bottom-part [1] - 190:12
bounds [6] - 20:16, 20:18, 134:15, 135:13, 257:4, 257:5
bow [1] - 142:24
box [3] - 42:20, 85:5, 98:8
boxes [3] - 98:12, 98:15, 98:17
boy [2] - 61:18, 258:22
branch [1] - 84:2
breached [1] - 61:9
breadth [1] - 141:18
break [9] - 55:22, 80:2, 80:9, 87:10, 138:25, 215:25, 246:7, 263:12
breakdown [1] - 104:22
breath [2] - 184:24, 223:14
breathe [1] - 65:20
breathes [1] - 244:14
breathtaking [1] - 67:15
brethren [1] - 64:2
brevity [2] - 180:6,

212:22
**Bridge** [8] - 39:5, 39:11, 44:21, 44:22, 68:6, 68:25, 242:9, 244:1
**bridge** [2] - 68:7, 69:17
**bridges** [1] - 68:7
**brief** [26] - 11:25, 13:4, 29:10, 32:6, 127:9, 127:18, 149:16, 153:25, 155:11, 178:18, 179:13, 179:21, 179:22, 179:23, 181:24, 182:13, 213:8, 227:16, 236:1, 239:7, 239:8, 240:25, 241:25, 244:23, 257:6
**briefed** [1] - 236:18
**briefing** [8] - 8:8, 84:15, 88:3, 88:25, 90:13, 94:9, 129:21
**briefings** [1] - 88:21
**briefly** [4] - 17:23, 18:3, 106:17, 243:15
**briefs** [9] - 86:11, 98:24, 99:7, 137:1, 186:15, 203:19, 257:22, 258:9, 264:4
**bring** [4] - 43:2, 132:6, 144:20, 200:9
**bringing** [5] - 13:5, 168:1, 175:13, 201:12, 242:7
**brings** [1] - 113:15
**broad** [2] - 29:2, 71:9
**Broad** [1] - 2:9
**broader** [3] - 47:4, 209:13, 209:15
**broker** [1] - 230:5
**Bronx** [10] - 57:12, 59:11, 59:14, 69:25, 249:20, 249:21, 250:15, 250:16, 250:17, 250:20
**brought** [6] - 115:19, 145:10, 168:24, 170:21, 200:17, 200:18
**BRUCE** [1] - 1:19
**bucket** [2] - 87:6, 87:18
**buckets** [1] - 70:24
**budgets** [1] - 205:6
**build** [3] - 68:6, 176:21, 225:10
**building** [2] - 69:25, 265:17

**built** [1] - 14:15
**bulk** [1] - 242:4
**bunch** [5] - 72:7, 78:6, 96:11, 166:25
**burden** [5] - 35:18, 54:5, 54:7, 84:18, 153:22
**Burden** [1] - 10:14
**burdened** [1] - 51:22
**burdens** [21] - 9:5, 9:9, 9:10, 9:13, 10:3, 11:2, 11:5, 23:9, 35:19, 46:25, 47:1, 47:12, 47:13, 47:24, 49:7, 49:9, 51:23, 51:24, 52:5, 53:24
**buses** [2] - 66:5, 129:15
**business** [9] - 22:1, 22:7, 22:12, 22:15, 65:19, 73:11, 73:14, 260:8, 263:25
**Buttigieg** [1] - 129:22
**BY** [21] - 1:15, 1:16, 1:19, 1:19, 2:4, 2:5, 2:8, 2:12, 2:16, 2:16, 2:17, 2:21, 2:21, 3:4, 3:15, 3:18, 4:2, 4:9, 4:12, 4:18, 4:21

## C

**cameras** [1] - 247:23
**candidly** [2] - 217:7, 264:8
**cannot** [12] - 59:2, 60:1, 60:2, 60:3, 61:9, 61:14, 61:16, 131:14, 166:11, 234:6, 241:20, 255:3
**capacity** [1] - 68:7
**capital** [4] - 65:19, 218:21, 236:16, 253:22
**capitalized** [1] - 234:18
**capricious** [7] - 133:16, 218:22, 219:4, 222:2, 236:17, 237:5, 237:16
**capriciousness** [1] - 236:21
**capturing** [1] - 103:19
**carbon** [2] - 39:22, 187:15
**care** [3] - 5:7, 63:18, 180:21
**careful** [1] - 97:18
**carefully** [1] - 114:18

**carpooling** [1] - 70:16
**carry** [2] - 99:5, 199:22
**cars** [2] - 66:5, 74:23
**carveout** [1] - 141:19
**case** [93] - 11:19, 11:24, 12:4, 12:7, 12:8, 12:12, 12:13, 13:17, 14:13, 15:6, 17:4, 21:16, 23:23, 30:4, 30:17, 31:8, 34:9, 34:25, 35:2, 39:8, 41:21, 42:18, 43:2, 54:2, 55:17, 58:11, 62:6, 62:12, 62:14, 62:16, 62:23, 63:13, 63:23, 64:9, 64:14, 99:23, 101:12, 101:15, 102:6, 102:9, 106:20, 106:25, 107:3, 115:19, 116:1, 136:11, 142:7, 147:12, 149:12, 149:15, 149:21, 150:6, 160:9, 170:19, 178:8, 179:18, 182:21, 205:16, 211:16, 211:25, 212:1, 212:13, 215:16, 217:10, 218:3, 222:4, 222:5, 222:11, 223:3, 224:16, 224:17, 227:6, 228:9, 228:13, 229:14, 231:19, 231:20, 232:12, 232:20, 235:4, 235:7, 235:11, 235:15, 235:20, 236:2, 248:17, 248:21, 259:19, 260:11, 265:22, 265:23
**case-by-case** [1] - 116:1
**cases** [19] - 11:16, 11:18, 11:23, 12:11, 34:8, 101:18, 147:9, 159:10, 159:13, 160:6, 160:19, 160:21, 161:4, 217:8, 224:6, 230:4, 231:5, 238:1, 259:21
**cat** [1] - 178:4
**categorical** [4] - 15:11, 15:20, 15:21, 97:19
**categories** [2] - 23:1,

183:2
**category** [10] - 18:24, 34:25, 47:15, 57:16, 120:3, 183:1, 183:5, 210:3, 211:4
**caught** [1] - 115:7
**causes** [1] - 98:20
**caveat** [1] - 158:19
**CBD** [14] - 14:21, 44:17, 44:24, 65:15, 72:11, 72:19, 156:3, 156:4, 156:19, 156:21, 156:23, 156:24, 164:11, 245:15
**CCR** [1] - 266:14
**CDC** [4] - 51:18, 51:23, 53:23, 54:5
**CEJST** [2] - 53:4, 54:9
**census** [21] - 9:12, 9:21, 10:2, 10:4, 10:8, 11:1, 22:18, 22:19, 22:21, 24:12, 38:16, 46:23, 47:13, 51:7, 51:20, 51:22, 54:15, 54:16, 67:7, 158:5
**Census** [1] - 46:18
**Center** [3] - 222:4, 232:12, 248:21
**center** [3] - 73:11, 73:12
**Centers** [1] - 229:14
**central** [7] - 22:1, 22:7, 22:12, 22:15, 65:18, 65:22, 73:14
**CEQ** [9] - 38:3, 38:6, 52:22, 53:3, 53:4, 53:6, 53:16, 53:21, 130:23
**CEQ's** [1] - 130:12
**certain** [11] - 26:6, 30:24, 46:18, 54:10, 85:6, 100:9, 119:1, 132:24, 206:11, 227:21, 233:8
**certainly** [12] - 36:18, 132:22, 140:10, 143:15, 156:3, 156:9, 157:3, 176:9, 183:12, 203:23, 243:9, 259:2
**certainty** [1] - 133:12
**CERTIFICATE** [1] - 266:9
**certify** [1] - 266:11
**cetera** [7] - 62:13, 141:4, 149:18, 155:19, 158:6, 228:20

**CFR** [22] - 29:17, 29:18, 29:20, 60:14, 60:16, 60:17, 61:12, 63:5, 63:7, 75:20, 76:7, 81:20, 82:3, 84:9, 88:17, 100:17, 130:9, 130:10, 130:24, 164:15, 186:21, 191:5
**chair** [1] - 150:21
**challenge** [6] - 34:19, 98:25, 99:1, 99:2, 149:20, 212:4
**challenged** [2] - 35:13, 62:12
**challenges** [3] - 12:18, 14:9, 14:10
**challenging** [7] - 11:22, 82:13, 86:13, 95:5, 112:14, 113:18, 113:19
**chambers** [1] - 101:9
**change** [10] - 54:15, 68:9, 69:4, 108:17, 156:5, 156:24, 186:7, 186:11, 251:4, 264:20
**changed** [5] - 44:1, 158:17, 166:17, 218:1, 245:15
**changes** [3] - 36:17, 75:4, 135:19
**characteristics** [3] - 34:22, 156:3, 156:23
**characterize** [1] - 158:12
**characterizing** [1] - 158:15
**charge** [1] - 169:23
**charged** [2] - 203:25, 228:22
**chart** [13] - 45:8, 45:11, 45:13, 75:17, 75:18, 82:20, 85:22, 87:4, 117:11, 117:12, 117:16, 118:12, 193:9
**charts** [3] - 59:25, 104:11, 104:21
**check** [2] - 98:8, 216:6
**checked** [4] - 98:12, 98:14, 98:15, 98:17
**chemicals** [1] - 211:21
**cherry** [2] - 256:4, 257:24
**cherry-picked** [2] - 256:4, 257:24
**CHERTOK** [116] - 2:16, 6:18, 7:3, 79:22, 79:25, 137:9,

137:11, 138:1, 138:20, 139:2, 139:4, 139:17, 139:20, 140:9, 140:15, 141:14, 141:19, 141:25, 142:9, 142:12, 142:14, 142:16, 142:20, 142:25, 143:8, 143:14, 143:19, 143:21, 144:22, 144:25, 145:2, 145:5, 145:13, 145:21, 146:3, 146:5, 146:7, 146:9, 146:12, 146:20, 146:25, 147:6, 147:9, 147:18, 147:21, 147:23, 148:3, 148:6, 148:9, 148:11, 148:18, 148:21, 148:24, 149:8, 149:11, 150:1, 150:4, 150:6, 150:23, 150:25, 151:20, 152:4, 153:4, 154:17, 155:11, 155:16, 155:18, 156:15, 156:18, 156:22, 157:19, 157:23, 158:19, 158:25, 159:2, 159:5, 159:11, 159:16, 159:20, 159:23, 160:6, 160:16, 160:20, 160:22, 160:25, 161:3, 161:9, 161:15, 161:18, 161:21, 161:25, 162:2, 175:12, 175:21, 176:1, 176:7, 177:1, 177:7, 177:12, 177:17, 178:5, 235:25, 236:7, 236:13, 237:9, 237:14, 237:19, 252:21, 253:3, 253:6, 257:19, 258:14, 258:17, 262:6, 262:20, 266:4

**Chertok** [34] - 4:10, 4:16, 4:22, 6:10, 8:4, 79:20, 137:5, 140:6, 142:22, 150:20, 155:4, 155:9, 155:15, 156:13, 157:15, 159:9, 159:12, 175:11,

176:19, 178:10, 235:24, 236:6, 237:3, 248:6, 252:14, 252:16, 252:25, 255:15, 256:24, 257:17, 258:12, 258:16, 259:21, 260:25

**child** [1] - 66:17
**choice** [4] - 21:24, 215:3, 262:16
**choices** [4] - 114:17, 115:5, 215:7, 225:24
**chomping** [1] - 221:9
**choose** [5] - 37:6, 45:3, 86:16, 114:17, 161:7
**chooses** [2] - 160:14, 233:4
**choosing** [2] - 34:25, 43:6
**chose** [6] - 87:23, 121:5, 140:17, 153:18, 161:9, 168:16
**chosen** [4] - 19:14, 45:6, 51:17, 140:17
**chronic** [20] - 9:8, 9:13, 10:9, 11:2, 11:5, 23:8, 23:15, 25:12, 26:3, 32:7, 46:25, 47:7, 47:13, 51:24, 52:4, 52:7, 53:24, 54:7, 251:6, 251:13
**Chronic** [1] - 10:14
**chuckle** [1] - 230:23
**circle** [2] - 21:19, 233:17
**circles** [1] - 64:25
**Circuit** [29] - 30:5, 30:17, 34:3, 35:10, 35:15, 36:12, 36:15, 36:19, 36:22, 58:14, 62:6, 102:4, 102:5, 106:21, 106:24, 126:22, 127:18, 149:15, 149:19, 212:2, 222:7, 227:18, 231:20, 232:12, 232:14, 234:3, 235:12, 248:16, 256:11
**circuit** [3] - 147:19, 222:11, 231:19
**circuits** [1] - 231:18
**circular** [1] - 258:15
**circumstance** [1] - 43:25, 116:20, 133:18, 214:16,

229:21, 234:23, 240:2
**circumstances** [11] - 66:8, 89:8, 102:8, 102:15, 147:25, 148:1, 159:13, 212:12, 229:24, 232:22, 265:24
**citation** [2] - 29:15, 260:12
**citations** [1] - 40:8, 40:18, 173:7, 256:4
**cite** [7] - 127:18, 134:4, 142:7, 170:7, 174:2, 179:17, 231:10
**cited** [11] - 11:24, 47:10, 77:3, 88:18, 149:15, 166:25, 168:14, 222:5, 233:16, 234:2, 248:17
**cites** [5] - 40:21, 147:14, 147:17, 164:15
**cities** [3] - 249:8, 251:2, 251:21
**citing** [1] - 44:6
**citizen** [2] - 3:12, 37:3
**Citizens** [1] - 35:10
**city** [1] - 138:16
**City** [16] - 18:25, 66:22, 68:4, 73:12, 73:14, 89:2, 89:3, 97:14, 138:11, 138:14, 138:15, 138:17, 141:11, 242:4, 249:17, 253:25
**CIVIL** [1] - 1:3
**claim** [9] - 102:6, 150:18, 152:21, 157:4, 157:25, 160:15, 163:17, 163:19, 182:23
**claims** [11] - 58:10, 140:19, 151:13, 151:15, 154:9, 155:19, 159:10, 165:1, 182:22, 239:17, 255:1
**clarification** [3] - 38:5, 137:10, 237:12
**Clarification** [1] - 68:1
**clarifications** [1] - 6:5
**clarified** [3] - 148:23, 172:19, 237:11
**clarifies** [1] - 10:8
**clarify** [5] - 5:13, 14:25, 24:14, 27:12,

159:23
**clarifying** [1] - 191:6
**clarity** [1] - 9:2
**class** [3] - 18:5, 58:10, 93:13
**classes** [1] - 264:8
**classification** [1] - 193:21
**clause** [1] - 17:3
**CLE** [1] - 262:15
**Clean** [20] - 3:6, 4:11, 118:2, 178:12, 178:24, 179:1, 179:8, 181:6, 182:23, 183:8, 184:3, 202:6, 204:1, 205:6, 209:12, 211:23, 219:1, 258:21, 258:24
**clean** [5] - 35:14, 35:18, 47:18, 147:8, 179:12
**cleaner** [2] - 65:20, 244:6
**clear** [26] - 17:15, 20:19, 27:12, 32:15, 33:4, 56:21, 57:1, 66:12, 95:15, 98:23, 107:24, 134:1, 134:14, 134:18, 134:24, 148:13, 152:20, 153:2, 153:10, 153:24, 161:5, 180:16, 209:12, 229:14, 229:23, 238:13
**clearly** [6] - 32:24, 106:23, 153:22, 157:7, 185:23, 223:9
**clerk's** [1] - 239:16
**client** [1] - 59:17
**clients** [6] - 71:19, 74:25, 77:20, 244:24, 245:4, 245:15
**climate** [3] - 37:16, 65:23, 244:15
**clock** [13] - 33:22, 41:7, 56:19, 71:7, 80:14, 155:9, 162:9, 217:14, 217:17, 222:19, 246:11, 246:20, 263:6
**close** [10] - 21:19, 91:23, 102:11, 102:16, 108:4, 108:13, 109:6, 131:25, 152:17, 252:15
**close-down** [1] -

159:23
152:17
**closer** [4] - 17:24, 22:3, 22:11, 103:1
**closest** [1] - 21:25
**Closing** [1] - 4:21
**closing** [10] - 6:15, 6:16, 109:2, 215:24, 218:7, 228:7, 236:3, 246:3, 259:20, 262:17
**Club** [2] - 16:17, 34:10
**clues** [1] - 211:11
**Coalition** [4] - 3:7, 11:25, 102:1, 212:1
**Coast** [2] - 34:13, 69:18
**coin** [1] - 8:4
**colleague** [3] - 72:25, 134:10, 204:11
**colleagues** [2] - 49:18, 241:3
**collected** [2] - 226:11, 235:18
**collecting** [1] - 226:11
**colloquy** [9] - 6:13, 42:1, 52:17, 142:4, 153:2, 161:20, 163:13, 257:25, 264:6
**Columbia** [1] - 34:9
**column** [6] - 96:2, 192:11, 192:12, 192:13, 192:14, 192:15
**combo** [1] - 83:15
**comfortable** [3] - 185:10, 185:14, 262:6
**coming** [8] - 22:17, 44:14, 139:13, 139:21, 174:10, 185:2, 243:15, 249:4
**Comité** [1] - 231:20
**commence** [2] - 5:7, 6:22
**Commencing** [1] - 1:11
**comment** [100] - 43:20, 43:23, 53:14, 56:15, 92:3, 92:4, 92:7, 92:9, 94:24, 94:25, 95:2, 95:4, 100:3, 102:11, 102:16, 103:7, 103:9, 103:11, 104:25, 106:15, 108:2, 109:5, 109:7, 109:11, 109:15, 111:15, 112:1, 112:17, 113:5,

114:16, 115:15,
115:16, 115:18,
115:20, 116:14,
116:16, 116:19,
120:21, 120:24,
122:14, 122:22,
123:3, 123:6,
123:19, 129:15,
129:22, 130:9,
130:21, 131:1,
131:5, 133:2,
133:21, 134:15,
134:25, 136:9,
137:19, 139:8,
141:8, 141:9,
143:25, 144:3,
144:11, 144:15,
144:17, 145:22,
146:11, 146:18,
146:21, 147:4,
147:10, 148:13,
151:6, 151:7,
151:21, 151:24,
153:13, 153:15,
156:4, 156:25,
157:2, 157:6,
159:17, 162:11,
166:5, 169:2,
170:14, 173:14,
173:22, 174:13,
175:18, 176:16,
176:17, 176:23,
177:14, 186:2,
210:22, 231:15,
257:6, 261:5, 261:21

**commentary** [2] -
164:9, 260:15

**commentator** [1] -
212:3

**commented** [3] -
50:24, 153:11,
163:11

**commenter** [1] - 248:5

**commenters** [1] -
150:14

**commenting** [4] -
132:17, 146:21,
153:20, 177:3

**comments** [90] - 5:23,
6:14, 36:10, 36:11,
36:16, 37:1, 37:4,
37:8, 43:8, 43:9,
43:10, 53:18, 99:20,
103:18, 106:6,
106:8, 106:12,
106:14, 107:20,
122:13, 122:15,
123:14, 123:16,
123:20, 123:23,
124:1, 131:3, 131:4,

131:19, 132:9,
132:12, 132:15,
132:25, 133:23,
134:6, 134:15,
134:19, 137:12,
144:2, 144:16,
145:12, 147:10,
148:3, 149:18,
150:12, 150:14,
150:15, 150:17,
151:21, 151:24,
151:25, 152:1,
156:10, 157:5,
157:9, 158:5, 158:7,
159:13, 159:16,
159:25, 160:2,
160:3, 160:7, 160:8,
160:12, 160:23,
161:6, 161:17,
161:18, 164:22,
165:11, 166:6,
166:8, 166:11,
166:15, 167:7,
175:12, 175:16,
175:22, 176:10,
186:16, 203:14,
211:20, 212:22,
243:4, 246:5,
257:12, 262:18

**commerce** [1] - 17:3

**commit** [2] - 104:10,
252:6

**commitment** [7] -
77:6, 77:13, 77:20,
167:16, 237:21,
237:23, 255:11

**commitments** [3] -
30:2, 61:4, 61:13

**committed** [6] - 47:22,
57:17, 57:19, 218:7,
218:15, 249:22

**common** [2] - 6:8,
231:18

**communicate** [1] -
84:4

**communities** [41] -
9:12, 9:19, 9:20,
9:22, 10:2, 10:5,
10:8, 11:1, 11:4,
11:10, 23:6, 24:23,
25:25, 26:8, 32:2,
32:10, 37:17, 38:14,
46:9, 46:12, 46:18,
47:21, 47:23, 47:25,
48:10, 51:3, 52:24,
52:25, 53:3, 53:7,
54:5, 54:10, 104:7,
141:6, 158:3, 218:5,
218:9, 250:18,
252:3, 254:9

**Communities** [4] -
8:20, 19:10, 22:25,
50:21

**community** [5] -
25:18, 28:15, 38:15,
53:25, 126:6

**commute** [1] - 65:15

**commuters** [9] - 22:7,
22:14, 65:11, 65:14,
65:17, 66:16,
157:13, 157:24,
244:13

**comparable** [2] - 19:6,
235:20

**comparative** [1] -
116:20

**compare** [2] - 90:25,
188:4

**compared** [5] - 39:21,
89:20, 188:23,
207:23, 249:11

**comparing** [1] - 42:3

**comparison** [8] -
51:11, 188:9,
188:11, 193:5,
195:15, 205:8,
240:4, 242:8

**compete** [1] - 114:23

**complain** [3] - 43:1,
76:23, 254:18

**complained** [2] -
76:24, 207:19

**complaints** [1] -
244:25

**complemented** [1] -
130:12

**Complete** [1] - 3:7

**complete** [1] - 67:20

**completed** [3] - 12:21,
14:6, 14:21

**completely** [6] -
31:10, 46:21, 70:17,
101:24, 108:25,
251:25

**completion** [1] - 126:5

**complex** [3] - 40:12,
94:22, 197:17

**complexity** [2] -
116:4, 116:8

**compliance** [5] -
14:19, 164:12,
175:2, 179:1, 199:7

**compliant** [2] - 202:6,
253:23

**complicated** [1] -
151:3

**complied** [1] - 186:20

**compliment** [1] -
247:5

**comply** [2] - 65:1,

183:8

**component** [3] -
109:14, 177:24,
234:3

**components** [1] -
219:2

**comport** [4] - 60:11,
62:4, 63:20, 263:8

**comports** [2] - 28:10,
134:10

**compounds** [1] -
39:23

**comprehensive** [2] -
105:22, 223:1

**computer** [1] - 1:24

**computer-aided** [1] -
1:24

**concede** [3] - 85:11,
138:19, 240:12

**conceded** [2] -
152:24, 214:24

**conceivably** [2] -
243:25, 244:9

**concept** [4] - 12:12,
63:10, 144:10,
160:11

**concern** [15] - 7:25,
11:6, 51:4, 54:5,
57:25, 86:9, 105:6,
141:18, 193:24,
193:25, 194:8,
194:11, 210:15,
257:18, 261:24

**concerned** [4] - 40:9,
86:15, 86:25, 212:8

**concerning** [3] -
11:14, 199:24,
214:25

**concerns** [22] - 36:18,
45:16, 104:2,
105:24, 123:25,
134:14, 136:21,
143:5, 143:7, 143:9,
143:10, 170:7,
170:24, 171:2,
184:17, 192:22,
205:21, 232:1,
256:24, 257:2,
257:8, 265:8

**conclude** [3] - 40:4,
78:10, 109:1

**concluded** [1] -
232:22

**concluding** [1] - 8:18

**conclusion** [5] -
168:22, 206:6,
231:24, 232:23,
254:12

**conclusions** [1] -
222:1

**concomitant** [1] -
48:15

**concur** [1] - 158:22

**condition** [2] - 44:6,
185:6

**conditions** [3] - 63:12,
207:25, 251:5

**conduct** [8] - 38:25,
156:7, 157:1, 188:5,
194:1, 194:13,
200:18, 222:25,
239:9

**conducted** [7] - 16:13,
39:14, 188:18,
191:10, 201:7,
206:2, 252:4

**conducting** [2] -
200:23, 228:23

**conducts** [1] - 16:11

**confer** [1] - 256:9

**conferences** [1] -
262:23

**confined** [1] - 197:2

**confines** [1] - 193:11

**confirm** [1] - 111:20

**confirmed** [1] - 191:18

**conflate** [1] - 38:9

**conform** [3] - 204:23,
206:14, 209:2

**conformance** [1] -
40:20

**conformed** [1] -
191:19

**conforming** [8] -
187:10, 187:12,
189:5, 189:6, 189:8,
189:10, 206:18,
209:4

**conformity** [60] -
40:24, 179:3, 181:4,
181:17, 184:20,
185:22, 185:24,
186:2, 186:8,
186:14, 186:15,
186:17, 186:20,
187:6, 188:1, 188:3,
191:1, 191:2, 191:4,
191:9, 192:8,
193:18, 194:1,
194:5, 194:13,
196:15, 197:20,
201:5, 202:7,
202:18, 203:15,
204:2, 204:20,
205:1, 205:2,
205:10, 205:12,
205:17, 205:18,
205:21, 205:24,
205:25, 206:6,
206:8, 206:14,

206:19, 207:20, 207:24, 208:6, 208:14, 208:15, 208:22, 208:25, 209:9, 209:13, 210:5, 210:10, 212:11

**Conformity** [3] - 187:2, 191:16, 213:23

**confuse** [2] - 112:11, 199:5

**confused** [1] - 111:12, 148:25

**confusing** [5] - 188:15, 191:13, 191:15, 198:24, 199:1

**confusion** [1] - 114:3

**congestion** [22] - 65:22, 66:12, 66:14, 66:20, 66:23, 67:3, 71:14, 71:15, 72:17, 73:1, 73:6, 73:9, 73:10, 73:13, 73:23, 78:8, 88:24, 164:11, 217:23, 223:25, 245:11, 255:5

**congestion-pricing** [1] - 223:25

**Congress** [3] - 15:18, 15:24, 16:12

**Congressman** [1] - 122:3

**conjunction** [1] - 48:14

**Connecticut** [4] - 196:17, 200:12, 211:5, 212:17

**connecting** [1] - 236:23

**connection** [1] - 13:16

**connects** [1] - 39:6

**connote** [1] - 96:9

**connotes** [1] - 96:11

**consciously** [1] - 153:18

**consequence** [1] - 219:23

**consequences** [1] - 255:5

**conservative** [1] - 35:1

**conservatively** [1] - 34:24

**consider** [19] - 22:9, 22:24, 36:13, 62:25, 69:15, 70:13, 70:17, 77:13, 109:3, 145:18, 161:6,

163:4, 167:15, 215:9, 218:11, 223:10, 224:4, 245:9, 253:19

**considerable** [1] - 139:25

**consideration** [11] - 24:13, 49:6, 51:9, 70:16, 73:24, 100:17, 102:14, 164:21, 209:14, 240:20, 252:10

**considerations** [6] - 48:25, 49:2, 62:24, 74:9, 201:14, 201:16

**Considered** [1] - 102:7

**considered** [10] - 22:13, 49:19, 107:5, 108:16, 160:10, 165:16, 166:21, 217:25, 218:10

**considering** [4] - 54:6, 93:16, 163:5, 223:11

**considers** [1] - 18:5

**consistency** [1] - 51:10

**consistent** [7] - 20:13, 27:5, 55:16, 73:5, 73:16, 100:24, 101:1

**consistently** [4] - 67:19, 128:2, 128:4, 177:22

**consists** [1] - 14:18

**Consolidated** [1] - 1:21

**conspiracy** [1] - 254:14

**constituent** [1] - 96:22

**construct** [1] - 161:10

**construction** [15] - 15:14, 18:13, 18:22, 18:23, 19:1, 19:3, 19:4, 19:6, 35:12, 42:4, 42:5, 42:8, 42:15, 42:16, 63:14

**consult** [9] - 81:12, 81:14, 81:16, 83:8, 88:2, 96:15, 137:15, 137:19, 190:23

**consultants** [1] - 153:19

**consultation** [5] - 40:20, 80:17, 167:6, 186:15, 218:25

**consultation/ selection** [1] - 85:25

**consulted** [9] - 82:21, 82:22, 83:4, 83:6, 85:12, 85:13, 85:23,

86:14, 88:6

**contacted** [1] - 81:3

**contained** [3] - 15:23, 105:9, 189:11

**contains** [2] - 39:22, 105:4

**contemplate** [1] - 176:18

**contemplated** [1] - 111:10

**contends** [1] - 38:25

**content** [2] - 135:19, 135:23

**contention** [1] - 232:10

**contents** [3] - 135:18, 170:13, 175:22

**contested** [1] - 42:7

**contesting** [1] - 183:21

**context** [10] - 12:16, 12:18, 13:14, 13:19, 14:9, 71:18, 114:1, 128:17, 178:25, 256:5

**continue** [17] - 13:20, 27:2, 48:9, 82:17, 87:2, 87:25, 95:7, 119:9, 130:15, 147:8, 152:3, 155:14, 166:14, 167:12, 221:2, 234:1, 240:11

**continuing** [1] - 105:21

**Continuing** [3] - 2:1, 3:1, 193:20

**contortions** [1] - 226:3

**contradictory** [1] - 69:9

**contrary** [2] - 67:20, 71:2

**contrast** [1] - 70:4

**contribute** [1] - 193:21

**control** [1] - 202:5

**Control** [1] - 126:24

**convenience** [1] - 258:6

**conversation** [6] - 115:12, 119:4, 170:23, 261:23, 264:9, 265:9

**conversational** [1] - 264:6

**conversations** [1] - 114:24

**convincing** [1] - 218:3

**cooperating** [9] -

83:18, 84:7, 84:12, 86:21, 89:10, 93:19, 117:5, 120:4, 231:2

**cooperation** [1] - 82:5

**coordination** [4] - 118:18, 119:12, 119:16, 119:21

**Coordination** [1] - 89:4

**copies** [4] - 7:11, 192:1, 202:16, 202:24

**copy** [3] - 203:4, 204:15, 204:16

**cordon** [2] - 73:13, 73:14

**core** [1] - 219:2

**Corp** [1] - 102:2

**Corps** [1] - 30:4

**Correct** [1] - 42:22

**correct** [101] - 5:13, 5:16, 5:17, 10:25, 13:2, 15:24, 18:14, 18:15, 21:9, 25:2, 25:5, 27:11, 27:15, 27:21, 28:1, 32:21, 36:21, 36:22, 37:5, 37:12, 37:25, 39:17, 40:1, 43:16, 44:2, 46:4, 46:8, 47:16, 49:24, 51:12, 51:15, 51:18, 52:4, 55:4, 74:11, 75:13, 81:6, 85:3, 85:4, 86:10, 86:19, 87:1, 87:20, 87:24, 91:15, 91:16, 92:1, 92:14, 93:12, 93:15, 93:21, 98:10, 99:12, 102:22, 106:15, 106:16, 107:14, 108:13, 108:14, 113:2, 113:3, 113:9, 113:10, 116:22, 118:15, 119:8, 122:1, 123:4, 124:17, 124:18, 126:1, 126:16, 136:9, 141:24, 158:25, 159:11, 161:25, 162:15, 166:9, 166:12, 167:8, 171:16, 171:19, 179:9, 189:2, 193:13, 194:9, 195:21, 203:1, 219:8, 223:17, 225:7, 225:21, 228:14, 233:24, 237:9,

239:4, 239:20, 266:11

**corrected** [2] - 180:25, 241:11

**corrections** [1] - 144:21

**correctly** [3] - 17:12, 48:11, 241:6

**correspondence** [1] - 167:10

**corridor** [1] - 19:1

**cost** [2] - 19:5, 157:25

**Council** [3] - 3:12, 37:15, 37:20

**counsel** [10] - 6:6, 6:20, 18:4, 63:18, 69:11, 76:4, 76:11, 78:22, 208:21, 264:19

**COUNSEL** [1] - 3:18

**count** [3] - 155:18, 184:24, 187:23

**counterparts** [1] - 143:24

**counties** [31] - 5:9, 5:10, 5:11, 14:14, 19:14, 19:15, 19:22, 19:24, 21:24, 21:25, 22:2, 22:11, 23:7, 23:8, 43:7, 43:14, 43:19, 59:7, 59:13, 60:1, 61:16, 187:17, 187:20, 187:23, 187:24, 226:6, 228:3, 240:4, 249:8, 249:10

**counting** [2] - 96:12, 97:4

**country** [6] - 15:10, 18:19, 34:4, 71:12, 99:18, 125:17

**counts** [1] - 256:21

**COUNTY** [2] - 3:18

**County** [59] - 3:7, 3:19, 3:20, 20:1, 22:19, 22:22, 22:23, 22:24, 39:9, 43:11, 44:3, 44:5, 44:6, 56:21, 57:4, 57:9, 57:15, 57:17, 57:19, 57:24, 58:1, 58:19, 59:2, 59:11, 59:17, 59:18, 59:24, 61:1, 61:15, 61:16, 61:19, 67:2, 67:8, 72:20, 75:24, 76:5, 76:11, 76:24, 210:5, 215:12, 218:10, 238:22, 238:23, 239:8, 239:9,

239:12, 239:14,
239:16, 239:19,
239:21, 240:6,
240:8, 240:14,
240:15, 243:24,
244:5, 253:15
**county** [10] - 11:20,
22:15, 51:8, 59:15,
72:11, 75:23, 183:6,
207:21, 210:2
**county's** [1] - 57:1
**county-by-county** [1]
- 11:20
**couple** [13] - 19:25,
27:10, 27:13, 85:20,
143:17, 143:21,
152:5, 154:15,
169:7, 172:7,
175:12, 176:11,
236:13
**coupled** [1] - 63:23
**course** [15] - 18:6,
18:24, 29:7, 29:9,
87:10, 89:15,
153:14, 154:13,
155:13, 158:4,
221:7, 224:23,
226:24, 254:17,
254:20
**court** [3] - 155:1,
222:20, 255:19
**COURT** [914] - 1:1,
1:12, 5:3, 5:17, 5:19,
6:19, 6:25, 7:2, 7:4,
7:6, 7:13, 7:16, 7:18,
7:24, 8:10, 8:12,
9:17, 10:10, 10:15,
10:20, 10:24, 11:11,
12:20, 12:24, 13:6,
13:9, 13:20, 13:24,
14:11, 14:24, 15:23,
16:1, 16:6, 16:8,
16:24, 17:1, 17:8,
17:10, 17:17, 17:19,
17:24, 18:2, 18:13,
20:5, 20:7, 20:10,
20:14, 20:16, 21:5,
21:9, 21:11, 21:15,
21:18, 21:22, 23:17,
23:21, 24:3, 24:6,
24:10, 24:14, 24:19,
24:25, 25:3, 26:10,
26:14, 26:16, 26:19,
27:7, 27:10, 27:18,
27:21, 27:23, 28:4,
28:6, 28:8, 28:13,
28:19, 28:22, 29:1,
29:4, 29:8, 29:11,
29:13, 29:19, 29:21,
30:12, 31:1, 31:24,

32:17, 32:23, 33:3,
33:5, 33:15, 33:17,
33:19, 34:14, 34:16,
35:8, 35:21, 36:1,
36:5, 36:9, 36:20,
37:2, 37:6, 37:9,
37:11, 37:19, 37:22,
37:24, 38:2, 38:18,
38:20, 39:19, 40:4,
40:14, 41:2, 41:4,
41:7, 41:19, 42:8,
42:10, 42:13, 42:15,
42:19, 42:23, 43:4,
43:12, 43:17, 43:25,
44:16, 44:19, 44:22,
44:25, 45:7, 45:11,
45:14, 45:16, 45:25,
46:6, 47:3, 47:14,
48:11, 48:23, 48:25,
49:9, 49:15, 49:17,
49:25, 50:8, 50:11,
50:15, 50:18, 50:23,
51:9, 51:13, 51:16,
52:1, 52:6, 52:12,
52:16, 53:1, 53:9,
53:11, 53:16, 54:18,
54:22, 54:24, 55:2,
55:5, 55:19, 55:21,
56:1, 56:6, 56:9,
56:14, 56:18, 58:7,
61:6, 62:8, 62:21,
63:21, 64:3, 64:15,
64:17, 65:3, 68:11,
68:17, 68:20, 68:23,
68:25, 69:2, 70:20,
71:3, 71:5, 71:7,
71:23, 71:25, 72:3,
72:5, 73:20, 73:22,
74:1, 74:9, 74:11,
76:15, 76:19, 77:23,
78:11, 78:14, 78:16,
79:2, 79:5, 79:7,
79:11, 79:13, 79:16,
79:19, 79:23, 80:1,
80:5, 80:9, 80:12,
80:14, 81:1, 81:3,
81:6, 81:8, 81:14,
81:19, 81:25, 82:7,
82:13, 82:17, 83:10,
83:16, 83:20, 83:24,
84:2, 84:8, 84:22,
85:2, 85:5, 85:15,
85:18, 85:22, 86:6,
86:15, 86:20, 86:24,
87:2, 87:6, 87:8,
87:14, 87:17, 87:21,
87:25, 88:8, 88:15,
88:19, 89:6, 89:13,
89:16, 90:7, 90:11,
90:20, 91:2, 91:14,
91:17, 91:20, 91:23,

92:9, 92:12, 92:15,
92:21, 93:2, 93:11,
93:13, 93:18, 93:22,
94:1, 94:6, 94:12,
94:17, 95:2, 95:4,
95:7, 95:11, 96:1,
96:8, 96:17, 96:21,
97:16, 97:18, 97:23,
98:7, 98:11, 98:14,
98:18, 98:23, 99:3,
99:10, 99:13, 99:22,
100:5, 100:18,
101:4, 101:6,
101:15, 101:21,
101:23, 102:17,
102:23, 103:3,
103:6, 105:3, 105:9,
105:14, 105:25,
106:4, 106:10,
106:14, 106:18,
106:24, 107:9,
107:16, 108:6,
108:8, 108:12,
108:15, 108:18,
108:23, 108:25,
109:16, 109:18,
109:20, 109:22,
109:25, 110:3,
110:6, 110:10,
110:12, 110:18,
110:20, 110:22,
110:25, 111:2,
111:8, 111:11,
111:14, 111:23,
112:8, 112:12,
112:15, 112:20,
112:22, 112:25,
113:3, 113:7, 113:9,
113:11, 113:14,
113:16, 113:20,
114:4, 114:12,
114:14, 115:1,
115:5, 115:23,
116:3, 116:8,
116:19, 116:23,
117:2, 117:7,
117:10, 117:15,
117:18, 117:20,
118:3, 118:9,
118:13, 118:16,
118:19, 118:23,
119:5, 119:9,
119:14, 119:17,
119:20, 119:24,
120:2, 120:7,
120:13, 120:16,
120:18, 120:22,
121:2, 121:5, 121:8,
121:22, 121:24,
122:7, 122:11,
122:17, 122:20,

122:24, 123:2,
123:5, 123:10,
124:2, 124:16,
124:22, 125:4,
125:8, 125:13,
125:18, 125:24,
126:2, 126:8,
126:14, 126:19,
126:21, 127:2,
127:5, 127:12,
127:16, 127:21,
128:6, 128:10,
128:12, 128:14,
128:19, 129:2,
129:4, 129:24,
130:3, 130:6,
130:13, 130:18,
130:22, 130:25,
131:18, 132:1,
132:4, 132:8,
132:12, 132:19,
132:23, 133:6,
133:25, 134:5,
134:8, 134:13,
134:18, 135:1,
135:3, 135:9,
135:12, 135:16,
135:22, 135:25,
136:2, 136:5,
136:11, 136:25,
137:2, 137:5,
137:22, 138:18,
138:22, 139:3,
139:16, 139:18,
140:5, 140:14,
141:12, 141:16,
141:23, 142:3,
142:11, 142:13,
142:15, 142:17,
142:22, 143:5,
143:12, 143:18,
143:20, 144:13,
144:24, 145:1,
145:4, 145:7,
145:19, 145:24,
146:4, 146:6, 146:8,
146:10, 146:13,
146:23, 147:2,
147:8, 147:16,
147:19, 147:22,
147:24, 148:5,
148:8, 148:10,
148:17, 148:20,
148:22, 149:3,
149:9, 149:22,
150:3, 150:5,
150:20, 150:24,
151:17, 152:3,
153:2, 154:14,
154:18, 155:2,
155:14, 155:17,

156:13, 156:16,
156:20, 157:15,
157:20, 158:10,
158:23, 159:1,
159:4, 159:6, 159:9,
159:12, 159:19,
159:22, 160:5,
160:8, 160:19,
160:21, 160:23,
161:1, 161:7,
161:14, 161:16,
161:20, 161:22,
162:1, 162:3, 162:5,
162:7, 162:9,
162:13, 162:16,
162:21, 163:1,
163:7, 163:9,
163:21, 163:25,
164:6, 164:8,
164:13, 164:16,
164:18, 164:24,
165:10, 165:13,
165:17, 165:21,
165:23, 166:5,
166:10, 166:13,
167:2, 167:9,
167:12, 167:21,
167:24, 168:4,
168:6, 168:11,
168:22, 169:8,
169:17, 169:20,
169:22, 169:25,
170:15, 171:3,
171:8, 171:15,
171:20, 171:24,
172:9, 172:12,
172:15, 172:18,
172:22, 172:24,
173:5, 173:12,
173:17, 173:24,
174:4, 174:8,
174:10, 174:15,
174:18, 174:25,
175:2, 175:6,
175:11, 175:20,
175:25, 176:6,
176:19, 177:4,
177:9, 177:15,
178:4, 178:10,
178:20, 178:23,
179:5, 179:11,
179:15, 180:2,
180:7, 180:10,
180:12, 180:15,
180:21, 180:24,
181:7, 181:9,
181:12, 181:19,
181:24, 182:6,
182:10, 182:16,
183:16, 183:18,
183:24, 184:5,

184:9, 184:11, 184:14, 184:18, 184:22, 184:24, 185:2, 185:7, 185:10, 185:14, 185:17, 185:20, 186:5, 186:7, 186:10, 186:25, 187:4, 187:19, 187:22, 188:8, 188:16, 188:25, 189:4, 189:9, 189:14, 189:17, 189:22, 189:24, 190:1, 190:3, 190:6, 190:8, 190:11, 190:14, 190:17, 191:6, 191:13, 191:22, 192:2, 192:4, 192:7, 192:11, 192:14, 192:17, 192:22, 192:25, 193:5, 193:14, 193:17, 194:7, 194:10, 194:15, 195:7, 195:10, 195:17, 195:20, 195:22, 196:1, 196:11, 196:19, 196:23, 196:25, 197:4, 197:7, 197:10, 197:13, 197:18, 198:1, 198:5, 198:15, 198:20, 198:24, 199:13, 199:16, 199:18, 200:1, 200:4, 200:6, 200:9, 200:14, 200:21, 200:23, 201:1, 201:11, 201:17, 201:19, 202:1, 202:8, 202:10, 202:14, 202:21, 202:24, 203:1, 203:4, 203:6, 203:10, 203:17, 204:8, 204:13, 204:15, 205:23, 206:1, 206:3, 206:6, 206:10, 206:12, 206:21, 206:24, 207:2, 207:4, 207:6, 207:9, 207:11, 207:15, 207:17, 208:3, 208:5, 209:1, 209:7, 209:9, 209:21, 209:23, 211:6, 211:9, 211:16, 212:12, 212:20, 212:25,

213:5, 213:11, 213:14, 213:19, 214:20, 215:18, 215:20, 216:9, 217:4, 217:7, 217:11, 217:14, 217:17, 219:6, 219:9, 219:15, 219:23, 220:5, 220:8, 220:15, 220:21, 220:23, 221:1, 221:10, 221:16, 221:19, 222:14, 222:16, 222:18, 223:14, 224:7, 225:1, 225:3, 225:12, 225:14, 225:17, 225:20, 226:8, 226:13, 226:15, 226:18, 226:22, 227:1, 227:3, 227:7, 228:8, 228:17, 228:19, 228:22, 229:2, 229:17, 229:19, 230:7, 230:9, 230:18, 230:22, 231:7, 231:12, 231:15, 232:21, 233:5, 233:7, 233:17, 233:25, 234:5, 234:11, 234:25, 235:3, 235:6, 235:19, 235:22, 235:24, 236:5, 236:12, 237:2, 237:12, 237:18, 238:11, 238:24, 239:2, 239:5, 239:18, 239:23, 240:1, 240:11, 240:21, 241:5, 241:9, 241:11, 242:6, 243:1, 243:7, 243:10, 243:13, 244:17, 244:19, 244:22, 245:22, 245:25, 246:11, 246:13, 246:16, 246:20, 247:4, 247:22, 248:2, 248:4, 250:24, 252:12, 252:17, 252:25, 253:5, 255:15, 255:23, 256:23, 258:12, 258:16, 258:18, 258:22, 259:1, 259:6, 259:8, 259:11, 259:23,

260:2, 260:4, 260:15, 261:4, 262:11, 262:21, 265:20, 266:9
**Court** [121] - 1:22, 5:2, 5:13, 6:6, 6:12, 6:13, 6:21, 8:14, 9:1, 11:13, 11:21, 11:23, 12:15, 13:25, 14:4, 15:1, 16:2, 32:17, 34:5, 34:10, 34:23, 36:6, 40:4, 40:13, 40:14, 41:19, 45:25, 46:5, 47:3, 53:17, 58:3, 59:4, 62:8, 62:25, 63:4, 63:5, 64:3, 66:7, 71:18, 91:24, 102:2, 109:3, 111:24, 112:16, 112:18, 123:24, 129:7, 129:10, 136:4, 142:3, 147:20, 149:14, 154:9, 154:16, 168:6, 168:8, 169:9, 170:12, 170:18, 175:4, 179:20, 180:8, 180:17, 181:13, 184:17, 208:17, 220:16, 221:23, 222:6, 222:21, 223:8, 227:20, 230:5, 230:12, 230:14, 230:15, 230:17, 230:20, 230:21, 231:3, 231:7, 231:8, 231:16, 232:1, 232:2, 232:5, 232:9, 232:10, 232:19, 232:22, 232:23, 233:2, 234:5, 236:22, 237:3, 237:4, 238:2, 242:8, 242:19, 243:15, 254:15, 254:21, 255:18, 255:25, 256:7, 256:20, 257:1, 257:4, 257:9, 258:6, 259:3, 259:17, 260:12, 260:13, 261:2, 262:17, 263:17, 264:19, 265:10, 266:15
**Court's** [4] - 111:24, 115:20, 130:5, 161:5
**courtesy** [1] - 263:15
**courthouse** [1] - 42:20

**Courthouse** [1] - 1:9
**courtroom** [2] - 247:15, 255:18
**Courts** [11] - 34:1, 35:23, 35:25, 151:10, 159:14, 159:24, 227:17, 234:9, 256:12, 256:15
**courts** [2] - 34:3, 147:21
**cover** [4] - 26:8, 51:24, 52:3, 52:7
**covered** [2] - 215:1, 215:23
**CRCR** [1] - 266:14
**create** [5] - 19:1, 48:20, 126:10, 131:15, 133:12
**created** [2] - 131:8, 131:22
**creates** [3] - 77:24, 78:2, 243:2
**creating** [1] - 18:10
**creation** [2] - 127:21, 131:23
**credence** [1] - 256:7
**Creegan** [1] - 261:22
**criteria** [3] - 84:22, 126:9, 153:8
**Criteria** [1] - 187:2
**critical** [10] - 60:17, 60:20, 62:16, 104:10, 132:6, 142:9, 154:10, 201:2, 232:2, 253:6
**critically** [2] - 26:12, 114:20
**critiqued** [1] - 253:18
**cross** [2] - 16:20, 179:13
**Cross** [4] - 69:25, 210:8, 213:10, 214:15
**crucial** [1] - 102:8
**crux** [1] - 73:22
**crystal** [3] - 66:11, 229:13, 229:22
**Cumming** [53] - 4:10, 4:16, 4:23, 5:12, 6:2, 14:25, 15:2, 16:9, 21:24, 24:14, 33:19, 33:21, 33:22, 35:21, 38:18, 48:12, 52:12, 52:16, 53:17, 53:21, 54:24, 79:14, 79:15, 79:16, 107:21, 110:7, 114:10, 114:15, 115:13, 117:3, 131:13,

136:6, 138:4, 141:20, 144:23, 146:23, 163:9, 172:25, 173:1, 174:8, 174:21, 175:9, 230:10, 230:19, 230:23, 235:22, 237:25, 248:17, 252:19, 255:16, 256:23, 258:18, 258:22
**cumming** [1] - 4:3
**CUMMING** [183] - 2:4, 5:14, 7:1, 15:3, 15:25, 16:4, 16:7, 16:10, 16:25, 17:2, 17:9, 33:23, 34:15, 34:17, 35:9, 35:24, 36:2, 36:8, 36:10, 36:22, 37:5, 37:8, 37:10, 37:12, 37:20, 37:23, 38:1, 38:3, 38:6, 38:19, 39:18, 40:3, 40:7, 40:16, 41:3, 52:20, 53:2, 53:10, 55:1, 55:4, 55:10, 55:20, 79:18, 114:11, 114:13, 115:14, 116:1, 116:6, 116:14, 116:22, 116:24, 117:6, 117:9, 117:14, 117:16, 117:19, 117:21, 118:15, 118:17, 118:20, 119:2, 119:8, 119:10, 119:15, 119:18, 119:21, 120:1, 120:6, 120:9, 120:15, 120:17, 120:19, 120:25, 121:4, 121:7, 121:9, 121:23, 122:2, 122:9, 122:13, 122:19, 122:23, 123:1, 123:4, 123:6, 123:11, 124:3, 124:18, 125:1, 125:6, 125:10, 125:16, 125:19, 126:1, 126:4, 126:11, 126:18, 126:20, 126:22, 127:4, 127:9, 127:15, 127:17, 128:5, 128:8, 128:11, 128:13, 128:17, 128:20, 129:3, 129:10,

130:1, 130:5, 130:7, 130:16, 130:19, 130:23, 131:17, 131:24, 132:2, 132:5, 132:9, 132:14, 132:21, 133:4, 133:20, 134:3, 134:7, 134:11, 134:16, 134:24, 135:2, 135:7, 135:11, 135:14, 135:21, 135:23, 136:1, 136:4, 136:10, 136:15, 137:1, 137:4, 173:3, 173:6, 173:15, 173:23, 174:2, 174:6, 174:9, 174:12, 174:17, 174:22, 175:1, 175:5, 175:10, 230:11, 230:20, 231:3, 231:10, 231:14, 231:16, 233:1, 233:6, 233:9, 233:24, 234:2, 234:9, 234:24, 235:2, 235:4, 235:10, 235:20, 235:23, 255:17, 255:25, 258:19, 258:24, 259:2, 259:7, 266:6
**Cumming's** [2] - 137:13, 238:5
**cured** [3] - 59:3, 60:3, 61:9
**curious** [1] - 55:5
**current** [1] - 70:25
**cursory** [1] - 30:9
**cut** [6] - 27:24, 119:6, 254:12, 254:13, 263:11
**cuts** [1] - 27:25
**cynical** [1] - 69:22
**cynicism** [1] - 67:15

**D**

**D.C** [3] - 2:13, 222:6, 222:11
**daily** [4] - 39:12, 44:15, 45:5, 57:5
**Dakota** [1] - 235:14
**danger** [1] - 178:2
**data** [12] - 50:6, 51:10, 51:18, 52:10, 53:8, 53:22, 57:3, 57:15, 58:2, 197:14, 226:11
**Date** [1] - 266:15

**date** [10] - 91:20, 91:25, 108:4, 163:15, 164:6, 234:20, 234:21
**dates** [1] - 92:23
**DAVID** [1] - 3:18
**days** [68] - 59:7, 60:8, 62:2, 90:17, 91:4, 91:5, 91:10, 92:6, 99:2, 99:8, 99:10, 99:14, 99:15, 99:18, 100:3, 101:6, 102:23, 103:1, 110:25, 111:10, 111:19, 111:21, 112:6, 112:8, 112:19, 112:20, 112:24, 113:6, 113:11, 113:12, 113:19, 113:22, 113:24, 115:16, 115:17, 148:14, 149:4, 149:5, 149:6, 149:16, 149:25, 150:2, 150:7, 150:15, 150:24, 155:15, 215:21, 217:21, 230:24, 236:10, 243:22, 244:21, 247:8, 252:23, 255:20, 256:1, 257:11, 262:22, 263:1, 265:12, 266:1
**DC** [3] - 2:6, 231:19, 235:12
**de** [2] - 165:6, 231:20
**deadline** [1] - 264:25
**deal** [11] - 8:2, 8:15, 14:4, 48:15, 184:18, 196:4, 202:11, 208:14, 220:9, 246:3, 257:9
**dealing** [2] - 196:8, 242:10
**deals** [7] - 109:25, 118:10, 161:23, 169:11, 169:12, 169:15, 189:1
**dealt** [1] - 73:3
**debated** [1] - 181:16
**decade** [1] - 18:9
**decades** [1] - 67:6
**decide** [5] - 28:2, 100:18, 230:17, 231:17, 232:5
**decided** [1] - 28:1
**decides** [1] - 233:2
**deciding** [5] - 129:7, 163:5, 231:5, 235:7,

245:10
**decision** [28] - 16:15, 21:7, 31:14, 34:2, 34:17, 45:19, 45:23, 55:6, 55:11, 57:3, 102:10, 128:25, 131:25, 149:14, 153:21, 165:1, 170:18, 193:24, 223:6, 233:12, 233:22, 235:15, 236:17, 236:21, 237:11, 252:20, 256:18, 264:24
**decision-makers** [1] - 256:18
**decision-making** [3] - 34:2, 45:19, 170:18
**decisions** [3] - 26:5, 226:2, 242:10
**declaration** [1] - 219:3, 219:23, 220:11
**declaratory** [8] - 219:7, 219:9, 219:12, 219:15, 219:16, 219:19, 220:5, 227:10
**declare** [4] - 100:6, 100:9, 100:10, 224:11
**declared** [1] - 225:6
**declaring** [2] - 219:18, 219:20
**decreases** [2] - 9:5, 38:15
**dedicate** [1] - 179:20
**deem** [2] - 180:17, 180:18
**deemed** [3] - 57:9, 57:10, 63:9
**deep** [4] - 184:24, 224:22, 227:6, 247:16
**deepest** [1] - 263:24
**deeply** [4] - 263:15, 264:3, 265:10, 266:2
**defect** [1] - 58:13
**defend** [1] - 255:22
**defendant** [6] - 7:2, 7:4, 56:7, 238:19, 239:6, 252:17
**Defendant** [1] - 1:8
**defendant's** [1] - 63:22
**Defendants** [5] - 2:6, 2:10, 2:14, 2:18, 2:23
**defendants** [5] - 6:25, 89:16, 230:15,

238:19, 256:20
**defender** [1] - 252:19
**defense** [1] - 56:4
**Defense** [4] - 3:16, 222:4, 229:14, 248:21
**defer** [2] - 5:14, 136:17
**deference** [1] - 160:17
**deferential** [1] - 34:1
**deficiencies** [3] - 224:1, 232:9, 233:3
**deficiency** [1] - 256:17
**deficient** [1] - 251:25
**define** [2] - 30:24, 32:16
**defined** [3] - 83:17, 157:7, 193:12
**defines** [2] - 81:19, 193:1
**definitional** [1] - 100:19
**degree** [8] - 53:14, 98:15, 98:17, 98:20, 109:12, 128:7, 144:11, 263:16
**Delaware** [2] - 107:2, 126:23
**delay** [1] - 151:8
**delegated** [3] - 124:25, 125:13, 169:5
**delineated** [1] - 119:3
**demarcation** [2] - 208:16, 208:18
**demonstrably** [1] - 69:16
**demonstrate** [2] - 30:6, 104:14
**demonstrated** [1] - 39:15
**demonstrative** [1] - 261:7
**denied** [1] - 151:5
**denominated** [1] - 137:18
**dense** [1] - 262:9
**densely** [1] - 70:6
**deny** [1] - 253:7
**DEP** [6] - 88:5, 89:5, 147:12, 152:25, 153:11
**departed** [1] - 32:18
**DEPARTMENT** [1] - 1:6
**Department** [13] - 34:11, 34:19, 86:5, 86:6, 88:5, 88:6, 89:2, 126:23, 140:2, 165:4, 211:15

**department** [2] - 83:8, 147:13
**deputy** [1] - 176:4
**derivative** [2] - 132:19, 132:22
**described** [6] - 31:4, 47:17, 96:25, 127:14, 177:20, 220:4
**describes** [8] - 16:18, 17:6, 40:16, 77:11, 127:9, 130:9, 131:1, 208:21
**describing** [2] - 46:11, 138:10
**description** [1] - 177:21
**deserves** [3] - 13:19, 37:9, 234:13
**deserving** [1] - 59:25
**designed** [5] - 66:6, 74:8, 139:20, 144:11, 151:15
**desire** [2] - 139:8, 139:9
**despite** [1] - 68:8
**destructive** [1] - 69:24
**detail** [8] - 30:9, 62:18, 62:19, 62:22, 63:1, 129:23, 157:5, 223:23
**detailed** [2] - 123:24, 255:4
**Determination** [1] - 191:16
**determination** [15] - 99:4, 118:25, 127:20, 166:16, 185:22, 185:24, 202:18, 205:1, 205:2, 205:10, 205:12, 205:18, 205:22, 205:25, 206:25
**determinations** [1] - 206:15
**determine** [13] - 52:23, 77:17, 84:23, 199:6, 202:3, 211:9, 230:14, 230:21, 231:3, 233:2, 237:5, 237:7, 237:13
**determined** [8] - 41:16, 46:11, 54:12, 204:23, 205:4, 205:15, 206:18, 206:19
**determining** [3] - 52:7, 66:8, 232:3
**develop** [7] - 76:3,

77:14, 167:16,
167:19, 180:15,
180:21, 181:2
**development** [3] -
78:3, 180:17, 181:14
**devote** [2] - 179:11,
183:21
**devoted** [4] - 121:10,
183:19, 183:22,
186:3
**dial** [1] - 120:12
**dial-in** [1] - 120:12
**dialogue** [1] - 80:23
**dials** [1] - 78:6
**dictate** [2] - 227:20,
228:19
**dictates** [1] - 228:12
**diesel** [1] - 40:10
**differ** [1] - 175:7
**difference** [12] - 9:15,
9:25, 18:21, 46:12,
54:14, 96:9, 109:12,
124:5, 130:7,
141:23, 146:7, 238:7
**differences** [1] - 256:9
**different** [57] - 9:23,
11:15, 11:16, 11:18,
12:4, 20:22, 31:10,
34:21, 36:20, 37:24,
38:11, 38:13, 50:14,
58:18, 69:13, 78:6,
85:7, 85:20, 86:17,
93:19, 96:1, 96:7,
99:9, 103:22,
108:23, 108:25,
109:14, 113:21,
117:7, 117:19,
120:11, 121:6,
130:19, 131:20,
132:16, 141:22,
165:4, 174:20,
184:9, 196:3,
201:13, 208:2,
208:13, 214:5,
214:8, 217:5, 217:7,
219:15, 221:11,
225:8, 234:15,
243:5, 258:5, 260:5,
264:12
**differential** [1] -
123:15
**differentiate** [2] -
28:16, 261:14
**differentiated** [1] -
181:20
**differentiation** [7] -
85:16, 90:8, 90:9,
117:4, 122:12,
205:20, 206:3
**differently** [5] - 28:13,

42:13, 198:20,
230:12, 243:5
**differs** [2] - 109:11,
208:6
**difficult** [2] - 198:25,
222:19
**dig** [2] - 173:12,
173:18
**dignity** [1] - 263:15
**dike** [2] - 223:7,
227:22
**diligent** [5] - 88:12,
88:15, 98:3, 98:8,
153:5
**diminution** [1] - 94:1
**dioxide** [1] - 39:24
**direct** [5] - 36:6,
109:22, 195:15,
229:1, 229:3
**directed** [2] - 11:3,
54:1
**directing** [1] - 233:8
**direction** [3] - 134:19,
163:10, 238:1
**directive** [2] - 48:15,
49:11
**directly** [11] - 24:1,
31:24, 31:25, 44:23,
69:9, 188:23,
189:19, 190:13,
190:14, 191:20,
214:9
**directs** [1] - 228:11
**disadvantage** [1] -
10:17
**disagree** [5] - 108:20,
109:12, 135:24,
168:8, 237:23
**disagreement** [1] -
238:6
**disagreements** [1] -
256:13
**disbursed** [1] - 39:7
**discount** [1] - 47:18
**discourages** [1] - 70:2
**discrepancies** [1] -
103:24
**discretion** [23] -
28:14, 81:25, 82:8,
82:11, 82:12, 82:15,
82:18, 83:7, 83:12,
84:16, 127:12,
127:13, 127:19,
133:17, 146:3,
146:4, 161:11,
163:4, 163:5, 215:4,
222:2, 240:2
**discuss** [7] - 54:9,
90:13, 92:2, 106:16,
118:21, 126:7,

234:22
**discussed** [12] - 35:4,
38:21, 53:17, 56:16,
163:12, 171:6,
171:9, 171:22,
214:7, 236:9,
238:17, 254:19
**discusses** [3] - 34:11,
191:17, 214:2
**discussing** [3] -
121:18, 213:9, 236:5
**discussion** [10] - 5:8,
46:10, 48:1, 80:15,
109:21, 126:8,
148:11, 159:8,
244:21, 245:17
**disease** [20] - 9:9,
9:13, 10:9, 11:2,
11:5, 23:8, 23:15,
25:12, 26:3, 32:7,
46:25, 47:7, 47:13,
51:24, 52:4, 52:8,
53:24, 54:7, 251:6,
251:14
**Disease** [1] - 10:14
**disingenuous** [1] -
69:23
**dismissed** [1] - 245:7
**disparate** [3] - 86:7,
93:11, 181:19
**disparity** [1] - 138:8
**display** [1] - 131:11
**dispositive** [1] - 62:16
**disproportionately** [1]
- 48:9
**dispute** [6] - 57:12,
88:4, 148:18,
187:19, 187:22,
187:23
**disputed** [3] - 58:16,
148:16, 148:22
**disputes** [1] - 256:9
**disputing** [1] - 169:19
**disregarded** [1] -
223:21
**dissatisfied** [2] -
85:24, 86:3
**distinct** [1] - 265:20
**distinction** [6] - 18:21,
50:16, 98:23,
191:21, 193:15,
213:19
**distinctions** [6] -
25:19, 25:23, 27:2,
27:23, 40:6, 148:2
**distinguish** [2] -
132:15, 137:16
**DISTRICT** [2] - 1:1, 1:1
**district** [8] - 22:1,
22:8, 22:12, 22:15,

65:19, 73:14, 147:21
**District** [10] - 12:1,
16:16, 17:5, 34:9,
34:10, 102:2, 102:3,
147:19, 222:6,
231:22
**diversion** [2] - 104:6,
158:8
**diversionary** [1] - 73:2
**diversions** [1] -
104:14
**Diversity** [1] - 232:13
**divert** [1] - 66:23
**divorced** [1] - 209:3
**docket** [1] - 87:4
**doctrine** [1] - 250:11
**document** [46] - 7:17,
12:25, 13:13, 14:5,
15:23, 16:1, 24:6,
35:1, 36:17, 40:21,
40:22, 47:9, 56:10,
56:11, 99:19, 107:8,
142:6, 143:25,
144:1, 159:18,
160:1, 160:3,
163:14, 165:11,
165:16, 165:17,
166:7, 166:17,
167:4, 168:8,
168:10, 171:4,
171:10, 171:25,
173:18, 174:3,
174:4, 174:14,
177:21, 203:11,
208:21, 233:12,
233:13, 233:22,
246:16
**documentary** [1] -
261:11
**documentation** [1] -
257:4
**documented** [1] -
15:21
**documents** [28] -
7:13, 15:6, 15:17,
21:4, 25:9, 52:23,
55:11, 55:12, 55:14,
55:17, 98:6, 111:16,
112:2, 122:7,
122:16, 132:16,
134:11, 134:13,
143:23, 151:3,
164:10, 166:19,
167:2, 170:11,
171:8, 176:20,
187:1, 256:25
**DOH** [3] - 88:6,
152:25, 153:11
**DOJ** [2] - 2:3, 2:12
**DOJ-ENRD** [2] - 2:3,

2:12
**dollar** [8] - 27:4,
57:19, 67:9, 249:24,
251:10, 251:17,
251:23
**dollars** [5] - 19:5,
47:22, 57:17, 59:8,
68:12
**done** [42] - 12:8,
12:19, 20:7, 33:17,
37:15, 41:25, 43:21,
59:1, 60:4, 97:7,
103:21, 104:14,
109:10, 114:2,
120:7, 138:11,
140:25, 141:25,
163:18, 174:19,
178:11, 181:4,
181:22, 182:1,
183:7, 188:2,
188:19, 198:18,
199:9, 202:12,
202:20, 208:22,
209:18, 209:19,
211:1, 211:15,
213:17, 215:1,
228:5, 247:7, 263:20
**DOT** [11] - 12:1, 12:25,
158:2, 172:5,
172:11, 172:12,
172:13, 172:14,
210:21, 210:23
**DOT_0007319** [1] -
23:4
**DOT_0007772** [2] -
94:20, 103:14
**DOT_0036142** [1] -
162:15
**DOT_0036855** [1] -
71:21
**DOT_0037042** [1] -
168:15
**DOT_0037816** [1] -
191:15
**DOT_0045032** [1] -
105:20
**DOT_0045346** [1] -
171:7
**DOT_0045366** [1] -
167:1
**DOT_045366** [1] - 77:9
**DOT_1164** [1] - 40:11
**DOT_36197** [1] -
245:14
**DOT_36818** [1] - 40:22
**DOT_36864** [1] - 40:21
**DOT_40589** [1] - 174:3
**DOT_6805** [1] - 40:23
**DOT_6846** [1] - 45:9
**DOT_6854** [1] - 40:22

**DOT_731** [1] - 24:2
**DOT_7322** [1] - 46:10
**dots** [1] - 236:23
**double** [2] - 87:18, 182:17
**doubling** [1] - 68:7
**doubt** [4] - 36:14, 182:16, 221:20, 232:15
**down** [20] - 25:7, 25:12, 32:16, 67:5, 68:6, 87:10, 113:25, 118:12, 127:10, 134:9, 139:21, 142:18, 152:17, 152:25, 173:6, 199:22, 216:22, 234:16, 249:4, 251:10
**dozen** [1] - 202:24
**dozens** [1] - 247:17
**draft** [102] - 43:8, 43:15, 43:23, 44:1, 50:22, 50:25, 69:19, 77:4, 88:22, 90:16, 90:18, 90:25, 91:18, 92:11, 92:12, 92:16, 92:18, 92:25, 93:4, 93:6, 93:9, 94:7, 94:10, 94:11, 94:13, 99:8, 99:25, 101:14, 103:18, 104:10, 104:12, 104:18, 105:2, 106:13, 107:7, 107:14, 108:3, 108:10, 121:17, 123:19, 132:2, 132:16, 133:21, 133:23, 134:19, 134:22, 135:2, 136:16, 139:12, 140:21, 141:7, 141:24, 143:25, 144:5, 144:14, 145:12, 145:22, 146:18, 146:21, 147:5, 148:14, 149:18, 152:6, 153:13, 156:4, 156:5, 156:10, 156:24, 157:5, 157:8, 158:4, 158:9, 158:16, 158:18, 159:17, 162:18, 162:24, 164:1, 164:4, 164:23, 165:7, 167:14, 170:4, 173:7, 173:9, 173:11, 173:13,

175:23, 176:16, 176:21, 185:21, 185:22, 186:7, 186:16, 194:4, 203:15, 217:9, 239:14, 240:15
**drafting** [1] - 245:7
**dramatic** [1] - 18:18
**draw** [11] - 91:2, 99:15, 101:7, 101:11, 101:19, 145:19, 149:24, 168:8, 172:18, 172:19
**drawing** [4] - 177:8, 177:9, 177:10, 177:12
**drawn** [6] - 100:12, 143:13, 150:1, 150:5, 177:14, 177:16
**draws** [1] - 189:17
**drive** [1] - 19:3
**driver** [2] - 245:13, 245:14
**drivers** [1] - 65:18
**driving** [3] - 70:3, 74:23
**due** [3] - 37:8, 94:24, 111:21
**duplicative** [1] - 7:13
**during** [30] - 66:18, 77:14, 92:25, 107:17, 107:22, 108:5, 108:7, 108:8, 122:13, 131:19, 132:12, 134:4, 135:9, 135:14, 137:19, 145:10, 145:24, 147:4, 147:11, 151:21, 153:12, 159:13, 163:3, 163:18, 166:1, 166:16, 166:20, 167:16, 175:18, 179:17
**duty** [3] - 61:7, 61:8, 99:4
**dynamics** [1] - 103:19

**E**

**e-mails** [1] - 248:7
**EA** [157] - 8:22, 9:1, 10:7, 15:12, 16:22, 30:5, 30:23, 35:1, 38:12, 39:4, 39:10, 41:15, 42:6, 42:25, 43:8, 43:10, 43:15, 43:23, 44:1, 46:1,

46:11, 46:15, 48:3, 49:19, 50:18, 50:20, 50:22, 50:25, 51:5, 55:14, 58:2, 69:19, 77:2, 85:2, 88:22, 89:21, 90:16, 90:18, 90:25, 91:15, 91:18, 92:11, 92:18, 94:7, 94:9, 94:10, 95:1, 99:8, 101:14, 103:18, 104:10, 104:17, 105:2, 107:7, 107:12, 118:22, 121:17, 123:19, 124:7, 128:7, 128:9, 129:18, 130:11, 132:16, 132:20, 132:25, 133:2, 133:21, 134:20, 134:23, 135:2, 136:16, 136:17, 139:12, 140:21, 141:7, 141:24, 143:11, 144:5, 144:8, 144:14, 144:16, 144:18, 145:4, 145:5, 145:20, 145:22, 146:12, 146:17, 146:19, 146:22, 148:14, 149:18, 152:6, 153:14, 155:24, 156:4, 156:5, 156:6, 156:10, 156:24, 157:8, 157:11, 157:12, 158:5, 158:9, 158:16, 158:18, 161:19, 162:18, 162:24, 164:1, 164:4, 164:12, 164:19, 164:23, 165:7, 170:4, 175:23, 176:16, 186:7, 186:8, 186:16, 202:17, 203:15, 215:6, 219:20, 222:7, 222:24, 224:1, 224:9, 229:19, 232:16, 233:3, 233:11, 233:20, 236:17, 237:5, 238:7, 239:11, 239:14, 239:16, 239:21, 245:14, 249:1, 249:12, 250:19, 251:1, 251:7, 251:17, 251:25,

255:4, 256:19
**EA/FONSI** [1] - 228:24
**ear** [1] - 27:18
**Earlbaum** [1] - 147:12
**early** [5] - 43:8, 80:22, 82:4, 119:23, 120:19
**ears** [1] - 242:19
**EAs** [3] - 15:21, 130:10, 222:24
**easier** [2] - 192:3, 192:7
**easily** [1] - 255:12
**East** [3] - 34:13, 70:1, 249:17
**Eastern** [1] - 231:22
**easy** [3] - 29:15, 179:5, 216:18
**echo** [1] - 252:21
**economic** [2] - 37:16, 253:8
**Ecopoetry.org** [1] - 3:8
**ed** [1] - 64:22
**educate** [2] - 261:25, 265:12
**educated** [1] - 64:1
**effect** [3] - 58:17, 149:7, 244:12
**effective** [3] - 260:22, 262:8, 262:15
**effectively** [3] - 131:5, 142:8, 214:24
**effects** [13] - 11:6, 18:18, 34:12, 35:9, 36:3, 37:18, 41:15, 42:6, 48:22, 76:3, 218:14
**effort** [4] - 153:5, 252:22, 264:3, 265:11
**efforts** [5] - 57:23, 88:12, 88:15, 98:3, 98:8
**EI** [1] - 158:5
**eight** [5] - 15:22, 18:9, 73:9, 91:4, 149:25
**eighth** [1] - 151:19
**EIS** [25] - 12:5, 12:22, 14:6, 15:12, 18:5, 18:10, 19:8, 41:11, 41:12, 67:16, 124:7, 124:8, 150:7, 150:25, 210:8, 223:18, 232:11, 237:19, 237:24, 237:25, 238:1, 241:18, 248:14, 248:18, 250:3
**Eisenhower** [1] - 1:20
**EISs** [3] - 15:22,

116:17, 116:19
**either** [22] - 8:5, 9:5, 9:8, 10:6, 26:2, 31:10, 31:22, 46:1, 48:14, 51:6, 84:24, 106:22, 107:5, 115:2, 120:3, 142:21, 165:11, 191:8, 199:16, 203:14, 214:22, 241:10
**EJ** [12] - 37:25, 49:20, 49:25, 51:22, 51:24, 52:7, 53:8, 53:22, 54:3, 141:6, 158:3
**EJTAG** [1] - 109:25
**elaboration** [1] - 237:11
**electronic** [2] - 123:18, 256:25
**element** [2] - 18:22, 82:8
**elements** [1] - 248:12
**elevate** [1] - 36:24
**elevated** [3] - 137:23, 193:20, 194:16
**elevator** [1] - 75:8
**eliminates** [1] - 161:8
**eliminating** [1] - 141:11
**ELIZABETH** [1] - 2:16
**elongate** [1] - 142:25
**eloquently** [1] - 256:11
**email** [7] - 77:10, 166:24, 167:5, 170:7, 170:13, 172:6, 261:22
**emails** [2] - 123:17, 247:17
**emanated** [1] - 172:1
**emanates** [3] - 133:2, 189:9, 196:6
**emanating** [1] - 193:2
**emissions** [2] - 204:25, 205:6
**emphasize** [3] - 57:8, 182:21, 203:13
**emphasized** [1] - 182:22
**emphasizes** [1] - 38:23
**Employees** [1] - 3:6
**Empower** [1] - 3:6
**empty** [2] - 234:8, 234:12
**emulating** [1] - 70:4
**enable** [1] - 247:7
**enables** [1] - 264:10
**encompasses** [1] -

169:16
encourage [1] - 74:22
encourages [2] - 77:12, 167:15
end [34] - 5:24, 6:10, 6:14, 8:24, 13:24, 20:21, 23:13, 23:14, 37:2, 52:21, 94:23, 100:20, 129:12, 145:21, 151:12, 151:14, 153:13, 162:19, 162:25, 170:11, 174:13, 174:15, 184:18, 216:2, 226:2, 226:3, 235:3, 246:9, 248:20, 259:9, 260:23, 261:16, 263:12, 264:13
endeavor [1] - 114:8
ended [1] - 234:25
ending [1] - 21:2
endless [1] - 151:6
endorsed [2] - 35:23, 35:24
endorses [2] - 56:22, 167:4
endorsing [1] - 106:6
ends [5] - 54:14, 144:4, 145:22, 146:13, 265:23
Energy [2] - 34:11, 34:19
enforce [3] - 60:22, 63:17, 64:11
enforceability [1] - 76:11
enforceable [7] - 30:1, 59:24, 61:3, 61:4, 61:11, 64:13, 76:5
enforcement [5] - 29:24, 60:19, 63:6, 63:10, 63:13
enforcing [1] - 203:25
engage [1] - 80:23
engaged [2] - 52:17, 142:3
engagement [6] - 91:11, 91:21, 122:18, 125:1, 167:19, 240:22
engaging [1] - 137:24
Engineers [1] - 30:4
enhanced [1] - 47:6
enjoin [2] - 66:9, 226:24
enjoined [1] - 220:18
enjoining [1] - 221:10
enjoyed [1] - 266:1
ENRD [2] - 2:3, 2:12

ensure [6] - 76:7, 197:21, 197:25, 201:24, 249:25, 252:7
entering [1] - 264:5
entertain [1] - 6:14
entire [9] - 50:6, 66:12, 67:7, 72:11, 72:17, 77:19, 205:4, 247:1, 253:9
entirely [1] - 84:16
entirety [2] - 9:10, 103:2
entities [17] - 83:17, 83:18, 86:2, 86:8, 86:20, 89:8, 93:13, 94:2, 94:13, 117:4, 117:5, 117:12, 119:1, 127:22, 127:23, 138:9, 152:16
entitled [5] - 57:12, 57:14, 187:2, 235:3, 266:12
entity [15] - 37:3, 75:23, 83:20, 84:23, 96:25, 97:1, 97:2, 111:2, 119:25, 120:4, 126:16, 129:7, 169:10
enunciate [2] - 91:24, 102:18
enunciated [1] - 208:11
environment [4] - 30:18, 87:9, 87:18, 253:12
Environment [1] - 3:12
environmental [102] - 5:23, 9:4, 14:12, 14:17, 14:20, 20:2, 21:25, 22:21, 23:4, 24:12, 25:14, 26:1, 26:25, 32:8, 33:25, 34:12, 37:14, 38:10, 48:10, 48:16, 49:7, 49:12, 49:20, 49:21, 50:1, 51:20, 52:24, 54:21, 57:1, 58:4, 60:3, 65:7, 65:21, 69:9, 69:12, 69:20, 71:10, 71:11, 72:17, 77:5, 77:12, 83:3, 83:9, 84:11, 85:10, 85:13, 85:23, 86:1, 86:4, 86:18, 87:12, 89:24, 93:24, 94:3, 94:14, 94:22, 104:1, 104:6, 105:23,

121:11, 121:12, 121:14, 123:21, 124:11, 125:2, 126:6, 126:15, 136:18, 136:22, 138:5, 143:23, 152:6, 152:8, 152:10, 152:11, 164:20, 185:21, 194:4, 201:8, 218:1, 219:3, 219:13, 220:3, 220:19, 221:17, 223:12, 226:7, 228:16, 229:1, 229:15, 229:25, 230:6, 240:16, 241:19, 245:2, 250:2, 253:8, 255:5, 255:8
Environmental [36] - 3:11, 3:12, 3:16, 8:20, 19:10, 22:24, 37:15, 37:20, 38:12, 45:20, 48:2, 49:2, 49:3, 50:21, 51:4, 71:11, 88:5, 89:3, 89:4, 95:15, 95:19, 96:19, 97:7, 97:14, 102:1, 124:12, 124:20, 125:19, 126:24, 140:2, 169:19, 218:5, 222:4, 229:14, 248:20, 253:10
environmental/
health [1] - 169:12
environmentally [1] - 252:2
envisions [1] - 77:25
EPA [43] - 36:10, 36:17, 40:20, 40:25, 49:22, 50:8, 52:2, 52:10, 53:17, 77:3, 77:4, 77:10, 77:12, 104:15, 105:19, 105:25, 106:7, 106:23, 142:2, 142:10, 143:2, 143:3, 143:9, 152:2, 166:24, 167:2, 167:6, 167:13, 167:14, 167:25, 177:7, 177:18, 177:24, 183:5, 193:21, 194:18, 203:25, 210:15, 210:16, 211:21, 211:23, 212:6
EPA's [17] - 12:9, 36:11, 36:23, 37:7,

37:24, 49:20, 50:7, 50:13, 51:22, 106:2, 106:8, 151:25, 183:1, 214:2, 215:14
equal [2] - 89:13, 248:4
equally [1] - 143:10
equate [1] - 99:19
equation [1] - 260:6
equity [1] - 104:1
equivalent [1] - 14:3
erasers [1] - 114:7
ergo [1] - 138:15
error [8] - 132:23, 132:25, 133:1, 133:2, 231:4, 231:17, 240:12, 240:15
errors [4] - 231:5, 231:6, 256:6
especially [3] - 21:10, 223:24, 240:5
ESQ [3] - 3:4, 3:15, 3:18
esque [1] - 246:4
ESQUIRE [13] - 1:15, 1:16, 1:19, 1:19, 2:4, 2:5, 2:8, 2:12, 2:16, 2:16, 2:17, 2:21, 2:21
essence [7] - 31:3, 125:14, 125:24, 136:8, 171:25, 238:2, 257:21
essentially [8] - 11:6, 34:20, 90:16, 91:12, 124:7, 237:20, 243:19, 254:21
Essex [1] - 22:22
established [1] - 106:20
Estate [1] - 71:13
estimated [1] - 34:24
et [9] - 1:3, 1:7, 62:13, 141:4, 149:18, 155:19, 158:6, 228:20
eval [1] - 55:2
evaluate [4] - 39:11, 77:16, 164:20, 167:17
evaluating [1] - 89:19
evaluation [4] - 15:4, 177:22, 189:10, 254:19
evaluations [2] - 16:10, 16:13
even-handed [1] - 263:9
event [2] - 9:25,

148:24
eventually [1] - 151:11
everywhere [3] - 26:24, 196:17, 251:24
evidence [8] - 72:9, 171:9, 219:21, 232:16, 238:21, 238:25, 239:3, 261:11
evidencing [1] - 171:4
evils [1] - 71:15
exact [2] - 24:6, 63:4, 248:8
exactly [24] - 11:22, 24:15, 27:11, 61:8, 66:6, 82:16, 88:11, 93:25, 94:5, 99:6, 129:10, 138:1, 143:8, 158:19, 159:21, 168:23, 169:18, 177:19, 210:5, 210:13, 213:24, 259:21, 261:16, 264:9
examining [1] - 12:5
example [7] - 70:15, 73:8, 91:20, 144:5, 225:23, 225:24, 236:22
examples [1] - 19:7
exceed [3] - 205:5, 205:6, 205:15
exceedances [5] - 39:16, 48:20, 201:10, 201:23, 202:4
exceeded [1] - 116:15
exceeding [1] - 215:16
exceeds [1] - 115:21
excellent [4] - 59:5, 66:25, 73:8
except [6] - 145:24, 161:18, 178:1, 207:7, 228:15
exception [2] - 145:25, 204:4
excerpts [1] - 103:15
excluded [1] - 226:12
exclusion [1] - 94:14
exclusions [3] - 15:11, 15:20, 15:21
exclusively [1] - 14:19
excuse [1] - 121:13, 142:11, 142:13, 142:15, 154:8, 208:25
executive [12] - 38:7, 48:4, 48:15, 49:11,

49:13, 51:2, 52:23, 84:2, 125:5, 140:1, 140:6, 140:7
**exemplarily** [1] - 21:9
**exercise** [4] - 82:14, 127:13, 240:1
**exercised** [3] - 82:8, 83:12, 127:13
**exercising** [2] - 82:18, 83:6
**exhaust** [2] - 105:16, 203:22
**exhaustion** [1] - 204:5
**exhaustive** [2] - 119:11, 255:4
**exhibited** [1] - 252:23
**exist** [5] - 61:1, 62:20, 64:20, 225:9, 254:14
**existed** [1] - 226:9
**existing** [13] - 9:4, 9:13, 11:5, 23:8, 35:5, 35:6, 35:13, 35:19, 47:24, 49:6, 49:9, 207:25, 251:5
**Existing** [1] - 10:13
**exists** [2] - 36:7, 227:11
**expand** [2] - 68:2, 70:5
**expanded** [2] - 143:3, 228:2
**expansion** [7] - 66:21, 68:22, 69:21, 70:15, 241:22, 242:2, 242:5
**expansive** [1] - 137:14
**expect** [4] - 138:16, 207:17, 216:13, 230:18
**expectation** [1] - 131:22
**expectations** [2] - 131:9, 243:2
**expecting** [1] - 22:20
**expediency** [1] - 256:6
**experience** [1] - 57:4
**experienced** [2] - 213:2, 217:8
**expert** [1] - 254:10
**expertise** [8] - 36:23, 37:7, 49:22, 81:17, 84:11, 127:11, 228:22, 228:23
**expiration** [1] - 159:17
**expires** [1] - 176:13
**explain** [20] - 7:21, 21:3, 21:4, 24:16, 31:9, 31:20, 32:20, 58:13, 107:8, 168:16, 184:2, 191:8, 193:23,

218:6, 218:12, 221:21, 223:22, 249:13, 255:22, 261:24
**explained** [17] - 39:4, 50:18, 50:22, 85:2, 128:7, 128:8, 128:10, 128:15, 130:8, 138:12, 144:23, 169:2, 193:24, 205:14, 215:6, 218:15, 253:11
**explaining** [4] - 51:5, 182:15, 204:19, 217:21
**explains** [7] - 9:25, 38:12, 50:20, 157:17, 215:15, 251:7
**explanation** [18] - 23:2, 24:21, 24:25, 25:8, 29:13, 31:15, 45:12, 57:10, 85:15, 113:20, 168:19, 191:9, 208:20, 228:4, 229:13, 236:23, 237:4, 250:10
**explanations** [1] - 249:19
**explore** [1] - 27:10
**expounded** [1] - 238:8
**Expressway** [1] - 70:1
**extended** [9] - 14:13, 14:14, 50:6, 113:9, 113:12, 113:22, 115:16, 123:7, 148:14
**extends** [1] - 241:23
**extension** [10] - 68:13, 111:3, 111:10, 111:17, 113:1, 150:7, 150:10, 150:11, 242:9
**extensions** [2] - 115:23, 234:16
**extensive** [3] - 138:10, 138:11, 151:2
**extent** [6] - 81:23, 132:17, 214:25, 238:20, 258:25, 259:2
**extra** [3] - 42:20, 114:22, 115:8
**extracted** [1] - 16:2
**extracts** [1] - 59:5
**extraordinarily** [1] - 255:3
**extremely** [3] -

240:25, 244:23, 247:1
**eyes** [2] - 10:16, 10:21

# F

**F.3d** [3] - 107:2, 212:1, 232:14
**F.3rd** [1] - 126:24
**face** [1] - 59:14
**faced** [1] - 196:12
**facilities** [1] - 216:6
**fact** [44] - 22:13, 31:12, 35:6, 35:14, 65:15, 69:11, 91:23, 95:21, 98:9, 104:25, 105:1, 106:4, 107:19, 121:25, 136:11, 138:8, 139:15, 142:5, 149:16, 160:10, 160:14, 161:9, 171:5, 171:21, 177:7, 187:24, 203:13, 209:11, 211:16, 224:3, 230:25, 239:9, 240:3, 243:21, 244:8, 244:11, 247:6, 247:8, 253:15, 254:6, 254:24, 254:25, 261:18
**factor** [2] - 73:23, 232:2
**factors** [1] - 62:25
**facts** [1] - 35:3
**factual** [2] - 99:4, 213:19
**fail** [3] - 64:22, 105:15, 105:16
**failed** [4] - 80:19, 80:21, 155:24, 239:9
**Fails** [1] - 30:6
**fails** [1] - 103:21
**failure** [9] - 38:25, 98:18, 154:8, 183:25, 184:1, 203:21, 223:10, 223:11
**fair** [11] - 26:16, 111:23, 143:14, 150:13, 175:21, 176:1, 176:19, 177:1, 177:17, 263:9
**fairly** [2] - 40:12, 143:15
**fairness** [3] - 90:23, 90:24, 202:21
**Faith** [1] - 3:7

**fall** [1] - 115:24
**false** [1] - 69:16
**familiar** [3] - 51:1, 148:24, 258:20
**Family** [1] - 3:12
**far** [16] - 57:15, 59:11, 59:13, 59:25, 61:24, 61:25, 66:1, 85:17, 86:24, 97:6, 126:25, 149:4, 168:9, 241:15, 244:5, 245:5
**fashion** [3] - 131:1, 156:25, 160:7
**fatal** [1] - 59:2
**favor** [5] - 17:17, 50:1, 162:21, 184:22, 230:15
**FDR** [1] - 19:3
**feasibility** [2] - 77:16, 167:18
**Featherstone** [1] - 261:23
**Fed** [3] - 16:24, 147:17
**federal** [17] - 13:14, 48:4, 48:8, 54:1, 54:20, 55:12, 69:15, 80:19, 81:11, 81:21, 84:18, 84:19, 88:1, 95:23, 191:4, 252:3, 256:10
**FEDERAL** [1] - 266:9
**Federal** [36] - 1:9, 15:16, 15:24, 16:16, 16:17, 16:23, 36:14, 36:16, 36:25, 52:22, 55:10, 66:25, 76:6, 81:9, 83:12, 87:22, 89:7, 115:17, 118:21, 123:12, 125:12, 125:17, 133:22, 136:20, 144:20, 172:2, 185:16, 186:20, 190:19, 191:2, 214:17, 219:24, 221:12, 224:12, 242:10, 244:3
**feedback** [3] - 173:10, 173:16, 174:1
**felt** [1] - 194:12
**fervid** [1] - 256:13
**few** [9] - 67:7, 83:11, 94:25, 126:12, 139:9, 179:10, 226:3, 237:25, 257:7
**FHA** [1] - 254:13
**FHWA** [92] - 18:5, 18:10, 21:1, 21:3, 25:8, 26:8, 30:15, 32:5, 38:23, 46:3,

46:11, 54:12, 54:20, 55:5, 55:8, 57:18, 67:18, 76:7, 77:10, 77:12, 80:25, 81:22, 82:1, 82:6, 82:9, 82:20, 83:21, 84:13, 84:22, 89:12, 95:2, 98:3, 98:19, 99:8, 101:2, 105:5, 105:11, 106:4, 107:5, 108:1, 108:16, 109:9, 110:3, 110:8, 110:20, 110:21, 111:8, 118:25, 124:17, 126:9, 136:13, 140:13, 141:17, 144:23, 145:10, 147:13, 151:23, 152:13, 153:22, 154:2, 156:7, 157:1, 160:9, 164:1, 164:25, 165:4, 165:5, 166:15, 167:6, 167:15, 176:4, 178:25, 193:18, 204:1, 210:8, 210:24, 211:23, 217:22, 218:12, 223:21, 226:9, 239:9, 249:25, 250:14, 251:12, 251:13, 251:18, 252:6, 254:13, 255:7, 260:25
**FHWA's** [10] - 18:3, 29:10, 38:25, 45:19, 45:23, 83:6, 83:14, 89:19, 124:24, 165:3
**field** [1] - 33:14
**fifth** [1] - 118:12
**Fifth** [2] - 2:22, 30:5
**figure** [19] - 67:9, 68:18, 112:4, 122:11, 128:3, 129:8, 137:2, 155:13, 175:4, 175:8, 211:17, 250:18, 251:10, 251:17, 251:23, 265:3, 265:4, 265:6
**figures** [1] - 254:5
**file** [3] - 172:1, 258:15, 260:18
**filed** [5] - 15:23, 87:4, 105:25, 106:2, 135:13
**fill** [2] - 225:8, 237:1
**final** [73] - 35:1, 39:4,

43:10, 44:1, 46:1,
57:1, 58:3, 77:15,
77:17, 77:19, 89:21,
92:13, 92:16, 92:19,
93:1, 93:5, 93:7,
93:10, 94:7, 94:9,
94:10, 94:13, 100:1,
104:17, 104:18,
106:11, 106:13,
107:7, 107:12,
108:3, 108:10,
109:10, 109:13,
129:18, 131:2,
131:25, 132:20,
132:25, 133:2,
136:17, 141:24,
143:10, 144:8,
144:16, 144:18,
146:17, 146:19,
155:24, 156:6,
156:24, 158:18,
159:25, 160:3,
161:19, 162:18,
162:24, 164:1,
164:4, 164:12,
164:19, 165:7,
167:17, 167:19,
170:4, 176:13,
176:21, 186:8,
217:23, 224:3,
233:19, 246:5,
256:19

**finality** [5] - 144:10,
144:12, 144:18,
145:19, 145:22

**finally** [3] - 33:6,
169:7, 170:1

**financial** [1] - 73:11

**findings** [10] - 58:2,
58:16, 58:21, 60:16,
61:2, 132:21,
132:24, 222:1,
230:2, 256:16

**fine** [15] - 6:18, 40:14,
80:1, 103:22,
108:18, 110:25,
114:2, 119:17,
137:8, 147:16,
147:22, 154:23,
199:18, 241:9, 245:4

**fine-graded** [1] -
103:22

**finger** [1] - 223:6

**fingertips** [1] - 36:6

**finish** [4] - 6:1, 13:9,
154:15, 216:3

**finishing** [1] - 5:22

**FINK** [1] - 2:20

**firm** [1] - 32:5

**firmly** [1] - 31:25

**first** [69] - 9:18, 10:4,
18:17, 27:24, 31:3,
40:9, 47:14, 56:2,
56:6, 56:21, 81:21,
84:1, 84:6, 84:14,
87:13, 88:9, 88:23,
90:3, 94:21, 95:21,
99:18, 103:17,
105:7, 110:14,
111:4, 119:6,
129:13, 131:17,
138:1, 140:21,
141:12, 141:13,
141:14, 141:15,
155:24, 157:21,
174:4, 194:3, 196:4,
196:7, 196:10,
196:11, 204:21,
204:23, 207:18,
211:14, 213:15,
221:5, 222:6, 223:9,
223:24, 224:20,
227:23, 230:17,
230:20, 231:3,
231:4, 231:6,
236:15, 236:20,
238:16, 249:7,
249:8, 252:18,
255:18, 257:17,
258:19

**first-in-the-nation** [1]
- 223:24

**fiscal** [1] - 15:17

**fit** [3] - 23:1, 47:14,
87:17

**fitting** [1] - 120:3

**five** [6] - 55:22, 67:22,
155:4, 155:9,
246:21, 253:4

**five-minute** [1] - 55:22

**fix** [2] - 233:3, 233:5

**fixing** [2] - 232:8,
253:23

**flat** [1] - 216:17

**flaw** [5] - 59:2, 60:2,
60:3, 60:4, 145:3

**flawed** [2] - 218:17,
225:23

**flaws** [3] - 224:21,
227:24, 230:1

**flexibility** [1] - 263:6

**flexible** [1] - 102:14

**flip** [1] - 253:13

**Floor** [4] - 2:13, 2:17,
2:22, 3:19

**flow** [1] - 119:7

**flowing** [1] - 235:15

**fly** [1] - 97:5

**flyspeck** [1] - 256:16

**focus** [6] - 58:12,

60:6, 67:14, 73:22,
225:25, 248:11

**focused** [5] - 60:12,
93:22, 105:22,
177:24, 189:8

**focusing** [1] - 85:25

**folks** [7] - 13:24,
155:2, 215:20,
216:10, 230:24,
261:16, 262:1

**follow** [4] - 29:4,
68:17, 191:23,
228:12

**following** [5] - 18:3,
125:23, 126:5,
139:22, 144:8

**follows** [2] - 63:4,
125:9

**FONSI** [73] - 25:14,
27:1, 29:22, 29:25,
30:23, 46:1, 58:13,
58:15, 58:22, 59:14,
61:10, 62:20, 63:15,
67:17, 69:8, 70:10,
76:8, 76:10, 85:3,
94:8, 94:10, 94:11,
107:7, 107:14,
108:3, 108:10,
108:11, 130:11,
132:3, 132:6,
132:15, 132:19,
132:24, 133:1,
133:23, 134:15,
134:19, 134:22,
145:5, 145:12,
146:11, 146:19,
147:5, 162:18,
162:24, 164:5,
165:7, 170:4, 173:7,
173:9, 173:11,
173:13, 173:22,
173:25, 174:9,
174:13, 174:15,
174:16, 174:24,
176:13, 218:3,
219:13, 219:20,
224:9, 226:24,
229:15, 229:19,
232:17, 233:12,
233:20, 233:21,
249:2

**FONSIs** [2] - 15:12,
15:21

**font** [1] - 262:14

**footing** [1] - 6:8

**footnote** [1] - 239:7

**FOR** [1] - 1:1

**foregoing** [1] - 266:11

**foregone** [1] - 254:12

**foremost** [1] - 223:10

**Forest** [1] - 227:19

**Forestwatch** [1] -
227:18

**forever** [1] - 262:5

**forget** [1] - 198:9

**form** [19] - 8:2, 9:18,
94:11, 105:15,
118:23, 120:7,
123:14, 123:18,
131:1, 131:6,
134:20, 150:13,
166:11, 167:22,
171:20, 224:11,
234:19, 262:4,
263:22

**formal** [5] - 122:13,
122:14, 122:21,
123:3, 167:22

**format** [1] - 117:19

**former** [1] - 256:7

**formula** [1] - 254:13

**Fort** [6] - 58:10, 58:19,
59:17, 193:20,
194:16, 249:16

**forth** [8] - 25:9, 53:25,
56:22, 59:7, 99:9,
157:8, 240:19, 264:5

**forward** [10] - 35:20,
58:14, 58:22, 60:5,
77:21, 151:5, 208:1,
244:12, 245:19,
265:24

**four** [35] - 9:19, 9:23,
24:12, 24:19, 24:23,
25:7, 25:12, 25:15,
38:24, 42:16, 83:3,
87:17, 87:22,
118:12, 128:21,
149:10, 158:11,
159:10, 182:14,
188:18, 189:21,
199:11, 207:21,
215:12, 218:7,
218:11, 246:17,
246:19, 249:8,
249:14, 249:16,
253:3, 253:4

**four-month** [1] -
149:10

**four-year** [2] - 188:18,
189:21

**fours** [2] - 212:13,
212:14

**fourth** [2] - 116:25,
129:17

**Fourth** [1] - 168:21

**fraction** [1] - 19:23

**frame** [5] - 148:12,
149:20, 149:21,
150:7, 150:8

**frames** [2] - 151:2,
186:1

**framework** [3] - 34:4,
100:19, 230:13

**Frank** [1] - 1:9

**FRANKEL** [1] - 3:14

**frankly** [3] - 61:18,
257:3, 261:16

**Free** [3] - 239:17,
239:21, 240:13

**Freight** [1] - 210:9

**frequency** [1] - 38:10

**frequently** [3] -
123:23, 123:25,
151:2

**fresh** [1] - 246:7

**Friday** [1] - 16:6

**friends** [1] - 260:4

**Friends** [1] - 3:11

**FROM** [1] - 56:12

**front** [7] - 74:18,
127:17, 203:1,
203:6, 217:24,
231:10, 247:23

**fuel** [1] - 34:13

**full** [17] - 141:20,
141:21, 170:13,
217:25, 219:14,
220:19, 221:17,
223:18, 228:16,
229:15, 229:25,
230:5, 233:17,
244:21, 248:14,
250:3, 262:22

**fully** [11] - 56:21, 90:2,
93:23, 128:6,
157:10, 173:21,
177:5, 207:17,
216:13, 240:18,
263:14

**fulsome** [2] - 172:7,
255:21

**fund** [1] - 76:4

**Fund** [2] - 3:9, 3:16

**fundamental** [4] -
145:3, 145:15,
227:24, 238:6

**fundamentally** [2] -
218:17, 225:23

**funded** [2] - 75:7,
249:20

**funding** [7] - 57:22,
57:25, 59:23, 74:2,
74:6, 75:2, 218:8

**furthermore** [1] - 77:3

**future** [5] - 62:3,
63:19, 64:7, 77:6,
265:22

## G

**gantries** [1] - 19:3
**gap** [2] - 224:18, 237:1
**gaps** [3] - 224:24, 225:8
**Garcia** [1] - 77:10
**Gas** [1] - 3:8
**gases** [6] - 65:24, 65:25, 66:1, 66:2, 66:4, 66:13
**general** [8] - 41:20, 58:18, 104:8, 114:15, 118:23, 120:5, 231:12, 253:25
**generalized** [3] - 60:8, 60:10, 103:21
**generally** [2] - 181:12, 211:17
**generate** [1] - 247:23
**generation** [3] - 73:24, 74:3, 75:1
**generations** [2] - 68:9, 69:4
**generic** [1] - 164:13
**generous** [1] - 179:16
**genesis** [1] - 17:7
**gentlemen** [4] - 78:18, 114:23, 245:25, 262:21
**geographic** [1] - 121:12
**George** [2] - 44:20, 44:22
**giant** [1] - 234:18
**giant-sized** [1] - 234:18
**given** [23] - 23:3, 24:22, 24:25, 31:7, 40:6, 57:3, 71:20, 71:25, 72:1, 73:12, 99:21, 105:13, 106:8, 111:15, 112:22, 116:3, 116:8, 127:19, 137:24, 193:25, 208:20, 246:25
**glad** [3] - 40:7, 138:20, 155:14
**glaring** [7] - 132:23, 132:24, 133:1, 133:2, 144:19, 145:9, 146:2
**goals** [3] - 65:23, 244:16
**GORDON** [1] - 1:12
**gordon** [1] - 5:2
**Gottheimer** [1] - 122:3
**governed** [1] - 188:12

**government** [16] - 6:25, 66:24, 80:19, 81:22, 82:22, 84:19, 88:1, 103:16, 141:11, 144:13, 168:7, 168:13, 168:24, 169:14, 170:20, 252:3
**government's** [2] - 39:3, 81:12
**governments** [1] - 238:20
**governor** [6] - 65:10, 129:21, 139:11, 141:9, 170:8, 170:15, 171:18, 172:16, 176:8, 247:19
**Governor** [2] - 94:21, 170:2
**governor's** [5] - 170:5, 170:22, 171:10, 171:11, 210:14
**Governor's** [2] - 135:20, 136:8
**grab** [1] - 75:11
**gradations** [4] - 27:14, 27:20, 30:13, 30:15
**graded** [1] - 103:22
**grading** [1] - 67:12
**grandchildren** [2] - 235:7, 235:9
**grant** [1] - 256:20
**granted** [2] - 111:17, 111:25
**granting** [1] - 63:14
**granularity** [1] - 38:13
**grateful** [3] - 246:24, 247:2, 252:10
**great** [7] - 95:12, 110:16, 199:18, 229:18, 230:1, 235:6, 244:3
**greater** [5] - 8:22, 12:16, 46:24, 51:8, 157:24
**greatly** [2] - 247:6, 247:9
**Green** [1] - 3:10
**greenhouse** [6] - 65:24, 65:25, 66:1, 66:2, 66:4, 66:13
**GREGORY** [1] - 2:4
**ground** [1] - 125:14
**group** [9] - 40:19, 40:20, 40:24, 96:11, 96:20, 97:12, 126:6, 152:17, 245:3
**Group** [4] - 35:10, 95:20, 124:12,

125:20
**groups** [17] - 65:7, 65:21, 71:9, 96:17, 96:23, 97:2, 97:4, 110:3, 110:19, 124:14, 138:5, 152:7, 152:9, 152:10, 152:11, 152:14
**grubbing** [1] - 74:19
**Guard** [1] - 69:18
**guardrails** [1] - 248:14
**guess** [8] - 55:5, 72:21, 128:14, 196:11, 211:14, 236:4, 250:19, 251:8
**guessing** [2] - 34:6, 231:25
**guidance** [19] - 40:20, 52:23, 53:4, 53:6, 54:21, 89:6, 100:11, 126:17, 126:18, 126:19, 134:18, 147:3, 163:10, 165:14, 165:15, 166:8, 215:14, 215:15
**guides** [1] - 231:8
**gullible** [1] - 258:22
**guys** [1] - 76:22
**GW** [5] - 39:5, 39:11, 244:1

## H

**Hackensack** [2] - 3:9, 3:19
**half** [8] - 63:3, 76:16, 78:24, 110:14, 154:21, 157:22, 179:17, 180:13
**halfway** [3] - 11:11, 95:11, 124:2
**hand** [10] - 7:7, 10:22, 19:11, 133:14, 133:15, 187:9, 189:1, 189:4, 202:15, 217:2
**handed** [5] - 7:14, 7:20, 56:10, 263:9
**handle** [2] - 257:7, 262:3
**handout** [4] - 7:9, 12:14, 14:19, 186:23
**handouts** [1] - 10:19
**happy** [11] - 8:4, 16:4, 40:15, 130:2, 130:16, 134:4, 137:7, 180:25, 242:11, 257:18,

262:14
**Harbor** [4] - 210:9, 213:10, 213:12, 214:15
**hard** [13] - 58:16, 64:19, 64:21, 206:12, 217:22, 218:18, 224:19, 230:24, 254:4, 254:24, 255:4, 258:2
**harm** [1] - 39:25
**harmless** [4] - 231:4, 231:8, 231:17, 240:15
**HARRIS** [1] - 2:21
**harsh** [1] - 262:25
**hat** [3] - 63:5, 74:17, 238:2
**have..** [1] - 187:1
**hazardous** [1] - 72:7
**head** [3] - 67:11, 134:9, 142:17
**head's** [1] - 216:11
**heading** [2] - 60:16, 216:10
**heads** [1] - 139:21
**heads-up** [1] - 139:21
**Health** [5] - 3:6, 86:5, 86:6, 88:6, 140:2, 169:21
**health** [10] - 11:7, 39:25, 85:13, 86:18, 87:8, 87:16, 87:18, 93:24, 94:2, 94:14
**hear** [19] - 8:5, 14:2, 55:22, 56:25, 64:1, 64:4, 78:25, 79:3, 80:13, 137:7, 138:20, 138:24, 149:11, 185:12, 198:2, 236:4, 257:8, 257:14, 257:18
**heard** [21] - 13:11, 30:14, 56:24, 60:7, 60:8, 62:2, 62:5, 75:16, 95:14, 103:8, 107:4, 109:6, 153:12, 224:24, 225:2, 236:3, 237:22, 247:15, 249:1, 250:14, 255:25
**hearing** [2] - 236:6, 247:22
**hearings** [4] - 121:16, 121:23, 122:4, 122:21
**hearsay** [2] - 261:12, 261:14
**heart** [1] - 247:10

**HECKER** [1] - 2:20
**held** [9] - 5:1, 30:5, 80:15, 90:13, 90:25, 109:21, 123:9, 159:8, 227:18
**help** [20] - 59:16, 68:20, 84:5, 100:14, 101:21, 102:19, 128:15, 129:6, 131:13, 131:15, 133:18, 182:6, 182:8, 192:4, 198:5, 198:8, 208:3, 253:20, 253:21, 261:25
**helped** [1] - 202:10
**helpful** [3] - 36:6, 188:13, 264:7
**helping** [1] - 201:19
**helps** [1] - 204:18
**high** [9] - 9:4, 9:10, 9:12, 11:2, 20:8, 47:12, 54:6, 54:7, 119:13
**higher** [3] - 22:13, 45:2, 117:13
**higher-level** [1] - 117:13
**highest** [5] - 19:16, 19:21, 22:6, 39:12, 45:5
**highlighted** [1] - 45:1
**highlighting** [2] - 46:4, 91:11
**highlights** [1] - 193:19
**highly** [2] - 41:24, 51:22
**highway** [22] - 12:17, 12:22, 14:16, 39:10, 39:15, 39:20, 40:4, 40:18, 40:24, 42:2, 42:12, 42:14, 44:9, 67:16, 69:21, 69:24, 70:6, 70:14, 141:1, 215:11, 241:18, 241:22
**Highway** [22] - 15:13, 15:16, 15:24, 16:17, 19:3, 35:10, 45:4, 52:22, 81:9, 83:12, 87:22, 89:7, 123:12, 133:22, 144:20, 172:2, 185:16, 219:24, 221:12, 224:12, 232:13, 242:10
**Highway's** [2] - 76:6, 115:17
**Highways** [14] - 36:14, 36:17, 36:25, 55:10,

66:25, 118:21,
125:12, 125:17,
136:21, 186:20,
190:19, 191:3,
214:17, 244:3
**highways** [3] - 39:6,
141:5, 215:11
**hire** [1] - 72:22
**historically** [1] -
209:15
**history** [3] - 18:7,
35:23, 131:6
**Hoboken** [2] - 3:13,
90:15
**hoc** [6] - 21:8, 21:13,
45:19, 46:15,
250:12, 251:9
**hold** [17] - 6:13, 23:17,
24:25, 33:21, 43:12,
109:18, 136:5,
154:14, 174:10,
186:25, 221:23,
222:14, 262:5,
262:11, 263:4
**holding** [2] - 99:22,
115:9
**holes** [1] - 227:22
**Holland** [2] - 66:23,
68:4
**hollow** [1] - 154:8
**home** [1] - 261:3
**honest** [1] - 230:5
**honestly** [1] - 122:10
**Honor** [355] - 6:18,
6:24, 7:1, 7:3, 7:5,
7:19, 8:16, 13:12,
15:3, 15:7, 15:16,
15:25, 16:5, 16:7,
16:14, 17:9, 17:13,
17:14, 17:22, 18:1,
18:15, 18:25, 19:9,
19:11, 19:13, 19:18,
19:24, 20:18, 21:8,
22:2, 22:17, 23:2,
23:25, 24:9, 25:5,
26:13, 26:18, 26:21,
28:5, 28:7, 28:12,
28:21, 28:24, 29:3,
29:7, 29:9, 29:17,
30:11, 30:16, 30:21,
32:21, 33:23, 34:7,
34:15, 36:8, 38:1,
38:9, 38:19, 39:18,
40:7, 40:9, 40:25,
41:3, 41:6, 41:9,
42:1, 44:2, 44:11,
47:8, 48:18, 49:5,
49:16, 52:15, 52:20,
53:8, 53:15, 54:23,
55:4, 55:13, 56:5,

56:8, 56:12, 56:17,
56:20, 58:6, 58:13,
60:12, 60:13, 62:11,
66:19, 67:4, 67:10,
69:3, 70:8, 70:19,
70:22, 70:24, 71:6,
71:8, 71:17, 71:19,
72:2, 72:16, 72:24,
73:5, 73:19, 73:25,
74:20, 75:14, 75:17,
75:19, 76:2, 76:12,
76:25, 77:8, 77:22,
78:1, 79:15, 79:22,
80:16, 86:23, 95:6,
98:13, 107:25,
114:11, 114:13,
114:25, 115:14,
116:2, 116:6,
116:15, 116:25,
117:17, 118:12,
118:17, 119:10,
119:22, 120:6,
121:9, 121:16,
121:18, 122:5,
124:3, 124:9,
126:20, 127:4,
128:5, 128:11,
128:13, 128:18,
130:1, 130:16,
133:4, 134:12,
134:17, 142:14,
142:19, 143:8,
143:14, 144:4,
147:9, 147:15,
153:9, 153:17,
154:12, 159:3,
159:11, 160:17,
161:3, 162:2, 162:4,
172:6, 172:23,
173:3, 173:7, 174:6,
174:23, 175:12,
177:1, 178:2, 178:9,
178:17, 178:22,
179:14, 179:24,
180:5, 180:9,
180:23, 181:1,
181:15, 181:25,
182:12, 182:18,
182:20, 183:14,
183:17, 183:20,
184:8, 184:10,
184:13, 184:15,
184:16, 184:19,
185:5, 185:16,
185:19, 186:4,
186:6, 186:9,
186:12, 186:19,
186:23, 187:3,
187:16, 187:21,
188:13, 189:3,
189:7, 189:13,

190:18, 190:25,
191:12, 191:14,
191:24, 192:20,
193:4, 193:16,
194:2, 196:10,
196:21, 197:9,
197:11, 198:23,
199:2, 200:22,
200:25, 202:9,
202:13, 203:9,
206:23, 207:13,
207:18, 207:21,
208:25, 209:11,
209:24, 210:7,
210:13, 211:8,
211:25, 212:14,
212:19, 212:21,
212:24, 213:7,
213:13, 213:21,
214:1, 214:14,
214:18, 214:22,
215:19, 217:6,
217:10, 217:13,
217:22, 218:12,
218:18, 218:23,
219:2, 219:8,
219:22, 220:2,
220:10, 220:14,
220:25, 221:3,
221:7, 221:22,
223:16, 224:15,
225:11, 225:18,
226:5, 226:16,
226:24, 227:5,
227:25, 228:6,
228:15, 228:25,
229:23, 230:11,
234:10, 235:10,
235:23, 235:25,
238:10, 238:18,
239:20, 239:25,
240:10, 240:20,
241:1, 241:14,
242:21, 243:6,
243:21, 244:7,
244:20, 245:6,
245:9, 245:20,
246:12, 246:15,
246:18, 246:22,
246:23, 247:3,
247:10, 247:12,
248:10, 248:11,
248:22, 249:6,
250:8, 250:11,
250:23, 251:1,
251:12, 251:16,
252:5, 252:11,
252:21, 255:12,
255:17, 257:19,
258:15, 258:19,
259:10, 259:14,

259:19, 260:1,
260:7, 260:19,
260:23, 262:7,
262:19, 262:20,
265:19, 266:3,
266:4, 266:5, 266:6
**Honor's** [5] - 58:9,
67:11, 122:15,
137:12, 217:1
**HONORABLE** [1] -
1:12
**Honorable** [1] - 5:1
**hope** [3] - 212:23,
261:3, 264:14
**hoped** [1] - 83:13
**hoping** [3] - 178:19,
217:13, 259:9
**hosted** [1] - 89:1
**hot** [16] - 12:8, 16:18,
199:9, 199:13,
199:19, 199:20,
200:14, 200:16,
200:23, 205:13,
205:19, 207:21,
207:23, 209:14,
210:4
**hot-spots** [1] - 210:4
**hotspot** [43] - 12:9,
39:1, 39:21, 40:5,
187:13, 187:15,
188:5, 188:22,
194:22, 195:8,
195:11, 195:14,
196:16, 196:24,
197:20, 198:8,
198:9, 198:10,
198:17, 198:21,
200:2, 200:7,
200:10, 200:19,
201:3, 201:6,
205:13, 205:14,
205:25, 206:3,
206:20, 207:20,
208:6, 208:11,
208:15, 209:10,
214:13, 214:25,
215:15
**hotspots** [8] - 39:15,
141:4, 197:4, 197:5,
197:7, 197:12,
197:13, 198:11
**hour** [6] - 78:23,
140:19, 151:14,
151:18, 151:19,
154:21
**hours** [5] - 65:16,
78:21, 78:23, 89:23,
245:13
**Howard** [15] - 4:13,
79:13, 184:12,

184:14, 184:22,
186:5, 191:6,
191:23, 202:16,
204:19, 205:11,
205:14, 213:3,
256:24, 258:18
**HOWARD** [93] - 2:12,
79:15, 184:13,
184:15, 184:19,
184:23, 185:1,
185:4, 185:8,
185:12, 185:15,
185:19, 185:21,
186:6, 186:9,
186:12, 187:3,
187:5, 187:21,
187:25, 188:13,
188:17, 189:3,
189:7, 189:13,
189:15, 189:19,
189:23, 189:25,
190:2, 190:5, 190:7,
190:10, 190:13,
190:16, 190:18,
191:12, 191:14,
191:24, 192:3,
192:6, 192:10,
192:13, 192:16,
192:19, 192:24,
193:4, 193:13,
193:16, 194:2,
194:9, 194:11,
194:20, 195:8,
195:14, 195:19,
195:21, 195:23,
196:10, 196:15,
196:21, 196:24,
197:3, 197:6, 197:9,
197:11, 197:16,
197:19, 198:4,
198:13, 198:19,
198:23, 199:1,
199:23, 200:3,
200:5, 200:7,
200:13, 200:20,
200:22, 200:25,
201:6, 201:16,
201:18, 201:22,
202:2, 202:9,
202:13, 213:4,
213:7, 213:13,
213:15, 213:21
**Hudson** [9] - 3:7,
19:16, 61:16, 67:2,
96:6, 207:22, 210:4,
240:14, 244:5
**hugely** [1] - 67:6
**human** [3] - 11:6,
39:25, 114:8
**Humane** [1] - 222:5

**humans** [1] - 263:18
**hundred** [2] - 115:7, 242:20
**hundreds** [1] - 248:7
**hung** [1] - 63:5
**hypocrisy** [2] - 67:15, 241:23
**hypocritically** [2] - 70:10, 70:11

**I**

**I-10** [1] - 15:13
**I-95** [3] - 44:14, 44:16, 45:3
**I..** [1] - 13:10
**ICG** [2] - 40:19, 110:7
**idea** [4] - 14:1, 118:5, 173:22, 195:5
**identical** [1] - 147:25
**identifiable** [2] - 198:11, 198:13
**identification** [4] - 46:9, 198:10, 198:17, 198:21
**identified** [31] - 8:23, 9:7, 9:14, 11:1, 11:7, 24:19, 30:21, 43:14, 43:17, 46:13, 46:19, 46:22, 46:24, 47:4, 47:5, 47:21, 48:5, 48:7, 64:9, 70:24, 74:24, 77:2, 78:3, 117:11, 117:24, 127:23, 199:21, 200:15, 201:24, 232:9
**identify** [12] - 28:15, 29:14, 50:21, 51:22, 53:23, 76:2, 81:9, 84:16, 112:3, 124:23, 141:6, 164:20
**identifying** [5] - 51:20, 52:4, 54:4, 127:6, 153:8
**ies** [1] - 187:23
**IF** [2] - 234:18, 236:16
**ignore** [3] - 182:23, 262:2
**ignored** [2] - 65:16, 128:20
**ignoring** [1] - 46:21
**Ilio'ulaokalani** [2] - 212:1, 212:13
**illegal** [1] - 224:22
**illuminate** [1] - 62:8
**illusions** [1] - 105:10
**illusory** [1] - 131:15
**illustrate** [2] - 202:19,

204:18
**illustrative** [1] - 261:7
**impact** [26] - 19:7, 30:18, 57:2, 58:5, 58:23, 60:2, 60:4, 60:17, 61:2, 61:13, 69:9, 69:21, 103:19, 104:6, 129:15, 165:6, 218:1, 218:12, 219:14, 220:19, 221:17, 228:18, 229:1, 229:15, 229:25, 230:6
**impacting** [1] - 201:25
**impacts** [51] - 25:21, 25:25, 26:25, 29:25, 30:3, 30:7, 30:8, 30:10, 30:22, 32:12, 39:9, 48:7, 57:8, 60:24, 73:2, 73:3, 73:18, 77:2, 77:18, 78:4, 78:8, 80:24, 104:15, 105:23, 141:4, 157:13, 158:2, 158:8, 164:21, 169:4, 177:22, 192:22, 218:4, 223:13, 223:21, 228:4, 229:11, 240:7, 243:19, 244:2, 244:10, 248:16, 248:20, 248:25, 250:2, 250:4, 251:25, 252:8, 255:5, 255:8, 255:10
**implement** [1] - 154:2
**Implementation** [10] - 186:3, 188:2, 188:5, 188:24, 190:20, 195:1, 199:7, 210:11, 210:12, 214:10
**implementation** [17] - 72:14, 73:15, 77:21, 99:3, 118:4, 169:15, 179:2, 181:5, 181:17, 182:25, 184:4, 194:14, 205:9, 209:3, 209:4, 209:5
**implemented** [3] - 73:7, 90:2, 154:3
**implementing** [1] - 98:4
**implements** [2] - 193:22, 194:18
**implicate** [1] - 134:20
**implication** [3] -

170:15, 170:17, 212:10
**implied** [1] - 175:1
**implore** [1] - 252:5
**importance** [2] - 48:8, 84:5
**important** [16] - 26:12, 49:7, 62:14, 74:6, 114:20, 128:17, 137:16, 161:12, 182:22, 191:21, 221:4, 221:6, 245:9, 262:7, 264:9, 265:17
**importing** [1] - 34:12
**imposes** [1] - 61:7
**impossibility** [1] - 59:21
**impossible** [1] - 151:23
**improve** [1] - 75:5
**improved** [1] - 244:6
**Improvement** [6] - 187:11, 188:14, 188:17, 197:22, 197:23, 214:11
**improvement** [4] - 191:18, 204:22, 206:16, 206:18
**improvements** [5] - 65:20, 167:14, 168:3, 253:20, 253:22
**inadequacies** [1] - 157:9
**inadequacy** [1] - 253:14
**inadequate** [14] - 39:20, 112:17, 113:25, 129:6, 139:14, 139:16, 141:17, 150:24, 218:25, 222:7, 222:23, 222:24, 225:18, 239:19
**inappropriate** [4] - 100:4, 114:1, 223:20, 253:19
**Inc** [3] - 3:8, 3:9, 3:11
**incentivizes** [1] - 70:3
**inclined** [1] - 242:17
**include** [5] - 65:6, 84:20, 87:23, 100:1, 215:7
**included** [27] - 10:18, 14:7, 39:5, 63:12, 84:19, 87:22, 123:13, 123:17, 123:23, 128:24, 163:16, 177:19, 187:17, 187:20,

187:24, 197:21, 204:22, 204:25, 205:5, 205:10, 205:11, 205:19, 215:11, 215:13, 245:2, 245:3
**includes** [4] - 10:25, 69:17, 98:5, 158:3
**including** [24] - 18:10, 24:23, 47:17, 49:20, 51:17, 65:18, 71:10, 77:13, 79:11, 114:6, 157:13, 167:15, 175:23, 203:25, 208:20, 210:4, 212:17, 218:9, 220:19, 222:4, 227:18, 238:17, 244:4, 252:24
**inclusion** [1] - 218:24
**income** [1] - 51:3
**inconsequential** [1] - 19:17
**inconsistency** [2] - 100:22, 241:23
**inconsistent** [1] - 242:13
**inconvenient** [1] - 65:15
**incorporated** [1] - 142:7
**incorporating** [2] - 106:6, 143:2
**incorporation** [2] - 76:10, 142:4
**incorrect** [1] - 232:11
**incorrectly** [1] - 239:17
**increase** [8] - 20:4, 22:6, 44:5, 45:2, 58:18, 69:5, 72:22, 90:14
**increased** [3] - 23:9, 26:4, 61:25
**increases** [13] - 8:21, 9:5, 9:8, 14:23, 38:14, 44:7, 57:4, 57:16, 72:20, 72:21, 201:10, 201:23, 202:4
**increasing** [1] - 66:14
**incredible** [1] - 20:19
**incur** [1] - 245:10
**incurable** [1] - 58:12
**indebted** [1] - 265:10
**indeed** [2] - 175:19, 258:8
**indefinitely** [1] - 145:23
**indicate** [5] - 40:23,

129:19, 143:7, 147:10, 167:3
**indicated** [6] - 83:11, 138:4, 149:19, 163:10, 169:3, 237:25
**indication** [1] - 57:24
**indicia** [2] - 22:13, 173:20
**individual** [5] - 39:7, 123:13, 123:16, 189:23, 190:4
**individuals** [1] - 125:21
**indulgence** [1] - 130:5
**inference** [1] - 143:12
**inferences** [8] - 168:7, 172:18, 177:8, 177:10, 177:12, 177:13
**infirmity** [1] - 96:4
**inform** [5] - 176:12, 190:11, 199:23, 208:15, 256:17
**information** [27] - 15:19, 16:2, 16:11, 17:16, 55:17, 82:23, 85:14, 102:9, 105:1, 105:4, 105:13, 120:14, 124:21, 129:1, 141:7, 144:3, 145:14, 172:8, 173:10, 173:11, 176:14, 189:18, 214:14, 239:10, 240:8, 243:9, 256:25
**informational** [1] - 88:21
**informative** [1] - 223:5
**informed** [2] - 145:16, 152:12
**informs** [1] - 190:9
**infrastructure** [4] - 42:10, 42:15, 42:16, 253:24
**ing** [1] - 197:24
**inherent** [2] - 31:13, 92:21
**inherently** [1] - 90:20
**initial** [6] - 111:18, 111:21, 112:22, 113:5, 113:22, 167:7
**initiative** [1] - 47:18
**injunction** [5] - 220:16, 220:24, 221:7, 221:10, 221:11
**input** [1] - 123:12, 138:14, 164:22
**inquiry** [1] - 108:1

insert [1] - 84:18
inside [1] - 197:5
insight [1] - 257:13
insignificance [1] - 231:6
installed [1] - 16:21
instance [3] - 12:5, 18:16, 122:2
instances [5] - 12:16, 23:21, 23:22, 133:9, 133:10
instead [3] - 5:20, 39:10, 256:17
instruct [1] - 261:12
instruction [6] - 165:14, 165:15, 166:8, 224:7, 229:16, 229:25
instructions [2] - 228:11, 236:25
instructive [2] - 34:9, 264:7
insufficient [9] - 77:7, 94:24, 104:8, 111:5, 111:15, 111:25, 112:9, 113:19, 152:22
insulted [1] - 263:23
insuring [1] - 48:8
integrated [1] - 176:20
intend [4] - 131:8, 244:23, 257:6, 257:14
intended [9] - 38:11, 133:12, 256:5, 256:12, 256:17, 260:12, 261:2, 263:19, 263:25
intending [1] - 7:7
intends [1] - 164:25
intense [1] - 230:25
intent [3] - 67:11, 131:2, 133:10
interchange [1] - 177:6
interchanges [1] - 14:7
interconnectedness [1] - 134:21
interest [4] - 65:10, 153:23, 155:25, 255:9
interested [2] - 131:10, 134:1
interests [1] - 71:10
interference [1] - 62:13
interim [1] - 156:5
Interior [1] - 147:14
International [2] - 5:2,

234:6
INTERNATIONAL [1] - 1:12
interpretation [3] - 28:10, 120:11, 130:20
interrelated [2] - 48:23, 208:9
intersection [2] - 39:8, 141:1
intersections [8] - 12:7, 38:22, 38:24, 39:4, 39:6, 39:7, 141:4, 215:13
interveners [1] - 238:19
intervenor [2] - 7:2, 252:17
Intervenor [2] - 2:18, 2:23
intervenor's [1] - 239:6
intervenors [1] - 6:23
intro [1] - 164:10
introduced [1] - 8:9
introduces [1] - 164:10
invitation [5] - 110:8, 118:23, 124:15, 126:3, 126:10
invitations [2] - 119:7, 124:13
invite [4] - 83:21, 89:25, 110:3, 118:25
invited [28] - 88:11, 88:21, 88:23, 88:25, 89:9, 89:10, 90:4, 92:4, 92:17, 92:22, 93:5, 93:7, 93:10, 94:9, 95:18, 110:19, 118:20, 124:14, 124:19, 127:23, 127:24, 138:16, 139:7, 140:12, 168:14, 168:17, 168:20, 168:25
inviting [1] - 124:24
involve [6] - 12:3, 19:7, 81:22, 98:3, 159:13, 238:20
involved [10] - 18:22, 86:21, 89:4, 89:21, 89:22, 118:5, 120:23, 125:25, 196:17, 196:18
involvement [5] - 86:17, 93:14, 119:25, 152:18, 177:24
involves [1] - 193:10

involving [3] - 179:7, 209:21, 209:22
irrational [7] - 22:15, 22:23, 26:23, 27:4, 218:22, 219:5, 226:1
irrationality [1] - 24:20
irrelevant [3] - 35:7, 35:8, 35:9
ish [1] - 258:25
Island [3] - 16:21, 17:5, 72:21
Isles [1] - 3:8
isolate [1] - 52:25
issuance [6] - 130:11, 145:21, 176:21, 233:20
issue [48] - 6:21, 21:12, 27:1, 30:23, 73:23, 94:14, 94:18, 95:21, 102:8, 106:21, 106:23, 121:6, 126:16, 131:20, 135:16, 135:17, 136:23, 149:13, 153:7, 156:25, 163:17, 165:1, 170:19, 176:13, 179:20, 181:13, 182:14, 182:19, 183:14, 184:5, 184:6, 185:18, 186:10, 186:14, 188:1, 199:5, 201:5, 203:16, 204:3, 210:20, 210:24, 212:18, 236:24, 237:17, 241:16, 241:24, 246:4, 265:2
issued [6] - 144:5, 147:3, 152:6, 160:1, 160:4, 235:15
issues [34] - 6:3, 84:11, 105:17, 108:21, 118:21, 121:11, 121:12, 121:15, 124:11, 136:12, 136:15, 140:23, 141:18, 143:17, 147:11, 158:15, 158:18, 160:11, 160:15, 169:12, 170:10, 175:23, 194:23, 196:5, 196:8, 212:7, 218:24, 220:4, 220:10, 223:9, 231:23, 236:14, 238:17, 242:19
issuing [1] - 164:3

italics [2] - 104:19, 104:22
iterative [1] - 77:25
itself [9] - 13:15, 84:18, 120:23, 173:9, 173:18, 174:9, 178:6, 178:7, 252:4

## J

JC [1] - 3:8
JERSEY [2] - 1:1, 1:3
Jersey [317] - 1:10, 1:20, 2:9, 3:5, 3:6, 3:10, 3:11, 3:12, 3:12, 3:19, 4:8, 9:19, 11:17, 12:18, 12:21, 13:15, 13:16, 14:6, 19:14, 19:19, 19:20, 19:23, 20:20, 22:2, 22:11, 23:6, 25:13, 32:2, 32:10, 38:24, 41:12, 42:6, 43:1, 43:8, 43:23, 49:21, 49:25, 50:3, 50:4, 50:5, 50:16, 50:19, 50:24, 51:13, 51:25, 52:3, 52:7, 52:9, 53:8, 56:23, 61:15, 61:18, 61:20, 62:11, 65:6, 65:11, 65:13, 65:17, 65:21, 65:25, 66:13, 66:14, 66:15, 66:22, 67:19, 68:4, 70:4, 71:1, 75:3, 75:6, 75:9, 75:12, 75:24, 76:13, 76:23, 78:21, 79:20, 80:6, 80:17, 80:20, 80:22, 80:24, 81:3, 83:3, 83:5, 83:8, 83:24, 84:3, 84:20, 85:8, 85:11, 85:12, 85:23, 86:11, 86:14, 86:18, 86:20, 87:14, 87:15, 87:16, 87:19, 87:23, 88:3, 88:5, 88:20, 89:5, 90:1, 90:4, 90:13, 90:19, 92:17, 93:5, 93:10, 93:16, 94:8, 94:12, 94:15, 95:10, 95:14, 95:18, 96:18, 96:19, 97:7, 97:11, 97:12, 103:8, 103:19, 103:20, 103:21, 103:23, 103:25, 104:9, 104:24, 105:6, 105:15, 106:8, 111:2, 111:6, 112:1,

117:24, 118:1, 118:5, 118:10, 118:13, 120:22, 121:13, 121:15, 124:19, 124:20, 126:12, 127:8, 127:23, 128:13, 128:17, 128:20, 128:21, 128:23, 128:24, 129:13, 129:16, 129:19, 132:17, 137:15, 138:7, 138:9, 139:7, 139:17, 140:7, 140:10, 140:16, 140:17, 142:6, 143:9, 144:7, 147:12, 148:15, 148:21, 149:16, 150:16, 151:15, 152:11, 152:14, 152:23, 153:7, 153:11, 153:18, 153:21, 154:1, 154:7, 155:18, 155:25, 157:12, 157:24, 158:2, 158:4, 166:19, 167:4, 168:24, 169:1, 169:5, 171:1, 175:24, 176:9, 177:3, 177:14, 177:16, 178:3, 178:5, 178:11, 181:11, 181:21, 182:1, 182:25, 183:5, 183:8, 184:2, 186:1, 186:3, 186:15, 187:17, 187:20, 187:24, 188:2, 188:8, 188:10, 189:18, 190:21, 190:23, 191:1, 191:2, 191:11, 192:14, 192:16, 192:19, 192:23, 193:8, 193:15, 193:18, 194:1, 194:12, 194:14, 194:25, 195:1, 195:16, 195:20, 200:12, 205:19, 205:21, 207:22, 209:18, 209:21, 209:22, 209:24, 210:2, 210:9, 210:11, 211:4, 212:16, 212:18, 213:12, 213:17, 215:8, 215:10, 218:5,

218:8, 218:13, 218:15, 218:16, 218:24, 218:25, 226:3, 226:6, 228:3, 228:4, 229:11, 237:21, 238:7, 240:18, 242:4, 242:8, 242:13, 243:5, 243:19, 244:4, 244:10, 244:14, 246:25, 247:20, 247:21, 249:5, 249:11, 249:15, 249:22, 249:23, 249:24, 250:18, 251:2, 251:15, 251:21, 252:2, 252:8, 253:7, 253:13, 253:18, 253:20, 254:13, 254:20, 254:23, 254:25

**Jersey's** [21] - 41:10, 67:4, 69:23, 84:18, 85:24, 86:25, 104:13, 129:22, 132:10, 143:10, 152:21, 154:5, 157:14, 181:5, 190:18, 190:20, 203:14, 212:8, 241:17, 244:15, 254:3

**Jersey-related** [1] - 13:16

**Jersey-specific** [1] - 121:13

**Jersey/Connecticut** [1] - 210:25

**Jerseyans** [1] - 94:25

**JFK** [2] - 18:11, 19:8

**job** [4] - 110:16, 175:7, 223:2, 244:3

**Johanns** [1] - 222:6

**JOHN** [3] - 2:17, 3:4, 3:4

**join** [1] - 49:18

**joke** [1] - 180:11

**Judge** [10] - 25:4, 34:17, 58:21, 60:11, 62:4, 62:10, 64:8, 64:19, 64:23, 65:2

**judge** [1] - 217:8

**judges** [1] - 264:13

**judgment** [1] - 69:23, 219:7, 219:9, 219:12, 219:16, 219:19, 220:5, 227:10, 256:20

**judicial** [1] - 233:23

**juncture** [1] - 242:17

**June** [25] - 106:17, 107:4, 108:6, 109:3, 129:25, 130:1, 130:8, 144:9, 155:16, 161:17, 162:12, 162:20, 162:25, 169:2, 170:6, 170:8, 175:17, 194:5, 221:8, 264:17, 264:24, 265:2

**jury** [2] - 261:10, 261:13

**justice** [47] - 5:23, 9:4, 14:12, 14:17, 14:21, 20:2, 21:25, 22:21, 24:12, 26:1, 33:25, 37:14, 37:16, 38:10, 48:10, 48:16, 49:7, 49:12, 49:20, 49:21, 50:1, 51:20, 52:24, 54:21, 69:13, 71:10, 71:12, 89:24, 104:1, 104:6, 105:23, 121:11, 121:12, 121:14, 124:11, 125:3, 126:6, 136:19, 136:22, 138:5, 152:7, 152:8, 152:10, 152:11, 226:7, 241:19, 245:2

**Justice** [19] - 8:20, 19:10, 22:24, 38:12, 45:20, 48:2, 49:2, 49:3, 50:21, 51:4, 71:11, 95:15, 95:19, 97:8, 97:14, 124:12, 124:20, 125:19, 218:5

**justifications** [1] - 21:13

**justify** [1] - 232:17

## K

**KAPLAN** [2] - 2:20, 2:21

**Kaplan** [2] - 248:1, 248:6

**KATE** [1] - 2:21

**keep** [8] - 25:18, 104:20, 151:11, 201:21, 213:25, 230:25, 254:4, 264:15

**keeps** [1] - 55:16

**key** [7] - 72:16, 74:9, 77:21, 176:12, 177:24, 220:14,

248:12

**kicking** [2] - 64:24, 64:25

**kills** [1] - 151:8

**kind** [15] - 18:17, 18:20, 31:8, 41:12, 116:11, 118:24, 139:6, 174:14, 222:18, 233:17, 242:1, 246:7, 252:25, 259:21, 259:25

**kinds** [1] - 196:8

**KING** [1] - 1:15

**Knauer** [38] - 4:3, 4:13, 5:15, 5:25, 7:6, 8:1, 8:10, 11:12, 13:20, 14:11, 14:24, 21:23, 23:3, 23:12, 41:5, 41:7, 43:12, 49:18, 50:12, 52:14, 52:16, 52:21, 53:13, 138:12, 151:1, 177:20, 202:14, 210:20, 214:21, 215:18, 248:6, 250:14, 250:25, 251:1, 251:19, 252:14, 260:25

**KNAUER** [95] - 2:16, 5:16, 5:18, 7:9, 7:15, 7:17, 7:21, 8:7, 8:11, 8:16, 9:21, 10:12, 10:18, 10:22, 10:25, 11:13, 12:21, 13:2, 13:8, 13:21, 14:5, 14:12, 41:6, 41:9, 41:23, 42:9, 42:12, 42:14, 42:17, 42:22, 42:24, 43:5, 43:16, 43:22, 44:2, 44:18, 44:20, 44:23, 45:1, 45:8, 45:12, 45:15, 45:18, 46:4, 46:8, 47:8, 47:16, 48:18, 48:24, 49:5, 49:13, 49:16, 49:24, 50:3, 50:9, 50:13, 50:17, 50:20, 50:24, 51:12, 51:15, 51:19, 52:4, 52:9, 52:15, 53:15, 53:20, 54:19, 54:23, 202:15, 202:23, 203:2, 203:5, 203:7, 203:12, 203:18, 204:9, 204:14, 204:18, 205:24, 206:2, 206:5, 206:7, 206:11, 206:13, 206:22, 206:25,

207:3, 207:5, 207:7, 207:10, 214:22, 215:19, 252:16, 266:5

**Knauer's** [1] - 25:8

**know-it** [1] - 41:17

**knowing** [1] - 195:24

**knowledge** [4] - 125:12, 125:15, 127:22, 138:17

**known** [1] - 134:6

**knows** [6] - 52:12, 55:15, 62:11, 140:1, 221:22, 259:14

**Kootenai** [1] - 149:15

**kosher** [1] - 161:13

**KRAMER** [1] - 3:14

**kumbaya** [2] - 259:9, 261:3

## L

**labeled** [1] - 185:23

**labored** [1] - 185:8

**lack** [6] - 86:4, 86:16, 86:17, 91:11, 94:24, 104:25

**ladies** [3] - 78:18, 245:25, 262:21

**laid** [8] - 46:14, 47:9, 47:10, 51:5, 54:20, 60:21, 189:10, 241:25

**Lamberth's** [1] - 34:17

**lamp** [1] - 42:18

**lane** [3] - 16:18, 18:11, 19:8

**lanes** [1] - 15:15

**language** [17] - 9:18, 35:22, 36:2, 36:5, 36:7, 62:15, 63:4, 63:6, 63:22, 63:23, 75:21, 75:22, 105:9, 134:16, 134:22, 208:23

**languages** [1] - 120:11

**large** [2] - 22:5, 50:4

**larger** [2] - 43:14, 72:21

**largest** [1] - 66:2

**last** [22] - 6:10, 15:18, 18:9, 38:9, 59:7, 74:16, 100:21, 137:6, 147:24, 158:11, 171:24, 214:6, 217:24, 227:8, 227:14, 235:10, 247:8, 247:15, 252:20,

252:23, 265:12, 265:15

**late** [4] - 155:3, 159:25, 265:16

**latitude** [1] - 13:17

**latter** [2] - 85:14, 98:16

**laugh** [1] - 155:15

**LAUREN** [1] - 1:16

**Lautenberg** [1] - 1:9

**law** [39] - 30:4, 31:8, 36:21, 41:18, 58:13, 60:6, 60:11, 60:20, 62:4, 63:20, 65:1, 88:24, 101:12, 101:15, 106:20, 106:24, 133:6, 133:11, 133:12, 142:7, 194:21, 194:22, 195:2, 195:4, 195:12, 205:16, 211:25, 219:5, 220:14, 222:3, 222:4, 223:3, 224:16, 224:17, 229:13, 231:7, 236:2, 248:15, 264:8

**LAW** [1] - 3:4

**lawsuit** [3] - 135:24, 136:8, 140:19

**lawyers** [1] - 261:13

**layer** [5] - 32:13, 183:2, 183:7, 210:3, 211:24

**layman's** [1] - 40:17

**lays** [4] - 9:2, 45:23, 187:5, 206:25

**lead** [3] - 36:25, 84:12, 84:16

**leading** [9] - 44:17, 44:18, 44:19, 44:20, 44:22, 65:6, 65:21, 112:16, 207:22

**leads** [2] - 100:22, 196:3

**least** [7] - 18:4, 18:9, 26:2, 134:9, 193:24, 236:10, 251:15

**leave** [6] - 61:14, 101:8, 156:15, 181:13, 221:20, 260:22

**leaving** [2] - 24:13, 228:3

**led** [3] - 112:18, 125:11, 206:4

**Lee** [6] - 58:10, 58:19, 59:17, 193:20, 194:16, 249:16

**leeway** [3] - 242:16,

242:17, 243:11
**left** [10] - 5:5, 17:14, 23:18, 113:2, 130:3, 189:1, 215:22, 226:5, 246:2, 247:15
**left-hand** [1] - 189:1
**legacy** [1] - 70:5
**legal** [12] - 31:12, 64:12, 99:4, 101:9, 190:20, 190:24, 214:24, 238:25, 239:1, 249:25, 254:24
**legislation** [1] - 154:6
**legislative** [3] - 17:7, 35:23, 131:6
**legislature** [2] - 64:25, 154:4
**legs** [1] - 216:5
**length** [2] - 116:15, 116:16
**lengthy** [1] - 16:1
**lens** [1] - 232:19
**Leo** [1] - 5:1
**LEO** [1] - 1:12
**less** [17] - 19:7, 25:24, 26:5, 30:10, 55:12, 67:22, 116:21, 126:25, 178:19, 178:20, 217:13, 223:4, 241:15, 250:7, 250:9
**lesser** [1] - 8:22
**lesson** [1] - 142:23
**letter** [79] - 94:20, 94:21, 95:8, 103:12, 103:17, 104:13, 104:16, 105:4, 105:10, 105:19, 105:25, 106:1, 106:2, 106:17, 107:4, 107:5, 108:6, 109:4, 111:5, 129:24, 129:25, 130:1, 135:4, 135:5, 135:8, 135:12, 135:18, 135:20, 136:8, 136:13, 136:20, 140:18, 140:21, 141:12, 141:13, 141:14, 141:15, 141:17, 143:2, 144:7, 144:9, 155:16, 155:21, 157:15, 158:15, 160:13, 160:18, 161:17, 163:3, 167:3, 169:2, 170:6, 170:9, 170:14, 170:24, 171:4,

171:10, 171:11, 171:13, 171:18, 171:20, 175:17, 176:5, 176:7, 176:8, 177:7, 177:13, 193:19, 194:5, 194:16, 210:13, 210:14, 210:22, 211:20, 214:2, 214:3
**letters** [15] - 92:3, 103:8, 103:10, 108:5, 123:14, 123:17, 129:22, 130:8, 135:8, 135:9, 141:9, 144:25, 145:3, 150:13, 166:20
**level** [57] - 11:20, 30:10, 30:19, 38:13, 38:16, 88:12, 103:20, 117:13, 119:13, 125:2, 184:5, 184:6, 189:20, 191:20, 193:13, 196:16, 196:19, 196:22, 197:1, 197:16, 197:17, 197:19, 198:10, 198:12, 198:14, 198:16, 198:18, 198:22, 199:4, 199:8, 199:10, 199:11, 199:14, 199:20, 199:21, 199:22, 199:23, 200:1, 200:3, 200:6, 200:7, 200:10, 205:17, 205:24, 213:25, 214:6, 214:10, 214:11, 214:12, 232:6, 233:7
**levels** [7] - 23:9, 26:2, 30:18, 39:23, 193:20, 194:16, 198:7
**LEVIN** [1] - 3:14
**Lexington** [1] - 2:17
**Liberty** [1] - 3:11
**Library** [3] - 239:17, 239:21, 240:13
**Lieber** [1] - 74:15
**life** [1] - 259:19
**lifecycle** [1] - 77:19
**lift** [1] - 17:24
**light** [2] - 63:22, 230:25
**likelihood** [1] - 231:24
**likely** [1] - 63:9
**limit** [3] - 234:7, 250:6,

257:22
**limitations** [1] - 165:1
**limited** [6] - 39:21, 46:20, 67:14, 86:12, 134:19, 209:14
**line** [15] - 58:23, 58:25, 91:2, 91:3, 99:15, 100:12, 101:7, 101:11, 101:19, 145:19, 149:25, 150:1, 150:4, 150:5, 161:16
**lines** [1] - 262:13
**lining** [1] - 74:14
**Link** [1] - 45:4
**link** [12] - 39:10, 39:11, 39:15, 39:20, 40:5, 40:18, 40:24, 44:9, 44:14, 44:16, 45:6, 63:13
**linkage** [1] - 58:23
**linking** [1] - 69:24
**links** [2] - 39:13, 44:13
**lion's** [1] - 141:23
**Lisa** [1] - 77:10
**list** [27] - 13:22, 23:13, 24:21, 24:23, 24:24, 25:6, 25:20, 25:23, 26:7, 27:2, 43:14, 44:13, 45:2, 76:21, 76:25, 88:3, 88:14, 92:23, 119:11, 126:10, 127:21, 164:13, 226:4, 240:13, 245:1, 251:2
**listed** [7] - 10:2, 30:8, 117:10, 163:20, 163:21, 163:22, 239:13
**listen** [2] - 242:11, 248:4
**listened** [1] - 243:22
**lists** [5] - 8:21, 87:4, 88:1, 164:1, 168:17
**literally** [1] - 247:17
**litigation** [7] - 17:2, 17:3, 72:23, 141:2, 142:24, 148:9, 158:1
**lives** [1] - 66:15
**living** [1] - 260:4
**LLC** [1] - 3:4
**LLP** [5] - 1:15, 1:16, 1:18, 2:20, 3:14
**Lobby** [1] - 3:11
**local** [13] - 14:13, 38:22, 39:4, 76:22, 80:20, 81:22, 84:10, 95:17, 95:23, 97:22, 125:12, 125:14, 238:20

**locale** [2] - 239:19, 240:3
**locales** [1] - 59:16
**localities** [1] - 238:23
**localized** [1] - 47:24
**located** [6] - 66:21, 67:22, 205:3, 239:21, 240:14
**location** [6] - 45:4, 207:22, 215:10, 215:11, 239:14, 240:7
**locations** [3] - 215:3, 215:7, 215:16
**Logan** [1] - 147:13
**logic** [5] - 20:19, 97:5, 97:15, 143:15, 150:11
**logical** [1] - 59:21
**London** [7] - 73:7, 73:9, 73:11, 73:13, 77:22, 78:6, 78:8
**look** [63] - 19:25, 21:13, 21:15, 23:7, 32:8, 35:21, 35:22, 40:14, 42:19, 62:6, 64:19, 64:21, 66:8, 66:19, 70:22, 81:13, 81:20, 82:20, 85:21, 95:25, 103:17, 104:11, 104:17, 128:25, 137:2, 140:21, 155:20, 155:22, 159:4, 165:24, 166:2, 173:20, 184:4, 187:7, 188:18, 189:21, 191:15, 193:6, 193:11, 197:5, 197:7, 197:11, 197:12, 197:13, 197:20, 197:24, 199:13, 199:19, 201:9, 207:25, 209:6, 214:6, 216:22, 217:22, 218:18, 224:19, 244:24, 254:4, 255:4, 261:19, 261:20, 265:23
**look-see** [1] - 193:6
**looked** [11] - 5:9, 19:20, 22:4, 35:2, 35:12, 43:9, 63:4, 63:6, 174:6, 199:21, 215:11
**looking** [22] - 14:22, 15:9, 35:9, 51:17, 54:10, 85:22, 89:19,

89:20, 90:7, 92:23, 96:8, 117:16, 123:8, 199:11, 199:12, 201:2, 201:11, 201:22, 206:13, 207:21, 208:1, 220:23
**looks** [6] - 35:20, 41:14, 54:4, 152:25, 178:13
**loop** [1] - 109:2
**Los** [6] - 227:18, 228:9, 228:13, 231:21, 233:16, 234:2
**lost** [2] - 197:18, 245:13
**love** [1] - 64:6
**loved** [1] - 259:22
**loves** [2] - 259:25, 260:2
**low** [2] - 20:8, 51:3
**lower** [3] - 67:2, 193:22, 194:18
**lowest** [2] - 19:16, 19:21
**luck** [1] - 216:3
**luckily** [1] - 148:25
**lunch** [5] - 138:25, 139:3, 147:7, 147:14, 154:15
**Lunch** [1] - 154:24
**lungs** [1] - 246:8
**ly** [1] - 67:20

# M

**machine** [1] - 74:19
**Madam** [1] - 222:21
**magic** [2] - 195:11, 211:6
**magnitude** [1] - 18:12
**mails** [1] - 248:7
**main** [7] - 51:9, 143:3, 148:25, 177:2, 177:14, 177:18, 257:10
**maintaining** [1] - 210:4
**maintains** [1] - 39:19
**maintenance** [2] - 183:3, 183:7
**major** [9] - 15:14, 18:23, 65:24, 139:4, 183:1, 210:4, 237:17, 253:16, 259:20
**majority** [2] - 65:13, 66:15
**make-up** [1] - 85:18

makers [1] - 256:18
manage [1] - 77:21
management [6] - 77:7, 77:14, 78:5, 167:16, 167:21, 177:19
mandate [1] - 239:23
mandatory [3] - 63:12, 82:9, 83:10
Manhattan [4] - 44:19, 72:19, 156:3, 156:4
manipulate [1] - 254:6
manner [1] - 131:4
manufacture [1] - 256:6
map [6] - 9:3, 9:11, 9:18, 9:19, 66:19, 234:9
mapping [2] - 158:3, 158:5
March [1] - 90:12
MARK [1] - 2:16
marked [2] - 71:21, 185:23
markets [1] - 103:22
marriage [1] - 142:25
marshals [1] - 255:19
MARTIN [1] - 2:4
Maryland [2] - 16:16, 16:19
massive [1] - 68:8
MASTRO [170] - 1:15, 6:24, 7:19, 7:22, 13:12, 17:13, 17:18, 17:22, 18:1, 18:3, 18:15, 20:6, 20:9, 20:12, 20:15, 20:18, 21:8, 21:10, 21:12, 21:17, 21:19, 21:23, 23:20, 23:25, 24:5, 24:8, 24:11, 24:18, 24:20, 25:2, 25:5, 26:11, 26:15, 26:18, 26:21, 27:9, 27:17, 27:19, 27:22, 28:1, 28:5, 28:7, 28:12, 28:17, 28:21, 28:24, 29:3, 29:7, 29:9, 29:12, 29:17, 29:20, 29:22, 30:16, 31:23, 31:25, 32:21, 33:1, 33:4, 33:9, 33:16, 33:18, 110:16, 142:19, 178:17, 178:21, 178:24, 179:10, 179:14, 179:24, 180:5, 180:9, 180:11, 180:14, 180:20, 180:23, 181:1,

181:8, 181:10, 181:15, 181:22, 181:25, 182:8, 182:12, 182:18, 183:17, 183:20, 183:25, 184:7, 184:10, 207:13, 207:16, 207:18, 208:4, 208:18, 209:2, 209:8, 209:11, 209:22, 209:24, 211:8, 211:13, 211:19, 212:14, 212:21, 217:1, 217:6, 217:10, 217:13, 217:16, 217:18, 219:8, 219:11, 219:22, 220:2, 220:7, 220:10, 220:18, 220:22, 220:25, 221:3, 221:14, 221:17, 221:20, 222:1, 222:15, 222:17, 222:21, 223:16, 224:15, 225:2, 225:11, 225:13, 225:15, 225:18, 225:21, 226:10, 226:14, 226:16, 226:19, 226:23, 227:2, 227:4, 227:14, 228:15, 228:18, 228:21, 228:25, 229:8, 229:18, 229:22, 230:8, 246:12, 246:14, 246:18, 246:22, 247:10, 247:25, 248:3, 248:9, 250:25, 259:9, 259:13, 259:24, 260:3, 260:7, 260:17, 262:19, 265:19, 266:3
Mastro [86] - 4:4, 4:12, 4:15, 4:22, 7:24, 8:19, 10:1, 10:7, 13:7, 13:11, 13:21, 17:12, 17:17, 17:21, 20:7, 20:17, 21:22, 26:10, 26:14, 27:7, 31:1, 33:15, 35:4, 36:10, 36:11, 37:13, 42:2, 42:4, 44:3, 44:9, 44:12, 45:1, 45:9, 45:18, 47:11, 59:5, 60:12, 66:7, 69:14, 72:22, 100:8,

103:23, 110:12, 110:15, 138:10, 138:18, 142:1, 142:18, 150:21, 178:14, 178:15, 178:20, 179:5, 179:11, 180:2, 180:7, 186:13, 207:11, 208:3, 209:7, 211:6, 212:20, 213:2, 213:10, 214:2, 214:15, 214:23, 215:9, 216:24, 219:6, 222:16, 223:14, 226:15, 230:19, 233:10, 233:16, 234:2, 235:11, 243:3, 243:16, 246:11, 252:12, 259:8, 259:11, 261:4, 265:16
Mastro's [5] - 46:17, 140:14, 232:10, 236:3, 252:22
MATEEN [11] - 3:18, 56:17, 56:20, 238:18, 239:1, 239:4, 239:6, 239:20, 239:25, 240:5, 240:12
Mateen [8] - 4:6, 4:18, 56:2, 56:13, 56:15, 58:7, 238:16, 240:21
MATEEN'S [1] - 56:12
material [14] - 8:7, 10:11, 116:4, 116:9, 117:21, 161:19, 161:22, 161:23, 218:2, 257:9, 257:24, 258:8, 263:21, 264:1
materials [1] - 92:5
Matloff [3] - 4:19, 240:24, 241:5
MATLOFF [2] - 1:19, 240:25
matter [20] - 5:1, 39:22, 40:10, 67:2, 84:24, 89:9, 97:5, 97:10, 112:1, 114:17, 115:5, 115:8, 139:9, 185:16, 187:16, 242:14, 243:21, 255:12, 266:12
matters [1] - 242:14
max [2] - 193:22, 194:18

maximum [1] - 179:15
mayor [1] - 59:17
Mayor's [1] - 89:3
Meadowlands [1] - 3:8
mean [21] - 23:22, 24:16, 41:24, 42:19, 43:22, 50:9, 50:15, 52:22, 96:24, 107:21, 112:11, 118:19, 131:7, 157:20, 184:7, 194:15, 209:12, 224:17, 227:25, 248:24
meaning [5] - 22:20, 25:1, 59:17, 124:16, 195:17
meaningful [6] - 80:22, 91:11, 100:16, 150:15, 167:18, 242:1
meaningfully [1] - 92:4
meanings [1] - 93:19
means [6] - 23:13, 25:10, 81:25, 157:16, 157:22, 165:24
meant [1] - 130:14
measure [1] - 61:11
measured [1] - 57:16
measures [19] - 11:9, 30:6, 30:9, 30:18, 46:22, 47:19, 62:18, 62:19, 62:22, 63:8, 63:11, 77:1, 78:3, 104:23, 126:7, 202:5, 218:8, 218:14, 251:3
mechanical [1] - 1:24
mechanism [2] - 30:18, 64:11
medical [1] - 185:6
meet [6] - 65:23, 118:20, 126:7, 183:1, 208:1, 234:14
meeting [23] - 88:23, 89:2, 89:9, 90:12, 90:17, 129:13, 139:12, 139:16, 170:2, 170:3, 171:5, 171:9, 171:12, 171:14, 171:17, 171:18, 171:21, 171:22, 172:15, 175:13, 175:14, 176:4, 265:17
meetings [20] - 80:23, 82:25, 89:10, 90:5,

90:16, 90:25, 91:12, 92:18, 92:19, 92:22, 92:25, 93:4, 93:6, 93:9, 98:5, 119:11, 128:21, 152:5, 152:7, 239:10
meets [5] - 20:18, 126:25, 139:11, 149:21, 256:19
Melissa [4] - 1:22, 5:19, 116:11, 266:14
melissa_mormile@ njd.uscourts.gov [1] - 1:23
member [4] - 102:10, 120:1, 120:2, 121:25
members [4] - 63:11, 134:1, 152:17, 166:18
membership [2] - 110:1, 110:7
memo [1] - 171:25
memorialization [1] - 171:24
memorialize [1] - 171:21
memorialized [4] - 170:24, 171:3, 175:17, 176:6
memorializing [1] - 171:1
memory [2] - 17:11, 142:18
mention [1] - 97:13
mentioned [7] - 54:3, 68:14, 95:24, 98:2, 151:7, 157:21, 176:16
mentions [2] - 140:24, 170:1
mere [3] - 90:17, 92:5, 105:10
merely [4] - 45:22, 74:3, 223:5, 224:22
merit [3] - 25:15, 193:25, 249:18
merits [8] - 39:3, 150:17, 236:6, 236:9, 241:4, 247:13, 254:2, 255:3
message [1] - 230:2
met [2] - 36:18, 170:15
metes [1] - 20:16
methodologies [1] - 51:1
methodology [16] - 12:10, 33:25, 34:6, 34:23, 37:13, 50:20, 51:5, 51:17, 52:22, 140:23, 141:3,

141:5, 215:15,
228:20, 254:6,
254:10
**methods** [1] - 227:21
**metric** [3] - 45:3, 45:4,
62:1
**metrics** [3] - 58:18,
59:9, 61:24
**Metropolitan** [3] -
18:18, 44:16, 188:20
**Meyers** [1] - 109:22
**mic** [1] - 17:24
**microphone** [2] -
17:19, 156:14
**mid** [1] - 221:8
**middle** [4] - 190:4,
190:9, 198:11,
198:18
**Middlesex** [15] -
19:25, 22:3, 22:5,
22:9, 22:15, 22:19,
22:24, 23:7, 43:11,
44:3, 44:5, 44:6,
218:10, 249:9
**might** [15] - 5:24, 9:23,
22:25, 44:10, 52:18,
64:3, 78:23, 113:21,
155:7, 158:12,
182:4, 192:3,
202:19, 203:19,
261:6
**mile** [3] - 14:15, 20:2,
68:2
**miles** [7] - 20:3, 22:14,
44:5, 57:5, 67:22,
73:9, 73:17
**million** [10] - 20:2,
44:5, 57:22, 57:25,
59:14, 59:15, 68:5,
104:12, 249:20,
255:11
**million-vehicle-miles
-traveled** [1] - 44:5
**millions** [2] - 19:5,
47:22
**mind** [1] - 213:25
**Mineta** [1] - 35:11
**minimal** [1] - 73:17
**minimis** [1] - 165:6
**minimize** [1] - 19:19
**minimum** [4] - 149:21,
149:23, 150:2,
239:23
**minor** [3] - 42:9,
152:5, 231:5
**minorities** [1] - 51:6
**minority** [1] - 51:3
**minus** [1] - 67:12
**minute** [19] - 14:11,
26:10, 26:20, 53:12,

55:22, 64:8, 64:17,
70:20, 71:17, 73:4,
80:2, 109:1, 120:20,
121:20, 202:22,
215:25, 242:22,
246:6
**minutes** [44] - 5:25,
7:6, 15:2, 17:12,
17:21, 32:23, 33:20,
41:8, 52:19, 56:18,
76:16, 79:8, 79:17,
80:10, 103:6, 107:1,
130:3, 137:6,
154:15, 155:5,
155:9, 158:11,
162:6, 162:7, 173:1,
173:2, 178:15,
178:18, 178:19,
178:20, 216:24,
217:11, 217:15,
238:8, 238:16,
241:15, 246:13,
253:4, 257:7, 263:5,
265:16
**mispronouncing** [1] -
241:12
**misrepresentation** [1]
- 183:18
**missed** [1] - 132:6
**missing** [2] - 23:24,
57:11
**misspoken** [1] - 5:10
**misstate** [1] - 116:10
**mistake** [1] - 229:20
**mistakes** [1] - 114:5
**misunderstood** [1] -
204:10
**mitigate** [9] - 25:24,
26:24, 76:3, 78:3,
104:15, 249:15,
250:1, 251:23,
251:24
**mitigated** [4] - 27:1,
29:25, 61:2, 248:25
**Mitigation** [2] - 63:8,
73:3
**mitigation** [113] - 8:23,
9:15, 11:3, 11:8,
11:9, 23:1, 23:11,
25:7, 25:13, 25:15,
25:18, 25:20, 25:24,
26:11, 28:2, 28:16,
29:23, 29:25, 30:1,
30:6, 30:17, 30:23,
30:24, 32:2, 32:4,
32:11, 32:14, 33:13,
37:14, 41:16, 46:13,
46:14, 46:19, 46:21,
47:4, 47:6, 47:17,
47:20, 47:25, 48:5,

53:3, 53:7, 54:11,
54:16, 57:13, 57:14,
57:23, 58:24, 59:23,
59:24, 60:20, 60:25,
61:4, 62:7, 62:17,
63:11, 64:13, 64:20,
64:21, 67:9, 73:19,
75:14, 75:18, 75:20,
76:2, 76:10, 76:21,
77:1, 77:17, 78:3,
102:8, 104:11,
104:20, 104:25,
105:20, 105:22,
107:8, 126:7,
141:21, 158:18,
164:21, 167:18,
167:22, 177:20,
183:25, 184:1,
218:8, 218:13,
218:15, 218:16,
223:9, 223:21,
223:22, 224:2,
226:4, 228:5,
237:20, 249:3,
249:4, 249:12,
249:18, 249:24,
250:20, 251:3,
251:10, 251:14,
251:16, 251:22,
251:23, 255:9
**mitigations** [1] - 76:8
**mixed** [1] - 10:3
**Mobility** [1] - 77:16
**mode** [2] - 74:23
**model** [3] - 34:19,
103:18, 103:20
**modeling** [3] - 39:14,
40:25, 254:9
**modified** [1] - 144:1
**moment** [8] - 6:4,
115:8, 127:16,
191:25, 255:2,
259:10, 260:16,
261:3
**moments** [3] - 27:13,
83:11, 231:1
**money** [20] - 26:6,
27:4, 28:20, 60:1,
60:9, 64:6, 64:21,
68:8, 74:13, 74:17,
74:19, 74:21, 75:25,
76:1, 157:25,
237:21, 250:7,
250:9, 250:15,
250:17
**money-grubbing** [1] -
74:19
**monitored** [1] - 183:3
**monitoring** [2] -
29:24, 62:12

**monocle** [1] - 74:16
**monoxide** [2] - 39:23,
187:15
**Montclair** [1] - 3:5
**month** [2] - 149:1,
149:10
**months** [3] - 34:3,
149:9, 229:9
**Mormile** [1] - 1:22,
266:14
**morning** [9] - 5:4,
5:22, 6:22, 58:12,
60:12, 65:5, 69:11,
78:20, 215:2
**Moses** [2] - 69:25,
70:2
**Moses's** [1] - 70:4
**most** [14] - 11:24,
15:18, 34:1, 69:22,
70:6, 102:8, 104:9,
182:4, 205:1, 240:6,
244:14, 257:20,
258:1, 258:2
**motion** [5] - 69:23,
179:13, 234:15,
260:14, 260:15
**mouth** [1] - 158:13
**move** [6] - 58:22, 60:4,
99:14, 115:15,
151:5, 245:19
**moving** [2] - 26:7,
56:23
**MR** [527] - 5:14, 6:18,
6:24, 7:1, 7:3, 7:5,
7:19, 7:22, 13:12,
15:3, 15:25, 16:4,
16:7, 16:10, 16:25,
17:2, 17:9, 17:13,
17:18, 17:22, 18:1,
18:3, 18:15, 20:6,
20:9, 20:12, 20:15,
20:18, 21:8, 21:10,
21:12, 21:17, 21:19,
21:23, 23:20, 23:25,
24:5, 24:8, 24:11,
24:18, 24:20, 25:2,
25:5, 26:11, 26:15,
26:18, 26:21, 27:9,
27:17, 27:19, 27:22,
28:1, 28:5, 28:7,
28:12, 28:17, 28:21,
28:24, 29:3, 29:7,
29:9, 29:12, 29:17,
29:20, 29:22, 30:16,
31:23, 31:25, 32:21,
33:1, 33:4, 33:9,
33:16, 33:18, 33:23,
34:15, 34:17, 35:9,
35:24, 36:2, 36:8,
36:10, 36:22, 37:5,

37:8, 37:10, 37:12,
37:20, 37:23, 38:1,
38:3, 38:6, 38:19,
39:18, 40:3, 40:7,
40:16, 41:3, 52:20,
53:2, 53:10, 55:1,
55:4, 55:10, 55:20,
56:5, 56:8, 56:12,
56:17, 56:20, 58:9,
61:8, 62:10, 63:2,
63:24, 64:5, 64:16,
64:18, 65:5, 68:16,
68:19, 68:21, 68:24,
69:1, 69:3, 70:21,
71:4, 71:6, 71:8,
71:24, 72:1, 72:4,
72:6, 73:21, 73:25,
74:2, 74:10, 74:12,
76:18, 76:20, 78:1,
78:12, 78:15, 79:18,
79:22, 79:25,
110:16, 114:11,
114:13, 114:25,
115:4, 115:14,
116:1, 116:6,
116:14, 116:22,
116:24, 117:6,
117:9, 117:14,
117:16, 117:19,
117:21, 118:4,
118:11, 118:15,
118:17, 118:20,
119:2, 119:8,
119:10, 119:15,
119:18, 119:21,
120:1, 120:6, 120:9,
120:15, 120:17,
120:19, 120:25,
121:4, 121:7, 121:9,
121:23, 122:2,
122:9, 122:13,
122:19, 122:23,
123:1, 123:4, 123:6,
123:11, 124:3,
124:18, 125:1,
125:6, 125:10,
125:16, 125:19,
126:1, 126:4,
126:11, 126:18,
126:20, 126:22,
127:4, 127:9,
127:15, 127:17,
128:5, 128:8,
128:11, 128:13,
128:17, 128:20,
129:3, 129:10,
130:1, 130:5, 130:7,
130:16, 130:19,
130:23, 131:17,
131:24, 132:2,
132:5, 132:9,

132:14, 132:21,
133:4, 133:20,
134:3, 134:7,
134:11, 134:16,
134:24, 135:2,
135:7, 135:11,
135:14, 135:21,
135:23, 136:1,
136:4, 136:10,
136:15, 137:1,
137:4, 137:9,
137:11, 138:1,
138:20, 139:2,
139:4, 139:17,
139:20, 140:9,
140:15, 141:14,
141:19, 141:25,
142:9, 142:12,
142:14, 142:16,
142:19, 142:20,
142:25, 143:8,
143:14, 143:19,
143:21, 144:22,
144:25, 145:2,
145:5, 145:13,
145:21, 146:3,
146:5, 146:7, 146:9,
146:12, 146:20,
146:25, 147:6,
147:9, 147:18,
147:21, 147:23,
148:3, 148:6, 148:9,
148:11, 148:18,
148:21, 148:24,
149:8, 149:11,
150:1, 150:4, 150:6,
150:23, 150:25,
151:20, 152:4,
153:4, 154:17,
155:11, 155:16,
155:18, 156:15,
156:18, 156:22,
157:19, 157:23,
158:19, 158:25,
159:2, 159:5,
159:11, 159:16,
159:20, 159:23,
160:6, 160:16,
160:20, 160:22,
160:25, 161:3,
161:9, 161:15,
161:18, 161:21,
161:25, 162:2,
173:3, 173:6,
173:15, 173:23,
174:2, 174:6, 174:9,
174:12, 174:17,
174:22, 175:1,
175:5, 175:10,
175:12, 175:21,
176:1, 176:7, 177:1,

177:7, 177:12,
177:17, 178:5,
178:17, 178:21,
178:24, 179:10,
179:14, 179:24,
180:5, 180:9,
180:11, 180:14,
180:20, 180:23,
181:1, 181:8,
181:10, 181:15,
181:22, 181:25,
182:8, 182:12,
182:18, 183:17,
183:20, 183:25,
184:7, 184:10,
207:13, 207:16,
207:18, 208:4,
208:18, 209:2,
209:8, 209:11,
209:22, 209:24,
211:8, 211:13,
211:19, 212:14,
212:21, 217:1,
217:6, 217:10,
217:13, 217:16,
217:18, 219:8,
219:11, 219:22,
220:2, 220:7,
220:10, 220:18,
220:22, 220:25,
221:3, 221:14,
221:17, 221:20,
222:1, 222:15,
222:17, 222:21,
223:16, 224:15,
225:2, 225:11,
225:13, 225:15,
225:18, 225:21,
226:10, 226:14,
226:16, 226:19,
226:23, 227:2,
227:4, 227:14,
228:15, 228:18,
228:21, 228:25,
229:8, 229:18,
229:22, 230:8,
230:11, 230:20,
231:3, 231:10,
231:14, 231:16,
233:1, 233:6, 233:9,
233:24, 234:2,
234:9, 234:24,
235:2, 235:4,
235:10, 235:20,
235:23, 235:25,
236:7, 236:13,
237:9, 237:14,
237:19, 238:18,
239:1, 239:4, 239:6,
239:20, 239:25,
240:5, 240:12,

241:8, 241:10,
241:14, 242:21,
243:6, 243:8,
243:12, 243:14,
244:18, 244:20,
244:23, 245:24,
246:12, 246:14,
246:18, 246:22,
247:10, 247:25,
248:3, 248:9,
250:25, 252:21,
253:3, 253:6,
255:17, 255:25,
257:19, 258:14,
258:17, 258:19,
258:24, 259:2,
259:7, 259:9,
259:13, 259:24,
260:3, 260:7,
260:17, 262:6,
262:19, 262:20,
265:19, 266:3,
266:4, 266:6

**MS** [387] - 5:16, 5:18,
7:9, 7:15, 7:17, 7:21,
8:7, 8:11, 8:16, 9:21,
10:12, 10:18, 10:22,
10:25, 11:13, 12:21,
13:2, 13:8, 13:21,
14:5, 14:12, 41:6,
41:9, 41:23, 42:9,
42:12, 42:14, 42:17,
42:22, 42:24, 43:5,
43:16, 43:22, 44:2,
44:18, 44:20, 44:23,
45:1, 45:8, 45:12,
45:15, 45:18, 46:4,
46:8, 47:8, 47:16,
48:18, 48:24, 49:5,
49:13, 49:16, 49:24,
50:3, 50:9, 50:13,
50:17, 50:20, 50:24,
51:12, 51:15, 51:19,
52:4, 52:9, 52:15,
53:15, 53:20, 54:19,
54:23, 79:1, 79:4,
79:6, 79:10, 79:12,
79:15, 80:8, 80:10,
80:13, 80:16, 81:2,
81:5, 81:7, 81:11,
81:16, 81:20, 82:2,
82:11, 82:16, 82:18,
83:14, 83:19, 83:23,
84:1, 84:6, 84:9,
85:1, 85:4, 85:9,
85:17, 85:20, 86:3,
86:10, 86:19, 86:23,
87:1, 87:3, 87:7,
87:10, 87:15, 87:20,
87:24, 88:1, 88:9,
88:17, 88:20, 89:11,

89:15, 89:18, 90:9,
90:12, 90:24, 91:9,
91:16, 91:18, 91:22,
92:1, 92:11, 92:14,
92:16, 92:23, 93:9,
93:12, 93:16, 93:21,
93:25, 94:5, 94:7,
94:16, 94:19, 95:3,
95:6, 95:8, 95:12,
96:5, 96:14, 96:19,
97:6, 97:17, 97:20,
97:24, 98:10, 98:13,
98:16, 98:22, 98:25,
99:6, 99:12, 99:16,
99:25, 100:15,
101:2, 101:5,
101:12, 101:20,
101:22, 101:24,
102:22, 102:25,
103:5, 103:7, 105:8,
105:12, 105:18,
106:2, 106:8,
106:12, 106:16,
106:19, 107:2,
107:14, 107:25,
108:7, 108:10,
108:14, 108:16,
108:20, 108:24,
109:2, 109:17,
109:19, 109:24,
110:2, 110:5, 110:9,
110:11, 110:19,
110:21, 110:24,
111:1, 111:4, 111:9,
111:13, 111:19,
112:7, 112:10,
112:13, 112:19,
112:21, 112:24,
113:2, 113:6, 113:8,
113:10, 113:13,
113:15, 113:18,
114:3, 162:4, 162:6,
162:8, 162:10,
162:15, 162:17,
162:22, 163:2,
163:8, 163:19,
163:23, 164:1,
164:7, 164:9,
164:15, 164:17,
164:19, 164:25,
165:12, 165:15,
165:19, 165:22,
166:3, 166:9,
166:12, 166:15,
167:8, 167:11,
167:13, 167:23,
167:25, 168:5,
168:9, 168:12,
168:23, 169:14,
169:18, 169:21,
169:23, 170:1,

170:20, 171:7,
171:11, 171:19,
171:23, 172:4,
172:10, 172:14,
172:17, 172:21,
172:23, 184:13,
184:15, 184:19,
184:23, 185:1,
185:4, 185:8,
185:12, 185:15,
185:18, 185:21,
186:6, 186:9,
186:12, 187:3,
187:5, 187:21,
187:25, 188:13,
188:17, 189:3,
189:7, 189:13,
189:15, 189:19,
189:23, 189:25,
190:2, 190:5, 190:7,
190:10, 190:13,
190:16, 190:18,
191:12, 191:14,
191:24, 192:3,
192:6, 192:10,
192:13, 192:16,
192:19, 192:24,
193:4, 193:13,
193:16, 194:2,
194:9, 194:11,
194:20, 195:8,
195:14, 195:19,
195:21, 195:23,
196:10, 196:15,
196:21, 196:24,
197:3, 197:6, 197:9,
197:11, 197:16,
197:19, 198:4,
198:13, 198:19,
198:23, 199:1,
199:15, 199:17,
199:23, 200:3,
200:5, 200:7,
200:13, 200:20,
200:22, 200:25,
201:6, 201:16,
201:18, 201:22,
202:2, 202:9,
202:13, 202:15,
202:23, 203:2,
203:5, 203:7,
203:12, 203:18,
204:9, 204:14,
204:18, 205:24,
206:2, 206:5, 206:7,
206:11, 206:13,
206:22, 206:25,
207:3, 207:5, 207:7,
207:10, 213:4,
213:7, 213:13,
213:15, 213:21,

214:22, 215:19,
240:25, 252:16,
266:5
**MTA** [43] - 21:1, 21:2,
49:19, 55:3, 55:6,
55:15, 57:18, 64:10,
65:18, 68:11, 71:20,
72:25, 74:2, 74:6,
74:13, 74:18, 74:21,
75:2, 75:3, 75:5,
75:6, 75:12, 84:14,
87:5, 90:13, 103:16,
107:5, 108:1,
108:16, 124:16,
124:25, 136:17,
152:12, 153:25,
154:2, 156:7, 157:1,
221:10, 249:25,
250:13, 252:4,
252:6, 264:18
**MTA's** [8] - 15:5,
21:16, 65:19, 69:11,
208:20, 218:20,
250:7, 250:9
**multi** [1] - 27:4
**multi-billion** [1] - 27:4
**multiple** [13] - 12:6,
99:7, 99:17, 103:24,
123:25, 138:3,
150:16, 154:3,
176:17, 176:18,
176:20, 206:14,
206:15
**municipalities** [4] -
9:22, 9:24, 58:1,
253:15
**Murphy** [3] - 94:21,
129:21, 170:2
**must** [13] - 58:23,
58:24, 62:18, 64:22,
82:4, 83:15, 102:9,
105:21, 188:12,
208:18, 233:8,
248:18, 258:1
**muster** [1] - 128:7
**MYERS** [201] - 1:16,
79:1, 79:4, 79:6,
79:10, 79:12, 80:8,
80:10, 80:13, 80:16,
81:2, 81:5, 81:7,
81:11, 81:16, 81:20,
82:2, 82:11, 82:16,
82:18, 83:14, 83:19,
83:23, 84:1, 84:6,
84:9, 85:1, 85:4,
85:9, 85:17, 85:20,
86:3, 86:10, 86:19,
86:23, 87:1, 87:3,
87:7, 87:10, 87:15,
87:20, 87:24, 88:1,

88:9, 88:17, 88:20,
89:11, 89:15, 89:18,
90:9, 90:12, 90:24,
91:9, 91:16, 91:18,
91:22, 92:1, 92:11,
92:14, 92:16, 92:23,
93:9, 93:12, 93:16,
93:21, 93:25, 94:5,
94:7, 94:16, 94:19,
95:3, 95:6, 95:8,
95:12, 96:5, 96:14,
96:19, 97:6, 97:17,
97:20, 97:24, 98:10,
98:13, 98:16, 98:22,
98:25, 99:6, 99:12,
99:16, 99:25,
100:15, 101:2,
101:5, 101:12,
101:20, 101:22,
101:24, 102:22,
102:25, 103:5,
103:7, 105:8,
105:12, 105:18,
106:2, 106:8,
106:12, 106:16,
106:19, 107:2,
107:14, 107:25,
108:7, 108:10,
108:14, 108:16,
108:20, 108:24,
109:2, 109:17,
109:19, 109:24,
110:2, 110:5, 110:9,
110:11, 110:19,
110:21, 110:24,
111:1, 111:4, 111:9,
111:13, 111:19,
112:7, 112:10,
112:13, 112:19,
112:21, 112:24,
113:2, 113:6, 113:8,
113:10, 113:13,
113:15, 113:18,
114:3, 162:4, 162:6,
162:8, 162:10,
162:15, 162:17,
162:22, 163:2,
163:8, 163:19,
163:23, 164:1,
164:7, 164:9,
164:15, 164:17,
164:19, 164:25,
165:12, 165:15,
165:19, 165:22,
166:3, 166:9,
166:12, 166:15,
167:8, 167:11,
167:13, 167:23,
167:25, 168:5,
168:9, 168:12,
168:23, 169:14,

169:18, 169:21,
169:23, 170:1,
170:20, 171:7,
171:11, 171:19,
171:23, 172:4,
172:10, 172:14,
172:17, 172:21,
172:23, 199:15,
199:17
**Myers** [29] - 4:9,
27:18, 78:25, 79:2,
80:6, 80:7, 87:2,
89:13, 91:7, 96:24,
101:7, 101:21,
102:17, 109:20,
111:12, 111:23,
114:5, 117:12,
124:11, 128:14,
128:21, 138:22,
149:6, 153:3, 162:3,
163:7, 172:22,
173:8, 182:7
**Myers'** [1] - 150:21

# N

**N.E** [2] - 2:5, 2:13
**NAAQS** [1] - 39:16
**NAFTALIS** [1] - 3:14
**NAGEL** [10] - 1:18,
1:19, 58:9, 61:8,
62:10, 63:2, 63:24,
64:5, 64:16, 64:18
**Nagel** [9] - 4:6, 56:3,
58:8, 61:6, 62:9,
62:21, 64:15, 65:3,
240:23
**name** [5] - 21:22, 96:8,
164:2, 241:12
**narrow** [8] - 23:13,
25:23, 26:7, 27:2,
33:14, 77:24,
156:12, 249:14
**narrowed** [1] - 152:25
**narrowing** [1] - 127:10
**narrowly** [1] - 157:7
**nary** [1] - 179:17
**Nassau** [1] - 22:3
**nation** [1] - 223:24
**nation's** [1] - 18:6
**National** [3] - 14:19,
232:13, 253:10
**national** [3] - 35:5,
201:25, 205:15
**NATURAL** [1] - 2:4
**Natural** [1] - 126:23
**nature** [1] - 124:24
**naught** [1] - 112:5
**nauseam** [1] - 185:25
**near** [1] - 101:13

**nearly** [2] - 20:2, 57:25
**necessarily** [2] - 21:3,
49:1
**necessary** [5] - 35:16,
220:12, 235:12,
235:16, 252:7
**need** [71] - 17:19,
23:10, 25:7, 25:13,
25:18, 25:20, 26:11,
27:16, 28:2, 29:13,
30:23, 32:2, 32:14,
33:13, 34:1, 64:13,
69:8, 69:20, 70:10,
76:17, 78:22, 81:10,
98:8, 100:25,
101:21, 104:5,
110:16, 114:12,
122:12, 131:4,
151:11, 154:21,
157:6, 157:7,
172:18, 173:1,
178:16, 183:12,
183:14, 194:19,
195:4, 199:18,
201:1, 202:4, 203:4,
210:5, 212:3,
214:17, 215:17,
216:13, 216:24,
217:12, 221:7,
226:15, 228:2,
237:11, 237:25,
238:3, 238:13,
241:18, 244:9,
247:14, 248:25,
249:12, 251:24,
253:17, 257:16,
259:4, 265:6, 265:12
**needed** [5] - 33:7,
74:16, 89:25,
101:17, 108:17,
166:17, 181:6,
181:12, 183:10,
186:2, 188:1,
194:13, 205:17
**needle** [1] - 26:7
**needs** [9] - 28:16,
66:7, 70:11, 75:10,
151:11, 156:11,
204:15, 245:15,
259:3
**negative** [6] - 104:4,
177:13, 243:18,
244:1, 244:10,
244:11
**negatively** [3] -
244:12, 244:13,
244:15
**NELSON** [1] - 2:17
**NEPA** [47] - 4:8, 12:13,
15:6, 15:8, 15:16,

17:2, 26:23, 26:24,
27:5, 35:7, 35:14,
35:19, 36:2, 41:14,
48:3, 48:7, 48:12,
48:14, 48:15, 48:16,
48:19, 49:4, 49:10,
67:11, 98:2, 98:4,
126:5, 143:24,
145:15, 151:4,
154:9, 164:12,
182:22, 183:23,
209:11, 220:12,
222:10, 223:4,
223:23, 249:25,
252:8, 256:8,
256:11, 256:15,
256:17
**NEPA's** [3] - 126:25,
222:10, 235:13
**network** [1] - 157:13
**never** [11] - 58:16,
144:4, 153:7, 194:7,
195:24, 224:4,
226:9, 254:17,
259:11, 259:12,
259:19
**NEW** [2] - 1:1, 1:3
**new** [17] - 10:24, 13:5,
41:12, 46:6, 48:20,
68:6, 104:4, 156:1,
161:18, 161:22,
161:23, 173:10,
193:22, 194:18,
223:4, 229:1
**New** [451] - 1:10, 1:17,
1:20, 2:9, 2:18, 2:22,
3:5, 3:6, 3:10, 3:11,
3:12, 3:12, 3:16,
3:19, 4:8, 9:19,
11:17, 12:18, 12:21,
13:15, 13:16, 14:6,
18:9, 18:25, 19:14,
19:15, 19:19, 19:20,
19:21, 19:23, 20:8,
20:20, 20:22, 22:2,
22:11, 22:12, 23:6,
25:13, 32:2, 32:10,
38:24, 41:10, 41:12,
42:6, 42:20, 43:1,
43:8, 43:23, 44:16,
49:21, 49:25, 50:3,
50:4, 50:5, 50:16,
50:19, 50:24, 51:13,
51:25, 52:3, 52:7,
52:9, 53:8, 56:23,
59:13, 59:15, 59:25,
61:15, 61:20, 61:23,
62:11, 64:9, 65:6,
65:11, 65:13, 65:17,
65:21, 65:25, 66:13,

66:14, 66:15, 67:4,
67:19, 69:23, 70:4,
71:1, 71:13, 73:10,
73:12, 73:14, 75:3,
75:6, 75:9, 75:12,
75:24, 76:13, 76:23,
78:21, 79:20, 80:6,
80:17, 80:20, 80:22,
80:24, 81:3, 82:21,
82:25, 83:3, 83:4,
83:5, 83:8, 83:24,
84:3, 84:18, 84:20,
85:7, 85:8, 85:11,
85:12, 85:19, 85:23,
85:24, 86:11, 86:14,
86:18, 86:20, 86:25,
87:3, 87:5, 87:12,
87:14, 87:15, 87:16,
87:18, 87:19, 87:23,
88:3, 88:5, 88:20,
89:2, 89:3, 89:5,
89:24, 90:1, 90:3,
90:4, 90:13, 90:19,
91:1, 92:17, 93:5,
93:10, 93:16, 94:8,
94:12, 94:15, 94:25,
95:10, 95:14, 95:18,
96:2, 96:6, 96:10,
96:18, 96:19, 97:2,
97:7, 97:13, 97:14,
103:8, 103:19,
103:20, 103:21,
103:23, 103:25,
104:9, 104:13,
104:24, 105:6,
105:15, 106:8,
111:2, 111:6, 112:1,
118:1, 118:5,
118:10, 118:13,
120:22, 121:13,
121:15, 124:19,
124:20, 126:12,
127:8, 127:22,
127:23, 128:13,
128:17, 128:20,
128:21, 128:23,
128:24, 129:13,
129:16, 129:19,
129:22, 132:10,
132:17, 137:15,
138:7, 138:8, 138:9,
138:11, 138:14,
138:15, 138:17,
139:7, 139:17,
140:7, 140:10,
140:16, 140:17,
141:11, 142:6,
143:9, 143:10,
144:7, 147:12,
148:15, 148:21,
149:16, 150:16,

151:15, 152:7,
152:11, 152:14,
152:21, 152:23,
153:7, 153:11,
153:18, 153:21,
154:1, 154:4, 154:5,
154:7, 155:18,
155:25, 157:12,
157:14, 157:24,
158:2, 158:4,
166:19, 167:4,
168:24, 169:5,
171:1, 172:4,
172:12, 172:14,
175:24, 176:9,
177:3, 177:14,
177:16, 178:3,
178:5, 178:11,
181:5, 181:8,
181:10, 181:11,
181:18, 181:20,
181:21, 182:1,
182:25, 183:4,
183:5, 183:8, 184:2,
186:1, 186:3,
186:15, 187:17,
187:20, 187:24,
188:2, 188:8,
188:10, 189:18,
190:18, 190:20,
190:21, 190:23,
191:1, 191:10,
191:11, 191:19,
192:9, 192:14,
192:16, 192:19,
192:23, 192:25,
193:2, 193:6, 193:7,
193:8, 193:10,
193:15, 193:18,
194:1, 194:12,
194:14, 194:25,
195:1, 195:16,
195:17, 195:19,
195:20, 197:2,
197:5, 197:8,
197:12, 197:14,
197:15, 200:12,
203:14, 205:9,
205:19, 205:20,
205:21, 207:22,
207:23, 208:19,
209:2, 209:3, 209:4,
209:6, 209:17,
209:18, 209:21,
209:22, 209:24,
209:25, 210:1,
210:2, 210:9,
210:11, 210:21,
210:23, 210:25,
211:4, 211:5,
211:14, 212:8,

212:15, 212:16,
212:18, 213:12,
213:16, 213:17,
215:8, 215:10,
218:5, 218:8,
218:13, 218:15,
218:16, 218:24,
218:25, 226:3,
226:6, 228:3, 228:4,
229:11, 237:21,
238:7, 240:18,
241:17, 242:8,
242:13, 243:5,
243:19, 244:4,
244:10, 244:13,
244:14, 244:15,
246:25, 247:20,
247:21, 249:4,
249:5, 249:11,
249:15, 249:22,
249:23, 249:24,
250:18, 251:2,
251:15, 251:21,
252:2, 252:8, 253:7,
253:13, 253:18,
253:20, 253:21,
253:24, 254:1,
254:3, 254:12,
254:13, 254:20,
254:23, 254:25
**Newark** [10] - 1:10,
2:9, 3:9, 3:10, 66:22,
68:3, 68:6, 68:13,
68:25, 249:17
**newest** [1] - 54:20
**next** [36] - 9:11, 16:6,
20:24, 22:17, 23:2,
23:16, 24:24, 25:6,
28:8, 59:12, 81:13,
82:2, 82:19, 99:23,
104:3, 118:8,
118:17, 119:21,
121:16, 124:3,
124:9, 154:19,
156:11, 157:1,
157:6, 157:9,
157:12, 158:2,
197:17, 223:19,
224:16, 234:14,
250:21, 265:4,
265:6, 265:7
**night** [2] - 247:15,
265:3
**nine** [4] - 120:11,
149:1, 149:9, 215:25
**nine-minute** [1] -
215:25
**nine-month** [1] -
149:1
**Ninth** [11] - 102:4,

102:5, 149:14,
149:19, 212:2,
222:6, 227:18,
232:12, 232:14,
234:3, 248:16
**nitrogen** [1] - 39:23
**NJ** [4] - 3:6, 3:7, 3:9,
3:11
**NJ-Rockland** [1] - 3:9
**NJTA** [1] - 86:11
**no-action** [1] - 44:6
**no-construction** [2] -
19:4, 19:6
**noble** [1] - 241:3
**nobody** [4] - 93:7,
114:6, 203:23,
210:20
**nominate** [3] - 83:21,
83:25, 125:24
**nominated** [1] -
125:20
**nomination** [3] -
110:8, 110:22, 126:3
**non** [1] - 189:6
**nonattaining** [1] -
211:4
**nonattainment** [11] -
183:4, 183:6,
193:21, 194:17,
208:4, 210:1, 210:2,
211:2, 211:3, 212:17
**none** [6] - 42:25,
169:4, 203:14,
254:22, 263:24,
265:16
**nonparticipating** [1] -
121:24
**nonprofit** [2] - 95:18,
96:16
**nonsensical** [1] -
154:6
**North** [7] - 3:8, 97:12,
117:24, 169:1,
239:17, 239:20,
240:13
**Note** [1] - 35:11
**note** [21] - 5:19, 13:21,
24:14, 48:2, 55:13,
82:23, 86:10, 89:18,
106:19, 119:10,
121:9, 121:18,
121:23, 150:12,
173:9, 174:22,
214:23, 226:19,
233:10, 239:6,
253:10
**noted** [4] - 42:3, 68:3,
122:20, 125:23
**notes** [5] - 17:6, 72:5,
110:13, 127:19,

159:4
**nothing** [16] - 13:16,
38:19, 57:13, 61:17,
61:20, 61:22, 122:1,
131:12, 139:11,
156:1, 166:17,
175:5, 175:10,
177:2, 202:9, 249:22
**notice** [42] - 43:19,
94:17, 98:5, 98:25,
99:2, 102:5, 105:5,
105:11, 118:24,
120:8, 130:25,
131:5, 134:1,
134:11, 134:13,
136:13, 140:6,
140:7, 141:17,
142:20, 146:17,
162:11, 163:2,
163:8, 163:11,
163:16, 163:23,
164:3, 166:18,
173:8, 173:17,
173:20, 174:23,
175:1, 175:4,
176:11, 176:15,
212:8, 239:19,
239:24, 265:8
**notices** [1] - 134:24
**notification** [1] -
173:25
**notified** [2] - 82:4,
152:12
**notify** [1] - 105:16
**noting** [1] - 130:24
**notion** [7] - 75:11,
90:22, 90:24,
137:17, 160:6,
236:15, 237:19
**notwithstanding** [1] -
14:16
**novelty** [1] - 116:9
**nowhere** [6] - 27:14,
27:19, 101:13,
163:2, 186:4, 251:8
**nuance** [1] - 23:24
**nullity** [1] - 131:14
**number** [32] - 5:8,
5:13, 5:19, 8:22,
12:11, 12:25, 22:22,
23:19, 43:19, 47:4,
47:5, 54:15, 75:17,
82:21, 83:3, 85:6,
85:7, 87:23, 91:10,
96:12, 97:4, 113:11,
117:11, 117:22,
118:18, 121:10,
157:24, 182:17,
239:24, 247:18,
254:8

NUMBER [1] - 1:3
Number [2] - 10:13
numbers [3] - 15:7,
123:15, 165:9
numerous [4] - 15:15,
119:22, 123:19,
231:18
NYMTC [1] - 205:2
NYMTC's [1] - 205:1

**O**

o'clock [3] - 78:19,
78:24, 216:4
O'Reilly [1] - 30:4
Oakwood [1] - 3:5
object [1] - 218:20
objected [1] - 43:18
objection [1] - 8:2
objections [2] - 6:9,
261:11
objective [1] - 211:10
obligated [4] - 145:18,
161:6, 161:7, 264:18
obligation [10] -
26:24, 81:8, 81:12,
82:10, 146:5, 146:6,
146:10, 146:13,
211:18, 249:25
obligations [2] -
117:8, 117:13
oblique [1] - 157:2
obliquely [1] - 156:10
observation [1] -
179:6
obvious [14] - 59:22,
106:22, 140:16,
203:20, 203:24,
210:16, 210:18,
211:7, 211:12,
211:18, 212:2,
212:10, 213:1,
230:19
obviously [11] - 69:5,
89:22, 131:24,
134:9, 153:10,
169:18, 226:23,
230:14, 245:6,
253:21, 259:3
obviousness [4] -
140:14, 204:4,
211:7, 211:10
occasionally [1] -
212:22
occasions [1] - 60:18
occur [5] - 22:14,
27:15, 196:8,
208:17, 208:18
occurred [5] - 92:25,
93:4, 93:6, 152:6,

170:3
occurring [1] - 42:25
OF [4] - 1:1, 1:3, 1:6,
1:12
off-the-record [3] -
80:15, 109:21, 159:8
offended [1] - 263:23
offense [1] - 114:9
offered [6] - 21:6,
25:8, 101:2, 120:11,
120:24, 121:14
offering [2] - 37:3,
46:6
Office [4] - 1:9, 89:3,
172:13, 172:14
OFFICE [5] - 2:3, 2:8,
2:11, 3:18, 56:12
office [4] - 140:1,
170:22, 172:2,
239:16
offices [1] - 82:22
official [2] - 162:17,
162:23
OFFICIAL [1] - 266:9
Official [2] - 1:22,
266:15
officials [2] - 138:14,
238:22
Ohio [2] - 101:20,
102:1
oil [1] - 235:15
old [6] - 10:16, 10:20,
235:8, 249:4
older [1] - 248:17
oldest [1] - 71:11
once [15] - 24:11,
27:24, 28:1, 28:15,
30:21, 60:18, 65:18,
106:14, 148:22,
156:9, 205:11,
206:17, 208:13,
263:18, 264:15
one [124] - 5:6, 6:10,
7:9, 7:10, 8:22, 8:25,
9:1, 10:22, 10:25,
11:24, 12:14, 12:19,
13:22, 14:10, 14:11,
14:18, 15:12, 18:4,
18:21, 20:20, 23:17,
26:10, 26:16, 26:20,
27:13, 38:20, 42:3,
49:17, 51:20, 51:21,
53:20, 64:8, 64:17,
65:23, 66:3, 66:7,
70:6, 70:20, 70:24,
71:11, 74:9, 74:23,
75:10, 87:15, 96:6,
96:20, 97:4, 97:9,
97:12, 101:18,
103:12, 103:13,

109:1, 109:5,
115:20, 116:16,
116:21, 117:22,
118:12, 120:23,
122:3, 122:20,
127:25, 129:4,
129:15, 131:24,
133:14, 133:18,
138:4, 139:4, 140:6,
140:9, 142:8,
142:11, 142:13,
142:15, 147:24,
151:21, 155:12,
158:12, 158:19,
168:25, 169:6,
170:18, 176:16,
176:21, 186:25,
190:21, 191:25,
195:6, 196:7,
199:10, 203:2,
203:3, 204:7,
207:21, 207:22,
211:17, 213:6,
219:7, 222:18,
226:9, 226:10,
227:14, 231:23,
234:6, 235:10,
239:14, 239:19,
240:3, 240:7, 245:2,
245:3, 246:3,
250:12, 253:6,
255:13, 256:1,
257:15, 261:6,
264:11, 265:15
One [1] - 3:19
ones [16] - 9:7, 9:14,
11:2, 11:7, 22:23,
25:20, 67:21, 71:2,
89:11, 89:12, 92:4,
109:11, 125:11,
203:14, 203:15
ongoing [5] - 48:8,
167:18, 245:11,
245:12
open [4] - 61:14,
108:4, 155:1, 234:25
open-ended [1] -
234:25
opening [2] - 179:12,
182:13
opens [1] - 165:19
operating [1] - 172:10
opinion [7] - 90:9,
91:8, 101:9, 168:12,
216:23, 227:9, 238:7
opinions [1] - 147:20
opportunities [5] -
118:18, 119:15,
121:20, 137:14,
139:24

opportunity [26] -
79:5, 80:22, 89:13,
94:25, 100:2,
102:16, 107:19,
120:20, 121:3,
122:14, 132:5,
137:25, 138:23,
146:18, 158:23,
160:2, 175:2, 176:2,
176:3, 178:5, 180:2,
194:8, 248:4,
255:22, 259:4,
261:25
opposed [10] - 19:15,
25:1, 35:22, 43:8,
73:24, 99:4, 211:4,
236:25, 258:7
opposition [1] -
207:19
option [2] - 132:14,
133:22
options [2] - 120:12,
124:6
oral [8] - 99:23, 101:8,
122:8, 122:9,
122:20, 123:2,
227:7, 257:10
ORAL [1] - 1:5
Orange [2] - 249:17
orange [1] - 9:7
oranges [1] - 242:7
order [22] - 30:23,
47:5, 48:15, 49:11,
49:14, 51:2, 51:21,
52:23, 58:9, 58:24,
62:17, 100:25,
102:20, 125:5,
199:2, 212:4, 217:9,
220:16, 232:10,
252:13, 257:1, 265:4
ordered [1] - 221:14
ordering [1] - 221:12
orders [2] - 38:7, 48:4
organic [1] - 39:23
organization [2] -
86:12, 95:22, 97:9
organizations [4] -
71:12, 85:21,
168:25, 245:2
originally [1] - 111:10
originating [1] - 193:1
ostensibly [1] - 46:2
ostensively [2] -
134:22, 146:15
otherwise [6] - 43:21,
144:4, 145:23,
222:3, 226:16,
232:24
OTIS [24] - 3:15, 7:5,
56:8, 71:6, 71:8,

71:24, 72:1, 72:4,
72:6, 73:21, 73:25,
74:2, 74:10, 74:12,
76:18, 76:20, 78:1,
78:12, 78:15,
114:25, 115:4,
244:20, 244:23,
245:24
Otis [8] - 4:7, 4:20,
56:8, 56:9, 71:5,
78:11, 244:19,
245:22
ought [1] - 258:14
outcome [6] - 29:5,
100:13, 129:5,
129:6, 255:21,
265:21
outcomes [2] - 22:20,
34:21
outgrowth [1] - 125:4
outline [1] - 63:16
outlined [1] - 170:23
outlines [1] - 170:7
outlining [2] - 104:11,
169:4
outpouring [1] -
247:24
outreach [12] - 94:25,
95:9, 119:23,
120:19, 138:3,
139:23, 152:22,
156:8, 157:2, 157:3,
238:22, 239:9
outright [1] - 168:1
outset [2] - 183:13,
246:24
outside [12] - 7:22,
86:24, 93:24,
106:15, 193:11,
195:3, 197:8,
197:12, 197:13,
197:15, 259:15,
259:16
overall [8] - 38:16,
39:12, 44:15, 45:5,
72:24, 74:7, 116:5,
153:10
overlaid [1] - 48:14
overlap [1] - 123:10
overlooked [3] -
117:25, 156:2,
156:22
overnight [3] - 11:23,
47:18, 258:2
override [2] - 160:11,
160:14
overriding [1] - 218:20
oversight [1] - 76:9
overstepped [1] -
263:23

**overview** [1] - 119:12
**overwhelming** [2] - 183:22, 232:16
**own** [10] - 21:3, 32:5, 32:8, 68:10, 70:14, 70:18, 80:21, 211:14, 241:21, 257:5
**oxides** [1] - 39:23
**ozone** [9] - 183:2, 183:6, 210:3, 211:2, 211:3, 211:4, 211:24, 212:7, 212:17

## P

**P.C** [1] - 2:15
**p.m** [7] - 154:24, 155:1, 216:8, 246:10, 266:7
**package** [1] - 105:22
**Padres** [5] - 227:18, 228:9, 228:13, 233:16, 234:2
**Page** [2] - 30:5, 32:6
**PAGE** [7] - 4:2, 4:5, 4:9, 4:12, 4:15, 4:18, 4:21
**page** [46] - 7:10, 14:18, 44:11, 63:8, 94:21, 95:8, 103:17, 104:3, 111:4, 114:18, 115:6, 115:11, 116:25, 118:8, 118:17, 119:22, 121:16, 124:3, 124:9, 127:17, 153:25, 155:21, 173:19, 173:21, 173:25, 174:3, 174:4, 174:5, 174:7, 174:12, 180:4, 180:12, 183:10, 183:11, 186:23, 202:17, 203:1, 203:2, 214:6, 227:8, 258:5, 262:13
**Pages** [1] - 207:19
**pages** [19] - 46:15, 47:10, 92:7, 94:23, 99:19, 99:25, 101:14, 101:17, 101:18, 103:2, 174:16, 179:11, 179:17, 181:3, 182:13, 182:17, 257:21, 258:2, 258:4
**PAGET** [1] - 2:15
**paid** [1] - 76:1

**painfully** [1] - 250:13
**paper** [5] - 67:12, 67:13, 159:6, 256:25, 265:11
**papers** [2] - 32:5, 56:23
**paragraph** [3] - 14:18, 203:3, 204:24
**paragraphs** [1] - 203:5
**parameter** [1] - 115:25
**parameters** [2] - 62:24, 263:2
**Pardon** [1] - 142:14
**pardon** [1] - 144:6
**parentheses** [1] - 239:8
**Park** [1] - 3:11
**parking** [1] - 141:11
**Parkway** [1] - 1:20
**parroting** [1] - 46:2
**Part** [1] - 205:13
**part** [39] - 13:13, 14:2, 14:8, 28:8, 28:15, 46:11, 48:3, 50:4, 69:23, 72:23, 74:6, 75:10, 76:8, 78:4, 84:2, 85:14, 87:19, 88:9, 88:10, 95:4, 97:8, 97:10, 98:18, 100:6, 140:6, 161:8, 164:17, 186:22, 190:12, 191:5, 193:9, 208:10, 208:14, 253:17, 254:7, 258:3, 258:8, 261:7, 261:9
**partaking** [1] - 153:23
**participants** [2] - 120:21, 133:13
**participate** [21] - 81:4, 81:10, 86:21, 88:2, 95:19, 121:21, 124:14, 125:21, 125:22, 138:16, 140:18, 152:15, 152:16, 153:18, 153:20, 154:8, 168:14, 168:17, 168:18, 169:1, 247:8
**participated** [5] - 95:22, 140:17, 152:24, 244:25, 245:3
**participating** [34] - 83:16, 83:19, 83:22, 84:7, 84:17, 84:23, 89:8, 93:14, 93:17, 93:18, 93:23, 117:4, 117:12, 117:23, 118:6, 119:2, 119:4,

119:5, 119:24, 120:3, 120:23, 121:25, 126:16, 127:7, 137:17, 137:19, 137:22, 153:8, 153:19, 154:7, 156:1, 171:1, 255:1
**Participating** [2] - 117:1, 127:6
**participation** [35] - 78:21, 79:21, 80:6, 80:18, 84:17, 86:4, 86:12, 86:16, 97:25, 102:4, 103:9, 119:22, 119:24, 124:4, 124:5, 124:8, 124:10, 125:3, 126:13, 126:25, 129:20, 152:19, 153:6, 154:5, 170:21, 178:11, 241:16, 241:24, 242:1, 242:3, 244:24, 245:1, 245:4
**Participation** [1] - 4:8
**particles** [2] - 211:21, 211:24
**particular** [16] - 47:11, 54:11, 54:13, 65:11, 129:5, 173:21, 210:17, 211:21, 212:6, 219:3, 219:12, 221:13, 221:15, 224:1, 236:24, 249:12
**particularly** [8] - 16:14, 84:4, 105:22, 211:1, 224:2, 263:11, 264:18
**particulate** [5] - 39:22, 40:10, 67:1, 187:16, 212:8
**parties** [13] - 16:3, 89:10, 93:23, 117:10, 117:11, 127:6, 131:11, 181:14, 238:13, 246:5, 257:3, 257:10, 258:7
**parts** [8] - 45:22, 51:19, 70:6, 75:19, 96:22, 164:15, 190:15, 208:9
**party** [5] - 86:22, 93:14, 106:21, 120:23, 242:24
**Party** [1] - 3:13
**pass** [6] - 17:19, 17:20, 110:17,

128:7, 204:11, 215:16
**Passaic** [3] - 22:3, 22:5, 249:10
**Passengers** [1] - 3:10
**passing** [1] - 141:8
**passion** [3] - 29:1, 242:6, 254:23
**passions** [1] - 247:16
**past** [11] - 17:14, 67:19, 70:23, 107:18, 115:23, 217:20, 223:7, 242:24, 255:19, 256:1, 257:11
**PATH** [1] - 90:15
**path** [2] - 29:4, 113:25
**patience** [1] - 252:23
**patterns** [3] - 68:9, 69:4, 104:5
**pause** [2] - 202:22, 202:25
**paying** [2] - 115:2, 115:3
**payment** [2] - 75:22, 76:24
**peace** [1] - 262:5
**peaceful** [1] - 207:11
**pedestrian** [1] - 90:14
**peep** [1] - 62:5
**Peltz** [2] - 134:8, 174:10
**PELTZ** [1] - 2:5
**pencils** [1] - 114:7
**pending** [2] - 190:25, 214:19
**Pennsylvania** [1] - 231:22
**penumbra** [1] - 169:10
**people** [13] - 66:5, 74:22, 75:3, 93:24, 94:3, 125:24, 172:5, 175:7, 175:22, 247:18, 263:2, 264:10
**People** [1] - 3:9
**per** [6] - 58:9, 120:21, 214:12, 245:13, 245:14
**perceive** [1] - 246:1
**perceived** [1] - 263:11
**percent** [15] - 19:23, 20:4, 22:7, 32:7, 51:7, 65:14, 65:17, 65:24, 66:1, 115:7, 150:8, 150:10, 242:20, 244:13
**percentages** [1] - 19:22
**percentile** [16] - 9:14,

23:9, 23:14, 23:15, 25:11, 25:12, 26:3, 47:1, 53:23, 54:4, 54:6, 54:9, 54:14, 54:17, 251:6
**percentiles** [1] - 37:17
**Perez** [1] - 231:21
**perfect** [2] - 62:19, 114:6
**perfectly** [3] - 140:16, 150:9, 245:4
**perform** [1] - 103:22
**perfunctory** [1] - 223:5
**perhaps** [8] - 52:17, 70:25, 150:14, 155:6, 159:7, 179:16, 195:8, 258:1
**period** [101] - 23:10, 90:21, 92:8, 92:9, 99:1, 99:2, 102:12, 103:13, 106:15, 107:6, 107:10, 107:11, 107:13, 107:17, 107:23, 108:2, 108:5, 108:7, 108:9, 108:13, 109:6, 111:15, 111:17, 112:6, 112:18, 113:5, 113:22, 115:15, 115:16, 115:18, 115:20, 116:5, 116:14, 116:16, 116:20, 122:14, 123:2, 123:3, 123:6, 130:10, 130:14, 130:21, 131:5, 131:9, 131:10, 131:14, 131:16, 131:19, 131:23, 132:13, 133:3, 133:21, 133:25, 134:25, 135:10, 135:13, 135:15, 143:22, 144:3, 144:11, 144:14, 144:17, 145:8, 145:11, 145:12, 145:22, 146:1, 146:11, 146:15, 146:21, 147:10, 147:11, 148:4, 148:5, 148:13, 149:2, 149:10, 149:22, 149:24, 151:14, 151:21, 151:24, 153:13, 158:24, 159:14, 159:17, 162:12,

162:14, 162:18, 162:23, 163:3, 163:18, 165:20, 166:16, 166:20, 170:5, 175:18, 176:13, 176:16, 264:1

**periods** [2] - 176:17, 176:18

**permissible** [2] - 107:17, 134:6

**permit** [3] - 63:12, 63:14, 69:18

**permitted** [2] - 120:18, 132:12

**person** [2] - 203:25, 257:17

**personal** [4] - 260:5, 260:7, 263:24

**persons** [1] - 152:16

**perspective** [3] - 60:7, 257:5, 262:6

**Perspective** [1] - 3:6

**pertains** [1] - 194:23

**pervasive** [2] - 224:1, 224:21

**petitioner** [1] - 178:7

**Philadelphia** [1] - 265:18

**phone** [4] - 120:12, 140:13, 165:9, 248:7

**phonetic** [1] - 241:7

**phrase** [4] - 28:13, 42:11, 156:21, 198:20

**physical** [1] - 14:15

**pick** [5] - 5:5, 5:22, 19:20, 19:21, 140:12

**picked** [4] - 19:21, 159:6, 256:4, 257:24

**pickle** [1] - 61:21

**piece** [2] - 159:6, 167:10

**pike** [1] - 139:21

**pile** [2] - 106:20, 186:25

**pin** [1] - 174:2

**Pinelands** [1] - 3:8

**pinpoint** [1] - 45:7

**Pipeline** [1] - 235:14

**pipeline** [2] - 62:12, 235:16

**Pipelines** [1] - 3:9

**pivotal** [1] - 249:6

**placards** [1] - 141:10

**place** [26] - 8:23, 9:15, 11:8, 25:15, 46:14, 59:9, 61:10, 61:11, 68:7, 84:24, 104:23, 138:15, 167:6,

198:21, 202:5, 224:20, 226:24, 227:23, 233:14, 233:15, 242:4, 243:24, 249:18, 254:15, 256:12

**place-based** [7] - 8:23, 9:15, 11:8, 25:15, 46:14, 104:23, 249:18

**placed** [1] - 191:17

**places** [5] - 25:24, 213:17, 226:3, 239:24, 251:22

**Plaintiff** [2] - 1:4, 1:17

**plaintiff** [11] - 6:22, 6:23, 38:23, 39:19, 40:2, 56:23, 67:18, 141:18, 193:19, 241:2, 257:23

**Plaintiff's** [9] - 34:5, 34:18, 41:20, 41:21, 102:6, 139:18, 193:23, 193:25

**Plaintiffs** [1] - 1:21

**plaintiffs** [7] - 35:13, 38:9, 74:14, 77:24, 115:19, 117:25, 138:18

**Plan** [10] - 186:3, 188:2, 188:5, 188:24, 190:20, 195:1, 199:7, 210:11, 210:12, 214:10

**plan** [44] - 58:14, 58:17, 59:9, 59:22, 60:20, 61:11, 61:15, 61:19, 62:3, 62:7, 62:17, 64:20, 64:22, 65:12, 67:5, 77:14, 78:5, 78:8, 118:4, 167:16, 167:19, 167:21, 169:15, 179:2, 179:3, 181:5, 181:18, 182:25, 184:4, 187:10, 187:12, 189:6, 189:8, 189:10, 189:20, 194:14, 205:9, 209:3, 209:4, 209:5, 214:10, 224:24, 253:22

**planned** [1] - 217:11

**Planning** [4] - 117:24, 118:13, 168:24, 169:1

**planning** [3] - 67:24, 199:4, 199:8

**plans** [5] - 59:16,

59:24, 60:10, 137:8, 214:3

**play** [1] - 214:9

**played** [1] - 54:8

**Plaza** [1] - 3:19

**pleased** [1] - 149:11

**pleasure** [2] - 178:13, 265:20

**pledged** [1] - 67:9

**plow** [1] - 216:1

**plug** [3] - 224:18, 224:23, 227:22

**plural** [1] - 39:2

**plus** [1] - 112:22

**PM** [1] - 12:9

**PM-2.5** [5] - 193:20, 193:22, 194:16, 194:18, 215:14

**pockets** [1] - 74:15

**podium** [1] - 6:3

**point** [98] - 8:5, 9:1, 11:23, 11:24, 18:8, 19:24, 26:22, 27:7, 36:22, 38:9, 40:8, 40:12, 43:3, 43:13, 45:8, 53:20, 58:15, 60:13, 60:14, 64:1, 66:7, 72:16, 72:24, 90:3, 91:7, 94:10, 94:13, 96:13, 96:14, 97:21, 106:25, 113:24, 117:22, 121:3, 124:4, 128:23, 129:8, 137:6, 138:2, 138:3, 138:19, 139:5, 140:5, 140:10, 143:1, 143:3, 148:25, 156:16, 156:18, 156:19, 156:20, 156:23, 167:25, 173:17, 173:19, 174:22, 176:9, 176:19, 177:2, 177:18, 181:24, 181:25, 182:2, 185:17, 188:3, 191:8, 206:7, 207:3, 209:24, 212:3, 213:15, 214:24, 214:25, 215:3, 224:17, 225:22, 227:5, 230:16, 233:1, 235:3, 235:10, 237:15, 238:5, 246:1, 249:6, 251:16, 251:18, 251:22, 251:23, 260:9, 262:7,

263:10, 263:12, 263:20, 263:21, 264:11, 265:2

**pointed** [9] - 18:19, 45:9, 45:22, 60:13, 210:13, 213:10, 214:2, 218:23, 259:15

**pointing** [1] - 212:6

**points** [14] - 37:13, 57:7, 126:12, 143:21, 170:9, 172:4, 172:6, 172:11, 173:4, 176:11, 194:16, 194:17, 258:20

**poles** [1] - 138:12

**policed** [1] - 63:10

**policies** [1] - 241:21

**Policy** [2] - 3:6, 253:10

**policy** [2] - 48:4, 256:19

**political** [3] - 64:25, 256:6, 256:9

**pollutant** [6] - 9:9, 9:10, 35:18, 47:1, 47:12, 51:23, 53:24, 54:5

**pollutants** [15] - 9:13, 23:8, 23:14, 32:7, 35:13, 35:15, 39:24, 47:7, 61:25, 66:4, 72:7, 72:8, 72:9, 201:24, 251:13

**Pollutants** [1] - 10:14

**pollution** [10] - 25:11, 26:2, 58:19, 66:13, 71:16, 72:19, 73:17, 73:23, 245:12, 251:5

**populated** [2] - 41:24, 70:6

**population** [1] - 51:7

**populations** [1] - 141:6

**port** [1] - 34:21

**portion** [1] - 203:7

**portions** [1] - 14:6

**ports** [1] - 34:13

**pose** [1] - 30:24

**posed** [1] - 11:14

**posing** [1] - 199:2

**posited** [1] - 149:4

**position** [38] - 5:12, 21:18, 29:2, 31:6, 31:7, 57:1, 67:20, 69:7, 69:12, 69:13, 71:1, 81:18, 83:13, 85:24, 86:3, 86:25, 101:2, 105:3, 105:12, 105:14, 122:6, 176:25,

177:4, 178:7, 186:11, 194:7, 237:4, 237:22, 241:3, 241:17, 241:19, 242:14, 254:3, 255:22, 256:12

**positions** [1] - 238:12

**positive** [1] - 78:5

**possibilities** [1] - 122:17

**possibility** [1] - 224:6

**possible** [1] - 111:3

**post** [6] - 21:8, 21:13, 45:19, 46:15, 250:12, 251:9

**Post** [1] - 1:9

**post-hoc** [6] - 21:8, 21:13, 45:19, 46:15, 250:12, 251:9

**posted** [4] - 89:6, 120:8, 129:18, 240:3

**poster** [1] - 66:17

**posting** [3] - 166:7, 239:18, 239:24

**posts** [1] - 42:18

**pot** [1] - 27:3

**potential** [10] - 12:6, 34:21, 39:9, 39:12, 49:19, 73:2, 77:18, 164:20, 232:20, 255:8

**potentially** [4] - 30:8, 158:13, 248:25, 254:9

**Potomac** [1] - 16:19

**power** [1] - 256:10

**powerful** [1] - 230:2

**PowerPoint** [8] - 8:3, 14:3, 129:18, 179:7, 184:17, 246:4, 257:21, 262:12

**PowerPoint-esque** [1] - 246:4

**practicable** [2] - 81:23, 102:9

**practical** [1] - 238:20

**practice** [12] - 17:15, 67:19, 70:25, 90:22, 107:18, 107:20, 115:23, 125:8, 196:14, 234:16, 243:1, 243:2

**practices** [5] - 69:25, 70:23, 89:6, 241:21, 242:24

**pre** [13] - 9:4, 9:13, 11:5, 23:8, 35:5, 35:6, 35:13, 35:19, 47:24, 49:6, 49:9,

207:25, 251:5

**Pre** [1] - 10:13

**pre-existing** [13] - 9:4, 9:13, 11:5, 23:8, 35:5, 35:6, 35:13, 35:19, 47:24, 49:6, 49:9, 207:25, 251:5

**Pre-Existing** [1] - 10:13

**precedent** [5] - 18:19, 102:4, 179:18, 180:16, 256:2

**precise** [1] - 115:9

**precisely** [5] - 42:17, 47:8, 63:24, 63:25

**preclude** [2] - 122:5, 137:23

**precludes** [2] - 122:1, 154:7

**preclusion** [2] - 146:20, 147:1

**predetermined** [1] - 222:25

**predicated** [1] - 146:19

**predictability** [1] - 133:13

**predicted** [2] - 39:12, 39:22

**preempt** [1] - 254:20

**preface** [1] - 11:17

**prejudge** [2] - 231:25, 232:8

**premise** [5] - 33:6, 33:10, 33:12, 96:15, 145:15

**preparation** [2] - 101:13, 265:11

**prepare** [1] - 238:1

**prepared** [6] - 15:20, 90:17, 144:2, 164:19, 170:9, 248:18

**prepares** [1] - 15:16

**preparing** [2] - 98:4, 99:20

**prerogative** [1] - 108:19

**prescribed** [1] - 125:7

**presence** [1] - 47:6

**present** [7] - 10:4, 12:15, 13:18, 172:15, 257:13, 262:12, 263:3

**presentation** [25] - 7:16, 8:3, 14:3, 14:4, 41:11, 41:21, 45:18, 59:5, 67:1, 122:9, 122:20, 123:2, 137:13, 154:16,

155:5, 179:7, 187:14, 214:7, 216:16, 227:16, 240:24, 248:23, 257:21, 262:15, 263:10

**presentations** [9] - 66:18, 121:17, 122:8, 169:3, 246:4, 257:10, 258:4, 259:22, 264:4

**presented** [19] - 6:12, 10:1, 10:6, 13:22, 43:6, 43:19, 43:23, 44:10, 44:13, 45:12, 59:21, 92:5, 129:1, 256:5, 257:1, 257:3, 257:9, 259:14, 263:14

**presents** [1] - 45:9

**preservation** [1] - 159:10

**Preservation** [1] - 3:8

**preserve** [4] - 140:19, 147:11, 155:19, 212:4

**preserved** [6] - 148:7, 159:15, 160:12, 160:15, 161:2, 184:21

**press** [1] - 13:25, 248:3

**pressure** [1] - 151:4

**presumably** [4] - 140:1, 140:3, 140:12, 237:10

**presumptive** [1] - 222:8

**pretty** [4] - 106:13, 111:9, 111:19, 178:21

**prevailing** [1] - 41:10

**preventing** [1] - 156:24

**preview** [1] - 139:13

**previously** [2] - 217:5, 241:17

**pricing** [14] - 65:22, 66:12, 66:20, 66:23, 67:3, 71:14, 72:18, 73:1, 73:6, 78:8, 88:24, 217:23, 223:25, 255:6

**primarily** [5] - 39:6, 103:19, 163:19, 169:23, 253:15

**primary** [4] - 39:3, 145:11, 145:13, 184:6

**principally** [1] - 86:15

**principals** [1] - 130:20

**private** [1] - 152:7

**privilege** [1] - 71:8

**probe** [1] - 208:7

**probing** [1] - 20:16

**problem** [17] - 21:6, 52:2, 96:24, 103:5, 130:6, 155:3, 156:14, 161:8, 172:21, 207:13, 209:25, 244:9, 245:11, 245:12, 260:20

**problems** [6] - 77:4, 210:17, 224:21, 227:6, 250:16, 250:21

**procedures** [1] - 98:4

**proceed** [7] - 6:7, 6:16, 17:20, 17:21, 116:23, 137:8, 187:4

**proceeding** [3] - 5:7, 6:11, 122:21

**Proceedings** [1] - 1:24

**proceedings** [2] - 266:7, 266:12

**process** [55] - 43:13, 77:25, 78:4, 84:19, 85:25, 86:24, 88:7, 91:21, 93:20, 94:4, 94:15, 103:4, 110:23, 122:21, 125:6, 125:11, 125:20, 126:5, 127:3, 127:5, 127:10, 133:8, 135:5, 137:16, 137:20, 137:24, 143:24, 144:4, 144:10, 144:20, 144:22, 145:5, 145:23, 153:20, 153:23, 154:9, 154:11, 155:24, 158:3, 168:14, 171:1, 176:20, 197:23, 218:24, 224:22, 229:3, 229:4, 233:5, 233:6, 243:20, 244:25, 245:5, 255:1, 257:1, 264:13

**processes** [1] - 151:6

**processing** [1] - 198:3

**produced** [1] - 1:24

**production** [1] - 232:11

**Professionals** [1] - 3:6

**program** [21] - 16:22, 65:9, 66:6, 66:9, 66:11, 69:24, 70:1, 71:14, 71:18, 72:18, 73:1, 73:7, 73:15, 77:22, 177:20, 191:18, 204:22, 206:19, 218:21, 244:6

**Program** [7] - 187:11, 188:14, 188:17, 197:22, 197:23, 210:9, 214:11

**programs** [6] - 54:1, 73:6, 76:3, 76:4, 206:16, 256:14

**prohibit** [1] - 30:14

**prohibition** [1] - 28:9

**project** [189] - 11:4, 12:4, 12:5, 12:23, 13:14, 13:16, 14:16, 15:12, 15:13, 15:14, 16:18, 16:20, 16:21, 17:3, 17:4, 17:6, 18:6, 18:12, 18:22, 18:24, 19:5, 19:6, 21:2, 21:10, 27:4, 35:12, 35:14, 35:17, 36:25, 39:15, 41:11, 41:13, 41:15, 41:23, 42:5, 44:4, 44:7, 48:20, 55:11, 55:18, 67:21, 68:9, 68:11, 68:14, 68:22, 69:3, 69:13, 69:15, 69:17, 69:21, 70:18, 74:7, 75:8, 77:13, 77:19, 81:18, 84:4, 89:1, 89:20, 90:2, 99:18, 105:21, 118:21, 124:6, 124:7, 124:16, 124:23, 124:25, 125:11, 125:13, 126:3, 126:9, 129:22, 140:11, 151:5, 151:23, 152:13, 153:12, 153:22, 154:2, 154:3, 156:2, 156:22, 162:19, 162:24, 164:2, 164:3, 164:11, 164:21, 165:2, 165:3, 165:6, 167:15, 169:4, 177:23, 187:8, 187:10, 187:13, 187:17, 188:6, 188:21, 188:23, 189:5, 189:7, 189:9,

189:16, 190:11, 190:19, 191:17, 191:19, 191:20, 192:19, 192:21, 192:22, 193:1, 193:7, 193:8, 193:10, 193:12, 193:13, 194:22, 194:24, 195:15, 195:17, 195:18, 195:19, 196:6, 196:16, 196:21, 196:22, 197:1, 197:2, 197:16, 197:19, 197:21, 198:11, 198:13, 198:16, 198:22, 199:10, 199:20, 199:22, 199:23, 200:3, 200:6, 200:7, 200:10, 202:3, 202:6, 202:20, 204:20, 204:21, 204:25, 205:3, 205:5, 205:8, 205:11, 205:17, 205:24, 206:19, 209:20, 210:7, 210:9, 213:9, 213:12, 213:16, 213:22, 214:1, 214:3, 214:4, 214:12, 214:16, 218:13, 241:22, 242:9, 243:5, 244:11, 250:1, 253:6, 253:12, 253:18, 254:18

**project's** [3] - 156:11, 157:6, 218:14

**project-sponsor** [1] - 126:3

**projected** [1] - 34:12

**projects** [25] - 12:17, 13:22, 15:8, 15:10, 16:14, 16:15, 18:5, 18:9, 18:13, 42:2, 42:3, 42:4, 42:16, 67:16, 68:15, 75:7, 151:8, 187:8, 188:4, 188:19, 188:22, 189:23, 197:24, 199:11, 204:2

**promise** [1] - 77:6

**promises** [1] - 76:13

**promulgated** [2] - 213:23, 214:13

**promulgating** [1] - 222:9

**prong** [1] - 74:7

pronounced [1] - 241:6
proper [1] - 254:22
properly [2] - 135:13, 212:9
proposal [2] - 223:12, 224:3
propose [2] - 104:15, 105:21
proposed [7] - 36:3, 109:13, 131:2, 212:5, 236:8, 239:7, 248:19
proposition [3] - 28:23, 29:8, 29:15
prospective [1] - 35:21
Protection [4] - 88:6, 89:3, 140:3, 169:19
protection [1] - 83:9
proud [3] - 247:20, 247:21
proved [1] - 227:6
provide [25] - 6:4, 16:2, 31:15, 32:4, 52:10, 89:7, 94:17, 105:5, 105:11, 115:17, 130:11, 131:10, 133:21, 133:22, 154:4, 166:7, 174:1, 206:23, 211:11, 218:3, 223:21, 230:12, 250:1, 253:8, 263:13
provided [14] - 30:8, 102:9, 107:20, 112:17, 123:24, 126:25, 144:17, 173:8, 175:2, 175:3, 190:21, 190:24, 208:8, 255:9
provides [7] - 39:3, 40:11, 58:15, 76:21, 123:24, 177:22, 221:22
providing [2] - 146:17, 146:18
provision [5] - 60:18, 60:19, 60:23, 61:12, 82:2
provisions [2] - 29:24, 60:19
proximity [6] - 8:21, 9:6, 9:8, 14:22, 91:14, 91:24
proxy [1] - 40:5
public [130] - 15:19, 65:14, 70:3, 80:18, 87:15, 92:7, 92:9,

94:24, 97:25, 98:3, 98:5, 98:25, 99:1, 99:8, 99:20, 100:2, 100:12, 100:17, 101:3, 102:4, 102:10, 102:11, 102:15, 107:6, 107:10, 107:13, 107:17, 107:20, 107:22, 108:2, 108:8, 109:5, 109:7, 109:11, 109:14, 111:22, 118:24, 119:22, 119:24, 119:25, 120:1, 120:2, 120:4, 120:7, 120:21, 121:18, 121:20, 122:1, 122:4, 123:6, 123:12, 124:3, 124:5, 124:8, 124:10, 126:24, 130:9, 130:11, 130:14, 131:8, 131:9, 131:14, 131:16, 131:19, 131:23, 131:24, 132:2, 132:5, 132:13, 133:23, 133:25, 134:2, 134:6, 135:10, 135:14, 137:15, 137:25, 143:22, 143:25, 144:3, 145:7, 145:10, 145:11, 145:14, 145:15, 145:17, 145:24, 145:25, 146:15, 146:17, 147:4, 149:17, 151:6, 151:14, 152:18, 152:21, 152:22, 153:6, 159:14, 160:4, 162:13, 162:18, 162:23, 164:4, 164:22, 165:19, 165:23, 165:24, 166:1, 166:3, 166:19, 166:20, 167:18, 170:4, 173:10, 174:24, 176:12, 176:14, 177:23, 239:10, 239:15, 241:16, 241:24, 242:1, 253:25, 256:18
Public [3] - 239:17, 239:21, 240:13
public's [1] - 55:14
publication [5] -

54:25, 90:18, 91:12, 106:11, 108:3
publicly [3] - 107:12, 121:7, 163:15
publish [2] - 55:11, 130:25
published [18] - 15:4, 21:7, 55:3, 55:6, 55:8, 88:22, 91:1, 91:18, 92:6, 92:11, 92:18, 94:8, 106:12, 106:14, 107:15, 131:3, 144:14, 162:11
pull [4] - 28:24, 221:8, 221:9, 263:19
pulled [1] - 17:16
pulling [2] - 221:11, 227:2
punished [1] - 180:5
punishing [1] - 180:8
pure [2] - 96:12, 97:4
purporting [1] - 222:25
purpose [20] - 67:11, 74:21, 76:2, 76:25, 77:1, 131:1, 131:16, 145:11, 145:14, 151:24, 156:11, 157:6, 157:7, 164:10, 175:13, 176:14, 222:10, 235:1, 235:13, 253:17
purposely [2] - 178:6, 255:1
purposes [5] - 22:21, 38:11, 47:4, 146:16
pursuant [3] - 48:3, 48:4, 52:23
pursue [1] - 139:9
push [2] - 242:21, 246:9
pushed [1] - 198:6
pushes [1] - 91:25
pussy [1] - 178:4
put [38] - 12:17, 14:8, 28:3, 29:9, 32:15, 44:7, 53:12, 60:7, 74:16, 74:17, 105:5, 112:4, 114:1, 131:11, 140:18, 141:17, 143:25, 144:2, 150:14, 150:17, 158:13, 202:5, 208:23, 210:7, 210:21, 210:22, 212:8, 223:6, 225:25, 236:16, 249:7,

252:5, 252:22, 258:14, 259:17, 260:18, 264:4, 265:11
puts [2] - 34:14, 224:23
putting [5] - 211:20, 216:14, 238:2, 255:2, 258:7
pyramid [2] - 190:1, 190:2

**Q**

quad [1] - 169:13
qualified [1] - 22:25
Quality [1] - 14:20
quality [36] - 5:23, 11:6, 11:14, 14:17, 19:9, 19:14, 20:1, 33:25, 35:5, 36:24, 38:9, 38:14, 38:17, 40:19, 43:5, 43:22, 48:19, 48:21, 49:1, 57:6, 58:17, 89:22, 104:3, 118:6, 141:3, 158:7, 158:8, 195:9, 197:25, 201:25, 205:16, 212:7, 215:1, 218:4, 226:6, 253:8
Quality's [2] - 37:16, 37:20
quarter [1] - 14:15
quarterly [1] - 126:7
quasi [1] - 6:20
questioned [1] - 11:17
questioner [1] - 89:14
questions [30] - 6:3, 14:25, 31:24, 33:6, 78:12, 78:16, 89:17, 113:21, 129:14, 129:17, 136:4, 137:12, 139:9, 143:5, 146:24, 154:12, 154:14, 154:16, 155:13, 159:2, 163:10, 182:11, 190:25, 214:19, 238:10, 245:21, 245:22, 248:18, 264:5, 265:15
quick [3] - 55:22, 163:12, 173:4
quickly [1] - 59:4
quite [11] - 61:18, 96:12, 113:21, 114:4, 157:22, 176:24, 191:23,

213:5, 258:5, 259:12, 261:4
quo [2] - 35:19, 71:15
quote [15] - 29:22, 29:23, 30:5, 63:9, 102:7, 127:6, 162:17, 167:13, 193:7, 212:3, 223:1, 248:20, 260:11
quoted [4] - 32:8, 153:5, 208:24, 235:11
quotes [3] - 193:7, 193:12, 197:2
quoting [2] - 153:25, 224:16

**R**

railcar [1] - 75:7
Railroad [1] - 3:10
raise [11] - 86:11, 140:23, 141:8, 151:15, 151:17, 151:22, 154:9, 154:10, 203:15, 204:1, 257:17
raised [54] - 6:11, 8:4, 8:19, 12:18, 47:11, 69:11, 84:14, 95:9, 104:16, 106:22, 108:21, 136:12, 136:13, 142:2, 142:8, 143:5, 143:9, 145:3, 148:3, 151:16, 151:19, 151:20, 151:24, 152:22, 153:7, 156:9, 156:10, 157:4, 158:1, 158:4, 158:6, 158:16, 158:20, 158:21, 159:13, 159:16, 160:11, 170:8, 175:24, 176:10, 176:11, 179:25, 186:14, 188:1, 203:23, 210:20, 211:6, 254:17, 256:24, 257:2, 258:9
raises [2] - 106:23, 258:8
raising [6] - 74:13, 74:21, 103:9, 150:18, 158:15, 218:20
ramifications [1] - 217:25
ran [1] - 263:6
RANDEE [1] - 1:19

**RANDY** [1] - 1:15
**range** [5] - 34:8, 34:21, 71:9, 179:16, 216:4
**ranging** [1] - 71:13
**rather** [4] - 38:16, 40:13, 114:21, 152:13
**rational** [2] - 22:10, 46:8
**rationale** [10] - 21:2, 21:6, 22:10, 34:18, 47:9, 54:19, 85:6, 168:22, 237:10, 250:20
**rationales** [1] - 46:6
**rationalization** [2] - 45:19, 46:15
**rationalizations** [3] - 21:8, 250:12, 251:9
**RDR** [1] - 266:14
**re** [6] - 15:4, 16:10, 16:13, 55:2, 95:9, 254:19
**re-eval** [1] - 55:2
**re-evaluation** [2] - 15:4, 254:19
**re-evaluations** [2] - 16:10, 16:13
**re-raised** [1] - 95:9
**reach** [3] - 154:1, 231:24, 244:15
**reached** [2] - 168:18, 232:23
**reaching** [1] - 131:25
**read** [15] - 61:14, 61:17, 61:19, 62:3, 77:9, 103:15, 116:11, 155:22, 162:21, 163:14, 165:8, 166:15, 173:21, 226:20, 228:10
**Read** [1] - 116:13
**reading** [6] - 24:6, 24:8, 77:23, 99:19, 165:14, 195:5
**ready** [2] - 245:19, 247:7
**Real** [1] - 71:13
**real** [6] - 29:15, 31:17, 76:14, 139:15, 179:5
**Really** [1] - 181:9
**really** [25] - 12:3, 23:13, 48:6, 52:10, 53:21, 54:13, 59:4, 67:4, 74:16, 76:17, 138:11, 140:20, 143:23, 152:20, 181:7, 182:14,

182:18, 197:18, 212:21, 217:12, 228:6, 230:24, 243:23, 254:15, 260:19
**realm** [2] - 151:11, 196:15
**reason** [21] - 19:13, 19:18, 41:25, 54:10, 91:25, 153:24, 170:20, 175:16, 176:12, 178:6, 179:4, 194:20, 235:21, 236:21, 237:19, 238:5, 248:12, 248:14, 250:15, 251:1, 253:19
**reasonable** [22] - 40:5, 41:1, 54:12, 101:3, 105:5, 105:11, 112:3, 115:24, 116:14, 116:18, 142:18, 143:20, 148:12, 149:7, 149:12, 150:9, 150:11, 175:7, 201:4, 237:8, 263:20, 264:1
**reasonableness** [6] - 12:7, 82:14, 91:14, 100:20, 128:25, 170:25
**reasonably** [1] - 31:21
**reasoned** [6] - 31:15, 57:3, 115:24, 215:5, 215:6, 237:10
**reasoning** [1] - 102:6
**reasons** [3] - 87:21, 218:6, 223:17
**Rebuttal** [1] - 4:2
**rebuttal** [15] - 6:7, 17:11, 38:21, 41:5, 79:11, 80:11, 128:15, 134:4, 139:3, 162:5, 203:20, 207:8, 207:12, 238:12, 238:14
**receipt** [1] - 165:10
**receive** [2] - 47:5, 59:8
**received** [10] - 108:5, 122:13, 123:12, 123:16, 123:23, 129:21, 131:3, 164:22, 214:15, 247:17
**receiving** [2] - 57:24, 59:8
**recent** [10] - 12:22,

16:15, 38:4, 38:6, 53:4, 53:6, 62:15, 205:1, 215:9, 257:20
**recently** [2] - 12:22, 34:3
**Recess** [4] - 55:25, 80:4, 216:8, 246:10
**recess** [1] - 154:24
**reciprocate** [1] - 110:13
**recitation** [2] - 39:17, 40:2
**recite** [2] - 75:21, 127:25
**recognition** [2] - 255:10, 255:23
**recognize** [6] - 12:6, 48:8, 85:11, 90:2, 205:17, 247:7
**recognized** [2] - 49:13, 255:8
**recognizing** [3] - 11:8, 12:12, 247:9
**recollection** [2] - 40:1, 153:4
**reconstruct** [1] - 68:12
**Record** [1] - 116:13
**record** [80] - 7:10, 7:12, 7:23, 8:12, 8:13, 8:14, 8:17, 13:1, 13:3, 13:14, 13:23, 23:5, 24:1, 24:15, 25:1, 25:9, 30:20, 38:8, 40:11, 40:21, 43:7, 44:8, 45:7, 45:15, 45:22, 46:7, 46:9, 57:11, 58:15, 80:2, 80:15, 82:24, 83:2, 92:24, 99:24, 103:13, 109:21, 119:11, 119:19, 123:23, 124:21, 127:9, 129:5, 129:19, 134:12, 135:7, 137:3, 155:22, 159:8, 171:4, 171:8, 172:7, 172:11, 172:19, 172:20, 176:6, 191:9, 223:9, 229:10, 238:21, 239:11, 249:7, 256:1, 256:5, 256:6, 257:25, 258:3, 258:5, 258:6, 258:8, 258:20, 258:23, 259:15, 259:16, 260:10, 260:11, 260:12, 261:2,

266:12
**recorded** [1] - 1:24
**rectangular** [1] - 42:20
**redefine** [1] - 32:3
**redefinition** [1] - 33:14
**redo** [1] - 232:16
**reduce** [5] - 30:10, 30:18, 65:24, 66:4, 164:11
**reduced** [2] - 218:7, 218:13
**reducing** [2] - 66:13, 105:23
**reduction** [5] - 43:18, 72:12, 72:14, 73:16, 254:8
**reductions** [1] - 72:18
**refer** [7] - 8:1, 40:13, 71:19, 75:16, 89:12, 203:10, 211:20
**reference** [8] - 5:10, 60:19, 68:18, 106:6, 136:19, 142:4, 142:7, 159:9
**referenced** [5] - 8:8, 13:4, 74:15, 119:12, 176:5
**references** [1] - 119:19
**referencing** [2] - 15:17, 53:21
**referred** [7] - 36:10, 36:11, 67:22, 171:10, 171:25, 174:13, 182:17
**referring** [7] - 40:21, 40:22, 127:14, 160:18, 202:16, 210:16, 254:5
**refers** [5] - 153:5, 167:25, 171:12, 186:4, 204:24
**reflect** [1] - 244:8
**reflects** [1] - 135:7
**refreshing** [1] - 153:4
**refused** [4] - 70:13, 241:25, 242:2, 256:16
**refute** [1] - 103:15
**reg** [7] - 28:22, 29:14, 83:17, 130:25, 131:2, 186:21
**Reg..** [1] - 16:24
**regard** [5] - 209:25, 231:2, 237:2, 244:24, 245:6
**regarding** [7] - 49:11, 80:23, 93:20, 167:7, 214:15, 241:18,

248:19
**regardless** [3] - 97:21, 122:6, 255:21
**regards** [1] - 252:1
**region** [10] - 35:6, 66:12, 67:7, 72:24, 73:12, 205:3, 253:7, 253:9, 253:16, 254:7
**regional** [19] - 5:18, 11:9, 11:20, 39:6, 46:21, 47:17, 76:22, 103:19, 104:22, 140:25, 141:4, 189:2, 197:24, 204:25, 205:5, 205:6, 205:10, 205:12, 251:3
**regionally** [1] - 188:18
**regions** [1] - 121:12
**Register** [1] - 16:23
**regs** [9] - 25:17, 28:9, 28:11, 28:18, 29:14, 107:16, 130:12, 130:23, 131:18
**regular** [1] - 124:7
**regulation** [12] - 48:3, 61:7, 77:24, 78:2, 83:14, 90:22, 107:21, 115:22, 125:7, 130:20, 131:6, 153:5
**Regulations** [1] - 213:23
**regulations** [27] - 80:21, 81:22, 83:6, 95:23, 98:2, 100:16, 115:17, 116:15, 125:2, 125:3, 126:15, 130:9, 130:19, 150:1, 151:9, 164:12, 165:5, 175:3, 176:18, 186:21, 191:4, 205:16, 208:9, 213:24, 214:12, 214:17
**regulatory** [8] - 31:6, 116:16, 117:8, 124:22, 126:17, 126:18, 126:19, 256:2
**Reichman** [17] - 4:7, 4:19, 56:4, 65:4, 68:11, 71:3, 72:25, 74:4, 74:24, 241:6, 241:8, 241:13, 242:6, 243:10, 244:17
**REICHMAN** [21] - 3:4, 3:4, 56:5, 65:5,

68:16, 68:19, 68:21, 68:24, 69:1, 69:3, 70:21, 71:4, 241:8, 241:10, 241:14, 242:21, 243:6, 243:8, 243:12, 243:14, 244:18
**reins** [1] - 263:19
**reiterate** [2] - 33:14, 57:7
**reiterated** [2] - 34:2, 111:6
**rejected** [5] - 50:1, 50:8, 51:14, 70:17, 111:8
**relate** [2] - 135:5, 158:7
**related** [7] - 13:16, 47:19, 152:23, 158:18, 188:2, 194:13, 195:1
**relates** [1] - 187:25
**relating** [2] - 150:6, 218:24
**relationship** [1] - 189:17
**relative** [4] - 9:18, 96:10, 200:17, 242:18
**relatively** [3] - 174:1, 238:13, 245:7
**relax** [1] - 184:25
**relaxed** [2] - 185:1, 185:9
**released** [1] - 139:13
**relevant** [16] - 70:25, 81:12, 81:16, 81:19, 81:23, 83:8, 84:19, 84:20, 86:17, 87:23, 90:4, 108:1, 121:12, 140:8, 193:9, 243:9
**reliance** [1] - 95:21
**relief** [1] - 100:7
**relies** [1] - 14:19
**rely** [3] - 151:25, 259:3, 261:19
**relying** [1] - 143:9
**remains** [4] - 34:18, 97:21, 109:13, 226:24
**remand** [35] - 219:24, 220:3, 220:6, 220:13, 221:6, 223:18, 223:20, 224:7, 224:12, 225:5, 225:19, 225:22, 227:20, 228:11, 229:4, 229:16, 229:24, 230:4, 230:5,

231:25, 232:5, 232:7, 232:16, 232:18, 232:24, 233:2, 233:8, 234:3, 234:7, 234:12, 234:18, 236:19, 236:25, 238:1, 248:13
**remanded** [1] - 219:14
**remanding** [4] - 224:22, 234:8, 234:12, 234:19
**remands** [1] - 234:5
**remarkable** [2] - 139:6, 140:21
**remarkably** [1] - 137:14
**remarks** [2] - 78:10, 215:10
**remediate** [1] - 30:7
**remediated** [1] - 229:13
**remediation** [2] - 226:4
**remedied** [1] - 244:9
**remedies** [2] - 105:17, 258:24
**remedy** [24] - 4:14, 100:9, 215:22, 216:10, 216:12, 216:17, 222:7, 222:8, 222:10, 223:18, 230:14, 232:20, 236:8, 238:14, 238:17, 240:17, 241:4, 243:16, 243:17, 244:7, 245:6, 245:10, 247:14, 258:21
**remember** [3] - 142:9, 174:7, 211:2
**remind** [1] - 59:4
**renders** [1] - 195:12
**renewed** [1] - 228:24
**reopening** [1] - 134:25
**repeat** [11] - 16:24, 27:11, 27:16, 116:6, 137:13, 177:21, 178:2, 236:10, 236:11, 247:13, 254:4
**repeated** [1] - 177:5
**repeatedly** [4] - 39:4, 66:18, 253:18, 256:16
**repeating** [1] - 219:11
**replace** [1] - 68:6
**replacement** [1] - 69:17

**reply** [9] - 11:25, 13:4, 32:5, 153:24, 179:22, 180:3, 182:14, 239:7, 258:25
**report** [4] - 15:18, 16:11, 234:20, 234:21
**report-back** [2] - 234:20, 234:21
**reported** [1] - 55:15
**Reporter** [8] - 1:22, 38:5, 68:1, 137:10, 221:25, 222:13, 222:22, 266:15
**reporter** [2] - 222:20, 255:19
**REPORTER'S** [1] - 266:9
**repositories** [2] - 239:11, 239:13
**represent** [3] - 71:9, 96:21, 185:15
**representation** [3] - 141:16, 169:9, 208:5
**representative** [4] - 72:10, 97:3, 128:23, 172:5
**representatives** [2] - 93:5, 96:22
**represented** [1] - 20:19
**representing** [4] - 58:9, 71:9, 96:11, 98:11
**represents** [2] - 97:9, 167:5
**request** [2] - 148:14, 259:3
**requested** [3] - 111:6, 152:15, 152:16
**requests** [2] - 6:15, 246:5
**require** [11] - 19:7, 28:18, 67:16, 75:20, 75:22, 81:22, 84:10, 98:3, 100:16, 237:24, 261:20
**required** [28] - 18:10, 32:11, 36:15, 38:13, 49:3, 76:11, 80:20, 81:15, 83:13, 88:13, 95:23, 97:24, 125:1, 125:3, 133:21, 133:24, 181:5, 187:5, 187:7, 188:6, 189:15, 190:19, 190:22, 213:25, 221:7, 232:7, 238:19, 239:24

**requirement** [7] - 49:10, 64:12, 203:20, 203:24, 204:5, 206:13
**requirements** [6] - 30:1, 48:13, 61:4, 127:1, 214:5, 214:7
**requires** [21] - 36:2, 41:11, 41:12, 58:14, 60:3, 60:4, 61:12, 69:18, 78:2, 102:14, 138:14, 165:3, 178:24, 179:1, 187:11, 205:13, 223:23, 236:25, 248:15, 252:8
**requiring** [2] - 38:15, 48:17
**rescue** [1] - 174:11
**rescued** [1] - 226:18
**research** [2] - 97:7, 228:1
**reserve** [4] - 163:5, 178:18, 207:8, 217:14
**reserved** [4] - 17:12, 78:21, 79:8, 213:4
**reserves** [1] - 163:3
**reserving** [1] - 79:11
**residence** [1] - 240:8
**residents** [5] - 57:25, 253:20, 253:21
**resolve** [1] - 256:8
**resolved** [1] - 255:13
**resolving** [1] - 256:12
**RESOURCES** [1] - 2:4
**Resources** [1] - 126:23
**resources** [3] - 139:25, 150:16, 252:7
**respect** [39] - 40:10, 45:24, 59:2, 67:21, 69:12, 70:10, 84:11, 85:6, 85:7, 85:9, 86:8, 93:19, 127:22, 132:24, 134:14, 136:18, 145:20, 158:16, 163:17, 165:2, 191:10, 192:8, 193:6, 200:17, 201:4, 215:23, 238:16, 241:4, 241:19, 241:20, 241:21, 242:2, 242:14, 248:23, 257:8, 263:15
**respectful** [1] - 265:5
**respectfully** [2] -

18:12, 242:21
**respond** [6] - 78:12, 95:2, 151:23, 180:3, 207:14, 259:4
**responded** [9] - 123:20, 129:23, 131:4, 143:7, 149:6, 152:1, 160:9, 160:10, 160:23
**responding** [3] - 159:20, 179:25, 182:5
**responds** [2] - 161:1, 164:22
**response** [13] - 38:4, 38:7, 39:3, 40:2, 95:4, 142:5, 143:6, 143:7, 146:24, 163:9, 170:22, 194:4, 261:21
**response/reply** [1] - 179:13
**responses** [3] - 123:22, 144:1, 149:17
**responsibilities** [2] - 76:9, 169:11
**responsibility** [2] - 36:12, 124:23
**responsible** [1] - 118:2
**rest** [7] - 55:16, 55:17, 55:24, 158:7, 172:8, 204:6, 207:8
**restart** [1] - 144:9
**result** [6] - 39:16, 67:3, 155:24, 158:8, 244:6, 254:11
**results** [2] - 104:4, 240:5
**retire** [1] - 139:10
**retroactive** [2] - 35:20, 35:22
**reveal** [2] - 238:21
**revenue** [6] - 66:14, 73:24, 74:3, 75:1, 75:11, 157:13
**revenues** [2] - 64:10, 253:17
**reverse** [1] - 149:24
**reversed** [2] - 149:15, 149:19
**Review** [1] - 77:16
**review** [30] - 9:3, 20:21, 21:25, 39:21, 84:18, 94:24, 99:8, 103:1, 107:6, 107:10, 109:6, 109:8, 130:11, 132:2, 149:17,

151:6, 151:7, 174:24, 219:4, 220:12, 220:19, 223:1, 232:6, 232:19, 233:5, 233:6, 233:23, 238:20, 256:15, 261:1

**reviewed** [7] - 101:12, 101:17, 108:5, 135:7, 135:17, 144:25, 167:13

**reviewing** [4] - 160:9, 170:19, 221:23, 227:20

**reviews** [5] - 12:13, 12:17, 12:19, 12:20

**revised** [2] - 77:11, 144:2

**revision** - 151:6, 151:7

**Revolution** [1] - 3:11

**Rhode** [2] - 16:21, 17:5

**RICE** [1] - 1:18

**Richman** [1] - 241:7

**rid** [1] - 161:1

**RIESEL** [1] - 2:15

**right-hand** [2] - 187:9, 189:4

**rightly** [1] - 70:22

**rights** [8] - 33:13, 93:20, 93:22, 94:1, 94:3, 117:7, 117:13, 131:15

**ringmaster** [1] - 259:12

**risk** [3] - 34:24, 219:11, 225:6

**river** [2] - 35:13, 84:24

**River** [1] - 16:19

**Riverkeeper** [2] - 3:9, 107:3

**road** [2] - 234:16, 249:4

**roadmap** [2] - 121:19, 134:5

**Robert** [1] - 69:25

**ROBERTA** [1] - 2:21

**Rock** [2] - 222:11, 235:11

**Rockland** [1] - 3:9

**rods** [1] - 34:13

**role** [1] - 36:24

**roll** [3] - 9:17, 61:21, 171:15

**rolls** [1] - 75:9

**room** [1] - 82:1

**rose** [2] - 13:7, 88:12

**Roseland** [1] - 1:20

**roughly** [5] - 16:12, 79:16, 174:16, 234:14, 264:17

**round** [1] - 260:18

**rub** [2] - 25:16

**rubber** [1] - 223:7

**rule** [3] - 91:25, 222:9, 230:15

**ruled** [1] - 218:21

**rules** [1] - 76:6

**ruling** [1] - 260:23

**Rumsfeld** [1] - 212:1

**run** [8] - 27:8, 57:21, 144:15, 202:24, 224:22, 227:6, 247:16, 264:11

**running** [7] - 41:20, 70:8, 122:24, 123:1, 123:2, 250:13, 261:10

**runs** [4] - 66:21, 68:3, 146:10, 179:8

**rushed** [1] - 5:24

## S

**S-l-o-c-k-i-s-h** [1] - 147:13

**SafestreetsJC** [1] - 3:9

**Safety** [1] - 232:13

**sake** [1] - 200:11

**SAMANTHA** [1] - 2:5

**sandbag** [1] - 129:11

**sands** [2] - 23:12, 31:2

**sat** [1] - 243:22

**satisfied** [1] - 152:2

**satisfy** [2] - 103:9, 251:3

**sauce** [1] - 61:22

**saw** [2] - 209:25, 245:1

**say..** [1] - 219:10

**scale** [2] - 99:14, 99:18

**scenario** [6] - 12:13, 35:2, 44:14, 45:1, 57:4, 105:24

**Scenario** [1] - 72:14

**scenarios** [9] - 11:15, 11:19, 12:4, 12:6, 34:8, 39:13, 44:14, 99:9, 223:13

**schedule** [1] - 55:24

**scheduled** [1] - 79:23

**scheme** [14] - 18:17, 68:12, 77:25, 78:2, 109:10, 117:8, 124:22, 208:10, 208:14, 208:16,

217:23, 217:24, 218:1, 223:25

**schemes** [1] - 167:17

**school** [1] - 264:8

**Science** [1] - 3:10

**scientific** [1] - 40:16

**scintilla** [1] - 239:2

**scope** [5] - 32:3, 156:18, 156:21, 169:11, 179:23

**scoping** [2] - 156:2, 156:22

**scrap** [1] - 67:5

**scratch** [1] - 226:5

**screen** [11] - 37:17, 44:13, 49:21, 49:25, 50:1, 50:3, 51:22, 51:24, 53:6, 53:22, 54:3

**screening** [12] - 37:16, 37:19, 37:21, 37:25, 49:20, 49:21, 51:13, 52:25, 53:3, 53:8, 53:16, 53:18

**search** [1] - 256:17

**seat** [1] - 155:2

**seated** [5] - 5:3, 56:1, 216:9

**second** [32] - 9:19, 14:18, 22:6, 23:17, 34:6, 47:15, 56:3, 60:23, 63:3, 88:10, 90:12, 95:25, 96:5, 115:9, 129:15, 135:3, 135:5, 135:12, 135:20, 136:8, 138:3, 142:11, 142:13, 142:15, 156:2, 166:24, 167:10, 174:5, 186:14, 186:25, 230:22, 237:15

**Second** [1] - 256:11

**second-guessing** [1] - 34:6

**second-highest** [1] - 22:6

**secondary** [1] - 184:5

**secondly** [1] - 138:5

**seconds** [8] - 33:21, 43:12, 64:18, 114:22, 115:8, 118:9, 204:13, 246:21

**secretary** [7] - 139:11, 170:2, 170:10, 172:16, 175:14, 175:17, 176:4

**Secretary** [2] - 129:21,

170:16

**secretary's** [1] - 172:1

**section** [8] - 29:14, 68:3, 73:3, 104:20, 105:20, 174:14, 185:23, 247:14

**SECTION** [1] - 2:4

**Section** [9] - 29:17, 29:18, 29:20, 81:21, 84:9, 88:17, 191:16, 202:17, 204:24

**see** [31] - 10:13, 10:15, 13:8, 15:9, 24:2, 41:17, 42:20, 53:4, 57:15, 74:2, 74:5, 74:25, 96:24, 98:8, 106:10, 120:25, 154:23, 187:7, 188:25, 193:6, 198:5, 201:9, 201:22, 204:3, 204:9, 216:7, 225:3, 238:13, 240:6, 240:23

**seeing** [1] - 265:24

**seeking** [1] - 70:5

**seem** [4] - 31:22, 33:5, 143:6, 167:3

**segment** [1] - 215:2

**selected** [1] - 83:25

**selecting** [1] - 85:6

**selection** [1] - 77:15

**self** [8] - 83:21, 83:25, 110:8, 110:22, 125:20, 125:24, 126:3, 189:11

**self-contained** [1] - 189:11

**self-nominate** [3] - 83:21, 83:25, 125:24

**self-nominated** [1] - 125:20

**self-nomination** [3] - 110:8, 110:22, 126:3

**sense** [4] - 22:16, 57:23, 62:23, 89:7

**sensors** [1] - 42:18

**sent** [5] - 77:10, 171:13, 171:18, 227:4, 246:16

**sentence** [4] - 13:9, 60:23, 157:17, 165:8

**separate** [3] - 60:18, 122:17, 197:23

**September** [18] - 88:25, 94:20, 103:11, 104:13, 104:16, 105:4, 106:1, 106:3, 111:4, 123:8, 129:24,

130:7, 136:20, 144:7, 176:5, 176:8, 210:8, 210:23

**sequentially** [1] - 122:25

**seriously** [4] - 36:13, 37:1, 58:17, 179:19

**serve** [5] - 30:10, 38:11, 235:1, 253:25, 256:5

**served** [1] - 247:6

**serves** [1] - 17:11

**serving** [1] - 146:15

**session** [3] - 154:19, 262:11, 263:13

**SESSION** [1] - 154:25

**sessions** [2] - 138:4, 262:22

**set** [23] - 10:4, 18:18, 36:18, 38:7, 48:13, 50:6, 52:22, 53:5, 53:22, 56:22, 59:7, 64:13, 80:19, 98:7, 115:21, 116:15, 147:2, 157:7, 157:10, 208:16, 221:23, 240:18, 257:20

**sets** [3] - 37:17, 51:10, 255:25

**setting** [3] - 36:23, 53:25, 99:9

**settle** [1] - 147:6

**seven** [19] - 5:25, 7:6, 9:21, 15:2, 15:10, 46:20, 46:23, 46:24, 49:19, 58:1, 91:4, 99:9, 173:1, 215:25, 246:13, 246:17, 246:19, 263:5, 265:16

**Seventh** [2] - 35:10, 35:15

**several** [4] - 157:9, 177:5, 190:23, 262:22

**Shall** [1] - 29:22

**shall** [6] - 14:2, 30:1, 61:2, 71:22, 211:11, 221:23

**shape** [7] - 105:15, 134:20, 166:10, 171:20, 234:19, 262:4, 263:22

**share** [3] - 62:4, 64:10, 141:23

**SHARI** [1] - 2:12

**shift** [1] - 153:21

**shifted** [1] - 23:12

**shifting** [2] - 31:2,

126:14
**shoes** [2] - 112:4, 216:14
**short** [8] - 9:18, 20:21, 116:16, 149:24, 153:17, 224:11, 244:8, 248:11
**shorter** [2] - 149:11, 151:2
**shorthand** [1] - 229:20
**shortly** [1] - 108:12
**show** [14] - 28:20, 28:22, 29:5, 29:16, 104:4, 170:21, 170:25, 209:19, 210:10, 240:6, 250:13, 251:8, 255:3, 264:12
**showed** [4] - 44:12, 67:1, 103:23, 241:17
**showing** [2] - 229:11, 244:4
**shown** [4] - 39:8, 73:15, 225:23, 244:1
**shows** [7] - 9:3, 72:6, 72:11, 72:12, 72:14, 254:23
**shred** [2] - 238:21, 238:25
**shut** [2] - 75:6, 152:18
**shut-out** [1] - 152:18
**side** [24] - 8:3, 19:2, 23:18, 56:4, 64:2, 64:5, 84:24, 96:6, 96:7, 96:10, 97:13, 118:11, 126:15, 185:3, 187:9, 189:1, 189:4, 192:17, 203:6, 253:13, 259:25, 260:5, 263:7
**Side** [1] - 19:2
**sidebar** [1] - 114:23
**sides** [3] - 78:22, 203:4, 247:16
**Sierra** [2] - 16:16, 34:10
**signage** [1] - 129:16
**Signal** [2] - 231:19, 232:3
**signal** [2] - 75:4
**signed** [2] - 142:12, 246:16
**significance** [4] - 30:19, 84:5, 132:21, 158:17
**significant** [40] - 15:14, 25:21, 25:25, 26:25, 29:25, 30:2, 30:8, 30:10, 30:22,

32:12, 37:18, 41:16, 48:6, 48:21, 57:2, 57:9, 57:10, 58:4, 58:23, 60:2, 60:16, 60:24, 61:2, 61:13, 72:18, 134:21, 145:9, 219:13, 229:11, 248:16, 248:20, 248:24, 250:2, 250:4, 251:25, 252:8, 263:12, 263:16, 264:1, 264:19
**significantly** [2] - 82:4, 83:7
**SILAGI** [1] - 2:8
**silo** [1] - 109:10
**similar** [10] - 16:20, 19:22, 34:8, 44:12, 73:8, 73:9, 133:13, 147:25, 148:1, 184:17
**similarly** [5] - 95:8, 104:16, 172:10, 190:22, 256:15
**simple** [7] - 31:17, 180:6, 182:24, 183:9, 183:15, 225:12, 245:7
**simply** [6] - 16:2, 18:10, 25:14, 75:1, 75:12, 261:2
**simultaneously** [2] - 122:24, 123:1
**sincerely** [1] - 114:3
**single** [12] - 57:3, 57:19, 90:14, 97:1, 97:2, 141:8, 203:24, 243:23, 260:9, 260:10
**singular** [2] - 188:21
**Sioux** [2] - 222:11, 235:11
**SIP** [28] - 169:17, 186:4, 188:9, 188:10, 188:11, 188:12, 189:18, 189:19, 190:3, 190:4, 190:8, 190:11, 191:11, 191:19, 193:6, 193:8, 193:11, 193:15, 195:20, 197:14, 198:6, 200:17, 200:18, 214:9
**sister** [1] - 140:4
**sit** [3] - 107:21, 173:6, 216:22
**site** [1] - 34:20

**site-specific** [1] - 34:20
**sited** [1] - 213:16
**sitting** [1] - 150:20
**situation** [3] - 196:9, 196:13, 222:23
**situations** [1] - 133:13
**SIVE** [1] - 2:15
**six** [8] - 58:18, 90:17, 91:4, 91:20, 92:6, 94:23, 103:6, 235:8
**six-day** [1] - 91:20
**six-year** [1] - 235:8
**size** [2] - 73:8, 73:9
**sized** [1] - 234:18
**slide** [20] - 20:24, 23:16, 29:10, 59:12, 81:13, 82:19, 95:13, 98:1, 110:25, 116:25, 119:14, 123:8, 124:13, 187:2, 187:9, 209:19, 221:5, 223:19, 224:16, 250:21
**slides** [12] - 6:11, 13:22, 19:11, 59:6, 109:23, 179:8, 208:24, 257:20, 259:20, 259:25, 260:21, 260:24
**slight** [1] - 158:19
**slightly** [7] - 45:2, 117:19, 150:8, 150:10, 178:2, 232:12, 252:13
**Slockish** [1] - 147:12
**slow** [2] - 222:14
**small** [1] - 27:3
**smaller** [1] - 47:5
**smart** [1] - 63:14
**so-called** [1] - 254:16
**so..** [1] - 206:12
**Society** [1] - 222:5
**solicit** [1] - 80:20
**solicited** [1] - 82:5
**Soma** [2] - 3:7, 3:10
**someone** [4] - 21:6, 75:6, 106:22, 211:20
**someplace** [1] - 173:20
**sometime** [1] - 99:23
**sometimes** [3] - 119:3, 152:20, 152:21
**somewhat** [2] - 149:12, 199:1
**somewhere** [3] - 120:8, 179:16, 216:3
**sophisticated** [1] -

211:22
**sorry** [28] - 7:19, 9:21, 10:18, 13:8, 13:12, 29:19, 33:1, 33:9, 37:19, 39:1, 68:16, 74:5, 76:23, 79:2, 99:1, 111:13, 112:10, 114:25, 116:6, 169:1, 190:6, 190:8, 200:4, 204:9, 206:9, 222:15, 246:18, 246:19
**sort** [7] - 8:21, 10:3, 10:4, 14:8, 45:16, 202:4, 245:10
**sought** [2] - 193:18, 240:17
**sounds** [1] - 52:21
**source** [2] - 65:25, 66:2
**South** [2] - 3:12, 97:11
**Southern** [1] - 102:3
**space** [2] - 234:8, 234:13
**spaces** [1] - 141:11
**SPALDING** [1] - 1:15
**spats** [1] - 74:17
**speaking** [4] - 56:7, 79:20, 122:5, 152:10
**special** [2] - 61:22, 84:11
**specific** [31] - 34:20, 59:8, 67:8, 75:22, 76:21, 76:24, 81:17, 89:11, 91:10, 105:12, 118:24, 121:11, 121:13, 121:15, 124:10, 125:2, 127:10, 134:16, 168:20, 169:4, 174:12, 194:12, 194:15, 194:20, 195:12, 216:21, 220:16, 228:12, 229:6, 237:21
**specifically** [24] - 11:8, 11:15, 47:24, 48:6, 48:13, 52:5, 59:15, 60:23, 69:20, 85:9, 118:25, 121:10, 126:12, 139:7, 140:12, 142:1, 142:6, 152:1, 171:12, 171:23, 195:5, 212:4, 215:10, 217:19
**specificity** [4] - 96:10, 105:11, 194:19, 233:7

**specifics** [2] - 102:19, 263:4
**specifies** [1] - 51:2
**specifying** [1] - 232:6
**speculate** [1] - 52:9
**speculating** [1] - 82:24
**speculative** [1] - 63:22
**spelled** [7] - 30:19, 35:22, 48:14, 49:10, 49:11, 74:11
**spend** [9] - 26:5, 26:6, 67:25, 68:5, 70:5, 181:2, 250:7, 250:9, 257:7
**spending** [1] - 217:20
**spent** [4] - 34:13, 68:8, 89:23, 111:23
**spike** [1] - 34:20
**sponsor** [5] - 55:11, 64:9, 125:11, 125:14, 126:3
**sponsor-led** [1] - 125:11
**sponsors** [13] - 77:13, 89:1, 105:21, 118:21, 124:13, 124:16, 125:17, 126:9, 151:23, 152:13, 153:22, 164:3, 167:15
**sponsors'** [1] - 124:23
**spot** [3] - 12:8, 199:9, 200:23
**spotlights** [1] - 264:9
**spots** [11] - 199:13, 199:19, 199:20, 200:14, 200:16, 205:19, 207:21, 207:23, 209:14, 210:4
**spring** [1] - 144:6
**square** [2] - 226:9, 226:10
**Square** [1] - 1:9
**squared** [1] - 241:20
**staff** [2] - 247:19, 255:19
**stage** [1] - 80:19
**stairway** [1] - 90:14
**Stakeholder** [1] - 125:20
**stamp** [2] - 168:5, 223:7
**stanchion** [1] - 42:23
**stand** [6] - 97:2, 98:21, 100:8, 182:10, 241:11, 248:6
**stand-alone** [1] - 97:2

standard [22] - 32:6, 32:9, 32:10, 32:18, 32:19, 40:25, 41:18, 62:6, 81:24, 88:16, 89:18, 102:13, 102:14, 102:18, 222:10, 236:18, 238:25, 251:19, 256:15, 256:19
Standards [1] - 14:20
standards [16] - 36:18, 48:21, 100:23, 127:25, 183:2, 183:5, 195:20, 201:25, 205:16, 208:2, 208:12, 210:15, 210:17, 211:21, 212:7, 215:17
Standing [2] - 222:11, 235:11
standing [5] - 25:3, 112:15, 136:1, 247:20, 247:21
stands [2] - 63:18, 222:24
start [23] - 7:7, 17:14, 80:12, 82:21, 84:6, 103:11, 113:3, 115:15, 137:6, 155:8, 162:10, 213:9, 217:1, 217:11, 217:14, 220:1, 220:4, 225:9, 226:5, 226:9, 226:10, 227:25, 229:3
started [1] - 214:24
starting [7] - 40:22, 40:23, 58:15, 60:13, 60:14, 81:24, 174:3
starts [3] - 105:20, 155:21, 163:23
STATE [1] - 1:3
state [66] - 16:15, 16:20, 17:7, 29:22, 30:1, 61:3, 65:7, 65:16, 66:1, 67:24, 69:5, 69:10, 70:7, 70:9, 70:13, 75:22, 81:10, 81:22, 84:10, 95:17, 95:22, 97:8, 97:10, 97:22, 103:18, 117:23, 118:4, 125:17, 137:15, 138:5, 139:25, 143:24, 151:1, 157:25, 169:15, 169:24, 170:22, 172:12,

179:1, 181:5, 181:17, 182:25, 184:4, 184:16, 186:13, 190:25, 193:1, 194:3, 194:21, 195:2, 195:16, 196:5, 196:7, 196:9, 196:13, 201:12, 201:13, 201:14, 211:20, 214:14, 219:18, 240:18, 241:25, 244:2, 256:9
State [42] - 3:11, 18:9, 56:23, 61:18, 71:12, 75:24, 76:13, 76:23, 80:20, 84:3, 84:25, 85:7, 85:8, 86:25, 105:6, 105:15, 112:1, 142:6, 167:4, 170:25, 186:3, 188:2, 188:4, 188:23, 189:18, 190:20, 192:25, 193:2, 194:14, 195:1, 199:7, 205:9, 209:2, 209:4, 209:5, 210:11, 210:21, 210:23, 214:9, 242:13, 246:25
state's [8] - 65:23, 69:7, 70:15, 118:2, 135:24, 136:20, 136:21, 179:2
State's [1] - 67:15
statement [26] - 28:10, 29:2, 55:7, 60:9, 60:10, 63:3, 69:9, 69:16, 69:21, 92:21, 131:21, 136:6, 154:6, 164:14, 180:12, 194:3, 219:17, 220:20, 221:18, 228:18, 229:1, 229:16, 230:1, 230:6, 260:9, 260:11
statements [2] - 68:10, 97:19
Staten [1] - 72:21
STATES [6] - 1:1, 1:6, 1:12, 2:3, 2:8, 2:11
States [3] - 5:2, 82:3, 102:1
states [7] - 82:3, 162:17, 193:19, 196:6, 200:12, 200:15, 200:18
station [2] - 75:10, 90:15

stations [1] - 253:23
status [6] - 35:19, 71:15, 137:23, 137:24, 183:3, 262:23
statute [9] - 28:9, 28:11, 35:23, 35:24, 36:7, 88:13, 97:24, 154:4, 193:3
statutes [1] - 256:2
statutory [3] - 36:5, 126:17, 130:20
stay [2] - 53:12, 265:3
stenography [1] - 1:24
step [2] - 231:4, 231:6
steps [5] - 75:6, 204:19, 207:1, 229:6, 265:4
stewardship [1] - 76:9
stick [1] - 20:21
still [11] - 9:23, 20:10, 57:22, 94:11, 123:16, 137:19, 160:1, 163:6, 235:7, 259:12, 260:2
stood [5] - 69:14, 111:14, 183:13, 250:4, 250:16
stop [10] - 12:24, 60:5, 65:12, 75:8, 81:1, 156:13, 196:25, 235:16, 252:5
stopped [1] - 120:25
stopping [1] - 27:7
story [6] - 72:17, 108:23, 108:25, 184:9, 234:15, 248:11
straight [3] - 31:12, 48:19, 224:7
straightforward [2] - 178:21, 181:3
Strait [1] - 102:6
strategy [2] - 65:23, 66:3
Street [4] - 2:5, 2:9, 3:7, 19:2
street [1] - 2:13
stretch [4] - 55:22, 80:2, 216:5, 246:7
stretched [1] - 168:9
stretching [1] - 16:18
strong [2] - 155:25, 243:8
strongly [1] - 65:9
structure [4] - 63:16, 77:15, 77:17, 167:20
studied [17] - 20:1, 20:3, 22:16, 22:23, 42:6, 42:24, 42:25,

104:5, 211:22, 212:9, 223:13, 224:4, 249:9, 249:10, 251:22
studies [1] - 61:25
study [21] - 5:18, 9:10, 14:12, 14:13, 19:15, 20:7, 23:10, 39:13, 43:5, 50:4, 50:6, 54:13, 60:4, 72:12, 140:24, 141:21, 179:3, 208:22, 212:11, 225:25, 240:6
subgroups [2] - 96:12, 97:3
subject [4] - 145:6, 155:20, 165:3, 234:15
subjective [5] - 100:21, 100:23, 133:8, 133:15
submission [4] - 107:19, 123:18, 166:6, 166:8
submissions [2] - 123:13, 123:18
submit [12] - 58:3, 102:13, 122:14, 122:15, 132:9, 133:23, 163:3, 165:16, 173:10, 173:15, 186:2, 258:5
submitted [16] - 69:19, 103:12, 108:8, 108:12, 122:7, 123:15, 135:14, 144:16, 147:10, 159:25, 165:18, 166:11, 166:16, 166:20, 257:23, 258:10
submitted... [1] - 108:6
subpart [2] - 186:22, 191:5
subsection [1] - 60:17
subsequent [2] - 198:22, 265:9
subset [1] - 10:9
substance [1] - 186:8
substantial [4] - 36:17, 219:21, 222:12, 248:18
substantive [4] - 80:23, 150:15, 215:23, 238:17
substitute [4] - 40:5, 207:24, 254:21, 254:24
subvert [2] - 222:10,

235:13
subway [1] - 253:24
suddenly [1] - 161:12
suffer [2] - 96:3, 252:2
suffering [1] - 185:5
suffers [2] - 59:11, 59:12
suffice [1] - 140:7
sufficient [14] - 43:18, 43:19, 63:1, 102:5, 105:4, 105:10, 157:3, 211:19, 223:23, 236:23, 262:5, 264:24, 265:5
sufficiently [2] - 30:6, 63:9
suggest [6] - 18:12, 57:13, 109:3, 143:8, 212:6, 246:6
suggested [6] - 44:4, 45:18, 74:5, 149:2, 155:7, 177:15
suggesting [3] - 77:23, 89:25, 228:10
suggestion [1] - 244:7
suggestions [3] - 149:5, 257:8, 257:16
suing [1] - 65:11
Suite [1] - 1:20
sulfur [1] - 39:24
sum [1] - 70:19
summaries [1] - 238:9
summarize [1] - 158:10
summary [5] - 69:23, 163:12, 167:5, 236:3, 256:20
summer [2] - 94:23, 144:6
super [1] - 36:24
Supp [7] - 12:1, 17:5, 34:10, 34:14, 102:2, 147:17, 231:21
supplemental [3] - 109:6, 109:8, 233:3
support [14] - 31:6, 31:13, 46:7, 65:9, 65:22, 71:14, 71:19, 160:6, 193:17, 240:18, 241:2, 242:12, 257:10
supportable [1] - 60:1
supported [3] - 30:20, 58:2, 63:9
supports [7] - 28:22, 29:6, 29:14, 31:7, 56:21, 102:6, 163:17
supposed [29] - 21:15, 36:21, 78:19, 107:8, 107:22, 110:13,

112:5, 132:8,
154:19, 170:16,
170:19, 179:22,
180:4, 191:3,
207:25, 211:9,
216:20, 216:22,
218:19, 223:8,
224:19, 228:23,
229:5, 229:6, 229:8,
246:14, 249:5,
253:14, 261:13
**supposedly** [1] -
251:3
**Supreme** [2] - 129:10,
231:7
**sur** [1] - 258:25
**sur-reply-ish** [1] -
258:25
**surmise** [1] - 134:9
**surprised** [1] - 110:12
**surrounding** [1] -
73:18
**suspect** [4] - 5:12,
82:25, 153:11,
247:25
**Sustainability** [1] -
3:11
**Sustainable** [1] -
11:25
**swaths** [1] - 22:5
**switch** [5] - 74:22,
221:8, 221:9,
221:11, 227:2
**system** [1] - 253:24

---

**T**

---

**table** [18] - 8:19, 9:1,
10:1, 10:7, 10:10,
10:12, 10:24, 71:24,
72:6, 72:8, 72:16,
192:16, 200:9,
200:17, 200:18,
201:12, 214:7
**Table** [2] - 71:20,
76:21
**talks** [6] - 104:1,
104:3, 104:4, 104:8,
208:11, 253:13
**target** [1] - 136:21
**targeted** [1] - 59:16
**TBTA** [1] - 164:3
**teach** [1] - 264:8
**team** [8] - 101:9,
247:1, 247:5,
247:20, 253:1,
255:24, 260:25,
264:23
**Team** [1] - 3:10
**tear** [1] - 68:6

**technical** [2] - 199:3,
199:5
**Technical** [2] - 95:19,
124:12
**techniques** [1] - 40:25
**tee** [1] - 212:25
**telephone** [1] - 138:12
**television** [1] - 247:23
**ten** [27] - 14:14, 17:21,
19:15, 19:21, 26:19,
27:8, 32:23, 33:19,
41:8, 43:12, 56:18,
64:24, 91:5, 114:22,
115:8, 118:9, 162:6,
162:7, 173:2,
178:18, 178:19,
178:20, 204:13,
217:15, 238:16,
241:15
**Tenth** [1] - 127:18
**term** [3] - 166:3,
238:25, 239:1
**termed** [1] - 256:13
**Terminal** [1] - 90:15
**terminology** [1] -
88:15
**terms** [25] - 8:20,
40:17, 43:5, 44:3,
44:9, 45:20, 46:17,
47:23, 48:5, 54:8,
70:11, 93:13, 134:6,
135:13, 175:4,
177:7, 194:19,
201:2, 206:8, 212:7,
233:7, 253:14,
262:16, 262:25,
263:9
**test** [2] - 64:7, 231:18
**testimony** [1] - 261:11
**Texas** [1] - 15:13
**that'll** [1] - 147:3
**that..** [1] - 12:20
**THE** [913] - 1:1, 1:12,
5:3, 5:17, 5:19, 6:19,
6:25, 7:2, 7:4, 7:6,
7:13, 7:16, 7:18,
7:24, 8:10, 8:12,
9:17, 10:10, 10:15,
10:20, 10:24, 11:11,
12:20, 12:24, 13:6,
13:9, 13:20, 13:24,
14:11, 14:24, 15:23,
16:1, 16:6, 16:8,
16:24, 17:1, 17:8,
17:10, 17:17, 17:19,
17:24, 18:2, 18:13,
20:5, 20:7, 20:10,
20:14, 20:16, 21:5,
21:9, 21:11, 21:15,
21:18, 21:22, 23:17,

23:21, 24:3, 24:6,
24:10, 24:14, 24:19,
24:25, 25:3, 26:10,
26:14, 26:16, 26:19,
27:7, 27:10, 27:18,
27:21, 27:23, 28:4,
28:6, 28:8, 28:13,
28:19, 28:22, 29:1,
29:4, 29:8, 29:11,
29:13, 29:19, 29:21,
30:12, 31:1, 31:24,
32:17, 32:23, 33:3,
33:5, 33:15, 33:17,
33:19, 34:14, 34:16,
35:8, 35:21, 36:1,
36:5, 36:9, 36:20,
37:2, 37:6, 37:9,
37:11, 37:19, 37:22,
37:24, 38:2, 38:18,
38:20, 39:19, 40:4,
40:14, 41:2, 41:4,
41:7, 41:19, 42:8,
42:10, 42:13, 42:15,
42:19, 42:23, 43:4,
43:12, 43:17, 43:25,
44:16, 44:19, 44:22,
44:25, 45:7, 45:11,
45:14, 45:16, 45:25,
46:6, 47:3, 47:14,
48:11, 48:23, 48:25,
49:9, 49:15, 49:17,
49:25, 50:8, 50:11,
50:15, 50:18, 50:23,
51:9, 51:13, 51:16,
52:1, 52:6, 52:12,
52:16, 53:1, 53:9,
53:11, 53:16, 54:18,
54:22, 54:24, 55:2,
55:5, 55:19, 55:21,
56:1, 56:6, 56:9,
56:14, 56:18, 58:7,
61:6, 62:8, 62:21,
63:21, 64:3, 64:15,
64:17, 65:3, 68:11,
68:17, 68:20, 68:23,
68:25, 69:2, 70:20,
71:3, 71:5, 71:7,
71:23, 71:25, 72:3,
72:5, 73:20, 73:22,
74:1, 74:9, 74:11,
76:15, 76:19, 77:23,
78:11, 78:14, 78:16,
79:2, 79:5, 79:7,
79:11, 79:13, 79:16,
79:19, 79:23, 80:1,
80:5, 80:9, 80:12,
80:14, 81:1, 81:3,
81:6, 81:8, 81:14,
81:19, 81:25, 82:7,
82:13, 82:17, 83:10,
83:16, 83:20, 83:24,

84:2, 84:8, 84:22,
85:2, 85:5, 85:15,
85:18, 85:22, 86:6,
86:15, 86:20, 86:24,
87:2, 87:6, 87:8,
87:14, 87:17, 87:21,
87:25, 88:8, 88:15,
88:19, 89:6, 89:13,
89:16, 90:7, 90:11,
90:20, 91:2, 91:14,
91:17, 91:20, 91:23,
92:9, 92:12, 92:15,
92:21, 93:2, 93:11,
93:13, 93:18, 93:22,
94:1, 94:6, 94:12,
94:17, 95:2, 95:4,
95:7, 95:11, 96:1,
96:8, 96:17, 96:21,
97:16, 97:18, 97:23,
98:7, 98:11, 98:14,
98:18, 98:23, 99:3,
99:10, 99:13, 99:22,
100:5, 100:18,
101:4, 101:6,
101:15, 101:21,
101:23, 102:17,
102:23, 103:3,
103:6, 105:3, 105:9,
105:14, 105:25,
106:4, 106:10,
106:14, 106:18,
106:24, 107:9,
107:16, 108:6,
108:8, 108:12,
108:15, 108:18,
108:23, 108:25,
109:16, 109:18,
109:20, 109:22,
109:25, 110:3,
110:6, 110:10,
110:12, 110:18,
110:20, 110:22,
110:25, 111:2,
111:8, 111:11,
111:14, 111:23,
112:8, 112:12,
112:15, 112:20,
112:22, 112:25,
113:3, 113:7, 113:9,
113:11, 113:14,
113:16, 113:20,
114:4, 114:12,
114:14, 115:1,
115:5, 115:23,
116:3, 116:8,
116:19, 116:23,
117:2, 117:7,
117:10, 117:15,
117:18, 117:20,
118:3, 118:9,
118:13, 118:16,

118:19, 118:23,
119:5, 119:9,
119:14, 119:17,
119:20, 119:24,
120:2, 120:7,
120:13, 120:16,
120:18, 120:22,
121:2, 121:5, 121:8,
121:22, 121:24,
122:7, 122:11,
122:17, 122:20,
122:24, 123:2,
123:5, 123:10,
124:2, 124:16,
124:22, 125:4,
125:8, 125:13,
125:18, 125:24,
126:2, 126:8,
126:14, 126:19,
126:21, 127:2,
127:5, 127:12,
127:16, 127:21,
128:6, 128:10,
128:12, 128:14,
128:19, 129:2,
129:4, 129:24,
130:3, 130:6,
130:13, 130:18,
130:22, 130:25,
131:18, 132:1,
132:4, 132:8,
132:12, 132:19,
132:23, 133:6,
133:25, 134:5,
134:8, 134:13,
134:18, 135:1,
135:3, 135:9,
135:12, 135:16,
135:22, 135:25,
136:2, 136:5,
136:11, 136:25,
137:2, 137:5,
137:22, 138:18,
138:22, 139:3,
139:16, 139:18,
140:5, 140:14,
141:12, 141:16,
141:23, 142:3,
142:11, 142:13,
142:15, 142:17,
142:22, 143:5,
143:12, 143:18,
143:20, 144:13,
144:24, 145:1,
145:4, 145:7,
145:19, 145:24,
146:4, 146:6, 146:8,
146:10, 146:13,
146:23, 147:2,
147:8, 147:16,
147:19, 147:22,

147:24, 148:5,
148:8, 148:10,
148:17, 148:20,
148:22, 149:3,
149:9, 149:22,
150:3, 150:5,
150:20, 150:24,
151:17, 152:3,
153:2, 154:14,
154:18, 155:2,
155:14, 155:17,
156:13, 156:16,
156:20, 157:15,
157:20, 158:10,
158:23, 159:1,
159:4, 159:6, 159:9,
159:12, 159:19,
159:22, 160:5,
160:8, 160:19,
160:21, 160:23,
161:1, 161:7,
161:14, 161:16,
161:20, 161:22,
162:1, 162:3, 162:5,
162:7, 162:9,
162:13, 162:16,
162:21, 163:1,
163:7, 163:9,
163:21, 163:25,
164:6, 164:8,
164:13, 164:16,
164:18, 164:24,
165:10, 165:13,
165:17, 165:21,
165:23, 166:5,
166:10, 166:13,
167:2, 167:9,
167:12, 167:21,
167:24, 168:4,
168:6, 168:11,
168:22, 169:8,
169:17, 169:20,
169:22, 169:25,
170:15, 171:3,
171:8, 171:15,
171:20, 171:24,
172:9, 172:12,
172:15, 172:18,
172:22, 172:24,
173:5, 173:12,
173:17, 173:24,
174:4, 174:8,
174:10, 174:15,
174:18, 174:25,
175:2, 175:6,
175:11, 175:20,
175:25, 176:6,
176:19, 177:4,
177:9, 177:15,
178:4, 178:10,
178:20, 178:23,

179:5, 179:11,
179:15, 180:2,
180:7, 180:10,
180:12, 180:15,
180:21, 180:24,
181:7, 181:9,
181:12, 181:19,
181:24, 182:6,
182:10, 182:16,
183:16, 183:18,
183:24, 184:5,
184:9, 184:11,
184:14, 184:18,
184:22, 184:24,
185:2, 185:7,
185:10, 185:14,
185:17, 185:20,
186:5, 186:7,
186:10, 186:25,
187:4, 187:19,
187:22, 188:8,
188:16, 188:25,
189:4, 189:9,
189:14, 189:17,
189:22, 189:24,
190:1, 190:3, 190:6,
190:8, 190:11,
190:14, 190:17,
191:6, 191:13,
191:22, 192:2,
192:4, 192:7,
192:11, 192:14,
192:17, 192:22,
192:25, 193:5,
193:14, 193:17,
194:7, 194:10,
194:15, 195:7,
195:10, 195:17,
195:20, 195:22,
196:1, 196:11,
196:19, 196:23,
196:25, 197:4,
197:7, 197:10,
197:13, 197:18,
198:1, 198:5,
198:15, 198:20,
198:24, 199:13,
199:16, 199:18,
200:1, 200:4, 200:6,
200:9, 200:14,
200:21, 200:23,
201:1, 201:11,
201:17, 201:19,
202:1, 202:8,
202:10, 202:14,
202:21, 202:24,
203:1, 203:4, 203:6,
203:10, 203:17,
204:8, 204:13,
204:15, 205:23,
206:1, 206:3, 206:6,

206:10, 206:12,
206:21, 206:24,
207:2, 207:4, 207:6,
207:9, 207:11,
207:15, 207:17,
208:3, 208:5, 209:1,
209:7, 209:9,
209:21, 209:23,
211:6, 211:9,
211:16, 212:12,
212:20, 212:25,
213:5, 213:11,
213:14, 213:19,
214:20, 215:18,
215:20, 216:9,
217:4, 217:7,
217:11, 217:14,
217:17, 219:6,
219:9, 219:15,
219:23, 220:5,
220:8, 220:15,
220:21, 220:23,
221:1, 221:10,
221:16, 221:19,
222:14, 222:16,
222:18, 223:14,
224:7, 225:1, 225:3,
225:12, 225:14,
225:17, 225:20,
226:8, 226:13,
226:15, 226:18,
226:22, 227:1,
227:3, 227:7, 228:8,
228:17, 228:19,
228:22, 229:2,
229:17, 229:19,
230:7, 230:9,
230:18, 230:22,
231:7, 231:12,
231:15, 232:21,
233:5, 233:7,
233:17, 233:25,
234:5, 234:11,
234:25, 235:3,
235:6, 235:19,
235:22, 235:24,
236:5, 236:12,
237:2, 237:12,
237:18, 238:11,
238:24, 239:2,
239:5, 239:18,
239:23, 240:1,
240:11, 240:21,
241:5, 241:9,
241:11, 242:6,
243:1, 243:7,
243:10, 243:13,
244:17, 244:19,
244:22, 245:22,
245:25, 246:11,
246:13, 246:16,

246:20, 247:4,
247:22, 248:2,
248:4, 250:24,
252:12, 252:17,
252:25, 253:5,
255:15, 255:23,
256:23, 258:12,
258:16, 258:18,
258:22, 259:1,
259:6, 259:8,
259:11, 259:23,
260:2, 260:4,
260:15, 261:4,
262:11, 262:21,
265:20
**the..** [1] - 50:10
**theirs** [1] - 14:15
**theme** [2] - 41:10,
41:20
**themselves** [3] -
47:25, 121:5, 176:2
**theoretically** [5] -
48:23, 78:19, 79:8,
106:15, 145:9
**theory** [1] - 254:14
**therefore** [11] - 48:21,
55:7, 80:21, 93:7,
96:3, 105:14, 183:3,
193:8, 197:4,
211:18, 220:12
**thereof** [1] - 86:4
**they've** [4] - 28:1,
152:23, 226:11,
247:7
**thinking** - 224:23,
261:8
**thinks** [1] - 176:19
**third** [7] - 20:4, 90:17,
96:2, 112:14,
129:16, 156:16,
168:13
**Third** [12] - 30:17,
34:3, 36:12, 36:15,
36:19, 36:22, 58:14,
62:6, 106:21,
106:24, 126:22,
231:20
**thoroughly** [2] -
111:11, 198:24
**three** [34] - 15:11,
23:6, 23:7, 24:23,
40:8, 64:9, 83:4,
87:12, 88:21, 91:5,
118:12, 121:13,
130:3, 146:16,
158:11, 159:10,
160:19, 160:21,
173:3, 179:17,
184:24, 200:12,
200:15, 200:18,

201:15, 201:18,
202:22, 229:9,
246:1, 246:6, 249:8,
254:2, 257:10,
257:22
**three-and-a-half** [1] -
179:17
**three-minute** [2] -
202:22, 246:6
**threshold** [4] - 51:6,
53:25, 54:9, 54:14
**throughout** [7] -
77:18, 88:7, 237:22,
243:19, 244:10,
257:1, 257:11
**throughput** [1] - 75:5
**Thursday** [1] - 1:10
**tie** [1] - 142:24
**timeline** [3] - 170:6,
264:17, 264:20
**timely** [2] - 156:25,
160:7
**timing** [1] - 170:13
**tiny** [4] - 5:24, 216:11,
223:14, 244:9
**TIP** [25] - 187:10,
187:11, 187:12,
188:10, 188:11,
188:12, 189:1,
189:8, 189:10,
189:20, 189:21,
190:5, 190:6,
196:19, 198:10,
198:18, 199:4,
199:8, 199:11,
199:13, 199:21,
200:5, 205:4, 214:10
**tired** [3] - 8:24, 10:16,
10:20
**titled** [1] - 117:1
**today** [31] - 6:14, 8:9,
10:24, 23:3, 34:18,
56:24, 56:25, 59:1,
65:8, 66:18, 71:25,
98:21, 135:24,
136:9, 136:12,
150:18, 182:4,
186:14, 186:24,
215:23, 218:23,
235:18, 238:17,
240:19, 242:16,
242:19, 242:23,
243:4, 259:15,
264:16
**Together** [1] - 3:10
**together** [5] - 10:3,
226:1, 262:22,
265:22, 266:1
**toll** [1] - 47:18
**tolling** [22] - 16:14,

16:20, 16:21, 18:23, 57:4, 65:9, 65:13, 66:6, 68:12, 69:24, 70:1, 77:15, 77:17, 99:9, 105:24, 109:10, 129:14, 167:17, 167:19, 217:24, 244:6
**tolls** [1] - 235:18
**took** [2] - 32:23, 167:6
**tool** [26] - 37:16, 37:19, 37:21, 37:25, 38:3, 38:6, 49:21, 49:25, 50:1, 50:3, 50:7, 50:8, 50:13, 50:14, 50:16, 50:19, 51:14, 51:23, 52:2, 52:7, 53:8, 53:18, 53:21, 54:3, 54:5
**tools** [3] - 49:20, 52:25, 53:16
**top** [10] - 48:16, 74:17, 189:5, 190:3, 190:14, 192:11, 192:13, 192:14, 193:9, 198:7
**topic** [2] - 119:3
**topics** [6] - 155:20, 155:23, 171:5, 171:9, 171:21, 215:23
**total** [8] - 38:24, 68:24, 82:21, 83:2, 94:23, 112:20, 112:25, 113:2
**totality** [4] - 66:8, 66:11, 102:7, 102:14
**totally** [1] - 22:23
**totals** [1] - 233:14
**touch** [1] - 95:11
**touched** [1] - 37:14
**tough** [1] - 206:12
**towards** [3] - 6:14, 11:3, 222:24
**town** [1] - 58:10
**towns** [3] - 59:18, 228:4, 251:15
**toxic** [1] - 66:4
**TP** [1] - 14:21
**Trabajadores** [1] - 231:21
**tract** [3] - 28:16, 38:16, 51:7
**tracts** [23] - 9:4, 9:12, 9:21, 9:22, 10:2, 10:4, 10:8, 11:1, 22:18, 22:19, 22:21, 23:19, 24:12, 24:19, 26:1, 46:23, 47:13, 51:21, 51:22, 54:15,

54:16, 67:7, 158:5
**Tracts** [2] - 10:13, 46:18
**Trade** [2] - 5:2, 234:6
**TRADE** [1] - 1:12
**traditional** [1] - 178:8
**traffic** [31] - 8:21, 9:5, 9:8, 14:22, 22:6, 23:9, 26:4, 38:15, 38:24, 39:5, 39:7, 39:13, 40:10, 42:23, 44:15, 45:5, 57:5, 58:18, 62:1, 66:14, 66:23, 67:8, 68:9, 69:4, 69:5, 104:5, 104:6, 140:24, 140:25, 243:25, 244:1
**Traffic** [2] - 77:15, 232:13
**trains** [1] - 66:5
**transcript** [2] - 1:24, 266:11
**transcription** [1] - 1:24
**transit** [4] - 66:15, 74:22, 74:24, 253:20
**Transit** [3] - 90:13, 111:6, 157:24
**translate** [1] - 225:3
**translated** [1] - 120:10
**transmitted** [1] - 172:2
**Transportation** [15] - 117:24, 118:13, 157:13, 165:4, 169:1, 170:16, 187:11, 188:14, 188:17, 191:16, 197:22, 211:15, 213:23, 214:11
**TRANSPORTATION** [1] - 1:7
**transportation** [46] - 65:7, 65:15, 70:3, 85:11, 86:2, 86:8, 86:14, 87:8, 88:4, 88:10, 88:11, 88:20, 90:15, 92:3, 92:17, 92:20, 93:17, 94:2, 94:8, 94:12, 117:23, 139:7, 140:3, 152:24, 169:13, 170:3, 185:23, 186:20, 187:6, 187:8, 188:19, 191:4, 191:17, 195:25, 197:24, 202:18, 204:2, 204:22, 205:1, 206:9, 206:14,

206:15, 206:18, 253:8, 256:14
**Trap** [1] - 3:7
**traveled** [4] - 20:3, 44:5, 57:5, 73:17
**treading** [1] - 210:3
**treated** [3] - 15:8, 37:2, 37:3
**treatment** [4] - 86:8, 93:11, 181:19, 181:20
**Tremont** [1] - 70:1
**Tri** [2] - 71:12, 84:25
**Tri-State** [2] - 71:12, 84:25
**trial** [1] - 261:9
**trials** [1] - 261:10
**triangle** [7] - 190:3, 190:4, 190:9, 190:12, 190:15, 198:6, 198:18
**Tribe** [1] - 149:15
**tried** [1] - 263:8
**trigger** [2] - 211:18, 211:23
**triggered** [3] - 212:10, 233:19, 233:22
**triple** [1] - 22:22
**trivial** [1] - 231:5
**truck** [9] - 8:20, 9:5, 9:8, 14:22, 26:4, 40:10, 67:8, 243:24, 243:25
**Trucking** [1] - 17:4
**trucks** [2] - 45:3, 47:18
**true** [6] - 34:18, 42:5, 45:21, 46:20, 173:23, 187:25
**trust** [11] - 6:5, 13:24, 234:11, 234:17, 249:4, 249:5, 258:19, 261:13, 262:1, 263:1, 263:4
**trusting** [1] - 110:10
**truth** [1] - 109:13
**try** [12] - 16:4, 33:14, 137:9, 137:11, 140:19, 147:7, 178:17, 226:17, 227:15, 227:21, 230:24, 251:9
**trying** [17] - 31:21, 68:17, 68:18, 112:3, 115:1, 127:2, 128:3, 151:10, 158:12, 159:23, 188:3, 223:6, 224:9, 224:18, 230:24, 250:6, 254:5

tunnel [1] - 207:23
**Tunnel** [2] - 66:23, 68:4
**turn** [11] - 67:10, 67:12, 74:18, 98:1, 103:7, 116:25, 178:12, 186:23, 208:13, 227:15, 241:16
**turning** [1] - 88:10
**Turnpike** [12] - 3:7, 14:7, 14:8, 67:24, 68:2, 68:13, 68:22, 69:18, 86:11, 242:2, 242:5, 242:8
**turnpike** [1] - 66:21
**turns** [1] - 223:12
**twice** [1] - 63:6
**twin** [1] - 71:15
**two** [87] - 5:6, 8:21, 16:16, 19:14, 31:10, 34:3, 39:14, 40:18, 40:21, 43:6, 43:13, 51:19, 52:19, 59:7, 59:13, 59:16, 60:7, 60:18, 62:2, 68:6, 68:14, 74:7, 75:15, 76:16, 78:21, 78:22, 80:2, 88:23, 90:16, 93:19, 107:1, 118:12, 120:20, 121:13, 122:17, 132:2, 138:4, 139:6, 146:16, 155:6, 155:15, 157:17, 167:2, 170:6, 170:18, 171:8, 171:13, 171:18, 173:4, 182:13, 187:14, 190:14, 196:6, 198:7, 203:5, 208:8, 211:13, 215:21, 217:21, 224:14, 227:19, 230:24, 235:8, 236:10, 239:11, 239:16, 243:22, 244:21, 246:1, 246:3, 247:8, 248:16, 252:23, 255:20, 255:25, 256:1, 257:11, 258:20, 262:22, 263:1, 265:12, 266:1
**two-and-a-half** [1] - 76:16
**two-day** [1] - 187:14
**two-minute** [2] - 80:2, 120:20
**two-prong** [1] - 74:7

**two-year** [1] - 235:8
**tying** [1] - 142:23
**type** [5] - 124:7, 125:1, 152:18, 188:6, 199:9
**types** [5] - 11:16, 12:16, 83:5, 138:4, 168:18
**typically** [2] - 125:10

**U**

**U.S** [5] - 1:9, 12:1, 30:4, 172:13, 172:14
**UC** [1] - 3:11
**ulations** [1] - 186:21
**ultimately** [3] - 57:22, 233:22, 240:17
**unable** [1] - 150:17
**uncharacteristically** [1] - 178:18
**unconfuse** [1] - 188:25
**under** [35] - 15:8, 15:10, 15:11, 15:12, 26:24, 36:21, 54:21, 57:16, 60:20, 80:21, 83:6, 88:13, 89:8, 95:23, 97:24, 117:8, 124:6, 124:22, 150:10, 181:6, 181:17, 183:5, 195:9, 204:24, 205:6, 215:14, 220:12, 222:11, 223:3, 229:14, 232:22, 239:13, 249:25, 256:15, 265:24
**undercut** [1] - 105:1
**underlying** [1] - 145:15
**underscored** [1] - 104:25
**understood** [4] - 217:6, 222:21, 234:24, 235:2
**undertake** [2] - 221:12, 221:14
**undertaken** [4] - 30:2, 61:5, 61:13, 205:15
**undisputed** [2] - 60:25, 88:5
**unfair** [3] - 27:5, 177:8, 177:9
**unfortunately** [2] - 10:15, 198:2
**unhappy** [2] - 98:15, 98:16
**uniform** [1] - 127:22
**unintended** [1] - 23:24

**union** [1] - 22:8
**Union** [2] - 22:22, 61:16
**unique** [4] - 156:2, 156:18, 156:21, 156:23
**Unitarian** [1] - 3:7
**United** [2] - 5:2, 102:1
**UNITED** [6] - 1:1, 1:6, 1:12, 2:3, 2:8, 2:11
**Universalist** [1] - 3:7
**universe** [1] - 250:6
**unlawful** [6] - 90:10, 219:17, 219:20, 221:23, 224:12, 225:6
**unless** [7] - 27:1, 134:20, 136:4, 154:12, 232:16, 238:10, 245:20
**unprecedented** [3] - 18:6, 18:17, 223:25
**unquote** [1] - 223:1
**unreasonable** [17] - 26:23, 27:5, 39:2, 91:21, 95:5, 96:14, 99:10, 99:21, 100:10, 100:13, 112:17, 115:21, 116:5, 150:22, 166:23, 219:21, 237:6
**unreasonableness** [1] - 20:23
**unrefutable** [1] - 59:10
**unspecified** [1] - 234:20
**unsupported** [1] - 219:20
**unusual** [2] - 143:23, 150:19
**up** [88] - 5:5, 5:22, 7:6, 13:5, 14:25, 17:24, 18:3, 19:11, 22:4, 22:8, 22:17, 24:16, 25:3, 28:24, 29:9, 31:8, 33:19, 35:14, 35:18, 41:5, 43:2, 44:14, 54:14, 56:2, 56:3, 56:6, 56:16, 63:18, 66:18, 69:14, 70:19, 71:5, 75:9, 79:13, 79:14, 80:6, 85:18, 89:16, 97:3, 100:8, 111:14, 112:5, 115:8, 115:13, 130:23, 134:9, 137:5, 139:21, 140:13,

141:2, 142:17, 154:15, 155:4, 159:6, 163:9, 168:1, 168:24, 170:21, 172:25, 175:11, 175:13, 175:15, 183:13, 185:10, 185:14, 202:15, 208:16, 210:7, 210:22, 212:25, 216:3, 216:11, 216:16, 216:24, 217:2, 226:3, 238:16, 243:20, 247:20, 247:21, 248:7, 249:7, 249:20, 250:4, 250:16, 259:17, 260:19, 265:3
**updated** [1] - 167:14
**upfront** [1] - 174:1
**ups** [1] - 260:10
**US** [1] - 227:19
**USC** [1] - 164:25
**uses** [4] - 53:21, 54:3, 54:6, 166:3
**utilize** [1] - 228:23
**utilized** [3] - 84:23, 126:9, 129:19

**V**

**vacate** [6] - 58:3, 220:1, 220:3, 222:7, 223:18, 227:11
**vacated** [2] - 219:14, 233:13
**vacating** [4] - 222:9, 225:20, 233:10, 233:21
**vacatur** [18] - 220:8, 220:13, 221:6, 223:20, 224:8, 224:13, 226:13, 226:14, 231:17, 231:23, 232:3, 232:21, 235:12, 235:16, 236:20, 236:25, 237:13, 248:13
**vacature** [1] - 230:3
**validated** [1] - 103:20
**Valley** [1] - 102:1
**variable** [2] - 16:21, 34:25
**various** [4] - 52:25, 72:12, 138:5, 254:5
**vast** [3] - 65:13, 66:15, 150:16
**vegetation** [1] - 62:13

**vehicle** [5] - 20:2, 22:14, 44:5, 73:17, 256:8
**vehicles** [4] - 20:6, 39:25, 57:5, 65:25
**Vermont** [2] - 129:11, 178:8
**version** [1] - 144:2
**versus** [7] - 27:25, 53:17, 54:17, 84:7, 87:8, 193:15
**veto** [2] - 36:24, 256:10
**viability** [2] - 62:7, 224:9
**viable** [2] - 62:18, 149:20
**view** [18] - 43:17, 63:22, 66:11, 78:5, 91:21, 139:18, 139:19, 144:17, 158:24, 161:23, 175:20, 175:21, 232:2, 233:21, 236:9, 239:18, 255:12, 260:22
**viewed** [1] - 211:11
**viewers** [1] - 121:17
**views** [1] - 82:5
**Village** [1] - 147:13
**violate** [1] - 90:22
**violates** [2] - 26:23, 90:24
**violation** [3] - 81:15, 219:5, 222:9
**violations** [2] - 35:5, 35:6
**Virginia** [2] - 16:19, 102:3
**virtual** [4] - 88:25, 94:9, 119:23, 120:24
**virtually** [1] - 254:25
**vis** [2] - 89:24
**vis-a-vis** [1] - 89:24
**vis-à-vis** [2] - 127:7, 127:23
**visuals** [1] - 262:16
**VMT** [3] - 72:6, 72:12, 72:18
**VMTs** [1] - 73:23
**voice** [1] - 185:5
**voicemails** [1] - 123:17
**volatile** [1] - 39:23
**volume** [5] - 22:6, 90:14, 111:16, 112:2, 116:4
**voluntarily** [1] - 64:10
**vomit** [1] - 243:23
**VPPP** [2] - 15:7, 16:22

**W**

**wait** [4] - 64:22, 65:1, 81:1, 204:13
**waiting** [4] - 129:12, 138:21, 203:8, 203:13
**waive** [4] - 105:17, 106:21, 183:12, 191:2
**waive/not** [1] - 161:2
**waived** [4] - 108:22, 136:13, 161:17, 163:6, 166:22, 180:17, 180:19, 184:7, 184:21, 185:18, 186:18, 186:19, 191:1, 203:21, 254:25
**waiver** [4] - 136:14, 136:15, 136:18, 136:24
**walk** [1] - 72:3
**walking** [1] - 103:3
**wants** [5] - 13:18, 100:9, 129:4, 194:25, 254:20
**Ward** [1] - 3:12
**warrant** [1] - 46:13
**warranted** [1] - 234:18
**warranting** [2] - 46:19, 47:24
**Washington** [5] - 2:6, 2:13, 12:2, 44:20, 44:22
**Water** [1] - 3:6
**water** [2] - 210:3, 216:5
**Waterfront** [1] - 3:9
**Watkins** [1] - 34:10
**ways** [5] - 50:14, 126:2, 218:2, 229:12, 243:19
**WE** [1] - 71:10
**weak** [1] - 255:3
**webinars** [10] - 119:23, 120:9, 120:13, 120:19, 120:24, 121:10, 121:14, 122:3, 122:21, 123:9
**website** [5] - 15:6, 55:3, 55:6, 55:8, 55:15
**websites** [1] - 165:9
**week** [2] - 139:22, 217:25
**weeks** [8] - 16:16, 91:5, 94:23, 170:6, 171:13, 171:18,

172:7
**weigh** [2] - 102:10, 102:11
**weigh-in** [1] - 102:11
**weight** [5] - 13:19, 37:7, 37:8, 259:18, 260:13
**welcome** [9] - 6:19, 27:12, 109:18, 178:10, 184:11, 230:9, 240:21, 247:4, 252:12
**wells** [1] - 62:12
**West** [2] - 19:2, 102:3
**west** [2] - 39:4, 39:11
**Western** [1] - 12:1
**Westlaw** [2] - 16:17, 147:18
**whatsoever** [1] - 61:12
**wheel** [1] - 154:1
**wheelbarrow** [1] - 74:17
**whereas** [1] - 14:20
**wheres** [1] - 120:20
**whispering** [1] - 27:18
**whole** [10] - 29:13, 71:18, 96:11, 105:20, 164:17, 204:23, 218:11, 226:5, 243:20, 253:16
**wholesale** [1] - 36:16
**widely** [1] - 55:15
**widening** [3] - 14:8, 42:12, 42:14
**wiggle** [1] - 82:1
**willing** [3] - 176:24, 257:7, 257:14
**win** [1] - 248:3
**wind** [1] - 198:1
**window** [5] - 42:19, 111:18, 111:21, 147:4, 166:2
**wires** [1] - 138:13
**wisdom** [1] - 256:13
**wish** [3] - 5:6, 6:21, 13:11
**with..** [1] - 92:10
**woefully** [1] - 39:20
**wondering** [1] - 24:11
**word** [11] - 61:3, 83:10, 86:17, 114:17, 115:5, 166:5, 169:10, 211:6, 252:20, 262:1, 264:15
**words** [20] - 27:24, 30:12, 86:7, 114:17, 114:18, 130:19,

131:10, 134:8,
134:21, 140:14,
146:1, 149:7,
157:20, 158:13,
160:13, 195:11,
208:10, 230:19,
232:7, 262:13
**works** [7] - 125:17,
126:2, 133:6,
140:15, 251:11,
251:12, 264:14
**world** [3] - 73:7,
150:25, 151:4
**worried** [2] - 86:7,
93:2
**worse** [8] - 22:20,
35:18, 61:24, 61:25,
67:8, 160:3, 215:16,
223:12
**worse-case** [1] -
215:16
**worst** [14] - 11:16,
11:18, 11:19, 12:4,
12:7, 12:12, 12:13,
34:25, 35:2, 39:8,
44:14, 59:11, 59:13
**worst-case** [2] -
34:25, 35:2
**worth** [5] - 115:12,
199:11, 199:12,
259:18, 261:7
**worthy** [1] - 248:24
**wrap** [1] - 31:8
**write** [5] - 91:8, 101:9,
102:20, 216:14,
216:22
**writes** [1] - 94:21
**writing** [4] - 46:3,
110:12, 210:23,
259:4
**written** [7] - 122:15,
122:22, 123:3,
132:9, 132:12,
134:15, 142:5
**wrongly** [1] - 239:8

## Y

**Yankee** [2] - 129:11,
178:8
**year** [9] - 15:17, 72:13,
99:23, 188:18,
189:21, 235:8,
245:13
**years** [8] - 64:23,
64:24, 88:23,
150:25, 199:11,
227:19, 245:16,
248:17
**years'** [1] - 199:12

**yesterday** [38] - 5:5,
5:8, 6:3, 6:12, 7:14,
8:18, 9:9, 10:6,
10:12, 11:14, 13:22,
15:1, 23:18, 34:7,
35:4, 37:15, 40:17,
44:11, 47:17, 48:12,
54:3, 56:16, 56:24,
57:18, 65:16, 67:1,
72:1, 95:14, 103:16,
109:9, 125:23,
139:1, 215:2,
242:23, 244:3,
254:19, 257:6, 261:5
**yesterday's** [3] - 6:10,
10:10, 247:22
**yielded** [1] - 254:10
**York** [117] - 1:17, 2:18,
2:22, 3:16, 18:9,
18:25, 19:15, 19:20,
19:21, 20:8, 20:22,
22:12, 42:20, 44:16,
59:13, 59:15, 59:25,
61:23, 64:9, 71:13,
73:10, 73:12, 73:14,
82:21, 82:25, 83:4,
84:20, 85:7, 85:19,
87:3, 87:5, 87:12,
87:16, 87:18, 89:2,
89:3, 89:24, 90:1,
90:3, 91:1, 95:10,
96:2, 96:6, 96:10,
97:2, 97:13, 97:14,
103:23, 103:25,
127:22, 138:8,
138:11, 138:14,
138:15, 138:17,
141:11, 152:7,
154:4, 172:4,
172:12, 172:14,
181:8, 181:10,
181:18, 181:20,
183:4, 191:10,
191:11, 191:19,
192:9, 192:25,
193:2, 193:6, 193:7,
193:10, 193:15,
195:17, 195:19,
197:2, 197:5, 197:8,
197:12, 197:14,
197:15, 200:12,
205:9, 205:20,
207:23, 208:19,
209:2, 209:3, 209:4,
209:6, 209:17,
209:21, 209:22,
210:1, 210:11,
210:21, 210:23,
211:5, 212:15,
212:16, 213:16,
244:13, 249:4,

249:5, 249:11,
253:21, 253:25
**York's** [1] - 211:14
**York/New** [3] - 210:9,
210:25, 213:12
**Yorkers** [1] - 254:1
**yourself** [2] - 112:4,
216:14
**yourselves** [1] -
264:18

## Z

**zero** [13] - 13:19,
24:16, 57:17, 59:18,
59:20, 62:1, 83:4,
85:23, 87:14, 87:15,
87:16, 87:18
**zeros** [3] - 23:21,
23:22, 24:8

*United States District Court of New Jersey*
*I certify the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*
*/s/ Melissa A. Mormile*   05/22/2024