**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

STATE OF NEW JERSEY,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al.,

        Defendants,

        and

METROPOLITAN TRANSPORTATION
AUTHORITY, et al.,

        Defendant-Intervenors.

Before: Leo M. Gordon, Judge

Court No. 2:23-cv-03885

## OPINION

[FHWA's determinations affirmed in part; remanded in part.]

Dated: December 30, 2024

Randy M. Mastro and Lauren Myers, King & Spalding LLP, of New York, NY, argued for Plaintiff State of New Jersey. With them on the brief were Craig Carpenito, Jessica Benvenisty, Peter Hsiao, and Cynthia AM Stroman.

Gregory M. Cumming and Shari Howard, Trial Attorneys, Environment & Natural Resources Division, U.S. Department of Justice of Washington, DC, for argued Defendant United States. With them on the briefs was Samantha G. Peltz, Trial Attorney, Environment & Natural Resources Division, U.S. Department of Justice, and Alex D. Silagi, Assistant United States Attorney, District of New Jersey, United States Attorney's Office of Newark, NJ.

Mark A. Chertok and Elizabeth Knauer, Sive, Paget & Riesel, P.C., of New York, NY, argued for Defendant-Intervenors the Metropolitan Transportation Authority and the Triborough Bridge and Tunnel Authority. With them on the briefs were Daniel Chorost and John F. Nelson, Sive, Paget & Riesel, P.C., and Roberta A. Kaplan,

Gabrielle E. Tenzer, Joshua A. Matz, and Kate Harris of Kaplan Martin LLP, of New York, NY.

Andrew D. Otis, Kramer Levin Naftalis & Frankel LLP, of New York, NY, argued for Amici Curiae Environmental Defense Fund, New York League of Conservation Voters, Tri-State Transportation Campaign, Riders Alliance, Open Plans, Real Estate Board of New York, New York Lawyers for the Public Interest, We Act for Environmental Justice, Streetspac, Transportation Alternatives, and New York Public Interest Research Ground Fund.  With him on the brief were Nathan Schwartzberg, Karen Steinberg Kennedy, and Charles S. Warren, McLaughlin & Stern, LLP of New York, NY.

Bruce H. Nagel and Randee M. Matloff, Nagel Rice, LLP, of Roseland, NJ, argued for Amici Curiae Mark Sokolich and Richard Galler.

David Mateen, Office of Bergen County Counsel, of Hackensack, NJ argued for Amicus Curiae County of Bergen.

John H. Reichman, John Reichman Law LLC, of Montclair, NJ argued for Amici Curiae EmpowerNJ, New Jersey Police Perspective, Health Professionals & Allied Employees, Clean Water Action, Turnpike Trap Coalition, Hudson Country Complete Street, Soma Action, Unitarian Universalist Faith Action NJ, Pinelands Preservation Alliance, Bike North Bergen, Ecopoetry.org, Don't Gas The Meadowlands, Isles, Inc., Bike JC, SafestreetSJC, 350NJ-Rockland, Hackensack Riverkeeper, People Over Pipelines, Fund for a Better Waterfront, Newark Green Team, Action Together New Jersey, New Jersey Association of Railroad Passengers, BluewaveNJ, Bike Soma, Newark Science and Sustainability Inc., Our Revolution NJ, BICI UC, Friends of Liberty State Park, New Jersey Environmental Lobby, New Jersey Work Environment Council, New Jersey Citizen Action, South Ward Environmental Alliance, New Jersey Working Family Party, and Bike Hoboken.

Gordon,[1] Judge:  Disputes over charges, fees, tolls, taxes for, or other regulation of transit entering New York from New Jersey trace back prior to the founding of the country, and were "a central issue in the debate over the Constitution."  See Tax Quarrels Among States Go Back a Long Way, States News Service, May 7, 1989, https://www.nytimes.com/1989/05/07/nyregion/tax-quarrels-among-states-go-back-a-

---

[1]  The Honorable Leo M. Gordon, Judge of the United States Court of International Trade, sitting by designation.

long-way; see also The Federalist No. 7 at 37–38 (Alexander Hamilton) (Robert Scigliano ed. 2001) ("The opportunities which some States would have of rendering others tributary to them by commercial regulations would be impatiently submitted to by the tributary States.  The relative situation of New York, Connecticut, and New Jersey would afford an example of this kind.  New York, from the necessities of revenue, must lay duties on her importations.  A great part of these duties must be paid by the inhabitants of the two other States in the capacity of consumers of what we import.  New York would neither be willing nor able to forego this advantage.  Her citizens would not consent that a duty paid by them should be remitted in favor of the citizens of her neighbors....  Would Connecticut and New Jersey long submit to be taxed by New York for her exclusive benefit?").  These disputes have taken many forms and were fought by governors, state legislatures, Congress, and in the courts.  See, e.g., Gibbons v. Ogden, 22 U.S. 1 (1824) (dispute over right to navigate waters between New Jersey and New York).  In the late 20th century, the sparring involved New Jersey commuters paying New York City income taxes on moneys earned elsewhere.  See City of New York v. State of New York, 94 N.Y.2d 577 (2000) (suit challenging constitutionality of limiting the then–existing New York City commuter tax to only out-of-state residents working in New York City).

Fast forward to today and this long-running saga now involves the Metropolitan Transportation Authority ("MTA") and its affiliate, the Triborough Bridge and Tunnel Authority ("TBTA"), proposing a program to impose tolls on vehicles entering the Central Business District ("CBD") of Manhattan (the "Program" or "Project") that directly impacts commuters from New Jersey among others.  See Am. Compl., ECF No. 139.  In this

action, Plaintiff, the State of New Jersey, challenges the final determinations by the U.S. Department of Transportation's ("DOT") Federal Highway Administration ("FHWA") regarding the environmental review process under the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. (2018) ("NEPA") and the Clean Air Act, 42 U.S.C. §§ 7401 et seq. (2018) ("CAA") for the establishment of the Program.[2] Id. Plaintiff seeks relief in the form of an order vacating the FHWA's Final Environmental Assessment ("EA") and Final Finding of No Significant Impact ("FONSI") and requiring the FHWA to prepare an Environmental Impact Statement ("EIS"). See generally Am. Compl.

Before the court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed by Plaintiff and Federal Defendants, as well as Defendant-Intervenors, the MTA and TBTA. See Pl.'s Mot. for Summ. J., ECF No. 136 ("Pl.'s Mot."); see also Fed. Defs.' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot., ECF No. 129 ("Fed. Defs.' Cross-Mot."); Def.-Intervenors' Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot., ECF No. 127 ("Def.-Intervenors' Cross-Mot."); Pl.'s Opp'n to Defs.' Cross-Mots., ECF No. 86 ("Pl.'s Resp."); Fed. Defs.' Reply in Supp. of Cross-Mot., ECF No. 130 ("Fed. Defs.' Reply"); Def.-Intervenors' Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 128 ("Def.-Intervenors' Reply").[3] The court held oral argument on the parties'

---

[2] The court notes that NEPA was amended in June 2023. See 42 U.S.C. § 4336a(a)(2)(B), (D) (2018 & Supp. V 2024). Because the date of enactment of these provisions fell after the issuance of the Final EA, the court applies only the prior NEPA provisions.

[3] The parties submitted revised briefs to reflect citations to a condensed administrative record that is contained in the Joint Appendix, ECF No. 123. The ECF Numbers for those (footnote continued)

cross-motions.  See Transcripts of Oral Arg., (Apr. 3 & 4, 2024), ECF Nos. 153 ("1st Tr.") & 154 ("2d Tr.").

The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346 (2018).  For the reasons set forth below, the court affirms the FHWA's determinations in part and remands in part.

## I. Background

Traffic congestion has long plagued the New York metropolitan area that includes New York City, Long Island, Northern New Jersey, and certain counties in upstate New York and Southwestern Connecticut.  That congestion has an adverse economic impact, with a typical motorist experiencing 102 hours of lost time with a cost of nearly $1,595 per driver per year in the region.  See DOT_0036197; DOT_0036253[4]; Nicholas McEntyre, NYC's drivers spend a grueling 100 hours in traffic—here's where the Big Apple ranks among the world's most congested cities, New York Post (June 26, 2024, 4:40 am), https://nypost.com/2024/06/26/us-news/nyc-ranked-worlds-most-congested-city-again-inrix/.  A 2018 study estimated that "traffic congestion [would] be a $100 billion drag" on the area economy over five years and identified the Manhattan CBD—home to a quarter of the region's economic activity—as the primary locale of traffic congestion in the region. DOT_0036253; see also Partnership for New York City, $100 Billion Cost of Traffic

_____

revised briefs are reflected above, with the exception of Plaintiff's Opposition to Defendants' Cross-Motions, for which Plaintiff did not submit a revised brief.

[4] Citations are to the condensed administrative record that is contained in the Joint Appendix, ECF No. 123, and appear as follows: DOT_xxxxxxx.

Congestion    in    Metro    New    York    (2018),    https://pfnyc.org/wp-content/uploads/2020/01/2018-01-Congestion-Pricing.pdf (last visited December 30, 2024).  Yet, despite multiple traffic reduction initiatives and the nation's most extensive public transit network, New York City remains the most congested city in the country. DOT_0036196; DOT_0036242.

For over 50 years, state and local officials, policy experts, and advocacy groups have studied various solutions to determine the most effective way to reduce traffic congestion in and around the CBD of Manhattan.  DOT_0004513–22.  In 2018, the New York State Legislature ("Legislature") created the Metropolitan Transportation Sustainability Advisory Workgroup ("Workgroup") that ultimately recommended the implementation of a tolling program for the CBD to reduce traffic congestion and generate revenue to repair, improve, and modernize the MTA's regional public transit system. DOT_0004518.

In April 2019, based on the Workgroup's recommendations, the Legislature enacted the MTA Reform and Traffic Mobility Act (the "Act"), as part of the fiscal year 2020 New York State budget.  Id.  The Act's goals were to reduce CBD traffic congestion and to create a dedicated funding source for the MTA.  DOT_0002407.  The Act's findings recognized that "[t]he ongoing failures of the tracks, signals, switches, electrical power, and other transportation infrastructure throughout the subway system in New York City continue to have a significant deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers, as well as business and commerce in the metropolitan commuter transportation district…."  DOT_0004527.

Under the Act, the TBTA was charged with establishing the Program, and entering into a memorandum of understanding ("MOU") with the New York City Department of Transportation ("NYCDOT") to effectuate the Program.[5]  DOT_0004529; DOT_0036243. The June 2019 MOU specified that the TBTA, NYCDOT, and the New York State Department of Transportation ("NYSDOT") jointly would submit an application to the FHWA for any approval required by federal law.  DOT_0004549; DOT_0004554–55.  That same month, the TBTA, NYSDOT, and NYCDOT (collectively, the "Project Sponsors") submitted to the FHWA an Expression of Interest for variable price tolling authority pursuant to the FHWA's Value Pricing Pilot Program ("VPPP").  DOT_0038307–14.

In March 2021, the FHWA determined that the proposed Program should be treated as a NEPA Class III action, meaning that the significance of the environmental impact of the Program was not clearly established.  DOT_0036245; see also 23 C.F.R. § 771.115 (2018) (defining classes of actions in NEPA process).  For these types of actions, the FHWA is required to prepare an EA to determine whether the proposed action is likely to have significant environmental effects.  In conducting that assessment, if the FHWA finds a significant impact that is not amenable to mitigation, then the FHWA is

---

[5] Monies raised through the Program were to be deposited into a CBD tolling capital lockbox fund.  These monies, after program expenses, were to be applied to the MTA's capital projects included in the MTA's 2020–2024 capital program or any successor program.  Of the capital project costs to be paid by the fund, 80 percent were to be obligated to capital project costs of the MTA and its New York City-centric subsidiaries, with priority given to the New York City subway system.  Ten percent were to be dedicated to the MTA-owned Long Island Railroad capital projects and ten percent to the MTA-owned Metro-North Commuter Railroad Company capital projects. DOT_0004535-37.

required to prepare an EIS.  40 C.F.R. §§ 1501.3(a)(2) & (3), 1501.5; see also 23 C.F.R. §§ 771.115(c) & 771.119(i) (2018).  Alternatively, if the FHWA finds no significant impact, or if any predicted impacts will be mitigated to less than significant levels, the FHWA then may issue a FONSI.  See 40 C.F.R. § 1501.6(a) & (c).

During the next two years, the FHWA and Project Sponsors gathered information, engaged stakeholders, and analyzed data regarding traffic impact, air quality, and environmental justice issues.  The FHWA, in consultation with the Project Sponsors, issued a Draft EA in August 2022.  DOT_0036154–55.  After considering public comments, the FHWA, in May 2023, issued the Final EA and Draft FONSI, determining that the proposed Program would not have a significant effect on air quality or environmental justice communities after mitigation.  DOT_0036150–53; DOT_0036155; DOT_0040579–80.  Additionally, the Final EA in new Appendix 17E reflected a commitment from the Project Sponsors to a $155 million mitigation package over five years after implementation of the Program.  DOT_0007411–50; DOT_0036156, DOT_0036211–13; DOT_0037016–20.  This package is intended to improve air quality and public health in those environmental justice communities that the FHWA identified as facing pre-existing burdens due to historic transportation and land use planning.  Id.  As a result of the mitigation commitments, the FHWA determined that the proposed Program would not have a disproportionately high and adverse effect on environmental justice communities.  Id.

After the issuance of the Draft FONSI, the FHWA considered additional submissions received during the review period (mid-May to mid-June 2023) but

determined that those submissions did not provide new information. Therefore, the FHWA determined that no changes to the Final EA were necessary. DOT_0000393. In late June 2023, the FHWA signed the Final FONSI. DOT_0000363. This litigation ensued. See Compl., ECF No. 1. However, the regulatory process continued with the adoption by the TBTA of a tolling structure (i.e., final tolling rates) recommended by the Traffic Mobility Review Board ("TMRB"), a new entity responsible for making a formal recommendation to the TBTA regarding the Program's final tolling structure before the TBTA established the actual tolls. See Letter from Defendant-Intervenors, ECF No. 141 (notifying court on March 28, 2024 that TBTA Board approved CBD toll rates previously recommended by TMRB on November 30, 2023); see also Congestion Pricing in New York: A toll structure recommendation from the Traffic Mobility Review Board (Nov. 2023), https://new.mta.info/document/127761 ("Congestion Pricing in New York").

On June 14, 2024, the FHWA completed its required re-evaluation of the MTA-adopted tolling schedule and determined that the Final FONSI was still valid. See Fed. Defs.' Notice of Issuance of Re-Evaluation, ECF No. 156 (notifying court that "on June 14, 2024, FHWA issued a Re-Evaluation [the ("June 2024 Re-Evaluation")] finding that the conclusions in the Final EA remain valid in light of the final tolling schedule adopted by [MTA], and thus that no further environmental review is warranted."). The June 2024 Re-Evaluation confirmed that the March 2024 adopted toll structure and impacts associated with it were analyzed and mitigated appropriately under NEPA, that no additional environmental analysis was warranted, and that the conclusions in the Final EA and Final FONSI remained valid. See Supplement to the Record, ECF

No. 186-3 (supplement to record containing June 2024 Re-Evaluation and FHWA approval).

Before a tolling agreement under the VPPP was executed between the FHWA and Project Sponsors allowing for the CBD Tolling Program to be implemented, New York Governor Kathy Hochul announced on June 5, 2024 that the Program would be temporarily paused, citing concerns over the cost of the toll to drivers.  See Letter, ECF No. 155 (noting that Governor Hochul "directed the MTA to pause implementation of the Manhattan Central Business District Congestion Pricing Program (the "Program") under state law").  On June 26, 2024, the MTA Board officially voted to pause implementation of the Program.  See MTA Board Meeting at 7–9 (July 31, 2024 adoption of June 26, 2024 minutes), available at https://new.mta.info/document/147196.

In early November 2024, Governor Hochul recommended the lifting of the temporary pause.  Subsequently, on November 8, the Project Sponsors wrote the FHWA proposing that the March 2024 adopted toll structure be implemented through a phase-in over six years (the "Phase-In Approach").  Under the Phase-In Approach, the Program would be implemented in three steps, culminating with the full March 2024 adopted toll structure in the third phase.  On November 18, 2024, the MTA Board approved the phasing of the toll structure, announcing that the Program will launch on January 5, 2025. "MTA Board Approves Phasing In the Congestion Relief Zone Toll" https://new.mta.info/press-release/mta-board-approves-phasing-congestion-relief-zone-toll.

Pursuant to the Project Sponsors request, the FHWA conducted another re-evaluation of the Program in light of the new Phase-In Approach to the tolling structure. "On November 21, FHWA issued [its second re-evaluation (the "November 2024 Re-Evaluation")] finding that the conclusions in the Final EA and FONSI remain valid in light of the most recent tolling schedule adopted by the [TBTA], and thus that no further environmental review is warranted." See Fed. Defs.' Notice of Issuance of Re-Evaluation 2 and VPPP Agreement, ECF No. 174 (further noting that the "Project Sponsors and FHWA officials signed the VPPP agreement" on November 21 as well). In light of these significant subsequent developments, the court held a conference with the parties and directed supplementation of the record. See Status Conference, ECF No. 185; Order Directing Supplement to the Record, ECF No. 184 (directing the addition of FHWA's June 2024 and November 2024 Re-Evaluations to the record); see also Supplement to the Record, ECF Nos. 186 & 187 (supplement to record containing June 2024 and November 2024 Re-Evaluations).

## II. Standard of Review

Neither NEPA nor the CAA provide a standard of review for a challenge to the final determinations by the FHWA regarding the environmental review process under these statutes. Accordingly, the court looks to the Administrative Procedure Act's provisions on judicial review, 5 U.S.C. §§ 701–706, and in particular, its provision governing the scope of court review for this environmental challenge, i.e., whether the FHWA's actions were "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A); see also Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 375–78 (1989); Society Hill Towers Owners' Ass'n

v. Rendell, 210 F.3d 168, 178–79 (3d Cir. 2000) (adopting Section 706(2)(A) standard for review of administrative decision not to prepare EIS based on FONSI).

The arbitrary, capricious, or abuse of discretion standard is a long–established word formula.  See 3 Charles H. Koch, Jr. & Richard Murphy, Administrative Law and Practice §§ 9.21, 9.27[1] (3d ed. Mar. 2024) ("3 Admin. L. & Prac.").[6]  This standard encompasses judicial review of agency fact-finding, as well as review of the agency's reasoning for its decision.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414–16 (1971) (review of agency fact-finding); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974) (review of agency reasoning).

Judicial review under this standard is limited, see Citizens to Preserve Overton Park, 401 U.S. at 416, and "communicates a lesser degree of judicial scrutiny than the reasonableness test." 3 Admin. L. & Prac. § 9.25.  The touchstone of arbitrariness review is rationality, meaning that the court must analyze whether there is a rational connection between the facts found by the agency and its ultimate decision, "based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, 401 U.S. at 416; see also 6 Jacob A. Stein & Glenn A. Mitchell, Administrative Law § 51.03 (2024).  In so doing, the court is to examine whether an agency determination "entirely failed to consider an important aspect

---

[6] The "arbitrary, capricious, [or] abuse of discretion standard" combines two "roughly equivalent" word formulas, "arbitrary [or] capricious" and "abuse of discretion."  See 3 Admin. L. & Prac. § 9.27[1].  The equivalence is such that "[n]o distinctions are drawn among the terms 'arbitrary, capricious, [or] an abuse of discretion' in § 706(2)(A)."  Id. (quoting Ronald M. Levin, Scope-of-Review Doctrine Restated: An Administrative Law Section Report, 38 Admin. L. Rev. 239, 292 (1986)).

of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view

or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.

Ins. Co., 463 U.S. 29, 43 (1983). In arbitrariness review, the court is monitoring the

agency for a lower "probability of correctness", i.e., a willingness "to accept a higher risk

[for [tolerance] of error than would be appropriate under the reasonableness (substantial

evidence) [standard]." 3 Admin. L. & Prac. §§ 9.25[1], 9.25[2]; see also State of Oregon

v. Bureau of Land Mgmt., 876 F.2d 1419, 1425 (9th Cir. 1989) ("under this standard a

fairly high risk of agency error must be tolerated" (internal citation and quotation marks

omitted)).

An agency, like the FHWA, is required to take a "'hard look' at environmental

consequences" prior to issuing an EA and a FONSI. Kleppe v. Sierra Club, 427 U.S. 390,

410 n. 21 (1976) (quoting Natural Resources Defense Council, Inc. v. Morton, 458 F.2d

827, 838 (D.C. Cir. 1972)). In conducting its review, the court is to look "closely at whether

the agency has taken a hard look at the question (i.e. the court is not to take a hard look

itself)." 3 Admin. L. & Prac. § 9.26.

An agency satisfies its hard look obligation under NEPA when it has "adequately

considered and disclosed the environmental impact of its actions." Balt. Gas & Elec. Co.

v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 98 (1983)). However, NEPA does "not require

agencies to elevate environmental concerns over other appropriate considerations."

Balt. Gas & Elec. Co., 462 U.S. at 97. Therefore, "[i]f the adverse environmental effects

of the proposed action are adequately identified and evaluated, the agency is not

constrained by NEPA from deciding that other values outweigh the environmental costs."

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

### III. Discussion

Plaintiff raises a series of challenges that the FHWA acted arbitrarily in: (1) assessing the adverse environmental impacts on New Jersey resulting from increased air pollution; (2) assessing the adverse impacts on New Jersey communities, both inside and outside the focused study area, with environmental justice concerns; and (3) failing to adequately mitigate the adverse environmental impacts.  See Pl.'s Mot. at 21–39. Plaintiff also raises concerns regarding the FHWA's findings on the range of alternatives for the CBD tolling, as well as the adequacy of participation afforded to New Jersey governmental entities, officials, and the public throughout the administrative process. Id. at 39–48.  Lastly, Plaintiff claims that the FHWA failed to conduct a transportation conformity analysis for the Project against New Jersey's State Implementation Plan ("SIP") as required under the CAA.[7]  Id. at 48–50.

---

[7] Plaintiff also raised challenges to the final toll structure of the Program which was not set until November 30, 2023.  See Pl.'s Resp. at 9–10, 12–15.  While the parties disputed whether challenges to the final toll structure are properly before the court, see, e.g., Fed. Defs.' Reply at 3–4, that toll structure was changed again significantly in the subsequent Re-Evaluations in June and November 2024.  See generally Supplement to the Record, ECF Nos. 186 & 187.  Given that the court is remanding this matter for the FHWA to address other issues, the court does not reach Plaintiff's challenges to the final toll structure.  Instead, the court will allow the FHWA and Project Sponsors to directly address challenges to the final toll structure in the first instance on remand.

## A. Air Quality

NEPA does not contain specific requirements to define the potentially impacted area of a proposed project. Yet, the CEQ regulations for NEPA do address the issue. These regulations state that "[i]n considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action." 40 C.F.R. § 1501.3(b). Section 1501(b) further specifies:

> In considering the potentially affected environment, agencies should consider, as appropriate to the specific action the affected area (national, regional, or local) . . .. Significance [of the effects] varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

40 C.F.R. § 1501.3(b)(1).

The FHWA began its analysis of air quality issues by defining the relevant geographic region as consisting of 28 counties—12 in New York State (including the five New York City counties), 14 in New Jersey, and 2 in Connecticut. See DOT_0036245; DOT_0036246; DOT_0036818. Because the CBD Tolling Program focused on commuting patterns, the FHWA found that approximately 65 percent of the more than 1.2 million worker commuters into the CBD come from other parts of New York City, 8 percent are from two Long Island counties outside New York City, 7 percent are from New York State counties north of New York City, 18 percent are from New Jersey, and 2 percent are from Connecticut. See DOT_0036250–51. The 28 counties "represent the main catchment area for trips to and from the Manhattan CBD and therefore the area

where [vehicle miles travelled ("VMT")] would change as a result of the [chosen] CBD Tolling Alternative."  See DOT_0036304; DOT_0036827.

For the 28-county area, the FHWA in the Final EA determined that air quality compliance under the CAA is controlled by measurements against the national ambient air quality standards ("NAAQS") list of so-called criteria pollutants.  From that list, the FHWA found the relevant criteria pollutants for its final assessment are carbon monoxide ("CO"), ozone, particles (particulate matter) with a diameter less than or equal to 10 micrometers (referred to as $PM_{10}$), particles with a diameter less than or equal to 2.5 micrometers ("$PM_{2.5}$"), and sulfur dioxide.  See 42 U.S.C. §§ 7407(d)(4), 7407, 7409; 40 C.F.R. § 93.102(b)(1), DOT_0036820–21.  National primary ambient air quality standards are those required to meet public health concerns, while national secondary ambient air quality standards are those required to meet public welfare concerns.  See 42 U.S.C. § 7409(b)(1) & (2).  Areas within a state that do not meet the national primary or secondary standard for a particular pollutant are referred to as non-attainment areas. All but three of the 28 counties are in non-attainment status for ozone.  Many of the counties or parts of them are maintenance areas (previously non-attainment areas) for carbon monoxide, and particulate matter $PM_{2.5}$ and $PM_{10}$.  See 42 U.S.C. § 7407(d)(1)(A); 40 C.F.R. § 93.101; DOT_0006807–12; DOT_0036818; DOT_0036821.

The FHWA also took into account the EPA's list of nine hazardous chemical compounds, generated by vehicles among other sources and referred to as priority mobile source air toxics ("MSAT"), as they are drivers of cancer and other serious health effect risks.   See DOT_0036822.   The FHWA has developed a three-tiered approach

for analyzing MSAT in NEPA-related documents. Tier 3 requires "quantitative analysis to forecast local-specific emission trends of the priority MSAT for each alternative, to use as a basis of comparison." See Updated Interim Guidance on Mobile Source Air Toxic Analysis in NEPA Documents at 6 (Jan. 18, 2023), https://www.fhwa.dot.gov/environment/air_quality/air_toxics/policy_and_guidance/msat/fhwa_nepa_msat_memorandum_2023.pdf. The FHWA determined that the CBD Program was a Tier 3 program affecting a widespread area located proximately to populated areas. DOT_0036823. Finally, the FHWA analyzed the Program's effect on greenhouse gas ("GHG") emissions, recognizing that there are no national standards, criteria, or thresholds in effect for GHGs. The FHWA noted that carbon dioxide is the largest component of GHGs and GHGs are measured in carbon dioxide equivalents. DOT_0036826; DOT_36838–41.

To conduct its air quality mesoscale, MSAT, and GHG analyses, the FHWA utilized the CBD tolling scenario having the lowest toll rates among the seven scenarios.[8] The FHWA reasoned that this scenario would result in the smallest overall regional VMT

---

[8] To identify the "range of potential effects that could occur from implementing the Project," the FHWA evaluated multiple different tolling scenarios for the structure of implementing the "CBD Tolling Alternative." See DOT_0036290 (describing tolling scenarios for environmental review in Final EA); see also discussion infra Section III.D (addressing consideration of alternatives and selection of Alternative T-4, i.e., CBD Tolling Alternative). In brief summary, FHWA considered seven different tolling scenarios, with Tolling Scenario A used as the basis for FHWA's air quality analysis addressed in this section. See DOT_0036290–95 (describing differences, as well as shared similarities, in each of the seven tolling scenarios considered). Plaintiff's challenge to FHWA's decision to rely on Tolling Scenario A in its Air Quality analysis is addressed in greater detail in Section III.A.2 of this Opinion.

decrease compared to the No Action Alternative, and as a consequence, the FHWA would consider the scenario with the lowest beneficial effect on regional air quality. DOT_0036290–92; DOT_0036351; DOT_0036827–28.   Using that tolling scenario, the FHWA calculated for each of the 28 counties their VMT changes for 2023 and 2045. DOT_0036829–30.   Then, "[b]ased on the methodology used to identify the most concentrated areas of change," the FHWA reduced its focus down from 28 to 12 counties. The FHWA explained that:

> As shown in Table 10-3, the 12 counties analyzed include those in New York that are projected to have the largest increase in VMT (Richmond County [Staten Island]) and the largest decrease in VMT (New York County [Manhattan]) as a result of the Project, as well as those counties in New Jersey that are predicted to have the largest increase in VMT (Bergen County) and the largest decrease in VMT (Hudson County) as a result of the Project, in both 2023 and 2045.   VMT in Connecticut is predicted to decrease in both 2023 and 2045 between the No Action Alternative and the CBD Tolling Alternative; as such, Connecticut counties were not included in the mesoscale, MSAT, and GHG analyses.

DOT_0036827–28.

Having established this 12-county study area, the FHWA explained its methodology as follows:

> Air quality mesoscale, MSAT, and GHG analyses were conducted to determine how the Project would affect total mobile source emissions.   Air quality was also analyzed on a local (microscale) level to evaluate potential CO and PM impacts. The mesoscale analysis was conducted to show the differences between the No Action Alternative and the CBD Tolling Alternative, whereas the local analysis demonstrated that the hot-spot requirements are satisfied for Project-level conformity per the CAA as well as for NEPA.

> Analyses were conducted for the estimated time of completion (2023) and future analysis year (2045). It should be noted that the year 2023 No Action Alternative is also representative of existing conditions, as the Project will be implemented in a relatively short time period.

DOT_0036827 (description of "Methodology" from Final EA chapter on Air Quality).

## 1. Insignificant Impacts

Plaintiff's opening argument states that "[a]lthough the Final EA identifies several significant adverse impacts on air quality in New Jersey, it summarily labeled these impacts 'insignificant.'" See Pl.'s Mot. at 22; see also id. at 24 (arguing FHWA "identified severe air quality impacts in Bergen County, but labeled them insignificant, without explaining how it reached that conclusion"). Federal Defendants point out in response, Plaintiff's characterization of the underlying administrative findings is simply incorrect. See Fed. Defs.' Cross-Mot. at 29 n.24 ("It is unclear where the State believes the Final EA refers to the Project's impacts on New Jersey air quality as 'insignificant,' since the State provides no citation for that proposition."). Rather, Federal Defendants highlight that the Final EA and FONSI were predicated on commitments to mitigation that ameliorated potentially significant adverse effects. See id. at 16–20.

The administrative record does not appear to contain any findings that the adverse effects identified by Plaintiff would be "insignificant," but rather shows that the significant adverse effects likely to result from the Program would be reduced by committed mitigation. See, e.g., DOT_0007250 ("the Technical Memorandum identifies a package of mitigation measures to address potential traffic diversions and associated pollutant emissions or health effects resulting from the Project, to avoid creating a

disproportionately high and adverse effect."). Accordingly, the court addresses Plaintiff's challenges to the FHWA and Project Sponsors' findings as to the significance of adverse effects in connection with the issue of mitigation. See infra Section III.C.

Moving past Plaintiff's mischaracterization of the record, Plaintiff proceeds to raise three arguments as to why the air quality analysis in the Final EA and FONSI were arbitrary and capricious. Specifically, Plaintiff maintains that the "FHWA failed to consider the full range of environmental impacts on New Jersey by: (1) cherry-picking which tolling scenarios to analyze; (2) selectively relying on air quality results in only particular portions of the state; and (3) ignoring the EPA's expertise in assessing the need for a more robust air quality analysis." Pl.'s Mot. at 27. The court addresses each argument in turn, and then considers Plaintiff's related arguments regarding the FHWA's consideration of environmental justice communities.

### 2. Tolling Scenarios

After evaluating several preliminary alternatives to reduce traffic congestion, including the No Action Alternative, the FHWA and Project Sponsors found that "only Alternative T-4 (Zone-based pricing through the CBD Tolling Program) would meet the purpose for the Project and the screening criteria tied to the objectives. Consequently, Alternative T-4, the CBD Tolling Program, is the only reasonable build alternative and the only build alternative evaluated in detail in [the Final EA]."[9]  DOT_0036266. To identify the "range of potential effects that could occur from implementing the Project,"

---

[9] The FHWA and Project Sponsors' consideration of program alternatives, and the Plaintiff's related challenges, are discussed in more detail in Section III.D.

the FHWA evaluated multiple different tolling scenarios for the structure of implementing the "CBD Tolling Alternative." See DOT_0036290 (describing tolling scenarios for environmental review in Final EA).[10] Ultimately, the FHWA did not identify a "preferred tolling scenario," but nevertheless found that "the analyses in this EA afford an understanding of how, if warranted, the toll schedule can be structured to avoid adverse effects." DOT_0036299. For purposes of conducting its air quality mesoscale, MSAT, and GHG analyses, the FHWA:

> evaluated the No Action Alternative and the CBD Tolling Alternative (Tolling Scenario A) for the estimated time of completion (2023) and future analysis year (2045). Tolling Scenario A was used for the mesoscale, MSAT, and GHG analyses because it is the tolling scenario that would result in the smallest reduction of VMT compared to the No Action Alternative. Therefore, Tolling Scenario A would have the lowest beneficial effect on regional air quality because changes in regional air quality emissions burden are directly related to changes in VMT.

---

[10] Table 2-3 in the Final EA specifies the seven tolling scenarios considered by the FHWA, including Scenario A—the "Base Plan." See DOT_0036292. "The tolling scenarios vary in their assumptions about other factors, such as the amount of the toll for different types of vehicles, the times tolls would be imposed, exemptions from tolling, crossing credits for tolls paid on other toll tunnels or bridges, and discounts in the form of 'caps' on the number of tolls per 24-hour period to be applied to different types of vehicles. To meet the Project objective of creating a funding source for capital improvements and generating sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program, tolling scenarios that provide crossing credits, discounts, and/or exemptions have a higher toll value than those without these elements." DOT_0036291. The other six tolling scenarios were: (B) Base Plan with Caps and Exemptions; (C) Low Crossing Credits for Vehicles Using Tunnels to Access the CBD, with Some Caps and Exemptions; (D) High Crossing Credits for Vehicles Using Tunnels to Access the CBD; (E) High Crossing Credits for Vehicles Using Tunnels to Access the CBD, with Some Caps and Exemptions; (F) High Crossing Credits for Vehicles Using Manhattan Bridges and Tunnels to Access the CBD, with Some Caps and Exemptions; and (G) Base Plan with same Tolls for All Vehicle Classes. See DOT_0036292.

Court No. 2:23-cv-03885                                                          Page 22

DOT_0036828.

Plaintiff contends that "because the Final EA only analyzed Tolling Scenario A—the Base Plan—when conducting a regional analysis of air quality changes, it ignored the adverse environmental effects on New Jersey." Pl.'s Mot. at 27. While acknowledging the FHWA's rationale, Plaintiff maintains that this rationale is arbitrary and capricious as it "will not result in the smallest reduction of VMT (or, in some instances, any reduction in VMT) on a regional, Statewide, or local scale in New Jersey." Id. (citing DOT_0036353; DOT_0036359). Plaintiff argues, in contrast to Tolling Scenario A, "the other six tolling scenarios all show significantly greater increases in VMT throughout New Jersey." Id. (citing DOT_0036353).

Plaintiff's arguments hinge on a New Jersey-centered approach, and much of Plaintiff's argument is devoted to recharacterizing the entirety of the FHWA's and Project Sponsors' regional analysis in terms of focusing on New Jersey rather than the entire region. See Pl.'s Mot. at 28 (providing chart drawn from data in record focusing solely on VMT estimated impacts in New Jersey counties). Federal Defendants and Defendant-Intervenors[11] argue that Plaintiff's New Jersey-focused approach and criticisms are unpersuasive in the context of the FHWA's rationale for its selection of Tolling Scenario A as the basis for its regional analyses. See Fed. Defs.' Cross-Mot.

---

[11] Defendant-Intervenors raise exhaustion of administrative remedies as to certain of Plaintiff's arguments regarding the air quality analysis, including the scope of the analysis and the reliance on Tolling Scenario A. See Def.-Intervenors' Reply at 13–16. Since Federal Defendants did not raise the exhaustion defense as to these issues, and both sets of Defendants engaged these issues on the merits, the court will address these air quality arguments on the merits.

at 25–27; Fed. Defs.' Reply at 10–11; Def.-Intervenors' Cross-Mot. at 32–33; Def.-Intervenors' Reply at 14–15.    As to the mathematical calculations, Federal Defendants and Defendant-Intervenors emphasize that Plaintiff vastly inflated the adverse VMT increases in New Jersey of choosing any of Tolling Scenarios B through G over Tolling Scenario A.  Fed. Defs.' Cross-Mot. at 26–27; Def.-Intervenors' Cross-Mot. at 32–33.  A review of the record demonstrates no support for Plaintiff's position.  See, e.g., DOT_0036353–54; DOT_0036360–61 (record evidence reflecting a de minimis increase in VMT using Tolling Scenario C over Tolling Scenario A).

Fundamentally, the parties dispute whether a rational basis existed for the FHWA's methodological choice to use Tolling Scenario A.  While Plaintiff may have offered what it perceives as a more rational option to Tolling Scenario A, that alone does not make the FHWA's choice arbitrary.  As noted above, the FHWA explained why it selected Tolling Scenario A, focusing its methodological choice on the significance of tying "its regional air quality analysis to regional changes in VMT, given the link between the two factors." DOT_0036828.  Although localized impacts, perhaps those driving Plaintiff's position, may vary depending on the tolling scenario, the FHWA had a rational basis to use the worse-case scenario for its regional air quality analysis.  That methodological choice lies within the agency's discretion.  In the court's view, the FHWA did not act arbitrarily in the exercise of that discretion, so the court will defer to the FHWA's choice.  See Sierra Club v. Fed. Energy Reg. Comm'n, 867 F.3d 1357, 1367–68 (D.C. Cir. 2017) (emphasizing that courts applying NEPA "should not 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor;" instead, courts only look to confirm that

agency's analysis is "reasonable and adequately explained," noting that the agency's "choice among reasonable analytical methodologies is entitled to deference." (internal citations omitted)).  Accordingly, the court will sustain the FHWA's determination on this issue.

### 3. Geographic Scope

Plaintiff argues that the geographic scope of the Final EA and FONSI were unduly limited, maintaining that the FHWA selectively relied on air quality results in only particular portions of New Jersey.  See Pl.'s Mot. at 26–27.  Referring to the FHWA's decision to conduct its air quality analyses across a 12-county sub-region study area, narrowed down from the broader 28-county regional study area, Plaintiff contends that "the Final EA excluded 12 New Jersey counties from its regional air quality analysis for no good reason."  Id. at 29.  Plaintiff highlights that "[o]f the 28 counties [in the Regional Study Area], 12 were in New York, 14 in New Jersey, and 2 in Connecticut.  However, in analyzing the congestion pricing scheme's air quality impacts, the Final EA evaluated only 12 counties from those 28 counties in the Regional Study Area, and only two in New Jersey—despite the fact that New Jersey had represented half of the 28-county Regional Study Area."  Id. (citing DOT_0036304 & DOT_0036827–28).

Specifically, Plaintiff maintains that "because FHWA's air quality analysis evaluated only two New Jersey counties (Bergen and Hudson), it [was] simply impossible to rule out whether other New Jersey counties [would] experience similar or worse adverse impacts than Bergen County."  Id. at 22–23.  According to Plaintiff, the underlying regional air quality analysis is arbitrary and capricious as it fails to analyze 74 census

tracts (contained in six excluded counties) in New Jersey that will have adverse VMT because of the Project.  Id. at 30.  Plaintiff further argues that several of the excluded New Jersey counties had greater claims to analysis than New York counties like Suffolk, Putnam, and Rockland, which were included in the 12-county subset.  See id. at 29–31; see also 1st Tr. at 201:13–205:25 (Plaintiff's oral presentation on challenge to failure to include more New Jersey counties in 12-county air quality study area).  Lastly, Plaintiff contends that the FHWA failed to explain why there were only two New Jersey counties in the 12-county local study area for air quality but four New Jersey counties in the 10-county local study area for environmental justice.[12]  To the Plaintiff, that discrepancy highlights the arbitrariness of the FHWA's methodology.   See Pl.'s Resp. at 17–18; see also 1st Tr. at 221:19–224:24 (Plaintiff's argument that FHWA made "irrational distinctions" in determining 12-county air quality study area and 10-county environmental justice study area).

Federal Defendants maintain that the reduction from the 28-county Regional Study Area to the 12-county air quality local study area was fully explained and the final determination was neither arbitrary nor capricious.  See Fed. Defs.' Cross-Mot. at 15–17,

---

[12] Plaintiff raises other challenges with respect to the FHWA and Project Sponsors' consideration of environmental justice communities in New Jersey that are addressed in Section III.B.  Additionally, Plaintiff makes arguments challenging the FHWA's microscale "hot spot" analysis of air quality, which analyzed four intersections in New Jersey (out of 102 in the regional study area) to evaluate potential carbon monoxide and particulate matter.   Pl.'s Mot. at 31 (citing DOT_0036828; DOT_0036859; and DOT_0036476).  Plaintiff's arguments as to this analysis connect with its broader contentions that the FHWA and Project Sponsors failed to conduct adequate analysis with respect to Bergen County, and these arguments are addressed in Section III.B.2.

23–24; Fed. Defs.' Reply at 9.  Per Federal Defendants, "[w]hile 'the regional study area for the Project includes 28 counties' which 'represent the main catchment area for trips to and from the Manhattan CBD and therefore the area where VMT would change as a result of the [Project],' to identify 'concentrated areas of change,' FHWA's air quality analysis used a 12-county sub-area, including Hudson and Bergen counties in New Jersey.'"  Fed. Defs.' Cross-Mot. at 15 (citing to DOT_0036827–28).

Federal Defendants further explain that this narrowing to a 12-county study area allowed the agency to "focus on [ ] those segments . . . across the 12-county region <u>where the largest benefits and effects would be expected</u>.'"  <u>Id.</u> at 24 (citing DOT_0036823–24 with emphasis added).  The Government notes that the FHWA reasoned that its various air quality analyses were focused on areas likely to experience the "most concentrated … change."  <u>Id.</u> (citing DOT_0036827 & DOT_0036830).  Federal Defendants maintain that the air quality analysis methodology focusing on counties showing the greatest effects allows for reasonable extrapolation of effects on other New Jersey counties.  <u>Id.</u> (citing <u>Tinicum Twp. v. U.S. Dep't of Transp.</u>, 685 F.3d 288, 296 (3d Cir. 2012) for proposition that "NEPA does not require maximum detail.  Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information.").

Despite this explanation, Plaintiff maintains that the FHWA's methodological choices were arbitrary.  <u>See</u> Pl.'s Resp. at 15.  Plaintiff emphasizes that while the FHWA may have explained why it selected the two New Jersey counties for its 12-county study area, the "FHWA fail[ed] to explain why it also chose to analyze ten New York counties

in its regional analysis." Id. (citing DOT_0036827–28). Plaintiff reasons that "[i]f statewide air quality impacts in New Jersey can be reasonably predicted by analyzing just two counties, the same should hold true for New York." Id. Plaintiff thus concludes that given this distinction in the number of counties included in the 12-county area, the FHWA's methodology for selecting the 12-county air quality analysis study area could not have been "reasonable and adequately explained." Id. (citing Fed. Energy Reg. Comm'n, 867 F.3d at 1368).

Plaintiff's arguments highlighting other New Jersey counties that could have also been included in the 12-county study area fail to demonstrate that the agency's selection of the 12-county study area was arbitrary. Similarly, Plaintiff's emphasis on the number of New York counties included in the study area and its suggestion that more New Jersey counties should have been included also fails to persuade the court that the FHWA's methodological selection of the 12-county air quality study area should be remanded. Rather, it appears that Plaintiff is displeased with the agency's selection of a reasonable study area and would prefer that the agency have adopted an alternative study area more focused on New Jersey. See Pl.'s Mot. at 29–30 (detailing outcomes "if FHWA and the Project Sponsors had included those 12 New Jersey counties" that had been excluded from air quality study area in Final EA). Plaintiff's preference for another methodological choice does not render the agency's selection unreasonable nor arbitrary given the agency's rational explanation for its approach. See DOT_0036827–31 (Final EA Air Quality section detailing basis for 12-county study area for air quality mesoscale, MSAT, and GHG analyses); see also Fed. Energy Reg. Comm'n, 867 F.3d at 1367–68.

The court is also unpersuaded by Plaintiff's conflation of the air quality and environmental justice analyses.  See Pl.'s Resp. at 17–18.  As Federal Defendants explain, there is an approved federal methodology for defining environmental justice populations, which was explained in detail in the Final EA.  See Fed. Defs.' Reply at 9. To evaluate the effects of the Project on those populations, the FHWA decided to analyze a 10-county region "consisting of New York City and the five adjacent counties where the greatest change in traffic volumes and [VMT] are predicted to occur."  See id. (citing DOT_0036958).  Federal Defendants acknowledge that the metrics between the air quality and environmental justice analyses are similar, but point out that their purpose is different.  Namely, the air quality analysis was intended to assess certain regional and local air quality effects.  Id. (citing DOT_0036827).  By contrast, the environmental justice analysis was intended to identify, at the census tract level, where relevant populations might suffer adverse effects from the Project.  Id. (citing DOT_0036955–56).  That difference supports the FHWA's distinct choices because the air quality analysis could support extrapolation to other areas, while the environmental justice analysis could not (given it was based on local detail).  Accordingly, the court sustains the use of the 12-county study area and rejects Plaintiff's challenge to the geographic scope of the air quality analysis in the Final EA.

The FHWA also undertook microscale "hot spot" screening of 102 local road intersections to determine whether detailed microscale modeling for carbon monoxide or either of the particulate matter levels, $PM_{10}$ or $PM_{2.5}$ would be required.  The FHWA chose the intersections, primarily entry point locations near bridges and tunnels directly

connecting to the CBD, based on potential highway diversions from the 10 highway corridors within the 28-county region.  Four of the 102 were in New Jersey, all clustered in Jersey City as entry points for the Holland Tunnel.  DOT_0001143; DOT_0003668–69; DOT_0036476; DOT_0036501–03;  DOT_0036861–63.  All 102 intersections passed the screening for carbon monoxide and particulate matter. DOT_0003672; DOT_0036860; DOT_0036868.

Plaintiff challenges this "hot spot" analysis as arbitrary, arguing that the agency analyzed only four intersections in New Jersey to evaluate potential carbon monoxide and particulate matter.  Pl.'s Mot. at 31.  Plaintiff notes that the FHWA chose the 102 intersections because "they are the locations expected to demonstrate the largest changes in traffic due to the Project."  Id. (quoting DOT_0036859–60 (internal quotation marks omitted)).  Plaintiff, however, maintains that the Final EA focused only on those intersections "in New Jersey where traffic is expected to decrease and air quality to improve if the congestion pricing scheme is implemented."  Id.  Plaintiff urges the court to conclude that the FHWA's geographically-limited air quality analysis, including its microscale "hot spot" analysis, could not fulfill NEPA's "hard look" requirement as it excluded "the portions of New Jersey most likely to be adversely impacted by the congestion pricing scheme."  Id. at 31–32.[13]

---

[13] In footnotes, Plaintiff raises arguments regarding whether the FHWA's "hot spot analysis" violated New York law, as well as asserting that the FHWA's "noise pollution analysis based on the same intersections [as the "hot spot" analysis] is improper, arbitrary, and capricious."  See Pl.'s Mot. at 31–32, nn.34 & 35.  As Federal Defendants correctly point out, arguments raised solely in footnotes are considered waived.  See Fed. (footnote continued)

Court No. 2:23-cv-03885                                                                     Page 30

Federal Defendants maintain that the FHWA "produced a detailed analysis of potential effects on environmental justice communities, including by looking at increased traffic congestion and changes in air quality.  Fed. Defs.' Cross-Mot. at 34 (citing DOT_0036978–81 & DOT_0036981–84).  Federal Defendants highlight that "the Final EA includes a highway segment analysis in Fort Lee, in lieu of the hot-spot analysis applicable to intersections."  Id. (citing DOT_0036984); see also Fed. Defs.' Reply at 11 (explaining how highway link analysis addresses Plaintiff's concerns about limited hot spot analysis).  The Government further explains that "'[t]he local intersections at the New Jersey . . . approach[ ] to the George Washington Bridge and the New Jersey approach to the Lincoln Tunnel were not included because traffic at those intersections connects primarily to regional highways and not local streets.'"  Id. at n.6 (citing DOT_0036475 and DOT_0007927).

In response, Plaintiff raises challenges to the adequacy of the "highway link analysis," contending that this analysis was arbitrarily limited to certain particulate matter and that it was arbitrarily limited to considering impacts from only one tolling scenario.  See Pl.'s Resp. at 21–22.  As Defendant-Intervenors point out, however, Plaintiff failed to raise these arguments during the NEPA process or in its opening brief, and they are therefore forfeited.  See Def-Intervenors' Reply at 16 (citing In re Niaspan Antitrust Litig., 67 F.4th 118, 135 (3d Cir. 2023)).  The court agrees.  Accordingly, the court does not

---

Defs.' Cross-Mot. at 28 n.23 (citing John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d. Cir. 1997) ("arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived")).  Accordingly, the court does not reach any of Plaintiff's arguments raised solely in footnotes.

reach Plaintiff's challenges to the highway link analysis, and rejects Plaintiff's challenge to the adequacy of the "hot spot" analysis.

### 4. EPA Recommendations

The EPA submitted comments on the Program addressing both air quality and environmental justice from March 2022 through March 2023 with respect to various drafts of the EA.  Initially, the EPA noted (1) the lack of an adequate justification by the FHWA for its selected intersections and highway segments for its air quality analysis, and (2) that NAAQS attainment alone may not ensure no localized harm to EJ populations. DOT_0044941; DOT_0044944.  While acknowledging improvements from one draft of the EA to another, the EPA in its next comments again requested a more thorough evaluation of the burdens on EJ communities within the wider 28-county regional study area.  DOT_0041091.  Additionally, the EPA questioned why one of the alternatives considered by the FHWA was found to not be a viable alternative and suggested that the FHWA should consider combinations of alternatives that collectively could achieve the Project's objectives.[14]  DOT_0041092.

In a third set of comments, the EPA again highlights the insufficiency of data around localized and disproportionate air quality impacts, including adverse effects in Bergen County and recommended more expansive microscreening of intersections. DOT_0007920; DOT_0007922.  Additionally, the EPA emphasized that a cumulative impact analysis was needed throughout the entire EA, focusing particularly in the chapter

---

[14] For more on the FHWA's consideration of alternatives, see infra Section III.D.

on Environmental Justice.   DOT_0007922–24.   Ultimately, the EPA acknowledged improvements made by the FHWA made in all the drafts leading to the Final EA, with particular attention paid to Environmental Justice issues, with the addition of the Environmental Justice Technical Memorandum in Appendix 17D and the inclusion of an adaptive management plan.  DOT_0045366.

As to the entirety of that input, Plaintiff argues that the FHWA and Project Sponsors arbitrarily failed to take into account the EPA's feedback and recommendations on "'an insufficiency of data'" regarding the FHWA's environmental analyses "'around localized and disproportionate air quality impacts'" in certain areas in New Jersey.  Pl.'s Mot. at 5 (citing DOT_0045025).  Plaintiff further maintains that the FHWA ignored the EPA's recommendation that a more robust air quality analysis be undertaken before issuing the Final EA and FONSI.  Id. at 32–33.  In particular, Plaintiff contends that "the EPA recommended that FHWA expand its microscale screening analysis to include intersections with an increase in traffic (not just a decrease) and to encompass intersections in Bergen County, where VMT is expected to do just that."  Id. at 32 (citing DOT_0045025; DOT_0045029).

Plaintiff emphasizes that the EPA explicitly explained to the FHWA that "'benefits in some areas do not mean that disproportionate adverse impacts do not occur elsewhere.  All potential adverse impacts should be identified, explained, and analyzed, irrespective of benefits to other areas.'"  Id. (quoting DOT_0045029 with emphasis added).  Ultimately, Plaintiff maintains that the FHWA ignored the EPA's expert advice, turned a blind eye to increases in VMT and attendant air pollution in New Jersey, and

issued its FONSI without addressing the EPA's concerns, thereby rendering the FHWA's air quality analysis in the Final EA and FONSI arbitrary and capricious.  Id. at 32–33 (citing Cal. v. U.S. Dept of Transp., 260 F. Supp. 2d 969, 972–74 (N.D. Cal. 2003); Food & Water Watch v. Fed. Energy Reg. Comm'n, 28 F.4th 277, 289 (D.C. Cir. 2022); and 74 C.F.R. § 650.4(k)(2)(i)).

Federal Defendants disagree, arguing that Plaintiff misrepresents the "FHWA's response to the EPA's comments and overlooks the additional analysis in the Final EA." Fed. Defs.' Cross-Mot. at 28.  They acknowledge that Plaintiff is correct that the EPA recommended that the FHWA "include a more expansive microscale screening analysis" to include Bergen County.  Id. (citing DOT_0007922).  Nevertheless, the Federal Defendants contend that the FHWA undertook additional research to "broaden the analysis," including producing the environmental justice Technical Memorandum incorporating additional highway truck traffic emissions studies.  Id. (citing DOT_0007926).  Furthermore, the Government notes that the Final EA describes the methodology behind the intersection selection and screening analysis, as well as additional efforts to target mitigation measures.  Id. (citing DOT_0007927 & DOT_0007929); see also Def.-Intervenors' Cross-Mot. at 34–36.

As to the EPA's call for additional analysis of localized effects on air quality, the Project Sponsors thoroughly addressed those concerns by "'conduct[ing] an additional assessment of the Project effects on traffic proximate to environmental justice communities and resulting emissions and potential associated health effects,'" and committing to spend $155 million in mitigation for communities with preexisting pollution

and health burdens." Id. at 36 (citing DOT_0036989–96, DOT_0006963–82, & DOT_0007243–440). They also pointed out that the EPA subsequently "acknowledge[d] the improvements [made] throughout the NEPA process," praised the supplemental analysis and mitigation commitment, and most importantly did not request any further analysis. DOT_0045366. Upon review of the record as a whole, the court cannot agree with Plaintiff that the FHWA and Project Sponsors ignored the EPA's expert advice, nor turned a blind eye to impacts in New Jersey.

In response to Plaintiff's argument that the EA acted arbitrarily by analyzing only four intersections in New Jersey in the 102-intersection microscale analysis, Defendant-Intervenors point to the Final EA that explained that the FHWA focused only on those intersections "'deemed to have the greatest potential for increased traffic for certain tolling scenarios based upon an evaluation of diversions using the [Best Practice Model ("BPM")]." Def.-Intervenors' Cross-Mot. at 34 (quoting DOT_0007927; and citing DOT_0036475 & DOT_0004647–74). As to Plaintiff's argument that traffic modeling for the four New Jersey intersections predicted decreases in traffic, Defendant-Intervenors argue that the Final EA highlights that many of the analyzed intersections in New York also were projected to experience traffic decreases. Id. at 34–35 (citing DOT_0006815-24). New Jersey specifically complains that intersections in Bergen County were not analyzed, again ignoring the FHWA's response to the EPA's comment, which explained that "[t]he local intersections at the New Jersey and Manhattan approaches to the George Washington Bridge" (in Bergen County) were not included in the 102-intersection microscale analysis "because traffic at those intersections connects

primarily to regional highways and not local streets." Compare Pl.'s Br. at 32, 36–37, with DOT_0036475 (explaining FHWA's rationale addressing EPA's microscale analysis comment); see also DOT_0007927.  Because diversions would be most evident on the highway west of the George Washington Bridge, the FHWA instead performed a highway link analysis.  According to the Project Sponsors, this analysis showed that even under the tolling scenario predicted to have the greatest impact on traffic diversions in Fort Lee, the Project could result in an increase of $PM_{2.5}$ emissions of less than a tenth of one percent and would not cause exceedances of the NAAQS for particulate matter. Def.-Intervenors' Cross-Mot. at 34–35 (citing DOT_0036859); see also DOT_0036865; DOT_0007927.  Taking the record as a whole, the FHWA provided a rational explanation for its fact finding and determinations reflecting consideration of the EPA's comments. Accordingly, the court rejects Plaintiff's challenges to the Final EA and FONSI predicated on the EPA's comments.

## B. Environmental Justice

With regard to an environmental justice analysis, Executive Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 16, 1994), requires each Federal agency to collect and analyze:

> readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative . . . action.

Id. § 3-302(b), 59 Fed. Reg. at 7,631.

The CEQ publication Environmental Justice: Guidance Under the National Environmental Policy Act (Dec. 10, 1997), available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf (last accessed December 30, 2024) ("Guidance") provides additional context for conducting an environmental justice analysis. The first of its six general principles states that:

> Agencies should consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes.

Guidance at 8–9.

Relatedly, the Guidance reiterates the relevance of the area potentially affected in discussing the EA scoping process. See Guidance at 10–11. It further notes that, in determining "the affected communities," "agencies should identify a geographic scale for which they will obtain demographic information on the potential impact area." Id. at 14. Additionally, the Guidance states that

> [m]inority populations should be identified where either: (a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis.…The selection of the appropriate unit of geographic analysis may be a governing body's jurisdiction, a neighborhood census tract, or other similar unit that is to be chosen so as to not artificially dilute or inflate the minority population.

Id., Appendix A at 25–26.

In defining environmental justice communities, the FHWA began with the same 28-county catchment area described in the Air Quality section above. DOT_0036959. Next, it identified census tracts with minority or low-income populations within the 28-county area. The FHWA then examined those tracts for whether at least 50% of the tract's population identified as minority or whether the percentage identifying as minority was greater than the share of minority population in the county in which the tract was located. See DOT_0001292; DOT_0007250; DOT_0036961. For those tracts with a low-income population, the FHWA compared the percentage of low-income population (defined by the FHWA and Project Sponsors as twice the Federal poverty threshold) in a tract to the percentage of the low-income population throughout the entire 28-county region. DOT_0006974; DOT_0006980; DOT_0007250–51; DOT_0036961.

From that baseline, the FHWA evaluated the local effects on the identified environmental justice populations. To do so, the FHWA reduced the 28-county catchment area down to 10 counties, namely the five New York City counties and the five adjacent counties with the greatest predicted change in traffic volumes and VMT (Bergen, Essex, Hudson, and Union Counties in New Jersey, plus Nassau County on Long Island). The FHWA reasoned that "[t]his local study area is the area where localized effects (such as changes in traffic volumes, air emissions, or noise) would occur as a result of the Project." See DOT_0007250; DOT_0036958–59; DOT_0036962.

As to air quality and chronic disease burden data, the FHWA relied on the EPA's EJScreen tool and the Centers for Disease Control and Prevention's ("CDC") Environmental Justice Index ("EJI"). See DOT_0007249 n.1. The FHWA explained that,

while the EJScreen contained data at multiple levels—the block, block group, and tract level—the CDC and BPM data only drilled down to the larger tract level.  Therefore, the FHWA determined that utilizing the two data streams required staying at the tract level, reasoning that this ensured comparability in those data streams.  See DOT_0007263 n.40.  Based on this decision, the FHWA identified those EJ census tracts in the 10-county sub-region with pre-existing/cumulative pollutant burdens at or above the 80th percentile nationally or existing health/chronic disease burdens above the 66.66th percentile nationally.  Then, the FHWA used a higher cutoff, at or above the 90th percentile, for either burden in combination with proximity to potential increased truck traffic to determine which EJ tracts (56 tracts including one in Orange, one in East Orange, and four in Newark, all in Essex County, and one in Fort Lee in Bergen County) could benefit from mitigation.  In reaching its conclusion, the FHWA noted that the identified EJ tracts with potential truck traffic increases would be the same regardless of whether it used any of the aforementioned cutoff levels.  See DOT_0003674–75 & n.39, DOT_0007318–20; DOT_0007324–25; DOT_0007439–40; DOT_0036993–95 & n.17.  As for non-truck traffic, the FHWA conducted a similar analysis and found that 33 communities could have an increase in that type of traffic; however, all but 11 overlapped with the truck traffic increase communities.  DOT_0036996.

## 1. Data Collection

Plaintiff raises several challenges to the FHWA's EJ findings and conclusions.  The first two focus on (1) the FHWA's refusal to use a New Jersey mapping tool from the New Jersey Department of Environmental Protection ("NJDEP") (the New Jersey

Environmental Justice Mapping, Assessment and Protection Tool ("NJ Mapping Tool")),

and (2) the FHWA's failure to use New Jersey's definition for communities with EJ

concerns.  See Pl.'s Mot. at 35–36; see also 1st Tr. at 231:2–233:14 (Plaintiff's recitation

of these arguments, acknowledging that "[they are] not the basis on which we are saying

the whole thing should be thrown out.").

Plaintiff's mapping tool challenge raises the question of methodological choice.[15]

To identify environmental justice communities, the "FHWA and the Project Sponsors

considered USDOT and FHWA guidance, input from the community during early

outreach, as well as the availability and granularity of data sources 'to ensure that the

approach reflects the local context for the Project and employs an appropriate

methodological approach.'"    Def.-Intervenors'   Cross-Mot.   at   38   (quoting

DOT_0006974–79).  Defendant-Intervenors further explain that the "FHWA and the

Project Sponsors also considered seven potential environmental justice screening tools

to identify environmental justice communities, including EPA's EJSCREEN tool, various

New  York  State  and  City  guidance  and  poverty  metrics,  and  the  New  Jersey

Environmental Justice Screen."  Id. there is NJ's Mapping Tool, according to Plaintiff,

---

[15] Defendants initially argued that Plaintiff failed to raise this issue in its comments on the Draft EA, and therefore this mapping tool issue was waived.  See Fed. Defs.' Cross-Mot. at 32; Def.-Intervenors' Reply at 18.  However, the Government later conceded that the Governor of New Jersey did raise this issue in his letter of June 12, 2023 commenting on the Draft EA, and acknowledged that letter was foundational to the present lawsuit.  See Fed. Defs.' Reply at 13–14 (acknowledging June 12, 2023 letter, but maintaining insufficient notice); 2d Tr. at 135:11–137:11 (confirming agency reviewed June 12, 2023 letter and refused to make changes based on substantive disagreement)).  Accordingly, the court resolves this issue on the merits.

provides more precision in reflecting existing localized environmental and public health stressors by using more granular data from the census block group level rather than the census track data utilized by the FHWA.   See Pl.'s Mot. at 35.   Plaintiff's preferred approach presents another equally supportable alternative that may well yield "a more refined analysis" because it "encompass[es] much smaller areas than census tracts." Pl.'s Resp. at 26.   Nevertheless, that result in and of itself is not a sufficient basis for the court to declare the agency's methodological choice to be arbitrary.   As noted earlier, methodological choice is committed to the agency's discretion, and a court is to defer to that choice so long as it reflects rational decision-making and is adequately explained. See Fed. Energy Reg. Comm'n, 867 F.3d at 1367–68 (emphasizing that courts applying NEPA "should not 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor;" instead, courts only look to confirm that agency's analysis is "reasonable and adequately explained," noting that the agency's "choice among reasonable analytical methodologies is entitled to deference." (internal citations omitted))).

The FHWA relied on U.S. census data pursuant to the CEQ's Guidance manual for identifying environmental justice communities.   See DOT_0006968–69.   Federal Defendants also point out that the FHWA's decision to use census tract data, as opposed to another source with more precise data, has recently been upheld as reasonable by the Third Circuit.   See Fed. Defs.' Reply at 14 (citing Trenton Threatened Skies, Inc. v. F.A.A., 90 F.4th 122, 139 (3d Cir. 2024) ("The FAA's decision to use census tract data, corroborated by the EPA's modeling tool, was reasonable.")).   The FHWA's explanation

appears rational in light of the goal of utilizing consistent and reliable data.  Accordingly, the court will sustain the FHWA's decision not to use the NJ Mapping Tool.

As for the definition of communities with EJ concerns, the dispute between the parties is again one of methodological choice.  In reaching its definition, the "FHWA identified environmental justice populations using U.S. Census Bureau data, applied against the definitions in USDOT Order 5610.C and FHWA Order 6640.23A." Fed. Defs.' Cross-Mot. at 18 n.18 (citing DOT_0036956; DOT_0036961; DOT_0036965 (identifying relevant New Jersey census tracts); DOT_0006971–74 (methodology); DOT_0006974 (describing low-income threshold); DOT_0006979 (noting New Jersey income threshold in accordance)).  To arrive at its definition, the FHWA considered a census tract to be minority "if at least 50% of the population identifies as minority or if the percentage identifying as minority exceeds the share of minority population in the county where the census tract is located." DOT_0036961; DOT_0006969–81.

Plaintiff maintains that its preferred definition was superior as it would include "any census block group in which: (1) at least 35 percent of all households qualify as low-income households; (2) at least 40 percent of residents identify as a racial minority or as members of a State-recognized tribal community; or (3) at least 40 percent of households have limited English proficiency." Pl.'s Mot. at 35.  Plaintiff maintains that its standard "encompasses a broader number of overburdened communities" and "would have identified additional communities with EJ concerns." Pl.'s Resp. at 27 (internal citations omitted).

Resolution of the parties' differing views is similar to that of the mapping tool issue. As noted above, Plaintiff's desired definition may well yield a more precise analysis, but that in and of itself does not provide a basis to declare the agency's methodological choice as arbitrary. Further, the agency's selection among methodologies that may be equally supportable by the record does not make that selection arbitrary so long as it reflects rational decision-making and is adequately explained. Fed. Energy Reg. Comm'n, 867 F.3d at 1367–68.

Here, the court agrees that the FHWA's selection of its initial refence points appears to conform to the standard contained in the CEQ's Guidance. See Fed. Defs.' Cross-Mot. at 33 (citing Guidance & DOT_0036961). The court further agrees that the FHWA's choice also provides for a broader low-income definition by using twice the federal poverty level, which "better account[s] for the higher cost of living in the region." Def.-Intervenors Cross-Mot. at 39 (citing DOT_0006974). Accordingly, the court will sustain the FHWA's definition for communities with environmental justice concerns.

## 2. Bergen County

In arguing that the FHWA and Project Sponsors failed to adequately consider the impact of the Program on environmental justice communities, Plaintiff focuses in particular on Bergen County. See Pl.'s Mot at 36–37 (noting that "several communities with environmental justice concerns in Bergen County already rank above the 95th percentile in air toxics cancer risk, among other public health indicators … [and that under the Program] Bergen County will experience increases in every category of pollutant, including volatile organic compounds, nitrogen oxides, carbon monoxide, and carbon

dioxide equivalents").  Plaintiff highlights that Fort Lee (a borough of Bergen County) "illustrates the problem" as it has "pre-existing pollution and chronic disease burdens at the 90th percentile, including some of the highest levels of $PM_{2.5}$ in all of New Jersey.  Id. at 37 (citing DOT_0007348; DOT_0040855).  Despite the FHWA's findings that environmental justice communities in and around Fort Lee would experience the "highest [annual average daily traffic ("AADT")] in all scenarios," Plaintiff decries the FHWA's failure to expand its hot-spot pollution study to include this area.  Id. (citing DOT_0036859–61 & DOT_0036864).

In response, Federal Defendants maintain that Plaintiff's argument that "the Final EA ignored Bergen County is facially erroneous."  Fed. Defs.' Cross-Mot. at 28.  Rather, Federal Defendants emphasize that a multitude of analyses were performed at or around the George Washington Bridge given that it was one of "those sites that demonstrated the highest AADT and the highest increase in heavy-duty diesel trucks."  Id. (citing DOT_0036864 (noting preparation of highway screening analysis); DOT_0036404; DOT_0036470; and DOT_0036833 (internal quotation marks omitted)).

With respect to Plaintiff's arguments regarding Fort Lee, Federal Defendants point out that "the Final EA includes a highway segment analysis in Fort Lee, in lieu of the hot-spot analysis applicable to intersections."  Fed. Defs.' Cross-Mot. at 34 (citing DOT_0036984).  The record confirms that "[t]o address concerns related to the potential effects on local air quality from those traffic diversions, the Project Sponsors conducted additional, more detailed analyses for four highway segments near environmental justice neighborhoods."  DOT_0036984.  Plaintiff responds by arguing that the FHWA

"inexplicably failed to assess potential traffic impacts on non-highway roads, such as intersections near highway ramps, even though they may also experience traffic increases." Pl.'s Resp. at 30.  However, Plaintiff's arguments reflect a shifting of the goalposts, moving from its criticism that the FHWA and Project Sponsors failed to expand the hot-spot analysis to Fort Lee and morphing into a more general complaint that there was insufficient attention paid to non-highway roads.  Compare Pl.'s Mot. at 36–38, with Pl.'s Resp. at 29–30.

Ultimately, Plaintiff's arguments about the failures of the Final EA and FONSI with respect to Bergen County boil down to a call for more thorough and specified mitigation.  See, e.g., Pl.'s Mot. at 38 ("The Final EA compounded these problems by neglecting to propose any place-based mitigation measures in affected New Jersey communities with environmental justice concerns—even though it did so for similarly situated communities in New York."); Pl.'s Resp. at 6, 32 (criticizing FHWA's commitment of $20 million in mitigation to the Bronx with no specified funding for Bergen County, despite findings that traffic increases would be greater in Bergen County).    Federal Defendants even acknowledge, that based on the findings in the Final EA, "place-based mitigation is available for several locations in New Jersey, depending on the tolling rate and structure that is ultimately adopted by the TBTA."  See Fed. Defs.' Cross-Mot. at 34 (citing DOT_0037016–20; DOT_0007319–20).  Federal Defendants contend that the "specific regional and place-based mitigation measures under consideration" in the Final EA also address Plaintiff's concerns, highlighting that the Final EA identified that "New Jersey

census tracts that may merit mitigation include locations in Orange, East Orange, Newark, and Fort Lee." Id. (citing DOT_0007322–24; DOT_0007327; and DOT_0037030).

Accordingly, while the court does not agree with Plaintiff's arguments that the FHWA and Project Sponsors failed to take a "hard look" at impacts on New Jersey environmental justice communities in the Final EA and FONSI, for the reasons described in Section III.C of this Opinion, the court agrees with Plaintiff that the lack of specificity as to mitigation for some of these communities warrants further explanation, and if appropriate, reconsideration.

### 3. Impacts on Other New Jersey Communities

Plaintiff next argues that "[t]he Final EA also inexplicably failed to address other communities in New Jersey with census tracts in the regional study area with preexisting pollution and chronic disease burdens. These communities include, but are not necessarily limited to, Union City, East Newark, Harrison, Bayonne, Elizabeth, and Perth Amboy." Pl.'s Mot. at 38 (citing DOT_0007359–64). Plaintiff contends that the "FHWA arbitrarily limited its analysis of traffic volume changes in communities with EJ concerns to four New Jersey counties (Bergen, Essex, Hudson, and Union)." Pl.'s Resp. at 28.

Plaintiff takes issue with the FHWA's decision to rely on a small "10-county study area to assess potential traffic volume increases in communities with EJ concerns, which included only four New Jersey counties," instead of the 28-county study area that FHWA used to assess "increased costs (tolls), changes in trip time, and changes in transit conditions." Id. While Defendant-Intervenors argue that this 10-county study area was based off of counties selected because they represented "where the greatest change in

traffic volumes/VMT are predicted to occur," Plaintiff maintains that "nowhere does the EA explain the basis for this conclusion."  Id. (citing Def.-Intervenors' Cross-Mot. at 37). Plaintiff contends that "the record indicates that these four counties do not include those predicted to have the greatest increases in traffic volumes/VMT.  Instead, under Tolling Scenario A, Essex, Hudson, and Union Counties are predicted to experience the greatest decreases in VMT."  Id. at 29 (citing DOT_0036830).  Given all of the above, Plaintiff urges the court to conclude that the "FHWA's analysis of environmental impacts on New Jersey communities with environmental justice concerns was unacceptably 'cursory,' … [and that the FHWA's] failure to take a hard look at these impacts runs afoul of the federal environmental justice commitments and fails to comply with the requirements of NEPA." Pl.'s Mot. at 39.

In response, Federal Defendants contend that Plaintiff is simply incorrect when it claims that the Final EA "failed to address" certain New Jersey communities like Union City.   See Fed. Defs.' Cross-Mot at 34–35 (citing DOT_0036992–96).   Federal Defendants provide further citations to the record demonstrating where the Final EA identified municipalities (including those in New Jersey) with pollutant and chronic disease burdens as well as how those impacts in those communities were considered and designated for potential mitigation.  Id. at 35 (citing DOT_0007250; DOT_0007253; DOT_0007269; DOT_0007282–83; DOT_0007287; DOT_0007320; and DOT_0007326). Given the above, the court agrees with Federal Defendants that Plaintiff's arguments on this issue "are facially refuted by the extensive analysis in the Final EA."  Fed. Defs.' Cross-Mot. at 35.  Accordingly, the court rejects Plaintiff's argument that the FHWA did

not adequately assess impacts on other communities with environmental justice concerns in the regional study area.

## C. Mitigation

Under 40 C.F.R. § 1501.6(c), agencies may issue a FONSI, but in reaching that finding the agency "shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts."  Here, the Final FONSI contains a lengthy description of the commitments undertaken.  See DOT_0000370–91.  To meet those requirements, the Project Sponsors committed to a $155 million package over five years to mitigate any significant adverse air quality and public health effects in environmental justice communities that face pre-existing burdens due to historic transportation and land use planning.  The package contained $55 million for regional measures, including spending: (1) $30 million to reduce the overnight period toll to avoid and minimize overnight truck diversions into the 10-county EJ study area;[16] (2) $20 million to accelerate the replacement of approximately 500 older diesel trucks used in the area with newer electric, hybrid, or clean diesel vehicles; and (3) $5 million to expand NYCDOT's off-hours delivery program, which facilitates deliveries at less congested times.  See DOT_0000383 & DOT_0037018.  The package also included $100 million in localized, place-based mitigation, such as aiding construction of electric truck charging stations, installing roadside vegetation to improve near-road air quality, renovating parks

---

[16] Defendant-Intervenors explained that a reduced overnight toll reduced the incentive to divert from the CBD into alternate routes.  The $30 million is a reduction in anticipated toll revenue.  See 1st Tr. at 156:6–157:12.

and greenspace, and installing air filtration units in schools near highways in those same environmental justice communities.  See id.  In light of these commitments, the Final EA concluded that the proposed Program would not have a significant adverse effect on environmental justice communities.  See DOT_0036211–13.

Plaintiff argues that the FHWA and Project Sponsors failed to consider or specify commitments to mitigation for New Jersey, despite specifying mitigation commitments for similar impacts in New York.  See Pl.'s Mot. at 24–26, 36–38; Pl.'s Resp. at 31–34.  The Government and Defendant-Intervenors respond by pointing to the $155 mitigation package already on the record.  See Fed. Defs.' Reply at 18–19; Def.-Intervenors' Reply at 21–22.

In the court's view, Plaintiff's contentions that the FHWA and Project Sponsors failed to provide specific mitigation commitments for New Jersey areas likely to suffer adverse effects are partially undercut by the regional mitigation commitments outlined in the Final EA and Final FONSI.  However, Plaintiff raises some persuasive arguments that the FHWA appears to have acted in an arbitrary manner when it set specific place-based mitigation funding commitments for the Bronx but failed to do so with respect to New Jersey.  See, e.g., Pl.'s Mot. at 24–26, 36–38; 1st Tr. at 88:19–89:25, 100:5–104:9, 108:17–1116:14 (court's discussion of issue with Plaintiff's counsel); see also 1st Tr. at 146:10–149:22, 159:19–161:25, 164:15–165:17, 183:17–186:24, 187:16–190:22, 191:9–192:6, 192:23–195:13 (court's discussion of issue with counsel for Federal Defendants and Defendant-Intervenors).

Defendant-Intervenors explain that "[b]ecause the 'specific census tracts that would experience increased or decreased traffic change slightly depending on the tolling scenario,' once the final tolling structure is adopted, the Project Sponsors will determine the appropriate sites for place-based mitigation in consultation with an Environmental Justice Community Group to be established, relevant communities, elected officials, and local implementing agencies, to select optimal sites for place-based mitigation." Def.-Intervenors' Cross-Mot. at 42 (quoting DOT_0036994 (internal citation omitted)).  As set forth in the Final EA's Appendix 17D, the mitigation commitment was to be implemented through an "adaptive management approach … which will include monitoring the efficacy of mitigation, stakeholder consultation, and adjustments as warranted."  DOT_0007322.  Federal Defendants also point out that certain New Jersey communities were specifically identified as potential recipients of place-based mitigation.  See Fed. Defs.' Cross-Mot. at 20 (noting that Orange, East Orange, Newark, and Fort Lee, New Jersey were identified as "'communities that could have census tracts that merit place-based mitigation'" (quoting DOT_0037033)).

While Plaintiff decries the lack of specificity as to relief for New Jersey in the mitigation described in the Final EA and FONSI, the FHWA's and Project Sponsors' explanation as to the benefits of flexibility and the capability for ongoing adjustments generally strikes the court as sufficient to satisfy the standard of review.  The court, however, notes that although the flexibility provided by an adaptive management approach provides a reasoned explanation for why specific details as to monetary amounts and program locations may not have been established at the outset, that

rationale does not explain why the FHWA and Project Sponsors determined they were able to set with precision monetary amounts dedicated to relief in New York while providing no minimum amounts for mitigation for potentially impacted areas in New Jersey.  At oral argument, Defendants attempted to provide a basis in the record for the apparent disparate treatment that was afforded the Bronx as compared to areas in New Jersey entitled to mitigation.  Counsel argued that representatives from the Bronx had prepared specific action steps in the EJTAG consultations that justified a discrete amount for mitigation funding while representatives for New Jersey had not.  See, e.g., 1st Tr. at 159:18–161.25, 163:19–165:17; 187:18–188:7, 194:22–195:8 (conversation between court and counsel for Defendant-Intervenors regarding disparate treatment between Bronx and New Jersey as to mitigation); id. at 159:25–165:21 (counsel for Defendant-Intervenors explaining that Bronx representatives identified "specific measures" early in consultation process that justified concrete funding allocations unlike New Jersey); see also id. at 147:2–149:21 (court conversation with counsel for Federal Defendants resulting in counsel acknowledging its answers as to the court's inquiries regarding distinct treatment of Bronx and Bergen County were weak and "hop[ing] to give [the court] a better [response] during rebuttal").

When pressed for where the agency provided an explanation of its approach in the record, Federal Defendants referred the court to Final EA Appendix 17D.  See 1st Tr. at 189:14–190:20 (citing DOT_0007325).  However, that document does not support the explanation that counsel provided at oral argument for this disparate treatment.  See DOT_0007325 (describing high pre-existing burdens in the Bronx, explaining planned

place-based mitigation measures for the Bronx and elsewhere, noting specific project of replacing refrigeration units at Hunts Point but providing no explanation for why discrete mitigation commitments were made for some locations (i.e., the Bronx) but not others (i.e., New Jersey)).  The cited document describes that:

> [C]ertain areas in the Bronx, notably Hunts Point and High Bridge, have many census tracts with high pre-existing burdens.  Though the increase in traffic at some of these locations is more modest (e.g., along the Cross Bronx Expressway), when combined with the pre-existing burdens, it suggests a high priority for place-based mitigation measures.  Other locations, particularly East Harlem, do not have a large number of tracts with pre-existing pollutant or chronic disease burdens, but do have a larger increase in truck traffic and therefore also merit place-based mitigation measures.  Locations with neither high pre-existing burdens, nor large increases in truck traffic, that may experience adverse effects from Project-related diversions will be addressed more broadly through regional mitigation described earlier.

Id.  The document further provides that "[p]lace-based mitigation measures that will provide direct emissions reductions and air quality improvements, and will address some of the pre-existing health burdens that are identified in Table 17D-18."  Id.  This explanation, while relevant for detailing why certain areas in the Bronx merited mitigation, provides no insight as to why areas in New Jersey with similarly high pre-existing burdens did not receive place-based mitigation commitments.  See DOT_0007326–27 (Table 17D-17, identifying tracts with pre-existing pollutant and chronic disease burdens in various counties including Bronx, NY, Essex, NJ, and Bergen, NJ; and Table 17D-18, identifying "Place-Based Mitigation Commitments" with specified funding to the Bronx but no New Jersey counties).  It certainly does not provide a "justification for the difference

for the … approval of the mitigation project in the Bronx as opposed to [New Jersey]." 1st

Tr. at 189:19–191:5 (Federal Defendants maintaining that DOT_0007325 provides

justification for differing mitigation commitments of New Jersey versus Bronx).

Critically, the court is left only with the post-hoc rationalizations of counsel for

Defendant-Intervenors for this apparent disparate treatment. Without more, the court

must conclude that the FHWA and Project Sponsors acted in an arbitrary and capricious

manner in reaching their mitigation determination in the Final EA and FONSI.[17] See

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–69 (1962) ("The courts

may not accept ... counsel's post hoc rationalizations for agency action ... an agency's

discretionary order [must] be upheld, if at all, on the same basis articulated in the order

---

[17] Notably, the court ordered supplementation of the record to include developments subsequent to oral argument to allow the Government to demonstrate that this apparent arbitrary treatment had been resolved, perhaps by application of the adaptive management approach. Indeed, in the June 2024 Re-Evaluation it appears that some specific monetary figures have finally been allocated for mitigation in New Jersey counties. Compare DOT_0037018 (Table of "Regional and Place-Based Mitigation Measures" in Final EA failing to specify any funding amounts for NJ counties, despite allocating $15M for "Replacement of Transport Refrigeration Units (TRUs) at Hunts Point Produce Market" and another $20M to "Establish Asthma Case Management Program and Bronx Center"), with DOT_0045609 (Table of "Place-Based Mitigation Measures Funding Allocation" specifying $1.4M for Fort Lee, $0.9M for City of Orange, $1.8M for East Orange, and $5.7M for Newark, for a total of $9.8M in specified committed funding to NJ counties in June 2024 Re-Evaluation). However, given that Federal Defendants "do not concede that consideration of this supplemental record is appropriate at this time," the court defers to the Federal Defendants' concerns and no part of this Opinion depends on any information contained in that supplemental record. See Supplement to the Record, ECF No. 186 (notice that Federal Defendants "do not concede that the supplemental record is properly before the court"). Instead, the entirety of this Opinion, including the remand for further explanation and potential reconsideration as to the issue of mitigation, is founded on consideration of the record at the time of the issuance of the Final EA and FONSI. The FHWA and Project Sponsors will be permitted to address these post-record developments in the first instance on remand.

by the agency itself."); <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

Ultimately, the court concludes the Final EA and FONSI fail to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the Program, whether those impacts are in New York or New Jersey.  <u>See</u> 40 C.F.R. § 1501.6(c) ("If the agency finds no significant impacts based on mitigation, the mitigated finding of no significant impact <u>shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts</u>." (emphasis added)).  Accordingly, the court will remand this issue for further explanation, and if appropriate, reconsideration of the rationale providing for differing levels of mitigation commitments for the Bronx as compared to potentially significantly affected areas in New Jersey and the ultimate mitigation determination.

### D. Alternatives

NEPA provides that every recommendation or report regarding "major Federal actions significantly affecting the quality of the human environment" must include "a detailed statement" as to "alternatives to the proposed action."   <u>See</u> 42 U.S.C. § 4332(C), (E).  In the context of EAs, the applicable regulations require agencies to "[b]riefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and

alternatives, and include a listing of agencies and persons consulted."   40 C.F.R. § 1501.5(c)(2).   An agency need not consider alternatives that do not advance the purpose of a project or are otherwise infeasible or impractical.  See Concerned Citizens All., Inc. v. Slater, 176 F.3d 686, 706 (3d Cir. 1999) ("where the agency has examined a breadth of alternatives but has excluded from consideration alternatives that would not meet the goals of the project, the agency has satisfied NEPA").  Moreover, "agencies' 'obligation to consider alternatives under an EA is a lesser one than under an EIS,' and they may reject an alternative without detailed discussion if they considered the alternative and provided 'an appropriate explanation as to why [it] was eliminated.'" Leigh v. Raby, No. 3:22-cv-00034-MMD-CLB, 2024 WL 1345297 at *12 (D. Nev. Mar. 28, 2024) (quoting Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005)).

Here, Chapter 2 and Appendix 2 of the Final EA directly address these statutory and regulatory requirements.   See DOT_0036262–301; DOT_0004509–88; see also DOT_0036199–204.  Specifically, the Final EA explains that "in light of the purpose, need, and objectives for this Project, the FHWA and Project Sponsors evaluated the 12 preliminary alternatives described in Table 2-1,[18] which included multiple proposals for congestion management described in Chapter 2.3.  DOT_0036263–64.

---

18 Table 2-1 specifies the 12 alternatives considered by the FHWA, including NA-1—the No Action Alternative.  The other 11 were non-toll pricing (NTP), toll (T), and other (O) alternatives.  They were: (1) NTP-1—Parking pricing strategies, (2) T-1—Pricing on full roadways: Raise tolls or implement variable tolls on existing toll facilities, (3) T-2—Pricing on full roadways: Toll East and Harlem River bridges, (4) T-3—High-occupancy toll (HOT) (footnote continued)

Court No. 2:23-cv-03885                                                    Page 55

The Final EA also states that the FHWA and Project Sponsors relied on three objectives to "screen" these preliminary alternatives and establish a set of "reasonable" alternatives for further consideration.  DOT_0036266 (listing objectives of: (1) "Reduce daily vehicle-miles traveled (VMT) within the Manhattan CBD," (2) "Reduce the number of vehicles entering the Manhattan CBD daily," and (3) "Create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program").  Applying this screening method and relying on a variety of prior studies and documents ultimately resulted in the FHWA finding that "only Alternative T-4 (Zone-based pricing through the CBD Tolling Program) would meet the purpose for the Project and the screening criteria tied to the objectives."  DOT_0036266; DOT_0036268.  The FHWA therefore concluded that "Alternative T-4 (Zone-based pricing through the CBD Tolling Program) is the only reasonable build alternative and the only build alternative evaluated in detail in this EA."  Id.; see also DOT_0036267–68 (Table 2-2 providing "Results of Preliminary Alternatives Screening").

Plaintiff contends that the focus of the FHWA and Project Sponsors on generating revenue—Objective 3—did not justify the rejection of three congestion reduction alternatives.  Pl.'s Mot. at 4.  These rejected alternatives were tolling the East River and Harlem River bridges (Alternative T-2), rationing license plates (Alternative O-4), and

---

lanes, (5) T-4—Zone-based pricing: CBD Tolling Program, (6) O-1—Parking pricing: Reduce government-issued parking permits, (7) O-2—Provide additional taxi stands to reduce cruising, (8) O-3—Create incentives for teleworking, (9) O-4—Ration license plates, (10) O-5—Mandatory carpooling, and (11) O-6—Truck time-of-day restrictions. See DOT_0036265.

mandatory carpooling (Alternative O-5).  Id. at 45 (citing DOT_0036267).  Plaintiff further argues that "[e]ven if [the] FHWA was entitled to deference in defining the purpose and need, its alternative analysis does not rise to the requisite 'hard look' standard and was woefully inadequate and arbitrary and capricious."  Pl.'s Resp. at 42.

The Government and Defendant-Intervenors dispute Plaintiff's suggestion that alternatives were not adequately considered, and instead maintain that the FHWA correctly considered all reasonable alternatives against the three objectives.  They argue that revenue generation was a legitimate objective that reasonably justified the rejection of alternatives that were not economically feasible.  See Fed. Defs.' Cross-Mot. at 36 ("FHWA . . . had no obligation to further consider those alternatives resulting in less revenue because the range of alternatives that must be considered by an agency is 'bounded by some notion of feasibility.'" (relying on Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. 519, 551 (1978) and lower court cases)); Def.-Intervenors' Cross-Mot. at 24–25 (citing 40 C.F.R. §§ 1501.5(c) & 1508.1(z)). Additionally, the Government maintains that "although the State [of New Jersey] raises the specter of legislative limitations on consideration of [other] alternatives, [the] FHWA hardly rubber-stamped the Project Sponsors' purpose and need definition."  Fed. Defs.' Reply at 22 (citing DOT_0039214–19).

Plaintiff also contends that the FHWA was required to (and failed to) provide an independent evaluation of all alternatives under NEPA.  Pl.'s Resp. at 42–43 (relying on Idaho Conservation League v. Lannom, 200 F. Supp. 3d 1077, 1091 (D. Idaho 2016), amended, 2017 WL 242474 (D. Idaho Jan. 18, 2017)).  The court agrees with the

Government and Defendant-Intervenors that <u>Idaho Conservation League</u> expressly notes that the agency need only consider reasonable alternatives.  See <u>Idaho Conservation League</u>, 200 F. Supp. 3d at 1091 ("The [EIS] need not consider an infinite range of alternatives, only reasonable or feasible ones.").  As explained in the Final EA, the FHWA and Project Sponsors considered a wide range of possibilities and used historic findings to inform its decision-making.  <u>See, e.g.</u>, DOT_0036197–205 (Final EA executive summary detailing alternatives considered, as well as project purpose, need and objectives).  Given this, the court cannot agree with Plaintiff that the FHWA failed to consider a reasonable range of alternatives as required under NEPA, undertake an independent "hard look," and provide a "reasoned agency decision."

Plaintiff next argues that the FHWA unreasonably relied on "outdated studies (<u>i.e.</u>, from 2008), and 'concepts' from stakeholders who have an incentive to ensure [that the] MTA meets its revenue goals."  Pl.'s Resp. at 43 (relying on <u>American Rivers & Ala. Rivers All. v. FERC</u>, 895 F.3d 32, 50–51 (D.C. Cir. 2018)).  However, Plaintiff fails to provide little more than conclusory statements that the FHWA and Project Sponsors' use of prior studies and legislative purposes reflected a lack of reasoned decision–making.  Further, as Federal Defendants make clear, courts have upheld an agency's decisions not to consider alternatives that have been rejected in prior studies.  <u>See</u> Fed. Defs.' Reply at 24 n.14 (quoting <u>HonoluluTraffic.com v. Fed. Transit Admin.</u>, 742 F.3d 1222, 1231 (9th Cir. 2014) for proposition that "an agency does not violate NEPA by refusing to discuss alternatives already rejected in prior state studies").  Accordingly, Plaintiff's argument is unpersuasive.

Plaintiff's reliance on <u>American Rivers</u> is misplaced.  The cited portion of the decision did not involve the agency's failure to consider adequately whether the chosen alternative was the correct one.  Rather, the court there raised concerns that the undisputed information in the record indicated that there would be a large number of fish deaths from the project under consideration.  Accordingly, that court concluded that the agency could not reasonably ignore such a potential "significant" impact of the chosen alternative by relying on decades-old studies of varying relevance and reliability.  <u>See Am. Rivers & Ala. Rivers All.</u>, 895 F.3d at 51.  Therefore, in this Court's view, Plaintiff's argument regarding prior studies lacks merit.

Lastly, Plaintiff focuses on a specific alternative, Alternative T-2, providing for tolling of the currently un-tolled East River and Harlem River bridges, arguing that the FHWA should have chosen that alternative in place of Alternative T-4.  Pl.'s Resp. at 43-45.  Plaintiff highlights that Alternative T-2 "was rejected because it would not meet [the] MTA's revenue threshold even though it would have reduced congestion and 'could' generate comparable revenue."  <u>Id.</u> at 43–44.  The explanation in the Final EA provided that:

> For T-2: Earlier studies showed this alternative would reduce congestion and could raise toll revenues equivalent to Project objectives.  However, there is no law or agreement in place between the City of New York and MTA that would direct the revenue to MTA to support the Capital Program.  ***[In addition, the 2008 New York City Traffic Congestion Mitigation Commission Study identified a number of disadvantages to this alternative, including that this alternative would not address trips that start and end within Manhattan, such as trips beginning or ending on the Upper East Side and Upper West Side; and that this alternative would***

> *adversely affect local trips between the South Bronx and Harlem/Washington Heights, which could result in a local adverse economic impact in two environmental justice communities.]*

DOT_0036268 (Table 2-2 n.4).  Plaintiff contends that this conclusion is unsupported by the record and relevant case law, arguing that the mere requirement that additional legislation may be needed is not a sufficient justification to conclude that this alternative is not "reasonable."  See Pl.'s Resp. at 44 (citing Nat. Res. Def. Council v. Morton, 458 F.2d 827, 837 (D.C. Cir. 1972) and Env't Def. Fund, Inc. v. Froehlke, 473 F.2d 346, 351 (8th Cir. 1972)).  Plaintiff further argues that the potential adverse effect of Alternative T-2 on two environmental justice communities is analogous to the adverse effect in the Bronx of the chosen Alternative T-4 and for which the Project Sponsors have already committed mitigation funds.  Id. at 44–45.

Federal Defendants highlight that, in its response to comments, the FHWA during the underlying administrative process directly addressed and refuted similar arguments to those raised by Plaintiff regarding Alternative T-2.  Specifically, the FHWA explained that:

> In Alternative T-2, the tolling of currently free crossings plus the lack of a Manhattan CBD toll would be expected to have additional diversionary effects.  In order to reach revenue needs without tolling all entry points to the CBD, toll rates would have to be even higher than the highest toll rates studied in the EA.  Therefore, Alternative T-2 would cause not only diversions but burden low-income drivers, in comparison to the CBD Tolling Alternative.  Therefore, Alternative T-2 would neither be reasonable nor designed to reduce adverse effects and need not be advanced for further analysis.  Finally, Alternative T-2 is not contemplated by existing law and would require State legislation and/or complex agreements between

the State and City to allow toll revenues to be used for transit improvements.

Fed. Defs.' Reply at 23 (quoting DOT_0007943).

Plaintiff makes a facially appealing argument regarding Alternative T-2 as compared to Alternative T-4.  It does appear that Alternative T-2—tolling the currently un-tolled East River and Harlem River bridges—could meet the revenue projection goal of Objective 3 of the Project in an equivalent amount to that of Alternative T-4.  See DOT_0036267–68 (Table 2-2 & n.4).  In Plaintiff's view, it was arbitrary and capricious for the FHWA to select Alternative T-4 over Alternative T-2 when those alternatives were largely on equal footing.  Pl.'s Resp. at 43–45.  The court disagrees.  In keeping with the forgiving nature of the standard of review, an agency does not act arbitrarily or capriciously when choosing between viable alternatives, so long as the agency's choice is supported by rational decision-making.  See Louisiana Crawfish Producers Ass'n-W. v. Rowan, 463 F.3d 352, 357 (5th Cir. 2006) (quoting Mississippi River Basin All. v. Westphal, 230 F.3d 170, 177 (5th Cir. 2000)); see also Twp. of Belleville v. Fed. Transit. Admin., 30 F. Supp. 2d 782, 798–99 (D.N.J. 1998) ("The concept of alternatives under NEPA, however, 'must be bounded by some notion of feasibility' and 'common sense.' 'NEPA's requirement of a discussion of alternatives ... should be superintended according to a 'rule of reason.'  Stated another way, '[t]he degree to which an existing alternative should be considered, or indeed whether an alternative should be considered at all, varies with existing circumstances.'  The 'rule of reason necessarily governs which alternatives

Court No. 2:23-cv-03885                                                          Page 61

the agency must discuss, and the <u>extent</u> to which it must discuss them.'" (internal citations omitted)).

Further, while the parties do not dispute that Alternative T-2 includes a possible funding source, in the view of the FHWA and Project Sponsors, it presents several problems that make Alternative T-2 less desirable. The Government and Defendant-Intervenors maintain that tolling the un-tolled East River and Harlem River bridges are under the control of the NYC DOT and not the Defendant-Intervenors, and therefore, would require authorizing state legislation and/or an agreement with the City of New York to be a viable source of funding for the Project.

Because the administrative record supports the apparent equivalence on environmental impact of Alternatives T-2 and T-4, the court need not address the question of whether additional statutory authority or an agreement with the City would be required to toll the currently un-tolled East River and Harlem River bridges. In sum, the record does not support Plaintiff's arguments that the FHWA and Project Sponsors failed to consider reasonable alternatives as required under NEPA. The court therefore concludes that the FHWA considered a range of alternatives, found that only one of those alternatives could meet the Project's objectives, and explained its determination. The FHWA's analysis of alternatives here went far beyond the required "brief" discussion for EAs pursuant to 40 C.F.R. § 1501.5(c)(2) and by the standard of review.

Despite this conclusion, the court is not ready to sustain the consideration of alternatives in the Final EA. Given the subsequent developments in the structure of the Program, it appears that the FHWA's and Program Sponsors' reliance on Objective 3

(i.e., the funding objective) has diminished in relative importance in the ultimate decision-making for the Program.  As the court has already directed supplementation of the record to include these subsequent developments,[19] the court shall allow the Project Sponsors and FHWA to directly address this issue in the first instance in the context of the whole record.  See Supplement to the Record, ECF Nos. 186 & 187.  As a remand is already in order on the issue of mitigation, the court will reserve judgment on Plaintiff's challenge on the issue of alternatives.

## E. Participation, Coordination, and Public Comment

NEPA sets out requirements for interactions between the agency considering action and federal, state, and local agencies, as well as the public.  Specifically, NEPA states that a federal entity, before making any detailed NEPA environmental statement, "shall consult with and obtain the comments of any Federal agency which has . . . special expertise."  42 U.S.C. § 4332(C).  Further, copies of any comments and views of any federal, state, or local agencies that are authorized to develop and enforce environmental standards are to be made available to the public as provided by Section 552 of the APA. Id.

The CEQ's NEPA implementing regulations address agency engagement with the public.  For instance, the regulations require an agency, like the FHWA, to involve the public, state and local governments, and relevant agencies to the extent practicable in preparing EAs.  See 40 C.F.R. § 1501.5(e).  Further, for actions not requiring notice in

---

[19] See supra n. 16 (discussing court's approach to the supplement to the record).

the Federal Register, an agency may choose to provide public notice in a variety of formats including publication in local newspapers and other local media, notice to community organizations, publication in newsletters, direct mailing, notice through electronic media, as well as public hearings or meetings.  See id. §1506.6.

Beyond the obligations set forth in the aforementioned regulations, the U.S. DOT has regulations that supplement the FHWA's obligations regarding participation in a NEPA compliance review.  The regulations require the FHWA to provide early notification to and solicit views from "other States . . . that may be significantly affected by the action or by any of the alternatives."   See 23 C.F.R. § 771.111(e).   Further, 23 C.F.R. § 771.119(b) requires that the FHWA, in conducting an EA, must "begin consultation with interested agencies and others to advise them of the scope of the project" to determine its impact.

Plaintiff argues that the FHWA failed to meet the requirements of the various applicable regulations.  It also contends that, in contrast to the FHWA's active consultation with New York's counterparts, the FHWA knew that New Jersey's environmental agency and its health agency did not receive notice of their ability to participate in the EA's development.  See Pl.'s Mot. at 40–41.  As to New Jersey transportation agencies that did receive notice, Plaintiff acknowledges that there was some contact by the FHWA but maintains that contact was minimal at best.  Id. at 40–42.  Similarly, Plaintiff contends that the FHWA failed to provide adequate notice to those New Jersey communities affected by the Project, all of which have minority and low-income populations burdened with pre-existent pollutants and chronic diseases.  See Pl's. Resp. at 35–36.  Lastly, Plaintiff

maintains that the FHWA insufficiently extended the period for the submission of comments on the Draft EA, and then failed to provide adequate responses to any comments.  Pl.'s Mot. at 43; Pl's Resp. at 35–36.

Federal Defendants and Defendant-Intervenors maintain that the FHWA more than met its obligations for involvement and outreach.  <u>See</u> Fed. Defs.' Cross-Mot. at 38-44 (detailing how "FHWA and the Project Sponsors provided an opportunity for public participation at every step in the process," and highlighting specific opportunities for New Jersey agencies and the public to participate); Def.-Intervenors' Cross-Mot. at 16–22 (further explaining the "ample opportunity" provided to New Jersey to participate in NEPA process).  The court agrees.  As to interacting with the public, the FHWA provided extensive opportunities for interaction across the 28-county regional study area. The Final EA, in Chapter 18, sets out in detail the various means of notice and interaction that occurred.  DOT_0037042–065.  It describes the public outreach tools that included the Project website, Project fact sheets in nine languages, social media including Facebook, Twitter, and Instagram, with targeting of low income and minority populations by zip code, as well as online and print advertising in English and non-English outlets. The print advertising specifically included the Bergen Record, the Jersey Journal/NJ.com, the Newark Star-Ledger/NJ.com, Times of Trenton, El Especialito (for Essex, Hudson, and Union Counties), and the Korean Bergen News.  DOT_0037045–46.  As part of this process, the FHWA and Project Sponsors also established two environmental justice working groups to promote more in-depth discussion about environmental justice issues—the EJTAG and the EJSWG.  DOT_0037048.  The FHWA and Project Sponsors

extended invitations to 37 groups to participate in the EJTAG, including the New Jersey Environmental Justice Alliance.  DOT_0036217; DOT_0037037.  EJSWG membership was open to nomination and to individuals who expressed interest.  DOT_0036217. All 27 people nominated or who expressed interest in the EJSWG were invited to join the group.  Id.  The FHWA and Project Sponsors met with the EJTAG seven times and the EJSWG three times between 2021 and early 2023.  DOT_0037048–49.

The Final EA in Chapter 18 also describes the FHWA's early use of webinars in 2021, amounting to 19 in all, as part of its outreach effort to inform and educate the public. Five of the webinars targeted New Jersey audiences, but anyone could join any of them. Four of the 10 general webinars were more than two hours long, while seven environmental justice webinars were at least two hours long.  DOT_0037047.  The webinars also made language interpretation services available.  They were live streamed on YouTube and subsequently posted there for later on-demand viewing.  All meetings included a public comment session and a digital Question & Answer function, which members of the public could use to ask questions and receive responses in real time. The meetings were held at different times of day and over multiple days to maximize participation.  In total, over 1,000 people attended these outreach webinars, and nearly 400 people made oral presentations.  DOT_0037047–48.

The Draft EA was made available for public viewing on the proposed Program's website and at 62 repositories throughout the tri-state region, including 29 of them in New Jersey.  DOT_0037056–61.  The FHWA and Project Sponsors provided for a 30-day public comment period and extended it by 14 days, which ended on September 23, 2022,

during which anyone could submit written comments on the Draft EA.  DOT_0037063.

In late August 2022, the FHWA and Project Sponsors held six virtual public hearings on

the Draft EA.  DOT_0037062.  These virtual hearings were conducted using Zoom, and

later posted on YouTube, with information on how to submit comments via other means

including the website, email, fax, telephone, and U.S. Postal Service during the comment

period.  All the hearings lasted a minimum of four hours.  Over 1700 people attended,

with over 500 offering oral comments.  DOT_0036216–17; DOT_0037062.

Turning to the adequacy of outreach as to New Jersey agencies, the record

demonstrates that the FHWA invited New York State and City environmental agencies to

participate but did not extend invitations to comparable New Jersey entities.  The record

shows that the FHWA, using its statutory and regulatory discretion, limited its invitations

to become a participating agency to only New Jersey transportation-related entities.  See

DOT_0037042–43.  In total, the FHWA and Project Sponsors invited 21 non-federal

agencies from across the tri-state region to participate in the NEPA process; with five of

those agencies having representatives from New Jersey.  The New Jersey entities

included three state transportation agencies—the New Jersey Department of

Transportation ("NJDOT"), New Jersey Transit ("NJ Transit"), and the New Jersey

Turnpike Authority ("NJTA")—and two regional transportation agencies—North Jersey

Transportation Planning Authority ("NJTPA") and the Port Authority of New York and New

Jersey ("PANYNJ").  See DOT_0037043.  The court notes that the New Jersey

Governor's Office and those invited New Jersey entities chose not reach out to other

New Jersey state and local agencies to have those agencies seek participating agency

status with the FHWA.  The court further observes that although the applicable NEPA regulations expressly allowed state and local agencies to request cooperating agency status, as provided by 40 C.F.R. § 1501.8(a), no request was made by New Jersey state or local entities.

As part of their participation in the NEPA process, the New Jersey agencies that were invited had opportunities to provide input on multiple topics, including (1) the scope of the EA, (2) potential effects of the Project, (3) measures to mitigate potential adverse effects, and (4) issues identified by the public.  DOT_0037042.  New Jersey's transportation agencies did attend agency meetings.  For example, in mid-September 2021, NJDOT, NJ Transit, NJTPA, and PANYNJ attended a meeting during which the FHWA and Project Sponsors presented information on the proposed tolling program and the NEPA process.  NJ Transit, NJTPA, and PANYNJ asked questions that were answered.  See DOT_0037044; DOT_0041617–20.  In early August 2022, the same agencies plus NJTA attended another regional agency meeting, where the FHWA and Project Sponsors provided an overview of the Draft EA.  The FHWA and Project Sponsors sought input on the Draft EA before it was issued, but none was offered by any New Jersey agency.  See DOT_0041634–38.

The State of New Jersey submitted a two-page letter from Governor Murphy dated September 8, 2022 and subsequently a seven-page letter dated September 23, 2022, attaching comments from NJDOT, NJT, and NJTA.  DOT_0007768; DOT_0007772–75. Neither NJDEP nor the New Jersey Department of Health submitted any comments.  See Def.-Intervenors' Cross-Mot. at 11.

After the formal close of the comment period, the FHWA and Project Sponsors continued to receive and consider new comments on the Draft EA up until the point of the issuance of the Final EA.  They also held a regional agency meeting in mid-May 2023 to discuss the changes between the Draft and Final EA.  NJDOT, NJ Transit, NJTPA, and PANYNJ attended.  During the meeting, NJ Transit and NJDOT asked questions about next steps but did not raise any substantive concerns or submit any comments.  See DOT_0043818–21.

In sum, the court's review of the record as a whole does not support Plaintiff's position that the FHWA and Project Sponsors acted arbitrarily in their outreach to the public and relevant agencies.  Given the extensive nature of this outreach, the FHWA and Project Sponsors more than met their obligations under the applicable statutory and regulatory schemes.

## F. Clean Air Act

The CAA gives primary responsibility to the States for implementing air quality control within their individual borders.  Under 42 U.S.C. § 7407(d)(1)(A), the governor of each state, using the NAAQS for any pollutant for which air quality criteria have been issued, submits to the EPA a list of all areas within a state that are non-attainment (areas that do not meet the national primary or secondary standard for a particular pollutant), attainment (meeting the standard), or unclassifiable based on available information.  The primary NAAQS are those required to meet public health concerns, while secondary NAAQS are those required to meet public welfare concerns.  See 42 U.S.C. § 7409(b)(1) & (2).  The EPA then designates those areas accordingly, with any modifications that the

EPA might deem necessary.  See id. § 7407(d)(1)(B).  The EPA also can designate as an air quality control region any interstate area necessary for attainment or maintenance. See id. § 7407(c).  As discussed above, the relevant NAAQS criteria pollutants are ozone, carbon monoxide, nitrogen dioxide, particles ("particulate matter") with a diameter less than or equal to 10 micrometers (referred to as $PM_{10}$), and particles with a diameter less than or equal to 2.5 micrometers ($PM_{2.5}$).  See id. § 7407(d)(4)–(6); see also 40 C.F.R. § 93.102(b)(1).  Emissions of certain precursor pollutants are also covered.  See 40 C.F.R. § 93.102(b)(2).

Under 42 U.S.C. § 7410(a), each state is to adopt and submit to the EPA a State Implementation Plan ("SIP") specifying the manner in which the national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region of the state.  Once the EPA approves a SIP, a federal agency (here the FHWA) may not approve a transportation plan, program, or project unless that plan, program, or project was found to in conform with "any applicable" SIP in effect.  See 42 U.S.C. §§ 7410(k), 7506(c)(1) & (2).

Plaintiff contends that, while the FHWA conducted a conformity analysis with regard to the New York SIP, the CAA requires the FHWA to conduct a conformity analysis also as to New Jersey's SIP.  See Pl.'s Mot. at 48–50 (citing to 42 U.S.C. § 7506(c)). Plaintiff further maintains  that the FHWA was on notice of the conformity issue pertaining to New Jersey because in September 2021, NYSDOT sent a letter to the FHWA requesting conformity approval for only the New York portions of four areas, three of which include parts of New Jersey: (1) the New York-Northern New Jersey-Long Island

NY-NJ-CT $PM_{2.5}$ Maintenance Area; (2) the comparable region for Ozone non-attainment; and (3) the comparable area for carbon monoxide maintenance.  Id. at 49 (citing to DOT_0039319).  In Plaintiff's view, the FHWA should have also checked the New Jersey portions but failed to do so.  Id. at 48–50 (citing to DOT_0036867).

Plaintiff, relying on 40 C.F.R. § 93.105(a)(2), also argues that the FHWA was required but failed to provide a reasonable opportunity to consult with New Jersey State and local environmental agencies, including NJDEP, before making its conformity decisions.  Plaintiff contends that the FHWA has in the past required conformity analyses regarding both New York and New Jersey SIPs for similar tri-state projects, pointing to the Cross Harbor Freight Program EIS.  See Pl.'s Mot. at 50 & n.47.

The Government argues that Plaintiff waived its conformity arguments by not raising them during the formal comment period on the Draft EA, which included 20 references to conformity.  See Fed. Defs.' Cross Mot. at 45–46.  The Federal Defendants further maintain that Plaintiff never asked for a conformity analysis regarding the New Jersey SIP, nor did Plaintiff ask the FHWA to consult with New Jersey agencies before making a conformity determination.  Id. [20]

---

[20] Federal Defendants emphasize that, even if Plaintiff's argument is not waived, its reliance on 40 C.F.R.§ 93.150(b) was misplaced.  That section did not obligate the FHWA to examine a specific project like the one here.  That provision only applies to general federal actions.  Transportation projects like this Project do not require analysis of any SIP.  Those types of projects only require hot spot analysis for carbon monoxide, $PM_{2.5}$ and $PM_{10}$, and the FHWA did that hot spot analysis.  See Fed. Defs.' Cross-Mot. at 45-46 & n.36 (citing to 40 C.F.R. § 93.109(b), Table 1 and 40 C.F.R. § 93.116).

As for consultation, Federal Defendants argue that Plaintiff's reliance on 40 C.F.R. § 93.105(a)(2) is misplaced as it applies only to revisions of state SIPs, not to individual (footnote continued)

In reviewing the record, Plaintiff did not explicitly raise its concerns either in its September 27, 2022 submission (DOT_0007772–75) or its June 12, 2023 submission (DOT_0040844–58).    Neither set of New Jersey comments mentions the term "conformity" at all.  The focus of both submissions was on NEPA compliance of the Draft EA, Final EA, and Draft FONSI and cannot be reasonably found to raise arguments as to SIP conformity under the Clean Air Act.  Accordingly, the court concludes that Plaintiff waived its arguments regarding SIP conformity.

## IV. Conclusion

For the reasons set forth above, the court grants in part and denies in part Plaintiff's motion for summary judgment, and grants in part and denies in part Federal Defendants' and Defendant-Intervenors' cross-motions for summary judgment.

Accordingly, it is hereby:

**ORDERED** that Plaintiff's Motion for Summary Judgment is granted in part and denied in part; it is further

**ORDERED** that Federal Defendants' and Defendant-Intervenors' Cross-Motions for Summary Judgment are granted in part and denied in part; it is further

---

projects.  Id. at 46.  Defendant-Intervenors contend that the consultation provision does not apply to the FHWA but rather to metropolitan planning authorities and state departments of transportation.  Defendant-Intervenors also highlight that in April 2023, NJ TPA, the entity responsible for transportation conformity in northern New Jersey, emailed MTA staff asking for information for inclusion in NJ TPA's conformity analysis, and the MTA promptly provided the information.  See Def.-Intervenors' Cross-Mot. at 50 & n.39 (citing DOT_0040570–71).  Given that Plaintiff failed to raise the issue of conformity during the underlying administrative proceeding, the court does not reach the merits of these arguments.

Court No. 2:23-cv-03885                                                    Page 72

     **ORDERED** that this matter is remanded to the FHWA until January 17, 2025 for the FHWA to take actions in conformity with this Opinion; it is further

     **ORDERED** that Plaintiff shall file its comments on the Remand Results on or before January 29, 2025; it is further

     **ORDERED** that Federal Defendants and Defendant-Intervenors shall file their respective response comments on or before February 11, 2025; and it is further

     **ORDERED** that comments submitted by any party shall be no more than 15-pages in length, using 12-point font and 1" margins throughout.

                       /s/ Leo M. Gordon
                       Judge Leo M. Gordon,
                       U.S. Court of International Trade
                       (sitting by designation in the District of New Jersey)

Dated: December 30, 2024
      Newark, New Jersey