# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration,<br><br>Defendants,<br><br>and<br><br>METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,<br><br>Defendant-Intervenors. | Civil Case No. 2:23-cv-03885 |

### PLAINTIFF STATE OF NEW JERSEY'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION BY ORDER TO SHOW CAUSE FOR CLARIFICATION AND/OR RECONSIDERATION AND FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT...................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 5

    I.      Between March 2021 and June 2023, FHWA and the Project Sponsors Prepared the EA and FONSI ............................................................... 6

    II.     On November 30, 2023, the TMRB Announced its Recommended Tolling Scheme.................................................................................... 7

    III.    Between December 2023 and March 2024, the TBTA Reviewed the TMRB Recommendation ...................................................................... 7

    IV.    On June 5, 2024, New York Governor Hochul Paused Congestion Pricing........... 8

    V.     On June 14, 2024, FHWA Published Its Re-Evaluation of the Approved Tolling Scheme ............................................................................ 8

    VI.    In November 2024, Governor Hochul Un-Paused Congestion Pricing and the MTA Approved a Revised Scheme ...................................................... 10

    VII.   On November 21, 2024, FHWA Published Its Re-Evaluation 2............................11

    VIII.  On December 30, 2024, the Court Issued Its Decision........................................ 13

LEGAL STANDARD .................................................................................................. 14

ARGUMENT ............................................................................................................... 16

    I.      New Jersey Seeks Clarification that the District Court's Summary Judgment Decision Vacated the Final EA and FONSI Pending Remand and the Further Proceedings Ordered by the Court ......................................... 16

    II.     New Jersey Has Met the Requirements for a TRO and Preliminary Injunction ................................................................................... 18

          A.    New Jersey Succeeded on the Merits of Its Claims that FWHA Violated NEPA and the APA ...................................................... 19

          B.    New Jersey Will Suffer Irreparable Harm Absent Injunctive Relief ........ 23

          C.    Defendants and Intervenor-Defendants Will Not Suffer Harm from Injunctive Relief and the Public Interest Favors Granting the Motion ................................................................................... 28

CONCLUSION............................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acierno v. New Castle Cnty.*,
40 F.3d 645 (3d Cir. 1994)..................................................................5, 16, 23, 29

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................30

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
480 U.S. 531 (1987)...............................................................................4, 26

*Atl. City Mun. Utils. Auth. v. Reg'l Adm'r*,
803 F.2d 96 (3d Cir. 1986)..........................................................................26

*Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl.
Cnty.*,
893 F. Supp. 301 (D.N.J. 1995) ...................................................................26

*City of Los Angeles v. Nat'l Highway Traffic Safety Admin.*,
912 F.2d 478 (D.C. Cir. 1990), *overruled in part on other grounds*,
*Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996)................................26

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004) ...................................................................25

*Coastal Conservation League v. U.S. Army Corps of Eng'rs*,
2016 WL 6823375 (D.S.C. Nov. 18, 2016) .....................................................30

*Com. of Pa., Dep't of Env't Res. v. E.P.A.*,
618 F.2d 991 (3d Cir. 1980)..........................................................................29

*Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*,
774 F.3d 173 (3d Cir. 2014).................................................................3, 14, 16, 17

*Council Tree Commc'ns, Inc. v. F.C.C.*,
619 F.3d 235 (3d Cir. 2010).................................................................3, 15, 17

*Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*,
100 F.4th 1349 (11th Cir. 2024) .................................................................27

*Davis v. Mineta*,
302 F.3d 1104 (10th Cir. 2002) .................................................................16

*Deluhery v. Unifiednames, Inc.*,
2007 WL 9789620 (D.N.J. Sept. 14, 2007) .....................................................19

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022) ........................................................................17, 24

*Fed'n of State Massage Therapy Bds. v. Acad. of Oriental Therapy, LLC*,
   2013 WL 5888094 (D.N.J. Oct. 28, 2013)..................................................................15

*Fund For Animals v. Norton*,
   281 F. Supp. 2d 209 (D.D.C. 2003) .....................................................................16, 28

*Garcia v. Corr. Med. Serv., Inc.*,
   2018 WL 1317867 (D.N.J. Mar. 14, 2018)................................................................15

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
   263 F. Supp. 2d 796 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005)................................26

*ITServe All., Inc. v. Scalia*,
   2020 WL 7074391 (D.N.J. Dec. 3, 2020) ...................................................................28

*Jurista v. Amerinox Processing, Inc.*,
   492 B.R. 707 (D.N.J. 2013) ..............................................................................15

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004)..........................................................................16, 29

*Los Padres Forestwatch v. U.S. Forest Serv.*,
   776 F. Supp. 2d 1042 (N.D. Cal. 2011) ....................................................................28

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
   121 F.4th 902 (D.C. Cir. 2024)...........................................................................17

*Minard Run Oil Co. v. U.S. Forest Serv.*,
   670 F.3d 236 (3d Cir. 2011), *as amended* (Mar. 7, 2012) ..........................................16, 28, 29

*Morris v. Slater*,
   1998 WL 959658 (N.D. Tex. Jan. 15, 1998) ...............................................................30

*N.Y. v. Nuclear Regul. Comm'n*,
   681 F.3d 471 (D.C. Cir. 2012)........................................................................19, 23

*Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*,
   2 F.3d 493 (3d Cir. 1993)...............................................................................26

*Nat'l Res. Def. Council v. U.S. E.P.A.*,
   437 F. Supp. 2d 1137 (C.D. Cal. 2006), *aff'd sub nom. Nat. Res. Def. Council
   v. U.S. E.P.A.*, 542 F.3d 1235 (9th Cir. 2008) ...........................................................25

*New York v. Shinnecock Indian Nation*,
   280 F. Supp. 2d 1 (E.D.N.Y. 2003) ...................................................................25, 30

*In re Niaspan Antitrust Litig.*,
    67 F.4th 118 (3d Cir. 2023) ...................................................................18

*Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*,
    509 F.3d 562 (D.C. Cir. 2007) ...............................................................27

*Pioneer Aggregates, Inc. v. Pa. Dep't of Env't Prot.*,
    2012 WL 4364073 (M.D. Pa. Sept. 21, 2012),
    *aff'd*, 540 F. App'x 118 (3d Cir. 2013) ..................................................25

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Rice*,
    774 F. Supp. 317 (D.N.J. 1991) .............................................................29

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017)...................15, 19, 23, 28

*In re Revel AC, Inc.*,
    802 F.3d 558 (3d Cir. 2015)....................................................................19

*N.M. ex rel. Richardson v. Bureau of Land Mgm't*,
    565 F.3d 683 (10th Cir. 2009) .........................................................22, 23

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
    826 F.3d 1030 (8th Cir. 2016) ...............................................................27

*Selvaggi v. Borough of Point Pleasant Beach*,
    2022 WL 1664623 (D.N.J. May 25, 2022) .............................................19

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989)...................................................................28

*Sierra Forest Legacy v. Sherman*,
    646 F.3d 1161 (9th Cir. 2011) ...............................................................25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) .............................................................17

*Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*,
    243 F.3d 270 (6th Cir. 2001) .................................................................16

*Tinicum Twp., Pa. v. U.S. Dep't of Transp.*,
    685 F.3d 288 (3d Cir. 2012)...................................................................27

*United States v. Fiorelli*,
    337 F.3d 282 (3d Cir. 2003)...................................................................15

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019).......................................................14, 16

**Statutes**

5 U.S.C. § 706(2) ...................................................................................................3, 14, 19

**Other Authorities**

23 C.F.R. § 771. .................................................................................................................6

23 U.S.C. § 771.105(e) .....................................................................................................24

40 C.F.R. § 1501.6(c).................................................................................................24, 27

Fed. R. Civ. P. 60 ..............................................................................................................15

Fed. R. Civ. P. 59 ..............................................................................................................15

L. Civ. R. 7.1(i) .................................................................................................................15

## PRELIMINARY STATEMENT

This case concerns the Federal Highway Administration's ("FHWA") failure to comply with the National Environmental Policy Act ("NEPA") in evaluating a first-of-its-kind congestion pricing scheme, which is set to launch in five days starting January 5. Plaintiff State of New Jersey ("New Jersey") submits this application for clarification and/or reconsideration of this Court's order granting summary judgment in part, and for a temporary restraining order ("TRO") and preliminary injunction pending resolution of that clarification/reconsideration application and pending completion of all proceedings relating to the remand ordered by the Court to address the FHWA's "fail[ure] to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the Program," ECF No. 191 at 53, and relating to other issues raised by Plaintiff and not yet resolved by the Court.

On December 30, 2024, this Court issued its summary judgment decision, granting New Jersey summary judgment in part, and ruling that the "FHWA and Project Sponsors acted in an arbitrary and capricious manner in reaching their mitigation determination in the Final EA and FONSI." *Id.* at 52. The Court ruled—in no uncertain terms—that there are "areas in New Jersey entitled to mitigation." *Id.* at 50. Yet the Final EA and FONSI "provide[] no insight as to why areas in New Jersey with similarly high pre-existing burdens [as the Bronx] did not receive place-based mitigation commitments" and do not provide a justification for the "apparent disparate treatment" that was afforded to the Bronx as compared to New Jersey. *Id.* at 50–53. The Court therefore correctly remanded this matter to the FHWA on the most critically important issue there could be in this Final EA and FONSI—the adequacy of the mitigation measures provided for adversely affected communities. Only if those communities' significant adverse impacts are

1

adequately addressed through identified mitigation measures funded in the plan can an unprecedented project such as this one proceed without first conducting a full environmental impact statement ("EIS"). But the Court did not explicitly address what effect its remand has on the Project Sponsors' intended launch of congestion pricing on January 5.

New Jersey respectfully requests that the Court clarify that its remand also necessarily vacated the Final EA and FONSI pending these further proceedings. In the absence of an express vacatur order or injunction, the Metropolitan Transportation Authority ("MTA") has publicly announced that it intends to implement its congestion pricing scheme beginning five days from now on January 5, with different tolls phased in over time, disparate traffic effects, and unknown site-specific environmental impacts that were *never evaluated* by the FHWA.[1] In other words, despite the obvious import of this remand for further review on such a serious deficiency as mitigation, the MTA intends to alter the *status quo* and try to make congestion pricing a *fait accompli* starting January 5. To permit the MTA to move forward with this nation's first-of-its-kind congestion pricing scheme before the FHWA has even begun, let alone completed, the additional review that this Court has ordered would be fundamentally inconsistent with controlling Third Circuit law and the import of this Court's decision, which necessarily requires vacating the underlying approvals in the Final EA and FONSI on remand. In short, the FHWA and MTA would have this Court ignore the "hard look" that NEPA requires and, instead, endorse the "approve-now, assess-later" approach that NEPA prohibits, leaving New Jersey and some of its most vulnerable communities subject to significant environmental impacts without sufficient commitment of

---

[1] *See, e.g.*, Andrew Siff, *Congestion Pricing Set to Start as Planned Sunday After Ruling in Final Lawsuit: MTA*, NBC NEW YORK (Dec. 30, 2024), https://www.nbcnewyork.com/news/local/congestion-pricing-set-to-start-as-planned-sunday-after-ruling-in-final-lawsuit-mta/6089493/.

specific, enforceable mitigation measures—or even a completed, proper, and legal environmental review—as required under NEPA.

Remand without vacatur is an extraordinarily rare remedy that is not warranted here.  *See Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014) ("Ordinarily, reviewing courts have applied [Section 706(2) of the Administrative Procedure Act] by vacating invalid agency action and remanding the matter to the agency for further review."). Indeed, Section 706(2) of the Administrative Procedure Act ("APA") provides that a reviewing court "shall . . . hold unlawful *and* set aside" any agency action that violates the APA.  5 U.S.C. § 706(2) (emphasis added).   The Third Circuit has also stated that vacatur is "particularly appropriate" where, as here, the Court would otherwise leave in place an agency action "that is causing the very adverse effect that [the agency] is charged with preventing, and [thus] would be 'legally sanction[ing] an agency's disregard of its statutory or regulatory mandate.'"  *Comite' De Apoyo*, 774 F.3d at 191 (reversing district court and ordering remand with vacatur) (final alteration in original) (citation omitted).   Thus, vacatur is required under the APA where, as here, the "deficiencies in the challenged [agency action are] serious" *and* vacatur is not "likely to create any serious disruption."  *Council Tree Commc'ns, Inc. v. F.C.C.*, 619 F.3d 235, 258 (3d Cir. 2010). Nothing could be more "serious" in this case than the absence of sufficient specific mitigation measures for adversely affected New Jersey communities.  And there will be no "disruption" from maintaining the *status quo*, which is no congestion pricing, pending the remand proceedings.  That much is evident from the fact that the New York Governor and the MTA delayed implementation of congestion pricing for many months earlier this year when it suited their purposes, then abruptly changed gears, requiring this Court to resolve the parties' dispute on a truncated schedule.  In light of these baseline principles, New Jersey respectfully requests that this Court clarify that its decision

had the effect of vacating the Final EA and FONSI, as controlling Third Circuit law requires it to do.

In addition to its request for clarification/reconsideration, New Jersey now seeks a TRO and preliminary injunction, pending both the resolution of its clarification/reconsideration request *and* pending the further proceedings ordered by the Court in this matter. New Jersey's application readily satisfies the criteria for emergency injunctive relief. To begin with, New Jersey far surpasses a reasonable probability of success on its NEPA claim. Indeed, it has already succeeded on the merits of that claim. The Court held that the FHWA's failure to provide a "rational" explanation of "mitigation commitments" and the "disparate treatment" between New York and New Jersey is "arbitrary and capricious." ECF No. 191 at 50–53. Furthermore, New Jersey is likely to succeed on additional arguments on which the Court reserved judgment, including the FHWA's alternatives analysis, the failure to evaluate the tolling scheme that was actually adopted, and New Jersey's clarification/reconsideration application.

The irreparable harm that New Jersey will suffer once the MTA flips the switch on congestion pricing is manifest. Beginning on Day One, New Jersey will experience vehicle traffic increases and poorer air quality. That "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987). Because that "injury is sufficiently likely," the balance of harms "favor[s] the issuance of an injunction to protect the environment." *Id.* On the other hand, the FHWA and the MTA stand to lose nothing if the Court grants New Jersey's application and delays the congestion pricing scheme for a relatively brief period until it can determine whether the FHWA violated NEPA. The FHWA, in particular, will suffer no prejudice whatsoever from any delay in implementation. And while the MTA may

experience a *de minimis* delay in tolling revenue, the emergency relief now requested for a limited period would not meaningfully impact the MTA's total projected revenue, which spans almost a decade into the future under the revised tolling scheme and was delayed by New York's Governor for the past six months. Furthermore, injunctive relief is necessary to "maintain[] … the *status quo* until a decision on the merits of a case is rendered," which is a "primary purpose of a preliminary injunction." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). The balance of equities thus tips decidedly in favor of New Jersey. Finally, the public interest in protecting human health and the environment from significantly increased traffic congestion in New Jersey favors injunctive relief.

NEPA requires an agency to take a "hard look" at the environmental impacts of an action before making decisions. This Court should not allow the recently-amended and never-before-studied congestion pricing scheme to go into effect before the FHWA fully complies with the Court's directives for the remand. For these reasons, New Jersey respectfully asks this Court to clarify that its December 30, 2024 decision vacates the Final EA and FONSI for the duration of the additional proceedings required by the Court, and issue the TRO and preliminary injunction sought in this application by Order to Show Cause. Moreover, because this congestion pricing scheme will begin in just five days, this Court should immediately enter a TRO until it can hold a hearing on the relief requested here.

## **FACTUAL BACKGROUND**

New Jersey incorporates by reference the factual allegations set forth in the Complaint. *See* ECF No. 139.

### I.  Between March 2021 and June 2023, FHWA and the Project Sponsors Prepared the EA and FONSI

In March 2021, FHWA authorized the Project Sponsors (the Triborough Bridge and Tunnel Authority ("TBTA"), New York State Department of Transportation, and New York City Department of Transportation) to proceed with an EA under 23 C.F.R. § 771. DOT_0036154. On August 10, 2022, FHWA and the Project Sponsors published the Draft EA. *See* ECF No. 136 at 15. The Draft EA assessed seven different tolling scenarios. DOT_0036203. The seven scenarios varied, for instance, with respect to who would be entitled to an exemption or under what circumstances, which river crossings would receive a credit for paying relevant tolls, and what days and times tolling would occur. The Draft EA reflected FHWA's determination that an EIS was not required for the congestion pricing scheme—in other words, that any significant environmental impacts caused by congestion pricing would be effectively mitigated.

In early May 2023, FHWA and the Project Sponsors published the Final EA. *See* ECF No. 136 at 16–18. In conjunction with the Final EA, FHWA published a Draft FONSI which stated that it had "independently evaluated [the Final EA] and determined [it] to adequately and accurately discuss the purpose and need, environmental issues, and impact of the proposed project and appropriate mitigation measures." DOT_0040590; *see also* ECF No. 139 at 37–40. FHWA thus concluded that the Final EA "provide[d] sufficient evidence and analysis" to determine that an EIS was "not required." DOT_0040590. Critically, the Final EA and Draft FONSI failed to commit any mitigation measures to ameliorate identified site-specific impacts in New Jersey, even though FHWA determined the congestion pricing scheme would cause significant traffic diversions to parts of New Jersey. *See* ECF No. 136 at 17. Like the Draft EA, the Final EA and Draft FONSI were predicated on FHWA's evaluation of *seven* different tolling scenarios. *See, e.g.,*

6

DOT_0036291–95.  Just a few weeks later, FHWA approved the Final FONSI without notable changes.  *See* ECF No. 139 at 40–41.

## II.    On November 30, 2023, the TMRB Announced its Recommended Tolling Scheme

On November 30, 2023, after the "*final*" environmental impact analysis and findings were certified by FHWA, the Traffic Mobility Review Board ("TMRB")—the entity appointed by the MTA to create the tolling scheme—issued its final recommendation for the tolling scheme.[2]  The TMRB's recommendation differed in critical respects from the seven tolling scenarios analyzed in the Final EA.  Most importantly, the TMRB recommended a base toll of $15 for passenger type vehicles—a scenario that was never analyzed in the Final EA.

## III.    Between December 2023 and March 2024, the TBTA Reviewed the TMRB Recommendation

On December 6, 2023, the TBTA voted to start the public review process of the tolling scheme, which largely mirrored the TMRB's recommendation.[3]  On December 27, 2023, the TBTA published its proposed rulemaking announcement, in which it underscored that "generat[ing] revenue" remained a primary purpose of the congestion pricing scheme.  N.Y. State Register, Vol. XLV, Issue 52, Dec. 27, 2023, at 48.  On March 27, 2024, less than four months after the TMRB released its recommendation, the TBTA voted to approve the tolling scheme recommended by the TMRB, with only one dissenting vote.[4]  Soon after the TBTA vote, FHWA and the Project Sponsors initiated a "reevaluation" of the approved tolling scheme under NEPA.

---

[2]    TMRB, Congestion Pricing in New York (Nov. 2023), https://new.mta.info/document/127761.

[3] MTA, *MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule* (Dec. 6, 2023), https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate#:~:text=Updated%20Dec%206%2C%202023%204,New%20York's%20congestion%20pricing%20program.

[4] *Id.*

**IV.    On June 5, 2024, New York Governor Hochul Paused Congestion Pricing**

On June 5, 2024, New York Governor Hochul announced that she had "directed the MTA to indefinitely pause" the congestion pricing scheme.[5]  She stated that "implementing the planned congestion pricing system risks *too many unintended consequences*," but "committed to advancing all the improvements that New Yorkers have been promised" as part of the MTA's 2020-24 Capital Program.[6]  As part of that commitment, Governor Hochul provided significant additional funding to the MTA, including pledging $54 million in state resources to support a subway expansion project that would have been funded through the MTA's Capital Program.[7]  Governor Hochul also promised that New York would "make up the difference" in revenue if a modified tolling scheme, with a lower tolling rate, was adopted in the future (as ended up happening).[8]

**V.    On June 14, 2024, FHWA Published Its Re-Evaluation of the Approved Tolling Scheme**

Notwithstanding Governor Hochul's "pause," on June 14, 2024, FHWA issued a Re-Evaluation of that tolling scheme, finding that the Final EA and FONSI remained valid, and thus no further environmental review was warranted.  DOT_0045625–26; DOT_0045430–624.  No official notice was provided of the Project Sponsors' request for further reevaluation, and the FHWA afforded no party other than the Project Sponsors the opportunity to be heard on that request.  Unlike the Final EA, and in an admission of the fatal flaws in FHWA's "*final*" finding of

---

[5] Governor Kathy Hochul, *Video, Audio & Rush Transcript: Governor Hochul Addresses New Yorkers on Affordability and the Cost of Living* (June 5, 2024), https://www.governor.ny.gov/news/video-audio-rush-transcript-governor-hochul-addresses-new-yorkers-affordability-and-cost.

[6] *Id.* (emphasis added).

[7] Governor Kathy Hochul, *Governor Hochul Announces $54 Million in State Funding to Support the Second Avenue Subway Project* (July 30, 2024), https://www.governor.ny.gov/news/governor-hochul-announces-54-million-state-funding-support-second-avenue-subway-project.

[8] Governor Kathy Hochul, *Audio & Rush Transcript: Governor Hochul is a Guest on WNYC's All Things Considered* (Sept. 3, 2024), https://www.governor.ny.gov/news/audio-rush-transcript-governor-hochul-guest-wnycs-all-things-considered.

"*no significant impact*," the Re-Evaluation selected specific communities that would receive place-based mitigation.  Importantly, the amount of funding allocated to each of these communities was constrained by the $100 million cap on place-based mitigation set forth in the Final EA, which was the basis for FHWA's mitigated FONSI.  In other words, FHWA and the Project Sponsors worked backwards from a cap on mitigation funding, rather than deciding which communities merited place-based mitigation due to the congestion pricing scheme's significant environmental impacts, and then allocating the amount of funding necessary to avoid those impacts.  This approach resulted in *de minimis* mitigation funding for New Jersey compared to New York.

The Re-Evaluation allocated just $9.8 million in mitigation funding to New Jersey, limited to four communities (Fort Lee, City of Orange, East Orange, and Newark).  DOT_0045609.  By contrast, the Re-Evaluation allocated $90.1 million to New York, including $71.7 million to Bronx County *alone*, notwithstanding that daily traffic increases in Bergen County would be over *two times greater* than in the Bronx.  *See id.*; DOT_0045462.  In fact, Fort Lee—the only community in Bergen County to be allocated mitigation funding—received just $1.4 million, meaning Bronx County received over *seventy-one times* the amount of mitigation funding as Bergen County.

The Re-Evaluation also assessed whether the adopted tolling scheme would meet the three project objectives, one of which was to "generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program."  DOT_0045449.  The Re-Evaluation determined that the adopted tolling structure would generate only $0.9 billion per year, $100 million less than the $1 billion annual threshold evaluated in the Final EA.  *See id.*  Nevertheless, FHWA determined that the adopted tolling scheme met the revenue objective because, after the Final EA was published, the MTA's Chief Financial Officer "determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects

for the MTA Capital Program." *Id.* In doing so, FHWA transformed the revenue objective into a moving target, despite having superficially rejected all alternatives other than congestion pricing because they did not meet the revenue objective.

## VI.   In November 2024, Governor Hochul Un-Paused Congestion Pricing and the MTA Approved a Revised Scheme

On November 14, 2024, Governor Hochul lifted the pause on congestion pricing and announced a new proposed tolling scheme that would take effect by "early January."[9] That scheme differed in important ways from the $15 tolling rate previously approved by FHWA and the MTA. Most importantly, the revised scheme included an initial peak tolling rate for passenger vehicles that was 40% lower ($9); other tolls and credits were similarly reduced by 40% as compared to those approved by the TBTA in March 2024.[10] New York State officials recognized that the revised tolling scheme would not generate the same amount of revenue as the previously-adopted scheme, but said New York would "give the M.T.A. . . . a $15 billion credit card" with the recognition that a lower toll "may mean that it takes longer to pay it all back."[11]

Just four days later, on November 18, 2024, the MTA approved the revised congestion pricing scheme and announced that it would launch on January 5, 2025.[12] The revised scheme imposes a phased tolling rate, beginning with a $9 peak toll for passenger vehicles in 2025 ("Phase

---

[9] Governor Kathy Hochul, *Putting Commuters First, Keeping Costs Down: Governor Hochul Unveils Plans for Future of Transit and Traffic in New York City, Including a 40 Percent Reduction in Congestion Pricing Tolls* (Nov. 14, 2024), https://www.governor.ny.gov/news/putting-commuters-first-keeping-costs-down-governor-hochul-unveils-plans-future-transit-and.

[10] *Id.*

[11] Ana Ley and Winnie Hu, *Hochul Brings Back Congestion Pricing Plan After Months of Suspense* (Nov. 14, 2024), https://www.nytimes.com/2024/11/14/nyregion/congestion-pricing-nyc-hochul.html#:~:text=The%20retooled%20congestion%20pricing%20plan,previously%20approved%20rate%20of%20%2415.

[12] MTA, *MTA Board Approves Phasing In the Congestion Relief Zone Toll* (last updated Nov. 18, 2024 3:30 PM ET), https://new.mta.info/press-release/mta-board-approves-phasing-congestion-relief-zone-toll#:~:text=The%20Metropolitan%20Transportation%20Authority%20(MTA,2025%2C%202026%2C%20and%202027.

1"), which will increase to $12 in 2028 ("Phase 2") and to $15 in 2031 ("Phase 3")—a scenario never analyzed in the Final EA.  DOT_0047551–52.[13]

## VII.    On November 21, 2024, FHWA Published Its Re-Evaluation 2

On November 8, 2024—six days before Governor Hochul lifted the pause on congestion pricing and announced the phased tolling structure—the Project Sponsors requested that FHWA "proceed with assessing the effects of a phased-in tolling structure to complete the on-going re-evaluation of FHWA's May 5, 2023, Final [EA]."  ECF No. 174 at 1–2.  Less than two weeks later, on November 21, FHWA published its "Re-Evaluation 2."  *See id.*; DOT_0047541–57.  That same day, FHWA and the Project Sponsors signed the VPPP agreement.  *See* DOT_0047522–25.  With the agreement executed, congestion pricing is primed to begin on January 5, 2024.  Again, no official notice was provided—to the Court, to New Jersey, or the general public—of the Project Sponsors' request for further reevaluation, and the FHWA afforded no party other than the Project Sponsors the opportunity to be heard on that request.

Based on the ten-page Re-Evaluation 2, FHWA determined that "no additional environmental analysis is warranted" since "[t]he conclusions in the Final Environmental Assessment and Finding of No Significant Impact remains [sic] valid."  DOT_0047520–21.  But the revised tolling scheme fundamentally differs from the seven schemes evaluated in the Final

---

[13] Like the tolling scheme adopted in March 2024, the revised tolling scheme differs in other critical ways from the seven tolling scenarios assessed in the Final EA.  For example, it: (1) extends peak-hour pricing from 5:00 am to 9:00 pm on weekdays, even though the Final EA analyzed only peak hours of 6:00 am to 8:00 pm; (2) proposes a phased crossing credit for passenger vehicles traveling through the Lincoln, Holland, Queens-Midtown, and Hugh L. Carey tunnels, but no credit for the George Washington Bridge, even though the Final EA only examined scenarios with no credit or a higher credit; (3) provides a nighttime discount of 75% with no crossing credits during that time period, even though the Final EA never analyzed those options together; and (4) exempts NYC taxis and for-hire vehicles from the daily toll and instead recommends a per-ride toll for each passenger trip, even though the Final EA never evaluated the impact of a per-ride toll.

EA. For example, none of the tolling schemes evaluated in the Final EA resemble a phased tolling rate like the one adopted now. *See* DOT_0047551–52; DOT_0003559.

The supplemental administrative record confirms that FHWA never meaningfully considered how this change (or others) could alter its analysis or the validity of the FONSI. There are *no* documents in the record demonstrating that FHWA conferred with the Project Sponsors or internally regarding Re-Evaluation 2—let alone solicited input from other affected stakeholders. In fact, based on the supplemental record: (1) the Project Sponsors submitted a letter to FHWA on November 8, 2024, indicating their desire to "engage with FHWA to add a phase-in feature to the tolling structure described in the Reevaluation approved in June 2024," DOT_0047532; (2) the Project Sponsors submitted a draft Re-Evaluation 2 five days later, DOT_00475333–40; and (3) by November 21, 2024, without undertaking any consultations with the Project Sponsors, FHWA approved Re-Evaluation 2 and executed the VPPP agreement, DOT_0047520–30. Neither FHWA nor the MTA can claim that they undertook a more rigorous review process. The supplemental record represents "all administrative consideration[s] . . . in connection with the Central Business District Tolling Program that occurred subsequent to the issuance of the Final EA and FONSI pertaining to that Program." ECF No. 184.

Re-Evaluation 2 also confirms that the revised tolling scheme will not "generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program"—one of three project objectives used to dismiss alternatives in the Final EA. *See* DOT_0003556. In order to meet the revenue objective, the Final EA "assume[d] the Project should provide at least $1 billion annually in total net revenue, which would be invested or bonded to generate sufficient funds." DOT_0036300. In Re-Evaluation 2, FHWA determined that Phase 1 of the revised tolling scheme would generate only $0.5 billion per year—half of the requirement originally set forth in

12

the Final EA—and Phase 2 would generate only $0.7 billion per year. DOT_0047555. Despite recognizing that the revenue requirement would be met only if the tolling scheme generated "annual net revenues in the range of $0.9 billion," FHWA somehow concluded that the entire phased tolling scheme "meets" the revenue objective. *Id.*

Notwithstanding the lower projected revenue, Re-Evaluation 2 states that the Project Sponsors will "comply with all of the mitigation commitments set forth in the EA and FONSI within the same timeframes as contemplated in those documents and the reevaluation prepared for the March 2024 adopted toll structure." DOT_0047549. Once again, that means only $9.8 million will be allocated to New Jersey, and that paltry sum will be limited to just four communities.

**VIII.   On December 30, 2024, the Court Issued Its Decision**

On December 30, 2024, the Court granted New Jersey summary judgment in part, and remanded to FHWA for further proceedings based on its finding, among others, that "the Final EA and FONSI fail to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the Program, whether those impacts are in New York or New Jersey." ECF No. 191 at 53. The Court explained that there are "areas in New Jersey entitled to mitigation." *Id.* at 50. Yet the Final EA and FONSI "provide[] no insight as to why areas in New Jersey with similarly high pre-existing burdens [as the Bronx] did not receive place-based mitigation commitments," FHWA and the Project Sponsors did "not explain" why "they were able to set with precision monetary amounts dedicated to relief in New York while providing no minimum amounts for mitigation for potentially impacted areas in New Jersey," and the Final EA and FONSI thus do not provide a justification for the "apparent disparate treatment" that was afforded to the Bronx as compared to New Jersey. *Id.* at 50–53. Accordingly, the Court "remand[ed] this issue for further explanation, and if appropriate, reconsideration of the rationale providing for differing levels of mitigation

commitments for the Bronx as compared to potentially significantly affected areas in New Jersey and the ultimate mitigation determination." *Id.* at 53.

The Court also reserved judgment on two critical issues: (1) the lawfulness of FHWA's alternatives analysis in light of the subsequent changes to the tolling scheme and FHWA's re-evaluations, and (2) FHWA's failure to sufficiently evaluate the final adopted tolling scheme, which significantly deviates from the seven tolling scenarios evaluated in the Final EA. The Court recognized that "[g]iven the subsequent developments in the structure of the Program, it appears that the FHWA's and Program Sponsors' reliance on Objective 3 (i.e., the funding objective) has diminished in relative importance in the ultimate decision-making for the Program." ECF No. 191 at 62. Because this change in course calls into question FHWA's alternatives analysis and dismissal of all other options other than the congestion pricing scheme, the Court reserved judgment on this issue. With respect to FHWA's failure to evaluate the final adopted tolling scheme, the Court did "not reach Plaintiff's challenges" and instead "allow[ed] the FHWA and Project Sponsors to directly address challenges to the final toll structure in the first instance on remand." *Id.* at 14. The Court ruled in FHWA's favor on the remaining issues.

## LEGAL STANDARD

Where a court determines that an agency's action violates Section 706(2) of the APA, it will "[o]rdinarily . . . vacat[e] [the] invalid agency action and remand[] the matter to the agency for further review." *Comite' De Apoyo*, 774 F.3d at 191; *see also, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). Indeed, Section 706(2) provides that a reviewing court "shall . . . hold unlawful *and set aside*" agency action that violates the APA. 5 U.S.C. § 706(2) (emphasis added). The Third Circuit has held that vacatur is *required* where

14

"deficiencies in the challenged [agency action are] serious" and vacatur is not "likely to create any serious disruption." *Council Tree Commc'ns, Inc.*, 619 F.3d at 258.

"The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague" in the district court's order. *Garcia v. Corr. Med. Serv., Inc.*, 2018 WL 1317867, at *1 (D.N.J. Mar. 14, 2018). The Court may also clarify whether its December 30, 2024 Order vacates the Final EA and FONSI pending further proceedings under Federal Rules of Civil Procedure 60 and 59(e). Rule 60(a) permits a court to "correct a . . . mistake arising from oversight or omission" in any judgment or order while Rule 60(b)(6) allows for relief "from a final judgment, order, or proceeding," for "any other reason that justifies relief." Further, a court may alter or amend its judgment under Rule 59(e) where a party "allege[s] legal error." *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003). *See also* L. Civ. R. 7.1(i) (motions for reconsideration).

TROs and preliminary injunctions are governed by an identical standard. *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 777 n.53 (D.N.J. 2013); *Fed'n of State Massage Therapy Bds. v. Acad. of Oriental Therapy, LLC*, 2013 WL 5888094, at *1 (D.N.J. Oct. 28, 2013). The movant must show: "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (alteration and citation omitted). To satisfy these standards, the movant must demonstrate only "that it *can* win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* at 179 (emphasis added). Once those "threshold" requirements are met, the court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* at 176. When the government is

the opposing party, these last two elements are "consider[ed] together" and said to "'merge.'"
*Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011), *as amended* (Mar. 7, 2012) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Finally, in ruling on a motion for a TRO or a preliminary injunction the court should keep in mind that "one of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties."  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *see also Acierno*, 40 F.3d at 647 ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered.").

This court has authority to preliminarily enjoin not only the federal defendants, but also intervenor-defendants the MTA and TBTA, from taking further action to institute the congestion pricing scheme.  *See, e.g.*, *Davis v. Mineta*, 302 F.3d 1104, 1110 n.2 (10th Cir. 2002); *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001); *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 237 (D.D.C. 2003).

## ARGUMENT

### I.    New Jersey Seeks Clarification that the District Court's Summary Judgment Decision Vacated the Final EA and FONSI Pending Remand and the Further Proceedings Ordered by the Court

New Jersey understands the district court's ruling to have vacated the Final EA and FONSI when remanding to FHWA to address its NEPA violations because vacatur is the "ordinary practice" under the APA.  *United Steel*, 925 F.3d at 1279; *see also Comite' De Apoyo*, 774 F.3d at 191.  That said, given Defendants' contrary position, New Jersey seeks an order clarifying that the Final EA and FONSI are vacated pending remand such that congestion pricing cannot begin on January 5.  This is not one of the "rare cases" where remand without vacatur is appropriate, for multiple reasons.  *United Steel*, 925 F.3d at 1279.

16

First, Defendants cannot show that the identified deficiencies in the FHWA's analysis are not "serious" and that vacatur is "likely to create any serious disruption," as necessary to justify remand without vacatur. *Council Tree Commc'ns, Inc.*, 619 F.3d at 258. The lack of any "rational" explanation of "mitigation commitments" in the Final EA and FONSI is a serious deficiency. *See* ECF No. 191 at 53. "[W]here an agency's NEPA review suffers from a 'significant deficiency,' refusing to vacate the corresponding agency action would 'vitiate' the statute." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021). In part for this reason, courts routinely order remand with vacatur in NEPA cases. *See, e.g.*, *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) ("We vacate the inadequate EA, which is the presumptive remedy for agency action that violates the NEPA as reviewed through the APA"); *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 918 (D.C. Cir. 2024). Moreover, vacatur would *not* create any serious disruption, while allowing the congestion pricing scheme to go into effect would upend the *status quo* and result in serious harm. As explained in more detail below, *infra* Section II.C, there is no urgency or "disruption" resulting from a further delay to complete this remand process on the timeline required by this Court, especially when New York and the MTA have already delayed implementation of this scheme for many months when it suited their purposes. And it would be terribly disruptive to New Jersey's interests to allow the tolling to begin. *See infra* Section II.B.

Second, the Third Circuit has recognized that vacatur is "particularly appropriate" where remanding without vacatur would "leave in place a rule that is causing the very adverse effect that [the agency] is charged with preventing, and [the court] would be 'legally sanction[ing] an agency's disregard of its statutory or regulatory mandate.'" *Comite' De Apoyo*, 774 F.3d at 191 (final alteration in original) (citation omitted). That describes precisely this situation. Remand

without vacatur would leave in place FHWA's approval of the tolling scheme despite an inadequate environmental review, which is the very adverse effect that NEPA requires the agency to prevent. And by allowing congestion pricing to begin with FHWA's approval prior to FHWA's full compliance with its obligations under NEPA, the Court would be legally sanctioning FHWA's disregard of those statutory obligations.

Finally, Defendants did not raise the argument in their summary judgment briefs that, if New Jersey were to succeed, the extraordinary remedy of remand without vacatur would be appropriate. *See* ECF Nos. 127, 128, 129, 130. Thus, even if Defendants had a viable argument that remand without vacatur is appropriate in this case (and they do not), they forfeited it. *See, e.g.*, *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 135 (3d Cir. 2023) ("Arguments raised for the first time before a district court in a reply brief are deemed forfeited."); *see also* ECF No. 191 at 30 (holding plaintiff forfeited argument by failing to raise it in their opening brief); ECF No. 136 at 21 (New Jersey summary judgment brief stating "the Court must grant summary judgment to the State and vacate the Final EA and FONSI").

For these reasons, the NEPA violations identified by this Court justify vacatur, and New Jersey seeks an order clarifying that the Court's decision in fact vacated the Final EA and FONSI, with the effect of precluding MTA from initiating congestion tolling on January 5.

## II.    New Jersey Has Met the Requirements for a TRO and Preliminary Injunction

For the reasons explained above, New Jersey is likely to succeed on the merits of its claim that the Court's December 30, 2024 Order vacated the Final EA and FONSI pending remand proceedings. To the extent the Court requires additional time to clarify its order, a TRO and preliminary injunction are justified. Additionally, even if the Court did not order vacatur, New Jersey is likely to succeed on the merits of its NEPA and APA claims and is entitled to a TRO and

preliminary injunction prohibiting reliance on the Final EA and FONSI while this litigation is pending.

### A. New Jersey Succeeded on the Merits of Its Claims that FWHA Violated NEPA and the APA

The first requirement for a TRO or preliminary injunction is satisfied because New Jersey has prevailed on the merits of its NEPA claim and the Court has remanded this matter to the FHWA for "further explanation, and if appropriate, reconsideration of the rationale providing for differing levels of mitigation commitments for the Bronx as compared to potentially significantly affected areas in New Jersey and the ultimate mitigation determination." ECF No. 191 at 53.[14] Further, there is at the very least a "reasonable chance" that New Jersey will prevail on the merits of its other claims on which the Court reserved judgment. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (citation omitted); *see also Reilly*, 858 F.3d at 179 n.3 (likelihood of success does not require "a more-likely-than-not showing of success").

Courts may "hold unlawful and set aside" an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D). Where an agency must undertake a NEPA review of a proposed action, its "decision not to prepare an EIS must be set aside" if it falls into either of these two categories. *N.Y. v. Nuclear Regul. Comm'n*, 681 F.3d 471, 477 (D.C. Cir. 2012). Thus, if the agency's FONSI is "not supported by substantial evidence on

---

[14] New Jersey "need not show a likelihood of success as to every claim and every allegation" in order for the Court to grant a TRO and preliminary injunction. *Selvaggi v. Borough of Point Pleasant Beach*, 2022 WL 1664623, at *3 (D.N.J. May 25, 2022); *see also Deluhery v. Unifiednames, Inc.*, 2007 WL 9789620, at *2 (D.N.J. Sept. 14, 2007) ("[T]he Court may address the reasonable probability of success on the merits on only one claim, so long as that claim is connected to the injunctive relief sought." (citation omitted)).

the record" because the agency "failed to properly examine the risks" and "potential consequences" of the proposed action, the FONSI must be vacated. *Id.* at 478–79.

On December 30, this Court held that "the Final EA and FONSI fail to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the Program, whether those impacts are in New York or New Jersey" and thus "the FHWA and Project Sponsors acted in an arbitrary and capricious manner in reaching their mitigation determination in the Final EA and FONSI." ECF No. 191 at 52, 53. Specifically, the Final EA and FONSI do not provide a justification for the "apparent disparate treatment" that was afforded to the Bronx as compared to areas in New Jersey entitled to mitigation. *Id.* at 50–53. Accordingly, the Court "remand[ed] this issue for further explanation, and if appropriate, reconsideration of the rationale providing for differing levels of mitigation commitments for the Bronx as compared to potentially significantly affected areas in New Jersey and the ultimate mitigation determination." *Id.* at 53. On this basis alone, New Jersey clearly satisfies the first requirement for a TRO or preliminary injunction.

New Jersey is also likely to succeed on its claims that FHWA violated NEPA on additional grounds on which the Court reserved judgment; namely (1) FHWA's deficient alternatives analysis as reinforced by its subsequent re-evaluations, and (2) FHWA's failure to evaluate the final tolling structure, which does not resemble the seven scenarios assessed in the Final EA.

*First*, FHWA failed to assess any option other than the MTA's congestion pricing scheme and a "no action" alternative. *See* ECF No. 136 at 44–48; ECF No. 86 at 40–46. FHWA's arbitrary alternatives analysis was premised on three Project objectives: (1) reduce daily VMT within the CBD by at least 5%; (2) reduce the number of vehicles entering the CBD daily by at least 10%; and (3) generate sufficient annual net revenues to fund $15 billion for the MTA capital program.

DOT_0036266.  FHWA placed significant emphasis on the third requirement and rejected three alternatives *solely* because they would not generate sufficient revenue for the MTA.  *See* ECF No. 191 at 55–56.  Yet the revised tolling scheme approved in Re-Evaluation 2 also would *not* meet the revenue objective.

In order to meet the revenue objective, the Final EA "assume[d] the Project should provide at least $1 billion annually in total net revenue, which would be invested or bonded to generate sufficient funds."  DOT_0036300.  In its first Re-Evaluation, FHWA concluded that the fixed $15 tolling scheme would only generate $0.9 billion per year, yet decided that would satisfy the revenue objective because the MTA's Chief Financial Officer unilaterally—and without further explanation or documentation—"determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects for the MTA Capital Program."  DOT_0045449.  In Re-Evaluation 2, FHWA determined that Phase 1 of the revised tolling scheme would generate only $0.5 billion per year—half of the requirement originally set forth in the Final EA—and Phase 2 would generate only $0.7 billion per year.  DOT_0047555.[15] Despite once again recognizing that the revenue requirement would be met only if the tolling scheme generated "annual net revenues in the range of $0.9 billion," FHWA somehow concluded that the entire phased tolling scheme "meets" the revenue objective.  *Id.*  As the Court recognized, "[g]iven the subsequent developments in the structure of the Program, it appears that the FHWA's and Program Sponsors' reliance on Objective 3 (i.e., the funding objective) has diminished in

---

[15] Even though *only* Phase 3 would generate $0.9 billion per year—the minimum amount required to fund the MTA's Capital Plan—FHWA rubber-stamped the MTA's self-serving declaration that "the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure."  DOT_0047555.  FHWA thus failed to comply with its "duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project."  *Simmons*, 120 F.3d at 669.

relative importance in the ultimate decision-making for the Program."  ECF No. 191 at 61–62.

That shift undermines FHWA's entire alternatives analysis and indeed confirms that its

decisionmaking was arbitrary and capricious.

Second, FHWA never assessed the tolling scheme ultimately adopted.  Consequently,

FHWA never analyzed whether the phased tolling scheme altered its original analysis and

conclusions on environmental impacts.  Even if the revised tolling scheme could be broken down

into its component parts, the three phased tolling rates for passenger vehicles ($9, $12, and $15)

do not fall within the scope of the seven tolling schemes assessed in the Final EA.  For instance,

the Final EA assessed a $9 tolling scheme that would provide no crossing credits.  *See*

DOT_0036291–95.  Conversely, the $9 toll that will be imposed in Phase 1 of the revised tolling

scheme would provide crossing credits for the Lincoln, Holland, Queens-Midtown, and Hugh L.

Carey Tunnels.  *See* DOT_0047551–52.  FHWA never assessed the impact of these changes (such

as, for example, toll shopping).  Because nothing in the Final EA "so much as hinted at" these new

and changed elements, and "there is no direct or reliable way to compare the [environmental]

effects of these changes" to those elements previously analyzed, New Jersey is likely to prevail on

its argument that the FONSI violates NEPA.  *N.M. ex rel. Richardson v. Bureau of Land Mgm't*,

565 F.3d 683, 707 (10th Cir. 2009).

Indeed, Re-Evaluation 2 includes *no* environmental justice analysis for the phased-in

tolling scheme.  Instead of assessing environmental justice impacts, determining whether they are

significant, and allocating mitigation dollars appropriately, FHWA apportioned an arbitrarily-

capped $100 million pool of place-based mitigation funding.  As a result, out of the $100 million

place-based mitigation pool, FHWA allocated just $9.8 million to New Jersey, and limited that

funding to only four communities (Fort Lee, City of Orange, East Orange, and Newark).

DOT_0045609. FHWA's own analysis of environmental impacts demonstrates that additional mitigation dollars should have been allocated to New Jersey to avoid significant impacts. For example, FHWA allocated $71.7 million to Bronx County *alone*—over *seventy-one times* the amount of mitigation funding allocated to Bergen County—notwithstanding that daily traffic increases in Bergen County would be over *two times greater* than in the Bronx. *See id.*; DOT_0045462; *see also Nuclear Regul. Comm'n*, 681 F.3d at 481 (agency violates NEPA by "brush[ing] away" adverse environmental impacts identified by its own analysis).

Further, FHWA never explained why only *four* New Jersey communities merit place-based mitigation when the Final EA identified *fifteen* communities with environmental justice concerns in New Jersey with pre-existing air pollutant or chronic disease levels above the 90th percentile that "may need mitigation" because they will see increases in truck volume and, therefore, pollutants. DOT_0007319–20. The agency violated NEPA, which requires a hard look at all of these areas, and the preparation of a full EIS when there may be significant site-specific impacts that are not addressed by site-specific mitigation.

## B. New Jersey Will Suffer Irreparable Harm Absent Injunctive Relief

The second requirement for a TRO or preliminary injunction is also satisfied because "it is more likely than not" that New Jersey will "suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. "[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno*, 40 F.3d at 653 (quotation marks and citation omitted). As soon as congestion pricing begins in the Manhattan CBD, traffic will increase in parts of New Jersey as drivers circumvent the tolls, and FHWA did not commit to sufficient enforceable mitigation measures to alleviate the significant environmental impacts that will follow. As a result, New Jersey will suffer harms to its sovereign and proprietary interests in the State's air quality, and the health and safety of its residents, among

23

other injuries.  These harms will begin the moment congestion pricing takes effect and grow worse each day that the scheme remains in place.  By their nature, these harms cannot be remedied by relief granted after the congestion scheme has begun.

The record is clear: if congestion pricing goes into effect, vehicle traffic will increase in parts of New Jersey to the detriment of New Jersey's environment and the health of its communities, including certain of its hard-hit environmental justice communities.  While the Final EA and FONSI approved a program that provides no site-specific mitigation to New Jersey, it predicted that at least 15 communities with pre-existing pollutants or chronic disease burdens at or above the 90th percentile would experience increases in daily VMT under Tolling Scenario A (the closest analog to Phase 1 of the revised tolling scheme), and thus attendant decreases in air quality, in the first year that tolling is implemented.  *See* DOT_003635.  At least some of these communities will suffer irreparable harm beginning on day one of the congestion pricing scheme.  Indeed, the Court's December 30, 2024 decision recognizes that there are "areas in New Jersey entitled to mitigation" because significant impacts "may result" from the congestion pricing scheme.  ECF No. 191 at 50, 53.  In this circumstance, NEPA requires the agency to either prepare an EIS, *Evn't Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878–79 (9th Cir. 2022), or provide for enforceable mitigation commitments that will be undertaken to avoid significant impacts, 40 C.F.R. § 1501.6(c); *see also* 23 C.F.R. § 771.105(e).  FHWA has done neither.  As the Court correctly recognized, "the Final EA and FONSI fail to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the Program, whether those impacts are in New York or New Jersey."  ECF No. 191 at 53.  Specifically, the Final EA and FONSI "provide[] no insight as to why areas in New Jersey with similarly high pre-existing burdens [as the Bronx] did not receive place-based

mitigation commitments" and FHWA and the Project Sponsors did "not explain" why "they were able to set with precision monetary amounts dedicated to relief in New York while providing no minimum amounts for mitigation for potentially impacted areas in New Jersey." *Id.* at 51.

Without enforceable mitigation measures to alleviate significant environmental impacts in New Jersey, traffic increases and attendant air quality impacts will surely result from the congestion pricing scheme.

Although these injuries will surely worsen the longer congestion pricing remains in effect, they will begin to accumulate with even a single day of tolling. Preliminary relief preventing the initiation of congestion pricing is thus necessary to prevent harm to New Jersey's interests and its police power in protecting its environment, and the health and safety of its citizens. *See Pioneer Aggregates, Inc. v. Pa. Dep't of Env't Prot.*, 2012 WL 4364073, at *20 (M.D. Pa. Sept. 21, 2012), *aff'd*, 540 F. App'x 118 (3d Cir. 2013) (recognizing that a state has "a substantial, important interest in protecting its environment"); *see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (recognizing state could sue to "protect both its territory and its proprietary interests" from effects of federal action); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (explaining that a municipality has a "proprietary interest[]" in protecting its "natural resources" including from "impaired air quality"); *Nat'l Res. Def. Council v. U.S. E.P.A.*, 437 F. Supp. 2d 1137, 1152 (C.D. Cal. 2006) ("A state's interest in protecting its natural resources and environment from harm constitutes a proprietary interest."), *aff'd sub nom. Nat. Res. Def. Council v. U.S. E.P.A.*, 542 F.3d 1235 (9th Cir. 2008); *New York v. Shinnecock Indian Nation*, 280 F. Supp. 2d 1, 4–5 (E.D.N.Y. 2003) (finding irreparable harm to state-plaintiff where proposed action "would cause incredible traffic congestion" that was "likely to drastically heighten air pollution"). Preliminary relief is also necessary to shield the State's interest in complying with its obligations

to meet federal air quality standards.  *See City of Los Angeles v. Nat'l Highway Traffic Safety Admin.*, 912 F.2d 478, 484–85 (D.C. Cir. 1990) (recognizing injury where action would "adversely affect[] air quality in [the states'] urban areas, making it more difficult for them to comply, as they must, with the air quality standards imposed upon them by the Clean Air Act"), *overruled in part on other grounds*, *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996).

Having established that New Jersey will suffer environmental harm absent preliminary injunctive relief, there can be little doubt that the harm is irreparable.  The Supreme Court has explained that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."  *Amoco Prod. Co.*, 480 U.S. at 545; *see also id.* ("If such [environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.").  Following the Supreme Court's guidance, the Third Circuit has recognized that environmental harm generally constitutes irreparable injury.  *See Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 506 (3d Cir. 1993); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 873 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005).  This makes sense.  Once New Jersey suffers environmental harms from increased traffic congestion, the court may be able to limit or stop *future* environmental harm—but it could not order relief that would, for example, clean the more polluted air already breathed by New Jerseyans.[16]  This is particularly true because, as the Court recognized, FHWA failed to provide any "rational" explanation of the "mitigation

---

[16] Even if this were a rare situation where monetary relief could theoretically remedy the environmental harm (and it isn't), New Jersey could not obtain such relief against FHWA in this suit because "the APA does not waive sovereign immunity in monetary claims cases."  *Atl. City Mun. Utils. Auth. v. Reg'l Adm'r*, 803 F.2d 96, 102 (3d Cir. 1986).  So the injury would still be irreparable.  *Cf. Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cnty.*, 893 F. Supp. 301, 309 (D.N.J. 1995).

commitments" in the Final EA and FONSI, ECF No. 191 at 53, and thus has not provided for the "enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts" that are required to issue a mitigated FONSI under NEPA, 40 C.F.R. § 1501.6(c).

If more were needed (and it is not), New Jersey's procedural injuries bolster this conclusion. "NEPA is a procedural statute that does not mandate particular substantive results"; instead, it "ensures that an agency considers every significant aspect of the environmental impact of a proposed action and informs the public that it has indeed considered environmental concerns in its decisionmaking process." *Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 294 (3d Cir. 2012) (cleaned up). In other words, NEPA affords New Jersey a "procedural right" to a proper decision-making process. *See, e.g.*, *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1356–57 (11th Cir. 2024); *Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 509 F.3d 562, 567 (D.C. Cir. 2007). The flaws here—FHWA's failure to adequately consider the environmental impacts on New Jersey communities and their homes, schools, hospitals and businesses—are the very procedural harms against which NEPA is designed to protect.

Given the procedural nature of NEPA, numerous courts have recognized that, at least when combined with environmental harm, NEPA-based procedural harm supports a finding of irreparable injury. For example, the Eighth Circuit has found irreparable harm where the "record discloses both the procedural harm of inadequate review and [a] concrete, substantive environmental harm" because the "failure to comply with NEPA[] causes harm itself, specifically the risk that real environmental harm will occur through inadequate foresight and deliberation." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1039 (8th Cir. 2016) (cleaned up); *see also id.* ("Harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure." (cleaned up)). Similarly, the First Circuit has

recognized that because NEPA is a procedural statute, "the injury that ever-growing bureaucratic commitment to a project can work may prove to be 'irreparable harm' in a NEPA case." *Sierra Club v. Marsh*, 872 F.2d 497, 503 (1st Cir. 1989). District courts are in accord. *See, e.g.*, *Los Padres Forestwatch v. U.S. Forest Serv.*, 776 F. Supp. 2d 1042, 1051 (N.D. Cal. 2011); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 219-22 (D.D.C. 2003); *cf. ITServe All., Inc. v. Scalia*, 2020 WL 7074391, at *11 (D.N.J. Dec. 3, 2020) ("[M]any courts have found that a preliminary injunction may be issued solely on the grounds that [an agency action] was [taken] in a procedurally defective manner." (cleaned up)).

This Court identified NEPA violations related to FWHA's Final EA and FONSI, and its blessing of a series of tolling schemes. *See supra*. Allowing congestion pricing to begin without adherence to NEPA's mandates would thus cause New Jersey irreparable procedural harm in addition to concrete environmental injuries, even if the tolling was later halted.

### C. Defendants and Intervenor-Defendants Will Not Suffer Harm from Injunctive Relief and the Public Interest Favors Granting the Motion

The final two factors—harm to the nonmoving parties and the public interest—need only be considered to the extent relevant and may be considered together when the government is the opposing party. *See Reilly*, 858 F.3d at 176; *Minard Run Oil Co.*, 670 F.3d at 256. The factors favor injunctive relief. Neither FHWA nor the MTA or TBTA will suffer harm from delaying implementation of the congestion pricing scheme—and certainly not "even greater harm" than that to New Jersey. *Minard Run Oil Co.*, 670 F.3d at 250. The public interest also strongly favors halting this first-of-its-kind scheme until its environmental impacts are adequately evaluated.

To start, temporary injunctive relief will harm neither Defendants nor Intervenor-Defendants. FHWA and other federal defendants played a key role in the congestion pricing scheme's approval, but they have nothing to gain from the scheme's implementation. So any delay

(or abandonment) of the program will not cause them any harm. Nor will the MTA or TBTA be meaningfully harmed by the temporary maintenance of the *status quo*. The congestion pricing scheme has been many years in the making. *See* ECF No. 139 at 23–24. And the MTA and TBTA project revenue benefits on a timeline spanning many years into the future. *See* DOT_0047549 (explaining that the previously proposed toll structure will not even "come into full effect" until 2031). Given this long-term timeline, temporary injunctive relief pending the resolution of this litigation will not seriously impair the MTA's or TBTA's interests. Moreover, any claim of urgency is undermined by the long prior suspension of the program (without detrimental effects). Indeed, when Governor Hochul previously "paused" the program, she committed to supplying alternate funds to avoid harm to the MTA and TBTA. *See supra* at 8. The "balance of the equities," *Minard Run Oil Co.*, 670 F.3d at 256, favors New Jersey.

Relatedly, injunctive relief is necessary to "maintain[] … the status quo until a decision on the merits of a case is rendered," which is a "primary purpose of a preliminary injunction." *Acierno*, 40 F.3d at 647. The *status quo*—that is, "the last, peaceable, noncontested status of the parties," *Kos Pharms., Inc.*, 369 F.3d at 708—was a situation in which the MTA and TBTA were not collecting revenue through congestion tolling and New Jersey was not faced with increased traffic and pollution. At this stage, injunctive relief is necessary to preserve that status quo pending FHWA's actions on remand and the subsequent litigation.

The public interest also favors injunctive relief. Most obviously, there is a strong public interest in protecting the environment. As courts in this district have recognized, it is undoubtedly "in the public interest to prevent further pollution." *Pub. Int. Rsch. Grp. of N.J., Inc. v. Rice*, 774 F. Supp. 317, 329 (D.N.J. 1991); *cf. Com. of Pa., Dep't of Env't Res. v. E.P.A.*, 618 F.2d 991, 1000 (3d Cir. 1980) (recognizing "the public interest in maximizing elimination of sources of

pollution"). Allowing congestion pricing to go into effect would cause increased pollution in New Jersey. Making matters worse, the full extent of those environmental effects is unknown given FWHA's rushed approval of the scheme overall, and Re-Evaluation 2 in particular. The public interest supports preventing the onset of those impacts pending further review.

Furthermore, the increased traffic congestion in New Jersey implicates the public interest and weighs in favor of an injunction. *See, e.g.*, *Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 2016 WL 6823375, at *20 (D.S.C. Nov. 18, 2016); *Morris v. Slater*, 1998 WL 959658, at *5 (N.D. Tex. Jan. 15, 1998); *cf. Shinnecock Indian Nation*, 280 F. Supp. at 4. The congestion pricing scheme would also toll tens of thousands of New Jersey drivers, undeniably implicating the public interest. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("The effect on the health of the local economy is a proper consideration in the public interest analysis."). These concerns are further heightened by FWHA's inadequate review, which makes it unknowable just how detrimental the scheme will be to these facets of the public interest.

From the environment, to public health and safety, to traffic congestion, to the hefty economic impacts on New Jerseyans and others, the public interest strongly favors enjoining the congestion scheme until this litigation can be resolved and until FWHA adequately evaluates the full impacts of the project.

## **CONCLUSION**

For all these reasons, the Court should clarify that its December 30, 2024 decision vacates the Final EA and FONSI for the duration of the remand proceedings. In addition, the Court should issue a TRO and preliminary injunction as set forth in the attached proposed Order to Show Cause.

Dated:  New York, New York          By:  */s/ Randy M. Mastro*
        December 31, 2024          Randy M. Mastro (NJ Bar No. 011681982)
                  Craig Carpenito (NJ Bar No. 027102000)
                  Jessica Benvenisty (*pro hac vice*)
                  Lauren Myers (*pro hac vice*)
                  Camilla Akbari (*pro hac vice*)
                  KING & SPALDING LLP
                  1185 Avenue of the Americas
                  New York, New York 10036
                  Tel. (212) 556-2100

                  Peter Hsiao (*pro hac vice*)
                  KING & SPALDING LLP
                  633 West Fifth Street, Suite 1600
                  Los Angeles, CA 90071
                  Tel. (213) 433-4355

                  Cynthia AM Stroman (*pro hac vice*)
                  KING & SPALDING LLP
                  1700 Pennsylvania Avenue, NW, Suite 900
                  Washington, DC 20006-4704
                  Tel. (202) 737-0500

                  *Attorneys for Plaintiff*