JOHN H. REICHMAN
john@johnreichmanlaw.com
917.626.8025

January 2, 2025

**VIA ECF**
Hon. Leo M. Gordon
United States District Court
50 Walnut Street
Newark, New Jersey 07102

      Re: *State of New Jersey v. U.S. Dep't of Transportation et al.*, No. 2:23-cv-03885

Your Honor,

      The 34 New Jersey Amici Curiae ("NJ Amici")[1] respectfully submit this letter-brief in opposition to plaintiff State of New Jersey's eleventh-hour motion for a preliminary injunction. After Plaintiff's counsel publicly stated that the Court's December 30, 2024 Opinion prohibited the tolling program (the "Tolling Program") from going forward, Plaintiff is now seeking the relief that it implied it had already obtained.[2]

      This brief focuses on three issues. First, courts will not grant injunctive relief when it is contrary to the public interest. As Plaintiff's brief states, "[m]ost obviously, there is a strong public interest in protecting the environment." (Br. at 29). Plaintiff's motion fails to address the numerous, substantial environmental benefits of the Tolling Program, including lower greenhouse gas emissions ("GHGs") and toxic air pollutants throughout the metropolitan area,

---

[1] EmpowerNJ, New Jersey Police Perspective, Health Professionals & Allied Employees, Clean Water Action, Turnpike Trap Coalition, Hudson Country Complete Street, Soma Action, Unitarian Universalist Faith Action NJ, Pinelands Preservation Alliance, Bike North Bergen, Ecopoetry.org, Don't Gas The Meadowlands, Isles, Inc., Bike JC, SafestreetSJC, 350NJ-Rockland, Hackensack Riverkeeper, People Over Pipelines, Fund for a Better Waterfront, Newark Green Team, Action Together New Jersey, New Jersey Association of Railroad Passengers, BlueWaveNJ, Bike Soma, Newark Science and Sustainability Inc., Our Revolution NJ, BICI UC, Friends of Liberty State Park, New Jersey Environmental Lobby, New Jersey Work Environment Council, New Jersey Citizen Action, South Ward Environmental Alliance, New Jersey Working Family Party, and Bike Hoboken.

[2] Plaintiff's counsel issued a statement on December 31, 2024 stating that "the judge has ordered a remand, and the MTA therefore cannot proceed with implementing the current congestion pricing proposal on January 5, 2025." https://www.nj.gov/governor/news/news/562024/approved/20241231a.shtml

and the harm that would ensue from the loss of those benefits. NJ Amici include many of the leading environmental groups in the State and strongly support congestion pricing because of its beneficial environmental impacts.

Plaintiff also fails to address the harm that an injunction would cause New Jersey commuters, the vast majority of whom commute into the Central Business district ("CBD") using public transportation. The profound negative consequences an injunction would have on the environment, New Jersey commuters, and indeed New Jersey residents as a whole, requires the denial of Plaintiff's motion.

Second, Plaintiff is acting in bad faith and has unclean hands by virtue of taking positions in its motion that are diametrically opposite to those it is taking regarding its $7 billion plan to demolish and the expand the Newark Bay Bridge (the "Bridge Expansion"), which is part of its $10.7 billion plan to expand the entire the 8.1-mile Newark Bay Hudson County Extension ("NB-HCE") of the New Jersey Turnpike. *Stokely-Van Camp v. Coco-Cola Co.*, 646 F.Supp.2d 510, 532-34 (SDNY 2009) (preliminary injunction denied where movant previously engaged in the same conduct and took the same positions as defendant). The draft environmental assessment and FONSI submitted with respect to the Bridge Expansion (the "EA/FONSI") shows that the Bridge Expansion will cause an increase in diesel truck traffic during rush hours of between 23.2% and 38.5% when compared to a no-action alternative. While the alleged inadequacy of mitigation measures in Bergen County is at the heart of Plaintiff's motion, the State is taking the position in the EA/FONSI that no mitigation measures are needed for the Bridge Expansion.

Plaintiff has never denied that its positions in this litigation are inconsistent with those it is taking regarding the Bridge Expansion. These inconsistent positions require the denial of

Plaintiff's motion. At the very least, an injunction should not be issued without a full record of Plaintiff's conflicting positions.

Third, the Court should not consider Plaintiff's motion without the disclosure and consideration of the settlement proposals exchanged between Plaintiff and the Defendants. It has been reported that New York State has offered hundreds of millions of dollars to settle this action, which would address the concerns Plaintiff has raised regarding the Tolling Program. We understand that those settlement talks have ended with New York's Governor publicly accusing Plaintiff of negotiating in bad faith. The settlement discussions could very well show Plaintiff's lack of good faith, a prerequisite to granting injunctive relief. The Court should not issue an injunction without disclosure and consideration of the settlement proposals and an understanding of whether New Jersey acted in bad faith by refusing to accept a proposal that would have addressed its concerns regarding the Tolling Program.

**A. Plaintiff's Motion fails to Address the Harm that a Preliminary Injunction Would Cause New Jersey Commuters and Residents**

Likelihood of success on the merits is only the beginning of the analysis the Court must make in determining whether to grant a motion for a preliminary injunction. "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.' *Romero–Barcelo,* 456 U.S., at 312, 102 S.Ct. 1798; see also *Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941)." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course. *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.").

"Even assuming irreparable injury, the Supreme Court has overturned an injunction based solely on the balance of equities and the public interest. *Winter*, 555 U.S. at 26, 32, 129 S.Ct. 365. In doing so, it 'd[id] not address the underlying merits of plaintiffs' claims.' *Id.* at 31, 129 S.Ct. 365. [The Third Circuit has] taken this approach too. *See Weissbard v. Coty, Inc.*, 66 F.2d 559, 560 (3d Cir. 1933) (not opining on the merits because the District Court would be better placed to rule on them after a 'final hearing'). The other factors are independent grounds to deny relief." *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Security*, 108 F.4th 194, 202-3 (3d Cir. 2024)

The obvious and compelling interest that New York has in allowing the Tolling Program to proceed will be undoubtedly addressed by the Defendants and New York Amici. But not to be overlooked is the harm an injunction will cause New Jersey commuters and public transit users.

As detailed more fully in Amici's January 18, 2024 brief to the Court, the Tolling Program would benefit New Jersey residents and the State in eight ways.

1. **The vast majority of New Jersey residents use public transportation to commute into the CBD and would benefit from congestion pricing**

There are more than 400,000 Jersey Commuters. The vast majority of them, more than 75%, use public transportation to get to the CBD. Those commuters would not pay a congestion pricing toll and with fewer private vehicles on the road, bus commuters would have shorter and less polluted commutes.

2. **New Jersey residents use public transportation upon arriving in the CBD and would benefit from congestion pricing**

The Tolling Program will dramatically improve subway and bus service in New York City. A large percentage of New Jersey commuters use public transportation once they arrive in the CBD. Before the pandemic, 200,000 New Jerseyans used the subway daily. The Tolling

Program will improve subway and bus service in the CBD, benefiting those New Jersey commuters, including those who drive into the CBD.

### 3. New Jersey commuters would benefit from cleaner air in the CBD

Congestion pricing will dramatically improve air quality in the CBD by, among other things, reducing toxic particulate matter by more than 10%. All New Jersey commuters, public transportation users and drivers alike, will benefit from cleaner air once they arrive in the CBD.

### 4. New Jersey drivers will benefit from congestion pricing

For those choosing to continue to drive into the CBD, the Tolling Program will result in better and faster commutes into the CBD and faster travel and easier parking once they get there. It is reasonable to assume that many, if not most, New Jersey drivers would readily pay a toll for a better and faster commute in, easier driving and parking once they arrived, and more time with their families.

### 5. There Will be improved air quality and less pollution in New Jersey

The Tolling Program will produce improved air quality and less pollution in New Jersey as a whole. For example, Hudson County is projected to see large reductions in all air pollutants.

### 6. The Tolling Program is needed for New Jersey to meet its goal of reducing GHGs by 50% from 2006 levels by 2030 (the "50x30 Goal")

The 50x30 Goal is mandated by both statute and executive order. Executive Order 274 directs all State agencies to develop strategies to reduce GHGs by 50% below 2006 levels by 2030. N.J.S.A. 26:2C-58, part of New Jersey's Global Warming Response Act, requires the State to lower GHGs in accordance with the goals established by the United States Climate Alliance. One of those goals is to reduce GHG emissions by at least 50-52% below 2005 levels by 2030. 37% of GHGs in New Jersey are produced by the transportation sector, by far the largest source of GHGs in the State. New Jersey is not on track to meet the 50x30 Goal and has

no plan to meet it. Without a substantial reduction in GHGs from the transportation sector, the 50x30 Goal cannot be met. New Jersey needs the Tolling Program to meet its climate goals.

### 7. The Tolling Program will benefit New Jersey companies

MTA spending has benefited New Jersey companies and the Tolling Program will enhance those benefits. Consistent with historical spending, New Jersey companies will likely receive more than $1 billion in revenue generated solely from the Tolling Program.

### 8. The Tolling Program will incentivize the use of public transportation and provide much needed revenue for NJ Transit

By discouraging private vehicles from driving into the CBD and encouraging greater use of public transportation, the Tolling Program will provide desperately needed revenue for NJ Transit.

All of these important and substantial benefits outlined above would be lost by an injunction.

As Plaintiff's brief states, "[m]ost obviously, there is a strong public interest in protecting the environment." (Br. at 29). NJ Amici could not agree more; it is the reason the State's leading environmental groups have become involved in this action. While purporting to act in the name of the environment, Plaintiff's motion fails to address the numerous, substantial environmental benefits of the Tolling Program, including lower greenhouse gas emissions ("GHGs") and toxic air pollutants throughout the metropolitan area, and the harm that would ensue for the loss of those benefits. An injunction would undermine the strong public interest in protecting the environment.

### B. Plaintiff is Acting in Bad Faith and Has Unclean Hands

Plaintiff is acting in bad faith and has unclean hands by taking positions that are diametrically opposite to those it is taking regarding the $7 billion Bridge Expansion, which

would double the number of highway lanes in the one of the most densely populated areas of the country.

In *Stokely-Van Camp v. Coco-Cola Co.*, *supra*, the court denied a motion for a preliminary injunction where the movant previously engaged in the same conduct and took the same position as defendant. The court explained:

> Coca-Cola raises the defense that SVC would not be entitled to the equitable relief of a preliminary injunction because SVC has unclean hands. More specifically, Coca-Cola claims that because SVC has touted the importance of calcium and magnesium in sports drinks for years, and because SVC too planned to introduce a new formulation of Gatorade with calcium and magnesium, boosted by advertising claims similar to Coca-Cola's, it cannot equitably seek an order enjoining Coca-Cola from doing the same.
>
> It is a fundamental principle that he who comes into equity must come with clean hands. The idea underlying the doctrine is that since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff….
>
> Although SVC complains of Coca-Cola's touting of calcium and magnesium, the evidence at the preliminary injunction hearing demonstrated that SVC too has marketed the advantage of adding calcium and magnesium to Gatorade Endurance Formula….
>
> Courts in this Circuit and elsewhere have routinely found that a plaintiff's misconduct relates to the subject matter of its claims where, as here, the plaintiff has engaged in the same kind of behavior that it challenges. *See, e.g., Ultreo, Inc.,* 574 F.Supp.2d at 354–55; *Nikkal Indus., Ltd. v. Salton, Inc.,* 735 F.Supp. 1227, 1238 (S.D.N.Y.1990) (explaining that equitable relief would be inappropriate where plaintiff engaged in the "very same conduct" it had challenged); *Haagen-Dazs,* 493 F.Supp. at 76; *see also Morgan Stanley DW, Inc. v. Frisby,* 163 F.Supp.2d 1371, 1380 (N.D.Ga.2001) (holding that "Morgan Stanley is estopped from seeking a restraining order against competitive conduct which it admits to engaging in"); *Salomon Smith Barney Inc. v. Vockel,* 137 F.Supp.2d 599, 603 (E.D.Pa.2000) (denying plaintiff's motion for a preliminary injunction where it "seeks the help of a court of equity to prevent the same conduct by [the defendant] which it had previously abetted and from which it ha[d] handsomely profited").
> …

> [SVC's] own unclean hands also preclude the equitable relief of a preliminary injunction.

*Stokely-Van Camp v. Coco-Cola Co.*, *supra*, 646 F.Supp.2d at 532-34 (some internal citations and quotations omitted). *See also Procter & Gamble Co. v. Ultreo, Inc.*, 574 F.Supp.2d 339, 354–56 (S.D.N.Y.2008) (applying unclean hands doctrine where plaintiff had engaged in advertising virtually identical to the allegedly false advertising of defendant); *Havana Club Holding v. Galleon*, No. 96 Civ. 9655, 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998) (in suit in which plaintiff sought to enjoin defendant from falsely implying that rum originated in Cuba when it did not, holding that defendant adequately pleaded unclean hands defense by alleging that plaintiffs sold Panamanian rum under "Havana Club" label).

As set forth in NJ Amici's January 18, 2024 brief, and further detailed in the July 11, 2024 comments submitted by many of the NJ Amici and others with respect to the draft EA/FONSI prepared for the Bridge Expansion,[3] Plaintiff's positions in this action cannot be reconciled with its positions regarding the Bridge Expansion.

The Bridge Expansion will undisputably increase vehicle miles travelled GHGs, and pollution; alter traffic patterns; lead to even more traffic on local Jersey City streets; and disproportionately impact environmental justice communities. Nonetheless, the State contends that no environmental impact statement is required for the Bridge Expansion and it has no obligation to get public input, consult with public officials, or consider alternatives to reducing traffic congestion. None of these positions can be reconciled with New Jersey's contentions in this action.

---

[3] Amici's comments regarding the EA/FONSI for the Bridge Expansion are annexed hereto as **Exhibit A**.

At the heart of Plaintiff's motion is its claim that the EA provides insufficient mitigation measures for increased truck traffic in Bergen County.  But contrast that with the position it is taking regarding the Bridge Expansion.  The traffic analysis submitted as part of the EA/FONSI shows that the Bridge Expansion will cause an increase in diesel truck traffic during rush hours of between 23.2% and 38.5% when compared to a no-action alternative. The State did not do hot-spot analysis along the truck routes leading to the NB-HCE, has not acknowledged that the huge jump in truck traffic will have substantial environmental impacts, and is not providing any mitigation measures to address those impacts.[4]

Plaintiff has never denied that its positions in this litigation is inconsistent with those it is taking regarding the Bridge Expansion. These inconsistent positions require the denial of Plaintiff's motion.  At the very least, an injunction should not be issued without the development of a full record of Plaintiff's conflicting positions.

**C.  The Court should require the disclosure of the Parties' settlement proposals**

While Fed. R. Evid. 408 bars the disclosure of settlement discussions "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction," it does not prohibit the disclosure of those discussions if they are evidence of a party's bad faith. The Court should require the disclosure and consideration of the settlement proposals exchanged between Plaintiff and the Defendants to determine whether Plaintiff is proceeding in good faith, a prerequisite to granting injunctive relief.

Rule 408 only bars the introduction of a statement if it is being introduced to prove the validity of the claim that was being settled when the statement was made. *See Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 540 (7th Cir. 2017).  Thus, testimony made by trademark

---

[4] *Id.* at 3, 21-22.

owner during settlement discussions regarding owners' trademark infringement claims was admissible at trial to show owners' improper intent and ulterior motive in filing their lawsuit.

The Court has strongly encouraged the settlement of this action, astutely recognizing that a settlement would benefit all parties. NJ Amici did not attend the settlement discussions that were subsequently held (we were not invited). But reports of those talks have leaked out. New York Governor Hochul is quoted as saying that New Jersey officials were not negotiating in good faith.[5] It was also reported that "New York's negotiators have offered New Jersey hundreds of millions of dollars to settle the lawsuit. New York's representatives have also included additional toll credits for New Jersey drivers in the proposed deal."[6] Another report was that the offer included money not only for mitigation, but also "to prop up the beleaguered New Jersey Transit system."[7]

The disclosure of the settlement discussions could very well show Plaintiff's lack of good faith, a prerequisite to granting injunctive relief. The Court should not issue an injunction without disclosure and consideration of the settlement proposals and an understanding of whether New Jersey acted in bad faith by refusing to accept a proposal that would have addressed its concerns regarding the Tolling Program.

Respectfully submitted,

*/s/ John H. Reichman*

John H. Reichman

---

[5] https://www.nytimes.com/2024/12/18/nyregion/congestion-pricing-ny-nj-hochul.html
[6] Id.
[7] https://nyc.streetsblog.org/2024/12/18/nj-refusing-generous-congestion-pricing-lawsuit-ettlement-hochul-says