# EXHIBIT A

July 11, 2024

To: United States Coast Guard
Attn: Donna Fisher
SMB-D1Boston-Bridges-PublicNotices@uscg.mil

**Re: PUBLIC NOTICE D01-209-2024**
**PROPOSED REPLACEMENT OF THE NEWARK BAY-HUDSON COUNTY**
**EXTENSION BETWEEN INTERCHANGES 14 AND 14A (EXTENSION) INCLUDING**
**THE VINCENT R. CASCIANO MEMORIAL, NEWARK BAY BRIDGE (NBB) ACROSS**
**NEWARK BAY, MILE 3.8, BETWEEN NEWARK, ESSEX COUNTY AND BAYONNE,**
**HUDSON COUNTY, NEW JERSEY**

Dear Commander Fisher,

These comments are submitted on behalf of the 60 organizations ("Commenters"), including many of the most important and respected transportation, environmental, environmental justice, community, health, and labor groups in New Jersey and New York, regarding the draft Environmental Assessment (EA) prepared by the New Jersey Turnpike Authority ("NJTA") in connection with its plan to demolish, replace and expand the Newark Bay Bridge (the "Bridge"). The replacement and expansion of the Bridge is the first phase of NJTA's plan to tear down, replace and expand the entire 8.1-mile Newark Bay Hudson County Extension of the New Jersey Turnpike ("NB-HCE") at a 2022 projected cost of $10.7 billion (the "Project" or "NB-HCE Expansion").

The United States Coast Guard ("USCG") has tentatively agreed to take the unprecedented action of issuing a Finding of No Significant Impact ("FONSI") for a major highway expansion and bridge replacement project in lieu of requiring an environmental impact statement ("EIS"). EISs have been required for every major bridge and highway project around the country. In the New York City metropolitan area, EISs were in the recent past prepared for the replacements of the Tappan Zee, Goethals and Kosciuszko Bridges. Because the replacement and expansion of the Bridge (the "Bridge Expansion") will have substantial environmental impacts for generations, an EIS is required.

Alternatively, at a minimum, USCG should reject the clearly deficient EA. The EA fails to consider, among many other things, how the Bridge Expansion will impact traffic throughout Jersey City and the environmental justice communities bordering the NB-HCE. The refusal to allow input from the public and local officials and consider reasonable alternatives also violated NEPA regulations and New Jersey law.

The Bridge Expansion will double the size of a highway in a densely populated urban area, be constructed in highly contaminated areas impacted by two nearby Superfund sites and increase diesel truck travel by up to 38%. The notion that none of this will cause any substantial environmental impacts flies in the face of reason, experience, common sense, the facts, and the law.

1

## I. <u>Summary of Comments</u>

The National Environmental Policy Act ("NEPA") requires federal agencies to prepare an EIS where a project is likely to have significant environmental effects. 40 CFR §1501.3(a).[1] If a proposed action is "not likely to have significant effects on the environment, it may prepare an environmental assessment." §1501.3 (a). In determining whether an EIS must be prepared, an agency must examine whether a project is connected with other projects or actions and, if it is, look at the totality of the "connected actions" to determine whether they would have a significant environmental impact and require an EIS. 40 CFR §1501.3(b).

**An EIS is required for the entire NB-HCE Expansion**. The EA wrongly treats the Bridge Expansion as a stand-alone project and fails to consider the cumulative impacts of the entire NB-HCE Expansion. The Bridge is a segment of the 8.1-mile NB-HCE, which begins at the Newark entrance to the Bridge, runs through Bayonne and Jersey City, and ends at the Holland Tunnel access roads. As NJTA has acknowledged, the Bridge Expansion is the first phase of its NB-HCE Expansion. The Bridge Expansion makes no sense as a stand-alone project. It would leave the four eastbound lanes of the Bridge permanently merging into two lanes, creating monumental traffic congestion in perpetuity.

The NB-HCE Expansion will have undeniable environmental impacts for generations by, among other things, dramatically increasing diesel truck travel and vehicle miles traveled (VMT), which in turn will mean more greenhouse gas emissions (GHGs), more toxic pollutants, and worse health outcomes. Like so many other urban highway projects, overburdened communities will suffer the most harm from the NB-HCE Expansion. More than 70% of the census tracts closest to the NB-HCE are environmental justice communities.

The NB-HCE Expansion will also have potential environmental impacts on i) community resources and demographics; ii) wetlands; iii) threatened and endangered species; iv) flood hazard areas; v) open space and parklands; vi) noise; vii) cultural resources; and viii) aquatic resources, none of which were considered or fully considered in the EA because it only focused on the Bridge Expansion. These impacts must be considered in an EIS.

**An EIS is also required if the Bridge Expansion is wrongly considered a stand-alone project**. USCG's Environmental Planning Implementing Procedures provide that project, which are "highly controversial" or will affect "environmentally sensitive areas," normally require an EIS. The Project and the Bridge Expansion have been highly controversial from the outset and generated enormous and widespread opposition. The Jersey City and Hoboken City Councils have unanimously passed resolutions opposing it, citing among other things the environmental impact it would have. The Mayors of Newark, Jersey City and Hoboken oppose the Project and numerous editorials and op-eds have decried it. Jersey City residents have rallied to oppose NJTA's plans.

The Bridge Expansion will also be constructed in undeniably "environmentally sensitive areas" – highly contaminated areas of Newark Bay impacted by two nearby and notorious Superfund sites, Diamond Alkali and Pierson's Creek. The dredging of Newark Bay will disturb a stew of hazardous

---

[1] The NEPA regulations were amended effective July 1, 2024. While USCG is only legally bound to comply with the pre-existing regulations cited herein in addressing the EA, there is no reason why USCG should not in its discretion follow the updated and strengthened regulations.

substances. The EA provides no reason for USCG not to follow its normal practice of preparing an EIS for projects such as the Bridge Expansion and there is every reason to follow it for the reasons set forth herein.

The failure to require an EIS and the issuance of a FONSI would also conflict with long-standing practices by USCG and other federal agencies. USCG, the Federal Highway Administration (FHWA) and the Environmental Protection Agency (EPA) have uniformly required EISs on bridge and highway projects of the magnitude of the Bridge Expansion. We are unaware of any instance where they have not done so.

**Even assuming that an EIS is not required and the Bridge Expansion is wrongly considered in isolation, the EA fails to comply with NEPA and NEPA regulations and procedures and must be rejected.**

An agency preparing an EA has an obligation to take a hard look at all direct, indirect, and cumulative effects or impacts of the proposed action. No matter how great the perceived benefits, NEPA does not allow an agency to issue a "finding of no significant impact" if adverse impacts are not identified or remain unmitigated. The EA is deficient in the following resects:

1. The EA fails to examine the environmental impact on local streets in Jersey City and in Lower Manhattan. The EA and Traffic Analysis Report ("TA"), appendix B to the EA, address – albeit erroneously and incompletely – the effects the Bridge Expansion would have on Bridge traffic and at the toll plazas at exits 14 and 14A. Inexplicably, they do not consider the impacts at toll plazas 14B and 14C, on local streets in Jersey City, at the entrance to the Holland Tunnel, and in Lower Manhattan.

2. The TA, on which the EA is based, grossly understates the amount of new traffic the Bridge Expansion will generate. Induced demand is a fundamental principle of highway engineering and planning. Traffic studies and experience universally show that when highways are widened, particularly in urban areas, they soon fill to capacity, increasing the number of vehicles using the highway and only providing temporary reduction in traffic congestion. Yet the term induced demand is not mentioned in the EA or TA and many of the factors that cause induced demand are not considered in the EA or TA. The EA and TA fail to explain why urban highways all over the country quickly fill to capacity when expanded, but this phenomenon would miraculously not occur when the lanes on the Bridge are doubled.

3. The TA uses stale data and makes unsupported assumptions regarding future traffic patterns. The TA looked at traffic data for 2019 and 2021, which showed a "severe" drop in rush hour traffic because of the COVID-19 pandemic. NJTA then "assumed [the drop] not to be long lasting and thus no adjustments were made to future volume projections." It was improper to make that assumption when actual traffic data was available for 2022, 2023 and 2024 and there is substantial evidence and reporting that the pandemic has caused permanent changes in rush hour commuting.

4. The TA fails to consider traffic congestion resulting from choke points created by NJTA's phased, decades-long construction of the NB-HCE Expansion. The Project has four phases: phase 1 is the Bridge Expansion; phase 2 is the demolition, replacement, and expansion of the NB-HCE between Exits 14A and 14B; phase 3 is the demolition, replacement, and expansion of the NB-HCE between Exits 14B and 14C; and phase 4 is the demolition and replacement without widening of the ramps leading to the Holland Tunnel access roads. After the completion of phase 1 and before the completion of phase 2, four lanes on the Bridge will feed into the two existing eastbound lanes. After the completion of phase

3

2 and before the completion of phase 3, three lanes of traffic will have to funnel into two lanes. The EA does not consider the monumental congestion these choke points will create.

     5. Buried in the TA is data showing that the Bridge Expansion will cause an increase in diesel truck traffic during rush hours of between 23.2% and 38.5% when compared to a no-action alternative. Diesel trucks are the primary source of numerous toxic pollutants including particulate matter known as PM 2.5, which are associated with cancer, heart and lung disease, asthma, and respiratory issues. NJTA has not done a needed hot-spot analysis along the truck routes leading to the NB-HCE, has not acknowledged that the huge jump in truck traffic will have substantial environmental impacts, and is not providing any mitigation measures to address those impacts, each of which violates NEPA.

     6. The EA's environmental justice ("EJ") analysis is facially deficient. Its study area only consisted of "the portions of Newark, Bayonne, and Jersey City within approximately 0.25 mile (1,320 feet) of the NB-HCE between Interchanges 14 and 14A." (EA 39). There will be increased traffic along the entire NB-HCE as even the TA finds. The vast majority of census blocks that border the NB-HCE are EJ communities and will be impacted by the Bridge Expansion. NJTA did not consult with those communities ( or any other members of the public) or look at the impacts on those communities as NEPA requires.

     7. The EA fails to consider or arbitrarily rejected alternatives for the Bridge Expansion that would reduce traffic congestion and ensure the integrity and safety of the Bridge – the stated goals of the Bridge Expansion. It did not consider funding public transportation projects, which unlike the Bridge Expansion, would reduce traffic congestion and improve the quality of life and health of New Jersey residents.

     Improving bus service could solve the congestion problems on the NB-HCE. During the morning rush hour, 32 times more bus passengers use the Lincoln Tunnel than the Holland Tunnel. It does not take a highway engineer or an urban planner to see that before planning to spend $10.7 billion on an unpopular and controversial highway expansion project, NJTA should have considered ways to increase the number of bus passengers at the Holland Tunnel.

     The EA fails to consider building a new four lane bridge and arbitrarily rejected the alternative of replacing the existing bridge with a new six lane bridge. Building one six lane bridge, instead of two, would substantially reduce the environmental impact of the Bridge Expansion, save billions of dollars, reduce construction time by years and meet all of NJTA's safety concerns and longevity requirements. The EA nevertheless rejected this alternative because it supposedly would be insufficient to handle one hour of rush hour traffic going eastbound on weekdays. The EA failed to consider a host of ways to remedy this relatively minor issue such as lane reversible, shoulder use, and variable tolling.

     The EA also fails to consider Incentivizing off-hour pickup and deliveries or staggered port deliveries and pickups as a way to dissipate rush hour traffic. New York City announced such a program this year in which it seeks to add 5,000 off-hour delivery locations by 2040 and shift 62,000 trucks away from peak hours through various incentives that would cost a minute amount compared to spending $10.7 billion on the Project.

     The EA also rejected the no-action alternative of keeping the Bridge in safe repair by falsely asserting that the Bridge could not be maintained even with extensive repairs and maintenance. A study NJTA commissioned, the July 17, 2020 Needs Assessment and Alternative Study prepared by Jacobs ("Jacobs Study"), found that the existing Bridge can be safely maintained for 40 years at a cost of $260

million. By way of comparison, in 2022, NJTA projected that the Bridge Expansion would cost more than $6 billion.

8. NJTA and USCG have violated NEPA and USCG regulations and New Jersey law, Executive Order 172, by not obtaining public input when developing plans for the Bridge Expansion and drafting the EA. 40 CFR §1501.5(f) requires federal agencies to "involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments." USCG regulations regarding applications for bridge permits require the District Commander to ascertain "the views of local authorities and other interested parties" when a bridge permit application is received. 33 CFR §115.60(a). USCG's Procedures also state that a project proponent "must, whenever feasible, provide an opportunity for public input in the drafting of the EA." (Page 3-28). None of this happened. USCG and NJTA have refused to allow public input in the drafting of the EA without providing any reason why it was not "feasible" to do so; USCG refused multiple requests to meet with or even speak with interested stakeholders, including some Commenters; and NJTA refused to allow any public input into the development of its plans in violation of EO 172.

9. USCG and NJTA also violated the NEPA and USCG regulations by refusing input from or even meeting with Jersey City local officials. While one of NJTA's justifications for the Bridge Expansion is to accommodate expected population and economic growth in Jersey City, USCG and NJTA refused to consider or address Jersey City's concerns that the Bridge Expansion and the Project would be an economic detriment and an environmental disaster.

10. USCG has not involved FHWA and EPA in the environmental review process. Federal regulations provide that any federal agency with special expertise may be a cooperating agency in an environmental review. FHWA has unique and specialized knowledge about traffic impacts and potential alternatives for addressing traffic congestion. The EPA has unique expertise regarding air quality and hazardous substances, issues which should be at the heart of the environmental review of the Bridge Expansion. FWHA and EPA have routinely been involved in the environmental review of projects similar to the Bridge Expansion as lead or cooperating agencies.

USCG must also do a thorough and independent review of the EA and that review cannot be done without FHWA and EPA. It would be an abuse of discretion and conflict with long-standing practices not to involve these agencies here.

## II.  The Commenters

Commenters are among the most important and respected transportation, environmental, environmental justice, community, health, and labor groups in New Jersey and New York. They include:

**EmpowerNJ.** EmpowerNJ is a coalition of 140 environmental, civic, faith, and progressive organizations that advocates for prohibiting new fossil fuel projects and reducing greenhouse gas emissions in New Jersey. It regularly participates in judicial, administrative, and legislative proceedings in New Jersey.

**Hudson County Complete Streets.** HCCS's mission is to improve connectivity and transportation equity in Hudson County by advocating for safe streets, pedestrian and cycling infrastructure, and access to transit in each community. HCCS believes a more connected Hudson County that is safe for pedestrians,

cyclists, scooters, skaters, people in wheelchairs, and other vulnerable road users will promote the health and well-being of our more than 750,000 residents by providing people of all ages and abilities with more mobility options.

**Tri-State Transportation Campaign.** TSTC İs dedicated to promoting sustainable transportation, equitable planning policies and practices, and strong communities in the New York City metro area. Since it was founded in 1993, TSTC has become a leading voice in the region for transportation and land use policy reform.

**Turnpike Trap Coalition.** TTC is a coalition of grassroots organizations from around New Jersey standing together to stop the proposed widening of the Newark Bay Hudson County Extension of the New Jersey Turnpike.

**Food & Water Watch.** Food & Water Watch fights for safe food, clean water, and a livable climate. It has two million supporters and more than 2,000 members and supporters in New Jersey who live within one mile of the NB-HCE and/or recreate on Newark Bay.

**Environment New Jersey.** Environment New Jersey advocates for clean air, clean water, clean energy, wildlife and open spaces, and a livable climate on behalf of our more than 80,000 citizen members and activists across the State. It has supported a fix-it-first approach to highway infrastructure for decades and opposed highway expansions by NJDOT and NJTA, most successfully in stopping the wasteful proposal to build Route 92 in Central Jersey.

**Clean Water Action.** Clean Water Action seeks clean, safe and affordable solutions to water, waste, toxics and energy issues that address public health, environmental, consumer and community problems. Since 1982, Clean Water Action has staffed and operated offices throughout New Jersey with 1 million nationwide and 150,000 New Jersey members.

**BlueWaveNJ.** BWNJ is a grassroots, progressive organization seeking solutions through community. Its working groups, conferences, marches, and special events have mobilized voters and coalitions to demand positive change from legislators at the state and federal level in such critical areas as health care, the economy, marriage equality, the environment, education, electoral reform and sensible gun control.

**Delaware Riverkeeper Network.** DRN is the premier organization working to protect and restore the Delaware River Watershed.

**Don't Gas the Meadowlands.** Don't Gas the Meadowlands advocates for reducing air pollution and GHG emissions in New Jersey, focusing on projects in the northeastern part of the State.

**New Jersey Policy Perspective.** NJPP is an influential nonpartisan think tank that drives policy change to advance economic, social, and racial justice through evidence-based, independent research, analysis, and strategic communications.

**Riders Alliance.** Riders Alliance is a New York based organization that advocates for public transit and a more equitable and sustainable future.

**Transportation Alternatives.** TA works toward transforming our streets into safe, sustainable, and equitable places to walk, bike, take transit, gather, and thrive.

**League of Women Voters of New Jersey.** LWV's work includes protecting voting rights; promoting open, transparent, and accountable government statewide; and protecting our planet from the physical, economic and public health effects of climate change while also providing pathways to economic prosperity.

6

**BikeJC.** BikeJC **is** a volunteer-led nonprofit organization advocating for better, safer, more accessible, and more equitable biking in Jersey City. It organizes group rides and educational events, focused on biking as transportation.

**SafeStreetsJC.** SafeStreetsJC works towards Vision Zero in Jersey City, advocating for cleaner air, safer streets, and investments in mass transit.

**Weequahic Park Association.** WPA is a 30-year-old Olmsted Park Conservancy dedicated to the restoration, preservation and enrichment of Newark's Weequahic Park. WPA champions environmental stewardship through nature-based solutions so that community members can connect with nature, find solace, and experience the enduring beauty of the Park for generations to come.

**NY/NJ Baykeeper**. NY/NJ Baykeeper is the citizen guardian of the NY-NJ Harbor Estuary, working since 1989 to protect, preserve, and restore the waterways and habitats of the Estuary.

**Friends of Liberty State Park.** FLSP's mission is to protect and improve Liberty State Park ("LSP '') for the benefit of the quality of life of urban residents in crowded, congested, concrete, polluted and noisy Hudson County. It opposes plans, which will bring more traffic into and around LSP. LSP borders the NB-HCE.

**New Jersey Bike & Walk Coalition.** New Jersey Bike & Walk Coalition is a statewide advocacy organization for biking and walking and promoting equitable, sustainable active transportation as key components of our transportation system.

**New Jersey Environmental Lobby.** NJEL is an independent, non-partisan organization that engages in advocacy to protect New Jersey's natural resources and the quality of life of its residents. NJEL focuses its efforts on legislation and regulations for clean air, clean water, protection from toxins, and sustainable land use.

**New Jersey State Nurses Association.** NJSNA represents the interests of the state's 110,000 registered nurses, advances the profession of nursing and advocates on behalf of nurses and consumers.

**The Alliance of Nurses for Healthy Environments.** ANHE is a national nursing organization focused solely on the intersection of health and the environment.  Its mission is to promote healthy people and healthy environments by educating and leading the nursing profession, advancing research, incorporating evidence-based practice, and influencing policy.

**Association of New Jersey Environmental Commissions**. ANJEC helps New Jersey environmental commissions, individuals, and local and state agencies to preserve, protect, and restore natural resources and promote healthy communities.

**Make the Road New Jersey.** Make the Road New Jersey builds the power of immigrant, working-class and Latinx communities to achieve dignity and respect through community organizing, high-quality legal services, policy innovation and transformative education. Its legal services, health outreach and educational programming reach more than 100,000 low-income immigrants and people of color with critical, life sustaining and educational services.

**New Jersey Working Family Alliance.** NJWFA is a grassroots independent political organization. It fights for a government that represents the needs and values of working families, elects candidates and organizes campaigns to advance progressive policies, and is building a movement of working families to build a New Jersey for the many, not the few.

**Action Together New Jersey.**  ATNJ was founded in 2016 and led the greatest expansion of vote by mail in the state's history with independent voter data analysis providing unbiased insight into voting patterns and turnout.

**New Jersey Association of Railroad Passengers ("NJ-ARP")** is the leading consumer rail passenger organization within New Jersey. NJ-ARP was established in 1980 by concerned New Jersey residents who wanted a greater voice in deciding their future transit. It testifies at hearings held by New Jersey Transit, PATH, Amtrak, PATCO, and other governmental agencies and has been on the forefront in advocating efficient intermodal transportation solutions using rail, light rail, ferry, bus, and bicycle.

Other Commenters are **350NJ-Rockland, Bergen County Complete Streets, Bike Hoboken, Bike North Bergen, Bike&Walk Montclair, Coalition to Ban Unsafe Oil Trains, David Pringle Associates LLC, DivestNJ, Effective Transit Alliance, Embankment Preservation Coalition, Forest Watch NJ. Friends of Van Vorst Park, Inc, GreenFaith, Harismus Cove Association, Historic Paulus Hook Association, Jersey City Heights Neighborhood Association, Journal Square Community Association, Merchantville Democratic Committee,  Metuchen-Edison-Piscataway Branch - NJ NAACP, Montclair Climate Action, NJ State Industrial Union Council, Open Plans, North Jersey DSA, Our Revolution New Jersey, People over Pipelines, Progressive Democrats of America -New Jersey Chapter, SOMA Action, South Jersey Progressive Democrats, The Wei LLC, Union County Connects, Unitarian Universalist FaithAction NJ, and Waterspirit.**

### III.  Background

In 2020, NJTA approved a ten-year capital plan, which included the NB-HCE Expansion. The Project has four phases: phase 1 is the Bridge Expansion; phase 2 is the demolition, replacement, and expansion of the NB-HCE between Exits 14A and 14B; phase 3 is the demolition, replacement, and expansion of the NB-HCE between Exits 14B and 14C; and phase 4 is the demolition and replacement without widening of the ramps leading to the Holland Tunnel access roads.  As Appendix B to the EA states, the Bridge replacement is part of a long-term Program by NJTA to improve the entire NB-HCE. (TA 1).

The NB-HCE Expansion was budgeted to cost $4.3 billion in the 2020 Capital plan with the Bridge Expansion projected to cost $3.0 billion, 70% of the total cost of the Project.[2] In 2022, EmpowerNJ discovered that NJTA's cost projections bore no relationship to reality.  Buried in the NJTA annual 2023 budget was a line item that the Project would cost $10,695,591,000.  After news broke that the Project would cost $10.7 billion, $6.4 billion more than NJTA had publicly projected just two years earlier, NJTA attributed the increase to inflation and supply chain issues. Obviously, those issues alone could not have caused a $6.4 billion cost increase. (Exhibit 1).[3]

Meanwhile, the Turnpike Trap Coalition ("TTC") learned that NJTA submitted a Bridge Application and Independent Utility Assessment ("IUA") asking USCG to consider the Bridge as a "stand alone" project with "independent utility" and to issue a FONSI.

---

[2] https://www.njta.com/media/5832/2020_njtalongrangecapitalplan_v1-as-approved-may-2020.pdf
[3] Exhibit references are to the exhibits submitted with these comments.

On January 18, 2023, EmpowerNJ, TTC, and the City of Jersey City wrote to the USCG regarding the IUA. The letter explained why i) a full EIS is required for the Project, not the EA sought by NJTA.; ii) the Bridge should not be considered an independent project; iii) a full EIS is required even if the Bridge is wrongly considered a stand-alone project; and iv) the FHWA should be a cooperating agency in the environmental review of the Project. The letter requested a meeting with USCG, access to NJTA's filings and notifications of all NJTA filings and planned or completed actions by the USCG. (Exhibit 1). USCG never responded to the letter.

On January 5, 2024, EmpowerNJ and TTC wrote another letter to the USCG renewing the requests for a meeting and notice of NJTA filings. (Exhibit 2). The letter also explained how NJTA's positions supporting the issuance of a FONSI are diametrically opposed to those NJTA and its parent, the State of New Jersey, have taken regarding New York's congestion pricing plan. On June 12, 2023, Governor Murphy wrote to the FHWA with contributions from NJTA and other State agencies. (Exhibit 3). The letter states that because of congestion pricing, "New Jersey roads will be adversely impacted, our vulnerable communities exposed to more congestion and air quality issues and our state services will be further strained." NJTA went on to say that the congestion pricing plan "may disincentivize transit use and would in fact increase Vehicle Miles Traveled on the New Jersey side of the river, the exact opposite of one of the program's stated goals." It also cited the need for a "fine-grained analysis" of how congestion pricing would affect local neighborhoods. It points out one in four children in Newark has asthma (three times the national average) and that congestion pricing conflicts with President Biden's Justice40 commitments and Governor Murphy's E.O. 23 on environmental justice. Without a hint of irony, NJTA also complained about "the lack of public outreach" and the need for public hearings as part of the development of the EA for the program. These are the very reasons why an EIS is also required here and the EA is fatally flawed.[4]

USCG Commander Fisher responded to the January 5, 2024 letter by email saying that USCG will be issuing a Public Notice regarding the Bridge Expansion and USCG will add "everyone on this email distribution to the Public Notice distribution list so that you all receive a copy directly." She added that EmpowerNJ and TTC could contact Ms. Donna Leoce, the assigned project officer, "with any questions or concerns you have." When EmpowerNJ followed up with Ms. Leoce, Ms. Leoce refused to meet or even discuss the concerns raised in the letters and wrote that she would forward the January 5, 2024 letter "to the NJTA to address your concerns." (Exhibit 4). NJTA never responded except to say that our concerns would be addressed in "due course." (Exhibit 7). Due course came and went without any further communication from NJTA.

On May 9, 2024, USCG issued a Notice (the "Notice") regarding the EA requiring comments to be submitted by June 13, 2024. The Notice states that USCG intends to issue a FONSI "unless significant impacts are revealed by this public notification and public information events." EmpowerNJ and TTC were not sent the Notice despite USCG's promise to do so. As described below, only one of the three

---

[4] Subsequently, New Jersey filed suit to stop the congestion pricing plan from proceeding on the grounds that FHWA's environmental assessment was inadequate and a FONSI should not be issued (the "Congestion Pricing Action").

public information events referenced in the Notice had been held and there NJTA had refused to allow public comments or take questions from the audience.

The Notice disturbingly suggests that USCG will not be examining numerous significant environmental impacts caused by increased traffic on the Bridge, the NB-HCE, and local streets.  In the section of the Notice entitled "Solicitation of Comments," it asked "Mariners …  to comment on the placement of a bridge protective system and other navigational safety issues," and "interested parties to comment upon impacts on minority and/or low-income populations, if any." It did not ask for, but said it would consider, "comments of an environmental nature such as those regarding wildlife refuges, waterfowl refuges, public parks, historic sites, wetlands, floodplain issues, air, water quality, etc." Notably absent from the Notice is the elephant in the room, the effect that doubling the size of a highway in a densely populated urban area will have on air quality, climate, and the quality of life.

On May 19, 2024, EmpowerNJ, TTC and the Tri-State Transportation Campaign wrote to USCG asking that time for comments be extended until 30 days after the NJTA holds its long promised public information sessions or by 60 days, whichever is later. (Exhibit 5). The letter gave five reasons for the request: i) the failure to hold the promised public information sessions, which the Notice states are a component of the environmental review process; ii) the Notice was not sent to interested parties as promised by USCG; iii) NJTA was limiting notice to the public and stakeholders about the EA and the comment period by removing any reference to the on-going environmental review from its main website; iv) the Notice states that the EA documents will be made available at library branches in Bayonne and Jersey City and the main public library in Newark when those documents were unavailable at those locations; and v) 30 days is an unrealistic and inadequate timeframe for stakeholders to thoughtfully and meaningfully submit comments regarding a complex, multibillion dollar project.

The USCG only granted an extension until July 13th, despite the fact that the Jersey City public information session was held on July 9, 2024, leaving insufficient time for Jersey City residents to obtain the information needed to submit comments to the EA.

## IV.  An EIS is Required

### A.  NEPA Standards Regarding When an EIS is Required

NEPA requires federal agencies to take environmental considerations into account "to the fullest extent possible." 42 U.S.C. §4332.  Under NEPA's implementing regulations, federal agencies must prepare an EIS where a project is likely to have significant environmental effects.  40 CFR §1501.3(a).  If a proposed action is "not likely to have significant effects" on the environment, it may prepare an environmental assessment."  40 CFR §1501.5.

In determining whether an EIS must be prepared, an agency must examine whether a project is connected with other projects or actions and, if it is, look at the totality of the "connected actions" to determine whether they would have a significant environmental impact and require an EIS. 40 CFR §1501.3(b). Actions are connected if they "cannot or will not proceed unless other actions are taken previously or simultaneously" or are "interdependent parts of a larger action and depend on the larger action for their justification."  40 CFR §1501.9(e)(1).

10

Each agency is required to list in its regulations the actions that normally do not have a significant effect on the human environment and therefore do not require preparation of an EIS. 40 CFR § 1501.4. The USCG's regulations do not identify any actions that would not require an EIS. 33 CFR §1 et seq. The Project is not among those that normally do not require an EIS under the US Army Corp of Engineers implementing NEPA regulations. 33 CFR §230.7.

**B.  An EIS is Required for the Entire NB-HCE Expansion**

Because the Bridge Expansion is integrally connected to the expansion of the entire NB-HCE Expansion and that Project will have substantial environmental impacts for generations, an EIS must be prepared for the NB-HCE Expansion.

The Bridge is a segment of the 8.1-mile NB-HCE, which begins at the Newark entrance to the Bridge, runs through Bayonne and Jersey City, and ends at the Holland Tunnel access roads. As NJTA has acknowledged, the Bridge Expansion is the first phase of its NB-HCE Expansion. NJTA is seeking permits for the entire Project and its planning and budget documents, such as its 2023 annual budget, consider increasing the capacity of the entire NB-HCE as one interconnected project. (Exh.1).

Indeed, it would make no sense to increase the capacity of one segment of the NB-HCE, the Bridge, and not expand the other segments. That would cause the NB-HCE to look like a snake after a big meal. It would not reduce traffic congestion but make it worse. The four eastbound lanes of the Bridge would permanently feed into two lanes, creating monumental traffic congestion at that choke point in perpetuity.

The EA fails to consider, as it must, the cumulative impacts of the entire NB-HCE Expansion NEPA regulations define effects or impacts to include "cumulative effects which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." 40 CFR § 1508(1)(g). This requires the EA to examine all the impacts caused by the NB-HCE Expansion.

Similarly, the common action rule, also known as the rule against segmentation, prevents agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact, thereby failing to address the true scope and impact of the activities that should be considered. It was improper for the EA to break up the NB-CBE Expansion into segments and not consider the overall impact of the Project.

There is no serious question that if the NB-CBE Expansion is considered in its entirety, it would generate significant environmental impacts and the need for an EIS. As detailed below, the Project would increase GHGs, foul the region's already poor air quality, increase the health risks of the region's residents, disproportionately harm vulnerable and minority communities, conflict with the federal climate and environmental justice goals and affect wetlands, the habitats of endangered species, and the limited parkland and open spaces Jersey City has.

11

The NB-HCE Expansion would impact New Jersey's ability to meet its climate and carbon reduction goals. Pursuant to the Global Warming Response Act, N.J.S.A. 26:2C-58[5] and Executive Order 274,[6] New Jersey's policy is to reduce GHGs by 80% from 2006 levels. NJDEP's latest Greenhouse Gas Inventory Report ("GGIR") shows that the transportation sector is by far the largest source of GHGs in the State, accounting for 37.3% of all emissions with almost all those emissions coming from private cars and trucks.[7] By way of comparison, the next largest source of GHGs in the State – electric generation – accounts 19.1 % of GHGs. Both the percentage and amount of GHGs are now likely to be higher than shown in the GGIR. The GIRR is based upon 2021 data when the Covid-19 pandemic was still suppressing vehicle use.

The NB-HCE Expansion will greatly and disproportionately affect disadvantaged communities. As described below in connection with the flawed EA, an agency must take a hard look at environmental justice impacts and a large majority of census tracts closest to the NB-HCE are EJ communities, which will be disproportionately harmed by the Project.

The Jacobs Study states that the NB-HCE Expansion will potentially cause significant environmental impacts on i) community resources and demographics (Environmental Justice/Title VI); ii) wetlands adjacent to the NB-HCE on both sides of Newark Bay; iii) threatened and endangered species; iv) flood hazard areas; v) open space and parklands; vi) noise; vii) cultural and community resources; and (viii) aquatic resources." (Exhibit 6, p. 3-2).

According to Jacobs, **"**threatened and endangered species are known to occur in Newark Bay and the wetland areas associated with Rutkowski Park in Bayonne and in Liberty State Park and Liberty National Golf Course in Jersey City. These species are migratory and wading birds including herons, egrets, and the Peregrine falcon. Two federally listed species, the short-nosed sturgeon and the Atlantic sturgeon, are known to occur in the Hudson River." (Page 3-12).

Jacobs also identified eight different parks that would be affected by the NB-CHE Expansion, seven in Jersey City and one in Bayonne. There is already a shortage of open and park space in Jersey City that the Project would make worse. Jacobs notes that "Hudson County is densely developed with little available land for compensatory mitigation for the loss of parkland. The study area also generally represents an environmental justice community for which access to open space and recreational resources is important and impacts to parkland are likely to be subject to public scrutiny and opposition." (Pages 3-20, 3-21).

Because the EA was limited to the Bridge Expansion, none of these impacts were considered in violation of NEPA requirements.

## C. USCG's NEPA Implementing Procedures Call for an EIS

USCG's procedures require an EIS even if the Bridge Expansion is erroneously considered a stand-alone project. An agency's environmental review is deficient and subject to judicial reversal if it does not follow its own environmental review procedures. Coalition for Canyon Preservation v. Bowers, 632 F.2d

---

[5] N.J.S.A. 26:2C-58 requires the State to lower GHGs in accordance with the goals established by the United States Climate Alliance. One of those goals is to reduce GHG emissions at least 50-52% below 2005 levels by 2030.
[6] https://nj.gov/infobank/eo/056murphy/pdf/EO-274.pdf.
[7] https://dep.nj.gov/wp-content/uploads/ghg/2024-ghg-inventory-report.pdf, p.4

774, 786 (9th Cir. 1980) (enjoining highway construction project for failing to comply with an agency's policy and procedure manual).

USCG's Planning and Implementing Procedures for NEPA provide the following guidance regarding when to prepare an EIS:

> 2. Coast Guard Actions Normally Requiring EISs. Coast Guard actions normally requiring an EIS include, but are not limited to:
>
> a. Activities where the effects on the human environment are likely to be highly controversial in terms of environmental impacts or involve unique or unknown environmental risks;
>
> b. Construction projects that would have a significant effect on environmentally sensitive areas…. (Page 3-31).

The Bridge Expansion falls squarely within both standards. It has been highly controversial from the time it was announced and has generated enormous and wide-spread opposition.[8] The Jersey City and Hoboken City Councils have unanimously passed resolutions opposing it citing, among other things, the environmental impact it would have. Numerous editorials and op-eds have decried the Project. Jersey City residents have rallied to oppose the plan.[9]

The highly controversial nature of the Bridge Expansion is additionally shown by the breadth of organizations signing on to these comments. We further anticipate that governmental officials and numerous members of the public will be submitting comments objecting to the EA.

The Bridge Expansion will also occur in a highly contaminated area of Newark Bay impacted by two notorious Superfund sites, an undeniably "environmentally sensitive area," involving "unique or unknown environmental risks." As Appendix E-1 to the EA puts it:

> Newark Bay is impacted by two NPL "Superfund" sites, the Diamond Alkali Company and Pierson's Creek. Diamond Alkali operated on the bank of the Passaic River at 80 Lister Avenue in the Ironbound section of Newark approximately four miles up-river from the Newark Bay Bridge of the NB-HCE. The site operators manufactured numerous chemicals on the site, including 2,4,5-trichlorophenol, which is likely to contain dioxin as an impurity. The NPL includes the entire Newark Bay, the entire Passaic River up to the Dundee Dam in Clifton, and a portion of the Hackensack River to a location in the vicinity of Van Keuren Avenue in Jersey City. Pierson's Creek is in an industrial area of Newark and discharges to Newark Bay approximately 1.5 miles

---

[8] https://www.nj.com/news/2022/01/opposition-mounts-to-47b-plan-to-widen-the-highway-to-the-holland-tunnel.html;https://www.nj.com/news/2022/01/just-fix-nj-turnpike-extension-to-holland-tunnel-dont-spend-47b-to-widen-it-opponents-say.html

[9] https://www.nj.com/opinion/2022/06/the-4b-plan-to-choke-hudson-county-editorial.html; https://www.nj.com/opinion/2022/09/weinberg-widen-the-turnpike-thats-not-a-solution-opinion; htmlhttps://watch.ktwu.org/video/vo-bike-protest-1668454832/

13

downstream of its headwaters. Historically, there have been several sources of contamination to the creek, a main contributor being the Troy Chemical Corporation facility. (p 28).

On February 13, 2004, EPA entered an order adding Newark Bay to the Diamond Alkali Superfund Site, as the "Newark Bay Study Area of the Diamond Alkali Superfund Site."  When the Army Corp of Engineers sought to deepen shipping channels through dredging and blasting of the harbor floor, an EIS was prepared for that project. Environmental groups then successfully sued the Corps when it failed to take a hard look at whether a supplemental EIS had to be prepared.[10]

 Dredging will be required for constructing the foundations of the new bridges.  (EA xxxiv, 159, 198). The EA states that the "contamination is generally due to extensive past and present industrial and manufacturing activities in the area surrounding the project. Sites include chromate sites, Superfund site-related issues, and presence of contaminated historic fill." (EA 146-7). Because of the proximity of the Bridge to the Superfund site, the Bridge replacement and Newark Bay remediation will have to be coordinated. (EA 157). The EA admits that the "existing NB-HCE right-of-way will be considered sensitive areas." (EA 159).

From an even larger group of contaminated sites, the EA identifies 22 contaminated sites as areas of "potential environmental concern." (EA 148-49).  Appendix E-1 to the EA, the Hazardous Materials Survey Report, is more definitive, stating that these 22 sites are areas of environmental concern. It also recognizes the Project will not end with the Bridge Expansion and identifies 68 other sites of environmental concern along the NB-HCE corridor:

> Hazardous waste and contaminated materials are present virtually throughout the entire area near the NB-HCE corridor, as over 100 properties were identified as having environmental concerns within the Study Area(s) of the Program. Out of 154 properties, 90 properties are judged to be potential environmental constraints that may impact the NB-HCE right-of-way (ROW). The number of properties by Study Area considered as potential environmental constraints are as follows:
> - Project 1 – 22 properties.
> - Project 2 – 25 properties.
> - Project 3 – 21 properties.
> - Project 4 – 22 properties.

(EA, Appendix E-1, p.1).

In the area around the Bridge, there is an endless list of contaminants including petroleum hydrocarbons, polycyclic aromatic hydrocarbons (PAHs), metals, and extractable petroleum hydrocarbons, benzene, methyl t-butyl ether, total petroleum hydrocarbons, and light non-aqueous phase liquid [LNAPL]). (EA 154).  These contaminants are among the most toxic in the world. The EA says this about the potential disturbance of contaminated materials:

---

[10] Natural Resources Defense Council v. US Army Corps of Engineers, 399 F. Supp. 2d 386, 411-12 (S.D.N.Y. 2005)

"During project construction, historic fill and otherwise contaminated soil and/or water could be encountered in places along the entirety of the project during clearing, excavation, grading, demolition, and the construction of piers and footings of the viaducts and bridges. Soil disturbance will also occur during construction of temporary and permanent access roads, construction staging areas, and stormwater basins. Construction activities within contaminated media (soil, sediment, groundwater) have the potential to cause contaminants to migrate both vertically and horizontally. Contaminant release and transport mechanisms during construction include contaminated soil transported as dust and volatilization of contaminants from the soil and groundwater matrices to the soil vapor phase, and existing soil vapor contaminants. The most likely route of exposure will be through breathing volatile/semi-volatile compounds or particulate-laden air released during demolition, excavation, and construction activities." (EA xxxii-xxxiii).[11]

There is no reason for USCG not to follow its normal procedures of requiring an EIS and there is every reason for USCG to do so for all the reasons set forth herein.

D. **The Prior Practices of USCG and Other Federal Agencies Mandate an EIS**

EISs have been prepared for every major bridge replacement project in the New York City area such as the replacement of the Tappan Zee Bridge,[12] the Goethals Bridge,[13] and the Kosciuszko Bridge.[14] When USCG has been the lead agency, it has uniformly prepared EISs whenever large new bridge projects are being undertaken such as the construction of bridges over the Mississippi River,[15] the Ohio River,[16] and the Raritan River.[17]

Other federal agencies, such as the FHWA, have required an EIS for large highway and bridge projects. These include to name a few of many: the Chesapeake Bay Crossing Study, which sought to decrease congestion at the Bay Bridge in Maryland; the Lafayette Regional Xpressway  project in Louisiana; the I-495 and I-270 Managed Lanes Study in Maryland which proposed replacing an existing

---

[11] The EA claims that there will be no substantial environmental impact from dredging and the disturbance of hazardous waste because it will take "appropriate" preventive measures most of which are unspecified or not yet developed. These promised, unspecified mitigation measures not only do not overcome the presumption that an EIS is required under USCG Procedures, but rather support it.

[12] https://www.federalregister.gov/documents/2011/10/12/2011-26280/environmental-impact-statement-tappan-zee-hudson-river-crossing-project-rockland-and-westchesterr

[13] https://www.federalregister.gov/documents/2004/08/10/04-18205/draft-environmental-impact-statement-goethals-bridge-modernization-program

[14] https://www.dot.ny.gov/regional-offices/region11/projects/project-repository/kosciuszko/getdoc.html

[15] Citizens for Mass Transit v. Adams, 630 F.2d 309 (5th Cir. 1980) (USCG issued an environment assessment, received comments and held three public hearings and then prepared an EIS).

[16] Coalition for Responsible Regional Development v. Coleman, 430 F. Supp 13 (S.D. W.Va.), vacated on other grounds 518 F.2d 522 (4th Cir. 1975).

[17] Citizens' Committee for Environmental Protection v. USCG, 456 F. Supp. 101 (D.N.J. 1978).

15

bridge in an effort to decrease congestion; a bridge replacement project in Buffalo; and the addition of a vehicular travel lane near JFK airport.[18]

New Jersey made this same point in the Congestion Pricing Action, maintaining that large highway projects increase VMT, change traffic patterns, cause and increase air and noise pollution, and necessitate an EIS. Its Complaint states that "NEPA was enacted to address the impacts of large-scale federal highways … that could harm the environment and adversely affect local communities," and cites countless instances where highway projects required an EIS even when they were far, far smaller in scope and less consequential than the Project or the Bridge Expansion.[19]

The Bridge Expansion will profoundly impact traffic and pollution in the entire region for generations. We are unaware of any project of the magnitude of the Bridge Expansion that has not required an EIS. Doing so here would be wrong and unprecedented.

## VII.  The EA is Fatally Flawed

### A.  The Traffic Analysis Underlying the EA is Fundamentally and Fatally Flawed

The TA started from the premise that the eight lane Bridge Expansion is the "Initially Preferred Alternative for the NB-HCE program" (TA 41) and then reached the conclusions NJTA wanted it to come to. In doing so, the TA i) fails to consider the effect of the Bridge Expansion on NB-HCE exits, local streets and Lower Manhattan; ii) fails to consider induced demand and its significant environmental impacts; iii) uses stale data and makes unsupported assumptions regarding future traffic patterns; and iv) fails to consider traffic congestion caused by NJTA's phasing of the Project.

### 1.  The TA Fails to Consider the Effect of the Bridge Expansion on NB-HCE Exits, Local Streets and Lower Manhattan

An environmental assessment must take a hard look at all potential environmental impacts. The TA addressed, albeit erroneously and incompletely, the effects that the Bridge Expansion would have on traffic at the toll plazas at exits 14 and 14A. (TA 1). Inexplicably, it did not consider the effect of the Bridge Expansion on the toll plazas at 14B and 14C, local streets in Jersey City, congestion at the Holland Tunnel approach, and traffic in Lower Manhattan.

The increased number of vehicles on the Bridge will not, of course, all exit at 14 and 14A. Most vehicles will continue on to Jersey City or go through the Holland Tunnel into Lower Manhattan. This traffic will place an additional burden on the local road system to handle more vehicles, which is one of the reasons Jersey City and Hoboken are so adamantly opposing the Project.

Jersey City's local streets are already utilized as a cut-through alternative to reach the Holland Tunnel due to the frequent congestion at the Holland Tunnel approach. An independent traffic study prepared for Jersey City in 2021 showed that roughly 25% of vehicles exiting the NB-HCE at the Jersey City

---

[18] See New Jersey's brief in support of its motion for summary judgment in the Congestion Pricing Action, pp.12-13.
[19] Complaint at paragraphs 5,7, 38, and 40.

Blvd/Liberty Light Rail and Columbus Drive exits in Jersey City during the weekday AM peak were pass-through trips. The Bridge expansion will further exacerbate traffic congestion in neighborhoods adjacent to NB-HCE exits and on local roads used to reach the entrance to the Holland Tunnel. (Exhibit 1).

The increased traffic in Jersey City and Lower Manhattan will indisputably have significant environmental impacts by increasing GHGs, VMT, and toxic air pollutants. The EA's failure to consider those impacts requires the rejection of the EA.

    **2.**  **The TA Fails to Fully Consider Induced Demand and its Significant Environmental and Climate Impacts**

        **a.**  **Induced Demand is a Fundamental Principle of Highway Planning than Must be Considered in an Environmental Review**

Induced demand is a fundamental principle of highway engineering. Traffic studies and experience universally shows that when highways are widened, particularly in urban areas, they quickly fill to capacity, increasing the number of vehicles using the highway and only providing temporary reduction in traffic congestion. Yet the term induced demand does not even appear in the EA or the TA and its impact has not been fully considered. The EA and TA fail to explain why urban highways all over the country quickly fill to capacity when expanded, but this phenomenon miraculously would not occur when the lanes on the Bridge are doubled.

Rocky Mountain Institute ("RMI") is a highly regarded firm dedicated to researching climate change and sustainability issues. The New Jersey Board of Public Utilities previously hired RMI to provide modeling and consulting services for New Jersey's 2019 State Energy Master Plan. RMI summarized the effects of highway expansions this way: "[R]oad expansion projects move us in the wrong direction, generating more traffic that increases climate pollution, worsens local air quality, and leads to more road crashes. Vulnerable and frontline communities bear a disproportionate burden from these impacts, including health effects from hazardous air pollutants."[20]

A recent report from the Victoria Transport Policy Institute lists 27 other studies of induced demand that found, among other things, that VMT increases in proportion to lane-mileage, any benefits from relieving traffic congestion generally vanishes after five years, and a 10% increase in lane miles increases VMT by 9% beyond natural growth.[21]

For decades, federal agencies have also advised that induced demand increases traffic and traffic congestion and must be accounted for in highway planning. The EPA's 2002 Guidebook on Induced Travel included studies showing that a 10% increase in highway capacity caused an immediate 3% to 5% increase in VMT in 1 to 2 years and a 5% to 9% increase in VMT over 10 to 20 years.[22] FWHA's Environmental Review Toolkit states it "is important for transportation analyses to consider the significance of induced

---

[20] https://rmi.org/if-you-build-it-the-cars-and-the-pollution-will-come/
[21] https://www.vtpi.org/gentraf.pdf
[22] https://dep.nj.gov/wp-content/uploads/ghg/2024-ghg-inventory-report.pdf

demand."[23] FHWA calculated that each mile of new highway lane increases capacity up to 2,850 vehicles/hour.[24]

There are countless case studies of highway widenings increasing vehicle use and not relieving congestion. After Los Angeles' I-405 freeway was expanded, after five years of construction and a cost of more than $1 billion, traffic is moving slower than before the widening.[25] When the Katy Freeway in Houston was widened to more than 20 lanes at a cost of $2.8 billion, congestion returned to previous levels within a few years, and became worse. A report found that between 1993 and 2017, 30,511 new freeway lane-miles of road were built in the largest 100 urbanized areas in the country, an increase in capacity that far outstripped the population growth in those regions over the same time. Traffic delays in those urbanized areas increased by 144 %.[26]

USCG previously recognized the need to study and independently consider induced demand. In 2011, the Port Authority of New York and New Jersey applied to the USCG to raise the nearby Bayonne Bridge. USCG directed the Port Authority to produce an induced demand study and then retained its own independent consultant, to "confirm the reasonableness and appropriateness" of the Port Authority's analysis. [27]

This is a far stronger case for fully and independently considering induced demand than the Bayonne Bridge raising, where induced demand was a secondary impact arising from more cargo ships reaching the port and lanes were not added to the bridge. Here, the impact is direct from doubling the number of lanes on the Bridge.

### b. Traffic Generated by Induced Demand has Significant Environmental Impacts

The increase in VMT caused by induced demand will create particulate matter pollution, ground level ozone and toxic chemicals such oxides of nitrogen (NOx) and benzene that severely impact the health of New Jersey residents. The greater the VMT, the greater those health costs. Jersey City, Hudson County and the region already suffer disproportionately from bad air and the diseases, health related problems and the economic damage that bad air causes.

Particulate matter, known as PM 2.5, is a great risk to human health and one of the most dangerous environmental pollutants. It is associated with premature deaths, heart and lung disease, asthma, and respiratory issues, such as irritation of the airways, coughing or difficulty breathing. COVID-19 mortality rates are higher in areas with more particulate pollution than in areas with even slightly less. Particulates from vehicle use also react with sunlight to create ground-level ozone, informally known as smog. Vehicles are the largest cause of smog and nitrous oxide emissions. Smog causes respiratory

---

[23] https://www.environment.fhwa.dot.gov/nepa/Travel_LandUse/travel_landUse_rpt.aspx#l2-4-6-Addressing-Land-Development-or-Redistribution-Effects  Section 2.4.6.3
[24]  https://www.fhwa.dot.gov/policyinformation/pubs/pl18027_traffic_data_pocket_guide.pdf
[25] http://media.metro.net/projects_studies/pm/images/pm_october_2013_i405_sepulveda_pass_improvements2.pdf;http://la.curbed.com/archives/2014/10/405_commutes_now_a_minute_worse_than_before_carpool_lane.php
[26] The Congestion Con, http://t4america.org/maps-tools/congestion-con/
[27] Coalition for Healthy Ports v. USCG, 2015 WL 7460018 (S.D.N.Y. 2015). In rejecting a subsequent challenge to the EA, the court found that USCG had taken the requisite "hard look" at induced demand.

diseases and premature death and is especially harmful to children, senior citizens, and people with asthma or allergies. In New Jersey, more than 600,000 adults and 167,000 children suffer from asthma. One in four children in Newark have asthma, three times the national average.

New Jersey already has some of the worst air in the country. All of New Jersey has been designated as nonattainment for federal ozone national ambient air quality standards, meaning that the *entire state* suffers from unhealthy air due to excess levels of ground-level ozone. The Project will make Hudson County's bad air worse and increase the health and economic problems its residents already suffer from.

As discussed above, the traffic generated by induced demand will, of course, also run counter to the climate goals of the United States and New Jersey. On January 9, 2023, the Council on Environmental Quality issued interim guidance, effective immediately, with respect to NEPA compliance. The guidance requires agencies to "quantify proposed actions, GHG emissions, place GHG emissions in appropriate context and disclose relevant GHG emissions and relevant climate impacts and identify alternatives and mitigation measures to avoid or reduce GHG emissions." Agencies should "mitigate GHG emissions associated with their proposed actions to the greatest extent possible" and conduct a "climate change" analysis in order "to evaluate reasonable alternatives and mitigation measures that could avoid or reduce potential climate change-related effects and help address mounting climate resilience and adaptation challenges."[28]

When, as here, induced demand is not properly considered, there cannot be a complete and accurate accounting of GHGs and the climate impacts of a project.

### c.  The EA Fails to Fully Consider Induced Demand

While not even mentioning the term induced demand or the principles underlying it, the TA calculates that there would be a 21.9% increase in vehicles on the NB-HCE resulting from the diversion of vehicles now using other existing routes into Jersey City and Bayonne. (TA 65).  As demonstrated above, this number is grossly understated and is at odds with countless studies and the history of highway expansions. One reason for this is that it does not consider all the sources of induced demand.

FHWA's Environmental Toolkit found that "induced demand comes from a number of sources, including trips diverted from other routes, discretionary trips that might not have been made without the service improvement, and improved access to employment and other activity location choices."[29] Induced demand also results from persons using the expanded highway instead of using other modes of transportation such as public transportation.[30] While trip diversion was considered in the TA, none of the other factors causing induced demand were taken into account.

---

[28] https://www.federalregister.gov/documents/2023/01/09/2023-00158/national-environmental-policy-act-guidance-on-consideration-of-greenhouse-gas-emissions-and-climate

[29] https://www.environment.fhwa.dot.gov/nepa/Travel_LandUse/travel_landUse_rpt.aspx#l2-4-6-Addressing-Land-Development-or-Redistribution-Effects Section 2.4.6.3

[30] https://www.vtpi.org/gentraf.pdf

The environmental impacts of the Bridge Expansion cannot be properly evaluated without taking a hard look at induced demand and the significant environmental impacts it will bring about. And those impacts will be substantial.[31]

### 3. The TA Used Stale Data and Made Unsupported Assumptions

The TA looked at traffic data from 2019 to 2021, which showed a "severe" drop in rush hour traffic during that time because of the COVID-19 pandemic and then "**assumed** [the drop] not to be long lasting and thus no adjustments were made to future volume projections." (TA 35).

The EA does not explain why more current data was not used when that data was available for 2022, 2023 and 2024. The use of stale data is grounds to invalidate an environmental review. Northern Plains Resource Council, Inc. v Surface Transp. Bd., 668 F.3d 1067, 1086-7 (9th Cir. 2011) ("In summary, the Board relied on stale data during the environment impact analysis process of TRRC III and failed to properly update the data with additional studies and surveys. We hold that such faulty reliance does not constitute the "hard look" required under NEPA.")

It is also apparent that work-from-home and hybrid work trends that began during the pandemic are not changing soon, if at all. While overall traffic volumes have returned or exceeded pre-pandemic levels, rush hour traffic has thinned out because of flexible work schedules and more remote work.

A study by a faculty member in the UNC Department of City and Regional Planning found that "traffic demand is spreading out" in the post Covid period as people are not traveling at traditional rush hour times as much as they were prior to the pandemic. The study went on to warn public agencies not "to overbuild infrastructure" and "to consider planning for lower-peak demand."

> Using pre-pandemic factors that are no longer correct could lead agencies to overbuild infrastructure, leading to increases in cost, greater climate impacts, and ultimately induce more driving due to more widely available infrastructure. Public agencies should carefully consider future expansion plans, and consider planning for lower peak demand than they might otherwise based on pre-pandemic data. Even if travel continues to increase post-pandemic, if that travel is distributed differently, additional roadway capacity may not be warranted.[32]

The sole source that NJTA cites for assuming that rush hour traffic is immutable is the Transportation Planning Authority Long-Range Plan (the "NJTPA Plan") (EA xvii).[33] The EA does not provide

---

[31] RMI has developed a SHIFT (State Highway Induced Frequency of Travel) calculator to determine the added VMT and pollution caused by adding additional highway lanes. The portion of the NB-HCE between exits 14 and 14A is approximately four miles long. (EA 4) NJTA proposes adding four new highway lanes between those exits. Using RMI's SHIFT calculator those 16 additional lane miles are estimated to induce another 79 to 118 million vehicle miles traveled per year, producing emissions equivalent to an additional 9,400 passenger cars and light trucks. https://shift.rmi.org/

[32] https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0290534

[33] https://www.njtpa.org/Planning/Plans-Guidance/Plan-2050.aspx

a page reference for this because none exists. While the NJTPA Plan assumes that the region will largely recover to pre-pandemic "growth levels" after a five-to-ten-year setback (p. 4), no assumptions were made about whether the drop in rush hour will continue and whether people will continue to work from home. Indeed, in conflict with the EA, this statement is buried in the TA:

> Based on information obtained from the North Jersey Transportation Planning Authority (NJTPA), lasting changes in traffic forecasts due to the pandemic may not be fully understood for some time, until travel and work patterns settle into a recognizable post-pandemic pattern, which may not be known until the end of the current decade. (TA 43).

Notably, the NJTPA Plan strongly supports many of the points made in these comments. The Plan lists nine strategies to move the State "towards a more efficient and resilient transportation future," which include supporting and improving public transportation and active transportation such as bikeways and walkways. (pp 1, 8-10). Glaringly absent from those strategies is expanding highways generally or the NB-HCE specifically.

### 4. The TA Fails to Consider Traffic Congestion Caused by Choke Points NJTA Will Be Creating

The TA fails to consider traffic congestion resulting from choke points created by NJTA's phased, decades-long construction of the NB-HCE Expansion. As noted above, the Project has four phases: phase 1 is the Bridge Expansion; phase 2 includes the expansion of the NB-HCE between Exits 14A and 14B; phase 3 includes the expansion of the NB-HCE between Exits 14B and 14C; and phase 4 is the demolition and replacement, without widening, of the ramps leading to the Holland Tunnel access roads. After the completion of phase 1 and before the completion of phase 2, four lanes on the Bridge will feed into the two existing eastbound lanes. After the completion of phase 2 and before the completion of phase 3, three lanes of traffic will have to funnel into two lanes. The EA does not account for the monumental congestion these choke points will create.[34]

### B. The EA Fails to Address the Impact from the Dramatic Increase in Diesel Truck Traffic Generated by the Bridge Expansion

Buried in the TA and undisclosed in the EA is data showing that the Bridge Expansion will cause an enormous increase in diesel trucks coming into and leaving the port. The TA projects that under the no-build alternative 457 trucks would be going eastbound and 362 trucks going westbound during a weekday am peak rush hour between exits 14 and 14A. (TA 57). With the Bridge Expansion, those numbers would jump to 563 trucks going eastbound and 450 trucks going westbound. (TA 60). This

---

[34] If one engages in the fiction that the Bridge Expansion is a stand-alone project and the remainder of the NB-HCE will not be expanded, the choke point where four lanes of Bridge traffic merges into two lanes of the existing NB-HCE would be permanent and potentially create forever traffic congestion.

constitutes a 23.2% increase in eastbound rush hour truck traffic and a 24.3% increase in westbound traffic solely due to the Bridge Expansion.

Even larger increases will occur in the afternoon peak rush hour. Under the no-action alternative, 135 trucks would be going eastbound and 156 trucks would be going westbound. (TA 57). With the Bridge Expansion, those numbers would jump to 187 trucks going eastbound and 196 trucks going westbound, constituting a 38.5% increase in eastbound rush hour truck traffic and a 25.6% increase in westbound traffic solely due to the Bridge Expansion. (TA 60).

Diesel trucks are the primary source of particulate matter, known as PM 2.5, one of the most dangerous environmental pollutants. It is associated with premature deaths, heart and lung disease, asthma, and respiratory issues. Vehicles generally, and diesel trucks especially, produce numerous other toxic pollutants. The EPA has identified nine compounds primarily resulting from mobile sources that are cancer risk indicators including e1,3-butadiene, acetaldehyde, acrolein, benzene, diesel particulate matter, ethylbenzene, formaldehyde, naphthalene, and polycyclic organic matter (POM). (EA 120). The EA also says in passing that FHWA guidance provides that projects that "[c}reate new capacity or add significant capacity to urban highways have the potential to create "meaningful differences" in cancer causing pollutants. (EA 120).

The EA then ignores that guidance. NJTA has not done a needed hot-spot analysis along the truck routes leading to the NB-HCE, has not acknowledged that the huge jump in truck traffic will have substantial environmental impacts, and has not provided any mitigation measures to address those impacts, all of which violates NEPA.

The EA tries to address this issue through sleight of hand. It maintains that no hot-spot analysis or mitigation is warranted because PM 2.5 emissions are not expected to create or contribute to new violations of clean air standards. (EA xxi).[35] In other words, the EA is saying to Hudson County residents, your air already is unhealthy so it does not matter if the Bridge Expansion makes it worse. Making the air worse leads to worse health outcomes.

The EA also claims that its modeling shows that there would be no insignificant difference in pollutants between the no-action alternative and the Bridge Expansion (EA 131) even though diesel truck traffic would increase up to 38%. This flies in the face of logic and FHWA guidance. It is also no doubt due to the study area not aligning with the areas where there will be the largest impact from the increased truck traffic – the roads between the port and the NB-HCE. As noted above, the hot-spot analysis was only done at locations near the NB-HCE. (Appendix C, p. 9).

An agency is under no obligation to accept, and must reject, assertions by a project sponsor that are questionable. The discrepancy between the TA's traffic forecast and its air quality modeling reinforces the need for USCG to engage FHWA and EPA to do an independent review of the impact of the increase in truck traffic, just as USCG did in the Bayonne Bridge raising project and in other environmental reviews.

### C.  The EA Fails to Properly Consider the Environmental Justice Impacts of the Bridge Expansion

---

[35] This is not to suggest that we agree or accept the representation in the EA that the Bridge Expansion is not expected to create or contribute to new violations of clean air standards. The EPA should be making that determination.

Executive orders, guidance from the Council on Environmental Quality and case law each require that environmental reviews consider environmental justice and take a hard look at the impact that a project would have on minority, low income and disadvantaged communities ("EJ Communities").

Executive Order 14008 directs that "[a]gencies shall make achieving environmental justice part of their missions'' and provides that it is the "policy of [this] Administration to secure environmental justice and spur economic opportunity for disadvantaged communities that have been historically marginalized and overburdened by pollution." Exec. Order No. 14008, 3 C.F.R. §477 (2022). That builds upon the long-standing requirements that "[t]o the greatest extent practicable and permitted by law . . . each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations[.]" Exec. Order No. 12,898, 3 C.F.R. § 859 (1995).

The Council on Environmental Quality's interim guidance affirmed that the "NEPA process calls for identifying potential environmental justice-related issues and meaningfully engaging with communities that proposed actions and reasonable alternatives (as well as the no-action alternative) may affect…. When assessing environmental justice considerations in NEPA analyses, agencies should use the scoping process to identify potentially affected communities and provide early notice of opportunities for public engagement."[36]

The EA's environmental justice analysis is facially deficient. Its study area only consisted of "the portions of Newark, Bayonne, and Jersey City within approximately 0.25 mile (1,320 feet) of the NB-HCE between Interchanges 14 and 14A." (EA 39).

Far more communities will be affected by the Bridge Expansion. There will be increased traffic along the entire NB-HCE, which will cause all EJ communities bordering the NB-HCE to be affected by the Bridge Expansion. Minorities make up 72.1% of the population in the 21 census tracts closest to the NB-HCE.  Jersey City's recently completed *JC On The Move* study included an updated environmental justice analysis, which found that most census tracts within a quarter mile of the NB-HCE are considered as having high or very high concentrations of historically underserved populations, especially those tracts in the southeastern portion of the City.[37] The comments by the City of Jersey City further detail the unconsidered effects that the Project will have on disadvantaged communities. We incorporate by reference those comments with respect to environmental justice and all the rest of Jersey City's comments.

Simply put, the EA fails to consider the effect on the residents of the EJ Communities that border the NB-HCE, who will be disproportionately harmed by the increased traffic and pollution generated by the Bridge Expansion.

---

[36] https://www.federalregister.gov/documents/2023/01/09/2023-00158/national-environmental-policy-act-guidance-on-consideration-of-greenhouse-gas-emissions-and-climate

[37] JC On the Move Final Report Appendix, https://jconthemove-jerseycity.hub.arcgis.com/pages/study-documents

**D.  USCG and NJTA Failed to Allow Input from the Public**

USCG and NJTA wrongly failed to allow input from the public either directly or through their elected representatives about the Bridge Expansion or the Project.

Federal agencies must "[m]ake diligent efforts to involve the public in . . . implementing their NEPA procedures," 40 C.F.R. §1506.6(a), and "involve the public . . . to the extent practicable in preparing environmental assessments," 40 C.F.R. § 1501.5(e). Page 3-28 of USCG's Procedures also states:

> If a proposed action is unprecedented or one that normally requires an EIS or is closely similar to one that normally requires an EIS, the Proponent must, whenever feasible, provide an opportunity for public input in the drafting of the EA and make the DEA and draft FONSI available for public review, as described in 40 C.F.R. § 1501.4(e)(2).

USCG and NJTA have refused to allow public input in the drafting of the EA without providing any reason why it was not "feasible" to do so.  As noted above, a January 18, 2023 letter from EmpowerNJ, TTC, and Jersey City asked USCG for a meeting to provide input regarding NJTA's request for a FONSI. (Exhibit 1). USCG did not respond. On January 5, 2024, EmpowerNJ and TTC again wrote to the USCG in renewing their requests for a meeting and notice of NJTA filings. USCG refused this request as well. (Exhibits 4- 7).

NJTA has refused to allow any meaningful public input regarding the Bridge Expansion. NJTA's only "engagement" with the public has been to hold "information sessions'' in Newark, Bayonne, and Jersey City, to explain what it has already decided to do – the very type of fatally flawed process that New Jersey argued in the Congestion Pricing Action is grounds to scuttle New York's congestion pricing plan. In those sessions, NJTA refused to allow any public comments or public questions. NJTA would only answer questions on a "one-to-one" basis, where there would be no record of the questions and answers, no accountability for the information (or misinformation) given, and no ability for the public to better inform itself from public questions and answers. The failure to make transcripts alone invalidates the environmental review process. Coalition for Canyon Preservation v. Bowers, supra, 632 F.2d at 786 ("Significantly, a verbatim transcript of the hearing is required for the purpose of informing decision-makers. No such transcript was made of the February 1975 hearing. Although a brief written summary of the hearing was prepared by one official, we cannot say that this shows 'substantial compliance' with the formal hearing requirements or provides decision-makers with an adequate record upon which to base their decisions. To hold otherwise would be to defeat the important objectives of …  NEPA.")

The environmental review process was also fatally flawed by not allowing any input from New York residents and public officials. The Bridge expansion will worsen the air in Lower Manhattan and undercut its traffic and environmental goals. It will also affect New York City's plan to redesign Canal Street, the clogged and unsafe street known as the Boulevard of Death, which the increased Holland Tunnel traffic will empty into.

NJTA's failure to allow for public input during the development of the Project also violated EO 172 and the procedures NJTA was required to adopt for complying with that Order. EO 172 recognizes "the vital importance of public input" and the need "to assure that potential adverse effects and local concerns relating to any proposed project on these highways have been fully considered in the **development** of

24

such project." (Emphasis Added).  It requires public input during the "project development process for [NJTA] highway projects" and requires NJTA to adopt policies and implementing procedures to ensure this occurs.[38]

In 2022, EmpowerNJ and others filed a petition asking NJTA to develop rules that asked, among other things, for NJTA to develop a more robust public participation process that meets the letter and spirit of EO 172.  NJTA denied the petition, citing its implementing policies and procedures for complying with EO 172.

> The EO 172 Policy requires that the Authority consider and respond to all comments, opinions, and recommendations received as part of the **record of the proceedings**. The EO 172 Policy process (i) provides … ample opportunity for public comment and input; and …for Authority consideration of and response to **public comment** and input concerning a proposed highway project. All of these are processes in which the Authority can solicit, hear and consider the comments of the public and stakeholders, and make changes to the project according to public input. Such input is a valued aspect of the process and one that the Authority considers critical to its mission of providing and operating safe and convenient roadways for the public.  (Exhibit 8). (Emphasis Added). [39]

NJTA never kept its legally binding promises and has not even followed the procedures it employed previously. When NJTA was planning to widen a portion of the Turnpike between exits 6 and 9, it held public hearings regarding the **preliminary** design plans, specifically allowing for the possibility of modifications in the final design phase. All public comments received at the public hearings were recorded by a court stenographer as part of the record of the proceedings and the public was advised that the record of the proceedings would remain open for 15 days thereafter. NJTA committed itself to respond to all comments that are part of the Public Hearing record, whether oral or written.[40]

NJTA has not complied with EO 172, followed its policy and procedures implementing the Order, and broken its promises in countless respects. The public information sessions were held after a final design contract had already been awarded and did not allow for public comments or public questions. The sessions were not transcribed so no record could be kept.  There was no process for providing written comments or for NJTA to respond to comments.

---

[38]https://dspace.njstatelib.org/server/api/core/bitstreams/8344d7db-ce89-493a-8372-27b36ab34e71/content

[39] Executive Orders in New Jersey, like elsewhere, have the rule of law unless they are rescinded.  In denying the Petition, NJTA said it complies with EO 172 although EO 172 "expired." NJTA did not explain, and cannot explain, either how or why EO 172 expired since it has no expiration date and has never been rescinded or why it would comply with an "expired" order.

[40]http://www.njturnpikewidening.com/documents/Interchange6-9WideningProgramExecutiveOrderNo.172-PublicHearingReport.pdf

E.  **USCG and NJTA Violated NEPA Regulations by Not Involving Local Governments**

NJTA and USCG have violated NEPA and USCG regulations by not consulting with public officials and getting public input in the development of the Project.

40 CFR §1501(e) requires federal agencies to "involve the public and local governments to the extent practicable in preparing environmental assessments." USCG regulations regarding the procedures for handling applications for bridge permits also require the District Commander to ascertain "the views of local authorities and interested parties" when a bridge permit application is received. 33 CFR §115.60(a).

None of this happened. Neither USCG nor NJTA involved officials in Jersey City or Newark in the preparation of the EA or for that matter the development of the plans for the Bridge Replacement. The comments submitted by Jersey City, the Jersey City Council members and Newark Mayor Ras Baraka are incorporated by reference herein.

It was particularly egregious for NJTA and EA not to get input from Jersey City. While one of the justifications for the Bridge Expansion is to accommodate expected population and economic growth in Jersey City, USCG and NJTA have refused to consult with Jersey City about the Project and the Bridge Expansion or address the City's concerns that they would conflict with Jersey City's economic and environmental goals.

On January 10, 2024, the Jersey City Council unanimously passed a resolution asking USCG to reject the EA and to require the preparation of an EIS that takes into account the entire NB-HCE Expansion. Among the bases for the resolution is USCG and NJTA's refusal to consider input from Jersey City about the Bridge Expansion and alternatives to it, despite claiming that the Bridge Expansion is for Jersey City's benefit. The resolution goes on to state that the Project and Bridge replacement are each not needed for Jersey City's growth but instead will lessen the quality of life and health outcomes for Jersey City residents, new and old.

F.  **NJTA Failed to Consider Alternatives**

Section 102(2)(E) of NEPA and NEPA regulations require an environmental assessment to consider alternatives to a proposed project and the environmental impact of those alternatives. 40 CFR §1501.5(c)(2). NJTA did not seriously consider or arbitrarily rejected alternatives to the Bridge replacement, which singularly or in combination could achieve the goals of maintaining the integrity of the Bridge crossing and improving rush hour traffic, without the negative environmental impacts and higher costs of the Bridge Expansion.

1.  **A Bridge with a 100 to 150 Year Life Span is an Unreasonable Objective**

The EA states that the purposes of the Bridge Expansion are to "[i]mprove the long-term integrity of the structures on the NB-HCE between Interchanges 14 and 14A, to maintain the structures in a state of good repair over a minimum 100-year service life to a goal of a 150-year service life" and to '[i[mprove mobility between Interchanges 14 and 14A." (EA xviii).

NJTA had not always made a 100-year life span for the Bridge a mandatory requirement.  In 2017, it informed Jacobs that it was looking at alternatives with a 40-year time horizon for the Bridge:

> At a meeting held on April 3, 2017, the Authority indicated that we should assume that any bridge along the NB-HCE which will need to be widened or rehabilitated as part of this program shall target a minimum load rating capacity of HL-93 at the operating level and shall not require any significant structural repairs for a minimum of **40 years** from the completion of said widening. Exhibit 6, p. 2-15 (Emphasis added).

A project violates NEPA where its purported purpose is defined in such a way as to preclude alternatives. An agency cannot "define the objectives of [their] action[s] in terms so unreasonably narrow that only one alternative from among the environmentally benign ones . . . would accomplish the goals of the agency's action[.]" Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1070 (9th Cir. 2010) (internal citations omitted). An environmental assessment cannot be drafted to ensure a "predetermined" outcome.  Jones v. Peters, 2007 WL 2783387 at *18 (D. Utah 2007).

This is precisely what NJTA is doing here by adding the requirement that any structure has to have a 100-to-150-year life span. This requirement mandates only one alternative: the teardown and replacement of the Bridge.

 NJTA has not explained why it moved the goal posts to require a minimum 100-year lifespan for the Bridge.  There are, in fact, new reasons for a 40-year period. As described above, commuting and commuting hours have changed.  Even with the end of the pandemic, fewer workers, particularly office workers, are commuting five days a week and many former commuters are now working mainly or exclusively from home.

The TA reflects this. It acknowledges that the long-term effects from the pandemic are unknown nad only projects traffic volume and congestion until 2050, less than 20 years after the construction of the two new bridges.  This is a tacit admission that no one can accurately forecast what traffic will look like after 2050 or whether an eight-lane bridge in the twenty-second century would be an asset or an albatross.

## 2.   The EA Fails to Consider any Public Transportation Alternatives

Public transportation is a proven means of reducing traffic congestion. "Public transit systems have long provided alternatives to personal vehicle use for transportation needs. Expanded investment in public transit, and the infrastructure to support it, increases public transit usage by enhancing convenience and safety, making it a more attractive transportation option for many. In addition, public transit investments generally provide benefits for much longer timespans than the 5–10 years for the benefits typically provided by highway expansions."[41]

---

[41] https://shift.rmi.org/faq

The Federal Transit Administration has long recognized that public transportation decreases traffic demand and reduces the need for constructing more roads.[42]  The 2019 New Jersey Energy Master Plan (EMP) calls for, among other things, a concerted effort to expand public transportation options and reduce VMT which "will also yield many economy-wide financial and health benefits."[43]

 Even the TA implicitly recognizes all this. Its predictions about future traffic assumes that "there are no major changes assumed to transit services such that significant mode choice differences would result in the future." (TA 64).  Put in more understandable terms, the TA is admitting that enhancements to public transportation would reduce the number of vehicles on the NB-HCE.

In the EA, NJTA asserts that it looked at nine alternatives to the Bridge Replacement (EA xix), none of which included improving public transportation.  Public transportation investments, singularly or in combination, that NJTA should have considered to reduce traffic congestion include:

- Partnering with NJ Transit and private bus companies, to increase the use, frequency and reliability of trains and buses during rush hour.
- Completing the long-planned expansion of the Hudson Bergen Light Rail Line.
- Improving PATH service.
- Increasing and improving bus service at the Holland Tunnel.

Increasing bus service alone could solve any congestion problems on the NB-HCE as is evident when comparing the vehicle mix at the Lincoln Tunnel, where there are express bus lanes, and at the Holland Tunnel, which has none. Data compiled by the New York Metropolitan Transportation Council [44] shows that in 2022, between 7:00 and 10:00 a.m, 57,632 bus passengers used the Lincoln Tunnel and only 1,779 used the Holland Tunnel. (Table 18). In 2022, the total number of public transit passengers on a fall day was 262,297 at Lincoln and 10,752 at the Holland. (Table 5). There were no such disparities with private vehicles.  On the same fall day, 106,736 and 131,982 passengers respectively went through the Holland and Lincoln Tunnels in private vehicles. (Table 10).  While the location of the Port Authority Bus Terminal will always mean that more buses will use the Lincoln, the current disparity can and should be narrowed with more bus routes and express bus lanes.

It does not take a highway engineer or an urban planner to see that the first alternative that NJTA should have looked at before planning to spend $10.7 billion on a controversial and unpopular project was changing the vehicle mix and increasing the number of bus passengers at the Holland Tunnel.

---

[42] https://www.transit.dot.gov/regulations-and-programs/environmental-programs/transit-and-sustainability

[43] EMP at 14; https://nj.gov/emp/docs/pdf/2020_NJBPU_EMP.pdf

[44] https://www.nymtc.org/Portals/0/Pdf/Hub%20Bound/2022%20Hub%20Bound/May%202022/2022%20Hub%20Bound%20Report-%205.17.24-FINAL%

### 3.  NJTA Arbitrarily Rejected the Alternative of Building a New Six Lane Bridge

Building a new six lane bridge instead of building two new four lanes would meet the NJTA's safety and longevity goals.  It would also have obvious financial and environmental benefits compared to the Bridge expansion by saving billions of dollars in construction costs, reducing the amount and time of construction, lessening the environmental damage to Newark Bay, and reducing VMT, GHGs and toxic pollutants.

NJTA nevertheless rejected this alternative because it supposedly "would not provide for the traffic flow demand to at least 2050." (EA xvii).  But according to the TA, this would only be an issue during the eastbound rush hour, which occurs between 7:00 and 8:00 a.m. (TA 78), a period of five hours a week in one direction.  The required level of mobility would be met during the westbound rush hour.

This relatively minor concern could be remedied by any one of three measures NJTA never considered:  i) lane reversal, reversing one lane of traffic in the morning rush hour; ii) variable tolling; and iii) the use of the shoulder during rush hour. It considered lane reversal and shoulder use in rejecting a no-action alternative of maintaining the existing bridge, but inexplicably never examined this approach when evaluating a six- lane replacement bridge.

### 4.  NJTA Arbitrarily Rejected the No-Action Alternative

NJTA continually maintains that the Bridge and the surrounding structures are "nearing the end of their useful service lives." (EA 9).  Its principal reason for rejecting the no-action alternative is that the "structural sufficiency of the structures could not be maintained even with extensive repairs and maintenance[.]" (EA  14).[45]

This assertion directly conflicts with the Jacobs Study that NJTA commissioned yet fails to mention in the EA. That Study found that the existing Bridge can be safely maintained for 40 years at a cost of $260 million and repairs would "render the existing structure in a condition that will be free of major rehabilitation for 40+ years beyond the completion of the program, as stipulated during Scoping meetings." (Exhibit 6, p. 5-13).

NEPA requires an agency to provide "full and accurate information" and make "fair and open disclosure" of relevant facts.  See Action for Rational Transit v West Side Highway Project, 536 F Supp 1225, 1252-54 (S.D.N.Y. 1982) (enjoining construction of the Westway highway project)  Sierra Club v United States Army Corps of Engineers 541 F Supp 1367, 1382 (S.D.N.Y. 1982), dismissed without op. 697 F2d 297 (2d Cir. 1982) (invalidating permit granted by the Corps of Engineers for failing to disclose relevant information). USCG should reject the EA and require NJTA to explain why it now believes that the Study it commissioned is wrong.

It is also noteworthy that Jacobs recommended the replacement over repair on two grounds: NJTA's objective of a 100-year life span and a "comparison of the estimated cost of replacement versus

---

[45] NJTA also asserts that the no action alternative was unacceptable because "traffic flow would continue to deteriorate." As detailed herein, there are numerous other alternatives that in combination with keeping the Bridge in good repair would address this concern. NJTA also throws in the assertion that  "inadequate left shoulder areas" were problematic for various reasons.  NJTA does not show that this would be a consequential enough issue to reject the no-action alternative.

rehabilitation." (p. 5-14). Jacobs estimated the cost of replacing the Bridge and the roadways at exits 14 and 14A to be approximately $3.2 billion. (p. ES-4). The 2022 projected cost is at least twice this amount, calling into question the viability and logic of the entire Project.

**5. <u>NJTA Failed to Look at Other Alternatives for Reducing Rush Hour Traffic</u>**

Traffic congestion is only a problem during rush hours. These are the only times that NJTA focused on when looking at traffic congestion. (EA xxviii, 7, 94).

In addition to improving public transit and using reversible lanes as described above, there are two other alternatives that NJTA failed to consider for reducing traffic congestion during rush hour. Variable toll pricing would even out vehicle use during the day. London, Stockholm, Milan, and Singapore have each implemented successful congestion pricing programs, which have substantially reduced rush hour traffic. New York has passed legislation mandating congestion pricing in New York City. [46]

Traffic congestion during rush hour could potentially be substantially reduced by staggering the times trucks go into and out of the Port of Newark to avoid the rush hours. Trucks make up only 2.5% of the vehicles on the NB-HCE at night, but "15% in the morning peak hour." (EA 96). By simply staggering truck pickup and delivery times you could potentially make rush hour traffic dissipate. New York City just announced a program this year to incentivize off-hour deliveries in which it seeks to add 5,000 off-hour delivery locations by 2040, up from 1,120 now, and shift 62,000 trucks away from peak hours through various incentives that would cost a minute amount compared to the billions spent on highway widenings. [47]

**6. <u>NJTA Failed to Look at Freight as an Alternative for Reducing Truck Traffic</u>**

The EA fails to consider improving and expanding freight rail service is another alternative to reducing diesel truck traffic. Trains emit about 75% less GHGs than trucks. A Cross-Harbor Rail Tunnel, a long-time Port Authority and regional initiative supported by New York Governor Hochul, would allow the delivery of goods across the Hudson River to points east and north. Increasing and expanding the use of railcar barges that are currently moving freight across New York Harbor from the Greenville Yards in Jersey City to Bush Terminal in Brooklyn would reduce truck traffic. The Port Authority Master Plan calls for the revival of barge service to ease congestion and reduce truck traffic. To this end, the Port of Albany is looking at restarting barge service to New Jersey.[48] In California, the Board of Metro Directors rejected a

---

[46] Recently, New York Governor Kathleen Hochul unilaterally decided to "pause" the implementation of congestion pricing in New York, which is likely to be subject to numerous legal challenges including by the New York City Comptroller.

[47] https://nyc.streetsblog.org/2024/04/25/dot-will-spend-11m-to-boost-off-hour-deliveries

[48] https://www.timesunion.com/business/article/Port-of-Albany-reviving-barge-service-to-16616003.php a

long-planned highway expansion from the Port of Long Beach and instead authorized spending $1.5 billion to improve and expand rail service out of the port.[49]

G. **The EA's Mitigations Measures are Inadequate**

The EA projects that the Bridge Expansion will cause a 21.9% increase in traffic on the NB-HCE over the no-action alternative. (TA 65). Taking this projection at face value (and ignoring the fact that they are grossly understated), the EA does not provide for mitigation measures required by NEPA. The Bridge expansion will increase vehicles, VMT, GHGs and pollution on the NB-HCE and on local streets in Hudson County and Lower Manhattan for all the reasons previously discussed.

The general mitigation measures proposed in the EA are inadequate and do not even address the harms from increased traffic on the NB-HCE that the EA projects. The EA states that it has on-going initiatives to reduce PM2.5 roadway operational emissions, for example, through routine sweeping of fugitive dust from its roadways, including the NB-HCE, and by annually providing over $500 million to the State to support public transportation. The Authority is also "investing in electric vehicle (EV) charging stations systemwide at its rest areas in an effort to support use of EVs and reduce emissions from vehicles using the New Jersey Turnpike. No further mitigation is necessary." (EA 50)

These are totally vague and not specific to reducing PM2.5 levels. The EV charging projects are not relevant, because the biggest PM2.5 issue is from diesel exhaust, the majority of which comes from truck tailpipes.

The slow transition to electric cars will also not substantially mitigate GHG and pollutant emissions for many years. Electric cars accounted for just under eight percent of new cars sold in the United States last year.[50] The average car on the road is 12 years old, meaning that 92% of the cars sold today will emit carbon and pollutants for at least another decade.[51]

Payments to NJ Transit do not pass the straight face test as a mitigation measure for three reasons: funding NJ Transit will not reduce truck traffic or PM 2.5 levels; the payments that NJTA is making to NJ Transit are made pursuant to a memorandum of understanding that expires in 2028 and can be unilaterally terminated by NJTA; and the payments are funding NJ Transit's on-going operations and not for any project that would reduce the pollution caused by the Bridge Expansion.

NEPA does not allow an agency to issue a FONSI and bypass an EIS when the record shows, as here, there will be significant unmitigated environmental impacts. Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1220 (9th Cir. 2008) (EA "markedly deficient" when "the agency's FONSI is based primarily on its conclusory assertion—contradicted by evidence in the record—that the [project] will have no significant environmental impact").

The inadequate mitigation measures in the EA require its rejection.

---

[49] https://www.latimes.com/california/story/2021-05-22/710-freeway-expansion-stalls ;
https://polb.com/port-info/news-and-press/2024-a-pivotal-year-for-new-pier-b-rail-facility-11-29-2023/
[50] https://www.eia.gov/todayinenergy/detail.php?id=61344
[51] https://www.nytimes.com/2024/05/31/headway/highways-colorado-
transportation.html?searchResultPosition=1

H.  **The FHWA and EPA Should be Cooperating Agencies**

40 CFR §1501.8(a) provides that any "Federal agency with special expertise with respect to any environmental issue may be a cooperating agency." Each cooperating agency shall, among other things, "[p]articipate in the NEPA process at the earliest practicable time; assume responsibility for developing information and preparing environmental analyses, including portions of the environmental impact statement or environmental assessment concerning which the cooperating agency has special expertise; and to "the maximum extent practicable, jointly issue environmental documents with the lead agency." §1501.8(b).

While USCG has discretion whether to request the help of other federal agencies in undertaking an environmental review, it was an abuse of that discretion not to involve the FHWA. The Project is at its core a highway expansion project and the FHWA has special expertise regarding issues that must be considered in an environmental review of a highway expansion such as traffic flow, induced demand, public transportation alternatives, GHGs and vehicular pollutants.

FHWA is not listed as a cooperating agency in the EA. And while the EPA is listed, it appears that to the degree there was "cooperation," it was limited to hazardous material issues. There is no indication that EPA was, for example, asked to provide any input into the EA or asked to provide comments on it. We should add that the EA has a very loose definition, to be charitable, of what constitutes a cooperating agency. The EA states that one of the Commenters, Hudson County Complete Streets, was a cooperating agency even though it adamantly opposes the Bridge Expansion.

USCG is also not following its normal practice by failing to coordinate with FHWA.  When the Port Authority of New York and New Jersey proposed to raise the nearby Bayonne Bridge, USCG engaged in "extensive consultation with [its] federal partners," FHWA and EPA, in the preparation of a draft environmental assessment.  Coalition for Healthy Ports v. USCG, 2015 WL 7460018 at * 6.

USCG is required to do a "thorough and independent review" of the EA. Action for Rational Transit v West Side Highway Project, supra, 536 F Supp at 1249.  That level of review of the TA requires the robust involvement of FHWA and EPA, which have the unique expertise to evaluate a host of issues raised by the EA related to traffic, air pollution and hazardous materials. We do not know how this would be possible without the expertise of FHWA and EPA.

It is arbitrary and capricious for USCG not to fully involve FHWA and EPA in the environmental review of the Bridge Expansion.

Respectfully submitted on behalf of Commenters by

John H. Reichman

Johnreichmanlaw LLC
56 Oakwood Avenue
Montclair, NJ 07043
917.626.8025
John@johnreichmanlaw.com

32