# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | )    No. 23-3885 (LMG-LDW) |
| TRANSPORTATION, *et al.*, | ) |
| | ) |
| *Defendants,* | ) |
| | ) |
| and | ) |
| | ) |
| METROPOLITAN TRANSPORTATION | ) |
| AUTHORITY, *et al.*, | ) |
| | ) |
| *Defendant-Intervenors.* | ) |
| | ) |

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLARIFICATION AND/OR RECONSIDERATION AND FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ..................................................... 2

    I.     The Re-Evaluation .......................................................................... 2

    II.    The Re-Evaluation 2 ...................................................................... 3

STANDARD OF REVIEW ............................................................................................ 5

ARGUMENT .................................................................................................................. 6

    I.     Remand Without Vacatur is Permissible and Appropriate in the Third Circuit. ............................................................................... 8

          A.    Even if the State's Request Were Proper, the Court Correctly Applied *Allied-Signal* ................................................11

    III.   The State Fails to Meet the Standard to Obtain an Emergency Post-Decisional Injunction, if One is Even Available. .................................. 15

          A.    The State Cannot Seek Emergency Injunctive Relief *After* a Decision on the Merits. .............................................. 16

          B.    The State Has No Likelihood of Success on the Merits. ......................... 17

          C.    The State's Claims of Irreparable Harm Improperly Attempt to Re-litigate the Sufficiency of the Mitigation Commitments in the Final EA and FONSI. ....................................................... 20

          D.    The Equities Favor Permitting the Project to Proceed............................ 22

CONCLUSION............................................................................................................... 24

## INTRODUCTION

The central—and ultimately incorrect—premise of the State of New Jersey's ("the State") Motion for Emergency Relief ("Motion") (ECF No. 192-1), is that this Court was *required* to vacate the Federal Highway Administration's ("FHWA")[1] Finding of No Significant Impact ("FONSI") for the Manhattan Central Business District Tolling Program ("the Project") when the Court questioned certain aspects of the agency's review under the National Environmental Policy Act ("NEPA"). But that premise is simply wrong; instead, the Court declined to vacate the FONSI while FHWA provides additional explanation on remand as to those discrete areas identified by the Court.

Aside from its erroneous claim that the Court's decision constituted legal error, the State is left requesting either reconsideration or a post-decisional emergency injunction based on issues this Court has already decided. Accordingly, it fails to meet the stringent standard for either. As to the former, courts have consistently held that a party may not use reconsideration to re-litigate the merits, which is what the State is attempting to do here. As to the latter, the State fails to satisfy any of the demanding four-part standard for obtaining emergency relief. This is particularly so given that FHWA has already performed much of the analysis the Court found missing through two subsequent re-evaluations of the Project.

The Court should accordingly deny the State's Motion.

---

[1]     Defendants are the U.S. Department of Transportation, FHWA, Shailen Bhatt, in his official capacity as Administrator of FHWA, and Richard J. Marquis, in his official capacity as Division Administrator of the New York Division of FHWA.

## BACKGROUND AND PROCEDURAL HISTORY

The Court is familiar with the background of this matter.  *See* Dec. 30, 2024 Opinion (ECF No. 191) at 5-11.  Below is a brief discussion of relevant events post-dating the record as detailed in FHWA's prior briefing and referred to in the Court's recent decision.

### I.   <u>The Re-Evaluation</u>

On May 23, 2024, FHWA received a request from the Project Sponsors[2] that it review and approve the Re-Evaluation, which examined the tolling structure adopted on March 27, 2024. DOT_45450; *see also* DOT_45625.  As explained in the Re-Evaluation, "[i]f preliminary evaluation of the adopted toll structure demonstrated that effects would be same as, or less than, those described in the Final [Environmental Assessment ("EA")], more detailed quantified analysis (such as modeling) was not conducted.  For any effects where the preliminary evaluation was not conclusive, additional quantified analysis was conducted to further explore the effect." *Id.*  In particular, the Re-Evaluation used the same Best Practice Model transportation methodology as the Final EA, explaining that "[t]his allowed comparison of the results for the adopted toll structure to the results presented in each analysis included in the Final EA." DOT_45477; *see also, e.g.,* DOT_45478 (explaining that same regional transportation model was used for re-evaluations as the Final EA).

Based on this analysis, the Re-Evaluation concluded that "the effects associated with the adopted toll structure fall within the range of effects and analysis presented in the Final EA/FONSI except in the areas identified in the discussion [and that in those areas] [t]he deviations in effects . . . are minor and do not require additional environmental analysis and

---

[2]      The Project Sponsors are the Metropolitan Transportation Authority ("MTA"), the New York State Department of Transportation, and the New York City Department of Transportation.

mitigation." DOT_45624. Further, the Re-Evaluation noted that "[t]he Final EA/FONSI anticipated there would be variations in the potential effects once the toll structure was adopted and since these variations are very minor, they continue to fall within the parameters of the Final EA/FONSI." *Id.*

The Re-Evaluation also expanded upon and made more concrete the mitigation measures that had been included in the Final EA and FONSI. Specifically, the adopted toll structure increased the low-income toll discount and extended and deepened the overnight discount, resulting in an increased mitigation commitment of approximately $122.5 million. DOT_45441. Further, the Re-Evaluation finalized the funding allocation for place-based mitigation. DOT_45609. The agency resultingly concluded that "[t]he mitigation measures identified in the Final EA/FONSI are still applicable and will ensure that the adopted toll structure does not result in significant effects. With the adopted toll structure, and an understanding of the effects, the place-based mitigation will be finalized in concert with stakeholder involvement." DOT_ 45624.

On June 14, 2024, FHWA concluded "that the analysis conducted in the Re-Evaluation confirms that the adopted toll structure and impacts associated with it was analyzed and mitigated accordingly." Accordingly, the agency found that "no additional environmental analysis is warranted" and that "[t]he conclusions in the Final Environmental Assessment and Finding of No Significant Impact remains valid. DOT_45625-26.

## II.   The Re-Evaluation 2

On November 8, 2024, the Project Sponsors wrote to FHWA to express interest in "add[ing] a phase-in feature to the tolling structure described in the Reevaluation approved in June 2024." DOT_47548. To ensure that feature's consistency with the Final EA and FONSI, FHWA undertook a second re-evaluation of the feature's environmental effects. DOT_47523.

The phase-in approach did not modify the structure of the March 2024 adopted toll but instead established a schedule for three phases of implementation.  DOT_47530.  During Phase 1 (2025, 2026, and 2027), each of the relevant tolls and credits will be 60% of the tolls and credits in the March 2024 tolling structure.  DOT_47531.  During Phase 2 (2028, 2029, and 2030), the tolls and credits will rise to 80% of the final tolling structure.  *Id.*  And in Phase 3 (and going forward), the toll will be the structure adopted in March.  *Id.*  The MTA subsequently formally voted to adopt a phase-in approach on November 18, 2024, *see* MTA, Central Business District Tolling Program, *available at* https://new.mta.info/project/CBDTP.

FHWA approved Re-Evaluation 2 on November 21, 2024.  DOT_47541.  The agency concluded that "[n]otwithstanding the phasing in of tolls, the Project Sponsors would comply with all of the mitigation commitments set forth in the EA and FONSI within the same timeframes as contemplated in those documents and the reevaluation prepared for the March 2024 adopted tolling structure."  DOT_47557.  FHWA explained that, after adopting the phase-in, the Congestion Pricing Program would still meet the objectives set forth in the Final EA. DOT_47537.  With respect to revenue generation, Phase 1, Phase 2, and Phase 3 would generate $500 million, $700 million, and $900 million in annual revenue, respectively.  DOT_47537. Although these amounts fall below the amounts initially considered in the Final EA as sufficient to fund $15 billion in capital projects, Re-Evaluation 2 explains that "[t]he net revenues needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and terms."  DOT_47555.  "Following completion of the Final EA, based on current interest rates and expected timing of projects, MTA's Chief Financial Officer (CFO) determined that" $900 million in annual revenue would be sufficient.  *Id.*  And in the Re-Evaluation 2, "MTA's CFO [] determined that the expected revenues to be collected under the Phase-In

4

Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure." *Id.*

In evaluating the continued validity of the Final EA and FONSI, Re-Evaluation 2 explains that Phase 3 presents the same scenario as the tolling structure already analyzed in the Re-Evaluation. DOT_47557. For Phase 1 and Phase 2, "peak tolling rates would fall within the ranges studied in the Final EA." *Id.* Accordingly, on November 21, 2024, FHWA issued a letter stating: "FHWA concludes that the Re-Evaluation 2 confirms that the phase-in of the adopted toll structure and impacts associated with it was analyzed and mitigated accordingly. Thus, FHWA finds that no additional environmental analysis is warranted. The conclusions in the Final Environmental Assessment and Finding of No Significant Impact remains valid." DOT_47520-21.

## STANDARD OF REVIEW

***Reconsideration.*** A court's disposition of a motion for reconsideration under Federal Rule of Civil Procedure 60(b) is reviewed for abuse of discretion. *See Budget Blinds, Inc. v. White*, 536 F.3d 255, 251 (3d Cir. 2008). A motion for reconsideration under Local Civil Rule 7(i) is subject to the same standard. *See M.L. v. Haddonfield Borough Bd. of Educ.*, No. 22-7244, 2023 WL 7897181, at *2 (D.N.J. Nov. 16, 2023) (citing *See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)).

***Temporary Restraining Order.*** A party seeking emergency injunctive relief "must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc. v. Andrx*

*Corp.*, 366 F.3d 700, 708 (3d Cir. 2004).[3]  "A plaintiff's failure to establish any element in its favor renders" emergency relief "inappropriate."  *NutraSweet Co. v. Vit-Mar Enterp., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).  "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  *Kos*, 366 F.3d at 708 (citation omitted).  Accordingly, "the movant, by a clear showing, carries the burden of persuasion."  *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018) (citation omitted).

## ARGUMENT

The Court should reject the State's attempt to relitigate the merits of its summary judgment arguments via an emergency motion for at least three reasons.  First, the State applies the incorrect standard on vacatur; more recent case law in the Third Circuit clearly contemplates remand without vacatur, and this Court's Opinion thus did not violate controlling precedent.  Second, the facts in this circumstance clearly favor remand without vacatur and, crucially, this Court already ordered that remedy.  Third, displacing that remedy is inappropriate where the State cannot meet its burden for emergency injunctive relief.

As an initial matter, the State is simply wrong that a court finding a violation of NEPA *must* vacate the underlying agency action.  Instead, the Third Circuit has explained that courts should determine the appropriate remedy by evaluating the nature of the error, the likelihood the agency may correct its error on remand, and the disruptive consequences of vacatur.  Thus, the State's request for reconsideration fails at the outset because it does not identify how the Court's Opinion violated controlling precedent.

---

[3]    The last two "factors merge into a single inquiry in situations such as the case at hand, when the government is the defendant."  *Luokung Tech. Corp. v. U.S. Dep't of Defense*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021).

Moreover, this Court clearly and appropriately recognized that FHWA will likely be able to address and correct any deficiencies in its NEPA review and that there was thus no reason to halt implementation of a Project that will immediately begin to advance the important public interests identified by the New York State Legislature.  *See* ECF No. 192 at 52 n.17.  In other words, the Court's determination on remedy was plainly correct.

Finally, the State fails to clear the high hurdle necessary to obtain emergency injunctive relief, particularly given its unusual request post-dates a decision on the merits.  To that end, the State counterfactually presumes success on the merits when this Court has already determined that most of the State's arguments were meritless.  Thus, the State once again appears to seek an improper opportunity to re-litigate the merits.  So too, the State's claims of irreparable harm ignore this Court's findings as to mitigation and the validity of the bulk of the Final EA.  And the equities counsel against issuance of an injunction where the Court did not order vacatur in the first instance.

At bottom, the State brings this eleventh hour request because it disagrees with the outcome of the Court's merits decision.[4]  But that disagreement—absent identification of controlling Third Circuit precedent violated by the Court's Opinion— is insufficient to support a motion for reconsideration, and the Court should summarily decline the State's invitation to re-litigate this matter further.  Moreover, the Court's decision on remedy was not only consistent with Third Circuit precedent, but ultimately correct, given it appropriately recognized FHWA's analysis of the final tolls adopted by the TBTA in its two subsequent re-evaluations.

---

[4]     Clarification is thus unnecessary because the Court's order speaks for itself.  The Court acknowledged that "Plaintiff seeks relief in the form of an order vacating the FHWA's Final Environmental Assessment ("EA") and Final Finding of No Significant Impact ("FONSI") and requiring the FHWA to prepare an Environmental Impact statement ("EIS")," ECF No. 191 at 4, yet declined to issue this remedy.

**I.**    **Remand Without Vacatur is Permissible and Appropriate in the Third Circuit**.

While the State clearly disagrees with the remedy issued by the Court, disagreement is not grounds for reconsideration. Accordingly, the State does not meet the standard for reconsideration in the Third Circuit.

Under Local Civil Rule 7.1(i), a party may file a motion for reconsideration "setting forth concisely the matter or controlling decisions which the party believes the Judge has overlooked . . . ." "The word 'overlooked' is the operative term in the Rule . . . [m]ere disagreement with a decision of the District Court should normally be raised through the appellate process and is inappropriate on a motion for reargument." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 130 F. Supp. 2d 610, 612 (D.N.J. 2001).[5] Accordingly, "relief under the rule is granted 'very sparingly.'" *Id*. at 613 (citation omitted).[6]

The State's Motion is premised on the argument that Third Circuit caselaw mandates that the Court's Opinion "necessarily vacated the Final EA and FONSI" pending FHWA's determination on remand. Mot. at 2. That is simply incorrect. Instead, the most recent decision from the Third Circuit on this issue explained that "[v]acatur typically is inappropriate where it is 'conceivable' that the [agency] can, if given the opportunity, create a supportable [action]" on

---

[5]    The State incorrectly surmises the Court must have overlooked the issue of remedy. Mot. at 2. But the Court's Opinion acknowledges the State requested vacatur, ECF No. 191 at 4, but declined to order that remedy. *Id*. 71-72. "The fact that an issue was not explicitly mentioned by the court does not on its own entail that the court overlooked the matter in its initial consideration." *Morton v. Fauver*, No. 97-5127, 2011 WL 2975532, at *3 (D.N.J. July 21, 2011).

[6]    Similarly, under Federal Rule of Civil Procedure 60(b), a party may seek to correct a "mistake" or for other "extraordinary circumstances." *See* Fed. R. Civ. P. 60(b)(1), (6); *see also Budget Blinds*, 536 F.3d at 251 (referring to Rule 60(b)(6) as a "catch-all provision"). The Third Circuit has explained that "a Rule 60(b) motion 'may not be used as a substitute for an appeal, and that legal error, without more' does not warrant relief." *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003). The State's request meets neither standard.

remand. *Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 824 F.3d 33, 52 (3d Cir. 2016) (citing *Allied-Signal Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)); *see also Del. Riverkeeper Network v. U.S. Env't Prot. Agency*, No. 20-3412, 2021 WL 3476173, at *2 (E.D. Pa. Aug. 6, 2021) ("The Third Circuit, as well as this Court, has cited the D.C. Circuit's *Allied-Signal* test when considering whether vacatur is appropriate."). "Under [*Allied-Signal*], '[t]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Del. Riverkeeper Network*, 2021 WL 3476173, at *2 (quoting *Allied-Signal*, 988 F.2d at 150-51). Thus, and ultimately dispositive of the State's request, "[t]he decision to vacate the [Final EA and FONSI] or leave it in place while the agency reconsiders its decision is [ ] a matter within the Court's discretion." *Id*. (citation omitted).

The State's contrary precedent is unavailing. In *Council Tree Communications, Inc. v. Federal Communications Commission*, the Third Circuit explicitly expressed "no view" on the appropriateness of the remedy of remand without vacatur. 619 F.3d 235, 258 n.13 (3d Cir. 2010). Instead, the court "decline[d]" to remand without vacatur based on *specific* "deficiencies in the challenged rulemaking." *Id*. at 258. Similarly, the Third Circuit's decision to vacate the challenged rule in *Comite' de Apoyo A Los Trabajadores Agricolas v. Perez* was based not on a rejection of the *Allied-Signal* standard, but a tacit *application* of that standard, given the court explained that the fact that the agency had "no expectation of expeditious administrative review or rehabilitation" of the challenged policy on remand weighed in favor of vacatur. 774 F.3d 173, 191 (3d Cir. 2014). To that end, one court distinguished the facts of *Comite' de Apoyo*, noting that vacatur there was based on the court's determination that the agency's action was *ultra vires*,

a claim not presented here.  *See Del. Riverkeeper*, 2021 WL 3476173, at \*3-4.  Thus, the State cannot identify controlling precedent mandating a contrary outcome as to remedy.  *See Jannarone v. SunPower Corp.*, No. 18-9612, 2020 WL 2085635, at \*4 (D.N.J. Apr. 30, 2020) (holding that "because the Court's decision is supported by precedent" movant failed "to show that the Court's decision was a clear error of law" [7] sufficient to support a request for reconsideration).[8]

So too, the State's bald claim that vacatur is the presumptive remedy is inaccurate. Instead, as the Eleventh Circuit has explained, "our sister circuits that have considered this question have concluded that remand without vacatur is permitted under the APA." *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (citing cases); *see also, e.g.*, *Cent. & S.W. Servs., Inc. v. U.S. Env't Prot. Agency*, 220 F.3d 683, 692 (5th Cir. 2000); *N. N.M. Stockman's Ass'n v. U.S. Fish & Wildlife Serv.*, 494 F. Supp. 3d 850, 1040-41 (D.N.M. 2020) ("Pursuant to this grant of discretion, district courts across the Tenth Circuit have imposed various degrees of relief under the umbrella of vacatur based on the parties' equities and the deficiencies that courts have determined to exist in connection with the agencies' violative actions.").

What the Court is left with, then, is the State's mere disagreement with the Court's decision not to vacate the FONSI.  But "[i]t is improper on a motion for reconsideration to 'ask the court to rethink what it has already thought through-rightly or wrongly." *Interfaith Cmty.*

---

[7]    As such, even if Rule 59(e) were applicable (and because there is no final judgment, it is not), the Court's decision does not constitute a "clear error of law" sufficient to support a request for reconsideration.  *See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677-78 (3d Cir. 1999).

[8]    Indeed, even if any tension exists between *Prometheus Radio* and the cases cited by the State, a request for reconsideration is insufficient if it merely asks that a court "follow the outcome" of a line of cases.  *Jannarone* at \*5.

*Org. v. Honeywell Int'l, Inc.*, 215 F. Supp. 2d 482, 507 (D.N.J. 2002) (cleaned up); *see also id.* (explaining that "reconsideration does not contemplate a recapitulation of arguments considered by the court before rendering its decision). The State raised its request for vacatur at argument, *see* Apr. 4, 2024 Tr. at 222:4-223:21, and the Court declined to order that remedy.

### A. Even if the State's Request Were Proper, the Court Correctly Applied *Allied-Signal*.

Setting aside that the State's request is facially inappropriate, the Court's analysis supports remand without vacatur under *Allied-Signal*.[9] As to the first prong, the State is incorrect that the Court identified a "serious deficiency." Mot. at 2. Instead, the Court identified several discrete issued that it implied could be readily corrected on remand. Specifically, the Court determined that: (1) "the lack of specificity as to mitigation for some [environmental justice] communities warrants further explanation," ECF No. 191 at 45; (2) while the Final EA's approach to mitigation was "generally" "sufficient to satisfy the standard of review," *id.* at 49, "the Final EA and FONSI fail to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the" Project, such that remand for "further explanation" of the "rationale providing for differing levels of mitigation commitments" was warranted, *id.* at 53; and (3) FHWA should "directly address" the factual development of the Project on remand in the "first instance." *Id.* at 62. Indeed, at least as to mitigation, the Court already tacitly acknowledged that the re-evaluations, if considered as part of the record, may "demonstrate that [any] apparent arbitrary treatment ha[s] been resolved, perhaps by application of the adaptive management approach."

---

[9] The State's argument that FHWA has waived this issue should be dismissed out of hand. The Court explicitly asked that the Parties address remedy during argument on April 4, and the Parties did so. To that end, a request for remand without vacatur was explicitly made by counsel for Federal Defendants during argument. *See* Apr. 4 Tr. at 231:20-232:7.

*Id*. at 52 n.17; *see also id*. (explaining that the Re-Evaluation "allocated" funding for "mitigation in New Jersey counties").

The nature of those findings supports remand without vacatur. *See Ctr. for Biological Diversity v. U.S. Army Corps of Engr's*, No. 20-103, 2021 WL 1429, at *2 (D.D.C. Jan. 1, 2021) ("[W]here a remand is only for the purposes of clarifying an issue in the administrative record, a court might reasonably remand the action without vacatur to permit supplementation or clarification of the record or to permit the agency to clarify reasoning that was not pellucid"); *see also Solar Energy Indus. Ass'n v. Fed. Energy Regul. Comm'n*, 80 F. 4th 956, 997 (9th Cir. 2023) (finding vacatur inappropriate where "we have been given no reason to believe that the agency would be unable to cure those deficiencies on remand"); *Black Warrior Riverkeeper*, 781 F.3d at 1290 ("In circumstances like these, where it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate.").

Moreover, there is no need for the Court to speculate on the ability of the agency to correct any deficiencies on remand; FHWA has already done so.[10]  FHWA's Re-Evaluation and Re-Evaluation 2 provide precisely the mitigation commitments to New Jersey communities that were identified by the Court as lacking.[11]  Thus, rather than "legally sanctioning FWHA's disregard" of its obligations under NEPA, Mot. at 18, declining to vacate is an appropriate exercise of the Court's discretion in recognizing the agency's post-FONSI reviews of the Project.

---

[10]    FHWA provides these arguments solely to respond to the State's Motion.  The agency will of course comply with the Court's order and prepare additional documentation on remand responsive to the Court's concerns.

[11]    While FHWA acknowledges the Court's declination to consider the re-evaluations was at their request, *see* ECF No. 191 at 52 n.17, "to remand with an order that the defendants formally supplement the EA . . . when NEPA's letter and spirit have been complied with . . . would be futile."  *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003).

*See Midwater Trawlers Coop. v. Dep't of Comm.*, 393 F.3d 994, 1005-07 (9th Cir. 2004) (deeming remand "unnecessary" where the agency had "already conducted" actions necessary to remedy any violations).

The Re-Evaluation also provided additional explanation for the allocation of place-based mitigation. ECF No. 191 at 51-52. The Re-Evaluation used the same methodology as the Final EA to identify communities with pre-existing pollutant or chronic disease indicators that would experience increases in truck traffic as a result of the Project. *See* DOT_45580-86. That process identified certain New Jersey communities as meeting the criteria for place-based mitigation. *Id*. at 45585; *see also* DOT_45595 (identifying communities with census tracts with both pollutant and chronic disease burdens above the 90th percentile). From there, the Re-Evaluation determined funding allocations "based on the population of the affected census tracts as a percentage of the overall population of all affected census tracts." DOT_45605. That methodology resulted in the allocation of a total of $9.8 million in place-based mitigation funding for New Jersey communities. DOT_45609. Funding for specific projects will then be determined based on consultation with the Environmental Justice Community Group and relevant communities to "help determine which of the specific place-based mitigation measures . . . are appropriate for each community within the allocated funds, and exactly where they should be sited." DOT_45610.[12] "These documents establish that in reconsidering the decision to [issue] the EA/FONSI, the defendants did indeed take a 'hard look.'" *Highway J.*, 349 F.3d at 958; *see also N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154-55

---

[12]    Nothing about the mitigation commitments is affected by the phase-in tolling structure. Instead, Re-Evaluation 2 explains that "[n]othwithstanding the phasing in of tolls, the Project Sponsors would comply with all of the mitigation commitments set forth in the EA and FONSI within the same timeframe as contemplated in those documents and in the reevaluation prepared for the March 2024 adopted toll structure." DOT_47549.

(9th Cir. 2008) ("[I]f the agency, after the requisite 'hard look' in a reevaluation, determines that the new impacts will not be significant (or not significantly different from those already considered), then the agency is in full compliance with NEPA and is not required to conduct a supplemental EA." (citation omitted)).

As to alternatives, the Re-Evaluation and Re-Evaluation 2 both confirm that FHWA continued to assess the Project based on the three objectives identified in the Final EA. *See* DOT_45449 (Re-Evaluation); DOT_47555 (Re-Evaluation 2). Rather than showing any funding objective has "diminished in relative importance," ECF No. 191 at 62, the re-evaluations reflect FHWA's and the Project Sponsors' consideration of real-world circumstances. Specifically, by the time of issuance of the Re-Evaluation, the "MTA's Chief Financial Officer had determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects . . . ." DOT_45449. Thus, FHWA determined that the adopted tolling structure (with a peak auto toll of $15) met the purpose and need of the Project. *Id*. Thereafter, in Re-Evaluation 2, FHWA further explained that "MTA's CFO has determined that the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure." DOT_47555. Those conclusions are entitled to deference. *See Coal. for Advancement of Reg. Transp. v. FHWA*, 959 F. Supp. 2d 982, 1006-07 (W.D. Ky. 2013) (deferring to "financial data and reasoning" in NEPA document).

Moreover, any updated financial projections would not call into question FHWA's prior rejection of Alternative T-2, since that option was not a "viable source of funding for the Project." ECF No. 191 at 61. This is because while tolling the East and Harlem River bridges

could potentially generate revenue for the City of New York, there is no law or agreement in place that would direct that revenue to the MTA.  DOT_36268; *see Mulgrew v. U.S. Dep't of Transp.*, No. 24-1644, 2024 WL 3251732, at *25 (S.D.N.Y. June 20, 2024); *see also Save Our Sound OBX, Inc. v. North Carolina Dep't of Transp.*, 324 F. Supp. 3d 597, 620 (E.D.N.C. 2018) (rejecting challenge to alternatives where the litigants failed to "embrace all the reasons that the [a]gencies' deemed [an alternative] inadequate to meet the needs of the . . . project"); *Colorado Rail Passenger Ass'n v. Fed. Transit Admin.*, 843 F. Supp. 2d 1150, 1168 (D. Colo. 2011) ("it was not an abuse of discretion to eliminate alternatives" where the "lack of current funding and the uncertainty of any future funding" rendered them too speculative).[13]

As to any serious consequences from vacatur, the Project is now one business day from implementation; the Project Sponsors have taken numerous (and costly) steps to ensure the Project is ready to be started up seamlessly.  Further disruption of those steps would indeed be "serious," and argues (as the Court correctly found) against vacatur.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017) ("it is clear that courts in this Circuit have repeatedly considered the economic implications of vacatur— including in cases addressing environmental harms"); *see also Sierra Club v. U.S. Dep't of Agric., Rural Util. Serv.*, 841 F. Supp. 2d 349, 363 (D.D.C. 2012).

### III. <u>The State Fails to Meet the Standard to Obtain an Emergency Post-Decisional Injunction, if One is Even Available</u>.

The State also fails to meet the demanding standard for obtaining emergency injunctive relief.  As an initial matter, the State's request comes too late, and thus should be rejected as an

---

[13]     Given the above, this prong of *Allied-Signal* alone is enough to warrant remand without vacatur.  *See Sierra Club v. U.S. Env'tl Prot. Agency*, 60 F.4th 1008, 1022 (6th Cir. 2022) ("Neither *Allied-Signal* factor is dispositive; rather, 'resolution of the question turns on the [c]ourt's assessment of the overall equities and practicality of the alternatives.'").

improper request for unwarranted and expedited reconsideration.  Regardless, as to likelihood of success on the merits, the State conflates this Court's decision (which, as described above, already did not order vacatur despite the State's request that it do so) with the likelihood that the Court will find that—even after remand—FHWA's NEPA review is insufficient.  As to irreparable harm, the State argues that the relatively minimal traffic increases in certain New Jersey communities that will occur after the Project begins warrant issuance of an emergency injunction.  But that argument lacks evidentiary support.  The State also attempts to shift the burden by asking the Court to compare the State's claimed injuries to the benefits to FHWA and the Project Sponsors, but the appropriate inquiry is whether the *movant* can show irreparable harm, not some form of cost-benefit balancing.  Viewed through the correct lens, the State's request falls short.  Finally, the State argues the equities favor maintaining the *status quo*.  But it overlooks that courts regularly give due deference to permitting duly-enacted public programs to take effect.

**A. The State Cannot Seek Emergency Injunctive Relief *After* a Decision on the Merits**.

As an initial matter, because the Court's Opinion has already resolved this issue on the merits, the State's request comes too late.  For example, Federal Rule of Civil Procedure 65(a)(2) implies that a request under the Rule *precedes* a merits determination.  *See id*. ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing.").  Were it otherwise, a plaintiff could always seek another bite at the apple as an attempt to circumvent an unfavorable result.

Indeed, the Ninth Circuit has explained that a "court properly denied the motions for a TRO and preliminary injunction because the motions were filed after the district court's final orders granting summary judgment, the motions raised the same issue previously raised before

the district court, and the motions failed to establish" an entitlement to emergency relief. *United States v. Barton*, 211 F.3d 1275 at *2 (9th Cir. 2000). The Court should find the same here.

Moreover, as the D.C. Circuit has explained, the tests for emergency injunctive relief and remand without vacatur are "analogous." *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin*, 920 F.2d 960, 967 (D.C. Cir. 1990) (citation omitted). Thus, the Court's decision to decline to vacate resolves this aspect of the State's request too. *See also Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 546 n.12 (1987) (plaintiff must show "actual success" on the merits to obtain a permanent injunction). The Court exercised its discretion to remand without vacatur, and the State cannot use a motion for emergency relief as a thinly veiled attempt at reconsideration.

In sum, the Court should properly view the State's request as one for reconsideration, and deny it for the reasons explained above.

**B. The State Has No Likelihood of Success on the Merits**.

Regardless, the State cannot show a likelihood of success. As an initial matter, the State argues that the Court's decision to remand entitles it to an injunction. Mot. at 19. But the State seems to confuse an injunction maintaining the *status quo* while the parties await a merits determination with the situation here, where the appropriate inquiry is as to the proper remedy (addressed above). As the Supreme Court has explained, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 32 (2008). And particularly as to a violation of NEPA, the Supreme Court has explicitly rejected that courts should "presume that an injunction is the proper remedy for a NEPA violation." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). Instead, "[n]o such thumb on the scale is warranted." *Id.* Consistent with that

17

instruction, the Court exercised its discretion not to enter an injunction, and the State cannot use a so-called request for emergency relief to bootstrap what are in essence requests for reconsideration on an expedited basis.

Further, the State also cannot use a TRO to advance new claims. *See Gay v. Lori*, No 20-CV-85, 2021 WL 5879191, *2 (W.D. Penn. Dec. 13, 2021).  Indeed, "[i]t is well-established that parties cannot amend their complaints through briefing." *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  Instead, to warrant interlocutory relief, the movant "must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted *in the complaint*." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) (emphasis added).  Despite ample opportunity to do so, the State has declined to move to amend its Complaint or to supplement the record.

The State now makes arguments regarding the sufficiency of the analysis in the re-evaluations, yet those allegations appear nowhere in the State's Complaint or merits briefing (and despite the State having ample time to seek to amend its Complaint if it wished to do so).  *See Mulgrew v. U.S. Dep't of Transp.*, No. 24- 1644, 2024 WL 3251732, at *46-47 (S.D.N.Y. June 20, 2024) (treating allegations about the re-evaluation separately from challenges to the validity of the EA and FONSI); *Native Songbird Care and Conservation v. LaHood*, No. 13-2265, 2013 WL 3355657, at *5 (N.D. Cal. July 2, 2013) (distinguishing between challenge to underlying NEPA document and challenge based on alleged failure to supplement).  Indeed, one court considered this issue, finding that "a TRO motion [ ] filed after findings and recommendations have been issued on summary judgment," explicitly declined to address "new legal arguments" brought in that post-decisional request.  *See Friends of the Wild Swan v. Christiansen*, 955 F.

Supp. 2d 1197, 1201-02 (D. Mont. 2013).  Here, the State's Complaint only challenged the sufficiency of the Final EA's purpose and need statement and rejection of certain alternatives. Compl. ¶¶ 145-47 (ECF No. 1).  As to the assessment of the final tolling schedule, too, the State seems to challenge the sufficiency of the re-evaluations without any allegations in the Complaint to support such challenge.  *See id*. ¶ 151 (solely challenging the Final EA's use of tolling scenarios to model the Project's effects).   Thus, the State's request fails because injunctive relief is not connected to Defendants' alleged wrongdoing in the operative complaint.  *See Holley v. Davis*, No.21CV00515, 2022 WL 16856379, *2 (W.D. Va. Nov. 10, 2022).

One court's resolution of precisely this issue further informs the State's unlikelihood of success.  *See Mulgrew*, 2024 WL 3251732, at *28 ("the EA did not ignore the importance of specific toll rates.  Rather, Defendants argue the EA examined the impacts of several tolling scenarios to provide a conservative accounting of Congestion Pricing's potential negative effects."); *see also Messina v. College of New Jersey*, 566 F. Supp. 3d 236, 245-46 (D.N.J. 2021) (weight of persuasive authority is relevant to evaluating likelihood of success on the merits). Indeed, as that court explained, "[m]ulti-step NEPA reviews are not only lawful, but also salutary.  By examining potential tolling scenarios prior to the finalization of the tolling structure, the FHWA enabled the TMRB and TBTA to benefit from the federal government's environmental expertise in crafting a suitable tolling schedule."  *Id*.

Moreover, even if the State were properly able to argue the sufficiency of the re-evaluations, that argument fails too for the reasons discussed above—the revenue projections in the re-evaluations are entitled to deference, and FHWA reasonably employed a methodology to

allocate place-based mitigation funding based on population. *See* pages x-x, above.[14] In particular, the State claims "FHWA never analyzed whether the phased tolling scheme altered its original analysis and conclusions on environmental impacts," Mot. at 22. However, that is precisely the purpose of the two re-evaluations. *See* 23 C.F.R. § 771.129 (a re-evaluation is used to determine "whether an approved environmental document remains valid"). The State chose not to challenge the re-evaluations, and cannot do so at the eleventh hour via this post-decisional TRO request.

## C. The State's Claims of Irreparable Harm Improperly Attempt to Re-litigate the Sufficiency of the Mitigation Commitments in the Final EA and FONSI.

As an initial matter, the State must show more than a "risk of irreparable harm," and instead "has the burden of proving 'a clear showing of immediate irreparable injury.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). It fails to do so, given its claims are based on speculation regarding the sufficiency of mitigation that has now been crystalized through the Re-Evaluation or was otherwise found sufficient by the Court. *See Tanko v. Moore*, No. 23-2187, 2023 WL 3033573, at *2 (D.N.J. April 21, 2023) ("the risk of irreparable harm must not be speculative").

And aside from the State's speculation regarding mitigation and attempts to once again litigate the sufficiency of the re-evaluations, it largely relies on traffic effects that courts have consistently found do not constitute irreparable harm. *See Committee of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 203 (D.D.C. 2015) ("the Committee offers no evidence to rebut the EIS's conclusion that the incremental effects on the environment will be relatively modest given

---

[14] The State's argument on alternatives also misreads the breadth of the Court's remand, which explained FWHA's analysis of alternatives went far beyond the required 'brief' discussion for EAs . . . ." ECF No. 191 at 61. The Court's "reserve[ation] of judgment" alone thus cannot constitute likelihood of success.

the urban setting of the construction site and the mitigation measures assumed in the EIS.  The cases cited by the Committee in which courts have found irreparable harm from construction projects involved far more severe disruptions and environmental hazards than those predicted by the EIS."); *City of Tempe v. F.A.A.*, 239 F. Supp. 2d 55, 63 (D.D.C. 2003) ("But, ultimately, even if plaintiffs could prove that excessive emissions from the Center Runway Project will affect them, plaintiffs have not established that the emissions are anything more than minimal.").

Indeed, though the State argues "there can be little doubt that" any environmental harm is irreparable, Mot. at 26, it fails to establish how, for example, "particulate-matter concentrations . . . below the NAAQS," DOT_45552, constitute irreparable harm.  *See, e.g.*, *City of Tempe*, 239 F. Supp. 2d at 64 n.12 ("From the outset, however, plaintiffs have had the burden of showing irreparable harm. They would thus have been well-advised to submit evidence in their opening application that levels of emissions . . .  would be significant . . . .").  Further, the State provides no evidence that the State would experience *irreparable* harm before any decision on remand. *See Food & Water Watch, Inc. v. U.S. Army Corps of Engr's*, 570 F. Supp. 2d 177, 192 (D. Mass. 2008) (finding plaintiff did not demonstrate irreparable harm where, among other things, "[p]laintiff lacks any affidavits from scientists or experts proving that the Project presents a real threat of irreparable harm to the environment."); *see also Powder River Basin Res. Council v. U.S. Dep't of Interior*, No. 22-2696, 2023 WL 7298815, at *14 (D.D.C. Nov. 6, 2023) (Plaintiffs could not demonstrate irreparable harm where they "ignore[d] language in the final EIS explaining that many of these impacts are temporary or subject to mitigation, and therefore not irreparable.").

So too, the State's argument that their alleged procedural harms constitute irreparable harm, Mot. at 27, has been consistently rejected.  *See Sierra Club v. U.S. Army Corps of Engr's*,

No. 20-396, 2020 WL 3789744, at *8 (D. Me. Dec. 16, 2020) (noting that even a "likely NEPA violation does not automatically call for an injunction if the balance of harms points the other way.") (citing *Conservation Law Found. v. Busey*, 79 F.3d 1250, 1272 (1st Cir. 1996)); *Potomac Heritage Trail Ass'n, Inc. v. United States Dep't of Transp.*, No. CV 22-2482, 2022 WL 7051160, at *16 (D. Md. Oct. 11, 2022) ("For NEPA claims in particular, CEQ's NEPA Regulations instruct that 'the regulations in this subchapter create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm.'" (quotation omitted)).  And the State's reference to federal air quality standards ignores that it waived its argument under the Clean Air Act, ECF No. 191 at 71.[15]

At base, then, the States are left with the bald submission that any day the Project is in effect creates a *per se* irreparable harm.  But the State's claims are mere speculation and notably devoid of any citations to the record, reference to affidavits, or scientific and economic evidence—in other words, precisely the type of support courts have found is necessary to obtain emergency injunctive relief.

**D.  The Equities Favor Permitting the Project to Proceed.**

Finally, a plaintiff must demonstrate that the balance of equities tips in their favor, and that a preliminary injunction is in the public interest.  *Winter*, 555 U.S. at 20, 22.  When the Federal Government opposes the requested injunction, the balance of equities and public interest factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The "public interest" prong requires

---

[15]    The State's citations to the type of interests sufficient to afford states "special solicitude" for purposes of standing, Mot. at 25, conflate that doctrine, if it is not a dead letter, *see Netflix, Inc. v. Biden*, 88 F.4th 1080, 1089 n.12 (5th Cir. 2023) (noting the doctrine "seems to [ ] be falling out of favor with the Supreme Court"), with the showing a party must make to obtain emergency injunctive relief.

an inquiry into "whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005), *amended,* 390 F. Supp. 2d 44 (D. Me. 2005).  As to the balance of the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citation omitted).  Even when a plaintiff demonstrates a NEPA violation there is "no general presumption that a NEPA violation will in all cases outweigh other public interests." *Chem. Weapons Working Grp. v. U.S. Dep't of Army*, 963 F. Supp. 1083, 1097 (D. Utah 1997) (citing *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992)).  Here, the equities do not favor an injunction for two reasons.

First, the Project is the result of action by the New York State Legislature.  As one court has explained, "governmental action pursuant to a statutory scheme is 'taken in the public interest.'"  *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n.15 (10th Cir. 2006); *see also K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1279 (S.D. Fla. 2011).  And an injunction would *de facto* enjoin application of the Traffic Mobility Act.  Such a result cautions against injunctive relief.  *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration in original) (citation omitted)); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.").

Second, the State's arguments simply presuppose the correctness of their positions, and, in turn, overlook ongoing costs to the Project Sponsors and the public.  *See also Bos. Parent*

*Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021)

("We do not lightly grant emergency relief, especially where . . . the relief sought would interfere

with processes on which many others have reasonably relied." (internal citations omitted)).

Indeed, the benefits of the Project are precisely those that courts have accounted for in

transportation infrastructure projects. *See Native Songbird Care & Conservation v. LaHood*, at

*13 ("the Court must weigh the harm to the public of delaying for at least a year an important

transportation infrastructure project with significant direct and collateral economic benefits.").

## CONCLUSION

For the foregoing reasons, the Court should deny the State's Motion.

Respectfully submitted this 2nd day of January 2025,

<div style="margin-left:40%">

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ GREGORY M. CUMMING*
GREGORY M. CUMMING
Senior Attorney
SHARI HOWARD
SAMANTHA G. PELTZ
Trial Attorneys
Environment & Natural Resources Division
150 M St., N.E.
Washington, D.C. 20002
(202) 305-0457 (phone)
(202) 598-0414 (cell)
gregory.cumming@usdoj.gov
shari.howard@usdoj.gov
samantha.peltz@usdoj.gov

ALEX SILAGI
Assistant United States Attorney
District of New Jersey
United States Attorney's Office
970 Broad Street, 7th Floor

</div>

Newark, New Jersey 07102
973-353-6001 (phone)
alex.silagi@usdoj.gov

*Counsel for Defendants*