## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration,<br><br>*Defendants,*<br><br>and<br><br>METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY<br><br>*Intervenor-Defendants.* | Hon. Leo M. Gordon<br><br>Case No. 2:23-cv-03885-LMG-LDW |

**MEMORANDUM OF LAW IN OPPOSITION TO NEW JERSEY'S MOTION FOR CLARIFICATION OR RECONSIDERATION AND A PRELIMINARY INJUNCTION BY INTERVENOR-DEFENDANTS THE METROPOLITAN TRANSPORTATION AUTHORITY AND THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY**

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT BACKGROUND ................................................................................... 4

    I.    Factual Background ............................................................................. 4

    II.    Procedural Background......................................................................... 7

ARGUMENT ......................................................................................................... 9

    I.    New Jersey's Motion for Clarification or Reconsideration Should Be Denied............. 9

      A.    Applicable Standard............................................................................ 9

      B.    New Jersey Has Provided No Basis for the Court to Reconsider Regarding the Appropriate Remedy......................................................................... 11

    II.    New Jersey Is Not Entitled to Either a TRO or a Preliminary Injunction .................. 14

      A.    Legal Standard............................................................................... 14

      B.    The Court Should Deny New Jersey's Motion for a Preliminary Injunction .............. 15

CONCLUSION.................................................................................................... 29

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)................................................................................13, 14

*Anspach v. City of Phila.*,
503 F.3d 256 (3d Cir. 2007) ...........................................................................27

*Antonio-Villalba v. Hollingsworth*,
Nos. 12 Civ. 7779, 12 Civ. 7836, 2013 WL 5592367 (D.N.J. Oct. 13, 2013) .............................10

*Aquifer Guardians in Urban Areas v. FHWA*,
779 F. Supp. 2d 542 (W.D. Tex. 2011)................................................................24

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*,
842 F. Supp. 2d 672 (S.D.N.Y. 2012) .................................................................24

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) .......................................................................13

*Blystone v. Horn*,
664 F.3d 397 (3d Cir. 2011) ...........................................................................10

*Boretsky v. New Jersey*,
433 F. App'x 73 (3d Cir. 2011) .......................................................................10

*Bowers v. NCAA*,
130 F. Supp. 2d 610 (D.N.J. 2001) ..................................................................12

*Bridgeport, Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*,
No. 03 Civ. 599, 2004 WL 840140 (D. Conn. Apr. 15, 2004) ......................................24

*Carroll v. Pa. Bd. of Prob. & Parole*,
No. 17 Civ. 2170, 2018 WL 3130941 (M.D. Pa. June 26, 2018)...................................16

*Chan v. U.S. Dep't of Transp.*,
No. 23 Civ. 10365, 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024).................................25

*Chaves v. Int'l Boxing Fed'n*,
No. 16 Civ. 1374, 2016 WL 1118246 (D.N.J. Mar. 22, 2016) .....................................23

*City of Alexandria, Va. v. Slater*,
198 F.3d 862 (D.C. Cir. 1999)........................................................................24

*City of Dania Beach v. U.S. Army Corps of Eng'rs*,
No. 12 Civ. 60989, 2012 WL 3731516 (S.D. Fla. June 6, 2012) ...................................................27

*City of Oberlin, Ohio v. FERC*,
937 F.3d 599 (D.C. Cir. 2019) .....................................................................................................12

*Comite' De Apoyo A Los Trabajadores Agricoles v. Perez*,
774 F.3d 173 (3d Cir. 2014) .........................................................................................................11

*Council Tree Commc'ns, Inc. v. FCC*,
619 F.3d 235 (3d Cir. 2010) .........................................................................................................11

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) .................................................................................................15, 28

*Doris Behr 2012 Irrevocable Tr. v. Johnson & Johnson*,
No. 19 Civ. 8828, 2019 WL 1519026 (D.N.J. Apr. 8, 2019) .......................................................23

*Earth Is. Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) .........................................................................................................28

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) .........................................................................................................11

*Erlbaum v. N.J. Dep't of Env't Prot.*,
No. 16 Civ. 8198, 2017 WL 465466 (D.N.J. Feb. 3, 2017) ......................................22, 24, 25, 26

*Fatir v. Connections Cmty. Support Programs, Inc.*,
No. 18 Civ. 1549, 2020 WL 360895 (D. Del. Jan. 22, 2020) .......................................................16

*First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*,
155 F. Supp. 2d 194 (M.D. Pa. 2001) ...........................................................................................16

*Food & Water Watch v. FERC*,
28 F.4th 277 (D.C. Cir. 2022) .......................................................................................................12

*G-69 v. Degnan*,
748 F. Supp. 274 (D.N.J. 1990) ....................................................................................................10

*Garcia v. Corr. Med. Serv., Inc.*,
No. 13 Civ. 1250, 2018 WL 1317867 (D.N.J. Mar. 14, 2018).......................................................9

*Gillespie v. Newark Bd. of Educ.*,
No. 21 Civ. 18990, 2024 WL 4867025 (D.N.J. Nov. 22, 2024) ...................................................10

*Guinta v. Accenture, LLP,*
No. 08 Civ. 3776, 2009 WL 301920 (D.N.J. Jan. 23, 2009).............................................12

*Gulf Restoration Network v. Haaland,*
47 F.4th 795 (D.C. Cir. 2022) ........................................................................................13

*H-1 Auto Care, LLC v. Lasher,*
No. 21 Civ. 18110, 2022 WL 13003468 (D.N.J. Oct. 21, 2022) ..............................22–23

*Haines v. Liggett Group, Inc.,*
975 F.2d 81 (3d Cir. 1992) .............................................................................................10

*Healthy Gulf v. FERC,*
107 F.4th 1033 (D.C. Cir. 2024) ..................................................................................2, 12

*In re Revel AC, Inc.,*
802 F.3d 558 (3d Cir. 2015) ...........................................................................................22

*Instant Airfreight Co. v. C.F. Airfreight, Inc.,*
882 F.2d 797 (3d Cir. 1989) ...........................................................................................22

*Kos Pharm., Inc. v. Andrx Corp.,*
369 F.3d 700 (3d Cir. 2004) ...........................................................................................14

*Lynch v. Tropicana Prods., Inc.,*
No. 11 Civ. 7382, 2013 WL 4804528 (D.N.J. Sept. 9, 2013) ..........................................9

*Macchione v. Coordinator Adm'r in Wash., D.C.,*
591 F. App'x 48 (3d Cir. 2014) ......................................................................................22

*Marin Audubon Soc'y v. Fed. Aviation Admin.,*
121 F.4th 902 (D.C. Cir. 2024) ..................................................................................11, 12

*Martin v. Keitel,*
205 F. App'x 925 (3d Cir. 2006) ....................................................................................16

*Marvin A.G. v. Decker,*
No. 20 Civ. 1689, 2020 WL 3481746 (D.N.J. June 26, 2020)........................................26

*Max's Seafood Café v. Quinteros,*
176 F.3d 669 (3d Cir. 1999) ...........................................................................................10

*McMillan v. City of Camden,*
No. 21 Civ. 20237, 2023 WL 5627116 (D.N.J. Aug. 30, 2023).......................................16

*Miller v. Mitchell,*
598 F.3d 139 (3d Cir. 2010) ................................................................................15

*Miller v. N.J. Dep't of Corr.,*
No. 08 Civ. 03335, 2010 WL 4810659 (D.N.J. Nov. 17, 2010) ...................................22

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010)..........................................................................14, 26, 28

*Mulgrew v. U.S. Dep't of Transp.,*
No. 24 Civ. 1644, 2024 WL 3251732 (S.D.N.Y. Jun 20, 2024)....................................19

*Narragansett Indian Tribe v. Guilbert,*
934 F.2d 4 (1st Cir. 1991) ................................................................................21

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
241 F.3d 722 (9th Cir. 2001) ........................................................................20–21

*Nat. Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs,*
457 F. Supp. 2d 198 (S.D.N.Y. 2006) ....................................................................26

*Nken v. Holder,*
556 U.S. 418 (2009)....................................................................................26, 28

*NL Indus. Inc. v. Commercial Union Ins. Co.,*
935 F. Supp. 513 (D.N.J. 1996) ..........................................................................9

*Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co.,*
744 F. Supp. 1311 (D.N.J. 1990).........................................................................14

*Pelham v. United States,*
661 F. Supp. 1063 (D.N.J. 1987) ........................................................................9

*Prometheus Radio Project v. FCC,*
824 F.3d 33 (3d Cir. 2016) ...............................................................................13

*PTT, LLC v. Gimme Games,*
No. 13 Civ. 7161, 2014 WL 5343304 (D.N.J. Oct. 20, 2014) ....................................22

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Rice,*
774 F. Supp. 317 (D.N.J. 1991) ........................................................................28

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs,*
No. 20 Civ. 3817, 2021 WL 430054 (D.D.C. Feb. 7, 2021) .......................................24

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017) ..................................................................................15

*Sharon Steel Corp. v. EPA*,
597 F.2d 377 (3d Cir. 1979) ..................................................................................13

*Sierra Club v. Slater*,
120 F.3d 623 (6th Cir. 1997) .................................................................................24

*Sierra Forest Legacy v. Rey*,
670 F. Supp. 2d 1106 (E.D. Cal. 2009) .................................................................13

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) .......................................................................11, 14

*Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*,
90 F.4th 122 (3d Cir. 2024) ...................................................................................20

*Ultimate Trading Corp. v. Daus*,
No. 07 Civ. 4203, 2007 WL 3025681 (D.N.J. Oct. 15, 2007) ..............................22

*United States v. Compaction Sys. Corp.*,
88 F. Supp. 2d 339 (D.N.J. 1999) ...........................................................................9

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) .............................................................................11

*W. Ala. Quality of Life Coal. v. FHWA*,
302 F. Supp. 2d 672 (S.D. Tex. 2004) .............................................................24, 25

*W. Watersheds Project v. Bureau of Land Mgmt.*,
774 F. Supp. 2d 1089 (D. Nev. 2011) ...............................................................24, 28

*Winter v. NRDC*,
555 U.S. 7 (2008) ............................................................................................15, 26

*Zambelli Fireworks Mfg. Co. v. Wood*,
592 F.3d 412 (3d Cir. 2010) ..................................................................................27

**STATUTES**

23 C.F.R. § 771.107 ...............................................................................................19

40 C.F.R. § 1501.11(b)............................................................................................19

Fed. R. Civ. P. 65(c)...............................................................................................27

N.Y. Veh. & Tr. Law § 1704-a(1).................................................................................................18

Intervenor-Defendants the Metropolitan Transportation Authority (the "MTA") and the Triborough Bridge and Tunnel Authority ("TBTA") respectfully submit this memorandum of law in opposition to Plaintiff State of New Jersey's Application by Order to Show Cause for Clarification and/or Reconsideration and for a Temporary Restraining Order and Preliminary Injunction ("OTSC" or "Pl. Br."). ECF 192-1.[1]

## PRELIMINARY STATEMENT

Three days ago, this Court issued a comprehensive, 72-page decision on the parties' cross-motions for summary judgment (the "Decision"). The Decision granted Defendants' motion and denied New Jersey's motion in substantial part, rejecting the vast majority of New Jersey's objections under the National Environmental Policy Act ("NEPA") to the Final Environmental Assessment ("EA") for the Central Business District Tolling Program (the "Program"). The Court issued a limited remand to address two discrete issues: (1) specificity of mitigation measures for environmental justice ("EJ") communities in the Bronx, as compared to communities in New Jersey; and (2) whether the Program's objectives have changed in relative importance, focusing on the goal of raising revenue to fund capital improvements for NYC's public transportation network. ECF 191 ("Decision"). As the Court recognized, *id.* at 14 n.7, 52 n.17, these two discrete issues have each been addressed in two reevaluations prepared for the toll rate structure that TBTA adopted in November 2024, but which the Court did not consider as part of its Decision.

New Jersey now moves for "clarification" or "reconsideration" of the Decision on an emergency basis, to seek relief that the Court already considered and declined to grant. More specifically, New Jersey effectively argues that the Court either must have meant to vacate the EA and FONSI, but neglected to do so, or committed clear error in failing to grant vacatur and

---

[1] All terms not defined herein have the meaning ascribed to them in the OTSC or the Court's Decision, ECF 191.

injunctive relief.  For the first time since commencing this litigation nearly 18 months ago, New Jersey also has the temerity to seek a temporary restraining order enjoining Defendants from taking any action to implement the Program, based at least in part on challenges to the reevaluations that it expressly declined to add to this case while awaiting this Court's decision.  For the reasons set forth below, New Jersey's OTSC application should be denied.

No clarification of the Decision is needed.  The Decision notes that the Complaint sought "an order *vacating* the [EA and FONSI]," *id.* at 4 (emphasis added), but the relief granted by the Court is a "*remand*."  Although New Jersey now presumes that the Court was mistaken about "what effect its remand has on" the Program, OTSC at 2, there can be no mistake that remand is a distinct remedy.  New Jersey knows this; in its proposed summary judgment order, New Jersey distinguished between vacatur and other remedies. ECF 67-13 ("Proposed Order").

Moreover, the Court acted well within its discretion when it remanded to FHWA on limited grounds, rather than vacating the EA and FONSI.  New Jersey does not point to any intervening decision or reason arising since the Court's Decision to suggest that remand was inappropriate.  Now, for the very first time, New Jersey challenges the sufficiency of the two reevaluations.  But in the same way that New Jersey mischaracterizes the record,[2] it overtly mischaracterizes the law.  Courts regularly recognize that remand without vacatur is warranted in NEPA challenges where the alleged deficiencies are likely to be addressed by the agency on remand, and a vacatur would have disruptive consequences.  *See, e.g.*, *Healthy Gulf v. FERC*, 107 F.4th 1033 (D.C. Cir. 2024).

Here, the Court identified two narrow issues (out of at least 15 raised by New Jersey) concerning mitigation and revenue generation. Decision at 49–53; 62.  Neither of these issues

---

[2] In its decision, the Court noted New Jersey's failure to accurately characterize the record no fewer than 5 times. Decision at 20, 23, 46, 48, 61.

suggests some fundamental error in the EA and FONSI requiring them to be vacated—rather, the Decision acknowledges that they may have been addressed in the reevaluations (which they were). *Id.* at 14 n.7, 52 n.17. It was a provident exercise of discretion by the Court to remand to FHWA rather than stop the Program in its tracks.

Finally, New Jersey's request for injunctive relief likewise fails because New Jersey cannot establish a likelihood of success on the merits, irreparable harm, or the balance of the equities. New Jersey has failed to move for such relief over the course of more than a year—despite its repeated and recent threats to do so. That is because New Jersey cannot possibly show an uncurable NEPA error that would warrant vacatur. Nor can New Jersey show irreparable harm, given that its claims of environmental harm are vague and speculative, would be temporary, and could be addressed through traditional administrative remedies. And the balance of equities and public interest weigh heavily in favor of starting the Program, while a limited remand takes place over the course of the next several weeks.

In our adversarial system, it was New Jersey who chose to selectively challenge the EA and FONSI without amending its Complaint to challenge the reevaluations. It chose not to seek immediate injunctive relief—even as it repeatedly pressured the Court to issue its Decision before the January 5 implementation date. Earlier this week, this Court issued its Decision based on the case that New Jersey sought, and deliberately granted only a portion of the requested relief. New Jersey is dissatisfied with that outcome because its true purpose is to kill congestion pricing no matter what and however it can. That, of course, is no reason for the Court to revisit its Decision, or to issue an injunction. The Court should deny the OTSC and permit the modest additional NEPA review to play out as ordered.

## RELEVANT BACKGROUND

### I.  Factual Background

Given that the Court is already well aware of the facts leading up to the issuance of the EA and FONSI, what follows is a brief overview of FHWA's NEPA review and a more fulsome discussion of the reevaluations.

On August 10, 2022, after more than a year of federal, state, and local agency collaboration, an extensive public outreach campaign, and input from EJ groups, FHWA and the Project Sponsors published an 868-page draft EA (and appendices) for public comment. (DOT_0037151.)  Because the final tolling structure was not yet defined, and to assist the TMRB and the TBTA Board in evaluating the potential impacts of various tolling options, the EA analyzed seven different scenarios employing different variables. (DOT_0036328, DOT_0036343, DOT_0036340.)[3]  The draft EA analyzed the potential impacts of the Program by assessing the "worst-case tolling scenario" for each resource area to be conservative. (*E.g.*, DOT_0036290).

In May 2023, FHWA approved the Final EA (DOT_0036153), which included an expanded analysis of potential effects on EJ populations and communities, including the potential effect of traffic diversions on local air quality in communities with high levels of preexisting pollution and health burdens. (DOT_0036989–96, DOT_0006963–82, DOT_0007243–440.)  This assessment identified EJ communities with high burdens that, under a worst-case tolling scenario, would see any amount of increased highway truck traffic, and committed to a $155 million package of region-wide and place-based mitigation measures. (DOT_0007318–29.)  The EA contemplated that once a final toll structure was adopted, the same analysis would be performed to pinpoint the highly burdened census tracts and communities in which the Program could cause increased highway

---

[3] References to the administrative record cite to the Bates number of the relevant page(s).

4

truck traffic, and that the place-based mitigation funding would be allocated accordingly using a plan for siting specific measures.  (*Id.*)  Based on the EA, FHWA approved a draft FONSI, which was finalized on June 23, 2023.  (DOT_0000393.)  On March 27, 2024, the TBTA Board adopted a toll rate schedule through a formal ratemaking process under the New York State Administrative Procedure Act.  This toll rate schedule was reevaluated in a document ("Reevaluation 1") prepared pursuant to FHWA's NEPA regulations in consultation with FHWA (via submission of interim drafts) and submitted for final review on May 23, 2024.  (DOT_0047124–90, DOT_0047399.)

On June 5, 2024, several weeks before the Program's scheduled start, Governor Hochul announced a pause of its implementation.[4]  On June 14, 2024, FHWA concluded that the adopted toll structure and associated impacts were analyzed and mitigated appropriately under NEPA, that no additional environmental analysis was warranted, and that the conclusions in the EA and FONSI remained valid.  (DOT_0047520–21, DOT_0047539.)  Reevaluation 1 concluded that "[i]n every category, the effects are consistent with those predicted in the Final EA," and that, "importantly, some of the adverse effects no longer occur and many are on the lower end of those disclosed in the Final EA."  (DOT_0045437.)  Reevaluation 1 allocated funding for place-based mitigation based on relative population and detailed a site-selection and implementation process including community engagement.  (DOT_0045608–11.)

On November 14, 2024, Governor Hochul announced a proposal to proceed with the Program, but with the previously adopted toll rates phased-in over several years (the "Phase-In Approach").[5]  Under this approach, the Program tolls will be implemented in three steps,

---

[4] Press Release, Gov. Kathy Hochul, *Governor Hochul Announces Pause on Congestion Pricing to Address the Rising Cost of Living in New York* (June 5, 2024), https://www.governor.ny.gov/news/what-they-are-saying-governor-hochul-announces-pause-congestion-pricing-address-rising-cost.

[5] See Press Release, Gov. Kathy Hochul, *Putting Commuters First, Keeping Costs Down: Governor Hochul Unveils Plan for Future of Transit and Traffic in New York City, Including a 40 Percent Reduction in Congestion Pricing Tolls*

culminating with the rates set in the March 2024 adopted toll structure (*e.g.*, a $15 peak E-ZPass automobile rate). (DOT_0047550–57.) The interim steps will have tolls for each vehicle class and time of day, as well as tunnel crossing credits, proportionally reduced from the corresponding values in the March 2024 adopted toll structure. (*Id.*) The proportional reductions will result in values for Phase 1 (2025, 2026, and 2027) equaling 60% of the corresponding values for the March 2024 adopted toll structure (*e.g.*, a $9 peak E-ZPass automobile rate). (*Id.*) For Phase 2 (2028, 2029, and 2030), the tolls and credits would equal 80% of the March 2024 adopted toll structure values (*e.g.*, a $12 peak E-ZPass automobile rate). (*Id.*) The March 2024 adopted toll structure values would come into full effect in 2031. (*Id.*)

On November 18, 2024, the TBTA Board formally adopted the Phase-In Approach. The Project Sponsors sent FHWA a draft of a second reevaluation ("Reevaluation 2"). (DOT_0047533–40.) Reevaluation 2 confirms that under this approach, the Project Sponsors will still implement all mitigation commitments, including for EJ communities, consistent with the original timeframes contemplated in the EA/FONSI. (*Id.*) Reevaluation 2 also confirmed that the Phase-In Approach would achieve the Program's objectives of reducing VMT by at least 5%, reducing entries to the CBD by at least 10%, and raising sufficient revenue to finance $15 billion for the MTA's Capital Program. (DOT_0047550–57.) Although revenues would be lower in the first two phases, in combination, the projected revenues from the Phase-In Approach would allow the same $15 billion in capital projects to be funded through the issuance of bonds. *See* Declaration of Kevin Willens ("Willens Decl.") ¶¶ 9–11. (DOT_0047555–57.)

On November 21, 2024, FHWA approved Reevaluation 2, concluding that the effects of

---

(Nov. 14, 2024), https://www.governor.ny.gov/news/putting-commuters-first-keeping-costs-down-governor-hochul-unveils-plans-future-transit-and.

the Program were consistent with those disclosed in the EA, that "the phase-in of the adopted toll structure and impacts associated with it was analyzed and mitigated appropriately," and "that no additional environmental analysis is warranted." (DOT_0047548–57.) Thereafter, FHWA and the Project Sponsors signed an agreement under the Value Pricing Pilot Program (the "VPPP").[6]

## II.    **Procedural Background**

In its operative Complaint filed on March 14, 2024, New Jersey sought the following forms of relief: (i) an injunction "vacating and setting aside Defendants' FONSI and Final EA and compelling Defendants to complete a full and proper EIS," (ii) a declaration that the FONSI and EA were inadequate; and (iii) an order that FHWA "prepare a full and proper EIS." ECF 139 ("Compl.") at 66–67. On November 10, 2023, New Jersey moved for summary judgment, seeking similar relief. ECF 67-13. On December 15, 2023, Intervenor-Defendants and Federal Defendants cross-moved for summary judgment dismissing New Jersey's claims. ECF Nos. 74, 79. The motions were argued on April 3–4, 2024, which included argument from all parties on remedy, and at a conference on November 21, New Jersey again stated that it had no intention of challenging the reevaluations pending the Court's decision. The Court then directed Federal Defendants to supplement the record with the reevaluations. ECF 184. New Jersey has *repeatedly declined* to amend its Complaint to challenge either reevaluation. *See* ECF Nos. 166, 167, 169, 173 (pressuring the Court for a decision on the merits but declining to amend its Complaint to assert new challenges).

On December 30, 2024, the Court issued a 72-page opinion on the parties' cross motions, granting the majority of Defendants' motions, and rejecting the vast majority of the challenges raised by New Jersey. Decision at 14. The Court found that "FHWA provided a rational

---

[6] VPPP Agreement (Nov. 21, 2024), https://new.mta.info/project/CBDTP/reevaluation2-and-vppp-agreement.

explanation for its fact finding and determinations" with respect to air quality. *Id.* at 35.  The Court explained that FHWA had adequately explained that any significant adverse effects caused by the Program "would be reduced by committed mitigation," and that New Jersey's arguments to the contrary rested on a "mischaracterization of the record." *Id.* at 20.

The Court also rejected New Jersey's arguments that FHWA had not adequately considered impacts on New Jersey communities, finding "that Plaintiff's arguments on this issue 'are facially refuted by the extensive analysis in the Final EA.'" *Id.* at 44, 46.  And the Court held that New Jersey's contentions that "FHWA and the Project Sponsors failed to provide specific mitigation commitments for New Jersey" were "partially undercut by the regional mitigation commitments outlined in the Final EA and Final FONSI," *id.* at 48, but noted that the EA contained specific funding commitments for the Bronx, but not for potentially affected areas in New Jersey, and remanded for FHWA to provide additional explanation on this point, *id.* at 53.

While the Court concluded that "the record does not support Plaintiff's arguments that the FHWA and Project Sponsors failed to consider reasonable alternatives," and noted that "FHWA's analysis of alternatives here went far before the required 'brief' discussion," *Id.* at 61, it reserved judgment on New Jersey's challenge on this issue and permitted Defendants to address how subsequent developments in the structure of the Program might have affected the analysis. *Id.* at 61–62.

The Court also found that "FHWA more than met its obligations of involvement and outreach." *Id.* at 64.  And the Court dismissed New Jersey's CAA claim as waived because New Jersey had not raised the issue during the administrative process. *Id.* at 71.

As a result, the Court awarded summary judgment to Defendants on the majority of New Jersey's challenges, but granted limited relief to New Jersey in the form of a remand, directing

Defendants to provide further explanation as to the EA's different levels of specificity for some mitigation measures and with respect to the effect of subsequent changes to the tolling structure of the Program and revenue generation on the alternatives analysis. *See id.* at 52 n.17, 62. Despite acknowledging that New Jersey sought "relief in the form of an order vacating the FHWA's Final [EA and FONSI]," *id.* at 4, the Court declined to order vacatur and instead limited the relief granted to a remand for further explanation on the discrete issues described above, *id.* at 71–72.

## **ARGUMENT**

### **I.   New Jersey's Motion for Clarification or Reconsideration Should Be Denied**

New Jersey purports to seek "clarification" that the Court's "remand also *necessarily* vacated the Final EA and FONSI." Pl. Br. at 2. To the contrary, the Court ordered a limited remand, *see id.* at 71–72. That remedy was not only consonant with Third Circuit law, which allows district courts to determine the appropriate remedy in an APA challenge, *see infra* at Point I.B, and manifestly the correct outcome here given that FHWA will be able to provide the requested explanations, as demonstrated in the reevaluations. New Jersey's "clarification" motion therefore transparently asks the Court to change its mind. *See Garcia v. Corr. Med. Serv., Inc.*, No. 13 Civ. 1250, 2018 WL 1317867, at *1 (D.N.J. Mar. 14, 2018) (purpose of motion for clarification is "to explain or clarify something ambiguous or vague, not to alter or amend").

### **A.  Applicable Standard**

Motions for reconsideration or clarification are governed by Local Civil Rule 7.1(i), which requires the movant to set forth "concisely the matter or controlling decisions which the party believes the Judge has overlooked." *See United States v. Compaction Sys. Corp.*, 88 F. Supp. 2d 339, 345 (D.N.J. 1999); *see also Lynch v. Tropicana Prods., Inc.*, No. 11 Civ. 7382, 2013 WL 4804528, at *1 (D.N.J. Sept. 9, 2013). Reconsideration is "an extraordinary remedy" that is to be granted "very sparingly," *NL Indus. Inc. v. Commercial Union Ins. Co.*, 935 F. Supp. 513, 516

9

(D.N.J. 1996), and only when "dispositive factual matters or controlling decisions of law" were brought to the court's attention but not considered, *Pelham v. United States*, 661 F. Supp. 1063, 1065 (D.N.J. 1987).

The Third Circuit has held that a court may not grant a motion for reconsideration unless the moving party shows at least one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citation omitted). To be clearly erroneous, the Court must have a "definite and firm conviction that a mistake has been committed." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir. 1992). A manifest injustice is "an error in the trial court that is direct, obvious, and observable." *Antonio-Villalba v. Hollingsworth*, Nos. 12 Civ. 7779, 12 Civ. 7836, 2013 WL 5592367, at *2 (D.N.J. Oct. 13, 2013).

This heavy burden cannot be satisfied through "recapitulation of the cases and arguments considered by the court before rendering its original decision." *G-69 v. Degnan*, 748 F. Supp. 274, 275 (D.N.J. 1990). Nor does a party's mere disagreement with the court's ruling warrant reconsideration. *Boretsky v. New Jersey*, 433 F. App'x 73, 78 (3d Cir. 2011). For these reasons, "[a] motion for reconsideration is 'extremely limited' in scope and may not be used 'as an opportunity to relitigate the case.'" *Gillespie v. Newark Bd. of Educ.*, No. 21 Civ. 18990, 2024 WL 4867025, at *2 (D.N.J. Nov. 22, 2024) (quoting *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011)). These strict standards are intended "to prevent parties from filing a second motion, with the hindsight provided by the court's analysis, covering issues that should have been raised in the first set of motions." *United States v. Jones*, 158 F.R.D. 309, 314 (D.N.J. 1994).

10

### B.  New Jersey Has Provided No Basis for the Court to Reconsider Regarding the Appropriate Remedy

New Jersey maintains—incorrectly—that in ordering a limited remand to FHWA, the Court had to vacate the EA and FONSI and enjoin the Program from operating.  Pl. Br. at 2–4, 17–18.

But New Jersey does not point to any intervening change in the law, nor could it, as the two Third Circuit cases it cites both pre-date the filing of this action and are easily distinguishable examples of courts ordering remand with vacatur based on the facts before them, in cases not even involving NEPA.  *See Comite' De Apoyo A Los Trabajadores Agricoles v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014) (determining that vacatur of rule was the "particularly appropriate"); *Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235, 257 (3d Cir. 2010) (determining that vacatur of FCC rules was the "proper remedy" after balancing seriousness of rules' deficiencies with disruptive consequences of vacatur).

Similarly, all but one of the out-of-circuit cases that New Jersey cites pre-date the filing of this litigation, and none hold that a NEPA remand must always be accompanied by vacatur.  *See Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024) (remanding with vacatur where agencies had not shown that they would be able to reach same outcome on remand, but confirming that "[o]ur precedents have authorized remand without vacatur…if an agency's error is curable" (citation omitted)); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) (vacating EA after holding that agency should have prepared EIS instead); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (upholding district court's remand with vacatur where agency was unlikely to resolve issues on remand given that court had previously remanded *without* vacatur, confirming that "a court is not without discretion to leave agency action in place while the decision is remanded for further

11

explanation" (alterations and citation omitted)); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (vacatur of rule amending health and safety standards was appropriate remedy where agency failed to explain how rule could be saved on remand or how vacatur would cause disruption, but confirming that vacatur is not always required).[7]

Even if the two Third Circuit cases that New Jersey cites were controlling on this issue (which they are not), New Jersey failed to cite them previously, and it is therefore improper to rely on them now. *See Guinta v. Accenture, LLP*, No. 08 Civ. 3776, 2009 WL 301920, at *5 (D.N.J. Jan. 23, 2009); *Bowers v. NCAA*, 130 F. Supp. 2d 610, 613 (D.N.J. 2001). New Jersey's claim that Defendants forfeited an argument that remand without vacatur is appropriate is meritless and nonsensical. Defendants did not waive such an argument. On April 4, 2024, both Defendants and Intervenor-Defendants addressed whether remand without vacatur was appropriate. ECF 153 (Transcript of Oral Argument) at 231–32, 236–37. New Jersey's argument also makes no sense, as it would require the Court to hold that Defendants somehow waived an argument regarding the appropriateness of the Court's ruling on remedy before that decision was even issued.

New Jersey has also failed to establish that the Court committed a "clear error of law" or caused a "manifest injustice" in remanding without vacatur or injunctive relief. Courts regularly and routinely remand NEPA decisions without vacatur. *See, e.g.*, *Healthy Gulf*, 107 F.4th at 1047 (remanding without vacatur because it was "reasonably likely" that FERC could reach the same decision on remand and vacatur would "needlessly disrupt" the project); *Food & Water Watch v. FERC*, 28 F.4th 277, 292 (D.C. Cir. 2022) (in a case centrally relied upon by New Jersey in its summary judgment motion, *see* Decision at *13, remanding without vacatur because it was

---

[7] Judge Randolph's concurrence in *Marin Audubon Society* (which New Jersey does not cite) argues that the APA requires vacatur, 121 F.4th at 919–20 (Randolph, J., concurring), though Judge Randolph acknowledged that his interpretation conflicts with D.C. Circuit precedent, *see id.* at 919 (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)).

possible agency would reach the same conclusion after further consideration); *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019) (remanding without vacatur because it was "plausible that the [agency] will be able to supply the explanations required, and vacatur of the Commission's orders would be quite disruptive"); *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 805 (D.C. Cir. 2022) (remanding without vacatur in NEPA context); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289 (11th Cir. 2015); *see also Prometheus Radio Project v. FCC*, 824 F.3d 33, 52 (3d Cir. 2016) (citing *Allied-Signal*, 988 F.2d at 151); *cf. Sharon Steel Corp. v. EPA*, 597 F.2d 377, 377 (3d Cir. 1979) (in non-NEPA case, finding procedural errors in EPA's promulgation of rule to determine status of air quality for certain areas for various air pollutants, but allowing rule to remain in effect on remand).

To the extent that New Jersey implies that the Court committed a clear legal error in declining to enjoin the Program pending remand, that too is incorrect. Courts are accorded "broad discretion…in fashioning equitable remedies in the face of NEPA/APA violations," including allowing any projects approved as a result of the NEPA review to operate while the agency remedies the deficiencies on remand. *See Sierra Forest Legacy v. Rey*, 670 F. Supp. 2d 1106, 1113–14 (E.D. Cal. 2009), *aff'd in part, rev'd in part sub. nom. Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) (holding that "for the most part the EIS…complied with NEPA," but remanding to the agency to prepare a supplemental EIS to address deficiencies in the alternatives analysis, and confirming that "[e]xisting projects already evaluated and approved may continue while the Forest Service progresses through the supplemental EIS process").

In fact, even if the Court had vacated the EA and FONSI as New Jersey requested, that still would not automatically warrant an injunction. In *Standing Rock Sioux Tribe*, for example, the agency and the intervenor-defendant pipeline owner appealed the district court's order vacating an

13

easement for an oil pipeline, remanding to the agency for preparation of an EIS (instead of an EA), and issuing an injunction requiring the pipeline to be shut down and drained of oil to prevent a possible catastrophic explosion.  The D.C. Circuit upheld the remand and vacatur, but reversed the injunction, holding that per Supreme Court precedent, injunctions are not automatically warranted for NEPA violations and the court first "'must determine that an injunction should issue under the traditional four-factor test'" for injunctive relief.  985 F.3d at 1054 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010)).  For the reasons set forth in Section II.B.3, *infra*, an injunction would cause a significant disruption to a critical public program and achieving the goals of congestion reduction, better regional air quality and sustaining the transit system relied upon by millions of New Yorkers and New Jerseyans alike.  New Jersey has failed to establish its entitlement to an injunction halting the Program from operating.[8]

In rendering its original decision—which speaks for itself—this Court did not, as New Jersey contends, overlook any dispositive facts or controlling authority, misunderstand the record, or commit any legal error.  New Jersey's motion for "clarification and/or reconsideration" is improper because it "ask[s] the court to rethink what it ha[s] already thought through," and it should therefore be denied.  *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990).

## II.    New Jersey Is Not Entitled to Either a TRO or a Preliminary Injunction

### A.  Legal Standard

Like motions for reconsideration, the exercise of judicial power to issue injunctive relief is

---

[8] For the first time, New Jersey now suggests that it also seeks vacatur of the VPPP agreement authorizing the Program's collection of tolls.  *See* Pl. Br. at 2 (arguing that "controlling Third Circuit law and the import of this Court's decision…necessarily requires vacating the underlying approvals in the Final EA and FONSI on remand").  However, New Jersey's Complaint only challenged the EA and FONSI, and New Jersey has not amended its Complaint to challenge any subsequent agency action, including the reevaluations or the VPPP agreement, which was executed with the benefit of not only the EA and FONSI, but the reevaluations as well.

"an extraordinary remedy" that "should be granted only in limited circumstances." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). The movant (here, New Jersey) bears the burden of establishing: "(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010); *see also Winter v. NRDC*, 555 U.S. 7 (2008). The first two factors are the "most critical," and a court need only reach the remaining factors if the movant first demonstrates that it "can win on the merits" and that it will "suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). The Third Circuit has explained that "a court should not grant an injunction unless the plaintiff's right is clear, his impending injury is great, and only an injunction can avert that injury." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024).

**B. The Court Should Deny New Jersey's Motion for a Preliminary Injunction**

New Jersey's request for emergency injunctive relief rests entirely on challenges to the sufficiency of the reevaluations raised for the first time at the eleventh hour. However, New Jersey has had ample opportunity to amend its Complaint to litigate these claims in a timely and orderly fashion. New Jersey's conscious decision not to do so is fatal to its motion. Even if these newly raised arguments were properly before the Court, none of the preliminary injunction factors support New Jersey's untimely application for emergency relief.

1. New Jersey Is Not Likely to Succeed on the Merits

Illustrating the mismatch between the relief it seeks and the preliminary injunction standard, New Jersey argues that it has satisfied the likelihood-of-success prong because it has already "prevailed on the merits of its NEPA claim." Pl. Br. at 19–20. But New Jersey has it backwards. The Court *declined to give New Jersey the relief it now demands*—vacatur of the EA

15

and FONSI.  The Court affirmed the lion's share of FHWA's exhaustive environmental review under NEPA and ordered a limited remand "for further explanation, and if appropriate, reconsideration" related to the environmental justice mitigation program in New Jersey.  Decision at 53.  After affirming FHWA's alternatives analysis, the Court reserved final decision on Plaintiff's challenge based on "subsequent developments in the structure of the Program" related to revenue generated by the Project, *i.e.*, the adoption of the Phase-In Approach, to "allow the Project Sponsors and FHWA to directly address this issue in the first instance in the context of the whole record." *Id.* at 61–62.  New Jersey cannot seriously contend that the Decision entitles it to the very relief the Court declined to give.

Implicitly recognizing the flaw in its logic, New Jersey argues that it is likely to prevail on challenges that it *repeatedly declined to assert*. *See* ECF Nos. 166, 167, 169, 173.  Unlike plaintiffs in other cases who amended their complaints and pursued challenges to the reevaluations, New Jersey chose not to do so.[9]  This failure is fatal to New Jersey's motion. *See McMillan v. City of Camden*, No. 21 Civ. 20237, 2023 WL 5627116, at *2 (D.N.J. Aug. 30, 2023) (rejecting motion for preliminary injunction based on "allegations" that "have never been part of Plaintiff's amended complaint"); *see also Fatir v. Connections Cmty. Support Programs, Inc.*, No. 18 Civ. 1549, 2020 WL 360895, at *2 (D. Del. Jan. 22, 2020) ("party pursuing injunctive relief is confined to arguing the merits of his or her complaint"); *Carroll v. Pa. Bd. of Prob. & Parole*, No. 17 Civ. 2170, 2018 WL 3130941, at *3 (M.D. Pa. June 26, 2018) (same).  Clearly New Jersey is not likely to succeed on claims that it has declined to assert. *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 233 n.10 (M.D. Pa. 2001) ("This Court will not award a preliminary

_____

[9] *See Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, ECF No. 124 (S.D.N.Y.); *Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644, ECF No. 112 (S.D.N.Y.); *County of Rockland v. Triborough Bridge and Tunnel Auth.*, No. 24 Civ. 02285, ECF No. 52 (S.D.N.Y.) (denying motions for a preliminary injunction in two related cases).

injunction on grounds not raised in the complaint, as there is, by virtue of the absence of the issue from the complaint, no likelihood of success on the merits."); *cf. Martin v. Keitel*, 205 F. App'x 925, 928 (3d Cir. 2006) (holding such motions are "legally deficient").

Even if the Court were to entertain New Jersey's improper challenges to the reevaluations, they are meritless. New Jersey objects to FHWA's assessment of alternatives in Reevaluation 2, in which FHWA considered whether the Phase-In Approach would meet the same three Project objectives used to screen alternatives in the EA: (1) reducing daily VMT within the CBD by at least 5%; (2) reducing the number of vehicles entering the CBD daily by at least 10%; and (3) generating sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program, as required by the TMA. (DOT_0047555–56.) With respect to the funding objective—the issue on which the Court reserved decision on the EA—FHWA confirmed that the Phase-In Approach will meet the $15 billion funding mandate. (*Id.*)

Although Phases 1 and 2 would not raise as much *annual* revenue as the EA tolling scenarios, as part of the reevaluation process, the MTA's CFO determined that the escalation of revenues derived from the Phase-In Approach would, in combination and based on current interest rates, achieve the objective of funding $15 billion in capital projects and allow their completion consistent with the timeline as projected for the March 2024 adopted toll structure. (*Id.*) This is bolstered by his declaration, which provides further context for his conclusion and explains that the funding will not be achieved directly through annual revenue, but rather through the issuance of bonds that will be paid off over decades. Willens Decl. ¶ 6.

New Jersey now proclaims (again, for the first time) that the Phase-In Approach "would *not* meet the revenue objective." Pl. Br. at 21. But FHWA found that the exact opposite was true. (DOT_0047555–56.) And New Jersey has offered no basis to question FHWA's expert judgment.

17

(*Id.*) *See also* Willens Decl. ¶¶ 9–11.  Although New Jersey also argues that the Phase-In Approach will not generate $1 billion annually, the EA explained that the $1 billion annual figure was an *estimate* of what would be needed to fund $15 billion in total, which "depends on a number of economic factors, including but not limited to interest rates and term."  (DOT_0036301.)  *See also* Tr., ECF 153, at 51:3–5 (explaining that $1 billion was a "rough surrogate for what would need to be raised in a given year to meet the $15 billion goal").  The reevaluations are fully consistent with this.  (DOT_0045449, DOT_0045475, DOT_0047555–56.)  There has been no change in the Program's $15 billion funding requirement mandated by New York law.  N.Y. Veh. & Tr. Law § 1704-a(1).[10]

New Jersey also suggests that the reevaluations did not adequately assess the Phase-In Approach with respect to the crossing credits for vehicles traveling to the CBD through already-tolled tunnels.  Pl. Br. at 22.  Once again, New Jersey has not amended its Complaint to challenge the reevaluations, and it cannot do so for the first time in an application for emergency relief.  But even if this argument had been properly raised, it is incorrect.  Reevaluation 1 "[m]odeled the adopted toll structure using the same version of the BPM as was used for the Final EA," the results of which were used to reevaluate "the full range of topics from the Final EA," including air quality and EJ.  (DOT_0045477.)  This analysis included crossing credits.  (DOT_0045439–40.)  The modeling showed that air quality impacts were generally reduced under the adopted toll structure compared to the EA, and FHWA concluded that the "analysis for the adopted toll structure demonstrates that there are no potential adverse effects related to air quality and the conclusions of the Final EA remain valid."  (DOT_0045535–52.)  Reevaluation 2 studied a temporary phase-

---

[10] To the extent New Jersey argues that FHWA erred by failing "to assess any option other than the MTA's congestion pricing scheme and a 'no action' alternative," the Court has already held that it "cannot agree with Plaintiff that the FHWA failed to consider a reasonable range of alternatives as required under NEPA."  Decision at 57.  All the other potential alternatives considered in the EA, including Alternative T-2, were rejected for reasons other than revenue.

in of the adopted toll structure by comparing the tolling rates and other parameters (including crossing credits) at each phase of the Phase-In Approach to those of the seven tolling scenarios and the EA and Reevaluation 1. (DOT_0047553–54.) FHWA, the expert agency, found that further modeling was unnecessary because the crossing credits were similar to those analyzed in tolling scenarios C, D, E, and F, and because the Phase-In Approach merely involves a temporary proportional phase-in of the adopted toll structure, which had been extensively studied in Reevaluation 1. (*Id.*) This approach is consistent with NEPA, which does not require agencies to replicate the same analyses over and over again. *See* 40 C.F.R. § 1501.11(b) (explaining that an agency "may employ tiering" to "eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided"); 23 C.F.R. § 771.107; *see also Mulgrew*, 2024 WL 3251732, at *29 (holding that "[m]ulti-step NEPA reviews are not only lawful, but also salutary").

New Jersey also appears to challenge (again, for the first time) the allocation of place-based mitigation funding for EJ communities in Reevaluation 1. Even if this argument were before the Court (and it is not) the claim is without merit. The narrow issue on which the Court remanded for "further explanation and potential reconsideration" was studied in detail in Reevaluation 1. Decision at 52 n.17. Based on modeling, FHWA "confirm[ed] that the same [EJ] communities would be affected as predicted in the Final EA," but the adopted toll structure would *reduce diversionary impacts* compared to the worst-case scenario studied in the EA. (DOT_0045574–97.) In addition, Reevaluation 1 built on the EA by allocating place-based mitigation funding based on each community's "share of population in all affected" census tracts. (DOT_0045608–11.) Using the objective measure of population ensures that each potentially impacted EJ community receives an equitable pro rata share of place-based mitigation funding, in addition to

sharing in the benefits of regional mitigation that will provide tangible emissions reductions and benefit air quality. (DOT_0045607–11.) This data-driven method resulted in an allocation of $9.8 million for the four New Jersey communities (encompassing seven census tracts) meriting place-based mitigation under the analytical methodology upheld by the Court. (*Id.*; DOT_0045595)

Apart from describing the $9.8 million allocated to New Jersey as "paltry," Pl. Br. at 13, New Jersey proposes no other, fairer way to allocate mitigation funding. Instead, New Jersey's sole critique is to compare the funding allocated to communities in the Bronx with what was allocated to the one community identified in Bergen County, arguing that Bergen should receive more money because it will see a slightly greater county-wide percentage increase in daily traffic. *Id.* at 22–23. Here again, New Jersey's math is misleading: total VMT in both the Bronx and Bergen County are expected to increase very slightly—0.15% and 0.88% respectively—which FHWA determined would not result in significant adverse impacts on traffic or air quality. (DOT_0045542, DOT_0045478–86, DOT_0045550–52.)

New Jersey's argument also makes no sense. The EJ mitigation program is designed to address potential *localized* effects on specific EJ communities with preexisting burdens, not *county-wide* changes. More fundamentally, the simple reason why Bronx County is allocated more mitigation dollars than Bergen County is because the Bronx has a larger population within the communities identified for place-based mitigation. (DOT_0045609, DOT_0045597 (depicting this graphically).)[11] There is obviously nothing nefarious, irrational, arbitrary, or capricious about allocating mitigation dollars based on an objective and equitable metric like population percentages, rather than the amorphous and subjective approach that New Jersey seems to prefer.

---

[11] While not accounted for in the allocation, pre-existing pollution and chronic disease burdens in Bronx County are particularly high, and more pronounced than in Bergen County, particularly with respect to asthma. (DOT_0036989, DOT_0036994–96, DOT_0007273, DOT_0007275, DOT_0007277–79.)

*See, e.g.*, *Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*, 90 F.4th 122, 131 (3d Cir. 2024) (holding agencies applying NEPA are "entitled to a presumption of regularity which ensures that courts give proper deference and respect to the official actions of an agency . . . with the burden shifting to the attacker to show the contrary" (internal quotation marks omitted)); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001).[12]

Moreover, New Jersey's motion seeks to circumvent the Court's carefully structured remand and replace it with what amounts to a permanent injunction without the Court reviewing a full record following compliance with its remand order. In essence, New Jersey is asking the Court to prejudge the results of its remand. Speculation about what FHWA will do on remand cannot come anywhere close to meeting New Jersey's high burden for the issuance of injunctive relief. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991) ("Likelihood of success cannot be woven from the gossamer threads of speculation and surmise.").[13] The declaration submitted by the MTA's CFO illustrates the type of additional information that may be included in the record on remand, which further undermines New Jersey's transparent attempt to bypass the Court's remand order. Willens Decl. ¶¶ 6–11. Far from suggesting that New Jersey is likely to succeed in a hypothetical future case, the reevaluations demonstrate the exact opposite: there is a high

---

[12] Reevaluation 1 also sets forth a site selection process that includes data collection and multiple rounds of community engagement with the Environmental Justice Community Group, "relevant communities that warrant place-based mitigation," and "local implementing agencies." (DOT_0045610–11.) The Project Sponsors have sent letters to New Jersey communities to begin the process for siting place-based mitigation measures. C. de Cerreño Decl. ¶ 23.

[13] New Jersey also repeats its argument that FHWA failed to explain why four New Jersey communities were identified for place-based mitigation when additional communities were identified as potentially needing mitigation. Pl. Br. at 23. Whether New Jersey is actually mistaken or hopes to sow confusion, this is false. FHWA found that communities with *either* high pollutant *or* chronic disease burdens above the 90th percentile—i.e., so-called "90 or 90" census tracts—that were projected to see any increase in truck traffic proximity would benefit from regional mitigation. (DOT_0007319–23, DOT_0045575–76.) This includes the 15 communities identified in New Jersey's papers. Pl. Br. at 23. So-called "90 and 90" census tracts—i.e., "tracts where individuals experience at least one pre-existing pollutant burden *and* at least one pre-existing chronic disease burden at or above the 90th percentile, nationally"— that were projected to see *any* increase in truck traffic proximity were identified for place-based mitigation. (DOT_0007321–28, DOT_0045575–76.) These include the four New Jersey communities in Bergen and Essex counties that were allocated specific dollar amounts for place-based mitigation. (DOT_0045608–10.)

likelihood that FHWA will sustain the EA/FONSI on remand, which is why vacatur is inappropriate.

2.    New Jersey Fails to Demonstrate Irreparable Harm

To establish irreparable harm, a plaintiff must allege an injury that is "actual and imminent, not merely speculative." *Macchione v. Coordinator Adm'r in Washington, D.C.*, 591 F. App'x 48, 49 (3d Cir. 2014).  Further, the availability of adequate compensatory or other corrective relief at a later date "weighs heavily against a claim of irreparable injury." *Erlbaum v. N.J. Dep't of Env't Prot.*, No. 16 Civ. 8198, 2017 WL 465466, at *15 (D.N.J. Feb. 3, 2017) (quoting *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015)).  Failure to establish irreparable injury "automatically results in denial of a preliminary injunction." *Miller v. N.J. Dep't of Corr.*, No. 08 Civ. 03335, 2010 WL 4810659, at *3 (D.N.J. Nov. 17, 2010) (citing *Instant Airfreight Co. v. C.F. Airfreight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)).

It has been more than two months since the MTA announced on November 14, 2024 that it planned to begin the Program on January 5, 2025.  Rather than seek injunctive relief at any other point in this litigation, New Jersey raised the possibility of filing this application by letter on November 19, 2024, and in an email to your Honor on December 26, 2024.  ECF 169.  New Jersey instead waited until the very last minute to force the Court (and the other parties) to scramble to deal with its so-called need for emergency relief.   New Jersey's inexcusable delay belies its claim of any "emergency," or the existence of any irreparable harm.  *See PTT, LLC v. Gimme Games*, No. 13 Civ. 7161, 2014 WL 5343304, *3 (D.N.J. Oct. 20, 2014); *Ultimate Trading Corp. v. Daus*, No. 07 Civ. 4203, 2007 WL 3025681, at *3 (D.N.J. Oct. 15, 2007).  The only apparent change in circumstances between November 14, 2024 and New Jersey's application on December 31, is New Jersey's disappointment at the December 30 Decision.  Obviously, an order that *denied* most of New Jersey's challenges does not magically create a new opportunity for New Jersey to seek

emergency relief blocking the entire Program.

First and foremost, under the doctrine of laches, a delay in seeking a preliminary injunction is often "fatal" to a showing of irreparable harm. *See H-1 Auto Care, LLC v. Lasher*, No. 21 Civ. 18110, 2022 WL 13003468, at *4 (D.N.J. Oct. 21, 2022). Courts in the Third Circuit routinely find no irreparable harm where a plaintiff has delayed seeking a preliminary injunction until "the last minute," especially when they were on notice of potential harms earlier. *See, e.g.*, *Chaves v. Int'l Boxing Fed'n*, No. 16 Civ. 1374, 2016 WL 1118246, at *2 (D.N.J. Mar. 22, 2016) (no irreparable harm where plaintiff sought preliminary injunction the week before challenged action was scheduled to occur); *Doris Behr 2012 Irrevocable Tr. v. Johnson & Johnson*, No. 19 Civ. 8828, 2019 WL 1519026, at *4 (D.N.J. Apr. 8, 2019) (two week delay in seeking preliminary injunction "undermine[d] any argument of irreparable harm").

In any event, the "environmental" harm that New Jersey claims will befall its residents during the initial weeks of congestion pricing is speculative, temporary, and ultimately not irreparable. Indeed, the only specific environmental issue identified by the Court was the need for "further explanation, and if appropriate, reconsideration of the rationale for why, the Final EA did not allocate a specific place-based mitigation funding amount to communities in New Jersey whereas some specific measures located in the Bronx were identified." Decision at 53. While, as explained at Point II.B.1, *supra*, this question is fully addressed by Reevaluation 1, which allocated specific funding for New Jersey communities based on relative population, even in the unlikely event that the Court should determine following remand that FHWA's explanation of the funding commitment is insufficient, that can be easily fixed by the Project Sponsors making a larger financial commitment.

Even if remand were not a sufficient remedy (and it is), the availability of environmental

mitigation also renders any harm reparable.  In *Erlbaum*, the court declined to enjoin the New Jersey Department of Environmental Protection's plans to build sand dunes on a beach, concluding that any environmental harm, in the form of increased drainage issues, was compensable with monetary damages to fund mitigation efforts.  2017 WL 465466, at *16.[14]  The same is true here since the Court's order is explicitly concerned with the calculation of amounts needed for mitigation, and New Jersey alleges no harm that is not compensable with money to fund mitigation.

Moreover, any increased vehicular emissions in New Jersey communities during the time the remand will take will also be temporary.  Federal courts have consistently rejected litigants' requests to recognize temporary construction impacts as "irreparable injuries."  *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, No. 20 Civ. 3817, 2021 WL 430054 (D.D.C. Feb. 7, 2021) (declining to issue preliminary injunction where construction project's disruption to the environment would be temporary); *Aquifer Guardians in Urban Areas v. FHWA*, 779 F. Supp. 2d 542, 542 (W.D. Tex. 2011); *W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089 (D. Nev. 2011); *W. Ala. Quality of Life Coal. v. FHWA*, 302 F. Supp. 2d 672 (S.D. Tex. 2004); *City of Alexandria, Va. v. Slater*, 198 F.3d 862 (D.C. Cir. 1999); *Sierra Club v. Slater*, 120 F.3d 623 (6th Cir. 1997).  In *Aquifer Guardians*, the court rejected plaintiffs' effort to characterize "congestion, noise and air pollution" from construction as "irreparable injuries" warranting an injunction, observing: "'To be considered to be irreparable, the injury must be permanent or of long duration.' The hypothetical effects on the neighborhood during the construction process, even if they were to occur, would be temporary and thus not irreparable."  779 F. Supp. 2d at 556 (citation omitted).

---

[14] To the extent Plaintiff claims they will suffer irreparable harm due to economic effects of the Program, implementation of the Program will result in only compensable economic harm in the form of tolls, which is reparable through refunds and beyond the scope of harm addressed by NEPA.  C. de Cerreño Decl. ¶¶ 11–14; *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 842 F. Supp. 2d 672 (S.D.N.Y. 2012); *Bridgeport, Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, No. 03 Civ. 599, 2004 WL 840140, at *4 (D. Conn. Apr. 15, 2004).

And in a similar case, "while there may be temporary effects of the construction project such as inconvenience, increased traffic, and increased noise and air pollution," plaintiffs "failed to establish the second prong necessary for a preliminary injunction by not showing that the alleged harm…is irreparable." *W. Ala. Quality of Life Coal.*, 302 F. Supp. 2d at 685.

Here, while the increased traffic and air pollution New Jersey claims would occur immediately upon commencement of tolling are not construction-related, it is similar to the temporary effects found not to have constituted irreparable harm: motor vehicle emissions. In the unlikely event that the remand resulted in a cessation of the Program, any such effects would cease. In any event, the Program is projected to have an overall beneficial effect on vehicle emissions, with small increases in Bergen County as a whole and along some highways in New Jersey. (DOT_0036839, DOT_0045541). And the Court already determined that FHWA's findings with respect to air quality effects were supported by the administrative record. Decision at 15–47. Notably, those findings included the determination, contrary to New Jersey's unfounded claim, that the Program will not contravene National Ambient Air Quality Standards even along the highway links with the greatest traffic increases. (DOT_0036863–68, DOT_0045549–52.) Pl. Br. at 25–26; *see also Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 5199945, at *47–48 (S.D.N.Y. Dec. 23, 2024) (noting "although every additional car threatens marginal negative environmental externalities, it cannot be that a single rerouted car suffices to show irreparable injury"). Indeed, FHWA did not find that these small increases required contemporaneous mitigation, but rather accepted the plan in Reevaluation 1 to site mitigation measures. Finally, as in *Erlbaum*, since the ultimate relief New Jersey putatively demands is additional funds for mitigation, the alleged insufficiency of the amount allocated to New Jersey communities is by definition not irreparable. 2017 WL 465466, at *16.

25

New Jersey falls back on the erroneous notion that these well-accepted principles are nonexistent in the context of a NEPA challenge, ignoring controlling Supreme Court precedent. Pl. Br. at 26–27.  In *Winter*, a case involving a NEPA challenge to Navy sonar training which the plaintiffs claimed harmed marine mammals, the Supreme Court affirmed that injunctive relief is a "drastic" and "extraordinary remedy never awarded as of right," and it was not enough for plaintiffs to show a likelihood of success on the merits; they had to satisfy the four-factor test (including irreparable harm) like virtually any other plaintiff.  555 U.S. at 22–24.  The Supreme Court specifically rejected the notion that "a possibility of irreparable harm"—as opposed to that such harm is "likely"—is enough, given the "extraordinary" nature of the remedy and "clear showing" required.  *Id.* at 22.  *See also Monsanto*, 561 U.S. at 158 (reiterating that "[a]n injunction [for a NEPA violation] should only issue if the traditional four-factor test is satisfied"); *Erlbaum*, 2017 WL 465466, at *6, *15–16.  Here, the Court's remand order itself constitutes an appropriate remedy.  *See Nat. Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 2d 198, 235 (S.D.N.Y. 2006) (declining to enjoin further construction where "actual" environmental harm from the planned dredging of a basin could be managed and evaluated on a remand).

3.  A Preliminary Injunction Would Cause Substantial Hardship to Intervenor-Defendants and Harm to the Public Interest

The last two elements for issuance of injunctive relief—balance of harms and public interest—look at "whether imposing the requested injunctive relief will result in a greater harm to the nonmoving party and whether granting the injunction is in the public interest."  *Marvin A.G. v. Decker*, No. 20 Civ. 1689, 2020 WL 3481746, at *3 (D.N.J. June 26, 2020).  "When the government is [a] party opposing a preliminary injunction, the balancing of the equities and public interest factors merge."  *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Here, these two factors weigh heavily against the extraordinary confusion, uncertainty, and harm to the public fisc

26

from enjoining the Program hours prior to its scheduled implementation.  Intervenor-Defendants and the public will clearly suffer substantial prejudice if the Program cannot proceed.  According to Dr. Allison L. C. de Cerreño, TBTA Chief Operating Officer, a preliminary injunction postponing the Program's start date by even a limited period would cause TBTA to incur substantial costs of $12 million each month; lose average monthly revenues of some $40 million; delay undertakings including adding accessibility to numerous subway stations consistent with the Americans with Disabilities Act, improving outdated signaling, improving safety and customer service, and extending public transit to under-served areas; and delay relief from congestion in the CBD, with its concomitant economic and environmental costs.  C. de Cerreño Decl. ¶¶ 20–21.[15]

Intervenor-Defendants and the public have a clear interest in avoiding the loss of the value of TBTA's $500 million budget of public funds to prepare for the Program's design, build, implementation, operation, and maintenance and on an information campaign to inform the public of the January 5, 2025 implementation date.  *Id.* ¶ 19.  TBTA has already expended much of its $500 million budget for such work.  *Id.*  There is also a compelling public interest in avoiding the unnecessary costs that would be incurred if, as a result of an injunction, TBTA was required to pay continued operating costs to avoid yet additional costs of stopping and starting the Program.  *See id.* ¶¶ 22–24.  The Program's operating costs are substantial and many need to be paid regardless of whether the Program is delayed.  *Id.* ¶ 20.  And TBTA will incur at least $12 million in additional costs per month if implementation is delayed.  *See id.*  These expenses would amount to a preventable loss of public resources which the public has an undeniable interest in avoiding.  *See*

---

[15] Rule 65 provides that, before a temporary restraining order or preliminary injunction may issue, the movant must post a bond sufficient to cover the "costs and damages" injunctive relief would impose on the nonmoving party. *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 425 (3d Cir. 2010) (quoting Fed. R. Civ. P. 65(c)).  New Jersey did not argue that it should be excused from this requirement, thereby waiving the issue. *See Anspach v. City of Phila.*, 503 F.3d 256, 259 n.1 (3d Cir. 2007).

*City of Dania Beach v. U.S. Army Corps of Eng'rs*, No. 12 Civ. 60989, 2012 WL 3731516, at *9 (S.D. Fla. June 6, 2012) (denying preliminary injunction in action challenging airport runway expansion, "given the immense costs to [the] County and the community at large").

"Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Del. State Sportsmen's Ass'n*, 108 F.4th at 206 (internal quotation marks omitted); *accord Nken*, 556 U.S. at 436 (noting there "is always a public interest in prompt execution" of the laws). After decades of worsening traffic and air quality throughout the region, congestion pricing is the solution chosen by elected representatives at both the state and federal level. The public has a substantial interest in avoiding further delay in realizing the significant benefits of the Program, particularly congestion reduction and dedicated revenue to fund the MTA's capital projects. *See, e.g.*, *Earth Is. Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (affirming district court's denial of preliminary injunction based on economic harm that enjoining project would have on local economy); *W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103 (D. Nev. 2011) (denying preliminary injunction in part because project would benefit Nevada's economic recovery).

The Program will meaningfully improve air quality for residents and commuters in the wider region, including in much of New Jersey. (DOT_0036839–41, DOT_0045535–52.) As New Jersey concedes, it is "in the public interest to prevent further pollution" caused by present traffic patterns in and around the CBD. Pl. Br. at 29 (quoting *Pub. Int. Rsch. Grp. of N.J., Inc. v. Rice*, 774 F. Supp. 317, 329 (D.N.J. 1991)); *see also Monsanto*, 561 U.S. at 157 (noting "erroneous presumption that an injunction is generally the appropriate remedy for a NEPA violation"). And while the Program may result in some localized traffic increases, FHWA found that "[f]or all tolling scenarios, the changes in traffic volumes, including changes in truck trips, would not result in

28

regional or localized exceedances of National Ambient Air Quality Standards." (DOT_0036942, DOT_0045535–52). What's more, as explained above, localized effects will be effectively offset by the mitigation measures dedicated to improving air quality and public health in communities already suffering from the disproportionate effects of existing highway traffic. *See supra* at Point II.B.1–2. Here, an injunction would only delay implementation of mitigation, dedicated to improving air quality and public health in communities already suffering from the disproportionate effects of existing highway traffic. C. de Cerreño Decl. ¶¶ 23–24.

## **CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiff's Motion for Clarification or Reconsideration and for a Preliminary Injunction.

Dated: January 2, 2025                          Respectfully submitted,

*/s/ Daniel Chorost*
Daniel Chorost
Mark A. Chertok*
Elizabeth Knauer*
John F. Nelson*
Phillip Dane Warren*
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, NY 10022
(212) 421-2150
dchorost@sprlaw.com
mchertok@sprlaw.com
eknauer@sprlaw.com
jnelson@sprlaw.com

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan*
D. Brandon Trice*
KAPLAN MARTIN LLP
1133 Avenue of the Americas
Suite 1500
New York, NY 10036
(212) 316-9500
rkaplan@kaplanmartin.com

btrice@kaplanmartin.com

*Counsel for Intervenor-Defendants the Metropolitan Transportation Authority and the Triborough Bridge and Tunnel Authority*

*\*Admitted pro hac vice*