**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STATE OF NEW JERSEY, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration, <br><br> *Defendants*, <br><br> and <br><br> METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY <br><br> *Intervenor-Defendants*. | Hon. Leo M. Gordon <br><br> Case No. 2:23-cv-03885-LMG-LDW |

**DECLARATION OF KEVIN WILLENS**

I, Kevin Willens, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Financial Officer of the Metropolitan Transportation Authority (the "MTA"), a position I have held since February 2022. I have 40 years of experience in public finance. Prior to joining the MTA I served for 10 years as Co-head of US Public Finance at Goldman Sachs. I have provided investment banking expertise to the MTA for more than 30 years, including serving as the MTA's financial advisor for 10 years.

2. In my capacity as CFO of MTA, I advise the Board of MTA and the Board of its affiliate, the Triborough Bridge and Tunnel Authority ("TBTA"), with respect to the Central Business District ("CBD") Tolling Program (the "CBD Tolling Program"), a New York State legislatively mandated program which TBTA, the New York State Department of Transportation ("NYSDOT") and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") are working to implement. In particular, I advise the TBTA Board, which is composed of the same membership as the MTA Board, with respect to its consideration of the setting of variable toll rates, credits, and exemptions for the Program sufficient to satisfy the statutory requirement to fund $15 billion in projects identified in the 2020-2024 MTA Capital Program ("Capital Program").

3. Every year, consistent with its historic practice, the MTA and TBTA issue bonds to raise money to pay for the project expenditures of the Capital Program. Interest and a portion of the principal is paid in future years from the revenue pledged to investors until the bonds are fully paid off, which is usually over a 30-to-40-year period, roughly matching the expected useful life of the projects that are financed by the bonds.

4. This approach to funding the Capital Program is analogous to an individual financing a home purchase with a mortgage and paying the bank back over 30 years using the individual's income.

5. The 2019 MTA Reform and Traffic Mobility Act (the "TMA") requires TBTA to implement the CBD Tolling Program in a manner that achieves a minimum $15 billion of funding for MTA's 2020-2024 Capital Program. Specifically, the statute provides:

> For purposes of establishing a central business district toll or tolls the TBTA board shall, at minimum, ensure annual revenues and fees collected under such program, less costs of operation of the same, provide for sufficient revenues into the central

> business district tolling capital lockbox fund … necessary to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program.

N.Y. Veh. & Traf. Law § 1704-a.

6. Using the ordinary approach I described above, bonds to be paid from CBD Program revenue will be issued over the next several years to pay for the $15 billion in Capital Program project expenditures, and then principal and interest of the congestion pricing bonds will be paid from toll revenue over an approximately 30-year period.

7. When the TMA was enacted in 2019, the MTA and TBTA intended to raise $15 billion in funding for the Capital Program quickly after the Capital Program was approved. In the first year, the MTA and TBTA would collect data on the revenue generated under the Program, such a track record being necessary to persuade investors to purchase sufficient amounts of bonds issued against Program revenue. The expected $1 billion in annual revenue would then have accommodated significant upfront financing of the full $15 billion in projects. At the time that this approach was originally formulated in 2019 (by MTA finance professionals in consultation with the NYS Division of Budget and officials of then-Governor Cuomo's team), the TBTA Board had not yet established the tolling structure for the Program. In keeping with this approach, the Final Environmental Assessment ("EA") for the Program approved by the Federal Highway Administration ("FHWA") used $1 billion as a benchmark amount of annual revenue that was projected to be adequate to accommodate upfront financing by bond investors of the $15 billion in projects in the various tolling scenarios studied in the EA.

8. In March 2024, the TBTA Board approved a specific toll rate structure for the Program (the "March 2024 adopted toll rate structure"), which was studied in a reevaluation document approved by FHWA in June 2024 ("Reevaluation 1"). Reevaluation 1 projects that the March 2024 adopted toll rate structure will generate approximately $900 million per year. At the

3

time that this toll rate structure was approved by the TBTA Board, this projection was known to me. I believed that based on current economic factors such as interest rates, the March 2024 adopted toll structure could generate sufficient funding through the issuance of bonds to meet the TMA requirement. In consulting with FHWA with respect to Reevaluation 1, I explained my professional opinion to FHWA; Reevaluation 1 therefore reflects my opinion on this matter. I believe that FHWA understood that my opinion was grounded in the typical practice for public infrastructure project finance used by the MTA in issuing bonds for capital projects, with which FHWA has familiarity in its role providing funding for federal shares of large infrastructure projects otherwise funded by states.

9. After the phase-in concept was raised shortly before Governor Hochul lifted the "pause" on the program, I was asked to examine whether it would be possible to generate the $15 billion in funding in the event that the toll rate schedule was phased-in over six years. In response, I developed an alternative approach for obtaining the funding for the Capital Program required by the TMA. Specifically, rather than issue bonds relatively quickly to fully fund the $15 billion in projects, the MTA and TBTA will instead issue the required amount of bonds over a longer period of several years. As before, in the first year following implementation of the Program, the MTA and TBTA will collect data on the revenue generated under the Program to provide to potential investors. Following that, in the next several years, the MTA and TBTA will issue the bonds. Although this approach will take several additional years, it will nonetheless satisfy the Capital Program funding obligation imposed by the TMA and allow the MTA to complete the projects identified in the Authority's 2020-24 MTA Capital Program.

10. The projects identified in the Capital Program are in different stages of development, and the full $15 billion in funding is not all required immediately. (Significantly,

much of the MTA Capital Program incurred an 18-to-24-month delay during the COVID pandemic, when capital expenditures were delayed in case the money was needed just to maintain day-to-day operations.) I and my colleagues on the MTA's finance team have analyzed the projected project costs under the Capital Program and have concluded that obtaining the requisite funding over several years, rather than upfront, will not impact the ability of the MTA and TBTA to execute the Capital Program and to comply with the TMA.

11. In November 2024, the TBTA Board was presented with and voted to approve a plan to phase in the March 2024 adopted toll structure, resulting in lower projected annual revenue for the first six years of the Program (approximately $500 million for the first three years and approximately $700 million for the second three years). With the changed approach to bond issuance described above, I reached the conclusion that the phase-in approach as a whole, including the projected revenue as the Program phased up to the full March 2024 adopted toll rates in its seventh year, could achieve the required TMA funding. Once again, my opinion was reflected in a second reevaluation conducted for the Phase-In approach, which FHWA approved in November 2024.

12. I declare under penalty of perjury that the foregoing is true and correct.

Dated:   January 2, 2025
         New York, New York

*Kevin Willens*
Kevin Willens (Jan 2, 2025 12:55 EST)
Kevin Willens

# Kevin Willens Declaration

Final Audit Report                                                                2025-01-02

| | |
|---|---|
| Created: | 2025-01-02 |
| By: | Brandon Trice (btrice@kaplanmartin.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAwP4jwatY_VolZJ30bAi3m_QNGIhMSu7h |

## "Kevin Willens Declaration" History

- Document created by Brandon Trice (btrice@kaplanmartin.com)
  2025-01-02 - 5:44:01 PM GMT

- Document emailed to kevin.willens@mtahq.org for signature
  2025-01-02 - 5:44:49 PM GMT

- Email viewed by kevin.willens@mtahq.org
  2025-01-02 - 5:51:23 PM GMT

- Signer kevin.willens@mtahq.org entered name at signing as Kevin Willens
  2025-01-02 - 5:55:48 PM GMT

- Document e-signed by Kevin Willens (kevin.willens@mtahq.org)
  Signature Date: 2025-01-02 - 5:55:50 PM GMT - Time Source: server

- Agreement completed.
  2025-01-02 - 5:55:50 PM GMT

Adobe Acrobat Sign