# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY, | ) |
| *Plaintiff*, | ) |
| v. | ) |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, | ) No. 23-3885 (LMG-LDW) |
| *Defendants*, | ) |
| and | ) |
| METROPOLITAN TRANSPORTATION AUTHORITY, *et al.*, | ) |
| *Defendant-Intervenors*. | ) |

**FEDERAL DEFENDANTS' NOTICE OF COMPLIANCE WITH COURT'S REMAND ORDER AND EXPLANATION OF SUPPLEMENTAL MEMORANDUM**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................ 1

PROCEDURAL BACKGROUND ..................................................................................................... 2

STANDARD OF REVIEW ................................................................................................................. 3

ARGUMENT ....................................................................................................................................... 4

      I.      FHWA's Re-Evaluations and Additional Analysis Demonstrate Mitigation Funding Was Allocated Based on a Reasonable Methodology. .............................. 4

      II.     The Project Sponsors' Evolving Revenue-Generation Estimates Did Not Alter the Project's Purpose and Need or Call Into Question the Rejection of Certain Alternatives. ........................................................................................................ 7

      III.    The Analysis in the Final EA Encompassed the Range of Effects Predicted to Result From the Final Tolling Schedule and the Phase-In Approach. ...............11

CONCLUSION.................................................................................................................................. 15

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Envt'l Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) .................................................................................. 12

*Alaska Survival v. Surface Transp. Bd.*,
705 F.3d 1073 (9th Cir. 2013) ................................................................................. 7

*Christ The King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*,
673 Fed. App'x 164 (3d Cir. 2016) .......................................................................... 4

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ................................................................................. 9

*Citizens for Smart Growth v. Peters*,
716 F. Supp. 2d 1215 (S.D. Fla. 2010) .................................................................... 9

*City of Crossgate v. U.S. Dep't of Veterans Affs.*,
526 F. Supp. 3d 239 (W.D. Ky. 2021) ................................................................... 13

*City of Los Angeles v. U.S. Dep't of Transp.*,
165 F.3d 972 (D.C. Cir. 1999) ................................................................................. 4

*Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*,
959 F. Supp. 2d 982 (W.D. Ky. 2013) ..................................................................... 9

*Colorado Rail Passenger Ass'n v. Fed. Transit Admin.*,
843 F. Supp. 2d 1150 (D. Colo. 2011) ................................................................... 10

*Desert Prot. Council v. U.S. Dep't of the Interior*,
927 F. Supp. 2d 949 (S.D. Cal. 2013) ...................................................................... 7

*Hannon v. Clark*,
70 Fed. App'x 519 (10th Cir. 2024) ..................................................................... 3, 4

*Highway J Citizens Grp. v. Mineta*,
349 F.3d 938 (7th Cir. 2003) ................................................................................... 6

*Hughes River Watershed Conservancy v. Johnson*,
165 F.3d 283 (4th Cir. 1999) ................................................................................... 4

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
545 F.3d 1147 (9th Cir. 2008) ............................................................................... 15

*In re BlackRock Mutal Funds Advisory Fee Lit.*,
327 F. Supp. 3d 690 (D.N.J. 2018) ........................................................................ 11

*Indian River Cnty. v. Dep't of Transp.*,
348 F. Supp. 3d 17 (D.D.C. 2019) ........................................................................... 9

*Kahan v. Slippery Rock Univ. of Pa.*,
 2014 U.S. Dist. LEXIS 171297 (W.D. Pa. 2014) ...................................................................11

*Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*,
 26 F.3d 375 (3d Cir. 1994) .....................................................................................................11

*Loper Bright Enters. v. Raimondo*,
 603 U.S. 369 (2024) ................................................................................................................ 9

*Mulgrew v. U.S. Dep't of Transp.*,
 No. 23-CV-10365 (LJL), 2024 WL 3251732 (S.D.N.Y. June 20, 2024) ........................... 10, 12

*Nat. Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*,
 457 F. Supp. 2d 198 (S.D.N.Y. 2006) ..................................................................................... 3

*Nat'l Post Off. Collaborate v. Donahoe*,
 No. 3:13CV1406 JBA, 2014 WL 6686691 (D. Conn. Nov. 26, 2014) ................................... 10

*Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*,
 113 F.3d 1505 (9th Cir. 1997) ................................................................................................ 13

*Prisons v. U.S. Dep't of Justice*,
 197 F. Supp. 2d 226 (W.D. Pa. 2001) ..................................................................................... 4

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*,
 713 F.3d 175 (4th Cir. 2013) ..................................................................................................11

*Save Our Sound OBX, Inc. v. North Carolina Dep't of Transp.*,
 324 F. Supp. 3d 597 (E.D.N.C. 2018) .................................................................................... 10

*Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*,
 90 F.4th 122 (3d Cir. 2024) ........................................................................................... 7, 8, 12

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
 305 F.3d 1152 (10th Cir. 2002) ............................................................................................... 9

*Vill. of Bensenville v. Fed. Aviation Admin.*,
 457 F.3d 52 (D.C. Cir. 2006) ................................................................................................. 13

*WildEarth Guardians v. Conner*,
 920 F.3d 1245 (10th Cir. 2019) .............................................................................................. 13

**Rules**

Fed. R. Civ. P. 25(d) ...................................................................................................................... 1

**Regulations**

23 C.F.R. § 771.119 ..................................................................................................................... 12

23 C.F.R. § 771.29 ....................................................................................................................... 13

# INTRODUCTION

Pursuant to this Court's December 30, 2024 Opinion ("Opinion") (ECF No. 191), Federal Defendants[1] submit the attached documentation addressing the discrete issues on which the Court ordered remand without vacatur. Op. at 72; *see also* Jan. 3, 2024 Tr. 58:1-2. Specifically, FHWA has: (1) provided additional explanation about how, after two re-evaluations, the agency has finalized mitigation commitments to New Jersey communities and why certain mitigation projects have already been identified for other locations; (2) further explained how updated financial projections do not alter the Manhattan Central Business District Tolling Program's (the "Project") purpose and need, or FHWA's prior rejection of certain alternatives; and (3) explained how two subsequent re-evaluations have confirmed that the analysis of effects in the Final Environmental Assessment ("EA") validly applies to the final tolling schedule. *See* Ex. 1, FHWA Supplemental Memorandum ("Supp.") (Jan. 17, 2025) (FHWA_001-25).

Accordingly, this remand evinces FHWA's full compliance with the requirements of the National Environmental Policy Act ("NEPA") and the directives in this Court's Opinion. The Court should expeditiously resolve this matter by entering judgment for Federal Defendants.[2]

---

[1] Defendants are the U.S. Department of Transportation, the Federal Highway Administration ("FHWA"), Gloria M. Shepherd, in her official capacity as Acting Administrator of FHWA (automatically substituted for Shailen Bhatt pursuant to Fed. R. Civ. P. 25(d)), and Richard J. Marquis, in his official capacity as Division Administrator of the New York Division of FHWA.

[2] Given that the Court's Opinion posed discrete questions to be answered on remand, *see, e.g.*, Jan. 3 Tr. 60:18-22 (noting remand on "two narrow issues"), Federal Defendants provide not only FHWA's Supplemental Memorandum, but also the applicable legal standard governing remand and an explanation of how the agency's Memorandum addresses the Court's concerns and the requirements of NEPA. This approach accords with the Third Circuit's recent instruction

1

**PROCEDURAL BACKGROUND**

On December 30, 2024, the Court issued an Opinion granting partial summary judgment to Federal Defendants.[3] The Court found that FHWA's analysis in the Final EA complied with NEPA as to almost all claims brought by Plaintiff the State of New Jersey ("the State"). For example, the Court rejected the State's challenges to the methodology used by FHWA to assess the effects of the Project on air quality, finding the State "mischaracterize[ed]" the record, Op. at 20, and that FHWA's choice of a "worse-case scenario for its regional air quality analysis" had a "rational basis." *Id*. at 23. So too, the Court found FHWA "provided a rational explanation" for certain traffic modeling, *id*. at 35, and appropriately identified, and assessed the effects on, environmental justice communities. *Id*. at 39-43. Finally, the Court explained that FHWA "more than met" its "obligations" for ensuring public participation, *id*. at 68,[4] and "considered a wide range of possibilities" in assessing a "reasonable range" of alternatives. Op. at 57.

The Court did, however, remand to the agency on three discrete issues. First, as to mitigation, the Court remanded "for further explanation, and if appropriate, reconsideration of the rationale for providing differing levels of mitigation commitments for the Bronx as compared to potentially significant affected areas in New Jersey and the ultimate the mitigation determination." *Id*.; *see id*. at 45 ("the lack of specificity as to mitigation for some [environmental justice] communities warrants further explanation"); *see also* Jan. 3 Tr. 59:21-25

---

that the agency "move the remainder of this case speedily." Order, No. 25-1033 (3d Cir. Jan. 4, 2025).

[3]    The Court is familiar with the background of this matter. *See* Op. at 5-11. Accordingly, in the interest of brevity, Federal Defendants incorporate by reference their discussion of events post-dating issuance of the Final EA from their recent opposition to the State's Emergency Motion. *See* ECF No. 204 at 2-5.

[4]    The Court also found the State had waived its arguments under the Clean Air Act. Op. at 71.

2

(clarifying that the first issue for remand was "FHWA['s] decision not to allocate any place-based mitigation dollars to New Jersey in contrast to the allocations to the Bronx").

Second, although the Court found "FHWA considered a reasonable range of alternatives" that "went far beyond the required 'brief' discussion for EAs," Op. at 61, "subsequent developments in the structure of the [Project]" made it "appear[]" to the Court that FHWA's "reliance on Objective 3 (*i.e.*, the funding objective) has diminished in relative importance in the ultimate decision-making for the [Project]." *Id.* at 61-62. Accordingly, the Court determined it was "not ready to sustain the consideration of alternatives in the Final EA," *id.* at 61, and directed FHWA to "directly address this issue in the first instance [on remand] in the context of the whole record." *Id.* at 62; *see also* Jan. 3 Tr. 60:2-4 (explaining second issue for remand was "FHWA's reasoning as to the possible alternatives to CBD tolling in light of . . . the actual tolling schedules").

Third, the Court declined to reach the State's "challenges to the final toll structure," and directed FHWA to "directly address" those challenges "in the first instance on remand." Op. at 14 n.7.

The Court accordingly ordered FHWA to take "actions in conformity" with the Opinion by January 17, 2025. Op. at 72.

## STANDARD OF REVIEW

On remand, courts apply the "the well-established standard of arbitrary and capricious review." *Nat. Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 2d 198, 221 (S.D.N.Y. 2006); *see also Hannon v. Clark*, 70 Fed. App'x 519, 524 (10th Cir. 2024) (An agency action "in response to [a] remand order" that has a "rational basis" "must be upheld."). A remand permits "the agency to conduct additional investigation or provide additional

3

explanation." *Christ The King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 673 Fed. App'x 164, 172 (3d Cir. 2016). To that end, "[t]he mere fact that the agency arrived at the same conclusion after remand that it did initially does not, by itself, demonstrate bias or require a stricter standard of review." *Hannon*, 70 Fed. App'x at 523-24; *see also City of Los Angeles v. U.S. Dep't of Transp.*, 165 F.3d 972, 977 (D.C. Cir. 1999).

## ARGUMENT

In remanding FHWA's decision, the Court instructed the agency to provide additional explanation and analysis of three discrete aspects of its review of the Project under NEPA. The agency has acted accordingly, and the content of the attached Supplemental Memorandum demonstrates that FHWA has fully complied with the Court's directives and the requirements of NEPA. *See Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 290 (4th Cir. 1999) ("By . . . giving more detailed consideration to all of these factors, the Agencies have fully complied with NEPA consistent with this court's instructions."); *see also Citizens Advisory Comm. on Priv. Prisons v. U.S. Dep't of Justice*, 197 F. Supp. 2d 226, 250 (W.D. Pa. 2001) ("federal agencies get a chance to cure initial NEPA violations"). Because the agency's explanation on remand is consistent with its decision to issue a FONSI for the Project, the Court should enter judgment for Federal Defendants on those issues subject to remand, along with those claims as to which it previously deferred ruling.

I.  **FHWA's Re-Evaluations and Additional Analysis Demonstrate Mitigation Funding Was Allocated Based on a Reasonable Methodology**.

To the extent the Court found that the Final EA lacked sufficient analysis of the allocation of mitigation funding between communities in New York and communities in New Jersey, FHWA's subsequent re-evaluations and supplemental explanation have remedied any such deficiency.

Specifically, and as described in FHWA's Supplemental Memorandum, Supp. at 3-19, the June 14, 2024 re-evaluation ("Re-Evaluation #1") expanded on and made more concrete the mitigation measures that had been included in the Final EA and FONSI. First, the adopted toll structure increased the low-income toll discount and extended and deepened the overnight discount, resulting in an increased regional mitigation commitment of approximately $122.5 million. DOT_45441. Second, Re-Evaluation #1 finalized the funding allocation for place-based mitigation. Supp. at 12-15; *see also* DOT_45609. On that point, Re-Evaluation #1 used the same methodology as the Final EA to identify communities with preexisting pollutant or chronic disease indicators that would experience increases in truck traffic because of the Project. *See* Supp. at 12-13; *see also* DOT_45580-86. That process identified certain New Jersey communities as meeting the criteria for place-based mitigation. Supp. at 14-15; DOT_45585; *see also* DOT_45595 (identifying communities with census tracts with both pollutant and chronic disease burdens above the 90th percentile). From there, Re-Evaluation #1 determined funding allocations "based on the population of the affected census tracts as a percentage of the overall population of all affected census tracts." DOT_45605; *see also* Supp. at 16-17 ("The distribution of the $100 million in Place-Based Mitigation funding is based on the proportion of the population in the census tracts of each community meeting the mitigation criteria as compared to the population of all the census tracts that meet the mitigation criteria, to ensure the Place-Based Mitigation funding is distributed equitably across the affected environmental justice population"). That methodology resulted in the allocation of a total of $9.8 million in place-based mitigation funding for New Jersey communities. DOT_45609; Supp. at 16; *see also* Op. at 52 n.17 ("specific monetary figures have [ ] been allocated for mitigation in New Jersey

counties.").[5] The selection of specific projects for funding from that allocation will be determined by consultation with the Environmental Justice Community Group and relevant communities to "help determine which of the specific place-based mitigation measures . . . are appropriate for each community within the allocated funds, and exactly where they should be sited."  DOT_45610; *see* Supp. at 18 (referring to Supplemental Appendix B (FHWA_167-227), which details "consul[tation] and coordination on mitigation"); *see also* Op. at 52 n.17 (noting "developments subsequent to oral argument" may "demonstrate that this apparent arbitrary treatment has been resolved, perhaps by application of the adaptive management approach").[6] "These documents establish that in reconsidering the decision to [issue] the EA/FONSI, the defendants did indeed take a 'hard look.'" *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 958 (7th Cir. 2003).

As a result, FHWA concluded that "[t]he mitigation measures identified in the Final EA/FONSI . . . will ensure that the adopted toll structure does not result in significant effects. With the adopted toll structure, and an understanding of the effects, the place-based mitigation will be finalized in concert with stakeholder involvement."  DOT_ 45624; *see also* Supp. at 12-13.  That allocation, along with FHWA's explanation of the methodology used to allocate

---

[5]     The Supplemental Memorandum also clarifies that "the early identification of projects meriting Place-Based Mitigation funding [such as the Bronx asthma clinic] did not and does not reduce the allocation of funds to communities in New Jersey: that funding was ultimately distributed based on the proportion of the population in the census tracts of each community meeting the mitigation criteria as compared to the population of all the census tracts that meet the criteria, to ensure the Place-Based Mitigation funding is distributed equitably across the affected environmental justice population."  Supp. at 17-18; *see also* Appendix A (FHWA_026-166).

[6]     Nothing about the mitigation commitments is affected by the phase-in tolling structure. Instead, the November 21, 2024 second re-evaluation ("Re-Evaluation #2") explains that "[n]othwithstanding the phasing in of tolls, the Project Sponsors would comply with all of the mitigation commitments set forth in the EA and FONSI within the same timeframe as contemplated in those documents and in the reevaluation prepared for the March 2024 adopted toll structure." DOT_47549.

mitigation funding, is reasonable and more than satisfies this Court's remand instructions and NEPA. *See Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013) (agency's mitigation methodology entitled to deference so long as it is reasonable); *cf. Desert Prot. Council v. U.S. Dep't of the Interior*, 927 F. Supp. 2d 949, 969 (S.D. Cal. 2013); *aff'd,* 630 F. App'x 705 (9th Cir. 2015) ("Disagreeing with the methodology conducted by the agency does not constitute a NEPA violation."). Indeed, because FHWA's use of census tract data to identify affected environmental justice communities was reasonable, *see* Op. at 42, using a similar population-based methodology to determine the downstream allocation of mitigation funds is reasonable as well. *See Trenton Threatened Skies, Inc. v. Fed. Aviation Admin.*, 90 F.4th 122, 139 (3d Cir. 2024).

In sum, FHWA's analysis in the re-evaluations and supplemental analysis appended here has reasonably explained the amount of mitigation funding allocated to New Jersey communities, thus rectifying the deficiency identified in this Court's Opinion.

## II. The Project Sponsors' Evolving Revenue-Generation Estimates Did Not Alter the Project's Purpose and Need or Call Into Question the Rejection of Certain Alternatives.

Despite finding that "the record does not support [the State's] arguments" regarding FHWA's consideration of alternatives, the Court questioned how recent developments affected FHWA's alternatives analysis. Op. at 61-62. But as described in FHWA's Supplemental Memorandum and explained further below, the funding objective for the Project has not diminished in importance; accordingly, the agency's rejection of Alternative T-2[7] remains reasonable.

---

[7] Alternative T-2 provides for "tolling of the currently un-tolled East River and Harlem River Bridges." Op. at 58; *see also* DOT_36265. The Court found that FHWA's determination to reject that alternative was "supported by rational decision-making." Op. at 60.

In particular, the re-evaluations confirm that FHWA continued to assess the Project based on the three objectives identified in the Final EA. *See* DOT_45449 (Re-Evaluation #1); DOT_47555 (Re-Evaluation #2); Supp. at 20. Rather than showing a change in how the agency weighted those objectives, the re-evaluations reflect FHWA's and the Project Sponsors'[8] appropriate consideration of real-world circumstances. Specifically, by the time Re-Evaluation #1 was issued, "MTA's Chief Financial Officer had determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's objective to fund $15 billion of capital projects . . . ." DOT_45449. Thus, FHWA determined that the adopted tolling structure (with a peak auto toll of $15) continued to meet the purpose and need of the Project. *Id*.; *see also* Supp. at 20 ("Prior to issuance of Re-evaluation #1, FHWA confirmed with the MTA Chief Financial Officer [ ] that the net revenue generation at $0.9 billion met the objective identified for the funding source to generate sufficient annual net revenue to fund the $15 billion capital program.").

Thereafter, in Re-Evaluation #2, FHWA explained that because "[t]he net revenues needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and terms," "MTA's CFO has determined that the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure." DOT_47555; *see also id*. (explaining that Phase 1, Phase 2, and Phase 3 would generate $500 million, $700 million, and $900 million in annual revenue, respectively.); Supp. at 21 ("When the Project Sponsors proposed the Phase-in approach in

---

[8] The Project Sponsors are the Metropolitan Transportation Authority ("MTA"), the New York State Department of Transportation, and the New York City Department of Transportation.

8

November 2024, and consistent with FHWA's oversight responsibility, the agency requested that MTA confirm that the Phase-in approach would still meet the Project's financial objectives."). Those conclusions are entitled to deference. *See Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 959 F. Supp. 2d 982, 1006-07 (W.D. Ky. 2013); *aff'd,* 576 F. App'x 477 (6th Cir. 2014) (deferring to "financial data and reasoning" in NEPA document); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (Section 706 of the APA mandates that "judicial review of agency policymaking and factfinding be deferential.").

This is particularly so because "Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991). "Instead, "the relationship of . . . [the] FHWA to [a government sponsor] should be one that is premised on the idea that the representatives of the community are best situated to make the decisions regarding transportation planning for their community." *Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1224 (S.D. Fla. 2010); *aff'd sub nom. Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203 (11th Cir. 2012). Thus, an agency may "appropriate[ly]" evaluate alternatives in light of a sponsor's "financial model." *Indian River Cnty. v. Dep't of Transp.*, 348 F. Supp. 3d 17, 53 (D.D.C. 2019) *aff'd sub nom. Indian River Cnty., Fla. v. United States Dep't of Transp.*, 945 F.3d 515 (D.C. Cir. 2019) (citation omitted). Here, FHWA reasonably accepted the Project Sponsors' projections of the ability of the final tolling schedule to meet the requirements of the applicable New York State law. *See also Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1171 (10th Cir. 2002) ("The fact that Appellants disagree with the financial projections [the project sponsor and agency] made does not by itself make those projections inadequate.").

Nor do those projections call into question FHWA's prior rejection of Alternative T-2, since that option was deemed not a "viable source of funding for the Project." Op. at 61.[9] This is because while tolling the East and Harlem River bridges might generate revenue for the City of New York (regardless of the amount of revenue such toll could generate), there is no law or agreement in place that would direct that revenue to the MTA. DOT_36268; *see Mulgrew*, 2024 WL 3251732, at *26 ("[a] sponsor's desire to generate revenue is a legitimate reason for rejecting an alternative under NEPA." (citing *Nat'l Post Off. Collaborate v. Donahoe*, No. 3:13CV1406 JBA, 2014 WL 6686691, at *8 (D. Conn. Nov. 26, 2014)); *see also Save Our Sound OBX, Inc. v. North Carolina Dep't of Transp.*, 324 F. Supp. 3d 597, 620 (E.D.N.C. 2018); *aff'd*, 914 F.3d 213 (4th Cir. 2019) (rejecting challenge where plaintiffs failed to "embrace all the reasons that the [a]gencies' deemed [an alternative] inadequate to meet the needs of the . . . project"). Indeed, an agency does not abuse its discretion in rejecting alternatives where the "lack of current funding and the uncertainty of any future funding" rendered them too speculative. *Colorado Rail Passenger Ass'n v. Fed. Transit Admin.*, 843 F. Supp. 2d 1150, 1168 (D. Colo. 2011).[10] That is precisely FHWA's basis for rejection of Alternative T-2 here, one unaffected by any revenue projections.

---

[9]   The State acknowledged that to successfully challenge the Final EA's alternatives analysis it would need to identify a "viable but unexamined alternative." ECF No. 136 at 44 (citation omitted). But all the alternatives the State identified as preferable to the Project are per se not viable—Alternative T-2 for the reasons discussed above, and Alternatives O-4 and O-5 because they would not generate *any* revenue at all, let alone revenue directed to MTA capital projects. Op. at 55-56; *see also Mulgrew v. U.S. Dep't of Transp.,* No. 23-CV-10365 (LJL), 2024 WL 3251732, at *26 (S.D.N.Y. June 20, 2024). The States' preferred alternatives were thus appropriately rejected out of hand, irrespective of any later changes to the Project's revenue projections.

[10]   To that end, Section 1705 of the Traffic Mobility Act requires that the TBTA "collect" tolls from the Project.

10

### III. The Analysis in the Final EA Encompassed the Range of Effects Predicted to Result From the Final Tolling Schedule and the Phase-In Approach.

Finally, the Court left unresolved the State's arguments regarding FHWA's use of tolling scenarios to evaluate the effects of the Project and the effect of the final tolling schedule on the accuracy of the projections in the Final EA. Op. at 14 n.7. For the reasons discussed below, those arguments are meritless.

As an initial matter, the State's putative challenge to the final tolling schedule is not properly before the Court. In its Complaint, the State makes one central allegation: that the agency's NEPA analysis was insufficient. *See generally* ECF No. 139. Specifically, the State asserted that the Final EA's seven scenarios did not properly assess the impact of the Project on New Jersey communities. Compl. ¶ 151. But despite ample opportunity to do so, the State declined to present any allegations regarding the final tolling schedule, which would, at minimum, be a different *kind* of claim than those alleged in the operative Complaint. Nor did it allege that the use of modeled tolling scenarios was facially improper. *See also* ECF No. 136. The State cannot use remand briefing to advance new claims. *See S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *see also Kahan v. Slippery Rock Univ. of Pa.*, 2014 U.S. Dist. LEXIS 171297, at *13 (W.D. Pa. 2014).[11]

But even if those claims were properly before the Court, they would fail on the merits. FHWA's decision to analyze scenarios in the Final EA, with a commitment to re-evaluate based

---

[11] To that end, the State's reply is the first instance where it challenges the need to re-evaluate the analysis in the Final EA based on the final tolling schedule. ECF No. 86 at 13-14. But it is axiomatic that "[a]n issue is waived unless a party raises it in its opening brief." *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994); *see also In re BlackRock Mutal Funds Advisory Fee Lit.*, 327 F. Supp. 3d 690, 736 n.42 (D.N.J. 2018); *aff'd*, 816 F. App'x 637 (3d Cir. 2020).

11

on the final tolling schedule ultimately adopted by the Project Sponsors, was a reasonable method of assessing the Project's effects under NEPA. In particular, the Final EA accounts for uncertainty by describing "the effects of the tolling scenario that would result in the greatest potential negative effects for that particular topic." DOT_36306; *see also Mulgrew*, 2024 WL 3251732, at *29 (Because analyzing the "worse-case scenario approach" for each resource area (*e.g.*, traffic, air quality, environmental justice) "results in the most potential negative effects" of the Project (*i.e.*, is "fundamentally conservative"), it is a "reasonable means of confronting uncertainty" and informing the public about the maximum potential impacts); *see also* 23 C.F.R. § 771.119 (EA must determine "which aspects of the proposed action have the potential for . . . environmental impact[s]"). Said differently, FHWA's use of the worst-case scenario for each resource area, coupled with a re-evaluation to consider the final tolling schedule, was a reasonable approach to solving the "'chicken or egg' conundrum" (of the fact the information in the Final EA was necessary to inform selection of a final tolling schedule) by "consider[ing] hypothetical situations that represented the spectrum of foreseeable results." *N. Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006); *see also Mulgrew*, 2024 WL 3251732, at *29 ("courts have endorsed worst-case scenario analyses as a reasonable means of confronting uncertainty under NEPA." (citing cases)). This is particularly so considering the Third Circuit's recent instruction that "NEPA [is] 'merely intended to make decision makers aware of the potential environmental ramifications of their actions.'" *Trenton Threatened Skies*, 90 F.4th at 132 (citation omitted). FHWA's analysis in the Final EA and subsequent re-evaluations more than clears that bar.

Moreover, FHWA's intent to re-evaluate the Final EA based on the final tolling schedule by no means renders the initial analysis inadequate. Instead, agencies can revisit environmental

12

reviews based on project developments. *See* 23 C.F.R. § 771.29 ("[FHWA] must determine, prior to granting any new approval related to an action or amended any previously approved aspect of an action, including mitigation commitments, whether an approved environmental document remains valid."). As courts have explained, "conducting an environmental reevaluation is an appropriate procedure for the FHWA to determine the significance of the impacts produced by the modified design and whether a supplemental EA is required." *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997); *cf. WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019) ( "the [agency] was not postponing the requisite environmental analysis until it picks the specific sites . . . rather, it was saying that such future analysis would be unnecessary because, in its expert opinion, whatever sites it ultimately chooses (within the constraints imposed by the Project), there would not be a negative impact"). This holding accords with the principle that an agency may "reasonably" "create[e] its models with the best information available when it beg[ins] its analysis and then check[] the assumptions of those models as new information became available." *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 71 (D.C. Cir. 2006); *see also City of Crossgate v. U.S. Dep't of Veterans Affs.*, 526 F. Supp. 3d 239, 250 (W.D. Ky. 2021). There was nothing unusual about the FHWA's intent to re-evaluate the Final EA.

Consistent with that standard practice, the two re-evaluations thoroughly assessed the effects of the final tolling schedule, as well as the later phase-in approach, and ultimately found that the adopted tolling structure would be "within the range of effects studied in the EA." DOT_47557; *see also* Supp. at 23; DOT_45624 ("The Final EA/FONSI anticipated there would be variations in the potential effects once the toll structure was adopted and since these variations are very minor, they continue to fall within the parameters of the Final EA/FONSI."). In

particular, Re-Evaluation #1 used the same Best Practice Model transportation methodology as the Final EA, explaining that "[t]his allowed comparison of the results for the adopted toll structure to the results presented in each analysis included in the Final EA." DOT_45477; *see also* DOT_45478. Based on this analysis, FHWA concluded that "the effects associated with the adopted toll structure fall within the range of effects and analysis presented in the Final EA/FONSI except in the areas identified in the discussion [and that in those areas] [t]he deviations in effects . . . are minor and do not require additional environmental analysis and mitigation." DOT_45624; *see also* Supp. at 23 ("the Phase-In Approach, like the March 2024 Adopted Toll Structure, does not result in significant effects.")

For example, while Re-Evaluation #1 indicated that the adopted tolling structure would result in some increases in criteria pollutants when compared to the Scenario A modeled in the Final EA, the analysis confirmed that "the overall increase of pollutants in these counties is small and the difference between Tolling Scenario A and the adopted toll structure is even smaller, less than 1 percent." DOT_45551. This makes sense, since the agency also determined the final tolling structure would result in regional traffic effects falling within the range modeled in the Final EA. *See* DOT_45443; *see also* DOT_45445-46 (changes in emissions); DOT_45542-43 (emissions by county). As for environmental justice, FHWA similarly found that the final toll structure would only "have small differences in the tracts and communities where potential truck diversion effects would occur," DOT_45582, and that the "same communities would be affected as predicted in the Final EA." DOT_45608. Further, "[t]he adopted toll structure would have lower intensities of truck-traffic proximity increases" in overburdened communities. DOT_45577. Indeed, for New Jersey environmental justice communities, the change in traffic between the scenario modeled in the Final EA and Re-Evaluation #1 is 0.3% for truck traffic,

14

DOT_45595, and largely none for non-truck traffic. DOT_45603. Thus, environmental justice effects fall within the range assessed in the Final EA, particularly for New Jersey communities.

As for the Phase-In Approach, Re-Evaluation #2, in turn, explains that Phase 3 presents the same scenario as the tolling structure already analyzed in Re-Evaluation #1, DOT_47557, and that for Phase 1 and Phase 2, "peak tolling rates would fall within the ranges studied in the Final EA." *Id.*[12] Accordingly, the agency concluded that the effects of the phase-in "would fall within the ranges studied in the Final EA. DOT_47557; *see also* Supp. at 23. This is logical because, as the Final EA explained, "[t]he most important factor in the magnitude and distribution of Project effects is the toll rate," DOT_36295, and the toll rates during the phase-in fall within the range already studied.

Ultimately, then, both re-evaluations used the same methodology to analyze the specific impacts of the final tolling schedule and phase-in approach, and reasonably concluded that the impacts were consistent with those already considered. Supp. at 23; s*ee N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154-55 (9th Cir. 2008).

## CONCLUSION

For the foregoing reasons, FHWA's Supplemental Memorandum completes the remand ordered by the Court and demonstrates the agency's compliance with NEPA. The Court should accordingly enter judgment for Federal Defendants.

Respectfully submitted this 17th day of January 2025,

>KATHERINE KONSCHNIK
>Acting Assistant Attorney General
>United States Department of Justice

---

[12] During Phase 1 (2025, 2026, and 2027), each of the relevant tolls and credits will be 60% of the tolls and credits in the March 2024 tolling structure. DOT_47551. During Phase 2 (2028, 2029, and 2030), the tolls and credits will rise to 80% of the final tolling structure. *Id*. And in Phase 3 (and going forward), the toll will be the structure adopted in March 2024. *Id*.

15

Environment & Natural Resources Division

*/s/ Gregory M. Cumming*
GREGORY M. CUMMING
Senior Attorney
SHARI HOWARD
SAMANTHA G. PELTZ
Trial Attorneys
Environment & Natural Resources Division
150 M St., N.E.
Washington, D.C. 20002
(202) 305-0457 (phone)
(202) 598-0414 (cell)
gregory.cumming@usdoj.gov
shari.howard@usdoj.gov
samantha.peltz@usdoj.gov

ALEX SILAGI
Assistant United States Attorney
District of New Jersey
United States Attorney's Office
970 Broad Street, 7th Floor
Newark, New Jersey 07102
973-353-6001 (phone)
alex.silagi@usdoj.gov

*Counsel for Defendants*

16