# Manhattan Central Business District Tolling Program Supplemental Memorandum

**FEDERAL LEAD AGENCY**

FEDERAL HIGHWAY ADMINISTRATION

**PROJECT SPONSORS**

New York State Department of Transportation
Triborough Bridge and Tunnel Authority
New York City Department of Transportation

January 2025

FHWA-0000001

## Supplemental Memorandum on Remand

Manhattan Central Business Tolling Program

*Re: New Jersey v. U.S. Dep't of Transp.*, No. 23-3885 (D.N.J.)

# Introduction & Scope

On December 30, 2024, in the case *New Jersey v. U.S. Department of Transp.* (No. 23-3885 (D.N.J), a challenge to the Federal Highway Administration's (FHWA) Final Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) for the Manhattan Central Business District Tolling Program, U.S. District Court Judge Leo L. Gordon issued an Opinion remanding part to the agency on two discrete issues. First, the Court asked for further explanation on the allocation of mitigation funding identified in the Final EA. Second, the Court asked the FHWA to clarify the agency's analysis of alternative approaches to achieve the Project's purpose and need, given the Project's final tolling structure. [1]

This document was created by FHWA in response to the Court's remand order to provide further clarification as to the distribution of Place-Based Mitigation funds and the financial objective of the Phase-in Adopted Toll Structure. It does not represent a formal re-evaluation or National Environmental Policy Act (NEPA) review under 23 CFR 771.

# Background

The Central Business District (CBD) Tolling Program was created in response to the April 2019 New York's Traffic Mobility Act. The project allows for tolling of vehicles entering lower Manhattan below 60th street.  The intent of the project is to reduce traffic congestion in the Central Business District while creating a recurring source of funding for the Metropolitan Transportation Authority (MTA) Capital Program.

A Draft Environmental Assessment (EA) was made available for public review August 10, 2022, through September 23, 2022.  At the time of the EA's publication, the final CBD tolling structure was unknown, so the environmental document analyzed seven potential tolling scenarios to cover the range of potential effects of the Project.

Following the publication of the Draft EA and after consideration of all comments received, the Federal Highway Administration (FHWA) issued the Final EA and FONSI in April 2023.

The Final EA incorporated revisions and provided new and/or updated information in response to public comments. It also provided more specificity on earlier mitigation and enhancement commitments as well as further analysis and a package of mitigation measures to address

---

[1]In addition, the Court deferred ruling on the Plaintiff State of New Jersey's claim that the final tolling schedule rendered the analysis in the Final EA inaccurate. That issue is addressed in Part III below.

1

concerns raised during the public comment period and through discussions with the Environmental Justice Technical Advisory Group.

The Traffic Mobility Review Board was tasked with recommending a specific tolling structure to the Triborough Bridge and Tunnel Authority (TBTA). In December 2023[2], the TBTA commenced the State Administrative Procedure Act process to adopt a toll rate structure through proposing the TMRB's recommended tolling structure. This proposed ratemaking was the subject of public review through March 2024, at which time it was approved by the TBTA Board (the Adopted Toll Structure)[3].

Once the Adopted Toll Structure was finalized, a re-evaluation was required pursuant to 23 CFR 771.129[4] to ensure that the effects of the Adopted Toll Structure were consistent with the effects disclosed in the Final EA and that the mitigation identified in the FONSI remained valid.

On June 5, 2024, New York Governor Hochul issued a pause for the project.[5] June 13, 2024, the Project Sponsors requested FHWA to complete the reevaluation[6]. On June 14, 2024[7], FHWA's re-evaluation (the Re-Evaluation #1) confirmed that the Adopted Toll Structure was projected to result in effects falling within those modeled in the Final EA and thus did not require additional analysis under the NEPA. The FONSI remained valid.

In November 2024, the MTA adopted a Phase-in approach proposing to increase the Adopted Toll Structure over a period of six years. With this approach, the initial revised toll rate or the first three years (2025-2027) would be 60% of the March 2024 rates:  e.g., automobiles with EZPass would be charged at a rate of $9 per day instead of $15 per day during the peak period. From 2028 to 2030, the rates will rise to 80% of the initially approved rates – $12 for automobiles during peak times, and $3 overnight. The March 2024 Adopted Toll Structure will begin in 2031.

FHWA completed a second re-evaluation (Re-Evaluation #2) of the Phase-in approach to ensure that the effects of that approach were consistent with the effects disclosed in the Final EA and that the mitigation remained valid. On November 21, 2024,[8] FHWA confirmed that the effects of the Phase-in approach fell within those assessed in the Final EA, and that the mitigation remained valid.

---

[2] https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate
[3] https://new.mta.info/press-release/mta-board-adopts-central-business-district-toll-rates
[4] 23 CFR 771.129 states "The Administration must determine prior to granting any new approval related to an action or amending any previously approved aspect of action, including mitigation commitments, whether an approved environmental document remains valid…"
[5] https://www.governor.ny.gov/news/what-they-are-saying-governor-hochul-announces-pause-congestion-pricing-address-rising-cost
[6] Letter from Winkelhake, de Cerreno, Beaton to Marquis June 13, 2024.
[7] https://new.mta.info/project/CBDTP/reevaluation
[8] Letter from Marquis to de Cerreno, Winkelhake, and Beaton November 21, 2024

FHWA-0000003

## I.    Distribution of Place-Based Mitigation

The approach to Place-Based Mitigation in the Final EA and FONSI is ultimately based on the population of the affected environmental justice communities. Those documents identified environmental justice communities that are (1) already intensely burdened with chronic disease and exposure to pollutants *and* (2) that will experience increased truck traffic from this Project. In the Final EA and FONSI, FHWA described Place-Based Mitigation commitments to those communities with the understanding that FHWA would conduct a re-evaluation once the TBTA adopted final toll rates and structure. In the FONSI, FHWA also committed to an adaptive management approach for mitigation. This strategy allowed for flexibility for variations in the location of adverse effects (as compared with the final toll structure and what was reported in the Final EA), and the results of consultation with environmental justice communities and other agencies involved in implementing mitigation measures.

Reevaluation #1 analyzed the effects of the Adopted Toll Structure and refined the Place-Based Mitigation. There was some slight shifting of census tracts, but the communities impacted remained the same. Reevaluation #2 evaluated the Phase-in of the Adopted Toll Structure. There was no change in the census tracts affected or the Place-Based Mitigation. Using the proportional population-based methodology for distributing the funds remained valid. Using this method, FHWA determined that New Jersey was properly allocated $9.8 million in mitigation funds.

### Background on Mitigation Analysis and Commitments from the Final EA and FONSI

"New York City's air quality has been improving in many ways since 1990; indeed, the city has experienced substantial declines in the annual average of [United States Environmental Protection Agency (USEPA)]'s criteria pollutants since 1990. Nevertheless, the impacts of the region's history of land-use and transportation development is still felt by residents living near roadway traffic. Further, the people of the 10-county local study region—whether they live in communities designated as environmental justice communities or in other communities—are burdened with high levels of air toxics cancer risk, air toxics respiratory hazards risk, and diesel particulate matter levels, when compared to the rest of the United States" (**Final EA Section 17 and 17D-3**).

**Appendix 17D to the Final EA** includes the analysis of environmental justice communities and the impacts of the CBD Tolling Program on those communities. Based on the conclusions of the other chapters of the Final EA, the Final EA identifies the Local (Neighborhood) Study Area, where the potential neighborhood effects of the CBD Tolling Alternative would occur and are primarily related to diverted trips, changes in traffic patterns, and the potential resulting effects in terms of traffic congestion, air emissions, and noise. The Final EA specifically evaluates impacts to environmental justice populations associated with the Project based on traffic

FHWA-0000004

patterns where truck and non-truck vehicles traffic proximity and Annual Average Daily Traffic[9] (AADT) increases would affect communities already overburdened by air pollutants or chronic disease. The Local (Neighborhood) Study Area for Environmental Justice communities is the 10-county study area where traffic patterns are expected to change due to the project (**Final EA Chapters 4A and Appendix 4A**)[10]. The same methodology for the impact assessment was applied equally across the 10 counties. Tolling Scenario E was used for the impact analysis in the Final EA because Tolling Scenario E had the highest amount of truck traffic diversions. The Final EA and FONSI defines an adverse effect as increases in truck traffic in currently overburdened environmental justice communities [chronic illness <u>or</u> pollutant burdens], relative to national percentiles. The effects vary in magnitude depending on the additional volume of truck traffic and the extent of preexisting pollutant and chronic disease burdens (**Final EA Chapter 17 and Appendix 17D**). Because of the nature of this region and the distribution of both environmental justice census tracts and the level of preexisting burdens, the environmental justice census tracts with either preexisting pollutant or chronic disease indicators that could experience truck traffic increases are the same whether applying the 66.66th-, 80th-, or the 90th percentile (**Final EA Figure 17-11**). These areas would benefit from the committed Regional Mitigation Measures. (**Final EA Table 17-16**).

*Local (Place-Based) Mitigation*

To ensure that the most affected communities receive the benefits of the mitigation, FHWA took a more tailored approach to identify locations for Place-Based Mitigation. These locations are shown in **Re-evaluation #1 Figure 17.4** below. Environmental justice communities that experience increased truck traffic and have both one or more chronic illness and pollutant factors at or above the 90th national percentile was identified as eligible to receive Place-Based Mitigation. The Final EA focused on truck traffic increases because truck traffic contributes to particulate matter pollution more than non-truck traffic (**Final EA Section 10.7.1.4**). However, non-truck traffic increases were also considered.

---

[9]AADT is the total volume of vehicle travel on a road for an entire year, divided by 365. AADT is generally used to measure long-term trends or changes in travel demand.

[10] To evaluate the local effects on environmental justice populations, the Project Sponsors used a 10-county local study area consisting of New York City and the five adjacent counties where the greatest change in traffic volumes and vehicle-miles traveled (VMT) are predicted to occur (Final EA Figure 17-1). This local study area is the area where localized effects (such as changes in traffic volumes, air emissions, or noise) would occur as a result of the Project. This 10-county study area includes \: Bronx County, Kings County (Brooklyn), New York County (Manhattan), Queens County, Richmond County (Staten Island), Nassau County, New York; and Bergen County, Essex County, Hudson County, Union County, New Jersey.

FHWA-0000005

Re Evaluation #1 Figure 17.1 - Modified Final EA Figure 17D-18. Environmental Justice Census Tracts with High Pre-Existing Pollutant and Chronic Disease Burdens Where Truck Traffic Proximity Could Potentially Increase (Adopted Toll Structure)



Source:    USEPA NATA and Agency Air Quality System via EJScreen 2021 data; CDC PLACES Estimates 2020 via EJI 2022 data; BPM, WSP 2021 and 2023.

Note:    Percentiles are national. Census Tract 3009, Nassau County not shown. Potential truck volume increases and decreases on roadways within the tract would ultimately cancel each other out and result in no change of truck traffic proximity for the residential populations within the tract.

**Final EA Figure 17-12** identifies the environmental justice census tracts where individuals experience at least one preexisting pollutant burden and at least one preexisting chronic disease burden at or above the 90th national percentile, and where truck proximity could increase because of the Project. The map referenced in the Final EA further categorizes each tract by the number of indicators for which the tract is in the 90th national percentile or higher. However, the number of indicators does not change the eligibility for mitigation. The specific census tracts that would experience increased or decreased truck traffic change slightly depending on the tolling scenario, but the communities encompassing those census tracts remain the same.

FHWA-0000006

Similar analysis was performed for non-truck traffic proximity changes resulting from the Project in the Final EA. In this case, 35 environmental justice communities with at least one census tract demonstrating a preexisting air pollutant burden <u>or</u> chronic disease burden would potentially experience a <u>decrease</u> in highway non-truck traffic proximity. However, 33 communities with these same preexisting air pollutant or chronic disease burdens could experience an <u>increase</u> in non-truck traffic proximity. All but 11 of the 33 communities were also identified during the analysis of potential truck traffic increases. The results from this analysis and concerns raised by environmental justice communities drew particular attention to a projected increase in non-truck traffic on the FDR Drive next to communities in Lower Manhattan and the Lower East Side. This effect was mitigated by tolling vehicles traveling northbound on the FDR Drive that exit at East Houston Street and then travel southbound on FDR Drive (**Final EA page ES-19 and 20**).

Of the seven Place-Based Mitigation measures identified in the Final EA, five are flexible in where they can be implemented, while the tolling of movements into the Manhattan CBD at East Houston Street and the replacement of transport refrigeration units (TRUs) at Hunts Point Produce Market are specific to those locations. TRUs are diesel-powered refrigeration units that are typically hauled behind trucks, but the TRUs at Hunts Point Market are stationary. Hunts Point Market supplies New York City and the New York metropolitan region with 2.5 billion pounds of produce a year, about 25 percent of the city's fresh produce, and is vital to New York City's food system.[11] Along with the warehouses, there are about one thousand TRUs used to supply the required refrigerated space. Replacement of TRUs at Hunts Point Market could lead to as much as 21 tons of NOx and 2.5 tons of PM2.5 reduction per year for every 100 TRUs. These reductions are greater in magnitude than the potential additional emissions of these pollutants that the Project could cause in the Bronx as a whole but would most benefit the Hunts Point area. **Final EA Table 17-16** summarizes the Regional and Place-Based Mitigation and also notes where certain measures were suggested during the public participation process.

*Final EA Table 17-16. Regional and Place-Based Mitigation Measures*

| Mitigation Measures | Benefit and Result of Mitigation | 5-Year Funding[1] | Relevant Location(s) | Funding Source | Implementation Lead |
|---|---|---|---|---|---|
| **Regional Mitigation** | | | | | |
| Further reduced overnight toll | Minimize/avoid truck diversions | $30 million | 10-county environme | CBD Tolling Program | TBTA |

---

[11] https://huntspointproducemkt.com/

FHWA-0000007

| Mitigation Measures | Benefit and Result of Mitigation | 5-Year Funding[1] | Relevant Location(s) | Funding Source | Implementation Lead |
|---|---|---|---|---|---|
| Expand NYC Clean Trucks Program[12] | Nitrogen oxide (NOx) and $PM_{2.5}$ reductions from ~500 new clean trucks | $20 million | ntal justice study area | CBD Tolling Program | New York City Department of Transportation (NYCDOT) |
| Expand NYCDOT Off-Hours Delivery Program | Safety and emissions reduction benefits resulting from reduced truck traffic during the day | $5 million | | CBD Tolling Program | NYCDOT |
| **Place-Based Mitigation** | | | | | |
| Toll vehicles traveling northbound on the FDR Drive that exit at East Houston Street and then travel southbound on FDR Drive | 25 to 35 percent of the non-truck traffic increases on the FDR Drive could be mitigated | N/A | FDR Drive between the Brooklyn Bridge and East Houston Street | N/A | TBTA |
| Replacement of Transport Refrigeration Units (TRUs) at Hunts Point Produce Market[13] | Major NOx and $PM_{2.5}$ reductions from the replacement of up to 1,000 TRUs | $15 million[2] | Hunts Point | MTA CMAQ Program | NYCDOT |

[12] Requested Oct. 7, 2022 by WE ACT;
[13] Requested by South Bronx Unite and recommended by EPA; also requested by Representative Torres, Natural Resource Defense Council, and Environmental Defense Fund. See Appendix A.

7

FHWA-0000008

| Mitigation Measures | Benefit and Result of Mitigation | 5-Year Funding[1] | Relevant Location(s) | Funding Source | Implementation Lead |
|---|---|---|---|---|---|
| Implement Electric Truck Charging Infrastructure[14] | NOx and $PM_{2.5}$ reductions from electric vehicles using 35 new chargers (at seven stations) | $20 million | After toll rates are set, a process that includes both additional analyses and community input will take place to determine specific locations | $10 million Federal CRP + $10 million CBD Tolling Program | New York State Department of Transportation (NYSDOT) |
| Install Roadside Vegetation to Improve Near-Road Air Quality[15] | Improves near-road air quality by pollutant capture from ~4,000 trees and ~40,000 shrubs | $10 million | | CBD Tolling Program | TBTA with Relevant State and Local Agencies |
| Renovate Parks and Greenspace in Environmental Justice Communities[16] | Increases overall community well-being. 2-5 park/ greenspace renovations depending on size and complexity. | $25 million | | CBD Tolling Program | TBTA with Relevant State and Local Agencies |
| Install Air Filtration Units in Schools Near Highways[17] | Removes air pollutants from classrooms. 25-40 schools depending on school size and complexity of existing HVAC system. | $10 million | | CBD Tolling Program | TBTA with Relevant State and Local Agencies |

[14] Requested Jan. 5, 2023, by NYC EJ Alliance and South Bronx Unite; Jan. 12, 2022, South Bronx Unite. See Appendix. Also requested by WE ACT. See Appendix A.
[15] Requested Jan. 12, 2022, by South Bronx Unite; Aug. 22, 2022, South Bronx Unite; Oct. 7, 2022, South Bronx Unite and WE ACT. See Appendix A.
[16] Requested Jan. 12, 2022, by South Bronx Unite. Oct. 7, 2022, South Bronx Unite and El Puente Green Light District; May 10, 2023, support by South Bronx Unite. Also requested by WE ACT. See Appendix A.
[17] Requested Jan. 12, 2022, by WE ACT and El Puente Green Light District. See Appendix A.

FHWA-0000009

| Mitigation Measures | Benefit and Result of Mitigation | 5-Year Funding[1] | Relevant Location(s) | Funding Source | Implementation Lead |
|---|---|---|---|---|---|
| Establish Asthma Case Management Program and Bronx Center[18] | Reduces hospitalizations and doctor visits, decreases days and nights with symptoms and missed school days – program expansion up to 25 schools | $20 million | | CBD Tolling Program | NYC DOHMH |

Table Notes:

1 (5-Year Funding) An additional $5 million has been allocated for mitigation and enhancement measures related to monitoring across other topics, along with $47.5 million for the low-income toll discount discussed below. Enhancement measures include air quality monitoring that will expand NYC's existing monitoring network. Locations will be selected in consideration of the traffic and air quality analyses in the EA and in coordination with environmental justice stakeholders and relevant state and local agencies. This will complement the regional and Place-Based Mitigation measures related to traffic diversions outlined here (see **Chapter 10, "Air Quality,"** for details).

2 (Noted on $15 million) After three years, any remaining funds designated for TRU replacements may also be used for clean truck replacement vouchers through the NYC Clean Trucks Program.

The specific feasibility factors and forms of engagement vary by mitigation and include[19]:

**Electric Truck Charging Infrastructure**: This mitigation will be implemented through the Federal Carbon Reduction Program (CRP) using funds received by NYSDOT and will therefore be limited to locations in New York. Siting considerations will include potential visual impacts, proximity to highways (to minimize travel on local roads), and the study of potential traffic and noise impacts. The New York Metropolitan Transit Council Clean Freight Corridors Study—a study developed by the metropolitan planning organization in consultation with motor carriers, utility companies, fuel infrastructure manufacturers/suppliers, truck stop operators, industrial real estate companies, and community- and advocacy organizations—will be used to help identify priority locations. Such groups will be re-engaged, as warranted, along with state and local officials, to provide feedback in identifying appropriate locations. New York representatives specifically requested this under the adaptive management approach. Given that 4.8 percent of the trucks with destinations in New York City, come from or pass through New Jersey daily, and 0.2 percent come from or pass through Connecticut. New Jersey and Connecticut communities will benefit from this mitigation, as will New York communities that have truck traffic but where charging stations will not be located. The installation of 35 electric truck chargers at seven stations could lead to a reduction of as much as 32.6 tons of $NO_x$ and 1.54 tons of PM2.5 reduction, citywide by 2035.

**Roadside Vegetation to Improve Near-Road Air Quality**: The Project Sponsors will work with relevant local and state agencies to assess the availability of roadside space and the presence of

---

18 Presented Oct. 6, 2022, and supported by the community representatives. Asthma Center Requested by WE ACT specifically for Harlem. See Appendix A. There was no request from NJ representatives.
19 Final EA page 17-66 has additional details.

FHWA-0000010

existing plantings, as well as access and maintenance considerations, to identify appropriate sites near sensitive receptors (e.g., schools, day care, senior, or community centers, or outdoor recreational facilities) as locations for new plantings. To align with community priorities, the Project Sponsors will engage with community stakeholders, elected officials, and the Environmental Justice Community Group. This measure could be deployed in communities in both New Jersey and New York.

**Parks and Greenspace in Environmental Justice Communities**: The Project Sponsors will work with relevant state and local agencies to assess potential locations for park and greenspace investments in the affected communities, including in existing parkland where the expansion of green space, tree planting, or other upgrades are feasible. The agencies will solicit input on prioritization of locations and treatments from the Environmental Justice Community Group, local officials, and other community stakeholders. This measure could be deployed in communities in both New Jersey and New York.

**Air Filtration Units in Schools Near Highways**: The Project Sponsors will work with relevant school authorities to assess needs and analyze the feasibility of upgrading existing filtration systems in schools in census tracts within 300 meters of highways where truck traffic is projected to increase. Factors will include the design and performance of existing HVAC systems, the facility's proximity to highways, and the area asthma rates, as well as scheduled capital projects. The Project Sponsors will work with relevant state and local agencies and solicit input from community stakeholders to determine locations where air filtration upgrades will be most effective. This applies to both New Jersey and New York.

**Asthma Case Management Program and Center**: This mitigation will expand on the success of existing city programs operating within the five New York counties. New York representatives specifically requested this under the adaptive management approach.

> **Asthma Case Management Program**—NYC Department of Health and Mental Hygiene (DOHMH) will conduct a needs assessment to identify schools in affected census tracts with existing high rates of asthma. Additionally, NYC DOHMH will engage with school leadership on expansion of the Asthma Care Management Program and will solicit input from the Environmental Justice Community Group, parents, and other community stakeholders on priority locations that should be prioritized and how to best reach families of children with asthma. This mitigation would expand on the existing NYC Asthma Case Management Program and a new Bronx Asthma Center would be modeled after NYC DOHMH's East Harlem Asthma Center of Excellence (EHACE). EHACE's counselor program reported outcomes of 50 percent reduction in hospitalizations, a 56 percent decrease in emergency department visits, and a significant decrease in the number of days and nights with asthma symptoms, along with reductions in missed school days related to asthma, for program participants.

FHWA-0000011

**Asthma Center**—Selection of a location in the Bronx[20] will include consideration of asthma rates, population concentration, proximity to sensitive receptors, the location of existing facilities and services, accessibility via public transportation, and availability of suitable space. NYC DOHMH will work with community stakeholders to solicit input on programming and outreach strategies to ensure that the center maximizes its benefit to people with asthma[21].

*Final EA and FONSI Adaptive Management Commitment*

The Final EA and FONSI committed to a process to implement the Place-Based Mitigation once the final toll schedule was set and FHWA completed the reevaluation of the effects of those tolls (outlined in **Appendix 17D**). The Adopted Toll Structure analyses are documented in the Reevaluation#1. The Project Sponsors committed to a stakeholder involvement process that would occur after the FONSI that includes both additional analyses and community input to determine the sites of the five Place-Based Mitigation measures (e.g., in which schools to install air filtration units, or on what roadways to plant vegetation). This requires coordination among the Project Sponsors, the Environmental Justice Community Group, the relevant communities receiving the Place-Based Mitigation, and local implementing agencies. The Final EA and FONSI committed the Project Sponsors, in consultation with those stakeholders, to undertake a needs assessments and feasibility screening to determine the range of possibilities for specific locations; this process will equally apply to New Jersey communities.

After the publication of the Final EA and FONSI, the Environmental Justice Technical Advisory Group requested that new invitations be sent out to additional organizations to gain their input into the mitigation and monitoring. The Project Sponsors have since complied with that request (*See* **Environmental Justice Community Group Section in this document and Appendix B**). The Environmental Justice Community Group allows for additional flexibility to enhance the engagement of the environmental community in the study area after the NEPA process, reflecting a commitment to inclusivity.

---

[20] Data show that the Bronx has the highest rates of asthma. Across all communities within New York City, on a variety of measures, NYSDOH data show the greatest burdens of asthma, cancer, cardiovascular disease, and diabetes in the Bronx, with Richmond County having burdens of cancer and cardiovascular disease above the citywide average.  Rates of current adult asthma in the Bronx (12.7 percent), across all communities, observed between 2017 and 2019, were higher than the rate across the city (9.5 percent), but not statistically different. However, the rates of hospitalization and death were both statistically higher than the citywide rates, and NYSDOH has found that rates of asthma death have been stable when it compared data collected between 2013 and 2015 with data collected between 2016 and 2018. On Staten Island (10.4 percent), the percentage of adults with asthma is statistically similar to the citywide rate, but rates of asthma deaths have increased in in recent years (**Final EA page Appendix 17D-25 to 26**).  In New Jersey, across all communities [in their respective counties], the percentage of adults who reported having asthma in the period from 2016 to 2018 was highest in Essex County at 8.8 percent, followed by Union County (8.4 percent), Hudson County (8.0 percent), and—with the lowest rate—Bergen County (6.2 percent). However, none of these rates was statistically different from the overall New Jersey rate (8.4 percent). These percentages were stable for the four counties and the state of New Jersey between 2011 and 2018 (**Final EA page Appendix 17D-27**).
[21] New Jersey did not request a similar place-based mitigation measure.

FHWA-0000012

*Final EA Environmental Justice Stakeholder Involvement*

Initially, two groups of environmental justice stakeholders were convened through the NEPA process. Meetings and input are documented in the **Final EA in Chapter 17 and Chapter 18**. Outreach included efforts to attract stakeholders in New Jersey, New York, and Connecticut throughout the 28-county study area. The Project Sponsors formed an Environmental Justice Technical Advisory Group comprised of community leaders, advocacy groups, industry groups, and community members. Of the 37 groups invited to participate, 16 accepted the invitation (including New Jersey Environmental Justice Alliance, Connecticut Coalition for Environmental Justice, and Urban League of Greater Hartford) and are listed in **Final EA Section 17.9.2**. This advisory group actively voiced concerns related to consideration of existing chronic disease and pollutant burdens. This group was also instrumental in identifying the need for mitigation of pollution at Hunts Point and the need for access to an asthma treatment center in the South Bronx. The other measures related to air filtration at schools, parks, and greenspace, as well as additional vegetation were supported by this group with the understanding that additional details would be worked out in consultation with the affected communities.

The **Final EA and FONSI (see page 17-71[22], page 17-78[23] in Chapter 17**) outlined continuing opportunities for participation and engagement related to the concerns of environmental justice communities through sharing updated data and analysis and listening to concerns. The Project Sponsors will conduct additional coordination with the Environmental Justice Community Group and the relevant communities receiving Place-Based Mitigation related to environmental justice concerns.

*Identification of Census Tracts Eligible for Place-Based Mitigation in the Re-Evaluation #1*

FHWA re-evaluated the adopted TBTA toll rates and structure to determine whether the decision made in the FONSI was still valid (**23 CFR 771.129**). This required that the TBTA demonstrate to FHWA that the effects of the final tolling rates and structure are consistent with the effects disclosed in the final EA. Crucially, the mitigation commitments must also remain valid. Re-Evaluation #1 analyzes the effects associated with the Adopted Toll Structure (adopted by the TBTA in March 2024) using the same methodology described in the Final EA for the modeled tolling scenarios. The Re-evaluation confirmed the Adopted Toll Structure would affect the same environmental justice communities with high preexisting chronic disease and pollutant burdens as those identified in the Final EA, see **Reevaluation Table 17.4,** although the

---

[22] Establishment of an Environmental Justice Community Group: The Project Sponsors commit to establishing an Environmental Justice Community Group that will meet with the first meeting taking place before Project implementation. The Project Sponsors will continue to provide meaningful opportunities for participation and engagement related to environmental justice concerns by sharing updated data and analysis, listening to concerns and seeking feedback on the toll setting process.

[23] Following this analysis (analysis refers to what was provided in Reevaluation #1), specific siting of place-based mitigation measures will require further coordination between the Project Sponsors, the Environmental Justice Community Group (representing the 10-county environmental justice study area), the relevant communities receiving the place-based mitigation, and relevant local and state implementing agencies.

FHWA-0000013

specific census tracts within each community changed somewhat because of the Adopted Tolling Structure.

Specifically, Re-Evaluation #1 assessed the Adopted Toll Structure to refine the areas identified for Place-Based Mitigation for those environmental justice census tracts where individuals experience at least one preexisting pollutant burden <u>and</u> at least one preexisting chronic disease burden at or above the 90th percentile, nationally, and where truck traffic proximity could increase as a result of the Project (the mitigation criteria). **The distribution of the $100 million in Place-Based Mitigation funding is based on the proportion of the population in the census tracts of each community meeting the mitigation criteria as compared to the population of all the census tracts that meet the mitigation criteria, to ensure the Place-Based Mitigation funding is distributed equitably across the affected environmental justice population**. **Re-evaluation #1 Table 17.9** identifies those environmental justice communities, the number of tracts within the community that exceed the 90th percentile for preexisting pollutant <u>and</u> chronic disease burdens, and that are expected to experience an increase in truck traffic because of the CBD Tolling Program.

To complete the specifics of the Place-Based Mitigation, FHWA, and the Project Sponsors are applying the adaptive management approach described above. As documented in both the FONSI and Re-Evaluation #1, the Project Sponsors committed to a stakeholder involvement process that includes both additional analyses (completed in the Re-Evaluation #1), siting assessments, and stakeholder input to determine the specific sites for the five Place-Based Mitigation measures (e.g., in which schools to install air filtration units, or on what roadways to plant vegetation). This adaptive management approach requires coordination among the Project Sponsors, the Environmental Justice Community Group, and the relevant communities receiving the Place-Based Mitigation, as well as local implementing agencies.

13

FHWA-0000014

*Reevaluation #1 Table 17.9 - Modified Final EA Table 17D-17. Environmental Justice Tracts and Communities That Would Merit Place-Based Mitigation (Scenario E), With the Adopted Toll Structure ("90 and 90" Tracts and Communities)*

| COUNTY | MAP MARKER | COMMUNITY | NO. OF TRACTS WITH AT LEAST ONE PRE-EXISTING POLLUTANT AND CHRONIC DISEASE BURDEN | | HIGHWAYS | DAILY TRUCK VOLUME | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FINAL EA SCENARIO E | | | ADOPTED TOLL STRUCTURE | | |
| | | | FINAL EA SCENARIO E | ADOPTED TOLL STRUCTURE | | No Action (AADT) | Change (AADT) | Change (%) | No Action (AADT) | Change (AADT) | Change (%) |
| Bronx, NY | 1 | High Bridge–Morrisania and Crotona–Tremont | 18 | 18 | Cross Bronx Expwy | 21,819 | 168 | 0.8% | 21,819 | 237 | 1.1% |
| | | | 0 | 1 | Major Deegan Expwy | Community does not have tracts with potential truck traffic increases adjacent to Major Deegan Expwy | | | 14,106 | 240 | 1.7% |
| | 2 | Hunts Point–Mott Haven/Pelham–Throgs Neck | 14 | 14 | Bruckner Expwy | 5,624 | 277 | 4.9% | 5,624 | 263 | 4.7% |
| | 3 | Hunts Point–Mott Haven | 3 | 3 | Major Deegan & Bruckner Expwys | 7,618 | 874 | 11.5% | 7,618 | 695 | 9.1% |
| | | | 1* | 1* | Approach to RFK Bridge | 9,868 | 1,339 | 13.6% | 9,868 | 1,100 | 11.1% |
| | 4 | Pelham–Throgs Neck | 1 | 1 | Throgs Neck Expwy | 4,194 | 50 | 1.2% | 4,194 | 73 | 1.7% |
| | | | 1 | 1 | Cross Bronx Expwy Ext. | 9,580 | 398 | 4.2% | 9,580 | 388 | 4.1% |
| | 5 | Northeast Bronx | 1 | 1 | New England Thruway | 13,640 | 191 | 1.4% | 13,640 | 106 | 0.8% |
| New York, | 6 | East Harlem | 2 | 2 | RFK Bridge Approach at E 125th St | 1,702 | 1,924 | 113.0% | 1,702 | 672 | 39.5% |
| | 7 | Randall's Island** | 1 | 1 | RFK Bridge on Randall's Island | 12,432 | 3,170 | 25.5% | 12,432 | 1,913 | 15.4% |
| Kings, NY | 8 | Downtown–Heights–Slope (Downtown Brooklyn–Fort Greene)*** | 3 | 3 | Brooklyn Queens Expwy | 14,107 | 891 | 6.3% | 14,107 | 378 | 2.7% |
| | 9 | Greenpoint (South Williamsburg)† | 4 | 4 | Brooklyn Queens Expwy | 15,870 | 853 | 5.4% | 15,870 | 428 | 2.7% |
| Essex, NJ | 10 | Orange–East Orange–Newark | 6 | 6 | I-280 | 6,106 | 116 | 1.9% | 6,106 | 137 | 2.2% |

FHWA-0000015

| COUNTY | MAP MARKER | COMMUNITY | NO. OF TRACTS WITH AT LEAST ONE PRE-EXISTING POLLUTANT AND CHRONIC DISEASE BURDEN | | HIGHWAYS | DAILY TRUCK VOLUME | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FINAL EA SCENARIO E | ADOPTED TOLL STRUCTURE | | FINAL EA SCENARIO E | | | ADOPTED TOLL STRUCTURE | | |
| | | | | | | No Action (AADT) | Change (AADT) | Change (%) | No Action (AADT) | Change (AADT) | Change (%) |
| Bergen, NJ | 11 | Fort Lee | 1 | 1 | I-95/George Washington Bridge | 14,768 | 195 | 1.3% | 14,768 | 231 | 1.6% |

Source:    U.S. Census Bureau, ACS 2015-2019 5-Year Estimates; USEPA NATA 2017 and Agency Air Quality System 2018 via EJScreen 2021 data; CDC PLACES Estimates 2020 via EJI 2022 data; BPM, WSP 2021 and 2023.

Notes:

As in Final EA Table 17D-17, this table lists the 13 identified communities under both Tolling Scenario E and the adopted toll structure into 11 rows. Census Tract 3009, Nassau County, not shown. As noted in Final EA, Table 17D-17, "closer examination indicates that this tract is shown with a potential increase in truck traffic proximity under Tolling Scenario E; though roadways passing through the tract have the potential to see decreases in truck traffic, the center of its population is near [a portion of] a roadway where modeling indicates that truck traffic could increase."

In the Final EA, No Build truck AADT and Scenario E truck AADT change were miscalculated for a portion of a highway described in Table 17D-17. This table includes corrected values. These corrections do not change the conclusions of the Final EA, as potential truck-traffic proximity increases of any magnitude were used to identify tracts and communities for potential effects and mitigation.

*       Census Tract 27.01, Bronx County, immediately north of junction between RFK Bridge approach and Bruckner Expwy; tract also included in row for Major Deegan & Bruckner Expwys above.

**      As noted in Final EA, Appendix D to Appendix 17D, part of the East Harlem UHF neighborhood, but labeled as "Randall's Island" to further specify location.

***     As noted in Final EA, Appendix D to Appendix 17D, Part of the Downtown–Heights–Slope UHF neighborhood but labelled "Downtown Brooklyn-Fort Greene" to further specify location.

†       As noted in Final EA, Appendix D to Appendix 17D, Part of the Greenpoint UHF neighborhood, but labeled as "South Williamsburg" to further specify location.

15

*Distribution of Place-Based Mitigation Funding*

**Re-evaluation #1 Table 17.14** shows the distribution of the $100 million committed to in the FONSI for Place-Based Mitigation measures. **The distribution of the $100 million in Place-Based Mitigation funding is based on the proportion of the population in the census tracts of each community meeting the mitigation criteria as compared to the population of all the census tracts that meet the mitigation criteria, to ensure the Place-Based Mitigation funding is distributed equitably across the affected environmental justice population.**

*Reevaluation #1 Table 17.14 - Place-Based Mitigation Measures Funding [Distribution] Allocation*

| COUNTY | COMMUNITY IDENTIFIED FOR PLACE-BASED MITIGATION | TOTAL POPULATION | SHARE OF POPULATION IN ALL AFFECTED TRACTS | ALLOCATED FUNDS |
|---|---|---|---|---|
| Bronx, NY | Crotona - Tremont | 51,133 | 22.6% | $22.6M |
| | High Bridge - Morrisania | 20,884 | 9.2% | $9.2M |
| | Hunts Point - Mott Haven | 42,621 | 18.9% | $18.9M |
| | Northeast Bronx | 9,912 | 4.4% | $4.4M |
| | Pelham - Throgs Neck | 37,608 | 16.6% | $16.6M |
| Kings, NY | Downtown Brooklyn–Fort Greene* | 12,819 | 5.7% | $5.7M |
| | South Williamsburg** | 16,807 | 7.4% | $7.4M |
| New York, NY | East Harlem | 9,968 | 4.4% | $4.4M |
| | Randall's Island*** | 2,009 | 0.9% | $0.9M |
| Bergen, NJ | Fort Lee | 3,159 | 1.4% | $1.4M |
| Essex, NJ | City of Orange | 1,925 | 0.9% | $0.9M |
| | East Orange | 4,124 | 1.8% | $1.8M |
| | Newark | 12,982 | 5.7% | $5.7M |

\*      As noted in Final EA, Appendix D to Appendix 17D, Part of the Downtown–Heights–Slope UHF neighborhood but labelled "Downtown Brooklyn-Fort Greene" to further specify location.

\*\*     As noted in Final EA, Appendix D to Appendix 17D, Part of the Greenpoint UHF neighborhood, but labeled as "South Williamsburg" to further specify location.

\*\*\*    As noted in Final EA, Appendix D to Appendix 17D, part of the East Harlem UHF neighborhood, but labeled as "Randall's Island" to further specify location.

The following specific Place-Based Mitigation measures, totaling $100 million and are consistent with the allocation in the Final EA and FONSI for the type of mitigation.

- $15M to replace diesel-powered TRUs at Hunts Point Produce Market in the Bronx.

- $20M to establish an asthma center and case management program in the Bronx.

FHWA-0000017

- $20M to implement electric truck charging infrastructure in New York City, which also has regional benefits: although the charging points can be located only in New York State because they are funded by NYSDOT, all trucks may use the charging points regardless of their points of origin or destination.
- $10M to install air filtration units in schools near highways in any of the affected communities regionwide.
- $10M to install roadside vegetation in any of the affected communities regionwide.
- $25M to renovate parks and greenspace in any affected communities regionwide.

The $15 million for new TRUs at Hunts Point Produce Market and $20 million for an asthma center and case management program will be funded from the $71.7 million distribution to the Bronx communities impacted by the Project (The Environmental Justice Technical Advisory Group identified these specific measures during the NEPA process as noted in **Appendix A).** The electric truck charging infrastructure will come from allocations to New York communities where the locations will be sited, which will be in New York. But the electric truck charging infrastructure will also have regional benefits, including to certain residents and businesses in New Jersey communities.

All communities, including those identified in New Jersey, are eligible for the remaining three mitigation strategies – installation of roadside vegetation, renovation of parks and greenspace, and installation of air filtration units in schools near highways, pending the identification of feasible sites.

Based on the proportion of the population in the census tracts of each community meeting the mitigation criteria, $9.8 million in Place-Based Mitigation funding is allocated to New Jersey communities. From that amount, measures such as Roadside Vegetation to Improve Near-Road Air Quality, Parks, and Greenspace in Environmental Justice Communities, and Air Filtration Units in Schools Near Highways may be deployed after consultation with the Environmental Justice Community Group and community stakeholders. **Final EA Table 17-16**, included in this document, describes the benefits expected from these mitigation measures. In addition, Re-Evaluation #1 reiterates the benefits of the mitigation measures; for example, installation of air filtration units in schools near highways will improve indoor air quality at schools, which are sites that are particularly sensitive to pollutants caused by increased truck traffic.

Specific to the Court's remand order, communities in the Bronx have been allocated a total of $71.7 million in Place-Based Mitigation funding based on the proportion of the population in the census tracts meeting the mitigation criteria. Through the Environmental Justice Technical Advisory Group, and other public participation, representatives of that community identified specific Place-Based Mitigation projects before the EA/FONSI was complete; those projects are the TRUs at Hunts Point Produce Market and an Asthma Center and Case Management Program.

To be clear, the early identification of projects meriting Place-Based Mitigation funding did not and does not reduce the allocation of funds to communities in New Jersey: that funding was

FHWA-0000018

ultimately distributed based on the proportion of the population in the census tracts of each
community meeting the mitigation criteria as compared to the population of all the census
tracts that meet the criteria, to ensure the Place-Based Mitigation funding is distributed
equitably across the affected environmental justice population. The remaining $18.5 million for
New York Kings County and New York County communities will use the same adaptive
management approach described above.

## Environmental Justice Community Group Outreach

Pursuant to the commitment in the FONSI, the Project Sponsors engaged the Environmental
Justice Community Group to consult and coordinate on mitigation. An initial meeting was
convened February 22, 2024. Because of the pause placed on the CBD Tolling Program in June
2024 by New York Governor Hochul, a second meeting took place on December 17, 2024.
**Appendix B** includes information on invitations, the December presentation, and notes from the
December meeting.

To form the new Environmental Justice Community Group, the Project Sponsors invited
members of the Environmental Justice Technical Advisory Group established during the NEPA
process as well as representatives of additional environmental justice organizations, some at the
request of the Environmental Justice Technical Advisory Group. Representatives from 12
organizations attended the first meeting February 22, 2024. Community Groups from both New
Jersey and New York were invited to attend the meeting.

At that meeting, the Project Sponsors presented an overview of the Project, the proposed toll
structure, a history of environmental engagement for the Project to date, the mitigation
commitments made in the FONSI focusing on the commitments to environmental justice
communities, and a timeline for future actions. After the presentation, the meeting included a
discussion in which participants asked questions and raised concerns. Comments and concerns
largely related to potential traffic diversions, Place-Based Mitigation, and future capital projects.
**Re-Evaluation #1 Table 18.2** summarizes those organizations invited to attend the meeting.

*Reevaluation #1 Table 18.2 – Environmental Justice Community Group Invitations and Attendance at
February 2024 Meeting*

| GROUP INVITED TO ATTEND | ATTENDANCE | GROUP INVITED TO ATTEND | ATTENDANCE |
|---|---|---|---|
| ALIGN | Invited | New York City Environmental Justice Alliance | Attended |
| American Indian Community House | Invited | New York Urban League | Invited |
| Asian American Federation | Attended | Northern New Jersey Community Foundation | Attended |
| Chhaya | Invited | The Point Community Development Corporation | Attended |
| Community Voices Heard | Invited; Declined | Riders Alliance | Invited |
| El Puente | Attended | South Bronx Unite | Attended |
| ERASE Racism New York | Attended | South Ward Environmental Alliance | Invited |

18

FHWA-0000019

| GOLES (Good Old Lower East Side) | Attended | Staten Island Urban Center | Attended |
|---|---|---|---|
| Hispanic Federation | Invited | United Jewish Organizations of Williamsburg and North Brooklyn | Attended |
| The HOPE Program (formerly Sustainable South Bronx) | Invited | UPROSE | Attended |
| Ironbound Community Corporation | Invited; Declined | Urban Indigenous Collective | Invited |
| Make the Road New York | Invited | Urban League of Bergen County | Invited |
| National Association for the Advancement of Colored People (NAACP) – Long Island Region | Invited | Urban League of Essex County | Invited |
| NAACP – Metropolitan Council Region, NY | Invited | Urban League of Hudson County | Invited |
| NAACP – NJ State Conference | Invited | Urban League of Union County | Attended |
| National Action Network | Invited | WE ACT for Environmental Justice | Invited |
| Neighborhood Initiatives Development Corporation | Invited | WE STAY / Nos Quedamos | Invited |
| New Jersey Environmental Justice Alliance | Invited | Youth Ministries for Peace and Justice | Invited |

19

FHWA-0000020

## II.    Financial Objective of Adopted Toll Structure and Phase-in Approach

The Project Sponsors and FHWA share responsibility for defining the purpose and need[24] and objectives of the Project.[25] For the CBD Tolling Program, four objectives were identified to address the Project needs.

The Final EA identifies the following objectives to address the needs described above:

• Reduce daily vehicle-miles traveled (VMT) within the Manhattan CBD.

• Reduce the number of vehicles entering the Manhattan CBD daily.

• Create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program.

• Establish a tolling program consistent with the purposes underlying the New York State legislation entitled the "MTA Reform and Traffic Mobility Act."

The purpose of FHWA's Value Pricing Pilot Program (VPPP) [26] is to reduce congestion, a goal achieved by the first two objections listed above. The third and fourth objectives are the domain of the Project Sponsors as the New York state agencies responsible for compliance with state law, as is the structure of the financial instruments intended to meet the state law goal[27] of raising $15 billion with Project revenues. Within that distribution of expertise, FHWA ensured that the Project Sponsors addressed the objectives of the project, and that the agency was provided with adequate assurances that the state law and financial objectives of the Project were met by the Adopted Toll Structure.

The **Final EA Table ES-3** notes: "*The net revenue needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and term. For the purposes of this EA, the modeling assumes the Project should provide at least $1 billion annually in total net revenue, which would be invested or bonded to generate sufficient funds. The net revenue values provided in this table are rounded and based on Project modeling.*"

The analysis of the Adopted Toll Structure in Re-evaluation #1 showed net revenue generation of $0.9 billion. Analysis by the TBTA demonstrated that although the net revenue generation was below $1 billion, the Adopted Toll Structure could nonetheless provide the revenue stream needed to bond $15 billion. Prior to issuance of Re-evaluation #1, FHWA confirmed with the MTA Chief Financial Officer (CFO) that the net revenue generation at $0.9 billion met the objective identified for the funding source to generate sufficient annual net revenue to fund the

---

[24] https://www.environment.fhwa.dot.gov/nepa/trans_decisionmaking.aspx
[25] 23 USC 139(c )(6)( C)
[26] 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA), Public Law 102-240, as amended by section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21), and section 1604 (a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub. L. 109-59 (August 10, 2005) establishes the VPPP
[27] Traffic Mobility Act of 2019, §1704-A.

FHWA-0000021

$15 billion capital program. This confirmation was recorded in the Executive Summary Table of Re-evaluation #1: "*Following completion of the Final EA, based on current interest rates and expected timing of projects, MTA's Chief Financial Officer has determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects for the MTA Capital Program.*" FHWA also confirms that the January 2, 2025, declaration of MTA CFO Kevin Willens reflects the agency's contemporaneous understanding of the revenue-generation issue and the information that was conveyed to FHWA by the Project Sponsors before issuance of the Re-Evaluation.

When the Project Sponsors proposed the Phase-in approach in November 2024, and consistent with FHWA's oversight responsibility, the agency requested that MTA confirm that the Phase-in approach would still meet the Project's financial objectives **Footnote 2** in the corresponding table from Re-evaluation #2 states "*For this re-evaluation, MTA's CFO has determined that the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure.*"

The Project Sponsors provided additional explanation in **Re-evaluation #2, pages 8 and 9** regarding the financing objective and revenue generation:

> "*The Phase-In Approach would achieve the congestion reduction objectives of the CBD Tolling Program of reducing vehicle miles travelled (VMT) within and the number of vehicles entering the CBD of 5% and 10%, respectively. Phases 1 and 2 would not raise as much annual revenue as the tolling scenarios studied in the EA or the March 2024 adopted tolling scenario (Phase 3). However, over time, the Program would still meet the Act's mandate to raise sufficient revenues to fund $15 billion for capital projects for the MTA Capital Program.  The Project Sponsors have reached a consensus that an incremental start would have the benefit of helping drivers adapt more easily to the Program, while monitoring data regarding implementation and effects. For example, drivers would have the time to adjust transportation modes, and continued improvements to mass transit – partly funded by revenues derived from the initial phases of the Program – would incentivize drivers to switch from autos to transit as the toll increased. The Project Sponsors have determined that these benefits outweigh more immediate revenues.*
>
> *Therefore, the Phase-In Approach would meet the purpose and need of the CBD Tolling Program as described in the EA: to reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into the VPPP.*"

FHWA-0000022

As with Re-evaluation #1, FHWA confirmed this understanding with MTA's CFO before issuance of Re-Evaluation #2.  Mr. Willens' January 2 declaration reflects FHWA's contemporaneous understanding of the information conveyed by the Project Sponsors before FHWA's issuance of Re-Evaluation #2.

FHWA-0000023

### III.    Effects of the Adopted Toll Structure

Re-Evaluation #1 comprehensively evaluated the effects of the March 2024 Adopted Toll Structure and determined that the mitigation set forth in the EA and FONSI would be sufficient to avoid significant effects from the final toll structure. *See* **Re-Evaluation #1 Table 1.1**.  As described above, Re-Evaluation #1 also set forth a distribution of funding for Place-Based Mitigation and a plan for developing and implementing that mitigation for environmental justice communities where traffic diversions would cause increases in truck traffic.

Under the Phase-In Approach, the March 2024 toll structure would fully come into effect in 2031. During Phases 1 and 2, the structure of tolls would be the same, but the cost of tolls would be lower (although still within the range of scenarios analyzed in the Final EA). While some effects of the interim phases would be reduced as compared to Phase 3 due to lower tolls, the mitigation set forth in the EA and the June 2024 re-evaluation would be implemented as previously contemplated – and would not be deferred until Phase 3. *See* **Table 2.2 from Re-Evaluation #2**

The analysis of various tolling scenarios in the Final EA and Re-Evaluation #1 indicates that while the effects of the CBD Tolling Program may have minor variations from those modeled in the Final EA during the Phase-in, effects would fall within the range studied in the Final EA and Re-Evaluation #1 because the Phase 1 and 2 peak tolling rates would fall within the ranges studied in the Final EA (and therefore traffic effects and downstream air quality and environmental justice effects would similarly fall within those ranges). By Phase 3, the effects would be those in Re-Evaluation #1. Moreover, the traffic and air quality monitoring commitments set forth in the EA and FONSI would be implemented throughout the Phase-in along as part of the adaptive management approach committed to by FHWA and the Project Sponsors.

In conclusion, the mitigation measures identified in the Final EA and the FONSI still apply and will ensure that the Phase-In Approach, like the March 2024 Adopted Toll Structure, does not result in significant effects. Thus, the Phase-in Approach is consistent with the worst-case scenario modeling in the Final EA.

FHWA-0000024

# Signature Page

Dated: January 17, 2025

RICHARD
JOSEPH
MARQUIS

Digitally signed by
RICHARD JOSEPH
MARQUIS
Date: 2025.01.17
12:32:56 -05'00'

Richard J. Marquis
New York Division Administrator

FHWA-0000025