# EXHIBIT A
## Proposed Supplemental Complaint

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STATE OF NEW JERSEY, | Civil Case No. 2:23-cv-03885 |
| Plaintiff, | |
| v. | **[PROPOSED] SUPPLEMENTAL COMPLAINT** |
| UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, KRISTEN WHITE, in her official capacity as Acting Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration, | |
| Defendants. | |
| and | |
| METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, | |
| Defendant-Intervenors. | |

Plaintiff State of New Jersey, by and through its undersigned counsel, hereby files this Complaint against the United States Department of Transportation ("USDOT"), the Federal Highway Administration ("FHWA"), Kristen White, in her official capacity as Acting Administrator of the FHWA, and Richard J. Marquis, in his official capacity as Division Administrator of the New York Division of the FHWA.

## I.    <u>NATURE OF THE CASE</u>

1.      This case challenges the FHWA's decision to rubber-stamp the environmental review phase of New York's Central Business District Tolling Program (the "proposed action" or the "congestion pricing scheme") based on the FHWA's inexplicable "finding" that the "Proposed Action . . . will have no significant impact on the human or natural environment." Crucially, the FHWA reached this decision before the Metropolitan Transportation Authority ("MTA") had even adopted a tolling scheme.  Then, when the MTA did adopt a tolling scheme that fundamentally differed from the tolling schemes assessed by the FHWA, the agency rubber-stamped that decision in an inadequate re-evaluation ("Re-Evaluation 1").  When the MTA again changed plans (after pausing the scheme) and adopted a never-before-considered phased-in tolling scheme, the FHWA again greenlit the program without meaningful further analysis in a second barebones re-evaluation ("Re-Evaluation 2").  These misguided decisions violate the requirements of the National Environmental Policy Act ("NEPA") that a federal agency must conduct a comprehensive review and prepare a complete environmental impact statement ("EIS") whenever a proposed action is of such consequence, as here, that it will "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Nothing in this bedrock federal environmental law allows the FHWA to turn a blind eye to the significant environmental impacts that congestion pricing in the Manhattan Central Business District ("Manhattan CBD") will have on New Jersey, favoring New York at the expense of its neighbors. New Jersey Governor Phil Murphy put it best: "We can't fix a broken MTA in New York City on the back of New Jersey commuters . . . . It's a huge tax on them, and frankly, it challenges our

environment because of all the re-routing of traffic that will take place."[1]  That the FHWA ignored the elephant in the room—namely, the fact that this congestion pricing scheme will necessarily have a significant environmental impact, as it is intended to do, by changing commuting patterns in and around New York City—only reinforces that this federal agency has abrogated its legal responsibility to do a comprehensive environmental review.  Federal law requires it.

2.     The FHWA's decision that a full EIS was unnecessary was not the product of a reasoned and comprehensive fact-based environmental review, as required by NEPA and the Administrative Procedure Act ("APA").  Rather, this federal agency worked backwards to achieve a predetermined outcome, issuing a "Finding of No Significant Impact" ("FONSI")— and two re-evaluations after the MTA repeatedly modified the congestion pricing scheme—that disregarded the significant impacts to New Jersey's environment.  But the impacts do not stop at state borders—they extend, most notably, to northern New Jersey, where many communities are already overburdened with pollution and its adverse health effects.  For example, the FHWA itself found that, as a result of this scheme, Bergen County will experience increased air pollutants—including increases in known carcinogens—through at least 2045.  In addition, the FHWA knew that several communities with environmental justice concerns in Bergen County already rank above the 95th percentile in air toxins cancer risk, among other public health indicators.  DOT_0007924.  Yet the FHWA determined that the probable impacts on Bergen County and its residents (and those of other areas in northern New Jersey) did not warrant commitment to enforceable mitigation measures in the Final Environmental Assessment ("Final

---

[1]    Jordan Fitzgerald, *New Jersey 'Lawyering Up' Over Congestion Tax, Murphy Says*, Bloomberg (July 5, 2023), https://www.bloomberg.com/news/articles/2023-07-05/new-jersey-lawyering-up-over-nyc-congestion-tax-murphy-says.

EA") and FONSI.  When the FHWA eventually did commit mitigation funds to *one* community in Bergen County, it allocated only $1.4 million.  *See* DOT_0045609.  That is less than 2% of the mitigation funding allocated to Bronx County ($71.7 million)—even though the Final EA determined that daily traffic increases in Bergen County would be *two to four* times greater than in the Bronx.  *See id.*; DOT_0045462.  There is no excuse for the FHWA's fundamentally flawed and improperly truncated decision-making process that failed to consider critical issues requiring a full environmental review.

3.     Indeed, the FHWA not only failed to adequately consider the environment impacts on New Jersey; it also ignored the significant financial burden being placed on New Jerseyans and New Jersey's transportation system as a result of this congestion pricing scheme.  A goal of congestion pricing, as articulated in the New York legislation authorizing it—the MTA Reform and Traffic Mobility Act—is to, "at minimum, ensure annual revenues and fees collected" of "*fifteen billion dollars* for . . . the 2020 to 2024 MTA capital program."  N.Y. Veh. & Traf. Law § 1704-a(1) (emphasis added).[2]  In connection with this extraordinary and unprecedented

---

[2]     At the time New Jersey filed its original complaint, the MTA was reportedly in debt to the tune of $48 billion—notwithstanding the fact that it received $15 billion in federal COVID-19 pandemic funds over the past three years.  Stephen Nessen & Clayton Guse, *A $48 Billion Debt is Crushing the MTA. Paying it Off Could Disrupt the Future of NYC Transit*, Gothamist (June 21, 2023), https://gothamist.com/news/a-48-billion-debt-is-crushing-the-mta-paying-it-off-could-disrupt-the-future-of-nyc-transit; N.Y. State, *Statement from Governor Kathy Hochul on the MTA Receiving 769 Million in Additional COVID Relief Funding from the Federal Transit Administration (2022)*, https://www.governor.ny.gov/news/statement-governor-kathy-hochul-mta-receiving-769-million-additional-covid-relief-funding.  Indeed, in pursuit of even more money, on Wednesday July 19, 2023, the MTA raised its base fare from $2.75 to $2.90 and voted to increase fares on bridges and tunnels by 6% for those with an E-ZPass and 10% for those who pay by mail.  *See* Ana Ley, *Price of N.Y.C. Subway Ride Will Go Up for the First Time in Years*, N.Y. Times (July 19, 2023), https://www.nytimes.com/2023/07/19/nyregion/mta-subway-fare-hikes.html. *See infra* IV.F.  In December 2024, the MTA approved a budget plan that would increase its base fare to $3.  *See* Nicole Rosenthal, Haley Brown, and Craig McCarthy, *MTA plans fare hike as it OKs $1.27B train car purchase weeks before new congestion toll: 'Keep the grift alive'*, N.Y. Post (Dec. 18, 2024), https://nypost.com/2024/12/18/us-news/mta-plans-fare-hike-as-it-oks-1-27b-train-car-purchase-weeks-before-new-congestion-toll-keep-the-grift-alive/.

revenue stream, the MTA has agreed to allocate 10% to Long Island Rail Road and 10% to Metro-North Railroad[3]—but ***nothing*** to New Jersey's transit agencies, even though more than 400,000 New Jersey residents commute into Manhattan every day and will pay millions of dollars to the MTA under this congestion pricing scheme. But the costs to New Jersey will be more than just financial: diverting traffic from one place means it will increase traffic elsewhere, with all the concomitant environmental and public health impacts. The end result is that New Jersey will bear much of the burden of this congestion pricing scheme—in terms of environmental, financial, and human impacts—but receive virtually none of its benefits.

4.      For the past two decades, New York has sought to implement congestion pricing—a plan to impose fees on certain vehicles that drive into a designated area in Manhattan. In general, congestion pricing serves multiple purposes, including raising revenue—in this case, $15 billion for the MTA—and attempting to limit traffic in the Manhattan CBD. The FHWA acknowledges that diversion of traffic that would otherwise go below 60th Street to bordering neighborhoods will have impacts on air quality in those neighborhoods, so the MTA committed to fund mitigation efforts in New York communities to the tune of $90.1 million. DOT_0045609. But not so for New Jersey. In no scenario evaluated by the Final EA would New Jerseyans or New Jersey's transit system get any funds from this initiative's enormous revenue stream or any commitment to mitigation measures to address environmental impacts— notwithstanding the FHWA's acknowledgment that there will be serious environmental impacts on New Jersey. Then, in its Re-Evaluation 1, the FHWA committed just $9.8 million in place-

---

[3]   *Why New York City Needs Central Business District Tolling*, MTA, https://new.mta.info/project/CBDTP/why-NYC-needs-central-business-district-tolling (last visited July 20, 2023).

based mitigation to New Jersey, and limited that funding to mitigate impacts in only four communities.

5.      New York has always recognized that there would be environmental impacts associated with congestion pricing.  In fact, in 2018, a New York Governor-appointed advisory panel tasked with making recommendations to reduce congestion in Manhattan found that implementing a new pricing scheme, such as this one, would require a full EIS.[4]  However, in connection with this congestion pricing scheme, a senior MTA official attempted to minimize NEPA's requirements and claimed the FHWA was "us[ing] a routine environmental review process to hold this environmentally beneficial project up."[5]  Not so.  The FHWA routinely prepares full EISs, pursuant to NEPA, regarding projects within its purview—including, for example, four related to tolling between 2021 and the date New Jersey initiated this action[6]—and nine EISs in 2022 alone.[7]  The decision to forego an EIS for a proposed action that will affect hundreds of thousands of vehicles driving in and out of states in the New York metropolitan area on a daily basis stands in stark contrast to the FHWA's previous decisions to conduct an EIS for far less significant proposals, such as the addition of a 4.3-mile vehicular travel lane near JFK Airport in 2019.[8]

---

[4]    Fix NYC Report, HNTB (Jan. 19, 2023), https://www.hntb.com/fix-nyc-report/.

[5]    James Nani, *NYC Congestion Pricing May Be Delayed Until 2023, MTA Says*, Law360 (Dec. 1, 2020, 4:46 PM EST), https://www.law360.com/tax-authority/articles/1333308/.

[6]    For purposes of this complaint only, New Jersey refers to this as a "tolling" program because that is the term used in the FHWA's Final Environmental Assessment and "Finding of No Significant Impact."  But in reality, this is an improper tax on New Jerseyans.

[7]    EPA, *NEPA: Environmental Impact Statement (EIS) Database*, https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/search/ (last visited July 18, 2023).  Data was filtered by Agency ("FHWA"), Federal Registration Publication Date (from January 1, 2021 to July 21, 2023).  Repeating EIS records and supplements were discarded from this count, as well as any projects on which the FHWA has consulted but did not serve as the lead agency.

[8]    Fed. Highway Admin., Final Environmental Impact Statement, Van Wyck Expressway Capacity and Access Improvements to JFK Airport Project (Aug. 2019), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=279281 (last visited 07/18/2023).

6.      This congestion pricing scheme advanced in February 2021 when an FHWA representative confirmed the agency was "making New York's congestion pricing plan a priority." [9]  In March 2021, Janno Lieber, now the MTA's Chair/CEO, confirmed the FHWA "***will be fast tracking*** the MTA's environmental process, which will certainly get the MTA moving forward towards being able to realize this source of funds."[10]  In other words, the FHWA expressed its willingness to bypass a full environmental review, which would have taken more time and required significant agency resources.  The FHWA continued to take shortcuts when it prepared the Re-Evaluations.  Indeed, Re-Evaluation 2—which is the only agency document prepared in relation to the adopted tolling scheme currently being implemented—is a ten-page document prepared by the Triborough Bridge and Tunnel Authority ("TBTA"), the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") over just five days.  *See infra* at ¶¶ 141–42.  In preparing the Re-Evaluations, the FHWA also bypassed the public notice and comment period that rests at the heart of NEPA.  The public received no opportunity to comment on the FHWA's purported "analysis" of the adopted tolling scheme in the Re-Evaluations, since that scheme was never analyzed in the Final EA and FONSI, and FHWA conducted the Re-Evaluations in secret communication with the Project Sponsors with no opportunity for public notice and comment.

---

[9]     James Nani, *NY Congestion Pricing to Get Early Fed. Priority, FHWA Says*, Law360 (Feb. 12, 2021, 17:27) https://www.law360.com/tax-authority/articles/1354725/ny-congestion-pricing-to-get-early-fed-priority-fhwa-says?ref=bklyner.com (emphasis added).

[10]    MTA Board Meeting on March 17, 2021 Minutes, *in* MTA Board Action Items 15 (Mar. 2021), https://new.mta.info/document/33901; Erik Bascome, *NYC Congestion Pricing May Be Pushed Forward Under Biden*, Silive (Feb. 26, 2021, 1:09 PM), https://www.silive.com/news/2021/02/nyc-congestion-pricing-may-be-pushed-forward-under-biden.html.

7.     The irony here is that NEPA was enacted to address the impacts of large-scale federal highways, such as the Cross Bronx Expressway, that could harm the environment and adversely affect local communities.  As a result, NEPA obligates federal agencies, including the FHWA, to take a "hard look" at the environmental impacts of proposed actions, including from a socioeconomic and environmental justice perspective.  Yet that did not occur here, even given the stakes of a proposed action that sought to divert hundreds of thousands of vehicles that would otherwise drive in affluent parts of Manhattan towards other neighborhoods in New York City and New Jersey, including disadvantaged and already overburdened communities.

8.     NEPA also requires federal agencies to consult meaningfully with the public and affected stakeholders throughout its environmental review.  That did not happen here.  And a key stakeholder, New Jersey, was effectively cut out of the process.

9.     Under the proposed action, there will be dramatic shifts in traffic patterns affecting hundreds of thousands of vehicles, as well as mass transit, throughout New Jersey.  It is undeniable that the proposed action will cause significant environmental impacts on the region and beyond.  Indeed, this Court has already recognized that there are "areas in New Jersey entitled to mitigation" because significant impacts "may result" from the congestion pricing scheme.  ECF No. 191 at 50, 53. Yet the Final EA and FONSI "provide[] no insight as to why areas in New Jersey with similarly high pre-existing burdens [as the Bronx] did not receive place-based mitigation commitments" and do not provide a justification for the "apparent disparate treatment" that was afforded to the Bronx as compared to New Jersey.  *Id.* at 50–53. Those deficiencies were never corrected in the FHWA's Re-Evaluations, which arbitrarily apportioned *de minimis* mitigation funding to only four New Jersey communities based on a pre-determined $100 million cap on place-based mitigation set forth in the Final EA—before the

FHWA determined which mitigation measures were necessary to alleviate all significant impacts due to congestion pricing to any communities so adversely affected. The FHWA distributed that arbitrarily-capped pool of funds based on the share of population in each community, rather than the severity of the impacts and the measures necessary to mitigate those impacts at whatever the cost. *See infra* at ¶ 211. That decision improperly divorces the significance of the impacts (and the measures necessary to mitigate them at whatever the cost) from the capped amount made available for mitigation (without any explanation of the reasonableness of that amount to mitigate the significant impacts identified and the specific, enforceable means by which those impacts will be mitigated). As a result, the Final EA, FONSI, and Re-Evaluations cannot stand under NEPA.

10.      Furthermore, although the FHWA acknowledged this is the "first proposal in the nation to manage congestion through cordon pricing," the Final EA glossed over the fact that many of the proposed action's core features were—at the time the Final EA was prepared— undecided, unknown, and yet to be finalized. *See* DOT_0000361–401. In fact, the MTA presented *seven* different possible scenarios for its congestion pricing plan to the FHWA, and the FHWA left open the possibility of an undefined and undecided eighth scenario. Rather than requiring the MTA to choose one scenario for its analysis, the FHWA issued a "Finding of No Significant Impact" for any of these many scenarios to proceed, regardless of the differing environmental impacts. Then, the MTA did exactly what New Jersey warned of all along: It adopted a phased-in tolling scheme that was never assessed by the FHWA in the Final EA and FONSI or in Re-Evaluation 1.

11.      But NEPA requires federal agencies to evaluate all of the proposed action's environmental impacts, whether direct or indirect, and whether cumulative or singular. And no

matter how great the perceived benefits, NEPA does not allow an agency to issue a "finding of no significant impact" if adverse impacts remain unmitigated.  Moreover, the FHWA must consider comments and concerns raised by the public, including, specifically, state and local government entities.  But New Jersey was never adequately consulted.  *See infra* IV.L.i–ii.

12.    Moreover, the tolling scheme ultimately adopted by the MTA unequivocally undermines the FHWA's alternatives analysis.  The FHWA and the MTA dismissed all other alternative actions that would have decreased congestion in the CBD primarily because they would not have met the MTA's $1 billion yearly revenue goal, which is to be bonded or invested to generate $15 billion for MTA capital projects  DOT_0045449.  But that requirement didn't stop the FHWA from ultimately approving a tolling scheme that would generate hundreds of millions of dollars less annually.  Indeed, in Re-Evaluation 2, the FHWA determined that Phase 1 of the revised tolling scheme, which sets forth a $9 peak tolling rate for passenger vehicles, would generate only $0.5 billion per year—half of the requirement originally set forth in the Final EA—and Phase 2, which sets forth a $12 peak tolling rate for passenger vehicles, would generate only $0.7 billion per year.  DOT_0047555.  Without explanation or review, the FHWA rubber-stamped a tolling scheme that did not meet the revenue requirement, while maintaining that it could dismiss any other alternative for failing to meet that same requirement.

13.    The FHWA's actions here also fall short of President Biden's two executive orders mandating that agencies "make achieving environmental justice part of [their] mission[s]." Exec. Order No. 12,898, 59 Fed. Reg. 7,629, 7,629 (Feb. 11, 1994); Exec. Order No. 14,008, 86 Fed. Reg. 7,619, 7,629 (Jan. 27, 2021).  In direct contravention of those directives, and despite New Jersey officials having repeatedly raised these significant environmental justice concerns, the Final EA included only a passing reference to adverse impacts on numerous communities

with environmental justice concerns in New Jersey. Indeed, if there had been more meaningful engagement with New Jersey, the FHWA would have reviewed New Jersey's more detailed environmental justice community definition and could have identified appropriate place-based mitigation measures to implement. This disregard for New Jersey's expertise, including specific data and mapping tools, contributed to the FHWA's failure to commit to mitigation measures that would offset the significant impacts of the congestion pricing scheme that will be felt in New Jersey.

14.     As a threshold matter, the FHWA abrogated its responsibility under NEPA by failing to engage New Jersey and its agencies as interested stakeholders entitled to "early coordination" and "consultation," as required by 23 C.F.R. § 771.119(b).

15.     The FHWA's determination in its Final EA and FONSI that this proposed action presents no significant impacts requiring a full EIS is arbitrary, capricious, unlawful, and violates NEPA for at least four separate and independent reasons.

16.     *First*, the FHWA failed to meaningfully consider, propose, and commit to mitigate the increased air and noise pollution resulting from shifting traffic patterns, even though the FHWA admits the proposed action will cause these impacts throughout New Jersey. In doing so, the FHWA ignored its express finding that, for example, in Bergen County, there will be increases in every category of pollutant, including daily vehicle-miles traveled, volatile organic compounds, nitrogen oxides, carbon monoxide and carbon dioxide equivalents. *See* DOT_0036840–41.

17.     *Second*, the FHWA ignored the proposed action's admitted adverse impacts on New Jersey's communities with environmental justice concerns that have some of the highest preexisting pollution and chronic disease burdens. Moreover, the place-based mitigation

11

measures adopted in the Final EA would only mitigate impacts in New York, and there is no indication that there will be any investment of funds for mitigation measures across the region, including in New Jersey.

18.     *Third*, although the FHWA identified and, indeed, recommends a range of options to address traffic congestion, including parking pricing, priced vehicle sharing and dynamic ridesharing, pay-as-you-drive fees, and high-occupancy toll lanes, the FHWA arbitrarily and capriciously failed to consider any option other than the MTA's congestion pricing scheme and a "no action" alternative.  Any reasonable environmental review of the options available to address traffic congestion in Manhattan would have considered these other alternatives.

19.     *Fourth*, the FHWA failed to take a hard look at each of the seven "tolling scenarios" envisioned by the MTA—all of which involve vastly different toll fees, hours, and exemptions—and failed to conduct a sufficient analysis on the differing ranges and severity of regional and localized environmental impacts that each of these seven scenarios will generate.

20.     The FHWA further violated NEPA and the APA when it issued its re-evaluations of the congestion pricing scheme.  Despite getting four bites at the apple—in the Final EA, Re-Evaluation 1, Re-Evaluation 2, and the Supplemental Memorandum—FHWA has failed to adequately analyze—and, indeed, it has never actually analyzed—the tolling scheme that the MTA actually adopted and has now begun to implement and the impacts of that tolling scheme.[11] The FHWA has also failed to commit to sufficient mitigation measures to offset the significant impacts that will result from the congestion pricing scheme in New Jersey, and never adequately explained why New Jersey communities will receive disparate treatment compared to their New

---

[11] Although New Jersey does not directly challenge the Supplemental Memorandum because FHWA claims "[i]t does not represent a formal re-evaluation or National Environmental Policy Act (NEPA) review under 23 CFR 771," FHWA-0000002, it provides further evidence that the agency's Final EA, FONSI, and Re-Evaluations are fundamentally flawed.

York counterparts.  In doing so, the FHWA affirmed its decision to issue a mitigated FONSI

despite not knowing the precise impacts that would ensue from this congestion pricing scheme or

ensuring those impacts would be mitigated.  But in each of these evaluations and re-evaluations

the FHWA unilaterally shirked its duty to either issue a mitigated FONSI that requires specific,

enforceable, and fully-funded mitigation measures that will mitigate all significant adverse

environmental impacts, or else prepare a full EIS, neither of which it did here.  The Re-

Evaluations also confirmed that the adopted tolling scheme will not comply with one of the key

project objectives set forth in the Final EA—the requirement to raise sufficient net revenues to

generate $15 billion for MTA capital projects—even though the FHWA dismissed many other

alternatives because they supposedly would not comply with this objective.  At minimum, these

deficiencies necessitated a comprehensive reassessment of the tolling scheme through a

supplemental EA or EIS.

21.    In addition, the FHWA violated the requirements of the Clean Air Act ("CAA")

and its implementing regulations by failing to provide a "reasonable opportunity for

consultation" and undertake a transportation conformity analysis to ensure the tolling scheme is

consistent with air quality goals, including those in New Jersey.  *See* 40 C.F.R. § 93.105(a)(2).

22.    Accordingly, New Jersey asks this Court to: (1) issue preliminary and permanent

injunctions vacating and setting aside Defendants' FONSI, Final EA, Re-Evaluation 1, and

Re-Evaluation 2, and compelling Defendants to complete a full and proper EIS for the

Manhattan CBD, or in the alternative, a supplemental NEPA review (i.e., a supplemental EIS, or

at the very minimum, a supplemental EA to determine, among other issues, whether there are

significant impacts, the sufficiency of the mitigation, and whether additional environmental

analysis should be undertaken); (2) issue preliminary and permanent injunctions vacating and

setting aside the Value Pricing Pilot ("VPPP") agreement until Defendants complete a full and proper EIS for the Manhattan CBD, or in the alternative, a supplemental NEPA review (i.e., a supplemental EIS, or at the very minimum, a supplemental EA to determine, among other issues, whether there are significant impacts, the sufficiency of the mitigation, and whether additional environmental analysis should be undertaken); (3) declare that the FHWA's failure to prepare an EIS for the Manhattan CBD congestion pricing scheme, or to adequately explain why an EIS is unnecessary, violates NEPA, its implementing regulations, and the APA; (4) issue preliminary and permanent injunctions vacating and setting aside Defendants' FONSI, Final EA, Re-Evaluation 1, and Re-Evaluation 2, until a proper transportation conformity analysis under the CAA is completed in New Jersey; (5) declare that Defendants violated the CAA and APA, and that the transportation conformity determination for congestion pricing in the Manhattan CBD was incomplete and provided no lawful basis for granting any approval; (6) declare that Defendants' actions, including their FONSI, Final EA, Re-Evaluation 1, and Re-Evaluation 2 are invalid as a matter of law; (7) order the FHWA to prepare a full and proper EIS for the Manhattan CBD Tolling Program; and (8) order the FHWA to conduct the transportation conformity analysis as required by the CAA.

## II.    JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit presents a federal question under the laws of the United States, including NEPA, the APA, and the CAA.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1346 because the United States is a defendant.

24.     New Jersey has performed any and all conditions precedent to filing this action and has exhausted all administrative remedies available to it to the extent required by law, and the violations of law claimed below are ripe for judicial review.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B), because a substantial part of the events or omissions giving rise to New Jersey's claims occurred in this District.  Additionally, venue is proper under 28 U.S.C. § 1391(e)(1)(C), because no real property is involved in the action and New Jersey resides within this District.

26.     A substantial part of the events or omissions which give rise to the claims herein occurred in New Jersey: the congestion pricing scheme will directly impact New Jersey, including multiple routes that connect New Jersey to New York City such as the George Washington Bridge, Lincoln Tunnel, and Holland Tunnel.  These routes are located in Bergen County and Hudson County, New Jersey.  Also, the Goethals Bridge and the Outerbridge Crossing in Union County—which connect New Jersey to Staten Island, New York—are likely to see an increase in traffic by vehicles avoiding the Manhattan CBD.  Thus, many of the adverse impacts of Defendants' violations of the law, including environmental impacts as alleged herein, will occur in these counties.  Indeed, half of the counties in the Final EA study area are located in New Jersey, and they are home to more than seven million residents.  DOT_0040844. Assignment to the Newark Vicinage of this Court—the nearest federal courthouse in this District to these routes—is proper under the Local Civil and Criminal Rules of the United States District Court for the District of New Jersey, Rule 40.1(a).

### III.     PARTIES

27.     Plaintiff State of New Jersey is one of the United States of America and is responsible for managing and protecting, among other things, its environment, economy, transit

system, highways, and the health and welfare of its residents.  New Jersey is located immediately

adjacent to the Manhattan CBD and therefore bears a significant interest in the congestion

pricing scheme.  Two of the four major vehicular routes used to enter and exit the Manhattan

CBD (south of 60th Street) are directly connected to New Jersey—the Lincoln Tunnel and

Holland Tunnel.  In addition, a third route connecting New Jersey with New York City—the

George Washington Bridge—is located north of the Manhattan CBD and will likely experience

increased traffic as drivers circumvent the Manhattan CBD.  These routes are used every day by

hundreds of thousands of New Jerseyans and New Jersey's transportation authorities.  Also, the

Goethals Bridge and the Outerbridge Crossing—which connect New Jersey to Staten Island,

New York—are likely to see an increase in traffic by vehicles avoiding the Manhattan CBD, and

traffic backups will expand through Newark, Union County, and Essex County, New Jersey.

New Jersey has a sovereign interest in and authority over all of the New Jersey territory that will

be impacted by the congestion pricing scheme.  New Jersey also has a proprietary interest in the

environment and health of the state, as well as a well-founded desire to preserve its territory.  For

this reason, New Jersey has serious concerns regarding the congestion pricing scheme's impacts

on the State air quality, noise pollution, health of its residents, and traffic congestion, among

other harms.  These harms will be directly felt by New Jersey, its residents, communities

(including the most disadvantaged ones), businesses, commuters, and its transportation agencies,

including the New Jersey Turnpike Authority ("NJTA"), which operates toll roads taken by New

Jersey commuters traveling to the Manhattan CBD, and New Jersey Transit ("NJTRANSIT"),

which operates New Jersey's public transportation system.[12]

---

[12]   NJTA and NJTRANSIT are State-created corporations.  Each is an "instrumentality of the State" of
New Jersey that exercises "public and essential government functions."  N.J. Stat. Ann. §§ 27:23-
3(A); 27:25-4(a).  The entities are also subject to New Jersey's supervision and control in three key

28.     Defendant USDOT is the executive department of the federal government responsible for oversight of the transportation planning process, including implementing the requirements of NEPA, and ensuring the conformity of federally developed, funded, or approved transportation projects.

29.     Defendant FHWA is a federal agency within the USDOT that supports state and local governments in the design, construction, and maintenance of the Nation's highway system, including by providing financial and technical assistance.  The FHWA is responsible for ensuring that America's roads and highways are among the safest and most technologically sound in the world.  Among its management responsibilities, the FHWA must ensure that the activities it authorizes comply with governing federal environmental statutes, including NEPA.  The FHWA authorizes States to toll on federal roads and highways under the VPPP.  23 U.S.C. § 129.  The FHWA issued the Final EA and FONSI for the congestion pricing scheme and must approve it under the VPPP; it was therefore required to perform a NEPA review pursuant to its regulations. *See* 23 C.F.R. Part 771.

30.     Defendant Kristin White is the Acting Administrator of the FHWA, a federal agency within the USDOT that has authorized the congestion pricing scheme challenged in this case.  Her predecessor, Shailen Bhatt, was responsible for the Final EA and FONSI.  She is named herein and at all times mentioned herein in her official capacity.

---

respects.  First, NJTA and NJTRANSIT are governed by boards that are appointed by the Governor of New Jersey, and the members can be removed from office by the Governor for cause. *Id.* §§ 27:23-3(B); 27.25-4(b) (noting public hearing also required for removal from NJTA).  Second, the Governor has the authority to veto decisions and overturn an action by either board. *Id.* §§ 27:23-3(F); 27.25-4(f).  Third, the agencies are subject to significant state reporting requirements, including the obligation to provide an annual financial report and budget requests to the Governor. *Id.* §§ 27:23-3(f); 27:23-3.2; 27:25-4(f); 27:25-20(a).  NJTA contributes to the New Jersey Transportation Trust Fund, which is used to pay for the development of State transportation projects.  New Jersey Turnpike Authority, 2023 Annual Budget Book, https://www.njta.com/media/7117/njta-2023-budget-book.pdf.

31.     Defendant Richard J. Marquis is the Division Administrator for the New York

Division of the FHWA.  In his official capacity, Marquis is also responsible for the Final EA and

FONSI at issue and is a signatory to each document.  Defendants FHWA, Acting Administrator

White, and Division Administrator Marquis are referred to collectively in this complaint as the

FHWA.

## IV.     FACTUAL BACKGROUND

### A.     In 1970, Congress Enacted NEPA in Response to Concerns About the Impact of Large-Scale Highway Projects on Local Communities.

32.     In the decades preceding NEPA's enactment, the federal government pursued

extensive development projects at the expense of local communities.  Rapid highway

construction, in particular, brought about devastating impacts on the environment, historic sites,

and the health and well-being of vulnerable populations.  Indeed, in the late 1940s and early

1950s, much of the public in New York watched in horror as the Cross Bronx Expressway

bulldozed through the Bronx neighborhood of East Tremont, displacing local communities, and

instigating large-scale environmental impacts that continue to affect local residents.  As the

federal government accelerated its efforts, a national anti-freeway movement emerged.  By the

1960s, the so-called "freeway revolts" gained widespread attention from the public and

government alike.

33.     In 1970, Congress passed NEPA in response to "[t]he public's growing concern"

about the environmental impact of "federally sponsored or aided construction activities such as

highways."  S. Rep. No. 91-296, at 8 (1969).  By its plain terms, NEPA was enacted "to promote

efforts which will prevent or eliminate damage to the environment" and to "stimulate the health

and welfare of man."  28 U.S.C. § 4321.  In recognition of the "profound influences of

population growth, high-density urbanization," and other activity affecting the "environmental

quality" of human health and welfare, NEPA requires the federal government to "use *all practicable means* . . . to improve and coordinate Federal plans, programs, and resources" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings."  28 U.S.C. § 4331 (emphasis added).

34.    To that end, NEPA is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1(a). NEPA fulfills this purpose by: (1) requiring agencies to take a hard look at the environmental impacts of an action before it occurs; and (2) providing the public with a "role in both the decision-making process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

35.    Today, a wide range of decisions made by scores of federal agencies, including transportation agencies such as the FHWA, are subject to NEPA's procedures.

**B.    NEPA Requires Federal Agencies to Determine Whether Each Individual Proposed Action Would "Significantly Affect[] the Quality of the Human Environment," And, if it Does, They Must Prepare a Full "Environmental Impact Statement."**

36.    Under NEPA, the lead agency funding, authorizing, or implementing a proposed action must conduct and prepare an Environmental Assessment ("EA") analyzing the proposed action's direct, indirect, and cumulative impacts to determine whether or not the action would "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The EA is prepared by a federal agency to aid an agency's compliance with NEPA and support its determination of whether to prepare an EIS or a FONSI.  40 C.F.R. § 1501.4.

37.    NEPA requires a thorough evaluation of direct, indirect, cumulative, and potential adverse effects when a federal agency considers a proposed action.  Specifically, it requires the agency to assess four types of "[e]ffects or impacts . . . to the human environment from the

proposed action . . . that are reasonably foreseeable." 40 C.F.R. § 1508.1(g). *First*, agencies

must consider an action's "[d]irect effects," which are "caused by the action and occur at the

same time and place." *Id.* § 1508.1(g)(1). *Second*, they must consider "indirect effects," which

may be "later in time or farther removed in distance, but are still reasonably foreseeable." *Id.*

§ 1508.1(g)(2). "Indirect effects may include . . . related effects on air and water and other

natural systems." *Id. Third*, they must consider an action's "cumulative effects," which "result

from the incremental effects of the action when added to the effects of other past, present, and

reasonably foreseeable actions," regardless of who undertakes those actions. *Id.* § 1508.1(g)(3).

Notably, cumulative effects "can result from individually minor but collectively significant

actions taking place over a period of time." *Id. Fourth*, and in line with this broad mandate,

agencies must assess an action's potential "effects on natural resources and on the components,

structures and functioning of affected ecosystems," as well as any "aesthetic, historic, cultural,

economic, social, or health" impacts. *Id.* § 1508.1(g)(4).

38.     There are two potential outcomes of an EA. If the lead agency finds that the

action *will* significantly affect the quality of the human environment, the agency must prepare a

detailed EIS. 40 C.F.R. § 1501.5(c)(1); 23 C.F.R. § 771.119(i). An EIS requires a detailed and

rigorous assessment of the proposed action and imposes more stringent requirements on the

public consultation process. Pursuant to the FHWA regulations, an EIS must provide a full and

fair discussion of significant environmental impacts, inform decisionmakers and the public of

reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of

the human environment, assess all reasonable alternatives that are consistent with the identified

purpose and need, and evaluate a no-action alternative and all reasonably available measures to

mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14(a), 1502.14(c).

If the lead agency finds, in the alternative, that the proposed action will have *no* significant impact on the environment, it may issue a Finding of No Significant Impact, or a "FONSI." *Id.* § 1501.6.

39.     NEPA's implementing regulations, including the FHWA's NEPA regulations, require the agency "to the extent practicable" to consult "State . . . and local governments" throughout the entire process. *See id.* at §§ 1501.5(a), (e); 23 C.F.R. § 771.111(e).

40.     Over the past ten years, the FHWA has determined that over 110 projects in its purview required a full EIS pursuant to NEPA,[13] and at least 20 FHWA-approved projects since January 1, 2020 have required full EISs.[14]  Preparing an EIS takes time; on average, the FHWA takes about three and a half years to complete an EIS.[15]

41.     Indeed, at least four FHWA-approved projects in the last ten years involving tolling schemes have required an EIS.  To name a few: the Chesapeake Bay Crossing Study[16] sought to decrease congestion at the Bay Bridge in Maryland by building a new corridor and changing tolling facilities to all-electronic tolling; the Hood River-White Salmon Interstate

---

[13]   United States Environmental Protection Agency, *NEPA: Environmental Impact Statement (EIS) Database*, *supra* note 8.  Data were filtered by Agency ("FHWA") and Federal Registration Publication Date ("From January 1, 2013, To July 12, 2023").  Repeating EIS records and supplements were discarded from the count, as well as any projects that consulted the FHWA but did not list the FHWA as the head agency.

[14]   *Id.*  Data were filtered by Agency ("FHWA") and Federal Registration Publication Date ("From January 1, 2020, To July 12, 2023").  Repeating EIS records and supplements were discarded from our count, as well as any projects that consulted the FHWA but did not list the FHWA as the head agency.

[15]   Fed. Highway Admin., Environmental Review Toolkit, https://www.environment.fhwa.dot.gov/nepa/timeliness_of_nepa.aspx (last visited July 13, 2023).

[16]   Fed. Highway Admin., Final Environmental Impact Statement, Chesapeake Bay Crossing Study: Tier 1 NEPA (Mar. 2022), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=323312 (last visited July 20, 2023).

Bridge Replacement Project[17] involved changing tolling facilities to all-electronic tolling at the

Oregon-Washington border, and required an EIS; the Lafayette Regional Xpressway[18] project in

Baton Rouge, Louisiana proposed the building of a new connector and tolling alternatives were

considered in the EIS; and the I-495 and I-270 Managed Lanes Study[19] in Maryland proposed

replacing an existing bridge and implementing two high-occupancy toll lanes in an effort to

decrease congestion.  In fact, projects implementing or changing tolling often trigger the need for

an EIS even if the project was retaining existing tolls but making them all-electronic.  Thus,

merely changing the tolling procedure—not instituting a whole new tolling scheme—warranted

an EIS in each of those situations.

  42. The FHWA has also determined a full EIS was required for at least eight projects

in New York State in the past ten years.[20]  For example, in 2014, the FHWA required an EIS to

assess a project that would modify the I-87 Exit 4 area in the Town of Colonie, New York by

constructing new exit ramps, an intersection and bridge, and widening surrounding

pavement.[21]  It also required EISs for a proposal to re-route existing I-81 to connect with existing

---

[17] Fed. Highway Admin., Supplemental Draft Environmental Impact Statement, Hood River – White Salmon Interstate Bridge Replacement Project (Nov. 2020), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=314171 (last visited July 20, 2023).

[18] Fed. Highway Admin., Final Environmental Impact Statement, Lafayette Regional Xpressway: Combined Tier 1 FEIS/ROD (Dec. 2022), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=397583 (last visited July 20, 2023).

[19] Fed. Highway Admin., Final Environmental Impact Statement, I-495 & I-270 Managed Lanes Study (June 2022) at ES-7 to ES-8, available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=368681 (last visited July 20, 2023).

[20] EPA, *NEPA: Environmental Impact Statement (EIS) Database*, *supra* note 8.  Data were filtered by Agency ("FHWA"), Federal Registration Publication Date ("From January 1, 2013, To July 12, 2023"), and State or Territory ("New York").  Repeating EIS records and supplements were discarded from our count, as well as any projects that consulted the FHWA but did not list the FHWA as the head agency.

[21] Fed. Highway Admin., Final Environmental Impact Statement, Interstate 87 (I-87) Exit 4 Access Improvements (Aug. 2014), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=88433 (last visited July 20, 2023).

I-481 and replace signage in Syracuse and for a proposal to construct two new ramps and replace a bridge near Buffalo.[22]

43.    By contrast, the FHWA has issued a FONSI, when, for example, evaluating a project to construct a 7.5-mile pedestrian and bicycle bath in Santa Cruz, California—a proposal that received only 38 comments throughout the entire NEPA assessment process.[23]

44.    In addition to the requirements imposed by NEPA and its implementing regulations, recent executive orders, including Executive Order 12898, Executive Order 14008, and the Council on Environmental Quality ("CEQ")'s NEPA Environmental Justice guidance, require agencies to study and address environmental justice issues when conducting a NEPA review.

45.    Specifically, Executive Order 12898 directed agencies to "make achieving environmental justice part of [their] mission by identifying and addressing, as appropriate, disproportionately high, and adverse human health or environmental effects of [their] programs, policies, and activities."  Exec. Order No. 12,898, 59 Fed. Reg. 7,629, 7,629 (Feb. 11, 1994). The Order also requires agencies to develop and implement an "environmental justice strategy" that "promote[s] enforcement of all health and environmental statutes," "ensure[s] greater public participation," and "improve[s] research and data collection relating to the health of and environment of minority and low-income populations."  *Id.* at 7,630.

---

[22]    Fed. Highway Admin., Final Environmental Impact Statement, Interstate 81 Viaduct Project (Apr. 2022), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=362431 (last visited July 20, 2023); Fed. Highway Admin., Final Environmental Impact Statement, NYS Route 198 (Scajaquada Expressway) Corridor Project (Nov. 2017), available at https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=241793 (last visited July 20, 2023).

[23]    Fed. Highway Admin., Finding of No Significant Impact, North Coast Rail Trail CA SCR T5(1) Santa Cruz County, CA (Oct. 8, 2021), available at https://highways.dot.gov/sites/fhwa.dot.gov/files/ncrt-final-fonsi-w-appendices_0.pdf (last visited July 20, 2023).

46.    Likewise, Executive Order 14008 mandates that "[a]gencies shall make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."  Exec. Order No. 14,008, 86 Fed. Reg. 7,619, 7,629 (Jan. 27, 2021).

47.    Further, the CEQ provides NEPA Environmental Justice Guidance "to further assist Federal agencies with their NEPA procedures so that environmental justice concerns are effectively identified and addressed."[24]  CEQ highlights that "[m]itigation measures identified as part of an environmental assessment (EA), a finding of no significant impact (FONSI), an environmental impact statement (EIS), or a record of decision (ROD), should, whenever feasible, address significant and adverse environmental effects of proposed federal actions on minority populations, low income populations, and Indian tribes."[25]  The guidance states that "[e]nvironmental justice issues may arise at any step of the NEPA process and agencies should consider these issues *at each and every step of the process*, as appropriate."[26]  Indeed, agencies should specifically consider at least: "the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on [them]";[27] "relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental

---

[24]    Council on Env't Quality, Environmental Justice: Guidance Under the National Environmental Policy Act 1 (1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf [hereinafter "CEQ NEPA Guidance"].

[25]    *Id.* at 4.

[26]    *Id.* at 8 (emphasis added).

[27]    *Id.* at 9.

hazards in the affected population";[28] "the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the [action, including the communities'] physical sensitivity [and] the effect of any disruption on the community structure associated with the proposed action."[29]  Finally, to comply with NEPA, agencies "should seek input from [environmental justice communities] as early in the process as information becomes available."[30]

C.    **In 1991, Congress Established the Value Pricing Pilot Program, Which Authorized FHWA To Review and Approve Congestion Programs Proposed By State And Local Governments.**

48.    In 1991, Congress established what is now known as the VPPP.  Value pricing "includes a variety of strategies to manage congestion" on highways and streets, such as priced highways, zones, road networks, or usage-based vehicle charges.[31]  The purpose of the VPPP is to determine whether and to what extent roadway congestion may be reduced through congestion pricing strategies, and the magnitude of such strategies' impact on driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs.

49.    Through the VPPP, the FHWA must approve tolling schemes proposed by state and local governments that would toll existing federal-aid highway lanes, as would the congestion pricing scheme here, before they can be implemented.[32]  When the FHWA reviews an

---

28    *Id.*

29    *Id.*

30    *Id.* at 11.

31    Letters from Stephanie Pollack, Deputy Administrator, Fed. Highway Admin., U.S. Dep't of Transp., to Hon. Peter A. DeFazio, U.S. House of Representatives, Hon. Sam Graves, U.S. House of Representatives, Hon. Tom Carper, U.S. Senate, & Hon. Shelley Moore Capito, U.S. Senate (Feb. 16, 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp20rpt.pdf.

32    *Id.*; Fed. Highway Admin., U.S. Dep't of Transp., Value Pricing Program (Aug. 22, 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/index.htm; Fed. Highway Admin., U.S.

application to the VPPP, it must evaluate the potential environmental effects of the proposed

action under NEPA.  DOT_0036154.

> **D.    For Nearly Two Decades New York Has Pursued Plans for Congestion Pricing in Manhattan.**

50.    As the idea of congestion pricing gained traction with the federal government's

VPPP, in 2007, New York City attempted, without success, to implement its first congestion

pricing scheme.

51.    That year, then-Mayor Bloomberg announced "PlaNYC: A Greener, Greater New

York," a proposal to help New York City achieve certain sustainability goals by 2030.[33]  The plan

involved open space, energy improvements, improving water and air quality, addressing climate

change, and, lastly, congestion pricing.  Specifically, Mayor Bloomberg's congestion pricing

proposal aimed, among other goals, to decrease air pollution and asthma rates in the streets of

Manhattan.[34]  While lobbying for PlaNYC, Mayor Bloomberg touted the environmental benefits

of congestion pricing and urged New Yorkers and the State legislature to "seize this golden

opportunity to use Federal funds to reduce congestion [and] improve air quality."[35]

52.    Mayor Bloomberg proposed an $8 toll for vehicles entering parts of Manhattan

between 6 a.m. and 6 p.m. on weekdays.  The project was expected to produce $491 million

---

Dep't of Transp., Frequently Asked Questions (Feb. 11, 2022), https://ops.fhwa.dot.gov/congestionpricing/faq/index.htm#faq_05_08.

[33]  Jen Chung, *Mayor Bloomberg Says Congestion Pricing and Likes It*, Gothamist (Apr. 23. 2007), https://gothamist.com/news/mayor-bloomberg-says-congestion-pricing-and-likes-it.

[34]  *Id.*

[35]  Matthew Schuerman, *Mayor Bloomberg Outlines Case for Congestion Pricing*, WNYC (Mar. 19, 2008), https://www.wnyc.org/story/78009-mayor-bloomberg-outlines-case-for-congestion-pricing/; Sewell Chan, *U.S. Offers New York $354 Million for Congestion Pricing*, N.Y. Times (Aug. 14, 2007), https://archive.nytimes.com/cityroom.blogs.nytimes.com/2007/08/14/us-will-give-new-york-354-million-for-congestion-pricing/?searchResultPosition=1.

annually for transit improvements and propel a massive transit build-out for the MTA.[36]

However, due to a lack of public support, state assembly leaders blocked the project in 2008.[37]

53.    In October 2017, then-Governor Cuomo brought together a mix of community

representatives, government officials, and business leaders from across New York State to serve

on the "Fix NYC Advisory Panel" and tasked that group with developing recommendations to

address congestion in Manhattan and identify sources of revenue to fix the ailing subway

system.[38]  In January 2018, this panel issued a report recommending that "the MTA must *first*

invest in public transportation alternatives and make improvements in the subway system *before*

implementing a zone pricing plan to reduce congestion."[39]  The report explicitly mentioned that

this would require "completion of an Environmental Impact Statement (EIS)."[40]

### E.    In 2019, the New York State Legislature Passed the MTA Reform and Traffic Act, Setting the Stage for New York's Latest Attempt to Implement Congestion Pricing.

54.    In 2019, the New York State Legislature resumed its efforts to pursue a

congestion pricing program that would, like Mayor Bloomberg's proposal, stand to benefit only

New York City.

55.    In April 2019, the Legislature passed the MTA Reform and Traffic Mobility Act

(the "Traffic Mobility Act").  The goal of the Traffic Mobility Act is clear:  to create a dedicated

revenue stream that "**at minimum**, ensure[s] **annual revenues and fees collected under such**

---

[36]    Laura Bliss, *Congestion Pricing: Here's How the Governor-backed Plan Could Win This Time Around*, Bloomberg (Aug. 16, 2017, 7:00 AM EDT), https://www.bloomberg.com/news/articles/2017-08-16/new-york-city-has-a-new-congestion-pricing-plan.

[37]    Nicholas Confessore, *$8 Traffic Fee for Manhattan Gets Nowhere*, New York Times (Apr. 8, 2008), https://www.nytimes.com/2008/04/08/nyregion/08congest.html.

[38]    Fix NYC Report, HNTB (Jan. 19, 2023), https://www.hntb.com/fix-nyc-report/.

[39]    *Id.* at 3 (emphasis added).

[40]    *Id.*

**program** . . . fund **_fifteen billion dollars_** [] **for** . . . **the 2020 to 2024 _MTA capital program_**" as

well as any successor programs while reducing traffic congestion within the Manhattan CBD.[41]

N.Y. Veh. & Traf. Law § 1704-a(1) (emphases added).  The Traffic Mobility Act authorized the

TBTA, an affiliate of the MTA, to "establish and charge variable tolls and fees."  *Id.*  It also

directed the TBTA to establish a plan to toll vehicles entering or remaining in the Manhattan

CBD.  *Id.* §§ 1704-a(3)(a), 1705.  The Manhattan CBD will generally include the entirety of

Manhattan south of 60th Street, with a few key exceptions, including the FDR Drive and the

West Side Highway:



[42]

---

[41]  The Manhattan CBD is defined as "the geographic area in the borough of Manhattan south of and
inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New
York state route 9A otherwise known as the 'West Side Highway' including the Battery Park
underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting West St.  The
boundaries of the central business district shall not be modified, expanded, or reduced and shall
incorporate the outer bounds of the aforementioned district to the extent practicable."  N.Y. Veh. &
Traf. Law § 1704(2).

[42]  MTA, Map, Central Business District Tolling Program (Jan. 22, 2020),
https://new.mta.info/map/6726.

56.    The Traffic Mobility Act imposed only four requirements for the ultimate congestion pricing scheme: (1) qualifying vehicles transporting persons with disabilities and authorized emergency vehicles are exempt; (2) passenger vehicles will be tolled no more than once a day; (3) residents whose primary residence is in Manhattan and whose New York State adjusted gross income is less than $60,000 will be eligible for a tax credit equal to the amount of tolls paid per year; and (4) passenger vehicles that "remain" in the Manhattan CBD that are detected when leaving but were not detected entering the same day, will be charged for remaining in the CBD.  *See id.* § 1704-a(2); *see also* DOT_0000369.  The remaining contours of the congestion pricing scheme are left up to the TBTA and its appointed Traffic Mobility Review Board ("TMRB").  For example, the TMRB will decide the toll price, the time period when the toll will be operative, any credits to cars that access the Manhattan CBD through the tunnels and already pay a toll to the Port Authority of New York and New Jersey,[43] exemptions for taxis, pricing schemes for buses, and small and large trucks, among other considerations.  *See e.g.*, DOT_0036291–95 (describing the seven different tolling scenarios, none of which have been decided yet).

57.    Shortly after the Traffic Mobility Act's enactment, the New York State Legislature passed the 2019-2020 budget authorizing the congestion pricing scheme and mandating that it be

---

[43]    The Port Authority of New York and New Jersey is a joint organization between the two states that oversees many of the transportation hubs of the region, including bridges, tunnels, airports, and seaports.  The Port Authority does not receive tax revenue from either state or any local jurisdiction.  It relies primarily on revenue from facility-operated tolls from its bridges and tunnels between New York and New Jersey, user fees from the airports and bus terminals, fares on transit systems, rent, and retail stores.  *See e.g.*, About the Port Authority, https://www.panynj.gov/port-authority/en/about.html (last visited July 20, 2023).

implemented no earlier than December 31, 2020.[44]  Thereafter, the Project Sponsors began

developing proposals for the congestion pricing scheme.

58.    For admission to the VPPP, *see supra* IV.C, the Project Sponsors need to receive

federal approval before the final congestion pricing scheme can be implemented.  Following

enactment of the Traffic Mobility Act, the Project Sponsors submitted an Expression of Interest

to the FHWA, seeking tolling authority under the VPPP to implement its congestion pricing

scheme.  DOT_0036154.

59.    Between April 2019 and early 2020, the Project Sponsors met with the previous

federal administration more than a dozen times to discuss its assessment and approval of

congestion pricing in the Manhattan CBD, including whether an EA or EIS was needed.[45]  With

little progress made, New York officials began accusing the federal government of delaying

congestion pricing and making the EA process more strenuous than was necessary.  By July

2020, the federal government had not yet informed the MTA as to whether it needed to undertake

an EA or EIS.[46]

**F.    During the COVID-19 Pandemic, the MTA Experienced Severe Financial Distress and Again Turned to Congestion Pricing as a Funding Mechanism.**

60.    As the COVID-19 pandemic hit New York, ridership on the New York City

subway and buses plummeted and the MTA lost billions of dollars.  The federal government

stepped in with a lifeline.  Throughout the pandemic and the years shortly thereafter, the MTA

---

[44]    Dana Rubinstein, *Why Congestion Pricing Might Be Delayed*, Politico (Feb. 18, 2020), https://www.politico.com/states/new-york/city-hall/story/2020/02/18/why-congestion-pricing-might-be-delayed-1261628; S. 1509-C, 2019-2020 Leg., Senate Assemb. (N.Y. 2020), https://www.nysenate.gov/node/7059296.

[45]    Christopher Robbins, *Congestion Pricing's Failure A "Shining Example" of Government Dysfunction*, Gothamist (July 15, 2020), https://gothamist.com/news/congestion-pricings-failure-shining-example-government-dysfunction.

[46]    *Id.*

received significant federal emergency funding.  First, in May 2020, the MTA received $500

million in transit funding under the Coronavirus Aid, Relief, and Economic Security Act.[47]  Then,

between May 2020 and March 2022, the MTA received **over $15 billion** in pandemic relief

funding—coincidentally, the same amount it stands to gain from its congestion pricing scheme.[48]

61.    Almost right away, the MTA came under fire for mismanaging these funds, and in

October 2022, Congresswoman Nicole Malliotakis (NY-11) and Congressman Josh Gottheimer

(NJ-05) called for a congressional oversight hearing and investigation, which would examine

"how $15 billion of COVID-19 relief taxpayer dollars were spent" and why the MTA is "hitting

commuters with a new Congestion tax that would charge drivers upwards of $23 per day to enter

[the Manhattan CBD]."[49]  In their call for an investigation, the Representatives noted that the

MTA is expected to hit a "fiscal cliff," with a $2.5 billion deficit in 2025 and a $4.6 billion

operating deficit by 2026—despite receiving over $15 billion from the federal government over

the past two years.[50]

    **G.**    **In 2021, the FHWA Indicated It Would "Fast Track" Congestion Pricing and Bypass the Full Environmental Review Required By NEPA.**

62.    New York and the MTA saw a renewed opportunity for congestion pricing

following President Biden's election.  Indeed, the FHWA signaled that it intended to move as

---

[47]    Stephanie Pagones, *MTA to Get $3.9B in Coronavirus Aid, Cuomo Says Trump 'cut red tape' to Send NY Expedited Funding*, Fox Business (May 14, 2020, 2:58 PM EDT), https://www.foxbusiness.com/lifestyle/trump-cuomo-new-york-city-subway-funding.

[48]    N.Y. State, Statement from Governor Kathy Hochul on the MTA Receiving 769 Million in Additional COVID Relief Funding from the Federal Transit Administration (Mar. 7, 2022), https://www.governor.ny.gov/news/statement-governor-kathy-hochul-mta-receiving-769-million-additional-covid-relief-funding.

[49]    Press Release, Malliotakis, Gottheimer Call for Congressional Oversight & Investigation of MTA's Mismanaged Spending (Oct. 14, 2022), https://malliotakis.house.gov/media/press-releases/malliotakis-gottheimer-call-congressional-oversight-investigation-mtas.

[50]    *Id.*

quickly as possible to produce an EA well before beginning its requisite formal assessment under NEPA.

63.    First, in February 2021, the MTA's then-chief development officer (now Chair and CEO), Janno Lieber, publicly stated, "[i]n recent weeks," the MTA "heard from the Federal Highway Administration that they are going to fast-track our environmental process."[51]

64.    The next month, as reflected in the March 17, 2021 MTA Board meeting minutes, Lieber confirmed the "good news" that "the MTA has heard from the Federal Highway Administration that they will be fast tracking the MTA's environmental process, which will certainly get the MTA moving forward towards being able to realize this source of funds and instituting [congestion pricing]."[52]

65.    A few days later, the FHWA authorized the MTA and New York transportation agencies to proceed with a NEPA Class III EA action under 23 C.F.R. § 771.  DOT_0036154.  In its authorization letter, the FHWA emphasized that it would "***expedite*** its efforts wherever possible," and that the EA would require "enhanced coordination and public involvement that engages stakeholders from ***throughout all three States***."  DOT_0040972–73 (emphasis added).  But as New Jersey would soon discover, this was an empty promise.

**H.    Between May 2021 and August 2022, the Project Sponsors Prepared the Draft EA Without Meaningfully Consulting the EPA or New Jersey.**

66.    In Spring of 2021, the Project Sponsors began preparing the Draft EA, even though the details of the congestion pricing scheme were far from settled—and indeed would *not*

---

[51]  Eric Bascome, *NYC Congestion Pricing May Be Pushed Forward Under Biden*, silive.com (Feb. 26, 2021, 1:09 PM EST), https://www.silive.com/news/2021/02/nyc-congestion-pricing-may-be-pushed-forward-under-biden.html.; Alissa Walker, *Secretary Pete Is Already Coming Through for New York City on Congestion Pricing*, Curbed (Feb. 23, 2021), https://www.curbed.com/2021/02/congestion-pricing-nyc-approval-pete-buttigieg.html.

[52]  MTA Board Meeting on March 17, 2021 Minutes, *in* MTA Board Action Items 15 (Mar. 17, 2021), https://new.mta.info/document/33901.

be settled before the FHWA purportedly completed its NEPA review. It was (and still is) unclear, for example, how much the toll would be, what times and days the toll would be in effect, who would have to pay it, and whether and for whom there would be exemptions—and of course, each of those decisions can substantially affect whether and how the scheme impacts surrounding communities. Because the congestion pricing scheme itself left so much to be figured out later on, it was impossible for the Project Sponsors—and affected stakeholders—to assess to what extent the scheme would impact the surrounding environment, including the counties and towns in New Jersey that border New York City.

67. As the Project Sponsors well knew, New Jersey's transportation agencies have a strong interest in a congestion pricing scheme that will inherently affect interstate transportation and, most likely, burden transportation systems in states adjacent to New York. Furthermore, New Jersey's Department of Environmental Protection ("NJDEP") has a vital interest in any action that will affect New Jersey's environment and natural resources, including impacts on air quality in areas already overburdened with air pollution.

68. Nevertheless, during the year it took to draft the EA, the Project Sponsors invited New Jersey's transportation agencies to attend just two meetings. Meanwhile, other interested New Jersey state agencies, including NJDEP and the New Jersey Department of Health ("NJDOH") were never contacted.

69. First, on September 20, 2021—two years after the New York State Legislature passed the Traffic Mobility Act and this process started—NJTRANSIT, NJTA, and North Jersey Transportation Planning Authority ("NJTPA") attended a virtual meeting in which the Project Sponsors shared information about congestion pricing. The Project Sponsors invited no other

interested New Jersey agencies to participate, even though their New York counterparts were
consulted.

70.     One year later, on August 4, 2022—mere days before the Draft EA was
published—the same agencies and the New Jersey Department of Transportation ("NJDOT")
were invited to attend a virtual briefing on the Draft EA.  At both meetings, New Jersey's
agencies were given the opportunity to ask questions about the congestion pricing scheme and
the scope of the EA.  But this in no way rose to the level of meaningful engagement required by
NEPA.

71.     Because New Jersey was not consulted in a meaningful way—and the MTA's
primary goal was to stack the deck in favor of a proposal that would generate $15 billion—the
"need" and "purpose" of congestion pricing were defined too narrowly and failed to consider
other alternative actions that would also reduce congestion. Pursuant to the Draft EA, the MTA's
congestion pricing scheme was intended to: (1) reduce daily vehicles miles traveled ("VMT") in
the Manhattan CBD; (2) reduce the number of vehicles entering the Manhattan CBD; (3) create a
funding source capable of raising $15 billion for the MTA Capital Project; and (4) establish a
tolling program consistent with the Traffic Mobility Act.  DOT_0036259; DOT_0037187.  This
framework ignored potential regional impacts, such as increased air pollution caused by traffic
diversion to avoid the Manhattan CBD.  Moreover, the purpose was so narrowly defined that
only one option could achieve each of the four stated goals: the MTA's congestion pricing
scheme.

## I.     In August 2022, the Project Sponsors Completed the Draft EA.

72.     On August 10, 2022, the Project Sponsors made the completed Draft EA available
to the public.  The Draft EA reflected their determination that an EIS was not required for the

congestion pricing scheme—in other words, that if there were any significant environmental impacts caused by congestion pricing, they could be effectively mitigated.

73.    The publication of the Draft EA initiated a 30-day formal comment period, which was subsequently extended by only 14 days despite requests for substantially longer extensions. During those 44 days, the FHWA and the Project Sponsors received more than 14,000 individual submissions and 55,000 form letters.  DOT_0036155.  In total, over 22,000 individual comments were submitted.  *Id.*

74.    New Jersey, Governor Murphy, and several New Jersey agencies were among those who submitted comments in response to the Draft EA, and they outlined the Draft EA's failure to adequately identify, address, and mitigate impacts on New Jersey and its residents that would be caused by the congestion pricing scheme.  *See infra* IV.J (discussing New Jersey's September 23, 2022 Letter).  But without a meaningful dialogue between the FHWA, the Project Sponsors, and New Jersey officials and agencies, New Jersey's concerns remained unheard and unaddressed.  In fact, the FHWA and the Project Sponsors never gave any of New Jersey's transportation agencies an opportunity to engage in substantive meetings or dialogue with the FHWA regarding the congestion pricing scheme's potential regional impacts.  There was *no* meaningful opportunity for a dialogue between the Project Sponsors and the New Jersey transportation or environmental agencies during meetings, as would ordinarily occur in a meeting with stakeholders, nor was there any attempt to follow up with New Jersey's transportation agencies after the meetings.  On the other hand, the FHWA routinely consulted federal and New York state agencies and authorities while preparing the Draft EA. DOT_0036302.

75.     In fact, the FHWA itself recognized only one New Jersey-based entity as a participating agency in the Final EA: NJTPA.  DOT_0036682.  But there was no meaningful dialogue or engagement with NJTPA's Board, nor did the FHWA or the Project Sponsors sufficiently consider its comments.  Instead, NJTPA attended meetings where the Project Sponsors merely talked at the attendees, rather than engaging in a constructive conversation. And while NJDOT and NJTRANSIT participate on the NJTPA Board, NJTA does not.  Additionally, *none* of the New Jersey transportation agencies has staff embedded in NJTPA, and thus, NJTPA has no staff with the expertise necessary to meaningfully contribute to the proposed action's development process, or express the concerns of New Jersey's transportation agencies. Importantly, none of the New Jersey transportation agencies ceded their respective authority to NJTPA to comment on the proposed congestion pricing scheme.  DOT_0040846–47.  Therefore, any coordination with NJTPA only, in lieu of engagement with the New Jersey transportation agencies, denied those agencies a real chance to contribute to the development of the congestion pricing scheme.

76.     New Jersey's local communities were also denied an opportunity to meaningfully engage in the consultation process.  Although the Project Sponsors convened an Environmental Justice Technical Advisory Group, it did not include legitimate representation of New Jersey's interests.  Of the 16 individual organizations that participated in that broader group, only *one* represented the interests of any New Jersey communities with environmental justice concerns. *See* DOT_0037037.  There was *no* meaningful engagement with localized groups in Orange, East Orange, Newark, Fort Lee and/or Bergen and Essex County—all of which are geographically proximate to New York City, contain large commuter populations, and are

necessarily impacted by congestion pricing, as the FHWA recognized in the Final EA.  It was to

no one's surprise, then, that the Draft EA did not account for any of New Jersey's concerns.

**J.     In September 2022, New Jersey and the EPA Attempted to Voice Their Concerns to the FHWA That the Draft EA Did Not Acknowledge Environmental Impacts on New Jersey.**

77.     On September 23, 2022, New Jersey Governor Murphy sent a letter to the FHWA,

imploring the agency to complete a full EIS as required under NEPA.  The letter incorporated

comments from NJDOT, NJTRANSIT, and NJTA.  Governor Murphy made clear that New

Jersey opposed the proposed congestion pricing scheme because "the Program as proposed has

revenue production as a primary goal."  DOT_0007768–75.  Since the FHWA was so focused on

revenue generation, the Draft EA left open "a high degree of uncertainty and potential for

significant impact associated with the [congestion pricing scheme] as outlined."  DOT_0007768.

Specifically, Governor Murphy explained that the scheme will impact New Jersey highways and

roads, expose vulnerable communities to more congestion and air quality issues, pass costs onto

New Jersey commuters, and, as proposed, may actually *disincentivize* transit use and *increase*

vehicles on the New Jersey side of the river.  *Id.*  In other words, the putative benefits are

reserved for New Yorkers, while the very real disadvantages are borne by New Jerseyans.

78.     Moreover, Governor Murphy expressed New Jersey's dismay with the FHWA's

improper fast-tracking of the congestion pricing scheme at the expense of New Jersey.  First, the

FHWA provided inadequate time for public review and comment.  The Draft EA was 4,005 pages

long and the FHWA gave commenters a mere six weeks for review and comment.

DOT_0007768.  Second, the FHWA did not provide public hearings as *part of* the Draft EA's

development, and instead, only held hearings *after the fact*, in direct contradiction of the purpose

of NEPA.  Third, and as a direct result of the FHWA's skirting of NEPA's requirements, few New

Jersey residents had the opportunity to comment on the Draft EA, despite the fact that congestion

pricing will *directly impact* them. *Id.* Fourth, New Jersey has no representation on the MTA
Board, TBTA, or TMRB, and the Traffic Mobility Act makes clear that the revenue generated
from the congestion pricing scheme—revenue collected, in part, from New Jerseyans—will go to
the MTA. *Id.*

79.     Governor Murphy also emphasized a foundational problem with the Draft EA—it
failed to adequately consider New Jersey when analyzing significant impacts. Thus, while the
Draft EA contained a detailed discussion of impacts to various neighborhoods in New York City,
it offered only a generalized analysis of impacts in New Jersey. The FHWA's modeling
considered the overall New Jersey transportation network but failed to perform fine-grained
analyses of the different markets within New Jersey as it did with New York. DOT_0007772.
This letter also highlighted the inadequate treatment of environmental justice communities and
adverse impacts on air and noise quality.

80.     New Jersey was not the only one calling foul. The FHWA's fellow federal
agency, the EPA, also raised significant concerns about the impacts of the scheme, including on
New Jersey. On September 22, 2022, the EPA sent a letter to the FHWA and the Project
Sponsors. DOT_0007920–25. The EPA reviewed the Draft EA and found that "[d]ue to the
insufficiency of data in the Draft EA around localized and disproportionate air quality impacts in
the surrounding area, EPA is ***unable to confirm*** that impacts are less than significant ***without
appropriate mitigation***. EPA ***remains concerned*** about the potential for ***adverse air quality
impacts on communities outside the CBD***," including Bergen County, "where the analysis ***in the
Draft EA*** projects that traffic congestion will likely ***worsen*** due to the Project implementation."
*Id.* at DOT_0007920 (emphasis added). The EPA recommended that the FHWA "improve[]" its
analysis "of these sensitive areas" and identify "appropriate mitigation . . . to ensure adverse

impacts are less than significant, especially given the historical environmental justice (EJ)

concerns and cumulative impacts to the affected communities." *Id.*

81.    Moreover, the EPA recommended that the Project Sponsors "include a more

robust air quality modeling to assess localized Project impacts in areas of [environmental justice]

concern." *Id.* The EPA stressed that "[a]ddressing these issues is ***incumbent on the Lead***

***Agency and Project Sponsors***," namely the FHWA, in accordance with Executive Orders 12898

and 14008, which require federal agencies to make environmental justice part of their mission

and address the disproportionately high and adverse human health, environmental, climate-

related, and other cumulative impacts on disadvantaged communities. *Id.* (emphasis added).

82.    More specifically, the EPA elaborated on three important points raised by

Governor Murphy: (1) the Draft EA did not include a sufficient air quality or hot-spot analysis of

the entire study area, especially those areas where traffic increases and pollutant increases are

anticipated, such as in Bergen County; (2) the Draft EA did not adequately address communities

with environmental justice concerns that will be harmed due to changes in the traffic patterns;

and (3) the Draft EA did not incorporate feedback and engagement with localized environmental

justice stakeholders as required under NEPA. *Id.* at DOT_0007921–25.

83.    Overall, the EPA pressed the FHWA to engage in "additional analysis" to "clarify

and expand" on several topics in the Final EA and "provide mitigation measures in accordance

with EPA's . . . detailed comments to better address: the alternatives analysis; direct, indirect, and

cumulative impacts; impacts on communities with [environmental justice] concerns; and

mitigation commitments to address significant adverse impacts during and after implementation

of the proposed action." *Id.* at DOT_0007920–21. The FHWA did not.

**K.    The FHWA Published its Final EA and FONSI, Giving the Project Sponsors the Green Light to Move Forward with Approval of an Undefined Congestion Pricing Scheme.**

84.    In March 2023, the MTA reportedly submitted a secret memo to the FHWA, describing that it would commit to spending $130 million (almost all from congestion pricing revenues) towards mitigation measures for New York communities with environmental justice concerns.[53]  None of the measures outlined in the memo addressed any of the potential harms to New Jersey as a result of the congestion pricing scheme.  And because the memo was not made publicly available, neither New Jersey nor other interested stakeholders were able to comment.

85.    In early May 2023, the FHWA published its Final EA.  Despite New Jersey's concerns, the Final EA remained largely unchanged from the initial draft.  Although several mitigation measures were added, *none* directly addressed the issues identified by New Jersey.

86.    In conjunction with the Final EA, the FHWA published a Draft FONSI.  In the Draft FONSI, the FHWA stated that it had "independently evaluated the Final EA and determined it to adequately and accurately document the purpose and need, environmental issues, and impact of the Proposed Action and appropriate mitigation measures." DOT_0040590.  The FHWA thus concluded that the Final EA "provide[d] sufficient evidence and analysis" to determine that an EIS was "not required."  *Id.*

87.    The Draft FONSI summarized the potential effects of congestion pricing and New York-based mitigation measures that would allegedly prevent any significant impacts. DOT_0040594–605.  The Draft FONSI, however, failed to propose or commit to mitigation measures for the FHWA-identified effects on New Jersey.  Notably, the FHWA recognized that

---

[53]    Dave Colon, *MTA Offers Funding for Bronx Clean-Up to Get Congestion Pricing Over the Line*, StreetsBlogNYC (Mar. 27, 2023, 12:01 AM EST), https://nyc.streetsblog.org/2023/03/27/exclusive-secret-mta-memo-offers-funding-for-bronx-clean-up-to-get-congestion-pricing-over-the-line.

congestion pricing could increase traffic diversions, and thus emissions, in the Bronx, New York and Bergen County, New Jersey under **all seven** tolling scenarios.  DOT_0040601.  Nevertheless, the FHWA determined there was "no mitigation needed" and "no adverse effects."  However, it did recommend that the TBTA—an MTA affiliate—work with New York City Department of Health and Mental Hygiene, as well as the New York State Department of Environmental Conservation to monitor $PM_{2.5}$ (a measure of fine inhalable particles)[54] to determine whether changes in air pollution occur as a result of the changes in traffic patterns in New York.  In contrast, the FHWA failed to propose any corresponding monitoring for New Jersey in conjunction with its environmental agencies.  DOT_0040601–02.

88.    Similarly, the Draft FONSI recognized that "certain environmental justice communities . . . that are already over-burdened by pre-existing air pollution and chronic disease could see an adverse effect as a result of increased traffic" and listed Orange, East Orange, Newark, and Fort Lee, New Jersey as potentially impacted communities.  DOT_0040605.  Once again, the FHWA's mitigation measures omitted any reference to New Jersey or cooperation with New Jersey agencies.  Instead, the FHWA only ensured cooperation with the NYCDOT, which will expand its clean trucks program and expand its off-hours delivery program, replace diesel-burning trucks, and coordinate to expand electric truck charging infrastructure.  The FONSI further noted that the Project Sponsors—all New York entities—would install or upgrade air filtration units in New York schools.  DOT_0040606.  New Jersey was cut out of the mitigation discussion entirely.

89.    The Draft FONSI was made available for public review for 30 days, after which time the FHWA would make its final determination on whether to prepare an EIS.  Once again,

---

[54]    EPA, Particulate Matter ($PM_{2.5}$) Trends, available at https://www.epa.gov/air-trends/particulate-matter-pm25-trends (last updated May 23, 2023).

New Jersey was insufficiently consulted. New Jersey's transportation agencies were invited to just one meeting following the publication of the Final EA and Draft FONSI—a virtual briefing on the two documents with no opportunity for meaningful engagement. Neither NJDEP nor NJDOH was contacted.

90.     On June 12, 2023, Governor Murphy, joined by NJDOT, NJDEP, NJDOH, NJTRANSIT and NJTA, sent a letter to the FHWA opposing the adoption of the Final EA and the Draft FONSI. New Jersey wrote, in sum and substance:

a. The Final EA was the result of a failed process since it did not afford New Jersey a meaningful opportunity to participate, notwithstanding the significant direct, indirect, and cumulative environmental effects congestion pricing will have on New Jersey;

b. The FHWA did not conduct adequate outreach to impacted New Jersey agencies and local entities. None of the New Jersey transportation agencies had any substantive meetings or dialogue with the FHWA and instead were invited to informational meetings only;

c. Congestion pricing's purpose and needs were too narrowly defined as a result of inadequate public outreach, specifically the lack of outreach to New Jersey;

d. The FHWA failed to consider tolling alternatives, and only considered the "No Action" alternative;

e. The Final EA failed to account for potential revenue impacts to NJTA, including that the impact of traffic diversion from NJTA's roadways will vary, perhaps greatly, based on the final selected tolling scenario. This fact, coupled with the short timeframe allotted for review of the Final EA, meant that NJTA could not commission a formal origin and destination study, toll sensitivity study or diversion analysis;

f. The Final EA failed to account for potential fare impacts for New Jersey's most economically distressed communities;

g. The Final EA failed to account for shifts in traffic amongst various roadways and facilities in New Jersey, and therefore did not consider NJDOT's ability to manage traffic demand;

h. The Final EA failed to appropriately consider effects of the congestion pricing scheme on New Jersey's communities with environmental justice concerns, and utilized inaccurate and ill-defined federal data and mapping tools that did

not accurately assess adverse environmental and public health impacts on these communities;

i.   The Final EA improperly confused economic disparity with environmental disparity and failed to adequately determine whether congestion pricing would cause disparate environmental and public health impacts for certain groups of people based on their race, language, or income;

j.   The Final EA failed to consider air quality impacts in New Jersey as a result of traffic diversions, the increase in air pollutants in Bergen County, and the pre-existing pollution and chronic disease in Fort Lee;

k.   The Final EA failed to allocate mitigation measures to New Jersey notwithstanding the recognition that there will be increased air pollution.  The Final EA was explicit about spending funds in New York on electric truck charging infrastructure and asthma centers with programming to benefit neighborhoods with asthma, but did not provide for funds to go to New Jersey;

l.   The Final EA failed to account for the increase in $PM_{2.5}$ levels in Fort Lee and the likely result in the levels exceeding revised EPA standards; and

m.   The Final EA obscured the impacts to areas outside of New York by shifting the perspectives from a local level (where there will be negative impacts) to a regional level, and it buried the reality that while Manhattan's air quality may improve, New Jersey's air quality will deteriorate as traffic and pollutants shift.  DOT_0040844–58.

91.   New Jersey requested that the FHWA rescind the Draft FONSI and require the Project Sponsors to complete an EIS based on the MTA's preferred tolling scenario—instead of seven or more proposed congestion pricing schemes—and ensure that the EIS considers the harms to New Jersey, its residents, its communities (including its most disadvantaged) and its businesses, commuters, and agencies.

92.   However, just a few weeks later, without even responding to New Jersey's letter, the FHWA published its Final FONSI without notable changes.  In many respects, the Final EA and FONSI reflected a deficient and inadequate assessment of the seven or more tolling scenarios and their possible effects on New Jersey, a failure to require necessary mitigation measures, particularly in all communities with environmental justice concerns, and a failure to

consider alternatives—all culminating in an unjustified finding of no significant impact that
provided for no commitment to mitigation in New Jersey.

  **L.**  **The Final EA and FONSI Failed to Comply with NEPA.**

  93.  The Final EA, which FHWA adopted, and FONSI failed to comply with NEPA for
at least four reasons: (1) the FHWA failed to consider, propose, or commit to mitigation of the
increased air and noise pollution in New Jersey; (2) the FHWA ignored the impacts on New
Jersey's communities with environmental justice concerns and failed to propose or commit to
mitigation for those communities; (3) the FHWA erroneously did not consider alternatives
besides a no-action alternative; and (4) the FHWA failed to take a hard look at each of the
proposed congestion pricing schemes, as it is required to do so under NEPA.

    i.  <u>The Final EA and FONSI Failed to Consider or Propose Mitigation of the
Increased Air and Noise Pollution that the Congestion Pricing Scheme
Will Have on New Jersey Due to Traffic Pattern Shifts.</u>

  94.  Contrary to the requirements of NEPA, the FHWA's Final EA fails to consider
fully the effects that congestion pricing will have on air pollution in New Jersey.  While the Final
EA acknowledged that congestion pricing *will* cause increased air pollution in New Jersey, it
mischaracterized those impacts as insignificant, ignored the concomitant effects of those impacts
on the health of New Jerseyans, failed to adequately assess the localized nature of those impacts,
and refused to provide for and commit to any mitigation of those impacts.

  95.  *First*, the FHWA *did* identify adverse impacts to New Jersey but erroneously
dismissed them as not significant.  Notably, the Final EA explicitly stated that increases in "all
pollutants" will occur in Bergen County in 2023 and 2045 due to shifts in truck traffic.  *See*

DOT_0036838, DOT_0036854, DOT_0036855.[55]  Specifically, National Ambient Air Quality

criteria pollutants—such as carbon monoxide; nitrogen dioxide; ozone; particulate matter ("PM")

regulated in two sizes, 2.5 microns and 10 microns; sulfur dioxide; and lead and mobile source

air toxins, as well as carcinogens like formaldehyde—will rise in Bergen County.

DOT_0036838, DOT_0036854, DOT_0036855.  These impacts will also be long-lasting:  the

FHWA *concluded* that the proposed scheme will increase air pollutants in Bergen County in both

2023 and 2045.  DOT_0036838.  These harms to the air quality in Bergen County will have

detrimental impacts on human health, including premature mortality, increased hospital

admissions for heart or lung causes, acute and chronic bronchitis, asthma attacks, emergency

room visits, respiratory systems, and restricted everyday activities.  *See* DOT_0040856.

96.     *Second*, notwithstanding the FHWA's increased air emissions conclusions, the

Final EA failed to include any assessments of the impact of air quality on the health of New

Jerseyans.  Assessing health outcomes from potential impacts on air quality requires modeling

and risk assessments.  The congestion pricing scheme will exacerbate $PM_{2.5}$ levels near Fort Lee,

which consistently records some of the highest levels of $PM_{2.5}$ in all of New Jersey, and may

result in levels that exceed the EPA's standards for $PM_{2.5}$.  DOT_0040853, DOT_0040855,

DOT_0007924.  $PM_{2.5}$ has significant health impacts due to its ability to penetrate deeply into the

lungs and can cause short-term health effects such as eye, nose, throat, and lung irritation;

worsen medical conditions such as heart disease and asthma; and increase risk of heart attack.[56]

---

[55]  The Final EA only included a regional air quality assessment under Tolling Scenario A because that
scenario was "predicted" to result in the "smallest change in VMT."  DOT_0036838.  The logical
conclusion is that with larger "change[s] in VMT," which will occur under other scenarios, air
pollutants will also increase.

[56]  New York State Department of Health, *Fine Particles (PM 2.5) Questions and Answers*,
https://www.health.ny.gov/environmental/indoors/air/pmq_a.htm (last updated July 20, 2023).

In fact, the New York Department of Health recognizes that $PM_{2.5}$ "primarily come[s] from car, truck, bus, and off-road vehicle . . . exhausts."[57]

97.     *Third*, the FHWA improperly cabined its localized analysis of air quality impacts in New Jersey to only a select few areas.  The Final EA analyzed air quality on a microscale level to evaluate potential carbon monoxide and PM impacts in certain areas.  DOT_0036827.  This microscale analysis focused on 102 "hot-spot" intersections around key approaches to the Manhattan CBD and the local streets that enter the Manhattan CBD from north of 60th Street.  However, this area included **only four** locations in New Jersey—all of which were in Hudson County, where the FHWA expected the largest decrease in VMT (and therefore air pollution) across all New Jersey counties.  *Id.* at DOT_0036859, DOT_0036476, DOT_0036828.  By contrast, air quality impacts on communities in Bergen County were not included in the localized analysis, even though the FHWA admitted that air quality will decrease across the County.

98.     Notably, the FHWA applied this same limited 102-intersection area to evaluate noise pollution impacts—even though the FHWA acknowledged that "potential increases in noise levels are partly tied to instances where there would be increases in vehicular traffic" and thus "the largest potential noise exposure across the tolling scenarios should be consistent with the highest incremental increase in traffic volumes."  DOT_0036878.  For this reason, the Final EA did not take into account the noise pollution that will occur elsewhere in New Jersey given shifts in traffic patterns to avoid the Manhattan CBD.  Accordingly, the FHWA erroneously found that the congestion pricing scheme would create no noise pollution impacts within the evaluated traffic analysis area.  DOT_0036886–87.

---

[57] *Id.*

99.     In addition to its improper microscale analysis, the FHWA evaluated only 12 counties—*only two* of which were in New Jersey—for its broader regional analysis of air quality. DOT_0036827–28.[58]  Indeed, while the FHWA claimed to apply a "28-county study area" to its analysis, it inconsistently selected segments of this study area to assess potential impacts of the congestion pricing scheme.  DOT_0036194.  Overall, the FHWA improperly limited its study area to a few impacted areas in New York, and not New Jersey.

100.     *Fourth*, as a result of the FHWA's selective analysis, and despite its generalized findings on decreased air quality in Bergen County, the FHWA improperly concluded that the congestion pricing scheme will result in no significant impacts to air quality in New Jersey. Accordingly, the FHWA did not provide for or commit to any mitigation of adverse air impacts. For instance, the Final EA provides that New York communities will receive higher priority for zero emission buses, but there are *no similar mitigation* measures that address the projected increases in traffic congestion and air pollution levels in New Jersey.  DOT_0036989.  In addition, as part of its congestion pricing scheme, the MTA has committed to invest funds to install and upgrade air filtration units in NYC schools, as well as expanded asthma case management.  DOT_0036867.  Once again, there is no proposal or commitment to mitigate similar impacts to New Jersey residents.  Instead, the Final EA and FONSI state that no mitigation is needed and suggest ongoing monitoring and reporting of potential effects will be conducted only for New York.

101.     The FHWA's deficient analysis and inexplicable conclusions were not merely a result of careless error.  Indeed, the EPA and New Jersey repeatedly brought these issues to the FHWA's attention.

---

[58]   The FHWA used the same limited study area for its Mobile Source Air Toxics ("MSAT"), and Greenhouse Gas ("GHG") analyses.

102.    As explained above, *supra* ¶¶ 78–81, the EPA criticized "the **insufficiency of data** in the Draft EA around localized and disproportionate air quality impacts in the surrounding area" and requested that the FHWA "include **more robust air quality modeling** to assess localized . . . impacts in areas of [environmental justice] concern"—such as in Bergen County— to be able to identify "more thorough, comprehensive, and targeted mitigation measures." DOT_0007920 (emphasis added).  The EPA further recommended that the air quality analyses include the "**entire** study area, especially where traffic **increases** and pollutant **increases** are anticipated," as is expected throughout New Jersey.  DOT_0007922 (emphasis added).

103.    Further, the EPA urged the inclusion of a "**more expansive** microscale screening analysis of intersections" (beyond the 102 hot-spot intersections already included—only four of which were in New Jersey), including certain intersections in Bergen County that will see increased traffic as a result of the congestion pricing scheme.  DOT_0007922 (emphasis added). The EPA encouraged the FHWA to consider "**[a]ll potential adverse impacts** . . . irrespective of benefits to other areas," and prepare a "comprehensive mitigation package" accordingly. DOT_0007922, DOT_0007925 (emphasis added).

104.    The EPA also highlighted that mere compliance with federal air quality standards (the National Ambient Air Quality Standards) "does **not** equate to no potential impacts and localized harm to human health and the environment."  DOT_0007922 (emphasis added).  The EPA—relying on Executive Order 14008—reminded the FHWA that air pollution contributes to a variety of adverse health effects, including asthma attacks and premature death, and because of these dire health consequences, the impacts of the proposed action on air emissions, specifically regarding shifts in truck traffic, need to be evaluated "**beyond** EPA's public health air quality standards or benchmarks."  *Id.* (emphasis added).

105.    New Jersey expressed similar concerns in its September 23, 2022 and June 12,

2023 letters to the FHWA about the increase in air pollution in New Jersey as a result of traffic

pattern shifts that will occur as a result of congestion pricing—an indirect impact that the FHWA

did not consider.  *See supra* ¶¶ 77, 88.  These letters also highlighted the disparate analysis that

the FHWA conducted for New York compared to New Jersey, as well as its disparate

consideration of mitigation for impacted areas.

106.    For example, New Jersey's June 12, 2023 letter emphasized that communities in

Bergen County will be adversely affected by congestion pricing as drivers attempt to circumvent

the Manhattan CBD.  Communities in Bergen County are *already* burdened by pre-existing

pollution, and the Final EA did nothing to address this concern.  Fort Lee is a borough at the

eastern border of Bergen County, located along the Hudson River, and is home to the George

Washington Bridge—the "busiest bridge in the world" that connects Northern Manhattan to Fort

Lee, New Jersey.[59]  Fort Lee has pre-existing pollution and chronic disease burdens at the ***90th***

***percentile***.  DOT_0040853.  Under the congestion pricing scheme, Fort Lee is one of the

communities with the "***highest propensity*** for truck diversion if the proposed action is

implemented." *Id.* (emphasis added).  Despite these comments from New Jersey and the EPA,

the FHWA did not expand the air pollution study area in the Final EA and, overall, insufficiently

analyzed air impacts.

107.    The Final EA did not adequately consider these EPA and New Jersey comments

about the environmental impacts of congestion pricing in the area, notwithstanding that the

FHWA is required to do so under NEPA.

---

[59]    *See e.g.*, George Washington Bridge, https://www.panynj.gov/bridges-tunnels/en/george-washington-bridge.html (last visited July 21, 2023).

ii.    The Final EA and FONSI Failed to Fully Consider the Congestion Pricing
Scheme's Adverse Impacts on New Jersey's Communities with
Environmental Justice Concerns.

108.    The Final EA and FONSI failed to consider several significant environmental

harms to New Jersey's communities with environmental justice concerns—despite comments

from New Jersey highlighting them.  While the Final EA acknowledged that the congestion

pricing scheme *will* affect four communities with environmental justice concerns—Fort Lee,

Orange, East Orange, and Newark—it does not propose or commit to any mitigation of those

impacts and does not consider other communities with environmental justice concerns in New

Jersey that will be adversely impacted.  DOT_0036929.

109.    As an initial matter, the Final EA failed to explain its environmental justice

methodology and the bases for including certain New Jersey communities with environmental

justice concerns and excluding others.  The Final EA relied on federal data and mapping tools for

the environmental justice analysis, which resulted in New Jersey's communities being

inaccurately and ill-defined.  The Final EA did not consult, for example, an online interactive

mapping tool from NJDEP, the Environmental Justice Mapping, Assessment and Protection Tool,

which would have accurately assessed existing environmental and public health stressors in New

Jersey's overburdened communities.  The Final EA also did not review New Jersey's

environmental justice community definition, which generally includes any census block group in

which: (1) at least 35 percent of all households qualify as low-income households; (2) at least 40

percent of residents identify as a racial minority or as members of a State-recognized tribal

community; or (3) at least 40 percent of households have limited English proficiency.  N.J. Stat.

§ 13:1D-158.  Instead, the FHWA inexplicably limited its assessment to communities in which:

(1) at least 50 percent of the census tract's population identifies as a racial minority, or the

percentage of residents identifying as a racial minority exceeds the minority share in the county;

and (2) the percentage of individuals with household incomes up to twice the Federal poverty threshold was higher than that for the 28-county region. DOT_0036961. If there had been more meaningful engagement with New Jersey, the FHWA would have included New Jersey's robust and refined analysis that would accurately identify the disparate environmental and public health impacts for certain groups of people throughout New Jersey. *See e.g.*, DOT_0040852–53.

110.     The EPA also criticized the FHWA's flawed environmental justice analysis in the Draft EA and suggested that "additional analysis should be conducted to identify mitigation measures to reduce disproportionate, significant impacts to communities with [environmental justice] concerns." DOT_0007920–21. The EPA further recommended that the Project Sponsors "include concrete mitigation requirements as commitments in its decision document." *Id.* The Final EA failed to do so.

111.     Instead, and as a result of a flawed analysis, the Final EA listed only four New Jersey communities (Fort Lee, Orange, East Orange, and Newark) as having census tracts that would warrant place-based mitigation measures. The Final EA acknowledged that these areas have some of the highest existing pollution and chronic disease burdens. *E.g.*, DOT_0036229. For example, nine communities in East Orange rank above the 90th percentile for at least three of five major chronic disease burdens, including asthma, cancer, diabetes, high blood pressure, and poor mental health.[60] DOT_0007353–54.[61] Notwithstanding that, each of the place-based mitigation measures adopted in the Final EA will mitigate impacts only in New York, and there is

---

[60]   This community-specific analysis of public health and environmental risks only appears once in the 958-page Final EA, in a 91-page table in a 494-page appendix. *See, e.g.*, DOT_0007347–76. The FHWA was aware of the risks to New Jersey's communities; it simply chose not to account for them.

[61]   The Final EA Chapter 17 Appendix (DOT_0006959–7450) is included as an exhibit hereto because it is cited herein. The Final EA and all Appendices thereto are available at: https://new.mta.info/project/CBDTP/environmental-assessment-2022 (May 12, 2023).

no indication that there will be an investment of funds for mitigation measures across the region, including in New Jersey.  DOT_0036929; *see also* DOT_0040855.

112.    Specifically, the Final EA noted that three of the seven identified mitigation measures are limited to New York City.  DOT_0037018–19.  These measures include replacing transport refrigeration units at Hunts Point Produce Market, implementing electric truck charging infrastructure in New York, and establishing an asthma case management program and asthma center in the Bronx.  The remaining four measures—installing roadside vegetation to improve air quality, renovating parks and greenspace in environmental justice communities, installing air filtration units in schools near highways, and tolling certain vehicles traveling on the FDR Drive—are to be implemented by the TBTA, a New York entity affiliated with the MTA.  Thus, none of the mitigation measures commit to implementation beyond New York communities.  Nowhere in the Final EA or FONSI did the FHWA identify or commit to any mitigation measures for New Jersey.

113.    The Final EA also did not address other communities in New Jersey with census tracts within the regional study area that have pre-existing pollution and chronic disease burdens, and thus, mitigation measures likely will not be provided to these communities; to name a few, Union City, East Newark, Harrison, Bayonne, Elizabeth, and Perth Amboy.  In Union City, every census tract ranks at or above the 90th percentile for at least three of four major pollutant burdens, including air toxics cancer risk, air toxics exposure, diesel particulate matter, and $PM_{2.5}$.  DOT_0007361.  A main transit hub near New York City, Union City is also likely to experience increased traffic as a result of the congestion pricing scheme.  *See* DOT_0007768.  Yet the FHWA failed to assess any potential impacts on Union City's communities with environmental justice concerns.  East Newark and Harrison will also be impacted by traffic diversion from the

Manhattan CBD since New Jersey's highway, I-280, runs through these areas and connects to I-95, which serves as the feeder route to the George Washington Bridge. DOT_0040854. Further, the Final EA did not consider impacts in Bayonne, Elizabeth, and Perth Amboy, which have bridges to Staten Island—another way to avoid the Manhattan CBD—and are all communities with environmental justice concerns. Instead, the Final EA merely acknowledged that in places like Bayonne, there "would be a net increase in . . . traffic volumes" during "peak hours," but did not propose or commit to any mitigation measures. DOT_0036456. Overall, the inclusion of some affected communities but not others runs afoul of the Administration's environmental justice goals and fails to comply with the requirements of NEPA.

       iii.    The Final EA and FONSI Failed to Consider Any Alternatives Besides a No Action Alternative.

114.    In the Final EA, the FHWA nominally determined that the purpose and need of congestion pricing was to "reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements" to the MTA and "establish a tolling program consistent with the purposes underlying the [Traffic Mobility Act]." DOT_0037068.[62] But the FHWA did not consider a reasonable range of alternatives to the proposed congestion pricing scheme in its NEPA review, as required by law.

115.    Instead, the FHWA considered only one alternative—the No Action Alternative. All other potential alternatives were rejected at the outset because they would not achieve the $15 billion revenue goal set forth by the Traffic Mobility Act—notwithstanding the fact that they would have **reduced** VMT (one of the goals of the Act) and thus traffic congestion.

---

[62]   The FHWA claims that it did not consider this final objective of the congestion pricing scheme, DOT_0036264, but that is belied by its failure to meaningfully consider other means of revenue generation.

116.    Among other reasonable alternatives, the FHWA failed to meaningfully consider rationing license plates, incorporating mandatory carpooling, or creating tolls on the East and Harlem River Bridges.  DOT_0036267–68.  For instance, though the FHWA acknowledged that tolling the East and Harlem River Bridges would adequately reduce traffic congestion, it did not meaningfully consider this alternative because a single study found otherwise and there was no agreement in place to direct funds from the bridge tolls to the MTA so it wouldn't meet its $15 billion threshold.[63]  DOT_0036267–68.

117.    The FHWA also failed to meaningfully consider *its own recommended congestion pricing strategies*, including parking pricing, priced vehicle sharing, and dynamic ridesharing.[64] The FHWA was obviously aware of these alternatives, yet the Final EA barely mentioned—let alone seriously considered—these possibilities, notwithstanding that some such systems might better serve the policy objectives of congestion pricing and comport with New York laws.  For example, the FHWA determined that high-occupancy toll lanes are not a reasonable alternative despite their "effective revenue generat[ion] . . . due to the availability of free lanes on the same highway."  DOT_0036268.  The Final EA did not provide an explanation or analysis for this claim.

118.    Furthermore, the Final EA made no attempt to consider cumulative alternatives that could have met the $15 billion revenue threshold contemplated by the MTA.  For instance, the FHWA failed to consider whether carpooling, license plate rationing, and bridge tolls together would have reduced VMT and the number of vehicles in the Manhattan CBD.

---

[63]    The FHWA found that such a lack of agreement did not render the proposed action unreasonable. The Traffic Mobility Act required that TBTA and NYCDOT enter into a memorandum of agreement to coordinate the planning, design, installation, construction, and maintenance of the tolling structure. DOT_0036273.

[64]    Fed. Highway Admin., *What Is Congestion Pricing?*, https://ops.fhwa.dot.gov/congestionpricing/cp_what_is.htm (last visited July 20, 2023).

DOT_0036267–68; DOT_0007768.  Additionally, the FHWA did not consider whether one or more of these alternatives could have been combined with the proposed congestion tolling to achieve greater congestion reductions that may not have created such pervasive environmental impacts borne by New Jerseyans.  Because no alternatives were considered, the FHWA could not take a hard look at the proposed congestion pricing scheme.

119.    Artificially leaving itself with only the No Action Alternative, the FHWA ensured from the start that the congestion pricing scheme would receive NEPA clearance.

iv.    <u>The Final EA and FONSI Failed to Take a Hard Look at Each of the MTA's Proposed Congestion Pricing Schemes.</u>

120.    In its assessment of congestion pricing in the Manhattan CBD, the FHWA considered seven proposed tolling "scenarios."  These scenarios greatly vary based on, for example, "the amount of the toll for different types of vehicles, the times tolls would be imposed, exemptions from tolling, crossing credits for tolls paid on other toll tunnels or bridges, and discounts in the form of 'caps' on the number of tolls per 24-hour period to be applied to different types of vehicles."  DOT_0036291.  The FHWA summarized the seven scenarios in the Final EA:

Table 2-3.    Tolling Scenarios Evaluated for the CBD Tolling Alternative

| PARAMETER[1] | SCENARIO A<br>Base Plan | SCENARIO B<br>Base Plan with Caps and Exemptions | SCENARIO C<br>Low Crossing Credits for Vehicles Using Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO D<br>High Crossing Credits for Vehicles Using Tunnels to Access the CBD | SCENARIO E<br>High Crossing Credits for Vehicles Using Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO F<br>High Crossing Credits for Vehicles Using Manhattan Bridges and Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO G<br>Base Plan with Same Tolls for All Vehicle Classes |
|---|---|---|---|---|---|---|---|
| **Time Periods[2]** | | | | | | | |
| Peak: Weekdays | 6 a.m. to 8 p.m. | 6 a.m. to 8 p.m. | 6 a.m. to 8 p.m. | 6 a.m. to 8 p.m. | 6 a.m. to 8 p.m. | 6 a.m. to 10 a.m.;<br>4 p.m. to 8 p.m. | 6 a.m. to 8 p.m. |
| Peak: Weekends | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. | 10 a.m. to 10 p.m. |
| Off Peak: Weekdays | 8 p.m. to 10 p.m. | 8 p.m. to 10 p.m. | 8 p.m. to 10 p.m. | 8 p.m. to 10 p.m. | 8 p.m. to 10 p.m. | 10 a.m. to 4 p.m. | 8 p.m. to 10 p.m. |
| Overnight: Weekdays | 10 p.m. to 6 a.m. | 10 p.m. to 6 a.m. | 10 p.m. to 6 a.m. | 10 p.m. to 6 a.m. | 10 p.m. to 6 a.m. | 8 p.m. to 6 a.m. | 10 p.m. to 6 a.m. |
| Overnight: Weekends | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. | 10 p.m. to 10 a.m. |
| **Potential Crossing Credits** | | | | | | | |
| Credit Toward CBD Toll for Tolls Paid at the Queens-Midtown, Hugh L. Carey, Lincoln, Holland Tunnels | No | No | Yes | Yes | Yes | Yes | No |
| Credit Toward CBD Toll for Tolls Paid at the Robert F. Kennedy, Henry Hudson, George Washington Bridges | No | No | No | No | No | Yes | No |
| **Potential Exemptions and Limits (Caps) on Number of Tolls per Day** | | | | | | | |
| Autos, motorcycles, and commercial vans | Once per day | Once per day | Once per day | Once per day | Once per day | Once per day | Once per day |
| Taxis | No cap | Once per day | Exempt | No cap | Exempt | Once per day | No cap |
| FHVs | No cap | Once per day | Three times per day | No cap | Three times per day | Once per day | No cap |
| Small and large trucks | No cap | Twice per day | No cap | No cap | No cap | Once per day | No cap |
| Buses | No cap | Exempt | No cap | No cap | Transit buses – Exempt<br>No cap on other buses | Exempt | No cap |
| **Approximate Toll Rate Assumed[3]** | | | | | | | |
| Peak | $9 | $10 | $14 | $19 | $23 | $23 | $12 |
| Off Peak | $7 | $8 | $11 | $14 | $17 | $17 | $9 |
| Overnight | $5 | $5 | $7 | $10 | $12 | $12 | $7 |

65

121.    Throughout the Final EA and FONSI, the FHWA repeatedly failed to identify the relative impacts of each scenario.  For example, the FHWA assumed that every scenario would have the same degree of effect on parking conditions, pedestrian traffic, and noise levels—despite the scenarios' significantly different toll fees, hours, and exemptions.  *See* DOT_0000375 (Table 1.4D, Table 1.4E), DOT_0000379 (Table 1.12); DOT_0036292 (Table 2-3).  That is the definition of conclusory.  And, even where the FHWA did disaggregate potential impacts, it did not explain how such impacts were calculated.  DOT_0000371 (Table 1); DOT_0036916–29 (Table 16-1).  Nowhere did the FHWA address how each scenario would affect adjacent states such as New Jersey.  For instance, the FONSI showed that each scenario created a vastly different effect on the number of daily car trips to the Manhattan CBD, but these differences do not factor into the FHWA's assessment of effects on New Jersey traffic.  The FONSI merely concluded that, despite VMT increases, New Jersey will not be adversely affected:

---

65    DOT_0036292.

> **No mitigation needed.** Beneficial effects in Manhattan CBD, New York City (non-CBD), north of New York City, and Connecticut; although there will be VMT increases in Long Island and New Jersey, the effects will not be adverse. [66]

122.    Moreover, the Final EA even contemplated that the TBTA could "adopt[] a toll schedule structure that has ***substantially different attributes*** from those examined in this EA" and if that happens, "the Project Sponsors would review those changes with FHWA" to "identify a course of action to assess and document the changes in accordance with NEPA prior to implementation of the Project." DOT_0036290 (emphasis added). That the FHWA leaves open the possibility that there could be a congestion pricing scheme that is "substantially different" than the ones proposed in the Final EA underscores that it did not take a hard look at the environmental impacts of the proposed project.

123.    Indeed, the FHWA presented summary findings unsupported by evidence that it then applied to each scenario as if there were no differences among them. Not only does this lack of analysis undermine the FHWA's decision-making, but it also rendered public comment on the congestion pricing scheme ineffectual. Without the FHWA adequately investigating and identifying the impacts of each tolling scenario, New Jersey, its transportation authorities, and interested stakeholders could not possibly engage in a meaningful dialogue with the FHWA. Instead of individually assessing each scenario as if it were an individual congestion pricing scheme, the FHWA put the blinders on and dismissed any NEPA obligations that stood in the way of authorizing a proposed action with sweeping implications.

---

[66]    DOT_0000371.

57

124.     Overall, the FHWA has decided, without undertaking the required environmental review, that a full EIS is unnecessary.  It seems to have worked backwards to achieve a predetermined outcome, issuing a FONSI for the congestion pricing scheme that disregarded the significant impacts to New Jersey's environment.  There is no excuse for the FHWA's fundamentally flawed and improperly truncated decision-making process, which failed to consider critical issues warranting a full environmental review.

**M.     On November 30, 2023, the TMRB Announced Its Recommended Tolling Scheme**

125.     On November 30, 2023, the TMRB—the entity appointed by the MTA to create the tolling scheme—issued its final recommendation for the tolling scheme (the "TMRB Recommendation").[67]  The TMRB Recommendation differed in critical respects from the seven tolling scenarios analyzed in the Final EA.  Most importantly, the TMRB recommended a base toll of $15 for passenger type vehicles—a tolling scheme that was never analyzed in the Final EA—and recommended that this toll "should be charged to vehicles only as they enter the CBD – not if they remain in or leave the zone."[68]

126.     The TMRB Recommendation also: (1) extended peak-hour pricing from 5:00 am to 9:00 pm on weekdays, even though each of the Final EA's scenarios analyzed only peak hours of 6:00 am to 8:00 pm; (2) set the recommended toll at $24 for small trucks and $36 for large trucks, even though the Final EA merely considered a "range" of $12–$65 for small trucks and $12–$82 for large trucks; (3) proposed a $5 crossing credit for passenger vehicles traveling through the Lincoln, Holland, Queens-Midtown, and Hugh L. Carey tunnels, but no credit for the George Washington Bridge, even though the Final EA examined a higher credit; (4) provided a

---

[67] TMRB, CONGESTION PRICING IN NEW YORK (Nov. 2023), https://new.mta.info/document/127761.
[68] *Id.* at 8.

nighttime discount of 75% with no crossing credits during that time period, even though the
Final EA never analyzed those options together; and (5) exempted NYC Taxi and Limousine
Commission licensed taxis and for-hire vehicles from the daily toll and instead recommended a
per-ride toll for each passenger trip, even though the Final EA never evaluated the impact of a
per-ride toll.

### N. Between December 2023 and March 2024, the TBTA Reviewed the TMRB Recommendation

127.    On December 6, 2023, the TBTA voted to start the public review process of the
tolling scheme, which largely mirrored the TMRB's Recommendation.[69]   On December 27,
2023, the TBTA published its proposed rulemaking announcement.  The announcement
underscored that "generat[ing] revenue" remained a primary purpose of the congestion pricing
scheme.  N.Y. State Register, Vol. XLV, Issue 52, Dec. 27, 2023, at 46 ("Purpose: A proposal to
reduce traffic congestion in a manner that will generate revenue for future transportation
improvements.").

128.    On March 27, 2024, less than four months after the TMRB released its
recommendation, a majority of the TBTA voted to approve the tolling scheme recommended by
the TMRB, with only one dissenting vote.   Soon after the TBTA vote, the FHWA and the Project
Sponsors initiated a "reevaluation" of the approved tolling scheme under NEPA.

---

[69] MTA, *MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate
Schedule* (Dec. 6, 2023), https://new.mta.info/press-release/mta-board-votes-begin-public-review-
process-central-business-district-tolling-
rate#:~:text=Updated%20Dec%206%2C%202023%204,New%20York's%20congestion%20pricing%
20program.

**O.      On June 5, 2024, Governor Hochul Paused Congestion Pricing**

129.    On June 5, 2024, New York Governor Kathy Hochul announced that she had

"directed the MTA to indefinitely pause" the congestion pricing scheme.[70]  She stated that

"implementing the planned congestion pricing system risks too many unintended consequences,"

but "committed to advancing all the improvements that New Yorkers have been promised" as

part of the MTA's 2020-24 Capital Program.[71]

130.    As part of that commitment, Governor Hochul provided significant additional

funding to the MTA, including pledging $54 million in state resources to support a subway

expansion project that would have been funded through the MTA's Capital Program.[72]

Governor Hochul also promised that New York would "make up the difference" in revenue if a

modified tolling scheme, with a lower tolling rate, was adopted in the future.[73]

**P.      On June 14, 2024, the FHWA Published Its Re-Evaluation 1 of the Approved
         Tolling Scheme**

131.    Notwithstanding Governor Hochul's "pause," on June 14, 2024, the FHWA issued

Re-Evaluation 1, finding that the Final EA and FONSI remained valid, and that thus no further

environmental review was warranted.  DOT_0045625–36; DOT_0045430–624.  The FHWA

reached this conclusion even though the Final EA never evaluated the environmental impacts of

a $15 toll.  Further, no official notice was provided regarding the Project Sponsors' request for

---

[70] Governor Kathy Hochul, *Video, Audio & Rush Transcript: Governor Hochul Addresses New Yorkers
on Affordability and the Cost of Living* (June 5, 2024), https://www.governor.ny.gov/news/video-
audio-rush-transcript-governor-hochul-addresses-new-yorkers-affordability-and-cost.

[71] *Id.*

[72] Governor Kathy Hochul, *Governor Hochul Announces $54 Million in State Funding to Support the
Second Avenue Subway Project* (July 30, 2024), https://www.governor.ny.gov/news/governor-hochul-
announces-54-million-state-funding-support-second-avenue-subway-project.

[73] Governor Kathy Hochul, *Audio & Rush Transcript: Governor Hochul is a Guest on WNYC's All Things
Considered* (Sept. 3, 2024), https://www.governor.ny.gov/news/audio-rush-transcript-governor-
hochul-guest-wnycs-all-things-considered.

further reevaluation, and the FHWA afforded no party other than the Project Sponsors the
opportunity to be heard on that request.

132.    The FHWA's decision to not undertake a supplemental EA or supplemental EIS,
which would have required public notice and comment, was particularly concerning because the
$15 tolling scheme differed from the seven tolling scenarios assessed in the Final EA in several
critical respects.  As noted, the Final EA never evaluated the environmental impacts of a $15 toll.
Additionally, the $15 tolling scheme: (1) extended peak-hour pricing from 5:00 am to 9:00 pm
on weekdays, even though each of the Final EA's scenarios analyzed only peak hours of 6:00 am
to 8:00 pm; (2) proposed a phased crossing credit for passenger vehicles traveling through the
Lincoln, Holland, Queens-Midtown, and Hugh L. Carey tunnels, but *no* credit for the George
Washington Bridge, even though the Final EA only examined scenarios with no credit or a higher
credit; (3) provided a nighttime discount of 75% with no crossing credits during that time period,
even though the Final EA never analyzed those options together; (4) exempted NYC Taxi and
Limousine Commission licensed taxis and for-hire vehicles from the daily toll and instead
recommends a per-ride toll for each passenger trip, even though the Final EA never evaluated the
impact of a per-ride toll; and (5) only tolled most vehicles upon entry into the CBD, rather than
tolling vehicles for both entering and remaining in the CBD as contemplated in the Final EA.

133.    Unlike the Final EA, and in an admission of the fatal flaws in the FHWA's "final"
finding of "no significant impact," Re-Evaluation 1 selected specific communities that would
receive place-based mitigation.  Importantly, the amount of funding allocated to each of these
communities was constrained by the $100 million cap on place-based mitigation set forth in the
Final EA, which was the basis for the FHWA's mitigated FONSI.  In other words, the FHWA and
the Project Sponsors worked backwards from a cap on mitigation funding, rather than deciding

which communities merited place-based mitigation due to the congestion pricing scheme's significant environmental impacts, and then allocating the amount of funding necessary to avoid those impacts.  This approach resulted in *de minimis* mitigation funding for New Jersey compared to New York.

134.    Re-Evaluation 1 allocated just $9.8 million in mitigation funding to New Jersey, and limited that funding to only four communities (Fort Lee, City of Orange, East Orange, and Newark).  DOT_0045609.  By contrast, Re-Evaluation 1 allocated $90.1 million to New York, including $71.7 million to Bronx County *alone*, notwithstanding that daily traffic increases in Bergen County would be *two to four* times greater than in the Bronx.  *See id.*; DOT_0045462.  In fact, Fort Lee—the only community in Bergen County to be allocated mitigation funding—received just $1.4 million, meaning Bronx County received over *fifty-one times* the amount of mitigation funding as Bergen County.  *See* DOT_0045609.

135.    Re-Evaluation 1 also assessed whether the adopted tolling scheme would meet three of the four project objectives, one of which was to "generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program."  DOT_0045449.  Re-Evaluation 1 determined that the adopted tolling structure would generate only $0.9 billion per year, $100 million less than the $1 billion annual threshold evaluated in the Final EA.  *See id.* Nevertheless, the FHWA determined that the adopted tolling scheme met the revenue objective because, after the Final EA was published, the MTA's Chief Financial Officer "determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects  for the MTA Capital Program."  *Id.*  In doing so, the FHWA transformed the revenue objective into a moving target, despite having superficially rejected all

alternatives other than congestion pricing in the Final EA because they did not meet the initial $1 billion per year revenue objective.

**Q.    On November 14, 2024, Governor Hochul Un-Paused Congestion Pricing**

136.    On November 14, 2024, Governor Hochul lifted the pause on congestion pricing and announced a new proposed tolling scheme that would take effect by "early January."[74]  That scheme differed in important ways from the $15 tolling rate previously approved by the FHWA and the MTA.  Most importantly, the revised scheme included an initial peak tolling rate for passenger vehicles that was 40% lower ($9); other tolls and credits were similarly reduced by 40% as compared to those approved by the TBTA in March 2024.[75]

137.    New York State officials recognized that the revised tolling scheme would not generate the same amount of revenue as the previously-adopted scheme, but said New York would "give the M.T.A. . . . a $15 billion credit card" with the recognition that a lower toll "may mean that it takes longer to pay it all back."[76]

**R.    On November 18, 2024, the MTA Approved the Revised Congestion Pricing Scheme**

138.    Just four days later, on November 18, 2024, the MTA approved the revised congestion pricing scheme and announced that it would launch on January 5, 2025.[77]  The

---

[74] Governor Kathy Hochul, *Putting Commuters First, Keeping Costs Down: Governor Hochul Unveils Plans for Future of Transit and Traffic in New York City, Including a 40 Percent Reduction in Congestion Pricing Tolls* (Nov. 14, 2024), https://www.governor.ny.gov/news/putting-commuters-first-keeping-costs-down-governor-hochul-unveils-plans-future-transit-and.

[75] *Id.*

[76] Ana Ley and Winnie Hu, *Hochul Brings Back Congestion Pricing Plan After Months of Suspense*, N.Y. TIMES (Nov. 14, 2024), https://www.nytimes.com/2024/11/14/nyregion/congestion-pricing-nyc-hochul.html#:~:text=The%20retooled%20congestion%20pricing%20plan,previously%20approved%20rate%20of%20%2415

[77] MTA, *MTA Board Approves Phasing In the Congestion Relief Zone Toll* (last updated Nov. 18, 2024 3:30 PM ET), https://new.mta.info/press-release/mta-board-approves-phasing-congestion-relief-zone-toll#:~:text=The%20Metropolitan%20Transportation%20Authority%20(MTA,2025%2C%202026%2C%20and%202027

revised scheme imposes a phased tolling rate, beginning with a $9 peak toll for passenger

vehicles in 2025 ("Phase 1"), which will increase to $12 in 2028 ("Phase 2"), and to $15 in 2031

("Phase 3")—a scenario never analyzed in the Final EA or Re-Evaluation 1.

139.    Like the tolling scheme adopted in March 2024, the revised tolling scheme differs

in other critical ways from the seven tolling scenarios assessed in the Final EA.  For example, it:

(1) extends peak-hour pricing from 5:00 am to 9:00 pm on weekdays, even though each of the

Final EA's scenarios analyzed only peak hours of 6:00 am to 8:00 pm; (2) proposes a phased

crossing credit for passenger vehicles traveling through the Lincoln, Holland, Queens-Midtown,

and Hugh L. Carey tunnels, but *no* credit for the George Washington Bridge, even though the

Final EA only examined scenarios with no credit or a higher credit; (3) provides a nighttime

discount of 75% with no crossing credits during that time period, even though the Final EA never

analyzed those options together; (4) exempts NYC Taxi and Limousine Commission licensed

taxis and for-hire vehicles from the daily toll and instead recommends a per-ride toll for each

passenger trip, even though the Final EA never evaluated the impact of a per-ride toll; and (5)

only tolls most vehicles upon entry into the CBD, rather than tolling vehicles for both entering

and remaining in the CBD as contemplated in the Final EA.

### S.    On November 21, 2024, the FHWA Published Its Re-Evaluation 2 and Signed the VPPP Agreement

140.    On November 8, 2024—six days before Governor Hochul lifted the pause on

congestion pricing and announced the phased tolling structure—the Project Sponsors requested

that the FHWA "proceed with assessing the effects of a phased-in tolling structure to complete

the on-going re-evaluation of FHWA's May 5, 2023, Final [EA]."  ECF No. 174 at 1–2.  Less

than two weeks later, on November 21, the FHWA published its "Re-Evaluation 2."  *See id.*;

DOT_0047541–57.  That same day, the FHWA and the Project Sponsors signed the VPPP

agreement.  *See* DOT_0047522–25.  Again, no official notice was provided—to the Court, to

New Jersey, or the general public—of the Project Sponsors' request for further reevaluation, and

the FHWA afforded no party other than the Project Sponsors the opportunity to be heard on that

request.

141.    Based on the ten-page Re-Evaluation 2, the FHWA determined that "no additional

environmental analysis is warranted" since "[t]he conclusions in the Final Environmental

Assessment and Finding of No Significant Impact remains [sic] valid."  DOT_0047520–21.  But

the revised tolling scheme fundamentally differs from the seven schemes evaluated in the Final

EA and the $15 tolling scheme evaluated in Re-Evaluation 1.  For example, none of the tolling

schemes evaluated in the Final EA and Re-Evaluation 1 included a phased tolling rate like the

one adopted now.  *See* DOT_0047551–52; DOT_0036292.

142.    The supplemental administrative record confirms that the FHWA never

meaningfully considered how this change (or others) could alter its analysis or the validity of the

FONSI.  There are no documents in the record demonstrating that the FHWA conferred with the

Project Sponsors or internally regarding Re-Evaluation 2—let alone solicited input from other

affected stakeholders. In fact, based on the supplemental record: (1) the Project Sponsors

submitted a letter to the FHWA on November 8, 2024, indicating their desire to "engage with

FHWA to add a phase-in feature to the tolling structure described in the Reevaluation approved

in June 2024," DOT_0047532; (2) the Project Sponsors submitted a draft Re-Evaluation 2 five

days later, DOT_00475333–40; and (3) by November 21, 2024, without undertaking any

consultations with the Project Sponsors, the FHWA approved Re-Evaluation 2 and executed the

VPPP agreement, DOT_0047520–30.  Neither the FHWA nor the MTA can claim that they

undertook a more rigorous review process.  With the exception of any administrative

consideration or action taken on remand, the supplemental record represents "all administrative

consideration[s] . . . in connection with the Central Business District Tolling Program that

occurred subsequent to the issuance of the Final EA and FONSI pertaining to that Program."

ECF No. 184.

143.    Re-Evaluation 2 also confirms that the revised tolling scheme will not "generate

sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital

Program"—one of three project objectives used to dismiss alternatives in the Final EA.  *See*

DOT_0036266.  In order to meet the revenue objective, the Final EA "assume[d] the Project

should provide at least $1 billion annually in total net revenue, which would be invested or

bonded to generate sufficient funds."  DOT_0036300.  In Re-Evaluation 2, the FHWA

determined that Phase 1 of the revised tolling scheme would generate only $0.5 billion per

year—half of the requirement originally set forth in the Final EA—and Phase 2 would generate

only $0.7 billion per year.  DOT_0047555.  Despite recognizing that the revenue requirement

would be met only if the tolling scheme generated "annual net revenues in the range of $0.9

billion," the FHWA somehow concluded that the entire phased tolling scheme "meets" the

revenue objective.  *Id.*

144.    The FHWA's radically new approach to assessing compliance with the revenue

objective in Re-Evaluation 2—which apparently imposed no limit on the time in which sufficient

revenues must be raised—undermined its earlier alternatives analysis in the Final EA, in which

the FHWA rejected three alternatives solely because they would not meet the funding objective:

(1) Alternative T-2 (tolling the East and Harlem River Bridges); (2) Alternative O-4 (prohibiting

vehicles from entering the CBD on certain days based on license plate number); and (3)

Alternative O-5 (prohibiting single-occupant vehicles from entering the CBD on weekdays

between 6 a.m. and 10 a.m.). *See* DOT_0036267.  If the adopted tolling scheme could not meet the revenue objective as stated in the Final EA, then other alternatives dismissed on that basis should have also been considered.  Alternative T-2, in particular, should have been further evaluated since the FHWA admitted it *had* revenue-generating potential.[78]  Notwithstanding the lower projected revenue, Re-Evaluation 2 states that the Project Sponsors will "comply with all of the mitigation commitments set forth in the EA and FONSI within the same timeframes as contemplated in those documents and the reevaluation prepared for the March 2024 adopted toll structure."  DOT_0047549.  Once again, that means only $9.8 million will be allocated to New Jersey, and that paltry sum will be limited to just four communities.

> **T.      On December 30, 2024, the Court Remanded this Matter to the FHWA**

145.      On December 30, 2024, the Court granted New Jersey summary judgment in part, and remanded to the FHWA for further proceedings based on its finding, among others, that "the Final EA and FONSI fail to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the Program, whether those impacts are in New York or New Jersey."  ECF No. 191 at 53.  The Court explained that there are "areas in New Jersey entitled to mitigation."  *Id.* at 50.  Yet the Final EA and FONSI (1) "provide[] no insight as to why areas in New Jersey with similarly high pre-existing burdens [as the Bronx] did not receive place-based mitigation

---

[78] The FHWA claimed that Alternative T-2 was additionally dismissed because "there is no law or agreement in place between the City of New York and MTA that would direct that revenue to the MTA," DOT_36268, whereas the Traffic Mobility Act authorizes congestion tolling to be directed to the MTA.  But the Traffic Mobility Act *only* authorizes tolls from congestion pricing—and not any other tolling program—to go to the MTA, which would mean any alternative tolling program would necessarily be rejected if the FHWA assessed alternatives on this basis.  Precisely for this reason, the "FHWA and the Project Sponsors did not use the fourth Project goal, 'Establish a tolling program consistent with the purposes underlying the New York State legislation entitled the "MTA Reform and Traffic Mobility Act"' for screening of alternatives."  DOT_0036266.

commitments," (2) do "not explain" why "[the FHWA and Project Sponsors] were able to set with precision monetary amounts dedicated to relief in New York while providing no minimum amounts for mitigation for potentially impacted areas in New Jersey," and thus (3) do not provide a justification for the "apparent disparate treatment" that was afforded to the Bronx as compared to New Jersey. *Id.* at 50–53. Accordingly, the Court "remand[ed] this issue for further explanation, and if appropriate, reconsideration of the rationale providing for differing levels of mitigation commitments for the Bronx as compared to potentially significantly affected areas in New Jersey and the ultimate mitigation determination." *Id.* at 53.

146. The Court also reserved judgment on two critical issues: (1) the lawfulness of the FHWA's alternatives analysis in light of the subsequent changes to the tolling scheme and the FHWA's re-evaluations, and (2) the FHWA's failure to sufficiently evaluate the final adopted tolling scheme, which significantly deviates from the seven tolling scenarios evaluated in the Final EA. The Court recognized that "[g]iven the subsequent developments in the structure of the Program, it appears that the FHWA's and Program Sponsors' reliance on Objective 3 (i.e., the funding objective) has diminished in relative importance in the ultimate decision-making for the Program." ECF No. 191 at 61–62. Because this change in course calls into question the FHWA's alternatives analysis and dismissal of all other options other than the congestion pricing scheme, the Court reserved judgment on this issue. With respect to the FHWA's failure to evaluate the final adopted tolling scheme, the Court did "not reach Plaintiff's challenges" and instead "allow[ed] the FHWA and Project Sponsors to directly address challenges to the final toll structure in the first instance on remand." *Id.* at 14 n.7.

**U.     On January 5, 2025, Congestion Pricing Began**

147. At 12:00 am on January 5, 2025, the MTA initiated congestion pricing. The program has now been operational for almost one month.

### V.    On January 17, 2025, the FHWA Published the Supplemental Memorandum

148.    On January 17, 2025, the FHWA submitted its Supplemental Memorandum and accompanying appendices.  The Supplemental Memorandum confirmed that: (1) the FHWA would not alter and could not explain its arbitrary approach to mitigation; (2) the FHWA did not conduct a new alternatives analysis even though Phases 1 and 2 of the approved tolling scheme do not comply with the MTA's $15 billion revenue requirement; and (3) the FHWA never assessed the environmental impacts of Phases 1 and 2 of the approved tolling scheme.

149.    First, the Supplemental Memorandum confirmed that New Jersey would receive just $9.8 million in mitigation funding, across four communities.  FHWA-0000017.  To arrive at this figure, the FHWA "distribut[ed]" the capped $100 million place-based mitigation pool "based on the proportion of the population in the census tracts of each community meeting the mitigation criteria as compared to the population of all the census tracts that meet the mitigation criteria."  FHWA-0000017.  The FHWA did not and could not explain how the number of people in each census tract necessarily equates to the intensity of the significant environmental impacts in each census tract—the latter of which the FHWA must mitigate to issue a FONSI under NEPA.  Indeed, the FHWA's only rationale for this arbitrary methodology is that it would "ensure the Place-Based mitigation funding is distributed equitably across the affected environmental justice population."  *Id.*

150.    Further, the four New Jersey communities designated to receive place-based mitigation remained eligible for only three mitigation measures: (1) installation of roadside vegetation; (2) renovation of parks and greenspace; and (3) installation of air filtration units in schools near highways—which may be implemented at some unknown future time "pending the identification of feasible sites."  FHWA-0000018.  The sites for mitigation and specific measures to be implemented will purportedly be selected in consultation with the Environmental Justice

Community Group ("EJCG"), the relevant communities receiving place-based mitigation, and local implementing agencies.  *See* DOT_0045616; FHWA-0000013 n.23.  But there is no deadline by which the MTA must complete this siting process and install mitigation measures.

151.    Additionally, the Supplemental Memorandum did not explain how the mitigation measures for which New Jersey communities are eligible would reduce environmental impacts to a level of insignificance.  In fact, based on the FHWA's description of these measures, it is clear they will not, individually or collectively, alleviate the community-wide significant environmental impacts of congestion pricing.  For instance, installation of roadside vegetation would only "improve *near-road* air quality" and, together with the renovation of parks and greenspaces, would "help to improve community well-being" and *could* have other benefits, such as "reducing air temperatures, reducing stormwater runoff, providing opportunities for exercise, and increasing social interaction"—none of which target the community-wide air pollution that will result from congestion pricing.  DOT_0045610.  Further, the installation of air filtration units in schools near highways with truck traffic increases would only "improve indoor air quality in [those] schools."  *Id.*

152.    Like the prior Re-Evaluations, the Supplemental Memorandum also failed to explain why only four communities in New Jersey merited place-based mitigation, when fifteen New Jersey communities with pre-existent pollutant or chronic disease burdens above the 90th percentile would experience traffic increases due to congestion pricing.  The FHWA's only justification for this distinction is that mitigation measures were limited to communities with *both* pre-existent pollutant and chronic disease burdens above the 90th percentile.  But the agency did not explain how or why it drew this arbitrary line in the sand and disregarded the

significant impacts in other communities.  Thus, the FHWA has done nothing to address the NEPA violations the Court found in its December 30, 2024 ruling.

153.    Second, the Supplemental Memorandum did not include any new alternatives analysis.  Instead, the FHWA doubled down on its decision to reject all other alternatives except the congestion pricing scheme, in part because these alternatives supposedly would not meet the MTA's $15 billion revenue requirement—even though Phases 1 and 2 of the adopted tolling scheme would also generate significantly lower revenues than the annual threshold required to meet that requirement.  *See* FHWA-0000021–22; *see also supra* at 143.  The FHWA stated "[w]hen the Project Sponsors proposed the Phase-in approach in November 2024, . . . the agency requested that MTA confirm that the Phase-in approach would still meet the Project's financial objectives."  However, that "confirmation" merely took the form of a self-serving statement from the MTA's Chief Financial Officer ("CFO"), Kevin Willens, in Re-Evaluation 2.  *See* FHWA-000002 ("For this re-evaluation, MTA's CFO has determined that the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure.").  There was no analysis provided to the FHWA, or set forth in Re-Evaluation 2 or the Supplemental Memorandum, that confirms this conclusion.  Rather, the Supplemental Memorandum attempts a post hoc rationalization for FHWA's uncritical acceptance of the MTA's unsupported statement by citing a declaration prepared by the MTA's CFO for purposes of litigation on January 2, 2025.[79]  But that declaration

---

[79] That litigation document, which post-dates the FHWA's response to Re-Evaluation 2, obviously was not part of the record before the FHWA months earlier.  Indeed, the supplemental administrative record, which reflects all agency deliberations and decisions through the Re-Evaluations, *see* ECF No. 184, confirms that no additional analysis regarding the revenue requirement was ever provided to the FHWA in connection with Re-Evaluation 2.  The only document provided to the agency in

proves that sufficient tolling revenues will not be generated "on the same timeline" as projected

in the Final EA, FONSI, and Re-Evaluation 1.  *See* ECF No. 203 ¶ 9 ("[R]ather than issue bonds

relatively quickly to fully fund the $15 billion in projects, the MTA and TBTA will instead issue

the required amount of bonds over a *longer period of several years*." (emphasis added)).   In

other words, in order to conclude that sufficient revenues would nevertheless be raised by the

adopted tolling scheme, the MTA's CFO was forced to adopt an entirely different methodology

for evaluating the project's ability to raise sufficient revenue once the project sponsors shifted to

the phase-in approach, which assumed that revenues could be raised over a much longer time

period.  Even if there were reason to think that the FHWA had understood the MTA's

methodological shift, there was no excuse for the FHWA not to revisit project alternatives that

were excluded from consideration on the basis of the MTA's original approach to its revenue-

raising objective but could not have been excluded on the basis of the MTA's new, diluted

approach.

154.    Third, the Supplemental Memorandum confirmed that the FHWA never assessed

the environmental impacts of Phases 1 and 2 of the approved tolling scheme.  The FHWA

claimed that the environmental "effects" of Phases 1 and 2 "would fall within the range studied

in the Final EA" because "the Phase 1 and 2 peak tolling rates would fall within the ranges

studied in the Final EA."  FHWA-0000024.  However, the mere observation that the tolling *rates*

for Phases 1 and 2 may fall within the range of *rates* previously evaluated fails to recognize that

the changes since the Final EA are not limited to the *rates* charged to most vehicles.  The Project

Sponsors changed a slew of other variables, including the amounts of crossing credits, peak

tolling hours, and approach to tolling taxis and for-hire vehicles (*i.e.*, adopting a per-ride fee

---

connection with its approval of Re-Evaluation 2 was a draft of the re-evaluation prepared by the
MTA.  *See supra* at ¶ 142.

versus a per-day or uncapped fee).  For instance, the closest tolling rate to Phase 1 that was

assessed in the Final EA is a $9 tolling scheme that (1) provides no crossing credits, (2) subjects

taxis and for-hire vehicles to the same tolling rates as passenger vehicles, and imposes no daily

toll cap for taxis and for-hire vehicles, and (3) sets peak tolling hours between 6 am and 8 pm on

weekdays and 10 am to 10 pm on weekends.  DOT_0036292.  Conversely, the $9 toll imposed

during Phase 1 will (1) provide crossing credits for the Lincoln, Holland, Queens-Midtown, and

Hugh L. Carey Tunnels, (2) subject taxis and for-hire vehicles to a reduced per-ride tolling rate

($0.75 for taxis, green cabs, and for-hire vehicles on trips, and $1.50 for for-hire vehicles on trips

dispatched by high-volume for-hire services), and (3) set peak tolling hours between 5 am and 9

pm on weekdays and 9 am to 9 pm on weekends.  These changes have important implications for

traffic diversions that were never analyzed in the Final EA.

155.    Phases 1 and 2 of the tolling scheme also deviate from the seven scenarios

assessed in the Final EA because they only toll vehicles upon *entry* to the CBD, and not also

when they *exit* the CBD after having remained in the zone for more than one day.  The Traffic

Mobility Act repeatedly states that tolls are to be assessed for "entering or remaining" in the

CBD.  *See* N.Y. Veh. & Traf. Law §§ 1701, 1703, 1704-a.  In accordance with that legislative

directive, the Final EA expressly envisioned that tolls would be charged both when vehicles enter

the CBD and when they remain within the CBD.  This would be implemented by assessing tolls

both on the day the vehicle enters the CBD and the day the vehicle exits the CBD.  *See*

DOT_0036202 ("Vehicles that remain in the Manhattan CBD are vehicles that are detected

leaving, but not detected entering the same day"); *id.* at DOT_0036271 ("If a passenger vehicle

enters the Manhattan CBD on Monday and is parked until it leaves on Wednesday, it would be

charged upon entering on Monday and for remaining when it drove through the Manhattan CBD

on Wednesday to leave."). Yet the toll structure adopted by the MTA provided for most vehicles to be tolled only once—upon entry into the CBD—regardless of how long they remain or how much they operate on the streets there. Thus, a vehicle that enters the CBD for one week and regularly drives within the CBD throughout that time would only be tolled *once*; whereas a commuter who drives into the CBD for a short period every day would be charged *seven* times. The FHWA never assessed how this fundamental change would alter the predicted environmental impacts on New Jersey (or acknowledged that the as-implemented scheme no longer complies with the requirements of the Traffic Mobility Act).

156.    Instead of assessing those implications in Re-Evaluation 2, the FHWA rushed to rubber-stamp the tolling scheme.

### FIRST CAUSE OF ACTION
**FHWA's Final EA and FONSI Violate NEPA and the APA**
(42 U.S.C. §§ 4321 *et seq.*; 5 U.S.C. §§ 701-706)

157.    New Jersey realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

158.    The FHWA's Final EA and FONSI constitute a final action under NEPA and the APA.

159.    The FHWA has failed to prepare an adequate environmental review of congestion pricing in the Manhattan CBD that would satisfy its duty to consider all environmental impacts of a proposed action, and to provide for public comment and participation in the public review process, in violation of NEPA and its implementing regulations. 42 U.S.C. § 4321 *et seq.*; 40 C.F.R. § 1500.1 *et seq.*

160.    As a result of these violations, the FHWA's Final EA and FONSI are arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law, in violation

of NEPA and its implementing regulations, and are subject to judicial review under the APA.  5

U.S.C. §§ 701-706.

161.    These deficiencies include, without limitation, the following:

## Failure to Prepare an EIS

162.    Prior to taking a major federal action, the FHWA must issue an EIS when the

proposed action is likely to have significant environmental effects.  40 C.F.R. § 1501.3(a)(3).  In

assessing whether the effects of a proposed action are significant, the FHWA is required to

analyze the potentially affected environment and degree of the effects of the action.  *Id.* §

1501.3(b).  In considering the degree of the effects, the FHWA must consider, *inter alia*, (i)

effects on public health and safety, (ii) both short- and long-term effects, and (iii) both beneficial

and adverse effects.  *Id.* § 1501.3(b)(2).  The FHWA may issue a FONSI only where it has

demonstrated that the proposed action "will not have a significant effect on the human

environment."  *Id.* § 1501.16.

163.    Pursuant to the APA, 5 U.S.C. §§ 701–706, courts will set aside a FONSI and

require preparation of an EIS if the FONSI is determined to be arbitrary and capricious.

164.    The FHWA violated NEPA by failing to prepare an EIS even though the

congestion pricing scheme will cause significant and unmitigated environmental impacts on New

Jersey and its residents, such as adverse air quality, public health, and pollution.  The FHWA

erred in issuing a FONSI despite evidence in the record showing the likelihood of significant

adverse environmental effects (direct, indirect, and cumulative) and findings that the congestion

pricing scheme, as is, will have significant and unavoidable impacts on New Jersey.  The FHWA

further erred in recognizing these adverse environmental effects, but then failing to propose

"enforceable mitigation requirements or commitments . . . to avoid significant impacts" or stating them within the FONSI as required under 40 C.F.R. § 1501.6(c).

165.    The FHWA's FONSI was conclusory and did not reflect adequate consideration of relevant factors necessary to understand the environmental effects of the congestion pricing scheme, nor did it consider adequate mitigation measures.

### Inadequacy of Final Environmental Assessment

166.    The FHWA failed to consider the full extent of direct, indirect, and cumulative effects in New Jersey of congestion pricing in the Manhattan CBD.  Even where the FHWA determined that New Jersey and its residents will suffer adverse impacts, the FHWA failed to account for such impacts through adequate mitigation measures.  Instead, the FHWA limited its mitigation commitments to New York City.  As a result, the FHWA improperly omits from its assessment the environmental impacts that congestion pricing in the Manhattan CBD will have on the residents of New Jersey, New Jersey's agencies, and other impacted communities. Further, the FHWA failed to consider the cumulative effects on New Jersey's disadvantaged communities, whose members are particularly vulnerable to environmental effects.

167.    The Final EA deficiencies, include, without limitation, the following:

### Failure to Mitigate Air and Noise Pollution Impacts on New Jersey and Its Residents

168.    Under NEPA and its applicable regulations, an agency preparing an EA has an obligation to take a hard look at the direct, indirect, and cumulative effects or impacts of the proposed action and its alternatives, resulting from all past, present, and reasonably foreseeable future actions.  Direct effects are those "caused by the action and occur at the same time and place."  40 C.F.R. § 1508.1(g)(1).  Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id*. § 1508.1(g)(2).

Cumulative effects are those "that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." *Id.* § 1508.1(g)(3).

169.    Here, the FHWA violated NEPA by failing to take the required hard look at direct, indirect, and cumulative impacts that the seven (or more) potential congestion pricing schemes will have on air pollution in New Jersey due to traffic pattern shifts and therefore failing to propose or commit to mitigation efforts.

170.    *First*, the FHWA overlooked the impacts of traffic pattern shifts in Bergen County. The FHWA is fully aware that cars and trucks are likely to avoid going directly into the Manhattan CBD to circumvent the cost of congestion pricing, but nevertheless failed to consider the impact these traffic pattern shifts would wreak on the surrounding communities and the corresponding changes in traffic patterns that would occur to avoid the CBD. The FHWA acted arbitrarily and capriciously in failing to consider the changes in traffic patterns in New Jersey.

171.    *Second*, the FHWA dismissed concerns about the insufficiency of data and modeling used in preparing the Final EA. This dismissal was arbitrary and capricious because, as the EPA noted, the EPA was unable to confirm the impacts on communities outside of Manhattan—like Bergen County, New Jersey—without a more robust air quality model. The FHWA failed to conduct an air quality analysis that included the entire study area, especially where traffic increases and pollutant increases are expected, as in New Jersey.

172.    *Third*, the FHWA failed to consider the pre-existing pollution and chronic disease burdens in New Jersey. The FHWA ignored comments from New Jersey about Fort Lee's pre-existing pollution and chronic disease burden, which is at the 90th percentile. The FHWA failed to consider that air pollution contributes to a variety of health effects, including asthma attacks and premature death. Fort Lee is one of the communities with the highest propensity for truck

77

diversion under the congestion pricing scheme. The FHWA acted arbitrarily and capriciously in its refusal to expand its air pollution study area to include Fort Lee.

173.    *Fourth*, because the FHWA only evaluated a subset of New Jersey counties, the FHWA failed to conduct any look, much less a hard look, at other impacted communities in New Jersey.

174.    The FHWA further violated NEPA by failing to take the required hard look at direct and indirect impacts that the congestion pricing scheme will have on increased noise pollution in New Jersey due to traffic pattern shifts, and therefore failed to propose mitigation efforts. Despite recognizing that the scheme will result in "noise exposure" and "increase[s] in traffic volumes," the FHWA arbitrarily analyzed the impact on 102 intersections, only *four* of which are located in New Jersey. Although the FHWA acknowledged that increases in noise pollution correlate to increases in traffic, it did not expand its assessment to areas where traffic will be diverted as a result of the congestion pricing schemes proposed by the Project Sponsors.

### Failure to Consider Congestion Pricing's Impact on New Jersey's Communities with Environmental Justice Concerns

175.    The FHWA violated NEPA by failing to take the required hard look at direct, indirect, and cumulative impacts that the congestion pricing scheme will have on New Jersey's communities with environmental justice concerns and, thus, failed to propose or commit to mitigation for those communities.

176.    *First*, the FHWA acted arbitrarily and capriciously when it failed to consider the traffic diversions to disadvantaged communities, including but not limited to, Bergen and Essex Counties.

177.    *Second*, the FHWA failed to involve the NJDEP to more accurately assess adverse environmental and public health impacts on New Jersey's communities with environmental

justice concerns. The FHWA's failure to involve an interested agency with clear expertise and relevant information and tools was arbitrary and capricious and will cause disparate environmental and public health impacts for groups of people based on their race, language proficiency, or income.

178.    *Third*, the FHWA overlooked the cumulative impacts on communities with environmental justice concerns within New Jersey. While the Final EA listed Fort Lee, Orange, East Orange, and Newark as communities that have some of the highest preexisting pollution and chronic disease burdens, it did not propose or commit the Project Sponsors to undertake any specific mitigation measures in those communities. The disregard of these communities was arbitrary and capricious, especially since the Final EA adopted mitigation measures for similarly situated areas in New York but no commitments to invest in funds for mitigation measures in New Jersey. Moreover, the Final EA did not address several other communities with environmental justice concerns that are projected to experience increased traffic—including East Newark and Harrison—and, thus, mitigation measures will not be provided to these communities.

### Failure to Consider a Reasonable Range of Alternatives

179.    NEPA requires agencies to study a reasonable range of alternatives to their proposed actions. 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E), 4332(2)(H); *see also* 40 C.F.R. §§ 1501.5(c)(2), 1502.14.

180.    The FHWA's statement of purpose and need—to generate revenue for the MTA's transportation projects—is arbitrary, capricious, and an abuse of discretion. As such, the FHWA did not consider a reasonable range of alternatives prior to the issuance of its Final EA and FONSI. Instead, the FHWA considered only one alternative—No Action Alternative.

181.    The FHWA arbitrarily and erroneously dismissed other alternatives submitted in comments, including rationing license plates, incorporating mandatory carpooling, and creating tolls on the East and Harlem River Bridges.  The FHWA further acted arbitrarily and capriciously by failing to consider alternatives that it itself expressly recommends in its own guidance, such as parking pricing, priced vehicle sharing and dynamic ridesharing, pay-as-you-drive fees, and high-occupancy toll lanes.

182.    The FHWA's failure to analyze these reasonable alternatives adversely affected its informed decision-making process and the ability of the public to meaningfully participate in its decision.

**Failure to Take a Hard Look at Direct, Indirect,
and Cumulative Impacts of Congestion Pricing**

183.    Pursuant to NEPA and its implementing regulations, the FHWA is required to take a hard look at the direct, indirect, and cumulative environmental impacts of any proposed action and each of its alternatives, including each of the proposed tolling scenarios.  42 U.S.C. §§ 4332(2)(C); 40 C.F.R. §§ 1501.5(c)(2), 1502.14(a), 1502.16.  Here, the FHWA failed to satisfy this mandate.

184.    *First*, the FHWA failed to take a hard look at the congestion pricing scheme because it made the decision to "fast track" its environmental approval.  The FHWA acted arbitrarily and capriciously in its decision to "fast track" its approval of the undefined congestion pricing scheme without preparing a full EIS and without inviting New Jersey to fully participate in the process.

185.    *Second*, the FHWA acted arbitrarily and capriciously by failing to take a hard look at each of the seven "scenarios" envisioned as the final congestion pricing scheme.  Instead, the FHWA appears to have assumed that each scenario—despite differing toll rates, hours, and

exemptions—would have the same effects on traffic in New Jersey, parking conditions,

pedestrian movement, air pollution, traffic patterns, health impacts, and noise levels.  The Final

EA and FONSI provided no data or analysis for the FHWA's arbitrary conclusion that all seven

scenarios—or a possible undefined scenario—will have the same effect, rendering the NEPA

hard look requirement utterly moot.

186.    *Third*, the FHWA failed entirely to take a hard look at impacts affecting New

Jersey and its residents, including increased traffic, increased air emissions, and environmental

justice issues.  Instead, the FHWA improperly limited its consideration of certain impacts by

selectively and inconsistently establishing what portions of the 28-county study area were

relevant to certain impact issues.  This inconsistency favored New York and its residents at the

expense of New Jersey and its residents.  As a result, the environmental impacts affecting New

Jersey have not been adequately identified, analyzed, considered, or mitigated.

187.    As a result of the FHWA's above failures, the FHWA's decision to issue the Final

EA and FONSI in place of an EIS was arbitrary, capricious, unreasonable, an abuse of discretion,

and not in accordance with law, and without observance of procedures required by law, in

violation of NEPA, its implementing regulations, and the APA.  5 U.S.C. § 706(2)(A), (D).

**Failure to Provide for Public Participation**

188.    Public participation is integral to the NEPA process.  The applicable regulations

are clear that "[a]gencies shall involve the public, State, Tribal, and local governments, relevant

agencies, and any applicants, to the extent practicable, in preparing environmental assessments."

40 C.F.R. § 1501.4(b); *see also id*. § 1506.6(a) (providing in part that agencies shall "[m]ake

diligent efforts to involve the public in preparing and implementing their NEPA procedures").

This is particularly true for State and local governmental entities that have specialized expertise

directly related to the proposed action and may also need to make their own project-related

decisions. Thus, NEPA's implementing regulations require federal agencies to "involve" "State .

. . and local governments" and "relevant agencies" while preparing an EA. 40 C.F.R § 1501.5(e).

189.    Moreover, the FHWA's own regulations require it to consult with state agencies

that will be impacted by a project regarding the scope of the EA. 23 C.F.R. §§ 771.111(a), (e),

771.119(b). These regulations specifically require the project applicant, in cooperation with the

FHWA, to notify state and federal land management entities that may be significantly affected by

the action or by any of the alternatives *early* and to solicit their views. 23 C.F.R. § 771.111(e).

190.    For EAs in particular, the FHWA's regulations require the project applicant to

consult with the FHWA to, "at the earliest appropriate time, begin consultation with interested

agencies" in order "to advise them of the scope of the project" and "identify alternatives" and

mitigation measures to reduce adverse environmental impacts. 23 C.F.R. § 771.119(b).

191.    Here, none of the New Jersey transportation agencies was afforded a meaningful

and early opportunity to engage in substantive meetings or dialogue with the FHWA regarding

the potential regional impacts of congestion pricing in the Manhattan CBD. And other relevant

New Jersey agencies were excluded entirely from the consultations process. As a result, the

FHWA issued a deficient Final EA. Had the FHWA engaged with New Jersey and its agencies as

interested stakeholders from the outset, as it did with New York state agencies and authorities,

the purpose and scope of the Final EA would have included impacts to New Jersey and its

residents and might have led to incorporating mitigation measures or exploring alternatives for

implementation.

192.    Since the FHWA failed to follow its procedural requirements for stakeholder

engagement, the Final EA and FONSI should be held unlawful and set aside. 5 U.S.C. §

706(2)(D) (a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and

conclusions . . . found to be without observance of procedure required by law").

### SECOND CAUSE OF ACTION
**FHWA's Re-Evaluations Violate NEPA and the APA**
(42 U.S.C. §§ 4321 *et seq.*; 5 U.S.C. §§ 701-706)

193.    New Jersey realleges and incorporates by reference all preceding paragraphs as if

set forth fully herein.

194.    The FHWA's Re-Evaluation 1 and Re-Evaluation 2 constitute final actions under

the APA because they each "mark the 'consummation' of the agency's decisionmaking process"

and are actions "by which 'rights or obligations have been determined,' or from which 'legal

consequences will flow.'"  *Pinho v. Gonzales*, 432 F.3d 193, 200 (3d Cir. 2005) (citations

omitted).

195.    The FHWA's Re-Evaluation 1 and Re-Evaluation 2 are arbitrary, capricious, and

an abuse of discretion, and otherwise not in accordance with the law, in violation of NEPA, its

implementing regulations, and the APA, and are subject to judicial review under the APA.  5

U.S.C. §§ 701–706.

196.    "[P]rior to granting any new approval related to an action or amending any

previously approved aspect of an action, including mitigation," the FHWA "must determine . . .

whether an approved environmental document remains valid as described in this section."  23

C.F.R. § 771.129.  Where the agency "is uncertain of the significance of the new impacts," the

project sponsor(s) must "develop appropriate environmental studies or, if the Administration

deems appropriate, an EA to assess the impacts of the changes, new information, or new

circumstances."  23 C.F.R. § 771.130(c).

197.    The FHWA's own guidance instructs the Administration to complete the following

steps whenever a re-evaluation is triggered by a change in the proposed project: (1) "[c]learly

document the change that triggers the re-evaluation (for example, changes in project scope, design, affected environment, impacts, mitigation, or applicable requirements) and the reason for or circumstances causing the proposed change;" (2) "[d]ocument the changes in environmental impacts or mitigation (as applicable) and describe how the impact will be different from what was previously described;" and (3) "[d]etermine whether the original environmental decision remains valid after comprehensively considering the changes."[80]  Further, "[f]ield reviews, additional environmental studies (as necessary), and coordination with other agencies should be undertaken as appropriate to analyze any new impacts or issues."  *Id.*

198.    The FHWA did not adhere to the procedures set forth in these regulations and the agency's own guidance.  The FHWA failed to adequately analyze the tolling scheme adopted by the MTA in the Re-Evaluations—despite the fact that Re-Evaluation 2 was issued after the MTA adopted the final tolling scheme.  The agency also did not commit to sufficient enforceable mitigation commitments to offset significant impacts that will result in New Jersey due to the congestion pricing scheme.

199.    The FHWA also did not explain why, in light of these deficiencies, it was not required to prepare a supplemental EIS or even a supplemental EA.  23 C.F.R. § 771.130; *see also Little Rock Downtown Neighborhood Ass'n, Inc. v. Fed. Highway Admin.*, 2022 WL 990341, at *6 (E.D. Ark. Mar. 31, 2022) ("[I]f the re-evaluation concludes that the impacts from the design changes would be significant[,] . . . a supplemental EA is required." (citing 23 C.F.R. § 771.130)).  This inaction is particularly improper because the Re-Evaluations demonstrate that the final tolling scheme does not meet one of the three project objectives on which the FHWA's

---

[80] *NEPA Re-Evaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), & Federal Transit Administration (FTA)* (Aug. 14, 2019), https://www.environment.fhwa.dot.gov/legislation/nepa/reevaluation_guidance_08142019.pdf.

NEPA review, particularly its alternatives analysis, was premised: the requirement to "generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program." DOT_0036266.

## Failure to Evaluate the Adopted Tolling Scheme

200.    The FHWA never adequately assessed the tolling scheme adopted by the MTA, which fundamentally differs from the seven tolling schemes evaluated in the Final EA and the $15 tolling scheme evaluated in Re-Evaluation 1. Indeed, none of the tolling schemes evaluated in the Final EA and Re-Evaluation 1 resemble a phased tolling scheme like the one adopted now. *See* DOT_0047551–52; DOT_0036292.

201.    As noted, the revised scheme imposes a phased tolling rate, beginning with a $9 peak toll for passenger vehicles in 2025 and increasing to a $15 peak toll for passenger vehicles by 2031. *See* DOT_0047551–52. The Final EA assessed seven tolling schemes—none of which imposed a phased tolling rate. *See* DOT_0036292. Even if the revised tolling scheme could be broken down into its component parts, the three individual tolling rates do not fall within the scope of the seven tolling schemes assessed in the Final EA. For instance, the only $9 tolling scheme assessed in the Final EA (1) provides no crossing credits, (2) subjects taxis and for-hire vehicles to the same tolling rates as passenger vehicles and imposes no daily toll cap for taxis and for-hire vehicles, and (3) sets peak tolling hours between 6 am and 8 pm on weekdays and 10 am to 10 pm on weekends. DOT_0036292. Conversely, the $9 toll imposed during Phase 1 will (1) provide crossing credits for the Lincoln, Holland, Queens-Midtown, and Hugh L. Carey Tunnels, (2) subject taxis and for-hire vehicles to a reduced per-ride tolling rate ($0.75 for taxis, green cabs, and for-hire vehicles on trips, and $1.50 for for-hire vehicles on trips dispatched by high-volume for-hire services), and (3) set peak tolling hours between 5 am and 9 pm on

weekdays and 9 am to 9 pm on weekends. DOT_0047551–52. These changes have important implications for traffic diversions that were never analyzed in the Final EA. For example, crossing credits could cause toll shopping and therefore meaningfully impact traffic diversions. And subjecting taxis and for-hire vehicles to a per-ride toll that can be passed onto customers, versus an uncapped toll at the same rate set for passenger vehicles, would provide a much lower disincentive to travel into the CBD. The FHWA never assessed the impacts of these changes or even acknowledged them.

202. Additionally, the FHWA never assessed or acknowledged the changes in environmental impacts that could result by switching from an "entry and exit" toll, to an "entry only" toll. In compliance with the Traffic Mobility Act, *see supra* at ¶ 155, the Final EA expressly envisioned that tolls would be charged both when vehicles enter the CBD and when they remain within the CBD. This would be implemented by assessing tolls both on the day the vehicle enters the CBD and the day the vehicle exits the CBD. *See* DOT_0036202 ("Vehicles that remain in the Manhattan CBD are vehicles that are detected leaving, but not detected entering the same day"); *id.* at DOT_0036271 ("If a passenger vehicle enters the Manhattan CBD on Monday and is parked until it leaves on Wednesday, it would be charged upon entering on Monday and for remaining when it drove through the Manhattan CBD on Wednesday to leave."). That approach was upended when the MTA adopted the final tolling scheme, which would only toll most vehicles once—upon entry into the CBD—regardless of how long they remain or how much they operate on the streets there. Thus, a vehicle that enters the CBD for one week and regularly drives within the CBD throughout that time would only be tolled *once*; whereas a commuter who drives into the CBD for a short period every day would be charged *seven* times. The FHWA never considered how this fundamental change would alter the

predicted environmental impacts on New Jersey. Likewise, Re-Evaluation 1 assessed only a $15 tolling scheme that resembles Phase 3 of the adopted tolling scheme. But nowhere does it consider the $9 and $12 tolling rates that are applied in Phases 1 and 2 of the congestion pricing scheme.

203.    Re-Evaluation 2 contains *no* new environmental analysis. The document merely describes the new project and summarily states—in four paragraphs—that the "the effects of the CBD Tolling Program may have minor variations" from the schemes previously assessed "but would be within the range of effects studied in the EA and the June 2024 reevaluation because the Phase 1 and 2 peak tolling rates would fall within the ranges studied in the Final EA." DOT_0047557. That same language is repeated in the Supplemental Memorandum. *See* FHWA-0000024. But there is no basis for this conclusion, since the FHWA never actually assessed the environmental impacts of the adopted scheme.

204.    Despite the fundamental changes in the adopted tolling scheme from those previously assessed by the FHWA, the agency never took the requisite "hard look" at the phased-tolling scheme. The FHWA's failure to do so is arbitrary, capricious, and unlawful.

## Failure to Mitigate Significant Impacts

205.    "An EIS must be prepared if there are 'substantial questions' regarding whether an agency's proposed action may have significant impacts." *Env't Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878–79 (9th Cir. 2022); *see also* 40 C.F.R. § 1501.6(c) ("mitigated [FONSI] shall state any enforceable mitigation requirements"). Thus, a mitigated FONSI can satisfy NEPA if, and only if, it states "enforceable mitigation requirements" that will reduce significant impacts to a level of insignificance. 40 C.F.R. § 1501.6(c); *see also* 23 C.F.R.

§ 771.105(e). This requirement applies equally to an agency re-evaluation that reaffirms a mitigated FONSI.

206.    The FHWA's Re-Evaluation 2 fails to commit to adequate mitigation measures to offset significant impacts of the adopted tolling scheme. Instead, it arbitrarily reaffirms the deficient mitigation approach set forth in Re-Evaluation 1.

207.    Of the $248 million allocated for mitigation in Re-Evaluation 1, only $100 million will fund place-based mitigation measures. The remaining $148 million will fund "regional" mitigation measures, including reductions in the overnight toll, and expanding NYC truck and off-hours delivery programs. DOT_0045606. The FHWA never explained how these "regional" measures would offset the specific significant impacts of congestion pricing on specific New Jersey communities. Instead, it vaguely described the region-wide benefits that would result from the regional mitigation measures. *See* DOT_0045607. That is not what NEPA requires when, as here, an agency identifies site-specific significant impacts and decides to issue a mitigated FONSI.

208.    The FHWA's approach to place-based mitigation is even more arbitrary. In Re-Evaluation 1, the FHWA apportioned a capped $100 million pool of place-based mitigation funding that was set forth in the Final EA. As a result, out of the $100 million place-based mitigation pool, the FHWA allocated just $9.8 million to New Jersey, and limited that funding to only four communities (Fort Lee, City of Orange, East Orange, and Newark). DOT_0045609. The FHWA never provided a rational explanation for this decision.

209.    The agency's approach to place-based mitigation is arbitrary, capricious, and unlawful for at least four reasons.

210.    *First*, an agency cannot determine the mitigation dollars that will be provided before determining the significant impacts of the proposed project.  The FHWA did exactly that by setting forth an arbitrarily capped $100 million place-based mitigation pool before it assessed the environmental impacts of the adopted tolling scheme.  The agency was required to assess the environmental impacts of the congestion pricing scheme, determine whether any impacts were significant, and then allocate the appropriate amount of mitigation dollars necessary to alleviate those impacts.  It did not.

211.    *Second*, the FHWA arbitrarily apportioned the $100 million place-based mitigation pool based on the "share of population in all affected tracts."  DOT_0045609.  But the FHWA did not and could not explain—either in Re-Evaluation 1, Re-Evaluation 2, or the Supplemental Memorandum—how the number of people impacted necessarily equates to the intensity of the impact.  The FHWA's calculus was thus fundamentally flawed, as it assumed all areas selected for place-based mitigation would be impacted equally, and population would be the only changing variable.  As a consequence of this approach, the FHWA allocated $71.7 million to Bronx County *alone*—over fifty-one times the amount of mitigation funding allocated to Bergen County—notwithstanding that daily traffic increases (and the associated pollution) in Bergen County would be two to four times greater than in the Bronx.  *See id.*; DOT_0045462.

212.    *Third*, the FHWA never demonstrated that the three mitigation measures available to New Jersey communities would sufficiently alleviate the significant impacts of congestion pricing.  The four New Jersey communities that will receive place-based mitigation are eligible for only three measures: (1) installation of roadside vegetation; (2) renovation of parks and greenspace; and (3) installation of air filtration units in schools near highways.  FHWA-0000018.  Based on the FHWA's own analysis, it is clear that these measures will not alleviate the

community-wide impacts of congestion pricing.  For instance, installation of roadside vegetation would only "improve *near-road* air quality" and, together with the renovation of parks and greenspaces, would "help to improve community well-being" and could have other benefits, such as "reducing air temperatures, reducing stormwater runoff, providing opportunities for exercise, and increasing social interaction"—none of which target the community-wide air pollution that will result from congestion pricing.  DOT_0045610 (emphasis added).  Further, the installation of air filtration units in schools near highways with truck traffic increases would only "improve indoor air quality *in [those] schools*," not in the communities at large.  *Id.*

213.    The cost to implement each of these measures also demonstrates that New Jersey's communities will not receive benefits sufficient to alleviate significant impacts.  For example, the City of Orange is set to receive just $0.9 million.  DOT_0045609.  The FHWA has allocated $10 million to the installation of air filtration units in schools near highways, which will be sufficient to fund 25-40 schools in communities eligible for this mitigation measure.  FHWA-0000009.  Even assuming 40 schools across the entire region can be funded by the full $10 million, and assuming the City of Orange's entire mitigation budget is allocated to this measure, that means less than 4 schools in Orange would receive air filtration units.  The FHWA cannot claim this would sufficiently reduce significant impacts across the entire community.

214.    Moreover, "the specific siting of mitigation measures" will be—at some unknown, future time—"determined through analysis of data on needs and feasibility and coordination among the Project Sponsors, the EJCG (representing the 10-county environmental justice study area), and relevant stakeholders and implementing agencies."  DOT_0045616; *see also* FHWA-0000013 n.23.  But there is no deadline by which the MTA must complete this siting

process and install mitigation measures. While NEPA may permit agencies to adapt mitigation measures throughout the life of a project, it does not authorize them to issue a mitigated FONSI that allows project sponsors to begin a project without implementing any mitigation measures or even knowing the date by which those measures will be implemented.

215.    Accordingly, The FHWA could not possibly determine with certainty that the significant impacts of congestion pricing in New Jersey's communities would be alleviated through mitigation.

216.    *Fourth*, the FHWA never explained why only *four* New Jersey communities merited place-based mitigation when the Final EA identified *fifteen* communities with environmental justice concerns in New Jersey with pre-existing air pollutant or chronic disease levels above the 90th percentile that "may need mitigation" because they will see increases in truck volume and, therefore, pollutants. DOT_0007319–20. The FHWA merely stated that mitigation measures were limited to communities with *both* pre-existent pollutant and chronic disease burdens above the 90th percentile, without explaining how or why it drew this arbitrary line in the sand. *See* FHWA-0000005.[81]

217.    As a result of these deficiencies, the FHWA's Re-Evaluation 1 and Re-Evaluation 2 are arbitrary, capricious, and unlawful.

## Failure to Prepare a Supplemental EA or EIS

218.    A supplemental EA or EIS—and not a re-evaluation—is required where, as here, the design changes in a proposed program would be significant and were not anticipated during the agency's initial NEPA review. *See* 23 C.F.R. § 771.130. This distinction is critical, since a

---

[81] This determination is further undermined by the fact that "[t]he Final EA and FONSI define[d] an adverse effect as increases in truck traffic in currently overburdened environmental justice communities [chronic illness or pollutant burdens], relative to national percentiles." FHWA-0000005 (emphasis in original).

supplemental EA or EIS—unlike a re-evaluation—requires the agency to comply with NEPA's

public notice and comment procedures and perform a comprehensive reassessment of the entire

project. Importantly, the agency must re-do those aspects of its original environmental analysis

that are called into question by the changes to the program. For example, where an agency's

original alternatives analysis was premised on compliance with certain project objectives, the

agency must re-assess alternatives in its supplemental EA or EIS to ensure it has taken the hard

look NEPA requires. That is exactly what should have happened here.

219.    Not only did the tolling scheme approved by the FHWA in its ten-page

Re-Evaluation 2 completely diverge from the seven tolling scenarios initially assessed by the

agency, it also did not comply with the revenue-raising objective—one of the four project

objectives set forth in the Final EA, FONSI, and Re-Evaluations. The agency dismissed out of

hand many other alternatives based on failure to comply with this objective when it conducted its

initial NEPA review.

220.    When the FHWA prepared its Final EA and FONSI, it evaluated alternatives

based on their compliance with three of the four defined project objectives. One of those

objectives was to "generate sufficient annual net revenues to fund $15 billion for capital projects

for MTA's Capital Program," which would require the project to "provide at least $1 billion

annually in total net revenue." DOT_0036266, DOT_0036300.

221.    When the agency reviewed the March 2024 tolling scheme in Re-Evaluation 1, it

determined that the adopted tolling structure would generate only $0.9 billion per year, $100

million less than the $1 billion annual threshold evaluated in the Final EA, but accepted this

revenue would still be sufficient to meet the revenue goal based solely on the ipse dixit of MTA's

CFO. DOT_0045449.

222.    When the agency reviewed the November 2024 tolling scheme, which is now being implemented in the CBD, it determined that Phase 1 of the revised tolling scheme would generate only $0.5 billion per year—half of the requirement originally set forth in the Final EA—and Phase 2 would generate only $0.7 billion per year.  DOT_0047555.  Despite recognizing that the revenue requirement would be met only if the tolling scheme generated "annual net revenues in the range of $0.9 billion," the FHWA somehow concluded that the entire phased tolling scheme "meets" the revenue objective.  *Id.*  But the agency provided no basis for that conclusion.  Again, it merely relied on a self-serving statement from the MTA's CFO.

223.    It takes no more than a cursory glance at the projected revenue figures to conclude that the adopted tolling scheme does not comply with the revenue objective initially set forth in the Final EA.  That is a significant change that, along with fundamental changes to the structure of the tolling scheme, should have prompted the agency to—at a minimum—prepare a supplemental EA or EIS.  The agency's decision to forego that supplemental review and complete a revised alternatives analysis is arbitrary, capricious, and unlawful under NEPA.

### THIRD CAUSE OF ACTION
**The Final EA and FONSI Violate the Clean Air Act** (42 U.S.C. §§ 7401 *et seq.*)

224.    New Jersey realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

225.    The CAA sets forth the framework and goals for improving air quality to protect public health and the environment and mandates establishment of air quality standards.  42 U.S.C. §§ 7401 *et seq.*  States that fail to meet one or more of those air quality standards must develop and obtain EPA approval of a State Implementation Plan ("SIP") to achieve those standards.  42 U.S.C. § 7410.

226.    The CAA conditions FHWA authorization of any project, program, or plan on conformance to the applicable SIP(s).  42 U.S.C. § 7506(c)(1).

227.    The CAA requires that a process known as a transportation conformity analysis be conducted to ensure that FHWA funding and approvals are given only to highway and transit activities that are consistent with the air quality goals of each State within the scope of the proposed activities and that conform to a SIP.  42 U.S.C. § 7506(c); 40 C.F.R. § 93.102(a)(1)(iii). Lead agencies such as FHWA must also provide a "reasonable opportunity for consultation" on transportation conformity with the EPA, state air agencies, and local air quality and transportation agencies before making conformity determinations.  40 C.F.R. § 93.105.

228.    The National Ambient Air Quality Standards ("NAAQS") addressed in SIPs and transportation conformity analyses include "criteria" pollutants identified under the CAA: ozone ($O_3$), carbon monoxide (CO), nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), particulate matter with an aerodynamic diameter smaller than or equal to 10 micrometers ($PM_{10}$), particulate matter with an aerodynamic diameter smaller than or equal to 2.5 micrometers ($PM_{2.5}$), and lead (Pb). 42 U.S.C. § 7409.

229.    The CAA, as amended in 1990, defines regions that have been designated as not meeting one or more of the NAAQS.  Areas with measured air quality concentrations lower than a given NAAQS are designated "attainment" for that standard.  Areas that exceed the NAAQS are designated "nonattainment."  An area can be designated "attainment" for one pollutant and "nonattainment" for others.  Areas that previously did not meet one of the NAAQS but have since attained the standard are subject to a SIP for air quality "maintenance."  Such areas are commonly referred to as "maintenance areas."  Maintenance areas can also be classified as attainment, maintenance, or nonattainment for other pollutants.  42 U.S.C. § 7410.

230.    Certain areas of New Jersey are designated as nonattainment areas for ozone, and certain areas of New Jersey are designated as maintenance areas for $PM_{2.5}$ and carbon monoxide. *See* DOT_0036821.

231.    The congestion pricing scheme is subject to transportation conformity requirements and rules imposed by Section 176(c) of the CAA, 42 U.S.C. § 7506, and its implementing regulations, 40 C.F.R. Part 93, for all nonattainment and maintenance areas for criteria pollutants within the scope of the scheme, namely, the transportation-related criteria pollutants of ozone, $PM_{2.5}$ and $PM_{10}$, nitrogen dioxide, carbon monoxide, and their precursor pollutants.

232.    The CAA specifies that it is an affirmative responsibility of the FHWA to assure conformity.  42 U.S.C. § 7506(c)(1).  Before the FHWA may approve, accept, or fund any transportation plans or projects, it must affirmatively confirm that all such activities conform to any relevant SIP, including ensuring that potential localized emissions impacts on health-based pollutant standards are addressed.  The proposed congestion pricing scheme is not exempt from the transportation conformity analysis requirements.  40 C.F.R. §§ 93.126–128.

233.    The FHWA should have conducted a transportation conformity analysis to assess whether the seven congestion pricing schemes—or an undefined scheme—for congestion pricing in the Manhattan CBD conform to any relevant SIP, including New Jersey's.  42 U.S.C. § 7506(c)(1)(B).

234.    Even though the FHWA acknowledged impacts to New Jersey, the FHWA did not perform a transportation conformity analysis for New Jersey's SIP.  Rather, it performed a transportation conformity analysis for only New York's SIP.  DOT_0036866.

235.    Additionally, the FHWA failed to provide a "reasonable opportunity for consultation" on the congestion pricing scheme's transportation conformity in New Jersey with the EPA and other consultation partners, including NJDEP, as required by regulation. 40 C.F.R. § 93.105(a)(2).

236.    FHWA's failure to perform a transportation conformity analysis for New Jersey was arbitrary, capricious, and otherwise not in accordance with law, in violation of the CAA and its implementing regulations and the APA.  5 U.S.C. § 706(2)(A).  This violation is subject to judicial review under the APA.  5 U.S.C. §§ 701–706.

## REQUEST FOR RELIEF

WHEREFORE, New Jersey respectfully requests that this Court grant the following relief:

i.     Issue preliminary and permanent injunctions vacating and setting aside Defendants' FONSI, Final EA, Re-Evaluation 1, and Re-Evaluation 2 and compelling Defendants to complete a full and proper EIS for the Manhattan CBD, or in the alternative, a supplemental NEPA review (i.e., a supplemental EIS, or at the very minimum, a supplemental EA to determine, among other issues, whether there are significant impacts, the sufficiency of the mitigation, and whether additional environmental analysis should be undertaken);

ii.    Issue preliminary and permanent injunctions vacating and setting aside the VPPP agreement until Defendants complete a full and proper EIS for the Manhattan CBD, or in the alternative, a supplemental NEPA review (i.e., a supplemental EIS, or at the very minimum, a supplemental EA to determine, among other issues, whether there are significant impacts, the sufficiency of the mitigation, and whether additional environmental analysis should be undertaken).

iii.   Declare that the FHWA's failure to prepare an EIS for the Manhattan CBD congestion pricing scheme, or to adequately explain (including with enforceable mitigation commitments sufficient to reduce significant impacts to insignificant levels) why an EIS is unnecessary, violates NEPA, its implementing regulations, and the APA;

iv.   Issue preliminary and permanent injunctions vacating and setting aside Defendants' FONSI, Final EA, Re-Evaluation 1, and Re-Evaluation 2 until a proper transportation conformity analysis under the CAA is completed in New Jersey;

v.   Declare that Defendants violated the CAA and APA, and that the transportation conformity determination for congestion pricing in the Manhattan CBD was incomplete and provided no lawful basis for granting any approval;

vi.   Declare that Defendants' actions, including their FONSI, Final EA, Re-Evaluation 1, and Re-Evaluation 2 are invalid as a matter of law;

vii.   Order the FHWA to prepare a full and proper EIS for the Manhattan CBD Tolling Program;

viii.   Order the FHWA to conduct the transportation conformity analysis required by the CAA;

ix.   Award Plaintiff its costs for the action, including reasonable attorneys' fees; and

x.   Grant such other relief as this Court deems just and proper.

Dated: January 27, 2025

KING & SPALDING LLP

Respectfully submitted,

/s/ Randy M. Mastro
Randy M. Mastro
Craig Carpenito
Jessica Benvenisty (*pro hac vice*)
Lauren Kobrick Myers (*pro hac vice*)
Camilla Akbari (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas, 36th Floor
New York, New York 10036-2601
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

Peter Hsiao (*pro hac vice*)
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 433-4355
Facsimile: (213) 443-4319

Cynthia AM Stroman (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4704
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

*Attorneys for Plaintiff*