# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF NEW JERSEY,<br><br>               Plaintiff,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration,<br><br>               Defendants,<br><br>   and<br><br>METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,<br><br>               Defendant-Intervenors. | Civil Case No. 2:23-cv-03885 |

## PLAINTIFF STATE OF NEW JERSEY'S OPPOSITION TO THE FHWA'S REMAND DECISION AND COMMENTS RESPONDING TO THE FHWA'S NOTICE AND SUPPLEMENTAL MEMORANDUM

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

LEGAL STANDARD ............................................................................................. 7

ARGUMENT ......................................................................................................... 8

I.      The FWHA's approach to mitigation violates Section 706(2)(A) because the agency failed to commit to sufficient enforceable mitigation measures to offset all significant impacts in New Jersey. ...................................................................... 8

II.     FWHA's alternatives analysis violates Section 706(2)(A) because it eliminated alternatives based on a requirement that it has since abandoned. ..................... 14

III.    FWHA's environmental analysis violates Section 706(2)(A) because the agency never assessed the environmental impacts of the adopted tolling scheme. ...................... 18

IV.     These errors require vacating the agency actions. ........................................... 21

CONCLUSION ................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
  72 F.4th 1324 (D.C. Cir. 2023)............................................................................2, 23

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
  No. 16-cv-01460 (APM), 2022 WL 2438512 (D.D.C. July 5, 2022)....................21

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991)..................................................................................7

*City of Port Isabel v. FERC*,
  111 F.4th 1198 (D.C. Cir. 2024)...............................................................................7

*Clairton Sportsmen's Club v. Pa. Tpk. Comm'n*,
  882 F. Supp. 455 (W.D. Pa. 1995).........................................................................22

*Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*,
  774 F.3d 173 (3d Cir. 2014).....................................................................................8

*Council Tree Commc'ns, Inc. v. F.C.C.*,
  619 F.3d 235 (3d Cir. 2010).........................................................................8, 21, 22

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) ...............................................................................22

*Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*,
  685 F.3d 259 (3d Cir. 2012)......................................................................................7

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of the U.S.*,
  718 F.3d 974 (D.C. Cir. 2013) ..................................................................................1

*Dubois v. U.S. Dep't of Agric.*,
  102 F.3d 1273 (1st Cir. 1996).................................................................................21

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) ................................................................................3, 7

*Env't Def. v. U.S. Army Corps of Eng'rs*,
  515 F. Supp. 2d 69 (D.D.C. 2007).........................................................................10

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)................................................................................................16

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.*,
    877 F.3d 1051 (D.C. Cir. 2017) ..................................................................5, 14

*Idaho Sporting Cong. v. Thomas*,
    137 F.3d 1146 (9th Cir. 1998) .........................................................................12

*Lehigh Valley Farmers v. Block*,
    829 F.2d 409 (3d Cir. 1987)............................................................................15

*Lemon v. McHugh*,
    668 F. Supp. 2d 133 (D.D.C. 2009) ...............................................................20

*Lower Alloways Creek Twp. v. Pub. Serv. Elec. & Gas Co.*,
    687 F.2d 732 (3d Cir. 1982)......................................................................11, 16

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)............................................................................6, 18, 21

*McDonnell Douglas Corp. v. NASA*,
    895 F. Supp. 316 (D.D.C. 1995) ....................................................................23

*Moret v. Karn*,
    746 F.2d 989 (3d Cir. 1984)...........................................................................17

*Nat'l Res. Def. Council v. Nuclear Regul. Comm'n*,
    879 F.3d 1202 (D.C. Cir. 2018) .....................................................................18

*O'Reilly v. U.S. Army Corps. of Eng'rs*,
    477 F.3d 225 (5th Cir. 2007) .........................................................................12

*Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*,
    497 F.3d 337 (3d Cir. 2007)...........................................................................10

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990)........................................................................................11

*Public Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) ...............................................................4, 10, 11

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
    565 F.3d 683 (10th Cir. 2009) .......................................................................21

*Simmons v. U.S. Army Corps of Eng'rs*,
    120 F.3d 664 (7th Cir. 1997) .........................................................................17

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
    997 F.3d 1247 (D.C. Cir. 2021) .....................................................................17

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ...........................................................22

*Town of Cave Creek v. FAA*,
   325 F.3d 320 (D.C. Cir. 2003) ..........................................................3, 7

*Twp. of Belleville v. Fed. Transit Admin.*,
   30 F. Supp. 2d 782 (D.N.J. 1998) .........................................................7

*Twp. of Bordentown v. FERC*,
   903 F.3d 234 (3d Cir. 2018) ..................................................................7

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019) ........................................................8, 21

*Webster v. U.S. Dep't of Agric.*,
   685 F.3d 411 (4th Cir. 2012) ...............................................................22

**Statutes**

5 U.S.C. § 706 ...............................................................................2, 7, 8, 18

42 U.S.C. §§ 4321 *et seq.* ...................................................................6, 18

**Other Authorities**

23 C.F.R. § 771.130 ...................................................................................18

40 C.F.R. § 1501.6 ...................................................................................2, 7

40 C.F.R. § 1502.9 ....................................................................................18

FHWA, NEPA Re-Evaluation Joint Guidance for Federal Highway
   Administration (FHWA), Federal Railroad Administration (FRA), & Federal
   Transit Administration (FTA) (2019),
   https://www.environment.fhwa.dot.gov/legislation/nepa/Reevaluation_guidan
   ce_08142019.aspx .................................................................................19

## PRELIMINARY STATEMENT

When this Court granted New Jersey summary judgment in part, it expressly ruled that the "FHWA and Project Sponsors acted in an arbitrary and capricious manner in reaching their mitigation determination in the Final EA and FONSI." ECF No. 191 at 52. This Court further explained that there are "areas in New Jersey entitled to mitigation," and that the Final EA and FONSI "provide[] no insight" for the "apparent disparate treatment" between New Jersey and New York communities—specifically, the FHWA did not explain "why areas in New Jersey with similarly high pre-existing burdens" as the Bronx "did not receive place-based mitigation commitments." *Id.* at 50–53. As a result, this Court was compelled to remand this matter to the FHWA to address the agency's "fail[ure] to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the Program." *Id.* at 53. The FHWA's response to that remand mandate is no response at all. Rather, the FHWA continues to rubber-stamp a woefully inadequate environmental review that is arbitrary and capricious when it comes to the many "areas of New Jersey entitled to mitigation" here.[1]

Moreover, this Court directed the parties to address two issues on which it reserved judgment: (1) the adequacy of FHWA's alternatives analysis, which resulted in the agency considering no alternative other than the congestion pricing scheme after it eliminated multiple alternatives solely based on their failure to meet a revenue-raising objective; and (2) the adequacy

---

[1] While New Jersey's comments are directed to the Court in accordance with the Court's December 30, 2024 decision, New Jersey respectfully submits that where a court remands an administrative decision to an agency, the proceeding should be left in the hands of the agency to reconsider its decision and, should the agency reach the same decision after consideration of comments like those herein, that decision may be challenged before a court with full consideration of any agency deliberations and decisions reached during the remand proceeding. *See Delta Air Lines, Inc. v. Exp.-Imp. Bank of the U.S.*, 718 F.3d 974, 978 (D.C. Cir. 2013).

of the Final EA and FONSI in light of the subsequent changes to the tolling scheme by the MTA. *Id.* at 14 n.7, 62. On these issues as well, the FHWA offers no rational explanation for continuing to greenlight this project without considering additional alternatives, or the actual tolling scheme that was ultimately implemented.

The FHWA has now issued its Supplemental Memorandum, which utterly fails to correct the deficiencies identified by this Court. It also fails to explain how the agency's alternatives analysis could still be lawful under NEPA or how its original assessment approving a tolling program expected to generate more than $1 billion per year back in 2023 could still be valid when it never even considered the phased-in, scaled-back tolling scheme that the MTA ultimately adopted. Indeed, the FHWA's Supplemental Memorandum includes no new environmental analysis, no new consideration of alternatives, and no new mitigation commitments to any New Jersey communities besides the pittance that was afforded in the June 14, 2024, re-evaluation ("Re-Evaluation 1"). Rather, the FHWA merely reiterates the agency's arbitrary and capricious analysis and reaffirms its irrational conclusions endorsed in the Final EA, FONSI, Re-Evaluation 1, and November 21, 2024, re-evaluation ("Re-Evaluation 2"). This Court must therefore "hold unlawful and set aside" the FHWA's Final EA and FONSI, and order the FHWA to prepare a comprehensive EIS. 5 U.S.C § 706(2)(A) & (D); *see also Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1343 (D.C. Cir. 2023) (agency's "failure to comply with [a] remand order … counsels toward vacatur, since it has yet again come up with insufficient support").

An agency's "commitment" to "enforceable" mitigation measures to be undertaken to avoid significant impacts likely to result from a project is the most critical aspect of a mitigated FONSI. 40 C.F.R. § 1501.6(d). Indeed, a mitigated FONSI can "*only*" be issued "if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a

minimum." *Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003) (citation omitted). Otherwise, "[a]n EIS *must* be prepared" because "there are 'substantial questions' regarding whether an agency's proposed action may have significant impacts." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878–79 (9th Cir. 2022), *cert. denied sub nom, Am. Petroleum Inst. v. Env't Def. Ctr.*, 143 S.Ct. 2582 (2023) (emphasis added).

On remand, the FHWA notes that following its issuance of the Final EA and FONSI, which committed no mitigation funding to New Jersey at all, *de minimis* mitigation funding has since been committed to just four New Jersey communities in Re-Evaluations 1 and 2. But that paltry funding commitment did nothing to remedy the FHWA's arbitrary and capricious approach to mitigation. Indeed, it simply confirms that the Final EA and FONSI are unlawful under NEPA because, as the FHWA's own analysis acknowledged, significant impacts *will* likely occur in New Jersey that *will not* be reduced to a level of insignificance through mitigation measures.

The FHWA's approach on remand violates Section 706(2)(A) of the APA for four key reasons: ***First***, the FHWA has continued to accept the MTA's self-imposed $100 million cap on place-based mitigation in the Final EA and FONSI—a cap set before analyzing the significant impacts resulting from this congestion pricing scheme and the costs necessary to address those impacts anywhere they will occur. The MTA has worked backwards from its arbitrary cap, cabining the communities eligible, and then distributing funds within that capped pool based on population size, rather than the severity of the impacts on each community likely to be adversely affected by this congestion pricing scheme. *See* DOT_0037018; DOT_0045609; FHWA-0000017. That is the antithesis of what NEPA requires when an agency issues a mitigated FONSI because it fails to ensure that all communities likely to be adversely affected will receive enough funding to sufficiently mitigate significant impacts. Importantly, this is a one-time-only $100-million

mitigation pool; it will not recur or be adjusted year-after-year, so there will be no future remedy for the harms that befall so many New Jersey communities from this misguided approach.  *See, e.g.*, DOT_0045608 ("[T]he Project Sponsors . . . commit[] a total of $100M to place-based mitigation measures."); FHWA-0000014 (adaptive management approach is limited to "determin[ing] the specific sites for the five Place-Based Mitigation measures").  ***Second***, the FHWA never "adequately explain[ed]" how the mitigation measures available to a subset of New Jersey's communities would reduce to a level of insignificance "any and all significant impacts" on any and all New Jersey communities likely to be adversely affected by this congestion pricing scheme.  ECF No. 191 at 53; *see Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).  ***Third***, the FHWA did not adequately explain why it allocated place-based mitigation funding to only *four* New Jersey communities when it identified *fifteen* New Jersey environmental justice communities with pre-existing air pollution or chronic disease levels above the 90th percentile that "may need mitigation" because they will likely experience increases in truck volume and air pollution.  DOT_0007319–20.  Indeed, it is simply irrational to say that only environmental justice communities in the 90th percentile in *both* air pollution and chronic disease get any mitigation funding at all, while communities falling into only one of those two extremes get nothing, no matter how severe the adverse impacts on those already distressed areas.  FHWA-0000005.  ***Finally***, the FHWA still has not adequately explained why the Bronx gets such a disproportionate amount of this capped $100 million—more than $70 million—while the four New Jersey communities eligible for mitigation funding get only $9.8 million combined.  The FHWA's own analysis acknowledged that Bergen County will experience increased adverse impacts from congestion pricing two to four times worse than the Bronx, yet the FHWA allocated only $1.4

million in mitigation funding for one community there (Fort Lee).  *See* DOT_0045609; DOT_0045462.

The FHWA's Supplemental Memorandum also shows that the agency never undertook the "meaningful alternatives analysis" required by NEPA. *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1063 (D.C. Cir. 2017) (citing 42 U.S.C. §§ 4332(C)(iii), (E)).  In the Final EA and FONSI, the FHWA refused to consider any alternative other than congestion pricing because those other alternatives supposedly would not satisfy the project's principal objective to "generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program," which meant that it had to "provide at least $1 billion annually in total net revenue."  DOT_0036267, DOT_0036300.  On this basis alone, the FHWA dismissed three otherwise viable alternatives.  Yet after the FHWA issued its Final EA and FONSI, the MTA approved a $15 tolling scheme that would generate only $0.9 billion in annual revenue.  DOT_0045449.  Then, after voluntarily pausing the implementation of congestion pricing for several months to get past the November election, the MTA approved a different phased-in tolling scheme, which would generate even less revenue—$0.5 billion annually for the first three years and $0.7 billion annually for the next three.  DOT_0047555.  While the FHWA claimed that the revenue objective would still somehow be met under the phased-in tolling scheme—a conclusion based only on the MTA's say-so yet belied by the admission of an initial 40% decrease in revenue generation—it is now clear that the agency simply rubber-stamped a tolling scheme that does not comply with the project's primary objective, even though the FHWA relied on that objective in the Final EA and FONSI to conclude that congestion pricing was the only viable alternative.  Yet the agency never revisited its alternatives analysis, and its decision to

dismiss other alternatives based on non-compliance with a revenue objective that the tolling scheme itself does not satisfy violates Section 706(2)(A) of the APA.

Finally, the Supplemental Memorandum shows that the FHWA never assessed—and still hasn't assessed—the environmental impacts of the phased-in tolling scheme that was actually adopted by the MTA and is now being implemented in Manhattan's Central Business District ("CBD").  That tolling scheme significantly differs from the seven schemes evaluated in the Final EA.  Indeed, it is premised on different phase-in pricing, imposes different peak tolling hours and crossing credits, incorporates an entirely new per-ride approach to tolling taxis and for-hire vehicles ("FHVs"), permits gridlock enhanced pricing, and only tolls vehicles that enter the CBD (rather than those that enter or remain in the CBD).  Each of these changes has important implications on traffic diversions and thus environmental impacts, which should have been evaluated by FHWA.  NEPA requires each agency to continue to take a "hard look" at the environmental effects of its planned action even after it grants initial approval.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989); 42 U.S.C. §§ 4321 *et seq.*  Yet neither the 10-page Re-Evaluation 2 nor the Supplemental Memorandum—the only two documents prepared by the agency after the MTA adopted the phased-in tolling scheme that is currently operative—include any environmental analysis of the actual tolling scheme.  And the FHWA *never* provided an opportunity for the public to comment on this scheme prior to its decision.

The FHWA's rushed decision to rubber-stamp this first-of-its-kind tolling scheme without the environmental review required under NEPA cannot stand.  This Court already gave the FHWA and MTA the extraordinary opportunity to proceed with this unprecedented scheme even after the matter had been remanded.  The FHWA has now squandered that opportunity, failing to provide any rational explanation on any of the issues remanded by this Court.  The FHWA and MTA must

do the full environmental review that federal law requires.  This Court should therefore now vacate the Final EA and FONSI and order the FHWA to complete a full environmental review, including a comprehensive EIS.

## **LEGAL STANDARD**

The adequacy of agency action on remand is governed by the same APA and NEPA standards as the original action.  *See, e.g.*, *City of Port Isabel v. FERC*, 111 F.4th 1198, 1206–07 (D.C. Cir. 2024); *see generally* ECF No. 136 at 18–21.  Under the APA, the Court must "hold unlawful and set aside" an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or undertaken "without observance of procedure required by law." 5 U.S.C § 706(2)(A), (D).  Compliance with NEPA is reviewed under this same standard. *Twp. of Bordentown v. FERC*, 903 F.3d 234, 248 (3d Cir. 2018).  NEPA's hard-look requirement prescribes an in-depth EIS unless the agency concludes that the project will not have a significant environmental impact and issues a FONSI.  *See Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 269–70 (3d Cir. 2012).  An agency can issue a mitigated FONSI only if it "state[s] the enforceable mitigation requirements or commitments that will be undertaken" to avoid significant impacts.  40 C.F.R. § 1501.6(d); *see also Town of Cave Creek*, 325 F.3d at 327 ("[Where a project will result in] impact[s] of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum."); *Env't Def. Ctr.*, 36 F.4th at 878–79.  NEPA also requires agencies to consider reasonable alternatives to the proposed action.  *See, e.g.*, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991); *Twp. of Belleville v. Fed. Transit Admin.*, 30 F. Supp. 2d 782, 798 (D.N.J. 1998) (citing 42 U.S.C. § 4332(2)(E)).

When an agency violates Section 706(2) of the APA, courts "[o]rdinarily . . . vacat[e] [the] invalid agency action and remand[] the matter to the agency for further review." *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014); *see also, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice [under the APA] is to vacate unlawful agency action."). Indeed, Section 706(2) provides that a reviewing court "shall . . . hold unlawful *and set aside*" arbitrary, capricious, or otherwise unlawful agency action. 5 U.S.C. § 706(2) (emphasis added). Vacatur is particularly appropriate where "deficiencies in the challenged [agency action are] serious" and vacatur is not "likely to create any serious disruption." *Council Tree Commc'ns, Inc. v. F.C.C.*, 619 F.3d 235, 258 (3d Cir. 2010) (citing *Allied–Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

## ARGUMENT

### I.    FWHA's approach to mitigation violates Section 706(2)(A) because the agency failed to commit to sufficient enforceable mitigation measures to offset all significant impacts in New Jersey.

On December 30, this Court held that "the Final EA and FONSI fail to provide a rational connection between the general mitigation commitments outlined and the specific resolution of any and all significant impacts that may result from the Program, whether those impacts are in New York or New Jersey" and thus "FHWA and Project Sponsors acted in an arbitrary and capricious manner in reaching their mitigation determination in the Final EA and FONSI." ECF No. 191 at 52, 53. FHWA did not correct that violation in the Re-Evaluations or Supplemental Memorandum. Rather, in its Supplemental Memorandum, FHWA confirmed that it arbitrarily: (1) imposed a $100 million cap on place-based mitigation in the Final EA and FONSI before analyzing the environmental impacts of the adopted tolling scheme, and distributed that funding pool based on the population size of each community eligible for place-based mitigation measures, rather than

the intensity of the impacts due to congestion pricing; (2) failed to explain how the mitigation measures available to New Jersey communities would reduce all significant impacts to a level of insignificance; (3) provided no place-based mitigation measures to several communities in New Jersey that may experience significant impacts; and (4) never adequately explained why the Bronx gets such a disproportionate amount of the capped $100 million place-based mitigation pool. For each of these reasons, FHWA's approach to mitigation remains arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

*First*, FHWA worked backwards from a $100 million cap on place-based mitigation, rather than—as required under NEPA—assessing the environmental impacts of the congestion pricing scheme, determining whether any impacts were significant, and then allocating the appropriate amount of mitigation dollars necessary to alleviate those impacts. *See* DOT_0037018; DOT_0045609; FHWA-0000017. Specifically, FHWA distributed that pool "based on the proportion of the population in the census tracts of each community meeting the mitigation criteria as compared to the population of all the census tracts that meet the mitigation criteria." FHWA-0000014. As a result, New Jersey communities received just $9.8 million.

FHWA claimed this methodology would "ensure the Place-Based Mitigation funding is distributed equitably across the affected environmental justice population." *Id.* Yet that reasoning is fundamentally inconsistent with NEPA's directive and this Court's order, which requires FHWA to ensure that all potential significant impacts will be mitigated, no matter the cost, before issuing a mitigated FONSI. *See* ECF No. 191 at 8 (agency "may issue a [mitigated] FONSI" only "if any predicted impacts will be mitigated to less than significant levels") (citing 40 C.F.R. §§ 1501.6(a) & (c)); *id.* at 53 (recognizing the agency must ensure "the specific resolution of any and all significant impacts that may result from the Program"). Crucially, the Final EA, FONSI, Re-

9

Evaluations, and Supplemental Memorandum leave no room for FHWA or the Project Sponsors to remedy this deficiency at some later time. The agency has committed to a $100 million *total* place-based mitigation pool over the life of the program and will not alter the total or per-community allocations based on the actual observed impacts of congestion pricing. *See* FHWA-0000017–20.

FHWA's decision to "work[] backwards from the mitigation dollars [the Project Sponsors] could afford" meant that "[m]any mitigation decisions [were] based on cost alone," and therefore FHWA's "conclusion that its proposal would fully mitigate adverse impacts on [affected communities] was neither 'rational [nor] based on consideration of the relevant factors'"—i.e., the significance of the impacts the agency must mitigate in order to issue a FONSI. *Env't Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 85 (D.D.C. 2007) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976)) (holding agency's "mitigation proposal is arbitrary and capricious in violation of the APA"); *see also Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 347 (3d Cir. 2007).[2]

*Second*, FHWA never "adequately explain[ed]" how the three mitigation measures available to New Jersey communities would sufficiently alleviate the significant impacts of congestion pricing. *See Public Citizen, Inc.*, 988 F.2d at 197 (agency must "adequately explain its result"). The four New Jersey communities that will receive place-based mitigation are eligible for only three measures: (1) installation of roadside vegetation; (2) renovation of parks and greenspace; and (3) installation of air filtration units in schools near highways. FHWA-0000018. Based on FHWA's own analysis, these measures will not alleviate the community-wide impacts of

---

[2] Although the phased-in tolling scheme will generate $0.5 billion, $0.7 billion, and $1 billion in annual revenues during Phases 1, 2, and 3, respectively, *see infra* at 15, the Project Sponsors committed only a fraction of that amount to place-based mitigation over the life of the project ($100 million) since most of the revenue was committed to the MTA to fund its capital projects.

congestion pricing. According to FHWA, installation of roadside vegetation will only "improve *near-road* air quality" and, together with the renovation of parks and greenspaces, will "help to improve community well-being" and could "reduc[e] air temperatures, reduc[e] stormwater runoff, provid[e] opportunities for exercise, and increas[e] social interaction"—none of which target the community-wide air pollution caused by congestion pricing. DOT_0045610 (emphasis added). Similarly, the installation of air filtration units in certain schools would only "improve indoor air quality *in [those] schools*," not in the communities at large. *Id.* (emphasis added).[3]

*Third*, FHWA did not—and cannot—explain why only *four* New Jersey communities are eligible for place-based mitigation when the agency identified *fifteen* environmental justice communities in New Jersey with pre-existing air pollutant or chronic disease levels above the 90th percentile that "may need mitigation" because they will see increases in truck volume and, therefore, pollutants. DOT_0007319–20.[4] The arbitrary and capricious standard of the APA "mandat[es] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). Yet FHWA's only proffered rationale is that place-based mitigation measures were limited to communities with *both* pre-existent pollutant *and* chronic

---

[3] The cost to implement these measures also demonstrates that New Jersey's communities will not receive benefits sufficient to alleviate the significant impacts of the congestion pricing scheme. For example, the City of Orange is set to receive just $900,000. DOT_0045609. FHWA's estimates indicate that, at best, air filtration units will cost an average of $250,000 per school. FHWA-0000009. If Orange's entire mitigation budget is allocated to this measure, fewer than 4 schools in Orange would receive air filtration units. FHWA cannot claim this would sufficiently reduce significant impacts across the entire community when it has failed to provide any explanation as to how the allocated mitigation funding and the available mitigation measures will reduce significant impacts to a minimum. It thus has not "supplied convincing reasons why potential impacts are truly insignificant." *Lower Alloways Creek Twp. v. Pub. Serv. Elec. & Gas Co.*, 687 F.2d 732, 741–42 (3d Cir. 1982).

[4] Re-Evaluation 1 identified fourteen such New Jersey communities. DOT_0045592–93.

disease burdens above the 90th percentile.  *See* FHWA-0000005.[5]  That does not explain *why* FHWA imposed this arbitrary "and"/"or" distinction, particularly given that "[t]he Final EA and FONSI define[d] an adverse effect as increases in truck traffic in currently overburdened environmental justice communities [chronic illness <u>or</u> pollutant burdens], relative to national percentiles."  FHWA-0000005 (emphasis and final set of brackets in original).  Although FHWA claims that any significant impacts in these communities will be alleviated through regional mitigation measures, the agency never adequately explained that conclusion.  Indeed, FHWA only described the *region-wide* benefits that could result from the regional mitigation measures, and not how they would alleviate the site-specific adverse impacts in the identified New Jersey communities.  *See* DOT_0045607–08.  But to issue a mitigated FONSI, the agency must "sufficiently demonstrate that the mitigation measures adequately address and remediate the [identified] adverse impacts so that they will not significantly affect the environment."  *O'Reilly v. U.S. Army Corps. of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007); *see also Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1998) ("The [agency] must provide analytical data supporting mitigation measures; otherwise, such measures constitute a 'mere listing' and fail to satisfy NEPA.").  This omission is particularly troubling because the significant impacts of congestion pricing will not be uniformly felt region wide.  *See, e.g.*, DOT_0045574 ("[E]ffects would vary in magnitude depending on . . . the extent of pre-existing pollutant and chronic disease burdens.").

---

[5] Even if this conclusion could be construed as a methodological choice, the Court must "defer to that choice" only "so long as it *reflects rational decision-making* and is *adequately explained*." ECF No. 191 at 40 (citing *Fed. Energy Reg. Comm'n*, 867 F.3d at 1367–68) (emphasis added). FHWA's choice satisfies neither requirement.

*Fourth*, FHWA never adequately explained why the Bronx will receive a disproportionate amount of the $100 million allocated to place-based mitigation.  FHWA provided only $9.8 million in place-based mitigation to four New Jersey communities: Fort Lee, Orange, East Orange, and Newark.  DOT_0045609.  Meanwhile, FHWA allocated $90.1 million to New York communities, including $71.7 million to Bronx County alone.  That is over fifty-one times the amount of mitigation funding allocated to Bergen County ($1.4 million) even though daily traffic increases in Bergen County will be two to four times greater than in the Bronx.  *See id.*; DOT_0045462.

This discrepancy is caused in part by FHWA's irrational decision to distribute mitigation dollars based entirely on the population of each community eligible for place-based mitigation, without considering the severity of the impacts in each community.  *See supra* at 9–10.  This approach resulted in the agency arbitrarily committing tens of millions of dollars to certain Bronx County communities and mere fractions of that amount to certain New Jersey communities, even though congestion pricing would, in some instances, increase traffic more in the relevant New Jersey communities than in the Bronx.  For example, FHWA committed $4.4 million in place-based mitigation to Northeast Bronx (Bronx County), which will experience a 0.8% increase in daily truck volume due to congestion pricing.  *See* FHWA-0000015–17.  Conversely, FHWA committed just $1.4 million to Fort Lee (Bergen County), which will experience a 1.6% increase in daily truck volume.  *See id.*

|  | Northeast Bronx | Fort Lee |
|---|---|---|
| Allocated Place-Based Mitigation Funding | $4.4M | $1.4M |
| Change in Daily Truck Volume Due to Congestion Pricing | +106 | +231 |
| % Change in Daily Truck Volume | 0.8% | 1.6% |

By distributing mitigation dollars based purely on population, FHWA ignored that the severity of the impacts will differ between these communities.  Even though Fort Lee will experience *double* the increase in truck traffic as the Northeast Bronx, it will receive less than *one-third* of the

mitigation funding. This disparity highlights the arbitrariness of FHWA's population-based distribution of mitigation funds. *Contra* ECF No. 191 at 53.

## II.    FWHA's alternatives analysis violates Section 706(2)(A) because it eliminated alternatives based on a requirement that it has since abandoned.

"NEPA requires a detailed, meaningful alternatives analysis." *Friends of Cap. Crescent Trail*, 877 F.3d at 1063 (citing 42 U.S.C. §§ 4332(C)(iii), (E)). Here, FWHA has fallen far short of that standard. In its initial, cursory analysis, the FWHA rejected out of hand a long list of alternatives because they purportedly did not meet one or more of the three project "objectives." DOT_0036266. Most notably for the present purposes, the FWHA rejected three alternatives solely because they did not meet "Objective 3" which required the project to "generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program." *Id.* But as this court recognized, "subsequent developments in the structure of the Program" demonstrate that "FHWA's and Program Sponsors' reliance on Objective 3 (i.e., the funding objective) has diminished in relative importance" as FHWA has moved the revenue goal post with each change to the tolling scheme. ECF No. 191 at 61–62. The inability to explain those shifts or revisit potential alternatives in light of the repeatedly modified revenue objective demonstrates that FHWA did not take the "hard look" required under NEPA and renders the alternatives analysis arbitrary and capricious.[6]

In the Final EA, FHWA "assume[d] the Project should provide at least $1 billion annually in total net revenue" when evaluating which alternatives met the funding objective. DOT_0036300. But the Project Sponsors settled on a tolling scheme that failed to meet that target,

---

[6]    New Jersey raised other arguments regarding the inadequacy of the alternatives analysis that this Court addressed in its summary judgment opinion. *See* ECF No. 191 at 53–61. Here, New Jersey focuses only on the alternatives issue on which this Court remanded, while preserving its right to raise on appeal the other, already rejected challenges to FHWA's alternatives analysis.

so they and FHWA adjusted their analysis in the first Re-Evaluation, "determin[ing] that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects." DOT_0045449. Worse still, when the first six years of toll rates were further reduced, Re-Evaluation 2 utterly failed to explain how the novel phased-in scheme meets the funding objective. Indeed, Re-Evaluation 2 was contradictory, stating that "based on current interest rates and expected timing of projects, MTA's Chief Financial Officer (CFO) determined that annual net revenues in the range of $0.9 billion should be sufficient to meet the Project's need to fund $15 billion of capital projects" and that "MTA's CFO has determined that the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure." DOT_0047555. But on the very same page, Re-Evaluation 2 projected that Phases 1 and 2 would raise only $0.5 billion annually and $0.7 billion annually, respectively. *Id.*

In short, at the time of the Final EA, FHWA understood that meeting Objective 3 required $1 billion in revenue annually; by the time of the first Re-Evaluation, $0.9 billion sufficed; and by Re-Evaluation 2, an average of $0.6 billion for the first six years was still enough to fund capital projects to "allow their completion on the same timeline" initially contemplated. DOT_0047555. FHWA's conclusory assertion that "the Program would still meet the Act's mandate to raise sufficient revenues to fund $15 billion for capital projects" despite recognizing that "Phases 1 and 2 would not raise as much annual revenue as the tolling scenarios studied in the EA or the March 2024 adopted tolling scenario," DOT_0047555–56; *see also* FHWA-0000022, is arbitrary and capricious because "when an agency changes its mind, 'it must supply adequate data and a reasoned analysis to support the change.'" *Lehigh Valley Farmers v. Block*, 829 F.2d 409, 413 (3d

Cir. 1987) (citation omitted); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This is even more so because FHWA failed to account for its own earlier, specific analysis about a $9 toll. In analyzing Tolling Scenario A, which evaluated a $9 toll *without* a cap on tolls charged to taxis and FHVs (that is, a scenario where taxis and FHVs were tolled just like regular passenger vehicles), the Final EA stated that if the Project Sponsors wanted to institute such a cap, "[t]o still meet the … revenue objective of the Project, tolls would need to be raised 10 percent to 15 percent on all vehicle classes in Tolling Scenario A to offset forgone taxi and FHV revenues." DOT_0036385; *see also* DOT_0036292. But Phase 1 of the now-adopted scheme utilizes a $9 toll with a *lower* per-ride toll for taxis and FHVs. FHWA fails to explain how this squares with its prior analysis that under a $9 toll scenario, taxis and FHVs would need to be charged similar rates as passenger vehicles on an uncapped basis to meet the revenue objective.[7]

Rather than engage in any analysis, FHWA relied (and still relies) on nothing more than the MTA CFO's say-so as to why the decreased revenue projections still meet the funding objective. *See* DOT_0047555–56; FHWA-0000022. But neither Re-Evaluation 2 nor the Supplemental Memorandum provides any analysis to justify this conclusion. Instead, the Supplemental Memorandum cites a declaration prepared by the MTA's CFO on January 2, 2025, for purposes of litigation. That document, which post-dates Re-Evaluation 2, was not part of the record before FHWA months earlier and is an impermissible post hoc attempt to rationalize past,

---

[7] In addition to the funding objective, the Final EA stated the same conclusion about needing to raise the toll above $9 to meet the *congestion* objective ("Objective 2")—reducing the number of vehicles entering the CBD by 10%—if there were to be a cap for taxis and FHVs. *See* DOT_0036266; DOT_0036292; DOT_0036385. In the Re-Evaluations and on remand, FHWA never explains why that analysis no longer stands and why the congestion objective is met in Phase 1, despite the per-ride fee taxis and FHVs, which is passed onto customers, and the $9 toll.

unreasoned decisions.[8]  *See Moret v. Karn*, 746 F.2d 989, 992 (3d Cir. 1984) ("[T]his court is not free to uphold the agency's determination on the basis of a post-hoc rationalization by the government.").  Even if it could be considered, it demonstrates that the adopted tolling scheme will not generate sufficient revenues "on the same timeline" as projected in the Final EA, FONSI, and Re-Evaluation 1.  *See* ECF No. 203 ¶ 9.   In other words, to conclude that the adopted tolling scheme would meet the funding objective despite reduced revenue, the MTA's CFO adopted a new methodology that assumed revenues could be raised over a much longer period.  FHWA's failure to revisit project alternatives that were excluded from consideration based on the MTA's original approach to its funding objective is arbitrary.  Especially given that dearth of explanation in the record, this Court should "take with a grain of salt the 'self-serving views of the regulated entities,' such as those offered by the [MTA]."  *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1257 (D.C. Cir. 2021) (citation omitted); *see also Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997) (noting "the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project").[9]

These unexplained changes undermine the alternatives analysis in the Final EA, which FHWA and the Project Sponsors never revisited.  In the Final EA, FHWA rejected three alternatives solely because they would not meet the funding objective: (1) Alternative T-2 (tolling the East and Harlem River Bridges); (2) Alternative O-4 (prohibiting vehicles from entering the CBD on certain

---

[8] The supplemental administrative record, which reflects all agency deliberations and decisions through the Re-Evaluations, *see* ECF No. 184, confirms that no additional analysis regarding the revenue requirement was ever provided to FHWA in connection with Re-Evaluation 2.  The only document provided to the agency in connection with its approval of Re-Evaluation 2 was a draft of the re-evaluation prepared by the MTA.  *See* DOT_0047520–40.

[9] New Jersey does not question how the MTA defines the project goals.  Instead, New Jersey accepts the funding objective as defined by the MTA and FHWA since the start of this process—which served as a basis for rejecting numerous alternatives in the Final EA—and challenges the agency's inconsistent statements as to how much revenue is needed to meet that objective.

days based on license plate number); and (3) Alternative O-5 (prohibiting single-occupant vehicles from entering the CBD on weekdays between 6 a.m. and 10 a.m.).  *See* DOT_0036267.  FHWA's dismissal of these alternatives based on their failure to meet the funding objective cannot be deemed "rational decision-making," *see* ECF No. 191 at 60, unless the adopted project *does* meet that objective.  In other words, it would be arbitrary to reject three alternatives because they fail to meet the funding objective, while *selecting* a plan that also fails to meet that goal.[10]  *See Nat'l Res. Def. Council v. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) ("[I]t would be arbitrary and capricious for the agency's decision making to be internally inconsistent." (cleaned up).  Because FHWA has wholly failed to explain how the phased-in scheme meets the funding objective despite failing to raise the annual revenue previously determined to be necessary, its rejection of other alternatives based solely on their failure to meet that objective was arbitrary and capricious and the Final EA and FONSI must be "set aside" under NEPA.  5 U.S.C. § 706.

### III. FWHA's environmental analysis violates Section 706(2)(A) because the agency never assessed the environmental impacts of the adopted tolling scheme.

NEPA requires that an agency continue to take a "hard look" at the environmental effects of its planned action even after the agency grants initial approval.  *Marsh*, 490 U.S. at 374; 42 U.S.C. §§ 4321 *et seq.*  For that reason, an agency must prepare a supplemental environmental review whenever it "makes substantial changes to the proposed action that are relevant to environmental concerns."  40 C.F.R. § 1502.9(d)(1)(i); *see also* 23 C.F.R. § 771.130(c).  In the context of a re-evaluation, FHWA must (i) "clearly document the change that triggers the reevaluation"; (ii) "*document the changes in environmental impacts* or mitigation . . . and describe

---

[10] That there was purportedly "no law or agreement in place between the City of New York and MTA that would direct the revenue to the MTA," under Alternative T-2, DOT_36268, is inapposite because this only explains *why* that alternative supposedly does not meet the revenue objective. Assuming that alternative did not meet the revenue objective, rejecting it on that basis is arbitrary and capricious where the approved project *also* fails to meet that objective.

how the impact will be different from what was previously described"; and (iii) "determine whether the original environmental decision remains valid *after comprehensively considering the changes*."[11]  The Supplemental Memorandum shows that FHWA failed to assess the environmental impacts of the adopted tolling scheme *at all* (let alone *adequately*).  That abdication of responsibility is arbitrary, capricious, and unlawful under NEPA.

FHWA claims it did not need to do this analysis because (1) the environmental effects of the phased-in tolling scheme would "fall within the ranges studied in the Final EA," which FHWA assumes is true because the Phase 1 and 2 "peak tolling rates" fall within the range studied in the Final EA; and (2) the Phase 3 tolling rate is the same as that considered in Re-Evaluation 1. FHWA-0000024.  FHWA, though, fails to account for the other differences between the seven tolling scenarios studied in the Final EA and the final tolling scheme.  As an initial matter, none of the tolling scenarios considered in the Final EA or Re-Evaluation 1 resemble a phased tolling rate. Further, unlike the phased-in tolling scheme, the scenarios assessed in the Final EA: (i) subjected taxis and FHVs to the same tolling rates as passenger vehicles and imposed no daily toll cap for taxis and FHVs; (ii) set peak tolling hours between 6AM and 8PM on weekdays and 10AM to 10PM on weekends; (iii) in some instances, provided tolling credits for the Lincoln, Holland, Hugh L. Carey, and Queens-Midtown Tunnels ranging from 47% to 69% of the peak passenger tolling rate;[12] and (iv) tolled vehicles both when they entered the CBD and as they remained in the CBD,

---

[11] FHWA, NEPA Re-Evaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), & Federal Transit Administration (FTA) (2019), https://www.environment.fhwa.dot.gov/legislation/nepa/Reevaluation_guidance_08142019.aspx (emphasis added).

[12] Tolling Scenario C ($14 base toll) provided a crossing credit of "[u]p to $6.55" for the Queens-Midtown, Hugh L. Carey, Lincoln, and Holland Tunnels.  Tolling Scenarios D ($19 base toll) and E ($23 base toll) provided a crossing credit of "[u]p to $13.10" for the same four tunnels.  Tolling Scenario F ($23 base toll) provided a crossing credit of "[u]p to $13.10" for the four tunnels and

as required by the MTA Reform and Traffic Mobility Act.  DOT_0036292; DOT_0004586–87; DOT_0036271.  Conversely the final scheme: (i) subjects taxis and FHVs to a reduced per-ride tolling rate ($0.75 for taxis, green cabs, and FHVs on trips, and $1.50 for FHVs on trips dispatched by high-volume for-hire services); (ii) sets peak tolling hours between 5AM and 9PM on weekdays and 9AM to 9PM on weekends; (iii) provides a 33% tolling credit for the Lincoln and Holland Tunnels, and a 17% credit for the Hugh L. Carey and Queens-Midtown Tunnels; and (iv) only tolls vehicles upon entry into the CBD, regardless of how long they remain.  *See* DOT_0047551–52.[13]

These changes have important implications for traffic diversions that were not "account[ed] for" in the Final EA as required by NEPA.  *See Lemon v. McHugh*, 668 F. Supp. 2d 133, 142 (D.D.C. 2009).  For example, the increased peak tolling hours will cause a greater number of traffic diversions from the CBD.  Subjecting taxis and FHVs to a per-ride toll that is passed onto customers, versus an uncapped toll at the same rate set for passenger vehicles, provides a much lower disincentive to travel into the CBD.  The change in crossing credits will cause toll shopping and therefore meaningfully impact traffic diversions.  The shift from an "entry and exit" toll to an "entry only" toll will also alter predicted environmental impacts, since vehicles entering Manhattan for an extended period will be less likely to divert from entryways into the CBD.[14]  Finally, the

---

the Robert F. Kennedy, Henry Hudson, and George Washington Bridges.  Tolling Scenarios A, B, and E ($9, $10, and $12 base tolls), which assessed base tolling rates closest to those in Phases 1 and 2 ($9 and $12 base tolls) provided no crossing credits.  DOT_0004586–87.

[13] The adopted tolling scheme also allows the MTA to "charge a 25% higher CBD charge" on designated "Gridlock Alert Days."  DOT_0047551–52.  The impact of this variable surcharge was never assessed in the Final EA and FONSI even though it would impact traffic diversions.  *See* DOT_0047554 ("[T]he modeling conducted for the Project does not reflect this higher toll . . . .").

[14] Rather than divert to North New Jersey to enter Manhattan via the George Washington Bridge, these vehicles, as well as taxis and FHVs, would be more likely to enter the CBD through the Holland and Lincoln Tunnels, which could increase traffic and require additional place-based mitigation funding in surrounding New Jersey communities, such as Newark.

use of a phased tolling rate—which was never assessed in the Final EA—has implications on short- and long-term traffic diversions.

Nothing in the Final EA "so much as hinted at" these new and changed elements, and "there is no direct or reliable way to compare the [environmental] effects of these changes" to those elements previously analyzed because Re-Evaluation 2—the only environmental review document prepared after the MTA adopted the phased tolling scheme—contains *no* new environmental analysis. *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 707 (10th Cir. 2009).[15] FHWA's failure to assess the final tolling scheme thus violates NEPA and the APA.

## IV. These errors require vacating the agency actions.

As for remedy, these errors necessitate vacating the Final EA and FONSI.[16] That is the "ordinary practice" under the APA, and this is not one of the "rare cases" that is an exception to the ordinary rule. *United Steel*, 925 F.3d at 1287.

To start, the deficiencies identified here are "serious." *Council Tree Commc'ns, Inc.*, 619 F.3d at 258. The identification of enforceable mitigation measures that will reduce otherwise significant environmental impacts to a level of insignificance is foundational to a mitigated FONSI

---

[15] FHWA's failure to evaluate the environmental impacts of the phased-in scheme undercuts NEPA's "twin aims" of informed agency decision-making and public access to information. *Marsh*, 490 U.S. at 371. Based on the Final EA, New Jersey and other stakeholders could not have anticipated, for instance, a phased-in tolling rate, a per-ride toll for taxis and FHVs, or peak tolling hours in excess of 6AM and 8PM on weekdays and 10AM to 10PM on weekends. The MTA's eventual inclusion of these elements diluted the relevance of public comment on the Final EA. *See, e.g.*, *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1293 (1st Cir. 1996) ("[P]ublic commenters might have pointed out, if given the opportunity—*and the [agency] might have seriously considered*—wholly new problems posed by the new [project] configuration." (emphasis added)).

[16] New Jersey welcomes further briefing on remedy, but briefly advances these arguments here to ensure that they are before the Court in the case that no separate briefing is ordered. *See, e.g.*, *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, No. 16-cv-01460 (APM), 2022 WL 2438512, at *9 (D.D.C. July 5, 2022), *subsequent determination*, 2023 WL 5094869 (D.D.C. Aug. 9, 2023), *rev'd and remanded by* 2025 WL 286514 (D.D.C. Jan. 24, 2025) (ordering separate briefing on remedy after holding agency action to be arbitrary and capricious).

like this one; otherwise, the significant environmental impacts require preparation of an EIS. FHWA and the MTA have failed to identify any situation, outside this Court's prior order, where a court has found a mitigation error in a FONSI and remanded without vacatur. That makes sense, because "where an agency's NEPA review suffers a 'significant deficiency'"—like failing to commit adequate mitigation measures—"refusing to vacate the corresponding agency action would 'vitiate' the statue." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021). The other two errors alleged here are similarly serious. "There is no dispute that the consideration of alternatives is a vital part of the NEPA process." *Clairton Sportsmen's Club v. Pa. Tpk. Comm'n*, 882 F. Supp. 455, 476 (W.D. Pa. 1995); *see also Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) ("The alternatives section is the 'heart' of an EIS." (quoting 40 C.F.R. § 1502.14(a)); *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 427 (4th Cir. 2012) (similar). And it is hard to imagine a more fundamental defect than failure to analyze the adopted scheme altogether.

On the other side of the ledger, vacatur is not "likely to create any serious disruption." *Council Tree Commc'ns, Inc.*, 619 F.3d at 258. Because the tolling program can largely be turned on and off with the flip of a switch, halting congestion pricing will not seriously disrupt the ability of the program to resume in the future, if FHWA and the Project Sponsors are later able to comply with their NEPA obligations. In the meantime, the necessary equipment can remain in place.

Moreover, the fact that this Court remanded this matter previously and FHWA failed to correct the identified deficiencies counsels in favor of vacatur. That the agency's actions and explanations remain insufficient despite this Court pinpointing the flaws in the Final EA suggests that the Administration is unable to "create a supportable action." ECF No. 212 at 59 (Jan. 3, 2025 hearing transcript). As the D.C. Circuit explained in analogous circumstances, the agency's

"failure to comply with [a] remand order … counsels toward vacatur, since it has yet again come up with insufficient support" for the action. *Am. Pub. Gas Ass'n*, 72 F.4th at 1343 (cleaned up); *see also id.* ("We see no reason to break from our established practice when for the second time 'we are not persuaded it was reasonable for the Secretary to conclude the Final Rule was supported by clear and convincing evidence.'").  More fundamentally, FHWA "is not entitled to a second bite of the apple" (here, a third bite) "just because it made a poor decision—if that were the case, administrative law would be a never ending loop from which aggrieved parties would never receive justice." *McDonnell Douglas Corp. v. NASA*, 895 F. Supp. 316, 319 (D.D.C. 1995).

 Relatedly, this Court's reasoning for previously remanding *without* vacatur is no longer applicable.  *See* ECF No. 212 at 58–61.  As to the mitigation issue, this Court suggested that the agency could cure its deficiencies on remand—but, given the opportunity, FHWA has now shown that it cannot do so.  Moreover, the Court suggested that mitigation is simply about "paying out of tolling funds or other financial resources," *id.* at 60, but it is now evident that the issues go far beyond "mitigation dollars," *id.*, because they are also about the *type* of mitigation measures available and whether some communities will receive mitigation at all or if they will instead face significant environmental impacts as a result of the congestion pricing program and despite no EIS being prepared, *see supra* at 8–14.  Lastly, this Court's prior analysis expressly declined to address whether the other deficiencies identified here justify vacatur.  *See id.* ("On the issue of alternatives, the Court finds that the issue of vacatur is premature.").  Now is the time to do so.

## CONCLUSION

 For all these reasons, the Court should hold that FWHA acted arbitrarily and capriciously in violation of the APA and NEPA, grant summary judgment to New Jersey, and vacate the Final EA and FONSI.

Dated:  New York, New York           By:  */s/ Randy M. Mastro*
        February 7, 2025                       Randy M. Mastro (NJ Bar No. 011681982)
                                          Craig Carpenito (NJ Bar No. 027102000)
                                          Jessica Benvenisty (*pro hac vice*)
                                          Lauren Myers (*pro hac vice*)
                                          Camilla Akbari (*pro hac vice*)
                                          KING & SPALDING LLP
                                          1185 Avenue of the Americas, 34th Fl.
                                          New York, New York 10036
                                          Tel. (212) 556-2100

                                          Peter Hsiao (*pro hac vice*)
                                          KING & SPALDING LLP
                                          633 West Fifth Street, Suite 1600
                                          Los Angeles, CA 90071
                                          Tel. (213) 433-4355

                                          Cynthia AM Stroman (*pro hac vice*)
                                          KING & SPALDING LLP
                                          1700 Pennsylvania Avenue, NW, Suite 900
                                          Washington, DC 20006-4704
                                          Tel. (202) 737-0500

                                          *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing document was filed electronically with the above-captioned court, with notice of case activity to be generated and sent electronically by the Clerk of said court this 7th day of February 2025, to all counsel of record.

Date: February 7, 2025                    */s/ Randy M. Mastro*                        
                                          Randy M. Mastro