# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

STATE OF NEW JERSEY,

                *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                *Defendants*,

   and

METROPOLITAN TRANSPORTATION
AUTHORITY and TRIBOROUGH BRIDGE
AND TUNNEL AUTHORITY,

                *Intervenor-Defendants*.

Hon. Leo M. Gordon

Case No. 2:23-cv-03885-LMG-LDW

**MEMORANDUM OF LAW IN SUPPORT OF FHWA'S REMAND DECISION
AND IN RESPONSE TO PLAINTIFF STATE OF NEW JERSEY'S OPPOSITION
BY INTERVENOR-DEFENDANTS THE METROPOLITAN TRANSPORTATION
AUTHORITY AND THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY**

## <u>TABLE OF CONTENTS</u>

Page(s)

PRELIMINARY STATEMENT ................................................................................... 1

LEGAL STANDARD................................................................................................... 4

ARGUMENT ............................................................................................................... 4

    I.     FHWA's Approach to EJ Mitigation Was Reasonable and Adequately Explained ....... 4

    II.    FHWA's Alternatives Analysis Remains Valid........................................................ 11

    III.   FHWA Took a Hard Look at the Adopted Toll Structure and Phase-In Approach ...... 16

       A.   The Reevaluations Thoroughly Analyzed the Toll Structure's Impacts ...................... 16

           1.     Modeling Showed That Impacts Were Within the Range in the EA............ 16

           2.     Reevaluation 2 Built on the EA and Reevaluation 1.................................... 18

       B.   New Jersey's Challenges to the Adopted Toll Structure Lack Merit.......................... 20

    IV.   New Jersey Has Provided No Reason to Vacate ......................................................... 21

CONCLUSION........................................................................................................... 24

i

## TABLE OF AUTHORITIES

**CASES**                                                                         **PAGE(S)**

*Afshar v. Dep't of State*,
702 F.2d 1125 (D.C. Cir. 1983) ................................................................22

*Allied-Signal Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ..................................................................21

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
72 F.4th 1324 (D.C. Cir. 2023) .................................................................22

*City of Port Isabel v. FERC*,
111 F.4th 1198 (D.C. Cir. 2024) .................................................................4

*Coal. for Healthy Ports v. U.S. Coast Guard*,
No. 13 Civ. 5347, 2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015) ................8

*Communities Against Runway Expansion, Inc. v. FAA*,
355 F.3d 678 (D.C. Cir. 2004) ...................................................................7

*Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*,
685 F.3d 259 (3d Cir. 2012) .......................................................................4

*Del. Riverkeeper Network v. EPA*,
No. 20 Civ. 3412, 2021 WL 3476173 (E.D. Pa. Aug. 6. 2021) .................21

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ....................................................................................4

*Env't Defense v. U.S. Army Corps of Eng'rs*,
515 F. Supp. 2d 69 (D.D.C. 2007) .............................................................8

*Hoch v. CIA*,
593 F. Supp. 675 (D.D.C. 1984) ...............................................................22

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ....................................................................................7

*McDonnell Douglas Corp. v. NASA*,
895 F. Supp. 316 (D.D.C. 1995) ...............................................................23

*Mulgrew v. U.S. Dep't of Transp.*,
--- F. Supp. 3d --- , 2024 WL 3251732 (S.D.N.Y. June 20, 2024) ...................................... *passim*

*Nat. Res. Def. Council v. EPA*,
489 F.3d 1250 (D.C. Cir. 2007) ...........................................................................23

*New Jersey v. U.S. Dep't of Transp.*,
--- F. Supp. 3d ---, 2024 WL 5247990 (D.N.J. 2024) ........................................ *passim*

*No Mid-Currituck Bridge-Concerned Citizens v. N. Carolina Dep't of Transp.*,
60 F.4th 794 (4th Cir. 2023) ...............................................................................16

*North Carolina v. EPA*,
550 F.3d 1176 (D.C. Cir. 2008) ...........................................................................23

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
896 F.3d 520 (D.C. Cir. 2018) .............................................................................22

*Or. Wild v. United State*s,
107 F. Supp. 3d 1102 (D. Or. 2015) ...............................................................7, 8, 9

*Penn. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*,
497 F.3d 337 (3d Cir. 2007) ..................................................................................8

*Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*,
113 F.3d 1505 (9th Cir. 1997) .............................................................................16

*Prometheus Radio Project v. FCC*,
824 F.3d 33 (3d Cir. 2016).................................................................................21

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) ....................................................................5, 6, 11

*S. Trenton Residents Against 29 v. FHWA*,
176 F.3d 658 (3d Cir. 1999)...............................................................................16

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017) ....................................................................7, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
No. 20-5197, 2020 WL 4548123 (D.C. Cir. 2020)................................................23

*Trenton Threatened Skies, Inc v. FAA*,
90 F.4th 122 (3d Cir. 2024)...........................................................................4, 6, 7

*U.S. Sugar Corp. v. EPA*,
844 F.3d 268 (D.C. Cir. 2016) ...........................................................................23

**STATUTES**                                                     **PAGE(S)**

5 U.S.C. § 706(2)(A)................................................................4

N.Y. Veh. & Tr. Law § 1704-a(1) ...............................................12

Pub. Auth. Law § 553-k(3) .........................................................12

**REGULATIONS**                                       **PAGE(S)**

23 C.F.R. § 771.105(b) ...............................................................18

23 C.F.R. § 771.107 ...................................................................18

23 C.F.R. § 771.129 ...................................................................16

23 C.F.R. § 771.130...............................................................16, 20

Intervenor-Defendants the Metropolitan Transportation Authority (the "MTA") and the Triborough Bridge and Tunnel Authority ("TBTA") respectfully submit this memorandum of law in support of the Federal Highway Administration's ("FHWA") remand decision and in response to Plaintiff the State of New Jersey's ("New Jersey") opposition comments (ECF 231).

## PRELIMINARY STATEMENT

While Groundhog Day[1] this year has come and gone, New Jersey is stuck in 2024, retreading its previously unsuccessful arguments. Since New Jersey's last attempt to halt the commencement of congestion pricing, the Central Business District Tolling Program (the "Program") has achieved dramatic success in reducing congestion, cutting commuting times for New Yorkers and New Jerseyans alike, enhancing emergency vehicle service, and making the streets safer, while enabling the MTA to begin financing projects critical for its millions of riders.

On January 17, 2025, FHWA responded to the Court's limited remand order, fully addressing the Court's questions concerning mitigation for environmental justice ("EJ") communities and the financial objective for the Program. But New Jersey largely ignores FHWA's response and continues to press the same failed arguments about nonexistent "significant" air pollution impacts in New Jersey and alternatives that the Court already found were not reasonable. New Jersey spins falsehoods about the extent to which FHWA's reevaluations of the Program studied the adopted toll structure, ignoring the extensive quantitative modeling conducted for all of its features. New Jersey seems to believe that if repeated often enough, its arguments will be adopted. But repeating a meritless argument does not somehow imbue it with merit, and FHWA's Finding of No Significant Impact ("FONSI") remains valid.[2]

---

[1] Groundhog Day (Columbia Pictures 1993).

[2] On February 19, 2025, U.S. Secretary of Transportation Sean Duffy wrote New York Governor Kathy Hochul, purporting to revoke tolling authorization for the Program. ECF 236-1. The MTA and TBTA have filed a legal challenge asserting that the putative revocation is unlawful on multiple grounds. Secretary Duffy's letter did not

## STATEMENT OF FACTS

The Court is familiar with the factual background concerning the issuance of the EA, FONSI, and the revaluations, which background is summarized in Intervenor-Defendants' briefs in support of their cross-motion for summary judgment and in opposition to New Jersey's motion for a preliminary injunction.  ECF 74-1, 98, 201.

On December 30, 2024, the Court issued an Opinion upholding the EA and FONSI in large part and rejecting most of New Jersey's challenges, and ordering FHWA to address two narrow, discrete issues on remand.  *New Jersey v. U.S. Dep't of Transp.*, --- F. Supp. 3d ---, 2024 WL 5247990, at *30 (D.N.J. 2024).  Specifically, the Court ordered FHWA to further explain: (1) "the rationale [for] providing for differing levels of mitigation commitments for the Bronx as compared to potentially significantly affected areas in New Jersey and the ultimate mitigation determination," *id.* at *22, and (2) whether FHWA and the Project Sponsors' "reliance on Objective 3 (i.e. the funding objective) has diminished in relative importance in the ultimate decision-making for the Program," *id.* at *26.   In reaching this determination, the Court noted that "no part of this Opinion depends on any information contained in [the Reevaluations]," and that "FHWA and Project Sponsors will be permitted to address these post-record developments in the first instance on remand."  *Id.* at *21 n.17.

In the interim, on January 5, 2025, the Program went into operation.  It has already achieved remarkable results.  Almost 1.2 million fewer vehicles entered the Central Business District ("CBD") in the month of January than would be expected without the Program.[3]  Crossing times

---

reference FHWA's review of the Program under the National Environmental Policy Act ("NEPA"), the EA, or the FONSI, *id.*, and the government has since sought a stay of this action pending resolution of that separate action.  ECF 238.

[3] Jorge L. Ortiz, *Trump Wants NYC's Congestion Pricing Dead. Will the Toll System be Roadkill?*, USA Today (Feb. 21, 2025), https://www.usatoday.com/story/news/nation/2025/02/21/whats-nycs-congestion-pricing-and-why-does-trump-want-it-dead/79319522007/#:~:text=Janno%20Lieber%2C%20CEO%20of%20New,in%20the%20area%20are%20up.

were 17% faster at the Lincoln Tunnel and 48% faster at the Holland Tunnel in January 2025 compared to January 2024.[4]  Trip times on the Williamsburg Bridge and Queensboro Bridge have been 30% faster.[5]  Drivers are seeing 10–48% faster trip times on average across river crossings into the CBD.[6]  Within the CBD, travel times are generally faster as well, with certain major streets seeing improvements of 20–40%.[7]  At the same time, foot traffic and business receipts are up in the CBD.[8]  The Program has also made the streets safer, with a striking 51% drop in crash-related injuries in the Program's first 12 days as compared to the same time period in 2024.[9]

In furtherance of the MTA's 2020-2024 Capital Program, which will increase the reliability and accessibility of the region's transit system, TBTA has issued $878.8 million in short-term notes that are supported by revenues generated by the Program and will be refinanced with bonds secured by Program revenues.  Declaration of Kevin Willens (Feb. 28, 2025) ("Feb. 2025 Willens Decl."), ¶¶ 4-6.  TBTA also anticipates closing a $500 million bank loan secured by CBD Tolling Program revenues in March 2025.  *Id.* at ¶ 7.

On January 17, 2025, FHWA filed a Supplemental Memorandum addressing the issues on which the Court remanded.  ECF 218-1.  The Supplemental Memorandum refers to a great extent to the Reevaluations and also includes additional records of public input on mitigation measures.

---

[4] MTA, *Congestion Relief Zone Tolling: January 29, 2025 Update* 4 (Jan. 29, 2025), https://www.mta.info/document/163411.
[5] *Id.*
[6] *Id.*
[7] *Id.* at 6.
[8] Caroline Spivack, *Business Foot Traffic Is Up Within the Congestion Pricing Zone*, Crain's N.Y. Bus. (Feb. 5, 2025), https://www.crainsnewyork.com/transportation/congestion-pricing-zone-business-foot-traffic; Arun Venugopal, *Vehicle Traffic is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says*, Gothamist (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says; Gersh Kuntzman, *Wind in Their Sales: Congestion Pricing Is No 'Toll' on the Broadway Box Office*, StreetsblogNYC (Feb. 5, 2025), https://nyc.streetsblog.org/2025/02/05/wind-in-their-sales-congestion-pricing-is-no-toll-on-the-broadway-box-office.
[9] Diana Ionescu, *NYC Congestion Pricing May be Saving Lives*, Planetizen (Jan. 27, 2025), https://www.planetizen.com/news/2025/01/133978-nyc-congestion-pricing-may-be-saving-lives.

**LEGAL STANDARD**

Courts reviewing agency action following a remand apply the same deferential standard of review that applies to all claims under NEPA and the Administrative Procedure Act ("APA"). *City of Port Isabel v. FERC*, 111 F.4th 1198, 1206 (D.C. Cir. 2024). "When an agency publishes an EA and concludes an EIS is not needed, courts set those determinations aside only if there is evidence they were arbitrary or capricious." *Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 271 (3d Cir. 2012); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004); 5 U.S.C. § 706(2)(A). "Judicial review under this standard is limited" to "whether there is a rational connection between the facts found by the agency and its ultimate decision, based on a consideration of the relevant factors and whether there has been a clear error of judgment." *New Jersey*, 2024 WL 5247990, at *5 (citation omitted). "An agency satisfies its hard look obligation . . . when it has adequately considered and disclosed the environmental impact of its actions." *Id.* (citation omitted). "Reviewing courts must show deference to an agency's judgment when considering whether it has violated NEPA," and a court may not "substitute its judgment for that of the agency as to the environmental consequences of its actions." *Trenton Threatened Skies, Inc v. FAA*, 90 F.4th 122, 131 (3d Cir. 2024) (citation omitted).

**ARGUMENT**

I.  **FHWA's Approach to EJ Mitigation Was Reasonable and Adequately Explained**

New Jersey has abandoned any challenge to the fact that the EA identified specific mitigation measures to be sited in the Bronx but deferred siting of other measures, and thus concedes that this determination was sufficiently explained in FHWA's Supplemental Memorandum. On this issue, ECF 212 at 60:21, FHWA explained that certain mitigation measures were identified in the EA for the Bronx (specifically, TRU replacement at Hunts Point Market and a Bronx Asthma Center) because stakeholders proposed those projects through the EJ Technical

4

Advisory Group ("ETAG") (FHWA-0000018), and in public comments on the Draft EA, (DOT_0016424; DOT_0007882; DOT_0007467; DOT_0009353; DOT_0017070; DOT_0031464; DOT_0019759; DOT_0024240), whereas New Jersey stakeholders did not propose any specific mitigation measures for their communities. Critically, however, "the early identification of projects meriting Place-Based Mitigation funding did not and does not reduce the allocation of funds to communities in New Jersey." (FHWA-0000018–19.) The allocation methodology is detailed in Reevaluation 1 and in FHWA's Supplemental Memorandum, which both also describe how the Program's place-based mitigation measures will provide tangible benefits. (DOT_0045605–11; FHWA-0000004–19.) New Jersey communities have already been engaged in the selection and siting of those projects.

Having effectively conceded the sufficiency of the remand on the issue raised by the Court, New Jersey instead seeks to relitigate a host of other mitigation-related arguments that the Court already implicitly rejected. Fundamentally, New Jersey's challenge rests on a "mischaracterization of the record." *New Jersey*, 2024 WL 5247990, at *8. New Jersey repeatedly claims, without citation, that the EJ mitigation measures were intended to "alleviate" purported "*significant* impacts" on air quality identified in the EA to a level of insignificance. Pl. Br. 8–14 (emphasis added). But this Court previously rejected New Jersey's challenges to the EA's air quality analysis, which found that the Program would *not* cause significant adverse impacts on air quality. *New Jersey*, 2024 WL 5247990, at *6–14; (DOT_0036838–68; DOT_0045535–52 (confirming same for the adopted toll structure).)

The EA's EJ analysis and mitigation program were based on then-effective Executive Order ("EO") 12,898, which instructed agencies "to consider whether the projects they sanction will have a '*disproportionately high and adverse*' impact on low-income and predominantly minority

communities." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (quoting EO 12,898) (emphasis added); (DOT_0036954; DOT_0006967–74).  Applying the separate analysis required by EO 12,898 and guidance implementing it, FHWA determined that, with the mitigation, the Program would not result in "disproportionately high and adverse" effects on EJ communities. (DOT_0037016–20; DOT_0007313–29; DOT_0045614–16.)

But EO 12,898 and the "disproportionately high and adverse" effects inquiry—the foundation of the EA's EJ analysis—do not even exist anymore, because President Trump *revoked* the EO on his first day in office.  *See* EO 14,173.  Moreover, one of the EA's principal tools used to identify EJ communities with high pre-existing burdens and to determine traffic proximity, "EJScreen" (DOT_0007262, DOT_0007265–66), has been removed from the internet by the Trump administration and is no longer available.  As a result, if the EA were being prepared today, or if this Court were to direct another remand, a similar analysis of communities facing significant pre-existing burdens that may see even tiny increases of pollution would not be necessary or even possible.  *See Trenton Threatened Skies, Inc.*, 90 F.4th at 138 (identifying EO 12,898 as the basis for agency analysis of potential EJ effects); *New Jersey*, 2024 WL 5247990, at *15 (same). Although the Project Sponsors stand behind their mitigation commitments, the legal premise for New Jersey's EJ claim no longer exists.

Even under the legal regime in effect in 2024, New Jersey's objections to the Program's robust EJ mitigation measures fail.  *First*, FHWA did not "work[] backwards from a $100 million cap on place-based mitigation," rather than identifying "significant" impacts "and then allocating the appropriate amount of mitigation dollars necessary to alleviate those impacts."  Pl. Br. 9–10. For starters, New Jersey has not cited any part of the record or any case suggesting that FHWA was required to apply a "significance" threshold to the EJ analysis.  *See Trenton Threatened Skies*,

90 F.4th at 138; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 101 (D.D.C. 2017) (a finding that a project "may disproportionately affect minority or tribal populations . . . would not compel the Corps to alter its prior decision to issue an EA" rather than an EIS). Notably, New Jersey has cited no case holding that EJ mitigation measures were inadequate to support a FONSI.

In any event, far from "work[ing] backwards" from a cap, Pl. Br. 3, the EA first evaluated the Program's effects on communities with high pre-existing burdens under a worst-case tolling scenario, and only then, informed by input from the EJTAG, identified various types of mitigation measures, along with a magnitude of funding, that would be sufficient to avoid disproportionately high and adverse effects. (DOT_0036981–96; DOT_0006963–81; DOT_0007313–29.) Then in Reevaluation 1, FHWA found that the adopted toll structure would reduce diversionary impacts on EJ communities compared to the worst-case scenario studied in the EA and that, with slight variations which New Jersey does not challenge, "the same communities would be affected as predicted" in the EA. (DOT_0045574–97; DOT_0045608.) Thus, FHWA found that with the mitigation measures detailed in the FONSI, the Program "would not result in disproportionately high and adverse effects on environmental justice populations or communities," and therefore "no new mitigation is needed." (DOT_0045613; DOT_0047557.) The funding commitment was never described as a cap that could not have increased if the Reevaluations showed effects on more communities eligible for place-based mitigation. FHWA's expert determination, with which EPA concurred, is entitled to deference. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989); *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (holding EJ methodology must be "reasonable and adequately explained," but the agency's "choice among reasonable analytical methodologies is entitled to deference"); *Or. Wild v. United State*s, 107 F.

Supp. 3d 1102, 1119 (D. Or. 2015).[10]

*Second*, New Jersey again mischaracterizes the record by arguing that FHWA failed to "adequately explain" how the Program's "mitigation measures . . . would reduce" purportedly significant "community-wide impacts of congestion pricing" to a level of insignificance. Pl. Br. 3, 9–10. The Program will not cause any significant air quality impacts, so no mitigation was required under NEPA. (DOT_0036838–68; DOT_0045535–52); *Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13 Civ. 5347, 2015 WL 7460018, at *25 (S.D.N.Y. Nov. 24, 2015) (holding NEPA does not require mitigation if no significant adverse impacts are identified). And the place-based mitigation program is not intended to address "*community-wide*" air quality impacts. Instead, the EJ mitigation program is designed to address disproportionately high and adverse effects on specific EJ communities *located near roadways* that could experience any increase in truck traffic proximity (a distance-weighted measure that "provides a way to describe a census tract's exposure to highway traffic from all directions"). (DOT_0007266–71; DOT_0007292; DOT_0007313–29; DOT_0045605–16.) The Court should reject New Jersey's latest attempt to "conflat[e] . . . the air quality and [EJ] analyses." *New Jersey*, 2024 WL 5247990, at *12. While the EA adequately explained the choice of mitigation measures, Reevaluation 1 provided greater detail about their efficacy, explaining how each measure would benefit EJ communities. (FHWA-0000005–19; DOT_0045607–11.) As Judge Liman held, the EA "provides clear descriptions of each mitigation measure and articulates how they will benefit the relevant EJ communities, though the benefits in many cases are also self-evident." *Mulgrew v. U.S. Dep't of Transp.*, --- F. Supp.

---

[10] New Jersey cites *Environmental Defense v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 69, 85 (D.D.C. 2007), but in that case—which did not involve EJ communities—the court held that the agency had "manipulated" its model and "worked backwards from the mitigation dollars it could afford, tweaking several of its original, fundamental understandings of its mitigation obligations." *Id.* No such manipulation occurred here. The other cited case, *Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 347 (3d Cir. 2007), is not even a NEPA case. These cases bear no resemblance to FHWA's careful consideration of mitigation informed by input from EPA and the EJTAG. (DOT_0045366; DOT_0037037–39; FHWA-0000019–20; FHWA-0000027–189.)

3d. --- , 2024 WL 3251732, at *43 (S.D.N.Y. June 20, 2024); *see also Or. Wild*, 107 F. Supp. 3d at 1119 ("The efficacy of the mitigation measures is the sort of technical, scientific question in which the agency is entitled to substantial deference.").

*Third*, New Jersey recycles its puzzling claim that FHWA "did not . . . explain," Pl. Br. 11–12, its decision to "tailor[]" place-based mitigation to "the most affected communities" facing severe pre-existing pollutant and chronic health burdens (FHWA-0000005). The EA explained clearly how it addressed effects on EJ communities using a two-pronged approach: (1) regional measures were adopted to benefit "tracts where individuals experience at least one pre-existing pollutant burden <u>or</u> at least one pre-existing chronic disease burden at or above the 90th percentile, nationally"—*i.e.*, so-called "90-or-90" census tracts—by reducing traffic diversions and emissions from large trucks; and (2) additional place-based mitigation measures were targeted to EJ communities "where individuals experience at least one pre-existing pollutant burden <u>and</u> at least one pre-existing chronic disease burden at or above the 90th percentile, nationally"—*i.e.*, so-called "90-and-90" census tracts. (DOT_0007322–24; DOT_0045575–76.)[11] The distinction between communities with only one category of high burdens and communities suffering from high pre-existing levels of both pollution and chronic disease is a rational way to allocate mitigation.

New Jersey speculates that the regional EJ mitigation measures will not "alleviate" purported "site-specific" "significant impacts." Pl. Br. 11–12. But again, FHWA found that the Program would *not* cause significant adverse air quality impacts. (DOT_0036954–56; DOT_0036984.) And FHWA explained that regional mitigation measures would (1) take higher emitting diesel trucks off the roads bypassing these communities, and thus contribute to better

---

[11] Reevaluation 1 identified 151 EJ census tracts that would benefit from regional mitigation and 57 tracts entitled to place-based mitigation, "a small fraction of the 2,194 [EJ]-designated census tracts in the 10-county environmental justice local study area and an even smaller fraction of all 3,106 tracts" in the study area. (DOT_0045607.)

local and regional air quality, and (2) reduce traffic diversions and thus improve near-road air quality in EJ communities that could otherwise experience increases in truck traffic. For example, replacing approximately 500 diesel trucks with lower-emission electric, hybrid, or other clean vehicles will directly reduce particulate matter and nitrogen oxide emissions from trucks that "travel on highways in [EJ] communities." (DOT_0007322–23; DOT_0037016–19; DOT_0045606–08; DOT_0045616.) The Project Sponsors' deepening of the overnight period toll discount and expansion of the NYC off-hours delivery program will reduce nighttime truck diversions and thus reduce near-road emissions. (*Id.*; DOT_0045606–07.) FHWA found that these measures will provide tangible emissions reductions and benefit local air quality in communities throughout the region, including in New Jersey. (DOT_0045607.)

*Fourth*, contrary to New Jersey's claims, FHWA did explain the reason communities in the Bronx will receive a larger share of place-based mitigation funding: more people live in the eligible Bronx communities than in their New Jersey counterparts. (FHWA-0000014–19; DOT_0045605–11.) As FHWA explained, the Program's place-based mitigation funding is allocated "based on the proportion of the population in the census tracts of each community meeting the [place-based] mitigation criteria as compared to the population of all the census tracts that meet the mitigation criteria." (*Id.*) FHWA found that this patently reasonable methodology would "ensure the Place-Based Mitigation funding is distributed equitably across the affected [EJ] population." (*Id.*) Indeed, as New Jersey recognizes, more mitigation funding can serve a greater population—by, *e.g.*, installing air filtration in more schools. Pl. Br. 11. Yet New Jersey argues that FWHA should have used a different methodology because, "in some instances," New Jersey census tracts will see slightly larger (but still tiny) percentage changes in truck traffic than will certain Bronx communities. Pl. Br. 13; (DOT_0045595; DOT_0045609). New Jersey cherry-picks one Bronx

10

community, Northeast Bronx, that will see the lowest (0.8%) increase in truck traffic among the eligible Bronx communities, and compares it to Fort Lee, which is also projected to see a very small (1.6%) increase in truck traffic.  Pl. Br. 13.  But as New Jersey acknowledges, several Bronx communities are projected to see larger increases in truck traffic than the 1.6% predicted in Fort Lee and the 2.2% in the Orange–East Orange–Newark community, with increases in the Bronx ranging from 0.8% to *11.1%*.  (DOT_0045595; DOT_0045609.)  Accordingly, it is hardly clear that an alternative method based on magnitude of change would yield a different allocation.[12] More fundamentally, such "methodological" choices lie "within the agency's discretion."  *New Jersey*, 2024 WL 5247990, at *10, *16; *Sierra Club*, 867 F.3d at 1368.

## II.    FHWA's Alternatives Analysis Remains Valid

The Court also raised for remand whether "reliance on Objective 3 (i.e. the funding objective) has diminished in relative importance in the ultimate decision-making for the Program." *New Jersey*, 2024 WL 5247990, at *26.  FHWA's Supplemental Memorandum answers this question.  (FHWA_0000021–22.).  Put simply, the Program objectives never changed, and the record, bolstered by the Supplemental Memorandum, makes clear how the financial objective will be met even with the Phase-In Approach studied in Reevaluation 2.  The Phase-In Approach is, of course, a phasing in of the toll structure studied in Reevaluation 1, and it will ultimately reach the annual revenue estimated for that toll structure.  In the interim, bonds will be issued to raise the needed funds and will be repaid as the revenues escalate over time.  (*Id.*; DOT_0047555.)

New Jersey argues that FHWA's conclusion that the Phase-In Approach will meet the

---

[12] New Jersey also misleadingly compares (very small) county-wide increases in daily traffic in Bergen County and the Bronx to argue that Bergen County should have received additional place-based mitigation.  Pl. Br. 13.  But the EJ mitigation is aimed at reducing *localized* near-road impacts in EJ communities with pre-existing burdens, not small county-wide changes.  (DOT_0036838–68; DOT_0045535–52.)  Moreover, FHWA's decision to allocate place-based mitigation funding based on an objective metric—relative population share—is plainly reasonable.

Program's funding objective is arbitrary and capricious for the sole reason that it will not result in "at least $1 billion annually in total net revenue." Pl. Br. 14. But raising $1 billion annually has never been a requirement of the Program. The Traffic Mobility Act ("TMA") requires the Program to generate sufficient revenue to fund $15 billion for the 2020-2024 MTA Capital Program. N.Y. Veh. & Tr. Law § 1704-a(1); Pub. Auth. Law § 553-k(3). The EA used this statutory mandate, as well as two other congestion-reduction objectives, to screen alternatives—an approach Judge Liman described as "pragmatically sensible . . . since it ensures federal agencies do not expend resources examining alternatives that the project sponsors are not legally authorized to implement." *Mulgrew*, 2024 WL 3251732, at *26 (internal quotation marks and citation omitted). (DOT_0036198; DOT_0036259; DOT_0036267–68; DOT_0004525–46.) While New Jersey fixates on a $1 billion annual figure, the EA explained that this was an *estimate* of what was needed to fund $15 billion, which "depends on a number of economic factors, including but not limited to interest rates and term." (DOT_0036301.)

Reevaluation 2 confirmed that the Phase-In Approach will meet the $15 billion mandate. (DOT_0047555–56; FHWA-0000022.) The anticipated annual net revenue to support the MTA's Capital Program is $0.5 billion in Phase 1, $0.7 billion in Phase 2, and $0.9 billion in Phase 3. (*Id.*) The MTA's Chief Financial Officer ("CFO") determined that although the Phase-In Approach "would not raise as much annual revenue" in the early years, it "would *in combination* still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline" as projected for the March 2024 adopted toll structure. (DOT_0047555–56 (emphasis added).) As the EA, Reevaluation 1, and Reevaluation 2 explained, Program revenue will "be invested directly into projects or bonded to generate sufficient funds," meaning that the funding will not only be achieved directly through annual revenue, but rather through issuance of bonds

that will be paid off over decades. *See* ECF 203, ¶ 6 (DOT_0036301; DOT_0045449; DOT_0047555.)

As the MTA's CFO explained, $1 billion in annual revenue would have accommodated significant upfront financing of the full $15 billion in projects. ECF 203, ¶ 7. However, obtaining the requisite funding over several years will still allow the MTA to execute the Capital Program and to comply with the TMA. *Id.* ¶ 10. To account for the Phase-In Approach, the MTA and TBTA have adjusted the speed at which they are issuing bonds secured by Program revenues. *Id.* ¶¶ 9–11. Instead of issuing bonds relatively quickly to fully fund the $15 billion in projects, the MTA and TBTA will issue bonds over a period of several years, thus allowing for more time to accumulate sufficient revenue in Phase 3 before having to fully pay off the bonds.[13] *Id.* ¶¶ 3, 9. This approach allows the MTA to meet the funding objective and execute the remaining projects in the 2020-2024 Capital Program. *Id.* New Jersey provides no basis to question the MTA CFO's conclusion.[14] FHWA rationally accepted the Project Sponsors' projections of the ability of the final tolling schedule to meet the requirements of applicable New York State law, as such issues "are within the domain of the Project Sponsors as the New York state agencies responsible for compliance with state law," including structuring the financial instruments to meet the state law's funding requirements. (FHWA-0000021; FHWA-0000023.)[15]

---

[13] Contrary to New Jersey's mischaracterization, the MTA CFO did not determine that the $15 billion would be raised over a "much longer period" under the Phase-In Approach, Pl. Br. 17, but rather that bonds could be issued over the course of several years instead of issuing all of the bonds needed to raise $15 billion immediately. ECF 203 ¶¶ 9–11. In any case, they would be paid back with Program revenues over the course of decades. *Id.* ¶ 6. The EA did not expressly contemplate any specific time frame for bond issuance, nor does the TMA.

[14] New Jersey claims the MTA CFO's conclusions are "self-serving," but the MTA CFO is an officer charged with advising the boards of the MTA and TBTA on financial matters, including how to comply with the TMA. ECF 203 ¶ 2. Given these responsibilities, he could not reach his conclusion that the Phase-In Approach will provide sufficient revenues to meet the Program's funding objective if it were not true. Moreover, none of the cases New Jersey cites to support its argument that the Court should ignore the MTA CFO's explanations and conclusions, Pl. Br. 15–17, or involve a remand seeking further explanation. Adopting New Jersey's position would nullify the whole purpose of a remand.

[15] The MTA CFO's explanation is not a "post hoc rationalization." Pl. Br. 16–17. As FHWA explained, it reflects FHWA's "contemporaneous understanding of the revenue-generation issue and the information that was conveyed to

More importantly, the Court's role is to review FHWA's NEPA analysis—not the MTA's financial projections. *See Mulgrew*, 2024 WL 3251732, at *26 ("NEPA does not empower the Court to second-guess the New York State Legislature's revenue objective under the guise of a purely procedural NEPA review."). While the revenue objective was used to screen alternatives, the EA did not screen out any alternative because it would not have raised specifically $1 billion annually.[16] Thus New Jersey's demand that FHWA "revisit" certain alternatives in light of the Phase-In Approach—namely, tolling the East and Harlem River Bridges (Alternative T-2), mandatory carpooling (Alternative O-5), and rationing license plates (Alternative O-4)—is senseless. Pl. Br. 14, 17–18. These alternatives were not rejected "solely because they would not meet the funding objective."

As recognized in *Mulgrew*, FHWA rejected Alternatives O-5 and O-4 because it was "self-evident" that "neither measure would directly raise *any* revenue"—failing to meet a "legitimate objective." *Mulgrew*, 2024 WL 3251732, at *25–26; *New Jersey*, 2024 WL 5247990, at *23–24. These alternatives to the Program clearly could not comply with the TMA's requirement that the Program provide sufficient revenues to fund $15 billion for capital projects. As for Alternative T-2, New Jersey blatantly ignores the several reasons why this alternative was rejected, which this Court has already held were based on "rational decision making," *id.* at *25, and none of which were based on the *amount* of revenue it could raise.

Moreover, contrary to New Jersey's claims, FHWA did analyze whether the adopted toll rate structure, including the per-trip toll on taxi and for-hire vehicle ("FHV") passengers, meets

---

FHWA by the Project Sponsors" before issuing the Reevaluations. (FHWA-0000022–23.) New Jersey also fails to cite a single portion of the MTA CFO's explanation that it believes deviates from what is in the Reevaluations.

[16] There is nothing contradictory about the MTA CFO's determination that the expected revenues to be collected under the Phase-In Approach would allow capital projects to be completed on the same timeline as projected for the March 2024 Adopted Toll Structure. Pl. Br. 15. The Phase-In Approach will generate sufficient funding, and the projects to be funded are in different stages of development, so the full $15 billion is not required immediately. ECF 203 ¶ 10.

the Program's funding and congestion-reduction objectives.[17]  Pl. Br. 16, n.7.  The per-trip toll charges for taxis and FHVs were included as an input to the Best Practices Model ("BPM") and are reflected in all the modeling results in Reevaluation 1, just like other aspects of the adopted toll structure.  (DOT_0045439–40; DOT_0045571–72.)  The Phase-In Approach, in turn, was modeled to retain all features of the March 2024 adopted toll structure, including the per-trip toll charge passed on to taxi and FHV passengers within the CBD.  (DOT_0047550.)  Quantitative modeling using the BPM was used again to project the amount of annual revenue, reduction in vehicle-miles travelled ("VMT"), and reduction in vehicle entries for each phase.  (DOT_0047554–55.)  This modeling demonstrated that even with the reductions in tolls during Phase 1 and Phase 2 of the Program—including the per-trip toll for taxis and FHVs—"over time, the Program would still meet the Act's mandate to raise sufficient revenues to fund $15 billion for capital projects" and would achieve the Program's congestion-reduction objectives.  (*Id.*)

Finally, New Jersey's argument that FHWA "failed to account for its own earlier, specific analysis about a $9 toll," Pl. Br. 15–16—specifically, that having a $9 toll and capping tolls on taxis and FHVs like passenger vehicles to once per day would not meet the Program funding objectives—misrepresents the record.  This conclusion was based on an assumption that a $9 toll would remain in effect in perpetuity, rather than for only three years under the Phase-In Approach.  As detailed above, FHWA determined that the Phase-In Approach would satisfy Objective 3.

---

[17] For context, the EA and FONSI committed to mitigate potential adverse effects on taxi and FHV drivers—which are an EJ population—by requiring TBTA "to adopt a toll structure with a toll of no more than once per day for taxi and FHV drivers." (DOT_0045571.) Partially in response to feedback from Uber advocating for per-ride tolls because they would be more practical and less likely to encourage intra-CBD cruising (*see* DOT_0009409), the adopted toll structure includes toll charge rates passed on to passengers "per trip…for trips to, within, or from" the CBD. (DOT_0045571.) As the TMRB explained, this approach furthers the Program's objectives because "[u]ltimately, it is passengers—not drivers—who make the choice to add to vehicle congestion in the CBD," and it is they "whose travel patterns must be influenced to fight congestion in the CBD." TMRB Report 22 (Nov. 2023), https://new.mta.info/document/127761. Moreover, the New York City Taxi and Limousine Commission rules "require[] that passengers reimburse the taxi driver for any toll costs during the trip" (DOT_0036744), so a per-trip charge rather than a once-per-day charge is more workable.

### III.    FHWA Took a Hard Look at the Adopted Toll Structure and Phase-In Approach

New Jersey's claim that FHWA "failed to assess the environmental impacts of the adopted tolling scheme *at all*," *id.* at 19 (emphasis in original), is contradicted by the EA, Reevaluation 1, and Reevaluation 2.  FHWA took the requisite "hard look" and determined that impacts from the adopted toll structure and the Phase-In Approach were consistent with those already analyzed, such that the conclusions in the EA and FONSI remained valid.[18]

#### A.  The Reevaluations Thoroughly Analyzed the Toll Structure's Impacts

First, FHWA used quantitative modeling to study the adopted tolling structure—including per-trip taxi and FHV tolls, entry-only tolls, peak and discounted overnight hours, and all of its other features, in Reevaluation 1.  (DOT_0045473–74.)  Contrary to New Jersey's false assertions that features of the adopted toll structure were not modeled, Pl. Br. 18–21, Reevaluation 1 clearly describes the detailed modeling, applying the same methodologies this Court and the *Mulgrew* court have already affirmed as a rational exercise of agency discretion.  *See New Jersey*, 2024 WL 5247990, at *8–19; *Mulgrew*, 2024 WL 3251732, at *19, *28–44 (characterizing the EA as a "painstaking examination of Congestion Pricing's environmental impacts").  Reevaluation 2 then determined that the Phase-In Approach, which retained the same features of the adopted toll structure with a proportional phasing in of toll rates, would not change the conclusion of Reevaluation 1.  (DOT_0045624; DOT_0047557.)

##### 1.   Modeling Showed That Impacts Were Within the Range in the EA

Reevaluation 1 "[m]odeled the adopted toll structure using the same version of the BPM

---

[18] To the extent New Jersey suggests that FHWA was required to prepare a supplemental environmental review of the adopted toll structure, Pl. Br. 18, FHWA's NEPA regulations require a supplemental EA or EIS only if a reevaluation determines that the existing environmental documents are no longer valid.  23 C.F.R. §§ 771.129, 771.130.  Courts have uniformly upheld FHWA's reevaluation procedure as consistent with NEPA.  *See Mulgrew*, 2024 WL 3251732, at *29; *see also Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997); *cf. No Mid-Currituck Bridge-Concerned Citizens v. N. Carolina Dep't of Transp.*, 60 F.4th 794, 802–05 (4th Cir. 2023); *S. Trenton Residents Against 29 v. FHWA*, 176 F.3d 658, 661, 665 (3d Cir. 1999).

as was used for the Final EA," the results of which were used to reevaluate "the full range of topics from the Final EA." (DOT_0045477.) The modeling demonstrated "that the adopted toll structure's effects on regional transportation patterns would be within the range of effects of the tolling structures studied in the EA" as it would reduce "the number of vehicles entering the [CBD] by approximately 17%," and would reduce VMT in the CBD by 8.9%, both of which met the congestion-reduction objectives set forth in the EA. (DOT_0045449; DOT_0045478–79.)

FHWA also used the same modeling techniques from the EA to evaluate the impacts of the adopted toll structure on highways and local intersections. (DOT_0045480–87.) Modeling showed that the adopted toll structure would yield *lower traffic volumes* at the most impacted highway segments compared to the volumes predicted in the EA and would not have additional adverse effects on any new segments. (DOT_0045480–83; DOT_0045486.) Reevaluation 1 similarly found that the adopted toll structure would *reduce* local intersection traffic compared to the results in the EA. (DOT_0036478–79; DOT_0036494–96; DOT_0045481–86.) Thus, the effect on local intersections was "within the range evaluated in the Final EA and no new adverse effects would occur." (DOT_0045486.)

Reevaluation 1 used EPA's latest vehicle emissions model—"MOVES3.1"—to analyze the adopted toll structure's impact on air emissions across the 12-county study area. (DOT_0045536–43.) The modeling showed that the "adopted toll structure would benefit regional air quality by reducing criteria pollutants, [mobile source air toxins], and [greenhouse gases] overall in the 12-county study area." (DOT_0045538.) The modeling predicted that VMT and emissions reductions would in fact be greater than those projected in the EA. (DOT_0045541.)

Reevaluation 1 used the EA's methodology to evaluate potential effects from carbon monoxide and particulate matter. (DOT_0036859–60; DOT_0045536–37.) All local intersections

fell below the applicable screening thresholds, demonstrating that the Program "would not create any new or worsen any existing violation" "or delay timely attainment" of air quality standards. (DOT_0036859–63; DOT_0036868; DOT_0045544–48.)  FHWA also updated its "highway link" analysis to evaluate the effect of traffic diversions on local air quality near highway segments (DOT_0045549–52), which showed that diversions would not violate standards.  (DOT_0045549–54.)  FHWA therefore concluded that "there are no potential adverse effects related to air quality and the conclusions of the Final EA remain valid."  (DOT_0045552.)

### 2.  Reevaluation 2 Built on the EA and Reevaluation 1

Consistent with the tiering authorized by FHWA's regulations, 23 C.F.R. §§ 771.105(b), 771.107, and building on the exhaustive analyses in the EA and Reevaluation 1, Reevaluation 2 focused on three questions: whether (1) the Phase-In Approach was consistent with the parameters of the tolling scenarios analyzed in the EA; (2) phasing in the adopted toll structure would continue to meet the Program's purpose and need and objectives; and (3) the effects of phasing in the adopted toll structure would be within the range of effects studied in the EA and Reevaluation 1.

FHWA first compared the tolling rates and other parameters of each phase of the Phase-In Approach to those of the seven tolling scenarios evaluated in the EA, noting that the phase-in, like the adopted toll structure evaluated in Reevaluation 1, "exceeds [the] commitment in the Final EA to include 'further reduced overnight tolls.'"  (DOT_0047553.)  FHWA found that the tunnel crossing credits were similar to those analyzed in tolling scenarios C, D, E, and F (applying where tunnels entered the CBD directly but not where bridges entered upper Manhattan).  (*Id.*)  FHWA also found that exemptions and limits for each class of vehicles were consistent with one or more of the tolling scenarios in the EA, and that the Phase-In Approach's per-trip tolls for taxis and FHVs would, on average, equal the EA's commitment to a once-per-day charge.  (*Id.*)  Likewise, while the peak period toll rates for each phase fell within the range analyzed in the EA for each vehicle class, the overnight

period rates were lower, exceeding the EA's commitment to implement "reduced overnight tolls at or below 50[%]" by reducing the peak period toll rate by 75%. (*Id.*)

Next, FHWA determined that the Phase-In Approach would meet the Program's purpose and need of reducing traffic congestion in the CBD in a manner that will generate revenue for future transportation improvements. (DOT_0047555.) FHWA found that the toll rates in all phases would meet the congestion-reduction objectives. (*Id.*) And, as explained in more detail in Point II, *supra*, the Phase-In Approach would, in combination, meet the objective of funding $15 billion for capital projects. (*Id*. n.2.) Reevaluation 2 also found that "an incremental start would have the benefit of helping drivers adapt more easily to the Program, while monitoring data regarding implementation and effects," and that "these benefits outweigh more immediate revenues." (DOT_0047555–57.)

Finally, Reevaluation 2 referred to Reevaluation 1's comprehensive analysis of the effects of the adopted toll structure, which found that the mitigation commitments in the EA and FONSI would be sufficient to avoid significant effects. (DOT_0047557; *see also* DOT_0045452–68.) Because the Phase-In Approach's toll structure would mimic the March 2024 adopted toll structure, just with proportionally lower rates for the first six years (with rates within the range analyzed in the EA), FHWA reasonably concluded that "some of the effects of the interim phases would by definition be reduced as compared to Phase 3" (DOT_0047557), and that while the effects of the Program might have minor, short-term variations in Phases 1 and 2, these effects would be within the range studied in the EA, FONSI, and Reevaluation 1. FHWA also explained that "the traffic and air quality monitoring commitments set forth in the EA and FONSI would be implemented throughout this time period, as well as adaptive management if unexpected adverse effects are revealed through monitoring[.]" (*Id.*) Accordingly, FHWA concluded that the requirements of NEPA had been satisfied, and that "the mitigation measures identified in the EA and FONSI are still applicable and will ensure that the Phase-In Approach does not result in significant effects." (*Id.*)

**B. New Jersey's Challenges to the Adopted Toll Structure Lack Merit**

New Jersey's "hard look" argument boils down to the assertion that FHWA failed to account for several "differences" between the tolling scenarios studied in the EA and the adopted toll structure, including the fact that the EA did not specifically analyze a phased approach. Pl. Br. 19. But New Jersey ignores the fact that Reevaluation 1 analyzed each of these features in the context of the adopted toll structure representing Phase 3, and Phases 1 and 2 would be proportionally lower in all respects. As explained in Point III.A, *supra*, Reevaluation 1 analyzed the impacts of all of the features New Jersey asserts were not analyzed: the lower, per-trip toll rates for taxis and FHVs (DOT_0045473; DOT_0045439–40; DOT_0045571–72); peak tolling hours from 5AM to 9PM on weekdays and 9AM to 9PM on weekends (DOT_0047553; DOT_0045440 n.2; DOT_0045452–68); a 33% credit for the Lincoln and Holland Tunnels and a 17% credit for the Hugh L. Carey and Queens-Midtown Tunnels[19] (DOT_0045452–68); and tolling vehicles upon entry to the CBD, rather than also tolling vehicles that exit the following day. (DOT_0045452–68.)[20] And as Reevaluation 2 explained, "some effects [during Phase 1 and Phase 2] would *by definition* be reduced as compared to Phase 3," (DOT_0047557) (emphasis added), and reduced effects are definitionally not significant. 23 C.F.R. § 771.130(b)(1). New Jersey speculates that a phasing in of the Program, at proportionally *lower* toll rates, would somehow have *greater* impacts

---

[19] New Jersey incorrectly claims that the credits analyzed in the EA tolling scenarios ranged from 47% to 69%. Pl. Br. 19–20. The scenarios in the EA included credits ranging from $0 to $13.10. (DOT_0004586.)

[20] In a footnote, New Jersey complains that the adopted toll structure allows for the MTA to charge a higher toll on designated "Gridlock Alert Days," claiming that this feature "was never assessed in the Final EA and FONSI." Pl. Br. 20 n.13. "[A]rguments raised solely in footnotes are considered waived." *New Jersey*, 2024 WL 5247990, at *12 n.13. Even if not waived, New Jersey's assertion is incorrect. As Reevaluation 2 explained: "All Final EA tolling scenarios and the adopted toll structure include a higher toll on designated 'Gridlock Alert' days, although the modeling conducted for the Project does not reflect this higher toll since it considers typical days rather than days with unusually higher traffic levels." (DOT_0047554 n.1.) New Jersey offers no support for its hypothesis that the higher charge "would impact traffic diversions," Pl. Br. 20 n.13, let alone that such hypothetical impacts would be significant, and does not even attempt to dispute FHWA's explanation for why the agency chose not to include the higher charge in the modeling—a choice the Court has already upheld in the EA as a rational exercise of agency discretion. *New Jersey*, 2024 WL 5247990, at *9–10.

than those already analyzed in Reevaluation 1.  But as the *Mulgrew* court recognized, the adoption of a phase-in period does not substantively alter the Program, but "merely postpones the full operation of Congestion Pricing."  *Mulgrew*, 2024 WL 3251732, at *27.

### IV. New Jersey Has Provided No Reason to Vacate

Continuing to insist that vacatur is the presumptive remedy for any APA issue except in "rare cases," Pl. Br. 21, New Jersey rehashes arguments that this Court has already rejected twice. *See New Jersey*, 2024 WL 5247990, at *30 (remanding without vacatur); ECF 208 (denying motion for reconsideration).  In doing so, New Jersey mischaracterizes the limited remand order, misconstrues the law, and ignores fundamental developments pertaining to FHWA's NEPA responsibilities directly affecting the scope of potential remedies in this case.

While FHWA's remand submission sufficiently addresses the Court's limited remand, in the unlikely event that the Court requires further explanation, vacatur still would be inappropriate under *Allied-Signal Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 151 (D.C. Cir. 1993).  *See Prometheus Radio Project v. FCC*, 824 F.3d 33, 52 (3d Cir. 2016) (citing *Allied-Signal*). "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *Del. Riverkeeper Network v. EPA*, No. 20 Civ. 3412, 2021 WL 3476173, at *2 (E.D. Pa. Aug. 6, 2021) (quoting *Allied-Signal*, 988 F.2d at 150–51).

Contrary to New Jersey's assertion of "serious" "errors," Pl. Br. 21, the Court did *not* find that FHWA and the Project Sponsors "fail[ed] to commit adequate mitigation measures," *id.* at 22, but rather asked for "further explanation" for the EA's differing level of specificity of mitigation for the Bronx compared to New Jersey.  *New Jersey*, 2024 WL 5247990, at *22; *see also id.* at *20 (holding that the EA's approach to mitigation was "generally" "sufficient to satisfy the standard of

review"). The Court never held that FHWA committed *any* error in the EA's alternatives analysis, which the Court otherwise found "went far beyond the required 'brief' discussion for EAs . . . ." *Id.* at *25. Rather, the Court remanded the alternatives analysis on narrow grounds to "allow the Project Sponsors and FHWA to directly address [the issue of the financial objective] in the first instance in the context of the whole record." *Id.* at *26.

In ordering remand without vacatur, the Court confirmed that neither of these issues are "serious deficiencies" under *Allied-Signal*. Indeed, with respect to the mitigation allocation, the Court acknowledged that the Reevaluations may "demonstrate that [any] apparent arbitrary treatment ha[s] been resolved." *Id.* at *21 n.17. As explained above, the Court's assumption was correct. And the President's rescission of EO 12,898 means that even remanding for further agency action with respect to the EJ analysis would be futile, because there is no longer any federal requirement that agencies consider or mitigate such potential effects. *See Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983); *Hoch v. CIA*, 593 F. Supp. 675, 685 (D.D.C. 1984) (holding "the Court could no longer award the relief Plaintiff sought" under a revoked EO "in light of the issuance of the superseding Executive Order").[21] Indeed, in accordance with EO 14,173, the Council on Environmental Quality has issued guidance on how agencies should implement NEPA going forward, which states: "NEPA documents should not include an environmental justice analysis, to the extent that this approach is consistent with other applicable law."[22] But even if the Court were to remand, vacatur is not warranted in the absence of a serious deficiency. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018).[23]

---

[21] In other words, in the event of further agency proceedings, New Jersey would not be entitled to any, as opposed to more, EJ mitigation funding, (although the Project Sponsors intend to honor their mitigation commitments regardless).
[22] Council on Environmental Quality, Memorandum on NEPA Implementation 5 (Feb. 19, 2025), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf.
[23] New Jersey argues that a second remand would mean that FHWA is unable to correct the identified deficiencies and therefore "counsels in favor of vacatur." Pl. Br. 22. There is no such rule, and the cases New Jersey cites for this proposition are distinguishable. In *American Public Gas Association v. U.S. Department of Energy*, 72 F.4th 1324,

With respect to the second *Allied-Signal* factor, New Jersey argues, remarkably, that vacatur is "not likely to create any serious disruption" because the Program "can largely be turned on and off with the flip of a switch," and that vacatur "will not seriously disrupt the ability of the program to resume in the future." Pl. Br. 22. But even assuming that vacatur of the FONSI would necessarily result in cessation of tolling,[24] New Jersey ignores the resulting significant negative effects. The Court already held that vacatur would cause a "serious disruption" when the start of the Program was imminent. ECF 212 at 60–61. Vacatur with an injunction would cause far more disruption now, when the public is enjoying the Program's economic, environmental, and health benefits, and short-term notes have been issued in reliance on Program revenues.

Courts have repeatedly held that vacatur is inappropriate where the challenged agency decision protects public health and safety. Especially where, as here, any "defects are curable," courts avoid defeating "the enhanced protection of the environmental values." *U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016) (quoting *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008)); *see also Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 104 ("courts … have repeatedly considered the economic implications of vacatur—including in cases addressing environmental harms"); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1265 (D.C. Cir. 2007). Here, those considerations weigh heavily against any order halting the Program.

---

1343 (D.C. Cir. 2023)—not a NEPA case—the court vacated a final rule by the agency setting energy efficiency standards, after the agency entirely failed to comply with the court's instruction to provide additional explanation for one of the rule's underlying assumptions on remand. *See id.* at 1341. *McDonnell Douglas Corp. v. NASA*, 895 F. Supp. 316 (D.D.C. 1995)—also not a NEPA case—involved a challenge to NASA's decision to release information based on the agency's interpretation of a FOIA exemption. After reversing the decision and enjoining the agency from releasing the information, the court denied the agency's motion for a remand to consider intervening caselaw, holding it was "unnecessary to remand to the agency" where the governing standard had not changed, "negating the agency's perceived need to reflect on new law." *Id.* at 319. Neither case supports New Jersey's proposition that a court may only remand without vacatur once for an agency to provide additional explanation or supplement the record.

[24] Intervenor-Defendants do not concede that vacatur would require halting the Program absent a court-ordered injunction. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 20-5197, 2020 WL 4548123, at *1 (D.C. Cir. 2020) (upholding vacatur of NEPA decision but staying injunction that ordered pipeline to be emptied of oil where district court did not make findings necessary for injunctive relief).

23

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should enter judgment in favor of Federal Defendants and Intervenor-Defendants.

Dated: February 28, 2025                                     Respectfully submitted,

<div style="margin-left:50%">

*/s/ Daniel Chorost*

Daniel Chorost
Mark A. Chertok*
Elizabeth Knauer*
John F. Nelson*
Phillip Dane Warren*
Amy Cassidy*
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, NY 10022
(212) 421-2150
dchorost@sprlaw.com
mchertok@sprlaw.com
eknauer@sprlaw.com
jnelson@sprlaw.com
dwarren@sprlaw.com
acassidy@sprlaw.com

*/s/ Roberta A. Kaplan*

Roberta A. Kaplan*
D. Brandon Trice*
KAPLAN MARTIN LLP
1133 Avenue of the Americas
Suite 1500
New York, NY 10036
(212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com

*Counsel for Intervenor-Defendants the Metropolitan Transportation Authority and the Triborough Bridge and Tunnel Authority*

*\*Admitted pro hac vice*

</div>

24